**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **MCR OIL TOOLS, LLC,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 3:18-CV-00731-K** |
| | § | |
| **SPEX OFFSHORE, LTD.,** | § | |
| **SPEX SERVICES, LTD.,** | § | |
| **SPEX OFFSHORE (UK) LTD.,** | § | |
| **SPEX GROUP US LLC,** | § | |
| **SPEX ENGINEERING (UK) LTD.,** | § | |
| **SPEX GROUP HOLDINGS, LTD,** | § | |
| **SPEX CORPORATE HOLDINGS,** | § | |
| **LTD., and** | § | |
| **JAMIE OAG.** | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF'S THIRD AMENDED COMPLAINT AND APPLICATION FOR
PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

Plaintiff MCR Oil Tools, LLC files this Third Amended Complaint and Application for

Preliminary and Permanent Injunctive Relief against Defendants SPEX Offshore, Ltd., SPEX

Services, Ltd., SPEX Offshore (UK) Ltd., SPEX Group US, LLC, SPEX Engineering (UK) Ltd.,

SPEX Group Holdings, Ltd., SPEX Corporate Holdings, Ltd. and Jamie Oag (collectively, the

"SPEX Defendants") as follows:

**PARTIES**

1.      Plaintiff MCR Oil Tools, LLC ("MCR") is a Texas limited liability company who

has appeared in this action.

2.      Defendant SPEX Offshore, Ltd. ("SPEX Offshore") is organized under the laws

of the United Kingdom, with its principal place of business in the United Kingdom. SPEX

Offshore has engaged in business in the State of Texas but does not maintain a regular place of

business or a designated agent for service of process in Texas. SPEX Offshore may be served via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil of Commercial Matters, 1965 U.S.T. 361, 658 U.N.T.S. 163 (1965). SPEX Offshore may be served at its home or home office address: FRP Advisory LLP, Suite 2B, Johnstone House, 52-54 Rose Street, Aberdeen, Scotland, AB10 1UD. Service of process on SPEX Offshore via the Hague Convention is underway.

3.      Defendant SPEX Services, Ltd. ("SPEX Services") is organized under the laws of the United Kingdom, with its principal place of business in the United Kingdom. SPEX Services has engaged in business in the State of Texas but does not maintain a regular place of business or a designated agent for service of process in Texas. SPEX Services may be served via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil of Commercial Matters, 1965 U.S.T. 361, 658 U.N.T.S. 163 (1965). SPEX Services may be served at its home or home office address: FRP Advisory LLP, Suite 2B, Johnstone House, 52-54 Rose Street, Aberdeen, Scotland, AB10 1UD. Service of process on SPEX Services via the Hague Convention is underway.

4.      Defendant SPEX Offshore (UK) Ltd. ("SPEX Offshore UK") is organized under the laws of the United Kingdom and has appeared in this action.

5.      Defendant SPEX Group US, LLC ("SPEX Group") is a Texas limited liability company that has appeared in this action.

6.      Defendant SPEX Engineering (UK) Ltd. ("SPEX Engineering UK") is organized under the laws of the United Kingdom and has appeared in this action.

7.      Defendant SPEX Group Holdings, Ltd. ("SPEX Holdings") is organized under the laws of the United Kingdom, with its principal place of business in the United Kingdom. Upon

information and belief, SPEX Holdings has engaged in business in the State of Texas but does not maintain a regular place of business or a designated agent for service of process in Texas. SPEX Holdings may be served via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil of Commercial Matters, 1965 U.S.T. 361, 658 U.N.T.S. 163 (1965). SPEX Holdings may be served at its home or home office address: Blackwood House, Union Grove Lane, Aberdeen, Scotland, AB10 6XU. MCR intends to initiate service of process on SPEX Holdings via the Hague Convention as soon as reasonably practicable.

8.      Defendant SPEX Corporate Holdings, Ltd. ("SPEX Corporate Holdings") is organized under the laws of the United Kingdom, with its principal place of business in the United Kingdom. Upon information and belief, SPEX Corporate Holdings has engaged in business in the State of Texas but does not maintain a regular place of business or a designated agent for service of process in Texas. SPEX Corporate Holdings may be served via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil of Commercial Matters, 1965 U.S.T. 361, 658 U.N.T.S. 163 (1965). SPEX Corporate Holdings may be served at its home or home office address: Blackwood House, Union Grove Lane, Aberdeen, Scotland, AB10 6XU. MCR intends to initiate service of process on SPEX Corporate Holdings via the Hague Convention as soon as reasonably practicable.

9.      Defendant Jamie Oag ("Oag") is an individual residing in the United Kingdom. Oag has engaged in business in the State of Texas but does not maintain a regular place of business or a designated agent for service of process in Texas. Oag may be served via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil of Commercial Matters, 1965 U.S.T. 361, 658 U.N.T.S. 163 (1965). Oag may be served at his home or home office address: Dunnottar House, Howe Moss Drive, Kirkhill Industrial Estate,

Aberdeen, Scotland, AB21 0FN or anywhere else he may be found. MCR intends to initiate service of process on Oag via the Hague Convention as soon as reasonably practicable.

JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 as the matter in controversy exceeds $75,000 and the suit involves a citizen or subject of a State and citizens or subjects of a foreign state.

11.     The Court has personal jurisdiction over SPEX Offshore because it established sufficient minimum contacts with the State of Texas such that exercise of jurisdiction over SPEX Offshore would not offend traditional notions of fair play and substantial justice. Among other acts, SPEX Offshore has engaged in business in Texas, entered into contracts in Texas, directed substantial communications to MCR representatives in Texas, and sent agents to Texas to test and develop competing tools or products. In addition, SPEX Offshore, both directly and through its affiliates and directors, has committed and continues to commit intentional torts expressly aimed at Texas, causing serious harm to MCR in Texas. At all relevant times, SPEX Offshore knew that the brunt of the injury resulting from its wrongful conduct would be felt by MCR in Texas. MCR's claims against SPEX Offshore arise out of events occurring in Texas.

12.     The Court has personal jurisdiction over SPEX Services because it established sufficient minimum contacts with the State of Texas such that exercise of jurisdiction over SPEX Services would not offend traditional notions of fair play and substantial justice. Among other acts, SPEX Services has engaged in business in Texas, entered into contracts in Texas, directed substantial communications to MCR representatives in Texas, and sent agents to Texas to test and develop competing tools or products. In addition, SPEX Services, both directly and through its affiliates and directors, has committed and continues to commit intentional torts expressly

aimed at Texas, causing serious harm to MCR in Texas. At all relevant times, SPEX Services knew that the brunt of the injury resulting from its wrongful conduct would be felt by MCR in Texas. MCR's claims against SPEX Services arise out of events occurring in Texas.

13.     The Court has personal jurisdiction over Jamie Oag because he established sufficient minimum contacts with the State of Texas such that exercise of jurisdiction over Oag would not offend traditional notions of fair play and substantial justice. Among other acts, Oag has engaged in business in Texas, entered into contracts in Texas, directed substantial communications to MCR representatives in Texas, and sent agents to Texas to test and develop competing tools or products. In addition, Oag, both directly and through the SPEX Defendants, has committed and continues to commit intentional torts expressly aimed at Texas, causing serious harm to MCR in Texas. At all relevant times, Oag knew that the brunt of the injury resulting from his wrongful conduct would be felt by MCR in Texas. MCR's claims against Oag arise out of events occurring in Texas.

14.     The Court has personal jurisdiction over SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings because each of these entities established sufficient minimum contacts with the State of Texas such that exercise of jurisdiction over them would not offend traditional notions of fair play and substantial justice. Among other acts, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings, both directly and through directors and affiliates, has engaged in business in Texas, directed substantial communications to MCR representatives in Texas, and sent agents to Texas to test and develop competing tools or products. In addition, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings, both directly and through affiliates and directors, have committed and continue to commit intentional torts expressly aimed at Texas,

causing serious harm to MCR in Texas. At all relevant times, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings knew that the brunt of the injury resulting from their wrongful conduct would be felt by MCR in Texas. MCR's claims against SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings arise out of events occurring in Texas. Alternatively, the Court has personal jurisdiction over SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings because they are alter egos of SPEX Offshore, SPEX Services, and Oag.

15.     Venue is proper because this district and division embrace the place in which the removed action was pending. 28 U.S.C. § 1441.

## BACKGROUND FACTS

**A.     MCR owns valuable oilfield tools and intellectual property.**

16.     For more than three decades, MCR has worked in the oilfield tool industry. MCR researches, invents, designs, develops, manufactures and sells oilfield tools, products, equipment and accessories ("Tools"), using patented technology, trade secrets, and confidential and proprietary information. MCR's Tools are generally thermite-based tools—pipe cutters or torches fueled by a solid combustible charge—used to cut, perforate and consume oil well pipe downhole.

17.     With respect to its Tools, MCR owns and controls a compilation of confidential and proprietary information and know-how relating to, among other things, the internal body size dimensions defining the diameter and length of the corresponding fuel load, the use of fuel extensions to increase power for the Tools, the design and function of nozzles (including the diameter, length, and number of nozzle holes), the design and length of pellets, the percentages

of fuel mixtures and materials, and the size of fuel loads, for its radial cutting, axial cutting, and perforating torches, and consumables.

18.     This know-how together with other confidential and proprietary information comprises protected trade secrets, all of which were developed and designed to obtain an advantage over MCR's competitors. MCR's trade secrets include all improvements, experimentation, designs, refinements, processes, formulations, tool configurations, know-how, data, reports, methods, test methods and systems developed, tested, perfected and owned by MCR for the purpose of designing, developing and manufacturing its Tools.

19.     MCR's trade secrets include not only how to design, develop, test, configure and manufacture its Tools for proper field use and to achieve successful downhole cutting and perforating of downhole tubulars, but also how *not* to design, develop, configure and manufacture the Tools. MCR's trade secrets include methods of design, manufacturing and use that were effective, and methods that were *not* effective, toward reaching certain goals for the optimization of MCR's Tools.

20.     Lastly, MCR's trade secrets include specialized knowledge, know-how and skills gained by MCR's employees through experimentation, testing, development, trial and error, and from the investment and expenditure of time, money, and resources.

21.     MCR has invested substantial time, money, resources, and effort to develop the confidential and proprietary information comprising its trade secrets. MCR's highly valuable trade secrets represent decades of research and development and provide MCR an advantage over its competitors. MCR's trade secrets derive independent economic value because they are not generally known to, or readily ascertainable through proper means by, other persons who can obtain economic value from the disclosure or use of the information.

**B.**     **MCR takes active measures to protect its Tools and intellectual property.**

22.     MCR closely regulates access to its valuable trade secrets and confidential and proprietary information by limiting access to and disclosure of such information. As one such security measure, MCR limits access to its offices, files, and computers.

23.     In addition, MCR takes other active measures to prevent theft of its intellectual property by dishonest, cunning licensees hoping to reverse engineer MCR's Tools or rebrand MCR's intellectual property as their own. Most importantly, MCR requires its customers to enter into comprehensive, well-crafted license agreements, which MCR has invested substantial time and resources developing and strengthening over the years. MCR closely monitors all licensees' use of its Tools and intellectual property once they are bound by the detailed license agreements, which are specifically designed to protect these valuable assets.

24.     As set forth below in detail, the crux of MCR's claims against the SPEX Defendants stem from breaches (and continuing breaches) of MCR's license agreements.

**C.**     **MCR licenses its Tools and intellectual property to SPEX Services in 2009 and 2011, and to SPEX Offshore in 2014 and 2015.**

     **SPEX Services**

25.     On April 20, 2009, SPEX Services was incorporated.

26.     On or about June 29, 2009, MCR licensed its Tools and intellectual property to SPEX Services.

27.     On May 16, 2011, MCR entered into a subsequent license agreement with SPEX Services.[1] John Fox ("Fox") signed the 2011 License Agreement as SPEX Services' Director.

28.     On May 24, 2011, eight days after signing the 2011 License Agreement, SPEX Services appointed Jamie Oag as Director.[2]

---

[1] Exhibit A (the "2011 License Agreement").

29.     On July 6, 2012 and April 18, 2013, respectively, SPEX Services appointed Rae Younger ("Younger") and Nadir Mahjoub ("Mahjoub") as Directors.

**SPEX Offshore**

30.     On September 11, 2012, SPEX Offshore was incorporated.[3] At the time of incorporation, SPEX Offshore listed Fox and Ryan Strachan ("Strachan") as Directors.

31.     On February 21, 2014, SPEX Offshore appointed Oag as Director.

32.     On May 21, 2014, MCR entered into a license agreement with SPEX Offshore.[4] Oag signed the 2014 License Agreement as SPEX Offshore's Chief Executive Officer.[5]

33.     On June 1, 2015, MCR agreed to extend the terms of the 2014 License Agreement for one year—to May 21, 2016.[6] Oag signed the 2015 Extension as SPEX Offshore's Chief Executive Officer.

34.     Importantly, in the 2015 Extension, MCR and SPEX Offshore agreed that "[e]xcept as specifically and explicitly amended … no other terms of the [2014 License Agreement] shall be affected by this extension."[7]

35.     The 2011 and 2014 License Agreements (and the 2015 Extension) contain essentially the same material terms, representations, acknowledgments and agreements by SPEX Services, SPEX Offshore and Oag, which were specifically negotiated by MCR in order to

---

[2] In the 2011 License Agreement, SPEX Services listed Dunnottar House, Howe Moss Drive, Kirkhill Industrial Estate, Dyce AB21 OFN ("Dunnottar House") for notices. Upon information and belief, this is Jamie Oag's home address.

[3] SPEX Offshore listed Blackwood House, Union Grove Lane, Aberdeen AB10 6XU ("Blackwood House") as its registered address.

[4] Exhibit B (the "2014 License Agreement").

[5] Although SPEX Offshore listed Blackwood House as its registered address in its incorporation papers, it listed Dunnottar House for notices in the 2014 License Agreement.

[6] Exhibit C (the "2015 Extension").

[7] *Id.*

---

protect its Tools and intellectual property. Moreover, in entering into the 2011 and 2014 License Agreements (and the 2015 Extension), MCR relied on all representations, acknowledgments and agreements made by SPEX Services, SPEX Offshore and Oag in the respective agreements.

**D.     The 2014 License Agreement contains specific terms and definitions related to MCR's Tools and intellectual property.**

36.     In the 2014 License Agreement, "Confidential Information" is defined to include, among other things, MCR's "confidential or proprietary information," "know-how," "methods," "processes," and "trade secrets."[8] "Confidential Information" also includes MCR's "products," "equipment," and "instruments," *i.e.*, its Tools.[9]

37.     "Improvements" are defined as any improvement or modification, or future improvement or modification, of any "device, product, method, or process belonging to MCR."[10] With respect to ownership of any Improvements, the 2014 License Agreement explicitly provides that "any and all future improvements and/or modifications … whether conceived and/or developed independently … or jointly … will be owned by MCR."[11]

38.     "Licensed Patents" are defined as U.S. and foreign patents MCR owns or holds, as listed in Appendix A to the 2014 License Agreement.[12]

39.     "Licensed Products" are defined as MCR's products, as listed in Appendix B to the 2014 License Agreement.[13]

---

[8] Exhibit B at §1.01.

[9] *Id.*

[10] *Id.* at § 1.02.

[11] *Id.* at §§ 1.02, 3.04.

[12] *Id.* at § 1.04.

[13] *Id.* at § 1.05.

40.     "Licensed Technology" is defined as MCR's "confidential or proprietary information" relating to its Licensed Patents and Licensed Products, specifically including, among other things, MCR's "know-how," "methods," "trade secrets," and "processes."[14]

41.     The 2011 License Agreement contains similar terms and definitions related to MCR's Tools and intellectual property.[15]

**E.     Oag and SPEX Offshore make numerous representations and acknowledgements in the 2014 License Agreement related to MCR's Tools and intellectual property.**

42.     Immediately following the definitions section in the 2014 License Agreement are representations and acknowledgements, which MCR requires of its licensees as part of its consistent, ongoing effort to protect its Tools and intellectual property.[16] These representations and acknowledgments, which Oag and SPEX Offshore made and MCR acted and relied on, include the following:

- Oag and SPEX Offshore acknowledged that MCR holds valuable rights in its Tools and intellectual property;[17]

- Oag and SPEX Offshore acknowledged that MCR has spent significant time and effort, at significant expense, to develop, acquire, protect, maintain and license its Tools and intellectual property;[18]

- Oag and SPEX Offshore represented that SPEX Offshore had not invented, designed, developed, or improved (nor contributed to inventing, designing, developing or improving) any technology or products for perforating, consuming or cutting of downhole pipes

---

[14] *Id*. at § 1.06.

[15] *See, e.g.*, Exhibit A at §§ 1.02, 1.03, 1.04, 1.06, 1.09, 1.10, 3.04.

[16] Exhibit B, p. 2-3.

[17] *Id*. at § 2.01.

[18] *Id*. at § 2.02.

using any part of MCR's Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools;[19]

• Oag and SPEX Offshore represented that SPEX Offshore was not aware of any person or entity having invented, designed, developed or improved (nor contributed to inventing, designing, developing or improving) any technology or products for perforating, consuming or cutting of downhole pipes using any of MCR's Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools;[20]

• Oag and SPEX Offshore represented that SPEX Offshore was not in the business of designing or developing thermite-based products or technology substantially similar to or competitive with MCR's Licensed Products and Licensed Technology;[21] and

• Oag and SPEX Offshore represented that SPEX Offshore had no intention of entering into the business of designing or developing thermite-based products or technology substantially similar to or competitive with MCR's Licensed Products and Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools.[22]

43.     In the 2011 License Agreement, SPEX Services made similar representations and acknowledgements, which MCR acted and relied on.[23]

---

[19] *Id.* at § 2.03.

[20] *Id.* at § 2.05.

[21] *Id.*

[22] *Id.*

[23] *See., e.g.*, Exhibit A at §§ 2.01, 2.02, 2.03, 2.05.

**F.      Oag and SPEX Offshore make numerous agreements in the 2014 License Agreement regarding their use of MCR's Tools and intellectual property.**

44.     Throughout various provisions of the 2014 License Agreement, Oag and SPEX Offshore made numerous agreements regarding SPEX Offshore's use of MCR's Tools and intellectual property, which MCR acted and relied on. These agreements include the following:

- Oag and SPEX Offshore agreed not to engage or assist in any testing, modifying, reverse engineering, or development of any of MCR's Tools or intellectual property, either directly or by cooperation with a third party;[24]

- Oag and SPEX Offshore agreed to use MCR's Tools and Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools, only in strict accordance with the terms of the agreement;[25]

- Oag and SPEX Offshore agreed that all rights, title and interest to any Improvements to MCR's Tools or intellectual property, including any and all patents and trade secrets, shall be exclusively owned by MCR;[26]

- Oag and SPEX Offshore agreed to assign and convey to MCR its entire right, title and interest to all Improvements, if any, including all applicable intellectual property rights related to any such Improvements;[27]

- Oag and SPEX Offshore agreed not to cooperate with, or seek to benefit from, any third party's infringement of MCR's rights in connection with its Licensed Technology,

---

[24] Exhibit B at § 3.03.

[25] *Id.*

[26] *Id.* at § 3.04. Within this provision, SPEX Offshore also agreed to provide MCR with prompt notice of the development of any Improvement and all information necessary to practice any such Improvement.

[27] *Id.*

which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools;[28]

• Oag and SPEX Offshore agreed to promptly notify MCR of any third-party infringement or threatened infringement of MCR's Licensed Patents or Licensed Technology;[29]

• Oag and SPEX Offshore agreed to protect MCR's Confidential Information, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools, and to use it only for purposes of the agreement;[30]

• Oag and SPEX Offshore agreed, upon expiration of the 2014 License Agreement, to cease all activities concerning and all use of MCR's Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools, and to return the Licensed Technology to MCR;[31] and

• Oag and SPEX Offshore agreed that all material terms related to the licensing, use, and confidentiality of MCR's Tools and intellectual property and the enforcement of MCR's rights under the 2014 License Agreement survived termination of the agreement.[32]

45. In the 2011 License Agreement, SPEX Services made similar agreements regarding its use of MCR's Tools and intellectual property, which MCR acted and relied on.[33]

---

[28] *Id.* at § 3.05.

[29] *Id.* at § 5.01.

[30] *Id.* at § 6.01.

[31] *Id.* at § 7.05.

[32] *Id.* at § 7.06.

[33] Exhibit A at §§ 3.01, 3.03, 3.04, 7.01, 8.01, 9.04.

**G.   Through Directors and affiliates, the SPEX Defendants file numerous international patent applications derived from MCR's Tools and intellectual property.**

46.    Just prior to and soon after Oag and SPEX Offshore signed the 2014 License Agreement, SPEX Services and its Directors and affiliates (including Oag) began filing patent applications, without notice to MCR, in an attempt to rebrand MCR's intellectual property as their own.[34]

47.    After filing these applications, the SPEX Defendants created shell companies, assigned the applications to the newly-created shell companies, and then used the shell companies to file additional patent applications derived from MCR's Tools and intellectual property. The SPEX Defendants also began appointing and terminating officers and directors in an ongoing game of musical chairs. The SPEX Defendants took these measures, among others, in an effort to avoid liability for their contractual breaches and to hide their wrongful conduct from MCR.

**<u>Oag and Younger file priority applications derived from MCR's Tools and intellectual property.</u>**

48.    On March 21, 2014, SPEX Services terminated Younger's appointment as Director.

49.    On September 22, 2014, Oag, Chief Executive Officer of SPEX Offshore and signatory to the 2014 License Agreement, filed UK Patent Application No. GB1416720.9 for an "Improved Plug" ("SPEX 1"). SPEX 1 was abandoned prior to publication and grant. However, it served as a priority document for PCT/GB2015/052738 ("SPEX PCT 1"), filed by Oag and Younger as co-inventors pursuant to the Patent Cooperation Treaty ("PCT"), which provides

---

[34] As discovery has only begun, MCR continues to discover patent applications that were filed by the SPEX Defendants in violation of the 2011 and 2014 License Agreements and 2015 Extension, as part of their scheme to misappropriate MCR's trade secrets and confidential and proprietary information.

protection in all member countries for a period of time. After the initial protection period expires, applicants may pursue patent protection in a number of individual countries.

50.     On November 18, 2014, Oag filed UK Patent Application No. GB1420491.1 for a "Downhole Tool with a Propellant Charge" ("SPEX 2"). SPEX 2 was abandoned prior to publication and grant. However, it served as a priority document for PCT/GB2015/053507 ("SPEX PCT 2"), filed by Oag, Younger and Johnston as co-inventors.

**After the filing of the priority applications, SPEX Engineering UK is formed.**

51.     On February 26, 2015, SPEX Engineering UK was incorporated.[35] SPEX Engineering UK is the parent company of SPEX Group.

52.     On May 5, 2015, SPEX Engineering UK appointed Oag, Mahjoub and Strachan as Directors.

**Oag, Younger and SPEX Engineering UK file additional priority applications derived from MCR's Tools and intellectual property.**

53.     On March 3, 2015, Oag filed UK Patent Application No. GB1503608.0 for "A Tool for Severing Or Assisting In The Severing Of A Conduit" ("SPEX 3"). SPEX 3 was abandoned prior to publication and grant. However, it served as a priority document for PCT/GB2016/050562 ("SPEX PCT 3"), filed by Oag and Younger as co-inventors.

54.     On April 13, 2015, Younger filed UK Patent Application No. GB1506265.6 for an "Improved Tool" ("SPEX 4"). SPEX 4 was abandoned prior to grant. However, it served as a priority document for PCT/GB2016/051032 ("SPEX PCT 4"), also filed by Younger.

55.     On November 18, 2015, Oag, Younger and Johnston filed UK Patent Application No. GB2532609 for a "Downhole Tool" ("SPEX 4A"). That same day, SPEX Engineering UK

---

[35] SPEX Engineering UK was known as SLLP 121 Ltd. until its name change on May 18, 2015.

filed UK Patent Application No. GB2544616 for a "Downhole Tool" ("SPEX 4B"). Oag, Younger and Johnston are named as co-inventors on both SPEX 4A and SPEX 4B.[36]

**Oag and Younger assign patent applications to SPEX Services.**

56.     After filing the UK application for SPEX 1, but prior to September 22, 2015 (the date on which it expired), Oag and Younger assigned SPEX 1 to SPEX Services.

57.     In the same manner, on or prior to November 25, 2015, Oag, Younger and Johnston assigned SPEX 2, 3, 4 and 4A to SPEX Services.

**Oag, SPEX Services and SPEX Engineering UK file additional patent applications derived from MCR's Tools and intellectual property.**

58.     On September 22, 2015 (the same day Oag and Younger assigned SPEX 1 to SPEX Services), SPEX Services filed SPEX PCT 1 for an "Improved Plug."

59.     On November 18, 2015, SPEX Services filed SPEX PCT 2 for a "Downhole Tool With Propellant Charge."

60.     On March 3, 2016, SPEX Engineering UK filed SPEX PCT 3 for "A Tool for Severing Or Assisting In the Severing Of A Conduit." That same day, Oag and Younger filed related UK Patent Application No. GB2538346 ("SPEX 3A") for an "Improved Tool."

61.     On April 13, 2016, SPEX Engineering UK filed SPEX PCT 4 for an "Improved Tool." That same day, Younger filed UK Patent Application No. GB2537749 for "Improved Tool" ("SPEX 4C").

**SPEX Services assigns patent applications to SPEX Engineering UK.**

62.     On November 25, 2015, SPEX Services assigned SPEX 2, SPEX PCT 2, SPEX 3, SPEX 4 and SPEX 4A to SPEX Engineering UK. Mahjoub, who serves as Director of assignee SPEX Engineering UK, signed on behalf of assignor SPEX Services.

---

[36] Both SPEX 4A and SPEX 4B disclose subject matter related to SPEX PCT 4.

63.     On March 8, 2016, SPEX Services assigned SPEX PCT 1 to SPEX Engineering UK. Strachan, who serves as Manager of SPEX Group and Director of SPEX Engineering UK and SPEX Offshore, signed on behalf of assignor SPEX Services.

64.     Soon after the filing of SPEX 4C on April 13, 2016, Younger assigned SPEX 4C to SPEX Engineering UK.

## The first wave of SPEX patent applications are published.

65.     On March 31, 2016, SPEX PCT 1 was published.[37]

66.     On May 26, 2016, SPEX PCT 2 was published.

67.     In May 2016, SPEX 4A and 4B were published.

68.     On September 9, 2016, SPEX PCT 3 was published.

69.     On October 20, 2016, SPEX PCT 4 was published.

70.     On October 26, 2016, SPEX 4C was published.

71.     On November 16, 2016, SPEX 3A was published.

**H.     In the midst of filing patent applications derived from MCR's Tools and intellectual property, the SPEX Defendants take active measures to conceal and avoid liability for their wrongful conduct.**

72.     As the first wave of SPEX patent applications were being published, the SPEX Defendants began a new cycle of forming shell holding companies, filing patent applications derived from MCR's Tools and intellectual property, assigning applications between and among affiliates, and appointing and terminating Directors. In an effort to further conceal their conduct,

---

[37] In successive motions to dismiss, the SPEX Defendants allege that MCR's claims are barred by the applicable statute of limitations. *See, e.g.*, Doc.  20, 31. PCT applications are published as soon as possible after the expiration of 18 months from the earliest filing date. SPEX PCT 1—the earliest patent application derived from MCR's Tools and intellectual property—was not published until March 31, 2016. As a result, the SPEX Defendants' wrongful acts were inherently undiscoverable prior to March 31, 2016, and all of MCR's claims are therefore timely. *WesternGeco v. Ion Geophysical Corp.*, 2009 WL 3497123, at *5 (S.D. Tex. Oct. 28, 2009). Moreover, and as set forth in detail herein, MCR affirmatively pleads application of the discovery rule and fraudulent concealment, both of which toll limitations.

the SPEX Defendants also began changing corporate names, diverting assets between and among affiliates, causing entities to be undercapitalized, and dissolving contractually-liable entities.

### SPEX Holdings is formed.

73.     On March 1, 2016, SPEX Holdings was incorporated. SPEX Holdings appointed Oag, Strachan and Mahjoub as Directors.

74.     On or about April 25, 2016, SPEX Holdings became the parent company of SPEX Engineering UK "following a share for share transfer" with SPEX Services.

75.     On July 5, 2016, SPEX Holdings changed its registered address to Blackwood House—the same address as SPEX Offshore.

### SPEX Offshore and SPEX Services divert assets, change names and terminate Directors.

76.     On April 25, 2016, SPEX Services purposely caused itself to be undercapitalized through a payment of dividends to its affiliates, an asset transfer to SPEX Holdings, and a reduction of its share premium account to zero.

77.     On June 16, 2016, SPEX Offshore terminated Oag as Director.

78.     On June 30, 2016, SPEX Services terminated Oag and Mahjoub as Directors.

79.     On August 1, 2016, SPEX Offshore purposely caused itself to be undercapitalized by transferring its assets to SPEX Offshore UK. SPEX Offshore also transferred its employment contracts to SPEX Offshore UK. Prior to the transfer, SPEX Offshore UK had no personnel.

80.     On August 19, 2016, SPEX Services changed its name to General Services 2, Ltd. ("General Services 2"). That same day, SPEX Offshore changed its name to General Services 1, Ltd. ("General Services 1"). Coincidentally, the only two SPEX Defendants to change their names away from the "SPEX" brand—SPEX Services and SPEX Offshore—are signatories to the 2011 and 2014 License Agreements and 2015 Extension.

81.     On October 27, 2016, after changing its name to General Services 2, SPEX Services passed a resolution to voluntarily wind itself up and appoint liquidators for that purpose. Strachan signed the resolution on behalf of SPEX Services.

82.     On December 2, 2016, both SPEX Services and SPEX Offshore terminated Strachan as Director.

### SPEX Corporate Holdings is formed.

83.     On December 21, 2016, SPEX Corporate Holdings was incorporated. Its Directors are Oag, Mahjoub, and Strachan, and its registered address is Blackwood House—the same address as SPEX Offshore and SPEX Holdings. SPEX Holdings is the parent of SPEX Corporate Holdings, SPEX Offshore UK, SPEX Engineering UK and SPEX Engineering, Ltd.

### In various countries around the world, SPEX Services and SPEX Engineering UK file patent applications derived from MCR's Tools and intellectual property.

84.     At the conclusion of the PCT application procedure, SPEX PCT 1 entered the "national phase," in which applicants may pursue patent protection directly in specific countries.

85.     In March and April of 2017, SPEX Services filed national phase applications, claiming priority from SPEX PCT 1, in Canada, Europe, Australia and the United States.

86.     In May and June of 2017, SPEX Services filed national phase applications, claiming priority from SPEX PCT 2, in Canada, Australia, the United States and Europe.

87.     In August and September of 2017, SPEX Engineering UK filed national phase applications, claiming priority from SPEX PCT 3, in Canada, Australia, the United States, and Europe (including the United Kingdom).

88.     In October 2017, SPEX Engineering UK filed national phase applications, claiming priority from SPEX PCT 4, in Australia, Canada, the United States and Europe.

**SPEX Engineering UK files additional patent applications derived from MCR's Tools and intellectual property.**

89.     On January 19, 2017, SPEX Engineering UK filed International PCT Application No. PCT/GB2017/050129 for a "Tool With Propellant Sections" ("SPEX PCT 5") and UK Patent Application No. GB2546630 for an "Improved Tool" ("SPEX 5A").

90.     On May 18, 2017, SPEX Engineering UK filed International PCT Application No. PCT/GB2017/051390 for a "Tool For Severing A Downhole Tubular By A Stream Of Combustion Products" ("SPEX PCT 6") and UK Patent Application No. GB2550691 for an "Improved Tool" ("SPEX 7").

**The SPEX Defendants take further active measures to conceal their wrongful conduct, even after MCR filed its State Court Petition.**

91.     With the new patent applications on file and sham holding companies in place (SPEX Holdings and SPEX Corporate Holdings), the SPEX Defendants no longer had any use for contractual signatory SPEX Offshore, which had already changed its name away from the "SPEX" brand. Thus, on September 30, 2017, the SPEX Defendants dissolved General Services 1 (formerly SPEX Offshore) without notice to MCR.

92.     On October 31, 2017, SPEX Engineering UK assigned numerous SPEX patents and patent applications to the newly-formed SPEX Corporate Holdings. The assignment included but was not limited to transfer of all rights, title and interest to: (1) SPEX PCT 1, including the national phase applications filed in Australia, Canada, Europe and the United States; (2) SPEX PCT 2, including the national phase applications filed in Australia, Canada, Europe and the United States; (3) SPEX PCT 4, including the national phase applications filed in Australia, Canada, Europe and the United States; and (4) SPEX 4A, SPEX 4B, SPEX 4C, SPEX PCT 5,

SPEX 5A, SPEX PCT 6, and SPEX 7. Strachan signed as SPEX Engineering UK's Director, Oag signed as SPEX Corporate Holdings' Director, and Mahjoub served as witness.

93.    On October 31, 2017, contemporaneous with the assignment to SPEX Corporate Holdings, SPEX Engineering UK changed its registered address to Blackwood House—the same address as SPEX Offshore, SPEX Holdings and SPEX Corporate Holdings.

94.    On December 27, 2017, MCR filed its original state court petition in this matter against SPEX Offshore, SPEX Offshore UK, SPEX Group, and SPEX Engineering UK. Because MCR was unaware of the full nature and extent of the SPEX Defendants' wrongful conduct, it did not name SPEX Services as a defendant at that time.

95.    Just nine days later, on January 5, 2018, the SPEX Defendants dissolved SPEX Services, which had changed its name to General Services 2, without notice to MCR.[38]

## I.    The SPEX Patents are derived from MCR's Tools and intellectual property.

96.    The SPEX patents and patent applications ("SPEX Patents") are derived from MCR's Confidential Information, Licensed Patents, Licensed Products, and Licensed Technology, as those terms are defined in the 2011 and 2014 License Agreements.[39] In addition, the SPEX Patents relate to MCR's radial cutting torches, solid combustible charge-based tools, thermite-based tools and technology, or constitute substantially similar technology.

97.    To the extent that any of the inventions or alleged inventions disclosed in the SPEX Patents are deemed patentable, they are Improvements, as that term is defined in the 2011

---

[38] Counsel for SPEX Offshore UK, SPEX Group and SPEX Engineering UK have refused to accept service on behalf of SPEX Offshore and SPEX Services. However, SPEX Offshore UK and SPEX Engineering UK have moved to dismiss MCR's claims against SPEX Offshore and SPEX Services alleging lack of capacity. [Doc. 81].

[39] Exhibit A at §§ 1.02, 1.03, 1.04, 1.06, 1.09, 1.10; Exhibit B at §§ 1.01, 1.04, 1.05 1.06, 1.09.

and 2014 License Agreements.[40] Pursuant to the terms of the 2011 and 2014 License Agreements and 2015 Extension, any such Improvements belong exclusively to MCR.[41]

98.    SPEX PCT 1 includes, among other things, embodiments of a consumable plug (tool) that is consumed or partially disintegrated by a deflagration reaction using solid combustible charge-based tools, thermite-based technology or substantially similar technology. The embodiments include a plug or tool body comprising a propellant and an initiator adapted to initiate the propellant causing deflagration, in which the plug or tool body partially disintegrates.

99.    SPEX PCT 1 discloses that the propellant is comprised of an oxidizer and metallic segments that are keyed together by the propellant, or a mix of materials, which may include an oxidizer with metals, glass, or gravel. This technology is taught and disclosed by, and directly related to, MCR's Licensed Patents, and substantially similar to MCR's Licensed Technology.

100.    SPEX PCT 2 includes, among other things, embodiments of propellant combinations that undergo deflagration reactions to create a stream of combustion products that are directed and flow through nozzles (outlets) for manipulating (*e.g.*, cutting) a tubular or segment of casing. SPEX PCT 2 includes nozzle patterns and configurations for directing the flow of the stream of the combustion products to cut or perforate downhole tubulars or other equipment. This technology is the same as or substantially similar to MCR's Licensed Technology, including MCR's nozzle patterns and configurations, and flow paths shown and described in MCR's Licensed Patents and contained within MCR's Licensed Technology.

101.    SPEX PCT 3 and SPEX 3A include, among other things, embodiments of a tool comprising at least one propellant, an ignition mechanism for igniting the propellant, and at least one modifying material, wherein ignition of the propellant causes deflagration and the release of

---

[40] Exhibit A at § 1.09; Exhibit B at § 1.02.

[41] Exhibit A at §§ 1.09, 3.04; Exhibit B at §§ 1.02, 3.04; Exhibit C.

a stream of combustion products that flow through channels and outlets (nozzles) to cut or sever a conduit. The propellant comprises a metal oxidizer and a modifying material in the form of a metal, which, upon deflagration, forms a molten plasma for cutting or severing the target (*e.g.*, conduit). This technology is taught and disclosed by, and directly related to, MCR's Licensed Patents, and substantially similar to MCR's Licensed Technology.

102.    SPEX PCT 4 includes, among other things, embodiments of a tool for removing material from a target, wherein the tool comprises a propellant that is ignited to form combustion products that are directed along at least one tool flow path.   The tool flow path(s) can be selectively opened or closed, such that upon exiting the tool flow path(s), the combustion products interact with a target causing the material to be removed.

103.    SPEX PCT 4 also includes figures showing the nozzle configurations and patterns for directing the combustion products along the tool flow path(s), which are the same as MCR's nozzle patterns and configurations for directing a stream of combustion products (*e.g.*, MCR's thermite combustion products) along MCR's cutter tool's flow paths and out toward the targeted conduit. This technology is shown and described in MCR's Licensed Patents and contained within MCR's Licensed Technology.

104.    SPEX PCT 4 further discusses a solid propellant that can comprise layers for different burn rates, and the direction of the combustion products that can be varied or deflected with respect to the tool. This technology is shown and described in MCR's Licensed Patents and contained within MCR's Licensed Technology.

105.    Below is a comparison of SPEX PCT 4 and MCR's related patent. This is just one example clearly demonstrating that the SPEX Patents were derived from MCR's Tools and intellectual property, in violation of the 2011 and 2014 License Agreements and 2015 Extension.

| SPEX Patent Applications: | MCR Licensed Patents and Technology: |
|---|---|
| **SPEX PCT 4, "Downhole Tool With A Propellant Charge":** **PCT/GB2016/051032:** **Publication Date: October 20, 2016:** <u>National Phase:</u> <br> • Australia 2016247742 <br> • Canada 2982254 <br> • Europe 16724446.6 <br> • US 15/565,497 <br><br> **SPEX PCT 4, Claim 1**. A method of removing material from a target, the method comprising the steps of: <br><br> providing **a tool**, the tool having at least one propellant source, <br><br> **igniting at least one of the propellant source(s)** to form a **combustion zone**, pressurising the tool to a pressure higher than the environmental pressure, and <br><br> **directing combustion products** generated at the combustion zone **along at least one tool flow path**, **the tool flow path(s) being selectively openable or closable**, such that upon **exiting the tool flow path(s) the combustion products interact with a target**, the interaction causing **material to be removed from the target**. | **MCR U.S. Patent No. 6186226 (MCR-003); Filed: May 4, 1999 and Issued February 13, 2001, having a title of "Borehole Conduit Cutting Apparatus." (US6186226 is included in Appendix A of the 2011 and 2014 License Agreements):** <br><br> Claim 1. An apparatus for use for severing a metal conduit disposed in a borehole extending downward into the earth, comprising: <br> a body adapted to be lowered into the metal conduit to be severed, <br> **said body comprising** a surrounding wall defining an elongated chamber with a central axis and having a lower portion, **an intermediate portion,** and an upper portion, <br> said lower portion defining a cavity with a plurality of apertures extending through said wall in a given plane at angularly spaced apart positions located 360° around said axis for providing passages from said cavity to the outside of said wall, <br> **a combustible charge located in said intermediate portion,** <br> a movable seal means located in said cavity above said apertures next to and below said combustible charge, and <br> an ignition means coupled to said upper portion for **igniting said combustible charge for creating a flame and hot combustion products** for moving said movable seal means in said cavity below said apertures **for passage of said flame and hot combustion products into said cavity and out of said apertures for severing the surrounding metal conduit.** |

WO 2016/166531                                    PCT/GB2016/051032

## CLAIMS

1.   A method of removing material from a target, the method comprising
the steps of:

providing a tool, the tool having at least one propellant source,

igniting at least one of the propellant source(s) to form a combustion zone,

pressurising the tool to a pressure higher than the environmental pressure,
and

directing combustion products generated at the combustion zone along at
least one tool flow path, the tool flow path(s) being selectively openable or closable,
such that upon exiting the tool flow path(s) the combustion products interact with a
target, the interaction causing material to be removed from the target.

2.   The method of claim 1, wherein material is removed from the target by
ablation, erosion, impacting, cleaning and/or transmitting heat to the target.

3.   The method of claim 2, wherein ablation, erosion, impacting and/or
cleaning the target and/or transmitting heat to the target removes material from the
target by severing, crushing, vibrating, skimming, applying a pressure to, hitting the
target, propelling or moving and/or melting the target.

4.   The method of, wherein the combustion products create a chemical
reaction in the target.

5.   The method of any preceding claim, wherein the step of directing
combustion products generated at the combustion zone along at least one tool flow
path, is at least partially continuous.

6.   The method of any preceding claim, wherein the flow path defines a
flow path profile, the flow path profile being configured to create a change in a
combustion product parameter.

19

---

US 6,186,226 B1

**3**

of the lower chamber portion 3411, by way of the apertures 351 and to the pipe 323 to cut or sever the pipe 323 at the level of the apertures.

The aperture 353 acts as a damper to allow the liquid below the seal member 361 to slowly flow out into the borehole and hence prevents the seal member 361 from slamming open against the bottom wall 345, 3491 which may otherwise damage the bottom of the apparatus.

After the pipe has been severed, the apparatus 321 is removed from the borehole, allowing the upper portion of the drill pipe to be removed and the lower portion of the drill pipe then drilled out in the event that the drill pipe 323 had become stuck in the borehole.

In one embodiment, the outside diameter of section 3341l may be 1 inch with 15 equally spaced apart apertures 351 around the axis 343 formed through the wall of member with each apertures 351 having a diameter of about 0.060. It is to be understood, however, that these specifications may vary.

This apparatus 321 also may be used to cut or sever conventional metal production tubing, metal coiled tubing, or metal casing in a borehole for remedial purposes. In FIG. 3, the apparatus 321 shown is employed to cut or sever metal casing 311 located in the borehole 325.

In FIG. 1, there is shown an anchor stud 301 connected to the bottom wall 345 of the apparatus to which a pressure balance anchor assembly may be coupled which may be of the type disclosed in U.S. Pat. No. 5,435,394. Referring to FIG. 4, there is illustrated an anchor 303 coupled to the anchor stud 301. The anchor 303 has an aperture 305 for receiving the stud 301 and set-screw holes 307 for receiving set screws 309 for coupling the anchor 303 to the stud 301.

In another embodiment, a slickline battery firing system may be employed in lieu of the electric line firing system to energize the ignition means 44. This system comprises a slickline cable connection for supporting the modified apparatus 321 and which is connected to a pressure firing head. The pressure firing head comprises a metal piston having a larger diameter head with a smaller diameter metal rod extending downward from the bottom of the larger diameter head. The piston is slidably located in a hollow cylinder. A spring surrounding the rod is employed to provide upward pressure against the under side of the larger diameter head. The spring is adjustable to allow for hydrostatic compensation of well fluids so that the system does not fire at bottom hole pressure. When the piston is moved downward, the lower end of the rod will make contact with an electrical lead from the battery pack and electrical lead coupled to one side of the ignition means (the minus terminal of the battery pack and the other side of the ignition means 44 are grounded) to discharge current to the ignition means to ignite the material 80 and fire the combustible charges 78. Fluid ports extend through the wall of the cylinder above the larger diameter piston head. When the borehole apparatus is in place in the borehole ready to cut the metal conduit, a pump at the surface increases the fluid pressure in the conduit and moves the piston downward against the pressure of the spring to allow the rod to make electrical contact with the leads to fire the combustible charges 78.

In still another embodiment, a slickline percussion firing system may be employed in lieu of the electric line firing system to ignite the charges 78. This system comprises a slickline cable head connection for supporting the modified apparatus 321 and which is connected to a pressure firing subassembly. The pressure firing subassembly comprises a cylinder having the piston and spring described in connection with the battery firing system. Ports are formed through

**4**

the cylinder wall above the piston. Fluid pressure is increased, to force the piston rod (firing pin) against a lower percussion firing cap which ignites upon impact to ignite the charges 78.

Also a percussion firing system run via coiled tubing, production tubing, or drill pipe may be employed in lieu of the electric firing system to ignite the charges 78. This system comprises coiled tubing for supporting the modified apparatus 321 connected to a connector subassembly which connects to a pressure firing head which comprises a hollow cylinder with a piston located therein and supported by shear pins. The coiled tubing is coupled to the interior of the cylinder at its upper end. The piston has a central flow path extending axially downward from its upper end and then radially outward through the cylinder wall. A firing pin extends from the lower end of the piston. The flow path allows the coiled tubing to fill with water as the assembly is lowered downhole and also allows for circulation of fluid in running of the assembly. When the apparatus is at the desired cutting depth, a ball is dropped into the tubing which passes to the piston, plugging the flow path allowing an increase in fluid pressure to be achieved in the tubing and upper end of the cylinder which shears the shear pins driving the firing pin into the percussion cap to ignite the charges 78.

What is claimed is:

1.  An apparatus for use for severing a metal conduit disposed in a borehole extending downward into the earth, comprising:

a body adapted to be lowered into the metal conduit to be severed;

said body comprising a surrounding wall defining an elongated chamber with a central axis and having a lower portion, an intermediate portion, and an upper portion,

said lower portion defining a cavity with a plurality of apertures extending through said wall in a given plane at angularly spaced apart positions located 360° around said axis for providing passages from said cavity to the outside of said wall,

a combustible charge located in said intermediate portion,

a movable seal means located in said cavity above said apertures next to and below said combustible charge, and

an ignition means coupled to said upper portion for igniting said combustible charge for creating a flame and hot combustion products for moving said movable seal means in said cavity below said apertures for passage of said flame and hot combustion products into said cavity and out of said apertures for severing the surrounding metal conduit.

2.  The apparatus of claim 1, wherein:

said combustible charge comprises a pyrotechnic charge.

3.  The apparatus of claim 1, wherein:

said combustible charge comprises a plurality of pyrotechnic charges.

4.  The apparatus of claim 1, wherein:

said seal means supports said combustible charge in said intermediate portion of said chamber prior to ignition.

5.  The apparatus of claim 4, wherein:

said charge comprise a pyrotechnic charge.

6.  The apparatus of claim 5, wherein:

said combustible charge comprises a plurality of pyrotechnic charges.

| | |
|---|---|
| **SPEX PCT 4 Application Drawings, Fig. 6:**<br>**PCT/GB2016/051032:**<br>**Publication Date: October 20, 2016:** | **MCR U.S. Patent No. 6186226 (MCR-003); Filed: May 4, 1999 and Issued February 13, 2001 (US6186226 is included in Appendix A of the 2011 and 2014 License Agreements):** |
| <br>**SPEX PCT 4, Fig. 6, Drawing page 6/6.**<br>Propellant source 412 is housed within tool body 416, and ignition mechanism 418 ignites propellant source 412 to create combustion zone 420, inside ignition recess 422 (cavity), for creating combustion products 428. Combustion products 428 are directed into flow paths 430 that narrow into nozzle head 432 having a plurality of nozzles 434 for directing flow of combustion products 428. The flow path 430 is sealed by a frustoconical seal 440 that prevents combustion products from exiting the tool body and nozzles 434 until the seal is broken/eroded and the flowpath is opened. | **MCR U.S. Patent No. 6186226:**<br><br>**Claim 1**. An apparatus for use for severing a metal conduit disposed in a borehole extending downward into the earth, comprising:<br><br>a body adapted to be lowered into the metal conduit to be severed,<br><br>**said body comprising** a surrounding wall defining **an elongated chamber with a central axis** and **having a lower portion, an intermediate portion, and an upper portion,**<br><br>said **lower portion defining a cavity with a plurality of apertures extending through said wall** in a given plane at angularly spaced apart positions located 360° around said axis for **providing passages from said cavity to the outside of said wall,**<br><br>**a combustible charge located in said intermediate portion,**<br><br>**a movable seal means located in said cavity above said apertures next to and below said combustible charge**, and<br><br>**an ignition means** coupled to said upper portion for **igniting said combustible charge for creating a flame and hot combustion products for moving said movable seal means** in said cavity below said apertures **for passage of said flame and hot combustion products** into said cavity and **out of said apertures for severing the surrounding metal conduit**. |

| **SPEX PCT 4, Claim 51**. | **MCR U.S. Patent No. 6186226 (MCR-003), Claim 1:** |
|---|---|
| The method of any preceding claim, wherein the method comprises the step of **varying the direction of the combustion products exiting the flow path with respect to the tool.** | …said lower portion defining a cavity with **a plurality of apertures extending through said wall in a given plane at angularly spaced apart positions located 360° around said axis for providing passages from said cavity to the outside of said wall**…<br><br>…an ignition means coupled to said upper portion for igniting said combustible charge for creating a flame and hot combustion products for moving said movable seal means in said cavity below **said apertures for passage of said flame and hot combustion products into said cavity and out of said apertures for severing the surrounding metal conduit.** |
| **SPEX PCT 4 Application Drawings, FIG. 3:**<br>**PCT/GB2016/051032:**<br>**Publication Date: October 20, 2016:** | **MCR U.S. Patent No. 6,598,679 Drawings (MCR-004), FIG. 3, Filed September 19, 2001 and Issued July 29, 2003, and**<br>**MCR U.S. Patent No. 6925,937 (MCR-004:CIP), Issued August 9, 2005:** |



Figure 3

**SPEX PCT 4, FIG. 3,** Drawing Page 3/6 of the 6 pages of drawings contained in the SPEX PCT 4 Application.

Propellant Source 112 includes a solid propellant 152 housed within the body of a tool 110. The tool includes a deflector plate 154 (diverter), which assists in deflecting the flow of the combustion products 128 through the nozzles 134.



**MCR US Patent 6,598,679**, titled "Radial Cutting Torch With Mixing Cavity and Method." (See FIG. 3 on page 3/7 of the Drawings), and **MCR U.S. Patent No. 6925,937,** titled "Thermal Generator For Downhole Tools And Methods of Igniting And Assembly." (See FIG. 3 on page 3/11).

There are significantly similar paths taken by the combustion materials, as shown in both Figures (*i.e.*, SPEX FIG. 3 and MCR FIG. 3). This is especially pertinent because this type of flow path (*i.e.*, the **use of nozzles** for **directing the flow path** shown in the FIGs.) **was not possible with the explosive tools that SPEX was using prior to the license agreements with MCR.** In general, you cannot use nozzles, in this type of configuration, as an explosive device. This is a nozzle design for a thermite tool (deflagration reaction), and MCR's US6598679B, US6186226 and US6925937 Patents are listed in Appendix A of the 2011 and the 2014 License Agreements.

| SPEX PCT 4 Application Drawings, Fig. 6: PCT/GB2016/051032: | MCR U.S. Patent No. 6,598,679 Drawings (MCR-004), FIG. 3, Filed September 19, 2001 and Issued July 29, 2003, and MCR U.S. Patent |
|---|---|

| Publication Date: October 20, 2016: | No. 6925,937 (MCR-004:CIP), Issued August 9, 2005: |
|---|---|







**SPEX PCT 4, FIG. 6, Drawing page 6/6:**

Propellant source 142 is housed within a tool body 416, and ignition mechanism 418 ignites propellant source 412 to create combustion zone 420, inside an ignition recess 422, for creating combustion products 428.

The combustion products 428 are directed into flow paths 430 that narrow into a nozzle head 432 having a plurality of nozzles 434 for directing the flow of the combustion products 428.  The flow path 430 is sealed by a frustoconical seal 440, which prevents the combustion products from exiting the tool body and nozzles 434 until the seal is broken or eroded and the flowpath is opened.

**MCR U.S. Patent No. 6,598,679, FIG. 3 and MCR U.S. Patent No. 6,925,937, FIG. 3:**

Combustible material 75, housed within a tool body, is ignited to generate combustion products that flow through openings 135 into a chamber or cavity (ignition recess) 153, for directing the flow of a flame and combustion products through aligned hole sets (nozzle flow paths) 225, into an annular chamber (narrowing of flow paths into a nozzle head) and out through nozzles (gaps) 243. (See Col. 4, ll. 16-41 of the '679 Patent). (MCR's US6598679B and US6925937 are included in Appendix A of the 2011 and 2014 License Agreements).

| | |
|---|---|
| **SPEX PCT 4:**<br>**PCT/GB2016/051032:**<br>**Publication Date: October 20, 2016:** | **MCR U.S. Patent No. 6186226 (MCR-003):** |
| **SPEX PCT 4, Claim 73**.<br>A tool for removing material from a target, the **tool comprising:**<br>**at least one propellant source,** | **Claim 1:**<br>…a body adapted to be lowered into the metal conduit to be severed, **said body comprising** a surrounding wall defining an elongated chamber with a central axis and having a lower portion**, an intermediate portion**, and an upper portion,…<br><br>…**a combustible charge located in said intermediate portion**… |
| at least one **mechanism for igniting the propellant source(s),** and | … **an ignition means** coupled to said upper portion for **igniting said combustible charge for creating a flame and hot combustion products**… |
| **at least one tool flow path**, the **tool flow path(s) being selectively openable or closable**; wherein, **upon ignition, at least one of the propellant source(s) combusts to form a combustion zone releasing combustion products** which pressurise the tool to a pressure higher than the environmental pressure, the **combustion products, in use, flowing out of the tool along the tool flow path(s) towards a target from which material is to be removed.** | …**said lower portion defining a cavity with a plurality of apertures extending through said wall** in a given plane at angularly spaced apart positions located 360° around said axis **for providing passages from said cavity to the outside of said wall**…<br><br>…**an ignition means coupled to said upper portion for igniting said combustible charge for creating a flame and hot combustion products for moving said movable seal means in said cavity below said apertures for passage of said flame and hot combustion products into said cavity and out of said apertures for severing the surrounding metal conduit**. |
| **SPEX PCT 4, Claim 74**. A method of initiating a change in a target, the method comprising the steps of:<br><br>providing **at least one propellant source,** | **MCR U.S. Patent No. 6186226 (MCR-003):**<br>**Claim 1:**<br>…a body adapted to be lowered into the metal conduit to be severed,<br>**said body comprising** a surrounding wall defining an elongated chamber with a central axis and having a lower portion, **an intermediate portion**, and an upper portion,…<br><br>…**a combustible charge located in said intermediate portion**… |

| | |
|---|---|
| **igniting at least one of the propellant source(s) to form a combustion zone**, and | …**an ignition means** coupled to said upper portion for **igniting said combustible charge for creating a flame and hot combustion products**… |
| **directing combustion products** generated at the combustion zone **along at least one flow path, such that upon exiting the flow path(s) the combustion products interact with a target, the interaction causing a change in the target.** | …said lower portion defining a cavity with **a plurality of apertures extending through said wall** in a given plane at angularly spaced apart positions located 360° around said axis **for providing passages from said cavity to the outside of said wall**…<br><br>…**an ignition means** coupled to said upper portion **for igniting said combustible charge for creating a flame and hot combustion products** for moving said movable seal means in said cavity below said apertures **for passage of said flame and hot combustion products into said cavity and out of said apertures for severing the surrounding metal conduit.** |
| **SPEX PCT 4, Claim 56:** The method of any preceding claim, wherein the method comprises the step of deflecting the generated combustion products prior to exiting the flow path.<br><br>**SPEX PCT 4, Claim 57:** The method of claim 56, wherein the combustion products are deflected by a deflector. | **MCR US Patent No. 6598679 (MCR-004):**<br><br>Claims 1, 3, 4, and 8 include "a nozzle and a diverter," wherein the diverter is used as deflector for deflecting the flow of the flame and combustion products. |

106.    SPEX 4A, 4B and 4C include, among other things, nozzle patterns and configurations for directing a flow of a stream of combustion products to cut or perforate downhole tubulars or other equipment. This technology, including the nozzle patterns, configurations and flow paths, is the same as or substantially similar to MCR's Licensed Technology, including MCR's nozzle patterns and configurations and flow paths shown and described in MCR's Licensed Patents and contained within MCR's Licensed Technology.

107.    SPEX PCT 5 includes, among other things, embodiments of a tool for manipulating a tubular (cutting or removing sections) that includes a propellant, an ignition mechanism and at least one modifying agent (a metal). Upon ignition, the propellant, comprising the modifying agent, is adapted to deflagrate, creating a stream of combustion products that are directed to flow away from the outer surface of the propellant source and through nozzles to impact the tubular. This technology is taught and disclosed by, and directly related to, MCR's Licensed Patents, and substantially similar to MCR's Licensed Technology.

108.    SPEX 5A includes, among other things, embodiments relating to a propellant and modifying agent, wherein an "ignition mechanism causes the propellant to deflagrate rather than explode, producing a high pressure stream of products." The propellant may be provided in a single state and as a solid, and the modifying agent can be a metal. The high-pressure stream of products flow through nozzles to impact the targeted tubular. This technology is taught and disclosed by, and directly related to, MCR's Licensed Patents, and substantially similar to MCR's Licensed Technology.

109.    SPEX PCT 6 includes, among other things, embodiments of a tool that includes an ignition mechanism for igniting a propellant, and a propellant comprised of a metal oxidizer and particles of a metal modifying agent.  When ignited, the propellant is operable to deflagrate,

creating a stream of combustion products that are directed through various outlets (nozzles) and towards a tubular to be manipulated. This technology is taught and disclosed by, and directly related to, MCR's Licensed Patents, and substantially similar to MCR's Licensed Technology.

110.    SPEX 7 includes, among other things, embodiments of a tool that includes a propellant comprised of a metal oxidizer and particles of a metal modifying agent. When ignited, the propellant is operable to deflagrate, creating a stream of combustion products that are directed through various outlets (nozzles) and towards a tubular to be manipulated. Control of the propellant may be achieved by controlling the constitution of the propellant or changing it into a molten plasma, which may include the introduction of oxygen. This technology is taught and disclosed by, and directly related to, MCR's Licensed Patents, and substantially similar to MCR's Licensed Technology.

**J.    SPEX Services made false representations and breached numerous provisions of the 2011 License Agreement.**

111.    SPEX Services breached the 2011 License Agreement by falsely representing that it was not in the business of designing or developing thermite-based products, technology substantially similar to MCR's Licensed Products or Licensed Technology, or any competing technology, and that it had no intention of entering into any such business.[42] Based on the following, it is clear that SPEX Services was either actively engaged in such business or had an intention of entering into such business at the time it entered into the 2011 License Agreement:

- The filing of the SPEX Patents by SPEX Services, both directly and by and through its Directors;

- The content of the SPEX Patents, which are derived from MCR's Tools and intellectual property;

---

[42] Exhibit A at §§ 2.03, 2.05.

- The assignment of the SPEX Patents from SPEX Services' Directors to SPEX Services, and from SPEX Services to SPEX Engineering UK; and

- The subsequent development of competing tools and products.[43]

112.    SPEX Services made this representation knowing it to be false and with the intention that MCR act and rely on it. In addition, SPEX Services made this false representation for the consideration bargained for in the 2011 License Agreement, including but not limited to access to and license to use MCR's valuable Tools and intellectual property in accordance with the terms of the agreement.

113.    SPEX Services breached the 2011 License Agreement by engaging and assisting in the testing, modifying, reverse engineering, and development of MCR's Tools and intellectual property, both directly and by cooperation with a third party.[44] Specifically, SPEX Services (both directly and by and through its Directors) tested, modified, reverse engineered, and developed MCR's Tools to develop competing tools and products and for use in the SPEX Patents, which were later assigned to SPEX Services. In addition, SPEX Services assisted and cooperated with SPEX Engineering UK and its Directors in testing, modifying, reverse engineering, and developing MCR's Tools and intellectual property by, among other things, assigning the SPEX Patents to SPEX Engineering UK.

114.    Moreover, because SPEX Services and the other SPEX Defendants share common officers and Directors, the knowledge obtained by SPEX Services' Directors (including Oag) through the testing, modifying, reverse engineering, and development of MCR's Tools and intellectual property on behalf of SPEX Services, was imparted on the other SPEX Defendants

---

[43] According to documents produced by the SPEX Defendants, they are continuing to develop competing tools and products. However, these documents have been designated Attorney's Eyes Only.

[44] Exhibit A at § 3.03.

and their Directors. These acts further establish cooperation with a third party in violation of the 2011 License Agreement.

115.    SPEX Services breached its agreement to use MCR's Tools and Licensed Technology only in strict accordance with the terms of the 2011 License Agreement.[45] In fact, SPEX Services used MCR's Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools, to: (1) develop and design competing tools and products; (2) test, modify, reverse engineer, improve upon and develop MCR's Tools and intellectual property; (3) file the SPEX Patents through its Directors and affiliates in an attempt to rebrand MCR's technology as its own; and (4) cooperate with third parties in performing these wrongful acts.

116.    SPEX Services breached its agreement to provide MCR with prompt notice of any development of, and all information necessary to, practice any Improvement to MCR's intellectual property.[46] Instead of complying with this provision, SPEX Services concealed the improvements and modifications it made to MCR's Tools and intellectual property along with the design and development of competing tools and products. SPEX Services concealed this information from MCR in order to allow its affiliates and Directors to use the information to develop competing tools and products and file the SPEX Patents, which were later assigned to SPEX Services.

117.    SPEX Services breached its agreement that all rights, title and interest to any Improvements to MCR's intellectual property, specifically including MCR's Licensed Patents and Licensed Technology, shall be exclusively owned by MCR.[47] SPEX Services concealed the

---

[45] *Id.*

[46] *Id.* at § 3.04.

[47] *Id.*

improvements and modifications it made to MCR's Tools and intellectual property along with the design and development of competing tools and products. In addition, SPEX Services (by and through its Directors) filed the SPEX Patents, seeking protection and ownership of the Improvements in direct violation of the 2011 License Agreement. SPEX Services' Directors then assigned the SPEX Patents to SPEX Services, instead of MCR. Subsequently, SPEX Services assigned the SPEX Patents to SPEX Engineering UK, instead of MCR. SPEX Services, its affiliates and Oag now claim that the SPEX Patents are not Improvements, as that term is defined in the 2011 and 2014 License Agreements. In addition, the SPEX Defendants claim ownership of the SPEX Patents and have refused to assign or convey them to MCR.

118.    SPEX Services breached its agreement to assign or convey to MCR its entire right, title and interest to all Improvements, including all applicable intellectual property rights related to any Improvements.[48] SPEX Services concealed the improvements and modifications it made to MCR's Tools and intellectual property along with the design and development of competing tools and products. In addition, SPEX Services (by and through its Directors) filed the SPEX Patents, seeking protection and ownership of the Improvements in direct violation of the 2011 License Agreement. SPEX Services' Directors then assigned the SPEX Patents to SPEX Services, instead of MCR. Subsequently, SPEX Services assigned the SPEX Patents to SPEX Engineering UK, instead of MCR. SPEX Services, its affiliates and Oag now claim that the SPEX Patents are not Improvements, as that term is defined in the 2011 and 2014 License Agreements. In addition, the SPEX Defendants claim ownership of the SPEX Patents and have refused to assign or convey them to MCR.

---

[48] *Id.*

119.    SPEX Services breached the 2011 License Agreement by failing to promptly notify MCR of any third-party infringement or threatened infringement of MCR's Licensed Patents or Licensed Technology.[49] Although SPEX Services was aware of (and complicit in): (1) the filing and assignment of the SPEX Patents; (2) the testing, modifying, reverse engineering, and development of MCR's Tools and intellectual property; (3) the development of competing tools and products; and (4) the theft of MCR's trade secrets, it failed to notify MCR of such infringement or threatened infringement. SPEX Services also failed to notify MCR of the third-party infringement or threatened infringement by SPEX Engineering UK and its Directors, including Oag.

120.    SPEX Services breached its agreement to protect MCR's Confidential Information, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools, and to use it only for purposes of the 2011 License Agreement.[50] SPEX Services disclosed MCR's Confidential Information to its Directors, who then used the information to test, modify, reverse engineer, and improve upon MCR's Tools and intellectual property for the design and development of competing tools and technology. SPEX Services' Directors also used MCR's Confidential Information in applying for the SPEX Patents. Finally, SPEX Services disclosed MCR's Confidential Information to SPEX Engineering UK and its Directors, including Oag, who then used the information to test, modify, reverse engineer, and improve upon MCR's Tools and intellectual property for the design and development of competing tools and technology and for use in applying for the SPEX Patents.

---

[49] *Id*. at § 5.01.

[50] *Id*. at § 8.01.

**K.      SPEX Offshore and Oag made false representations and SPEX Offshore breached numerous provisions of the 2014 License Agreement and 2015 Extension.**

121.     SPEX Offshore breached the 2014 License Agreement and 2015 Extension by falsely representing that it had not invented, designed, developed, or improved (nor contributed to inventing, designing, developing or improving) any technology or products for the perforating, consuming or cutting of downhole pipes using any part of MCR's Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools.[51] In fact, SPEX Offshore (by and through its Directors and affiliates) was in the process of developing competing tools and technology derived from MCR's Tools and intellectual property, which SPEX Services (and its common officers and Directors) had gained access to through the 2011 License Agreement. At the time SPEX Offshore entered into the 2014 License Agreement and 2015 Extension, SPEX Offshore and Oag knew that SPEX Offshore was in the process of developing competing tools and technology and contributed to the development of competing tools and technology by its Directors and affiliates, including but not limited to SPEX Engineering UK and Oag.

122.     SPEX Offshore further breached the 2014 License Agreement and 2015 Extension by falsely representing that it was not aware of any person or entity having invented, designed, developed or improved (nor contributed to inventing, designing, developing or improving) any technology or products for the perforating, consuming or cutting of downhole pipes using any part of MCR's Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools.[52] At the very least, SPEX Offshore knew of the activities of SPEX Services and its officers and Directors, including

---

[51] Exhibit B at §§ 2.03, 2.05.

[52] *Id*. at § 2.05.

their: (1) development of competing tools and products; and (2) testing, modifying, reverse engineering, and development of MCR's Tools and intellectual property and improvements to MCR's Tools and intellectual property.

123.   SPEX Offshore breached the 2014 License Agreement and 2015 Extension by falsely representing that it was not in the business of designing or developing thermite-based products or technology substantially similar to or competitive with MCR's Licensed Products and Licensed Technology, and that it had no intention of entering into any such business.[53] In fact, SPEX Offshore (by and through its Directors and affiliates) were in the process of developing competing tools and products derived from MCR's Tools and intellectual property, which SPEX Services and Oag had gained access to through the 2011 License Agreement. SPEX Offshore and Oag knew that SPEX Offshore was in the process of developing competing tools and products and contributed to the development of competing tools and products by its Directors and affiliates, including but not limited to SPEX Engineering UK and Oag. Alternatively, SPEX Offshore and Oag knew that SPEX Offshore intended to enter into the business of designing or developing thermite-based products or technology substantially similar to or competitive with MCR's Licensed Products and Licensed Technology.

124.   SPEX Offshore and Oag made these representations knowing them to be false and with the intention that MCR act and rely on them. SPEX Offshore and Oag made these false representations for the consideration bargained for in the 2014 License Agreement and 2015 Extension, including but not limited to access and license to use MCR's valuable Tools and intellectual property in accordance with the terms of the agreement.

---

[53] *Id.*

125.    SPEX Offshore breached the 2014 License Agreement and 2015 Extension by engaging and assisting in the testing, modifying, reverse engineering, and development of MCR's Tools and intellectual property, both directly and by cooperation with a third party.[54] More specifically, SPEX Offshore engaged or assisted its affiliates and Directors, including but not limited to Oag, SPEX Services, and SPEX Engineering UK, in the testing, modifying, reverse engineering, and development of MCR's Tools. Specifically, SPEX Offshore (by and through its Directors) tested, modified, reverse engineered, and developed MCR's Tools for use in the SPEX Patents. SPEX Offshore also assisted and cooperated with SPEX Engineering UK, and its Directors, in testing, modifying, reverse engineering, and improving MCR's Tools and intellectual property to develop competing tools and products and for use in the SPEX Patents.

126.    Moreover, because SPEX Offshore and the other SPEX Defendants share common officers and Directors, the knowledge obtained by SPEX Offshore's Directors through the testing, modifying, reverse engineering, and developing MCR's Tools and intellectual property on behalf of SPEX Offshore, was imparted on the other SPEX Defendants and their Directors. These acts further establish cooperation with a third party in violation of the 2014 License Agreement and 2015 Extension.

127.    SPEX Offshore breached its agreement to use MCR's Tools and Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools, only in strict accordance with the terms of the agreement.[55] In fact, SPEX Offshore and Oag used MCR's Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools, to: (1) develop and design competing tools and products; (2) test, modify, reverse engineer, improve

---

[54] *Id*. at § 3.03.

[55] *Id*.

on and develop MCR's Tools and intellectual property; (3) file the SPEX Patents through its Directors and affiliates in an attempt to rebrand MCR's technology as its own; and (4) cooperate with third parties in performing these wrongful acts.

128.    SPEX Offshore breached its agreement to provide MCR with prompt notice of any development of, and all information necessary to, practice any Improvement to MCR's intellectual property.[56] Instead of complying with this provision, SPEX Offshore concealed the improvements and modifications it had made to MCR's Tools along with its design and development of competing tools and products. SPEX Offshore concealed this information from MCR in order to allow its affiliates and Directors to use the information to develop competing tools and products and to file the SPEX Patents.

129.    SPEX Offshore breached its agreement that all rights, title and interest to any Improvements to MCR's intellectual property, specifically including MCR's Licensed Patents and trade secrets, shall be exclusively owned by MCR.[57] SPEX Offshore concealed the improvements and modifications it made to MCR's Tools along with the development of competing tools and products. In addition, SPEX Offshore (by and through its affiliates and Directors) filed the SPEX Patents, seeking protection and ownership of the Improvements in direct violation of the 2014 License Agreement. SPEX Offshore, its affiliates and Oag now claim that the SPEX Patents are not Improvements, as that term is defined in the 2011 and 2014 License Agreements. In addition, the SPEX Defendants claim ownership of the SPEX Patents and have refused to assign or convey them to MCR.

130.    SPEX Offshore breached its agreement to assign and convey to MCR its entire right, title and interest to all Improvements, if any, including all applicable intellectual property

---

[56] *Id*. at § 3.04.

[57] *Id*.

rights related to any Improvements.[58] SPEX Offshore, its affiliates and Oag now claim that the SPEX Patents are not Improvements, as that term is defined in the 2011 and 2014 License Agreements. In addition, the SPEX Defendants claim ownership of the SPEX Patents and have refused to assign or convey them to MCR.

131.    SPEX Offshore breached the 2014 License Agreement by failing to promptly notify MCR of any third-party infringement or threatened infringement of MCR's Licensed Patents or Licensed Technology.[59] Although SPEX Offshore was aware of (and complicit in): (1) the filing and assignment of the SPEX Patents; (2) the testing, modifying, reverse engineering, and development of MCR's Tools and intellectual property; (3) the development of competing tools and products; and (4) the theft of MCR's trade secrets, it failed to notify MCR of such infringement or threatened infringement. SPEX Offshore also failed to notify MCR of the third-party infringement or threatened infringement by SPEX Services, SPEX Engineering UK and their Directors, including Oag.

132.    SPEX Offshore breached its agreement to protect MCR's Confidential Information, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools, and to use it only for purposes of the 2014 License Agreement.[60] SPEX Offshore disclosed MCR's trade secrets to its Directors and affiliates, including but not limited to SPEX Engineering UK, for use in filing the SPEX Patents and developing competing tools and products.

133.    SPEX Offshore breached the 2014 License Agreement by failing to cease all activities concerning and all use of MCR's Licensed Technology, which is defined to include

---

[58] *Id.*

[59] *Id.* at § 5.01.

[60] *Id.* at § 6.01.

MCR's trade secrets, thermite-based technology and solid combustible charge-based tools, upon expiration of the agreement, and to return the Licensed Technology to MCR.[61] SPEX Offshore (by and through its Directors and affiliates, including Oag) continues to use MCR's Licensed Technology to develop competing tools and products and in prosecuting the SPEX Patents.

134.    In addition to the breaches described above, former SPEX Offshore employee Robert McKay recently confirmed that SPEX Offshore violated and continues to violate the 2014 License Agreement and 2015 Extension. Based on a conversation with SPEX representative, McKay learned that the SPEX Defendants are currently developing a non-explosive cutter to cut pipe downhole. In other words, the SPEX Defendants are currently attempting to replicate MCR's Tools and intellectual property through development of competing tools and products.

135.    Finally, MCR has learned that representatives of the SPEX Defendants recently met at SPEX Group's office in Houston, Texas to finalize the development of a thermite-based or solid combustible charge-based tool or product, which they plan to launch in 2018. Upon information and belief, the SPEX Defendants sent agents to Texas and are utilizing a research center in Texas to assist in the testing and development of these competing tools or products.[62]

**L.    Numerous facts demonstrate unity between the SPEX Defendants and their utter disregard for the corporate form.**

**The SPEX Defendants share common stock ownership.**

136.    When SPEX Offshore was incorporated, it listed SPEX Services as its sole initial shareholder. All of SPEX Offshore's annual returns list SPEX Services as its sole shareholder.

---

[61] *Id.* at § 7.05.

[62] Based on documents produced by the SPEX Defendants, MCR has discovered the identity and location of the research center. However, these documents have been designated Attorney's Eyes Only.

137.    In SPEX Offshore UK's 2013, 2014, 2015 and 2016 annual returns, it disclosed SPEX Services as its sole shareholder.[63] SPEX Offshore UK did not disclose any new assets in its financial statements until the end of 2016. According to SPEX Offshore UK's 2016 financial statement, its immediate and ultimate parent company is SPEX Holdings.

138.    On May 5, 2016, SPEX Services transferred its 100% ownership of SPEX Offshore UK to SPEX Holdings.

139.    In its Annual Return dated February 2, 2016, SPEX Engineering UK listed SPEX Services as its shareholder.

140.    On or about April 25, 2016, SPEX Holdings became the parent company of SPEX Engineering UK "following a share for share transfer" with SPEX Services.

141.    In its 2016 annual report, SPEX Holdings disclosed that it owned 100% of SPEX Engineering UK, SPEX Offshore UK, and SPEX Engineering, Ltd. In that same return, SPEX Holdings also disclosed that it had disposed of its 100% ownership of SPEX Offshore, SPEX Services, and SPEX Production, Ltd.

142.    When SPEX Corporate Holdings was incorporated, it listed SPEX Holdings as an initial shareholder. SPEX Holdings is the parent/shareholder of SPEX Corporate Holdings, SPEX Engineering UK and SPEX Offshore UK. In addition, SPEX Engineering UK is the parent/shareholder of SPEX Group.

143.    In SPEX Holdings' March 3, 2017 confirmation statement, Oag, Strachan and Younger are disclosed as shareholders. In addition, Oag is listed as a Person with Significant Control.

---

[63] SPEX Offshore UK was formerly known as Hot Forge, Ltd. until its name change on June 30, 2016.

144.    In SPEX Holdings' March 5, 2018 confirmation statement, Oag, Strachan, Younger, Johnston and Mahjoub are disclosed as shareholders.

**The SPEX Defendants share common officers and Directors.**

145.    There is complete and total overlap between the officers and Directors of the SPEX Defendants:

|  | **Jamie Oag** | **Nadir Mahjoub** | **Ryan Strachan** |
|---|---|---|---|
| **SPEX Group** | Chief Executive Officer President | Chief Executive Officer | Manager Secretary |
| **SPEX Services** | Director | Director | Director |
| **SPEX Offshore** | Chief Executive Officer Director | Director | Director |
| **SPEX Engineering UK** | Chief Executive Officer Director | Director | Director |
| **SPEX Offshore UK** | Chief Executive Officer Director | Director | Director |
| **SPEX Holdings** | Director | Director | Director |
| **SPEX Corporate Holdings** | Director | Director | Director |

146.    In addition, Oag, Mahjoub and Strachan are Directors of all other entities in the SPEX corporate enterprise, including but not limited to SPEX Engineering, Ltd., SPEX Oil and Gas, Ltd., SPEX Oilfield, Ltd. and SPEX Saudi Arabia, LLC.

**The SPEX Defendants share financial statements.**

147.    On June 12, 2014, SPEX Services filed its "Annual Report and Consolidated Financial Statements for the Year Ended 31 December 2013." In the corporate registration records, it is labeled as "Group of companies' accounts made up to 31 December 2013."

148.    Likewise, on June 12, 2014, SPEX Offshore filed the same document — SPEX Services' "Annual Report and Consolidated Financial Statements for the Year Ended 31 December 2013." In the corporate registration records, it is labeled as "Consolidated accounts of parent company for subsidiary company period ending 31/12/13."

149.    On October 1, 2015, SPEX Services filed its "Annual Report for the Year Ended 31 December 2014." In the corporate registration records, it is labeled as "Group of companies' accounts made up to 31 December 2014." The report includes SPEX Services' consolidated financial statements.

150.    Likewise, on October 1, 2015, SPEX Offshore filed the same document — SPEX Services' "Annual Report for the Year Ended 31 December 2014." In the corporate registration records, it is labeled as "Consolidated accounts of parent company for subsidiary company period ending 31/12/14."

151.    On September 13, 2016, SPEX Services filed its "Annual Report and Financial Statements for the Year Ended 31 December 2015." In the corporate registration records, it is labeled as "Group of companies' accounts made up to 31 December 2015."

152.    Likewise, on September 16, 2016, SPEX Engineering UK filed the same document — SPEX Services' "Annual Report for the Year Ended 31 December 2015." In the corporate registration records, it is labeled as "Consolidated accounts of parent company for subsidiary company period ending 31/12/15."

153.     According to SPEX Offshore UK's 2016 financial statement, its statements are consolidated into the financial statements of SPEX Holdings.

**The SPEX Defendants' corporate email practice further demonstrates a blending of identities and disregard of the separation between corporate entities.**

154.     A mere cursory review of the SPEX Defendants' email practice, both internally and with MCR, demonstrates unity between the SPEX Defendants. It also demonstrates that their daily operations are not kept separate between and among affiliates.

155.     For example, on April 25, 2016, Barry Chapman, Operations Director of SPEX Offshore, sent an email to MCR regarding setting up a meeting between MCR, Oag and Mahjoub. Chapman sent the email from a SPEX Group email address (barry.chapman@spex-group.com) to other SPEX Group employees, along with JJ Welsh, a SPEX Engineering UK employee, at his SPEX Engineering UK email address (jj.welsh@spex-engineering.com).

156.     As a second example, on April 25, 2016, Mahjoub sent an internal email from his First Organization email address (nadir_mahjoubf4f@first_organization.com) to other SPEX Group employees regarding "MCR license."[64] The signature block on Mahjoub's email from his First Organization email account states his title as Chief Operating Officer of SPEX Group.

157.     As a third example, on June 3, 2016, Chapman sent an email to MCR and SPEX Group employees regarding "Return of MCR confidential information." Although Chapman sent the email from his SPEX Group email address, the signature block states his title as Operations Director of SPEX Offshore (licensee to the 2014 License Agreement and 2015 Extension). SPEX Group employee Steven McPhee, Logistics and Materials Coordinator of SPEX Holdings, responded to Chapman's email confirming delivery details.

---

[64] SPEX Offshore was dissolved into First Organization.

158.    As a fourth example, on May 17, 2016, SPEX Group employee Craig Lowe sent an email to MCR regarding "our obligations to our current license with MCR…" Lowe's signature block states his title as Global Operations Manager of SPEX Offshore. Although the email pertained solely to SPEX Offshore's alleged fulfillment of certain licensee obligations to MCR, Lowe used his SPEX Group email address (craig.lowe@spex-group.com) and copied four other SPEX Group employees with SPEX Group email addresses.

159.    As a fifth example, in a string of emails between July 26, 2016 and August 18, 2016, several SPEX Group and SPEX Engineering UK employees discuss the return of MCR inventory pursuant to the obligations set forth in the 2014 License Agreement and 2015 Extension between MCR and SPEX Offshore. However, no SPEX Offshore employee email addresses are included in the email string. Moreover, SPEX Group employee Andy Eaton's email address changes from andy.eaton@spex-group.com to andy.eaton@spex-engineering.com within the same email string.

160.    As a final example, on April 27, 2017, Chapman used his SPEX Offshore email address (barry.chapman@spex-offshore.com) instead of his SPEX Group email address to send an email regarding "MCR Casing Removal Tool Patent" to SPEX Engineering UK employee John Fox (john.fox@spex-engineering.com) and SPEX Group employee Andrew Pettitt (andrew.pettitt@spex-group.com).

161.    Once discovery continues, MCR will support these contentions, allegations and claims with additional detailed facts.

162.    MCR pleads all claims herein in the alternative.

## COUNT ONE – BREACH OF CONTRACT

163.    MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

164.    MCR entered into valid, binding contracts with SPEX Offshore and SPEX Services. All necessary and material terms were agreed to by the parties. MCR fully performed its obligations under the contracts. Alternatively, MCR's performance was excused by the acts of SPEX Offshore and SPEX Services.

165.    SPEX Offshore and SPEX Services breached and have failed to perform their obligations under the contracts, and are continuing to do so. As a result of these breaches, MCR has suffered actual, consequential, and incidental damages, as well as attorney's fees and costs of court. In addition to direct and actual damages, MCR seeks recovery of its out-of-pocket expenses, loss of use, lost profits, and pre-judgment interest.

166.    All conditions precedent necessary for MCR to recover in this action have been performed, occurred, or have been waived.

167.    Pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001, MCR is entitled to recover its reasonable and necessary attorney's fees for the investigation and prosecution of this action, including all trials and appeals.

## COUNT TWO – SPECIFIC PERFORMANCE

168.    MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

169.    SPEX Offshore and SPEX Services entered into valid, binding contracts with MCR. All necessary and material terms were agreed to by the parties. MCR did not repudiate or materially breach the contracts and has clean hands in the transactions.  MCR was ready, willing

and able to timely perform its obligations under the contracts and did perform its obligations under the contracts. Alternatively, MCR's performance was excused by the acts of SPEX Offshore and SPEX Services.

170.    There is no adequate remedy at law to compensate MCR for its loss and it cannot be fully compensated through the remedy of damages. MCR is therefore entitled to specific performance of SPEX Offshore and SPEX Services' obligation to assign, convey and transfer the SPEX Patents and all Improvements, as that term is defined in the contracts, to MCR.

## COUNT THREE - DECLARATORY JUDGMENT

171.    MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

172.    A dispute has arisen regarding the rights, responsibilities and obligations between the parties. Specifically, MCR claims that it is the rightful owner of all products, engineering, drawings, trade secrets, confidential information, and any other information related in any way to any thermite tool, thermite-based technology or solid combustible charge-based tool invented, developed, modified, or improved by or on behalf of the SPEX Defendants. Therefore, pursuant to 28 U.S.C.A. § 2201(a), MCR requests an order declaring that is the rightful owner of all products, engineering, drawings, trade secrets, confidential information, and any other information related in any way to any thermite tool, thermite-based technology or solid combustible charge-based tool invented, developed, modified, or improved by or on behalf of the SPEX Defendants.

173.    In addition, MCR claims that the SPEX Patents constitute Improvements, as that term is defined in the 2011 and 2014 License Agreements. The SPEX Defendants dispute that the SPEX Patents constitute Improvements and, as such, have been unwilling to assign, transfer

or convey the SPEX Patents to MCR pursuant to the terms of the 2011 and 2014 License Agreements and 2015 Extension. Therefore, pursuant to 28 U.S.C.A. § 2201(a), MCR requests an order declaring that the SPEX Patents constitute Improvements as defined in the 2011 and 2014 License Agreements and 2015 Extension.

174.     MCR's request for declaratory relief is supported by numerous underlying, viable causes of actions and judicially remediable rights, including claims for breach of contract, misappropriation of trade secrets, fraud and fraudulent inducement, tortious interference with contract and unfair competition.

175.     MCR is entitled to recover its reasonable and necessary attorney's fees for the investigation and prosecution of this action, including all trials and appeals.

### COUNT FOUR - MISAPPROPRIATION OF TRADE SECRETS UNDER THE TEXAS UNIFORM TRADE SECRETS ACT

176.     MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

177.     MCR owns valuable trade secrets. MCR uses its trade secrets in its business to obtain an advantage over competitors. MCR's trade secrets derive independent actual and potential value because they are not generally known or readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

178.     MCR takes active measures to protect the secrecy of its trade secrets by limiting access to and the disclosure of its trade secrets, limiting access to its offices, files, computers, and taking other security measures. MCR also requires its customers to enter into license agreements containing confidentiality provisions, which MCR has invested substantial time and resources developing and strengthening over the years.

**A.     The SPEX Defendants misappropriated MCR's trade secrets by acquiring them through improper means.**

179.     The SPEX Defendants acquired MCR's trade secrets by improper means, which is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, to limit use, or to prohibit discovery of a trade secret, or espionage through electronic or other means." TEX. CIV. PRAC. & REM. CODE § 134A.

**SPEX Services**

180.     In the 2011 License Agreement, SPEX Services falsely represented that it was not in the business of designing or developing thermite-based products or technology substantially similar to or competitive with MCR's Licensed Products and Licensed Technology, and that it had no intention of entering into any such business. SPEX Services made these false representations in order to acquire MCR's trade secrets by improper means. MCR acted and relied on these false representations in disclosing and licensing the use of its trade secrets to SPEX Services.

181.     In the 2011 License Agreement, SPEX Services agreed to maintain the secrecy of MCR's trade secrets. SPEX Services breached this duty by, among other things, disclosing MCR's trade secrets to its Directors and affiliates, including but not limited to Oag, Younger, Johnston, and the other SPEX Defendants.

182.     SPEX Services also agreed to limitations on the use of MCR's trade secrets. SPEX Services breached its duty to limit its use of MCR's trade secrets by, among other things, reverse engineering, developing, improving and modifying MCR's Tools for the benefit of SPEX Services and its Directors and affiliates, and the other SPEX Defendants, and filing patents for competing or substantially similar tools and products derived from MCR's trade secrets.

**SPEX Offshore**

183.    In the 2014 License Agreement and 2015 Extension, SPEX Offshore falsely represented that it had not invented, designed, developed, or improved (nor contributed to inventing, designing, developing or improving) any technology or products for the perforating, consuming or cutting of downhole pipes using any part of MCR's Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools. SPEX Offshore also falsely represented that it was not aware of any person or entity having done so.

184.    SPEX Offshore also falsely represented that it was not in the business of designing or developing thermite-based products or technology substantially similar to or competitive with MCR's Licensed Products and Licensed Technology, and that it had no intention of entering into any such business. SPEX Offshore made these false representations in order to acquire MCR's trade secrets by improper means. MCR acted and relied on these false representations in disclosing and licensing the use of its trade secrets to SPEX Offshore.

185.    In the 2014 License Agreement and 2015 Extension, SPEX Offshore agreed to maintain the secrecy of MCR's trade secrets. SPEX Offshore breached this duty by, among other things, disclosing MCR's trade secrets to its Directors and affiliates, including but not limited to Oag, Younger, Johnston, and the other SPEX Defendants.

186.    SPEX Offshore also agreed to limit its use of MCR's trade secrets. SPEX Offshore breached its duty to limit its use of MCR's trade secrets by, among other things, reverse engineering, developing, improving and modifying MCR's Tools for the benefit of SPEX Offshore and its Directors and affiliates, including the other SPEX Defendants.

**Jamie Oag**

187.    In the 2014 License Agreement and 2015 Extension, Oag falsely represented that SPEX Offshore had not invented, designed, developed, or improved (nor contributed to inventing, designing, developing or improving) any technology or products for the perforating, consuming or cutting of downhole pipes using any part of MCR's Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools. Oag also falsely represented that SPEX Offshore was not aware of any person or entity having done so.

188.    In addition, Oag falsely represented that SPEX Offshore was not in the business of designing or developing thermite-based products or technology substantially similar to or competitive with MCR's Licensed Products and Licensed Technology, and that it had no intention of entering into any such business. Oag made these false representations in order to acquire MCR's trade secrets by improper means. MCR acted and relied on these false representations in disclosing and licensing the use of its trade secrets to Oag and SPEX Offshore.

189.    In the 2014 License Agreement and 2015 Extension, Oag agreed to maintain the secrecy of MCR's trade secrets. Oag breached this duty by, among other things, disclosing MCR's trade secrets to SPEX Offshore's Directors and affiliates, including but not limited to Younger, Johnston, and the other SPEX Defendants.

190.    Oag also agreed, on behalf of SPEX Offshore, to limit SPEX Offshore's use of MCR's trade secrets. Oag breached this duty to limit SPEX Offshore's use of MCR's trade secrets by, among other things, reverse engineering, developing, improving and modifying MCR's Tools for the benefit of SPEX Offshore and its Directors and affiliates, and the other SPEX Defendants.

### SPEX Group, SPEX Offshore UK and SPEX Engineering UK

191.    SPEX Group, SPEX Offshore UK and SPEX Engineering UK induced SPEX Services, SPEX Offshore and Oag to breach their duties to maintain secrecy and to limit their use of MCR's trade secrets. In addition, at the time SPEX Group, SPEX Offshore UK and SPEX Engineering UK acquired MCR's trade secrets, they knew or had reason to know that SPEX Services, SPEX Offshore and Oag had acquired MCR's trade secrets through improper means.

### SPEX Holdings and SPEX Corporate Holdings

192.    SPEX Holdings and SPEX Corporate Holdings induced SPEX Services, SPEX Offshore and Oag to breach their duties to maintain secrecy and to limit their use of MCR's trade secrets. In addition, at the time SPEX Holdings and SPEX Corporate Holdings acquired MCR's trade secrets, they knew or had reason to know that SPEX Services, SPEX Offshore and Oag, and the other SPEX Defendants, had acquired MCR's trade secrets through improper means.

**B.    The SPEX Defendants misappropriated MCR's trade secrets by using or disclosing them without MCR's consent.**

### SPEX Services

193.    As set forth above, SPEX Services acquired knowledge of MCR's trade secrets by improper means. SPEX Services disclosed and used MCR's trade secrets without consent by, among other things: (a) disclosing MCR's trade secrets to its affiliates and other persons, including but not limited to Oag, Younger, Johnston, and the other SPEX Defendants; (b) using MCR's trade secrets to reverse engineer, develop, improve and modify MCR's Tools for the benefit of SPEX Services and its Directors and affiliates, and the other SPEX Defendants; (c) using MCR's trade secrets to develop competing tools and products; and (d) using MCR's trade secrets to file patents for competing or substantially similar tools and products either directly or through its Directors and affiliates.

194.   At the time SPEX Services disclosed or used MCR's trade secrets without consent, it knew that its knowledge of MCR's trade secrets was: (a) derived from or through a person who had used improper means to acquire the trade secrets; (b) acquired under circumstances giving rise to a duty to maintain secrecy and limit use; or (c) derived from or through a person who owed a duty to maintain the secrecy or limit use of MCR's trade secrets.

**SPEX Offshore**

195.   As set forth above, SPEX Offshore acquired knowledge of MCR's trade secrets by improper means. SPEX Offshore disclosed and used MCR's trade secrets without MCR's consent by, among other things: (a) disclosing MCR's trade secrets to its affiliates and other persons, including but not limited to Oag, Younger, Johnston, and the other SPEX Defendants; (b) using MCR's trade secrets to reverse engineer, develop, improve and modify MCR's Tools for the benefit of SPEX Services and its Directors and affiliates, and the other SPEX Defendants; (c) using MCR's trade secrets to develop competing tools and products; and (d) using MCR's trade secrets to file patents for competing or substantially similar tools and products either directly or through its Directors and affiliates.

196.   At the time SPEX Offshore disclosed or used MCR's trade secrets without its consent, SPEX Offshore knew that its knowledge of MCR's trade secrets was: (a) derived from or through a person who had utilized improper means to acquire the trade secrets; (b) acquired under circumstances giving rise to a duty to maintain secrecy and limit use; or (c) derived from or through a person who owed a duty to maintain secrecy or limit use of MCR's trade secrets.

**Jamie Oag**

197.   As set forth above, Oag acquired knowledge of MCR's trade secrets by improper means. Oag disclosed and used MCR's trade secrets without MCR's consent by, among other

things: (a) disclosing MCR's trade secrets to the SPEX Defendants and their Directors, including but not limited to Younger, Johnston, and the other SPEX Defendants; (b) using MCR's trade secrets to reverse engineer, develop, improve and modify MCR's Tools for his personal benefit and the benefit of the SPEX Defendants and their Directors, and the other SPEX Defendants; (c) using MCR's trade secrets to develop competing tools and products; and (d) using MCR's trade secrets to file patents for competing or substantially similar tools and products.

198.    At the time Oag disclosed or used MCR's trade secrets without its consent, he knew that his knowledge of MCR's trade secrets was: (a) derived from or through a person who had utilized improper means to acquire the trade secrets; (b) acquired under circumstances giving rise to a duty to maintain secrecy and limit use; or (c) derived from or through a person who owed a duty to maintain secrecy or limit use of MCR's trade secrets.

### SPEX Group, SPEX Offshore UK and SPEX Engineering UK

199.    As set forth above, SPEX Group, SPEX Offshore UK and SPEX Engineering UK acquired knowledge of MCR's trade secrets by improper means. SPEX Group, SPEX Offshore UK and SPEX Engineering UK disclosed and used MCR's trade secrets without MCR's consent by, among other things: (a) disclosing MCR's trade secrets to its affiliates and other persons, including but not limited to Oag, Younger, Johnston, SPEX Holdings and SPEX Corporate Holdings; (b) using MCR's trade secrets to reverse engineer, develop, improve and modify MCR's Tools for their own benefit or the benefit of their Directors and affiliates, and the other SPEX Defendants; (c) using MCR's trade secrets to develop competing tools and products; and (d) using MCR's trade secrets to file patents for competing or substantially similar tools and products either directly or through their Directors and affiliates.

200.    At the time SPEX Group, SPEX Offshore UK and SPEX Engineering UK disclosed or used MCR's trade secrets without its consent, SPEX Group, SPEX Offshore UK and SPEX Engineering UK knew that their knowledge of MCR's trade secrets was: (a) derived from or through a person who had utilized improper means to acquire the trade secrets; (b) acquired under circumstances giving rise to a duty to maintain secrecy and limit use; or (c) derived from or through a person who owed a duty to maintain secrecy or limit use of MCR's trade secrets.

### SPEX Holdings and SPEX Corporate Holdings

201.    As set forth above, SPEX Holdings and SPEX Corporate Holdings acquired knowledge of MCR's trade secrets by improper means. SPEX Holdings and SPEX Corporate Holdings disclosed and used MCR's trade secrets without MCR's consent by, among other things: (a) disclosing MCR's trade secrets to its affiliates and other persons, including but not limited to Oag, Younger, and Johnston; (b) using MCR's trade secrets to reverse engineer, develop, improve and modify MCR's Tools for their own benefit or the benefit of their Directors and affiliates, and the other SPEX Defendants; (c) using MCR's trade secrets to develop competing tools and products; and (d) using MCR's trade secrets to file patents for competing or substantially similar tools and products either directly or through their Directors and affiliates.

202.    At the time SPEX Holdings and SPEX Corporate Holdings disclosed or used MCR's trade secrets without its consent, SPEX Holdings and SPEX Corporate Holdings knew that their knowledge of MCR's trade secrets was: (a) derived from or through a person who had utilized improper means to acquire the trade secrets; (b) acquired under circumstances giving rise to a duty to maintain secrecy and limit use; or (c) derived from or through a person who owed a duty to maintain secrecy or limit use of MCR's trade secrets.

**Jamie Oag**

203.    As set forth above, Oag acquired knowledge of MCR's trade secrets by improper means. Oag disclosed and used MCR's trade secrets without MCR's consent by, among other things: (a) disclosing MCR's trade secrets to the SPEX Defendants and their Directors, including but not limited to Younger, Johnston, and the other SPEX Defendants; and (b) using MCR's trade secrets to reverse engineer, develop, improve and modify MCR's Tools for his own benefit and that of the SPEX Defendants and their Directors and affiliates.

204.    At the time Oag disclosed or used MCR's trade secrets without its consent, Oag knew that his knowledge of MCR's trade secrets was: (a) derived from or through a person who had utilized improper means to acquire the trade secrets; (b) acquired under circumstances giving rise to a duty to maintain secrecy and limit use; or (c) derived from or through a person who owed a duty to maintain secrecy or limit use of MCR's trade secrets.

**C.    Damages and injunctive relief.**

205.    MCR requests that the Court order the SPEX Defendants to pay all damages for actual loss, lost profits, unjust enrichment, head-start damages or, in lieu of damages measured by other methods, imposition of a reasonable royalty for the SPEX Defendants' unauthorized disclosure and use of MCR's trade secrets.

206.    The SPEX Defendants' conduct in misappropriating MCR's trade secrets was willful and malicious. As a result, MCR is entitled to an award of exemplary damages. TEX. CIV. PRAC. & REM. CODE § 134A.004(b).

207.    In addition to damages, MCR will be irreparably harmed if the SPEX Defendants are allowed to continue or further benefit from their unlawful acts. Pursuant to TEX. CIV. PRAC.

& REM. CODE § 134A.004(a), MCR requests that the SPEX Defendants be enjoined from disclosing or using, or further disclosing or using, MCR's trade secrets.

208.     Pursuant to TEX. CIV. PRAC. & REM. CODE §134A.005, MCR is entitled to recover its reasonable and necessary attorney's fees for the investigation and prosecution of this action, including all trials and appeals.

### COUNT FIVE – MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT

209.     MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

210.     MCR owns valuable trade secrets related to a product or service used in interstate or foreign commerce. MCR has invested considerable time, effort, and financial resources to develop and protect its trade secrets. MCR has treated the information as confidential and has protected the information from discovery by third parties. The information gives MCR a competitive advantage over others in the marketplace who do not know of or how to use it.

211.     The SPEX Defendants have misappropriated and wrongfully exploited MCR's trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1832, *et seq*. The SPEX Defendants have, without MCR's authorized consent, used or intended to use MCR's trade secrets in interstate or foreign commerce.

212.     MCR requests that the Court order the SPEX Defendants to pay all damages for actual loss, any unjust enrichment not addressed in computing damages for actual loss, head-start damages or, in lieu of damages measured by other methods, damages measured by imposition of a reasonable royalty for the SPEX Defendants' unauthorized disclosure and use of MCR's trade secrets.

213.    The SPEX Defendants' actions in misappropriating MCR's trade secrets were willful and malicious, entitling MCR to exemplary damages under 18 U.S.C. § 1836(3)(C) and an award of reasonable attorney's fees under 18 U.S.C. § 1836(3)(D).

214.    Pursuant to 18 U.S.C. § 1836(3), MCR requests that the SPEX Defendants be enjoined from disclosing or using, or further disclosing or using, MCR's trade secrets and confidential information. MCR further requests an injunction requiring the SPEX Defendants to take all necessary affirmative actions to ensure protection of MCR's trade secrets.

215.    Wrongful acts in furtherance of the SPEX Defendants' misappropriation under the Defend Trade Secrets Act were committed in the United States.

### COUNT SIX - UNFAIR COMPETITION UNDER TEXAS LAW

216.    MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

217.    MCR owns valuable confidential and proprietary information and know-how. MCR created its confidential and proprietary information and know-how through extensive time, labor, skill and money. The SPEX Defendants misappropriated and used MCR's confidential and proprietary information and know-how in competition with MCR, thereby gaining a special advantage in that competition (*i.e.,* a "free ride") because the SPEX Defendants were burdened with little or none of the expense incurred by MCR.

218.    The SPEX Defendants' misappropriation and unauthorized use of MCR's confidential and proprietary information and know-how has caused MCR actual, consequential, and incidental damages, as well as attorney's fees and costs of court.

219.    Moreover, the SPEX Defendants' misappropriation of MCR's confidential and proprietary information and know-how will continue to have a significant negative effect on

MCR's business. MCR believes that SPEX's use of MCR's confidential and proprietary information and know-how will continue unless enjoined by the Court. MCR therefore requests a preliminary and permanent injunction due to the irreparable harm caused by the misappropriation and use of MCR's confidential and proprietary information and know-how.

### COUNT SEVEN – COMMON LAW FRAUD AND FRAUDULENT INDUCEMENT[65]

220.    MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

221.    At the time the parties entered into the 2011 and 2014 License Agreements and 2015 Extension, SPEX Services, SPEX Offshore and Oag made material misrepresentations and omissions to MCR, which were false, and which were known to be false when made or were asserted recklessly or without knowledge of their truth. SPEX Services, SPEX Offshore and Oag intended MCR to act and rely upon these misrepresentations, and MCR did act and rely on these misrepresentations in entering into the 2011 and 2014 License Agreements and 2015 Extension, causing MCR injury. It was reasonable for MCR to act and rely on these misrepresentations, as they were part of the express terms of the agreement in the 2011 and 2014 License Agreements and 2015 Extension.

222.    SPEX Services, SPEX Offshore and Oag made these material misrepresentations in order to induce MCR to enter into the 2011 and 2014 License Agreements and 2015 Extension, and to benefit from MCR's performance of the agreements. MCR would not have entered into the 2011 and 2014 License Agreements and 2015 Extension had it known that the

---

[65] MCR recognizes that fraudulent inducement and common law fraud are separate causes of action. MCR has elected to plead them together solely for purposes of identifying the fraudulent representations and omissions for purposes of complying with Federal Rule of Civil Procedure 9(b) and to avoid any further challenge by the SPEX Defendants through yet another motion to dismiss.

representations were false or that SPEX Services, SPEX Offshore and Oag did not intend to bind themselves to the terms of the agreement.

223.    MCR has sufficiently alleged the time, place and contents of the false representation(s), as well as the identity of the person making the misrepresentation(s) and what that person or entity obtained by making the misrepresentation(s).

224.    Moreover, the acts by SPEX Services, SPEX Offshore and Oag post-execution of the 2011 and 2014 License Agreements and 2015 Extension indicate that they never intended to comply with the terms of the agreements. Instead, SPEX Services, SPEX Offshore and Oag used the license agreements merely as a vehicle to misappropriate MCR's trade secrets and confidential and proprietary information for their own benefit and for the benefit of the other SPEX Defendants.

225.    MCR has been damaged as a result of the SPEX Services, SPEX Offshore, and Oag's fraud and fraudulent inducement and is entitled to damages, pre- and post-judgment interest, costs and attorney's fees.

### COUNT EIGHT – TORTIOUS INTERFERENCE WITH AN EXISTING CONTRACT

226.    MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

227.    MCR had contracts with SPEX Offshore and SPEX Services, in the form of license agreements, subject to interference. Oag, SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings, and SPEX Corporate Holdings willfully and intentionally interfered with the contracts proximately causing injury to MCR. As a result of the interference by Oag, SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings, MCR has suffered actual damages or loss.

## COUNT NINE – ALTER EGO/PIERCING THE CORPORATE VEIL

228.    MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

229.    By forming SPEX Offshore, SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings for the specific purpose of: (1) testing, modifying, reverse engineering, and developing of MCR's Tools and intellectual property in violation of the 2011 License Agreement, 2014 License Agreement and 2015 Extension, both directly and by cooperation with affiliates; and (2) filing, assigning, and holding the SPEX Patents, SPEX Services, SPEX Offshore and Oag used the corporate form as an unfair device to achieve an inequitable result; specifically, theft of MCR's trade secrets, development of competing tools and products, and ownership of all Improvements and the SPEX Patents.

230.    SPEX Offshore, SPEX Services and Oag also used the corporate form to evade or avoid their legal obligations. SPEX Services, SPEX Offshore and Oag had, among other obligations, a duty to protect MCR's trade secrets and confidential information, and to use MCR's Tools and intellectual property in strict accordance with the terms of the respective license agreements. Instead of fulfilling these duties, SPEX Services, SPEX Offshore and Oag— through affiliates and common officers and Directors—created sham entities, changed corporate names, diverted corporate assets, and dissolved corporate entities to escape legal and contractual liabilities. In doing so, SPEX Services, SPEX Offshore and Oag deceived and violated confidences owed to MCR.

231.    As affiliates of SPEX Services and SPEX Offshore, SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings, and those in common and majority control of these entities (including Oag), used the corporate form for the

purpose of perpetrating an actual fraud on MCR for the direct benefit of Oag, SPEX Services and

SPEX Offshore, their common officers and Directors, and the other SPEX Defendants.

232.    The conduct of SPEX Services, SPEX Offshore and Oag involved dishonesty of

purpose, actual fraud and intent to deceive. The corporate form should be disregarded because

SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate

Holdings are alter egos of SPEX Services, SPEX Offshore and Oag. The corporate form of

SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate

Holdings should be disregarded because these entities were organized and operated by SPEX

Services, SPEX Offshore and Oag as mere tools or business conduits, or alter egos of

themselves, by those in common and majority ownership and control of both entities. As

affiliates of each other, with common majority owners, the SPEX Defendants have or had a

direct financial interest in each other.

233.    Moreover, there is such a unity between the SPEX Defendants and a blurring of

identities that the separateness of SPEX Services, SPEX Offshore and Oag on the one hand, and

SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings, SPEX Corporate

Holdings and Oag, on the other hand, never existed or has ceased to exist. Holding only SPEX

Services and SPEX Offshore liable for their contractual obligations would result in an injustice

in that SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings, SPEX

Corporate Holdings and Oag would be allowed to reap the benefits of SPEX Services and SPEX

Offshore's wrongful conduct, escape or avoid liability, and walk away with MCR's intellectual

property rebranded as their own.

234.    The SPEX Defendants, and each of them, used assets of each of the other SPEX

Defendants for their own purposes as though the assets were their own, and caused assets to be

transferred between them or to entities they controlled. In addition, the SPEX Defendants each directly and indirectly controlled each other. Each of the SPEX Defendants also has or had direct and indirect control of the other, including the power to direct or cause the direction of the management and polices of the other. Finally, the SPEX Defendants exercised active control over the day-to-day affairs of each other.

235.    For these reasons, SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings, SPEX Corporate Holdings and Oag may be held liable for the tortious acts and fraudulent conduct of SPEX Services, SPEX Offshore and Oag, in as much as these persons or entities are alter egos of SPEX Services, SPEX Offshore and Oag. Given that the two contractually-bound entities purposefully changed names and diverted all assets prior to their dissolution, holding only SPEX Services and SPEX Offshore liable would result in an injustice.

236.    Conversely, SPEX Services and SPEX Offshore may be held liable for the tortious acts and fraudulent conduct of Oag, SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings, in as much as these entities are alter egos of Oag, SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings. Holding only Oag, SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings for their conduct would result in an injustice.

237.    In addition, MCR alleges that because SPEX Services, SPEX Offshore and Oag perpetrated an actual fraud on MCR, Oag, SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings should be held liable for the existing legal and contractual obligations of SPEX Services and SPEX Offshore. Adherence to the fiction of the separate existence of SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX

Holdings and SPEX Corporate Holdings as entities distinct from SPEX Services, SPEX Offshore and Oag would permit an abuse of the corporate privilege, sanction fraud and promote injustice.

238.     Because this action involves assets located in Texas and transactions that took place in Texas, this action is brought pursuant to Texas law, including the Texas Business Corporations Act, TEX. BUS. ORGS. CODE § 21.001 *et seq.*

### COUNT TEN – DENUDING THE CORPORATION

239.     MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

240.     The SPEX Defendants deliberately stripped SPEX Services and SPEX Offshore of their assets prior to dissolution. In addition, the SPEX Defendants engaged in conduct to divert company assets between and among affiliates that are within control of the SPEX Defendants, including Oag. This rendered SPEX Services and SPEX Offshore incapable of paying their debts. Therefore, the SPEX Defendants denuded the corporations and are liable for damages resulting from the MCR's claims against SPEX Services and SPEX Offshore.

### COUNT ELEVEN - CONSPIRACY

241.     MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

242.     The SPEX Defendants, through a combination of two or more persons, sought to accomplish an unlawful objective. The SPEX Defendants reached a meeting of the minds to achieve their unlawful objective and committed numerous overt acts in pursuit of their objective.

243.     The objective of the SPEX Defendants' conspiracy was to: (1) gain access to MCR's trade secrets, Licensed Technology, Licensed Patents, Licensed Products and confidential and proprietary information; (2) reverse engineer, modify, improve, and develop

MCR's trade secrets and confidential and proprietary information into competing tools and products; and (c) apply for and obtain patents using MCR's trade secrets, Licensed Technology, Licensed Patents, Licensed Products and confidential and proprietary information, all without MCR's detection.

244.    As a direct and proximate result of the SPEX Defendants' conduct, MCR has suffered damages and the SPEX Defendants have been unjustly enriched. MCR further seeks an award of attorney's fees, interest and court costs.

245.    The SPEX Defendants' conduct was malicious and done with an intentional disregard of MCR's rights, thereby entitling MCR to an award of punitive damages.

246.    The SPEX Defendants and their officers, directors, agents and employees aided and abetted each other in these tortious acts. As a result of their conduct, conspiracy and scheme, each SPEX Defendant is jointly and severally liable for MCR's damages.

## APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTION

247.    MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

248.    Pursuant to Section 12.07 of the 2011 License Agreement, SPEX Services acknowledged that any breach of the agreement would irreparably harm MCR, that damages would be an inadequate remedy, and that injunctive relief would be appropriate to protect MCR's rights in its Licensed Technology, which includes MCR's confidential and proprietary information, trade secrets, thermite-based technology and solid combustible charge-based tools.

249.    Pursuant to Section 9.07 of the 2014 License Agreement, SPEX Offshore and Oag acknowledged that any breach of the agreement would irreparably harm MCR, that damages would be an inadequate remedy, and that injunctive relief would be appropriate to protect

MCR's rights in its Licensed Technology, which includes MCR's trade secrets, confidential and proprietary information, thermite-based technology and solid combustible charge-based tools.[66]

250.     MCR will suffer immediate irreparable injury if SPEX Services, SPEX Offshore and Oag are allowed to continue using MCR's valuable confidential and proprietary information, trade secrets, and intellectual property, either directly or through their affiliates, including SPEX Group, SPEX Engineering UK, SPEX Holdings, SPEX Corporate Holdings and SPEX Offshore UK. As a result of the actions of SPEX Services, SPEX Offshore and their affiliates, and Oag, MCR will be irreparably harmed due to SPEX Services and SPEX Offshore's breaches of the 2011 and 2014 License Agreements and 2015 Extension and their use and disclosure of MCR's trade secrets and confidential and proprietary information.

251.     MCR believes that the SPEX Defendants intend to continue using MCR's valuable trade secrets, confidential and proprietary information, and intellectual property. It is clear that the SPEX Defendants have no regard for the promises and agreements SPEX Services, SPEX Offshore and Oag made in the 2011 and 2014 License Agreements and 2015 Extension. It is also clear that the SPEX Defendants intend to use MCR's valuable trade secrets, confidential and proprietary information, and intellectual property for their own benefit.

252.     Moreover, there is no adequate remedy at law to compensate MCR for the damage inflicted by, among other unlawful acts, SPEX Services and SPEX Offshore's numerous breaches of the 2011 and 2014 License Agreements and 2015 Extension, the SPEX Defendants' misappropriation of MCR's trade secrets and confidential and proprietary information, and the disclosure or use of such information by the SPEX Defendants in competition with MCR.

---

[66] In the 2015 Extension, SPEX Offshore agreed that no other terms shall be affected except as "specifically and explicitly amended." Exhibit C. The parties did not amend the terms of Section 9.07.

253.    In addition to the strong language of Section 12.07 of the 2011 License Agreement and Section 9.07 of the 2014 License Agreement, SPEX has possession of MCR's trade secrets and confidential and proprietary information. And when a defendant possesses trade secrets and is in a position to use them, harm to the trade secret owner may be presumed.[67]

254.    Under circumstances like these, where the SPEX Defendants' entire corporate enterprise was built upon the theft of MCR's trade secrets and confidential and proprietary information, and where the stolen trade secrets are "inextricably intertwined" with the SPEX Defendants' business operations, an injunction prohibiting the SPEX Defendants from using those trade secrets is appropriate and warranted. There is no way for the SPEX Defendants to "unlearn" or divorce their knowledge of the misappropriated trade secrets from future business operations to which those trade secrets relate or concern.

255.    MCR is substantially likely to prevail on the merits of its claims. The injury to MCR greatly outweighs any injury to the SPEX Defendants that the requested injunction may cause. The balance of hardships tips strongly in favor of MCR. Finally, the injunction will not disserve the public interest. Therefore, MCR is entitled to preliminary and permanent injunctive relief against the SPEX Defendants as set forth more fully herein.

256.    Unless the SPEX Defendants are preliminarily and permanently enjoined, MCR will be irreparably harmed. Therefore, MCR requests that after a hearing is set, a preliminary injunction be awarded and after final trial on the merits, MCR be awarded a permanent injunction ordering as follows:

---

[67] *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 200 (Tex. App.—Fort Worth 2005, no pet.)*; T–N–T Motorsports, Inc. v. Hennessey Motorsports,* 965 S.W.2d 18, 24 (Tex. App.—Houston [1st Dist.] 1998, no pet.) (holding that appellant possessed confidential information and was in a position to use it; thus, appellant was likely to use information to former employer's detriment). The threatened disclosure of trade secrets constitutes irreparable injury as a matter of law. *Bell Helicopter*, 160 S.W.3d at 200; *Williams v. Compressor Eng'g Corp.,* 704 S.W.2d 469, 471 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (citing *FMC Corp. v. Varco Int'l, Inc.,* 677 F.2d 500, 503 (5th Cir.1982)).

a. The SPEX Defendants, and anyone in concert with them, shall immediately cease the development, marketing or sale of any thermite-based tools or products, solid combustible charge-based tools or products, or any tools or products related in any way to thermite-based technology or solid combustible charge-based technology;

b. The SPEX Defendants, and anyone in concert with them, shall immediately return and cease the use and disclosure of all MCR's trade secrets, confidential and proprietary information and all MCR's products or any documents or products related to thermite-based technology or solid combustible charge-based tools or products in their possession;

c. The SPEX Defendants, and anyone in concert with them, shall immediately return and cease the use and disclosure of all notes, memorandums, or copies of MCR's trade secrets, confidential and proprietary information that relate to the 2011 License Agreement, or to any thermite-based technology or solid combustible charge-based tools or products developed by, or on behalf of, any of the SPEX Defendants;

d. The SPEX Defendants, and anyone in concert with them, shall immediately return and cease the use and disclosure of all notes, memorandums, or copies of MCR's trade secrets, confidential and proprietary information that relate to the 2014 License Agreement, or to any thermite-based technology or solid combustible charge-based tools or products developed by, or on behalf of, any of the SPEX Defendants;

e. The SPEX Defendants, and anyone in concert with them, shall not use, disclose or transfer to any third party any records, communications, documents, and/or electronic data, or records, documents, and electronic data that belongs to MCR, relates to MCR's trade secrets, confidential and proprietary information or the 2011 License Agreement, or any thermite-based technology or solid combustible charge-based tools or products developed by, or on behalf of, the SPEX Defendants or was in any way derived from MCR's trade secrets or confidential and proprietary information, that is in their possession, for any purpose other than its return to MCR;

f. The SPEX Defendants, and anyone in concert with them, shall not use, disclose or transfer to any third party any records, communications, documents, and/or electronic data, or records, documents, and electronic data that belongs to MCR, relates to MCR's trade secrets or confidential and proprietary information or the 2014 License Agreement, or any thermite-based technology or solid combustible charge-based tools or products developed by, or on behalf of, the SPEX Defendants or was in any way derived from MCR's trade secrets or confidential and proprietary information, that is in their possession, for any purpose other than its return to MCR;

g. The SPEX Defendants, and anyone in concert with them, shall not destroy, delete, hide, secret, or otherwise remove from the jurisdiction of this Court any communications, documents, records, discs, drawings, photographs, or any other written or electronic documents or media which contains or describes any MCR records, documents, and/or electronic data, or relates to MCR's trade secrets or confidential and proprietary information, or any records, documents, and electronic data that was derived from MCR's records, documents, and/or electronic data, or relates to MCR's trade secrets or confidential and proprietary information;

h. The SPEX Defendants, and anyone in concert with them, shall return all documents containing MCR's trade secrets or confidential and proprietary information and all copies of such information;

i. The SPEX Defendants, and anyone in concert with them, shall destroy all electronically recorded or stored copies of MCR's trade secrets and confidential and proprietary information including such information stored on mobile phones, personal computers, or from any other device owned or controlled by the SPEX Defendants, with a statement under oath from an officer of each of the SPEX Defendants that such action has been completed;

j. The SPEX Defendants, and anyone in concert with them, shall immediately cease obtaining, downloading, using or disclosing MCR's trade secrets and confidential and proprietary information;

k. The SPEX Defendants, and anyone in concert with them, shall immediately cease manufacturing any thermite technology, thermite-based tools or products or solid combustible charge-based tools or products;

l. The SPEX Defendants shall immediately execute all necessary documents to fully comply with the terms of the 2011 and 2014 License Agreements and 2015 Extension.

## TOLLING OF LIMITATIONS - DISCOVERY RULE

257. MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

258. To the extent necessary, MCR affirmatively pleads the discovery rule. The SPEX Defendants' wrongful conduct was both inherently undiscoverable and objectively verifiable. As such, MCR claims are not precluded by the statute of limitations.

259. MCR did not know, and through the exercise of due diligence, could not have known, of the SPEX Defendants' wrongful conduct giving rise to MCR's claims and damages. The matters themselves were objectively verifiable, but the failure of the SPEX Defendants to provide information such that MCR could know of the events and the injury means that limitations were tolled until such time as MCR knew or using reasonable diligence could have known of the facts giving rise to its claims. MCR is entitled to application of the discovery rule, whereby a cause of action accrues either when the injury is discovered or when facts giving rise to its claims might reasonably be discovered through reasonable diligence.

## TOLLING OF LIMITATIONS – FRAUDULENT CONCEALMENT

260. MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

261. To the extent necessary, MCR affirmatively pleads fraudulent concealment, whereby the statute of limitations is tolled when the actions of a defendant prevent the plaintiff from discovering the facts giving rise to its claims. The SPEX Defendants knew of the facts giving rise to MCR's claims and had a duty to disclose these material facts to MCR. The SPEX Defendants knew that MCR was unaware of the facts and lacked an equal opportunity to discover such facts, but the SPEX Defendants were deliberately silent when they had a duty to speak. Instead of disclosing their wrongful conduct to MCR, the SPEX Defendants actively made misrepresentations and took measures to conceal it. Any applicable statutes of limitation have been tolled by the knowing and active concealment and denial of material facts known by the SPEX Defendants when they had a contractual or other duty to disclose those facts.

262. The SPEX Defendants are estopped from asserting a statute of limitations defense due to their failure to disclose, among other things, the following: (1) Improvements made to

MCR's Tools and intellectual property; (2) the development of competing tools and products; (3) the filing of the SPEX Patents; (4) breach of the 2011 and 2014 License Agreements and 2015 Extension; (5) the unauthorized use and misappropriation of MCR's trade secrets and confidential and proprietary information.

263.    The SPEX Defendants are further estopped from asserting a statute of limitations defense due to their fraud, which they committed through affirmative misrepresentations and omissions. As a result of the SPEX Defendants' fraudulent concealment, MCR was unaware and could not have known through reasonable diligence that the SPEX Defendants had committed the wrongful conduct giving rise to MCR's claims.

## CONDITIONS PRECEDENT

264.    All conditions precedent to MCR's claims for relief have been performed or have occurred.

## REQUEST FOR JURY TRIAL

265.    MCR requests a trial by jury on all triable issues and has paid the required fee.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that Defendants SPEX Offshore, Ltd., SPEX Services, Ltd., SPEX Group US, LLC, SPEX Offshore (UK) Ltd., SPEX Engineering (UK), Ltd., SPEX Group Holdings, Ltd., SPEX Corporate Holdings, Ltd., and Jamie Oag be cited to appear and answer, and that upon a final hearing of the cause, judgment be entered for Plaintiff and against Defendants as follows:

a.    A preliminary and permanent injunction restraining Defendants from the actions described above;

b.    All damages suffered by Plaintiff;

c.    Specific performance;

d.      All pre-judgment and post-judgment interest as allowed by law;

e.      Costs of court;

f.      Attorney's fees; and

g.      Such other and further relief, at law or in equity, to which Plaintiff may show itself to be justly entitled.

**Dated: August 30, 2018.**

Respectfully submitted,

/s/ Blake L. Beckham
Blake L. Beckham
State Bar No. 02016500
Blake@beckham-group.com
Jose M. Portela
State Bar No. 90001241
Jose@beckham-group.com
THE BECKHAM GROUP P.C.
3400 Carlisle, Suite 550
Dallas, Texas 75204
214-965-9300 (tel.)
214- 965-9301 (fax)

Frank Hill
State Bar No. 09632000
fhill@hillgilstrap.com
Frank Gilstrap
State Bar No. 07964000
fgilstrap@hillgilstrap.com
Hill Gilstrap, PC
1400 W. Abram
Arlington, Texas 76013
(817) 261-2222 (tel.)
(817) 861-4685 (fax)

***ATTORNEYS FOR PLAINTIFF***
***MCR OIL TOOLS, LLC***

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing document has been delivered to the following parties, pursuant to Fed. R. Civ. P. 5(b)(2)(E), through the ECF system on August 30, 2018.

Craig D. Dillard                                      *Via: cdillard@gardere.com*
Steven Lockhart                                   *Via: slockhart@gardere.com*
Gardere Wynne Sewell LLP
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201

*Attorneys for Defendants*


                                                   /s/ Blake L. Beckham
                                                   Blake L. Beckham


I:\MCR Oil Tools\SPEX\Pleadings\3rd Amended Complaint.doc