## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

### CIVIL ACTION NO: 3:18-cv-00731-M

**MCR OIL TOOLS LLC**

*Plaintiff*

**vs**

**SPEX OFFSHORE LIMITED**
**SPEX SERVICES LIMITED**
**SPEX OFFSHORE (UK) LIMITED**
**SPEX GROUP US LLC**
**SPEX ENGINEERING (UK) LIMITED**
**SPEX GROUP HOLDINGS LIMITED**
**SPEX CORPORATE HOLDINGS LIMITED**
**and**
**JAMIE OAG**

*Defendants*

---

### DECLARATION OF GARRY BORLAND, Q.C.

---

**Introduction**

1.     My name is Garry Borland QC.

2.     My date of birth is 20 June 1969. My business addresses are the Advocates Library, Parliament House, Edinburgh, and also 4 New Square, Lincoln's Inn, London.

3.     I am a practising member of the Scottish Bar[1] and also the English Bar. I was called to the Scottish Bar in 2000, and to the English Bar in 2014.

---

[1] Known as the Faculty of Advocates.

1

**EXHIBIT 6**                    APP.018

4.  I am a Queen's Counsel[2]. That rank is the most senior level of practising court lawyer in the United Kingdom. The appointment is made by Her Majesty the Queen following an application process in which the application is determined at the most senior level of the judiciary. I was appointed as a Queen's Counsel in 2014.

5.  I have rights of audience in the Supreme Court of the United Kingdom (the "UK"), and in all other courts in Scotland and in England. I have extensive oral advocacy experience, both before the courts and also other tribunals, such as arbitration panels.

6.  With regard to my academic qualifications, I achieved a first class honours degree in private law from the University of Glasgow. In my senior year, I was awarded the J Bennett Miller Prize for the top student in private law honours.

7.  I subsequently achieved a first class degree, Bachelor of Civil Law, from the University of Oxford.[3] I was also made Pirie-Reid scholar in the University of Oxford.

8.  Since calling to the Bar in 2000, my practice has been almost entirely commercial in nature. It has included general commercial cases, company work, restructuring and insolvency, tax and construction.

9.  As the matter at issue in the present proceedings is one of company law, I should point out that company, restructuring and insolvency work has always been a large element of my practice. By way of notable examples, I was instructed to act as counsel for Iberdrola SA in relation to its £12 billion takeover of Scottish Power plc. I also acted as counsel for Carlsberg/Heineken in relation to their £8 billion takeover of Scottish & Newcastle plc. Over the past year, I have been instructed for a syndicate of international banks in relation to the court restructuring of $3.8 billion of debt facilities of Premier Oil plc. I also very recently acted in court for the supervisors of a bankruptcy arrangement in relation to the major UK retail chain House of Fraser plc.

---

[2] Commonly referred to as a "QC" or a "silk".
[3] I attended St John's College, Oxford.

2

10. More generally, my practice covers areas such as acquisitions and disposals of companies, shareholder disputes, corporate and capital reorganisations, shareholders' and creditors' schemes of arrangements and capital reductions.

11. Between 2009 and 2012, I acted as a standing counsel in Scotland for Her Majesty's Revenue and Customs[4].

12. With regard to rankings in the leading legal directories, I am currently ranked by Chambers & Partners Legal Directory as a Band 1 counsel in the field of commercial dispute resolution and also for restructuring and insolvency work[5]. Band 1 is the highest ranking. I am also ranked by the Legal 500 as a leading counsel in the area of company and insolvency work[6].

**Instructions**

13. My instructions in relation to the present matter come from Pinsent Masons LLP ("PM"), a law firm acting for SPEX Corporate Holdings Limited. I refer to the letter of instruction from PM to me dated 23 October 2018 which is attached to this declaration as Exhibit A. These instructions relate to ongoing court proceedings raised by MCR Oil Tools LLC ("MCR") against certain named defendants. The proceedings are taking place in the United States District Court for the Northern District of Texas (the "Court").

14. In the PM letter of instruction, I am asked to provide my opinion on two particular points.

  (1) I am asked to provide my opinion on Scots law in relation to piercing the corporate veil with a view to that opinion being applied by the Court in the context of whatever other facts it finds in relation to the wider dispute[7].

---

[4] The UK's tax authorities. The role of standing counsel involves advising, and when necessary appearing in court for, the relevant government department.
[5] I have been ranked as a Band 1 counsel, in each area, for some time.
[6] Again, I have been ranked by this directory in this area for some time.
[7] See question 2.1 on page 4 of the PM letter of instruction.

3

(2)  I am also asked to provide my opinion as to whether or not a Scottish court would be likely to order that the corporate veil should be pierced such as to "expand the liability of SPEX Services Limited and SPEX Offshore Limited to other SPEX entities and Jamie Oag"[8].

## Role and duties

15.  I confirm that I am not currently acting (and indeed have never acted) for any of the named defendants in the Texas court proceedings. Nor have I ever acted for MCR Oil Tools LLC.

16.  In the present matter, I am instructed to give expert evidence in relation to Scots law. In that connection, I proceed on the basis that my overriding duty, in relation to this instruction as an expert, is to the Court. I consider that I have complied with that duty, and will continue to do so throughout my involvement in this matter.

17.  It should be noted at this stage that nothing I say in this declaration is intended to trespass on the Court's function in determining the facts of the case.

18.  Equally, I recognise that the application, in the present case, of any principles of Scots law which I identify will ultimately be a matter for the Court, and not me.

## Structure of this declaration

19.  I will sub-divide my opinion as follows.

(I)    Relevant court structures and the role of precedent in the UK.

(II)   The importance of the decision in the *Salomon* case.

(III)  The use of the expression "piercing the corporate veil".

(IV)   The main sources of the current Scots law on the subject of piercing the corporate veil.

(V)    A summary of the current Scots law on piercing the corporate veil.

(VI)   Commentary on the current Scots law on piercing the corporate veil.

(VII)  The first question in the PM instructions.

---

[8] See question 2.2 on page 4 of the PM letter of instruction.

(VIII)   The second question in the PM instructions.

(IX)   Additional points.

(X)   Declaration.

**(I)    Relevant court structures and the role of precedent in the UK**

20.   In terms of its legal systems, the UK is made up of three distinct parts: namely, the legal systems of (i) England and Wales; (ii) Scotland; and (iii) Northern Ireland.

21.   Each of these legal systems has its own distinct body of law and court system. In certain areas, however, the law is in effect UK-wide, covering all of the separate systems, with the result that any differences in the relevant law between the distinct systems are minimal. One example of this is company or corporate law where a great many of the rules of law – whether deriving from legislation or the common law – are the same across the UK. A by-product of this is that court decisions from one jurisdiction are regularly cited in the other jurisdictions as persuasive authorities.

22.   It should be recognised that English law has a particularly extensive and sophisticated body of case-law in the company/corporate law sphere (starting in the 19th century). In the modern era, the influence of English company law jurisprudence on the other jurisdictions of the UK can reasonably be said to have increased. This is the result of the large volume of company law litigation in the High Court in London, as well as the quality of judicial decision-making there. In any event, English cases on company law matters have for many years been regularly cited in comparable cases in Scotland[9], and regarded as persuasive (and sometimes highly persuasive) authorities by the Scottish courts.

23.   Furthermore, it should be noted that although Scotland and England have separate court structures, the final appellate court in civil matters in each jurisdiction is the same, i.e., the UK Supreme Court. It follows that whilst a decision of the UK Supreme Court in an English company law case might strictly be said not to be binding on the same court in a comparable Scottish company case, the English

---

[9] Assuming, of course, there is no Scottish "peculiarity" to the case on account of, for example, a specific Scottish legislative provision or concept, etc.

decision is, in reality, going to be regarded – at the least – as very highly persuasive in the Scottish case. That is particularly so in relation to a company law matter where there is no difference in principle between the positions in Scotland and in England, and no rational basis for applying any distinction between the laws in the two jurisdictions.

24.    The predecessor of the UK Supreme Court was the Judicial Committee of the House of Lords which, in its time, was the final appellate court in civil matters in both Scotland and England. The jurisdiction of the House of Lords ended in 2009 when the UK Supreme Court was created. However, past decisions of the House of Lords continue to have significant precedential value, including in the sphere of company law.

25.    In this context, I would note that the judges of the UK Supreme Court also sit as judges in the Judicial Committee of the Privy Council (the "JCPC"). The JCPC is the highest court of appeal for a number of Commonwealth countries, as well as the UK's overseas territories and its military sovereign bases abroad. Given that many of the countries to which appeals can be taken to the JCPC have a common law-based legal system, as well as a system of company law which is similar to that of the UK, decisions of the JCPC on such "foreign" company law matters can be instructive, and of material precedential value, when it comes to stating the law in the UK on an issue of company law.

26.    Finally, whether sitting in the UK Supreme Court or in the JCPC, the justices rarely sit *en banc*, i.e., as a full bench. The normal practice is that panels of five, sometimes seven, judges are drawn from the total of 12 to hear individual cases.

**(II)    The importance of the decision in the *Salomon* case**

27.    With regard to the substance of the matters put to me for my opinion, an appropriate starting point for analysis is the decision of the House of Lords[10] in the case of *Salomon v A Salomon & Company Limited*, [1897] AC 22. Mr Salomon carried on a business as a leather merchant. He then converted his business into a limited

---

[10] A copy of the decision is produced as Exhibit B.

company. Mr Salomon, his wife and five of his children were the shareholders[11] in the company. He was the company's managing director. The company ran into difficulties, and eventually entered liquidation[12]. The liquidator[13] of the company made a claim against Mr Salomon. The object of the claim was to make Mr Salomon personally liable for the trading debts of the company. The claim was unanimously rejected by the House of Lords.

28.   The essence and effect of the House of Lords' decision can be identified from passages in the judgments of Lord Halsbury LC[14] and Lord Macnaghten.

29.   According to Lord Halsbury[15], a validly incorporated company

"must be treated like any other independent person with its rights and liabilities appropriate to itself...the Act[16] appears to me to give a company a legal existence with, as I have said, rights and liabilities of its own, whatever may have been the ideas or schemes of those who brought it into existence."

30.   Later in his judgment[17] he said that:

"Either the limited company was a legal entity or it was not. If it was, the business belonged to it and not to Mr Salomon."

31.   Lord Macnaghten was to the same effect. As he put it[18]:

"The company is at law a different person altogether from the subscribers to the memorandum[19]; and, though it may be that after incorporation the business is precisely the same as it was before, and the same persons are managers, and the same hands receive the profits, the company is not in law the agent of the

---

[11] In this declaration, the terms "shareholders" and "members" should be taken as meaning the same thing, and capable of being used interchangeably.
[12] An insolvency process.
[13] The person responsible for collecting in an insolvent company's assets and settling its claims before it is dissolved.
[14] LC stands for "Lord Chancellor" – at the time, the senior member of the court.
[15] At pp 30-31.
[16] Being the Companies Act 1862.
[17] At p 31.
[18] At p 51.
[19] The memorandum of association is one of the key constitutional documents when it comes to incorporating a company in the UK.

7

subscribers or trustee for them. Nor are the subscribers as members liable, in any shape or form, except to the extent and in the manner provided by the Act."

32.     The decision in *Salomon* has been a foundation stone of UK company law ever since. It established that the fundamental attribute of corporate personality is that a company is a legal entity distinct from its members. Hence the company is capable of enjoying rights, and being subject to duties, which are not the same as, and indeed are regarded as separate from, those enjoyed or borne by the company's members. The company's property is its own, and not that of its shareholders.

**(III)     The use of the expression "piercing the corporate veil"**

33.     In the present type of dispute, the expression "piercing the corporate veil" is often rather freely used.

34.     In my opinion, this metaphor is not especially helpful. It describes a process or a result. For present purposes, I proceed on the basis that when one refers to piercing the corporate veil, that means disregarding the separate legal personality of the company.

35.     Importantly, however, the use of the metaphor does not illuminate the operative principle of law in this context or give meaningful guidance to a court as to when the veil should – or should not – be pierced.

36.     Accordingly, I am of the opinion that it is very important to identify the legal principle which underlies the doctrine of piercing the corporate veil in Scots law, as it currently stands. I consider that it is only by doing so that the Court, in the instant case, will be able properly to determine whether the veil here should, or should not, be pierced.

**(IV)     The main sources of the current Scots law on the subject of piercing the corporate veil**

37.     In my opinion, the current Scots law position on the subject of piercing the corporate veil can be principally derived from two cases. They are *Prest v Petrodel Resources*

APP.025

*Limited and others*, [2013] 2 AC 415 (hereinafter "*Prest*")[20], and *Persad v Singh*, [2017] BCC 779 (hereinafter "*Persad*")[21].

38.  Whilst neither of these cases is a Scottish court decision, for the reasons that I have set out above, they would – at the very least – be regarded as highly persuasive authorities in a comparable case were it to come before a Scottish court. These cases are decisions at the highest level of the appellate court structure in a UK and Commonwealth context. There is no Scottish peculiarity in the present context which would provide a rational basis for differing from the analysis in *Prest* and *Persad*[22]. I am reinforced in that view by the fact that in two recent Scottish first instance cases (which I will return to below), the decision in *Prest* was accepted as representing Scots law.

**(V)    A summary of the current Scots law on piercing the corporate veil**

39.  In my opinion, the current Scots law on the subject of piercing the corporate veil can be summarised by means of the following propositions (which should be read in conjunction with the additional points which I make in section (VI) below).

(1)    When speaking of piercing the corporate veil, that is a reference to the situation where a person who owns or controls a company is said to be identified with it in law by virtue of that ownership and control, such that the separate juristic personality of the company is disregarded: *Prest*, per Lord Sumption at para 16.

(2)    The decision in *Salomon* "plainly represents a substantial obstacle in the way of an argument that the veil of incorporation can be pierced": *Prest*, per Lord Neuberger[23] at para 67.

(3)    The court will only be justified in piercing the corporate veil if it is satisfied that a company's separate legal personality is being abused for the purpose of some

---

[20] A decision of the UK Supreme Court in an English case. A copy of the decision is produced as Exhibit C.
[21] A decision of the JCPC in relation to an appeal from a decision of the Court of Appeal of Trinidad and Tobago. A copy of the JCPC's decision is produced as Exhibit D.
[22] By, respectively, the UK Supreme Court and the JCPC.
[23] Lord Neuberger was, at the time of the *Prest* decision, the President of the UK Supreme Court. That position is the UK equivalent of the role of Chief Justice in the Supreme Court of the United States.

APP.026

wrongdoing: *Prest*, per Lord Sumption at para 27 (with whom Lord Neuberger specifically agreed at para 81).

(4)  In seeking to define what is relevant wrongdoing for these purposes, references to there being a "façade" or a "sham" – as a supposed justification for piercing the veil – beg too many questions to provide a satisfactory answer: *Prest*, per Lord Sumption at para 28 (with whom Lord Neuberger specifically agreed at para 81).

(5)  The operative legal principle which justifies the piercing of the corporate veil is the so-called "evasion principle". That principle is that the court "may disregard the corporate veil if there is a legal right against the person in control of it which exists independently of the company's involvement, and a company is interposed so that the separate legal personality of the company will defeat the right or frustrate its enforcement": *Prest*, per Lord Sumption at para 28 (with whom Lord Neuberger specifically agreed at para 81).

(6)  It is not, however, an abuse of the separate legal personality of a company for someone to cause a legal liability to be incurred by a company in the first place: *Prest*, per Lord Sumption at para 34 (with whom Lord Neuberger specifically agreed at para 81).

(7)  Nor is it an abuse to rely on the fact (if it is a fact) that a liability is not the controller's because it is the company's liability: *Prest*, per Lord Sumption at para 34 (with whom Lord Neuberger specifically agreed at para 81).

(8)  An argument that the corporate veil should be pierced so as to make the controllers of a company jointly and severally liable on the company's contract is wrong. The fundamental objection to such an argument is that, in such a situation, piercing the veil is being invoked so as to create a new liability that would not otherwise exist. That is impermissible whether the intention is to create a contractual or non-contractual liability. Refer to *Prest*, per Lord

10

Sumption at para 34 (with whom Lord Neuberger specifically agreed at para 81).

(9)     In conclusion, "there is a limited principle...which applies when a person is under an existing legal obligation or liability or subject to an existing legal restriction which he deliberately evades or whose enforcement he deliberately frustrates by interposing a company under his control. The court may then pierce the corporate veil for the purpose, and only for the purpose, of depriving the company or its controller of the advantage that they would otherwise have obtained by the company's separate legal personality": *Prest*, per Lord Sumption at para 35 (with whom Lord Neuberger specifically agreed at para 81).

Given this formulation of the operative principle, two key things will need to be established if the veil is to be pierced. First of all, it must be demonstrated that there was an <u>existing</u> legal obligation or liability owed by the person who is said to stand behind the corporate veil. If that is done, it must also be proved that the person in question then sought <u>deliberately</u> to evade or frustrate enforcement of that obligation or liability by interposing a company under his or her control.

## (VI)     <u>Commentary on the current Scots law on piercing the corporate veil</u>

40.     Nine additional points should be noted.

41.     First, in setting out the above-noted propositions which can be taken from *Prest*, I have referred to passages from the two main judgments – which were delivered by Lords Sumption and Neuberger. However, the other members of the Supreme Court – who delivered much shorter judgements – also agreed with the reasons given by Lords Sumption and Neuberger in relation to the issue of piercing the corporate veil: see Baroness Hale[24] at para 96; Lord Mance[25] at paras 97-98; and Lord Clarke[26] at para 103.

---

[24] Agreeing with the reasons given by Lord Sumption.
[25] Agreeing with the reasons given by Lords Sumption and Neuberger.
[26] Agreeing with the reasons of Lord Sumption.

11

42.     Second, the members of the court in *Prest* emphasised how rarely it will be that a court will be justified in piercing the corporate veil. According to Lord Sumption, the operative principle (the so-called evasion principle) is "a limited one"[27] and there will only be "a small residual category of cases"[28] where its application will be justifiable. For Lord Neuberger, the evasion principle is a "limited doctrine" which will be of value in only "the few cases where it can be properly invoked"[29].

43.     Although Lord Mance did not wish to foreclose development of the law in future cases, he made it very clear that, "No one should, however, be encouraged to think that any further exceptions, in addition to the evasion principle, will be easy to establish, if any exists at all"[30]. Lord Clarke took the same stance[31]: "I also agree with Lord Mance JSC[32] and others that the situations in which piercing the corporate veil may be available as a fall-back are likely to be very rare and that no one should be encouraged to think that any further exceptions, in addition to the evasion principle, will be easy to establish. It will not."

44.     Third, in the subsequent decision[33] of the JCPC in *Persad*, the court identified[34] the *ratio decidendi*[35] of *Prest* as being what Lord Sumption had said at para 35 of his judgment in the latter case, i.e., that piercing the corporate veil can be justified only where a person is under an existing legal obligation or liability or subject to an existing legal restriction which he then deliberately seeks to evade or the enforcement of which he deliberately seeks to frustrate by interposing a company under his control.

45.     Fourth, in *Persad* the JCPC held that the fact that the intention of the person interposing a company within a transaction was to enable the person who owned or

---

[27] Para 35.
[28] Para 35.
[29] Para 82.
[30] Para 102.
[31] Para 103.
[32] i.e., Justice of the Supreme Court.
[33] Decided on 30 October 2017.
[34] See para 17 of the decision of the JCPC. It should be noted that in the *Persad* case, the JCPC included Lords Reed and Hodge who are the Scottish justices who sit on the UK Supreme Court.
[35] The rule of law on which a judicial decision is based.

12

controlled the company to avoid a personal liability was not a proper basis for piercing the corporate veil[36]. As the JCPC said:

> "One of the reasons that an individual, either on their own or together with others, will take advantage of limited liability is to avoid personal liability if things go wrong…If such a factor justified piercing the veil of incorporation, it would make something of a mockery of limited liability both in principle and in practice"[37].

46.     Fifth, my opinion is that the propositions which I have extracted from *Prest* can legitimately be taken as representing Scots law on the subject of piercing the corporate veil. In relation to this part of company law, I am not aware of there being any distinction whatsoever between Scots law and English law. I am reinforced in that view by two recent Scottish first instance decisions.

47.     In *The Tartan Army Limited v Sett GmbH and others*, [2015] CSOH 141, Lord Glennie emphasised that, in a case where piercing the corporate veil is being attempted, the starting point is that a company is a legal entity distinct from its shareholders; with rights and liabilities of its own separate from those of its shareholders; and property of its own distinct from that of its shareholders[38]. Lord Glennie was content to accept Lord Sumption's analysis in *Prest* as representing Scots law, and, more specifically, he agreed that the only principle on which piercing the corporate veil could be justified was the evasion principle[39].

48.     In *Ashley, petitioner,* [2016] CSOH 78, submissions were made by counsel on the basis that Lord Sumption's analysis in *Prest* was applicable in a Scots law context. Without engaging in any detailed analysis, the judge (Lord Brodie) proceeded on that footing[40], albeit the issue of veil-piercing was not critical to the decision on the case.

---

[36] See para 20 of the decision of the JCPC.
[37] See para 20 of the decision of the JCPC.
[38] Para 26 of his judgment. A copy of the judgment is produced as Exhibit E.
[39] Paras 28-30 of his judgment.
[40] See para 30 of his judgment. A copy of the judgment is produced as Exhibit F.

APP.030

49.     Sixth, in my opinion, it follows from the foregoing that, post-*Prest*, the circumstances in which the courts in the UK (including in Scotland) will be justified in piercing the corporate veil are likely to be extremely limited[41]. That is because the veil-piercing doctrine, as enunciated by the UK Supreme Court in *Prest* and applied in *Persad*, is of very narrow scope.

50.     Seventh, the Court may find it instructive to note how the cases of *Prest, Persad* and *The Tartan Army* were decided in relation to the veil-piercing arguments advanced in each case.

51.     *Prest* was a divorce case in which the husband was the sole owner of a number of offshore companies. In the divorce proceedings, the wife alleged that the husband had used the companies to hold legal title to several valuable properties which, it was said, were in reality owned by him. The wife argued that the veil of incorporation in relation to these companies should be pierced (i.e., disregarded), such that the properties should be taken as held not by the companies, but by her husband. On this basis[42], the wife sought the transfer of the properties to her. The UK Supreme Court refused to pierce the corporate veil. For one thing, there was no finding by the trial judge of any impropriety on the part of the husband[43]. Furthermore, the legal interest in the properties had been vested in the companies long before the marriage began to break up. This was crucial. Whatever the husband's reasons were for organising his affairs as he did via the various companies, there was no evidence that he was thereby seeking to avoid any existing obligation[44]. As a result, the wife's veil-piercing argument was rejected[45].

52.     In the *Persad* case, Mr Singh was negotiating a lease with Mr Persad. Mr Singh was the owner of the relevant premises and thus was the prospective lessor. Mr Persad was the prospective lessee. Towards the end of the negotiations, Mr Persad (who was a

---

[41] For example, in *Prest*, Lord Clarke said (at para 103) that the circumstances in which piercing the corporate veil may be available "are likely to be very rare".

[42] The wife also had other arguments which did not depend on piercing the corporate veil.

[43] See Lord Sumption's judgment at para 36 where he noted that there was no such finding by the trial judge, Moylan J.

[44] See Lord Sumption's judgment at para 36.

[45] She succeeded on other grounds – essentially that the properties held by the companies were, in fact, held beneficially by those entities for the husband. It should be noted that beneficial ownership is not a concept recognised in Scots law.

14

qualified attorney) proffered a draft lease to be entered into not by him personally, but, rather, by a company under his control. In due course, the lease was entered into by Mr Singh and the company. In the court proceedings, Mr Singh sought payment of sums due under the lease, but his claim was made against Mr Persad personally. Given that the lessee under the formal lease was the company, Mr Singh's claim obviously depended on persuading the court that the corporate veil should be pierced. The JCPC held that the veil could not be pierced. On the evidence, Mr Singh got nowhere near establishing the "evasive or frustrating action"[46] on the part of Mr Persad which was necessary to justify piercing the veil. The key point[47] was that, at the time Mr Persad proffered the draft lease in the name of the company as lessee, he was under no relevant legal obligation or liability to Mr Singh which he could be said to have been trying to evade or frustrate by using a corporate vehicle as the lessee. The fact that the company was a "one man company" was irrelevant[48]. Nor was it relevant that, in proceeding as he did, Mr Persad wanted to take advantage of limited liability so as to avoid personal liability if things went wrong[49]. In the end, therefore, Mr Singh's claim failed.

53.   In *The Tartan Army* case, the claimant was attempting to pierce the corporate veil, and fix liability personally on the sole shareholder and director of one of the defendant companies. Lord Glennie held that no proper case had been made out by the claimant suggesting that the relevant individual had set up the company for any improper purpose, and, in particular, had sought to evade legal liabilities or obligations owed by him personally[50]. Consequently, the case against the shareholder/director was dismissed.

54.   Eighth, so far as I am aware, there is no case in either Scots law or English law in which a court has pierced a company's corporate veil such as to impose liabilities on parties who are not shareholders in the company whose veil is pierced.

---

[46] This is the expression used by the JCPC at para 17 of its decision.
[47] See para 17 of the JCPC's decision.
[48] Para 20 of the JCPC's decision.
[49] Para 20 of the JCPC's decision.
[50] See para 31 of his judgment.

15

55.    Thus, I am not aware of any authority vouching the proposition that, in Scots law or English law, the separate legal personality of a company ("Company A" for the purposes of this example) can be disregarded by piercing its corporate veil, such as to allow the imposition of a liability on another company ("Company B") at the same level of the group structure as Company A. It follows that I am not aware of any case in which, by means of piercing the corporate veil, a liability which on the face of it is owed by Company A has been held as being capable of being pursued against another subsidiary, Company B[51]. In my view, the absence of such case-law is not surprising. The doctrine of piercing the corporate veil has traditionally been, in both Scots law and English law, a means by which a party seeks to go behind a company's separate legal personality, and establish a liability against that company's shareholder(s). If Company B is not a shareholder in Company A, then piercing the corporate veil of the latter entity is simply inapplicable as a concept – at least as far as current Scots law is concerned.

56.    I find support for that conclusion in the case of *Adams v Cape Industries plc,* [1990] Ch 433, where the Court of Appeal in England[52] rejected an argument that a group of companies should be regarded as a "single economic unit". As Slade LJ observed[53] at p 536G:

> "…save in cases which turn on the wording of particular statutes or contracts, the court is not free to disregard the principle in *Salomon v A Salomon & Co Ltd* [1897] AC 22 merely because it considers that justice so requires. Our law, for better or worse, recognises the creation of subsidiary companies, which though in one sense the creatures of their parent companies, will nevertheless under the general law fall to be treated as separate legal entities with all the rights and liabilities which would normally attach to separate legal entities"[54].

The decision in *Adams* (including, specifically, the above-noted passage) was cited with approval by Lord Sumption in *Prest*, at para 21. In my opinion, a Scottish court

---

[51] Assuming that Company A and Company B are both subsidiaries, i.e., Company B is not a shareholder in Company A.
[52] Comprising Slade, Mustill and Ralph Gibson LJJ.
[53] Giving the judgment of the court. A copy of the case is attached as Exhibit G.
[54] This passage from the judgment of Slade LJ was cited, with apparent approval, by Lord Sumption in *Prest*, at para 21.

16

would adopt the same approach as the Court of Appeal in *Adams,* and reject a "single economic unit" argument if it were ever to be advanced. Such an argument is completely at odds with the principle in *Salomon* – which, of course, has recently been reaffirmed in *Persad*.

57.   Ninth, I have read MCR's third amended complaint, dated 30 August 2018 (the "MCR Complaint"). MCR's veil-piercing allegations are made in the section of that document headed "count nine" (page 65 et seq). In the sections of this opinion which follow, I will comment on those allegations in greater detail. At this stage, however, I note that in the MCR Complaint, at para 232 (page 66), an allegation is made that several different defendants are the "alter egos" of SPEX Services Limited ("SPEX Services"), SPEX Offshore Limited ("SPEX Offshore") and Mr Jamie Oag, with the result – so the argument goes – that the "corporate form" should be disregarded. Insofar as this "alter ego" argument is a legal one, I consider that it is not one which is recognised in Scots law as a proper basis for ignoring the separate personalities of the companies or the shareholders of those companies.

58.   For one thing, the contention that the corporate form should be disregarded on the nebulous basis of "alter ego" is contrary to the principle established in *Salomon*. In that case, it was argued that the company should simply be regarded as an "alias" for Mr Salomon. That seems very close to the idea of an alter ego being advanced by MCR in the present case. In *Salomon*, the argument that the company should be taken as Mr Salomon's alias was firmly rejected by the House of Lords. I refer, in particular, to the judgment of Lord Herschell, at p 42. More recently, in *Persad* the JCPC approved what Lord Herschell had said about the "alias" line of argument. Such pejorative terms are, the JCPC said, too easily invoked and lead to decisions which are "unreasoned and wrong": see *Persad*, para 21.

59.   It may be that the "alter ego" argument amounts to a contention that it would be too technical an approach for the Court to distinguish between parent and subsidiary companies or between subsidiaries. If so, I consider the contention to be wrong as a matter of Scots law. In *Adams*, the Court of Appeal held that it had no discretion to reject the distinction between the members of a corporate group on the basis that such

17

APP.034

a distinction was just a technical point. In this connection, the Court of Appeal endorsed the observations of Robert Goff LJ (as he then was) in *Bank of Tokyo Limited v Karoon*, [1987] AC 45, at p 64[55], when he said:

> "[Counsel] suggested beguilingly that it would be technical for us to distinguish between parent and subsidiary company in this context; economically, he said, they were one. But we are concerned not with economics but with law. The distinction between the two is, in law, fundamental and cannot be bridged."

## (VII) **The first question in the PM instructions**

60.    I refer to the opinions which I have set out above in sections (IV), (V) and (VI) of this declaration.

61.    What I have said there should be taken as my answer to the first question posed in the PM instructions.

## (VIII) **The second question in the PM instructions**

### *Prefatory points*

62.    In seeking to answer the second question put to me by PM, I must reiterate that nothing I say is intended to trespass on the Court's function in determining the facts of the case.   I also acknowledge that the application, in the present case, of any principles of Scots law which I have identified will ultimately be a matter for the Court, and not me.

63.    The question posed is whether a Scottish court would be likely to pierce the corporate veil in the circumstances of this case. In deciding whether something is "likely" in this context, I will apply the balance of probabilities standard. That means that I am assessing whether it is more likely than not that a Scottish court would hold that the corporate veil should be pierced here[56].

---

[55] A copy of this case is attached as Exhibit H.
[56] In other words, are the chances of the court doing so at least 51%?

64. I should also note that whether there is in reality any material and relevant factual dispute is a matter I leave to the US attorneys and to the Court[57]. Any opinion that I express herein must be read with this qualification in mind.

65. Very importantly, I confine myself to examining the issue of piercing the corporate veil at common law. It is not my intention to go beyond that issue, and explore any other applicable legal concept.

66. Finally, and as a general point, I note that it has been observed that the courts in the UK do not pierce the corporate veil "at large" and then look at the consequences. It has been said that, instead of doing that, the court should consider whether, in the light of the purpose for which it is desired to pierce the veil, the facts of the case make it an appropriate one for doing so. Refer to *Antonio Gramsci Shipping Corporation v Lembergs and others*, [2014] 1 BCLC 581, per Beatson LJ[58] at para 44.

*The key questions*

67. With regard to whether or not the corporate veil should be pierced in a case like the present one, I consider that there are two critical overarching questions.

    (a) Were the parties behind the corporate veil (i.e., those against whom MCR seeks to establish liability in these proceedings) subject to existing legal obligations or liabilities owed to MCR prior to the incorporation of the relevant SPEX companies?

    For the veil-piercing claim to have a proper basis, the parties against whom MCR seeks to establish liability would, in my opinion, also have to be shareholders in the company whose corporate veil is sought to be pierced.

---

[57] It is outwith the scope of my instructions – and indeed my expertise – as to whether the case can properly be disposed of on a summary basis without a trial being necessary (e.g., by way of summary judgment). That is a matter which I would regard as an issue of Texan law, and therefore not for me.

[58] With whom Ryder and Lloyd LJJ agreed. A copy of the decision in the case is produced as Exhibit I.

APP.036

In a comparable Scottish case, if question (a) was answered in the negative, then my opinion is that a Scottish court would hold that the corporate veil should not be pierced.

(b) If, however, question (a) is answered in the affirmative, did the party or parties against whom MCR tries to prove liability seek deliberately to evade or frustrate enforcement of the relevant obligation or liability by interposing a company under his or their control?

In my view, it is only if the evidence indicated – on the balance of probabilities – that the relevant party or parties deliberately sought to evade or frustrate enforcement of an existing obligation or liability, by the interposition of a company under their control, that a Scottish court would be likely to pierce the corporate veil.

68.  I will now proceed to examine questions (a) and (b) in more detail.

***Question (a)***

<u>Introduction</u>

69.  SPEX Services was, I am advised, incorporated in Scotland on 20 April 2009. I understand that this company was dissolved on 5 January 2018.

70.  I am also told that SPEX Offshore was incorporated in Scotland on 11 September 2012, and was dissolved on 30 September 2017.

71.  As noted above, I have read the MCR Complaint. In particular, I note that MCR's veil-piercing allegations are made in the section of that document headed "count nine" (page 65 et seq). My understanding is that what MCR is seeking to do is, *inter alia*, to have the Court disregard the separate legal personality of, respectively, SPEX Services and SPEX Offshore. Those are the companies I am asked to focus on in terms of the second question put to me in the PM letter of instruction[59].

---

[59] See question 2.2 on page 4 of the letter of instruction.

*SPEX Services*

72.   Thus, insofar as MCR's claim proceeds under reference to SPEX Services, the corporate veil which is relevant is the separate legal personality of SPEX Services. That is the veil which, in this context, MCR seeks to pierce.

73.   In relation to the claim proceeding under reference to SPEX Services, unless it can be established by MCR that the parties against whom it now seeks to establish liability (i.e., those said to be "behind" the corporate veil of SPEX Services) were subject to existing legal obligations or liabilities owed to MCR prior to the incorporation of SPEX Services on 20 April 2009, then in my opinion a comparable claim to pierce the veil would be rejected by a Scottish court[60]. If MCR failed to establish a relevant existing legal obligation or liability on the part of those against whom it now seeks to fix liability, the rejection of the veil-piercing claim would, in my view, follow from a straightforward application of the decisions in *Prest* and *Persad*.

74.   My understanding is that the parties alleged by MCR to be behind the corporate veil of SPEX Services are SPEX Offshore (UK) Limited; SPEX Group US LLC; SPEX Engineering (UK) Limited; SPEX Group Holdings Limited; SPEX Corporate Holdings Limited; and Mr Oag. In that connection, I refer to the MCR Complaint, at count nine, where its veil-piercing allegations are made (and, in particular, para 232 thereof).

75.   The information supplied to me by PM[61] indicates that the relevant companies[62] were incorporated on various dates in 2011, 2013, 2015 and 2016. Given that state of affairs, it seems very difficult to see – at least as a matter of Scots law – how these companies could have been subject to an existing legal obligation or liability owed to MCR prior to the incorporation of SPEX Services in Scotland in April 2009. The reason for that is obvious. None of those companies was in existence prior to 20 April 2009.

---

[60] Applying Scots law.
[61] See the SPEX group structure document which accompanied the PM letter of instruction.
[62] The dates of incorporation which I have been supplied with by PM are as follows: SPEX Offshore (UK) Limited (4 May 2011); SPEX Group US LLC (22 July 2013); SPEX Engineering (UK) Limited (26 February 2015); SPEX Group Holdings Limited (1 March 2016); and SPEX Corporate Holdings Limited (21 December 2016).

APP.038

76.     I therefore consider it likely that a Scottish court would reject the attempt by MCR to pierce the veil of SPEX Services with a view to fixing liability on the aforementioned companies.

77.     Accordingly, it would seem to me, on this basis, that it is only Mr Oag who could – as a matter of Scots law – be regarded as a party against whom liability might, at least in theory, be established by means of piercing the corporate veil of SPEX Services. That is because he was "in existence" prior to 20 April 2009. If so, the question which arises at this stage of the analysis is whether MCR could prove that Mr Oag (in a personal capacity) was subject to a legal obligation or liability owed directly to MCR which was in existence prior to the incorporation of SPEX Services on 20 April 2009.

78.     As I read the MCR Complaint, however, MCR does not make any allegation that Mr Oag was subject to an existing legal obligation or liability owed to MCR prior to the incorporation of SPEX Services on 20 April 2009. In the MCR Complaint, at count nine[63], there does not appear to be any allegation of any specificity to that effect.

79.     The closest which MCR comes to pleading such a case is at para 230 of the MCR Complaint where it is averred that:

> "SPEX Offshore, SPEX Services and Oag also used the corporate form to evade or avoid their legal obligations. SPEX Services, SPEX Offshore and Oag had, among other obligations, a duty to protect MCR's trade secrets and confidential information, and to use MCR's Tools and intellectual property in strict accordance with the terms of the respective licence agreements. Instead of fulfilling these duties, SPEX Services, SPEX Offshore and Oag – through affiliates and common officers and Directors – created sham entities, changed corporate names, diverted corporate assets, and dissolved corporate entities to escape legal and contractual liabilities. In doing so, SPEX Services, SPEX Offshore and Oag deceived and violated confidences owed to MCR" (emphasis added).

---

[63] Or, indeed, elsewhere in the MCR Complaint.

APP.039

80.   I make two points in this connection. First, there is no specific allegation in para 230 –
      or elsewhere in the MCR Complaint – that Mr Oag was under any existing legal
      obligation or liability owed to MCR prior to 20 April 2009 (the date of incorporation
      of SPEX Services). Second, and in any event, the passage of pleading at para 230 of
      the MCR Complaint refers to using MCR's tools and intellectual property in
      accordance with the relevant licence agreements. Given that the MCR Complaint
      alleges that the first of these agreements was only entered into between MCR and
      SPEX Services on 29 June 2009[64], it seems difficult to see how Mr Oag could have
      been under any legal obligation or liability related to that agreement (never mind a
      later one) prior to 20 April 2009. There is no allegation that he was.

81.   On the foregoing basis, my opinion is that it is likely that a Scottish court would reject
      the attempt by MCR to pierce the veil of SPEX Services with a view to fixing liability
      on Mr Oag.

82.   There is one final point which I wish to make. As stated above, my understanding is
      that the parties alleged by MCR to be behind the corporate veil of SPEX Services
      include SPEX Offshore (UK) Limited; SPEX Group US LLC; SPEX Engineering
      (UK) Limited; SPEX Corporate Holdings Limited; SPEX Group Holdings Limited;
      and Mr Oag. As I understand it, none of the aforementioned companies or Mr Oag[65]
      was the incorporating shareholder(s) in SPEX Services. If none of them was an
      incorporating shareholder in SPEX Services (or could legitimately be held to have
      procured its incorporation), I find it very difficult to see how the concept of piercing
      the corporate veil in Scots law could ever be validly held to be applicable in the
      present context, such as to provide a proper basis for MCR's attempt to fix liability on
      those companies or Mr Oag. For the veil-piercing concept in Scots law to be relevant
      in the present case in respect of those companies, MCR would need to prove that (i)
      one of the aforementioned companies or Mr Oag was under an existing obligation

---

[64] See the MCR Complaint at para 26. The point gains even greater force when one bears in mind that MCR's central allegations, as I read them, relate to the licence agreement between MCR and SPEX Services, dated 16 May 2011, and later agreements.

[65] PM have advised me that Mr Oag was not a shareholder in SPEX Services when that company was incorporated, albeit he became a shareholder following its incorporation. In addition, I understand that SPEX Group Holdings Limited was only a shareholder in SPEX Services between 13 April 2016 and 5 January 2018.

APP.040

owed to MCR (e.g., by virtue of a contract); and (ii) that entity or person then sought to evade that obligation by incorporating (or procuring the incorporation of) SPEX Services and interposing it in the contractual "chain" with MCR. As I have explained above, it does not seem possible that MCR can prove this in the circumstances of the present case.

*SPEX Offshore*

83. With regard to MCR's claim insofar as proceeding under reference to SPEX Offshore, the corporate veil which is relevant in this context is the separate legal personality of SPEX Offshore. By parity of reasoning, if MCR failed to establish that the parties against whom it now seeks to establish liability (i.e., those said to be "behind" the corporate veil of SPEX Offshore) were subject to existing legal obligations or liabilities owed to MCR prior to the incorporation of SPEX Offshore on 11 September 2012, I consider that a comparable claim in Scotland to pierce the veil would be rejected by a Scottish court[66].

84. Given the dates of incorporation of the corporate parties against whom MCR wishes to fix liability by means of piercing the SPEX Offshore corporate veil, I consider that it would appear, on the face of it, only to be possible – at least theoretically – for MCR to advance a veil-piercing claim against SPEX Services; SPEX Offshore (UK) Limited; or Mr Oag personally. On the information made available to me, SPEX Services was incorporated in Scotland on 20 April 2009, and SPEX Offshore (UK) Limited was incorporated in the same country on 4 May 2011. Thus, it is at least theoretically possible that one or more of SPEX Services, SPEX Offshore (UK) Limited and Mr Oag (in his personal capacity), could have been subject to an existing legal obligation or liability owed to MCR prior to the incorporation of SPEX Offshore on 11 September 2012. That possibility at least presents itself because each of SPEX Services, SPEX Offshore (UK) Limited and Mr Oag was "in existence" prior to the incorporation of SPEX Offshore.

85. On this analysis, the question would be whether MCR could prove that any of SPEX Services, SPEX Offshore (UK) Limited or Mr Oag (in a personal capacity) was under

---

[66] Applying Scots law.

24

a legal obligation or liability owed directly to MCR and which was in existence prior to the incorporation of SPEX Offshore on 11 September 2012.

86.    With regard to SPEX Services, there are plainly allegations made in the MCR Complaint against that company to the effect that it was, at the time of the incorporation of SPEX Offshore in September 2012, under existing legal obligations owed to MCR[67]. Those obligations were contained in the licence agreement[68] between MCR and SPEX Services dated 16 May 2011 (the "2011 Licence Agreement"). To that extent, MCR has, in my view, pleaded a case which, subject to any facts which it is necessary to establish at trial[69] (and also what I say below in relation to question (b)), would allow MCR to satisfy question (a) in a manner which allowed its case to proceed.

87.    On my reading of the MCR Complaint, however, there is no allegation of any specificity that SPEX Offshore (UK) Limited was subject to an existing legal obligation or liability owed to MCR prior to the incorporation of SPEX Offshore on 11 September 2012. If that is correct, then I consider it likely that a comparable claim in Scotland to pierce the corporate veil of SPEX Offshore with a view to fixing liability on SPEX Offshore (UK) Limited would be rejected by a Scottish court.

88.    If one tests the matter by looking at the passage of pleading at para 230 of the MCR Complaint, it leaves unanswered the questions of (i) which legal obligation(s) of SPEX Offshore (UK) Limited it is being alleged that that entity sought to evade; (ii) how those obligations arose as a matter of law; and (iii) when SPEX Offshore (UK) Limited became subject to those obligations.

89.    Equally, with regard to Mr Oag, my reading of the MCR Complaint is that it does not make any specific allegation against him that he was subject, in a personal capacity, to

---

[67] See, for example, the MCR Complaint at paras 43 and 45.

[68] There also appears to have been a licence agreement between the same parties, dated 29 June 2009 (see para 26 of the MCR Complaint), but it does not seem to be the basis for any of the allegations made by MCR.

[69] As noted above, it is not within the scope of my instructions to consider whether it is necessary, in terms of the procedures of the Court, for the case actually to go to trial (or to any particular form of trial) or whether it can be disposed of by way of summary judgment. Such issues are not within my expertise, as they concern Texan law. Consequently, I express no opinion on those issues. Nothing I say in this declaration should be taken as precluding any argument relative to the procedure necessary to bring the case to a conclusion.

25

an existing legal obligation or liability owed to MCR prior to the incorporation of SPEX Offshore on 11 September 2012. The three questions noted in the preceding paragraph also appear to be left unanswered vis-à-vis Mr Oag.

90.     In that connection, I would note again that in relation to the licence agreements entered by MCR in 2009 and 2011 the other contracting party was SPEX Services, and not Mr Oag.

91.     Finally, I note that my understanding[70] is that neither SPEX Offshore (UK) Limited nor Mr Oag was ever a shareholder in SPEX Offshore[71]. If that is correct, my opinion is that it would not be possible for the Scots law concept of piercing the corporate veil to be validly held to be applicable in the present context, such as to provide a proper basis for MCR's attempt to fix liability on SPEX Offshore (UK) Limited or Mr Oag.

***Question (b)***

<u>*SPEX Services*</u>

92.     Given the view which I have expressed above in relation to question (a) in the context of MCR's veil-piercing claim relative to SPEX Services, question (b) does not strictly arise.

93.     If, however, question (b) was thought to be relevant, the issue would be whether Mr Oag deliberately sought to evade or frustrate enforcement of the relevant obligation or liability owed to MCR (which obligation would need to be clearly identified) by the incorporation of SPEX Services in April 2009. In the MCR Complaint, there does not seem to be any allegation of any specificity that Mr Oag incorporated SPEX Services with a view, deliberately, to evading an existing obligation or liability owed by him to MCR prior to 20 April 2009. Indeed, my understanding is that Mr Oag was not an incorporating shareholder of SPEX Services. The absence of any allegation along those lines appears even more acute when one remembers that the genesis of the MCR

---

[70] As advised by PM.
[71] My understanding is consistent with what MCR itself pleads at paras 136 and 137 of the MCR Complaint regarding the shareholders of SPEX Offshore. Neither SPEX Offshore (UK) Limited nor Mr Oag is alleged ever to have been a shareholder in SPEX Offshore.

complaints is the 2011 Licence Agreement – which was obviously entered into a couple of years after the incorporation of SPEX Services.

*SPEX Offshore*

94.    If question (b) was thought to be relevant in this context, the issue would be whether any of SPEX Services, SPEX Offshore (UK) Limited or Mr Oag (in his personal capacity) deliberately sought to evade or frustrate enforcement of the relevant obligation or liability owed to MCR (which obligation would need to be clearly identified) by incorporating SPEX Offshore on 11 September 2012. In the MCR Complaint, there does not seem to be any allegation of any specificity to that effect in relation to SPEX Offshore (UK) Limited or Mr Oag.

95.    I acknowledge that in the MCR Complaint, at para 230, it is averred that SPEX Services "used the corporate form to evade or avoid their legal obligations". In my opinion, it will be a matter for the Court whether, by incorporating SPEX Offshore in September 2012, SPEX Services thereby deliberately sought to evade or frustrate enforcement of the obligations which it (i.e., SPEX Services) owed to MCR in terms of the 2011 Licence Agreement.

96.    In this regard, however, I would note that it is not at all clear to me how it is alleged that SPEX Services actually sought to evade <u>its own legal obligations</u> by incorporating SPEX Offshore.

97.    Following the incorporation of SPEX Offshore, the obligations under the 2011 Licence Agreement owed by SPEX Services remained enforceable against the latter company. Indeed, in the MCR Complaint[72] MCR purports to sue SPEX Services, and advances a number of allegations of breach of the obligations under the 2011 Licence Agreement against that company. In other words, there appears to have been no attempt by SPEX Services to evade its own obligations by somehow interposing SPEX Offshore into the contractual chain.

---

[72] See, for instance, paras 111-120 thereof.

27

98.     Furthermore, the fact that SPEX Offshore was incorporated and subsequently entered into separate legal obligations of its own in terms of the licence agreement with MCR dated 21 May 2014 (as extended in 2015) would not, in my opinion, be sufficient to establish that SPEX Services had incorporated SPEX Offshore in a deliberate attempt to evade or frustrate the obligations owed by SPEX Services – especially when those obligations were still enforceable against SPEX Services. It is clear from *Prest* that it is not an abuse of the separate legal personality of a company (here SPEX Offshore) to cause a legal liability to be incurred by such a company in the first place. Nor is it an abuse to rely on the fact that a liability is not the controller's because it is a separate company's liability (here SPEX Offshore's liability)[73].

**(IX)    Additional points**

***Paras 235 and 236 of the MCR Complaint***

99.     For completeness, I will comment briefly on the claims made in the MCR Complaint at paras 235 and 236.

100.    At para 235, MCR contends that SPEX Group US LLC, SPEX Offshore (UK) Limited, SPEX Engineering (UK) Limited, SPEX Group Holdings Limited, SPEX Corporate Holdings Limited, and Mr Oag should be held liable for the allegedly tortious acts and fraudulent conduct of SPEX Services, SPEX Offshore and Mr Oag[74] "in as much as these persons or entities are alter egos" of SPEX Services, SPEX Offshore and Mr Oag. MCR goes on to argue that, in these circumstances, holding only SPEX Services and SPEX Offshore liable for their own conduct would "result in an injustice".

101.    At para 236, MCR argues that it is SPEX Services and SPEX Offshore which should be held liable for the allegedly tortious acts and fraudulent conduct of Mr Oag and other SPEX group companies "in as much as these entities[75] are alter egos" of Mr Oag and those other companies. According to MCR, in these circumstances, holding only Mr Oag and the other SPEX companies liable for their own conduct would "result in

---

[73] *Prest*, per Lord Sumption at para 34 (with whom Lord Neuberger specifically agreed at para 81).
[74] It is not clear to me why MCR mentions Mr Oag twice in this context. On the face of it, he could not be his own "alter ego" here. This may just be a typographical error by MCR.
[75] i.e., SPEX Services and SPEX Offshore.

28

an injustice". On this basis, MCR appears to be attempting to pin some form of liability on SPEX Services and/or SPEX Offshore.

102.   With regard to this part of MCR's case, I make two points. First, as explained above in section (VI) of this declaration[76], there is no basis in Scots law for the disregarding of separate corporate personality on the ground simply that one corporate entity was the "alter ego" of another person or company (whatever "alter ego" is supposed to mean in this context – which is not clear to me).

103.   Second, it is certainly not sufficient, as a matter of Scots law, simply to suggest that there will be some form of injustice, and on that footing invite the court to disregard separate corporate personality and/or to transfer liabilities within a group of companies. As was made clear in the *Bank of Tokyo* case[77], a Scottish or English court has no discretion to reject the distinction between the members of a corporate group simply on the basis that such a distinction is supposedly just a technical point. It is not. It is a fundamental part of UK company law. In addition, I would note that in *Adams*[78] there was a submission made by counsel that "where legal technicalities would produce injustice in cases involving members of a group of companies, such technicalities should not be allowed to prevail". The Court of Appeal rejected that submission (at p 536F-G).

### *"Reverse" corporate veil piercing*

104.   Separately, I have been asked to comment on a concept described as "reverse" corporate veil piercing. The situation to be considered is where a court pronounces judgment against an individual who is a shareholder of a company. In such a situation, I am asked whether a Scottish court would allow the judgment creditor to go past the individual and gain access to the assets of the company of which the individual was a shareholder.

105.   So far as I am aware, there is no example of a Scottish court having engaged in this type of "reverse" piercing of the corporate veil.

---

[76] See the ninth point made in that section.
[77] See Exhibit H.
[78] Produced as Exhibit G.

APP.046

106. Indeed, in the first instance the situation described would involve disregarding the legal personality of the individual. If a person owns shares in a Scottish company, and subsequently finds himself the subject of a monetary court order which he cannot pay, he may in due course find himself subject to personal insolvency proceedings[79]. In such a situation, the person appointed to administer the individual's estate for the benefit of his creditors as a whole (in Scotland, the relevant person is called the trustee in sequestration) would engather the individual's estate. In such a situation, the shares in the relevant company held by the now bankrupt individual would form part of the estate which the trustee in sequestration was to administer – with a view to satisfying the various creditors' claims against the individual's estate.

107. But I consider that, in such a situation, the trustee in sequestration would not be entitled to disregard the separate legal personality of the company and engather the assets of the company into the individual's estate. That is because, in this scenario, the asset which the bankrupt individual held was the shares in the relevant company, and not the assets of the company itself. By virtue of the long-standing decision in the *Salomon* case, the company's property and assets are regarded as its own, and not those of its shareholders.

108. If the shares held by the bankrupt individual were capable of being sold to a third party, the trustee in sequestration might sell them with the sale proceeds going into the estate for the benefit of the creditors as a whole. But in that situation the assets of the company would be unaffected; all that would have changed would be who the company's shareholders were.

109. The same analysis would apply, in my view, if the shareholder was a corporate entity which held shares in another company.

110. In conclusion, in a matter governed by Scots law, the concept of "reverse" corporate veil piercing would not justify the judgment creditor who succeeded against an individual shareholder from enforcing the judgment against the assets of the company in which the shareholder held the shares. That is because the concept of "reverse" corporate veil piercing is not, in my opinion, one which is recognised by Scots law.

---

[79] In colloquial terms, being made bankrupt.

*Is there any potential for MCR to fix liability on SPEX Services or SPEX Offshore by piercing the corporate veil of other SPEX companies?*

111.  Finally, I have been asked to comment on whether the corporate veil of other SPEX companies could be pierced with a view to MCR establishing liability against SPEX Services or SPEX Offshore.

112.  Whether such a case against either SPEX Services or SPEX Offshore is sustainable can, in my opinion, be tested under reference to the same form of analysis as is set out above in para 67 of this declaration. In that connection, the undernoted questions would be relevant. In framing these questions, I have used SPEX Services as the example, but the same questions should be applied relative to the corresponding position of SPEX Offshore.

  (i)    Was SPEX Services subject to existing legal obligations or liabilities owed to MCR prior to the incorporation of the other SPEX companies mentioned in para 82 of this declaration?

  (ii)   Is SPEX Services currently a shareholder in those other companies?

  (iii)  Did SPEX Services deliberately seek to evade or frustrate enforcement of the existing obligation or liability by interposing a company or companies under its control?

113.  I would make the following observations in relation to these three questions.

*Question (i)*

114.  My understanding is that SPEX Services was first subject to obligations owed to MCR when those two parties entered into a licence agreement on 29 June 2009. Perhaps of more relevance is the licence agreement entered into by the same parties on 16 May 2011. At least some (but not all) of the companies mentioned in para 82 above were incorporated after 16 May 2011.

31

115. With regard to SPEX Offshore, my understanding is that it first entered into a licence agreement with MCR on 21 May 2014. In this context, at least some (but again not all) of the companies mentioned in para 82 above were incorporated after 21 May 2014.

*Question (ii)*

116. I am advised that SPEX Services is not a shareholder in (or could otherwise be regarded as being in control of) any of the companies mentioned in para 82 above.

117. With regard to SPEX Offshore, my understanding is that it was never (and is not now) a shareholder in any of the companies mentioned in para 82 above (or was otherwise in control of them).

118. If SPEX Services is no longer a shareholder in the relevant companies (and is not otherwise in control of those companies), I simply do not see how the corporate veil-piercing principle can have any application. In that regard, I refer to the view which I have expressed at para 67(a) of this declaration.

119. The same reasoning and result would, in my opinion, apply in relation to SPEX Offshore.

*Question (iii)*

120. As to question (iii), I do not see how SPEX Services could be taken as having sought to evade its existing obligations in the sense identified by Lord Sumption in *Prest*. I say that for two reasons. The first is that notwithstanding the incorporation of the companies mentioned in para 82 above, SPEX Services remained for some time directly subject to its obligations under the agreements which it had entered into with MCR in June 2009 and May 2011. This point is reinforced by the fact that MCR is still seeking to enforce those obligations against SPEX Services in the current court proceedings in Texas.

121. The second, and related, point is that it is not clear to me how MCR alleges that SPEX Services "interposed" (to use Lord Sumption's word from para 35 of his judgment in *Prest*) the other companies into the obligations owed by SPEX Services to MCR.

32

122.   Moreover, in *Persad*, the JCPC referred[80] to the idea of the "individual interposing a company <u>into the transaction</u>" (emphasis added).

123.   Looking at matters in this way, it is not clear to me how MCR alleges that the relevant companies were interposed "into the transaction" – which, in this context, would be the agreements between MCR and SPEX Services entered into in June 2009 and May 2011.

124.   I consider that the same two points can be made in connection with SPEX Offshore's position.

*Conclusion re the question posed*

125.   The question to be addressed is whether there is any potential for MCR to fix liability on SPEX Services or SPEX Offshore by piercing the corporate veil of other SPEX companies.

126.   On the basis of the points which I have made above, I do not consider that, as a matter of Scots law, there is any scope for doing so.

**(X)**   **Declaration**

127.   I declare that the foregoing represents my opinion on Scots law in relation to the matters considered herein. I declare under the penalty of perjury under the law of the United States of America that the foregoing opinion is true and correct to the best of my understanding, knowledge and research of the issues addressed.

Executed in Edinburgh, Scotland, on 30 January 2019.

....................................................

**GARRY BORLAND, Q.C.**

---

[80] At para 20 of the judgment.

33

# EXHIBIT A

# Pinsent Masons

BY E-MAIL AND POST

Mr Gary Borland QC
Axiom Advocates
Advocates Library
Parliament House
Edinburgh
EH1 1RF

Our Ref 99601981.4\gs4\673087.07001

23 October 2018

Dear Sir

**SPEX CORPORATE HOLDINGS LIMITED**

We are instructed by Spex Corporate Holding Limited.

Our client is a company within a group of companies which for the purpose of this letter we refer to as the Spex group. Our client, together with a number of other companies within its group, is currently defending proceedings which have been commenced by MCR Oil Tools LLC ("MCR") before the District Court for the Northern District of Texas. Foley Gardere is instructed by all of the Spex defendants and Mr Jamie Oag (a director of various companies in the Spex group) to conduct the proceedings in Texas and Pinsent Masons LLP is providing assistance in relation to matters of Scots law.

We should be grateful if you would review the enclosed papers together with the summary noted below and draft an opinion on the issues noted below. It is our intention that your opinion be filed at court in the same form as the Declarations that have been filed by both Roisin Higgins QC on behalf of the Plaintiff MCR, and by Craig Connal QC on behalf of our client. With that in mind we should be grateful if you would provide your opinion in the same format as the enclosed Declarations.

1.    **BACKGROUND**

On 29 June 2009 MCR entered into a licence agreement with Spex Services Limited. The licence granted Spex Services Limited the right to use MCR's Tools (as defined in the Plaintiff's Third Amended Complaint). On 16 May 2011 MCR entered into a subsequent licence agreement in respect of the Tools with Spex Services Limited.

On 21 May 2014 MCR entered into a licence agreement with SPEX Offshore Limited and on 1 June 2015 MCR agreed to extend the terms of the 2014 licence until 21 May 2016. The licence granted Spex Offshore Limited the right to use MCR's Tools.

As expected, all of the licence agreements contained provisions relating to protection of MCR's intellectual property in the Tools and associated confidential information.

Pinsent Masons LLP

141 Bothwell Street  Glasgow  G2 7EQ  United Kingdom

**T** +44 (0)141 567 8400  **F** +44 (0)141 567 8401  **DX** 135 - Glasgow

Pinsent Masons LLP is a limited liability partnership, registered in England and Wales (registered number: OC333653) authorised and regulated by the Solicitors Regulation Authority and the appropriate jurisdictions in which it operates. Reference to "Pinsent Masons" as the context requires. The word "partner", used in relation to the LLP, refers to a member of an employee or consultant of the LLP or any affiliated firm, with equivalent standing. A list of members of Pinsent Masons, those non-members who are designated as partners, and non-member partners in affiliated entities, is available for inspection at our offices or at www.pinsentmasons.com
For a full list of the jurisdictions where we operate, see www.pinsentmasons.com

APP.052

The current proceedings flow from MCR's allegation that Spex Services Limited and Spex Offshore Limited breached the terms of their licence agreements by creating new intellectual property which MCR considers to be enhancements and / or extensions of its intellectual property in the MCR Tools.

The basis for MCR's allegations appears to be patents which were applied for in 2014 by Spex Services Limited and Jamie Oag (one if it's Directors).  MCR argue that the content of these patents are extensions and / or enhancements of its Tools.  Details of the patent applications are set out in the enclosed documents and for brevity this information is not duplicated in this letter.

MCR alleges that after Spex Services Limited filed its patent applications, the Spex group created shell companies and assigned the patent applications to the shell companies in the group in ordered to avoid liability for the alleged breach of the licence agreements.

MCR alleges that SPEX Group US LLC, SPEX Offshore (UK) Limited, SPEX Engineering (UK) Limited, SPEX Holdings, and SPEX Corporate Holdings are alter egos of the dissolved companies SPEX Offshore Limited and SPEX Services Limited and Jamie Oag individually.

MCR asserts that numerous facts demonstrate unity between the SPEX entities, and as such, the corporate form should be disregarded: (1) SPEX entities share common stock ownership; (2) SPEX entities share common officers and directors; (3) SPEX entities share financial statements and overhead such as website, accountants and finance personnel, IT personnel, lease, facilities, phone system, HR, marketing costs, and depreciation costs; and (4) SPEX entities' daily operations are not kept separate between and among the entities as evidenced by the use of several corporate email addresses by directors and employees at SPEX entities.

Further, MCR alleges that actual fraud support its alter ego theory. Specifically, MCR argues that SPEX Services Ltd., SPEX Offshore Ltd. and Jamie Oag made false misrepresentations to induce MCR to enter into license agreements with SPEX Services Ltd. and SPEX Offshore Ltd. in 2011, 2014 and 2015. It is asserted that SPEX Services, SPEX Offshore and Jamie Oag used the license agreement as a means to misappropriate MCR's trade secret and confidential and proprietary information for their own benefit and for the benefit of the other SPEX entities. For example, MCR claims that SPEX Services, SPEX Offshore and Jamie Oag engaged and assisted in the testing, modifying, reverse engineering, and developing MCR's tools and intellectual property, developed and designed competing tools and product, and filed patents through SPEX entities and their directors to rebrand MCR's technology as its own. MCR rely on the following information:

1.1     On 20 April 2009 Spex Services Limited was incorporated in Scotland.

1.2     On 11 September 2012 Spex Offshore Limited was incorporated in Scotland.

1.3     On 1 March 2016 Spex Holding Limited was incorporated in Scotland.

1.4     On 25 April 2016 Spex Holdings Limited became the parent company of Spex Engineering UK Limited following a share for share transfer with Spex Services Limited.

1.5     It is alleged that on 25 April 2016 Spex Services Limited purposefully caused itself to be undercapitalised through the payment of dividends to affiliates and asset transfers to Spex Holdings Limited.

1.6     On 5 May 2016 Spex Services transferred 100% ownership of Spex Offshore UK Limited to Spex Holdings Limited.

1.7     It is alleged that on 1 August 2016 Spex Offshore Limited purposefully caused itself to be undercapitalised by transferring its assets to Spex Offshore UK Limited.

1.8     On 19 August 2016 Spex Services Limited changed its name to General Services 2 Limited and Spex Offshore Limited changed its name to General Services 1 Limited.

1.9     On 30 September 2017 General Services 1 Limited was dissolved under Scottish law and struck off the Register of Companies in Scotland.

1.10    On 5 January 2018, General Services 2 Limited was dissolved under Scottish law and struck off the Register of Companies in Scotland

The dissolutions occurred approximately 18 months after MCR unilaterally terminated its licence with Spex Offshore Limited which supported the vast majority of revenue the corporation generated, and forced it into liquidation.

Given that both Spex Services Limited (latterly General Services 2 Limited) and Spex Offshore Limited (latterly General Services 1 Limited) were dissolved, it is our client's position that neither of these companies can, at present, properly be sued either in Texas or in the UK.

In order to overcome this issue, MCR alleges that Spex Group US LLC, Spex Offshore (UK) Limited, Spex Engineering (UK) Limited, SPEX Holdings, and SPEX Corporate Holdings are alter egos of the dissolved companies Spex Offshore Limited and Spex Services Limited and Jamie Oag individually.

MCR has requested that the Texan court pierce the veil of incorporation so that it can demonstrate unity across our client's group. Based on the factual background provided above, MCR claims that SPEX entities and Jamie Oag are alter egos of SPEX Services, SPEX Offshore and Jamie Oag, and accordingly, SPEX entities and Jamie Oag should be liable for the tortious acts and fraudulent conduct of SPEX Services, SPEX Offshore and Jamie Oag. MCR rely on commonality between officers and Directors across the companies in the group and draw inferences from the financial organisation of the group of companies in an attempt to argue that there is a blending of the corporate entities within the group resulting in no distinction between each of the individual corporate entities in the group.

Our client wholly disagrees with this analysis and maintains the position that each of the companies within its group is independent. It is also our client's position that before any further action can be taken against Spex Services Limited (latterly General Services 2 Limited) and Spex Offshore Limited (latterly General Services 1 Limited) these companies must be restored to the Register of Companies. We understand that MCR have instructed Roisin Higgins QC to petition the Court of Session to restore the companies to the Register of Companies, but to date our client has not received any notice of the purported proceedings being commenced.

We enclose Spex's Affirmative Defences and Counterclaims which set out our client's defence in more detail. We also enclose further information relating to our client's corporate structure and the dissolution of the corporate entities which entered into the licence agreements with MCR.

In addition to this we enclose declarations which have already been filed by both Roisin Higgins QC on behalf of MCR and Craig Connal QC on behalf of our client in respect of this issue. You will see that Mr Connal's Declaration provided an overview of the relevant case law on this matter but does not provide a detailed analysis on the circumstances where a court in Scotland has ordered that the veil be pierced, nor does he apply the law to the particular circumstances of this matter.

Our client considers that it would be extremely helpful if we could provide, by way of a Declaration from you, an overview of the cases where a court in Scotland has been persuaded that the corporate veil should be lifted. We consider that the circumstances of the cases that have already been subject to determination by a Scottish court will be different to the unique circumstances of our client's case where a complex corporate structure exists.

We consider that such an analysis of Scottish case law would be of great benefit to a judge in Texas when they come to consider this matter, so too would your opinion on whether or not a Scottish court would likely be persuaded that in the circumstances of this case the corporate veil should be pierced.

2.     **NEXT STEPS**

We should be grateful if you would let us have a Declaration which provides your opinion on the following:

2.1     to review Scottish case law on piercing the corporate veil in order to produce a series of propositions (backed by case-law and textbook authority) which could then be applied by the court in the context of whatever other facts the court finds in relation to the wider dispute;

2.2     with reference to the particular circumstances of this case and in light of the propositions identified from Scottish case law, provide your opinion on whether or not a Scottish court is likely to order that the corporate veil should be pierced to expand liability of Spex Services Limited and Spex Offshore Limited to other Spex entities and Jamie Oag (in light of there being no case history of the doctrine of piercing the corporate veil being invoked to interpose the liability of one subsidiary on another).

The deadline for filing your Declaration with the Texan court is 31 October 2018. With that in mind we should be grateful if you would let us have your Declaration in draft before midday on 29 October 2018. We will share the draft with Foley Gardere and ask for their comments for your consideration. We would then work towards finalising the Declaration before 5pm on 30 October 2018 so that it could be filed on 31 October 2018.

Should you require any additional information beyond that provided in this letter and the supporting documents, please do not hesitate to contact Gillian Anderson on her direct dial 0141 249 5458 or by email Gillian.Anderson@pinsentmasons.com.

Yours faithfully

*[signature]*

Gillian Anderson
Senior Associate
for Pinsent Masons LLP

**Enclosed**:

1.     Plaintiff MCR's Third Amended Complaint

2.     SPEX Group US's Answer and Affirmative Defenses to MCR's Original Complaint;

3.     SPEX's Brief in support of Motion for Determination of Foreign Law (application of Scottish law on alter ego analysis);

4.     Appendix to Brief in support of Determination of Foreign Law (Declaration on application of Scottish law on alter ego analysis);

5.     MCR's Response to Defendants' Motion for Determination of Foreign Law;

APP.055

6.      Appendix to MCR's Response (Declarations of MCR's QC on alter ego analysis);

7.      SPEX's Reply in support of Motion for Determination of Foreign Law;

8.      Appendix to Reply (Declaration on application of Scottish law on alter ego analysis);

9.      Court's Order on Application of Scottish Law to alter ego analysis;

10.     Jamie's deposition transcript (Attorneys Eyes Only);

11.     Ryan's deposition transcript (Attorneys Eyes Only);

12.     Dissolved Company - SPEX Offshore Ltd's public documents - Notice of final meeting of creditors and Return of final meeting; and

13.     Dissolved Company - SPEX Services Ltd's public documents - Notice of final meeting of creditors and Return of final meeting.

14.     SPEX group structure

APP.056

Attorneys Eyes Only

# SPEX Group Structure



OFFSHORE BUSINESS AREA
- SPEX Offshore (UK) Limited

SPEX Group Holdings Limited

ENGINEERING BUSINESS AREA
- SPEX Corporate Holdings Limited
- SPEX Engineering (UK) Limited
- SPEX Engineering Limited
- SPEX Group US LLC
- SPEX Oilfield Limited
- SPEX Oil and Gas Limited

Copyright © & Confidential 2017 SPEX Group Holdings Ltd

SPEX

DEFENDANTS 014630

APP.057

Attorneys Eyes Only

# SPEX Group Companies

| Company Name | Company Number | Date of incorporation | State/Country of Incorporation | Parent/Shareholder | Status/Business Area |
|---|---|---|---|---|---|
| SPEX Group Holdings Limited | SC528327 | 1 Mar 2016 | Scotland | Shareholder group | Holding Company |
| SPEX Offshore (UK) Limited | SC398792 | 4 May 2011 | Scotland | SPEX Group Holdings Limited | Offshore |
| SPEX Corporate Holdings Limited | SC553125 | 21 Dec 2016 | Scotland | SPEX Group Holdings Limited | Engineering |
| SPEX Engineering (UK) Limited | SC499034 | 26 Feb 2015 | Scotland | SPEX Group Holdings Limited | Engineering |
| SPEX Engineering Limited | SC379535 | 1 Jun 2010 | Scotland | SPEX Group Holdings Limited | Engineering |
| SPEX Oilfield Limited | SC553130 | 21 Dec 2016 | Scotland | SPEX Engineering (UK) Limited | Dormant, never traded |
| SPEX Oil and Gas Limited | SC553138 | 21 Dec 2016 | Scotland | SPEX Engineering (UK) Limited | Dormant, never traded |
| SPEX Group US LLC | 801820275 | 22 Jul 2013 | Texas, US | SPEX Engineering (UK) Limited | Dormant, never traded |



Copyright © & Confidential 2017 SPEX Group Holdings Ltd

SPEX

DEFENDANTS 014631

Attorneys Eyes Only

# Company Directors and Secretary

| Company Name | Directors | Secretary |
|---|---|---|
| SPEX Group Holdings Limited | Graeme Coutts (Chairman), Jamie Oag, Ryan Strachan, Nadir Mahjoub, Mike Sibson (BGF Investment Director), Colin Smith (Non-Executive). David Fraser is a Board observer for BGF. | Blackwood Partners LLP |
| SPEX Group US LLC | Jamie Oag (President) | Ryan Strachan |
| Subsidiaries | Jamie Oag, Ryan Strachan, Nadir Mahjoub | Blackwood Partners LLP |



Copyright © & Confidential 2017 SPEX Group Holdings Ltd

DEFENDANTS 014632

# EXHIBIT B

H. L. (E.)    by an action for the purpose, but had no right virtute officii to
1896    have any part of the New Zealand mortgages appropriated
LORD
SUDELEY    to the estate of their testatrix in specie.
*v.*
ATTORNEY-
GENERAL.

                 *Order appealed from affirmed and appeal*
                          *dismissed with costs.*

           *Lords' Journals*, November 13, 1896.

     Solicitor for appellants : *J. A. Bertram.*
     Solicitor for respondent : *Solicitor of Inland Revenue.*

---

### [HOUSE OF LORDS.]

H. L. (E.)    ARON SALOMON (PAUPER) . . . . . APPELLANT ;
1896                            AND
*Nov.* 16.    A. SALOMON AND COMPANY, LIMITED RESPONDENTS.

                BY ORIGINAL APPEAL.

                      AND

A. SALOMON AND COMPANY, LIMITED APPELLANTS ;

                      AND

ARON SALOMON . . . . . . . . RESPONDENT.

                BY CROSS APPEAL.

*Company—Private Company—One Man Company—Limited Liability—Wind-*
*ing-up—Fraud upon Creditors— Liability to indemnify Company in*
*respect of Debts—Rescission—Companies Act* 1862 (25 & 26 *Vict. c.* 89)
*ss.* 6, 8, 30, 43.

     It is not contrary to the true intent and meaning of the Companies Act
1862 for a trader, in order to limit his liability and obtain the preference
of a debenture-holder over other creditors, to sell his business to a limited
company consisting only of himself and six members of his own family,
the business being then solvent, all the terms of sale being known to and
approved by the shareholders, and all the requirements of the Act being
complied with.

     A trader sold a solvent business to a limited company with a nominal
capital of 40,000 shares of 1*l.* each, the company consisting only of the
vendor, his wife, a daughter and four sons, who subscribed for one share
each, all the terms of sale being known to and approved by the shareholders.

In part payment of the purchase-money debentures forming a floating security were issued to the vendor. Twenty thousand shares were also issued to him and were paid for out of the purchase-money. These shares gave the vendor the power of outvoting the six other shareholders. No shares other than these 20,007 were ever issued. All the requirements of the Companies Act 1862 were complied with. The vendor was appointed managing director, bad times came, the company was wound up, and after satisfying the debentures there was not enough to pay the ordinary creditors :—

*Held*, that the proceedings were not contrary to the true intent and meaning of the Companies Act 1862 ; that the company was duly formed and registered and was not the mere " alias " or agent of or trustee for the vendor ; that he was not liable to indemnify the company against the creditors' claims ; that there was no fraud upon creditors or shareholders ; and that the company (or the liquidator suing in the name of the company) was not entitled to rescission of the contract for purchase.

The decisions of Vaughan Williams J. and the Court of Appeal ([1895] 2 Ch. 323) reversed.

H. L. (E.)
1896
SALOMON
v.
SALOMON
& Co.
———
SALOMON
& Co.
v.
SALOMON.

THE following statement of the facts material to this report is taken from the judgment of Lord Watson :—

The appellant, Aron Salomon, for many years carried on business, on his own account, as a leather merchant and wholesale boot manufacturer. With the design of transferring his business to a joint stock company, which was to consist exclusively of himself and members of his own family, he, on July 20, 1892, entered into a preliminary agreement with one Adolph Anholt, as trustee for the future company, settling the terms upon which the transfer was to be made by him, one of its conditions being that part payment might be made to him in debentures of the company. A memorandum of association was then executed by the appellant, his wife, a daughter, and four sons, each of them subscribing for one share, in which the leading object for which the company was formed was stated to be the adoption and carrying into effect, with such modifications (if any) as might be agreed on, of the provisional agreement of July 20. The memorandum was registered on July 28, 1892 ; and the effect of registration, if otherwise valid, was to incorporate the company, under the name of " Aron Salomon and Company, Limited," with liability limited by shares, and having a nominal capital of 40,000*l.*, divided into 40,000 shares of 1*l.* each. The company adopted

H. L. (E.)
1896
SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

the agreement of July 20, subject to certain modifications which are not material ; and an agreement to that effect was executed between them and the appellant on August 2, 1892.   Within a month or two after that date the whole stipulations of the agreement were fulfilled by both parties.   In terms thereof, 100 debentures, for 100*l.* each, were issued to the appellant, who, upon the security of these documents, obtained an advance of 5000*l.* from Edmund Broderip.   In February 1893 the original debentures were returned to the company and cancelled ; and in lieu thereof, with the consent of the appellant as beneficial owner, fresh debentures to the same amount were issued to Mr. Broderip, in order to secure the repayment of his loan, with interest at 8 per cent.

In September 1892 the appellant applied for and obtained an allotment of 20,000 shares ; and from that date until an order was made for its compulsory liquidation, the share register of the company remained unaltered, 20,001 shares being held by the appellant, and six shares by his wife and family.   It was all along the intention of these persons to retain the business in their own hands, and not to permit any outsider to acquire an interest in it.

Default having been made in the payment of interest upon his debentures, Mr. Broderip, in September 1893, instituted an action in order to enforce his security against the assets of the company.   Thereafter a liquidation order was made, and a liquidator appointed, at the instance of unsecured creditors of the company.   It has now been ascertained that, if the amount realised from the assets of the company were, in the first place, applied in extinction of Mr. Broderip's debt and interest, there would remain a balance of about 1055*l.*, which is claimed by the appellant as beneficial owner of the debentures.   In the event of his claim being sustained there will be no funds left for payment of the unsecured creditors, whose debts amount to 7733*l.* 8*s.* 3*d.*

The liquidator lodged a defence, in name of the company, to the debenture suit, in which he counter-claimed against the appellant (who was made a party to the counter-claim), (1.) to have the agreements of July 20 and August 2, 1892 rescinded,

(2.) to have the debentures already mentioned delivered up and
cancelled, (3.) judgment against the appellant for all sums paid
by the company to the appellant under these agreements, and
(4.) a lien for these sums upon the business and assets. The
averments made in support of these claims were to the effect
that the price paid by the company exceeded the real value of
the business and assets by upwards of 8200*l.*; that the arrange-
ments made by the appellant for the formation of the company
were a fraud upon the creditors of the company; that no board
of directors of the company was ever appointed, and that in
any case such board consisted entirely of the appellant, and
there never was an independent board. The action came on
for trial on the counter-claim before Vaughan Williams J.,
when the liquidator was examined as a witness on behalf of the
company, whilst evidence was given for the appellant by him-
self, and by his son, Emanuel Salomon, one of the members of
the company, who had been employed in the business for
nearly twenty years.

The evidence shews that, before its transfer to the new
company, the business had been prosperous, and had yielded to
the appellant annual profits sufficient to maintain himself and his
family, and to add to his capital. It also shews that at the date
of transfer the business was perfectly solvent. The liquidator,
whose testimony was chiefly directed toward proving that the
price paid by the company was excessive, admitted on cross-
examination that the business, when transferred to the company,
was in a sound condition, and that there was a substantial
surplus. No evidence was led tending to support the allegation
that no board of directors was ever appointed, or that the board
consisted entirely of the appellant. The non-success and
ultimate insolvency of the business, after it came into the
hands of the company, was attributed by the witness Emanuel
Salomon to a succession of strikes in the boot trade, and there
is not a tittle of evidence tending to modify or contradict his
statement. It also appears from the evidence that all the
members of the company were fully cognisant of the terms
of the agreements of July 20 and August 2, 1892, and that they
were willing to accept and did accept these terms.

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

3:18-cv-00731-X   Document 273-6   Filed 07/30/19   Page 48 of 421   PageID 1

H. L. (E.).

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

At the close of the argument Vaughan Williams J. announced that he was not prepared to grant the relief craved by the company. He at the same time suggested that a different remedy might be open to the company; and, on the motion of their counsel, he allowed the counter-claim to be amended. In conformity with the suggestion thus made by the Bench, a new and alternative claim was added for a declaration that the company or the liquidator was entitled (1.) to be indemnified by the appellant against the whole of the company's unsecured debts, namely, 7733l. 8s. 3d.; (2.) to judgment against the appellant for that sum; and (3.) to a lien for that amount upon all sums which might be payable to the appellant by the company in respect of his debentures or otherwise until the judgment was satisfied. There were also added averments to the effect that the company was formed by the appellant, and that the debentures for 10,000l. were issued in order that he might carry on the business, and take all the profits without risk to himself; and also that the company was the "mere nominee and agent" of the appellant.

Vaughan Williams J. made an order for a declaration in the terms of the new and alternative counter-claim above stated, without making any order on the original counter-claim.

Both parties having appealed, the Court of Appeal (Lindley, Lopes and Kay L.JJ.) being of opinion that the formation of the company, the agreement of August 1892, and the issue of debentures to the appellant pursuant to such agreement, were a mere scheme to enable him to carry on business in the name of the company with limited liability contrary to the true intent and meaning of the Companies Act 1862, and further to enable him to obtain a preference over other creditors of the company by procuring a first charge on the assets of the company by means of such debentures, dismissed the appeal with costs, and declined to make any order on the original counter-claim. (1)

Against this order the appellant appealed, and the company brought a cross-appeal against so much of it as declined to make any order upon the original counter-claim. Broderip having been paid off was no party to this appeal or cross-appeal.

(1) Reported as *Broderip* v. *Salomon*, [1895] 2 Ch. 323.

June 15, 22, 29. ° *Cohen Q.C.* and *Buckley Q.C.* (*McCall Q.C.*
and *Muir Mackenzie* with them), for the appellant in the
original appeal.  The view of Vaughan Williams J. that the
company was the mere alias or agent of the appellant so as to
make him liable to indemnify the company against creditors,
was not adopted by the Court of Appeal, who seem to have
considered the company as the appellant's trustee.  There is
no evidence in favour of either view.  The sale of the business
was bonâ fide : the business was genuine and solvent, with a
substantial surplus.  All the circumstances were known to and
approved by the shareholders.  All the requirements of the
Companies Act, 1862, were strictly complied with : the purpose
was lawful, the proceedings were regular.  How could the
registrar refuse to register such a company ?  What objection
is it that the vendor desires to convert his unlimited into a
limited liability ?  That is the prime object of turning a private
business into a limited company, practised every day by banks
and other great firms.  And what difference to creditors could
it make whether the debentures were held by the vendor or
by strangers ?  Whoever held them had the preference over
creditors—that is the future creditors—all the old creditors
having been paid off by the vendor.  There was no misrepre-
sentation of fact, and no one was misled : where is " the fraud
upon creditors " spoken of in the Court of Appeal ?  The
creditors were under no obligation to trust the company ; they
might, if they had desired, have found out who held the shares,
and in what proportion, and who held the debentures.  There
is not a word in ss. 6, 8, 30, 43, or any other section of the
Companies Act, 1862, forbidding or even pointing against such
a company so formed and for such objects.  Then, if the
company was a real company, fulfilling all the requirements of
the Legislature, it must be treated as a company, as an entity,
consisting indeed of certain corporators, but a distinct and
independent corporation.  The Court of Appeal seem to treat
the company sometimes as substantial and sometimes as
shadowy and unreal : it must be one or the other, it cannot be
both.  A Court cannot impose conditions not imposed by the
Legislature, and say that the shareholders must not be related

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

to each other, or that they must hold more than one share each. There is nothing to prevent one shareholder or all the shareholders holding the shares in trust for some one person. What is prohibited is the entry of a trust on the register : s. 30. If all the shares were held in trust that would not make the company a trustee. The authorities relied upon below (which all turn upon some one being deceived or defrauded) do not touch the present case and do not support the judgment below.

[They referred to *Reg.* v. *Arnaud* (1) ; *In re Ambrose Lake Tin and Copper Mining Co.* (2) ; *In re British Seamless Paper Box Co.* (3) ; *Farrar* v. *Farrars, Limited* (4) ; *North-West Transportation Co.* v. *Beatty* (5) ; *In re National Debenture and Assets Corporation* (6) ; *In re George Newman & Co.* (7) ]

As to the cross-appeal, there being no fraud, misrepresentation or deceit, not even any failure of consideration, there is no ground for rescission. Moreover, the company's assets having been sold the company is not in a position to ask for it.

*Farwell Q.C.* and *H. S. Theobald*, for the respondents. The question is one of fact rather than law, and the true inferences from the facts are these : The appellant incorporated the company to carry on his business without risk to himself and at his creditors' expense. The business was decaying when the company was formed, and though carried on as before, nay with more (borrowed) money, it failed very soon after the sale. To get an advantage over creditors the vendor took debentures and concealed the fact from them. The purchase-money was exorbitant, the price dictated solely by the vendor, and there was no independent person acting for the company. Though incorporated under the Acts the company never had an independent existence : it was in fact the appellant under another name ; he was the managing director, the other directors being his sons and under his control. The shareholders other than himself were his own family, and his vast preponderance of shares made him absolute master.

(1) (1846) 9 Q. B. 806.          (4) (1888) 40 Ch. D. 395.
(2) (1880) 14 Ch. D. 390, 394, 398.   (5) (1887) 12 App. Cas. 589.
(3) (1881) 17 Ch. D. 467, 476, 479.   (6) [1891] 2 Ch. 505.
                    (7) [1895] 1 Ch. 674, 685.

He could pass any resolution, and he would receive all the profits—if any. Whether therefore the company is considered as his agent, or his nominee or his trustee, matters little. The business was solely his, conducted solely for him and by him, and the company was a mere sham and fraud, in effect entirely contrary to the intent and meaning of the Companies Act. The liquidator is therefore entitled to counter-claim against him for an indemnity. As to the cross-appeal and the claim for rescission the decision in *Erlanger* v. *New Sombrero Phosphate Co.* (1) and the observations of Lord Cairns are precisely applicable and conclusive in favour of rescission. See also *Adam* v. *Newbigging.* (2)

[LORD WATSON referred to *Western Bank of Scotland* v. *Addie* (3), following *Clarke* v. *Dickson.* (4) ]

[They also referred to *Ex parte Cowen* (5) ; *In re Smith.* (6)]

The House took time for consideration.

Nov. 16. LORD HALSBURY L.C. My Lords, the important question in this case, I am not certain it is not the only question, is whether the respondent company was a company at all—whether in truth that artificial creation of the Legislature had been validly constituted in this instance ; and in order to determine that question it is necessary to look at what the statute itself has determined in that respect. I have no right to add to the requirements of the statute, nor to take from the requirements thus enacted. The sole guide must be the statute itself.

Now, that there were seven actual living persons who held shares in the company has not been doubted. As to the proportionate amounts held by each I will deal presently ; but it is important to observe that this first condition of the statute is satisfied, and it follows as a consequence that it would not

<div style="margin-left: 40px;">
H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.
</div>

(1) (1878) 3 App. Cas. 1218, 1236, 1238.
(2) (1888) 13 App. Cas. 308.
(3) (1867) L. R. 1 H. L., Sc. 145.
(4) (1858) E. B. & E. 148.
(5) (1867) L. R. 2 Ch. 563.
(6) (1890) 25 Q. B. D. 536, 541.

3:18-cv-00731-X   Document 273-6   Filed 07/30/19   Page 52 of 421   PageID 1

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord Halsbury
L.C.

be competent to any one—and certainly not to these persons themselves—to deny that they were shareholders.

I must pause here to point out that the statute enacts nothing as to the extent or degree of interest which may be held by each of the seven, or as to the proportion of interest or influence possessed by one or the majority of the shareholders over the others. One share is enough. Still less is it possible to contend that the motive of becoming shareholders or of making them shareholders is a field of inquiry which the statute itself recognises as legitimate. If they are shareholders, they are shareholders for all purposes; and even if the statute was silent as to the recognition of trusts, I should be prepared to hold that if six of them were the cestuis que trust of the seventh, whatever might be their rights inter se, the statute would have made them shareholders to all intents and purposes with their respective rights and liabilities, and, dealing with them in their relation to the company, the only relations which I believe the law would sanction would be that they were corporators of the corporate body.

I am simply here dealing with the provisions of the statute, and it seems to me to be essential to the artificial creation that the law should recognise only that artificial existence—quite apart from the motives or conduct of individual corporators. In saying this, I do not at all mean to suggest that if it could be established that this provision of the statute to which I am adverting had not been complied with, you could not go behind the certificate of incorporation to shew that a fraud had been committed upon the officer entrusted with the duty of giving the certificate, and that by some proceeding in the nature of scire facias you could not prove the fact that the company had no real legal existence. But short of such proof it seems to me impossible to dispute that once the company is legally incorporated it must be treated like any other independent person with its rights and liabilities appropriate to itself, and that the motives of those who took part in the promotion of the company are absolutely irrelevant in discussing what those rights and liabilities are.

I will for the sake of argument assume the proposition that

the Court of Appeal lays down—that the formation of the
company was a mere scheme to enable Aron Salomon to carry
on business in the name of the company.   I am wholly unable
to follow the proposition that this was contrary to the true
intent and meaning of the Companies Act.   I can only find
the true intent and meaning of the Act from the Act itself;
and the Act appears to me to give a company a legal existence
with, as I have said, rights and liabilities of its own, whatever
may have been the ideas or schemes of those who brought it
into existence.

I observe that the learned judge (Vaughan Williams J.) held
that the business was Mr. Salomon's business, and no one
else's, and that he chose to employ as agent a limited company;
and he proceeded to argue that he was employing that limited
company as agent, and that he was bound to indemnify that
agent (the company).   I confess it seems to me that that very
learned judge becomes involved by this argument in a very
singular contradiction.   Either the limited company was a
legal entity or it was not.   If it was, the business belonged to
it and not to Mr. Salomon.   If it was not, there was no person
and no thing to be an agent at all; and it is impossible to say
at the same time that there is a company and there is not.

Lindley L.J., on the other hand, affirms that there were
seven members of the company; but he says it is manifest
that six of them were members simply in order to enable the
seventh himself to carry on business with limited liability.
The object of the whole arrangement is to do the very thing
which the Legislature intended not to be done.

It is obvious to inquire where is that intention of the Legis-
lature manifested in the statute.   Even if we were at liberty to
insert words to manifest that intention, I should have great
difficulty in ascertaining what the exact intention thus imputed
to the Legislature is, or was.   In this particular case it is the
members of one family that represent all the shares; but if the
supposed intention is not limited to so narrow a proposition as
this, that the seven shareholders must not be members of one
family, to what extent may influence or authority or intentional
purchase of a majority among the shareholders be carried so as

H. L. (E.)

1896

SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord Halsbury
L.C.

e 3:18-cv-00731-X   Document 273-6   Filed 07/30/19   Page 54 of 421   PageID 1

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord Halsbury
L.C.

to bring it within the supposed prohibition? It is, of course, easy to say that it was contrary to the intention of the Legislature—a proposition which, by reason of its generality, it is difficult to bring to the test; but when one seeks to put as an affirmative proposition what the thing is which the Legislature has prohibited, there is, as it appears to me, an insuperable difficulty in the way of those who seek to insert by construction such a prohibition into the statute.

As one mode of testing the proposition, it would be pertinent to ask whether two or three, or indeed all seven, may constitute the whole of the shareholders? Whether they must be all independent of each other in the sense of each having an independent beneficial interest? And this is a question that cannot be answered by the reply that it is a matter of degree. If the Legislature intended to prohibit something, you ought to know what that something is. All it has said is that one share is sufficient to constitute a shareholder, though the shares may be 100,000 in number. Where am I to get from the statute itself a limitation of that provision that that shareholder must be an independent and beneficially interested person?

My Lords, I find all through the judgment of the Court of Appeal a repetition of the same proposition to which I have already adverted—that the business was the business of Aron Salomon, and that the company is variously described as a myth and a fiction. Lopes L.J. says: "The Act contemplated the incorporation of seven independent bonâ fide members, who had a mind and a will of their own, and were not the mere puppets of an individual who, adopting the machinery of the Act, carried on his old business in the same way as before, when he was a sole trader." The words "seven independent bonâ fide members with a mind and will of their own, and not the puppets of an individual," are by construction to be read into the Act. Lopes L.J. also said that the company was a mere nominis umbra. Kay L.J. says: "The statutes were intended to allow seven or more persons, bonâ fide associated for the purpose of trade, to limit their liability under certain conditions and to become a corporation. But they were not intended to legalise a pretended association for the purpose of

enabling an individual to carry on his own business with limited liability in the name of a joint stock company."

My Lords, the learned judges appear to me not to have been absolutely certain in their own minds whether to treat the company as a real thing or not. If it was a real thing; if it had a legal existence, and if consequently the law attributed to it certain rights and liabilities in its constitution as a company, it appears to me to follow as a consequence that it is impossible to deny the validity of the transactions into which it has entered.

Vaughan Williams J. appears to me to have disposed of the argument that the company (which for this purpose he assumed to be a legal entity) was defrauded into the purchase of Aron Salomon's business because, assuming that the price paid for the business was an exorbitant one, as to which I am myself not satisfied, but assuming that it was, the learned judge most cogently observes that when all the shareholders are perfectly cognisant of the conditions under which the company is formed and the conditions of the purchase, it is impossible to contend that the company is being defrauded.

The proposition laid down in *Erlanger* v. *New Sombrero Phosphate Co.* (1), (I quote the head-note), is that " Persons who purchase property and then create a company to purchase from them the property they possess, stand in a fiduciary position towards that company, and must faithfully state to the company the facts which apply to the property, and would influence the company in deciding on the reasonableness of acquiring it." But if every member of the company—every shareholder—knows exactly what is the true state of the facts (which for this purpose must be assumed to be the case here), Vaughan Williams J.'s conclusion seems to me to be inevitable that no case of fraud upon the company could here be established. If there was no fraud and no agency, and if the company was a real one and not a fiction or a myth, every one of the grounds upon which it is sought to support the judgment is disposed of.

My Lords, the truth is that the learned judges have never allowed in their own minds the proposition that the company

<div style="text-align: right">

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord Halsbury
L.C.

</div>

(1) 3 App. Cas. 1218.

34                    HOUSE OF LORDS                    [1897]

H. L. (E.)  has a real existence. They have been struck by what they
1896      have considered the inexpediency of permitting one man to be
SALOMON    in influence and authority the whole company; and, assuming
v.        that such a thing could not have been intended by the Legis-
SALOMON    lature, they have sought various grounds upon which they
& Co.     might insert into the Act some prohibition of such a result.
SALOMON    Whether such a result be right or wrong, politic or impolitic,
& Co.     I say, with the utmost deference to the learned judges, that
v.        we have nothing to do with that question if this company
SALOMON.   has been duly constituted by law; and, whatever may be the
Lord Halsbury  motives of those who constitute it, I must decline to insert
L.C.      into that Act of Parliament limitations which are not to be
          found there.

I have dealt with this matter upon the narrow hypothesis
propounded by the learned judges below; but it is, I think, only
justice to the appellant to say that I see nothing whatever to
justify the imputations which are implied in some of the
observations made by more than one of the learned judges.
The appellant, in my opinion, is not shewn to have done or to
have intended to do anything dishonest or unworthy, but to
have suffered a great misfortune without any fault of his own.

The result is that I move your Lordships that the judgment
appealed from be reversed, but as this is a pauper case, I regret
to say it can only be with such costs in this House as are
appropriate to that condition of things, and that the cross-
appeal be dismissed with costs to the same extent.

LORD WATSON. My Lords, this appeal raises some questions
of practical importance, depending upon the construction of the
Companies Acts, which do not appear to have been settled by
previous decisions. As I am not prepared to accept without
reservation all the conclusions of fact which found favour with
the Courts below, I shall, before adverting to the law, state
what I conceive to be the material facts established by the
evidence before us. [His Lordship stated the facts above
set out.]

The allegations of the company, in so far as they have any
relation to the amended claim, their pith consisting in the aver-

ments made on amendment, were meant to convey a charge of
fraud; and it is unfortunate that they are framed in such loose
and general terms.   A relevant charge of fraud ought to disclose
facts necessitating the inference that a fraud was perpetrated
upon some person specified.   Whether it was a fraud upon the
company and its members, or upon persons who had dealings
with the company, is not indicated, although there may be
very different considerations applicable to those two cases.   The
res gestæ which might imply that it was the appellant, and not
the company, who actually carried on its business, are not set
forth.   Any person who holds a preponderating share in the
stock of a limited company has necessarily the intention of
taking the lion's share of its profits without any risk beyond
loss of the money which he has paid for, or is liable to pay upon
his shares; and the fact of his acquiring and holding debentures
secured upon the assets of the company does not diminish the
risk of that loss.   What is meant by the assertion that the
company "was the mere nominee or agent" of the appellant
I cannot gather from the record; and I am not sure that I
understand precisely in what sense it was interpreted by the
learned judges whose decisions we have to consider.

No additional proof was led after the amendment of the
counter-claim.  . The oral testimony has very little, if any,
bearing upon the second claim; and any material facts relating
to the fraudulent objects which the appellant is said to have
had in view, and the alleged position of the company as his
nominee or agent, must be mere matter of inference derived
from the agreements of July 20 and August 2, 1892, the
memorandum and articles of association, and the minute-book
of the company.

On rehearing the case Vaughan Williams J., without dis-
posing of the original claim, gave the company decree of
indemnity in terms of their amended claim.   I do not profess
my ability to follow accurately the whole chain of reasoning by
which the learned judge arrived at that conclusion; but he
appears to have proceeded mainly upon the ground that the
appellant was in truth the company, the other members being
either his trustees or mere "dummies," and consequently that

H. L. (E.)

1896

SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord Watson.

3        D 2

APP.074

e 3:18-cv-00731-X   Document 273-6   Filed 07/30/19   Page 58 of 421   PageID 1

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord Watson.

the appellant carried on what was truly his own business under cover of the name of the company, which was nothing more than an alias for Aron Salomon. On appeal from his decision, the Court of Appeal, consisting of Lindley, Lopes, and Kay L.JJ., made an order finding it unnecessary to deal with the original claim, and dismissing the appeal in so far as it related to the amended claim. The ratio upon which that affirmance proceeded, as embodied in the order, was: " This Court being of opinion that the formation of the company, the agreement of August, 1892, and the issue of debentures to Aron Salomon pursuant to such agreement, were a mere scheme to enable him to carry on business in the name of the company, with limited liability, contrary to the true intent and meaning of the Companies Act, 1862, and further to enable him to obtain a preference over other creditors of the company by procuring a first charge on the assets of the company by means of such debentures." The opinions delivered by the Lords Justices are strictly in keeping with the reasons assigned in their order. Lindley L.J., observing " that the incorporation of the company cannot be disputed," refers to the scheme for the formation of the company, and says (1) : " the object of the whole arrangement is to do the very thing which the Legislature intended not to be done " ; and he adds that " Mr. Salomon's scheme is a device to defraud creditors."

Assuming that the company was well incorporated in terms of the Act of 1862, an assumption upon which the decisions appealed from appear to me to throw considerable doubt, I think it expedient, before considering the amended claim, to deal with the original claim for rescission, which was strongly pressed upon us by counsel for the company, under their cross-appeal. Upon that branch of the case there does not appear to me to be much room for doubt. With this exception, that the word " exorbitant " appears to me to be too strong an epithet, I entirely agree with Vaughan Williams J. when he says : " I do not think that where you have a private company, and all the shareholders in the company are perfectly cognisant of the conditions under which the company is formed, and the conditions

(1) [1895] 2 Ch. 337, 339.

of the purchase by the company, you can possibly say that pur-
chasing at an exorbitant price (and I have no doubt whatever
that the purchase here was at an exorbitant price) is a fraud
upon those shareholders or upon the company." The learned
judge goes on to say that the circumstances might have
amounted to fraud if there had been an intention on the part of
the original shareholders "to allot further shares at a later period
to future allottees." Upon that point I do not find it necessary
to express any opinion, because it is not raised by the facts
of the case, and, in any view, these considerations are of no
relevancy in a question as to rescission between the company
and the appellant.

Mr. Farwell argued that the agreement of August 2 ought
to be set aside upon the principle followed by this House in
*Erlanger* v. *New Sombrero Phosphate Co.* (1) In that case
the vendor, who got up the company, with the view of selling
his adventure to it, attracted shareholders by a prospectus which
was essentially false. The directors, who were virtually his
nominees, purchased from him without being aware of the
real facts; and on their assurance that, in so far as they knew,
all was right, the shareholders sanctioned the transaction. The
fraud by which the company and its shareholders had been
misled was directly traceable to the vendor; and it was set
aside at the instance of the liquidator, the Lord Chancellor
(Earl Cairns) expressing a doubt whether, even in those circum-
stances, the remedy was not too late after a liquidation order.
But in this case the agreement of July 20 was, in the full
knowledge of the facts, approved and adopted by the company
itself, if there was a company, and by all the shareholders who
ever were, or were likely to be, members of the company. In
my opinion, therefore, *Erlanger* v. *New Sombrero Phosphate
Co.* (1) has no application, and the original claim of the
liquidator is not maintainable.

The Lords Justices of Appeal, in disposing of the amended
claim, have expressly found that the formation of the company,
with limited liability, and the issue of 10,000*l.* worth of its
debentures to the appellant, were " contrary to the true intent

(1) 3 App. Cas. 1218.

H. L. (E.)
1896
SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord Watson.

3:18-cv-00731-X   Document 273-6   Filed 07/30/19   Page 60 of 421   PageID 1

H. L. (E.)
1896
SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord Watson.

and meaning of the Companies Act, 1862." I have had great difficulty in endeavouring to interpret that finding. I am unable to comprehend how a company, which has been formed contrary to the true intent and meaning of a statute, and (in the language of Lindley L.J.) does the very thing which the Legislature intended not to be done, can yet be held to have been legally incorporated in terms of the statute. "Intention of the Legislature" is a common but very slippery phrase, which, popularly understood, may signify anything from intention embodied in positive enactment to speculative opinion as to what the Legislature probably would have meant, although there has been an omission to enact it. In a Court of Law or Equity, what the Legislature intended to be done or not to be done can only be legitimately ascertained from that which it has chosen to enact, either in express words or by reasonable and necessary implication. Accordingly, if the words "intent and meaning," as they occur in the finding of the Appeal Court, are used in their proper legal sense, it follows, in my opinion, that the company has not been well incorporated; that, there being no legal corporation, there can be no liquidation under the Companies Acts, and that the counter-claim preferred by its liquidator must fail. In that case its creditors would not be left without a remedy, because its members, as joint traders without limitation of their liability, would be jointly and severally responsible for the debts incurred by them in the name of the company.

The provisions of the Act of 1862 which seem to me to have any bearing upon this point lie within a very narrow compass. Sect. 6 provides that any seven or more persons, associated for a lawful purpose, such as the manufacture and sale of boots, may, by subscribing their names to a memorandum of association and otherwise complying with the provisions of the Act in respect of registration, form a company with or without limited liability; and s. 8, which prescribes the essentials of the memorandum in the case of a company limited by shares, inter alia, enacts that "no subscriber shall take less than one share." The first of these enactments does not require that the persons subscribing shall not be related to each other; and the second

AND PRIVY COUNCIL.

plainly imports that the holding of a single share affords a sufficient qualification for membership; and I can find no other rule laid down or even suggested in the Act. Nor does the statute, either expressly or by implication, impose any limit upon the number of shares which a single member may subscribe for or take by allotment. At the date of registration all the requirements of the Act had been complied with; and, as matters then stood, there does not appear to have been any room for the pleas now advanced by the liquidator. The company was still free to modify or reject the agreement of July 20; and the fraud of which the appellant has been held guilty by the Court of Appeal, though it may have existed in animo, had not been carried into execution by the acceptance of the agreement, the issue of debentures to the appellant in terms of it, and by his receiving an allotment of shares which increased his interest in the company to $\frac{20001}{20007}$ of its actual capital. I have already intimated my opinion that the acceptance of the agreement is binding on the company; and neither that acceptance, nor the preponderating share of the appellant, nor his payment in debentures, being forbidden by the Act, I do not think that any one of these things could subsequently render the registration of the company invalid. But I am willing to assume that proceedings which are permitted by the Act may be so used by the members of a limited company as to constitute a fraud upon others, to whom they in consequence incur personal liability. In this case the fraud is found to have been committed by the appellant against the creditors of the company; but it is clear that if so, though he may have been its originator and the only person who took benefit from it, he could not have done any one of those things, which taken together are said to constitute his fraud, without the consent and privity of the other shareholders. It seems doubtful whether a liquidator as representing and in the name of the company can sue its members for redress against a fraud which was committed by the company itself and by all its shareholders. However, I do not think it necessary to dwell upon that point, because I am not satisfied that the charge of fraud against creditors has any foundation in fact.

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& CO.

SALOMON
& CO.
*v.*
SALOMON.

Lord Watson.

3:18-cv-00731-X   Document 273-6   Filed 07/30/19   Page 62 of 421   PageID 1

H. L. (E.)
1896
SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord Watson.

The memorandum of association gave notice that the main object for which the company was formed was to adopt and carry into effect, with or without modifications, the agreement of July, 1892, in terms of which the debentures for 10,000l. were subsequently given to the appellant in part payment of the price. By the articles of association (art. 62 (e)) the directors were empowered to issue mortgage or other debentures or bonds for any debts due, or to become due, from the company ; and it is not alleged or proved that there was any failure to comply with s. 43 or the other clauses (Part III. of the Act) which relate to the protection of creditors. The unpaid creditors of the company, whose unfortunate position has been attributed to the fraud of the appellant, if they had thought fit to avail themselves of the means of protecting their interests which the Act provides, could have informed themselves of the terms of purchase by the company, of the issue of debentures to the appellant, and of the amount of shares held by each member. In my opinion, the statute casts upon them the duty of making inquiry in regard to these matters. Whatever may be the moral duty of a limited company and its shareholders, when the trade of the company is not thriving, the law does not lay any obligation upon them to warn those members of the public who deal with them on credit that they run the risk of not being paid. One of the learned judges asserts, and I see no reason to question the accuracy of his statement, that creditors never think of examining the register of debentures. But the apathy of a creditor cannot justify an imputation of fraud against a limited company or its members, who have provided all the means of information which the Act of 1862 requires ; and, in my opinion, a creditor who will not take the trouble to use the means which the statute provides for enabling him to protect himself must bear the consequences of his own negligence.

For these reasons I have come to the conclusion that the orders appealed from ought to be reversed, with costs to the appellant here and in both Courts below. His costs in this House must, of course, be taxed in accordance with the rule applicable to pauper litigants.

A. C.                    AND PRIVY COUNCIL.                    41

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

LORD HERSCHELL. My Lords, by an order of the High Court, which was affirmed by the Court of Appeal, it was declared that the respondent company, or the liquidator of that company was entitled to be indemnified by the appellant against the sum of 7733*l.* 8*s.* 3*d.*, and it was ordered that the respondent company should recover that sum against the appellant.

On July 28, 1892, the respondent company was incorporated with a capital of 40,000*l.* divided into 40,000 shares of 1*l.* each. One of the objects for which the company was incorporated was to carry out an agreement, with such modifications therein as might be agreed to, of July 20, 1892, which had been entered into between the appellant and a trustee for a company intended to be formed, for the acquisition by the company of the business then carried on by the appellant. The company was, in fact, formed for the purpose of taking over the appellant's business of leather merchant and boot manufacturer, which he had carried on for many years. The business had been a prosperous one, and, as the learned judge who tried the action found, was solvent at the time when the company was incorporated. The memorandum of association of the company was subscribed by the appellant, his wife and daughter, and his four sons, each subscribing for one share. The appellant afterwards had 20,000 shares allotted to him. For these he paid 1*l.* per share out of the purchase-money which by agreement he was to receive for the transfer of his business to the company. The company afterwards became insolvent and went into liquidation.

In an action brought by a debenture-holder on behalf of himself and all the other debenture-holders, including the appellant, the respondent company set up by way of counter-claim that the company was formed by Aron Salomon, and the debentures were issued in order that he might carry on the said business, and take all the profits without risk to himself; that the company was the mere nominee and agent of Aron Salomon; and that the company or the liquidator thereof was entitled to be indemnified by Aron Salomon against all the debts owing by the company to creditors other than Aron Salomon. This counter-claim was not in the pleading as

H. L. (E.)
1896
SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord Herschell.

originally delivered ; it was inserted by way of amendment at the suggestion of Vaughan Williams J., before whom the action came on for trial. The learned judge thought the liquidator entitled to the relief asked for, and made the order complained of. He was of opinion that the company was only an " alias " for Salomon ; that, the intention being that he should take the profits without running the risk of the debts, the company was merely an agent for him, and, having incurred liabilities at his instance, was, like any other agent under such circumstances, entitled to be indemnified by him against them. On appeal the judgment of Vaughan Williams J. was affirmed by the Court of Appeal, that Court " being of opinion that the formation of the company, the agreement of August, 1892, and the issue of debentures to Aron Salomon pursuant to such agreement were a mere scheme to enable him to carry on business in the name of the company with limited liability contrary to the true intent and meaning of the Companies Act, 1862, and further to enable him to obtain a preference over other creditors of the company by procuring a first charge on the assets of the company by means of such debentures."

The learned judges in the Court of Appeal dissented from the view taken by Vaughan Williams J., that the company was to be regarded as the agent of the appellant. They considered the relation between them to be that of trustee and cestui que trust ; but this difference of view, of course, did not affect the conclusion that the right to the indemnity claimed had been established.

It is to be observed that both Courts treated the company as a legal entity distinct from Salomon and the then members who composed it, and therefore as a validly constituted corporation. This is, indeed, necessarily involved in the judgment which declared that the company was entitled to certain rights as against Salomon. Under these circumstances, I am at a loss to understand what is meant by saying that A. Salomon & Co., Limited, is but an " alias " for A. Salomon. It is not another name for the same person ; the company is ex hypothesi a distinct legal persona. As little am I able to adopt the view

that the company was the agent of Salomon to carry on his
business for him.  In a popular sense, a company may in every
case be said to carry on business for and on behalf of its share-
holders ; but this certainly does not in point of law constitute
the relation of principal and agent between them or render the
shareholders liable to indemnify the company against the debts
which it incurs.  Here, it is true, Salomon owned all the
shares except six, so that if the business were profitable he
would be entitled, substantially, to the whole of the profits.
The other shareholders, too, are said to have been " dummies,"
the nominees of Salomon.  But when once it is conceded that
they were individual members of the company distinct from
Salomon, and sufficiently so to bring into existence in con-
junction with him a validly constituted corporation, I am
unable to see how the facts to which I have just referred can
affect the legal position of the company, or give it rights as
against its members which it would not otherwise possess.

The Court of Appeal based their judgment on the proposition
that the formation of the company and all that followed on it
were a mere scheme to enable the appellant to carry on busi-
ness in the name of the company, with limited liability, con-
trary to the true intent and meaning of the Companies Act,
1862.   The conclusion which they drew from this premiss was,
that the company was a trustee and Salomon their cestui que
trust.   I cannot think that the conclusion follows even if the
premiss be sound.   It seems to me that the logical result
would be that the company had not been validly constituted,
and therefore had no legal existence.   But, apart from this, it
is necessary to examine the proposition on which the Court
have rested their judgment, as its effect would be far reaching.
Many industrial and banking concerns of the highest standing
and credit have, in recent years, been, to use a common expres-
sion, converted into joint stock companies, and often into what
are called " private " companies, where the whole of the shares
are held by the former partners.   It appears to me that all
these might be pronounced "schemes to enable " them " to
carry on business in the name of the company, with limited
liability," in the very sense in which those words are used in

H. L. (E.)

1896

SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord Herschell.

e 3:18-cv-00731-X   Document 273-6   Filed 07/30/19   Page 66 of 421   PageID 1

H. L. (E.)
1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord Herschell.

the judgment of the Court of Appeal. The profits of the concern carried on by the company will go to the persons whose business it was before the transfer, and in the same proportions as before, the only difference being that the liability of those who take the profits will no longer be unlimited. The very object of the creation of the company and the transfer to it of the business is, that whereas the liability of the partners for debts incurred was without limit, the liability of the members for the debts incurred by the company shall be limited. In no other respect is it intended that there shall be any difference : the conduct of the business and the division of the profits are intended to be the same as before. If the judgment of the Court of Appeal be pushed to its logical conclusion, all these companies must, I think, be held to be trustees for the partners who transferred the business to them, and those partners must be declared liable without limit to discharge the debts of the company. For this is the effect of the judgment as regards the respondent company. The position of the members of a company is just the same whether they are declared liable to pay the debts incurred by the company, or by way of indemnity to furnish the company with the means of paying them. I do not think the learned judges in the Court below have contemplated the application of their judgment to such cases as I have been considering ; but I can see no solid distinction between those cases and the present one.

It is said that the respondent company is a " one man " company, and that in this respect it differs from such companies as those to which I have alluded. But it has often happened that a business transferred to a joint stock company has been the property of three or four persons only, and that the other subscribers of the memorandum have been clerks or other persons who possessed little or no interest in the concern. I am unable to see how it can be lawful for three or four or six persons to form a company for the purpose of employing their capital in trading, with the benefit of limited liability, and not for one person to do so, provided, in each case, the requirements of the statute have been complied with and the company has been validly constituted. How does it concern the creditor

A. C.                    AND PRIVY COUNCIL.                         45

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord Herschell.

whether the capital of the company is owned by seven persons in equal shares, with the right to an equal share of the profits, or whether it is almost entirely owned by one person, who practically takes the whole of the profits? The creditor has notice that he is dealing with a company the liability of the members of which is limited, and the register of shareholders informs him how the shares are held, and that they are substantially in the hands of one person, if this be the fact. The creditors in the present case gave credit to and contracted with a limited company; the effect of the decision is to give them the benefit, as regards one of the shareholders, of unlimited liability. I have said that the liability of persons carrying on business can only be limited provided the requirements of the statute be complied with; and this leads naturally to the inquiry, What are those requirements?

The Court of Appeal has declared that the formation of the respondent company and the agreement to take over the business of the appellant were a scheme " contrary to the true intent and meaning of the Companies Act." I know of no means of ascertaining what is the intent and meaning of the Companies Act except by examining its provisions and finding what regulations it has imposed as a condition of trading with limited liability. The memorandum must state the amount of the capital of the company and the number of shares into which it is divided, and no subscriber is to take less than one share. The shares may, however, be of as small a nominal value as those who form the company please: the statute prescribes no minimum; and though there must be seven shareholders, it is enough if each of them holds one share, however small its denomination. The Legislature, therefore, clearly sanctions a scheme by which all the shares except six are owned by a single individual, and these six are of a value little more than nominal.

It was said that in the present case the six shareholders other than the appellant were mere dummies, his nominees, and held their shares in trust for him. I will assume that this was so. In my opinion, it makes no difference. The statute forbids the entry in the register of any trust; and it certainly

H. L. (E.)

1896

SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord Herschell.

contains no enactment that each of the seven persons subscribing the memorandum must be beneficially entitled to the share or shares for which he subscribes. The persons who subscribe the memorandum, or who have agreed to become members of the company and whose names are on the register, are alone regarded as, and in fact are, the shareholders. They are subject to all the liability which attaches to the holding of the share. They can be compelled to make any payment which the ownership of a share involves. Whether they are beneficial owners or bare trustees is a matter with which neither the company nor creditors have anything to do: it concerns only them and their cestuis que trust if they have any. If, then, in the present case all the requirements of the statute were complied with, and a company was effectually constituted, and this is the hypothesis of the judgment appealed from, what warrant is there for saying that what was done was contrary to the true intent and meaning of the Companies Act?

It may be that a company constituted like that under consideration was not in the contemplation of the Legislature at the time when the Act authorizing limited liability was passed; that if what is possible under the enactments as they stand had been foreseen a minimum sum would have been fixed as the least denomination of share permissible; and that it would have been made a condition that each of the seven persons should have a substantial interest in the company. But we have to interpret the law, not to make it; and it must be remembered that no one need trust a limited liability company unless he so please, and that before he does so he can ascertain, if he so please, what is the capital of the company and how it is held.

I have hitherto made no reference to the debentures which the appellant received in part-payment of the purchase-money of the business which he transferred to the company. These are referred to in the judgment as part of the scheme which is pronounced contrary to the true intent and meaning of the Companies Act. But if apart from this the conclusion that the appellant is bound to indemnify the company against its debts cannot be sustained, I do not see how the circumstance

that he received these debentures can avail the respondent company. The issue of debentures to the vendor of a business as part of the price is certainly open to great abuse, and has often worked grave mischief. It may well be that some check should be placed upon the practice, and that, at all events, ample notice to all who may have dealings with the company should be secured. But as the law at present stands, there is certainly nothing unlawful in the creation of such debentures. For these reasons I have come to the conclusion that the appeal should be allowed.

It was contended on behalf of the company that the agreement between them and the appellant ought, at all events, to be set aside on the ground of fraud. In my opinion, no such case has been made out, and I do not think the respondent company are entitled to any such relief.

LORD MACNAGHTEN. My Lords, I cannot help thinking that the appellant, Aron Salomon, has been dealt with somewhat hardly in this case.

Mr. Salomon, who is now suing as a pauper, was a wealthy man in July, 1892. He was a boot and shoe manufacturer trading on his own sole account under the firm of " A. Salomon & Co.," in High Street, Whitechapel, where he had extensive warehouses and a large establishment. He had been in the trade over thirty years. He had lived in the same neighbourhood all along, and for many years past he had occupied the same premises. So far things had gone very well with him. Beginning with little or no capital, he had gradually built up a thriving business, and he was undoubtedly in good credit and repute.

It is impossible to say exactly what the value of the business was. But there was a substantial surplus of assets over liabilities. And it seems to me to be pretty clear that if Mr. Salomon had been minded to dispose of his business in the market as a going concern he might fairly have counted upon retiring with at least 10,000l. in his pocket.

Mr. Salomon, however, did not want to part with the business. He had a wife and a family consisting of five sons and a

H. L. (E.)
1896
SALOMON
v.
SALOMON
& Co.
SALOMON
& Co.
v.
SALOMON.
Lord Herschell.

e 3:18-cv-00731-X   Document 273-6   Filed 07/30/19   Page 70 of 421   PageID 1

H. L. (E.)
1896
SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord
Macnaghten.

daughter.  Four of the sons were working with their father.
The eldest, who was about thirty years of age, was practically
the manager.  But the sons were not partners: they were
only servants.  Not unnaturally, perhaps, they were dissatisfied
with their position.  They kept pressing their father to give
them a share in the concern.  "They troubled me," says Mr.
Salomon, "all the while."  So at length Mr. Salomon did what
hundreds of others have done under similar circumstances.  He
turned his business into a limited company.  He wanted, he
says, to extend the business and make provision for his family.
In those words, I think, he fairly describes the principal
motives which influenced his action.

All the usual formalities were gone through; all the require-
ments of the Companies Act, 1862, were duly observed.  There
was a contract with a trustee in the usual form for the sale of
the business to a company about to be formed.  There was a
memorandum of association duly signed and registered, stating
that the company was formed to carry that contract into effect,
and fixing the capital at 40,000l. in 40,000 shares of 1l. each.
There were articles of association providing the usual machinery
for conducting the business.  The first directors were to be
nominated by the majority of the subscribers to the memo-
randum of association.  The directors, when appointed, were
authorized to exercise all such powers of the company as were
not by statute or by the articles required to be exercised in
general meeting; and there was express power to borrow on
debentures, with the limitation that the borrowing was not to
exceed 10,000l. without the sanction of a general meeting.

The company was intended from the first to be a private
company; it remained a private company to the end.  No
prospectus was issued; no invitation to take shares was ever
addressed to the public.

The subscribers to the memorandum were Mr. Salomon, his
wife, and five of his children who were grown up.  The sub-
scribers met and appointed Mr. Salomon and his two elder
sons directors.  The directors then proceeded to carry out the
proposed transfer.  By an agreement dated August 2, 1892,
the company adopted the preliminary contract, and in accord-

ance with it the business was taken over by the company as
from June 1, 1892. The price fixed by the contract was duly
paid. The price on paper was extravagant. It amounted to
over 39,000*l.*—a sum which represented the sanguine expecta-
tions of a fond owner rather than anything that can be called
a businesslike or reasonable estimate of value. That, no doubt,
is a circumstance which at first sight calls for observation ; but
when the facts of the case and the position of the parties are
considered, it is difficult to see what bearing it has on the
question before your Lordships. The purchase-money was
paid in this way : as money came in, sums amounting in all to
30,000*l.* were paid to Mr. Salomon, and then immediately
returned to the company in exchange for fully-paid shares.
The sum of 10,000*l.* was paid in debentures for the like amount.
The balance, with the exception of about 1000*l.* which Mr.
Salomon seems to have received and retained, went in discharge
of the debts and liabilities of the business at the time of the
transfer, which were thus entirely wiped off. In the result,
therefore, Mr. Salomon received for his business about 1000*l.*
in cash, 10,000*l.* in debentures, and half the nominal capital of
the company in fully paid shares for what they were worth.
No other shares were issued except the seven shares taken by
the subscribers to the memorandum, who, of course, knew all
the circumstances, and had therefore no ground for complaint
on the score of overvaluation.

The company had a brief career : it fell upon evil days.
Shortly after it was started there seems to have come a period
of great depression in the boot and shoe trade. There were
strikes of workmen too ; and in view of that danger contracts
with public bodies, which were the principal source of Mr.
Salomon's profit, were split up and divided between different
firms. The attempts made to push the business on behalf of
the new company crammed its warehouses with unsaleable
stock. Mr. Salomon seems to have done what he could : both
he and his wife lent the company money ; and then he got his
debentures cancelled and reissued to a Mr. Broderip, who
advanced him 5000*l.*, which he immediately handed over to
the company on loan. The temporary relief only hastened

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord
Macnaghten.

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord
Macnaghten.

ruin.  Mr. Broderip's interest was not paid when it became due.  He took proceedings at once and got a receiver appointed. Then, of course, came liquidation and a forced sale of the company's assets.  They realized enough to pay Mr. Broderip, but not enough to pay the debentures in full ; and the unsecured creditors were consequently left out in the cold.

In this state of things the liquidator met Mr. Broderip's claim by a counter-claim, to which he made Mr. Salomon a defendant.  He disputed the validity of the debentures on the ground of fraud.  On the same ground he claimed rescission of the agreement for the transfer of the business, cancellation of the debentures, and repayment by Mr. Salomon of the balance of the purchase-money.  In the alternative, he claimed payment of 20,000*l.* on Mr. Salomon's shares, alleging that nothing had been paid on them.

When the trial came on before Vaughan Williams J., the validity of Mr. Broderip's claim was admitted, and it was not disputed that the 20,000 shares were fully paid up.  The case presented by the liquidator broke down completely ; but the learned judge suggested that the company had a right of indemnity against Mr. Salomon.  The signatories of the memorandum of association were, he said, mere nominees of Mr. Salomon—mere dummies.  The company was Mr. Salomon in another form.  He used the name of the company as an alias. He employed the company as his agent ; so the company, he thought, was entitled to indemnity against its principal.  The counter-claim was accordingly amended to raise this point ; and on the amendment being made the learned judge pronounced an order in accordance with the view he had expressed.

The order of the learned judge appears to me to be founded on a misconception of the scope and effect of the Companies Act, 1862.  In order to form a company limited by shares, the Act requires that a memorandum of association should be signed by seven persons, who are each to take one share at least.  If those conditions are complied with, what can it matter whether the signatories are relations or strangers ? There is nothing in the Act requiring that the subscribers to the memorandum should be independent or unconnected, or

that they or any one of them should take a substantial interest in the undertaking, or that they should have a mind and will of their own, as one of the learned Lords Justices seems to think, or that there should be anything like a balance of power in the constitution of the company.   In almost every company that is formed the statutory number is eked out by clerks or friends, who sign their names at the request of the promoter or promoters without intending to take any further part or interest in the matter.

H. L. (E.)

1896

SALOMON
_v._
SALOMON
& Co.

SALOMON
& Co.
_v._
SALOMON.

Lord
Macnaghten.

When the memorandum is duly signed and registered, though there be only seven shares taken, the subscribers are a body corporate " capable forthwith," to use the words of the enactment, " of exercising all the functions of an incorporated company." Those are strong words.   The company attains maturity on its birth.   There is no period of minority—no interval of incapacity.   I cannot understand how a body corporate thus made " capable " by statute can lose its individuality by issuing the bulk of its capital to one person, whether he be a subscriber to the memorandum or not.   The company is at law a different person altogether from the subscribers to the memorandum ; and, though it may be that after incorporation the business is precisely the same as it was before, and the same persons are managers, and the same hands receive the profits, the company is not in law the agent of the subscribers or trustee for them.   Nor are the subscribers as members liable, in any shape or form, except to the extent and in the manner provided by the Act.   That is, I think, the declared intention of the enactment.   If the view of the learned judge were sound, it would follow that no common law partnership could register as a company limited by shares without remaining subject to unlimited liability.

Mr. Salomon appealed ; but his appeal was dismissed with costs, though the Appellate Court did not entirely accept the view of the Court below.   The decision of the Court of Appeal proceeds on a declaration of opinion embodied in the order which has been already read.

I must say that I, too, have great difficulty in understanding this declaration.   If it only means that Mr. Salomon availed

3        E 2

H. L. (E.)
1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord
Macnaghten.

himself to the full of the advantages offered by the Act of 1862, what is there wrong in that ?   Leave out the words " contrary to the true intent and meaning of the Companies Act, 1862," and bear in mind that " the creditors of the company " are not the creditors of Mr. Salomon, and the declaration is perfectly innocent : it has no sting in it.

In an early case, which in some of its aspects is not unlike the present, the owners of a colliery (to quote the language of Giffard L.J. in the Court of Appeal) " went on working the colliery not very successfully, and then determined to form a limited company in order to avoid incurring further personal liability."   " It was," adds the Lord Justice, " the policy of the Companies Act to enable this to be done."   And so he reversed the decision of Malins V.-C., who had expressed an opinion that if the laws of the country sanctioned such a proceeding they were " in a most lamentable state," and had fixed the former owners with liability for the amount of the shares they took in exchange for their property : *In re Baglan Hall Colliery Co.* (1)

Among the principal reasons which induce persons to form private companies, as is stated very clearly by Mr. Palmer in his treatise on the subject, are the desire to avoid the risk of bankruptcy, and the increased facility afforded for borrowing money.   By means of a private company, as Mr. Palmer observes, a trade can be carried on with limited liability, and without exposing the persons interested in it in the event ot failure to the harsh provisions of the bankruptcy law.   A company, too, can raise money on debentures, which an ordinary trader cannot do.   Any member of a company, acting in good faith, is as much entitled to take and hold the company's debentures as any outside creditor.   Every creditor is entitled to get and to hold the best security the law allows him to take.

If, however, the declaration of the Court of Appeal means that Mr. Salomon acted fraudulently or dishonestly, I must say I can find nothing in the evidence to support such an imputation.   The purpose for which Mr. Salomon and the other

(1) L. R. 5 Ch. 346.

subscribers to the memorandum were associated was " lawful."
The fact that Mr. Salomon raised 5000*l.* for the company on
debentures that belonged to him seems to me strong evidence
of his good faith and of his confidence in the company.  The
unsecured creditors of A. Salomon and Company, Limited, may
be entitled to sympathy, but they have only themselves to blame
for their misfortunes.  They trusted the company, I suppose,
because they had long dealt with Mr. Salomon, and he had
always paid his way ; but they had full notice that they were
no longer dealing with an individual, and they must be taken
to have been cognisant of the memorandum and of the articles
of association.  For such a catastrophe as has occurred in this
case some would blame the law that allows the creation of a
floating charge.  But a floating charge is too convenient a form
of security to be lightly abolished.  I have long thought, and I
believe some of your Lordships also think, that the ordinary
trade creditors of a trading company ought to have a preferential
claim on the assets in liquidation in respect of debts incurred
within a certain limited time before the winding-up.  But that
is not the law at present.  Everybody knows that when there
is a winding-up debenture-holders generally step in and sweep
off everything ; and a great scandal it is.

It has become the fashion to call companies of this class
" one man companies."  That is a taking nickname, but it does
not help one much in the way of argument.  If it is intended
to convey the meaning that a company which is under the
absolute control of one person is not a company legally incor-
porated, although the requirements of the Act of 1862 may have
been complied with, it is inaccurate and misleading : if it merely
means that there is a predominant partner possessing an over-
whelming influence and entitled practically to the whole of the
profits, there is nothing in that that I can see contrary to the
true intention of the Act of 1862, or against public policy, or
detrimental to the interests of creditors.  If the shares are fully
paid up, it cannot matter whether they are in the hands of one
or many.  If the shares are not fully paid, it is as easy to gauge
the solvency of an individual as to estimate the financial ability
of a crowd.

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord
Macnaghten.

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord
Macnaghten.

One argument was addressed to your Lordships which ought perhaps to be noticed, although it was not the ground of decision in either of the Courts below.   It was argued that the agreement for the transfer of the business to the company ought to be set aside, because there was no independent board of directors, and the property was transferred at an overvalue. There are, it seems to me, two answers to that argument.   In the first place, the directors did just what they were authorized to do by the memorandum of association.   There was no fraud or misrepresentation, and there was nobody deceived.   In the second place, the company have put it out of their power to restore the property which was transferred to them.   It was said that the assets were sold by an order made in the presence of Mr. Salomon, though not with his consent, which declared that the sale was to be without prejudice to the rights claimed by the company by their counter-claim.   I cannot see what difference that makes.   The reservation in the order seems to me to be simply nugatory.

I am of opinion that the appeal ought to be allowed, and the counter-claim of the company dismissed with costs, both here and below.

LORD MORRIS.   My Lords, I quite concur in the judgment which has been announced, and in the reasons which have been so fully given for it.

LORD DAVEY.   My Lords, it is possible, and (I think) probable, that the conclusion to which I feel constrained to come in this case may not have been contemplated by the Legislature, and may be due to some defect in the machinery of the Act. But, after all, the intention of the Legislature must be collected from the language of its enactments; and I do not see my way to holding that if there are seven registered members the association is not a company formed in compliance with the provisions of the Act and capable of carrying on business with limited liability, either because the bulk of the shares are held by some only, or even one of the members, and the others are what is called " dummies," holding, it may be, only one share

of 1*l.* each, or because there are less than seven persons who are beneficially entitled to the shares.

I think that this result follows from the absence of any provision fixing a minimum nominal amount of a share—the provision in s. 8 that no subscriber shall take less than one share, and the provision in s. 30 that no notice of any trust shall be entered on the register. With regard to the latter provision, it would, in my opinion, be impossible to work the machinery of the Act on any other principle, and to attempt to do so would lead only to confusion and uncertainty. The learned counsel for the respondents (wisely, as I think) did not lay any stress on the members, other than the appellant, being trustees for him of their shares. Their argument was that they were " dummies," and did not hold a substantial interest in the company, i.e., what a jury would say is a substantial interest. In the language of some of the judges in the Court below, any jury, if asked the question, would say the business was Aron Salomon's and no one else's.

It was not argued in this case that there was no association of seven persons to be registered, and the registration therefore operated nothing, or that the so-called company was a sham and might be disregarded ; and, indeed, it would have been difficult for the learned counsel for the respondents, appearing, as they did, at your Lordships' Bar for the company, who had been permitted to litigate in the Courts below as actors (on their counter-claim), to contend that their clients were non-existent. I do not say that such an argument ought to or would prevail; I only observe that, having regard to the decisions, it is not certain that s. 18, making the certificate of the registrar conclusive evidence that all the requisitions of the Act in respect of registration had been complied with, would be an answer to it.

We start, then, with the assumption that the respondents have a corporate existence with power to sue and be sued, to incur debts and be wound up, and to act as agents or as trustees, and I suppose, therefore, to hold property. Both the Courts below have, however, held that the appellant is liable to indemnify the company against all its debts and liabilities.

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord Davey.

H. L. (E.)
1896

SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord Davey.

Vaughan Williams J. held that the company was an " alias "
for the appellant, who carried on his business through the
company as his agent, and that he was bound to indemnify his
own agent; and he arrived at this conclusion on the ground
that the other members of the company had no substantial
interest in it, and the business in substance was the appellant's.
The Court of Appeal thought the relation of the company to
the appellant was that of trustee to cestui que trust.

The ground on which the learned judges seem to have chiefly
relied was that it was an attempt by an individual to carry on
his business with limited liability, which was forbidden by the
Act and unlawful. I observe, in passing, that nothing turns
upon there being only one person interested. The argument
would have been just as good if there had been six members
holding the bulk of the shares and one member with a very
small interest, say, one share. I am at a loss to see how in
either view taken in the Courts below the conclusion follows
from the premises, or in what way the company became an
agent or trustee for the appellant, except in the sense in which
every company may loosely and inaccurately be said to be an
agent for earning profits for its members, or a trustee of its
profits for the members amongst whom they are to be divided.
There was certainly no express trust for the appellant; and an
implied or constructive trust can only be raised by virtue of
some equity. I took the liberty of asking the learned counsel
what the equity was, but got no answer. By an " alias " is
usually understood a second name for one individual; but here,
as one of your Lordships has already observed, we have, ex
hypothesi, a duly formed legal persona, with corporate attri-
butes and capable of incurring legal liabilities. Nor do I think
it legitimate to inquire whether the interest of any member is
substantial when the Act has declared that no member need
hold more than one share, and has not prescribed any minimum
amount of a share. If, as was said in the Court of Appeal, the
company was formed for an unlawful purpose, or in order to
achieve an object not permitted by the provisions of the Act,
the appropriate remedy (if any) would seem to be to set aside
the certificate of incorporation, or to treat the company as a

nullity, or, if the appellant has committed a fraud or mis-demeanour (which I do not think he has), he may be proceeded against civilly or criminally; but how either of those states of circumstances creates the relation of cestui que trust and trustee, or principal and agent, between the appellant and respondents, is not apparent to my understanding.

I am, therefore, of opinion that the order appealed from cannot be supported on the grounds stated by the learned judges.

But Mr. Farwell also relied on the alternative relief claimed by his pleadings, which was quite open to him here, namely, that the contract for purchase of the appellant's business ought to be set aside for fraud. The fraud seems to consist in the alleged exorbitance of the price and the fact that there was no independent board of directors with whom the appellant could contract. I am of opinion that the fraud was not made out. I do not think the price of the appellant's business (which seems to have been a genuine one, and for some time a pros-perous business) was so excessive as to afford grounds for rescission; and as regards the cash portion of the price, it must be observed that, as the appellant held the bulk of the shares, or (the respondents say) was the only shareholder, the money required for the payment of it came from himself in the form either of calls on his shares or profits which would otherwise be divisible. Nor was the absence of any independent board material in a case like the present. I think it an inevitable inference from the circumstances of the case that every member of the company assented to the purchase, and the company is bound in a matter intra vires by the unanimous agreement of its members. In fact, it is impossible to say who was defrauded.

Mr. Farwell relied on some dicta in *Erlanger* v. *New Sombrero Phosphate Co.* (1), a case which is often quoted and not infre-quently misunderstood. Of course, Lord Cairns' observations were directed only to a case such as he had before him, where it was attempted to bind a large body of shareholders by a contract which purported to have been made between the vendor and

(1) 3 App. Cas. 1218, 1236.

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord Davey.

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord Davey.

directors before the shares were offered for subscription; whereas it appeared that the directors were only the nominees of the vendor, who had accepted his bidding and exercised no judgment of their own. It has nothing to do with the present case. That a company may contract with the holder of the bulk of its shares, and such contract will be binding though carried by the votes of that shareholder, was decided in *North-West Transportation Co.* v. *Beatty.* (1)

For these reasons, I am of opinion that the appellant's appeal should be allowed and the cross-appeal should be dismissed. I agree to the proposed order as to costs.

> *Order of the Court of Appeal reversed and cross-appeal dismissed with costs here and below; the costs in this House to be taxed in the manner usual when the appellant sues in formâ pauperis ; cause remitted to the Chancery Division.*

*Lords' Journals,* November 16, 1896.

Solicitors for appellant : *Ralph Raphael & Co.*
Solicitors for respondents : *S. M. & J. B. Benson.*

(1) 12 App. Cas. 589.

# EXHIBIT C

A                              Supreme Court

## Prest *v* Petrodel Resources Ltd and others

### [2012] EWCA Civ 1395

### [2013] UKSC 34

B
[On appeal from **Prest *v* Prest**]

2012  July 2, 3;                                    Thorpe, Rimer, Patten LJJ
       Oct 26

2013  March 5, 6;            Lord Neuberger of Abbotsbury PSC, Baroness Hale of
       June 12              Richmond, Lord Mance, Lord Clarke of Stone-cum-Ebony,
C                           Lord Wilson, Lord Sumption JJSC, Lord Walker of Gestingthorpe

*Husband and wife — Financial relief — Transfer of property — Properties held by
companies controlled by husband — Wife alleging that properties belonging
beneficially to husband — Husband and companies failing to comply with orders
for disclosure — Husband ordered to transfer properties to wife or to cause them
to be so transferred — Whether property to which husband "entitled" —*
D *Whether conditions for piercing companies' corporate veils established —
Whether court entitled to draw adverse inferences as to beneficial ownership of
properties — Whether jurisdiction to order husband to transfer properties held
by companies to wife — Matrimonial Causes Act 1973 (c 18), s 24(1)(a)*

The wife issued a claim for ancillary relief under section 23 of the Matrimonial
Causes Act 1973[1] against her husband, who was the sole owner of a number of
E complexly structured offshore companies. The wife alleged that the husband had
used the companies to hold legal title to properties which belonged beneficially to
him. However, the husband failed to comply with orders for the full and frank
disclosure of his financial position and the companies, which were joined as parties to
the proceedings, failed to file a defence or to comply with orders for disclosure. The
judge rejected the wife's submission that the husband had been guilty of any
impropriety in relation to the companies such as would ordinarily entitle the court to
F pierce the corporate veil, but held that, in matrimonial proceedings for ancillary relief,
section 24(1)(a) of the 1973 Act conferred a wider jurisdiction to pierce the corporate
veil. The judge concluded that, since the husband had the practical ability to procure
the transfer of the properties, he was "entitled" to them within the meaning of
section 24(1)(a), giving the court jurisdiction to make a transfer order in respect of
them. Accordingly, he ordered the husband to transfer or cause to be transferred to
the wife six properties and an interest in a seventh which were held in the name of two
G of the husband's companies. The Court of Appeal by a majority allowed an appeal by
the companies, holding that the Family Division's practice of treating the assets of
companies substantially owned by one party to the marriage as available for
distribution under section 24(1)(a) was beyond the jurisdiction of the court unless the
corporate personality of the company was being abused for a purpose which was in
some relevant respect improper or, on the particular facts, it could be shown that an
asset legally owned by the company was held in trust for the husband and that, since
H the judge had rejected both of those possibilities, he ought not to have made the order.
On the wife's appeal—
*Held*, (1) that the recognition of a limited power to pierce the corporate veil and
to disregard the separate personality of a company in carefully defined circumstances

[1] Matrimonial Causes Act 1973, s 24(1): see post, Court of Appeal judgments, para 68.

© 2013 The Incorporated Council of Law Reporting for England and Wales

© 2013 The Incorporated Council of Law Reporting for England and Wales

A

was necessary if the law were not to be disarmed in the face of abuse and, provided that the limits were recognised and respected, it was consistent with the general approach of English law to the problems raised by the use of legal concepts to defeat mandatory rules of law; that, therefore, if a person were under an existing legal obligation or liability or subject to an existing legal restriction which he deliberately evaded or the enforcement of which he deliberately frustrated by interposing a company under his control, the court could pierce the corporate veil for the purpose, and only for the purpose, of depriving that company or its controller of the advantage

B

which they would otherwise have obtained by the company's separate legal personality; but that the legal interest in the disputed properties was vested in the companies and, whatever the husband's reasons for organising matters in that way, there was no evidence that he was seeking to avoid any obligation which was relevant in the present proceedings; and that, accordingly, there was no justification as a matter of general legal principle for piercing the corporate veils of the companies (post, Supreme Court judgments, paras 27, 35–36, 57–58, 61, 80–82, 96, 97, 103,

C

104).

*Gilford Motor Co Ltd v Horne* [1933] Ch 935, CA, *Jones v Lipman* [1962] 1 WLR 832, *Gencor ACP Ltd v Dalby* [2000] 2 BCLC 734 and *Trustor AB v Smallbone (No 2)* [2001] 1 WLR 1177 considered.

(2) That, where there was no justification as a matter of general legal principle for piercing the corporate veil, no special and wider principle applied in matrimonial proceedings by virtue of section 24(1)(a) of the Matrimonial Causes Act 1973; that section 24(1)(a) invoked concepts of the law of property, with an established legal meaning and recognised legal incidents under the general law, which could not be suspended or mean something different in matrimonial proceedings; that there was nothing in the 1973 Act, or in its purpose or broader social context, to indicate that the legislature had intended to authorise the transfer by one party to the marriage to the other of property which was not his to transfer; that such a transfer would ordinarily be unnecessary for the purpose of achieving a fair distribution of the assets of the marriage since, if assets belonged to a company owned by one party to the marriage, the proper claims of the other could ordinarily be satisfied by directing the transfer of shares and, so far as a party deliberately attempted to frustrate the exercise of the court's ancillary powers by disposing of assets, section 37 of the Act provided for the setting aside of those dispositions in certain circumstances; that the recognition of a jurisdiction such as the judge had sought to exercise would cut across the statutory schemes of company and insolvency law, which were essential for the protection of those dealing with a company; and that, accordingly, section 24(1)(a) did not give the judge power to order the husband to transfer to the wife property to which he was not in law entitled (post, Supreme Court judgments, paras 37–41, 57–58, 86, 88–89, 96, 97, 103, 104).

D

E

F

But, (3) allowing the appeal, that the companies could be ordered to convey the seven disputed properties to the wife under section 24(1)(a) of the 1973 Act if the properties belonged beneficially to the husband by virtue of the particular circumstances in which they had come to be vested in the companies; that that issue required an examination of evidence which, almost entirely due to the husband's persistent obstruction and mendacity, was incomplete and in critical respects obscure; that in claims for ancillary relief in matrimonial proceedings, which had a substantial inquisitorial element, judges were entitled to draw on their experience and to take notice of the inherent probabilities when deciding what an uncommunicative spouse was likely to be concealing; that the wife had expressly alleged that the husband had used the companies to hold legal title to properties which belonged beneficially to him and the judge's findings about the ownership and control of the companies meant that the companies' refusal to co-operate with the proceedings was a course ultimately adopted on the direction of the husband; that it was a fair inference that the main, if not the only, reason for the companies' failure to co-operate was to protect the seven properties, which in turn suggested

G

H

A   that proper disclosure of the facts would reveal them to have been held beneficially by the husband; and that, accordingly, the seven disputed properties were held by the companies on trust for the husband and, in those circumstances, the order of the judge requiring the properties to be transferred to the wife would be restored (post, Supreme Court judgments, paras 44–45, 55, 57–58, 84–85, 96, 97, 103, 104).

     *Herrington v British Railways Board* [1972] AC 877, HL(E) and *R v Inland*
B   *Revenue Comrs, Ex p TC Coombs & Co* [1991] 2 AC 283, HL(E) considered.

     *Per* Lord Neuberger of Abbotsbury PSC, Lord Clarke of Stone-cum-Ebony and Lord Sumption JJSC. If it is not necessary to pierce the corporate veil, it is not appropriate to do so, because on that footing there is no public policy imperative which justifies that course (post, Supreme Court judgments, paras 35, 62, 103).

     Dictum of Munby J in *Ben Hashem v Al Shayif* [2009] 1 FLR 115, para 164 approved.

C   Dictum in *VTB Capital plc v Nutritek International Corpn* [2012] 2 Lloyd's Rep 313, para 79, CA disapproved.

     *Per* Lord Mance and Lord Clarke of Stone-cum-Ebony JJSC. The court should not seek to foreclose all possible future situations which may arise. However, the situations in which piercing the corporate veil may be available as a fall-back are likely to be very rare and no one should be encouraged to think that any further exception, in addition to the evasion principle, will be easy to establish (post,
D   Supreme Court judgments, paras 100, 102, 103).

     *Per* Lord Sumption JSC. Whether assets legally vested in a company are beneficially owned by its controller is a highly fact-specific issue. But, in the case of the matrimonial home, the facts are quite likely to justify the inference that the property was held on trust for a spouse who owned and controlled the company (post, Supreme Court judgments, para 52).

     Decision of the Court of Appeal, post, p 421; [2012] EWCA Civ 1395; [2013]
E   2 WLR 557 reversed in part.

The following cases are referred to in the judgments of the Supreme Court:

*A v A* [2007] EWHC 99 (Fam); [2007] 2 FLR 467
*Adams v Cape Industries plc* [1990] Ch 433; [1990] 2 WLR 657; [1991] 1 All ER 929, CA
*Alliance Bank JSC v Aquanta Corpn* [2012] EWCA Civ 1588; [2013] 1 All
F   ER (Comm) 819; [2013] 1 Lloyd's Rep 175, CA
*Allied Capital Corpn v GC-Sun Holdings LP* (2006) 910 A 2d 1020
*Atlas Maritime Co SA v Avalon Maritime Ltd (No 1)* [1991] 4 All ER 769, CA
*Attorney General v Equiticorp Industries Group Ltd* [1996] 1 NZLR 528
*Attorney General's Reference (No 2 of 1982)* [1984] QB 624; [1984] 2 WLR 447; [1984] 2 All ER 216, CA
*Bank of Tokyo Ltd v Karoon (Note)* [1987] AC 45; [1986] 3 WLR 414; [1986] 3 All
G   ER 468, CA
*Barcelona Traction, Light and Power Co Ltd (Belgium v Spain) (Second Phase), Case concerning* [1970] ICJ Rep 3
*Belmont Finance Corpn Ltd v Williams Furniture Ltd* [1979] Ch 250; [1978] 3 WLR 712; [1979] 1 All ER 118, CA
*Ben Hashem v Al Shayif* [2008] EWHC 2380 (Fam); [2009] 1 FLR 115
*Berkey v Third Avenue Railway Co* (1926) 155 NE 58
H   *Briggs v James Hardie & Co Pty Ltd* (1989) 16 NSWLR 549
*Broderip v Salomon* [1895] 2 Ch 323, CA; sub nom *Salomon v A Salomon & Co Ltd* [1897] AC 22, HL(E)
*Cape Pacific Ltd v Lubner Controlling Investments (Pty) Ltd* 1995 (4) SA 790
*Darby, In re; Ex p Brougham* [1911] 1 KB 95
*Gencor ACP Ltd v Dalby* [2000] 2 BCLC 734

© 2013 The Incorporated Council of Law Reporting for England and Wales

418
**Prest v Prest (SC(E))**                                              [2013] 2 AC

*Gilford Motor Co Ltd v Horne* [1933] Ch 935, CA                             A
*Green v Green* [1993] 1 FLR 326
*Herrington v British Railways Board* [1972] AC 877; [1972] 2 WLR 537; [1972]
    1 All ER 749, HL(E)
*Jenkins v Livesey (formerly Jenkins)* [1985] AC 424; [1985] 2 WLR 47; [1985] 1 All
    ER 106, HL(E)
*Jones v Lipman* [1962] 1 WLR 832; [1962] 1 All ER 442
*Kingston's (Duchess of) Case* (1776) 2 Smith's LC (13th ed) 644; 1 Leach 146    B
*Kosmopoulos v Constitution Insurance Co* [1987] 1 SCR 2
*Kremen v Agrest (No 2)* [2010] EWHC 3091 (Fam); [2011] 2 FLR 490
*La Générale des Carrières et des Mines Sarl v FG Hemisphere Associates LLC* [2012]
    UKPC 27; [2013] 1 All ER 409; [2012] 2 Lloyd's Rep 443, PC
*Lazarus Estates Ltd v Beasley* [1956] 1 QB 702; [1956] 2 WLR 502; [1956] 1 All ER
    341, CA
*Lonrho Ltd v Shell Petroleum Co Ltd* [1980] 1 WLR 627, HL(E)                 C
*Macaura v Northern Assurance Co Ltd* [1925] AC 619, HL(I)
*McFarlane v McFarlane* [2006] UKHL 24; [2006] 2 AC 618; [2006] 2 WLR 1283;
    [2006] 3 All ER 1, HL(E)
*Mubarak v Mubarak* [2001] 1 FLR 673
*Multinational Gas and Petrochemical Co v Multinational Gas and Petrochemical
    Services Ltd* [1983] Ch 258; [1983] 3 WLR 492; [1983] 2 All ER 563, CA
*Nicholas v Nicholas* [1984] FLR 285, CA                                     D
*Nokes v Doncaster Amalgamated Collieries Ltd* [1940] AC 1014; [1940] 3 All ER
    549, HL(E)
*R v Gomez* [1993] AC 442; [1992] 3 WLR 1067; [1993] 1 All ER 1, HL(E)
*R v Inland Revenue Comrs, Ex p TC Coombs & Co* [1991] 2 AC 283; [1991] 2 WLR
    682; [1991] 3 All ER 623, HL(E)
*R v Secretary of State for the Home Department, Ex p Puttick* [1981] QB 767; [1981]
    2 WLR 440; [1981] 1 All ER 776, DC
    E
*Secon Service System Inc v St Joseph Bank and Trust Co* (1988) 855 F 2d 406
*Smith v Hancock* [1894] 2 Ch 377, CA
*Stone & Rolls Ltd v Moore Stephens* [2009] UKHL 39; [2009] AC 1391; [2009]
    3 WLR 455; [2009] Bus LR 1356; [2009] 4 All ER 431, HL(E)
*Tjaskemolen (now Visvliet), The* [1997] 2 Lloyd's Rep 465
*Trustor AB v Smallbone (No 2)* [2001] 1 WLR 1177; [2001] 3 All ER 987
*VTB Capital plc v Nutritek International Corpn* [2012] EWCA Civ 808; [2012]    F
    2 Lloyd's Rep 313, CA; [2013] UKSC 5; [2013] 2 AC 337; [2013] 2 WLR 398;
    [2013] 1 All ER 1296, SC(E)
*Wallersteiner v Moir* [1974] 1 WLR 991; [1974] 3 All ER 217, CA
*Welwyn Hatfield Borough Council v Secretary of State for Communities and Local
    Government* [2011] UKSC 15; [2011] 2 AC 304; [2011] 2 WLR 905; [2011]
    PTSR 825; [2011] 4 All ER 851, SC(E)
*Wisniewski v Central Manchester Health Authority* [1998] PIQR P324, CA
*Woolfson v Strathclyde Regional Council* 1978 SC (HL) 90; 1978 SLT 159; 38 P &    G
    CR 521, HL(Sc)
*Wroth v Tyler* [1974] Ch 30; [1973] 2 WLR 405; [1973] 1 All ER 897

The following additional cases were cited in argument before the Supreme Court:

*BJ v MJ (Financial Order: Overseas Trust)* [2011] EWHC 2708 (Fam); [2012] 1 FLR
    667
    H
*Bank voor Handel en Scheepvaart NV v Slatford* [1953] 1 QB 248; [1952] 2 All ER
    956, CA
*Bhullar v Bhullar* (unreported) 10 May 2002, Judge Behrens, Leeds
*Blood v Blood* [1902] P 78
*Bosworthick v Bosworthick* [1927] P 64, CA

© 2013 The Incorporated Council of Law Reporting for England and Wales

A *Brooks v Brooks* [1996] AC 375; [1995] 3 WLR 141; [1995] 3 All ER 257, HL(E)
 *Campbell (A Bankrupt), In re* [1997] Ch 14; [1996] 3 WLR 626; [1996] 2 All ER
  537
 *Charman v Charman (No 4)* [2007] EWCA Civ 503; [2007] 1 FLR 1246, CA
 *Company, In re A* [1985] BCLC 333, CA
 *Crews-Orchard v Crews-Orchard* (1970) 114 SJ 150, CA
 *D v D* [2009] EWHC 3062 (Fam); [2011] 2 FLR 29
B *Director of Public Prosecutions v Compton* [2002] EWCA Civ 1720; The Times,
  11 December 2002, CA
 *E v E (Financial Provision)* [1990] 2 FLR 233
 *H (Restraint Order: Realisable Property), In re* [1996] 2 All ER 391, CA
 *Hawkes v Cuddy* [2007] EWHC 2999 (Ch); [2008] EWHC 210 (Ch); [2009] EWCA
  Civ 291; [2009] 2 BCLC 427, CA
 *Hope v Krejci* [2012] EWHC 1780 (Fam); [2013] 1 FLR 182
C *Imerman v Tchenguiz* [2010] EWCA Civ 908; [2011] Fam 116; [2011] 2 WLR 592;
  [2011] 1 All ER 555, CA
 *Jones v Jones* [2011] EWCA Civ 41; [2012] Fam 1; [2011] 3 WLR 582, CA
 *Midland Bank Trust Co Ltd v Green* [1981] AC 513; [1981] 2 WLR 28; [1981] 1 All
  ER 153, HL(E)
 *Milne v Milne* (1871) LR 2 P & D 295
 *Prinsep v Prinsep* [1929] P 225
 *R v K* [2005] EWCA Crim 619; [2006] BCC 362, CA
D *R (Prudential plc) v Special Comr of Income Tax (Institute of Chartered Accountants
  in England and Wales intervening)* [2013] UKSC 1; [2013] 2 AC 185; [2013]
  2 WLR 325; [2013] 2 All ER 247, SC(E)
 *Rackind v Gross* [2004] EWCA Civ 815; [2005] 1 WLR 3505; [2005] 4 All ER 735,
  CA
 *Roberts Petroleum Ltd v Bernard Kenny Ltd* [1983] 2 AC 192; [1983] 2 WLR 305;
  [1983] 1 All ER 564, HL(E)
E *Tobian Properties Ltd, In re; Maidment v Attwood* [2012] EWCA Civ 998, [2013]
  Bus LR 753, CA
 *W v H (Family Division: Without Notice Orders)* [2001] 1 All ER 300

The following cases are referred to in the judgments of the Court of Appeal:

 *A v A* [2007] EWHC 99 (Fam); [2007] 2 FLR 467
 *Adams v Cape Industries plc* [1990] Ch 433; [1990] 2 WLR 657; [1991] 1 All ER
F  929, CA
 *Ben Hashem v Al Shayif* [2008] EWHC 2380 (Fam); [2009] 1 FLR 115
 *British American Tobacco Co Ltd v Inland Revenue Comrs* [1943] AC 335; [1943]
  1 All ER 13, HL(E)
 *Company, In re A* [1985] BCLC 333, CA
 *Coroin Ltd, In re; Minwalla v Minwalla* [2004] EWHC 2823 (Fam); [2005] 1 FLR
  771
G *Crittenden v Crittenden* [1990] 2 FLR 361, CA
 *Gilford Motor Co Ltd v Horne* [1933] Ch 935, CA
 *Green v Green* [1993] 1 FLR 326
 *Hope v Krejci* [2012] EWHC 1780 (Fam); [2012] Fam Law 1327
 *Inn Spirit Ltd v Burns* [2002] EWHC 1731 (Ch); [2002] 2 BCLC 780
 *J v J* [1955] P 215; [1955] 3 WLR 72; [1955] 2 All ER 617, CA
 *Jones v Lipman* [1962] 1 WLR 832; [1962] 1 All ER 442
H *Kremen v Agrest (No 2)* [2010] EWHC 3091 (Fam); [2011] 2 FLR 490
 *Littlewoods Mail Order Stores Ltd v McGregor* [1969] 1 WLR 1241; [1969] 3 All
  ER 855, CA
 *Macaura v Northern Assurance Co Ltd* [1925] AC 619, HL(I)
 *McKillen v Misland (Cyprus) Investments Ltd* [2012] EWCA Civ 179; [2012]
  2 BCLC 611; [2012] BCC 575, CA

*Mubarak v Mubarak* [2001] 1 FLR 673                                                              *A*
*Munin Navigation Co Ltd v Petrodel Resources Ltd* [2012] EWCA Civ 136, CA
*Nicholas v Nicholas* [1984] FLR 285, CA
*Ord v Belhaven Pubs Ltd* [1998] 2 BCLC 447, CA
*Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204;
     [1982] 2 WLR 31; [1982] 1 All ER 354, CA
*Salomon v A Salomon & Co Ltd* [1897] AC 22, HL(E)
*Trustor AB v Smallbone (No 2)* [2001] 1 WLR 1177; [2001] 3 All ER 987        *B*
*VTB Capital plc v Nutritek International Corpn* [2011] EWHC 3107 (Ch); [2012]
     EWCA Civ 808; [2012] 2 Lloyd's Rep 313, CA
*W v H (Family Division: Without Notice Orders)* [2001] 1 All ER 300
*Wallersteiner v Moir* [1974] 1 WLR 991; [1974] 3 All ER 217, CA
*Wicks v Wicks* [1999] Fam 65; [1998] 3 WLR 277; [1998] 1 All ER 977, CA
*Woolfson v Strathclyde Regional Council* 1978 SC (HL) 90; 1978 SLT 159;
     38 P & CR 521, HL(Sc)                                                                   *C*

The following additional cases were cited in argument before the Court of Appeal:

*Antonio Gramsci Shipping Corpn v Stepanovs* [2011] EWHC 333 (Comm); [2011]
     Bus LR D117; [2012] 1 All ER (Comm) 293
*Aveling Barford Ltd v Perion Ltd* [1989] BCLC 626
*B (Appeal: Lack of Reasons), In re* [2003] EWCA Civ 881; [2003] 2 FLR 1035,
     CA                                                                                       *D*
*Bank voor Handel en Scheepvaart NV v Slatford* [1953] 1 QB 248; [1952] 2 All ER
     956, CA
*Brady v Brady* [1989] AC 755; [1988] 2 WLR 1308; [1988] 2 All ER 617, HL(E)
*Buchler v Talbot* [2004] UKHL 9; [2004] 2 AC 298; [2004] 2 WLR 582; [2004] 1 All
     ER 1289, HL(E)
*Gencor ACP Ltd v Dalby* [2000] 2 BCLC 734                                                    *E*
*H v H (Financial Relief: Conduct)* [1998] 1 FLR 971
*Herrington v British Railways Board* [1972] AC 877; [1972] 2 WLR 537; [1972]
     1 All ER 749, HL(E)
*Howard v Howard* [1945] P 1; [1945] 1 All ER 91, CA
*Jenkins v Livesey (formerly Jenkins)* [1985] AC 424; [1985] 2 WLR 47; [1985] 1 All
     ER 106, HL(E)
*Lee v Lee's Air Farming Ltd* [1961] AC 12; [1960] 3 WLR 758; [1960] 3 All ER 420,   *F*
     PC
*Lubbe v Cape plc* [2000] 1 WLR 1545; [2000] 4 All ER 268, HL(E)
*Milne v Milne* (1871) LR 2 P & D 295
*National Provincial Bank Ltd v Hastings Car Mart Ltd* [1965] AC 1175; [1965]
     3 WLR 1; [1965] 2 All ER 472, HL(E)
*Nokes v Doncaster Amalgamated Collieries Ltd* [1940] AC 1014; [1940] 3 All ER
     549, HL(E)                                                                              *G*
*Partridge v Crittenden* [1968] 1 WLR 1204; [1968] 2 All ER 421, DC
*Precision Dippings Ltd v Precision Dippings Marketing Ltd* [1986] Ch 447; [1985]
     3 WLR 812, CA
*Print Factory (London) 1991 Ltd v Millam* [2007] EWCA Civ 322; [2007] ICR 1331,
     CA
*Roberts Petroleum Ltd y Bernard Kenny Ltd* [1983] 2 AC 192; [1983] 2 WLR 305;
     [1983] 1 All ER 564, HL(E)                                                              *H*
*Smith Stone & Knight Ltd v Birmingham Corpn* [1939] 4 All ER 116
*Trebanog Working Men's Club and Institute Ltd v Macdonald* [1940] 1 KB 576;
     [1940] 1 All ER 454, DC
*Wisniewski v Central Manchester Health Authority* [1998] PIQR P324, CA
*X v X (Y and Z intervening)* [2002] 1 FLR 508

© 2013 The Incorporated Council of Law Reporting for England and Wales

421
[2013] 2 AC                                                    Prest v Prest (CA)
                                                                    Thorpe LJ

A  The following additional cases, although not cited, were referred to in the skeleton
   arguments before the Court of Appeal:

   *B v B (Financial Provision)* (1982) 3 FLR 298, CA
   *Browne v Browne* [1989] 1 FLR 291, CA
   *CMS Dolphin Ltd v Simonet* [2001] 2 BCLC 704
   *Donaldson v Donaldson* [1958] 1 WLR 827; [1958] 2 All ER 660
   *Duport Steel Ltd v Sirs* [1980] 1 WLR 142; [1980] ICR 161; [1980] 1 All ER 529,
B      HL(E)
   *George v George* [2003] EWCA Civ 202; [2004] 1 FLR 421, CA
   *Grey v Pearson* (1857) 6 HL Cas 61, HL(E)
   *O'D v O'D* [1976] Fam 83; [1975] 3 WLR 308; [1975] 2 All ER 993, CA
   *Ranson v Ranson* [2001] EWCA Civ 1929; [2002] 1 FCR 261, CA

   **APPEAL** from Moylan J
C     By a petition dated 10 March 2008 the wife, Yasmin Aishatu Mohammed
   Prest, petitioned for a decree of divorce from her husband, Michael Jenseabla
   Prest. She applied in those proceedings for ancillary relief against the husband.
   On 27 February 2009 and 14 April 2011 Petrodel Resources Ltd ("PRL"),
   Petrodel Resources (Nigeria) Ltd, Petrodel Upstream Ltd ("Upstream"),
   Vermont Petroleum Ltd ("Vermont"), Elysium Diem Ltd, Petrodel Resources
D  (Nevis) Ltd and Elysium Diem (Nevis) Ltd, were joined as parties to the
   proceedings. By a judgment dated 4 October 2011 [2011] EWHC 2956 (Fam)
   and order dated 16 November 2011 Moylan J ordered, inter alia, that the
   husband transfer or cause to be transferred to the wife (i) four London
   properties and an interest in a fifth all held in the name of PRL and (ii) two
   London properties held in the name of Vermont.
      By an appellant's notice filed on 7 December 2011 and pursuant to
E  permission granted by the Court of Appeal (Thorpe LJ) on 16 February
   2012 PRL, Upstream and Vermont (together "the Petrodel companies")
   appealed on the ground that the judge had misdirected himself in law in
   relation to the true construction of section 24(1)(a) of the Matrimonial Causes
   Act 1973 in that he had wrongly directed himself that as a matter of law assets
   of the Petrodel companies fell within the scope of section 24(1)(a) as being
F  "property to which [the husband] is entitled, either in possession or reversion".
      The facts are stated in the judgment of Thorpe LJ.

   *Tim Amos QC* and *Ben Shaw* (instructed by *Jeffrey Green Russell*) for the
   Petrodel companies.
   *Richard Todd QC* and *Stephen Trowell* (instructed by *Farrer & Co LLP*)
   for the wife.
G     The husband did not appear and was not represented.

   The court took time for consideration.

   26 October 2012.  The following judgments were handed down.

   **THORPE LJ**
H
   *Introduction*

      1  On 4 October 2011 Moylan J [2011] EWHC 2956 (Fam) delivered
   judgment in the financial provision case *Prest v Prest*, a truly extraordinary
   case even within the breadth and depth of family division bounds.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A
2   The husband and wife are both about 50 and both have dual Nigerian and British citizenship.  The husband was born in Nigeria, the wife in England, both are highly educated.  The husband was called to the Nigerian Bar.   The wife graduated from Thames Polytechnic and subsequently obtained an MBA from Cranfield.

B
3   They met in 1992 and married in 1993.  They have four children who are teenagers.  Throughout the marriage they lived principally in London but with properties in Nigeria and the Caribbean.  They lived to a very high standard.   Both came from affluent backgrounds.   At all material times the husband has been prominent and successful in international oil development and trade.  The final matrimonial home at Warwick Avenue is worth about £4m and there are a number of other properties that the husband has acquired in London, most in the name of three companies.

C
4   As well as the husband and the first respondent, there were seven corporate respondents.  None of the corporate respondents took any part in the proceedings until the final hearing when the second, fourth and fifth appeared by leading counsel.

5   In para 3 of his judgment Moylan J thus recorded the principal issues in the case:

D
"(a) The extent of the husband's wealth including the nature and extent of his interest in the respondent companies; and (b) whether I can make orders directly against properties and shares held in the name of some of the respondent companies."

E
6   Continuing with his introduction, the judge recorded the husband's case that the net excess of his liabilities over assets equalled £48m.

7   The wife's case was that the husband's assets net of liabilities equalled "tens if not hundreds of millions of pounds".

8   Thus on issue (a) the gulf between the respective positions of the husband and wife could hardly have been wider.

F
9   As to issue (b) Mr Todd QC, for the wife, stressed the extent of the court's power under section 24(1)(a) of the Matrimonial Causes Act 1973 which enabled orders to be made against alter ego companies.  Mr Todd relied on *Nicholas v Nicholas* [1984] FLR 285.  He distinguished *Ben Hashem v Al Shayif* [2009] 1 FLR 115.  Alternatively if *Ben Hashem's* case was not to be distinguished Mr Todd asserted impropriety in respect of the companies.  Mr Todd further submitted that the companies held the shares and assets as bare trustee for the husband.

G
10   Mr Pointer QC for the husband and Mr Wagstaffe QC for the companies disputed the assertion that the properties and shares in the company were held on trust for the husband and they further submitted that the authority of *Ben Hashem's* case prevented the judge from making orders against the properties or the shares.

11   As to outcome the wife sought an overall award of £30·4m.  The husband proposed a package that amounted to a little over £2m.

H
12   As is not uncommon in this specialist field of litigation the husband had repeatedly flouted his duty to give full frank and clear disclosure of his finances.  He was in breach of many orders for disclosure; he had been repeatedly condemned in costs which he had not paid.  At trial his evidence

423

[2013] 2 AC                                               Prest v Prest (CA)
                                                              Thorpe LJ

A   was both deceitful and shambolic. In paras 12–13 of his judgment Moylan J
    stated:

        "12. . . . I have sought to make sense of the husband's factual case.
    Ultimately I have decided that this has been a vain task because the
    husband has failed so comprehensively to comply with his obligation to
    provide full and frank disclosure and to give clear evidence that his case
B   does not permit of such an exercise . . . the result of the way in which the
    case has developed is that a great deal of energy has been expended by the
    husband on seeking to establish what he is not worth rather than the more
    conventional focus being on seeking to demonstrate what he is worth . . .
        "13. . . . his evidence consisted significantly of obfuscation and
    dissembling."

C       13   This introduction to the case illustrates what a difficult and
    frustrating task the judge faced. Responsibility for that state of affairs rested
    squarely with the husband and his companies.

    *The proceedings and the trial*

        14   The proceedings have not run smoothly. In para 34 of the judgment
D   below Moylan J recorded:

        "The husband has not voluntarily paid any part of the maintenance
    pending suit order in respect of costs. This is not a minor breach of the
    order; it is a significant failure. It is made the more significant when
    contrasted with the fact that the husband has paid in excess of £760,000
    towards his own costs."
E
        15   In a manoeuvre which I have not previously encountered the
    husband's brother issued against the husband and one of his companies an
    application in the High Court in Nigeria which produced an order
    unopposed restraining the husband from: (i) disclosing any information
    concerning the accounts or affairs of the company; (ii) asserting or disclosing
F   information that he is sole owner of the company.
        16   As to this device the judge recorded at para 142 of his judgment:

        "Notwithstanding the terms of the Nigerian order the husband has
    been able to produce documents which would appear to be covered by its
    terms. They have been produced at random and in a manner which has
    given me the clear impression that the husband does so when he considers
G   it might help his case . . . Such attempts to manipulate the process
    have been a recurrent feature of the husband's conduct during the
    proceedings."

        17   In like manner when the senior master directed a letter of request to
    judicial authorities in the Isle of Man, a director of the Manx company
    avoided production, asserting concerns about claims that would be made
H   against the board by shareholders or commercial partners for breach of
    confidence. Of that Moylan J aptly said, at para 47:

        "Given the husband's control over the corporate structure, it is hard to
    understand how these concerns could be genuine. It is not difficult, in my
    judgment, to see the hand of the husband behind this obstructive line

© 2013 The Incorporated Council of Law Reporting for England and Wales
APP.107

424
**Prest v Prest (CA)**                                                    [2013] 2 AC
Thorpe LJ

which is also reflected in letters written on behalf of the company by     *A*
Manx advocates."

18  These sort of manoeuvrings in the interlocutory stages gravely
impede the court and waste large sums of money.  The trial judge faced a
formidable task when he sat between 13 and 30 June 2011 to conduct the
final hearing.  He heard extensive oral evidence.  As well as the husband and
the wife there were two accountants whose evidence was of very limited     *B*
value since they at least agreed that neither had received the information and
documents that would enable them to make any worthwhile assessment or
valuation.  However, there was a strong card in the wife's hand given that
she was able to call as a witness Mr Le Breton, a former business associate
and fellow director of the husband.

19  The interval between 30 June and 4 October resulted from the
judge's struggle to make sense of the evidence and some 30 lever arch files of    *C*
documents.

20  Between paras 55 and 78 of his judgment the judge wrestled with the
incomplete, inadequate, confused and conflicting evidence as to the
husband's activities through the corporate vehicles.  The husband sought to
rely on the evidence of a director of the companies, Mr Murphy.
Mr Murphy chose not to appear.  In para 69 the judge concluded that      *D*
Mr Murphy was unwilling rather than unable to attend.

21  In this section of his judgment the judge made two crucial findings.
This is the first:

"I am satisfied that the directors of the group, including Mr Murphy,
act in accordance with instructions given by or on behalf of the husband.
The husband was unable in his oral evidence to provide details of any    *E*
specific occasion when the directors had not acted in accordance with his
instructions."

22  Here is the second: "I have no doubt at all that the husband does,
indeed, just draw from PRL whatever he and his family need, as and when
they need it."

23  In the next section of his judgment the judge reviewed the London    *F*
properties.  Apart from the final matrimonial home there were 11.  Apart
from one they were all in the name of one or other company.  BNP had a loan
charged against the properties.  As to that the judge said, at para 84:

"However, as a result of the husband's failure to give clear disclosure,
the evidence is not sufficient for me to reach any firm conclusions as to
what the true net position is in respect of the loan due to BNP."          *G*

24  The judge then reviewed the overseas properties and recorded the
evidence that had been given by the husband and the wife.  He also recorded
the evidence of Mr Le Breton.  In his evidence Mr Le Breton asserted that the
husband was the ultimate owner of the companies.  This is the judge's
record, at para 120, of his evidence:

"the husband was the effective owner of the Petrodel Group.  He          *H*
controlled every business decision.  The directors acted merely on his
instructions.  Throughout the seven or eight years that he worked with the
husband and Petrodel, the directors, according to Mr Le Breton,
acted only on the husband's instructions.  There was also significant

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   expenditure through Petrodel for the benefit of the husband, the wife and
    the children but Mr Le Breton was not aware of any significant sums
    being spent for other family members.  There are also investments made
    through the company which were not business opportunities but were, he
    said, 'private commitments that (the husband) chose to make'."

    25   Mr Le Breton also informed the judge that between 2001 and 2004
B   the husband stated that he was worth between $40 to $50m.
    26   Of the wife's evidence the judge said, at para 123: "I found the wife
    to be a careful and honest witness.  She gave her evidence in a calm and
    dispassionate manner which was convincing."
    27   The judge continued, at para 124:

        "I also found Mr le Breton to be an honest witness . . .  As I have
C   said . . . I am satisfied that his evidence was reliable.  For many years
    Mr Le Breton and the husband were very close work colleagues and were
    also friends.  I am satisfied that Mr Le Breton is in a very good position to
    give me an accurate insight into the husband's and Petrodel's affairs."

    28   By contrast the judge said, at para 125:

D       "I have found the husband to be a wholly unreliable witness.  The
    husband is clearly an extremely intelligent, articulate and astute
    individual.  I form the clear impression that he regards the proceedings as
    a game in which he has sought to manipulate the process to his advantage.
    Despite occasional suggestions, largely by prompting, that he was seeking
    to help the court, the husband was an extremely evasive witness.  He was
E   adroit but was deliberately evasive.  He would frequently fail to answer a
    question although he clearly understood its meaning and would often
    digress on to a different subject or ask questions about the question.  I do
    not consider that I can rely on any of the husband's evidence unless
    corroborated by other reliable evidence."

    29   Having then condemned the husband for his breach of obligation to
F   provide full frank and clear disclosure he said, at para 127:

        "It would, as I have said, be a vain task to seek to make sense of his
    evidence because I am satisfied that much of it was opportunistic in that
    he would say whatever he felt at the moment best suited his case or at
    least provided him with an answer to the question."

    30   The husband had asserted that he held corporate assets in trust for
G   his birth family because the initial capital, or seed money, had been supplied
    by his father subject to that trust.   This manoeuvre was trenchantly
    dismissed.  The judge said, in para 136: "I found the husband's evidence on
    this issue particularly unconvincing and I am satisfied that it is a deliberate
    invention."  Then in the next paragraph two sentences must be cited:

        "I am satisfied the husband's evidence as to the existence of any seed
H   moneys is false.  This has been invented for the purposes of seeking to
    defeat the wife's claims . . .  In so far as the husband has interests in the
    group or any of the companies within it or any of the assets held by the
    companies, such interests are held solely for the benefit of himself and his
    immediate family."

© 2013 The Incorporated Council of Law Reporting for England and Wales

31   When the judge turned to the section 25 exercise he considered the    *A*
general position thus in para 143:

"As a result of the husband's failure to provide proper disclosure and
honest evidence I do not have the information needed to enable me to
determine the extent and value of the husband's resources.    I am
satisfied that the husband's failure has been deliberate.  I have rejected
his attempt to rely on the Nigerian proceedings and orders.   I am    *B*
satisfied that they are based on a false factual case and were contrived at
the husband's instigation in an attempt to provide him with an
explanation for his failure to comply with his obligations in these
proceedings."

32   In relation to Petrodel the judge said:
                                                                           *C*
"Specifically as a result of the husband's failure to comply with his
disclosure obligations, the evidence which would be required to enable
the value of Petrodel to be determined is almost completely lacking."

33   At least the judge was able to value the London properties at £11·3m gross
and £9m net.

34   As to standard of living, the husband accepted that the running costs    *D*
of the London home were about $400,000 per annum.  He put his annual
income needs at £800,000.  The wife put her annual needs for herself and the
children at £730,000.

35   Counsel's submissions were predictable.   Mr Todd relied upon
*Nicholas v Nicholas* [1984] FLR 285 and *Mubarak v Mubarak* [2001]
1 FLR 673.  Mr Pointer relied on *Ben Hashem v Al Shayif* [2009] 1 FLR 115.
Mr Wagstaffe relied upon company rather than family authority, including    *E*
*Salomon v A Salomon & Co Ltd* [1897] AC 22, *Adams v Cape Industries plc*
[1990] Ch 433 and *Prudential Assurance Co Ltd v Newman Industries Ltd
(No 2)* [1982] Ch 204.

36   The judge in his review of authorities considered *Nicholas v
Nicholas*, *Crittenden v Crittenden* [1990] 2 FLR 361, *Mubarak v Mubarak*,
*Minwalla v Minwalla* [2005] 1 FLR 771, *W v H (Family Division: Without*    *F*
*Notice Orders)* [2001] All ER 300, *A v A* [2007] 2 FLR 467 and *Ben
Hashem v Al Shayif* [2009] 1 FLR 115.

37   From his review of these authorities he drew out the following
principles.  (a) Ownership and control were not in themselves sufficient to
pierce the corporate veil.  (b) Even where there was no unconnected third
party interest the veil could not be pierced only because it is necessary in    *G*
the interests of justice.    (c) The veil can only be pierced if there is
impropriety.  (d) The impropriety must be linked to the use of the company
structure to avoid or conceal liability.  (e) In order to pierce the veil, both
control by the wrongdoer and impropriety must be demonstrated.  (f) A
company may be a façade even though originally incorporated without
deceptive intent.
                                                                           *H*
38   The judge then applied those principles to the facts before him.  As to
Petrodel he held that the whole structure was for the husband's benefit alone
and in his control, the husband "is able to change the structure and distribute
the wealth within it to himself and/or his family as may be required or,
I would add, as he wishes".

© 2013 The Incorporated Council of Law Reporting for England and Wales

427
**[2013] 2 AC**                                              Prest v Prest (CA)
Thorpe LJ

A    39   The judge concluded this important section of his judgment in
paras 208–210 which I must cite in full:

"208. I spent some time during the hearing, and longer since trying to
make sense of what appeared to be inconsistent themes in the husband's
evidence and seeking to identify how they might be reconciled.
Ultimately I have decided that I have been seeking to impose an unduly
B    legalistic framework onto a relatively simple factual situation, namely
that the husband operates and controls the Petrodel group and its assets
for the benefit of his immediate family. The wealth within the group is the
family's wealth to which the husband has unrestricted access. I am
satisfied that the husband is both the effective owner and controller of the
whole of Petrodel corporate structure. In coming to this conclusion
C    I accept the evidence of Mr Le Breton that the husband told him that he is
the ultimate beneficial owner and I also accept his apposite phrase that
Petrodel is the husband and the husband is Petrodel. In my judgment, the
information memorandum as found by the wife accurately describes the
husband as the owner.

"209. The extent to which the companies are the husband's nominees
is demonstrated by the term in the contract, which I repeat, that he: 'shall
D    be assumed to report to the board for issues pertaining to the
management of the company, yet you shall have and employ full
discretion with the way you manage all the affairs of the company in so
far as your actions are for the benefit of the company and its
shareholders.' As the husband is the only effective shareholder, the
husband is managing the affairs of the company solely for his benefit,
hence the complete lack of any need for real board control. The husband
E    has clearly used the companies to meet his and his family's personal
expenditure, as well as his legal costs in these proceedings, without any
inhibition. The lack of any paper accounting also demonstrates the lack
of any board control or supervision.

"210. I am also satisfied that all the assets held within the companies
are effectively the husband's property. He is able to procure their disposal
F    as he may direct based again on his being the controller of the companies
and the only beneficial owner. There are no third party interests of any
relevance because the other shareholders are merely nominal with no
expectation of benefiting from their shareholdings."

40   The judge then turned to the heart of his judgment, the wife's award.
He began by reminding himself of the dicta of Sachs J in *J v J* [1955] P 215 as
G    to not only the duty of disclosure but also the consequences of breach,
namely the drawing of adverse inferences. Being free to draw adverse
inferences the judge concluded: "I consider that, conservatively, the husband
must be worth at least $60m, i e approximately £37·5m."

41   From that conclusion the judge assessed the wife's fair award at
£17·5m. The judge then addressed the vital question of how the husband's
liability to the wife was to be discharged. Orders against foreign properties
H    would be difficult to enforce. Orders against the husband's shareholdings
impossible, given that they were shrouded in the mist of concealment,
subterfuge and lies. The judge felt unable to find impropriety within the
meaning of the decided cases. The husband's litigation misconduct was not
so much impropriety as the giving of false evidence. The judge considered

© 2013 The Incorporated Council of Law Reporting for England and Wales
APP.111

A

that he had to choose between the *Nicholas* approach and the *Ben Hashem* approach. But the judge's essential ratio is to be found in para 220 when he posed the question: were the London houses "property" to which the husband was "entitled, either in possession or reversion" within the meaning of section 24(1)(a). There could be no doubt that the houses were property. Thus "the crucial words are, therefore, 'entitled either in possession or reversion,' words which have not been the subject of any particular analysis". The judge then concluded that that test was satisfied on the facts of this exceptional case. The directors were "stooges or ciphers". Payments were made for the benefit of the husband and his family without any apparent attempt to see whether the husband was entitled to such payments. The wealth within the structure was freely available to be distributed as the husband directed. Accordingly, at para 225:

B

C

"In this case the husband can without inhibition acquire the properties and shares which the wife seeks because, in effect, the companies are his nominees or agents. As a result, in my judgment, the husband is 'entitled' to the shares and properties held in the names of the corporate respondents because there is no impediment, including third party interests, to his enjoying the full benefit of those assets. They are held by the companies for the husband because the corporate structure is being used as a repository for the family wealth. Effectively the husband, in respect of the companies and their assets, is in the same position as he would be in if he was the beneficiary of a bare trust or the companies were his nominees. There exists no legal impediment to his procuring the transfer of the assets held by the companies into his name. In the language of the cases, they are his 'alter ego'."

D

E

42   In so holding and ordering the judge rested on the statutory power of section 24 which freed him from the constraints of company law as identified in *Salomon v A Salomon & Co Ltd* [1897] AC 22 and following cases.

43   Accordingly, in the order giving effect to judgment, the husband was ordered to transfer or cause to be transferred to the wife the London properties together with three properties in Nevis and the shares in a Nevis company. Following transfer the properties were to be sold and the net proceeds of sale applied in satisfaction of the lump sum.

F

44   I have followed the structure of the judgment in such detail and drawn out the judge's findings and conclusions in order to substantiate my opening observation that this was a truly exceptional case for the scale of the husband's litigation misconduct. There was almost no length to which he was not prepared to go in order to attempt to defeat or diminish the wife's claim. In such a case the judge's search for reality is never easy but it is vital that the court should not be prevented or emasculated by the devious and dishonest.

G

*Submissions on appeal*

45   It is in that context that I turn to the submissions on this appeal. The only appellants are the three companies who have had the advantage of representation by Mr Amos QC whose style of advocacy seems to clothe any client with respectability. They also had the advantage of a specialist company law junior in Mr Shaw.

H

© 2013 The Incorporated Council of Law Reporting for England and Wales

A      46   Mr Amos first urged that the word "entitled" could not mean by
custody or control but only by enforceable legal right.
       47   Second, Mr Amos submitted that the corporate veil could only be
pierced if impropriety of a particular character could be established.  That
proposition applied as much in Family as in Chancery proceedings.  *Ben
Hashem's* case [2009] 1 FLR 115 had been specifically approved by the
recent decision of this court in *VTB Capital plc v Nutritek International*
B   *Corpn* [2012] 2 Lloyd's Rep 313.
       48   Third, he submitted that that last word from this court implicitly
overruled the dicta in *Nicholas v Nicholas* [1984] FLR 285 and in *In re
A Company* [1985] BCLC 333.
       49   Fourth, Mr Amos distinguished *Mubarak's* case [2001] FLR 673.
Bodey J was considering the court's powers in the enforcement of an award
C   arising from a contested hearing in which the husband had conceded that the
company assets were to be treated as his.
       50   Finally Mr Amos submitted that the regulatory structure of company
law militated strongly in favour of allowing the appeal.  For what the order
had achieved was to change the order of priority, not just preferring one
creditor over another but advancing the husband as shareholder over any
D   and all creditors.
       51   Mr Todd QC and Mr Trowell essentially relied on the legal analysis
of Moylan J.  However, Mr Todd submitted that *Ben Hashem's* case and
*Nicholas's* case were not in conflict rather that they illustrated the operation
of two separate principles.  *Ben Hashem's* case considered and applied to
financial provision cases the classic rules of company law which tightly
confined the circumstances in which a court might pierce the corporate veil.
E   However, *Nicholas v Nicholas* recognised an essential power in financial
provision cases to make orders against assets which undoubtedly belonged
to the husband, despite the fact that he might, for whatever reason, have
chosen to hold them in a trust or company.


       *Conclusions*

F      52   In weighing these rival submissions on the development of the case
law I prefer the submissions of Mr Todd.  Were there only one line of
authority and were the Family Division judge bound to apply the
company law as stated in the *VTB* case [2012] 2 Lloyd's Rep 313, in
many cases he or she would be unable to make orders fair to applicant
wives.
G      53   The powers of redistribution of assets on pronouncement of a
decree came into force on 1 January 1971 and the development of the
necessary case law was a gradual process.  The decision in *Nicholas v
Nicholas* [1984] FLR 285 can be seen as a relatively early pronouncement
of the power necessary to enable the judge in financial provision cases to do
justice.
H      54   More recently, Munby J was ideally qualified to hold the balance
between the family law and the company law authorities.  Important is his
decision in *W v H (Family Division: Without Notice Orders)* [2001] 1 All ER
300.  Between pp 310E and 311D Munby J recognised the importance of the
power of Family Division judge in financial provision cases as first stated in
*Nicholas v Nicholas*.   He struck the balance in financial provision

© 2013 The Incorporated Council of Law Reporting for England and Wales

proceedings precisely when he said in the final paragraph of the passage to     A
which I have referred above:

> "Nothing that I say should be taken as intended to water down in any
> way the robustness with which the Family Division ought to deal in
> appropriate cases with husbands who seek to obfuscate or to hide or
> mask the reality behind shams, artificial devices and similar contrivances.
> Nor do I doubt for a moment the propriety and utility of treating as one     B
> and the same a husband and some corporate or trust structure which it is
> apparent is simply the alter ego or creature of the husband.  On the other
> hand, and as the *Nicholas* case itself demonstrates, the court does not—in
> my judgment cannot properly—adopt this robust approach where, for
> example, property is held by a company in which, although the husband
> has a majority shareholding, the minority shareholdings are what
> Cumming-Bruce LJ called 'real interest' held by individuals who as        C
> Dillon LJ put it, are not nominees but business associates of the husband."

55  I would adopt that paragraph as a clear statement of the principle
properly and necessarily applied in family provision proceedings.

56  When Munby J came to deliver his judgment in *Ben Hashem's* case
[2009] 1 FLR 115 the number of cases referred to in the judgment is        D
impressive and includes his earlier decision in *W v H* (cited as *In re W (Ex
parte Orders)* which is how it had been designated in the Family Law
Reports).

57  In *A v A* [2007] 2 FLR 467 Munby J had emphasised that his
observations in *W v H* did not permit a court to ride rough shod over
established principles especially if third party interests were involved.  In *Ben
Hashem's* case [2009] 1 FLR 115, para 94 he made the same point, citing     E
from his judgment in *A v A* those paragraphs in which he had set limit on his
prior observations in *W v H*.  Thus, although in *A v A* and *Ben Hashem's*
case I find Munby J cautioning against excess and emphasising that company
law was uniform in all divisions, he does not disavow the propositions stated
in *W v H*.

58  I would not complicate the approach that a Family Division judge      F
can legitimately adopt either by reference to company law authority on
"lifting or piercing the corporate veil" or by questioning whether judges have
used an alternative expression of the same principle when they have referred
to ownership by an alter ego.  The simple question is whether the individual
is entitled to the property within the meaning of section 24(1)(a).  The
Family Division judges with particular expertise in this field (such as, Bodey,
Coleridge and Mostyn JJ) have on many occasions stressed the need to get to     G
the reality in determining the assets to which the husband is entitled.  Indeed
Mostyn J in an obiter passage in his judgment in *Hope v Krejci* [2012]
EWHC 1780 (Fam), handed down on 29 June 2012, considered the impact
of the decision in the *VTB* case.  He concluded in para 22:

> "I can easily see why these principles are critically necessary when the
> objective is that which was sought in the *VTB* case, namely to deem        H
> someone to be a party to a contract to which he plainly is not.  But I have
> great difficulty in seeing why they must be satisfied for the form of
> piercing of the veil that is the telescoping order, which is almost
> invariably the situation confronted in financial remedy proceedings."

© 2013 The Incorporated Council of Law Reporting for England and Wales

431
[2013] 2 AC                                                      Prest v Prest (CA)
                                                                        Thorpe LJ

A    59   Moylan J, whose expertise in this area is no less, adopted that
approach and thereby achieved justice for the applicant.
     60   Mr Amos's submissions in this court are essentially the submissions
advanced by Mr Wagstaff below.  They were rightly rejected by the judge.
Vital are the judge's findings as to the complete absence of boundaries
between the husband and his companies observed by not only him, who is
not an appellant, but also the companies, who are.  On the exceptional facts
B    of this case I conclude that the judge was entitled to order the husband to
transfer or cause to be transferred the assets which he did.
     61   In the course of argument we were referred to a process which is
known as telescoping which involves ordering the individual not to transfer
the property but to transfer shares or to vote himself dividends or loans as a
route to the property.  That seems to me both cumbersome, expensive and
C    uncertain to achieve the desired end.  It is to import the discipline of
company law in to a situation where at all material times the individual has
not respected or utilised that discipline.  However, that point hardly arises in
the present case where none of the parties has ever advocated it.
     62   As indicated above I would dismiss this appeal.
     63   I have of course reviewed the judgment which I wrote in July in
response to the receipt in October of the powerful judgment written by
D    Rimer LJ.  However, despite its cogency I emphasise that all judges who have
endeavoured to achieve fairness in big money cases at first instance,
including Munby J, have followed the pathway marked by Cumming-
Bruce LJ, himself a former judge of the Division.  I myself followed this path
in the eight years that I sat in the Division and I have not questioned it in the
more years that I have sat in this court.  If this court now concludes that all
E    these cases were wrongly decided they present an open road and a fast car to
the money maker who disapproves of the principles developed by the House
of Lords that now govern the exercise of the judicial discretion in big money
cases.
     64   In this case the reality is plain.  So long as the marriage lasted, the
husband's companies were milked to provide him and his family with an
extravagant lifestyle.  That was only possible because the companies were
F    wholly owned and controlled by the husband and there were no third party
interests.  Of course in so operating them the husband ignored all company
law requirements and checks.
     65   Once the marriage broke down, the husband resorted to an array of
strategies, of varying degrees of ingenuity and dishonesty, in order to deprive
his wife of her accustomed affluence.  Amongst them is his invocation of
G    company law measures in an endeavour to achieve his irresponsible and
selfish ends.  If the law permits him so to do it defeats the Family Division
judge's overriding duty to achieve a fair result.

     **RIMER LJ**

     *Introduction*
H    66   This appeal raises a question as to the court's jurisdiction in
ancillary relief proceedings between spouses to order assets held by
companies to be transferred to the applicant spouse in or towards
satisfaction of her claim.  The applicant (respondent to the appeal) was
Yasmin Prest ("the wife").   Michael Prest ("the husband"), the main

© 2013 The Incorporated Council of Law Reporting for England and Wales

A

respondent to her application, was originally an appellant but his appeal was struck out for want of compliance with conditions of orders of the court. The remaining appellants, also respondents to her application, are three companies in his control: Petrodel Resources Ltd ("PRL"), Petrodel Upstream Ltd ("Upstream") and Vermont Petroleum Ltd ("Vermont"). All three are incorporated in the Isle of Man.

B

67  The main orders under challenge are those in para 5 of Moylan J's order of 16 November 2011 by which he ordered the husband to "transfer or cause to be transferred" to the wife: (i) four London properties and an interest in a fifth all "held in the name of" PRL; and (ii) two London properties "held in the name of" Vermont. Para 5 did not also relate to properties held by Upstream, but Upstream appeals (as do PRL and Vermont) against other orders made by the judge, including his costs orders, although there is no need to refer further to them in this judgment.

C

68  In making the para 5 orders the judge was purporting to exercise the jurisdiction conferred upon the court by section 24(1)(a) of the Matrimonial Causes Act 1973, which provides so far as material:

D

"On granting a decree of divorce . . . the court may make any one or more of the following orders, that is to say— (a) an order that a party to the marriage shall transfer to the other party . . . such property as may be so specified, *being property to which the first-mentioned party is entitled, either in possession or reversion* . . ." (Emphasis supplied.)

69  A question that exercised the judge, and this court on the appeal, was whether the properties the subject of his para 5 orders were "property" to which the husband was so entitled. Only if they were did the judge have jurisdiction to make the orders. Thorpe LJ has concluded that the judge was entitled to regard the properties as such "property" and so make the orders that he did.

E

70  I respectfully disagree with Thorpe LJ's reasoning and conclusion and would allow the appeals against the para 5 orders. I consider, with respect, that the judge fell into fundamental error. He made no primary findings justifying any conclusion other than that the properties were part of the assets of, and belonged beneficially to, the companies that respectively owned them. He held, however, that the husband's sole control of the companies as their 100% owner enabled him to deal as he wished with the companies' assets, and that it followed that the husband was therefore the beneficial owner of such assets and so "entitled" to them within the meaning of section 24(1)(a).

F

71  In so holding the judge was wrong. He should have held that section 24(1)(a) had no application to the para 5 properties and gave the court no jurisdiction to make the orders. That is because the shareholders of a company have no interest in, let alone entitlement to, the company's assets and the same applies to a shareholder who is a 100% owner of the company. The distinction between the respective legal personalities, rights and liabilities of a company and those of its shareholders is as valid today as when the House of Lords decided *Salomon v A Salomon & Co Ltd* [1897] AC 22 and it applies as much in the disposition of ancillary relief proceedings as in other proceedings. The judge, however, simply equated the companies with the husband and regarded their assets as his.

G

H

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    *The judge's judgment*

   72   The judge gave a very full judgment in which he explained that the husband's failure to co-operate in the disclosure process and to give clear evidence prevented him from giving a comprehensive account into which all the pieces of the jigsaw could be fitted. I do not question that such lack of co-operation made the judge's task more difficult than it should have been.

B    The judge's findings of central importance are, however, as to the companies, their ownership and their assets and I must explain them.

   73   The structure of the many companies in the Petrodel group is complicated but the relevant shareholdings are as follows. A Nevis company, Petrodel Resources (Nevis) Ltd ("the Nevis company"), holds 100% of Upstream. The Nevis company also holds 97·5% of a Nigerian company called Petrodel Resources (Nigeria) Ltd ("PRNL"), the other 2·5%

C    being held as to half each by the task wife and Helen Davies (the husband's sister). PRNL holds 99·99% of PRL, with the other 0·01% being held by Margaret Wilson, the wife's mother; and PRNL and PRL respectively hold 51% and 49% of Vermont. The husband's evidence was that the Nevis company (which owned 97·5% of PRNL) was itself wholly owned as to 100% by PRNL. The judge said (para 55(c)) that "this alleged circular ownership is but one of the puzzling features of this case". He also,

D    however, referred to the different evidence of Mr Le Breton (who had worked in the Petrodel group until 2008), which was that the Nevis company was not owned by PRNL but that its shares were held for the husband's benefit through a trust; and at the hearing of the appeal, Mr Amos QC, for the appellants, told us that the Nevis company is now owned by a Nevis entity called the Family One Foundation, whose shares are

E    held on trust for, amongst others, the husband. There are other companies in the group to which the judge referred in his judgment, but it is unnecessary to refer to them. The appeals are only about, or only directly about, PRL, Vermont and Upstream.

   74   The judge said (para 55(b)) that PRNL was "effectively a holding company for [PRL]". Both companies were incorporated in 1993. PRL was

F    the main trading company of the group, its accounts showing that it started trading in 2002. Its original shareholders were the husband and the wife and its first directors were relatives of the wife. By the trial, its shareholding was held as I have described and its directors were Ms Walters and Mr Murphy, the latter providing his services through a management company. The judge found that the husband began working full-time in the group in 2005, as chief executive officer of PRL. The judge said of PRL, at para 22, that:

G       "[it] has been involved in the oil business in what are called downstream activities, namely trade and transportation, and more recently has been involved in upstream activities, namely oil exploration and production. Accounts for the years 2005, 2007 and 2008 . . . show turnover of between \$572m and \$1,400m and profits of between just under \$3m and approximately \$6m."

H    75   The judge referred, at para 77, to the husband's evidence that although PRL was still trading in gasoline, it had not undertaken a trade since one effected in early 2010 for which payment remained due. Documents produced during the trial showed, however, that "substantial trades have continued to be made by companies within the group being,

probably, either [Vermont] and/or [the Nevis company]". Both PRL and     *A*
Vermont are, or were, trading companies.

76   The former matrimonial home, 16, Warwick Avenue, London W2,
was bought in PRL's name in 2001. The judge said, at para 228, that if it
were necessary so to decide, he would have held that Warwick Avenue was
held by PRL on trust, or as a nominee, for the husband (he had earlier set out
the evidence justifying such a finding) and (by para 3 of his order) he ordered    *B*
its transfer to the wife. There is no appeal against that order, permission to
appeal having been refused. As for the seven other London properties
respectively held by PRL and Vermont which are the subject of the appeals,
the judge made no like finding that any was held either on trust, or as
nominee, for the husband although he had been pressed by the wife to do so.
The judge explained that all the London properties were the subject of a
charge by their respective corporate owners to BNP Paribas and that all save    *C*
for Warwick Avenue were also charged to Ahli United Bank (UK) plc. The
charged properties had a combined gross value of £11·3m, the indebtedness
to Ahli being just under £1·9m. In paras 80–84 and 159–161, the judge
explained the evidence as to the indebtedness to BNP Paribas but was unable
to make a clear finding as to its amount. On one view, it may have been
about $7·6m.                                                              *D*

77   The judge made an important finding as to the husband's role in the
governance of PRL. He referred to Mr Le Breton's evidence that its directors
acted pursuant to the husband's instructions and to the terms of the
husband's employment contract as chief executive officer, which gave him
full discretion as to the management of PRL's affairs "in so far as [his]
actions are for the benefit of the company and its shareholders". He said, at    *E*
para 70, that:

    "I am satisfied that the directors of the group, including Mr Murphy,
    act in accordance with instructions given by or on behalf of the husband.
    The husband was unable in his oral evidence to provide details of any
    specific occasion when the directors had not acted in accordance with his
    instructions."

The judge thus found the husband to be a "shadow director" of PRL           *F*
(compare section 251(1) of the Companies Act 2006), although he did not so
describe him.

78   The judge explained (at paras 71–74) the unsatisfactory evidence in
relation to the directors' current account shown in the PRL accounts, which
showed liabilities to directors of just over $10m for each of 2008 and 2009.
This appeared to baffle the husband in his cross-examination, who at one      *G*
point denied that he had a current or loan account with PRL as he was not a
director. Despite this, the judge found it to be clear that "there is no person
other than the husband to whom such sums could or would be due" and he
referred to the husband's acknowledgement elsewhere that he did have a
director's loan account. The judge then said, at paras 74–75:

    "74. The loan account has not been produced. Indeed, there is no        *H*
    direct evidence at all as to how the husband's income and bonuses are
    dealt with in PRL's accounts save possibly for references to directors'
    remuneration which, given the amounts, are very unlikely to relate to
    actual directors. Further, the amounts given for directors' emoluments

A  are significantly less than the annual amounts spent by the husband on
   himself and his family and for which there appears to be no significant
   source other than PRL . . . The husband told me that he does not know
   how his income and bonus are dealt with in the accounts.  When he was
   asked whether he receives any benefits from PRL other than his salary he
   replied that this is an accounting question.   When asked in cross-
   examination to explain how some of the payments relating to the wife's
B  mother were for the company's benefit, the husband replied that she was a
   shareholder.   When Mr Todd asked whether a dividend had been
   declared, the husband said he was not sure how this benefit or these
   payments had been received.

        "75.  It was suggested to the husband in the course of his cross-
   examination that he just draws from PRL whatever he and his family
C  need.  He denied this but when then asked how he paid for school fees he
   said he would either pay it himself or he would take a director's loan.  The
   only company of which the husband is a director is [PRNL].  There is no
   indication that this company has had sufficient resources to enable school
   fees to be paid.  As the husband's employment contract permits him to set
   his own bonus, the whole exercise is artificial in any event as, if required,
   he could simply ascribe all payments made for his or his family's benefit as
D  being part of his bonus.  I have no doubt at all that the husband does,
   indeed, just draw from PRL whatever he and his family need, as and when
   they need it."

   The judge referred, at para 92, to the fact that school fees, other educational
   costs, holidays in Italy and the cost of a chalet in Meribel had been paid by
   PRL out of its Royal Bank of Scotland account in the Isle of Man.
E
   79   The judge made certain findings with regard to the husband's
   interest in the Petrodel group between paras 199 and 210.  He concluded as
   follows, at paras 208–210:

        "208. I spent some time during the hearing, and longer since, trying to
   make sense of what appeared to be inconsistent themes in the husband's
   evidence and seeking to identify how they might be reconciled.
F  Ultimately I have decided that I have been seeking to impose an unduly
   legalistic framework onto a relatively simple factual situation, namely
   that the husband operates and controls the Petrodel group and its assets
   for the benefit of his immediate family.  The wealth within the group is the
   family's wealth to which the husband has unrestricted access.  I am
   satisfied that the husband is both the effective owner and controller of the
G  whole of the Petrodel corporate structure.  In coming to this conclusion
   I accept the evidence of Mr Le Breton that the husband told him that he is
   the ultimate beneficial owner and I also accept his apposite phrase that
   Petrodel is the husband and the husband is Petrodel.  In my judgment, the
   Information Memorandum as found by the wife accurately describes the
   husband as the owner.

        "209. The extent to which the companies are the husband's nominees
H  is demonstrated by the term in his contract . . . that he 'shall be assumed
   to report to the board for issues pertaining to the management of the
   company, yet you shall have and employ full discretion with the way you
   manage all the affairs of the company in so far as your actions are for the
   benefit of the company and its shareholders'.  As the husband is the only

© 2013 The Incorporated Council of Law Reporting for England and Wales

effective shareholder, the husband is managing the affairs of the company   A
solely for his benefit, hence the complete lack of any need for real board
control. The husband has clearly used the companies to meet his and his
family's personal expenditure, as well as his legal costs in these
proceedings, without any inhibition. The lack of proper accounting also
demonstrates the lack of any board control or supervision.

"210. I am also satisfied that all the assets held within the companies   B
are effectively the husband's property. He is able to procure their disposal
as he may direct based again on his being the controller of the companies
and the only beneficial owner. There are no third party interests of any
relevance because the other shareholders are merely nominal with no
expectation of benefiting from their shareholdings."

80  Those paragraphs include a clear finding that the husband was the   C
ultimate owner of the group and so in a position to control its affairs. The
judge described him as the "effective owner" of the group and I read the
"effective" as reflecting that, whilst the ultimate shareholding was not vested
in the husband, he was nevertheless its sole controller. Given the evidence he
heard, that finding was unsurprising and the appeals involved no challenge
to it.

81  The question in the appeal is not, however, as to the ownership of   D
the ultimate shareholding that conferred control of the group companies,
but as to the ownership of the properties the subject of the para 5 orders.
There is no dispute that they were vested in and held by one or other of PRL
and Vermont and so, prima facie, were *their* assets. They could not therefore
be made the subject of the para 5 orders unless the true analysis was that,
although held by the companies, they were properties to which the husband   E
was "entitled, either in possession or reversion'" within the meaning of
section 24(1)(a). In para 210 the judge found that all the Petrodel group's
assets were "effectively the husband's property". I interpret the "effectively"
as reflecting the judge's reluctance, at any rate by that point in his judgment,
to go so far as to say that they *were* his property.

82  During the argument, Thorpe LJ suggested that the judge probably   F
there meant that the assets belonged to the husband "in reality". With
respect, that is to substitute for the judge's own imprecise wording a phrase
of like imprecision. The question for the judge was in principle simple.
Section 24(1)(a) obviously focuses only on property to which the respondent
spouse is beneficially entitled, the location of the legal title being immaterial.
The assets held by the companies (including therefore the properties) either
belonged beneficially to the companies or to the husband. No third   G
alternative was canvassed. Before the judge could make an order under
section 24(1)(a) in relation to the various London properties, he had to be
satisfied that they were the husband's beneficial property: and a finding that
were "effectively" his property (whatever that may mean) was not good
enough. The judge appears there to have been basing that finding on no
more than his primary finding that the husband's sole control of the Petrodel
group carried with it the authority to deal with all the group's assets. The   H
critical question, however, is whether such control meant that the husband
was in fact the beneficial owner of the companies' assets and, therefore, that
the companies had no beneficial interest in them. The judge has not yet
answered that question unambiguously, although these paragraphs were not

© 2013 The Incorporated Council of Law Reporting for England and Wales

A  his last word on the topic. The ordinary principle is that the shareholders of
a company (including a shareholder with 100% control) have no interest of
any nature in the company's assets.

83  In paras 211–230, the judge explained the award that he proposed to
make in favour of the wife. In assessing the husband's financial resources,
which was the first issue upon which the judge embarked, he referred again
B  to the husband's failure to give full and frank disclosure of his resources and
held that he was entitled to draw adverse inferences against him. In making
his assessment, the judge took into account the value of his interests in the
Petrodel group and explained, in para 215, that he was satisfied that the
husband had continued through Petrodel to trade successfully since 2004,
the accounts of PRL suggesting that it had made a net profit for the four
years 2005 to 2008 of $19m. The judge concluded that the husband "must
C  be worth at least $6om, i e approximately £37·5m". That finding reflected
that the husband's wealth included the value of his ultimate shareholding in
the Petrodel group. The judge decided that a fair award to make to the wife
was for her to receive resources totalling £17·5m.

84  The judge turned, at para 217, to consider how that award should be
structured. Mr Todd QC, for the wife, had sought a lump sum order, with
D  property transfer orders in respect of the London properties and the
company shares in part satisfaction. Counsel for the husband and the
companies had respectively submitted that no direct orders could be made in
respect of the shares or properties held by the companies unless the judge
was able to "find the requisite impropriety as set out in [Ben Hashem v Al
Shayif [2009] 1 FLR 115, a decision of Munby J]". That was a decision to
the effect that, without such a finding, it was not open to the court to pierce
E  the Petrodel companies' veils of incorporation and so identify the companies
with the husband; and that, without such piercing and identification, there
was no basis for an order directly in respect of shares and/or properties held
by the companies, because such assets were their assets, not the husband's.
The judge added that there was "also the separate issue of whether the
companies hold the shares and properties on trust for the husband or as his
F  nominee". If the answer to that was yes, the route to the order sought by
Mr Todd was straightforward: because if such shares and/or properties were
so held, they were plainly "property to which [the husband was entitled],
either in possession or reversion" within the meaning of section 24(1)(a). In
the event, the judge declined to answer that latter question in the affirmative.

85  Importantly, the judge also expressly rejected the case that there was
any relevant impropriety or, therefore (as might be thought to follow), any
G  case for piercing the corporate veils of the Petrodel companies. His reasons
were these, at paras 218–219:

"218. Dealing first with the issue of impropriety, has the wife
established that the company structure has been used to avoid or conceal
liability? In my judgment the company structure in this case was set up
and has been used for conventional reasons including wealth protection
H  and the avoidance of tax. Mr Todd is right, for example, to point to the
reference in the annex to the husband's Form E to his transferring his
shares in [PRNL] to the Nevis company because he was involved in
litigation. However, this does not result in the company structure being
used to conceal or avoid liability. It is seeking to provide a degree of

© 2013 The Incorporated Council of Law Reporting for England and Wales

438
Prest v Prest (CA)                                                  [2013] 2 AC
Rimer LJ

protection for the wealth, which may or may not be effective depending      A
on the nature of the rights retained by the husband.  He is also right to
point to the company structure effectively being the husband's money box
which he uses at will.  This might be contrary to accounting or company
law principles but any disregard of those principles does not, in my view,
mean that the structure is being used to avoid or conceal liability.  From
the husband's perspective the wealth and the corporate structure is and
remains his but at the same time he is able to take advantage of the tax      B
and other benefits of holding it within a corporate structure.

"219. I also do not accept Mr Todd's submission that the undoubted
use by the husband of the corporate structure to seek to deny that the
companies or their assets are his resources or are assets available to him
amounts to impropriety as that word is used in the authorities.  It is
simply a husband giving false evidence.  Accordingly, I do not consider       C
that the wife has established impropriety in this case."

86   Having held that the conditions for piercing the corporate veil were
not satisfied, the judge nevertheless went on to hold that the husband was
"entitled" to the relevant properties within the meaning of section 24(1)(a)
and, therefore, that he could and should make the para 5 orders for the
transfer of the properties held by PRL and Vermont.  That reasoning          D
substantially repeated what the judge had found in paras 208–210 (quoted
above) but he re-reasoned the issues and I must set out what he said, at
paras 220–228.  I should also first set out his interpretation, in para 193, of
Bodey J's decision in *Mubarak v Mubarak* [2001] 1 FLR 673:

"193. In essence, Bodey J decided, notwithstanding the comments in
[*Crittenden v Crittenden* [1990] 2 FLR 361], that property is within the     E
scope of section 24 if it is property to which a spouse is to be treated as
being 'entitled' which can include property held by a company of which a
spouse effectively has complete, or perhaps more accurately a sufficient
degree of, control or ownership.  Although the effect is to pierce the
corporate veil it is, in my view, a question of statutory interpretation.
Does the power given to the court by the Matrimonial Causes Act extend
to property held through a corporate or other structure to which one         F
spouse is (in effect) entitled through the use of rights and powers available
to him and her?  Bodey J decided that if a party has effective control of the
legal or corporate structure and, because third party interests would not
be prejudiced, is also the only person effectively entitled to the benefit of
the property, then that property is within the scope of section 24 as being
'property to which . . . (that) party is entitled in possession'."            G

"220. In my judgment, the question I must decide is whether the
relevant shares and properties are 'property' to which the husband 'is
entitled, either in possession or reversion'.  It is plain that the word
'property' is extremely broad and covers all forms of property.  The
crucial words are, therefore, 'entitled either in possession or reversion',
words which have not been the subject of any particular analysis.  I agree    H
with Mr Wagstaffe that if a lay person was asked the question whether a
husband who owns a company which owns a house is entitled to the
house, they would reply in the affirmative but I also agree with him that
I must decide from a legal perspective whether as a matter of statutory
interpretation, as applied to the facts of this case, the answer is the same.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A In undertaking this task, I am persuaded that I should apply [*Nicholas v Nicholas* [1984] FLR 285] and what appears to me to be Bodey J's reasoning in *Mubarak v Mubarak* as set out in para 193 above.

"221. As I have indicated, I am satisfied that the husband has complete control over the respondent companies both in terms of their operation and in terms of their management. He is the controlling force and the directors clearly act on his instructions. They are, to use the words of Munby J from *Ben Hashem's* case, the husband's 'stooges' or 'ciphers'. I could also adopt the following passage from Lord Denning MR's judgment in *Wallersteiner v Moir* [1974] 1 WLR 991, 1013: 'He was in control of them as much as any "one-man company" is under the control of the one man who owns all the shares and is the chairman and managing director . . . He controlled their every movement. Each danced to his bidding. He pulled the strings.'

C "222. There is no evidence that any of the directors of any of the companies acted other than in accordance with the husband's instructions. There is good evidence provided by Mr Le Breton that the corporate structure, the whole of it, was managed as the husband directed and I remind myself, again, of the terms of the husband's contract of employment. Payments were made for the benefit of the husband and his family without any apparent attempt to see whether the husband was entitled to such payments. I have seen no reference to any determination being made of the husband's bonus. The husband does not know how his income and bonus were accounted for in the accounts. There is reference to director's remuneration but the amounts are substantially less than the amounts paid to the husband or for the benefit of the family. The husband himself accepts that the structure is such that he is able to effect whatever might be required to meet his obligations under Itsekiri customary law, be it transferring shares to his siblings or otherwise. How, I ask, would the husband be able to achieve this if he is not the effective owner of the whole group and of the companies?

"223. The superficial nature of the company structure and the extent of the husband's control can be seen from his contract of employment and the other matters to which I have referred. It is also clear to me that the husband looks at things from the perspective of obligations or need. The legal structure is of secondary importance save that clearly any such structure must be capable of being used to enable his obligations and/or his needs to be met. So, for example, if the husband's customary law obligations require him to give his siblings shares in the company, then the structure must be such as to enable him to do so. I am confident that Mr Elusogbon did tell the husband not to worry because, indeed, the structure which holds the wealth and assets can be adjusted as required, or to put it another way the wealth held within the structure is freely available to be distributed as the husband directs. It is difficult to see how this could be achieved by him unless he controls, in English law terms, both the legal and the beneficial interest in the worth. Further, if the husband not only has complete control but also is the sole effective owner, which I have found that he is, in my judgment, again in English law terms, I would see this as equating to beneficial ownership.

"224. In summary, therefore, in my judgment the answer to the question of whether an asset held in the legal name of a company is

440
Prest v Prest (CA)                                                    [2013] 2 AC
Rimer LJ

A
property which falls within section 24(1)(a) depends on the facts of the
case. It is right, of course, that as a matter of company law a shareholder
only has a right of participation in accordance with the articles of
association and has no right to any particular item of property. But, what
if the shareholder is, in fact, able to procure the transfer to them of a
particular item of company property, such as a matrimonial home, as a
result of their control and ownership of the property and the absence of
B
any third party interests. Am I to ignore the reality that the shareholder is
able to procure the transfer to them of that property for the purposes of
deciding whether it is property to which they are entitled?

"225. In my judgment, it would be contrary to the purpose and
intention of the legislation if I were to do so. The legislation is intended to
ensure that marital wealth can be distributed by the court between the
parties in a fair and just manner. In this case the husband can without
C
inhibition acquire the properties and shares which the wife seeks because,
in effect, the companies are his nominees or agents. As a result, in my
judgment, the husband is 'entitled' to the shares and properties held in the
names of the corporate respondents because there is no impediment,
including third party interests, to his enjoying the full benefit of these
assets. They are held by the companies for the husband because the
D
corporate structure is being used as a repository for the family wealth.
Effectively the husband, in respect of the companies and their assets, is in
the same position he would be in if he was the beneficiary of a bare trust
or the companies were his nominees. There exists no legal impediment to
his procuring the transfer of the assets held by the companies into his
name. In the language of the cases, they are his 'alter ego'.

"226. I do not consider that the company law principles, relied upon in
E
particular by Mr Wagstaffe, determine the scope of the powers given to
the court under the Matrimonial Causes Act. In my view, if a party is
both the effective controller and the effective owner of a company it does
not strain the language of the Matrimonial Causes Act to decide that he is
'entitled . . . in possession' to an asset held by that company such as the
former matrimonial home. This interpretation accords with what was
F
said in *Nicholas v Nicholas*. As identified in *Mubarak*, he is entitled to the
asset in possession because he has the right and ability to procure its
transfer to him for his own use. This is not to challenge the principles
established by *Salomon* or *Adams v Cape Industries plc* or the other
authorities referred to in *Ben Hashem's* case. It is to recognise, as was
said by Slade LJ in the *Cape* case [1990] Ch 433, 536G, with my emphasis:
G
'*save* in cases which turn on the wording of particular statutes, the court is
not free to disregard the principles of *Salomon* merely because it considers
that justice so requires.'

"227. As a matter of general law the companies in the Petrodel group
may be separate legal entities but, in my judgment, under the
Matrimonial Causes Act their assets fall within the scope of section 24 as
a result of the complete nature of the husband's control and ownership.
H
As Mr Wagstaffe submitted, the wife can have no stronger claim than the
husband's. In this case, as a result of control and ownership, the husband
is able to procure the transfer of the properties and shares into his sole
name or as he may direct. The case was argued on behalf of the husband
and the companies on the basis of the husband's rights as against the

© 2013 The Incorporated Council of Law Reporting for England and Wales

441

A    company.  Apart from the alleged interests of the husband's siblings,
     which I have rejected, it has not been asserted that any other rights or
     interests would or should inhibit me from making the orders sought by
     the wife.
         "228. I also propose to deal specifically with the position of Warwick
     Avenue.  I am satisfied that the moneys used in the purchase and
     refurbishment of that property came from the husband.  There is no
B    evidence that he lent this money to the company, nor that he gifted it to
     the company.  Accordingly, if it were necessary for me to decide the issue,
     I would decide specifically that the company holds that property on
     resulting trust for the husband."

     *The appeals*

C        87   I make first some observations about section 24(1)(a) of the
     Matrimonial Causes Act 1973.  It is a clear and uncomplicated provision.
     The task that section 24(1)(a) sets the court is to identify "property to which
     [the respondent spouse] is entitled, either in possession or reversion", and
     then to consider whether to make a property adjustment order in relation to
     any property so identified.  The "property" to which the paragraph refers
     means property to which the respondent spouse is beneficially entitled.  The
D    nature of the court's inquiry as to the beneficial ownership of a particular
     asset will be the same as it would be in a case not arising under the section 24
     jurisdiction: "property" for the purposes of section 24(1)(a) cannot and does
     not mean something different from "property" in other contexts.  The
     inquiry will show that the asset in question either is, or is not, property of the
     respondent spouse.  If it is, it is vulnerable to the exercise of the section 24
E    jurisdiction.  If it is not, it is not.
         88   This takes me back to para 218 of the judge's judgment.  The judge's
     rejection there of the submission that the establishment of the Petrodel
     structure involved any impropriety such as to entitle the court to pierce the
     companies' respective corporate veils was crucial to the disposition of the
     inquiry as to the beneficial ownership of the assets held by the appellants.
F    The relevance of the "need for impropriety" submission was that it was *only*
     if relevant impropriety could be shown that the corporate veils could in
     consequence be pierced, following which it would then be open to the court,
     so far as it might think fit, to treat certain of the companies' assets as
     the husband's and make transfer orders in respect of them under
     section 24(1)(a).
         89   The judge, however, rejected the submission that there had been any
G    relevant impropriety and instead found that the company structure "was set
     up and has been used for conventional reasons including wealth protection
     and the avoidance of tax".  That can mean only that he was making a
     conventional finding that the "wealth" of the companies (which I presume
     means their assets) belonged beneficially to them.  That is because, if he was
     instead finding that their "wealth" had always belonged, and continued to
     belong, not to the companies but exclusively to the husband, he could in
H    consequence only have found that the companies were mere nominees for
     him, which would undermine his finding as to the legitimacy of the
     establishment and use of the company structure.  The judge underlined this
     by noting that the husband's use of the companies "effectively [as his] money
     box . . . at will" might have been contrary to accounting or legal principles

© 2013 The Incorporated Council of Law Reporting for England and Wales

but that such use did not undermine the legitimacy of the establishment of   A
their structure. He was implicitly saying that the companies were entities
with assets of their own the use and disposal of which might be constrained
by law, as a company's assets are; and that the husband, perhaps improperly,
had helped himself to their assets did not alter that.

90   The last sentence of at para 218 is more difficult. The judge there    B
said that whilst "from the husband's perspective" the companies' "wealth
and corporate structure is and remains his", at the same time "he is able to
take advantage of the tax and other benefits of holding it within a corporate
structure". I am not confident that I understand what the judge was saying
there. If he was saying that the companies' "wealth" in fact belonged (and,
presumably, had always belonged) beneficially to the husband, it would
follow that the husband was not entitled to take advantage of the suggested   C
benefits of holding them within a corporate structure: the assets (and
liabilities) would, on that basis, have belonged to him alone, the companies
would simply have held the assets as his nominees and the incorporation of
the companies could have achieved no relevant change in his personal
position. If, however, the judge was simply saying (as I regard more
probable, since otherwise para 218 would overall make no sense) that the
husband was, at least in substance, the sole beneficial owner of the shares in   D
the ultimate holding company and so had complete control of all the group
companies and *their* respective wealth, there is no problem. He would then
simply have been describing the commonplace circumstance under which
the one-man owner of a company, or a group of companies, enjoys total
control of its or their affairs.

91   I therefore arrive at the judge's para 220 on the basis that he has not   E
only made no finding that the assets held by the Petrodel companies were
other than assets that belonged to them beneficially (as a company's assets
do) but has in fact found (in para 218) that they did so belong. In para 220
the judge focused on the question that section 24(1)(a) posed for him and
indicated that he derived guidance from *Nicholas v Nicholas* [1984] FLR
285 and *Mubarak v Mubarak* [2001] 1 FLR 673 as to how he should answer
it.                                                                           F

92   The judge then again explained, in paras 221–223, how the husband
had sole control of the Petrodel companies and how he exercised that control
by being their sole (shadow) director and how he was "the effective owner of
the whole group" (meaning, as I have said, that he had sole control of the
shares in the ultimate parent, the Nevis company). At the end of para 223,
he concluded that the combined facts of the husband's complete control and
the fact that he was "the sole effective owner" equated to "beneficial        G
ownership": and he was apparently there saying that those combined
circumstances made the husband the sole beneficial owner of the companies'
assets. If he was not saying that, I do not know what he meant; if he was
saying it, his statement cannot stand with para 218.

93   In paras 224 and 225, the judge made clear his findings that the
husband *was* "entitled" to all the companies' assets, and that finding       H
necessarily carried with it a finding that the husband was the exclusive
beneficial owner of such assets and that the companies had no beneficial
interest in them. The companies which, in para 218, the judge had found to
be legitimately established "for conventional reasons including wealth

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   protection and the avoidance of tax" have, therefore, by para 225 become
    the husband's nominees or agents in respect of his own assets.

       94   The judge's conclusion to that effect was based on his holding that
    the husband's sole control of the companies' affairs gave him the beneficial
    ownership of all the assets held by the companies. His view was that such a
    sole shareholder's power over the assets of the company he owns is equal to
B   property. It was his view that if (as in every case he will) a sole ultimate
    shareholder of a group of companies is in a position to procure the transfer
    to himself of any asset held by any of the companies, then, in "the absence of
    any third party interests", any such asset is property to which the sole
    shareholder is "entitled" within the meaning of section 24(1)(a). The
    corollary must be that it is not property to which the company is entitled or
    in which the company has any beneficial interest: the company is, in such a
C   case, merely holding its assets as the nominee of its 100% controller.

       95   The judge summarised his findings in para 226. His conclusion was
    that the controller of a company who has the "right and ability" to transfer
    its assets to himself for his own use is "entitled in possession" to the asset.
    That does, the judge recognised, amount to treating the company's assets as
    the controller's rather than the company's. But he did not regard it as
    amounting to a departure from the principles of *Salomon v A Salomon & Co*
D   *Ltd* [1897] AC 22 since section 24(1)(a) authorised such an inroad into the
    *Salomon* principles. That last observation is a difficult one. If, as the judge
    appears to have considered, section 24(1)(a) is to be interpreted as meaning
    that, in the case of a company in the sole ownership of a single individual, all
    the assets of the company are "property to which [that individual] is
    entitled", that logically involves no inroad into the *Salomon* principles at all:
E   it simply means that the effect of section 24(1)(a) is that such a company
    owns beneficially none of the assets it holds, which instead all belong
    beneficially to its 100% owner. Such an interpretation, however, involves a
    misunderstanding of section 24(1)(a) and is wrong.

       96   In particular, if the judge regarded anything in *Nicholas v Nicholas*
    [1984] FLR 285 and *Mubarak v Mubarak* [2001] 1 FLR 673 as supporting
F   his conclusion, he misunderstood them. Those cases had nothing to say
    about the ordinary meaning of section 24(1)(a) and neither suggested that it
    means anything other than I have indicated it means. The relevant
    statements in the *Nicholas* and *Mubarak* cases were directed to a
    consideration of the circumstances in which it might be appropriate for the
    court to "pierce the corporate veil" of a company and then to *treat* its assets
    as those of the husband for the purposes of section 24(1)(a). In the present
G   case, however, the judge appears to have regarded the guidance in *Ben
    Hashem v Al Shayif* [2009] 1 FLR 115 as to when the corporate veil might be
    pierced as the applicable guidance and held, in paras 218 and 219, that there
    was no basis for piercing the veil. Such guidance differs from that in
    *Nicholas v Nicholas* [1984] FLR 285 and *Mubarak v Mubarak* [2001]
    1 FLR 673.

       97   I respectfully disagree with the judge's reasoning and conclusion.
H   Once he had rejected the submission that he could pierce the corporate veils
    of the companies in the Petrodel group, he had no choice but to find that
    assets of PRL and Vermont, including the London properties the subject of
    the appeals, belonged beneficially to PRL and/or Vermont respectively, and
    that none of such assets belonged beneficially to the husband. The judge's

different conclusion that such properties were, or were "effectively", the husband's property was based on reasoning that was internally inconsistent, contrary to principle and wrong. I shall now explain why in fuller detail.

*Basic principles*

98   First, the appeals concern companies all incorporated in jurisdictions other than England and Wales.  There was, however, no expert evidence as to any foreign law governing the operations of any of the companies and the appeals were argued on the basis that English law applied to their operations.

99   Second, *Salomon v A Salomon & Co Ltd* [1897] AC 22 provides the highest authority for the principle that a duly incorporated company is a legal entity wholly separate from those who incorporate it, with rights and liabilities of its own; and there was here no suggestion that any of the group companies was other than duly incorporated.  The principle established by the *Salomon* case is too well known to require elaboration.  I shall cite just two short passages.  Lord Halsbury LC said, at p 31:

"Either the limited company was a legal entity or it was not. If it was, the business belonged to it and not to Mr Salomon. If it was not, there was no person and no thing to be an agent at all; and it is impossible to say at the same time that there is a company and there is not."

Lord Macnaghten said, at p 53:

"It has become the fashion to call companies of this class 'one-man companies'.  That is a taking nickname, but it does not help one much in the way of argument.  If it is intended to convey the meaning that a company which is under the absolute control of one person is not a company legally incorporated, although the requirements of the 1862 Act may have been complied with, it is inaccurate and misleading: if it merely means that there is a predominant partner possessing an overwhelming influence and entitled practically to the whole of the profits, there is nothing in that that I can see contrary to the true intention of the 1862 Act, or against public policy, or detrimental to the interests of creditors."

100   Third, as appears from the latter quotation, it makes no difference to the fact of a company's separate entity that a single individual controls all its shares.  That is, and always has been, a commonplace circumstance. Companies can now be, and often are, incorporated with a single member. At the time of *Salomon's* case, the minimum number was seven and the *Salomon* company was incorporated with seven members, but the House made plain that it makes no difference to the separate existence of the company that all the shares are held in trust for one person who has full control over it: (see again per Lord Macnaghten, and also per Lord Herschell, at p 45, and per Lord Davey, at p 54).

101   Fourth, it follows from the fact of the company's separate identity that its property belongs beneficially to the company itself and in no sense belongs, either at law or in equity, to its shareholders, who have no interest of any nature, whether proprietary or otherwise, in its assets.  If they are working members and are remunerated by the companies for their efforts, the money so paid to them will cease to be the company's money and become

445
[2013] 2 AC                                                    Prest v Prest (CA)
                                                                      Rimer LJ

A    theirs; likewise if a dividend is lawfully declared and paid to them; and
     likewise again if, upon liquidation, the surplus assets after paying the
     creditors are divided between them. Until, however, any of such events
     occurs, the money or property hitherto held by the company does not belong
     to the shareholders but to the company. If authoritative support is required
     for that, see *Macaura v Northern Assurance Co Ltd* [1925] AC 619, 626
B    where Lord Buckmaster said: "Now, no shareholder has any right to any
     item of property owned by the company, for he has no legal or equitable
     interest therein." He might equally have said "no shareholder is *entitled*
     to any item of property . . ." And Lord Wrenbury said, at p 633: "the
     corporator *even if he holds all the shares* is not the corporation, and . . .
     neither he nor any creditor of the company has any property legal or
     equitable in the assets of the corporation." (Emphasis supplied.) The latter
C    quotation has a particular resonance for present purposes. That a
     shareholder of company A, which in turns wholly owns company B, owns
     none of the assets of either company was also recognised by the House of
     Lords in *British American Tobacco Co Ltd v Inland Revenue Comrs* [1943]
     AC 335: see p 339, per Viscount Simon LC. A company's beneficial
     ownership of its assets was similarly recognised by both Lords Justices in
D    *Nicholas v Nicholas* [1984] FLR 285 (the relevant dicta in that case, to
     which I shall return, are as to when it may be appropriate to pierce a
     company's veil and to *treat* the assets as instead belonging to its controller)
     and was again recognised by the same two judges in *Crittenden v Crittenden*
     [1990] 2 FLR 361. For a recent recognition of the same principle, see *In re
     Coroin Ltd; McKillen v Misland (Cyprus) Investments Ltd* [2012] BCLC
E    611, paras 50, 52 in a judgment of mine with which Tomlinson and
     Lloyd LJJ agreed.

        102   The judge noted in para 220 that "a lay person" might think that a
     husband "was entitled" to a house owned by a company that he owned.
     A lay person might so think but he would be wrong. If the same lay person
     carried on a business through a company of which he was the sole owner,
     and caused the company to incur liabilities that it could not meet, he would
F    have no hesitation in asserting that the liabilities must be met exclusively by
     the company (by recourse exclusively to *its* assets) and (provided his shares
     were fully paid) had nothing to do with him personally. That is what limited
     liability is about.

        103   Fifth, whilst in the second sentence of para 224 the judge appears
     rightly to have recognised that a shareholder has no interest in his company's
     assets, he went on to hold that this principle is trumped if the shareholder's
G    total control of the group empowers him to procure the transfer to himself of
     a "particular item of property". The judge found that the husband held such
     power, which meant, as the judge further held, that such item therefore
     belonged to him not to the company. It was not even necessary for the
     husband first to procure the *exercise* of the power: its mere existence meant
     that the property belonged beneficially not to the company, but to the
     husband.
H       104   With respect to the judge, his "power equals property" reasoning is
     wrong. It is heretical to suggest that the total control that a single individual
     is (and will *always* be) entitled to exercise over the affairs of his one-man
     company is a feature resulting in the company's assets becoming assets to
     which he is "entitled" and, therefore, to which the company is not entitled.

© 2013 The Incorporated Council of Law Reporting for England and Wales

"Entitlement" within the meaning of section $24(1)(a)$ can, as I have said,    *A*
only mean beneficially entitled (the paragraph cannot, for example, extend
to property vested in a spouse on trust for a third party).  The logic of the
judge's reasoning appears, therefore, to be that a one-man company can
never own assets beneficially but can only ever hold its assets as the nominee
of its sole controller.  That is what Lord Wrenbury said is not the law.

105   The flaw in the "power equals property" approach is that it ignores    *B*
the fundamental principle that the only entity with the power to deal with
assets held by it is the *company*.  Those who control its affairs—even if the
control is in a single individual—act merely as the company's agents.  Their
agency will include the authority to procure an exercise by the company of
its dispositive powers in respect of its property, but those powers are still
exclusively the company's own: they are not the agents' powers.  When and
if the agents act as such, and procure a corporate disposition, the property    *C*
which immediately before the disposition belonged to the company will
become the property of the disponee.  Until then, it remains the property of
the company and belongs beneficially to no one else.  The judge's point that
the agent is automatically the owner of all the company's assets by the mere
fact of his authority to procure the company to dispose of them to himself is
astonishing and does not begin to pass muster.  And why should it?  The    *D*
proposition was simply the fruit of a judicial attempt to shoehorn into
section $24(1)(a)$ assets which manifestly do not fit there.  The judge's finding
that the husband's mastery of the companies meant that they and their assets
were his, and that they were the equivalent of mere nominees or agents for
him (see, for example, his para 225) could have been lifted directly from the
argument of counsel for the respondents that was rejected in *Salomon v
A Salomon & Co Ltd* [1897] AC 22, 28, 29.    *E*

106   That is probably all that needs to be said about the judge's "power
equals property" theory.  I shall, however, add a little more.  A further
reason why the theory does not work is that the judge overlooked that even
the one-man in such a company does not have unlimited power to procure
the company to deal as he would wish with the company's assets.  He may in
practice be able to do so, by procuring the payment of its money and the    *F*
execution of corporate dispositions right, left and centre, all perhaps for
nothing in return.  But he will not be able to do so lawfully.  Even he will be
constrained by the capital maintenance provisions which limit such
wholesale disposals.  He cannot, for example, lawfully procure the making
of distributions by the company save out of its distributable profits and, if he
does, the distribution will be unlawful and void.  I discussed such problems
in *Inn Spirit Ltd v Burns* [2002] 2 BCLC 780, which concerned a one-man    *G*
corporate group, in which the one-man purported to pay himself a dividend.
The one-man is not in a position lawfully to distribute to himself the entirety
of his company's assets at any time.  To revert to the judge's para 225, there
*is* a "legal impediment" to wholesale transfers by a company in favour of its
one-man controller.  Only when the one-man lawfully procures the exercise
of the corporate power of disposition in his own favour is it possible to
identify which property has ceased to belong to the company and has    *H*
become his.

107   Further, the judge ignored that the companies he was dealing with
(at any rate PRL and Vermont) were trading companies.  They became the
wealthy entities they did through commercial dealings with third parties,

A  and were apparently financed by third party banks who took security for their loans over the group assets. In the course of creating their corporate wealth, the companies will have incurred liabilities to such third parties as creditors. Taking PRL as an example, if the judge's theory that "power equals property" is right, and all PRL's apparent assets in fact belonged beneficially to the husband, it would follow that during its trading operations PRL would logically have been meeting its liabilities with the

B  husband's money; and, if it ceased to do so and was put into creditors' liquidation by a dissatisfied creditor, the husband would be entitled to assert that none of its apparent remaining assets belonged to it, that they all belonged to him and that there was therefore nothing available for the creditors in the liquidation. Such a potential outcome is another absurd consequence of the judge's approach. If the judge was right, third parties

C  would be unlikely ever to be willing to trade with one-man companies, since such companies could never be more than mere nominees for the individual who controls them, whoever that might be. The third parties would, however, also face the problem that they would often not know whether any particular company was or was not a one-man company, since they might not know whether its control was enjoyed by a single individual.

108  How does the judge's approach square with these considerations?

D  With whom did the judge consider the companies' trading counterparties were dealing? The companies? The husband? We were told at the hearing of the appeals that separate judgment creditors' petitions had been presented in the Isle of Man against PRL by Mr Le Breton and Munin Navigation Co Ltd: see *Munin Navigation Co Ltd v Petrodel Resources Ltd* [2012] EWCA Civ 136 for an account of Munin's claim. As matters stand, the judge has

E  made a finding of fact, binding on PRL, to the effect that none of the assets apparently held by PRL belongs to it beneficially. To what assets did he consider its creditors would be entitled to look for repayment of their debts?

109  For these reasons, I conclude that the judge was wrong to hold that the properties the subject of the para 5 orders belonged beneficially other than to PRL and Vermont respectively. He should have held that the husband had no beneficial interest in them and that they were therefore not

F  "property to which [he was] entitled" for the purposes of section 24(1)(a).

110  I turn to the family proceedings authorities. Some support for the judge's decision might be said to be found in certain of them, although the judge did not deploy such support in the way he might have done. In my judgment, however, properly analysed, they provide no legitimate support. Certain of them contain dicta that I would regard as incorrect and which

G  should not in future be followed or applied.

*The family authorities*

111  Perhaps the best support for the judge's decision (but not his reasoning) is in certain dicta in the judgments of this court in *Nicholas v Nicholas* [1984] FLR 285 (Cumming-Bruce and Dillon LJJ). The husband was the 71% shareholder in two companies, with the other 29% held by his

H  business associates. The wife sought a property adjustment order. One of the companies owned a property, Elmwood, which had been used in part as the matrimonial home and in part for commercial purposes. The judge ordered the husband to undertake to procure the sale by the company of Elmwood to the wife for approximately £105,000 and to pay £105,000 to

© 2013 The Incorporated Council of Law Reporting for England and Wales

the wife to enable her to buy it.   The husband declined to give the    A
undertaking and appealed against the order.

112   In contrast to the orders made by the judge in this case, the
*Nicholas v Nicholas* order did not, therefore, seek simply to divert a
company's property to the wife for a nil return and so purport to confiscate
its assets for her benefit.   The judge instead fashioned an order whose
substance was that the husband was to buy Elmwood from the company at    B
full value for her benefit.   The husband's point on his appeal was that the
judge had no jurisdiction to make such an order.   In giving the first
judgment, Cumming-Bruce LJ accepted that there was no jurisdiction to
order the husband to give the undertaking but said that deficiency in the
order could be overcome by simply ordering the husband to use his
controlling vote in the company to achieve the sale.   I do not understand on    C
what basis it was thought that the court could have so ordered (and it turned
out that there was none) but Cumming-Bruce LJ also explained how there
was anyway a further problem.   He referred to section 24, the property
adjustment order section, and cited section 24(1)(a).   He continued, so far as
material, at pp 287–288:

"On the facts of the instant case, the property known as Elmwood . . .
is vested in the company which owns it, and a question arises whether,    D
having regard to the shareholdings in the two relevant companies . . . it is
proper for the court to pierce the corporate veil with the effect that though
the company is the legal owner of the realty the court would disregarded
[sic] the corporate ownership and make an order which, in effect, is an
order against the husband, the individual shareholder.   Of course it is
quite clear, and there is abundant authority, that where the shareholding    E
is such that the minority interests can for practical purposes be
disregarded, the court does and will pierce the corporate veil and make an
order which has the same effect as an order that would be made if the
property was vested in the majority shareholder.   But in the instant case it
is not possible to take the view that the minority interests in either
company can be thus disregarded.   The shareholdings . . . are of such a
character that the minority interests are real interests and it would not be    F
an appropriate case in which the court should exercise its power to pierce
the corporate veil.   That being so, as . . . Elmwood is vested in the
company and the company's ownership has to be respected, is it an
appropriate use of the power to order a lump sum under section 23 to add
to the order for a lump sum an obligation imposed upon the husband to
procure the transfer by the company of the company's property to the    G
wife by way of sale, the purchase money being the sum ordered by way of
lump sum?

"I am satisfied that, although I perfectly understand the reasons that
led the judge to take the view that such an order, made as he thought by
way of undertaking, should be made, having regard to the terms of
section 24 when read with the terms of section 23(1)(c) [which empowers
the court to order the payment of a lump sum], it is not open to the court    H
to supplement the express powers specified in section 23(1)(c) and
section 24(1) in such a way as to exercise an inherent power, the effect of
which will be to force a third party, to wit the company, to sell property
vested in the company by way of sale to the petitioner.   The difficulty,

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   I feel, is that Parliament has in section 24(1)(a) specifically limited the
    property that shall be the subject of a property adjustment order and has
    limited it to property which is property to which the first-mentioned party
    is entitled in possession or reversion.  Clearly, no order could be made in
    respect of Elmwood, the company's property, pursuant to section 24.
    Section 23 is in terms drafted in such a way as to limit it simply to the
    obligation to pay a lump sum.  I am unable to hold that I can collect from
B   section 23, when read with section 24, any power to order, as ancillary to
    an order for a lump sum, an order imposing an obligation upon a
    respondent to procure that a third party in whom the property is
    beneficially vested to divest itself of that property by way of sale to a
    petitioning wife, whether the machinery be by exercise of the majority
    shareholder's voting power or otherwise.

C       "For those reasons, though with reluctance, I take the view that there
    was no power to make the order that the judge made in respect of the
    transfer of Elmwood, whether by way of undertaking which, as I have
    already explained, was not an appropriate form of order, or by way of a
    direct order ordering the respondent to use his controlling vote in [the
    relevant company] to cause the sale of the company's property to the
D   petitioner.  For those reasons I would hold that that very important
    feature of the judge's order should be varied."

    113   Cumming-Bruce LJ then engaged in a discussion as to whether the
court should vary the lump sum order of £105,000, none of which is
material.  Dillon LJ said, at pp 292–293, that he entirely agreed and, so far as
material, continued:

E       "the case as presented in this court is presented on a significantly
    different basis from the case as understood by the judge.  He plainly
    understood, as did counsel for the wife, that the husband was prepared to
    undertake, if the judge took the view that Elmwood should be transferred
    to the wife, that the husband would use his controlling interest in [the
    relevant company], to achieve such a transfer against payment by the wife
F   of the sum which the husband would provide by way of lump sum
    payment.  On that understanding it is not surprising that he made the
    order he did.  But it is now clear that there was no authority in counsel to
    offer any undertaking to the court and no undertaking has been given.
    Therefore, it is a question whether the court has power to order the
    husband to transfer the property to the wife against the payment of
G   £105,000, the property being vested in the company and not in the
    husband himself.  If the company was a one-man company and the alter
    ego of the husband, I would have no difficulty in holding that there was
    power to order a transfer of the property, but that is not this case.  The
    evidence shows that the husband only has a 71% interest in the company.
    The remaining 29% is held by individuals who . . . are not nominees but
    business associates of the husband . . . I find it quite impossible, therefore,
H   to ignore the corporate entity of [the company].  Therefore the order the
    judge made cannot stand."

    114   Both judgments in *Nicholas v Nicholas* [1984] FLR 285 correctly
recognised the existence of the separate legal personalities of the company
that owned Elmwood and the husband and, therefore, that Elmwood was

not the latter's property which could be the subject of an order under      *A*
section 24(1)(a). For reasons that Cumming-Bruce LJ explained, with which
Dillon LJ agreed, there was no jurisdiction in the court to make either the
order the judge had made or a modified order to like effect requiring the
husband to procure the sale of Elmwood to the wife.    The present
importance of the case lies, however, in the indication by both judges that:
(i) (per Cumming-Bruce LJ, at p 287) in a case in which the husband is the
majority shareholder in the company holding the relevant asset, and           *B*

    "the minority interests in the company can for practical purposes be
    disregarded, the court does and will pierce the corporate veil and make an
    order which has the same effect as an order that would be made if the
    property was vested in the majority shareholder";

and (ii) (per Dillon LJ, at p 292):                                           *C*

    "If the company was a one-man company and the alter ego of the
    husband, I would have no difficulty in holding that there was power to
    order a transfer of the property, but that is not this case."

Cumming-Bruce LJ asserted that there was "abundant authority" for his
proposition.  He did not, however, refer to any, the report recorded none as
cited and during the overnight adjournment of the hearing of this appeal      *D*
counsel identified no reported authority to which they considered he might
have been referring.

    115   The judge took the view (at para 219) that the observations by
Cumming-Bruce and Dillon LJJ to which I have just referred were obiter and
I agree with him. In *Hope v Krejci* [2012] EWHC 1780 (Fam) at [27],
Mostyn J said he was not so sure, expressing the view that "the reasoning     *E*
went to the very core of the decision not to pierce the corporate veil".
I recognise that the opening words of my quotation from Cumming-
Bruce LJ's judgment ("a question arises . . .") might suggest that there was
an issue in the appeal as to whether or not the veil could be pierced. I do not,
however, understand that there was. The order under appeal was not a "veil
piercing" order: it was not premised on any basis other than that Elmwood     *F*
was an asset beneficially owned by the company.  The order was directed at
achieving its sale to the wife for full value and the issue on the appeal was
whether there was jurisdiction to make such an order.   There is no
suggestion that it became part of the wife's case in the Court of Appeal by a
cross-appeal that the court could achieve a like result as that intended by the
judge's order by piercing the corporate veil and making a direct transfer
order, and such a case would, on the facts, have been hopeless. The court's   *G*
decision was simply that there was no jurisdiction to make the type of order
the judge had made and it had nothing to do with the circumstances in which
the court can "pierce the veil".  In my view, the observations (per Cumming-
Bruce LJ) as to "veil piercing" or (per Dillon LJ) as to the company being the
husband's alter ego were obiter.

    116   I interpret those observations as simply indicating the Lords       *H*
Justices' views that, in a case in which the husband is, either actually or in
substance, the 100% owner of a company that owns an asset that might
usefully be applied in or towards satisfaction of a wife's ancillary relief
claim, it will or may be open to the court to pierce the company's corporate
veil and then *treat* that asset as property of the husband so as to enable it to

© 2013 The Incorporated Council of Law Reporting for England and Wales

451

A  be the subject of a section 24(1)(a) order. Mr Todd, for the wife, disagreed
   with that analysis and submitted that it was not what the Lords Justices were
   saying. Despite Cumming-Bruce LJ's express reference to "veil piercing"
   (which Mr Todd invited us to disregard), he said that both Lords Justices'
   respective observations were directed simply at applying a broad
   interpretation to the relevant language of section 24(1)(a), and that
B  submission perhaps reflected the judge's own understanding of them. They
   were, Mr Todd said, saying that property owned by a company of which the
   husband is, actually or in substance, the 100% owner is property to which
   the husband is "entitled" within the meaning of section 24(1)(a), whereas
   property owned by a company in which the husband has less than a 100%
   interest, and in which other shareholders have material shareholdings of
   their own, is not property to which the husband is so "entitled".
C     117  I respectfully reject that submission. There is no support for it in
   either judgment in *Nicholas v Nicholas* [1984] FLR 285, nor does it bear any
   sort of reasoned analysis. In essence, it amounts to an attribution to the
   Lords Justices in the *Nicholas* case of an adoption of Moylan J's approach
   that the 100% controller of a company is beneficially entitled to property
   held by it, whereas a company whose control is split between two or more
D  shareholders with independent interests will itself be the beneficial owner of
   such property. The suggestion that the beneficial entitlement to property
   held by a company will vary according to the number of controllers of its
   shares is absurd and neither Lord Justice in the *Nicholas* case was saying
   anything of the sort. All that they were saying—and Cumming-Bruce LJ
   used the very phrase—was that in a case in which a company is wholly
   owned by a husband, it will or may be open to the court to "pierce the
E  corporate veil"; and, having done so, by inference then to *treat* the property
   held by the company as belonging to him so as to enable it to be subjected to
   a section 24(1)(a) order. I say "by inference", because neither judge so spelt
   it out. But the inference must be right because the whole point of "veil
   piercing" is to identify the company with its controller. That is manifestly
   what Cumming-Bruce LJ was saying; and, although Dillon LJ did not also
F  expressly refer to "veil piercing", he did refer to the company as an alter ego
   of the husband, another traditional way of referring to the same concept.
      118  I therefore reject Mr Todd's submission as to the sense of the dicta
   in *Nicholas v Nicholas*. Section 24(1)(a) cannot bite on a company's
   property, it can only bite on the husband's, and both Lords Justices
   recognised that. The critical question raised by the *Nicholas* case is,
   however, whether they were right in their respective dicta as to how recourse
G  to "veil piercing" might enable the circumnavigation of that obstacle in the
   path of a wife whose ancillary relief sights are set on an asset held by a
   company. That is a central question raised by these appeals and I shall
   shortly return to it.
      119  We were also referred to *Crittenden v Crittenden* [1990] 2 FLR
   361, also a decision of this court (by coincidence, also of Dillon LJ and Sir
H  Roualeyn Cumming-Bruce). It is necessary only to cite from Dillon LJ's
   judgment, with which Sir Roualeyn Cumming-Bruce agreed. Dillon LJ said,
   at p 364:

      "The sections relied on by Mr Turner for the imposition of such a
      restriction are sections 24A and 37 of the Matrimonial Causes Act 1973.

© 2013 The Incorporated Council of Law Reporting for England and Wales

Section 24A is concerned with the position where the court is considering   A
ordering a sale of property. Subsection (1) provides: 'Where the court
makes under section 23 or 24 of this Act a secured periodical payments
order, an order for the payment of a lump sum or a property adjustment
order, then, on making that order or at any time thereafter, the court may
make a further order for the sale of such property as may be specified in
the order, being property in which or in the proceeds of sale of which
either or both of the parties to the marriage has or have a beneficial       B
interest, either in possession or reversion.' That wording can relate to the
shares in the company, Somerton Marine Ltd, which are owned in their
own right by Mr or Mrs Crittenden, but it cannot relate to the assets of
Somerton Marine Ltd."

120  The point that Dillon LJ was making was that whilst the shares in   C
the company owned respectively by Mr and Mrs Crittenden were "property"
in which they had a beneficial interest, they had no such interest in the assets
of the company and therefore no sale order in respect of such assets could be
made. Dillon LJ was simply recognising the trite principle that a company's
assets belong beneficially to the company and not to its shareholders. It was
suggested to us in argument that Dillon LJ was there departing from his      D
obiter remarks in the *Nicholas* case and that, in agreeing with him, Sir
Roualeyn Cumming-Bruce was departing from his own obiter remarks in the
*Nicholas* case. I disagree. In the *Nicholas* case, Sir Roualeyn Cumming-
Bruce made clear that the core principle is that a section 24(1)(a) order
cannot be made in respect of a company's property and Dillon LJ agreed.
Both Lords Justices, albeit expressing themselves differently, also uttered the
dicta to the effect that, in a one-man company case, recourse to "veil         E
piercing" may enable a departure from the core principle that ordinarily
applies. The court in the *Crittenden* case was not implicitly asserting that
there was no scope for any "veil piercing" exception to the core principle.
All it was doing was to refer to that principle without also referring to any
exception to it. We are still left with the question of the correctness of the
dicta in *Nicholas v Nicholas* [1984] FLR 285. I turn to that question.
121  The difficulty that the dicta pose is this. *Salomon's* case [1897] AC   F
22 shows that a duly incorporated company (including a "one-man
company") is a legal entity separate from its members, with rights and
liabilities of its own. Its assets belong beneficially to it, and it alone, and its
members have no interest in them. This follows from the formal distinction
between a company and its members, a distinction that applies equally to a
one-man company and its controller. The first problem with the *Nicholas*    G
dicta is that the court was saying that, in the case of a one-man company, its
corporate identity can be ignored and its assets treated as belonging not to it
but to the one man. That was apparently a heretical departure from the
*Salomon* principle. On what basis could the *Nicholas* case endorse it?
122  As to that, it has also long been recognised that there may be
circumstances in which it will be legitimate for the court to "pierce the
corporate veil" of a company, as it has come to be called, thereby identify the   H
company with those in control of it and, in its discretion, then to depart from
the separate identity principle established in *Salomon's* case. In such a case,
the court may then be prepared to grant remedies against the company
which, apart from any such veil piercing, might otherwise appear to be

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   available only against those controlling it; or to grant remedies against the
controllers which might otherwise appear to be available only against the
company.

123   In my preceding sentence, I was substantially quoting from para 47
of the judgment of the court delivered by Lloyd LJ in the Court of Appeal's
decision earlier this year in *VTB Capital plc v Nutritek International Corpn*
B   [2012] 2 Lloyd's Rep 313 (the court also comprising Aikens LJ and myself).
That case concerned a commercial dispute that raised several issues, one of
which related to the court's jurisdiction to pierce the corporate veil and the
effect and consequences of doing so. The issues were far removed from those
of the present case but the importance of the judgment in the *VTB* case is
that it recognised and affirmed the strict limitations identified in prior
authority as to the only factual circumstances in which it will be open to the
C   court to "pierce the veil". Thus it noted, at para 48, the unanimous (albeit
obiter) view of the House of Lords in *Woolfson v Strathclyde Regional
Council* 1978 SC (HL) 90, 96, that "it is appropriate to pierce the corporate
veil *only* where special circumstances exist indicating that it is a mere façade
concealing the true facts" (emphasis supplied). That limitation was
expressly recognised by the judgment of this court in *Adams v Cape
Industries plc* [1990] Ch 433, 539D–E, and the court had there also earlier
D   said, at p 536G:

"save in cases which turn on the wording of particular statutes or
contracts, the court is not free to disregard the principle of *Salomon v
A Salomon & Co Ltd* [1897] AC 22 merely because it considers that
justice so requires."

E   124   A decision not referred to in the *VTB* case, but to which we were
and which it is convenient to notice, is that of this court in *Ord v Belhaven
Pubs Ltd* [1998] 2 BCLC 447. That was a commercial case in which the
issue was whether, in a case in which the defendant company was perceived
as having insufficient assets to meet the claim, it was open to the court to
substitute as defendants its parent company and another subsidiary which
had taken over its trading operations. The judge had held that it was, relying
F   in part on the view that it was open to her to lift the defendant's corporate
veil and so enable the claim to be directed against the proposed new
defendants. Hobhouse LJ, in a judgment with which Brooke LJ and Sir John
Balcombe agreed, held that the judge was wrong. He said, at p 457, that she
had approached the case on the basis that it was open to her to regard the
companies as one economic unit and to disregard the distinction between
G   them and then to say:

"since the company cannot pay, the shareholders who are the people
financially interested should be made to pay instead. That of course is
radically at odds with the whole concept of corporate personality and
limited liability and the decision of the House of Lords in *Salomon v
A Salomon & Co Ltd* [1897] AC 22."

H   Hobhouse LJ then referred to *Woolfson's* case in the House of Lords and
quoted, as I have, from Lord Keith (in [1998] 2 BCLC 447, the quotation is
erroneously included as part of Hobhouse LJ's own words); and he referred
to the Court of Appeal's decision in the *Adams* case as showing that "there
must be some impropriety before the corporate veil can be pierced". He held

© 2013 The Incorporated Council of Law Reporting for England and Wales

that as the plaintiffs could not show the establishment of a façade concealing
the true facts, or any other relevant impropriety, they could not satisfy the
conditions for piercing the veil and the judge had been wrong to pierce it.
That reasoning was, I consider, part of the ratio of the court's decision as to
why the judge had been wrong to make the decision she did.  Sir John
Balcombe, with his experience of both commercial and family law, did not
qualify his agreement with Hobhouse LJ by indicating that different
principles applied in family cases.

125   Having digressed to *Ord's* case, I return to the cases referred to in
the *VTB* case as identifying the limitations upon the exercise of the veil
piercing jurisdiction.  *Trustor AB v Smallbone (No 2)* [2001] 1 WLR 1177
was a case in which, after referring to (amongst other cases) the *Woolfson*
and *Adams* cases, Sir Andrew Morritt V-C said, at para 23, that

"the court is entitled to 'pierce the corporate veil' and recognise the
receipt of the company as that of the individual(s) in control of it if the
company was used as a device or façade to conceal the true facts thereby
avoiding or concealing any liability of those individual(s))."

I shall now set out the material parts of what the court in the *VTB* case
[2012] 2 Lloyd's Rep 313, paras 78–80 said about the next key authority, a
decision in family proceedings:

"78. *Ben Hashem v Shayif* [2009] 1 FLR 115 is a judgment of Munby J
that includes between paras 144 and 221 a comprehensive discussion of
the principles by reference to which the court may pierce the veil of
incorporation.   Between paras 159 and 164 Munby J restated the
principles, which he summarised as follows.  First, ownership and control
of a company are not themselves sufficient to justify piercing the veil.
Second, the court cannot pierce the veil, even when no unconnected third
party is involved, merely because it is perceived that to do so is necessary
in the interests of justice.  Third, the corporate veil can only be pierced
when there is some impropriety.  Fourth, the company's involvement in
an impropriety will not by itself justify a piercing of its veil: the
impropriety 'must be linked to use of the company structure to avoid or
conceal liability' (a principle derived from *Trustor*).  Fifth, it follows that
if the court is to pierce the veil, it is necessary to show both control of the
company by the wrongdoer *and* impropriety in the sense of a misuse of
the company as a device or façade to conceal wrongdoing.  Sixth, a
company can be a façade for such purposes even though not incorporated
with deceptive intent: '164 . . . The question is whether it is being used as
a façade at the time of the relevant transaction(s).  And the court will
pierce the veil only so far as is necessary to provide a remedy for the
particular wrong which those controlling the company have done.  In
other words, the fact that the court pierces the veil for one purpose does
not mean that it will necessarily be pierced for all purposes.'

"79. Mr Snowden accepted that summary as a correct statement of the
principles save that he questioned the correctness of the final principle, as
to a requirement of necessity, as he also questioned the correctness of
Warren J's like point in [*Dadourian Group International Inc v Simms*
[2009] 1 Lloyd's Rep 601].  He said that it does not follow that a piercing
of the veil will be available only if there is no other remedy available

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   against the wrongdoers for the wrong they have committed. In principle, we agree with Mr Snowden's suggested qualification . . . With that qualification, we would, however, respectfully agree with Munby J's summary of the principles.

    "80. Mr Snowden also submitted, in expansion of Munby J's fourth principle (and reliance on what Munby J said at para 199) that it is not

B sufficient for veil piercing purposes merely to show that the company is involved in wrongdoing, for example that it is carrying out a fraud: there will be no question in such a case of the company being used as a façade. The relevant wrongdoing must be in the nature of an independent wrong that involves the fraudulent or dishonest misuse of the corporate personality of the company for the purpose of concealing the true facts. In principle, we agree with that too."

C

  126  The *VTB* case thus provided this court's affirmation, drawing on earlier judgments of the House of Lords, the Court of Appeal (to which it could usefully have included a reference to *Ord's* case), the Chancery Division and the Family Division, of the strict limits as to the exercise of the court's jurisdiction to pierce a company's corporate veil so as to enable it to

D disregard the separate corporate identity of a company and, instead, to identify it with its controllers. The decision showed that what is required is nothing less than proof of impropriety directed at the misuse of the corporate structure for the purpose of concealing wrongdoing. The judge in the present case did not have the advantage of the decision in the *VTB* case (either at first instance, per Arnold J [2011] EWHC 3107 (Ch), or in the Court of Appeal [2012] 2 Lloyd's Rep 313). He did, however, have the

E benefit of Munby J's decision in *Ben Hashem v Al Shayif* [2009] 1 FLR 115, which was in all material respects approved by this court in the *VTB* case, and, in para 217, he referred, as I have said, to the submissions made to him that he could not make orders against the shares or properties "unless I find the requisite impropriety as set out in *Ben Hashem's* case [2009] 1 FLR 115". He therefore directed himself correctly as to the conditions that must

F be satisfied before the court could pierce the veil of the Petrodel group companies and he rejected the submission that there had been any relevant impropriety. He found, therefore, that there was, for example, no question of the relevant properties having originally been beneficially owned by the husband and put into corporate names for the improper purpose of defeating the wife's claims in her financial provision application. He found, by the

G application of criteria since affirmed in this court, that there was no factual basis upon which it was open to the court to pierce the corporate veil of any of the Petrodel companies.

  127  With that discussion of the criteria for a judicial piercing of a corporate veil, I return to the dicta in *Nicholas v Nicholas* [1984] FLR 285. Both Lords Justices indicated their views that, if the respondent to an application for a property adjustment order is a husband with sole control of

H a one-man company, there is no difficulty in treating the company's assets as *his* property for the purpose of meeting any such application. They were apparently saying that the total control of a company in the husband is *by itself* enough to entitle the court to pierce its veil and treat its assets as the husband's.

© 2013 The Incorporated Council of Law Reporting for England and Wales

128  The legal basis for those assertions is unclear.  There was an    A
assumption in the argument before us that the "abundant authority" to
which Cumming-Bruce LJ was referring was unreported authority in the
Family Division, although he did not say so and unreported authority is
anyway hardly authority.  It is also improbable that Dillon LJ would have
been so basing his own dicta: he had, by September 1983, been a Lord
Justice for a year and before that his experience was made up of 31 years as a    B
practitioner at the Chancery Bar and three years as a judge of the Chancery
Division.

129  Whilst neither side suggested it to us, I regard it as probable that
Cumming-Bruce LJ, and also Dillon LJ, were basing themselves on (inter
alia) dicta falling from Lord Denning MR in *Wallersteiner v Moir* [1974]
1 WLR 991.  Cumming-Bruce LJ was later to refer to them in *In re*    C
*A Company* [1985] BCLC 333, when delivering the judgment of this court
(himself and Hollings J).  He said, at pp 337–338:

"In our view the cases before and after *Wallersteiner v Moir* [1974]
1 WLR 991 show that the court will use its powers to pierce the corporate
veil if it is necessary to achieve justice irrespective of the legal efficacy of
the corporate structure under consideration.  As Lord Denning MR said    D
[at p 1013], the companies identified were distinct legal entities and the
principles of *Salomon v A Salomon & Co Ltd* [1897] AC 22 prima facie
applied.  But only prima facie.  On the facts of the *Wallersteiner* case, the
companies danced to Dr Wallersteiner's bidding.  Buckley LJ disagreed on
the facts about the position of IFT, but Scarman LJ held that the evidence
disclosed liability in Wallersteiner on the ground that he instigated the
loan of £50,000."                                                        E

130  The difficulty with that, however, is that Lord Denning MR's dicta
in relation to veil piercing (as similarly also advanced by him in *Littlewoods
Mail Order Stores Ltd v McGregor* [1969] 1 WLR 1241, 1254) were the
subject of consideration by this court in the later decision *Adams v Cape
Industries plc* [1990] Ch 433, 543, where the court said that              F

"in *Wallersteiner v Moir* [1974] 1 WLR 991 Buckley LJ, at p 1027, and
Scarman LJ, at p 1032, expressly declined to tear away the corporate veil.
In the *Littlewoods* case [1969] 1 WLR 1241, 1255, Sachs LJ expressly
disassociated himself from the suggestion that the subsidiary was not a
separate legal entity and Karminiski LJ refrained from associating himself
with it.  We therefore think that the plaintiffs can derive little support
from those dicta of Lord Denning MR."                                    G

131  *In re A Company* [1985] BCLC 333 was not apparently referred to
in the *Adams* case, but following the *Woolfson*, *Adams* and *VTB* cases, it is,
I consider, clear, as Mr Amos submitted, that the opening sentence of the
quoted statement in *In re A Company* cannot be regarded as the law.  Nor
does the mere fact that a company dances to its sole controller's bidding
entitle the court, without more, to equate the company with that controller    H
(Moylan J also referred, at para 221, to Lord Denning MR's dicta in
*Wallersteiner v Moir* as if it provided a key to the case).  Mr Todd advanced
no argument in support of the approach adopted by the court in *In re
A Company* and the tide of authority is now solidly against it.

A     132   In my judgment, the dicta in *Nicholas v Nicholas* [1984] FLR 285 cannot stand with: (i) the prior House of Lords guidance in the *Woolfson* case 1978 SC (HL) 90 as to the *only* circumstance in which a judicial piercing of the corporate veil is appropriate, or (ii) with the subsequent adoption of that approach by the Court of Appeal in the *Adams* case [1990] Ch 433 and the *Ord* case [1998] 2 BCLC 447, or (iii) with the first three

B principles identified by Munby J in *Ben Hashem's* case [2009] 1 FLR 115, and accepted as correct by this court in the *VTB* case [2012] 2 Lloyd's Rep 313, as to the preconditions of a veil-piercing exercise. Whilst *Nicholas v Nicholas* was not cited in the *Adams* or *VTB* cases, there is no basis on which its dicta can be defended as establishing a separate, freestanding, legitimate principle of English law. They involve a head-on disregard of *Salomon v A Salomon & Co Ltd* [1897] AC 22. They were not advanced on

C the basis that they were directed at a special type of case justifying special treatment. In any particular case, an inability on the part of the court to make a property adjustment order in relation to property held by the husband's company rather than by the husband himself may be perceived as producing the potential for injustice; but the *Adams* case made clear that, by itself, such a consideration is no basis for assuming a jurisdiction to pierce

D the corporate veil: the court cannot disregard the *Salomon* case "merely because it considers that justice so requires". The husband and his company are separate legal persons and each owns his and its separate assets. Those differences must be respected and cannot be ignored merely because it is perceived as convenient to do so. A condition of the accepted basis for a piercing of the corporate veil is that the controller of the company has misused the fact of its separate corporate identify for the purpose of hiding

E facts or concealing wrongdoing. The rationale is that a wrongdoer cannot benefit from his dishonest misuse of a corporate structure for improper purposes. There was no suggestion in *Nicholas v Nicholas* [1984] FLR 285 that any such condition must be met before the veil could be pierced. The dicta were, in my judgment, wrong and should not be followed.

    133   In fact, they have been followed. In *Green v Green* [1993] 1 FLR

F 326, Connell J considered (I do not understand why) that there was a conflict between the dicta in the *Nicholas* case and the decision in *Crittenden's* case but regarded the former as providing the key to his case and decided it on the basis that the husband was to be equated with the company of which he was the 100% owner so that an order for sale could be made of its land. Connell J's reasoning does not further the discussion. He just took the *Nicholas* dicta at face value and applied them. He did, however, note, at p 340, that the

G dicta reflected a practice that his own experience told him had been followed for some time (without, though, referring to any reported authority reflecting it).

    134   In *Wicks v Wicks* [1999] Fam 65, this court overruled *Green v Green* on the basis that the court had no jurisdiction to make the order it did. The ratio of the decision did not, however, turn on Connell J's decision that,

H following the *Nicholas* case (to which the court did not refer), he could "pierce the corporate veil"; and only Peter Gibson LJ referred to that. He said, at p 89:

> "I find it difficult to see how the application for ancillary relief in *Green v Green* [1993] 1 FLR 326 could have been said to relate to land when the

© 2013 The Incorporated Council of Law Reporting for England and Wales

husband merely owned shares in the two companies which owned land.  *A*
I can well understand Connell J's desire to find a solution so that the
petitioner and her child could be provided with a home, but I do not think
that the court had power in that case to order a sale of the land."

135   *W v H (Family Division: Without Notice Orders)* [2001] 1 All ER
300 was a decision of Munby J. The wife obtained an ex parte injunction
against B Co and X restraining the disposition of a property held by B Co,  *B*
the shares of which were said to have been held on trust for the wife,
husband and children. X claimed to have bought the shares from the
husband but the wife asserted that the sale had been a sham. The report is
about the inter partes hearing at which X and B Co sought the setting aside
of the injunction.   Munby J held that it should be continued.    The
importance of the decision lies in his observations at pp 310–311:          *C*

"I ought to deal with a wider question canvassed by Mr Everall
[counsel for the wife].  This relates to the approach to be adopted in the
Family Division in cases where assets which a wife says belong in truth
and reality to her husband are, or appear to be, vested in some other
person, or in some corporate or trust entity.

"Mr Everall, referring me to *Nicholas v Nicholas* [1984] FLR 285,  *D*
*Green v Green* [1993] 1 FLR 326, *Purba v Purba* [2000] 1 FCR 652 and
*Khreino v Khreino (No 2)* [2000] 1 FCR 80, submits that the court adopts
a robust approach in such cases and does not allow itself to be, to use
Thorpe LJ's words in *Khreino's* case (at p 85), emasculated by over-
refined or technical arguments based on strict principles of property law.

"I readily accept that there is much force in Mr Everall's submission.
Thus, as can be seen from *Nicholas's* case (at pp 287, 292) and          *E*
*Green's* case (at pp 337, 340), where property is vested in a one-man
company which is the alter ego of the husband, the Family Division will
pierce the corporate veil, disregard the corporate ownership and, without
requiring the company to be joined as a party, make an order which has
the same effect as the order that would be made if the property was vested
in the husband. Indeed, the court can and will adopt this approach even  *F*
where there are minority interests involved if they are such that they can
for practical purposes be disregarded.

"Moreover, as Thorpe LJ's forthright observations in *Purba's* case (at
pp 654–655), and *Khreino's* case (at p 85), show, the court will not allow
itself to be bamboozled by husbands who put their property in the names
of close relations in circumstances where, taking a realistic and fair view,  *G*
it is apparent that the recipient is a bare trustee and where the answer to
the real question—Whose property is it?—is that it remains the husband's
property.  Again, in such cases there is no need for the third party to be
joined.  As *Purba's* case shows, where a transfer has been made post-
separation to a close relative in order to defeat a wife's claims, the court
can and will act without going through the formality of joining the third
party or making setting aside orders under section 37. And as *Khreino's*  *H*
case shows, the court can and in appropriate cases will grant Mareva
injunctions against both the husband and his offshore company and the
relative who holds the bearer shares in the company without requiring
either the company or the relative to be joined as parties.

© 2013 The Incorporated Council of Law Reporting for England and Wales

459
[2013] 2 AC                                                    Prest v Prest (CA)
Rimer LJ

A        "Nothing that I say should be taken as intended to water down in any
    way the robustness with which the Family Division ought to deal in
    appropriate cases with husbands who seek to obfuscate or to hide or
    mask the reality behind shams, artificial devices and similar contrivances.
    Nor do I doubt for a moment the propriety and utility of treating as one
    and the same a husband and some corporate or trust structure which it is
    apparent is simply the alter ego or the creature of the husband.  On the
B   other hand, and as *Nicholas's* case itself demonstrates, the court does
    not—in my judgment cannot properly—adopt this robust approach
    where, for example, property is held by a company in which, although the
    husband has a majority shareholding, the minority shareholdings are
    what Cumming-Bruce LJ [1984] FLR 285, 287 called 'real interests' held
    by individuals who, as Dillon LJ (at p 292) put it, are not nominees but
C   business associates of the husband."

    136  I have no difficulty with much of that.  If property held by a
husband has been put into the name of someone who, on the evidence, is
obviously a bare trustee for him, there will be no problem in holding that the
beneficial ownership has not changed.  As explained in the first sentence of
the last quoted paragraph, the court will also not be bamboozled by the use
D  by husbands to a like end of "shams, artificial devices and similar
contrivances".   The more difficult part of the quotation is in its third
paragraph and the remainder of the last paragraph, which reflect unqualified
acceptance of the proposition, drawn from the *Nicholas* case, of the court's
jurisdiction—in the absence of any relevant impropriety—to equate a one-
man company with the one-man and treat its assets as his.  No reasoned
E  justification for doing so was advanced, any more than in the *Nicholas* case.
The only implicit justification is that family justice requires it.  That, without
more, is no justification.  Why should family justice be regarded as different
from any other sort of justice?  No one would suggest that an unsatisfied
creditor of the owner of a one-man company could look to the assets of the
company to meet his debt, even though he might be able to look to the
owner's shares in the company (as a wife can on her ancillary relief
F  application).  Since I consider that the dicta in the *Nicholas* case were wrong,
I also consider, with respect, that Munby J's acceptance of them as correct
was wrong.  He was not, however, apparently referred to the authorities as
to the limitations upon the court's ability to pierce the corporate veil.

    137  The next authority, decided shortly after *W v H*, is Bodey J's
decision in *Mubarak v Mubarak* [2001] 1 FLR 673.  The question was
G  whether the wife was entitled to enforce a lump sum payment order by
recourse to assets held by one or other company in the ultimate control of
the husband.  The companies opposed the order.  Bodey J said there were
two strands of authority: those decided in the company/commercial sphere
and those decided in the family sphere.  The former strand, upon which the
companies relied, was based on the recognition of a company as a separate
legal entity, distinct from its shareholders, with assets belonging to it alone, a
H  strand based on the *Salomon* case.  Whilst it admitted of circumstances in
which the veil could be pierced, the principle of most general application
was that a company will be not allowed to be used as a device or sham to
evade obligations and Bodey J referred to *Gilford Motor Co Ltd v Horne*
[1933] Ch 935 and *Jones v Lipman* [1962] 1 WLR 832, which provide good

460
Prest v Prest (CA)                                                    [2013] 2 AC
Rimer LJ

examples of the sort of impropriety that is required. The companies' counsel      A
submitted that there was no suggestion of any misuse of them in the instant
case and that the *Adams* case showed that "no principle exists where, if
reliance on the strict technicalities would produce injustice, then the veil of
incorporation can, without more, be lifted".

138 Turning to the family cases, Bodey J referred to the *Nicholas*,
*Crittenden*, *Green* and *Wicks* cases. He then said [2001] 1 FLR 673,            B
681–682:

"Drawing all these authorities together, the precise extent of the
Family Division's power to go directly against the property of a company
owned or controlled by one of the spouses appears less than clear. In both
the Court of Appeal decisions disowning the power (*Crittenden v
Crittenden* [1990] 2 FLR 361 and *Wicks v Wicks* [1999] Fam 65) no          C
reference was seemingly made to *Nicholas v Nicholas* [1984] FLR 285,
which contained strong Court of Appeal observations that the power
exists when the circumstances there specified pertain. The one reported
case to which I have been referred where the veil was actually lifted
(*Green v Green* [1993] 1 FLR 326) has been disapproved by one of the
judgments of the Court of Appeal in *Wicks v Wicks* [1999] Fam 65, but
the disapproval was not the ratio of the decision: neither were *Crittenden*   D
*v Crittenden* [1990] 2 FLR 361 nor *Nicholas v Nicholas* [1984] FLR 285
seemingly cited to the Court of Appeal in *Wicks*.

"Further, it is quite certain that company law does not recognise any
exception to the separate entity principle based simply on a spouse's
having sole ownership and control.

"*Rationalisation of approach*                                             E

"Ideally the Family Division and the Chancery Division should plainly
apply a common approach. However, the fact remains that different
considerations do frequently pertain: the company approach, on the one
hand, being predominantly concerned with parties at arm's length in a
contractual or similar relationship; the family approach, on the other
hand, being concerned with the distributive powers of the court as
between husband and wife applying discretionary considerations to what       F
will often be a mainly, if not entirely, family situation.

"I would echo the experience referred to by both Cumming-Bruce LJ
and Connell J (above) as regards lifting the veil in the Family Division
when it is just and necessary. In practice, especially in 'big money'
cases, the husband (as I will assume) will often make a concession that
company/trust assets can be treated as his, whereafter the case proceeds
conveniently on that basis. It is pragmatic, saves expense and usually       G
works. Problems such as have arisen in this case are rare and anyway can
be avoided where there are other assets against which the lump sum order
can be enforced.

"The difficulty remains in defining those situations when lifting the veil
is appropriate by way of enforcement following such a concession in
ancillary relief proceedings. I would suggest that the Family Division can    H
make orders directly or indirectly regarding a company's assets where
(a) the husband (as I am assuming) is the owner or controller of the
company concerned and (b) where there are no adverse third parties
whose position or interests would be likely to be prejudiced by such an

© 2013 The Incorporated Council of Law Reporting for England and Wales
APP.144

461

[2013] 2 AC

Prest v Prest (CA)
Rimer LJ

A order being made. I include as third parties those with real minority interests in the company and (where relevant on the facts) creditors and directors. The reason for my including the latter two categories will become apparent later in this judgment.

"I adopt the rationalisation of this offered by Mr Hunter, that it would amount merely to a short-circuiting of the full company law route, namely the declaration of a dividend to the husband comprising the company asset concerned (e g the matrimonial home) enabling him and/or the court then to transfer it onwards to the wife. It would amount to his property for the purposes of section 24 in the same sense that the law may look on that as done as ought to be done; whilst the mechanics of the order would be along the lines adopted by Connell J in *Green v Green* [1993] 1 FLR 326, 341: 'the respondent do sell, or cause G Ltd to sell, four plots of the blue land to . . .'

"I would add that lifting the veil is most likely to be acceptable where the asset concerned (being the property of an effectively one-man company) is the parties' former matrimonial home, or other such asset owned by the company other than for day-to-day trading purposes."

D 139   After considering the evidence, Bodey J held that the case was not one in which he should lift the veil. His reasons were these, at pp 685–686:

"both companies are bona fide trading companies incorporated well before the matrimonial difficulties of the husband and wife. DIL is incorporated outside the jurisdiction and the husband is not a director. It is not suggested that they are as such being used as a sham or device, albeit that their existence is very convenient to the husband. In my judgment, there do exist genuine third party rights and interests which ought to be respected, namely the interests of bona fide commercial creditors (one of them secured on the jewellery) and the position of directors who have fiduciary duties and who oppose the seizure of stock in trade. The facts of the case are far away from those of *Green v Green* [1993] 1 FLR 326 which Mr Pointer asks me to follow.

F "Applying the above proposed approach as regards lifting the corporate veil to the evidence now before me and having heard full legal argument, I come to the conclusion that this case does not fall within the necessarily circumscribed circumstances in which lifting the veil would be acceptable. However much the court may wish to assist a wife and children where a lump sum has not been paid, I am satisfied that doing so here, whensoever it may be permissible, would be a step too far in the all the circumstances. This is a conclusion strengthened by article 1 of the First Protocol [to the Convention for the Protection of Human Rights and Fundamental Freedoms] that every natural and legal person is to be entitled, subject to specified exceptions, to the peaceful possession of their possessions."

H 140   I do not, with respect, find Bodey J's "rationalisation of approach" convincing. Different considerations obviously arise in commercial and family cases but I cannot see why they can justify a difference of approach as regards lifting the veil. In all situations, the company is a separate legal entity. A commercial creditor of the present husband, if unable to obtain satisfaction from him, might well wish to attach assets of PRL and/or

© 2013 The Incorporated Council of Law Reporting for England and Wales

Vermont as an alternative means of satisfaction. Absent an ability to lift the   *A*
corporate veil by first satisfying the *VTB* conditions, his claim would fail: the
companies assumed and owed him no relevant obligations.   I fail to
understand the principle by which the wife's ancillary relief claim is said to
be enforceable against such companies without any need first to be able to
satisfy the *VTB* conditions. Why should wives (or husbands) be entitled to a
preferential exemption from what the *Salomon* case decided?
                                                                                  *B*
  141   Bodey J's further discussion as to when it may be appropriate to lift
the veil in order to satisfy a wife's claim appears to have been premised on
the basis that the husband has conceded that the company's assets can be
regarded as his, which is not this case. Thorpe LJ, in argument, observed
that in his own experience such concessions are rare. I anyway cannot see
that such a concession can take the matter very far. As Bodey J noted, it will
still be necessary for the court to consider whether the veil should be lifted.   *C*
His approach was that the lifting (or not) of the veil in family proceedings in
relation to a company wholly or substantially owned by the husband is a
discretionary exercise dependent on a consideration of whether to award the
relevant asset to the wife would prejudice any minority interests in the
company and/or the interests of its directors and creditors. He therefore
favoured a balancing exercise directed to the consideration of whether the    *D*
diversion of a company asset to the wife would prejudice interests other than
those of the husband. If it would not, such diversion could be rationalised
(and given legitimacy) on the basis that the husband could be regarded as
under a duty to declare a dividend in his own favour of the asset, which
would then be his property; and "the law may look on that as done which
ought to be done".

  142   With respect, I neither follow nor agree with Bodey J's reasoning.   *E*
First, the husband is under no obligation to declare such a dividend even if it
is lawfully open to him to do so. Second, the court has no jurisdiction of
which I am aware to compel him to do so. Third, whether or not he ought to
do so (is that a reference to his moral obligations?), the law does not look on
as done that which ought to be done, even if equity sometimes does,
although it ordinarily does so only in respect of unperformed legal    *F*
obligations. Bodey J's approach does not appear to me to have much to do
with any true "lifting of the veil". It proceeds instead on the basis that the
relevant assets are the company's, as they are, which has not come by them
in circumstances involving any sort of relevant impropriety, but that the
family courts have a paternalistic jurisdiction to distribute them to a
claimant with no title to them provided that to do so will not prejudicially   *G*
affect anyone with a real interest in their being preserved within the
company.

  143   That approach is wrong. If, as it is, the question is whether or not
assets held by the company are (i) assets to which the husband is "entitled"
within the meaning of section 24(1)(a), or (ii) assets to which he is to be
*treated* as so entitled, the answer to (i) is that he is not so entitled. As for (ii),
the only circumstance in which it might, as a matter of discretion, be
appropriate to *treat* him as so entitled is if there are legitimate grounds for   *H*
lifting the corporate veil, for which purpose nothing less than compliance
with the *VTB* conditions will do. Those conditions did not feature in Bodey
J's rationalisation, even though he had been referred to this court's decision
in the *Adams* case as identifying the limitations constraining an ability to lift

© 2013 The Incorporated Council of Law Reporting for England and Wales

463
[2013] 2 AC                                           Prest v Prest (CA)
                                                              Rimer LJ

A  the veil. His suggestion that different principles apply—and, by inference, should continue to apply in two divisions of the High Court—is one with which I disagree. There is, as Mr Amos put it, but one law and but one High Court and all its divisions must apply the same law.

144  *A v A* [2007] 2 FLR 467 is a decision of Munby J. It did not turn on the piercing of any corporate veil, although in paras 18 and 19 he referred to, and affirmed, his own observations in *W v H*, on which I have earlier
B  commented, in part negatively. He also made the point, at para 95, that:

    "only property owned by a party to the marriage can be the subject of a property adjustment or other order under the Matrimonial Causes Act 1973. Thus, to take a specific example, there is no power in the court . . . to order the transfer to the wife of the Antigua property, which is owned by HDC [a company in which the shares were held by the husband, the
C    wife and a trust]."

As to that, I agree.

145  I come back to *Ben Hashem v Al Shayif* [2009] 1 FLR 115. Its importance is that it reflected Munby J's exposition, approved by the Court of Appeal in the *VTB* case in all respects save one (immaterial for present purposes), as to the conditions that must be satisfied before it is open to the
D  court to pierce the corporate veil and ignore the separate identities of the company and its corporators. What is essential is the proof of relevant impropriety. There are, however, perhaps two slightly odd features about Munby J's reasoning.

146  First, he listed several reported authorities as the source of the conditions that he summarised, and his list (at para 158) includes *Nicholas v*
E  *Nicholas* [1984] FLR 285. Neither the decision nor the dicta in the *Nicholas* case, however, support the existence of such conditions. The decision had nothing to do with veil piercing and the dicta are inconsistent with the principles that Munby J identified. Moreover, Munby J criticised Connell J's decision to pierce the corporate veil in *Green v Green* [1993] 1 FLR 326, for which Connell J had relied simply on the fact of the husband's ownership and control of the companies, having drawn his inspiration from the dicta in
F  the *Nicholas* case. If *Green's* case was in this respect wrong, it ought to have followed in Munby J's view that the dicta in the *Nicholas* case were also wrong. Munby J also pointed out, at para 173, that Bodey J had been correct in *Mubarak v Mubarak* [2001] 1 FLR 673 to recognise that the fact that one spouse has sole ownership and control of a company is not enough to justify a piercing of the company's corporate veil. All that Munby J
G  actually said about the *Nicholas* case, at para 176, was that the veil piercing claim failed because the minority interests in the company could not be ignored. But (i) as I have said, I do not consider that there was a "veil piercing" claim in the *Nicholas* case, and (ii) the suggestion by both Lords Justices that, but for the minority interests, such a claim could without more have succeeded cannot stand with Munby J's own explanation of the conditions that must be satisfied before such a claim can succeed. As for
H  Cumming-Bruce LJ's reference to the "abundant authority" in the Family Division as to the court's willingness and ability to pierce the veil in a "total control" case, Munby J noted at para 221 that counsel had been able to identify only one Family Division case to date in which the court had "pierced the veil" on that ground, namely *Green v Green*.

© 2013 The Incorporated Council of Law Reporting for England and Wales

464
Prest v Prest (CA)                                                          [2013] 2 AC
Rimer LJ

147   The second odd feature is that, in *Ben Hashem v Al Shayif* [2009]    A
1 FLR 115, Munby J implicitly endorsed his own earlier agreement with the
*Nicholas* dicta in *W v H*, from which he cited without critical comment at
para 94. As his own summary of the basis upon which a company's veil may
be pierced showed that the *Nicholas* dicta were wrong, so must it have
followed that his earlier endorsement of the dicta was wrong. Munby J was
not entitled to have it both ways.
                                                                            B
148   *Kremen v Agrest (No 2)* [2011] 2 FLR 490 is a decision of Mostyn
J. The case concerned the wife's claim to unscramble successive transfers of
a single share in a BVI company that owned an English property occupied by
the husband. The judge set the transfers aside and declared that the
company held the property beneficially for the husband. In making that
declaration, the judge pierced the company's corporate veil. At para 43, he
said that counsel had asked him to make explicit that, given the terms of    C
Munby J's judgment in *Ben Hashem's* case, he had found actual impropriety
on the part of the husband entitling him to pierce the veil. Mostyn J
summarised *Ben Hashem's* case and said at para 44 that the decision had
surprised practitioners in ancillary relief proceedings, whose understanding
for years had been conditioned by the dicta in the *Nicholas* case. Nor did
Mostyn J share Munby J's expressed difficulty with *Green v Green*. He then    D
referred to Bodey J's judgment in *Mubarak's* case, saying, at para 46:

"There is a strong practical reason why the cloak should be penetrable
even absent a finding of wrongdoing. In *Mubarak v Mubarak* [2001]
1 FLR 673, Bodey J pointed out that the same end of putting the
underlying asset into the hands of the claimant could be achieved by
going down a pure company law route rather than violating the sanctity    E
of the corporate veil."

Mostyn J then quoted the same passages from *Mubarak's* case that I have.
149   I do not understand what Mostyn J meant by "going down a pure
company law route rather than violating the sanctity of the corporate veil".
I am not clear that Bodey J had in mind that the court could order the
husband to declare an appropriate dividend and then release it to the wife. If    F
so, it would amount to an order requiring the husband to take steps to
achieve the holding by him of an asset he did not currently own and to which
he had no present entitlement. I do not know what jurisdiction there is to
make such an order. If, as I consider, Bodey J's dicta were directed at
making an order *directly* regarding a company's assets, that does violate the
sanctity to which Mostyn J referred. I add that if, contrary to Mostyn J's
view, impropriety needed to be shown before the veil could be pierced,    G
Mostyn J explained that there was abundant evidence of it in the case before
him. But the thrust of *Kremen's* case was, however, that the *Nicholas* dicta
should be preferred to the *Ben Hashem* principles.
150   I come finally to *Hope v Krejci* [2012] EWHC 1780 (Fam), another
decision of Mostyn J, to which I have already referred. I shall not discuss the
judgment in at any length. Mostyn J cited from, and discussed, various
authorities to which I have referred, including his own judgment in    H
*Kremen's* case. At para 27, he endorsed his view as to the supremacy and
binding nature of the dicta in the *Nicholas* case and said that he did not
regard the *VTB* case [2012] 2 Lloyd's Rep 313, in which the *Nicholas* case
was not referred to, as requiring it to be altered. I read Mostyn J's discussion

465

A   of these matters in *Hope v Krejci* (although not his decision in *Kremen's* case) as obiter, but there is no doubt as to his view of the law that is or should be applied in family proceedings.

*The respondent's notice*

    151   By a respondent's notice, and if wrong on her primary submissions
B   in support of the judge's reasoning, the wife sought to overturn the judge's findings in para 217 that there was no relevant impropriety in relation to the establishment of the Petrodel group structure.  The wife also challenged the finding in para 218 that the husband's conduct of the litigation did not amount to relevant impropriety sufficient to justify the court in piercing the companies' corporate veil.

C   152   This aspect of the wife's case was barely developed by Mr Todd in his oral submissions, who acknowledged that, given the judge's findings, it was a difficult argument.  I consider that it was not only difficult but impossible.  There is no factual basis upon which this court can conclude that these long-established companies were incorporated, or were used, as a cloak or mask to hide the PRL and Vermont properties from the court's gaze; or, more particularly, as part of an attempt to hoodwink the court into
D   believing that assets that belonged beneficially to the husband were now the companies' assets and so escaped the wife's reach.  The wife's case to such end was not improved by pointing, as she did—indeed it formed the main part of Mr Todd's submission—to the husband's unco-operative stance in the litigation.  In my judgment, there is no substance to this part of the wife's case and I shall devote no more space to it.

E   153   The wife also contended that the judge was wrong not to find that the relevant PRL and Vermont properties were held by those companies as nominees or trustees for the husband.  To that end, Mr Todd referred us to several paragraphs of the judge's judgment that he said supported such a finding.  These were, in the main, paragraphs in which the judge discussed whether the assets of the Petrodel companies belonged to the husband rather than the companies and concluded that they did.  I have explained why
F   I consider that the judge was wrong in that conclusion.  If my criticism of his judgment in that respect is justified, there is, I consider, nothing in his judgment that could enable this court to find that he ought none the less to have found that the specific properties held by PRL and Vermont that are the subject of para 5 of his order belonged beneficially to the husband.  I would also reject this argument advanced by the wife.

G   *Conclusion*

    154   I have made clear my views on the "veil piercing" issue, but shall summarise them.  *Salomon v A Salomon & Co Ltd* [1897] AC 22 is House of Lords authority affirming the distinction between the separate legal personalities of a company and its corporators.  It makes no difference to such distinction that the company has a single corporator with total control
H   over its affairs.  It is a feature of the principle that a company's assets belong beneficially to the company and that its corporators have no interest in, or entitlement to, them.  It is a further feature of it that such assets cannot be looked to in order to satisfy the personal obligations of the corporators, any more than the latters' personal assets can be looked to in order to satisfy the

© 2013 The Incorporated Council of Law Reporting for England and Wales

obligations of the company. In special circumstances, in particular in the    A
winding up of an insolvent company, there may be a statutory basis for
requiring the corporators to contribute personally to the company's assets,
for example if they have misapplied its assets or engaged in wrongful or
fraudulent trading: see sections 212 to 214 of the Insolvency Act 1986.
Exceptions of that nature are, however, irrelevant for present purposes.

155   Subject to exceptions such as those, and to cases in which it is    B
legitimate to pierce the corporate veil, the separate corporate identity of a
company is a fact of legal life that all courts are required to recognise and
respect, whatever jurisdiction they are exercising. It is not open to a court,
simply because it regards it as just and convenient, to disregard such separate
identity and to appropriate the assets of a company in satisfaction either of
the monetary claims of its corporator's creditors or of the monetary ancillary
relief claims of its corporator's spouse. *Salomon's* case precludes any such    C
approach; and the same was made clear by the House of Lords in *Woolfson v
Strathclyde Regional Council* 1978 SC (HL) 90 and by the Court of Appeal
in *Adams v Cape Industries plc* [1990] Ch 433, *Ord v Belhaven Pubs Ltd*
[1998] 2 BCLC 447 and *VTB Capital plc v Nutritek International Corpn*
[2012] 2 Lloyd's Rep 313. The obiter dicta in *Nicholas v Nicholas* [1984]
FLR 285 to different effect are inconsistent with the *Salomon*, *Woolfson*,    D
*Adams*, *Ord* and *VTB* cases and advance no reasoning why a different
principle should apply in the family jurisdiction as compared with other
jurisdictions. The *Salomon* principle must apply equally to all jurisdictions.
A one-man company does not metamorphose into the one-man simply
because the person with a wish to abstract its assets is his wife.

156   The *Woolfson*, *Adams*, *Ord*, *Ben Hashem* and *VTB* cases show that    E
there may be factual circumstances in which it will be legitimate for the
court to pierce a company's corporate veil and, to an appropriate extent,
disregard the fact of its separate identity from that of its corporators. They
all, however, affirm that that can only be done in limited circumstances,
central to which is the demonstration of relevant impropriety in the
corporators' use of the company. The rationale for such an exceptional
jurisdiction is that the controllers of the company have so used the fact of its    F
separate identity for improper purposes that it may be appropriate for the
court to disregard its separate identity in order that its controllers may not
derive the advantage from such abuse that they intended to achieve. It is
perhaps a relative of the principle that a wrongdoer cannot ordinarily be
allowed to profit from his own wrong. The jurisdiction, whilst of interest to
legal theorists, is an exceptional one and there are few reported decisions    G
where it has been applied (including, in particular, in family proceedings).
Just as there is no rational ground for regarding the family courts as exempt
from the *Salomon* case, so is there is no rational ground for regarding them
as exempt from the need to be satisfied as to the conditions affirmed in the
*VTB* case before piercing of a corporate veil. The dicta in the *Nicholas* case
cannot stand with the principles explained in the *Woolfson*, *Adams*, *Ord*,
*Ben Hashem* and *VTB* cases and they should no longer be regarded as of any    H
authority. In so far as Mostyn J has, in *Kremen v Agrest (No 2)* [2011]
2 FLR 490 and *Hope v Krejci* [2012] EWHC 1780 (Fam), treated those
principles as inapplicable in family cases and instead supported the *Nicholas*
dicta, I would respectfully disagree with him.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    157   In this case, once the judge had rejected the impropriety assertion,
he had no choice but to reject the claim that PRL and Vermont's London
properties were or could be regarded as properties to which the husband had
any entitlement. He had no jurisdiction under section 24(1)(a) to make the
orders he did in relation to them. In so far as he was suggesting that
section 24(1)(a) enabled the court to treat a company's property as
belonging to its 100% owner, he was wrong. Section 24(1)(a) confers no
B    such jurisdiction. It does no more than confer a jurisdiction to make a
transfer order in respect of property to which the respondent spouse is
beneficially entitled. Whether such spouse is or is not so entitled to the
particular item of property in issue will be a question of fact, to be answered
in the same way as it would regardless of the making of any application
under section 24(1)(a).
C    158   I would allow the appeals by PRL and Vermont against the judge's
para 5 orders.

### PATTEN LJ

159   I agree that the appeal should be allowed for the reasons contained
in the judgment of Rimer LJ and I fully endorse his treatment of the issues of
beneficial ownership and the limited circumstances in which it may be
D    appropriate to pierce the veil of incorporation.
160   What needs to be emphasised is that the provisions of
section 24(1)(a) of the Matrimonial Causes Act 1973 do not give the court
power to disapply the established principles of legal and beneficial
ownership or of company law. On the contrary, those principles were
plainly intended to define the limits of the court's jurisdiction under the
E    statute and Moylan J was wrong to give the words "entitled, either in
possession or reversion" any wider meaning. Married couples who choose
to vest assets beneficially in a company for what the judge described as
conventional reasons including wealth protection and the avoidance of tax
cannot ignore the legal consequences of their actions in less happy times.
161   I wish particularly to support Rimer LJ's criticism of the dicta in
*Nicholas v Nicholas* [1984] FLR 285 and his view that these cannot be relied
F    upon as a correct statement of the law following the decision of this court in
*Adams v Cape Industries plc* [1990] Ch 433. They have led judges of the
Family Division to adopt and develop an approach to company owned assets
in ancillary relief applications which amounts almost to a separate system of
legal rules unaffected by the relevant principles of English property and
company law. That must now cease.

G                                                               *Appeal allowed.*

21 November 2012. The court granted an application by the wife for
permission to appeal.

KEN MYDEEN, Barrister

H    **APPEAL**
The wife appealed. The issues for the Supreme Court, as set out in the
parties' statement of agreed facts and issues, were whether (1) the court had
power in the context of the Matrimonial Causes Act 1973 to order the
transfer of assets, as part of an ancillary relief award, which belonged to

© 2013 The Incorporated Council of Law Reporting for England and Wales

468
**Prest v Prest (SC(E))**                                                          [2013] 2 AC
Argument

third party companies; (2) on a proper analysis, the companies held the   *A*
properties on trust for the husband and as such the court was empowered to
transfer those properties to the wife; (3) section 24(1)(c)(d) of the Act
empowered the court to alter the settlement by which the husband was
entitled to a beneficial interest in both the shares in the companies and their
assets; and (4) the circumstances were such that the wife should be permitted
to pierce the veil of incorporation either on the ground of impropriety or in
the interests of justice.                                                           *B*

The facts are stated in the judgment of Lord Sumption JSC.

*Richard Todd QC*, *Daniel Lightman* and *Stephen Trowell* (instructed by
*Farrer & Co LLP*) for the wife.

Where an asset is held by a company which is effectively the alter ego of a
spouse, and the legitimate priority interests of innocent third parties can be   *C*
protected, section 24(1)(a) of the Matrimonial Causes Act 1973 operates as
a statutory exception to the rule against piercing the corporate veil, enabling
the court to look at the reality of the underlying ownership of the asset and
to deal with the asset accordingly: see *Nicholas v Nicholas* [1984] FLR 285;
*Green v Green* [1993] 1 FLR 326; *W v H (Family Division: Without Notice
Orders)* [2001] 1 All ER 300; *A v A* [2007] 2 FLR 467; *Ben Hashem v Al
Shayif* [2009] 1 FLR 115; *Mubarak v Mubarak* [2001] 1 FLR 673 and   *D*
*Kremen v Agrest (No 2)* [2011] 2 FLR 490.

A person is entitled to the possession of an asset if he has the right and
ability to procure its transfer to him for his own use, free of legitimate third
party objection. The husband has all the rights of a 100% shareholder and
controller in the respondent companies, including the right to a member's
voluntary liquidation. Since the husband and the companies failed to   *E*
disclose the net asset position of the companies and failed to provide the
disclosure as to the acquisition costs of the properties which the husband and
the companies had been ordered to produce, the judge was entitled to
proceed on the basis that the secured creditors would be unaffected by the
proceedings; further or alternatively that the wife's cross-appeal should
succeed on its facts and that it be declared that the companies held the
properties on resulting trust for the husband: for authority on the burden of   *F*
proof and who should call which evidence, see *Herrington v British
Railways Board* [1972] AC 877 and *Wisniewski v Central Manchester
Health Authority* [1998] PIQR P324.

The husband could be ordered to put the companies into a members
voluntary liquidation and the net proceeds then distributed to the wife;
rather than employ this largely artificial exercise, the process could be   *G*
"telescoped" into a transfer of the underlying assets (subject to the interests
of secured and trade creditors) to the wife.

The purpose of the Act is to do fairness as between spouses. The court
had a wide discretion to achieve this including by variation of a settlement:
see *Brooks v Brooks* [1996] AC 375. The Act requires the court to look not
only at what a spouse has now but at resources to which a spouse is or might
become entitled in the future: see sections 24(1) and 25 and *Crews-Orchard*   *H*
*v Crews-Orchard* (1970) 114 SJ 150.

The court may take notice of the fact that a spouse not only controls a
company but, subject to third party interests, may dispose of it at will: see *W
v H (Family Division: Without Notice Orders)* [2001] 1 All ER 300, 311;

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    *Nicholas v Nicholas* [1984] FLR 285, 287, 292; *Green v Green* [1993]
     1 FLR 326 and *Mubarak v Mubarak* [2001] 1 FLR 673, 679, 682. In the
     minority of cases where a spouse's legitimate claim can only be met by
     company assets the court should look to the powers vested in it by
     section 24(1) and have regard to the powers and control of the other spouse.
     If the interpretation of section 24(1)(a) favoured by the majority of the Court
B    of Appeal is upheld, the corporate structure will (subject to the applicability
     of section 24(1)(c)) become a mechanism through which the aim of
     achieving fairness will be defeated. Whilst the court can order the shares to
     be transferred that would be frustrated in this case where the shares are held
     in a "La Ronde" arrangement whereby company A owns B, which owns
     C which in turn owns A and the companies are in three different
     jurisdictions. The jurisdiction to transfer assets held by a company under
C    section 24(1) would only ever be exercised sparingly, and only in an "alter
     ego" case where the company and the spouse can be treated as one and the
     same person for the purposes of section 24(1): see *Ben Hashem v Al Shayif*
     [2009] 1 FLR 115 and *VTB Capital plc v Nutritek International Corpn*
     [2012] 2 Lloyd's Rep 313. The 1973 Act is not alone in representing a
     statutory departure from the sanctity of the corporate veil: see *Adams v*
     *Cape Industries plc* [1990] Ch 433; *Nokes v Doncaster Amalgamated*
D    *Collieries Ltd* [1940] AC 1014; *In re H (Restraint Order: Realisable*
     *Property)* [1996] 2 All ER 391 and *Director of Public Prosecutions v*
     *Compton* The Times, 11 December 2002.

         In circumstances where (1) the companies had failed to serve points of
     defence, (2) the husband had failed to provide the information sought and
     had given contradictory accounts of beneficial ownership, (3) a positive case
E    had been advanced by the wife in her statement that the understanding was
     that the properties were beneficially owned by the husband and (4) the judge
     had recorded that some of the properties had been transferred for a nominal
     amount, the judge was entitled to find that the properties were held by the
     companies on trust for the husband.

         Furthermore, the companies and/or the relevant underlying properties
     could be regarded as constituting "nuptial settlements" capable of variation
F    under section 24(1)(c). A liberal and purposive approach must be taken to
     the interpretation of "nuptial settlement" in the context of the Act: see *Blood*
     *v Blood* [1902] P 78, 82; *Bosworthick v Bosworthick* [1927] P 64, 71, 72;
     *Prinsep v Prinsep* [1929] P 225, 232, 235; *Brooks v Brooks* [1996] AC 375,
     391–392; *Ben Hashem v Al Shayif* [2009] 1 FLR 115, para 234; *E v*
     *E (Financial Provision)* [1990] 2 FLR 233; *D v D* [2011] 2 FLR 29; *BJ v MJ*
G    *(Financial Order: Overseas Trust)* [2012] 1 FLR 667 and *Hope v Krejci*
     [2013] 1 FLR 182. The jurisdiction under section 24(1)(c) is not limited to
     cases concerning the matrimonial home, nor is there any reason why the
     powers in section 24(1)(c) should be limited to trust structures. The
     legislation should be read so as to enable the court to do justice between the
     parties. The findings of fact made by the judge are consistent with a
     determination that there is a nuptial settlement. [Reference was made to
H    sections 994 and 996 of the Companies Act 2006; *Rackind v Gross* [2005]
     1 WLR 3505; *In re Tobian Properties Ltd; Maidment v Attwood* [2013]
     Bus LR 753; *Bhullar v Bhullar* (unreported) 25 March 2002, Judge Behrens,
     Leeds and *Hawkes v Cuddy* [2007] EWHC 2999 (Ch); [2008] EWHC 210
     (Ch); [2009] 2 BCLC 427, CA.]

© 2013 The Incorporated Council of Law Reporting for England and Wales

Alternatively, the wife should be entitled to pierce the corporate veil, either on the ground of impropriety or in the interests of justice, in order to obtain a fair outcome and the transfer of the properties which are in the names of the companies.  The judge erred in holding that the companies cannot be held to have been improperly used, having been originally constituted properly, and Rimer LJ, ante, pp 441–442, paras 89, 90, was wrong in holding that because the judge had found that the companies were originally properly constituted it would be inconsistent to hold that the companies were shams or nominees.  The husband was using the corporate structure to defeat both the court's inquiry and the subsequent enforcement of an order.  There was relevant impropriety: see *Ben Hashem v Al Shayif* [2009] 1 FLR 115, para 164.  Historically, the courts have recognised the need to pierce the corporate veil in the interests of justice: see *In re A Company* [1985] BCLC 333.  The suggestion in *Adams v Cape Industries plc* [1990] Ch 433 that the interests of justice is not a sufficient ground on which to pierce the corporate veil was made without the court's attention being drawn to *In re A Company* and should not be followed: see *Trustor AB v Smallbone (No 2)* [2001] 1 WLR 1177, para 21.  In the exceptional circumstances in which property has been held by a corporate structure that is wholly controlled by one party to the marriage, making that party's shareholding the subject of an order under section 24(1) of the Act both impractical and unlikely to be enforceable in practice, and that property has overwhelmingly been used for the benefit of the parties to the marriage, the court should have the discretion to pierce the corporate veil to make that property the subject of an order under section 24(1) of the Act in the interests of justice.  Such a narrow and precisely restricted exception would enable the court to respond to the demands of justice without unduly compromising certainty.  The husband's conduct in the present proceedings removes any doubt that the interests of justice are overwhelmingly in favour of the wife.

*Tim Amos QC*, *Oliver Wise*, *Ben Shaw* and *Amy Kisser* (instructed by *Jeffrey Green Russell Ltd*) for the Petrodel companies.

"Entitled" in section 24(1)(a) of the Matrimonial Causes Act 1973 must be given its ordinary narrow meaning.  It entails an enforceable right.  Thus the court can only order the transfer of assets in which a party holds a legal or beneficial interest.  The companies' assets are not the husband's assets: see *Broderip v Salomon* [1895] 2 Ch 323; sub nom *Salomon v A Salomon & Co Ltd* [1897] AC 22.  A controlling shareholder, even if he is the sole shareholder, has no interest in, or entitlement to, the company's own property: see *Macaura v Northern Assurance Co Ltd* [1925] AC 619, 626–627.  These principles form an integral part of English law and apply equally to ancillary relief proceedings since the law has to be applied in an homogeneous, structured and disciplined manner across all Divisions of the High Court: see *McFarlane v McFarlane* [2006] 2 AC 618; *Imerman v Tchenguiz* [2011] Fam 116; *Jones v Jones* [2012] Fam 1 and *A v A* [2007] 2 FLR 467.

Section 24(1)(a) does not operate as a statutory exception to these principles.  There is no suggestion within its language, or its legislative history, to indicate that Parliament intended, by implication, to create a far-reaching exception which would allow a court in ancillary relief proceedings

A   to ignore the separate legal personality of a company and treat its property
    as the personal property of its controlling shareholder. [Reference was made
    to section 45 of the Matrimonial Causes Act 1857 (20 & 21 Vict c 85) and
    *Milne v Milne* (1871) LR 2 P & D 295, 299.]   On the contrary,
    section 24(1)(a) on its face and as a matter of statutory construction is
    limited to property to which a party to a marriage has an enforceable right of
    ownership in possession or reversion.   An ability in practical terms to extract
B   an asset from a company does not equate to a rightful claim.   Unvested
    prospective rights are also insufficient: see *Crews-Orchard v Crews-Orchard*
    (1970) 114 SJ 150.   There is nothing within section 24(1)(a) to suggest that
    the court may simply disregard the English insolvency and capital-
    maintenance regimes and contractual rights of other shareholders and,
    instead, decide as a matter of judicial discretion which third party creditors
C   and shareholders are sufficiently deserving of protection.   Such an approach
    would create intolerable uncertainty for persons proposing to advance
    moneys to a company controlled by a party to a marriage.   Clear and express
    wording would be required to achieve such a result: see *Bank voor Handel
    en Scheepvaart NV v Slatford* [1953] 1 QB 248, 278.   That case also
    emphasises (at p 265) the international nature and acceptance of the concept
D   of separate corporate personality, which in the present case has the added
    importance of the consideration of increasing respect and recognition by
    foreign courts for the decisions and workings of English courts and English
    family law.
        The decision of the majority of the Court of Appeal does not enable an
    unscrupulous party to a marriage to evade an ancillary relief award.   First, if
    that party holds shares in a company, such shares themselves are property to
E   which he is entitled and a court granting ancillary relief may order that they
    be transferred to the other party to the marriage.   Further, if the
    unscrupulous party takes steps to place his assets in a corporate vehicle in
    order to avoid liability to pay ancillary relief, there are a variety of anti-
    avoidance measures which may be available to reverse such transfers: see
    section 37 of the 1973 Act and section 423 of the Insolvency Act 1986.
F   Alternatively, if a party to a marriage takes steps to place assets in a company
    in order to evade an award of ancillary relief, the matrimonial court may be
    justified in piercing the corporate veil through the application of common
    law principles by virtue of the impropriety exception.   The wife's reliance on
    statutes disregarding the separate legal personality of a company is
    misplaced: see *In re H (Restraint Order: Realisable Property)* [1996] 2 All
G   ER 391, 400–401; *Director of Public Prosecutions v Compton* [2002]
    EWCA Civ 1720 at [44]; *R v K* [2006] BCC 362, para 25 and *R v Gomez*
    [1993] AC 442, 496–497.   The unfortunate position of the wife is no reason
    for making an unprincipled order: see *Ben Hashem v Al Shayif* [2009] 1 FLR
    115, para 301.   If reform is needed it is a matter for Parliament, not the
    courts: see *R (Prudential plc) v Special Comr of Income Tax (Institute of
    Chartered Accountants in England and Wales intervening)* [2013] 2 AC 185,
H   para 49. [Reference was also made to *Charman v Charman (No 4)* [2007]
    1 FLR 1246; *Belmont Finance Corpn Ltd v Williams Furniture Ltd* [1979]
    Ch 250; *Roberts Petroleum Ltd v Bernard Kenny Ltd* [1983] 2 AC 192; *In re
    Campbell (A Bankrupt)* [1997] Ch 14 and *Midland Bank Trust Co Ltd v
    Green* [1981] AC 513.]

© 2013 The Incorporated Council of Law Reporting for England and Wales

472
**Prest v Prest (SC(E))**                                                      [2013] 2 AC
Argument

A
In *VTB Capital plc v Nutritek International Corpn* [2013] 2 AC 337 the
Supreme Court assumed, without deciding, that English law permits the veil
of incorporation to be pierced on appropriate facts. If it is necessary to
decide whether there are, as a matter of principle, any grounds on which the
corporate veil can be pierced at common law, it would be open to the court to
conclude that there are no freestanding common law principles. Given that
B
statute has given a company a separate legal existence, only statute can take
that existence away. Moreover, the cases which are relied on by the wife to
establish the courts' power to pierce the veil can be explained on other
grounds or, in so far as they do suggest that such a jurisdiction exists, they
should be rejected as inconsistent with the clear statements of principle
contained in *Broderip v Salomon* [1895] 2 Ch 323; sub nom *Salomon v
A Salomon & Co Ltd* [1897] AC 22; *Woolfson v Strathclyde Regional
C
Council* 1978 SC (HL) 90; *Adams v Cape Industries plc* [1990] Ch 433;
*Trustor AB v Smallbone (No 2)* [2001] 1 WLR 1177; *Ben Hashem v Al
Shayif* [2009] 1 FLR 115 and *VTB Capital plc v Nutritek International
Corpn* [2012] 2 Lloyd's Rep 313. The court should disapprove the obiter
dicta of Cumming-Bruce and Dillon LJJ in *Nicholas v Nicholas* [1984] FLR
285, 287E-F, 292F, of Cumming-Bruce LJ in *In re A Company* [1985] BCLC
333, 337I–338B and of Munby J in *W v H (Family Division: Without Notice
D
Orders)* [2001] 1 All ER 300, 310H. Alternatively, if there are freestanding
common law principles enabling the courts to pierce the corporate veil, the
courts may in any event only do so if there is proof of relevant impropriety
involving the misuse of a corporate structure to conceal or avoid a legal
liability: see *Ben Hashem v Al Shayif* [2009] 1 FLR 115, paras 159–164;
*VTB Capital plc v Nutritek International Corpn* [2012] 2 Lloyd's Rep 313;
[2013] 2 AC 337, para 79. The courts cannot simply pierce the corporate veil
E
whenever they perceive it to be in the interests of justice. The husband was
not guilty of relevant impropriety which would justify piercing the corporate
veil. Rather the corporate structure was set up and has been used for
conventional reasons, including wealth protection and the avoidance of tax.
The fact that the husband may have adopted an unco-operative stance in
litigation against the wife does not turn this entirely legitimate use of a
corporate structure into an improper use of such structure.
F
The judge did not find that the companies held all of their properties on
trust for the husband. On the contrary, he concluded that the properties were
"effectively" the property of the husband and that the companies were "in
effect" nominees of the husband. These conclusions would have made no
sense if the companies were in fact nominees for the husband. Accordingly,
as the Court of Appeal correctly concluded, the judge's rejection of this aspect
G
of the wife's case was clear. There is no new evidence or other material which
would provide a basis for the Supreme Court to disturb the clear rejection of
this aspect of the wife's case. Further, and in any event, the companies were
not and are not nuptial settlements—neither settlements, nor nuptial.

[LORD NEUBERGER OF ABBOTSBURY PSC. It is not necessary to address the
court on section 24(1)(c).]
H
The husband did not appear and was not represented.

*Todd QC* in reply.
It would be odious to the common law for a man who has complete
control over these companies and through them, these properties, to be able

A   to escape his responsibilities to his wife and children by deploying either
    (a) a corporate veil or (b) a cloak over the true beneficial ownership of the
    properties.   Here the husband's and the companies' failures to provide
    proper disclosure raised the inference that the companies were beneficially
    owned by the husband.  If so that beneficial interest could be transferred to
    the wife.  Once the wife had asserted a positive case of beneficial ownership
    it fell to the husband to produce the evidence which should have been in his
B   gift and which he and the companies were ordered to provide; their failure to
    do so should result in a finding that the companies hold the bare legal title on
    trusts of land for the husband as beneficial owner.
        The word "entitled" in the Matrimonial Causes Act 1973 is a word in
    common use; it gives for an easy interpretation.  If a reasonable person were
    asked "is Mr Prest entitled to these properties in circumstances where he
C   could lawfully require their transfer or sale without any legitimate third
    party objection" then they would answer "yes".  Any arcane interpretation
    which fails to achieve the underlying purpose of the Act is to be strongly
    discouraged.  Whilst of very limited use, the doctrine of piercing the corporate
    veil survives and this would be an appropriate case for its deployment.

D       The court took time for consideration.

        12 June 2013.  The following judgments were handed down.

    **LORD SUMPTION JSC**

    *Introduction*
E       1  This appeal arises out of proceedings for ancillary relief following a
    divorce.  The principal parties before the judge, Moylan J, were Michael and
    Yasmin Prest.  He was born in Nigeria and she in England.  Both have dual
    Nigerian and British nationality.  They were married in 1993, and during the
    marriage the matrimonial home was in England, although the husband was
    found by the judge to have been resident in Monaco from about 2001 to
F   date.  There was also a second home in Nevis.  The wife petitioned for
    divorce in March 2008.  A decree nisi was pronounced in December 2008,
    and a decree absolute in November 2011.
        2  The husband is not party to the appeal in point of form, although he is
    present in spirit.  The appeal concerns only the position of a number of
    companies belonging to the group known as the Petrodel Group which the
    judge found to be wholly owned and controlled (directly or through
G   intermediate entities) by the husband.   There were originally seven
    companies involved, all of which were joined as additional respondents to
    the wife's application for ancillary relief.  They were Petrodel Resources Ltd
    ("PRL"), Petrodel Resources (Nigeria) Ltd ("PRL Nigeria"), Petrodel
    Upstream Ltd ("Upstream"), Vermont Petroleum Ltd ("Vermont"), Elysium
    Diem Ltd, Petrodel Resources (Nevis) Ltd ("PRL Nevis") and Elysium Diem
    Ltd (Nevis).  Three of these companies, PRL, Upstream and Vermont, all
H   incorporated in the Isle of Man, are the respondents in this court.  PRL was
    the legal owner of the matrimonial home, which was bought in the name of
    the company in 2001 but was found by the judge to be held for the husband
    beneficially.   There is no longer any issue about that property, which is
    apparently in the process of being transferred to the wife.  In addition, PRL

was the legal owner of five residential properties in the United Kingdom and $A$
Vermont is the legal owner of two more.  The question on this appeal is
whether the court has power to order the transfer of these seven properties to
the wife given that they legally belong not to him but to his companies.

3   Part II of the Matrimonial Causes Act 1973 confers wide powers on
the court to order ancillary relief in matrimonial proceedings.  Section 23
provides for periodical and lump sum payments to a spouse or for the benefit
of children of the marriage.  Under section $24(1)(a)$, the court may order that $B$
"a party to the marriage shall transfer to the other party . . . such property as
may be so specified, being property to which the first-mentioned party is
entitled, either in possession or reversion".  Section 25, as substituted by
sections 3 and 48(2) of the Matrimonial and Family Proceedings Act 1984,
provides for a number of matters to which the court must in particular have
regard in making such orders, including, at section $25(2)(a)$, the "income, $C$
earning capacity, property and other financial resources which each of the
parties to the marriage has or is likely to have in the foreseeable future".

4   The proper exercise of these powers calls for a considerable measure
of candour by the parties in disclosing their financial affairs, and extensive
procedural powers are available to the court to compel disclosure if
necessary.  In this case, the husband's conduct of the proceedings has been
characterised by persistent obstruction, obfuscation and deceit, and a $D$
contumelious refusal to comply with rules of court and specific orders.  The
judge, Moylan J, recited in his judgment [2011] EWHC 2956 (Fam) the long
history of successive orders of the court which were either ignored or
evaded, the various attempts of the husband to conceal the extent of his
assets in the course of his evidence, and the collusive proceedings in Nigeria
by which he sought declarations that certain of the companies were held in $E$
trust for his siblings.  The only evidence on behalf of the respondent
companies was an affidavit sworn by Mr Jack Murphy, a director of PRL
and the corporate secretary of the three respondent companies, who failed to
attend for cross-examination on it.  The judge rejected his excuse that he was
in bad health, and found that he was "unwilling rather than unable to attend
court": para 69.  His conclusion was that $F$

"as a result of the husband's abject failure to comply with his
disclosure obligations and to comply with orders made by the court
during the course of these proceedings, I do not have the evidence which
would enable me to assemble a conventional schedule of assets": para 13.

However, he found that the husband was the sole beneficial owner and the
controller of the companies, and doing the best that he could on the material $G$
available assessed his net assets at £37·5m.

5   By his order dated 16 November 2011, Moylan J ordered that the
husband should procure the conveyance of the matrimonial home at
16, Warwick Avenue, London W2 to the wife, free of incumbrances, and
that he should make a lump sum payment to her of £17·5m and periodical
payments at the rate of 2% of that sum while it remained outstanding,
together with £24,000 per annum and the school fees for each of their four $H$
children.  In addition he awarded costs in favour of the wife, with a payment
of £600,000 on account.  The judge ordered the husband to procure the
transfer of the seven UK properties legally owned by PRL and Vermont to
the wife in partial satisfaction of the lump sum order.  He directed those

© 2013 The Incorporated Council of Law Reporting for England and Wales

475

A  companies to execute such documents as might be necessary to give effect to
the transfer of the matrimonial home and the seven properties. Moreover, in
awarding costs to the wife, the judge directed that PRL, Upstream and
Vermont should be jointly and severally liable with the husband for 10% of
those costs. Corresponding orders were made against certain of the other
corporate respondents to the original proceedings, but they did not appeal,
either to the Court of Appeal or to this court, and are no longer relevant,
B  save in so far as the facts relating to them throw light on the position of the
three respondents. No order was made (or sought) for the transfer of any
assets of Upstream, but that company is interested in the present appeal by
virtue of its liability under the judge's order for part of the wife's costs.

   6   The distinctive feature of the judge's approach was that he concluded
that there was no general principle of law which entitled him to reach the
C  companies' assets by piercing the corporate veil.  This was because the
authorities showed that the separate legal personality of the company could
not be disregarded unless it was being abused for a purpose that was in some
relevant respect improper.  He held that there was no relevant impropriety.
He nevertheless concluded that in applications for financial relief ancillary to
a divorce, a wider jurisdiction to pierce the corporate veil was available
under section 24 of the Matrimonial Causes Act 1973.  The judge found that
D  the matrimonial home was held by PRL on trust for the husband, but he
made no corresponding finding about the seven other properties and refused
to make a declaration that the husband was their beneficial owner.  It is
tolerably clear from his supplementary judgment of 16 November 2011
[2011] EWHC 3066 (Fam) (on the form of the order), that this was because
having decided that he was specifically authorised to dispose of the
E  companies' properties under section 24, it was unnecessary for him to do so
and undesirable because of "the potential tax consequences": para 14.  It is
not clear what potential tax consequences he had in mind, but his
observation suggests that without them he might well have made the
declaration sought.

   7   In the Court of Appeal, the three respondent companies challenged
the orders made against them on the ground that there was no jurisdiction to
F  order their property to be conveyed to the wife in satisfaction of the
husband's judgment debt. This contention, which has been repeated before
us, raises a question of some importance.  For some years it has been the
practice of the Family Division to treat the assets of companies substantially
owned by one party to the marriage as available for distribution under
section 24 of the Matrimonial Causes Act, provided that the remaining
G  assets of the company are sufficient to satisfy its creditors.  In the Court of
Appeal, the practice was supported by Thorpe LJ, but the majority
disagreed: ante, pp 421–467. Rimer LJ, delivering the leading judgment for
the majority, held that the practice developed by the Family Division was
beyond the jurisdiction of the court unless (i) the corporate personality of the
company was being abused for a purpose which was in some relevant respect
improper, or (ii) on the particular facts of the case it could be shown that an
H  asset legally owned by the company was held in trust for the husband.  He
considered that the judge had rejected both of these possibilities on the facts,
and that he ought not therefore to have made the order.  In a short
concurring judgment, Patten LJ, ante, p 467, para 161, said that the Family
Division had developed "an approach to company owned assets in ancillary

© 2013 The Incorporated Council of Law Reporting for England and Wales

relief applications which amounts almost to a separate system of legal rules     A
unaffected by the relevant principles of English property and company law."
The practice, he concluded, "must now cease". This has significant practical
implications. Unless the UK properties of the Petrodel Group are transferred
to Mrs Prest, it is possible (she says likely) that the lump sum order in her
favour will remain wholly unsatisfied. To date, the matrimonial home has
been transferred to her but only subject to a pre-existing charge in favour of     B
BNP Paribas to secure a debt of undisclosed amount. 10% of the money
ordered to be paid on account of costs has been paid by the three
respondents, but only in order to satisfy a condition imposed on them on
their being granted leave to appeal to the Court of Appeal. Otherwise, apart
from paying the children's school fees, the husband has not complied with
any part of Moylan J's order and shows no intention of doing so if he can
possibly avoid it.                                                                  C

### The issues

8   Subject to very limited exceptions, most of which are statutory, a
company is a legal entity distinct from its shareholders. It has rights and
liabilities of its own which are distinct from those of its shareholders. Its
property is its own, and not that of its shareholders. In *Salomon v*             D
*A Salomon & Co Ltd* [1897] AC 22, the House of Lords held that these
principles applied as much to a company that was wholly owned and
controlled by one man as to any other company. In *Macaura v Northern
Assurance Co Ltd* [1925] AC 619, the House of Lords held that the sole
owner and controller of a company did not even have an insurable interest in
property of the company, although economically he was liable to suffer by its     E
destruction. Lord Buckmaster said, at pp 626–627:

   "no shareholder has any right to any item of property owned by the
   company, for he has no legal or equitable interest therein. He is entitled
   to a share in the profits while the company continues to carry on business
   and a share in the distribution of the surplus assets when the company is
   wound up."                                                                       F

In *Lonrho Ltd v Shell Petroleum Co Ltd* [1980] 1 WLR 627 the House of
Lords held that documents of a subsidiary were not in the "power" of its
parent company for the purposes of disclosure in litigation, simply by virtue
of the latter's ownership and control of the group. These principles are the
starting point for the elaborate restrictions imposed by English law on a
wide range of transactions which have the direct or indirect effect of             G
distributing capital to shareholders. The separate personality and property
of a company is sometimes described as a fiction, and in a sense it is. But the
fiction is the whole foundation of English company and insolvency law. As
Robert Goff LJ once observed, in this domain "we are concerned not with
economics but with law. The distinction between the two is, in law,
fundamental": *Bank of Tokyo Ltd v Karoon (Note)* [1987] AC 45, 64. He             H
could justly have added that it is not just legally but economically
fundamental, since limited companies have been the principal unit of
commercial life for more than a century. Their separate personality and
property are the basis on which third parties are entitled to deal with them
and commonly do deal with them.

© 2013 The Incorporated Council of Law Reporting for England and Wales

477
[2013] 2 AC                                                        Prest v Prest (SC(E))
                                                                        Lord Sumption JSC

A  9  Against this background, there are three possible legal bases on which
the assets of the Petrodel companies might be available to satisfy the lump
sum order against the husband: (1) It might be said that this is a case in
which, exceptionally, a court is at liberty to disregard the corporate veil in
order to give effective relief. (2) Section 24 of the Matrimonial Causes Act
might be regarded as conferring a distinct power to disregard the corporate
B  veil in matrimonial cases. (3) The companies might be regarded as holding
the properties on trust for the husband, not by virtue of his status as their
sole shareholder and controller, but in the particular circumstances of this
case.

   *The judge's findings: the companies*

C    10  Most of the judge's findings of fact were directed to two questions
which are no longer in dispute, namely whether the husband owned the
Petrodel Group and what was the value of his assets. For present purposes, it
is enough to summarise those which bear on the position of the three
corporate respondents.
   11  At the time of the marriage, and throughout the 1990s, the husband
was employed by a succession of major international oil trading companies
D  as a trader, but in 2001 he left his last employer, Marc Rich, and began to
run his own companies. Initially, there were two principal companies
involved, Aurora and the Petrodel companies. In 2004 Aurora was wound
up and thereafter he operated mainly through the Petrodel companies. The
principal operating company of this group was PRL, a company
incorporated in the Isle of Man. Its financial statements record that it was
E  incorporated on 4 May 1993, was dormant until 1996, and did not begin
operations until 25 April 2002, i e after the husband had left Marc Rich and
set up on his own. Between 1996 and 2002, it is described in its financial
statements as a property investment company. Its sole function in that
period appears to have been to hold title to the matrimonial home at
16, Warwick Avenue in London and five residential investment properties in
London, and to act as a channel for funding property purchases by other
F  companies of the group. The husband's evidence was that the company had
engaged in substantial agricultural and oil related business in the 1990s, in
part in association with his then employer, Marc Rich. But this was
inconsistent with the company's financial statements, and the judge rejected
it. Mr Le Breton, a former business colleague of the husband, gave evidence
at the hearing which the judge accepted as reliable. Mr Le Breton said that
G  from about 2001 PRL was engaged in a limited way in oil trading and
shipping, and from 2006 moved into oil exploration and production in
Nigeria and West Africa. The latest disclosed accounts of PRL are draft
accounts for 2008 and 2009. The judge (para 147) declined to attach "any
significant weight" to the financial data in the 2008 accounts, which he
considered to have been manipulated. All the disclosed accounts are now
very much out of date. For what they are worth, the accounts for both years
H  show a substantial turnover and large balances. The husband's evidence was
that PRL ceased trading in 2010, when it lost its major exploration contract.
Given his evident determination to frustrate his wife's claims on him, it
cannot be assumed that the assets of the company recorded in the disclosed
accounts are still there.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A
   12   Management control of PRL has always been in the hands of the
husband, ostensibly as chief executive under a contract of employment
conferring on him complete discretion in the management of its business.
The judge found that none of the companies had ever had any independent
directors.  The husband is a director of PRL Nigeria, but otherwise the
directors are all nominal or professional directors, generally his relatives,
who accept directions from him.  The directors of PRL are Mr Murphy (the
principal of its corporate secretary) and a lady in Nevis who appears to have
been the couple's cleaner there.

B

   13   The ownership of the respondent companies proved to be more
difficult to establish.  The husband did not admit to having any personal
interest in the shares of any company of the group, and declined to say who
the ultimate shareholders were.  Substantially all of the issued shares of PRL
are owned by PRL Nigeria.  Almost all the shares of that company are
owned by PRL Nevis, a company about which very little is known, but
whose accounts show substantial balances, apparently derived from trading.
The husband's evidence was that the shares of PRL Nevis were owned by its
own subsidiary PRL Nigeria.   The judge described this as "puzzling"
(para 55) but made no finding as to whether it was true.  More recently, it
has been suggested that PRL Nevis is owned by a family trust about which,
however, nothing has been disclosed.  In the end, it did not matter, because
the judge cut through the complexities of the corporate structure by
accepting the evidence of the wife and Mr Le Breton that the husband was
the true owner of the Petrodel Group, as he had always told them he was,
even if the exact means by which he held it remained obscure.   That
accounted for PRL, PRL Nigeria and PRL Nevis.

C

D

   14   It also accounted for Vermont, whose shares are held 49% by PRL
and 51% by PRL Nigeria, and Upstream, which had a single issued share
held by PRL Nevis.  Vermont was and possibly still is a trading company.
The husband's evidence was that it began to ship crude oil in 2010.  The
exact nature of Upstream's business (if any) is unclear.  It does not appear to
trade.

E

   15   The husband declined to answer the question whether he received
any benefits from PRL other than his salary, saying that this was an
"accounting question".  The judge, however, made extensive findings about
this.  He found that his personal expenditure substantially exceeded his
salary and bonuses as chief executive, and that the difference was funded
entirely by the company.  There was no formality involved.  The husband
simply treated the companies' cash balances and property as his own and
drew on them as he saw fit.   The judge found that the husband had
"unrestricted access" to the companies' assets, unconfined by any board
control or by any scruples about the legality of his drawings: para 208.  He
used PRL's assets to fund his and his family's personal expenditure,
including the substantial legal costs incurred in these proceedings.   The
group was "effectively . . . the husband's money box which he uses at will":
para 218.

F

G

H

*Piercing the corporate veil*

   16   I should first of all draw attention to the limited sense in which this
issue arises at all.  "Piercing the corporate veil" is an expression rather
indiscriminately used to describe a number of different things.  Properly

479
[2013] 2 AC                                                    Prest v Prest (SC(E))
                                                               Lord Sumption JSC

A speaking, it means disregarding the separate personality of the company. There is a range of situations in which the law attributes the acts or property of a company to those who control it, without disregarding its separate legal personality. The controller may be personally liable, generally in addition to the company, for something that he has done as its agent or as a joint actor. Property legally vested in a company may belong beneficially to the

B controller, if the arrangements in relation to the property are such as to make the company its controller's nominee or trustee for that purpose. For specific statutory purposes, a company's legal responsibility may be engaged by the acts or business of an associated company. Examples are the provisions of the Companies Acts governing group accounts or the rules governing infringements of competition law by "firms", which may include groups of companies conducting the relevant business as an economic unit. Equitable

C remedies, such as an injunction or specific performance may be available to compel the controller whose personal legal responsibility is engaged to exercise his control in a particular way. But when we speak of piercing the corporate veil, we are not (or should not be) speaking of any of these situations, but only of those cases which are true exceptions to the rule in *Salomon v A Salomon & Co Ltd* [1897] AC 22, i e where a person who owns and controls a company is said in certain circumstances to be identified with

D it in law by virtue of that ownership and control.

    17 Most advanced legal systems recognise corporate legal personality while acknowledging some limits to its logical implications. In civil law jurisdictions, the juridical basis of the exceptions is generally the concept of abuse of rights, to which the International Court of Justice was referring in *Case concerning Barcelona Traction, Light and Power Co Ltd (Belgium v*

E *Spain) (Second Phase)* [1970] ICJ Rep 3 when it derived from municipal law a limited principle permitting the piercing of the corporate veil in cases of misuse, fraud, malfeasance or evasion of legal obligations. These examples illustrate the breadth, at least as a matter of legal theory, of the concept of abuse of rights, which extends not just to the illegal and improper invocation of a right but to its use for some purpose collateral to that for which it exists.

F    18 English law has no general doctrine of this kind. But it has a variety of specific principles which achieve the same result in some cases. One of these principles is that the law defines the incidents of most legal relationships between persons (natural or artificial) on the fundamental assumption that their dealings are honest. The same legal incidents will not necessarily apply if they are not. The principle was stated in its most absolute form by Denning LJ in a famous dictum in *Lazarus Estates Ltd v*

G *Beasley* [1956] 1 QB 702, 712:

    "No court in this land will allow a person to keep an advantage which he has obtained by fraud. No judgment of a court, no order of a Minister, can be allowed to stand if it has been obtained by fraud. Fraud unravels everything. The court is careful not to find fraud unless it is distinctly pleaded and proved; but once it is proved, it vitiates judgments, contracts

H     and all transactions whatsoever . . ."

The principle is mainly familiar in the context of contracts and other consensual arrangements, in which the effect of fraud is to vitiate consent so that the transaction becomes voidable ab initio. But it has been applied altogether more generally, in cases which can be rationalised only on

© 2013 The Incorporated Council of Law Reporting for England and Wales

grounds of public policy, for example to justify setting aside a public act such     *A*
as a judgment, which is in no sense consensual, a jurisdiction which has
existed since at least 1775: *Duchess of Kingston's Case* (1776) 2 Smith's LC
(13th ed) 644, 646, 651. Or to abrogate a right derived from a legal status,
such as marriage: *R v Secretary of State for the Home Department,
Ex p Puttick* [1981] QB 767. Or to disapply a statutory time bar which on
the face of the statute applies: *Welwyn Hatfield Borough Council v Secretary
of State for Communities and Local Government* [2011] 2 AC 304. These     *B*
decisions (and there are others) illustrate a broader principle governing cases
in which the benefit of some apparently absolute legal principle has been
obtained by dishonesty.  The authorities show that there are limited
circumstances in which the law treats the use of a company as a means of
evading the law as dishonest for this purpose.

19  The question is heavily burdened by authority, much of it     *C*
characterised by incautious dicta and inadequate reasoning. I propose, first,
to examine those cases which seek to rationalise the case law in terms of
general principle, and then to look at a number of cases in which the court
has been thought, rightly or wrongly, to have pierced the corporate veil in
order to identify the critical features of these cases which enabled them to do
so.     *D*

20  Almost all the modern analyses of the general principle have taken as
their starting point the brief and obiter but influential statement of Lord
Keith of Kinkel in *Woolfson v Strathclyde Regional Council* 1978 SC
(HL) 90. This was an appeal from Scotland in which the House of Lords
declined to allow the principal shareholder of a company to recover
compensation for the compulsory purchase of a property which the
company occupied.  The case was decided on its facts, but at p 96, Lord     *E*
Keith, delivering the leading speech, observed that "it is appropriate to
pierce the corporate veil only where special circumstances exist indicating
that it is a mere facade concealing the true facts".

21  The first systematic analysis of the large and disparate body of
English case law was undertaken by a strong Court of Appeal in *Adams v
Cape Industries plc* [1990] Ch 433 (Slade, Mustill and Ralph Gibson LJJ).     *F*
The question at issue in that case was whether the United Kingdom parent of
an international mining group which was, at least arguably, managed as a
"single economic unit" was present in the United States for the purpose of
making a default judgment of a United States court enforceable against it in
England. Among other arguments, it was suggested that it was present in the
United States by virtue of the fact that a wholly owned subsidiary was
incorporated and carried on business there.  Slade LJ, delivering the     *G*
judgment of the court, rejected this contention: pp 532–544.  The court,
adopting Lord Keith's dictum in *Woolfson v Strathclyde*, held that the
corporate veil could be disregarded only in cases where it was being used for
a deliberately dishonest purpose: pp 539, 540. Apart from that, and from
cases turning on the wording of particular statutes, it held at p 536 that:

"the court is not free to disregard the principle of *Salomon v     *H*
A Salomon & Co Ltd* [1897] AC 22 merely because it considers that
justice so requires. Our law, for better or worse, recognises the creation
of subsidiary companies, which though in one sense the creatures of their
parent companies, will nevertheless under the general law fall to be

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    treated as separate legal entities with all the rights and liabilities which would normally attach to separate legal entities."

22   In *Trustor AB v Smallbone (No 2)* [2001] 1 WLR 1177, Sir Andrew Morritt V-C reviewed many of the same authorities. Mr Smallbone, the former managing director of Trustor, had improperly procured large amounts of its money to be paid out of its account to a company called

B    Introcom Ltd, incorporated in Gibraltar. Introcom was owned and controlled by a Liechtenstein trust of which Mr Smallbone was a beneficiary. Its directors acted on his instructions. At an earlier stage of the litigation, Trustor had obtained summary judgment on some of its claims against Introcom, on the footing that the payments were unauthorised and a breach of Mr Smallbone's duty as managing director, that the company was "simply

C    a vehicle Mr Smallbone used for receiving money from Trustor", and that his knowledge could be imputed to the company. The Vice-Chancellor was dealing with a subsequent application by Trustor for summary judgment against Mr Smallbone himself. It was accepted that there was an arguable defence to the claims against him for damages or compensation for breach of his duties as a director of Trustor. Accordingly the sole basis of the application was that he was liable to account as a constructive trustee on the

D    footing of knowing receipt. This depended on the proposition that he was to be identified with Introcom and so treated as having received the money himself. It was submitted that the authorities justified piercing the corporate veil in three, possibly overlapping, cases: (i) where the company was a "facade or sham"; (ii) where the company was involved in some form of impropriety; and (iii) where it was necessary to do so in the interests of

E    justice. In each of these cases, the right of the court to pierce the corporate veil was said to be subject to there being no third party interests engaged, such as unconnected minority shareholders or creditors. Sir Andrew Morritt V-C concluded that the authorities supported the submission in case (i), and also in case (ii) provided that the impropriety was a relevant one, i e "linked to the use of the company structure to avoid or conceal liability for that impropriety": para 22. He followed *Adams v Cape*

F    *Industries plc* in rejecting the submission as applied to case (iii). In summary, the court was "entitled to 'pierce the corporate veil' and recognise the receipt of the company as that of the individual(s) in control of it if the company was used as a device or facade to conceal the true facts, thereby avoiding or concealing any liability of those individual(s)": see para 23.

23   For years after it was decided, *Adams v Cape Industries plc* was

G    regarded as having settled the general law on the subject. But for much of this period, the Family Division pursued an independent line, essentially for reasons of policy arising from its concern to make effective its statutory jurisdiction to distribute the property of the marriage on a divorce. In *Nicholas v Nicholas* [1984] FLR 285, the Court of Appeal (Cumming-Bruce and Dillon LJJ) overturned the decision of the judge to order the husband to procure the transfer to the wife of a property belonging to a company in

H    which he held a 71% shareholding, the other 29% being held by his business associates. However, both members of the court suggested, obiter, that the result might have been different had it not been for the position of the minority shareholders. Cumming-Bruce LJ, at p 287, thought that, in that situation, "the court does and will pierce the corporate veil and make an

order which has the same effect as an order that would be made if the    A
property was vested in the majority shareholder." Dillon LJ said, at p 292,
that "If the company was [a] one-man company and the alter ego of the
husband, I would have no difficulty in holding that there was power to order
a transfer of the property." These dicta were subsequently applied by judges
of the Family Division dealing with claims for ancillary financial relief, who
regularly made orders awarding to parties to the marriage assets vested in
companies of which one of them was the sole shareholder. Connell J made    B
such an order in *Green v Green* [1993] 1 FLR 326. In *Mubarak v Mubarak*
[2001] 1 FLR 673, 682C, Bodey J held that for the purpose of claims to
ancillary financial relief the Family Division would lift the corporate veil not
only where the company was a sham but "when it is just and necessary", the
very proposition that the Court of Appeal had rejected as a statement of the
general law in *Adams v Cape Industries plc* [1990] Ch 433. And in *Kremen*    C
*v Agrest (No 2)* [2011] 2 FLR 490, para 46, Mostyn J held that there was a
"strong practical reason why the cloak should be penetrable even absent a
finding of wrongdoing".

24    There were of course dissenting voices, even in decisions on ancillary
relief. Much the most significant of them for present purposes was that of
Munby J. In *A v A* [2007] 2 FLR 467, paras 18–19, he drew attention to the
robust approach which had always been adopted by judges of the Family    D
Division in seeing through sham arrangements designed to hide the
ownership of assets of the marriage by vesting them in relatives or
companies which were in reality holding them as their nominees. But he
warned against departing from fundamental legal principle. He observed, at
para 21:

"In this sense, and to this limited extent, the typical case in the Family    E
Division may differ from the typical case in (say) the Chancery Division.
But what it is important to appreciate (and too often, I fear, is not
appreciated at least in this division) is that the relevant legal principles
which have to be applied are precisely the same in this division as in the
other two divisions. There is not one law of 'sham' in the Chancery
Division and another law of 'sham' in the Family Division. There is only    F
one law of 'sham', to be applied equally in all three divisions of the High
Court, just as there is but one set of principles, again equally applicable in
all three divisions, determining whether or not it is appropriate to 'pierce
the corporate veil.'"

25    In *Ben Hashem v Al Shayif* [2009] 1 FLR 115, another decision of
Munby J, the difference between the approach taken in the Family Division    G
and in other divisions of the High Court arose in a particularly acute form,
because he was hearing the claim for ancillary relief in conjunction with
proceedings in the Chancery Division. In the Family Division, the wife was
seeking an order transferring to her a property which she was occupying but
which was owned by a company controlled by the husband, while in the
Chancery proceedings the company was seeking a possession order in
respect of the same property. After reminding himself of what he had said in    H
*A v A* and conducting a careful review of both family and non-family cases,
Munby J formulated six principles at paras 159–164 which he considered
could be derived from them: (i) ownership and control of a company were
not enough to justify piercing the corporate veil; (ii) the court cannot pierce

A    the corporate veil, even in the absence of third party interests in the
     company, merely because it is thought to be necessary in the interests of
     justice; (iii) the corporate veil can be pierced only if there is some
     impropriety; (iv) the impropriety in question must, as Sir Andrew
     Morritt V-C had said in the *Trustor* case [2001] 1 WLR 1177, be "linked to
     the use of the company structure to avoid or conceal liability"; (v) to justify
B    piercing the corporate veil, there must be "*both* control of the company by
     the wrongdoer(s) *and* impropriety, that is (mis)use of the company by them
     as a device or facade to conceal their wrongdoing"; and (vi) the company
     may be a "facade" even though it was not originally incorporated with any
     deceptive intent, provided that it is being used for the purpose of deception
     at the time of the relevant transactions.  The court would, however, pierce
     the corporate veil only so far as it was necessary in order to provide a remedy
C    for the particular wrong which those controlling the company had done.
        26   In *VTB Capital plc v Nutritek International Corpn* [2012] 2 Lloyd's
     Rep 313, VTB Capital sought permission to serve proceedings out of the
     jurisdiction on the footing that the borrower under a facility agreement was
     to be identified with the persons who controlled it, so as to make the latter in
     law parties to the same agreement.  The attempt failed in the Court of
D    Appeal because the court was not satisfied that that would be the
     consequence of piercing the corporate veil even if it were legitimate to do so:
     see paras 90–91.  The decision is not, therefore, direct authority on the
     question whether the court was entitled to pierce the corporate veil.  But the
     court considered all the principal authorities on that question and arrived at
     substantially the same conclusions as Sir Andrew Morritt V-C and Munby J.
E    Munby J's statement of principle was adopted by the Court of Appeal
     subject to two qualifications.  First, they said that it was not necessary in
     order to pierce the corporate veil that there should be no other remedy
     available against the wrongdoer, and so far as Munby J suggested that it
     was, he had set the bar too high.  Secondly, they said that it was not enough
     to show that there had been wrongdoing.

F       "The relevant wrongdoing must be in the nature of an independent
        wrong that involves the fraudulent or dishonest misuse of the corporate
        personality of the company for the purpose of concealing the true facts":
        see paras 79–80.

     On this point, the case took the same course in the Supreme Court [2013]
     2 AC 337, which dismissed VTB Capital's appeal.  So far as piercing the
G    corporate veil is concerned, the court's reasons were given by Lord
     Neuberger of Abbotsbury PSC.  He noted the broad consensus among judges
     and textbook writers that there were circumstances in which separate legal
     personality of a company might be disregarded and the company identified
     with those who owned and controlled it.  However, he declined to decide
     whether the consensus was right on an appeal from an interlocutory
     decision, given that, like the Court of Appeal, he considered that even if the
H    veil were pierced the result would not be to make a company's controllers
     party to its contracts with third parties.  But he adopted, as it seems to me,
     both the general reasoning of the Court of Appeal and the view of Munby J
     that any doctrine permitting the court to pierce the corporate veil must be
     limited to cases where there was a relevant impropriety: see paras 128, 145.

© 2013 The Incorporated Council of Law Reporting for England and Wales

27  In my view, the principle that the court may be justified in piercing       *A*
the corporate veil if a company's separate legal personality is being abused
for the purpose of some relevant wrongdoing is well established in the
authorities.  It is true that most of the statements of principle in the
authorities are obiter, because the corporate veil was not pierced.  It is also
true that most cases in which the corporate veil was pierced could have been
decided on other grounds.  But the consensus that there are circumstances in       *B*
which the court may pierce the corporate veil is impressive.  I would not for
my part be willing to explain that consensus out of existence.  This is because
I think that the recognition of a limited power to pierce the corporate veil in
carefully defined circumstances is necessary if the law is not to be disarmed
in the face of abuse.  I also think that provided the limits are recognised and
respected, it is consistent with the general approach of English law to the
problems raised by the use of legal concepts to defeat mandatory rules of       *C*
law.

28  The difficulty is to identify what is a relevant wrongdoing.
References to a "facade" or "sham" beg too many questions to provide a
satisfactory answer.  It seems to me that two distinct principles lie behind
these protean terms, and that much confusion has been caused by failing to
distinguish between them.  They can conveniently be called the concealment       *D*
principle and the evasion principle.  The concealment principle is legally
banal and does not involve piercing the corporate veil at all.  It is that the
interposition of a company or perhaps several companies so as to conceal the
identity of the real actors will not deter the courts from identifying them,
assuming that their identity is legally relevant.  In these cases the court is not
disregarding the "facade", but only looking behind it to discover the facts
which the corporate structure is concealing.  The evasion principle is       *E*
different.  It is that the court may disregard the corporate veil if there is a
legal right against the person in control of it which exists independently of
the company's involvement, and a company is interposed so that the
separate legal personality of the company will defeat the right or frustrate its
enforcement.  Many cases will fall into both categories, but in some
circumstances the difference between them may be critical.  This may be
illustrated by reference to those cases in which the court has been thought,       *F*
rightly or wrongly, to have pierced the corporate veil.

29  The first and most famous of them is *Gilford Motor Co Ltd v Horne*
[1933] Ch 935.  Mr E B Horne had been the managing director of the
Gilford Motor Co.  His contract of employment precluded him being
engaged in any competing business in a specified geographical area for five
years after the end of his employment "either solely or jointly with or as       *G*
agent for any other person, firm or company".  He left Gilford and carried on
a competing business in the specified area, initially in his own name.  He then
formed a company, JM Horne & Co Ltd, named after his wife, in which she
and a business associate were shareholders.  The trial judge, Farwell J, found
that the company had been set up in this way to enable the business to be
carried on under his own control but without incurring liability for breach of
the covenant.  However the reality, in his view, was that the company was       *H*
being used as "the channel through which the defendant Horne was carrying
on his business": p 943.  In fact, he dismissed the claim on the ground that
the restrictive covenant was void.  But the Court of Appeal allowed the
appeal on that point and granted an injunction against both Mr Horne and

© 2013 The Incorporated Council of Law Reporting for England and Wales

A the company.  As against Mr Horne, the injunction was granted on the
concealment principle.  Lord Hanworth MR said, at pp 961–962, that the
company was a "mere cloak or sham" because the business was really being
carried on by Mr Horne.   Because the restrictive covenant prevented
Mr Horne from competing with his former employers whether as principal
or as agent for another, it did not matter whether the business belonged to
him or to JM Horne & Co Ltd provided that he was carrying it on.  The only
B relevance of the interposition of the company was to maintain the pretence
that it was being carried on by others.  Lord Hanworth MR did not explain
why the injunction should issue against the company, but I think it is clear
from the judgments of Lawrence and Romer LJJ, at pp 962 and 966, that
they were applying the evasion principle.  Lawrence LJ, who gave the fullest
consideration to the point, based his view entirely on Mr Horne's evasive
C motive for forming the company.  This showed that it was

    "a mere channel used by the defendant Horne for the purpose of
    enabling him, for his own benefit, to obtain the advantage of the
    customers of the plaintiff company, and that therefore the defendant
    company ought to be restrained as well as the defendant Horne."

D In other words, the company was restrained in order to ensure that Horne
was deprived of the benefit which he might otherwise have derived from the
separate legal personality of the company.  I agree with the view expressed
by the Court of Appeal in *VTB Capital v Nutritek* [2012] 2 Lloyd's Rep 313,
para 63, that this is properly to be regarded as a decision to pierce the
corporate veil.  It is fair to say that the point may have been conceded by
counsel, although in rather guarded terms ("if the evidence admitted of the
E conclusion that what was being done was a mere cloak or sham").  It is also
true that the court in *Gilford Motor Co Ltd v Horne* [1933] Ch 935 might
have justified the injunction against the company on the ground that
Mr Horne's knowledge was to be imputed to the company so as to make the
latter's conduct unconscionable or tortious, thereby justifying the grant of
an equitable remedy against it.  But the case is authority for what it decided,
not for what it might have decided, and in my view the principle which the
F Court of Appeal applied was correct.  It does not follow that JM Horne &
Co Ltd was to be identified with Mr Horne for any other purpose.
Mr Horne's personal creditors would not, for example, have been entitled
simply by virtue of the facts found by Farwell J, to enforce their claims
against the assets of the company.
    30  *Jones v Lipman* [1962] 1 WLR 832 was a case of very much the same
G kind.  The facts were that Mr Lipman sold a property to the plaintiffs for
£5,250 and then, thinking better of the deal, sold it to a company called
Alamed Ltd for £3,000, in order to make it impossible for the plaintiffs to get
specific performance.  The judge, Russell J, found that company was wholly
owned and controlled by Mr Lipman, who had bought it off the shelf and
had procured the property to be conveyed to it "solely for the purpose of
defeating the plaintiffs' rights to specific performance".  About half of the
H purchase price payable by Alamed was funded by borrowing from a bank,
and the rest was left outstanding.  The judge decreed specific performance
against both Mr Lipman and Alamed Ltd.  As against Mr Lipman this was
done on the concealment principle.  Because Mr Lipman owned and
controlled Alamed Ltd, he was in a position specifically to perform his

obligation to the plaintiffs by exercising his powers over the company. This       A
did not involve piercing the corporate veil, but only identifying Mr Lipman
as the man in control of the company.   The company, said Russell J
portentously at p 836, was "a device and a sham, a mask which [Mr Lipman]
holds before his face in an attempt to avoid recognition by the eye of equity".
On the other hand, as against Alamed Ltd itself, the decision was justified on
the evasion principle, by reference to the Court of Appeal's decision in         B
*Gilford Motor Co Ltd v Horne*.   The judge must have thought that in the
circumstances the company should be treated as having the same obligation
to convey the property to the plaintiff as Mr Lipman had, even though it was
not party to the contract of sale. It should be noted that he decreed specific
performance against the company notwithstanding that as a result of the
transaction, the company's main creditor, namely the bank, was prejudiced          C
by its loss of what appears from the report to have been its sole asset apart
from a possible personal claim against Mr Lipman which he may or may not
have been in a position to meet. This may be thought hard on the bank, but
it is no harder than a finding that the company was not the beneficial owner
at all. The bank could have protected itself by taking a charge or registering
the contract of sale.
   31   In *Gencor ACP Ltd v Dalby* [2000] 2 BCLC 734, the plaintiff made a       D
large number of claims against a former director, Mr Dalby, for
misappropriating its funds. For present purposes the claim which matters is
a claim for an account of a secret profit which Mr Dalby procured to be paid
by a third party, Balfour Beatty, to a British Virgin Island company under his
control called Burnstead. Rimer J held, at para 26, that Mr Dalby was
accountable for the money received by Burnstead, on the ground that the            E
latter was "in substance little other than Mr Dalby's offshore bank account
held in a nominee name", and "simply . . . the alter ego through which
Mr Dalby enjoyed the profit which he earned in breach of his fiduciary duty
to ACP". Rimer J ordered an account against both Mr Dalby and Burnstead.
He considered that he was piercing the corporate veil.   But I do not think
that he was. His findings about Mr Dalby's relationship with the company
and his analysis of the legal consequences show that both Mr Dalby and            F
Burnstead were independently liable to account to ACP, even on the footing
that they were distinct legal persons. If, as the judge held, Burnstead was
Mr Dalby's nominee for the purpose of receiving and holding the secret
profit, it followed that Burnstead had no right to the money as against
Mr Dalby, who had in law received it through Burnstead and could properly
be required to account for it to ACP. Burnstead itself was liable to account to    G
ACP because, as the judge went on to point out, Mr Dalby's knowledge of
the prior equitable interest of ACP was to be imputed to it. As Rimer J
observed, "The introduction into the story of such a creature company is . . .
insufficient to prevent equity's eye from identifying it with Mr Dalby". This
is in reality the concealment principle.   The correct analysis of the situation
was that the court refused to be deterred by the legal personality of the
company from finding the true facts about its legal relationship with            H
Mr Dalby.   It held that the nature of their dealings gave rise to ordinary
equitable claims against both. The result would have been exactly the same
if Burnstead, instead of being a company, had been a natural person, say
Mr Dalby's uncle, about whose separate existence there could be no doubt.

© 2013 The Incorporated Council of Law Reporting for England and Wales

Case 3:18-cv-00731-X  Document 273-6  Filed 07/30/19  Page 154 of 421  PageID 1...

487
[2013] 2 AC                                    Prest v Prest (SC(E))
                                                    Lord Sumption JSC

A    32   The same confusion of concepts is, with respect, apparent in Sir
Andrew Morritt V-C's analysis in *Trustor AB v Smallbone (No 2)* [2001]
1 WLR 1177, which I have already considered.  The Vice-Chancellor's
statement of principle at para 23 that the court was entitled to pierce the
corporate veil if the company was used as a "device or facade to conceal the
true facts thereby avoiding or concealing any liability of those individual(s)"
B  elides the quite different concepts of concealment and avoidance.  As I read
his reasons for giving judgment against Mr Smallbone, at paras 24–25, he
did so on the concealment principle.  It had been found at the earlier stage of
the litigation that Introcom was "simply a vehicle Mr Smallbone used for
receiving money from Trustor", and that the company was a "device or
facade" for concealing that fact.  On that footing, the company received the
money on Mr Smallbone's behalf.  This conclusion did not involve piercing
C  the corporate veil, and did not depend on any finding of impropriety.  It was
simply an application of the principle summarised by the Sir Andrew
Morritt V-C at para 19 of his judgment, that receipt by a company will count
as receipt by the shareholder if the company received it as his agent or
nominee, but not if it received it in its own right.  To decide that question, it
was necessary to establish the facts which demonstrated the true legal
relationship between Mr Smallbone and Introcom.    Mr Smallbone's
D  ownership and control of Introcom was only one of those facts, not in itself
conclusive.  Other factors included the circumstances and the source of the
receipt, and the nature of the company's other transactions if any.

     33   In the *Trustor* case, as in the *Gencor* case, the analysis would have
been the same if Introcom had been a natural person instead of a company.
The evasion principle was not engaged, and indeed could not have been
E  engaged on the facts of either case.  This is because neither Mr Dalby nor
Mr Smallbone had used the company's separate legal personality to evade a
liability that they would otherwise have had.  They were liable to account
only if the true facts were that the company had received the money as their
agent or nominee.  That was proved in both cases.  If it had not been, there
would have been no receipt, knowing or otherwise, and therefore no claim
to be evaded.  The situation was not the same as it had been in *Gilford Motor
F  Co v Horne* [1933] Ch 935 and *Jones v Lipman* [1962] 1 WLR 832, for in
these cases the real actors, Mr Horne and Mr Lipman, had a liability which
arose independently of the involvement of the company.

     34   These considerations reflect the broader principle that the corporate
veil may be pierced only to prevent the abuse of corporate legal personality.
It may be an abuse of the separate legal personality of a company to use it to
G  evade the law or to frustrate its enforcement.  It is not an abuse to cause a
legal liability to be incurred by the company in the first place.  It is not an
abuse to rely on the fact (if it is a fact) that a liability is not the controller's
because it is the company's.  On the contrary, that is what incorporation is
all about.  Thus in a case like *VTB Capital v Nutritek* [2012] 2 Lloyd's Rep
313; [2013] 2 AC 337, where the argument was that the corporate veil
should be pierced so as to make the controllers of a company jointly and
H  severally liable on the company's contract, the fundamental objection to the
argument was that the principle was being invoked so as to create a new
liability that would not otherwise exist.  The objection to that argument is
obvious in the case of a consensual liability under a contract, where the
ostensible contracting parties never intended that any one else should be

party to it. But the objection would have been just as strong if the liability in    A
question had not been consensual.

35  I conclude that there is a limited principle of English law which
applies when a person is under an existing legal obligation or liability or
subject to an existing legal restriction which he deliberately evades or whose
enforcement he deliberately frustrates by interposing a company under his
control. The court may then pierce the corporate veil for the purpose, and
only for the purpose, of depriving the company or its controller of the          B
advantage that they would otherwise have obtained by the company's
separate legal personality. The principle is properly described as a limited
one, because in almost every case where the test is satisfied, the facts will in
practice disclose a legal relationship between the company and its controller
which will make it unnecessary to pierce the corporate veil. Like Munby J in
Ben Hashem v Al Shayif [2009] 1 FLR 115, I consider that if it is not necessary   C
to pierce the corporate veil, it is not appropriate to do so, because on that
footing there is no public policy imperative which justifies that course.
I therefore disagree with the Court of Appeal in VTB Capital v Nutritek
[2012] 2 Lloyd's Rep 313 who suggested otherwise at para 79. For all of these
reasons, the principle has been recognised far more often than it has been
applied. But the recognition of a small residual category of cases where the     D
abuse of the corporate veil to evade or frustrate the law can be addressed only
by disregarding the legal personality of the company is, I believe, consistent
with authority and with long-standing principles of legal policy.

36  In the present case, Moylan J held that he could not pierce the
corporate veil under the general law without some relevant impropriety, and
declined to find that there was any. In my view he was right about this. The     E
husband has acted improperly in many ways. In the first place, he has
misapplied the assets of his companies for his own benefit, but in doing that he
was neither concealing nor evading any legal obligation owed to his wife.
Nor, more generally, was he concealing or evading the law relating to the
distribution of assets of a marriage on its dissolution. It cannot follow that
the court should disregard the legal personality of the companies with the
same insouciance as he did. Secondly, the husband has made use of the            F
opacity of the Petrodel Group's corporate structure to deny being its owner.
But that, as the judge pointed out, at para 219, "is simply [the] husband giving
false evidence". It may engage what I have called the concealment principle,
but that simply means that the court must ascertain the truth that he has
concealed, as it has done. The problem in the present case is that the legal
interest in the properties is vested in the companies and not in the husband.
They were vested in the companies long before the marriage broke up.             G
Whatever the husband's reasons for organising things in that way, there is no
evidence that he was seeking to avoid any obligation which is relevant in these
proceedings. The judge found that his purpose was "wealth protection and
the avoidance of tax": para 218. It follows that the piercing of the corporate
veil cannot be justified in this case by reference to any general principle of law.

*Section 24(1)(a) of the Matrimonial Causes Act 1973*                            H

37  If there is no justification as a matter of general legal principle for
piercing the corporate veil, I find it impossible to say that a special and wider
principle applies in matrimonial proceedings by virtue of section 24(1)(a) of
the Matrimonial Causes Act 1973. The language of this provision is clear. It

© 2013 The Incorporated Council of Law Reporting for England and Wales

A   empowers the court to order one party to the marriage to transfer to the other "property to which the first-mentioned party is entitled, either in possession or reversion". An "entitlement" is a legal right in respect of the property in question. The words "in possession or reversion" show that the right in question is a proprietary right, legal or equitable. This section is invoking concepts with an established legal meaning and recognised legal incidents under the general law. Courts exercising family jurisdiction do not

B   occupy a desert island in which general legal concepts are suspended or mean something different. If a right of property exists, it exists in every division of the High Court and in every jurisdiction of the county courts. If it does not exist, it does not exist anywhere. It is right to add that even where courts exercising family jurisdiction have claimed a wider jurisdiction to pierce the corporate veil than would be recognised under the general law,

C   they have not usually suggested that this can be founded on section 24 of the Matrimonial Causes Act 1973. On the contrary, in *Nicholas v Nicholas* [1984] FLR 285, 288, Cumming-Bruce LJ said that it could not.

    38   This analysis is not affected by section 25(2)(a) of the Matrimonial Causes Act 1973. Section 25(2)(a) requires the court when exercising the powers under section 24, to have regard to the "income, earning capacity, property and other financial resources which each of the parties to the

D   marriage has or is likely to have in the foreseeable future". The breadth and inclusiveness of this definition of the relevant resources of the parties to the marriage means that the relevant spouse's ownership and control of a company and practical ability to extract money or money's worth from it are unquestionably relevant to the court's assessment of what his resources really are. That may affect the amount of any lump sum or periodical

E   payment orders, or the decision what transfers to order of other property which unquestionably belongs to the relevant spouse. But it does not follow from the fact that one spouse's worth may be boosted by his access to the company's assets that those assets are specifically transferrable to the other under section 24(1)(a).

    39   Moylan J considered that it was enough to justify his order to transfer the properties that the husband should have the practical ability to

F   procure their transfer, whether or not he was their beneficial owner. He found that this was established in the present case because of the power which the husband had over the companies by virtue of owning and controlling them. The judge did not make any finding about whether the properties of the corporate respondents were held in trust for the husband, except in the case of the matrimonial home in Warwick Avenue, which he

G   found to be beneficially his. What he held was that the assets of the companies were "effectively" the husband's property, because he treated them as such. He was "able to procure their disposal as he may direct, based again on his being the controller of the companies and the only beneficial owner": para 210. The judge accepted that as a matter of company law, the husband as shareholder had no more than a right of participation in accordance with the company's constitution, and that that did not confer

H   any right to any particular property of the company. "But, what if the shareholder is, in fact, able to procure the transfer to them of a particular item of company property, such as a matrimonial home," the judge asked, "as a result of their control and ownership of the company and the absence of any third party interests." The judge's answer to that question was that

the "purpose and intention" of the Matrimonial Causes Act 1973 was that     A
the companies' assets should be treated as part of the marital wealth.
"Effectively", he said, "the husband, in respect of the companies and their
assets, is in the same position he would be in if he was *the beneficiary* of a
bare trust or the companies were his nominees": para 225.

40  I do not accept this, any more than the Court of Appeal did. The
judge was entitled to take account of the husband's ownership and control of    B
the companies and his unrestricted access to the companies' assets in
assessing what his resources were for the purpose of section 25(2)(a). But he
was not entitled to order the companies' assets to be transferred to the wife in
satisfaction of the lump sum order simply by virtue of section 24(1)(a). I do
not doubt that the construction of section 24(1)(a) of the Act is informed by
its purpose and its social context, as well as by its language.  Nor do I doubt
that the object is to achieve a proper division of the assets of the marriage.    C
But it does not follow that the courts will stop at nothing in their pursuit of
that end, and there are a number of principled reasons for declining to give
the section the effect that the judge gave it.  In the first place, it is axiomatic
that general words in a statute are not to be read in a way which "would
overthrow fundamental principles, infringe rights, or depart from the general
system of law, without expressing its intention with irresistible clearness".
The words are those of Lord Atkin in *Nokes v Doncaster Amalgamated*           D
*Collieries Ltd* [1940] AC 1014, 1031–1032, but the principle is very familiar
and has been restated by the courts in many contexts and at every level.
There is nothing in the Matrimonial Causes Act 1973 and nothing in its
purpose or broader social context to indicate that the legislature intended to
authorise the transfer by one party to the marriage to the other of property
which was not his to transfer.  Secondly, a transfer of this kind will ordinarily   E
be unnecessary for the purpose of achieving a fair distribution of the assets of
the marriage.  Where assets belong to a company owned by one party to the
marriage, the proper claims of the other can ordinarily be satisfied by
directing the transfer of the shares.  It is true that this will not always be
possible, particularly in cases like this one where the shareholder and the
company are both resident abroad in places which may not give direct effect
to the orders of the English court.  In an age of internationally mobile spouses   F
and assets this is a more significant problem than it once was, but such cases
remain the exception rather than the rule.  Section 24 cannot be construed as
if it were directed to that problem.  Third, so far as a party to matrimonial
proceedings deliberately attempts to frustrate the exercise of the court's
ancillary powers by disposing of assets, section 37 provides for the setting
aside of those dispositions in certain circumstances.  Section 37 is a limited    G
provision which is very far from being a complete answer to the problem, but
it is as far as the legislature has been prepared to go.

41  The recognition of a jurisdiction such as the judge sought to exercise
in this case would cut across the statutory schemes of company and
insolvency law.      These include elaborate provisions regulating the
repayment of capital to shareholders and other forms of reduction of capital,
and for the recovery in an insolvency of improper dispositions of the         H
company's assets.  These schemes are essential for the protection of those
dealing with a company, particularly where it is a trading company like PRL
and Vermont.  The effect of the judge's order in this case was to make the
wife a secured creditor.  It is no answer to say, as occasionally has been said

© 2013 The Incorporated Council of Law Reporting for England and Wales

491

[2013] 2 AC                                      Prest v Prest (SC(E))
                                                  Lord Sumption JSC

A    in cases about ancillary financial relief, that the court will allow for known
     creditors.  The truth is that in the case of a trading company incurring and
     discharging large liabilities in the ordinary course of business, a court of
     family jurisdiction is not in a position to conduct the kind of notional
     liquidation attended by detailed internal investigation and wide publicity
     which would be necessary to establish what its liabilities are.  In the present
B    case, the difficulty is aggravated by the fact that the last financial statements,
     which are not obviously unreliable, are more than five years old.  To some
     extent that is the fault of the husband and his companies, but that is unlikely
     to be much comfort to unsatisfied creditors with no knowledge of the state of
     the shareholder's marriage or the proceedings in the Family Division.  It is
     clear from the judge's findings of fact that this particular husband made free
     with the company's assets as if they were his own.  That was within his
C    power, in the sense that there was no one to stop him.  But, as the judge
     observed, he never stopped to think whether he had any right to act in this
     way, and in law, he had none.  The sole shareholder or the whole body of
     shareholders may approve a foolish or negligent decision in the ordinary
     course of business, at least where the company is solvent: *Multinational Gas
     and Petrochemical Co v Multinational Gas and Petrochemical Services Ltd*
     [1983] Ch 258.  But not even they can validly consent to their own
D    appropriation of the company's assets for purposes which are not the
     company's: *Belmont Finance Corpn Ltd v Williams Furniture Ltd* [1979] Ch
     250, 261 (Buckley LJ), *Attorney General's Reference (No 2 of 1982)* [1984]
     QB 624, *R v Gomez* [1993] AC 442, 496–497 (Lord Browne-Wilkinson).
     Mr Prest is of course not the first person to ignore the separate personality of
     his company and pillage its assets, and he will certainly not be the last.  But
E    for the court to deploy its authority to authorise the appropriation of the
     company's assets to satisfy a personal liability of its shareholder to his wife,
     in circumstances where the company has not only not consented to that
     course but vigorously opposed it, would, as it seems to me, be an even more
     remarkable break with principle.
         42   It may be said, as the judge in effect did say, that the way in which the
     affairs of this company were conducted meant that the corporate veil had no
F    reality.  The problem about this is that if, as the judge thought, the property
     of a company is property to which its sole shareholder is "entitled, either in
     possession or reversion", then that will be so even in a case where the sole
     shareholder scrupulously respects the separate personality of the company
     and the requirements of the Companies Acts, and even in a case where none
     of the exceptional circumstances that may justify piercing the corporate veil
G    applies.  This is a proposition which can be justified only by asserting that
     the corporate veil does not matter where the husband is in sole control of the
     company.  But that is plainly not the law.

     *Beneficial ownership of the properties*

         43   It follows from the above analysis that the only basis on which the
     companies can be ordered to convey the seven disputed properties to the
H    wife is that they belong beneficially to the husband, by virtue of the
     particular circumstances in which the properties came to be vested in them.
     Only then will they constitute property to which the husband is "entitled,
     either in possession or reversion".  This is the issue which the judge felt that
     he did not need to decide.  But on the footing that he was wrong about the

© 2013 The Incorporated Council of Law Reporting for England and Wales

ambit of section 24(1)(a), it does need to be decided now. The issue requires *A*
an examination of evidence which is incomplete and in critical respects
obscure.    A good deal therefore depends on what presumptions may
properly be made against the husband given that the defective character of
the material is almost entirely due to his persistent obstruction and
mendacity.

44  In *Herrington v British Railways Board* [1972] AC 877, 930–931, *B*
Lord Diplock, dealing with the liability of a railway undertaking for injury
suffered by trespassers on the line, said:

"The appellants, who are a public corporation, elected to call no
witnesses, thus depriving the court of any positive evidence as to whether
the condition of the fence and the adjacent terrain had been noticed by any
particular servant of theirs or as to what he or any other of their servants *C*
either thought or did about it.   This is a legitimate tactical move under our
adversarial system of litigation.   But a defendant who adopts it cannot
complain if the court draws from the facts which have been disclosed all
reasonable inferences as to what are the facts which the defendant has
chosen to withhold.   A court may take judicial notice that railway lines are
regularly patrolled by linesmen and Bangers.   In the absence of evidence to
the contrary, it is entitled to infer that one or more of them in the course of *D*
several weeks noticed what was plain for all to see.   Anyone of common
sense would realise the danger that the state of the fence so close to the live
rail created for little children coming to the meadow to play.   As the
appellants elected to call none of the persons who patrolled the line there
is nothing to rebut the inference that they did not lack the common sense
to realise the danger.   A court is accordingly entitled to infer from the
inaction of the appellants that one or more of their employees decided to *E*
allow the risk to continue of some child crossing the boundary and being
injured or killed by the live rail rather than to incur the trivial trouble and
expense of repairing the gap in the fence."

The courts have tended to recoil from some of the fiercer parts of this
statement, which appear to convert open-ended speculation into findings of
fact.   There must be a reasonable basis for some hypothesis in the evidence or *F*
the inherent probabilities, before a court can draw useful inferences from a
party's failure to rebut it.   For my part I would adopt, with a modification
which I shall come to, the more balanced view expressed by Lord Lowry
with the support of the rest of the committee in *R v Inland Revenue Comrs,
Ex p TC Coombs & Co* [1991] 2 AC 283, 300:

"In our legal system generally, the silence of one party in face of the *G*
other party's evidence may convert that evidence into proof in relation to
matters which are, or are likely to be, within the knowledge of the silent
party and about which that party could be expected to give evidence.
Thus, depending on the circumstances, a prima facie case may become a
strong or even an overwhelming case.   But, if the silent party's failure to
give evidence (or to give the necessary evidence) can be credibly *H*
explained, even if not entirely justified, the effect of his silence in favour of
the other party, may be either reduced or nullified."

Cf *Wisniewski v Central Manchester Health Authority* [1998] PIQR P324,
P340.

© 2013 The Incorporated Council of Law Reporting for England and Wales

493
[2013] 2 AC                                               Prest v Prest (SC(E))
                                                          Lord Sumption JSC

A    45  The modification to which I have referred concerns the drawing of
adverse inferences in claims for ancillary financial relief in matrimonial
proceedings, which have some important distinctive features. There is a
public interest in the proper maintenance of the wife by her former husband,
especially (but not only) where the interests of the children are engaged. Partly
for that reason, the proceedings although in form adversarial have a
B    substantial inquisitorial element. The family finances will commonly have
been the responsibility of the husband, so that although technically a claimant,
the wife is in reality dependent on the disclosure and evidence of the husband
to ascertain the extent of her proper claim. The concept of the burden of proof,
which has always been one of the main factors inhibiting the drawing of
adverse inferences from the absence of evidence or disclosure, cannot be
C    applied in the same way to proceedings of this kind as it is in ordinary civil
litigation.     These considerations are not a licence to engage in pure
speculation. But judges exercising family jurisdiction are entitled to draw on
their experience and to take notice of the inherent probabilities when deciding
what an uncommunicative husband is likely to be concealing. I refer to the
husband because the husband is usually the economically dominant party, but
of course the same applies to the economically dominant spouse whoever it is.
D    46  The facts, so far as the judge was able to make findings about them,
are that the London properties were acquired as follows:

December 1995   Flat 4, 27, Abbey Road was transferred to PRL by the
                husband for £1. It had been bought by him in 1991,
                before the marriage and before the incorporation of PRL.
                There are two charges on the property, in favour of Ahli
E                United Bank and BNP Paribas, apparently to secure loans
                made to PRL. Neither the husband nor PRL has
                complied with orders to disclose the loan agreement and
                related documents.

                Flat 5, 27, Abbey Road was transferred to PRL on the
                same day, also for £1, by the husband's younger brother
F                Michel. It had been bought in March of that year for
                £48,650 in Michel's name. The wife's evidence was that,
                at the time, Michel was a student in London with no
                substantial assets of his own who was being supported by
                her husband. She said that her husband had led her to
                believe that he had paid for it.

G    March 1996  Flat 2, 143, Ashmore Road, is a leasehold property
                transferred to PRL for £1 by the wife. It had originally been
                bought by the husband in November 1992 in the name of
                someone called Jimmy Lawrence. There is no information
                about Jimmy Lawrence or the reasons for his involvement.
                According to the husband's evidence, the purchase money
                came from PRL, but since PRL was not incorporated until
H                six months after that, this cannot be correct. At some stage,
                it is unclear when or how, the lease was transferred into the
                name of the wife, and she must have signed the transfer
                when it was conveyed to PRL, but she had no recollection
                of being involved or of ever having owned it.

© 2013 The Incorporated Council of Law Reporting for England and Wales

| | | |
|---|---|---|
| 1998 | The wife transferred her interest in the freehold of 143, Ashmore Street to PRL. The freehold had originally been bought in 1996 in the name of the wife and one Esta Blechman, who was the leasehold owner of another flat in the building. There is no information about the consideration paid either in 1996 or in 1998. The husband's evidence was the funds to buy the wife's interest in 1996 came from PRL. | *A*<br><br><br><br><br><br>*B* |
| August 2000 | Flat 6, 62–64, Beethoven Street was transferred to PRL by the husband for £85,000. He had originally bought it in 1988 (before the marriage) for £70,500. The property is charged to secure the loans made by Ahli United Bank and BNP Paribas. | |
| May 2001 | The matrimonial home, 16, Warwick Avenue, was bought in the name of PRL for £1·4m and subsequently refurbished at a cost of about £1m. The judge rejected the husband's evidence that the purchase price and refurbishment costs were funded by PRL, because at that stage the company had not commenced trading operations. He found that they were funded from bonuses earned by the husband, presumably, at this stage, from his last employer before he set up on his own. The judge found that PRL had always held this property on trust for the husband and that conclusion is not challenged on this appeal. The property is charged to secure the loans made by Ahli United Bank and BNP Paribas. In accordance with the judge's order PRL has now conveyed it to the wife, but subject to the charges. | *C*<br><br><br><br><br><br>*D*<br><br><br><br><br>*E* |
| July 2001 | Flat 310, Pavilion Apartments was bought in the name of Vermont for £635,000. The judge found that the money was derived from PRL. | |
| January 2004 | 11 South Lodge, Circus Road, was bought in the name of Vermont for £700,000. The judge found that the purchase price was also derived from PRL. The property is charged to secure the loans made to Ahli United Bank and BNP Paribas. | *F* |

The judge recorded the wife's evidence that the husband had once advised her that if anything were to happen to him, she should sell all the properties, move to Nevis and use the proceeds of sale to meet her living expenses there.

47   The starting point is that in her points of claim the wife expressly alleged, among other things, that the husband used the corporate defendants to hold legal title to properties that belonged beneficially to him. All seven of the properties in dispute on this appeal were identified in her pleading as having been held for him in this way. In her section 25 statement, she gives evidence of her belief that he was their beneficial owner, supported in some cases by admittedly inconclusive reasons for that belief. Neither the husband nor the companies have complied with orders for the production of the completion statements on the purchase of the properties and evidence of the source of the money used to pay the purchase price. The companies were

495
[2013] 2 AC                                    Prest v Prest (SC(E))
                                                   Lord Sumption JSC

A   joined to these proceedings only because they were alleged to be trustees for
    the husband of the shareholdings and the properties and because orders were
    being sought for their transfer to the wife. Yet the companies failed to file a
    defence, or to comply with orders for disclosure. One of the few things that
    is clear from Mr Murphy's affidavit was that the companies' refusal to
    co-operate was deliberate, notwithstanding that they were conscious that
    the London properties (unlike the other assets) were within the jurisdiction
B   of the court, which was in a position directly to enforce any order that it
    might make in respect of them. The only explanation proffered for their
    contumacy was that the information was confidential to the companies'
    shareholders or "commercial partners". It is difficult to imagine that any
    commercial partners could enjoy rights of confidence over information
    concerning residential investment properties in London, and on the judge's
C   findings the only shareholder was the husband himself. The only directly
    relevant evidence given by Mr Murphy in his affidavit is a bald assertion that
    the companies are the sole beneficial owners of the shareholdings and the
    properties, but he declined to appear for cross-examination on it. The judge
    rejected his explanation that his health was not up to it. The judge's findings
    about the ownership and control of the companies mean that the companies'
    refusal to co-operate with these proceedings is a course ultimately adopted
D   on the direction of the husband. It is a fair inference from all these facts,
    taken cumulatively, that the main, if not the only, reason for the companies'
    failure to co-operate is to protect the London properties. That in turn
    suggests that proper disclosure of the facts would reveal them to have been
    held beneficially by the husband, as the wife has alleged.

    48   Turning to what is known about the acquisition of the disputed
E   properties, PRL acquired the legal interest in six London properties
    (including the matrimonial home) between 1995 and 2001. All of these
    properties were acquired by PRL before it began commercial operations and
    began to generate funds of its own. This was the main basis on which the
    judge found that the matrimonial home was held on trust for the husband
    from its acquisition in 2001. Since, as the judge found, no rent was paid to
    PRL for the family's occupation of the matrimonial home, this is a
F   particularly clear case of the husband using PRL as a vehicle to hold legal
    title on trust for himself.

    49   Of the other five properties owned by PRL, the first category
    comprises the three properties (Flats 4 and 5, 27, Abbey Road, and Flat 2,
    143, Ashmore Road) acquired by the company in December 1995 and
    March 1996, in each case for a nominal consideration of £1. Since no
G   explanation has been forthcoming for the gratuitous transfer of these
    properties to PRL, there is nothing to rebut the ordinary presumption of
    equity that PRL was not intended to acquire a beneficial interest in them.
    The only question is who did hold the beneficial interest. Flat 4, 27, Abbey
    Road was transferred by the husband, who had originally bought it in his
    own name in 1991, before PRL was incorporated. There is therefore an
    ordinary resulting trust back to the husband, which is held by him subject to
H   the charges in favour of Ahli United Bank and BNP Paribas. Flat 5,
    27, Abbey Road was transferred to PRL by the husband's younger brother
    Michel. He had acquired title shortly before at a time when he could not
    have paid for it himself. The wife's evidence was that the husband paid for
    it. Again, there is no evidence to rebut the ordinary inference that the

© 2013 The Incorporated Council of Law Reporting for England and Wales

husband was the beneficial owner of the property at the time of the transfer   *A*
to PRL, and that the company held it on a resulting trust for him. The
leasehold interest in Flat 2, 143, Ashmore Road was transferred to PRL by
the wife. The rather curious chain of title before that is summarised above.
The circumstances suggest that the husband must have provided the
purchase money and was the beneficial owner when the legal estate was held
by Jimmy Lawrence and also at the time of its transfer from him to the wife.
Either it then became the beneficial property of the wife (which is what   *B*
equity would initially presume); or else it remained in the beneficial
ownership of the husband, which is what I would on balance infer from the
wife's evidence that the transfer was procured by the husband without her
conscious involvement. In either case, the company as the legal owner can
be required to transfer this property to the wife. I conclude that the husband
was at all relevant times the beneficial owner of all three properties.   *C*

50 The freehold interest in 143, Ashmore Road and Flat 6,
62–64, Beethoven Street come into a different category. Flat 6,
62–64, Beethoven Street is known to have been acquired by PRL from the
husband in August 1998 for substantial consideration. Since PRL had not
begun operations at that stage, I infer that the purchase money must have
come from the husband. Virtually nothing is known about the terms of   *D*
acquisition of the wife's interest in the freehold of 143, Ashmore Road,
except that the husband says that the money came from PRL. I infer for the
same reason that PRL was funded by the husband. In itself, that is consistent
with PRL being the beneficial owner if, for example, the husband provided
the money to the company by way of loan or capital subscription. But there
is no evidence to that effect, and I would not be willing to presume it in the
absence of any. I conclude that the husband was the beneficial owner of   *E*
these two properties.

51 That leaves the two London properties (Flat 310, Pavilion
Apartments and 11 South Lodge, Circus Road) which were acquired in the
name of Vermont for substantial consideration, in July 2001 and January
2004 respectively. Vermont is an oil trading company which according to
the husband started lifting oil in 2010. In the company's financial
statements for 2008, the two properties are listed as its only assets and there   *F*
were no liabilities apart from the bank loans charged on Flat 310, Pavilion
Apartments. Flat 310, Pavilion Apartments was acquired with funds derived
from PRL at a time when the company had not begun trading operations.
I infer that the funds were provided to PRL by the husband. The position is
the same in the case of 11 South Lodge, except that this was bought with
money provided by PRL at a time when it was an active trading company   *G*
and could therefore have funded the purchase itself. However, it is right to
note (i) that the ownership of residential investment property in London
appears to have nothing to do with the oil trading business in which PRL
was then engaged, and (ii) that at this stage of the history a consistent
pattern can be discerned by which the husband causes properties to be acquired with
funds provided by himself by companies under his control, nominally
funded by PRL but in fact by himself. If 11 South Lodge was the exception,   *H*
then it was a break with past practice. In the absence of any explanation of
these transactions by the husband or his companies, I conclude that both of
the properties acquired in the name of Vermont were beneficially owned by
the husband.

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    52   Whether assets legally vested in a company are beneficially owned by
its controller is a highly fact-specific issue.  It is not possible to give general
guidance going beyond the ordinary principles and presumptions of equity,
especially those relating to gifts and resulting trusts.  But I venture to suggest,
however tentatively, that in the case of the matrimonial home, the facts are
quite likely to justify the inference that the property was held on trust for a
B    spouse who owned and controlled the company.  In many, perhaps most
cases, the occupation of the company's property as the matrimonial home of
its controller will not be easily justified in the company's interest, especially
if it is gratuitous.  The intention will normally be that the spouse in control
of the company intends to retain a degree of control over the matrimonial
home which is not consistent with the company's beneficial ownership.  Of
course, structures can be devised which give a different impression, and
C    some of them will be entirely genuine.  But where, say, the terms of
acquisition and occupation of the matrimonial home are arranged between
the husband in his personal capacity and the husband in his capacity as the
sole effective agent of the company (or someone else acting at his direction),
judges exercising family jurisdiction are entitled to be sceptical about
whether the terms of occupation are really what they are said to be, or are
D    simply a sham to conceal the reality of the husband's beneficial ownership.

*Nuptial settlement*

53   The wife sought special leave to argue that the companies
constituted a nuptial settlement within the meaning of section 24(1)(c) of the
Act.  The court ruled in the course of the hearing that leave would be refused.
E    The point was not argued below and does not appear to be seriously
arguable here.

*Terms for permission to appeal*

54   Before parting with this case, I will only record my surprise that the
companies were given permission to appeal on such undemanding terms.
F    They were required to make a payment on account of costs, but they were
not required to purge their contempt in failing to disclose documents or
information, nor were they put on terms as to dealings with the properties.
There may have been good reasons for not imposing such terms, but on the
face of it the possibility was not even considered.

G    *Conclusion*

55   I would accordingly declare that the seven disputed properties vested
in PRL and Vermont are held on trust for the husband, and I would restore
para 6 of the order of Moylan J so far as it required those companies to
transfer them to the wife.
56   Subject to any contrary submissions as to costs, I would also restore
para 14 of the judge's order so far as it dealt with the costs payable by PRL
H    and Vermont, and would order them to pay the costs of the appeal to the
Court of Appeal and to this court.  As at present advised, I would not require
Upstream, against whom no relief has ever been sought, to pay any costs, but
in the rather unusual circumstances of this case, I would not make any costs
order in their favour either.

© 2013 The Incorporated Council of Law Reporting for England and Wales

**LORD NEUBERGER OF ABBOTSBURY PSC**                                          *A*

57  I agree that Mrs Prest's appeal succeeds.  More particularly, I agree
that her appeal should be (i) allowed on the basis that the properties were
acquired and held by the respondent companies on trust for the husband, but
(ii) dismissed in so far as it relies on piercing the veil of incorporation, or on
section 24(1)(a) or (c) of the Matrimonial Causes Act 1973.

58  I agree with all that Lord Sumption JSC says on (i) the construction      *B*
of section 24(1)(a) of the 1973 Act, in paras 37–42, (ii) the trust issue, in his
masterly analysis of the facts and inferences to be drawn from them, in
paras 43–52, (iii) the point sought to be raised under section 24(1)(c), in
para 53, and (iv) his conclusions in paras 55 and 56, and there is nothing
I wish to add on those issues.

59  I wish, however, to add a little to what Lord Sumption JSC says on
the question of whether, and if so, in what circumstances, the court has      *C*
power to pierce the corporate veil in the absence of specific statutory
authority to do so.

60  I agree that there are two types of case where judges have described
their decisions as being based on piercing the veil, namely those concerned
with concealment and those concerned with evasion.  It seems to me that
Staughton LJ had a similar classification in mind in *Atlas Maritime Co SA v   D*
*Avalon Maritime Ltd (No 1)* [1991] 4 All ER 769, 779G (quoted in *VTB
Capital plc v Nutritek International Corpn* [2013] 2 AC 337, para 118),
where he sought to distinguish between "lifting" and "piercing" the
corporate veil.

61  I also agree that cases concerned with concealment do not involve
piercing the corporate veil at all.  They simply involve the application of
conventional legal principles to an arrangement which happens to include a   *E*
company being interposed to disguise the true nature of that arrangement.
Accordingly, if piercing the corporate veil has any role to play, it is in
connection with evasion.

62  Furthermore, I agree that, if the court has power to pierce the
corporate veil, Munby J was correct in *Ben Hashem v Al Shayif* [2009]
1 FLR 115 to suggest that it could only do so in favour of a party when all   *F*
other, more conventional, remedies have proved to be of no assistance (and
therefore I disagree with the Court of Appeal in *VTB Capital v Nutritek*
[2012] 2 Lloyd's Rep 313, para 79, who suggested otherwise).

63  However, as in the recent decision of this court in *VTB v Nutritek*, it
is not necessary to decide whether there is a principle that it is open to a
court, without statutory authority (or, possibly, in the absence of the
intention of contracting parties), to pierce the veil of incorporation ("the   *G*
doctrine"), and, if it is, the scope, or boundaries, of the doctrine.

64  However, I can see considerable force in the view that it is
appropriate for us to address those matters now.  This is the second case in
the space of a few months when the doctrine has been invoked before this
court on what are, on any view, inappropriate grounds.  It is also clear from
the cases and academic articles that the law relating to the doctrine is       *H*
unsatisfactory and confused.  Those cases and articles appear to me to
suggest that (i) there is not a single instance in this jurisdiction where the
doctrine has been invoked properly and successfully, (ii) there is doubt as to
whether the doctrine should exist, and (iii) it is impossible to discern any

© 2013 The Incorporated Council of Law Reporting for England and Wales

499
[2013] 2 AC                                          Prest v Prest (SC(E))
                                          Lord Neuberger of Abbotsbury PSC

A   coherent approach, applicable principles, or defined limitations to the
    doctrine.

    65   In these circumstances, there is obvious value in seeking to decide
    whether the doctrine exists, and if so, to identify some coherent, practical
    and principled basis for it, if we can do so in this case.

    66   Any discussion about the doctrine must begin with the decision in
B   *Salomon v A Salomon & Co Ltd* [1897] AC 22, in which a unanimous
    House of Lords reached a clear and principled decision, which has stood
    unimpeached for over a century. The effect of the decision is encapsulated at
    pp 30–31, where Lord Halsbury LC said that a "legally incorporated"
    company "must be treated like any other independent person with its rights
    and liabilities appropriate to itself . . . , whatever may have been the ideas or
    schemes of those who brought it into existence". Whether that is
C   characterised as a common law rule or a consequence of the companies
    legislation (or an amalgam of both), it is a very well established principle of
    long standing and high authority. Writing extrajudicially, Lord Templeman
    referred to the principle in the *Salomon* case as the "unyielding rock" on
    which company law is constructed, and on which "complicated arguments"
    might ultimately become "shipwrecked": *Forty Years On* (1990) 11 Co Law
    10.
D
    67   The decision in the *Salomon* case plainly represents a substantial
    obstacle in the way of an argument that the veil of incorporation can be
    pierced. Further, the importance of maintaining clarity and simplicity in this
    area of law means that, if the doctrine is to exist, the circumstances in which
    it can apply must be limited and as clear as possible.

    68   Since the decision in the *Salomon* case, there have been a number of
E   cases where the courts have considered "piercing" or "lifting" the corporate
    veil. The most important of those cases are discussed by Lord Sumption JSC
    in paras 20–35 above. That discussion demonstrates, as I see it, the
    following: (i) the decision of the International Court of Justice in *Case
    concerning Barcelona Traction, Light and Power Co Ltd (Belgium v Spain)
    (Second Phase)* [1970] ICJ Rep 3 recognises the doctrine; however, that is in
    the context of a civil law system which includes the principle of abuse of
F   rights, and begs the question whether, in a common law system, the doctrine
    should be applicable by the courts in the absence of specific legislative
    sanction; (ii) there are judgments in family cases based on obiter dicta in
    *Nicholas v Nicholas* [1984] FLR 285 (e g the judgments of Thorpe LJ in this
    case and of Mostyn J in *Kremen v Agrest (No 2)* [2011] 2 FLR 490), where
    the doctrine has been treated as valid and applicable; but the application of
G   the doctrine, even if it exists, in these cases is unsound, as Munby J
    effectively (in both senses of the word) indicated in *A v A* [2007] 2 FLR 467
    and *Ben Hashem v Al Shayif* [2009] 1 FLR 115; (iii) there are two cases
    outside the family law context which laid the ground for the establishment
    of the doctrine, namely the decisions of the Court of Appeal in *Gilford
    Motor Co Ltd v Horne* [1933] Ch 935, and of Russell J in *Jones v Lipman*
    [1962] 1 WLR 832; (iv) there are two subsequent decisions, one of the
H   House of Lords, *Woolfson v Strathclyde Regional Council* 1978 SC (HL) 90,
    the other of the Court of Appeal, *Adams v Cape Industries plc* [1990] Ch
    433, in which it was assumed or accepted that the doctrine existed, but they
    cannot amount to more than obiter observations, as in neither of them did
    the doctrine apply; (v) in subsequent cases in the Court of Appeal and High

© 2013 The Incorporated Council of Law Reporting for England and Wales

Court, it has been (unsurprisingly) assumed that the doctrine does apply, two        A
recent examples being the Court of Appeal decisions in *VTB v Nutritek*
[2012] 2 Lloyd's Rep 313 and *Alliance Bank JSC v Aquanta Corpn* [2013]
1 All ER (Comm) 819; (vi) however, in only two of those subsequent cases
(the first instance decisions in *Gencor ACP Ltd v Dalby* [2000] 2 BCLC 734
and *Trustor AB v Smallbone (No 2)* [2001] 1 WLR 1177) has the doctrine
actually been relied on, and they each could have been decided the same way        B
without recourse to the doctrine, and therefore involved illegitimate
applications of the doctrine on any view: see para 62 above.

69   On closer analysis of cases mentioned in subpara (iii) above, it does
not appear to me that the facts and outcomes in the *Gilford Motor* and *Jones*
cases provide much direct support for the doctrine. However, the decisions
can fairly be said to have rested on the doctrine if one takes the language of
the judgments at face value. Further, they indicate that, where a court is of       C
the view (albeit that I think that it was mistaken in those cases) that there is
no other method of achieving justice, the doctrine provides a valuable means
of doing so.

70   In the *Gilford Motor* case [1933] Ch 935, the legal argument at first
instance and on appeal seems to have concentrated on the validity of the
restrictive covenant: see pp 936–937, 950–952. It is also clear from the           D
judgment of Lord Hanworth MR, at p 961, that counsel for the company
conceded that if, contrary to his contention, the company was a "mere cloak
or sham" and that the business was actually being carried on by Horne in
breach of the restrictive covenant, then the company should also be
restrained. Further, in my view, as that passage indicates, the case was one
of concealment, and therefore did not really involve the doctrine at all.

71   In any event, it seems to me that the decision in the *Gilford Motor*       E
case that an injunction should be granted against the company was amply
justified on the basis that the company was Horne's agent for the purpose of
carrying on the business (just as his wife would have been, if he had used her
as the "cloak"); therefore, if an injunction was justified against Horne, it was
justified against the company. There is nothing in the judgments in the
*Gilford Motor* case to suggest that any member of the Court of Appeal           F
thought that he was making new law, let alone cutting into the well
established and simple principle laid down in *Salomon v A Salomon & Co
Ltd* [1897] AC 22.

72   It is by no means inconceivable that the three members of the Court
of Appeal in the *Gilford Motor* case were using the expression "cloak or
sham" to suggest, as a matter of legal analysis, a principal and agent
relationship. Lord Hanworth MR relied on a passage in a judgment of            G
Lindley LJ in *Smith v Hancock* [1894] 2 Ch 377, 385 (where the expression
"cloak or sham" appears to have originated), and in that passage, it seems to
me that the cloak or sham is treated as amounting to the business being
"carried on for the defendant". This view is supported by something Lord
Denning MR said in *Wallersteiner v Moir* [1974] 1 WLR 991, 1013, namely
it was "quite clear" that the companies in that case:                            H

"were just the puppets of Dr Wallersteiner . . . Transformed into legal
language, they were his agents to do as he commanded. He was the
principal behind them . . . At any rate, it was up to him to show that any
one else had a say in their affairs and he never did so: cf *Gilford*."

501

A    73   As for *Jones v Lipman* [1962] 1 WLR 832, I am unconvinced that it
was necessary for Russell J to invoke the doctrine in order to justify an
effective order for specific performance, as sought by the plaintiffs in that
case.  An order for specific performance would have required Lipman not
merely to convey the property in question to the plaintiffs, but to do
everything which was reasonably within his power to ensure that the
B    property was so conveyed: see e g *Wroth v Tyler* [1974] Ch 30, 47–51.
Lipman and an employee of his solicitors were the sole shareholders and
directors of the company, and its sole liability appears to have been a loan of
£1,500 to a bank (borrowed to meet half the £3,000 which it paid for the
property).  In those circumstances, it seems clear that Lipman could have
compelled the company to convey the property to the plaintiffs (on the basis
that he would have to account to the company for the purchase price, which
C    would have ensured that the bank was in no way prejudiced).  Indeed,
I consider that the company could fairly have been described and treated as
being Lipman's "creature", without in any way cutting into the principle
established in *Salomon v A Salomon & Co Ltd* [1897] AC 22.
     74   The history of the doctrine over 80 years of its putative life (taking
the *Gilford Motor* case [1933] Ch 935 as the starting point) is, therefore, at
least as I see it, a series of decisions, each of which can be put into one of
D    three categories, namely: (i) decisions in which it was assumed that the
doctrine existed, but it was rightly concluded that it did not apply on the
facts; (ii) decisions in which it was assumed that the doctrine existed, and it
was wrongly concluded that it applied on the facts; and (iii) decisions in
which it was assumed that the doctrine existed and it was applied to the
facts, but where the result could have been arrived at on some other,
E    conventional, legal basis, and therefore it was wrongly concluded that it
applied: see para 62 above.  (The doctrine has been invoked in cases not
considered by Lord Sumption JSC, but they take matters no further: see the
decisions mentioned and briefly considered in *VTB v Nutritek* [2013] 2 AC
337, paras 125, 127.)
     75   The lack of any coherent principle in the application of the doctrine
has been commented on judicially in many of the major common law
F    jurisdictions.  In this country, Clarke J in *The Tjaskemolen (now Visvliet)*
[1997] 2 Lloyd's Rep 465, 471 said that "The cases have not worked out
what is meant by 'piercing the corporate veil' ".  In Australia, in *Briggs v
James Hardie & Co Pty Ltd* (1989) 16 NSWLR 549, 567, Rogers AJA in the
New South Wales Court of Appeal observed that "there is no common,
unifying principle, which underlies the occasional decision of courts to
G    pierce the corporate veil", and that "there is no principled approach to be
derived from the authorities".  In *Kosmopoulos v Constitution Insurance Co*
[1987] 1 SCR 2, para 12, Wilson J in the Supreme Court of Canada said that
"The law on when a court may . . . '[lift] the corporate veil' . . . follows no
consistent principle".  The New Zealand Court of Appeal in *Attorney
General v Equiticorp Industries Group Ltd* [1996] 1 NZLR 528, 541, said
that " 'to lift the corporate veil' . . . is not a principle.  It describes the
H    process, but provides no guidance as to when it can be used".  In the South
African Supreme Court decision, *Cape Pacific Ltd v Lubner Controlling
Investments (Pty) Ltd* 1995 (4) SA 790, 802–803, Smalberger JA observed
that "The law is far from settled with regard to the circumstances in which it
would be permissible to pierce the corporate veil."

© 2013 The Incorporated Council of Law Reporting for England and Wales

502
Prest v Prest (SC(E))                                                    [2013] 2 AC
Lord Neuberger of Abbotsbury PSC

76   Judges in the United States have also been critical, even though the      A
doctrine has been invoked and developed to a much greater extent than in
this jurisdiction. In *Secon Service System Inc v St Joseph Bank and Trust Co*
(1988) 855 F 2d 406, 414, Judge Easterbrook in the US Court of Appeals
described the doctrine as "quite difficult to apply, because it avoids
formulating a real rule of decision. This keeps people in the dark about the
legal consequences of their acts". And in *Allied Capital Corpn v GC-Sun*      B
*Holdings LP* (2006) A 2d 1020, 1042–1043, the Delaware Court of
Chancery said that the doctrine has been "rightfully criticized for its
ambiguity and randomness", and that its application "yield[s] few
predictable results".

77   The doctrine has fared no better with academics. Easterbrook and
Fischel, "Limited Liability and the Corporation" (1985) 52 Univ Chicago
L Rev 89, pithily observe that " 'Piercing' seems to happen freakishly. Like   C
lightning, it is rare, severe, and unprincipled." The jurisprudence on the
doctrine has been described as "incoherent and unprincipled" by Farrar,
"Fraud, Fairness and Piercing the Corporate Veil" (1990) 16 Can Bus LJ 474,
478. C Mitchell, in "Lifting the Corporate Veil in the English Courts: An
Empirical Study" (1999) 3 Co Fin & Ins LR 15, 16 observes that "courts
have often used conclusory terms to express their decisions on the point,
which for all their vividness tell us nothing about the reasoning which       D
underpins these decisions". Neyers in "Canadian Corporate Law, Veil-
Piercing, and the Private Law Model Corporation" (2000) 50 Univ
Toronto LJ 173, 180, asks rhetorically: "How can the 'legal person doctrine'
that is so central to corporate law in one sentence be disregarded so casually
in the next?" D Michael in "To Know a Veil" (2000) 26 J Corp Law 41, 55,
refers to the doctrine as "a non-existent and false doctrine". Ramsay and     E
Noakes, "Piercing the Corporate Veil in Australia" (2001) 19 C & SLJ 250,
251, note that the doctrine "is far from clear in the case law". Oh, "Veil-
Piercing" (2010) 89 Texas Law Review 81, 84 says that "The inherent
imprecision in metaphors has resulted in a doctrinal mess".

78   This last view has some resonance with my remarks in *VTB v*
*Nutritek* [2013] 2 AC 337, para 124, about the use of pejorative expressions
to mask the absence of rational analysis. It also chimes with Cardozo J's     F
reference to the "mists of metaphor" in company law, which, "starting as
devices to liberate thought, . . . end often by enslaving it", in *Berkey v Third*
*Avenue Railway Co* (1926) 155 NE 58, 61.

79   In these circumstances, I was initially strongly attracted by the
argument that we should decide that a supposed doctrine, which is
controversial and uncertain, and which, on analysis, appears never to have    G
been invoked successfully and appropriately in its 80 years of supposed
existence, should be given its quietus. Such a decision would render the law
much clearer than it is now, and in a number of cases it would reduce
complications and costs: whenever the doctrine is really needed, it never
seems to apply.

80   However, I have reached the conclusion that it would be wrong to        H
discard a doctrine which, while it has been criticised by judges and
academics, has been generally assumed to exist in all common law
jurisdictions, and which represents a potentially valuable judicial tool to undo
wrongdoing in some cases, where no other principle is available.
Accordingly, provided that it is possible to discern or identify an approach to

A  piercing the corporate veil, which accords with normal legal principles, reflects previous judicial reasoning (so far as it can be discerned and reconciled), and represents a practical solution (which hopefully will avoid the problems summarised in para 75 above), I believe that it would be right to adopt it as a definition of the doctrine.

B  81  Having read what Lord Sumption JSC says in his judgment, especially in paras 17, 18, 27, 28, 34 and 35, I am persuaded by his formulation in para 35, namely that the doctrine should only be invoked where "a person is under an existing legal obligation or liability or subject to an existing legal restriction which he deliberately evades or whose enforcement he deliberately frustrates by interposing a company under his control".

C  82  It appears to me that such a clear and limited doctrine would not fall foul of at least most of the strictures which have been made of the doctrine. In particular, (i) it should be of value in the few cases where it can be properly invoked; (ii) it is, I believe and hope, sufficiently clear as to render it unlikely to be raised in inappropriate cases; and (iii) it does not cut across the rule in *Salomon v A Salomon & Co Ltd* [1897] AC 22 because it is consistent with conventional legal principles.

D  83  It is only right to acknowledge that this limited doctrine may not, on analysis, be limited to piercing the corporate veil. However, there are three points to be made about that formulation. In so far as it is based on "fraud unravels everything", as discussed by Lord Sumption JSC in para 18, the formulation simply involves the invocation of a well established principle, which exists independently of the doctrine. In any event, the formulation is not, on analysis, a statement about piercing the corporate veil at all. Thus, it

E  would presumably apply equally to a person who transfers assets to a spouse or civil partner, rather than to a company. Further, at least in some cases where it may be relied on, it could probably be analysed as being based on agency or trusteeship especially in the light of the words "under his control". However, if either or both those points were correct, it would not undermine Lord Sumption JSC's characterisation of the doctrine: it would, if anything,

F  serve to confirm the existence of the doctrine, albeit as an aspect of a more conventional principle. And if the formulation is intended to go wider than the application of "fraud unravels everything", it seems to me questionable whether it would be right for the court to take the course of arrogating to itself the right to step in and undo transactions, save where there is a well established and principled ground for doing so. Such a course is, I would have thought, at least normally, a matter for the legislature. Indeed

G  Parliament has decided to legislate to this effect in specified and limited circumstances with protection for third parties, in provisions such as section 37 of the Matrimonial Causes Act 1973 and section 423 of the Insolvency Act 1986.

**BARONESS HALE OF RICHMOND JSC** (with whom **LORD WILSON JSC** agreed)

H  84  I agree that this appeal should succeed, on the basis that the properties in question were held by the respondent companies on trust for the husband. As he is beneficially entitled to them, they fall within the scope of the court's power to make transfer of property orders under section 24(1)(a) of the Matrimonial Causes Act 1973. It also means that the

© 2013 The Incorporated Council of Law Reporting for England and Wales

court has power to order that the companies, as bare trustees, transfer these  *A*
properties to the wife.

85   The reasons for holding that these properties were beneficially
owned by the husband have been amply explained by Lord Sumption JSC.
I would only emphasise the special nature of proceedings for financial relief
and property adjustment under the Matrimonial Causes Act 1973, which he
explains in para 45.   There is a public interest in spouses making proper  *B*
provision for one another, both during and after their marriage, in particular
when there are children to be cared for and educated, but also for all the
other reasons explored in cases such as *McFarlane v McFarlane* [2006] 2 AC
618.   This means that the court's role is an inquisitorial one.   It also means
that the parties have a duty, not only to one another but also to the court, to
make full and frank disclosure of all the material facts which are relevant to
the exercise of the court's powers, including of course their resources: see  *C*
*Livesey (formerly Jenkins) v Jenkins* [1985] AC 424.   If they do not do so, the
court is entitled to draw such inferences as can properly be drawn from all
the available material, including what has been disclosed, judicial experience
of what is likely to be being concealed and the inherent probabilities, in
deciding what the facts are.

86   I also agree, for the reasons given by Lord Sumption JSC, that  *D*
section 24(1)(a) does not give the court power to order a spouse to transfer
property to which he is not in law entitled.   The words "entitled, either in
possession or reversion" refer to a right recognised by the law of property.
This is clear, not only from the statutory language, but also from the
statutory history.

87   The words "entitled to any property either in possession or reversion"
first appeared in the Matrimonial Causes Act 1857 (20 & 21 Vict c 85), which  *E*
introduced judicial divorce to the law of England and Wales.   Section 45 gave
the court power, when granting a decree of divorce on the ground of the wife's
adultery, to settle such property for the benefit of the husband and/or the
children of the marriage.   The same words were used in section 3 of the
Matrimonial Causes Act 1884 (47 & 48 Vict c 68), when extending the same
power to a husband's application for restitution of conjugal rights.   They
were carried through, respectively, into section 191(1)(2) of the Supreme  *F*
Court of Judicature (Consolidation) Act 1925, then into section 24(1)(2) of
the Matrimonial Causes Act 1950, then into sections 17(2) and 21(3) of the
Matrimonial Causes Act 1965.   The decree of restitution of conjugal rights
was abolished in the comprehensive package of matrimonial law reforms
which came into force on 1 January 1971.   That package included, in
section 4(a) of the Matrimonial Proceedings and Property Act 1970, the  *G*
power to order either spouse to transfer to the other "property to which the
first-mentioned party is entitled, either in possession or reversion".   This was
an expansion, for the benefit of either spouse and to outright transfer as well
as settlement, of the earlier power to settle the wife's property.   Section 4(a)
later became section 24(1)(a) of the Matrimonial Causes Act 1973.

88   There is nothing in the language, the history, or indeed the report of  *H*
the Law Commission which led to the 1970 Act, *Report on Financial
Provision in Matrimonial Proceedings* (1969) (Law Com No 25), to suggest
that those words should be read to include "property over which the first-
mentioned party has such control that he could cause himself to become
entitled, either in possession or reversion".   But of course such property can

© 2013 The Incorporated Council of Law Reporting for England and Wales

A be taken into account when computing that party's resources for the purpose of section 25(2) of the 1973 Act, which lays down a non-exhaustive list of factors to be taken into account by the court when deciding how to exercise its various powers to make financial and property adjustment orders.

89 Nor is there anything in the language of section 24(1)(a) to suggest that it was Parliament's intention to grant the divorce courts an express
B power to "pierce the corporate veil" in such a way as to treat property belonging to a limited company as property belonging to the spouse who owns and/or controls the company. The question nevertheless arises as to whether, in a case such as this, the courts have power to prevent the statutes under which limited liability companies may be established as separate legal persons, whether in this or some other jurisdiction, being used as an engine of fraud. I agree with Lord Sumption JSC that "piercing the corporate veil"
C is an example of that general principle, with which family lawyers are familiar from *R v Secretary of State for the Home Department, Ex p Puttick* [1981] QB 767.

90 Lord Sumption JSC refers to the process compendiously as "disregarding the separate personality of the company" at para 16. When considering its scope, however, it may be helpful to consider what the
D purpose of doing this is. In *Salomon v A Salomon & Co Ltd* [1897] AC 22 the purpose was to go behind the separate legal personality of the company in order to sue Aron Salomon personally for a liability that was legally that of the company which he had set up (with himself and members of his family as shareholders) to conduct his leather and boot-making business. This succeeded at first instance and in the Court of Appeal (sub nom *Broderip v Salomon*), Lindley LJ going so far as to say [1895] 2 Ch 323, 339 that
E "Mr Aron Salomon's scheme is a device to defraud creditors". They did not think that Parliament had legislated for the setting up of limited liability companies in order that sole traders should be able to conduct their businesses on limited liability terms. But the House of Lords disagreed: the company was a separate person from Mr Salomon and he could not be made liable for the company's debts. They did not think that there was any fraud
F involved simply in using a limited liability company as a vehicle for conducting a legitimate business. Thus was the legal structure of modern business born.

91 But there are a few cases where the courts have apparently been prepared to disregard the separate personality of a company in order to grant a remedy, not only against the company, but also against the individual
G who owns and/or controls it. Both *Gilford Motor Co Ltd v Horne* [1933] Ch 935 and *Jones v Lipman* [1962] 1 WLR 832 are examples of this. In both those cases, it so happened that the controller had a pre-existing legal obligation which he was attempting to evade by setting up a company, in the one case a contractual obligation not to compete with his former employers, in the other case a contractual obligation to sell some land to the claimant. In *In re Darby; Ex p Brougham* [1911] 1 KB 95, on the other hand, the
H liquidator of a creditor company was permitted to go behind the separate personality of a debtor company registered in Guernsey in order to obtain a remedy personally against its promoters who had fraudulently creamed off the profit from the sale by the Guernsey company to the creditor company of a worthless licence to run a slate quarry in Wales.

© 2013 The Incorporated Council of Law Reporting for England and Wales

92    I am not sure whether it is possible to classify all of the cases in which    *A*
the courts have been or should be prepared to disregard the separate legal
personality of a company neatly into cases of either concealment or evasion.
They may simply be examples of the principle that the individuals who
operate limited companies should not be allowed to take unconscionable
advantage of the people with whom they do business.  But what the cases do
have in common is that the separate legal personality is being disregarded in    *B*
order to obtain a remedy against someone other than the company in respect
of a liability which would otherwise be that of the company alone (if it
existed at all).  In the converse case, where it is sought to convert the
personal liability of the owner or controller into a liability of the company, it
is usually more appropriate to rely on the concepts of agency and of the
"directing mind".

93    What we have in this case is a desire to disregard the separate legal    *C*
personality of the companies in order to impose on the companies a liability
which can only be that of the husband personally.  This is not a liability
under the general law, for example for breach of contract.  It is a very specific
statutory power to order one spouse to transfer property to which he is
legally entitled to the other spouse.  The argument is that that is a power
which can, because the husband owns and controls these companies, be    *D*
exercised against the companies themselves.  I find it difficult to understand
how that can be done unless the company is a mere nominee holding the
property on trust for the husband, as we have found to be the case with the
properties in issue here.  I would be surprised if that were not often the case.

94    There is a statutory power to set aside certain dispositions made with
the intention of defeating a claim for financial provision or property
adjustment in section 37 of the Matrimonial Causes Act 1973.  It is not    *E*
suggested in this case that the expenditure involved in buying these
properties, all of which were bought long before the marriage broke down,
was made with that intention.  If it had been, there might have been an
argument that the exception for bona fide purchasers for value contained in
section 37(4) did not apply to a company where the controlling mind was
acting with that intention.  But that is not this case.

95    *Stone & Rolls Ltd v Moore Stephens* [2009] AC 1391 is an example    *F*
of going behind the separate legal personality of the company in order to
"get at" the person who owned and controlled it, not for the purpose of
suing him, but in order to attribute his knowledge to the company so that its
auditors could raise a defence of ex turpi causa to the company's allegation
that they had negligently failed to detect the fraudulent nature of its
business.    *G*

96    For all those reasons, in addition to those given by Lord
Sumption JSC, I would dismiss this appeal on all but the issue of whether
either party had a beneficial interest in the properties in question but allow it
on that ground.  I fervently hope that the wife will gain some benefit from the
outcome of all this litigation, although in the light of the mortgages which
apparently encumber the properties I am not optimistic that she will.    *H*

**LORD MANCE JSC**

97    I agree that the appeal should be allowed for the reasons given by
Lord Sumption JSC, supplemented in their essence by Lord Neuberger of
Abbotsbury PSC.

© 2013 The Incorporated Council of Law Reporting for England and Wales

507
[2013] 2 AC                                    Prest v Prest (SC(E))
                                                         Lord Mance JSC

A    98   I agree with Lord Sumption JSC's analysis of the domestic case law
to date in which the metaphor of "piercing the veil" has been deployed as
part of the reasoning for a decision representing an exception to the basic
principle in *Salomon v A Salomon & Co Ltd* [1897] AC 22.

     99   In the upshot, the only cases which Lord Sumption JSC identifies in
which a principle of "piercing the veil" can be said to have been critical to the
reasoning can be rationalised as falling within what he describes as the
B    evasion principle. In other cases, the corporate entity was simply being used
to conceal the real actor, or some other analysis or relationship existed (such
as principal and agent, nominee or trustee-beneficiary) to explain the
decision.

     100   It is however often dangerous to seek to foreclose all possible future
situations which may arise and I would not wish to do so. What can be said
C    with confidence is that the strength of the principle in *Salomon's* case and the
number of other tools which the law has available mean that, if there are
other situations in which piercing the veil may be relevant as a final fall-
back, they are likely to be novel and very rare.

     101   In this connection, I have in mind that, in giving the recent
Privy Council judgment in *La Générale des Carrières et des Mines Sarl v
Hemisphere Associates LLC (Jersey)* [2012] 2 Lloyd's Rep 443, para 77,
D    I said (in a context where Gécamines was a state corporation, not susceptible
of being wound up):

     "The alternative way in which Hemisphere puts its case is to submit
     that, if Gécamines is otherwise accepted as a separate juridical entity, the
     facts found justify the lifting of the corporate veil to enable Hemisphere to
     pursue Gécamines as well as the state. In the Board's view, this involves a
E    misapplication of any principles on which the corporate veil may be lifted
     under domestic and international law.    Assuming for the sake of
     argument that the 'unceremonious' subjecting of Gécamines to the
     controlling will of the state involved a breach by the state of its duty to
     respect Gécamines as a separate entity, that might conceivably justify an
     affected third party, possibly even an aggrieved general creditor of
F    Gécamines, in suggesting that the corporate veil should be lifted to make
     the state, which had deprived Gécamines of assets, liable for Gécamines'
     debts. The Board need express no further view on that possibility. It
     represents the inverse of the present situation. There is no basis for
     treating the state's taking or Gécamines' use of Gécamines' assets for state
     purposes, at which Hemisphere directs vigorous criticism, as a
     justification for imposing on Gécamines yet further and far larger burdens
G    in the form of responsibility for the whole of the debts of the Democratic
     Republic of the Congo.  In international law as in domestic law, lifting the
     corporate veil must be a tailored remedy, fitted to the circumstances
     giving rise [to] it."

     102   It may be that the possibility on which I touched in para 77 would
evaporate as a possible further exception to the principle in *Salomon's* case
H    [1897] AC 22.  It is certainly a different situation to those which Lord
Sumption JSC discusses.  But one would wish to hear further argument on
this or any other suggested exception, in a case where it was directly
relevant, before deciding this.  No one should, however, be encouraged to
think that any further exception, in addition to the evasion principle, will be

© 2013 The Incorporated Council of Law Reporting for England and Wales

easy to establish, if any exists at all.  The evident absence, under the close     *A*
scrutiny to which Lord Sumption JSC has subjected the case law, of
authority for any further exception speaks for itself.

### LORD CLARKE OF STONE-CUM-EBONY JSC

103   I agree with the other members of the court that the appeal should
be allowed for the reasons given by Lord Sumption JSC. I only wish to add a
word on piercing the corporate veil. I agree that there is such a doctrine and     *B*
that its limits are not clear. I also agree that Munby J was correct in *Ben
Hashem v Al Shayif* [2009] 1 FLR 115 to suggest that the court only has
power to pierce the corporate veil when all other more conventional
remedies have proved to be of no assistance. It is thus likely to be deployed
in a very rare case. Lord Sumption JSC may be right to say that it will only
be done in a case of evasion, as opposed to concealment, where it is not        *C*
necessary. However, this was not a distinction that was discussed in the
course of the argument and, to my mind, should not be definitively adopted
unless and until the court has heard detailed submissions on it. I agree with
Lord Mance JSC that it is often dangerous to seek to foreclose all possible
future situations which may arise and, like him, I would not wish to do so.
I expressed a similar view in *VTB Capital plc v Nutritek International Corpn*    *D*
[2013] 2 AC 337 and adhere to it now. However, I also agree with Lord
Mance JSC and others that the situations in which piercing the corporate veil
may be available as a fall-back are likely to be very rare and that no one
should be encouraged to think that any further exception, in addition to the
evasion principle, will be easy to establish. It will not.

### LORD WALKER OF GESTINGTHORPE

104   Lord Sumption JSC has comprehensively analysed the rather           *E*
confused evidence relating to beneficial ownership of the London properties.
His conclusion that they are all in the beneficial ownership of Mr Prest is in
my view irresistible, based as it is on positive evidence of the sources from
which the purchases were funded, as well as on inferences drawn from the
failure of Mr Murphy, a director of PRL, to attend court for cross-
examination. I also agree with all Lord Sumption JSC's observations as to     *F*
the construction and effect of the Matrimonial Causes Act 1973, to which
Baroness Hale of Richmond JSC has added a full account of its legislative
history. The appeal should be allowed in the terms proposed by Lord
Sumption JSC.

105   In these circumstances it is not strictly necessary for this court to
add further general comments on the vexed question of piercing the            *G*
corporate veil. But for my part I think it would be a lost opportunity—even
perhaps a minor dereliction of duty—if we were to abstain from any further
comment. I do therefore welcome the full discussion in the judgments of
Lord Neuberger of Abbotsbury PSC, Baroness Hale, Lord Mance and Lord
Sumption JJSC.

106   I am reluctant to add to the discussion but for my part I consider      *H*
that "piercing the corporate veil" is not a doctrine at all, in the sense of a
coherent principle or rule of law. It is simply a label—often, as Lord
Sumption JSC observes, used indiscriminately—to describe the disparate
occasions on which some rule of law produces apparent exceptions to the
principle of the separate juristic personality of a body corporate reaffirmed

A   by the House of Lords in *Salomon v A Salomon & Co Ltd* [1897] AC 22.
These may result from a statutory provision, or from joint liability in tort, or
from the law of unjust enrichment, or from principles of equity and the law
of trusts (but without any "false invocation of equity" in the phrase used by
C Mitchell in the article mentioned by Lord Neuberger PSC, at para 77).
They may result simply from the potency of an injunction or other court
order in binding third parties who are aware of its terms. If there is a small

B   residual category in which the metaphor operates independently no clear
example has yet been identified, but *Stone & Rolls Ltd v Moore Stephens*
[2009] AC 1391, mentioned in Baroness Hale JSC's judgment, is arguably an
example.

*Appeal allowed.*

C

JILL SUTHERLAND, Barrister

———————

D

END OF VOLUME AND OF APPEAL CASES SERIES FOR 2013

E

F

G

H

© 2013 The Incorporated Council of Law Reporting for England and Wales

# EXHIBIT D



**Michaelmas Term**
[2017] UKPC 32
**Privy Council Appeal No 0021 of 2016**

# JUDGMENT

# Dave Persad (Appellant) *v* Anirudh Singh (Respondent) (Trinidad and Tobago)

## From the Court of Appeal of Trinidad and Tobago

**before**

**Lord Neuberger**
**Lord Kerr**
**Lord Reed**
**Lord Hughes**
**Lord Hodge**

## JUDGMENT GIVEN ON

## 30 October 2017

**Heard on 21 June 2017**

*Appellant*
Hari N Ramkarran SC

(Instructed by Sheridans)

*Respondent*
Anand Beharrylal
Kwaku Awuku-Asabre
(Instructed by Yaseen
Ahmed)

**LORD NEUBERGER:**

1.      The primary issue on this appeal is whether, as the Court of Appeal held, Pemberton J was entitled to conclude that the appellant, Dave Persad, was liable to the claimant, Anirudh Singh, for sums due under a lease which Mr Singh had granted to a company called Chicken Hawaii (Trinidad) Ltd ("CHTL").

2.      The background facts are as follows. Mr Singh is the owner of premises consisting of two buildings at ¼ MM Manzanilla Road, Mayaro, Trinidad. In late autumn 2001, when he was about to leave for the United States, he told his brother that he was looking for a tenant for the premises. In early 2002, having been told of the premises by Mr Singh's brother, Mr Persad contacted Mr Singh by telephone to discuss the possibility of taking a lease of the premises. Discussions then took place between the two men and they reached an agreement whereby Mr Persad would take a five-year lease of the premises starting on 1 April 2002, and that Mr Persad, who is a qualified attorney, would draft the lease.

3.      Sometime in March 2002, Mr Singh allowed Mr Persad to occupy the premises in advance of the anticipated grant of the lease. Mr Persad then proceeded to carry out some works of decoration and improvement.

4.      Meanwhile, Mr Persad had prepared a form of lease of the premises, which it appears he negotiated with Mr Singh's brother. The draft lease reserved a rent of TT$4,000 per month for the first two years and TT$5,000 per month for the last three years, payable monthly in advance. It also contained covenants by the tenant, including a covenant to pay the rent, to keep the premises in repair, to deliver up the premises at the end of the term, and not to commit nuisance. In addition, the draft lease contained a proviso for forfeiture in the event of the lessee failing to pay the rent or breaching any covenant.

5.      In its opening passage, the draft lease stated that the lessor was Mr Singh, and, importantly for present purpose, that the lessee was CHTL, not Mr Persad. In about January 2002, a copy of the draft lease executed on behalf of the lessee was sent to Mr Singh in the USA for execution. In the normal way, at the end of the lease it was recorded as executed on behalf of the lessor and the lessee. The lessor was to be Mr Singh with a space left for him to sign. The lessee was recorded as CHTL, and it was stated that the seal of CHTL had been "affixed by Sandra Dass, Company Secretary". In the space left for execution by the lessee was Ms Dass's signature under which CHTL's company seal had been affixed. Mr Singh took some time to sign the lease

himself, but he did so on 1 May 2002, which is the date on which the lease is recorded as having been executed.

6.      There appears to have been no mention of CHTL during the negotiations, which had proceeded on the assumption that Mr Persad would be the lessee. It would seem that the first time that Mr Singh heard that CHTL was to be the lessee, indeed the first time he had heard of CHTL was when he received the draft lease executed on behalf of CHTL. However, although he took some time to sign the lease and to send it back, Mr Singh did not challenge or even question the inclusion of the company as the lessee. In his evidence, Mr Singh said that he noticed that CHTL had been identified as the lessee and that he appreciated that its status as a limited company meant that it was a separate legal entity from Mr Persad - unsurprisingly as Mr Singh is a qualified MBA.

7.      Following the grant of the lease, a restaurant was run from the majority of the premises, but a part was used by Mr Persad personally as an office, and another part may have been used for residential purposes. The rent was initially paid, albeit not always on time. The evidence established that, on at least two occasions, namely in July and August 2004, the rent was paid by cheques signed by Mr Persad drawn on CHTL's bank account. Meanwhile, after having received complaints of nuisance, Mr Singh visited the premises in early September 2003 when he observed some disrepair. In April 2004, a notice identifying the items of disrepair and requiring their remedy was served on CHTL by Mr Singh's attorney. (Such a notice is required by section 70(1) of the Conveyancing and Law of Property Act (Chapter 56, No 1) as a preliminary step before a forfeiture can be initiated.)

8.      On 28 September 2004, Mr Singh issued proceedings for possession, arrears of rent amounting to TT$16,000, damages for breach of covenant, and mesne profits. Both CHTL and Mr Persad were named as defendants. The statement of claim identified the lease as having been made between Mr Singh and CHTL, and referred to Mr Persad as a director of CHTL and "at all material times acting on his own or as the servant and/or agent of [CHTL]". It referred to "the defendants" as having been in breach of the repairing and nuisance covenants, and stated that CHTL was in arrear with the rent. The prayer for relief sought against both defendants possession, arrears of rent, mesne profits, and damages for breach of covenant, The statement of claim was later amended to record the fact that the premises were vacated during August 2005.

9.      CHTL and Mr Persad served a defence and counterclaim. In the defence, the grant of the lease to CHTL and the covenants pleaded in the claim were admitted. It was also admitted that Mr Persad is and was "a director and agent" of CHTL, but it was denied that he "at all material times acted on his own". The breaches of covenant alleged by Mr Singh were denied. In its counterclaim, CHTL sought damages from

Mr Singh for allegedly disrupting its restaurant business carried on at the premises, repayment of a loan, and reimbursement for the cost of some improvements to the premises.

10.    The claim and counterclaim came on for trial before Pemberton J, and after hearing witnesses (including Mr Singh and Mr Persad) and legal argument, she gave judgment on 15 July 2011. The effect of her decision was that judgment was given against both CHTL and Mr Persad for TT$21,569.69 damages for breach of covenant, for TT$17,833.33 in respect of arrears of rent, and for mesne profits at TT$5,000 per month for the period between 11 August 2004 and 18 August 2005, together with interest in each case at the rate of 10% per annum from 18 August 2005 to the date of judgment; and the defendants were ordered to pay TT$11,673 costs. On the counterclaim, she gave CHTL judgment for compensation for improvements, but dismissed the other claims.

11.    Mr Persad appealed to the Court of Appeal (Smith, Moosai and Mohammed JJA) against the finding that he was liable to Mr Singh for any of the sums awarded against him, but his appeal was dismissed in a short ex tempore judgment given on 21 May 2014.

12.    Mr Persad now appeals to the Board against the finding that he was liable to Mr Singh for any of the sums awarded against him and upheld by the Court of Appeal. There is no challenge as to the Judge's conclusions in relation to the liability of CHTL (or the amounts awarded against that company) or any of her findings of primary fact.

13.    In these circumstances, the only part of the Judge's full and careful judgment to which reference needs to be made is in paras 63 to 66 where she considered the issue which she described as "Who were the 'real' parties to the lease and from whom can [Mr Singh] recover?" She concluded that Mr Persad and CHTL "were one and the same and his personal liability for any defaults of [CHTL] is founded" and so Mr Singh "can recover from both defendants".

14.    She justified this conclusion primarily on the basis that CHTL was only formed after the discussions as to the level of rent, that Mr Persad did not draw the identity of the lessee or even the existence of CHTL to Mr Singh's attention when or before sending him the draft lease for execution, and that Mr Persad took possession personally from the start. She held that this entitled her to pierce the corporate veil and hold that CHTL's liabilities under the lease were also the liabilities of Mr Persad. She further justified this conclusion on the ground that Mr Persad "use[d] the company as an avoidance mechanism so as to displace the question of whether it is just to pierce the veil". She found that "there was a fluid exchange of persona between [Mr Persad] and [CHTL], which was not present at the negotiation and conclusion of the lease",

and that Mr Persad "concluded the negotiations in his personal capacity [and] then formed the company". She also made the point that he "produced no corporate documents", and that "it [was] evident that this was a one man show, in the hope that if all was not well he would not be held personally liable".

15.     In upholding this decision, the Court of Appeal explained that "[a] court may pierce the corporate veil when there is an abuse of the corporate personality to evade or frustrate the legal consequences of one's actions". They summarised the reasons for the Judge's conclusion that she could pierce the veil in this case as being "[Mr] Persad, concluded the negotiations in his personal capacity", "he then formed the company", "he produced no corporate documents and he could not recall when last annual returns had been filed", and "from his testimony, it is evident that was a one man show". As the Court of Appeal then said, "[b]ased on these facts, the trial judge inferred and concluded that this company was formed in the hope that if all was not well, [Mr Persad] would not be held personally liable". The Court of Appeal then concluded that there was "no reason" to interfere with Pemberton J's decision, based as it was on the evidence, and she had had the advantage of seeing the witnesses. They also added that Mr Singh, whose credibility was not challenged, had described CHTL as a "front" for Mr Persad.

16.     The issue therefore is whether, as the Court of Appeal found, the Judge had been entitled to hold that, notwithstanding that the lease had been granted to CHTL, Mr Persad could be liable for CHTL's failure to pay rent and breaches of covenant. The Judge considered that she was entitled to take this course because the facts justified piercing the veil of incorporation. The Board intends no disrespect, particularly in the context of what was otherwise a careful and painstaking judgment, in stating that the facts of this case do not begin to justify piercing the veil of incorporation.

17.     As the Court of Appeal rightly acknowledged, piercing the veil is only justified in very rare circumstances, a point which was implied in the UK Supreme Court's decision in *VTB Capital Plc v Nutritek International Corpn* [2013] 2 AC 337, paras 127, 128 and 147, and was expressed in terms in its subsequent decision in *Prest v Petrodel Resources Ltd* [2013] 2 AC 415, paras 35, 81-82, 99-100 and 106. As Lord Sumption explained in *Prest* at para 35, piercing the veil can be justified only where "a person is under an existing legal obligation or liability or subject to an existing legal restriction which he deliberately evades or whose enforcement he deliberately frustrates by interposing a company under his control". In this case, Mr Singh cannot get near establishing any evasive or frustrating action on the part of Mr Persad. Mr Persad was under no relevant "legal obligation or liability" to Mr Singh at the time that he proffered to Mr Singh the draft lease executed by CHTL or at the time that the lease became binding. He had been negotiating for the grant of a formal lease and therefore there could have been no question of his having been bound as lessee prior to the formal completion of the Lease. In any event, the parties always envisaged a

term of five years, and such a lease can only be granted by deed - see section 3 of the Landlord and Tenant Ordinance (Chapter 27, No 16).

18.     The fact that Mr Persad proffered a draft lease with CHTL as the lessee, after he and Mr Singh had been negotiating on the assumption that Mr Persad would be lessee, does not assist Mr Singh's case. Mr Persad did not give any sort of assurance that he personally would take the lease or that he would not put forward a limited company as the lessee, when the proposed lease came to be drawn up. Further, it is not as if Mr Persad misled Mr Singh in any way: Mr Singh appreciated that the lease which he was being asked to execute involved the grant to a lessee which was not Mr Persad but was CHTL. It is not even as if Mr Singh failed to appreciate that a limited company was a different legal person from its shareholder or director.

19.     The fact that Mr Persad had gone into occupation of the premises adds nothing. Given that he was a director and shareholder of CHTL (or, assuming CHTL was not formed until 2 April 2002 (see para 25 below), an intended director and shareholder), it was entirely consistent with CHTL taking the lease. But even ignoring that point, it is difficult to see how Mr Persad's early occupation of the premises could assist Mr Singh's argument that the corporate veil should be pierced: the occupation is consistent with the fact that the parties negotiated on the assumption that Mr Persad would be the lessee, but given that that common assumption does not assist Mr Singh's case, Mr Persad's occupation of the premises cannot do so either.

20.     In the light of the issues before the Judge, the fact that Mr Persad did not produce any documents relating to the creation or constitution of CHTL takes matters no further. The fact that CHTL was a "one man company" is also irrelevant: see *Salomon v A Salomon and Co Ltd* [1897] AC 22, which famously established the difference between a company and its shareholders. That case also exposes the fallacy of the notion that the court can pierce the veil where the purpose of an individual interposing a company into a transaction was to enable the individual who owned or controlled the company to avoid personal liability. One of the reasons that an individual, either on their own or together with others, will take advantage of limited liability is to avoid personal liability if things go wrong, as Lord Herschell said at pp 43 to 44. If such a factor justified piercing the veil of incorporation, it would make something of a mockery of limited liability both in principle and in practice.

21.     That passage in Lord Herschell's speech also disposes of the suggestion that CHTL was a "front" for Mr Persad. Such (mildly) pejorative terms can only too easily be invoked to justify a decision which is both unreasoned and wrong. Lord Herschell said, at p 42, that he was "at a loss to understand what is meant by saying that" the company was an "alias" for its shareholder and director, as the company "is not another name for the same person; the company is ex hypothesi a distinct legal persona".

Page 6

22.     In the course of his able and spirited submissions, Mr Beharrylal suggested that the facts of this case were comparable with those in *Gilford Motor Co Ltd v Horne* [1933] Ch 935 and *Jones v Lipman* [1962] 1 WLR 832, whose facts are respectively set out by Lord Sumption in *Prest* at paras 29 and 30. The Board considers that those cases are readily distinguishable from the present case. Not only did the person who set up the company in those cases have an existing relevant legal obligation which he was trying to avoid by entering into a transaction involving the company, but also the involvement of the company was unilaterally effected by the person concerned, without the knowledge, let alone the consent, of the other party. In this case, as already mentioned, Mr Persad had no relevant obligation to Mr Singh at the time of the transaction involving the company, namely the grant of the lease, and furthermore Mr Singh, the person seeking to pierce the corporate veil, was directly involved in, indeed was a necessary party to, that transaction.

23.     Mr Beharrylal also suggested that Mr Singh might be able to rely on other causes of action, including misrepresentation, mistake and rectification. Apart from the fact that they were not pleaded, none of these causes of action could arise on the facts of this case. However, there are two outstanding points which must be dealt with.

24.     The first is the possibility that Mr Persad could be liable for mesne profits (or, more accurately, damages for trespass) between the time that the lease came to an end and the time that the premises were vacated. This would be on the basis that, although he could not be liable for any breaches of the lessee's covenants, Mr Persad could be liable for trespass while he occupied the premises once the lease had expired. However, there is no evidence to suggest that he was there during the period in respect of which mesne profits were ordered. The most that can be said is that it does appear that for some period during the currency of the lease he was occupying an office in the premises, but that is as far as the evidence goes. Furthermore, there is no evidence as to the extent, let alone the value, of the office space, other than the indication that it is a pretty small room. Given the absence of any satisfactory factual or valuation evidence on the point, and fact that the possibility of Mr Persad being liable as a trespasser was not raised below, it is inappropriate to consider this issue further.

25.     The second issue arises from Mr Singh having discovered after the hearing that CHTL had not been incorporated until the day after the lease was formally granted. That is a point which was not raised at trial or in the Court of Appeal. However, Mr Singh wishes to raise the point before the Board, by way of an application to rely on new evidence, namely the certificate of incorporation of CHTL, which of course records the date of its formation. In pursuing this application, the Board considers that Mr Singh may well have faced real problems in justifying not having raised this point at the hearing. After all, the certificate was publicly available before the hearing. It is arguable that the certificate should have been produced on disclosure in the proceedings by CHTL, but it can be said with some force that it would not have gone to any issue on the pleadings, and anyway that any failure to disclose would have been

that of CHTL not of Mr Persad. However, it is unnecessary to reach a conclusion on those issues, because Mr Singh faces an insurmountable problem in connection with his application.

26.    The problem for Mr Singh is that, even if the Board was to admit this new evidence, it would get him nowhere. Section 20 of the Companies Act (Chapter 81:01 of the Laws of Trinidad and Tobago) deals with "pre-incorporation agreements" by companies. Section 20(1) provides that where an agreement is entered into by a person on behalf of a company which does not exist, that person is bound in place of the company. Section 20(2) states that, in such a case, the company concerned may nonetheless "adopt" a written agreement "by any action or conduct signifying the intention to be bound" within a reasonable time. Section 20(3) provides that, in such a case, the company can enforce and is bound by the agreement from its inception, and, subject to an irrelevant exception, the person otherwise bound by virtue of subsection (1) ceases to be so bound. The effect of this section therefore is that Mr Singh's argument based on the late incorporation of CHTL must fail because (i) the payment of rent by CHTL in 2004 (and possibly earlier) served to ratify its status as lessee under the lease by virtue of section 20(2), and (ii) even if that were not right, the effect of section 20(1) is that Ms Dass is liable as lessee under the lease, and the issue on this appeal is whether Mr Persad is liable.

27.    For these reasons, the Board allows Mr Persad's appeal, and refuses Mr Singh's application. The parties should try and agree costs and a form of order. As at present advised, and subject to argument to the contrary from Mr Singh, the Board would be inclined to order Mr Singh to pay Mr Persad his costs of the entire proceedings, but the first instance costs should be limited to the extra costs attributable to Mr Persad's involvement over and above the costs which were or would have been incurred in connection with the claim against CHTL.

28.    In fairness to Pemberton J it should be recorded that the decisions of the UK Supreme Court in *VTB* and *Prest* were given after she had given her judgment in this case. Both *VTB* and *Prest* had been decided by the time of the Court of Appeal hearing, but they were not referred to *Prest*, although they were referred to *VTB*.

# EXHIBIT E

## OUTER HOUSE, COURT OF SESSION

[2015] CSOH 141

A49/09

## OPINION OF LORD GLENNIE

In the cause

THE TARTAN ARMY LIMITED

<u>Pursuer</u>;

against

(FIRST) SETT GMBH, (SECOND) OLIVER REIFLER, (THIRD) IAIN EMERSON
and (FOURTH) ALBA FOOTBALL FANS LIMITED

<u>Defenders</u>:

Pursuer:  Mackenzie, solicitor advocate;  Shepherd and Wedderburn LLP

Third Defender:  Young;  Drummond Miller LLP

<u>22 October 2015</u>

**Introduction**

[1]      In this Intellectual Property action the pursuer advances claims against a
number of defenders in respect of alleged infringements of various "Tartan
Army" trademarks.

[2]      The "Tartan Army" name was first used in the late 1970s, when the
Scotland football team qualified for the 1978 World Cup in Argentina.  A novelty
song was released entitled "Ally's Tartan Army", "Ally" referring to the team

manager, Ally MacLeod, and "Tartan Army" referring to the fans who travelled to support the Scotland team.  Since then, the Tartan Army, i.e. the Scotland football supporters travelling under that name, have won various awards for their friendly nature, sporting spirit and charity work.  They have been awarded a FIFA fair play award by the Belgian Olympic Committee and were named as the best supporters during the 1992 European Championship and at the 1998 World Cup in France, where they were presented with a trophy for non-violence in sport and for their sense of fair play.

[3]      The pursuer avers that the "Tartan Army" mark has developed and is now well established as a symbolic renowned brand associated with sporting spirit, friendly travelling support and fair play.  It is the owner of a number of trademarks for the "Tartan Army" mark which have been filed and registered in the United Kingdom and a number of other countries, it having purchased some or all of those trademarks from one Ian Aide in about 2006.  The UK trademarks provide protection in classes which include textile goods, clothing, footwear, headgear and football strips, and the registered trademarks in other countries, including New Zealand, Australia and the USA, providing similar protection.  In addition, it has a Community trade mark which provides protection in, among other things, printed matter and magazines, travel agency services, travel and ticket reservation services and travel information services.  The pursuer avers that it offers a range of high quality goods and services to the public, including various sponsorship deals and travel promotions, through its online Tartan Army shop.  It has granted permission to associated companies to use the brand. Its website provides a place for all Scotland supporters worldwide to obtain exclusive Tartan Army merchandise, gifts and travel, to obtain the latest sports news, and to take part in discussions with other members of the Tartan Army.  It publishes a monthly newsletter.  It is also involved in charity work and has

organised tour co-ordinated events with a view to raising money for charities such as Children in Need.

[4]     The pursuer claims that from about 2007 or 2008 the defenders have infringed its rights in the "Tartan Army" trade mark by publishing a magazine known as "The Famous Tartan Army magazine" and offering other services using the "Tartan Army" mark.  It avers that the defenders' sign highlights the words "Tartan Army" in a manner which is identical to the way in which those words appear when it uses them, and that the defenders offer goods, travel services and promotions identical with its own offerings.  It seeks interdict preventing the defenders infringing its exclusive right to use the "Tartan Army" mark and from passing off, by use of the that mark, its own goods and services as if they were manufactured or sold by the pursuer; an order for destruction of all products and promotional and marketing material in the defenders' possession using the "Tartan Army " mark; and count and reckoning by the defenders for the profits made by them from September 2007 to date from the publication and sale of magazines and the supply of goods and services infringing the trademarks, and payment of the balance found due, which failing the sum of £300,000, plus interest.  It also seeks the expenses of the action.

[5]     The pursuer has settled its dispute with the first and second defenders.  I need say nothing more about them.  However, the action continues as against the third and fourth defenders, namely Iain Emerson ("Mr Emerson") and Alba Football Fans Limited ("Alba").

[6]     Alba was incorporated on 4 November 2008.  Mr Emerson is its sole director.

They both admit that Alba publishes the Famous Tartan Army Magazine ("the Magazine").  However, they raise a number of defences.  Among other things, they say that the Magazine was first published in 2005 by SFM Promotions Limited ("SFM"), a company incorporated by Mr Emerson and his then business

partner.  They say that Mr Aide, who then owned the UK trademarks, represented that he had no issue with SFM publishing the Magazine.  They aver that the pursuer was fully aware of this when it purchased the UK trademarks from Mr Aide and even placed advertisements in and contributed to the Magazine thereafter.  When SFM went into liquidation in late 2008 its intellectual property rights were assigned to Alba, which was incorporated by Mr Emerson for the specific purpose of acquiring and continuing SFM's business.  Since then both Mr Emerson and Alba have invested time and money in developing, producing, promoting and growing the Magazine.  Alba publishes the Magazine; Mr Emerson does not.  No trademark protecting rights in publication of a magazine existed when Alba commenced publication.  Only the Community trademark protected such rights and it did not exist at that time.  In any event, both Mr Emerson and Alba deny that the "Tartan army" mark is sufficiently distinctive to be capable of protection by a trademark.  Mr Emerson counterclaims for declarator that the trademarks are invalid and also for declarator that the Community trademark, which was only registered in 2009, is invalid in whole or in part, having been acquired in bad faith.

**Procedure**

[7]     The action began some considerable time ago but was sisted soon afterwards.  The fourth defender, Alba, was only brought into the action in February 2015.  Alba lodged defences in March 2015 in substantially the same terms as those already lodged by Mr Emerson.  Those defences raise potentially complex issues of fact and law.

[8]     It is the pursuer's case that Mr Emerson is personally liable for the actings of Alba in relation to the matters complained of in the action.  Mr Emerson, by contrast, says that every action of which the pursuer complains, to the extent that it was done at all, was done by Alba, not by him personally.  On 1 April 2015, at a

preliminary hearing in terms of Rule of Court 55.2E, the pursuer sought and obtained an order for further specification of the structure and management of Alba and, in effect, the relationship between Mr Emerson and Alba. The preliminary hearing was continued. Alba complied with the order by providing the information in a precognition by Mr Emerson.

[9]      At the resumed preliminary hearing in June 2015 the pursuer submitted that the question whether Mr Emerson was properly convened as a party to the action on the basis that he was personally liable for the actions of Alba was likely to have an important bearing on the future conduct of the case and ought to be decided first. The defenders, for their part, argued that the case should be appointed to a proof before answer restricted to the issues of validity raised in Mr Emerson's counterclaim. I preferred the suggestion made by the pursuer. It seemed to me that the issue of Mr Emerson's personal liability might well be critical to the future progress of the action and I appointed the case to debate on this question.

**The relevant averments**

[10]     The pursuer's case on the pleadings on this point is as follows. In Art.1 of Condescendence it avers that:

> "The third defender [Mr Emerson] is the sole director and shareholder of the fourth defender [Alba]. There has never been and there is unlikely to be any employees (*sic*) of the fourth defender. The day to day decisions are taken by the sole director, the third defender. The third defender is the controlling mind of the fourth defender. The third defender has directed or procured the commission of the wrongful act complained of. The third defender is convened as he is the personification of the company."

In Art.6 it makes the following further averments:

> "Alba Football Fans Limited was incorporated on 4 November 2008.  The third defender is the sole director of Alba Football Fans Limited.  Alba Football Fans Limited was set up by the third defender to provide a vehicle to continue to use the Tartan Army trademark.  The third defender directed and directs or procured and procures the actions of Alba Football Fans Limited.  Alba Football Fans Limited has not files accounts with Companies House and the Annual Return is overdue. …  The third defender directs and procures the actions of the fourth defender.  The fourth defender is called upon to explain the averment 'It [the magazine] is not, and has never been, produced and published by the third defender personally.'"

In Art.9 the pursuer avers that the Magazine is published by Alba, who own the copyright.  It also avers that "the defenders" (i.e. all four defenders) publish the Magazine and offer travel services and promotions.  Finally, in Art.10, the pursuer says this:

> "The third defender incorporated Alba Football Fans Limited in November 2009.  This company was incorporated to continue the publication of the Famous Tartan Army magazine.  The continued publication of this magazine is an infringement of the pursuer's trade marks.  The third defender avers … that he is the directing mind of Alba Football Fans Limited.  The third and fourth defenders are acting in concert in the publication of the Famous Tartan Army magazine and the offering of travel services using the trade mark TARTAN ARMY."

[11]     There is no specific plea-in-law for the pursuer focusing the issue of Mr Emerson's liability for the acts of Alba.  The pursuer's pleas-in-law simply assert

that "the defenders" have infringed the pursuer's trademarks and that "the actings of the defenders" amount to a passing off of their goods as those of the pursuers.

[12]    In his defences Mr Emerson admits much of the detail in the pursuer's pleadings.  But he does not accept the assertion (a) that he has directed or procured the actions of Alba, (b) that he is acting in concert with Alba or (c) that he is in any way liable personally for any of the acts about which the pursuer complains.  For the avoidance of doubt, the averments in Mr Emerson's defences relevant to the question of his personal liability for the acts of Alba can be summarised as follows:

1.  In January 2005 Mr Emerson and his then business partner incorporated SFM with the intention that it publish a Scottish football magazine (Ans.6);

(2)    In late 2008, after SFM had been put into liquidation, Mr Emerson arranged for Alba to be incorporated with the specific purpose of acquiring and continuing SFM's business of publishing the Magazine (Ans.6);

(3)    Mr Emerson is the sole director and shareholder of Alba (Ans.1);

(4)    Alba has never had any employees and is unlikely to have any employees in the future (Ans.1).

(5)    Day to day decisions within Alba are taken by Mr Emerson (Ans.1);

(6)    Mr Emerson relied on the continued acquiescence of the pursuer in the production of the Magazine (Ans.8 and 10);

(7)    Mr Emerson has injected significant amounts of his own time, money and effort into the business, and has given up other employment to work on the business and to develop its brand (Ans.10).

In addition, in his precognition lodged in process pursuant to the order of the court referred to in para [8] above, Mr Emerson confirmed that Alba had never had nor was likely to have any employees and that, as sole director, he took the day to day decisions himself.  He added this further information:

> (8)    So far as concerns the publication of the Magazine, there is a wide group of people who contribute by providing content and pictures, mostly free of charge.  Digital publication is produced by [a publishing company] who are paid for bringing content and graphics together.  In the past another company had carried out graphic design.

> (9)    Mr Emerson provides the editorial content.

> (10)   Alba has the final say on all content and layout of the Magazine.

Since Mr Emerson confirmed that he took the day to day decisions himself, I take this last point, (10), to mean that he himself has the final say on all content and layout of the Magazine.

[13]    I should add that the order made at the preliminary hearing on 1 April 2015 required Alba to produce all minutes of board meetings.  None were produced.  I take it from that, and indeed this was accepted on behalf of both defenders at the continued preliminary hearing, that no minutes were kept of any board meetings.  This no doubt reflects the reality of the fact that Mr Emerson was sole director and took all decisions himself.

[14]    For what it is worth, I should note that, in its defences, Alba repeats Mr Emerson's averments to the effect that he, Mr Emerson, relied on the continued acquiescence of the pursuer in the production of the Magazine.  It also repeats Mr Emerson's averments to the effect that he, Mr Emerson, has injected significant amounts of his own time, money and effort into the business and has given up other employment in order to work on the business and develop its brand.

**Submissions in outline**

[15]     Both parties helpfully submitted detailed Notes of Argument and a joint bundle of authorities.  They elaborated on certain aspects in oral argument.  I summarise the main points below.

[16]     A number of propositions were not contentious.  A company is a legal entity separate and distinct from its shareholders and directors.   A director or shareholder may be held personally liable for the acts of a company in the circumstances where his relationship with the company indicates that he is the true actor, the company simply being used to conceal that fact.  He may also be held liable in the limited circumstances where it is permissible for the court to pierce the corporate veil (in cases where a company is interposed to enable the individual to evade a pre-existing legal liability).  Otherwise the only basis for holding a director or shareholder liable is as joint tortfeasor (counsel used the English terminology and I shall do the same, at this stage at least).  Whether the individual is jointly liable with the company is to be determined by reference to the principles identified in a large number of well-known authorities. In summary they provide that liability attaches when the individual procures the commission of the wrongful act by another or assists in it pursuant to a common purpose or intention that the act, which turns out to be wrongful, takes place. The joint tortfeasor must have been so involved in the commission of the wrongful act as to make himself liable for it.  He must have made the infringing act his own.  A director or shareholder will not be jointly liable with the company if he does no more than a carry out his constitutional role in the governance of the company.  It is therefore necessary to examine with care what part the director played personally in regard to the act or acts complained of.

[17]     Mr Mackenzie, who appeared for the pursuer, pointed to the admission by Mr Emerson that the purpose of incorporating Alba was to continue the

publication of the Magazine, it having previously been published by SFM, another company incorporated by him.  He submitted that, despite the repeated denials in the defences that the company acted as a vehicle or agent for him in carrying out its activities, and despite the assertion in the defences that Alba is a separate corporate entity from Mr Emerson, it was apparent from the admitted facts that Mr Emerson fell squarely into the category of an individual who had made the infringing act his own.  In support of this he pointed to the fact that Alba was incorporated for the purpose of continuing the publication of the Magazine and was, in his words, "a vehicle for the third defender's activities"; that Mr Emerson was the only individual involved in Alba and therefore only his intentions could exist and be shared with Alba; that Mr Emerson took all day to day decisions and was responsible for all decision-making both commercial and otherwise; and that no minutes were kept of board meetings of Alba, that being consistent not only with Mr Emerson being the controlling mind of the company but also with an absence of any attempt to separate governance and operational responsibilities.  The conclusion, he submitted, was that Mr Emerson had not simply assisted or facilitated the infringement; rather he was the <u>only</u> actor.  The joint tortfeasor with him was the corporate shell which he had created.  The fact that Mr Emerson averred that, in setting up Alba he, Mr Emerson, had relied on the continued acquiescence of the pursuer in the production of the Magazine showed that it was in reality his business, not that of Alba.  On the basis of those submissions, Mr Mackenzie invited the court to exclude from probation the averments in Mr Emerson's defences which denied his personal liability for such acts of infringement as were proved to have occurred.

[18]     Mr Young, who appeared for Mr Emerson, drew my attention to what he described as the "confused, contradictory and vague" nature of the pursuer's case.  He pointed out that at times the pursuer made averments about "the defenders" generally, in a sense which must be taken to include not only Mr

Emerson and Alba but also the first and second defendants.  More importantly, he pointed out that the basis upon which it was alleged that Mr Emerson was responsible for the allegedly infringing acts was uncertain and changing.  At times it appeared to be averred that Alba was merely a "vehicle" of Mr Emerson, he being described as the directing mind and even the "personification" of the company; whereas at other times the pursuer's case appeared to be that Mr Emerson had directed or procured the infringing acts or had acted in concert with Alba in their commission.  The pursuer's Notes of Argument appeared to proceed on the latter basis, alleging that Mr Emerson was, in effect, liable as an accessory, but the pursuer's pleadings were far from clear.

[19]    Mr Emerson's position was quite simple and straightforward.  He did not personally undertake any of the infringing acts, whether with others or by himself.  To the extent that any of the alleged infringing acts were committed, they were committed by Alba.  Alba was legitimately set up in November 2008 to acquire the business of SFM.  It did not act as an agent or vehicle for Mr Emerson.  Mr Emerson had simply chosen to take advantage of limited liability and incorporation in order to pursue legitimate business activities.  Mr Emerson did not acquire liability either with or in place of Alba simply by virtue of his position as director and shareholder.  No other coherent basis for holding him liable had been advanced.

[20]    Mr Young submitted that the pursuer' s pleaded case made no averments sufficient to bring the case within these principles.  For example, there is no specification of how it is said, if it is said, that Mr Emerson is using Alba to conceal the fact that he himself is carrying out the alleged infringing activities on his own account and for his own profit.  The only case appeared to be that Mr Emerson is liable as an accessory to Alba's alleged infringement, but no relevant case had been pled against him on this basis either.  In particular the pursuer

makes no averments of any particular activities on the part of Mr Emerson that are said to show him acting out with his constitutional functions as a director.

[21]    Mr Young also made submissions about the relevancy of the claim against Mr Emerson for count and reckoning.  In view of the conclusion I have reached on the principal issue, I do not require to set out these submissions in detail.

[22]    The following authorities and other materials were referred to in the course of submissions, and in the Notes of Argument:

*Salomon* v *Salomon* [1897] AC 22

*Hook* v *McCallum* (1905) 7 F 528

*Ellerman Lines Limited* v *Clyde Navigation Trustees* 1911 SC 122

*HMA* v *Lappen* 1956 SLT 109

*Mentmore Manufacturing Co. Ltd* v *National Merchandising Manufacturing Co. Inc* (1978) 89 DLR (3d) 195

*Hoover Plc* v *George Hulme (Stockport) Ltd* [1982] 3 CMLR 186

*C Evans & Sons Ltd* v *Spritebrand Ltd* [1985] FSR 267

*CBS Songs Ltd* v *Amstrad Consumer Electronics Plc* [1988] AC 1013

*Unilever Plc* v *Gillette (UK) Ltd* [1989] RPC 583

*PLG Research Ltd* v *Ardon International Ltd* [1993] FSR 197

*Credit Lyonnais Bank Nederland NV* v *Exports Credits Guarantee Department* [2000] 1 AC 486

*MCA Records* v *Charly Records Ltd* [2002] FSR 26

*Sabaf* v *Meneghetti* [2003] RPC 264

*Halford* v *Seed Hawk Inc* [2006] FCA 275

*Boegli-Gravures SA* v *Darsail-ASP Ltd, Andrei Ivanovich Pyzhov* [2009] EWHC 2690 (Pat)

*L'Oreal SA* v *eBay International AG* [2009] RPC 693

*Keller & Ors* v *LED Technologies PTY Ltd* [2010] FCAFC 55

*Naxos Rights International Ltd* v *Project Management (Borders) Ltd* [2012] CSOH 158

*Cairn Energy Plc* v *Greenpeace Ltd* 2013 SLT 570

*Prest* v *Petrodel Resources Ltd* [2013] 2 AC 415

*Frank Houlgate Investment Company Limited* v *Biggart Baillie LLP* 2013 SLT 993 (OH), 2015 SC 187 (IH)

*Fish & Fish Ltd* v *Sea Shepherd UK* [2015] UKSC 10

*Jetivia SA* v *Bilta (UK) Limited* [2015] UKSC 23

Gordon, Criminal Law, 3rd ed., vol.1 at paras 5.19-5.36

Prof Reid *Accession to Delinquency: Frank Houlgate Investment Co. Ltd.* v *Biggart Baillie LLP* (2013) 17(3) Edin LR 388

I also considered the following authorities which were not cited but which seemed to me to be directly relevant on one of the issues in the case:

*Re Horsley and Weight* [1982] Ch 442

*Multinational Gas and Petrochemical Co* v *Multinational Gas and Petrochemical Services Ltd* [1983] Ch 258

*Stocznia Gdanska SA* v *Latvian Shipping Company* [2001] EWHC 500 (Comm) (Thomas J), [2002] 2 Lloyd's Rep 436 (CA)


**Discussion**

[23]     At the stage of debate the substantive issues have to be considered only on the basis of the parties' pleaded cases.  The correct approach is that laid down in *Jamieson* v *Jamieson* 1952 SC (HL) 44.  Mr Emerson's motion to dismiss the claim as against him proceeds on the basis that the pursuer's averments of fact are irrelevant to instruct a case that he is personally liable for the publication of the Magazine and other allegedly infringing acts ostensibly carried out by Alba. That is a plea to the relevancy of the pursuer's averments, a plea which will only succeed if it can be shown that the pursuer will inevitably fail to establish its case on this point even if it proves everything which in its pleadings it offers to prove.  Similarly, the pursuer's motion to exclude from probation Mr Emerson's

denial of personal liability for such acts of infringement as are proved to have occurred will only succeed if his personal liability will clearly be established even on the facts averred by him in his defences and despite his denials.

[24]     There is considerable force in Mr Young's complaint that the pursuer's pleadings in relation to the alleged personal liability of Mr Emerson for acts ostensibly carried out by the company, Alba, are confused, contradictory and vague.  But I do not think it would be right to decide against the pursuer on this basis.  Had I considered that there was any merit in the pursuer's case that Mr Emerson incurred some personal liability for the publication of the Magazine and other allegedly infringing acts, I would not have allowed the case to proceed unless and until the pursuer's pleadings had been put in better order.  I would have put the case out By Order to give the pursuer an opportunity to do this.  But I have come to the view that, even on the most charitable reading of the averments made by the pursuer, its case against Mr Emerson personally is bound to fail.  In those circumstances it seems to me to be in the interests of all parties that I should express my view on the substantive issue of personal liability, rather than dismiss the pursuer's case against Mr Emerson on a narrow pleading point.

[25]     The pursuer's case lays much stress on the closeness of the relationship between Mr Emerson and the company, Alba.  The facts averred on record relevant to that relationship have already been set out.  In short, on the liquidation of SFM (a company set up by Mr Emerson and a business partner for the purpose of publishing a Scottish football magazine), Mr Emerson arranged for Alba to be incorporated to take over and continue that business.  Mr Emerson is the sole shareholder and director of Alba.  It is under his control and his is the guiding and controlling mind.  No board meetings of Alba are ever held.  Alba has never filed any accounts with Companies House and its Annual Return is overdue.  Alba has never had any other employees and is unlikely ever to have

any in the future.  Mr Emerson has injected significant amounts of his own time, money and effort into the business, and has given up other employment to work on the business and to develop its brand. Not surprisingly, Mr Emerson makes all the day to day decisions at and concerning Alba and its business.  He makes all the editorial decisions.  It is on this basis that the pursuer seeks to hold Mr Emerson liable for the publication of the Magazine.

[26]     The starting point for any consideration of the pursuer's arguments is, as both parties accepted, that a company is a legal entity distinct from its shareholders, with rights and liabilities of its own distinct from those of its shareholders and property of is its own distinct from that of its shareholders. These principles apply as much to a company that is wholly owned and controlled by one man as to any other company: *Salomon* v *Salomon*, *Prest* v *Petrodel Resources Ltd* per Lord Sumption JSC at para 8.  It follows that there is nothing wrong in principle in a director or shareholder, even a sole director or shareholder, causing a liability to be incurred by a company, nor is it wrong in principle for such a director or shareholder, in defending a claim, to rely upon the fact that the liability is not his but that of the company he controls – that is what incorporation is all about (*ibid* at para 34).

[27]     All of that is trite, though it is often overlooked by those seeking to hold a person personally liable for the acts or omissions of a company owned and controlled by him or to hold a parent company liable for the acts or omissions of a wholly owned subsidiary.

[28]     There are a limited number of situations where the court may look behind, beyond or through the corporate structure to hold an individual liable for acts or omissions ostensibly done by a company under his control.  The same principles apply to parent companies and subsidiaries, but it is convenient to identify the principles by reference to the paradigm case of a company with a sole director and shareholder, the type of case with which I am here concerned.

Two of these situations are summarised in the judgment of Lord Sumption JSC in *Prest* at para 28, an analysis with which the other Justices agreed.  One such situation is where a director or shareholder is held personally liable for the acts of a company where it is clear from his relationship with the company that in a particular transaction he is the true actor, the company simply being used to conceal that fact.  This is sometimes referred to as the "concealment principle". The court can look behind the corporate structure to discover the true facts which the interposition of the company into the transaction is concealing.  This is not strictly a case of "piercing" the corporate veil – the "veil" is simply pushed to one side to reveal the true facts.  In such a case, on a proper analysis of the facts, the company may be held to be acting as agent, trustee or nominee of the individual concerned.  Another situation is where a person is under an existing legal obligation or liability or subject to an existing legal restriction which he deliberately evades or whose enforcement he deliberately frustrates by interposing a company under his control.  The court may then pierce the corporate veil for the purpose, and only for the purpose, of depriving the company or its controller of the advantage that they would otherwise have obtained by the company's separate legal personality: *Prest* per Lord Sumption JSC at paras 34-35 and per Lord Neuberger PSC at para 81.  This, which Lord Sumption JSC calls the "evasion principle", is correctly described as "piercing the corporate veil".  But the court will only allow the veil to be pierced to prevent abuse of the corporate legal personality and where no other remedy is available to prevent that abuse; it will not allow the veil to be pierced to unravel situations, short of abuse, where incorporation of a company with a separate legal personality is used to cause a legal liability to be incurred by the company rather than by the individual and is relied on to assert, if it be true, that the liability is that of the company rather than that of the individual: (*Prest*, per Lord Sumption JSC at para 34).

[29]     There may possibly be other situations where it is appropriate to pierce the corporate veil as a "final fall-back" (*Prest*, per Lord Mance JSC at para 100 and Lord Clarke JSC at para 103), but these are likely to be very rare.  It is unnecessary to explore those possibilities in the present case.

[30]     Although the authorities cited in this area are all English, it was not suggested that Scots law differed in any material respect.

[31]     It was not clear from his pleaded case whether the pursuer was contending that Mr Emerson should be held liable for Alba's alleged acts of infringement by any of these routes.  However, in his reply Mr Mackenzie confirmed that he was relying on both.  I accept that the relationship between Mr Emerson and Alba, as informed by the facts upon which Mr Mackenzie relies, is undoubtedly close.  Alba is, to all intents and purposes, "his" company.  He makes all the decisions.  He is its directing or controlling mind.  But that relationship is no different in principle from the relationship between individual and company to be found in every case of a one man company set up for the purpose of enabling the individual to carry on a business with the benefits of incorporation.  The fact that Alba can properly be described as a "one man company" does not of itself give any substance to the pursuer's case: *Salomon* per Lord Macnaghten at p.53, *Prest* per Lord Sumption JSC at para 8.  The averment that the company was incorporated for the purpose of taking over and continuing SFM's business (SFM having, on this hypothesis, been set up by Mr Emerson for the purpose of publishing a Scottish football magazine) likewise adds nothing of relevance.  Nor does the fact, if it be a fact, that, before setting up Alba, Mr Emerson relied on the continued acquiescence of the pursuer in the production of the Magazine add anything; a person setting up a company will inevitably bring into play all his experiences and expectations from before the company is incorporated.  Every company is set up for a purpose, usually informed by past experience, hopes and ambitions, but that purpose, short of

fraud or concealment or evasion of some legal liability, is irrelevant to the question of whether the rights and liabilities arising out of acts or omissions of the company are rights and liabilities belonging to the company or the individual: see *Salomon* per Lord Halsbury LC at p.30, *Prest* per Lord Sumption JSC at paras 8 and 34.  There is no averment in the pursuer's pleadings which might open up a case that Mr Emerson set up Alba for any improper purpose, whether to conceal his involvement in publishing the Magazine and offering the goods and services or to evade legal liabilities or obligations placed on him personally.  Nor, from what I heard in argument, do I consider it likely that any such averments could responsibly be made.  In those circumstances these principles do not provide any basis for holding Mr Emerson to be personally liable for Alba's acts.

[32]     The main thrust of the pursuer's case, however, as I understood it, was that Mr Emerson was jointly liable with Alba for the acts of infringement.  It made this submission in reliance on the following principles by which a person may incur personal liability jointly with another.

[33]     The first is where he has procured the commission by that other of the wrongful act by inducement, incitement or persuasion.  The leading authority establishing this basis of joint liability is *CBS Songs Ltd* v *Amstrad Consumer Electronics Plc* per Lord Templeman at p.1058D-F: see *Sea Shepherd UK* v *Fish & Fish Ltd*, per Lord Toulson JSC at para 19.  It is unnecessary to add further authority.

[34]     The second is where he has assisted the principal wrongdoer in the commission of the wrongful acts.  To be liable, he must have assisted in the commission of the wrongful act by another; and have done so pursuant to a common design with that person to do an act which is, or turns out to be tortious or delictual.  The principles are well-established.  They are identified (albeit in slightly differing language) and the leading authorities are discussed in *Sea*

*Shepherd*, per Lord Toulson JSC at paras 20-24, per Lord Sumption JSC at paras 37-44, and per Lord Neuberger PSC at paras 55-61.  In those judgments there is some discussion about the amount and importance of the assistance required of the person sought to be made jointly liable and the extent and focus of his required knowledge.  But I need not go into that in any detail for the purpose of dealing with the case before me.

[35]    There are no specific averments in the pursuer's pleadings instructing a relevant case under either of these principles.  There is no averment that Mr Emerson procured any of the acts of infringement carried out by Alba.  There is no averment that Mr Emerson specifically assisted in the commission of any particular act of infringement, or that he did so pursuant to any common design.  That is not a mere pleading point.  The pursuer's case rests entirely upon the fact that Alba is a one man company, owned and controlled by Mr Emerson.  The inference, presumably, is that Mr Emerson took the decisions to publish and offer goods and services.  That is obviously right, but to my mind it takes the pursuer nowhere.  On that basis every owner or director of a one man company would be liable without more for the acts of the company.  In every case the rule in *Salomon*, re-emphasised in *Prest*, could simply be side-stepped by an averment that the director was jointly liable with the company in the commission of the tort or delict.  The "corporate veil" would not only be pierced; it would be left in tatters.

[36]    In *MCA Records* v *Charly Records Ltd*, in a passage which has been often cited but never (so far as I know) disapproved, Chadwick LJ, with whom the other members of the court agreed, having analysed the previous cases in some detail, set out at paras 48-52 four propositions which he thought it could be said "with some confidence" were supported by the authorities.  The first two are relevant here:

"49      First, a director will not be treated as liable with the company as a joint tortfeasor if he does no more than carry out his constitutional role in the governance of the company - that is to say, by voting at board meetings.  That, I think, is what policy requires if a proper recognition is to be given to the identity of the company as a separate legal person.  Nor, as it seems to me, will it be right to hold a controlling shareholder liable as a joint tortfeasor if he does no more than exercise his power of control through the constitutional organs of the company - for example by voting at general meetings and by exercising the powers to appoint directors. ... I would hesitate to use the word 'never' in this field; but I would accept that, if all that a director is doing is carrying out the duties entrusted to him as such by the company under its constitution, the circumstances in which it would be right to hold him liable as a joint tortfeasor with the company would be rare indeed. ...

50.      Second, there is no reason why a person who happens to be a director or controlling shareholder of a company should not be liable with the company as a joint tortfeasor if he is not exercising control through the constitutional organs of the company and the circumstances are such that he would be so liable if he were not a director or controlling shareholder.  In other words, if, in relation to the wrongful acts which are the subject of complaint, the liability of the individual as a joint tortfeasor with the company arises from his participation or involvement in ways which go beyond the exercise of constitutional control, then there is no reason why the individual should escape liability because he could have procured those same acts through the exercise of constitutional control. ... "

[37]     In this case the pursuer makes no averment that Mr Emerson did anything other than in his capacity as sole shareholder and director.  This case falls squarely within the first of Chadwick LJ's propositions.

[38]     Mr Mackenzie laid some stress on the absence of board meetings and the company's failure to file accounts.  He submitted that this informality showed that Mr Emerson was not making decisions as part of his constitutional governance of the company; and that there was thus no bar to him being held liable for the actions of Alba in accordance with Chadwick LJ's second proposition.  To my mind, such a submission reflects a misunderstanding of what Chadwick LJ is saying.  In a one man company, with a sole director and shareholder, there will never be board meetings in any real sense.  There is only one director and no one to have a meeting with.  If minutes are produced they are intended simply to reflect decisions made by the director as and when he makes them.  The appearance of formality is a fiction.  The personal liability of a director or shareholder for decisions taken by him in the name of the company cannot depend on the existence or non-existence of a piece of paper or other trappings of formality.

[39]     This question has been discussed in a number of cases.  They are gathered together in the judgments of the Court of Appeal in *Re Horsley and Weight* [1982] Ch 442 and *Multinational Gas and Petrochemical Co* v *Multinational Gas and Petrochemical Services Ltd* [1983] Ch 258.  In both cases it was made clear, following earlier authority, that a company is bound in a matter which is *intra vires* the company by the unanimous agreement of its members, even where that agreement is given informally and without any meeting: *Re Horsley and Weight* per Buckley LJ at p.454, *Multinational Gas and Petrochemical Co* v *Multinational Gas and Petrochemical Services Ltd* per Dillon LJ at p.289.  In *Stocznia Gdanska SA* v *Latvian Shipping Company* [2001] EWHC 500 (Comm), Thomas J (as he then was) considered these cases in the context of claim that the defendants, Latvian

Shipping Company (Latco), were liable for inducing breach of contract by their wholly owned subsidiary, Latreefers.  The section of the judgment dealing with direct inducement is at paras 226-255.  At paras 239-244 Thomas J considered the argument that Latco could not be liable for inducing breach of contract if it, as shareholders, had made a decision that Latreefers would not perform the contracts.  He expressed the view that such an argument would have succeeded if that was indeed what Latco had done, notwithstanding that that decision was taken informally and outwith a properly constituted meeting (see paras 242-244).  But Latco had denied throughout the trial that they had made any such decision and therefore that line of defence failed.  That part of the judgment was not considered when the case went to the Court of Appeal (reported at [2002] 2 Lloyd's Rep 436).

[40]     That line of authority is wholly consistent with my decision that it does not matter that decisions taken by Mr Emerson were taken informally.  If those decisions were taken, however informally, in his capacity as sole shareholder and director of Alba, they provide no basis for a finding that he is jointly liable with Alba for any alleged infringement.

[41]     What Chadwick LJ was focusing on in his second proposition was not the situation outlined above where a decision made by a shareholder or director is made informally and outwith a duly constituted meeting.  He was identifying a different type of case altogether, where a director or shareholder, otherwise in his capacity as such, made decisions or took action which procured the commission of the wrongful act or assisted in its commission pursuant to a common design.  If, for example, it were proved that Mr Emerson in his own capacity owned and operated a printing press or distribution outlets and, through such operations of his own, procured or assisted in the alleged infringement by publishing and distributing the Magazine, then he could be held jointly liable with the company notwithstanding, as Chadwick LJ makes clear,

that he could have avoided liability had he organised matters in a different way and arranged for the company itself to print and distribute the Magazine.  An example of such a case is to be found in my decision in *Naxos Rights International Ltd* v *Project Management (Borders) Ltd*.  Another is the decision of Arnold J in *Boegli-Gravures SA* v *Darsail-ASP Ltd, Andrei Ivanovich Pyzhov* at paras 134-137. The mere absence of board meetings or other formalities of corporate governance does not bring the case into that category.  Nor is there any averment here suggesting that the case can be brought within that category.

[42]     It has been said repeatedly that the application of the principles affecting the issue of joint liability is highly fact sensitive: see e.g. *Sea Shepherd* per Lord Sumption JSC at para 37.  In a number of English cases the courts have refused to strike out a claim asserting joint liability in similar circumstances to those of the present case on the basis that it would only do so if it could be said that a director would <u>in no circumstances</u> be personally liable; otherwise the question of liability should be determined after the facts have been ascertained at trial: see e.g. *C Evans & Sons Ltd* v *Spritebrand Ltd* at p.329.  I accept that the court must be careful not to jump to conclusions on liability in cases such as this too readily, in the absence of evidence and findings of fact.  But in Scotland the ability to lead evidence at proof is constrained by the pleadings; and our procedure is designed to enable the relevancy of a case to be determined on the averments made in the pleadings at debate or at a discussion on the procedure roll.  If the pursuer makes no averments which would entitle him to seek to prove any facts which could, on any reasonable view, result in a finding of personal liability, then the case (on that basis at least) should be dismissed.

[43]     The discussion of joint liability thus far in this Opinion proceeds on the basis of English authority.  That is because that was the primary way in which the case was presented on both sides in argument.  I sought to apply these principles and some of the relevant English cases in *Naxos Rights* and *Cairn*

*Energy Plc* v *Greenpeace Ltd*. It was not suggested in those cases that Scots law was any different. Nor has that been suggested in the present case. However, in *Frank Houlgate Investment Company Limited* v *Biggart Baillie LLP* Lord Hodge, in the Outer House (reported at 2013 SLT 993), made a finding of accessory liability against the defender on the basis that a party could be held liable as an accessory to a wrongful act by another if he participated in or acceded to that wrongful act, without it having to be shown that he had the mental element necessary for commission of the delict itself. That, of course, is consistent with the English cases on knowing assistance, but it leaves open the question of whether it has to be proved that his assistance was in pursuance of some common purpose shared with that other person. The facts of that case were complicated and it is not necessary for present purposes to go into them. In refusing the reclaiming motion the Inner House expressed differing views on Lord Hodge's analysis. Lord Menzies accepted it (on the basis that it was supported by passages in Stair and Glegg, The Law of Reparation in Scotland, 4th ed), though only as an alternative ground of decision, but made it clear that he thought it established that the defender did share a common intention or common purpose with the wrongdoer: see paras 44-45. His primary ground of decision was that the defender, a solicitor, had failed to correct a continuing implied representation made to the other party to the transaction that he did not know that information he had previously given was untrue. Lord Malcolm rejected it: see paras [63]-[69]. He considered that some mental element was required, otherwise liability would be opened up in a wide variety of situations. He found accessory liability established on a different basis. Lord McEwan agreed in the disposal of the cross-appeal for either of those reasons: see para [91].

[44]    The decision in *Frank Houlgate* appears therefore to leave open the question whether, for the establishment of accessory or joint liability in Scotland, it has to be established that the person sought to be made liable as an accessory

did share a common intention or common purpose with the wrongdoer.  I do not

need to resolve this issue for the same reasons as set out above.  There are no

specific averments that Mr Emerson did anything specific to assist in or become

an accessory to any alleged infringing acts other than taking decisions as sole

shareholder and director, and the mere fact that he took such decisions as sole

shareholder and director does not make him personally liable for the acts of the

company.  In short, the absence of a requirement for a mental element is simply

irrelevant to the question of his liability on the case as advanced by the pursuer.


**Decision**

[45]    For the reasons set out above, I consider that the action in so far as

directed against the third defender is irrelevant and should be dismissed.

However, before pronouncing an interlocutor to that effect I shall put the case

out By Order so that further procedure can be discussed.  I shall reserve all

questions of expenses in the meantime.

# EXHIBIT F

## OUTER HOUSE, COURT OF SESSION

[2016] CSOH 78

P989/15

OPINION OF LORD BRODIE

in the petition

by

MICHAEL ASHLEY

<u>Petitioner</u>;

for Judicial Review of determinations of a Judicial Panel and Appellate Tribunal of
The Scottish Football Association Limited

**Petitioner:  Sandison QC; Brodies LLP**

**Respondents:  O'Neill QC; Burness Paull LLP**

<u>10 June 2016</u>

**Parties and their relationship**

[1]      The petitioner is a businessman.  He is concerned in the business of football.  He
controls MASH Holdings Limited ("MASH").  MASH has interests in Newcastle United
Limited ("NUL").  NUL operates a professional football club.

[2]      The respondent is the Scottish Football Association Limited.  The respondent
acts as the governing body of Scottish football and exists to promote, foster and develop
the game of football at all levels in Scotland.  It is constituted by Articles of Association
("the Articles") which impose certain obligations on those subject to its jurisdiction.

The Articles make provision for a Judicial Panel and Judicial Panel Protocol ("the Protocol").  In terms of Article 65 of the Articles alleged breaches of the Articles which fall under the jurisdiction of the Judicial Panel shall be dealt with and be construed in terms of the Protocol.  The Protocol includes at annex A the respondent's Disciplinary Rules, certain of which apply to persons and bodies under the jurisdiction of the respondent.  The Protocol makes provision for the enforcement of the Articles and the Disciplinary Rules and the determination of matters arising from alleged breaches.  That provision includes the appointment of a Compliance Officer who has general responsibility for observance of the Disciplinary Rules and the pursuit of proceedings before the tribunals appointed under the Protocol and the power to represent the respondent in such proceedings.  The tribunals which may be appointed from the Judicial Panel established under the Protocol include a Disciplinary Tribunal for consideration and determination of cases at first instance and an Appellate Tribunal of consideration and determination of appeals.

[3]      On 6 August 2012 the pursuer gave a letter of agreement to the respondent.  In that letter he confirmed:

>  "I am (i) a shareholder; (ii) a director; (iii) involved in the management or administration of; and/or (iv) have the power to influence the management or administration of:

>>  (i)      Newcastle United Limited (Company Number 02529667) whose registered office is at St James' Park, Newcastle-upon-Tyne, NE1 4ST ("NUL"); and

>>  (ii)     SDI Retail Services Limited (Company Number 08143303) whose registered office is at Unit A Brook Park East Road, Shirebrook, Mansfield, NG20 8RY ("SDI"), or of their respective parent companies"

Further, the petitioner stated that he intended to become a shareholder of The Rangers Football Club Limited ("RFCL") "which owns and operates the associated football club known as Rangers FC."  The petitioner then went on to acknowledge the Articles and to agree to abide by the Articles for so long as he was a shareholder of RFCL and a shareholder, director, involved in the management or administration of and/or having the power to influence the management or administration of NUL.  The letter then stated that for the avoidance of doubt it was acknowledged by the respondent that ownership by the petitioner of less than 10% of the issued share capital in RFCL should not constitute a breach of the Articles.

**Article 13 and Disciplinary Rule 19**

[4]      Among the Articles by which the petitioner agreed to abide in terms of the letter of 6 August 2012 was Article 13 and among the Disciplinary Rules which applied to the petitioner was Rule 19.  Rule 19 is essentially in the same terms as Article 13.1.  As far as is material Article 13.1 provides:

"Except with the prior written consent of the Board:-

(a)   no club or nominee of a club;  and

(b)   no person, whether absolutely or as a trustee, either alone or in conjunction with one or more associates or solely through an associate or associates (even where such person has no formal interest), who:-

(i)   is a member of a club; or

(ii)   is involved in any capacity whatsoever in the management or administration of a club; or

(iii)   has any power whatsoever to influence the management or administration of a club,

may at the same time either directly or indirectly:-

(a)   be a member of another club; or

(b)   be involved in any capacity whatsoever in the management or administration of another club; or

(c)   have any power whatsoever to influence the management or administration of another club."

RFCL is a full member of the respondent and "a club" within the meaning of Article 13.1, as is NUL.

**The Credit Facility Agreement**

[5]     RFCL was formed (as Sevco Scotland Limited) in 2012.  The petitioner became a shareholder in RFCL in October 2012.  On 18 December 2012 the shareholders of RFCL exchanged their shares for shares in Rangers International Football Club Plc ("RIFC").  As a result of this exchange RIFC became the sole shareholder in RFCL.  On 1 October 2014 the pursuer transferred his shares in RIFC to MASH.

[6]     On 26 October 2014 MASH (as "Lender") and RFCL (as "Borrower") entered into a Credit Facility Agreement whereby MASH undertook to make a loan of £2 million available to RFCL subject to the condition, among others, that "the Lender has appointed the Lender's Director in accordance with clause 13".  Clause 13 of the Credit Facility Agreement provided:

"Immediately prior to first drawdown under the Facility, and at all times whilst any amount is outstanding under any Finance Document, the Lender shall have the right to appoint up to 2 directors (the "Lender's Director") on the board of directors of the Borrower.  The Lender shall be entitled to remove and replace any Lender Director from time to time."

[7]     On 5 November 2014 Mr Derek Llambias was appointed as a director of RFCL. On 2 November 2014 he had been appointed a director of RIFC.

**The disciplinary proceedings against the petitioner**

[8]      On 15 December 2014 the petitioner was served with a complaint under the Protocol alleging breaches of Disciplinary Rules 19 and 77.  The libel of the complaint was in the following terms:

> "…in that already having an interest in Newcastle United FC as a controlling party of MASH Holdings Limited, you did on 26 October 2014 enter into a Credit Facility Agreement with Rangers Football Club Limited, and thereafter MASH Holdings Limited did nominate Derek David Llambias to Rangers FC for appointment as a Director, resulting in his subsequent appointment as a Director of both Rangers International Football Club Plc and Rangers Football Club Limited upon 2 and 5 November 2014 respectively.  These acts being breaches of article 13 of the Articles of Association of the Scottish FA…"

In addition, the alleged breach of Rule 77 stated a breach of the undertaking provided by the petitioner to the respondent on 6 August 2012.

[9]      The matter proceeded to a full hearing before a Disciplinary Tribunal appointed from the Judicial Panel on 2 March 2015.  The respondent was represented by its Compliance Officer.  The petitioner was represented by a solicitor.  By prior agreement, both parties lodged detailed written submissions.  Neither party led oral evidence.  Written statements from a number of witnesses were produced.

[10]     Following the hearing the Disciplinary Tribunal determined, on 17 March 2015, *inter alia* that the petitioner was in breach of Article 13 of the Articles and Disciplinary Rule 19 and imposed a fine of £7,500.  It did not find the petitioner in breach of Disciplinary Rule 77.  The Disciplinary Tribunal's factual findings included the following:

> "The Panel was satisfied, on a balance of probabilities, that the factual basis of the charges in the Notice of Complaint had been proved.  Mr Ashley's

controlling interest in Newcastle United FC was not disputed.  While the Credit
Facility had been agreed with the Club by MASH Holdings Limited, rather than
with Mr Ashley personally, it was effectively Mr Ashley who provided the
Credit Facility.  While only the nomination of Mr Llambias by MASH Holdings
Limited to the PLC had been confirmed in statements and documents, the Panel,
in the absence of any other clear evidence, was satisfied that the inference could
be drawn in the whole circumstances, that the arrangements put in place
between Rangers FC and MASH Holdings Limited effectively led to Mr Ashley's
nomination of choice being nominated for and appointed to both boards.

Turning to the question of whether a breach of Rule 19 was incurred, the Panel
took the view that, even applying a purposive approach, the intention of the Rule
and of Article 13 was to prohibit Dual Interests, except with the prior consent of
the SFA.  The question of whether any power or influence was actually exercised,
or whether it was for the benefit rather than the detriment of the clubs involved,
was not relevant.  The Panel was satisfied, as previously stated, that the
arrangements gave Mr Ashley a choice over who became a director of Rangers
FC and, accordingly, a degree of power to influence the management or
administration of that club.

On a balance of probabilities, the Panel was satisfied that the first charge on the
Notice of Complaint had been proved."

The Disciplinary Tribunal went on to find that a second charge, a breach of Rule 77, had
not been proved.

[11]      Paragraph 14.2 of the Protocol provides that a party in breach has the right to
appeal under the Protocol to the Appellate Tribunal against a determination of a
Disciplinary Tribunal in respect of first instance proceedings.  Paragraph 14.8 provides

in respect of any such appeal that findings on fact at first instance should be final and an appeal shall only be permitted on specified grounds, one of which (paragraph 14.8.3) is that the Disciplinary Tribunal has issued a determination which it could not properly have issued on the facts of the case.

[12]     The petitioner exercised his right of appeal in terms of paragraph 14.2.  He presented three grounds of appeal.  These were as follows:

> "(i)   The evidence clearly established that MASH Holdings Limited entered into the Credit Facility Agreement and not the appellant, with the result that the Judicial Panel finding was inconsistent with the terms of the complaint;
>
> (ii)   There was no direct evidence that either the appellant or MASH Holdings Limited nominated Mr Llambias as a director and a full and fair reading of all witness statements provided no basis for such an inference; and
>
> (iii)   The Judicial Panel failed to recognise that only illegitimate or adverse interference in the affairs of another club was struck at by Article 13 by failing to adopt a purposive approach to the interpretation of the articles."

[13]     Following a hearing the Appeal Tribunal, by way of determination dated 3 June 2015, refused the petitioner's appeal.  In terms of its determination the Appeal Tribunal concluded that the Disciplinary Tribunal had been entitled to make the findings that it did and that it therefore followed that the Rule and Article had been contravened in respect of the appellant, with a controlling interest in one club, having been demonstrated to have power to influence the management or administration in another.  However, in relation to sanction, the Appeal Tribunal reduced the fine imposed upon the petitioner to £1,000.

**The application for judicial review**

[14]    By way of this application for judicial review, the petitioner now seeks reduction of the determinations by the Disciplinary Tribunal and the Appeal Tribunal on the basis of material error of law.  In very large part, the grounds upon which the petitioner presents his challenge comprises a reiteration of the arguments deployed before the respective Tribunals.  The relevant averments in the petition are as follows:

"8.    That the said Judicial Panel and Appellate Tribunal erred in law in upholding the libel of the complaint that the Petitioner had on 26 October 2014 entered into a Credit Facility Agreement with the Club, it being accepted by both the Judicial Panel and Appellate Tribunal that the party which had in fact entered into that Credit Facility Agreement with the Club was MASH.  The terms of the complaint served on the Petitioner clearly distinguished the alleged actions of MASH which were libelled as material to the complaint from the alleged actions of the Petitioner which were libelled as so material to the complaint from the alleged actions of the Petitioner which were libelled as so material, and clearly identified the person alleged to have entered into the Credit Facility Agreement as the Petitioner.  There was no material before the Judicial Panel or the Appellate Tribunal justifying in point of law their treatment of the action of MASH in entering into the Credit Facility Agreement as the action of the Petitioner.

9.    That, *separatim*, in concluding on the basis of the evidence before them that it was open to them to determine that MASH had nominated Mr Llambias for appointment as a director of Rangers International Football Club PLC ('the PLC') and the Club, resulting in his appointment as such on 2 and 5 November 2014 respectively, the said Judicial Panel and Appellate Tribunal erred in law.  The circumstances of the appointment of Mr Llambias to those offices were described in witness statements before the

Judicial Panel and the Appellate Tribunal by Mr Llambias, Justin Barnes and David Somers, the content of which statements was not put in issue by the Respondent's Compliance Officer before either body.  On the basis of those statements, no reasonable tribunal could have made any factual determination other than that Mr Llambias, who was already a consultant to the Club, was regarded by Mr Somers, the acting chairman of the PLC, as a person suitable for appointment as a director of the PLC and of the Club, that consequently a suggestion that he be appointed to the PLC Board was communicated by Paul Shackleton, the Nominated Advisor for AIM purposes to the PLC, to Mr Barnes as representing MASH, and that Mr Barnes agreed for the purposes of the operation of the Credit Facility Agreement that Mr Llambias be treated as if he were a nomination of MASH to the Board of the PLC alone.  In these circumstances, no reasonable tribunal could have considered that Mr Llambias had been nominated by MASH for appointment to the Board of the Club.  In the absence of any nomination by MASH of Mr Llambias to the Board of the Club, there was no basis in fact or law upon which any reasonable tribunal could have determined that the Petitioner had any power whatsoever to influence the management or administration of the Club, and was therefore in breach of Article 13 and/or Disciplinary Rule 19.

10.    That, *separatim* and in any event, the said Judicial Panel and Appellate Tribunal erred in law in concluding that, *esto* Mr Llambias had been nominated by MASH as a director of the PLC and the Club, resulting in his appointment as such, that such circumstances amounted to a breach of Article 13 of the Articles of Association of the Respondent and/or of General Disciplinary Rule 19.  The Judicial Panel and Appellate Tribunal had no basis in fact or law for concluding that any such nomination would result in

the Petitioner having any power whatsoever to influence the management or administration of the Club.  Mr Llambias had, as a director of the PLC and of the Club, legal duties (a) to act in the way in which he considered, in good faith, would be most likely to promote the success of the company in which he was a director, for the benefit of its members as a whole (Companies Act 2006, s.172) and (b) to exercise independent judgment in the performance of his functions as such director (Companies Act 2006, s.173), and the Judicial Panel and Appellate Tribunal had no basis for any conclusion that he would perform those functions other than in full compliance with those legal duties.  Further, on the basis of the content of Mr Llambias's witness statement, placed before the Judicial Panel and Appellate Tribunal and not put in issue by the Respondent's Compliance Officer, the Judicial Panel and Appellate Tribunal had no basis for any conclusion that Mr Llambias would be susceptible to any influence which the Petitioner might attempt to exert on him."

[15]    The respondent has lodged answers.  In addition to pleas directed at the relevancy and factual basis of the petition, the respondent takes a plea of no jurisdiction.

**Discussion**

[16]    The petition called for first hearing at which the petitioner was represented by Mr Sandison, QC and the respondent Mr O'Neill, QC.  Both had lodged written notes of argument which they adopted and to which they referred in the course of oral submissions.

[17]    I shall in due course turn to the three grounds for review which are put forward by the petitioner but, logically, the first matter for consideration is whether this court has jurisdiction to entertain an application of this sort.

*Jurisdiction*

[18]    In presenting his submissions on behalf of the respondents Mr O'Neill reminded me that the decisions which the petitioner sought to challenge had their source in a purely private law relationship between him and the respondent; what had given rise to the power of the Tribunals to make their respective decisions was the contract between the parties as constituted by the letter of 6 August 2012 and the Articles. That, submitted Mr O'Neill, had consequences for the extent of the court's jurisdiction. This was not an appeal. In disputes of which the disciplinary proceeding against the petitioner was an example, parties had agreed, in terms of article 65.5, "not … to take such difference or questions to a court of law". What the petitioner sought to invoke in this application was the court's supervisory jurisdiction, the sole purpose of which was to ensure the person or body does not exceed or abuse the jurisdiction that has been delegated or entrusted to it: *Davidson* v *Scottish Ministers* 2006 SC (HL) 41 at para 45. Thus, given that the context was that of private law, the only issue that properly could be brought before the court in the present case was whether or not either of the Tribunals had exceeded the jurisdiction with which they had been invested by the parties: see *Shanks & McEwan (Contractors) Ltd* v *Mifflin* 1993 SLT 1124 at 1130 D-E and *Diamond* v *PJW Enterprises Ltd* 2004 SC 430 at paras 37-38 and 40. The supervisory jurisdiction simply did not extend to a consideration of supposed errors of law on the part of decision-makers whose powers were conferred by contract.

[19]    In response Mr Sandison provided a number of examples of the court having entertained applications to its supervisory jurisdiction in respect of decisions of the present respondents: *St Johnstone Football Club* v *Scottish Football Association* 1965 SLT 171, *Dundee United Football Co Ltd* v *Scottish Football Association* 1998 SLT 1244, *Kevin Fotheringham Petitioner* [2008] CSOH 170, *Rangers Football Club Petitioner* 2012 SLT 1156. He explained that the distinction between public law and private law upon which Mr O'Neill sought to found had never been of importance in Scots law; the supervisory

jurisdiction has always been capable of being invoked to review decisions of purely private as well as public bodies: *West* v *Secretary of State for Scotland* 1992 SC 385 at 399-340, *AXA General Insurance Ltd Petitioners* 2012 SC (UKSC) 122 at para 57. As far as the distinction between *ultra vires* and *intra vires* errors of law, as discussed in *Anisminic Ltd* v *Foreign Compensation Commission* [1969] 2 AC 147, was concerned, it was made clear by Lord Hope in *Eba* v *Advocate General for Scotland* 2012 SC (UKSC) 1 that that had been abandoned in Scotland. *Diamond* v *PJW Enterprises* fell to be distinguished as a case concerning the ability of the court to review *intra vires* errors of law in the context of arbitration in circumstances where Parliament had provided alternative remedies.

[20]    It is uncontroversial that the decisions of decision-makers whose powers have been conferred by private contract, such as the Tribunals in the present case, are amenable to review by the Court of Session in exercise of what is usually referred to as the supervisory jurisdiction. In that they are no different from decision-makers whose powers are derived from a public law source (typically statute). Equally, it was expressly conceded by Mr Sandison that just as parties could create a decision-making power by contract so could they limit its review by sufficiently clear contractual provision. However, he submitted that they had not done so here and, notwithstanding what he said about article 65.5, I did not understand Mr O'Neill ultimately to dispute that. On that I agree with Mr Sandison. Article 65.5 provides:

> "The fact of membership of the Scottish FA shall constitute an agreement by a member that it, any body or person interested through such member, shall submit (and/or agree to the submission of) such complaints, breaches, claims, disciplinary matters, appeals, and/or disputes as are specified in the Judicial Panel Protocol to the jurisdiction of the judicial panel and shall not be permitted to take such difference or questions to a court of law."

Here the parties did not take a difference or question to a court of law. Matters were taken to the respondent's Tribunals. The petitioner comes to this court not, as Mr

O'Neill correctly submitted, to appeal a decision but to have it reviewed as an abuse of jurisdiction. Of course the distinction between appeal and review begins to blur when one turns to consider the grounds upon which that application for review is presented. Mr O'Neill's submission can be seen as an attempt to restore that distinction by contrasting two sorts of error of law: error of law as to the extent of jurisdiction (*ultra vires* error) and error of law in the exercise of jurisdiction (*intra vires* of error). The key cases in understanding Mr O'Neill's argument but also in leading to the conclusion that, as the law presently stands, it must be rejected, are *Anisminic* (as explained by Lord Diplock in *Re Racal Communications* [1981] AC 374 and *O'Reilly* v *Mackman* [1983] 2 AC 237), *Watt* v *Lord Advocate* 1979 SC 120 and *Eba*. The relevant line of authority is instructively discussed by Professor Himsworth in *Jurisdictional aspects of Judicial Review in Scots Law* 2015 JR 353.

[21]    A decision maker can make a variety of errors which can be characterised in various ways. What the present petition is concerned with are what the petitioner describes as errors of law but, as Mr O'Neill emphasised by his citation of Lord Reid in *Anisminic* at 171B, errors of law are of different sorts,  there are errors of law that can be regarded as having led the decision maker to exceed his jurisdiction or power to decide (*ultra vires* errors) and then there are errors as to what the law is or how it is to be applied which can be regarded as having been made in the course of an otherwise legitimate exercise of jurisdiction (*intra vires* errors). What the petitioner complains of here are *intra vires* errors of law. Mr Sandison did not suggest otherwise, his position being that even if the distinction between *ultra vires* and *intra vires* errors is one that can and should be made it is of no consequence.

[22]    There was a point in the development of Scots law when the distinction certainly was of consequence, or at the very least was thought to be. In *Watt* v *Lord Advocate* at 131 Lord President Emslie stated (albeit *obiter*) that "the Court of Session has never had power to correct an *intra vires* error of law made by a statutory authority exercising statutory jurisdiction." That statement can be readily understood by reference to what

Professor Himsworth describes as the jurisdictional basis of judicial review in Scots law; judicial review is about policing the borders of the jurisdictions or powers to decide conferred on inferior decision makers, rather than with reconsidering the merits of their decisions. Lord President Emslie's statement is not inconsistent with the propositions set out by Lord President Hope in *West* v *Secretary of State for Scotland* 1992 SC 385 at 412 as intended to define the principles by reference to which the competency of all applications to the supervisory jurisdiction of the Court of Session were to be determined. There, for example, Lord Hope explains that the sole purpose for which the supervisory jurisdiction may be exercised is to ensure that the person or body does not exceed or abuse that jurisdiction, power or authority or fail to do what the jurisdiction, power or authority requires. However, maintaining the distinction between *ultra vires* and *intra vires* errors of law was not the way that things were taken forward in England following the decision of the House of Lords in *Anisminic* (see Himsworth *supra* and Wade & Forsyth *Administrative Law* (10th edit) pp 220-225). There, as Lord Diplock put it, the distinction between errors of law that went to jurisdiction and that those that did not was for practical purposes abolished: *Racal* at 383.

[23]    When delivering the opinion of the Inner House in *Eba* Lord President Hamilton, in the course of a wide survey of the law, noted what had been said in *Watt* and contrasted with it what had been said in *Racal*. He also referred to *Brown* v *Hamilton District Council* 1983 SC (HL) 1 where Lord Fraser expressed the view that the grounds for judicial review in Scotland and England were the same. However, having noted that what was said in *Watt* (and other Scottish cases) might require reconsideration, the Inner House did not consider it necessary to do so in the case before them (see 2011 SC 70 at paras 42 – 46).

[24]    It was Mr Sandison's submission that the issue which had been left over by the Inner House in *Eba* was addressed and emphatically answered by Lord Hope when that case reached the Supreme Court. The relevant paragraph in his opinion is 34:

"In my opinion the time has come for it to be declared that Lord President Emslie's *dictum* in *Watt* (p 131) is incompatible with what was decided in *Anisminic Ltd v Foreign Compensation Commission*. *In Re Racal Communications Ltd* (p 382) Lord Diplock said that the decision in *Anisminic* was a legal landmark which proceeded on the presumption that, where Parliament confers on an administrative tribunal or authority power to decide particular questions defined by the Act, it intends to confine that power to answering the question as it has been so defined and that, if there is any doubt what that question is, this is a matter that the court must resolve. I would hold that the *dictum* in *Watt* cannot be reconciled with that interpretation of the decision and that it should no longer be followed. Once again it must be stressed that there is, in principle, no difference between the law of England and Scots law as to the substantive grounds on which a decision by a tribunal which acts within its jurisdiction may be open to review (*Brown v Hamilton District Council*, per Lord Fraser, p 42; *West v Secretary of State for Scotland* 1992 SC 885, pp 402, 413)."

While Mr O'Neill accepted that the distinction drawn in *Anisminic* had been superseded in the public law sphere, he submitted that Lord Hope's declaration in *Eba* did not relate to those decision makers whose powers were derived from private law. A difficulty with that submission is that it gets no express support from what Lord Hope said. It is true that Lord Hope referred to power conferred by Parliament "on an administrative tribunal or authority". In that what was in issue was whether and in what circumstances a decision of the Upper Tribunal could be reviewed, that was understandable, but the tenor of what he had to say is entirely general, as it had been in *West*. Then, while it is true that different considerations are in play, there is the lack of any obvious good reason why there should be any difference as between the grounds for exercise of the supervisory jurisdiction in the public law sphere, to use Mr O'Neill's expression, and the grounds for its exercise in the private law sphere. The nearest Mr

O'Neill got to offering a reason was to emphasise that the petitioner had acquiesced in the procedures provided for in the Protocol and that what was in issue were decisions made in a "footballing context". I would observe in response to the first of these considerations that acquiescence in particular disciplinary procedures would seem to be close to a necessary prerequisite for any attack on a resulting decision for error of law and that acquiescence in a procedure is not the same as acquiescence in a supposed error made in the course of the procedure. As far as the second of these considerations is concerned I would readily concede the Tribunals' expertise in matters to do with the business of football and its corporate governance but that of itself does not justify immunity from review for legal error. However, what I would see as being of greater significance is that Mr O'Neill pitched his argument at a high level of generality. Thus, if he is correct, his proposed limitation of review of private law decision makers on error of law to *ultra vires* error, would apply in every case and yet he proposed no reason of general application for exercising what Lord Hope has explained is the same jurisdiction in one way for one category of cases and another way in another category of cases. Moreover, I question the practicability of drawing the line in the way suggested by Mr O'Neill. In *Watt* Lord Emslie expressed his regret that, in his opinion, the Court of Session did not have power to correct *intra vires* errors of law by a National Insurance Commissioner. Thus, while that observation has to be seen in its particular context, he was not suggesting that there was anything problematic in the court exercising this sort of review. Moreover, much has happened, north and south of border, since 1978 when Lord Emslie issued his opinion. In particular, the courts have been willing to engage in an increasingly intensive degree of judicial review which has become inconsistent with the notion that the primary decision maker is entitled to make any error of law whatsoever. True, this has largely been in relation to public law decisions (in England, the only sort of decision subject to judicial review) engaging human rights, but experience in one area tends to spill into another. Of significance was the position

adopted in the speeches of Lord Diplock in *Racal* and *O'Reilly*.  Wade & Forsyth

describe the stage by then reached in England as follows (at p222):

> "… it was soon seen that the concept of jurisdictional error had been stretched to
>
> breaking-point. For it requires only a simple verbal manipulation to represent
>
> any error of law as the result of the tribunal asking itself the wrong question or
>
> imposing some wrong requirement. By such logic any and every error of law
>
> could be shown to involve excess of jurisdiction. Thus the House of Lords, while
>
> purporting to uphold the distinction between errors of law which went to
>
> jurisdiction and errors which did not, in fact undermined it. A tribunal had now,
>
> in effect, no power to decide any question of law incorrectly: any error of law
>
> would render its decision liable to be quashed as *ultra vires*."

[25]     Accordingly, the respondent's plea of no jurisdiction is based on a distinction

which has not been expressly recognised in the authorities and which relies upon a

supposed dichotomy which is slippery at best and in practice has increasingly been

ignored. I shall therefore repel it. In doing so I recognise that this is to give the

petitioner what Mr O'Neill described as "a third bite of the cherry", in other words this

is the third occasion on which the petitioner has had the opportunity to deploy the same

arguments in relation to the same issue. Essentially, Mr O'Neill's point raises, in a

private law context, the question that *Eba* and its companion case of *R (Cart)* v *Upper*

*Tribunal* [2012] 1 AC 663 raised in a public law context: how often should an issue be

litigated? In *Cart* at para 41 Lady Hale observed: "There must be a limit to the number

of times a party can ask a judge to look at a question". Equally, there must be a limit to

the number of times a party has to submit to having a question looked at. Given the

expertise of the Tribunals which have decided on the complaint against the petitioner

and the formality of their decision-making processes, it might be suggested that by now

seeking judicial review of the Tribunals' decisions, the petitioner is pushing beyond the

limit envisaged by Lady Hale. However, other than the argument as to the competency

██████████████████████████████████

█████████████████████████████████

████████████████████████

*Ground 1*

[26]    It is convenient to repeat the terms of the complaint served on the petitioner:

"…in that already having an interest in Newcastle United FC, as the controlling party of MASH Holdings Limited, you did on 26 October 2014 enter into a Credit Facility Agreement with Rangers Football Club Limited, and thereafter MASH Holdings Limited did nominate Derek David Llambias to Rangers FC for appointment as a Director, resulting in his subsequent appointment as a Director of both Rangers International Football Club Plc and Rangers Football Club Limited upon 2 and 5 November 2014 respectively.  These acts being breaches of article 13 of the Articles of Association of the Scottish FA…"

As is apparent the complaint contains three propositions: (1) that having an interest in NUL and as the controlling party of MASH the petitioner did enter into a Credit Facility Agreement with RFCL; (2) that thereafter MASH nominated Mr Llambias for appointment and as a result Mr Llambias was appointed as a director of RIFC and RFCL; and (3) that the having and exercise of the power of appointment constituted a breach of article 13 of the Articles. The petitioner argues that none of these propositions was established. The three grounds upon which he seeks to reduce the findings of the Tribunals correspond to the three propositions in the complaint.

[27]    The first ground is that the Tribunals erred in law in upholding the libel in the notice of complaint. Mr Sandison emphasised the importance of precision in the framing of a complaint such as that which contained the charge against the petitioner and the need to avoid the unfairness consequential on going beyond the charge. When the argument was before it, the Appeal Tribunal saw the focus as being on the need to

give fair notice. It held that the petitioner had been given clear notice of what was complained of, that being that the source of the petitioner's power to nominate directors was the Credit Facility Agreement entered into by MASH. The Appeal Tribunal rejected the contention that the Disciplinary Tribunal's finding fell outwith the complaint. Before this court Mr Sandison accepted that the complaint had given clear notice. Where the Tribunals had erred was in finding what had been given clear notice of had been established by the uncontroversial evidence. The critical part of the libel was that "you did on 26 October 2014 enter into a Credit Facility Agreement with Rangers Football Club Limited". The "you" in that clause was the petitioner; the individual who had in terms of the letter of 6 August 2012 agreed to abide by the Articles. What the evidence showed was that it was MASH which had, on 26 October 2014, entered into a Credit Facility Agreement with RFCL. The petitioner had not entered into any such agreement. Mr O'Neill pointed out that these facts had not escaped the notice of the Tribunals but the Disciplinary Tribunal, supported by the Appeal Tribunal, had held that while the Credit Facility had been agreed with RFCL by MASH, it was effectively the petitioner who had provided the facility. That, said Mr Sandison, was to pierce the corporate veil in circumstance where to do so was unwarranted: *Prest* v *Petrodel Resources Ltd* [2013] 2 AC 415.

[28]     The purpose of the prohibition in article 13 is to prevent, otherwise to the extent authorised by the board of the respondent, any person having what was referred to before the Tribunals as "a dual interest", that is being a member of one club or otherwise being in a position to influence the management or administration of one club while at the same time being a member of another club or otherwise being in a position to influence the management or administration of another club. The article is framed with a view to striking at a variety of ways in which a person can have a prohibited dual interest.  The prohibitions include: "no person … alone or …through an associate …who …has any power whatsoever to influence the management or administration of a club, may at the same time either directly or indirectly … have any

power whatsoever to influence the management or administration of another club". Article 13.5 (c) (i) defines "associate" in relation to an individual as including "any company of which that individual …is a director or over which that individual …is able to exercise control or influence".

[29]     As appears from the definition, MASH is an associate of the petitioner. Accordingly, if it be accepted that entering into the Credit Facility Agreement gave MASH a power (of nominating a director) such as to allow it to influence the management or administration of RFCL then, at least once that power was exercised, "through an associate" the petitioner had acquired the requisite interest in RFCL such as to constitute a dual interest, when taken with his pre-existing interest, through the same associate, in NUL, in contravention of article 13. Thus, it was sufficient to establish the first proposition in the complaint that MASH had entered into the Credit Facility Agreement. The Disciplinary Tribunal did find that MASH entered into the Credit Facility Agreement. Mr Sandison's point therefore comes to be the very narrow one that the wording of the complaint directed at the petitioner is "you did …enter" rather than, for example, "your associate MASH Holdings Limited did enter". According to Mr Sandison, on the wording which was used in the complaint the Disciplinary Tribunal was simply not entitled to find that the petitioner had contravened article 13. That was not the view of the Tribunals and it is not my view. I would see Mr Sandison as ignoring the words which come immediately before "you" in the libel. These are "as the controlling party of MASH Holdings Limited". The allegation was that MASH had entered into the Credit Facility Agreement and that this was a breach of article 13 by the petitioner because he was the controlling party of MASH. I accept that the placing of the comma at the end of the phrase "…in that already having an interest in Newcastle United FC, as the controlling party of MASH Holdings Limited," indicates that what is being referred to there is the nature of the petitioner's interest in NUL and I accept that the phrase "as the controlling party of MASH Holdings Limited" is not repeated after "you". I do not consider that that matters. It is true that the Protocol provides for a

relatively high degree of formality but, nevertheless these are not, for example, criminal proceedings on indictment. I shall have to consider whether the Tribunals were entitled to find the second and third propositions in the complaint to have been established but I agree with their conclusion as to the first proposition: the complaint gives fair notice that it is the actions of MASH that are founded upon and that that allegedly gives rise to breach of article 13 by the petitioner by reason of the fact that he controls MASH which is therefore his "associate" in terms of article 13.

[30]     Mr Sandison briefly but accurately summarised the conclusion  of Lord Sumption's analysis, in his opinion in *Prest* v *Petrodel Resources Ltd* [2013] 2 AC415 at paras 16 to 35, of the circumstances in which the court may pierce the corporate veil: when a person is under an existing legal obligation or liability or subject to an existing legal restriction which he deliberately evades or whose enforcement he deliberately frustrates by interposing a company under his control, the court may then "pierce the corporate veil" for the purpose of depriving the company or its controller of the advantage that they would have otherwise obtained by the company's separate legal personality. It is a matter of circumventing the consequences of the person's impropriety. I would accept, as Mr Sandison argued, that here there is no case for piercing the corporate veil. It is sufficient, and this is a different matter, to notice that the petitioner controls MASH and to notice the terms of the relevant prohibition. The Disciplinary Tribunal was accordingly entitled to find that the petitioner had acted "through" his associate, MASH. As acting through an associate is expressly prohibited by article 13 there was no such evasion of a restriction necessitating consideration of whether any corporate veil should be pierced.


*Ground 2*

[31]     The petitioner submits that the Tribunals erred in law in finding that the petitioner or MASH had appointed or nominated for appointment Mr Llambias as director of RFCL in circumstances where there was no evidence to support this finding.

In considering that submission I accept, as Mr O'Neill argued, that where what is
founded on is error of law, for the petitioner to succeed on this ground the court must
be able to conclude that there was *no* relevant evidence and that therefore the finding
can be regarded as irrational or perverse.

[32]     I have been unable so to conclude. The Disciplinary Tribunal did not require to
have direct evidence of nomination or appointment by MASH; it was entitled to draw
such inferences as were available from the evidence put before it. It was not bound to
hold the terms of the witness statements to be conclusive or to have dealt with matters
comprehensively. The declarations that witnesses believed the contents of their
statements to be true and the absence of cross-examination on the statements went
merely to weight. Clause 13 of the Credit Facility Agreement conferred a right on
MASH to appoint up to two directors on the board of RFCL and thereafter to remove
and replace them. The date of the Credit Facility Agreement was 25 October 2014. Mr
Llambias was appointed to the board of RFCL on 5 November 2014, having been
appointed to the board of RIFC three days previously, on 2 November 2014. As appears
from his witness statement Mr Llambias knows the petitioner well and in 2008 he
became managing director of NUL. Whereas Mr Llambias refers to a subsequent
disagreement with the petitioner which led to him leaving NUL in 2013, it may be
inferred that Mr Llambias was someone in whose abilities the petitioner has confidence.
These facts alone might point to Mr Llambias as having joined the board of RFCL as
MASH's appointee or nominee, but there was other material which is discussed by the
Appeal Tribunal as follows:

> "Paragraph 13 of the Credit Facility Agreement gave MASH Holdings Ltd the
> right to appoint two directors to the Board of Rangers Football Club Limited. At
> the same time MASH Holdings Ltd entered into an agreement with Rangers
> International Football Club PLC whereby the latter irrevocably invited the
> former to put forward the names of two nominees of its choice for appointment
> as directors.  That obligation was to subsist for the duration of the Credit Facility

Agreement, and Rangers International Football Club PLC undertook to ensure that the director appointment rights contained in the Agreement were fully complied with. The letter stated in terms that it was "understood and agreed" that the two persons nominated by MASH Holdings Ltd to join the Board of Rangers International Football Club PLC would be the same persons nominated by them as lender under the Credit Facility Agreement to join the Board of Rangers Football Club Limited.

On 27 October 2014 Rangers International Football Club PLC announced through the Regulatory News Service of the London Stock Exchange that their subsidiary, The Rangers Football Club Limited, had entered into a Credit Facility Agreement with MASH Holdings Ltd ('MASH') and that Rangers International Football Club PLC had entered into a letter agreement with MASH, pursuant to which they had invited MASH to put forward the names of two nominees of its choice for appointment to the Board. On 3 November 2014 Rangers International Football Club PLC made a further announcement through that same vehicle to the effect that their Board had appointed Derek Llambias as a non-executive director. The notice went on to state: 'He was nominated as a director of its choice by MASH Holdings Limited pursuant to its agreement…as set out in the announcement dated 27 October 2014'.

In paragraph 7 of his statement, Justin Barnes, consultant to MASH Holdings Ltd, refers to a discussion with Paul Shackleton of the Rangers International Football Club PLC's Nominated Advisor about the need for MASH to make two nominations to the Board of Rangers International Football Club PLC to enable a drawdown to be made against the Credit Facility. Mr Shackleton asked Mr Barnes if he would be prepared to treat Derek Llambias as one of MASH's nominees to the Board. Mr Barnes told him that he was happy to treat

Mr Llambias as MASH's first nominee to the Board. They also reached agreement that MASH would waive its second nomination for the purpose of enabling the drawdown of the funds. It is clear from the statement of Mr Somers that Derek Llambias was appointed to the Board of Rangers International Football Club PLC on 2 November 2014and to the Board of Rangers Football Club Limited on 5 November 2014.

If that were the only evidence on the subject, the Judicial Panel would clearly have been entitled to make the finding that MASH Holding Ltd nominated Mr Llambias for appointment as director resulting in his subsequent appointment as a director of both companies on 2 and 5 November 2014 respectively.  It is equally clear that the Judicial Panel gave careful consideration to the statements of Messrs Barnes, Llambias and Somers. Ms O'Neill submitted that the terms of the statements have to be treated as true and accurate since they were not challenged by cross-examination. In her submission they demonstrate that Mr Llambias was appointed at the instigation of Mr Somers and that that flatly contradicts the notion that he was nominated by MASH Holdings Ltd.

What this Tribunal found odd about these statements is their failure to address specifically the question of nomination for appointment to the Board, bearing in mind that that was a vital issue to be addressed in any statement relating to the complaint.  Reference was made to paragraphs 7, 9 and 12 in particular of the statement of Mr Llambias.  In paragraph 12 he makes reference to his appointment as a director of both companies without saying anything about who nominated him. He refers to Mr Somers, the acting chairman, stating that he was pleased with the changes being made (Mr Llambias had been engaged as a consultant) and that he recognised that in order for Mr Llambias to continue improving the Club's position he needed to be able to make decisions on behalf

of the Club. In paragraph 13 of his statement, Mr Somers states that it was not practical for him as the only executive director to be present every time a decision was being made.  He goes on to add: 'Accordingly, on 2 November 2014 and 5 November 2014, Derek was appointed as a non-executive director of the Club's PLC Board and the Club respectively.' The question of nomination is not addressed. Reference has been made above to the statement of Mr Barnes. Ms O'Neill relied particularly on paragraph 7, already dealt with above, and paragraph 4 in which Mr Barnes says that MASH did not nominate any individuals for appointment as directors to the Club when the Credit Facility Agreement was signed. Paragraph 7 reflects the situation somewhat later.

Having reviewed the statements relied upon by Ms O'Neill, the Tribunal are of the opinion that the Judicial Panel were entitled to consider, as they did, that the information in all three was 'vague about exactly how Mr Llambias' appointment to the Club Board took place'.

The letter dated 10 November 2014 from RPC, Solicitors, was apparently new material not presented to the Judicial Panel. It refers to earlier correspondence which this Tribunal has not seen. There is nothing in the letter to indicate that the writer has been personally involved in the matters referred to and was doing other than relaying instructions from a client. The terms of the letter contradict the Regulatory News Service announcement of 3 November 2014 by Rangers International Football Club PLC.  The Appellate Tribunal do not consider that the terms of the letter provide a basis for rejecting as inaccurate or misleading the clear statement made in the 3 November announcement. The other document relied on, an Agreement amending the Credit Facility Agreement, contains a clause waiving the requirement on Rangers Football Club Limited to appoint directors, but solely in relation to appointment 'on the proposed drawdown date

of a Loan only'. The only parts of this Agreement produced are those identifying the parties, all or part (it is not clear which) of the interpretation clause, and the signatures at the end. The import of the waiver is not clear. The original Agreement required the appointment of two directors.  There is no evidence of the nomination of a second director. The Tribunal do not consider that the terms of the waiver as disclosed to them provide a basis for saying that the Judicial Panel were not entitled to accept the evidence they did and make the finding they did.

[The solicitor acting for the now petitioner] stressed that the timing of both documents, after the alleged nomination and before any complaint was initiated by the Compliance Officer, was an indication of their reliability as evidence that no nomination was made. This Tribunal do not consider the timing to be particularly significant bearing in mind the obvious prospect of dual interest raised by the very terms of the Credit Facility Agreement relating to the nomination of directors."

[33]    The Appeal Tribunal considered that the Disciplinary Tribunal was entitled to make the finding it did about nomination. I agree.

*Ground 3*

[34]    The petitioner submits that even if MASH is taken to have nominated or appointed Mr Llambias as a director of RFCL, that of itself cannot be regarded as a breach of article 13 in that an exercised power to appoint an director does not amount to being "involved in any capacity whatsoever in the management or administration of a club". It is said that the mischief aimed at by article 13 was to prevent one person being able to influence the management of more than one football club, or one club influencing the management of another,  in a way which might not coincide with the

best interests of one or other of the clubs concerned. Mr Sandison emphasised that any director is under the duties set out at sections 171 to 177 of the Companies Act 2006. He must act within his powers and therefore according to the company's constitution, and for the purposes for which the powers were conferred; seek to promote the success of the company for the benefit of its members; exercise independent judgement; exercise reasonable skill care and diligence; avoid conflict of interests; not accept benefits from third parties; and declare any interest that he may have in any transaction. In the absence of evidence to the contrary Mr Sandison submitted that it was to be assumed that Mr Llambias, having been appointed as a director, would properly carry out these duties in good faith and in the best interests of RFCL. There could therefore be no question of the management or administration of RFCL being influenced in a way which was contrary to its best interests.

[35]     The question here is whether MASH by exercising a contractual power to appoint a director can be said to have had "any power whatsoever to influence the management or administration of" RFCL. The Disciplinary Tribunal expressed the view that when considering whether there had been breach of article 13 the "question of whether any power or influence was actually exercised or whether it was for the benefit rather than the detriment of the clubs involved was not relevant." I agree. The Appeal Tribunal observed, before noting that the Compliance Officer confined his complaint to the situation following exercise of the power of appointment, that the "very granting of the right to nominate directors in and of itself gave rise to the possibility of the petitioner influencing the affairs of two clubs." Again I agree. Article 13 should be given its natural meaning. I do not see there to be any need to posit misconduct on the part of the director appointed in terms of a power of appointment before there can be a breach. Rather, I would see it as appropriate to assume that Mr Llambias was nominated by reason of his positive qualities and experience in business and corporate governance, as spoken to in his witness statement. All directors must comply with the statutory duties to which Mr Sandison drew attention but it does not follow that every company

director has exactly the same qualities. Some are better equipped to direct the affairs of a company than are others. Where there is power to do so, the appointment as director of a particular candidate in whom the appointer has confidence because of his particular qualities is one way of influencing the direction which a company will follow. Again agreeing with the Appeal Tribunal, that the fact that the person appointed is someone of independent mind is beside the point.

**Decision**

[36]     I shall uphold the second plea-in-law for the respondent.  The petition is dismissed. I shall reserve all questions of expenses.

# EXHIBIT G

A  the jurisdiction of the Guernsey court. However, if the branch of
Barclays Bank in Guernsey is holding moneys belonging to either of the
defendants, the bank (being a bank locally resident in England) will,
after service of the order, be required not to part with such moneys
from the accounts held with the bank with their Guernsey branch.

I should make it clear that, although I in fact decided this case on
the basis that I have mentioned (namely on the basis of sections 3 and 6
B  of the Act of 1986), my researches overnight suggest that an alternative,
and possibly clearer, route would be under section 57 of the Act, which
deals specifically with advertisements, in relation to which section 61
confers on the Secretary of State (and therefore on the S.I.B.) powers
which are very similar to those contained in section 6 of the Act, which
I have considered.

C  Finally, I should point out that these orders do not in any way
preclude customers of Pantell individually from enforcing their rights
against any assets of Pantell: see sections 6(9) and 61(9) of the Act.

*Order accordingly.*

*Solicitors: Booth & Blackwell.*

D

S. W.

E  ————————

[COURT OF APPEAL]

F  ADAMS and Others v. CAPE INDUSTRIES PLC. and Another

[1984 A. No. 2597]

1988  Feb. 15, 16, 17, 18, 19, 24, 25, 26, 29;                    Scott J.
      March 1, 2, 3, 4, 7, 8, 9, 10, 11, 14,
      15, 16, 17, 18, 21, 22, 23, 24, 25;
G     April 11, 12, 13, 14, 18, 19;
      June 17;
      July 26;
1989  April 5, 6, 7, 10, 11, 13, 14, 17,                    Slade, Mustill and
      18, 20, 21, 24, 25, 27, 28;                           Ralph Gibson L.JJ.
      May 2, 3, 24;
      July 27

H
*Conflict of Laws—Foreign judgment—Jurisdiction to enforce—English
companies mining asbestos in South Africa—Marketing subsidiary
of English parent company incorporated in Illinois—Subsidiary
trading in asbestos but having no authority to bind English*

Adams v. Cape Industries Plc. (C.A.)                    [1990]

*companies in contract—Claim against English companies arising*          A
*from sale of English companies' asbestos for use in Texas settled*
*by consent judgment in Texas—Whether submission to Texas*
*court's jurisdiction—Further claims—Whether English companies*
*having presence within jurisdiction—Default judgment given in*
*Texas court against English companies—Damages assessed without*
*evidence relating to individual plaintiffs—Whether contrary to*
*natural justice—Whether default judgment enforceable*

                                                                         B
Until 1979 the first defendant, Cape, an English company,
presided over a group of subsidiary companies engaged in the
mining in South Africa, and marketing, of asbestos. The
marketing subsidiary in the United States of America was a
wholly owned subsidiary, N.A.A.C., incorporated in Illinois in
1953. The marketing subsidiary worldwide was the second
defendant, Capasco, a wholly owned English company. Asbestos      C
from the South African mines was sold for use in an asbestos
factory at Owentown, Texas. In 1974, some 462 plaintiffs,
mainly employees or ex-employees at the Owentown factory,
brought actions in the United States Federal District Court at
Tyler, Texas, for damages for personal injuries allegedly suffered
as a result of exposure to asbestos dust ("the Tyler 1 actions").
The defendants included Cape, Capasco, N.A.A.C., the South
African mining subsidiary and other parties including the United   D
States Government. Those actions were settled in September
1977 for U.S.$20m. of which Cape and its subsidiaries were to
bear over $5m. Cape and Capasco had entered motions
protesting the jurisdiction of the Tyler court and had filed
defences as to the merits which, inter alia, repeated the
jurisdiction protests. The settlement of the Tyler 1 actions was
recorded by a consent order made on 5 May 1978.
Between April 1978 and November 1979, a further 206      E
plaintiffs instituted actions in the Tyler court against the same
defendants ("the Tyler 2 actions"). Cape and Capasco took no
part in the Tyler 2 actions maintaining that that court lacked
jurisdiction over them. They were prepared to let default
judgments be entered against them but to resist their enforcement
in England. Cape decided to put N.A.A.C. into liquidation
and, as from 31 January 1978, N.A.A.C. ceased to carry on   F
business. Cape promoted the incorporation of a new Illinois
corporation, C.P.C., and a Liechtenstein entity, A.M.C. The
shares in C.P.C. were held by M., the chief executive of
N.A.A.C., and those in A.M.C. were held by a nominee on
trust for a Cape subsidiary, C.I.O.L. Arrangements were made
for C.P.C. to carry out much the same marketing function for
the sale of Cape asbestos in the United States as had previously
been carried out by A.M.C. Those arrangements continued   G
until 1979 when Cape sold its asbestos mining and marketing
subsidiaries. In 1983, 133 plaintiffs in the Tyler 2 actions settled
their actions against the main United States defendants, including
N.A.A.C. but excluding the United States Government. Later
all the 206 plaintiffs in the Tyler 2 actions agreed to settle their
actions against the United States Government on terms that
they would obtain default judgments against Cape and Capasco   H
and that the United States Government would finance the steps
to be taken to enforce those judgments against Cape and
Capasco in England. The Tyler court fixed 12 September 1983
as the date for the hearing of the default judgment applications.

A    Under the United States Federal Rules, since Cape and Capasco were in default, the pleaded allegations against them were, save in relation to damage, taken to be admitted. But no judicial hearing took place. On 12 September the judge signed a default judgment for over U.S.\$15½m. The awards made to individual plaintiffs fell into a number of bands: 67 were awarded \$37,000, 31 \$60,000, 47 \$85,000 and 61 \$120,000. The judge directed that the total award should represent an average award of \$75,000

B    per plaintiff but it was the plaintiffs' counsel who selected the level of the bands and who identified the plaintiffs to be placed in each band in order to produce the directed average award. All those plaintiffs, but one, sought to enforce the default judgment against Cape and Capasco by the present proceedings. They contended that Cape and Capasco had submitted to the jurisdiction in the Tyler 1 actions, and that the submission to

C    the jurisdiction in the Tyler 1 actions constituted a submission to the jurisdiction in the Tyler 2 actions or, alternatively, an agreement to submit to the jurisdiction in the Tyler 2 actions. Secondly, the plaintiffs contended that the Tyler court was entitled to take jurisdiction over Cape and Capasco by reason of their presence in Illinois when the Tyler 2 actions were commenced.

D    Scott J. dismissed the actions holding, inter alia, that the jurisdiction of a foreign court over defendants could be established either on a territorial basis by showing that the defendants were present within the territory of the foreign court or on a consensual basis by showing that the defendants had consented to the foreign court exercising jurisdiction over them; that Cape and Capasco by participating in the application in the Tyler 1 actions to the judge to make the consent order of 5 May 1978 submitted to the jurisdiction of the Tyler court, but that

E    the Tyler 1 actions and the Tyler 2 actions were distinct and separate actions so that submission to the jurisdiction in the Tyler 1 actions could not be regarded as a submission to the jurisdiction in the Tyler 2 actions; that an agreement to submit to the jurisdiction of a foreign court might be evidenced either by a term of an agreement binding in contract or by a unilateral representation of willingness to submit to the jurisdiction, but if such a representation was to be relied on, it should be clear and

F    unequivocal and have been acted on by the plaintiff and that Cape and Capasco had not contracted to submit nor made any representation of willingness to submit in the Tyler 2 actions; that, on the basis that the same principles applied to the question whether a corporation was present in the territory of a foreign court as applied to the question whether a corporation had a sufficient presence in England to enable service of a writ

G    on the corporation to be effected by service on its agent in England, the presence of N.A.A.C. and C.P.C. in Illinois and the business carried on from their respective offices in Illinois did not constitute the presence of Cape or Capasco in Illinois; and that the procedure adopted by the judge in the Tyler court in giving the default judgment of 12 September 1983 offended against English principles of natural justice, in that there had

H    been no judicial assessment of the defendants' liability and the award of damages had been arbitrary, not based on evidence and not related to the individual entitlements of the various plaintiffs.

On an appeal by the plaintiffs:—

*Held,* dismissing the appeal, (1) that an overseas trading corporation was likely to be treated by the English court as present within the jurisdiction of the courts of another country only where either such a corporation had established and maintained at its own expense in that other country a fixed place of business and had carried on from there its business for more than a minimal period of time through its servants or agents or through a representative; that in either of those two cases presence could only be established where the overseas corporation's business, whether together with the representative's own business or not, had been transacted at or from the fixed place and, in order to ascertain whether the representative had carried on the corporation's business or his own, it would be necessary to investigate his functions and his relationship with the overseas corporation (post, p. 530D–G).

*Okura & Co. Ltd. v. Forsbacka Jernverks Aktiebolag* [1914] 1 K.B. 715, C.A.; *Littauer Glove Corporation v. F. W. Millington (1920) Ltd.* (1928) 44 T.L.R. 746 and *Vogel v. R. and A. Kohnstamm Ltd.* [1973] Q.B. 133 applied.

*Quaere.* Whether residence without presence will suffice (post, p. 518C–D).

(2) That, on the facts, C.P.C. was an independently owned company and by the liquidation of N.A.A.C. and the creation of A.M.C. and C.P.C. Cape wanted sales of asbestos from its subsidiaries to continue in the United States but intended, by any lawful means which it was entitled to do, to reduce the appearance of its, or its subsidiaries', involvement there and to reduce the risk of its being held liable for United States taxation or subject to the jurisdiction of the United States courts, and that, accordingly, since it was not a mere facade concealing the true facts it was not appropriate to pierce the corporate veil; that furthermore, since it was accepted that N.A.A.C. was incorporated so as to assist in marketing and to be a marketing agent of the Cape group in the United States and, since a substantial part of its business at all material times was, in every sense, its own business, it did not act as an agent of the Cape group; that, in any event, since N.A.A.C. had no general authority to enter into contracts binding Cape or Capasco and third parties no such transactions were ever entered into by N.A.A.C.; and that, accordingly, the defendants were not present in the United States of America through N.A.A.C., C.P.C. or A.M.C. (post, pp. 541F–H, 544A–C, 544H—545B, G—546A, 547A–D, 549C–D).

(3) That, as a matter of principle, the onus fell on the plaintiff, who sought to enforce a judgment of a foreign court, to demonstrate the competence of that court and that it was only the judgment of the competent foreign court recognised as such by English law which would bind the defendant; that, if the onus fell on the defendants to disprove the competence of the Tyler court to give judgment against them, they had discharged that onus because they had shown that they were not present in the United States (post, p. 550C–F).

(4) That the method by which the Tyler court came to a decision as to the amount of the default judgment was contrary to the requirements of substantial justice contained in English law (post, p. 568F).

(5) That the failure of the defendants to apply to set aside the default judgment did not preclude them from relying on

A   that breach of natural justice by way of defence to the present action to enforce that judgment, since the plaintiffs had failed to give prior notice to the defendants of the unusual course they were proposing to take, did not seek to dissuade the judge from adopting that method of assessment of damages and drew up and served a form of judgment which did not show the procedure adopted, and the effect on the defendants, although everything was done by the plaintiffs in good faith, was that

B   they remained unaware of any basis for seeking relief from the Tyler court in respect of the defect in the judgment (post, p. 572B–E).

Pemberton v. Hughes [1899] 1 Ch. 781, C.A. and Jacobson v. Frachon (1928) 138 L.T. 386, C.A. applied.

Decision of Scott J., post, p. 441G, affirmed.

C   The following cases are referred to in the judgment of the Court of Appeal:

Abouloff v. Oppenheimer & Co. (1882) 10 Q.B.D. 295, C.A.

Albazero, The [1977] A.C. 774; [1976] 3 W.L.R. 419; [1976] 3 All E.R. 129, H.L.(E.)

Bank of Tokyo Ltd. v. Karoon (Note) [1987] A.C. 45; [1986] 3 W.L.R. 414; [1986] 3 All E.R. 468, C.A.

Baroda (Maharanee of) v. Wildenstein [1972] 2 Q.B. 283; [1972] 2 W.L.R. 1077; [1972] 2 All E.R. 689, C.A.

D   Boys v. Chaplin [1971] A.C. 356; [1969] 3 W.L.R. 322; [1969] 2 All E.R. 1085, H.L.(E.)

Bulova Watch Co. Inc. v. K. Hattori & Co. Ltd. (1981) 508 F. Supp. 1322.

Burnet v. Francis Industries Plc. [1987] 1 W.L.R. 802; [1987] 2 All E.R. 323, C.A.

Canada Enterprises Corporation Ltd. v. MacNab Distilleries Ltd. (Note) [1987] 1 W.L.R. 813, C.A.

E   Carrick v. Hancock (1895) 12 T.L.R. 59

Castrique v. Imrie (1870) L.R. 4 H.L. 414, H.L.(E.)

Colt Industries Inc. v. Sarlie [1966] 1 W.L.R. 440; [1966] 1 All E.R. 673, C.A.

Crawley v. Isaacs (1867) 16 L.T. 529

D.H.N. Food Distributors Ltd. v. Tower Hamlets London Borough Council [1976] 1 W.L.R. 852; [1976] 3 All E.R. 462, C.A.

F   Dunlop Pneumatic Tyre Co. Ltd. v. Actien-gesellschaft für Motor und Motorfahrzeugbau vorm. Cudell & Co. [1902] 1 K.B. 342, C.A.

Emanuel v. Symon [1908] 1 K.B. 302, C.A.

Employers' Liability Assurance Corporation Ltd. v. Sedgwick, Collins & Co. Ltd. [1927] A.C. 95, H.L.(E.)

Erie Railroad Co. v. Tompkins (1938) 304 U.S. 64

Firestone Tyre and Rubber Co. Ltd. v. Lewellin (Inspector of Taxes) [1957]

G   1 W.L.R. 464; [1957] 1 All E.R. 561, H.L.(E.)

General Steam Navigation Co. v. Guillou (1843) 11 M. & W. 877

Godard v. Gray (1870) L.R. 6 Q.B. 139

Grant v. Anderson & Co. [1892] 1 Q.B. 108, C.A.

Guaranty Trust Co. v. York (1945) 326 U.S. 99

Haggin v. Comptoir d'Escompte de Paris (1889) 23 Q.B.D. 519, C.A.

Holdsworth (Harold) & Co. (Wakefield) Ltd. v. Caddies [1955] 1 W.L.R.

H   352; [1955] 1 All E.R. 725, H.L.(Sc.)

Holstein, The [1936] 2 All E.R. 1660

Istituto Chemioterapico Italiano S.p.a. and Commercial Solvents Corporation v. Commission of the European Communities (Cases 6 and 7/73) [1974] E.C.R. 223, E.C.J.

*Jabbour (F. & K.) v. Custodian of Israeli Absentee Property* [1954] 1   A
W.L.R. 139; [1954] 1 All E.R. 145

*Jacobson v. Frachon* (1928) 138 L.T. 386, C.A.

*Jeannot v. Fuerst* (1909) 100 L.T. 816

*Jet Holdings Inc. v. Patel* [1990] 1 Q.B. 335; [1988] 3 W.L.R. 295, C.A.

*Jones v. Lipman* [1962] 1 W.L.R. 832; [1962] 1 All E.R. 442

*La Bourgogne* [1899] P. 1; sub nom. *Compagnie Générale Transatlantique v. Thomas Law & Co.* [1899] A.C. 431, H.L.(E.)                    B

*Lalandia, The* [1933] P. 56

*Littauer Glove Corporation v. F. W. Millington (1920) Ltd.* (1928) 44 T.L.R. 746

*Littlewoods Mail Order Stores Ltd. v. Inland Revenue Commissioners* [1969] 1 W.L.R. 1241; [1969] 3 All E.R. 855, C.A.

*Local Government Board v. Arlidge* [1915] A.C. 120, H.L.(E.)

*Merchandise Transport Ltd. v. British Transport Commission* [1962] 2 Q.B.   C
173; [1961] 3 W.L.R. 1358; [1961] 3 All E.R. 495, C.A.

*Miller v. B.C. Turf Ltd.* (1969) 8 D.L.R. (3d) 383

*Mississippi Publishing Corporation v. Murphree* (1946) 326 U.S. 438

*Moore v. Mercator Enterprises Ltd.* (1978) 90 D.L.R. (3d) 590

*Newby v. Von Oppen & The Colt's Patent Firearms Manufacturing Co.* (1872) L.R. 7 Q.B. 293

*Okura & Co. Ltd. v. Forsbacka Jernverks Aktiebolag* [1914] 1 K.B. 715,   D
C.A.

*Omni Capital International v. Rudolph Wolff & Co. Ltd.* (1987) 108 S. Ct. 404

*Pemberton v. Hughes* [1899] 1 Ch. 781, C.A.

*Princesse Clementine, The* [1897] P. 18

*Revlon Inc. v. Cripps & Lee Ltd.* [1980] F.S.R. 85, C.A.

*Reynolds v. Fenton* (1846) 16 L.J. C.P. 15                    E

*Roberta, The* (1937) 58 Ll. L.R. 159

*Robinson v. Fenner* [1913] 3 K.B. 835

*Rousillon v. Rousillon* (1880) 14 Ch.D. 351

*Saccharin Corporation Ltd. v. Chemische Fabrik Von Heyden Aktiengesellschaft* [1911] 2 K.B. 516, C.A.

*Salomon v. A. Salomon & Co. Ltd.* [1897] A.C. 22, H.L.(E.)

*Schibsby v. Westenholz* (1870) L.R. 6 Q.B. 155                    F

*Scottish Co-operative Wholesale Society Ltd. v. Meyer* [1959] A.C. 324; [1958] 3 W.L.R. 404; [1958] 3 All E.R. 56, H.L.(Sc.)

*Sfeir & Co. v. National Insurance Co. of New Zealand Ltd.* [1964] 1 Lloyd's Rep. 330

*Sirdar Gurdyal Singh v. Rajah of Faridkote* [1894] A.C. 670, P.C.

*South India Shipping Corporation Ltd. v. Export-Import Bank of Korea* [1985] 1 W.L.R. 585; [1985] 2 All E.R. 219, C.A.                    G

*Thames and Mersey Marine Insurance Co. v. Societa di Navigazione a Vapore del Lloyd Austriaco* (1914) 111 L.T. 97, C.A.

*Theodohos, The* [1977] 2 Lloyd's Rep. 428

*Vogel v. R. and A. Kohnstamm Ltd.* [1973] Q.B. 133; [1971] 3 W.L.R. 537; [1971] 2 All E.R. 1428

*Wallersteiner v. Moir* [1974] 1 W.L.R. 991; [1974] 3 All E.R. 217, C.A.

*Williams v. Jones* (1845) 13 M. & W. 628                    H

*Woolfson v. Strathclyde Regional Council*, 1978 S.L.T. 159

*World Harmony, The* [1967] P. 341; [1965] 2 W.L.R. 1275; [1965] 2 All E.R. 139

*X Bank Ltd. v. G.* (1985) 82 L.S.G. 2016, C.A.

A    The following additional cases were cited in argument in the Court of
     Appeal:

       *Badcock v. Cumberland Gap Park Co.* [1893] 1 Ch. 362
       *Blohn v. Desser* [1962] 2 Q.B. 116; [1961] 3 W.L.R. 719; [1961] 3 All E.R. 1
       *Calvin's Case* (1608) 7 Co. Rep. 1a
       *Hercules v. Grand Trunk Pacific Railway Co.* [1912] 1 K.B. 222
       *Joyce v. Director of Public Prosecution* [1946] A.C. 347, H.L.(E.)

B
     The following cases are referred to in the judgment of Scott J.:

       *Albazero, The* [1977] A.C. 774; [1976] 3 W.L.R. 419; [1976] 3 All E.R.
           129, H.L.(E.)
       *Bank of Tokyo v. Karoon (Note)* [1987] A.C. 45; [1986] 3 W.L.R. 414;
           [1986] 3 All E.R. 468, C.A.
       *Blohn v. Desser* [1962] 2 Q.B. 116; [1961] 3 W.L.R. 719; [1961] 3 All E.R. 1
C      *Boissière & Co v. Brockner & Co.* (1889) 6 T.L.R. 85
       *Dunlop Pneumatic Tyre Co. Ltd. v. Actien-Gesellschaft für Motor und
           Motorfahrzeugbau Vorm. Cudell & Co.* [1902] 1 K.B. 342, C.A.
       *Emanuel v. Symon* [1908] 1 K.B. 302, C.A.
       *Erie Railroad Co. v. Tompkins* (1938) 304 U.S. 64
       *Firestone Tyre and Rubber Co. Ltd. v. Lewellin* [1957] 1 W.L.R. 464; [1957]
           1 All E.R. 561, H.L.(E.)
D      *Godard v. Gray* (1870) L.R. 6 Q.B. 139, D.C.
       *Holstein, The* [1936] 2 All E.R. 1660
       *Istituto Chemioterapico Italiano S.p.A. and Commercial Solvents Corporation
           v. Commission of the European Communities* (Cases 6 and 7/73) [1974]
           E.C.R. 223, E.C.J.
       *Jabbour (F. & K.) v. Custodian of Israeli Absentee Property* [1954] 1
           W.L.R. 139; [1954] 1 All E.R. 145
E      *Jacobson v. Frachon* (1928) 138 L.T. 386, C.A.
       *La Bourgogne* [1899] P. 1, C.A.
       *Lalandia, The* [1933] P. 56
       *Littauer Glove Corporation v. F. W. Millington (1920) Ltd.* (1928) 44
           T.L.R. 746
       *Ochsenbein v. Papelier* (1873) L.R. 8 Ch.App. 695
       *Okura & Co. Ltd. v. Forsbacka Jernverks Aktiebolag* [1914] 1 K.B. 715,
           C.A.
F      *Pemberton v. Hughes* [1899] 1 Ch. 781, C.A.
       *Point Landing Inc. v. Omni Capital International Ltd.* (1986) 795 F. 2d 415
       *Prima Paint Corporation v. Flood & Conklin Manufacturing Co.* (1967) 388
           U.S. 395
       *Princesse Clementine, The* [1897] P. 18
       *Rein v. Stein* (1892) 66 L.T. 469, C.A.
       *Robinson v. Fenner* [1913] 3 K.B. 835
G      *Russell v. Smyth* (1842) 9 M. & W. 810
       *S.A. Consortium General Textiles v. Sun and Sand Agencies Ltd.* [1978]
           Q.B. 279; [1978] 2 W.L.R. 1; [1978] 2 All E.R. 339, Parker J. and
           C.A.
       *Saccharin Corporation Ltd. v. Chemische Fabrik Von Heyden Aktiengesellsch-
           aft* [1911] 2 K.B. 516, C.A.
       *Schibsby v. Westenholz* (1870) L.R. 6 Q.B. 155
H      *Sfeir & Co. v. National Insurance Co. of New Zealand Ltd.* [1964] 1 Lloyd's
           Rep. 330
       *Sirdar Gurdyal Singh v. The Rajah of Faridkote* [1894] A.C. 670, P.C.
       *South India Shipping Corporation Ltd. v. Export-Import Bank of Korea*
           [1985] 1 W.L.R. 585; [1985] 2 All E.R. 219, C.A.

*Thames and Mersey Marine Insurance Co. v. Societa di Navigazione a*   A
    *Vapore del Lloyd Austriaco* (1914) 111 L.T. 97, C.A.
*Vogel v. R. and A. Kohnstamm Ltd.* [1973] Q.B. 133; [1971] 3 W.L.R. 537;
    [1971] 2 All E.R. 1428
*Williams & Glyn's Bank Plc. v. Astro Dinamico Compania Naviera S.A.*
    [1984] 1 W.L.R. 438; [1984] 1 All E.R. 760, H.L.(E.)
*World Harmony, The* [1967] P. 341; [1965] 2 W.L.R. 1275; [1965] 2 All
    E.R. 139
  B

The following additional cases were cited in argument before Scott J.:

*Abouloff v. Oppenheimer & Co.* (1882) 10 Q.B.D. 295, C.A.
*Actiesselskabet Dampskib "Hercules" v. Grand Trunk Pacific Railway Co.*
    [1912] 1 K.B. 222, C.A.
*Attorney-General for Alberta v. Cook* [1926] A.C. 444, P.C.
*Bank of Australasia v. Nias* (1851) 16 Q.B. 717   C
*Béguelin Import Co. v. G. L. Import-Export S.A.* (1972) 11 C.M.L.R. 81,
    E.C.J.
*Bergerem v. Marsh* (1921) 91 L.J.K.B. 80
*Berliner Industriebank Aktiengesellschaft v. Jost* [1971] 2 Q.B. 463; [1971] 3
    W.L.R. 61; [1971] 2 All E.R. 1513, C.A.
*Casdagli v. Casdagli* [1919] A.C. 145, H.L.(E.)
*Castrique v. Imrie* (1870) L.R. 4 H.L. 414, H.L.(E.)   D
*Crawley v. Isaacs* (1867) 16 L.T. 529
*Deverall v. Grant Advertising Inc.* [1955] Ch. 111; [1954] 3 W.L.R. 688;
    [1954] 3 All E.R. 389, C.A.
*Elefanten Schuh GmbH. v. Pierre Jacqmain* [1981] E.C.R. 1671, E.C.J.
*Europemballage Corporation and Continental Can Co. Inc. v. Commission*
    *of European Communities* (1973) 12 C.M.L.R. 199, E.C.J.
*Fender v. St. John-Mildmay* [1938] A.C. 1; [1937] 3 All E.R. 402, H.L.(E.)   E
*Ferguson v. Mahon* (1839) 11 Ad. & E. 179
*Gatty (F.A.) and Gatty (P.V.) v. Attorney-General* [1951] P. 444
*Gray(orse. Formosa) v. Formosa* [1963] P. 259; [1962] 3 W.L.R. 1246;
    [1962] 3 All E.R. 419, C.A.
*Henderson v. Henderson* (1844) 6 Q.B. 288
*Houlditch v. Marquess of Donegal* (1834) 2 Cl. & Fin. 470
*Imperial Chemical Industries Ltd. v. Commission of European Communities*
    (1972) 11 C.M.L.R. 557, E.C.J.   F
*Jeannot v. Fuerst* (1909) 25 T.L.R. 424
*Jet Holdings Inc. v. Patel* [1990] 1 Q.B. 335; [1988] 3 W.L.R. 295, C.A.
*Local Government Board v. Arlidge* [1915] A.C. 120, H.L.(E.)
*Macalpine v. Macalpine* [1958] P. 35; [1957] 3 W.L.R. 698; [1957] 3 All
    E.R. 134
*Meyer, In re* [1971] P. 298; [1971] 2 W.L.R. 401; [1971] 1 All E.R. 378
*Newby v. Von Oppen and the Colt's Patent Firearms Manufacturing Co.*   G
    (1872) L.R. 7 Q.B. 293
*Price v. Dewhurst* (1837) 8 Sim. 279
*Reg. v. Chief Registrar of Friendly Societies, Ex parte New Cross Building*
    *Society* [1984] Q.B. 227; [1984] 2 W.L.R. 370; [1984] 2 All E.R. 27,
    C.A.
*Rousillon v. Rousillon* (1880) 14 Ch.D.351
*Secretary of State for Foreign Affairs v. Charlesworth Pilling & Co.* [1901]   H
    A.C. 373, P.C.
*Smith, Stone and Knight Ltd. v. Birmingham Corporation* [1939] 4 All E.R.
    116
*Syal v. Heyward* [1948] 2 K.B. 443; [1948] 2 All E.R. 576, C.A.

A
    *Trottier v. Rajotte* [1940] 1 D.L.R. 433
    *Vadala v. Lawes* (1890) 25 Q.B.D. 310, C.A.
    *Vervaeke (formerly Messina) v. Smith* [1983] 1 A.C. 145; [1982] 2 W.L.R.
        855; [1982] 2 All E.R. 144, H.L.(E.)
    *Wahl v. Attorney-General* (1932) 147 L.T. 382, H.L.(E.)
    *Weiss, Biheller and Brooks Ltd. v. Farmer* [1923] 1 K.B. 226, C.A.

B
ACTION

    By a writ and statement of claim dated 1 August 1984, the plaintiff, Jimmy Wayne Adams commenced an action against Cape Industries Plc. and its wholly owned subsidiary, Capasco Ltd., seeking to enforce a default judgment which had been awarded to him in the United States of America. In the statement of claim it was alleged that (1) on 21 April 1978, the plaintiff commenced an action against the defendants in the

C
United States District Court for the Eastern District of Texas, Tyler Division, in the State of Texas in the United States of America; (2) the court was duly constituted and held in accordance with the laws of the state and had jurisdiction in that behalf; (3) on 12 September 1983 the court gave judgment in favour of the plaintiff for damages and assessed the damages to which the plaintiff was entitled in the sum of U.S.$37,000 and ordered the defendants to pay the plaintiff forthwith

D
the sum of $37,000 and interest at the rate of 9 per cent. per annum from that date until payment. Payment was claimed accordingly, it being certified that at the appropriate rate $37,000 amounted to £25,298.28.

    The writ was one of 205 claims to enforce the default judgment of the Tyler court in consolidated actions by plaintiffs with similar claims in respect of personal injuries alleged to have been caused by asbestos

E
dust. The defendants denied that the Tyler court had, for the purposes of English law, jurisdiction over them.

    The facts are stated in the judgments of Scott J. and the Court of Appeal.

    *T. R. A. Morison Q.C.* and *Charles Falconer* for the plaintiffs.

F
    *Sir Godfray Le Quesne Q.C., Jonathan Playford Q.C., Adrian Brunner* and *George Alliott* for the defendants.

                                         *Cur. adv. vult.*

    17 June 1988.   SCOTT J. read the following judgment. The judgment I am about to give is nearly but not quite my complete judgment. After

G
reserving judgment on Tuesday 19 April my judicial duties required me to sit in the North of England until the end of May. A consequence has been that preparation of my judgment in this important case has been unavoidably delayed. Representations have been made to me on behalf of Cape Industries Plc. to the effect that if the result of the case remains uncertain beyond this week, serious financial damage may ensue to the company and to its shareholders. I need not elaborate on the nature of

H
the fears but will say that they did not seem to me to be without substance.

    I would think it unacceptable in principle that litigants or those connected with them should be brought to suffer financial loss by a

judge's delay in preparing a reserved judgment, if that result can be A
avoided. Since the outcome of this case is now clear in my mind and it is
only the expression of that outcome that is incomplete, the result can, I
think, be avoided. I have proposed to both sides that I should deliver
now my judgment to the extent that it is complete—something over
three-quarters is in fact complete—and express, in summary form, my
conclusions on the issues to be covered by that part of my judgment that
is not yet complete. B

The defendants have pressed me to take that course. The plaintiffs
have asked that I should hold my hand until my complete judgment is
ready for delivery. I have decided, however, that I ought to proceed in
the manner I have indicated. I do not think any injustice will be
occasioned thereby to the plaintiffs or anyone connected with them.

I will make clear the point at which my definitive judgment ends. C
What I say thereafter will not form part of my definitive judgment but
will be an indication in summary terms of what will be contained in the
final part of my judgment when it is complete. I will reconvene the court
in due course for the delivery of that final part. The delay will, I trust,
be a short one. The order to be made consequent upon my judgment
will not be drawn up until the final part has been delivered. So time for
appeal will not start running. I will deal with costs at that stage. D

I have before me 205 consolidated actions. In each action the
defendants are Cape Industries Plc. ("Cape") and Capasco Ltd.
("Capasco"). Each of the plaintiffs is a person or the personal
representative of a person in whose favour a damages award was made
on 12 September 1983 in the United States District Court for the
Eastern District of Texas, Tyler Division, in the State of Texas, United E
States of America. I shall refer to this federal district court as the "Tyler
court."

The judgment of 12 September 1983 was a default judgment given by
Judge Steger, a federal district judge, sitting in the Tyler court. The
judgment, after setting out a number of findings of fact and conclusions
of law, concluded:

F

> "By virtue of defaulting defendants' acts and omissions of negligence
> and breaches of warranty, this court finds that defaulting defendants
> are liable jointly and severally to each plaintiff listed in appendix A
> for the amounts of money indicated for each plaintiff. It is therefore
> ordered and adjudged by the court that plaintiffs recover from
> defendants, jointly and severally, $15,654,000 and further that such
> judgment shall run with 9 per cent. interest per annum from the G
> date hereof until paid . . ."

The awards made to the individual plaintiffs as set out in appendix A
to the judgment fell into a number of bands. 67 plaintiffs were awarded
$37,000, 31 plaintiffs were awarded $60,000, 47 plaintiffs were awarded
$85,000 and 61 plaintiffs were awarded $120,000. There were thus 206
awards in all. The surviving plaintiffs and the personal representatives of H
all bar one of the plaintiffs who have died since 12 September 1983 have
brought actions in this country for payment of the damages and interest
ordered to be paid by the judgment of 12 September 1983. The cause of

A   action asserted and sued on in each action is the judgment of the Tyler
court. These are the consolidated actions before me.

A judgment of a foreign court can be enforced by action in this
country only if the jurisdiction of the foreign court to have given the
judgment is recognised by the law of this country. The jurisdiction of
the Tyler court over Cape and Capasco is in issue in these actions. It is
well settled also that a foreign judgment given by a court of competent
B   jurisdiction will not be enforced in this country if the judgment can be
shown to have been obtained by fraud or if its enforcement would
offend natural justice or public policy. These defences are relied on by
Cape and Capasco. So the actions and the defences thereto raise a
number of issues both of fact and of law and I must, in order to enable
the issues to be comprehensible, start by briefly relating the history that
C   has led to these actions. When I have done so I will endeavour to
describe the issues that arise for decision.

*History*

Cape until 1979 presided over a group of subsidiary companies
engaged in the mining and marketing of asbestos. On 29 June 1979 the
D   mining and marketing companies were sold by Cape to a South African
company, Transvaal Consolidated Exploration Co. Ltd. It was, however,
the mining and marketing of the asbestos in the period before the 1979
sale that gave rise to the litigation against Cape that culminated in the
12 September 1983 default judgment. The mines from which the asbestos
came were situated in South Africa. The mining companies, the most
important of which for present purposes was Egnep Pty. Ltd. ("Egnep"),
E   were South African companies. Egnep mined amosite asbestos. The
shares in Egnep and the other mining companies were held by Cape
Asbestos South Africa (Pty.) Ltd. ("Casap"), also a South African
company. Prior to 2 December 1975 the shares in Casap were held by
Cape.

One of the important markets for sale of the asbestos produced by
the South African mines was the United State of America. On 14
F   October 1953, Cape had caused to be incorporated in Illinois a company
called North American Asbestos Corporation ("N.A.A.C."). The shares
in N.A.A.C. were held by Cape. The function of N.A.A.C. which I
shall have to examine in more detail later, was to assist in the marketing
of the asbestos in the United States of America. N.A.A.C. acted as a
liaison between the United States purchasers of the asbestos and the
G   seller, either Egnep or Casap. N.A.A.C. also purchased asbestos on its
own account and sold the asbestos in the U.S. market. In the later 1950s
Capasco, an English company, was incorporated. Its shares were and
still are held by Cape. Capasco, formerly called Cape Asbestos Fibres
Ltd., was responsible for the marketing world wide of Cape's asbestos
and asbestos products. But the prior existence of N.A.A.C. had the
result that marketing in the United States of America was left in the
H   main to N.A.A.C.

In 1975 an organisational change took place. Cape International &
Overseas Ltd. ("C.I.O.L.") was incorporated. C.I.O.L. was an English
company and its shares were held by Cape. The shares in Casap and the

APP.270

shares in N.A.A.C. were transferred to C.I.O.L. But the manner in   A
which Capasco, N.A.A.C., and Casap and the mining companies carried
on business and managed their affairs was not materially altered by the
insertion of C.I.O.L. between Cape, on the one hand, and Casap and
N.A.A.C. on the other hand. The sale to Transvaal Consolidated
Exploration Co. Ltd. in 1979 took the form of a sale of the shares in
C.I.O.L. So, to rehearse the corporate structure, Cape was the parent
company; N.A.A.C. was the marketing subsidiary for the United States   B
of America; Capasco was the marketing subsidiary world wide; Casap
was the subsidiary which owned the mining companies and Egnep
owned the asbestos mines from which came the amosite asbestos which
was sold into the United States of America.

One of the main customers in the United States for Egnep's amosite
asbestos was Pittsburg Corning Corporation ("P.C.C."). In 1962, P.C.C.   C
purchased from Union Asbestos and Rubber Corporation ("Unarco")
an asbestos factory at Owentown in Texas. Unarco had been a customer
for Egnep's amosite asbestos. After its purchase of the Owentown
factory in 1962 P.C.C. became a customer. Egnep's amosite asbestos
was purchased by P.C.C. and used in the factory for 10 years from 1962
until 1972 when the factory was closed.

Awareness of the potential long-term damage capable of being   D
caused by asbestos dust to those exposed to it reached the point in the
mid-1970s in the United States of America at which personal injuries
actions began on a large scale to be instituted. Many of those who had
worked or were working in the Owentown factory and those who lived
in the neighbourhood of the factory commenced actions in the period
1974 to 1979. An accurate estimate is difficult to make but from what I   E
have heard in the course of this action it seems that over that period
some 2,000 to 3,000 plaintiffs issued proceedings based upon allegations
of injury caused by exposure to asbestos dust emanating from the
Owentown factory. There were several defendants to the actions. Unarco
and P.C.C., the successive owners of the factory, were defendants. The
corporate shareholders of P.C.C., namely P.P.G. Industries Inc.
("P.P.G.") and Corning Glassworks Inc., were joined as defendants on   F
the basis that each had taken sufficient part in management decisions
regarding the use of asbestos at the Owentown factory to subject itself
to tortious liability arising from that use. N.A.A.C., Cape and Egnep
became defendants.

Liability was alleged on the ground that they had been responsible
for the supply of the amosite asbestos used in the Owentown factory   G
and, notwithstanding knowledge of its dangers, had failed to warn
against those dangers. In addition, the United States itself became a
defendant in some of the actions and a third party defendant in others.
So did the union to which most of the Owentown factory workers
belonged, the Oil Chemical and Atomic Workers International Union.
Not all these defendants were residents of Texas. Moreover, the
defendants included the United States of America itself. So the actions   H
were brought not in a Texas state court but in a federal court under its
diversity of citizenship jurisdiction, which I will later endeavour to
explain.

A    The first action was commenced in the Tyler court on 2 January 1974. There were some seven plaintiffs. The action was framed as a "class" action with the plaintiffs purporting to sue "on behalf of themselves and all others similarly situated." This was the "Yandle" action. On 17 January 1974 a second action was commenced in the Tyler court, the "Kay" action. Both actions were assigned to Judge Steger.

B    On 25 February 1974 Cape filed a motion in the Yandle action to quash service on the ground of lack of jurisdiction. On 26 March 1974 Cape filed a similar motion in the Kay action. On 10 April 1974 Egnep did likewise. In 1976 Capasco became a defendant and filed similar motions.

     On 31 July 1974, by which time it must have been apparent that hundreds of claimants alleging injury caused by the amosite asbestos used in the Owentown factory were queueing up in the wings, a

C    conference took place between Judge Steger and counsel for the parties in the two actions. It was decided that the Rules for Complex and Multi-District Litigation would be followed. I shall have to describe these more fully later. For the moment, it suffices to say that they are rules set out in the *Manual for Complex Litigation for use with Federal Practice and Procedure*, the authors of which are Professor Charles Wright and Professor Arthur Miller. The latter gave evidence before

D    me. The rules, widely used in federal courts, represent in substance management techniques for the efficient management and conduct of complex civil litigation.

     One of the first procedural questions which needed to be decided was whether or not the actions would proceed as "class" actions. A hearing on this issue took place on 17 December 1974. On 31 December

E    1974 Judge Steger ruled that the actions should not have "class" action status. His judgment contains a useful summary of the litigation and the issues therein. In the penultimate paragraph of his judgment, Judge Steger said:

         "The court is of the opinion that the superior method for adjudication of this case is to continue to allow intervention freely

F        for those who wish to join and to maintain firm control over this litigation by utilising the tools set forth in the *Manual for Complex and Multi District Litigation*. It is therefore ordered that the plaintiffs' motion for class action status be and the same is hereby in all things denied . . ."

G    I must explain the reference to "intervention." Under rule 24 of the Federal Rules of Civil Procedure, a person may, with leave of the court, intervene in an action and become a party thereto if the "applicant's claim or defence and the main action have a question of law or fact in common." Following Judge Steger's order of 31 December 1974 a large number of claimants intervened in the Yandle and Kay actions. On 31 December 1974 a third action was commenced in the Tyler court, the

H    "McNeece" action. The United States of America was the only defendant. The three actions I have mentioned (the Yandle action, the Kay action and the McNeece action) have become known compendiously as Tyler 1. I shall so refer to them.

APP.272

I have already referred to the motions based upon an alleged lack of A
jurisdiction. Those motions were not dealt with until 19 April 1977. In
the meantime, Cape and Capasco took a number of procedural steps in
or in connection with the actions. The effect of these steps is one of the
issues before me.

On 19 August 1977 Judge Steger dismissed the motions. He gave no
written judgment or reasons. The dismissal was not, however, final. It
did not bar Cape and Capasco from taking the same jurisdiction point at B
trial. In substance, the dismissal was, I think, no more than a decision
that the point was not so obvious as to warrant a summary dismissal of
Cape and Capasco from the action, and that the point should be left for
final decision at trial.

Following the dismissal of the motions, Cape and Capasco filed
answers in the Yandle action and the Kay action. They pleaded to the C
merits of the claims while nonetheless maintaining their jurisdiction
objection. By this time, mid-1977, the process of intervention had
swelled the number of claimants for damages in the Tyler actions to well
over 400. The number was, moreover, still increasing. On 15 July 1977
Judge Steger set 12 September 1977 as the trial date for the three Tyler
actions.

One of the most striking features of the Tyler litigation, to English D
eyes at least, is the personal involvement of Judge Steger in the
negotiations for a settlement between the claimants and the defendants.
It is a fair inference from the evidence before me that the judge set 12
September 1977 as the trial date in order to concentrate the minds of all
parties on the need for a settlement and without any real expectation
that an effective trial would commence on that date. E

When, on 12 September 1977, the actions were called on, the
defendants applied for an adjournment on the ground that they were
not yet ready for trial. Judge Steger, without ruling on the application,
sent the parties away to negotiate. It is interesting to recall the evidence
of Mr. Richard Bernays, counsel for N.A.A.C. He said:

"Judge Steger then asked the marshall to show us all—and we were F
quite an aggregation—into his conference room in his chambers,
and he was completing the call of his docket and said he would join
us shortly, which he did. There were a number of us round a very
large conference table and the judge finally appeared and directed
us to stay there and work until we had settled the cases. He gave us
orders that nobody was to leave Tyler, that we could set our own
hours of work, come and go as we pleased with that one restriction, G
that nobody was to leave Tyler without his permission, and he
ordered us to stay and work as long as was required to get these
cases settled—period."

The negotiations continued in Tyler for some three days. The judge
played a broking role, putting pressure on the plaintiffs' counsel to
reduce the demands they were making and putting pressure on the H
defendants' counsel to make offers he regarded as realistic. Sometimes it
was the judge himself who communicated the offers and counter-offers
to the other side. After the initial three days, counsel were permitted by

A    the judge to leave Tyler in order to confer with their clients and to
     obtain fresh instructions. They returned to Tyler about a week later and
     a further three days of negotiations took place. Final negotiations at
     which agreement was reached took place over the period 28 September
     to 30 September 1977. The agreed settlement figure was $20m.

         One of the difficulties which had apparently stood in the way of
     settlement had been the ever increasing number of plaintiffs. Accordingly
B    on 28 September, after I think agreement in principle on the $20m.
     figure had been reached, Judge Steger announced that no further
     intervention in any of the Tyler 1 actions would be permitted. There
     were then 462 plaintiffs. No more would be added. A formal order to
     that effect was in due course made on 16 December 1977 and was
     expressed to be "nunc pro tunc as of 28 September 1977."

C        The burden of providing the $20m. was shared among the defendants
     in agreed proportions. A sum of $5.2m. was to be contributed by
     N.A.A.C., Cape and Egnep; $8.05m. by P.C.C. and its shareholders;
     $1m. by Unarco; and $5.75m. by the United States Government. The
     $20m. was intended to settle all claims of the existing 462 plaintiffs.

         Notwithstanding that effective agreement was reached in the
     negotiations on 28, 29 and 30 September 1977, the final judgment
D    disposing of the Tyler 1 actions was not given until 5 May 1978. The
     judgment provided:

         "all parties agreed to waive a jury herein and submit all matters to
         the court without the intervention of a jury, whereupon all parties
         made it know to the court that all matters in controversy between
         them and each of them had been settled by an agreement made in
E        open court which agreement has been transcribed, and the court
         finds from the evidence that said agreement is fair, reasonable, just,
         and to the best interests of plaintiffs herein, including the minor
         plaintiffs, and that said agreement should be in all things approved,
         it is therefore, ordered, adjudged and decreed by the court that the
         compromise settlement agreement evidenced by the record of
         proceedings made herein on 28, 29 and 30 September 1977, and 15
F        February 1978, be and the same is hereby in all things approved. It
         is accordingly ordered, adjudged and decreed by the court that the
         plaintiffs and intervenor, and each of them, take nothing by reason
         of these suits and said causes are hereby dismissed with prejudice."

     Judge Steger's oral direction given on 28 September 1977, confirmed by
G    the written order of 16 December 1977, had prevented any further
     interventions in the Tyler 1 actions. New actions had, therefore, been
     commenced by claimants who would, no doubt, have otherwise
     intervened in the Tyler 1 actions. These new actions are referred to as
     the Tyler 2 actions. They, too, were assigned to Judge Steger. There are
     eight actions in all. The first was commenced on 19 April 1978. The last
     was commenced on 19 November 1979. Intervention by other claimants
H    into one or other of the Tyler 2 actions took place on an even greater
     scale than had been the case with the Tyler 1 actions. Cape, Egnep and
     N.A.A.C. were defendants in each of the eight Tyler 2 actions. But
     Capasco was a defendant in only three of them, namely those identified

by the numbers 78–102, 78–104, and 79–114. P.C.C., P.P.G., Corning     A
Glass and O.C.A.W. were defendants in all actions. The United States
Government was a defendant in some of the actions and a third party
defendant in others.

On 28 December 1981 an important procedural order was made by
Judge Steger. The order commences with this explanatory passage:

"There are several issues in these massive tort actions which should     B
be addressed in order that the court may exercise more control over
the proceedings as this litigation progresses. First, the defendants
have filed motions in which they contend that the claims of many of
the plaintiffs are premature because no injury has yet been suffered
by the party allegedly exposed to asbestos. Second, it appears that a
pretrial statement of damages would improve the court's ability to
take a more active role in managing the progress of these actions."     C

The operative part of the order provided:

"It is ordered that each plaintiff asserting a claim for money/damages
in this action shall provide the information requested by the court
on or before 1 February 1982. The answers shall be based on
personal knowledge and attested to under penalty of perjury. Every     D
person providing the information requested has an obligation to
exercise good faith in disclosing all material facts that are relied on
in asserting the respective claims. Non-responsive or evasive answers
will not be permitted. Counsel shall assist in preparing the responses
when appropriate. This case has been pending for several years and
there has been ample time for counsel to evaluate the claims of
their clients.                                                          E

"For the present time, a plaintiff whose deposition has previously
been taken in this action, need not provide the requested
information. However, the court urges counsel for the plaintiffs to
carefully examine and analyze the claims asserted by every individual
they purport to represent to determine whether the claims asserted
are premature or frivolous. If so, counsel should take whatever     F
action necessary to protect the rights of their clients.

"In the event a plaintiff determines that the claim he or she is
asserting has been filed prematurely, he or she may file a motion to
voluntarily dismiss under rule 41(a)(2) of the Federal Rules of Civil
Procedure. Unless good cause to the contrary is demonstrated, the
court will grant said motions and dismiss the claims without
prejudice.                                                              G

"In the event a plaintiff fails to provide the requested information
within the time allowed, his or her claim will be subject to dismissal
without prejudice in accordance with the provisions contained in
rule 37(b)(2) and rule 41(b) of the Federal Rules of Civil Procedure."

Under headings "Preliminary information," "Has the cause of action
accrued," and "Pre-trial statement of damages" the information to be     H
supplied was specified.

As a result of the order of 28 December 1981 and the response, or
lack of response, thereto by the respective plaintiffs, a large number

A   thereof had their claims summarily dismissed "without prejudice." The
number of plaintiffs left in the Tyler 2 actions was 206 or thereabouts. It
may be assumed that each of the 206 had responded to the order of 28
December 1981 by alleging some physical condition that was at least
capable of having been caused by exposure to asbestos dust and was
capable of constituting an injury.

B   Cape, Capasco and Egnep took no part in any of the Tyler 2 actions.
This was a deliberate tactical decision. It appears from the evidence I
have seen and heard that the senior officers of Cape regarded the Tyler
1 actions, initially at least, as of little more than nuisance value. They
could not understand how tortious liability to the Owentown workers
could be visited upon the Cape companies simply on the ground that
Cape subsidiary companies had mined the asbestos and sold it into the
C   United States of America. It may be that they underestimated the
breadth of the net of tortious product liability as applied in the United
States of America. They also, it seems, expected to succeed on their
jurisdiction objection, either at the interlocutory stage or, later, at trial.
But the Tyler 1 settlement negotiations and the pressure for a settlement
exerted by Judge Steger shattered any previous complacency. If the
other defendants had stood firm, Cape would, I think, have preferred to
D   go to trial and to have endeavoured to win on the jurisdiction point. But
if all the other defendants were to settle, Cape would be left as the only
defendant in potentially big and expensive jury trials. So they agreed to
participate in the Tyler 1 settlement at a group cost of $5.2m.

After the settlement had been concluded the future did not look
attractive to Cape. It was known, or at least feared, that there were
hundreds more claimants waiting to step forward and press claims. The
E   $5.2m. contribution to the $20m. settlement had been borne as to
$4.1m. by N.A.A.C.'s insurers. But the insurance cover was, apparently,
virtually exhausted. Cape had no assets in the United States of America
save for the shares in N.A.A.C. held by C.I.O.L. The N.A.A.C. shares
were, by reason of the number of outstanding asbestos related claims,
assets of no value. So the decision was taken by the senior management
F   of Cape that Cape, Capasco and Egnep would take no step at all in any
of the Tyler 2 actions. They were prepared to allow default judgments
to be obtained. There were no United States assets against which any
judgments could be enforced and they were prepared to defend actions
brought in England to enforce any judgments on the ground that under
English law, the United States courts had no jurisdiction over Cape,
Capasco or Egnep. The decision to take no step in the Tyler 2 actions
G   was necessary in order to avoid anything being done that might be
represented as a submission to the jurisdiction of the Tyler court. In
addition it was decided to put N.A.A.C. into liquidation.

These decisions were taken at a meeting of the board of Cape
Industries held on 1 November 1977. The minutes of the meeting
record:

H   "The managing director stated that, having regard to the opinion of
Mr. J. Fox-Andrews Q.C., it was proposed in respect of any future
United States claims not to contest the proceedings in the American
courts and to accept the risk of a default judgment being given

against the company in the United States of America, it being   A
considered most unlikely that such a judgment would be enforced
by an English court. . . . Reference was made to a proposed re-
organisation of the group's asbestos selling arrangements, particularly
in the United States of America, which in future would be more
closely controlled from South Africa. As part of this re-organisation
it is proposed that North American Asbestos Corporation should be
wound up."                                                       B

The minutes do not so state but there can really be no doubt but that
the decision to wind up N.A.A.C. was taken in order to try and avoid
the danger of an argument that under English law Cape's interest in
N.A.A.C.'s United States business suffced to give the Tyler court
jurisdiction over Cape.                                           C
    It was not, however, desired that the United States of America, as a
market for Cape's asbestos, should be abandoned. The liquidation of
N.A.A.C. was accompanied by the devising and implementation of
alternative marketing arrangements. First, a Liechtenstein corporation,
Associated Mineral Corporation ("A.M.C."), was formed, the bearer
shares in which were held by Dr. Ritter, a Liechtenstein lawyer, as
fiduciary for C.I.O.L. All sales of Cape's asbestos into the United States   D
of America were to be sales by A.M.C. The second step involved the
creation of a new United States marketing entity. The president of
N.A.A.C. for the past four years or so had been a Mr. Morgan. On 12
December 1977 a new Illinois corporation, Continental Productions
Corporation ("C.P.C.") was formed. The shares in C.P.C. were held by
Mr. Morgan. Under an agreement dated 5 June 1978 made between   E
C.P.C. and A.M.C. it was agreed that C.P.C. would act as agent for
A.M.C. in the U.S.A. for the purpose of the sale of asbestos. C.P.C.
was to be remunerated on a commission basis but had no authority to
contract on behalf of its principal, A.M.C., or any other Cape company.
It was to act as a link between A.M.C. and the United States purchasers
in connection with shipping arrangements, insurance and the like.
    As from 31 January 1978, N.A.A.C. ceased to act on behalf of any   F
of the Cape companies or to carry on any business on its own account
save for the purpose of liquidating its assets. N.A.A.C. executed articles
of dissolution on 18 May 1978. The relationship between N.A.A.C.,
C.P.C., A.M.C. and the Cape companies is a matter on which a good
deal turns and to which I shall have to return in more detail. My
intention for the moment is simply to give an outline of events. Through   G
the medium of A.M.C. and with the assistance of C.P.C., Egnep's
amosite asbestos continued to be sold into the U.S. until the sale in 1979
to Transvaal Consolidated Exploration Co. Ltd. What happened
thereafter I do not know.
    I must return to the Tyler 2 actions. Between 1981 and 1982, it will
be recalled, the number of plaintiffs had been thinned down to about
206. On 3 November 1982 Judge Steger fixed 2 February 1983 as the   H
trial date. Shortly before the hearing date, settlement negotiations took
place. On 24 January 1983 there was a meeting between defence
counsel. The purpose was to discuss the forthcoming trial. The possibility

A   of settlement of the Tyler 2 actions was also discussed. No one on behalf of Cape, Capasco or Egnep was present. They were taking no part in the proceedings. No one for Unarco was present. Unarco had entered into bankruptcy proceedings and, as I understand it, the actions against it had consequently been stayed. But the other defendants, including N.A.A.C. were represented. When discussion of a possible settlement began, counsel for the United States made clear that the United States

B   would not agree to make any payment by way of settlement. A policy decision had apparently been taken by the Justice Department that the industry and not the taxpayer should bear the cost of compensating claimants for asbestos related disease.

On the following day another conference took place. On this occasion the plaintiffs' counsel, too, were present. So was the judge, who seems

C   to have played a part comparable to that which he played in the 1978 settlement of the Tyler 1 actions. It is important to record that the plaintiffs represented at this conference did not include those plaintiffs, for convenience called "the Unarco plaintiffs," who had worked at the Owentown factory during its ownership by Unarco pre-1962 but not during its ownership by P.C.C. post-1962. The Unarco plaintiffs obviously had no claim against P.C.C. or its shareholders. So they were not

D   represented in the settlement negotiations that took place on 25 January 1983 and thereafter. The plaintiffs represented at these negotiations numbered 133.

Offers were made on behalf of the plaintiffs. Offers were made by the defendants. It is a feature of the negotiations that the plaintiffs' demands were presented in the form of an average figure per plaintiff.

E   Initially, a sum of $40,000 per plaintiff was sought. This, given 133 plaintiffs, would have led to a settlement figure of $5.32m. The defendants offered a total sum of only $619,000. So there was a wide gap between the two sides. In the course of the day, the plaintiffs' figure came down and the defendants' figure went up. Judge Steger was closely involved in the negotiations, discussing quantum sometimes with plaintiffs' counsel, sometimes with all counsel together. He made plain

F   that he thought the plaintiffs were asking for too much and that the defendants were not offering enough. He was instrumental in bringing the plaintiffs down to an average of $10,000 per plaintiff, a total of $1.33m.

This figure was within reach of a figure that defendants' counsel would have been prepared to accept. But they lacked authority from

G   their clients to go that high. So the negotiations were adjourned to 2 February 1983. The lead counsel for the plaintiffs in these negotiations was Mr. Blake Bailey. He occupied this position not because he represented more plaintiffs than anyone else, but simply because he had been appointed by Judge Steger to be liaison counsel on behalf of the plaintiffs. In the course of the discussions on 25 January Mr. Bailey raised the question of the possible liability of the United States

H   Government. The United States had indicated an unwillingness to agree to make any payment to the plaintiffs. But Mr. Bailey, apparently after discussions with Judge Steger, thought there was a good chance that a judgment against the United States Government could be obtained, at

least on the third party claims, if not on the plaintiffs' direct claims. Mr.  A
Bailey conceived the idea that the terms of settlement might keep alive,
for the benefit of the plaintiffs, the third party claims of the settling
defendants against the United States Government.

On 2 February 1983 the parties met once more. Agreement was
reached on a settlement at an average of $10,000 per plaintiff, a total of
$1.33m. This figure was that which on 25 January Judge Steger had told
Mr. Bailey that the plaintiffs should accept and had told the defendants  B
that they should offer. As between the settling defendants, the $1.33m.
was to be provided as to $900,000 by P.C.C. and P.P.G., $130,000 by
Corning Glass, $50,000 by O.C.A.W. and $250,000 by N.A.A.C. On
payment of these sums the settling defendants were to be released from
all claims by the 133 plaintiffs.

In addition, however, Mr. Bailey put to the defendants' counsel, and  C
obtained their agreement to, a device intended to give the plaintiffs the
chance of additional recovery against the United States Government.
The device was this: the settlement figure would be expressed in the
intended settlement agreement not as $1.33m. but instead as $6.65m.,
an average of $50,000 per plaintiff. The defendants would be obliged to
pay only $1.33m. The balance of $5.32m. ($40,000 per plaintiff) would
be payable only if and to the extent that the defendants' third party  D
claims against the United States succeeded. The prosecution of those
claims in the names of the defendants was to be the responsibility of the
plaintiffs' counsel, no costs in respect thereof falling on any of the
defendants. The $6.65m. was a figure proposed by Mr. Bailey. It was
not a figure which mattered at all to the defendants since their obligation
to pay was limited to the $1.33m. They did not bargain about the  E
amount. They simply agreed to Mr. Bailey's proposal which would cost
them nothing. Mr. Bailey told me that the figure was based upon what
he thought might be awarded against the United States at the suit of the
settling defendants. How it could have been supposed that the liability
of the United States under the third party claims could exceed the
$1.33m. that the settling defendants, the third party claimants, had
agreed to pay the plaintiffs, defeats me. But there it is. I shall have to  F
return to the implications of this device later.

Terms having been reached between plaintiffs and settling defendants,
the agreement was announced to Judge Steger in open court on the
same day, 2 February 1983. There is a transcript of what was said. Judge
Steger approved the settlement. He certainly knew of the true settlement
figure of $1.33m. Indeed, the $10,000 average had been suggested and  G
recommended by him. Whether he had any knowledge of the $6.65m.
figure is an important matter to which I must return.

On 8 April 1983 Judge Steger fixed 20 June 1983 as the trial date for
the outstanding Tyler 2 claims against the United States. In addition to
the third party claims, a few of the plaintiffs had direct claims against
the United States. The lead counsel for the United States in the Tyler 2
actions was Peter Nowinski. He and Mr. Bailey met and discussed the  H
possibility of settlement. Mr. Nowinski again made clear that the United
States Government thought that the industry, not the taxpayers, should
bear the burden of compensation for asbestos related injury. Mr. Bailey

A  then suggested an agreement under which, in settlement of the claims
against the United States, the United States would agree to bear the
costs of enforcement of default judgments against, Cape, Capasco and
Egnep. Agreement on these lines was reached. A compromise agreement
dated 15 June 1983 was signed. Paragraphs 3 and 4 thereof provided:

B  "Plaintiffs or third-party plaintiffs, or both, will promptly make due
application to the Texas court for judgment against the Cape
companies, or any of them, for damages suffered as a result of
exposure to asbestos at or from the Texas plant. Such application
shall not be presented to the Texas court without the prior approval
of the United States of America, both as to form and content,
which approval shall not be unreasonably withheld.

C  "Upon satisfaction of the promises made in clauses 1, 2 and 3
above and upon entry of judgment or judgments against the Cape
companies, or any of them, the United States agrees diligently to
cause to be taken or assist in taking of such appropriate action as
may be reasonably required to enforce or attempt to enforce such
judgment or judgments in the United Kingdom of Great Britain or
the Union of South Africa, or in such other countries as may be
D  appropriate against the judgment debtors, their predecessors,
successors, assigns or other appropriate entities."

The stage was therefore set for applications for default judgments
against Cape, Capasco and Egnep, none of which had taken any part in
the Tyler 2 actions and each of which therefore was in default in filing
an answer to the plaintiffs' pleadings. The purpose of obtaining these
E  default judgments was that they should be enforced in England. It is not
surprising, therefore, that the application should have been preceded
by consultations between Mr. Bailey, Mr. Nowinski and Messrs.
Oppenheimers, solicitors for the plaintiffs. The advice given by
Oppenheimers is protected by privilege, but it is not hard to infer that it
dealt with the English law on enforcement of foreign judgments.

F  The application for the default judgment and the judgment itself
were drafted by Mr. Bailey. Various preliminary drafts are in evidence
and there is some difficulty in following the development of the original
draft to the final version. Mr. Bailey testified to consultations both with
Mr. Nowinski and with Judge Steger on the matter. Cape and Capasco
were informed by notice that the application for the default judgment
would be heard on 12 September 1983. This notice was not strictly
G  required under the relevant Federal Rules of Procedure but, I expect,
was given ex abundanti cautela on the advice of the plaintiffs' English
lawyers.

A hearing of the application, or at least some judicial adjudication
thereon, was necessary in order that the unliquidated damages claims of
the respective plaintiffs should be quantified. The documents in support
of the application were lodged with Judge Steger on 12 September 1983
H  and sought for each plaintiff one or other of four levels of damages,
$150,000, $115,000, $85,000 and $60,000. The sum allocated to each
plaintiff was designed to produce an average of $120,000 per plaintiff.
On 12 September 1983 Judge Steger was sitting not in Tyler but in

Marshall, Texas. The documents handed in on 12 September 1983    A
included medical records relating to each of the 206 plaintiffs. In relation
to a few of the plaintiffs there were doctors' reports. With the records
and reports relating to each plaintiff was a summary. Each summary
gave the name and age of the plaintiff, a short statement of the
plaintiff's exposure to asbestos dust, the name of the person or
organisation by whom the plaintiff had been medically examined and a
short statement of the result of the examination. The summaries had    B
been prepared by the plaintiffs' respective attorneys.

The default judgment itself was signed by Judge Steger and dated 12
September 1983. It was presumably signed on that day. It was certainly
signed earlier than 14 September 1983 since on that date the judgment
was formally recorded on the court docket sheets relating to the Tyler 2
actions. At some point, perhaps in the afternoon of 12 September, Mr.    C
Bailey was informed on the telephone by Judge Steger's law clerk that
the judge was not prepared to give judgment for an average of $120,000
per plaintiff but was prepared to give judgment for an average of
$75,000 per plaintiff. It was left to Mr. Bailey and Mr. Charles Clark,
counsel for some 181 of the plaintiffs, to re-work the details in the
appendix to the judgment so as to produce an average award of $75,000.
They did so by reducing the four levels of damages to $115,000, $85,000,    D
$60,000 and $37,000. Thus the directed average of $75,000 was produced.
The re-worked appendix was handed in at the Tyler courthouse and was
annexed to the signed judgment. All this must have taken place earlier
than 14 September and before Judge Steger signed the judgment. No
hearing as such had taken place. No witness had given evidence, orally
or by affidavit. The extent to which Judge Steger looked at, or could    E
have looked at, the medical records and reports is in doubt. I will return
to this later. The propriety of the judge dealing with the assessment of
damages without any evidence, in the strict sense, is also in issue. It is
not necessary for me at this stage to do more than outline the manner in
which the default judgment came to be produced.

The actions before me were commenced by specially endorsed writs
most of which were issued on 1 August 1984. Each statement of claim    F
pleaded the Tyler 2 action in which the plaintiff had been a party,
asserted that the Tyler court had had jurisdiction to deal with the action,
pleaded the default judgment of 12 September 1983, and claimed the
amount allocated by that judgment to the plaintiff with interest thereon.

*The issues*                                                              G

The plaintiffs cannot enforce the default judgment by action in this
country unless, by the standards of English law, the Tyler court was
entitled to take jurisdiction over Cape and Capasco. The plaintiffs rely
on three alternative grounds. First, the plaintiffs contend that Cape and
Capasco voluntarily appeared in the proceedings in the Tyler court. This
contention requires some explanation since it is common ground that
Cape and Capasco took no part at all in the Tyler 2 actions. The    H
plaintiffs rely, however, on the steps taken by Cape and Capasco in the
Tyler 1 actions and on the relationship between the Tyler 1 actions and
the Tyler 2 actions. The first step in the argument is that Cape and

A    Capasco voluntarily appeared in the Tyler 1 actions. Cape and Capasco deny this. They contend that each step they took in the actions was taken subject to the protest to the jurisdiction they had made at the outset and that, notwithstanding the interlocutory dismissal of their motions, jurisdiction remained a live issue for the trial. In the circumstances they contend that nothing was done in the Tyler 1 actions that could constitute a voluntary appearance or submission to the

B jurisdiction. The plaintiffs' second step in the argument is their assertion that the Tyler 1 actions and Tyler 2 actions represent "one litigation unit" so that a voluntary appearance or submission to the jurisdiction in any of the actions was sufficient to give the Tyler court jurisdiction over Cape and Capasco in all the actions. This somewhat startling proposition is based upon the alleged effect of bringing Owentown asbestos related

C litigation under the umbrella of the Rules for Complex and Multi District Litigation.

    Second, the plaintiffs contend that even if they are wrong on their first point, nonetheless Cape and Capasco must be taken to have agreed to submit to the jurisdiction of the Tyler court in the Tyler 2 actions. The plaintiffs rely on the inferences which it is contended must be drawn

D from the various steps taken by Cape and Capasco in the Tyler 1 actions. Cape and Capasco deny that those steps can be represented as their agreement to submit to the jurisdiction in other actions.

    Third, the plaintiffs contend that the Tyler court was entitled to take jurisdiction over Cape and Capasco by reason of their presence in Illinois either in January 1974, when the Tyler 1 actions commenced or in April 1978 to November 1979, the period over which the Tyler 2

E actions were commenced. This contention raises issues both of law and fact. For the fact of presence, the plaintiffs rely on N.A.A.C.'s Illinois presence up to its dissolution in 1978 and on C.P.C.'s Illinois presence from 31 January 1978 up to the sale to Transvaal Consolidated in June 1979. It is contended that the relationship between each of these companies and Cape and Capasco justifies treating their presence in

F Illinois as, for jurisdiction purposes, the presence of Cape and Capasco. This contention is in issue. It is also in issue whether, under English law, presence in Illinois is sufficient to give jurisdiction to a federal district court sitting in Texas on a tort claim governed by the law of Texas. The last of the Tyler 2 actions was commenced in November 1979, some months after the sale to Transvaal Consolidated. But, if the plaintiffs'

G presence in Illinois is sound so far as the earlier Tyler 2 actions are concerned, the plaintiffs rely on the "one litigation unit" argument for the purpose of bringing the last action under the same umbrella.

    Finally, the plaintiffs have a comity or reciprocity ground. It is pleaded in the further and better particulars of the statement of claim that, if the situation had been in reverse, the English courts would have assumed jurisdiction and that the English courts should therefore

H recognise the jurisdiction of the Tyler court. Mr. Morison, however, in opening the plaintiffs' case gave me the welcome news that he would not be relying before me on this fourth ground. There is apparently clear authority, binding at least on courts of first instance, that comity or

APP.282

reciprocity is an inadequate ground for enforcement in England of the   A
judgment of a foreign court.

Cape and Capasco deny that the Tyler court had, for the purposes of
English law, jurisdiction over them on any of the three grounds relied
on by the plaintiffs. Cape and Capasco have, however, additional
defences. They allege that the default judgment is impeachable and
unenforceable, first upon the ground that it was obtained by the fraud of
Mr. Bailey, second that it was obtained in circumstances opposed to   B
natural justice; and, finally, that to enforce it would be contrary to
public policy. Broadly the same particulars are relied on in support of
each of the three grounds. It is alleged that the default judgment, as
drafted by Mr. Bailey and signed by Judge Steger, contained to the
knowledge of Mr. Bailey a number of mis-statements of fact. It is
alleged that, to Mr. Bailey's knowledge, the procedure employed for   C
quantification of the plaintiffs' damages did not represent a judicial
determination or assessment thereof. It is alleged that Mr. Bailey
induced the judge to award more than he would otherwise have awarded
by misrepresenting that the February 1983 settlement between the 133
plaintiffs and the settling defendants had been agreed at an average
figure of $50,000 per plaintiff, rather than the true figure of $10,000 per
plaintiff. It is alleged that the damages awarded by the default judgment   D
were to Mr. Bailey's knowledge, arbitrary, exorbitant and manifestly
unjust. There are additional allegations, but I have mentioned the
principal ones. These allegations are all denied and have been bitterly
contested. Apart from the issues of fact raised by these allegations they
raise also issues of law as to the criteria that must be satisfied if an
otherwise enforceable foreign judgment is to be rejected on grounds of   E
fraud, natural justice or public policy.

In summary, therefore, there are the following issues with which I
must deal. (1) Did Cape and Capasco voluntarily appear or submit to
the jurisdiction in the Tyler 1 actions? (2) If so, did they thereby submit
to the jurisdiction in the Tyler 2 actions? (3) Alternatively, did they
thereby agree to submit to the jurisdiction in the Tyler 2 actions?
(4) Did the presence of N.A.A.C. in Illinois represent the presence of   F
Cape and Capasco in Illinois for jurisdiction purposes? (5) Did the
presence of C.P.C. in Illinois represent the presence of Cape and
Capasco in Illinois for jurisdiction purposes? (6) Did the presence in
Illinois of Cape and Capasco entitle the Tyler court to take jurisdiction
over Cape and Capasco in the Tyler 2 actions? (7) Is the default
judgment impeachable on any of the fraud, natural justice and public   G
policy grounds pleaded by Cape and Capasco?

I will take these issues in turn, but it is worth first emphasising that
each falls to be decided in accordance with English law. Questions as to
whether certain acts represent a submission to the jurisdiction of the
Tyler court must be decided by reference to English law. It may be that
English law will answer certain questions by applying the law of Texas
or United States federal law, as the case may be, but that will be   H
because English law requires that approach. My task is to try and
identify the rule of English law that applies to each question and then
apply that rule.

A    I can conveniently start by identifying the basis on which English courts will enforce the in personam judgments of foreign courts. In *Russell v. Smyth* (1842) 9 M. & W. 810, 818, Lord Abinger C.B. said: "Foreign judgments are enforced in these courts because the parties liable are bound in duty to satisfy them." Parke B. expressed the same principle, at p. 819: "Where the court of a foreign country imposes a duty to pay a sum certain, there arises an obligation to pay, which may
B    be enforced in this country." In *Godard v. Gray* (1870) L.R. 6 Q.B. 139, 148–149, Blackburn J. said:

"But in England and in those states which are governed by the common law, such judgments are enforced, not by virtue of any treaty, nor by virtue of any statute, but upon a principle very well stated by Parke B. in *Williams v. Jones* (1845) 13 M. & W. 628,
C    633: 'Where a court of competent jurisdiction has adjudicated a certain sum to be due from one person to another, a legal obligation arises to pay that sum, on which an action of debt to enforce the judgment may be maintained. It is in this way that the judgments of foreign and colonial courts are supported and enforced.' And taking this as the principle, it seems to follow that anything which negatives
D    the existence of that legal obligation, or excuses the defendant from the performance of it, must form a good defence to the action. It must be open, therefore, to the defendant to show that the court which pronounced the judgment had no jurisdiction to pronounce it, either because they exceeded the jurisdiction given to them by the foreign law, or because he, the defendant, was not subject to that jurisdiction; and so far the foreign judgment must be
E    examinable. Probably the defendant may show that the judgment was obtained by the fraud of the plaintiff, for that would show that the defendant was excused from the performance of an obligation thus obtained . . ."

In *Schibsby v. Westenholz* (1870) L.R. 6 Q.B. 155 judgment was delivered on the same day as the judgment in *Godard v. Gray*, L.R. 6
F    Q.B. 139. The same judge, Blackburn J., repeated the principle stated in *Godard v. Gray*, and added, at p. 159, that "anything which negatives that duty, or forms a legal excuse for not performing it, is a defence to the action."

The "obligation to pay" to which Blackburn J. referred in *Godard v. Gray* may, under English law, arise in two ways. First, it is accepted that a foreign court is entitled to take jurisdiction on a territorial basis.
G    "All jurisdiction is properly territorial" said the Earl of Selbourne L.C. in *Sirdar Gurdyal Singh v. Rajah of Faridkote* [1894] A.C. 670, 683. He expanded the proposition thus:

"Territorial jurisdiction attaches (with special exceptions) upon all persons either permanently or temporarily resident within the territory while they are within it; but it does not follow them after
H    they have withdrawn from it, and when they are living in another independent country. It exists always as to land within the territory, and it may be exercised over moveables within the territory; and, in questions of status or succession governed by domicil, it may exist

A

as to persons domiciled, or who when living were domiciled, within the territory. As between different provinces under one sovereignty (e.g. under the Roman Empire) the legislation of the sovereign may distribute and regulate jurisdiction; but no territorial legislation can give jurisdiction which any foreign court ought to recognise against foreigners, who owe no allegiance or obedience to the power which so legislates."

B

It is the territorial basis of jurisdiction that the plaintiffs invoke in asserting that Cape, through N.A.A.C. or C.P.C., was present in Illinois.

The alternative basis of jurisdiction, where in personam money judgments are concerned, is that of consent. Prima facie, a foreign court does not, in the eyes of English law, have jurisdiction over an absent foreigner. But if the foreigner consents to the court exercising jurisdiction over him, the position is different. The element of consent is clearly present if the foreigner, as plaintiff, commences proceedings in the foreign court. It is also present if the foreigner, as defendant, makes a voluntary appearance without protest in the foreign court. In either case there is a submission by the foreigner to the jurisdiction of the foreign court that, in the eyes of English law, may give rise to an "obligation to pay." Further, whether or not a defendant takes any part in an action in a foreign court, he may have contractually bound himself to accept the jurisdiction of the foreign court. Accordingly, the jurisdiction of a foreign court over a defendant may be established, on a consensual basis, either by the defendant's participation in the proceedings or by the defendant's agreement to submit to the jurisdiction. This consensual basis is relied on by the plaintiffs both in its voluntary submission argument and in its contention that there was an agreement by Cape and Capasco to submit.

C

D

E

It is important, to my mind, to keep clear and distinct the two alternative bases upon which the jurisdiction of a foreign court over a defendant may be established. Jurisdiction on the ground of presence in the foreign country is based on territoriality. Consent on the part of the defendant is not necessary and is irrelevant. On the other hand, jurisdiction on the ground of voluntary submission or of an agreement to submit is based upon consent. An actual consent is, in principle, necessary. The over-riding consideration, however, relevant to each of the issues with which I must deal is whether the default judgment in the Tyler 2 actions created an "obligation to pay" which, under English law, the defendants are bound to discharge.

F

G

*Issue 1*

The principle that a foreign court has jurisdiction to give an in personam judgment if the judgment debtor, the defendant in the foreign court, submitted to the jurisdiction of the foreign court, is well settled in English law. Application of this principle presents no difficulty if the defendant took no part at all in the proceedings, nor if the defendant simply appeared therein and fought the case on its merits. Difficulty arises where the defendant has objected to the jurisdiction of the foreign

H

A court and, while maintaining that objection, has taken part in the proceedings. The difficulty has, in part, been remedied by Parliament. Section 33(1) of the Civil Jurisdiction and Judgments Act 1982 provides:

> "For the purposes of determining whether a judgment given by a court of an overseas country should be recognised or enforced in England and Wales or Northern Ireland, the person against whom
B the judgment was given shall not be regarded as having submitted to the jurisdiction of the court by reason only of the fact that he appeared (conditionally or otherwise) in the proceedings for all or any one or more of the following purposes, namely (*a*) to contest the jurisdiction of the court; (*b*) to ask the court to dismiss or stay the proceedings on the ground that the dispute in question should be submitted to arbitration or to the determination of the courts of
C another country; (*c*) to protect, or obtain the release of, property seized or threatened with seizure in the proceedings."

Problems, obviously, still remain, particularly in cases where the steps taken by the defendant in the foreign proceedings were taken not only for the purpose of contesting the jurisdiction but also for the purpose of preparing for a trial on the merits. Some authority suggests that in such
D cases the defendant will be regarded as having submitted to the jurisdiction of the foreign court: see e.g. *Boissière & Co. v. Brockner & Co.* (1889) 6 T.L.R. 85. But in *Williams & Glyn's Bank Plc. v. Astro Dinamico Compania Naviera S.A.* [1984] 1 W.L.R. 438 the House of Lords approved a dictum of Cave J. in *Rein v. Stein* (1892) 66 L.T. 469, 471 that

E > "in order to establish a waiver, you must show that the party alleged to have waived his objection has taken some step which is only necessary or only useful if the objection has been actually waived, or if the objection has never been entertained at all."

It is time I identified the various steps taken by Cape and Capasco in the Tyler 1 actions which bear upon this issue.

F (i) The first step taken by each was to file a motion challenging the jurisdiction of the Tyler court. Cape did so on 25 February 1974 in the Yandle action and on 28 March 1974 in the Kay action. I am not clear on what date Capasco filed its motion in the Yandle action. The operative part of each motion declared that the applicant was

> "specially appearing . . . for the sole and only purpose of making this motion to assert lack of jurisdiction of this Honorable Court
G over its person and for said purpose only moves this Honorable Court to set aside and quash the supposed service of summons upon this defendant . . ."

(ii) On 31 July 1974 Judge Steger called the conference of counsel at which it was agreed that the Rules for Complex and Multi-District Litigation would be followed. Mr. Richard Bernays, who acted as
H counsel for Cape and Capasco until 14 September 1977, attended the conference.

(iii) On 26 September 1974 another conference of counsel took place. It was agreed that there would be limited discovery for the

purpose of dealing with the question whether the Yandle and Kay   A
actions should proceed as "class" actions. Cape and Capasco were
represented at this conference.

(iv) On 7 November 1974 Cape answered written interrogatories
which had been filed by the plaintiffs.

(v) On 29 November 1974 Cape filed a brief on the "class" action
question. The brief was expressed to be subject to Cape's objection to
the jurisdiction. In the brief Cape opposed "class" action status for the   B
Yandle and Kay actions.

(vi) On 17 December 1974 the hearing on the "class" action issue
took place. Cape was represented at the hearing. On 31 December 1974
Judge Steger denied "class" action status for the two actions.

(vii) On 4 June 1975 the deposition of Mr. Godfrey Higham was
taken in London. This was part of the pre-trial discovery normal under   C
the procedure of American courts. Mr. Higham gave the deposition as a
witness on behalf of Cape. Mr. Bernays, Cape's counsel, took part in
the taking of the deposition. Subsequently, depositions were taken from
other Cape witnesses and from a Mr. Buckley on behalf of P.C.C. with
counsel for Cape in attendance.

(viii) On 19 April 1977 Cape's and Capasco's motions on the
jurisdiction question were dismissed by Judge Steger. The jurisdiction   D
objection remained alive, however, as an objection to be taken, finally,
at trial. I have already commented that Judge Steger did not purport to
deal definitively with the jurisdiction point. He cut short Mr. Bernay's
submissions on behalf of Cape and gave no reasons for his decision. An
appeal by Cape was theoretically possible, but only theoretically. First,
Judge Steger would have had to be persuaded to certify the point as   E
suitable for an immediate interlocutory appeal. Second, the United
States Court of Appeals for the Fifth Circuit would have had to be
persuaded to give leave for the appeal to proceed. I was satisfied by the
evidence I heard from Mr. Bernays and Mr. Brin, both of whom were
Texan attorneys with wide experience in the federal courts, that the
prospects of getting an appeal heard would have been practically nil.
Both Judge Steger and the United States Court of Appeals would have   F
left the jurisdiction point to be taken at trial and, if necessary, to be
appealed thereafter.

(ix) On 6 May 1977 Cape and Capasco sought and obtained an
extension of time to answer interrogatories. They answered the
interrogatories on 17 June 1977.

(x) On 23 May 1977 Cape and Capasco filed answers in the two
actions. The answers commenced with this paragraph "These defendants   G
and each of them still insist that this Honorable Court does not have
jurisdiction over the person of said defendants." The answers proceeded
to plead to the merits of the case. In addition, and in the same
document, Cape and Capasco made cross-claims against the other
defendants claiming an indemnity against or contribution towards any
sum they might be adjudged liable to pay the plaintiffs. The pleading   H
ended with a demand for a jury trial.

(xi) On the same day, 23 May 1977, Cape and Capasco filed written
material opposing the plaintiffs' motion to be permitted to use depositions
taken in previous asbestos cases.

APP.287

A    (xii) The date of trial was fixed for 12 September 1977. Cape and Capasco were represented in court on that day by Mr. Bernays; he also represented N.A.A.C. Mr. Bernays joined in the application for an adjournment. Thereafter Mr. Bernays represented only N.A.A.C. and Mr. Millwid participated on Cape and Capasco's behalf in the settlement negotiations which took place. The negotiations took place not simply in the face of the judge but at the insistence of the judge.

B    (xiii) Settlement terms were agreed. Cape and Capasco were represented before Judge Steger on 5 May 1978 when the consent was made. The order dismissed with prejudice both the plaintiffs' actions and the defendants' cross-claims.

These were the steps taken in the Tyler 1 actions by Cape and Capasco. Did they, taken cumulatively, represent a submission by Cape and Capasco to the jurisdiction of the Tyler court in the Tyler 1 actions? Mr. Morison, for the plaintiffs, has submitted that they did. He relies, particularly, on the consent order. He is, in my view, right to do so. The various steps taken prior to the settlement negotiations on 23 September 1977 were all, either expressly or implicitly, accompanied by a re-assertion of the jurisdiction objection. I am satisfied that none of the steps taken would, under the law governing the Tyler court, have been regarded as a submission by Cape and Capasco to the jurisdiction or as a waiver of the jurisdiction objection. If the steps would not have been regarded by the domestic law of the foreign court as a submission to the jurisdiction, they ought not, in my view, to be so regarded here, notwithstanding that if they had been steps taken in an English court they might have constituted a submission. The implication of procedural steps taken in foreign proceedings must, in my view, be assessed in the context of the foreign proceedings.

But the consent order is another matter. It represented a clear exercise by the Tyler court of jurisdiction over the Tyler 1 actions. Cape and Capasco participated in inviting Judge Steger to make the order. If any of the Tyler 1 plaintiffs sought to sue Cape in England on the causes of action sued on in Tyler 1, Cape would be entitled to rely on the consent order of 5 May 1978 as a bar to the action. The order extinguished the causes of action against Cape that the Tyler 1 plaintiffs had been asserting. So, in my judgment, the conclusion is inescapable that by participating in the application to Judge Steger to make the consent order of 5 May 1978 Cape and Capasco recognised the jurisdiction of the Tyler court to deal with, and dispose of, the claims made against them in the Tyler 1 actions and waived the jurisdiction objection that was then still on foot.

*Issue 2*

Did the submission to the jurisdiction in the Tyler 1 actions represent also a submission to the jurisdiction in the Tyler 2 actions? The plaintiffs contend that Cape and Capasco, by accepting the court's jurisdiction in the Tyler 1 actions, submitted to the jurisdiction of the court in the Tyler 2 actions. This contention is, in my opinion, for a number of reasons, unsustainable.

First and foremost, the basis of the contention is, in my judgment, **A**
unsound. The argument advanced by Mr. Morison was that the Tyler 1
actions and the Tyler 2 actions were to be regarded as "one unit of
litigation." This followed, it was suggested, from Judge Steger's decision
to apply to the litigation the Rules for Complex and Multi-District
Litigation. But these rules represent no more than management
techniques designed to facilitate the handling of complex cases. They
have, in themselves, no direct procedural effect. The adoption of the **B**
rules by Judge Steger on 31 July 1974 did not have the consequence that
discovery in Tyler 1 could be automatically used in Tyler 2. On the
contrary, specific orders to that effect were later necessary. It did not
have the effect that pleadings from plaintiffs and defendants in Tyler 2
were unnecessary. It did not have the effect that defendants' appearances
in Tyler 1 sufficed as appearances in Tyler 2. It did not have the effect **C**
that the dismissal "with prejudice" of the Tyler 1 actions barred the
commencement of the Tyler 2 actions. It did not have any procedural
effect whatsoever in the Tyler 2 actions, save that the Tyler 2 actions,
like the Tyler 1 actions, became subjected for management purposes to
the Rules for Complex and Multi-District Litigation.

The proposition that because of the adoption of the "Complex
Rules" Cape's participation in the Tyler 1 actions can be treated as it **D**
had been participation in the Tyler 2 actions is, in my view, a fanciful
one with no substance to it, either in American law or in English law.
Support for the proposition was given in evidence by Professor Miller, a
professor of law at Harvard University and co-author of the *Manual for
Complex and Multi-District Litigation*. Professor Miller is a highly
distinguished academic lawyer but in his evidence that all the Owentown
asbestos related litigation had become "one unit of litigation" he did not **E**
give me the impression that he was testifying on a matter of current
procedural or substantive law applicable to United States federal courts.
Rather he seemed to me to be flying an academically attractive kite. In
so far as there was a conflict between the evidence of Professor Miller
and that of Mr. Brin and Mr. Bernays, I far preferred, on this point at
least, the evidence of Mr. Brin and Mr. Bernays. I am satisfied that **F**
under the law applicable to United States federal courts the Tyler 2
actions were new actions separate and distinct from the Tyler 1 actions.

Second, the "one unit of litigation" theory, when used to translate a
submission to the jurisdiction in Tyler 1 into a submission to the
jurisdiction in Tyler 2, ignores the essential basis of English law
concerning submissions to the jurisdiction. Where steps taken in **G**
proceedings are being examined in the context of an alleged submission
to the jurisdiction, what is being sought is evidence of consent on the
part of the defendant to the exercise by the court of jurisdiction over
him. Until the settlement negotiations in September 1977 the jurisdiction
objection which Cape and Capasco had taken was being maintained. I
have already expressed the view that the pre-settlement procedural steps
taken by Cape and Capasco in Tyler 1 could not, in the context of the **H**
federal procedure applicable in the Tyler court, be regarded as a waiver
of the jurisdiction objection. But even if that is wrong, those steps could
not possibly be regarded as evidencing Cape's and Capasco's consent to

A  jurisdiction being exercised over them in future actions not yet started. Nor could Cape's participation in the application to Tyler 1 for a consent order, under which the existing actions against Cape were to be dismissed "with prejudice," be regarded as evidencing that consent. Any other conclusion would, in my view, be grossly unfair to Cape and would divorce a submission to the jurisdiction from the bedrock of consent that ought to underlie it. Accordingly, in my judgment, there

B  was no submission to the jurisdiction by Cape or Capasco in the Tyler 2 actions.

*Issue 3*

    Did the steps taken by Cape and Capasco in the Tyler 1 actions represent their agreement to submit to the jurisdiction in the Tyler 2

C  actions? The rule that an agreement by a party to submit to the jurisdiction of a foreign court will, under English law, justify the foreign court in taking jurisdiction over that party (see *Dicey & Morris' Conflict of Laws*, 11th ed. (1987), pp. 444–445) is another example of the consensual basis whereby a party may, under English law, come under an obligation to obey a judgment of a foreign court. Consent may be

D  evidenced by a term in a contract. A term expressly providing for disputes to be referred to the foreign court is the most obvious and common example. A unilateral statement by a party that he would accept the jurisdiction of a foreign court is an alternative means by which an agreement to submit might be constituted. But, here, caution is in my view needed. A contract containing a foreign court submission clause is one thing. A party to such a contract is prima facie bound by

E  its terms. But a unilateral statement of willingness to accept the jurisdiction of a foreign court does not, of itself, have any obvious binding effect. It ought, in my view, like any other non-contractual statement of future intention, to be capable of being withdrawn, at any rate until acted upon.

    In the present case, the "agreement to submit" that is relied on is not contractual. Nor can any unequivocal statement of willingness to

F  submit be identified. The plaintiffs' contention is that Cape and Capasco, by participating in the Tyler 1 actions, impliedly agreed to submit to the jurisdiction in the Tyler 2 actions. The steps relied on are the same steps as were relied on as evidencing Cape and Capasco's submission to the jurisdiction in the Tyler 2 action. I have already detailed them, and need not do so again. The plaintiffs' argument, as initially advanced by Mr.

G  Morison, was based upon implied agreement. The use of the verb "agree" in this formulation of the argument is, however, misleading. It was not contended that Cape or Capasco had entered into any contract with any of the plaintiffs. Rather it was contended that Cape and Capasco, by their conduct in the Tyler 1 actions, had represented that they would similarly participate in future asbestos related actions brought in the Tyler court by other Owentown plaintiffs, and, in that sense, had

H  impliedly agreed to submit to the jurisdiction.

    So, it seems to me, two questions arise. First, can the conduct of Cape and Capasco in Tyler 1 be fairly regarded as a representation that they would accept the jurisdiction of the court in the Tyler 2 actions?

Second, is a representation by conduct of the sort contended for a   A
sufficient basis, in English law, to justify the taking by a foreign court of
jurisdiction?

The first question is one of fact. Mr. Morison relied heavily on the
circumstances that under the directions for intervention given by Judge
Steger in Tyler 1, any Owentown claimant could, until intervention was
stopped on 23 September 1977, have become a plaintiff in Tyler 1.
Intervention was stopped in order to facilitate a settlement of the claims   B
of the then plaintiffs and in the expectation that claimants who had not
yet intervened would become plaintiffs in new actions. All parties to
Tyler 1, including the judge as well as Cape and Capasco, had that
expectation. All parties contemplated that Cape and Capasco would be
among the defendants in the new actions. I agree with Mr. Morison that
all of this is borne out by the evidence. I accept also that counsel acting   C
for the Tyler 1 plaintiffs, counsel acting for the non-Cape defendants
and Judge Steger would, if they addressed their minds to the matter,
which they did not, have assumed that Cape and Capasco would be
participating in the new actions as they had done in the Tyler 1 actions.
Nonetheless, in my judgment, Cape's and Capasco's conduct in Tyler 1
cannot fairly be regarded as a representation by them that they would
be participating in Tyler 2. Nothing they did in Tyler 1 justified any   D
observer in making assumptions about what they would do in or about
the expected new actions. If they had been asked their intentions and
had given a false or misleading answer, the position might have been
different. But, as it was, they were, in my judgment, entitled to chest
their cards, to keep their options open and to leave others who were
minded to speculate about the future to do so at their own risk.   E

There is a further point to be made on the facts. To whom was the
alleged representation made? Who acted on it? Who relied on it to his
detriment? No answer to any of these questions has been given by the
pleadings, by the evidence or by the arguments addressed to me. In
particular none of the Tyler 2 plaintiffs has pleaded or has claimed, or,
on the evidence, could claim, to have refrained from intervening in
Tyler 1 in reliance on a representation by Cape that it would submit to   F
the jurisdiction in Tyler 2, or to have joined Cape as a defendant in
Tyler 2 in that reliance, or in any other way to have acted on such a
representation.

The second question requires some reference to authority. In both
*Cheshire and North's Private International Law*, 11th ed. (1987), p. 344
and in *Dicey & Morris' Conflict of Laws*, vol. 1, p. 446, the view is   G
expressed that an agreement to submit must be express and cannot be
implied. Cape and Capasco certainly did not expressly agree to submit
to the jurisdiction in the Tyler 2 actions.

Mr. Morison referred me to *Blohn v. Desser* [1962] 2 Q.B. 116 in
which Diplock J., in an ex tempore judgment, considered the
requirements of an agreement to submit to the jurisdiction. The
defendant had been a sleeping partner in a firm carrying on business in   H
Vienna, and her name, together with the names of the other partners,
was registered on the commercial register in Vienna. The defendant was
resident in England, took no part in the business and received no

A    income from it. But she remained, in Austrian law, a partner, and her
name was on the register in Vienna. The plaintiff obtained judgment in
the commercial court of Vienna against the partnership firm. The
defendant took no part in the proceedings. The plaintiff sued the
defendant in England on the Austrian judgment. Diplock J. said, at
p. 123:

B        "It is also, I think, clear law that the contract referred to in the fifth
case, to submit to the forum in which the judgment was obtained,
may be express or implied. It seems to me that, where a person
becomes a partner in a foreign firm with a place of business within
the jurisdiction of a foreign court, and appoints an agent resident in
that jurisdiction to conduct business on behalf of the partnership at
that place of business, and causes or permits, as in the present case,
C        these matters to be notified to persons dealing with that firm by
registration in a public register, he does impliedly agree with all
persons to whom such a notification is made—that is to say, the
public—to submit to the jurisdiction of the court of the country in
which the business is carried on in respect of transactions conducted
at that place of business by that agent."

D    Diplock J. went on, however, to hold that the foreign judgment against
the firm was an insufficient basis for enforcement of the judgment debt
against the defendant personally. So the plaintiff's action failed and the
remarks I have cited are only obiter. Nonetheless, Mr. Morison naturally
relies on them. There are, however, two authorities which cast doubt on
the dicta from *Blohn v. Desser* on which Mr. Morison relies.

E        In *Sfeir Co. v. National Insurance Co. of New Zealand Ltd.* [1964] 1
Lloyd's Rep. 330, 340, Mocatta J. said of an alleged implied agreement
to submit:

        "However, in considering whether conduct or oral or written
agreements give rise to the implication, it is not in my judgment
sufficient to reach the conclusion from the evidence that it would be
F        reasonable to find the implied submission or agreement; the court
must also conclude from the evidence that the implication is a
necessary one."

The facts and circumstances from which Diplock J. was prepared to
imply an agreement to submit do not satisfy the criterion suggested by
Mocatta J. It could not, I think, have been argued that the implication
G    was a necessary one. In *Vogel v. R. and A. Kohnstamm Ltd.* [1973]
Q.B. 133 Ashworth J. declined to follow the dicta from *Blohn v. Desser*
[1962] 2 Q.B. 116 that I have cited and held that an agreement to
submit to the jurisdiction of a foreign court must, to be effective, be
express and that an implied agreement would be insufficient.

        I do not think Diplock J. was right in regarding it as settled law that
an agreement to submit to the jurisdiction need not be expressed but
H    could be implied. The leading text books suggest otherwise and there
are dicta in two cases which suggest otherwise: see Lord Selborne in
*Sirdar Gurdyal Singh v. Rajah of Faridkote* [1894] A.C. 670, 686, and
Kennedy L.J. in *Emanuel v. Symon* [1908] 1 K.B. 302, 314. But,

accepting that an implied agreement to submit might suffice, nonetheless   A
it is, in my judgment, a clear indication of consent to the exercise by the
foreign court of jurisdiction that is required. I find it very difficult to
accept that the defendant's name in the commercial register in Vienna
was a clear indication of her consent to submit to the jurisdiction of the
Austrian court. She had entered into no contract to submit, implied or
otherwise, with anyone. The entry of her name in the register had,
obviously, a commercial purpose. But it seems to me an unacceptably   B
flimsy basis from which to imply that she was consenting to the exercise
by the court in Vienna of jurisdiction over her.

Mr. Morison referred also to *S.A. Consortium General Textiles v.
Sun and Sand Agencies Ltd.* [1978] Q.B. 279. One of the points
discussed in the judgments in the Court of Appeal was the meaning to
be attributed to the expression "agreed . . . to submit to the jurisdiction"   C
in paragraph (iii) of section 4(2)(*a*) of the Foreign Judgments (Reciprocal
Enforcement) Act 1933. Goff L.J. said, at p. 303: "It was argued that
'agreed' in paragraph (iii) means no more than consented. That is
probably right . . ." Shaw L.J. said, at pp. 307–308:

> "In this context it seems to me that 'agreed' must mean expressed
> willingness or consented to or acknowledged that he would accept   D
> the jurisdiction of the foreign court. It does not require that the
> judgment debtor must have bound himself contractually or in formal
> terms so to do."

Mr. Morison argued that the requirements for an agreement to submit
at common law should be co-extensive with the requirements for an
agreement to submit for the purposes of paragraph (iii). This may very   E
well be a sound approach. But in the *Sun and Sand Agencies Ltd.* case
the expression of willingness, the consent to accept the jurisdiction of
the foreign court, had been signified and had been acted upon by the
plaintiffs.

If the alleged "consent" does not form part of a contractually
enforceable agreement, it ought, in my view, to be treated not as an
agreement—for it is not one—but as a representation. As with any   F
representation it ought, in my view, to be of no legal effect if not acted
upon or if withdrawn before being acted on. It ought, in my opinion, to
follow that if proceedings in the foreign court were instituted and
brought to judgment against the absent defendant without reliance on
the representation of willingness to submit to the jurisdiction, or a
fortiori, in ignorance of it, the representation could not subsequently be   G
relied on by the plaintiff as a consensual basis for establishing the court's
jurisdiction. Finally, in my view, if a non-contractual representation is to
be relied on as establishing the court's jurisdiction, it must be a
representation intended to be acted upon or, at least, be a representation
that the plaintiff believed and had reasonable ground for believing was
intended to be acted upon.

In my judgment, the steps taken by Cape and Capasco in the Tyler 1   H
actions do not indicate the consent of Cape and Capasco to accept the
jurisdiction of the court in the Tyler 2 actions. Not only do these steps
fail to constitute the necessary consent, I do not see how an inference of

A  consent is even faintly arguable. Nor is there any evidence that these steps were relied on by any of the plaintiffs. Moreover, many of the plaintiffs intervened in the Tyler 2 actions long after it must have become apparent that Cape and Capasco were taking no part therein. For all these reasons there was, in my judgment, no agreement to submit sufficient under English law to establish on a consensual basis the jurisdiction of the Tyler court to give the default judgment against Cape and Capasco.

B

*Issues 4 and 5*

The territorial basis of jurisdiction entitles a foreign court, in the eyes of English law, to exercise in personam jurisdiction over persons present in the country of the foreign court. Whether temporary presence is sufficient is a matter that does not arise in the present case. Presence
C  is a clear enough concept when applied to individuals. It is otherwise with corporations that have no physical existence. Where is a corporation resident or present? In what circumstances will the territorial basis of jurisdiction permit jurisdiction to be exercised over a foreign corporation? The answers to these questions, at least where a trading company is concerned, depend upon the extent to which the company has a place of
D  business in the relevant territory. In *Littauer Glove Corporation v. F.W. Millington (1920) Ltd.* (1928) 44 T.L.R. 746, 747, Salter J. said that "there must be some carrying on of business at a definite and, to some reasonable extent, permanent place," within the jurisdiction. The case was one in which an action had been brought in England on a money judgment given against an English company by a New York court. The
E  action failed on the ground that the company, although transacting business in New York through the medium of an agent, was not in any sense resident in New York. In *La Bourgogne* [1899] P. 1 the question for decision was whether an English court was entitled to take jurisdiction over a French company. It was held that it was. The French company had acquired business premises in London and had installed in the premises a manager whose duties included the carrying on of the
F  company's business. A. L. Smith L.J. expressed the question for the court, at p. 12:

> "The question is whether the defendant company, at the date when this writ was served, was carrying on business in this country under such circumstances as would enable it to be said that it was resident in this country."

G  He concluded, on the facts, at p. 15:

> "the company came over here and took premises within the jurisdiction for the purpose of carrying on its business, and it put in M. Fanet as manager . . . for the purpose of carrying on its business, though it may be in conjunction with his own business."

H  So the company was, he held, at p. 15: "carrying on business here in such a way as to constitute residence in this country." Collins L.J. agreed.

The critical feature in *La Bourgogne* was that the business premises in London at which the French company's business was transacted were

3:18-cv-00731-X   Document 273-6   Filed 07/30/19   Page 278 of 421   PageID

Scott J.          Adams v. Cape Industries Plc. (Ch.D.)          [1990]

the French company's premises, cf. *The Princesse Clémentine* [1897]   A
P. 18. The cases establish that jurisdiction on the territorial basis may be
taken by an English court over a foreign company if the foreign
company has business premises in England from which or at which its
business is carried on. A striking example of this principle may be found
in *Dunlop Pneumatic Tyre Co. Ltd. v. Actien-Gesellschaft für Motor und
Motorfahrzeugbau Vorm. Cudell & Co.* [1902] 1 K.B. 342 where a
foreign corporation, manufacturer of motor cars abroad, hired a stand at   B
a Crystal Palace exhibition and for a period of nine days exhibited a
motor car on the stand. It was held by the Court of Appeal that service
of a writ on the person in charge of the stand was good service on the
foreign corporation. Sir Richard Henn Collins M.R. said, at p. 346:

> "In order to see whether they were liable to be so served, it is
> necessary to consider whether, upon the facts, they can be said to   C
> have been resident in England when the service was effected."

He then referred to *La Bourgogne* [1899] P. 1 and said, at p. 347:

> "There, a foreign company employed as their agent in this country
> a person who also acted as agent for two other companies, and
> transacted their business on the same premises; and we held that
> the defendants were through him carrying on business in such a way   D
> as to be resident within the jurisdiction. No such difficulty arises
> here as arose in that case. Here the defendants hired premises for
> their own exclusive use, and did not resort for their purposes to
> some person who was carrying on an independent business, but
> employed their own servant to conduct the business."

There are, however, cases where residence or presence of a foreign   E
company in England has been held established notwithstanding that the
foreign company did not itself own or lease any business premises in
England. A feature of these cases has been that the foreign company
had a resident English agent who had authority to contract on behalf of
and thereby to bind the principal. In those circumstances the presence
or residence in England of the agent has been treated as the presence or   F
residence of the foreign company, the principal. In the *Dunlop* case
[1902] 1 K.B. 342, 349, Romer L.J. said:

> "The result of the authorities appears to me to be that, if for a
> substantial period of time business is carried on by a foreign
> corporation at a fixed place of business in this country, through
> some person, who there carries on the corporation's business as
> their representative and not merely his own independent business,   G
> then for that period the company must be considered as resident
> within the jurisdiction for the purpose of service of a writ."

In *Saccharin Corporation Ltd. v. Chemische Fabrik Von Heyden
Aktiengesellschaft* [1911] 2 K.B. 516 the defendant, a foreign company,
employed a sole agent who had business premises at Fenchurch Street,
London. From these premises he carried on the defendant company's   H
business as well as his own business. He had general authority to enter
into contracts in the defendant's name for the sale of the defendant's
goods. Vaughan Williams, L.J. said, at pp. 522–523:

APP.295

A "The question is whether on these facts it is true to say that the defendants carried on their own business at their own place of business in London. It cannot reasonably be suggested that they must necessarily be lessees or tenants of the place of business, though if they were, that would be a cogent piece of evidence against them. I have no doubt myself that a foreign corporation can carry on business at a place in this country within the meaning of

B the rule, if, although the corporation is not the lessee of the place, it is in any sense its own place of business."

Fletcher-Moulton L.J. cited the passage from Romer L.J.'s judgment in the *Dunlop* case [1902] 1 K.B. 342, 349, that I have cited and continued, at p. 524:

C "The question before us therefore seems to me to be purely one of fact. We must look at all the evidence given by both parties and consider whether the plaintiffs have brought the case to such a point that if falls within the principle enunciated by Romer L.J. The question being one of fact, it is safer to decide it by looking at the things which are done rather than at the words which are used. For example, Blasius is called an agent. That may signify a variety of

D things. Let us see, therefore, what his position as agent of the defendants entitles him to do."

Having reviewed the evidence, Fletcher-Moulton L.J. said, at p. 525:

"the result is that in my opinion a very strong case is made out . . . in . . . that the defendants do carry on business in England at

E Blasius' address by means of Blasius."

Farwell L.J. said, at p. 526:

"These facts are in my opinion sufficient to prove that the defendants do carry on their business in England. Then, do they carry it on at a fixed place in England? It is said that for this purpose it is necessary they should be the owners or tenants of the place where their business is alleged to be carried on. To my mind that

F proposition is quite untenable. That the foreign corporation must have a fixed place of business in this country is quite clear, but the particular tenure on which it occupies that fixed place is quite immaterial."

He concluded, at p. 527: "the evidence shows that the defendants do

G carry on their business at the office of their agent in Fenchurch Street."

The *Saccharin Corporation* case [1911] 2 K.B. 516 may be contrasted with *Okura & Co. Ltd. v. Forsbacka Jernverks Aktiebolag* [1914] 1 K.B. 715. Here, too, a foreign company employed sole agents in London. But these agents had no general authority to contract on behalf of their principal. Special authority had to be obtained in the case of each proposed contract. It was held by the Court of Appeal, distinguishing

H the *Saccharin Corporation* case [1911] 2 K.B. 516, that the foreign company was not carrying on business at the agents' office in London. Buckley L.J. expressed the problem in this way [1914] 1 K.B. 715, 718–719:

"It is not enough to show that the corporation has an agent here;   A
he must be an agent who does the corporation's business for the
corporation in this country. This involves the still more difficult
question, what is meant exactly by the expression 'doing business'."

He said, at p. 721:

"The agents have never sold any steel manufactured by the   B
defendants except as agents and in the manner indicated. They have
no control over the way in which the defendants do their business
and have no general authority from them with regard to making
contracts. . . . These being the facts, 101, Leadenhall Street is really
only an address from which business is from time to time offered to
the foreign corporation; the question whether any particular business
shall or shall not be done is determined by the foreign corporation   C
in Sweden and not by any one in London. In my opinion the
defendants are not 'here' by an alter ego who does business for
them here, or who is competent to bind them in any way. They are
not doing business here by a person but through a person.
That person has to communicate with them, and the ultimate
determination, resulting in a contract, is made not by the agents in
London, but by the defendants in Sweden. It follows from this that   D
one of the essential elements which must be present before a writ
can be served in this country on the agent of a foreign corporation
is lacking in this case."

Phillimore L.J. said, at p. 724:

"The important distinction between the two cases is that in the   E
*Saccharin Corporation* case [1911] 2 K.B. 516, the agent in London
had authority to enter into contracts on behalf of the defendants
without submitting the orders to them for their approval; whereas in
the present case the agents have not that authority, their duty being
merely to submit the orders to the defendants; and until they have
signified their approval no contract can be entered into. In these   F
circumstances it seems to me impossible to say that the position of
the defendants is in any way analogous to that of a person residing
or a firm carrying on business in this country."

The significance of the manner in which and place at which contracts
with the foreign company, the principal, are made can be noticed also in
*Thames and Mersey Marine Insurance Co. v. Societa di Navigazione a*   G
*Vapore del Lloyd Austriaco* (1914) 111 L.T. 97 where it was held that
the foreign company was carrying on business at its agent's London
offices. Buckley L.J. treated the fact that contracts were made at the
London offices as the critical factor. In *The World Harmony* [1967]
P. 341 the foreign company was a Liberian shipping company which
owned a ship, *World Harmony*. An independent English company in
London acted as shipping agent and broker for the foreign company   H
and, in effect, operated and controlled *World Harmony*. It was held by
Hewson J. that the foreign company had a place of business in England
through the English agent.

A       In *The Lalandia* [1933] P. 56 on the other hand, the English agents did not make contracts for their foreign principal and it was held that the foreign principal was not carrying on business at the agent's London offices. To the same effect was *The Holstein* [1936] 2 All E.R. 1660 where Sir Boyd Merriman P. said, at p. 1664:

> B    "When . . . you find that the agency is merely selling the foreign corporation's contract, then the foreign corporation is not carrying on the business in this country."

In *F. & K. Jabbour v. Custodian of Israeli Absentee Property* [1954] 1 W.L.R. 139, 146, Pearson J. said:

> C    "A corporation resides in a country if it carries on business there at a fixed place of business, and, in the case of an agency, the principal test to be applied in determining whether the corporation is carrying on business at the agency is to ascertain whether the agent has authority to enter into contracts on behalf of the corporation without submitting them to the corporation for approval."

D    Most of the authorities to which I have referred were dealing with the question whether a foreign corporation had a sufficient presence or residence in England to enable service of a writ on its agent in England to represent good service on the foreign corporation. That question turned upon the meaning to be attributed to sections of English statutes (e.g. section 412 of the Companies Act 1948) or of particular rules which prescribe the means by which service of process on corporations may be effected. The *Littauer Glove Corporation* case, 44 T.L.R. 746 and *Vogel v. R. and A. Kohnstamm Ltd.* [1973] Q.B. 133, on the other hand, were cases where the question was whether English common law would recognise the legitimacy of the jurisdiction taken by a foreign court. Both counsel before me have treated the statements of principle to be found in the authorities as applicable equally to both classes of cases. I am content to proceed on that footing although I confess to a feeling of a little unease. It does not seem to me self-evident that the F    statutory provisions which enable service of English process to be effected in England on foreign corporations represent, without any material variation, the principles of common law that determine whether a corporation is to be regarded as resident or present in a foreign country so as to permit the courts of that country to exercise jurisdiction over it. I will assume, however, that the statements of principle in the authorities do apply equally to both classes of case.

G    The question in the present case is whether Cape and Capasco were, when the Tyler 2 actions were instituted, resident or present in Illinois. Reliance is placed by the plaintiffs on the activities and presence first of N.A.A.C. and later of C.P.C. at their respective Illinois offices at 150, North Wacker Drive, Chicago. I must describe the relevant facts and then endeavour to apply to those facts the principles established by the H    authorities to which I have referred. The object of doing so is to decide whether the United States federal court was entitled, on a territorial basis, to assume jurisdiction over Cape and Capasco in the Tyler 2 actions.

I have already described the corporate structure of the Cape group   A
and the business activities of the various subsidiaries. Cape, the parent
company, was incorporated in 1893. The amosite mines at Penge, in the
Transvaal, were owned and worked by Egnep, a wholly owned subsidiary
of Casap. The first Tyler 2 action, the Ray action, was commenced in
April 1978. Since 1975 Casap had been a wholly owned subsidiary of
C.I.O.L. which, in turn, was a wholly owned subsidiary of Cape.
N.A.A.C. incorporated in 1953 as a wholly owned subsidiary of Cape,   B
and from November 1975 a wholly owned subsidiary of C.I.O.L. was
the marketing agent of the Cape group in the United States. Capasco,
incorporated in 1958 or 1959, was a wholly owned subsidiary of Cape
and was responsible for the supply, marketing and sales promotion
throughout the world of Cape asbestos and asbestos products.

On 1 December 1970 Mr. Morgan, a United States citizen and a   C
resident of Illinois, became vice-president of N.A.A.C. He became
president on 1 July 1974, an office he retained until the dissolution of
N.A.A.C. in 1978. At all times relevant to the Tyler actions, the vice-
president of N.A.A.C. was a Mr. Meyer, an attorney and a partner in
the firm Lord, Bissell & Brook of Chicago. Lord, Bissell & Brook were
the United States attorneys for the Cape group of companies. N.A.A.C.
had offices on the fifth floor of 150, North Wacker Drive, Chicago.   D
N.A.A.C. was the lessee and the rent was paid by N.A.A.C. The office
furniture and fittings were owned by N.A.A.C. N.A.A.C. maintained a
staff of some four people. Mr. Morgan was, of course, in charge. He
had, however, an imporant assistant, a Mrs. Holtze. In addition, there
were two or three other office staff.

N.A.A.C.'s dominant business purpose was to assist and encourage   E
sales in the United States of asbestos mined by the Cape subsidiaries,
one of which was Egnep. Contracts with United States customers for the
supply of asbestos were entered into by Egnep or Casap—I am not clear
which and it does not matter. The contracts tended to be long term but
did not usually specify the quantity of asbestos to be sold. The practice
was for the United States customer to specify from time to time the
quantity of asbestos it wished to purchase and the time when it desired   F
delivery to be made. This information would be conveyed via N.A.A.C.
to Casap and Egnep. Whether the information went directly from
N.A.A.C. to Casap and Egnep or whether it went via Capasco is not
clear. Shipping arrangements and delivery dates would be arranged by
Casap or Egnep and communicated to the United States customer via
N.A.A.C. The vagaries of production in the mines had the consequence   G
that Egnep was not always able to provide the United States customer
with the full amount of asbestos that had been ordered. When a
shortfall between the customers' requirements and Egnep's delivery
capacity emerged, N.A.A.C. would endeavour to fill the gap by
purchasing asbestos from United States Government stocks and selling
the asbestos to the United States customers.

These were the two main forms of business carried on by N.A.A.C.   H
First, it acted as intermediary in respect of contracts between the United
States customers and Egnep. For these services it received a commission
from Casap. Secondly, N.A.A.C. sold asbestos to United States

A     customers in order from time to time to supplement sales from Egnep. In respect of these transactions N.A.A.C. contracted, both in purchasing the asbestos and in selling on to the United States customers, as principal. In addition, N.A.A.C. carried on business in purchasing asbestos textiles, mainly from Japan, and selling the textiles in the United States. In transacting this business, N.A.A.C. acted as principal on its own account. N.A.A.C. also, it seems from the evidence, from

B     time to time purchased asbestos from Egnep or Casap and sold on to United States customers. These purchases and sales it transacted as principal. For the purpose of storing asbestos which it had purchased, whether from United States Government stocks or from Egnep or Casap, N.A.A.C. rented warehousing facilities in the United States. These facilities were in N.A.A.C.'s name and were paid for by N.A.A.C.

C     Prior to 11 July 1975 the board of directors of N.A.A.C. included two senior officers of Cape. Until 1974 a Mr. Dent, chief executive of Cape, was chairman of N.A.A.C. In 1979, however, Mr. Higham succeeded Mr. Dent as chief executive of Cape and succeeded also to the chairmanship of N.A.A.C. The other Cape director of N.A.A.C. was Dr. Gaze who was, at all material times, chairman of Capasco and an executive director of Cape. In July 1975 Mr. Higham and Dr. Gaze

D     resigned from the board of N.A.A.C. This change was directly attributable to the involvement of Cape and Capasco in the Tyler 1 actions and was explained thus by Mr. Morgan in a deposition he gave in the Tyler 1 actions. The intention, he said, was

> "to dissociate the parent company as fully as possible from the operating companies . . . It does not imply any change whatever in
E     > the method of operation or the present responsibilities of individuals concerned . . ."

The "method of operation" and "the present responsibilities" of, in particular, Mr. Morgan, did not permit either N.A.A.C. or Mr. Morgan, its chief executive, to bind Cape, Capasco, Casap or Egnep, or any other of the Cape subsidiaries to any contract for the supply or sale of

F     asbestos. It was suggested by Mr. Morison that Mr. Morgan's evidence given in depositions in the Tyler 1 actions showed that he considered he had authority to accept orders for asbestos to be supplied by Casap or one of the mining companies. I do not accept that the passage relied on justifies the suggestion. I think it clear from the evidence that N.A.A.C. and Mr. Morgan had no such authority.

G     There is no doubt, on the other hand, that N.A.A.C. did constitute the channel of communication between United States customers, such as P.C.C., and Capasco or Casap. There is undoubtedly a sense in which N.A.A.C. was, if the Cape group of companies is viewed as a whole, part of the selling organisation of the group and Cape's agent in the United States.

H     There is also evidence, as perhaps might be expected, that the corporate, as opposed to commercial, activities of N.A.A.C. were controlled by Cape. Thus, each year an indication would come from Cape as to the dividend that N.A.A.C. was to declare. The correspondence reveals some argument and representations from Mr.

Morgan regarding the amount of the suggested dividend but, in the last     A
resort, and subject to compliance with Illinois law, the parent company
was in a position to and did direct the level of the dividend. In addition,
the financial controllers in London were consulted about the level of
borrowing permitted to N.A.A.C. in each financial year. This corporate
financial control exercised by a parent company over its subsidiary is, in
my view, no more and no less than one would expect to find in a group
of companies such as the Cape group. There is, however, no evidence of     B
any like control exercised by Cape and Capasco over the conduct by
N.A.A.C. of its commercial activities. Mr. Morgan was in executive
control of N.A.A.C.'s conduct of its business. Both Dr. Gaze and, to a
lesser extent, Mr. Higham, visited the United States from time to time,
discussed with United States customers their asbestos supply requirements
and dealt with their complaints in that regard. They did so, not as     C
directors of N.A.A.C. but as directors and representatives of Cape or
Capasco.

Mr. Morison argued that if N.A.A.C.'s offices at 150, North Wacker
Drive, Chicago, had been a branch office belonging to Cape, the
business transacted at that office would have been well sufficient to
justify the conclusion that Cape was present in Illinois for jurisdiction
purposes. This submission has support from *South India Shipping*     D
*Corporation Ltd. v. Export-Import Bank of Korea* [1985] 1 W.L.R. 585
and is, in my view, probably right. But it is equally pertinent to observe
that if the offices had been those of an independent Illinois corporation,
the nature of the business transacted thereat would not have justified the
conclusion that Cape was present in Illinois. The offices were not Cape's
branch office. Nor were they the offices of an independent Illinois     E
corporation. They were the offices of N.A.A.C., a wholly owned
subsidiary in the Cape group of companies.

Mr. Morison argued that, on the facts of this case, N.A.A.C. should
be treated as Cape's alter ego in Illinois or, alternatively, that the
corporate veil distinguishing N.A.A.C. from Cape should be lifted.
There is no reasonable basis, in my view, for regarding N.A.A.C. as the
alter ego of Cape. N.A.A.C. was an Illinois corporation, carrying on     F
business in the United States from which it earned profits and on which
it paid United States taxes. Its debtors were *its* debtors, not Cape's
debtors. Its creditors were *its* creditors, not Cape's creditors. Cape was
not taxed in the United Kingdom or in the United States on N.A.A.C.'s
profits. The return to N.A.A.C.'s shareholders took the form of an
annual dividend passed by a resolution of N.A.A.C.'s board of directors.     G
The corporate forms applicable to N.A.A.C. as a separate legal entity
were observed. N.A.A.C. made its own warehousing arrangements for
the storage of its own asbestos. It had its own pension scheme for its
own employees. The expression "alter ego" when used to describe the
relationship between a company and its shareholders is not a term of art
and can bear a flexible meaning. But I do not think it is in the least apt
to describe the relationship between N.A.A.C. and Cape.     H

The question whether the corporate veil should be lifted is more
difficult. It is, I think, one which raises an issue of general importance.
Is a parent company to be treated, for jurisdiction purposes, as resident

A   in a country in which its wholly owned subsidiary is resident and carries on business? Should the answer be dependent on whether the subsidiary's business is associated with and, in a group sense, a part of the business of the parent company?

     Mr. Morison argued the point by concentrating on the economic unity of the asbestos trade carried on by the Cape group. N.A.A.C. was a non-autonomous part of the Cape group which, as a unit, was mining
B   and marketing asbestos. So, he argued, N.A.A.C.'s presence and business activity at 150, North Wacker Drive should be regarded as the presence and business activity of Cape. He prayed in aid, by analogy, *Firestone Tyre and Rubber Co. Ltd. v. Lewellin* [1957] 1 W.L.R. 464 in which the House of Lords had upheld an assessment to tax on the footing that the business of a subsidiary was carried on as agent for its
C   parent company and so was the business of its parent company. But that case was not one in which the corporate veil was lifted. It turned on the factual finding of agency. He referred also to E.E.C. cases in which the question for decision had been whether actions of a subsidiary could, for the purpose of article 86 of the E.E.C. Treaty, be attributed to the parent company. In *Istituto Chemioterapico Italiano S.p.A. and Commercial Solvents Corporation v. Commission of the European*
D   *Communities* (Cases 6 and 7/73) [1974] E.C.R. 223, 263, Advocate-General Warner said:

     "neither article 85 nor article 86 anywhere refers to 'persons.' In both articles the relevant prohibitions are directed to 'undertakings,' a much wider and looser concept. This indeed is what one would expect, because it would be inappropriate to apply rigidly in the
E   sphere of competition law the doctrine referred to by English lawyers as that of *Salomon v. Salomon & Co. Ltd.* [1897] A.C. 22—i.e. the doctrine that every company is a separate legal person that cannot be identified with its members. Basically that doctrine exists in order to preserve the principle of limited liability. It is concerned with the rights of creditors in the context of company law. It has been applied, with more or less happy results, in other
F   spheres, such as those of conveyancing, of contracts and of liability for tort. But to export it blindly into branches of the law where it has little relevance, could, in my opinion, serve only to divorce the law from reality. Suppose, my Lords, that C.S.C. had traded in Italy through a branch office. There could have been no doubt then that it was amenable to the jurisdiction of the Commission and of
G   this court. Could it have made any difference if C.S.C. has chosen to trade in Italy through a wholly owned subsidiary? The difference would have been one only of legal form, not of reality. Why then should it make any difference that it chose to trade in Italy through a subsidiary that it controlled by a 51 per cent. majority rather than by a 100 per cent. majority? What matters in this field, in my view, is control, not extent of beneficial ownership."

H   He said, at p. 264:

     "It is, my Lords, with these considerations in mind that I approach the argument of C.S.C. in the present case. In my opinion those

considerations import at least: 1. that there is a presumption that a   A
subsidiary will act in accordance with the wishes of its parent
because according to common experience subsidiaries generally do
so act; 2. that, unless that presumption is rebutted, it is proper for
the parent and the subsidiary to be treated as a single undertaking
for the purposes of articles 85 and 86 of the E.E.C. Treaty . . .''

In my opinion, however, this approach is not suitable to a resolution of   B
the question with which I am faced. The question in the present case is
not whether the economic reality of the activities of the Cape group
justifies the conclusion that Cape, the parent, was trading in the United
States. Perhaps it was. But trading in a country is insufficient, by the
standards of English law, to entitle the courts of the country to take in
personam jurisdiction over the trader: see the *Littauer Glove Corporation*
case, 44 T.L.R. 746. The trading must be reinforced by some residential   C
feature, be it a branch office or a resident agent with power to contract.

Mr. Morison pointed out that the economic function being discharged
by N.A.A.C. from its Illinois office served, in the context of the trading
activities of the Cape group as a whole, the same function as could have
been discharged by a branch office at the same address. Since in the
latter case Cape would have been resident in Illinois, why should it not   D
be held to be resident in the former case? In my opinion, however, this
argument overlooks the nature of the fundamental question at issue.
The fundamental question is whether the United States court was
entitled, on territorial grounds, to take jurisdiction over Cape. Cape was
entitled, if it wished, to organise its group activities so as to avoid being
present in the United States of America. The group traded in the
United States through subsidiaries, Egnep, Casap, N.A.A.C. and   E
Capasco. Each discharged a function relevant to the group business in
the United States, but N.A.A.C. was the only one with a United States
office. If Cape had been an individual, it would not, in my view, have
been arguable that in trading in such a fashion Cape had subjected itself
to the territorial jurisdiction of the United States' courts. Why should
Cape's corporate character justify any different conclusion?   F

The approach to be adopted to parent companies trading through
subsidiaries was considered by Roskill L.J. in *The Albazero* [1977] A.C.
774. He said, at p. 807:

"each company in a group of companies (a relatively modern
concept) is a separate legal entity possessed of separate legal rights
and liabilities so that the rights of one company in a group cannot
be exercised by another company in that group even though the   G
ultimate benefit of the exercise of those rights would enure
beneficially to the same person or corporate body irrespective of the
person or body in whom those rights were vested in law.''

He referred to this principle as one of the "fundamental principles of
English law long established.'' The decision of the Court of Appeal was
reversed by the House of Lords, but nothing was said to detract from   H
the principle referred to by Roskill L.J.

In *Bank of Tokyo Ltd. v. Karoon* [1987] A.C. 45, 53 Ackner L.J.
said:

A      "It is however quite fundamental to Mr. Hoffmann's submission, (and he readily accepts this) that the public policy on which he relied requires the court to overlook the corporate distinctions in law between B.T. and B.T.T.C. While accepting that B.T. and B.T.T.C. are separate legal entities, Mr. Hoffmann contends that from a practical point of view it makes no difference whether B.T.T.C. was a branch of B.T. or a subsidiary. He argues that if
B      one looks at the substance of the matter, B.T. are being sued in New York on account of the evidence which they gave in their own defence in proceedings brought against them by Mr. Karoon in London. The protection of B.T.'s own interests required the giving of this information and accordingly B.T., which must in practice be treated as having this information in their possession, was not in
C      breach of its implied obligation of secrecy: see *Tournier v. National Provincial and Union Bank of England* [1924] 1 K.B. 461. The reality of the matter is that B.T.T.C. is not a branch of B.T. That is not the way in which B.T. has chosen to organise its business as a bank."

       Robert Goff L.J. said, at p. 64:
D
       "Mr. Hoffmann suggested beguilingly that it would be technical for us to distinguish between parent and subsidiary company in this context; economically, he said, they were one. But we are concerned not with economics but with law. The distinction between the two is, in law, fundamental and cannot here be bridged."

E      These statements of principle seem to me to be an answer to the submission that in the present case the separate corporate identity of N.A.A.C. should be ignored and that the corporate veil should be lifted. On the facts of this case neither Cape nor Capasco had an office in Illinois. The 150, North Wacker Drive offices were N.A.A.C.'s offices. N.A.A.C.'s business was its own business, not the business of Cape or of Capasco. N.A.A.C. had no authority to contract on behalf
F      of Cape or Capasco or any other company in the Cape group. Accordingly, in my judgment, the presence of N.A.A.C. at 150, North Wacker Drive, Chicago, Illinois, did not constitute the presence in Illinois of Cape or of Capasco so as to subject them, on a territorial basis, to the jurisdiction of United States courts.
       On 1 November 1977 Cape resolved to place N.A.A.C. in liquidation
G      and on 31 January 1978 a liquidating trust agreement for N.A.A.C. was signed. N.A.A.C. executed articles of dissolution on 18 May 1978 and a certificate of dissolution was issued on 19 May 1978. It was the intention of all concerned that N.A.A.C.'s functions in the United States in respect of the sale of Cape's amosite asbestos would come to an end on 31 January 1978. They did so. However, N.A.A.C. at that date was the owner of a quantity of asbestos held in United States warehouses. Over
H      the period of 31 January to 18 May 1978 sales of this asbestos took place. These sales were not made in the course of N.A.A.C. carrying on business as a going concern. They were made for the purposes of the intended liquidation of N.A.A.C.

The decision to put N.A.A.C. into liquidation was a consequence of          A
the experience of Cape in the Tyler 1 actions. It had become apparent
to the senior management of Cape by, at latest, the summer of 1977 that
actions in the United States brought against Cape by plaintiffs
complaining of injury caused by exposure to asbestos dust presented a
very real problem. This had, perhaps, become apparent a good deal
earlier. It was in 1975 that Mr. Higham and Dr. Gaze had resigned from
the board of N.A.A.C., a step taken in order to reduce the appearance          B
of Cape involvement with N.A.A.C. But by 1977 Cape's motions on
jurisdiction had been dismissed by Judge Steger and in September 1977
Cape had agreed to pay some $5m. in order to dispose of the Tyler 1
actions. It was clear to all that a multitude of similar actions lay ahead.
It was in these circumstances that the decision to liquidate N.A.A.C.
was taken.                                                                     C
     Mr. Penna was the main witness for Cape as to the circumstances in
which N.A.A.C. was placed in liquidation and in which A.M.C. and
C.P.C. were formed. He was, in the period 1975 to 1979, employed by
Cape as its group solicitor. In 1982 he became company secretary, a
position he held until 1985 when he left to take up other employment.
He told me of meetings in Chicago and in London in November and
December 1977 at which discussions took place between senior executives          D
of the Cape group, including Mr. Morgan, and at which decisions were
taken to place N.A.A.C. in liquidation and to form A.M.C. and C.P.C.
as the corporate vehicles for the sale of Cape asbestos in the United
States. Mr. Penna was inclined to suggest that the decision to place
N.A.A.C. in liquidation and the decision by means of A.M.C. and
C.P.C. to create a new sales framework for the United States were          E
independent of one another. He also suggested that the idea of
incorporating C.P.C., a new and independent Illinois corporation, to
take over part of the selling function formerly discharged by N.A.A.C.
came from Mr. Morgan who, in effect, offered Cape the services of his
new company, C.P.C. This slant on the facts is one that I found myself
unable to accept. I am satisfied from the evidence that the arrangements
made regarding N.A.A.C., A.M.C. and C.P.C. were part of one          F
composite arrangement designed to enable Cape asbestos to continue to
be sold into the United States while reducing, if not eliminating, the
appearance of any involvement therein of Cape or its subsidiaries.
     The decision to put into effect this composite arrangement was
associated with Cape's decision to take no part in any other asbestos
related action brought against it in the United States, whether in Tyler,
Texas, or elsewhere. Cape was prepared to let default judgments be          G
taken against it or its subsidiaries. Cape had no assets in the United
States apart from its shares in N.A.A.C., which, by reason of N.A.A.C.'s
own contingent liability to plaintiffs in asbestos related actions, were
worthless. Cape's intention and concern was to resist enforcement in
England of any default judgments. Enforcement was intended to be
resisted by contesting the legitimacy, under English common law, of the          H
jurisdiction taken by the United States courts over foreign companies. A
defence on these lines would require the trading connection between
Cape and its subsidiaries and the United States to be kept to a

A   minimum. Hence the need to liquidate N.A.A.C., Cape's United States subsidiary, and to allow at least some of N.A.A.C.'s trading functions to be assumed by an Illinois corporation that was not a subsidiary, i.e. C.P.C. If and to the extent that Mr. Penna's evidence suggests a different provenance or motive for the arrangements that were made, I do not accept it.

B   But the question whether C.P.C.'s presence in Illinois can, for jurisdiction purposes, be treated as Cape's presence, must, in my view, be answered by considering the nature of the arrangements that were implemented, not the motive behind them. The documentary evidence I have seen has made clear that the senior management of Cape, including Mr. Penna, were very anxious that Cape's connections with C.P.C. and with A.M.C. should not become publicly known. Some of the letters

C   and memoranda have a somewhat conspiratorial flavour to them. But this too, although interesting to notice, is not, in my opinion, relevant to the main question.

   The new trading arrangements involved these features: (i) A.M.C., a Liechtenstein corporation, was incorporated by a Dr. Ritter, a well-known Liechtenstein lawyer. The bearer shares in A.M.C. were held by

D   Dr. Ritter upon trust for C.I.O.L. The cost of incorporating A.M.C. was, I think, borne by Capasco. It was certainly borne within the Cape group. The intention was that all sales of Cape asbestos to United States customers would be made by A.M.C. The exact nature of the arrangements with Egnep and Casap whereby A.M.C. became the owner of the asbestos has not been disclosed by the evidence adduced before me. This is not surprising since the relevant documentation has,

E   since the sale of C.I.O.L. and Casap to Transvaal Consolidated Exploration Co. Ltd., been under the control of Transvaal Consolidated. It seems clear, however, that A.M.C. was no more than a corporate name. It was described by Mr. Penna as "an invoicing company" with no employees of its own. I would expect to find, if all the relevant documents were available, that A.M.C. acted through employees or

F   officers of either Casap or Egnep.

   (ii) C.P.C. was incorporated on 12 December 1977. The shares were issued to Mr. Morgan. The lawyers acting in the incorporation were Lord, Bissell & Brook. There is no clear evidence as to who paid the costs of incorporation. I am prepared to assume that, directly or indirectly, the funds came from Cape or Capasco. This assumption does not lead to the conclusion that Cape or Capasco was the beneficial

G   owner of the C.P.C. shares. It was an essential feature of the new trading arrangements that the new Illinois corporation would be an independent corporation outside the Cape group owned as well as managed by Mr. Morgan. There would not, in these circumstances, be any equity in the shares that Cape could claim as against Mr. Morgan. In my opinion, the C.P.C. shares were, in equity as well as in law,

H   owned by Mr. Morgan.

   (iii) An agency agreement dated June 1978 was entered into. The parties were A.M.C., C.P.C. and Mr. Morgan. This is an important agreement. Under paragraph 1, A.M.C. appointed C.P.C.:

"as its exclusive advice and consultancy bureau to assist the sale of
its asbestos fibre (the product) in the United States of America,
Canada and Mexico (hereinafter jointly called 'the territory') for a
period of 10 years from 1 February 1978 to 31 January 1988 . . ." A

There was a proviso for termination on 12 months' notice. Paragraph 3
set out the duties of C.P.C. It provided:

"C.P.C. will carry out this appointment diligently exercising all B
reasonable care and skill and will without limiting the generality
hereof (a) keep A.M.C. advised at regular intervals as to competitor
products market conditions and other commercial matters of mutual
interest; (b) perform such services as may be required to facilitate
or expedite the delivery of products contracted to be sold by
A.M.C. in the territory; (c) endeavour to seek out and promote C
prospective business on behalf of A.M.C. and forward to A.M.C.
requests for supplies of products provided always that supplies shall
only be at prices and upon terms and conditions determined by
A.M.C."

Under paragraph 4, C.P.C. agreed to "use its best endeavours to
promote the sale of the product on behalf of A.M.C. within the D
territory." Paragraph 4(d) provided inter alia:

"nothing herein shall be construed to give C.P.C. any authority to
accept any orders to make any sales or to conclude any contracts on
its behalf."

"Its behalf" in that context was a reference to A.M.C. Paragraph 5
coupled with paragraph 4(b) left C.P.C. free to sell material and E
products other than asbestos fibre and to involve itself in other
commercial activities. Paragraph 6 required C.P.C.

"at its own cost and expense [to] provide proper office accommoda-
tion and staff for the purpose of running an efficient advice and
consultancy bureau and will pay all expenses incurred in maintaining
and operating the same." F

Paragraph 7 provided for C.P.C. to be remunerated by a percentage
commission based on the cost of all asbestos sales by A.M.C. in the
territory. Paragraph 11 gave A.M.C. an option in certain circumstances
to acquire the C.P.C. shares:

"C.M. shall in such event offer all shares owned by him in C.P.C.
for sale to A.M.C. (or such nominee as it may appoint) at their net G
book value excluding goodwill . . ."

Paragraph 12 contained an acknowledgement that beneficial ownership
of the name "Continental Products Corporation" belonged to A.M.C.

I have endeavoured to give a broad indication of the contents of this
agency agreement. C.P.C. commenced business on 1 February 1978—in
order to dovetail with N.A.A.C.'s cesser of business on 31 January H
1978—but there is no evidence that between 1 February and 5 June
1978, or for that matter thereafter, C.P.C. did any business inconsistent
with the terms of the agency agreement. I conclude, therefore, that the

A  terms of the agreement are a reliable guide to the nature of the relationship between C.P.C. and A.M.C. and, hence between C.P.C. and Cape.

(iv) C.P.C. leased offices on the 12th floor of 150, North Wacker Drive. N.A.A.C.'s offices had been on the fifth floor. A.M.C.'s employees became C.P.C.'s employees. A good deal, though not all, of the furniture and fittings in N.A.A.C.'s offices were removed to C.P.C.'s
B  offices. C.P.C. took over N.A.A.C.'s telephone number.

(v) The financial agreements in connection with the commencement by C.P.C. of business are, on the evidence I have seen, somewhat obscure. It is clear that C.P.C. would have had an immediate need of funds. N.A.A.C.'s furniture and fittings had to be paid for. Rent had to be paid for the 12th floor offices at 150, North Wacker Drive. The
C  salaries of the employees, all ex-N.A.A.C. employees, had to be paid. There were, no doubt, other outgoings as well. But commission under the agreement with A.M.C. would not be payable immediately. There is evidence that a sum of $12,000 was paid to C.P.C. by N.A.A.C. In one of his depositions Mr. Morgan described this sum as made up of $10,000 severance pay due to him from N.A.A.C. and paid at his request to C.P.C., and $2,000 as C.P.C.'s charge for storing various files. It seems
D  likely that this sum of $12,000 was calculated to assist C.P.C. in meeting the cost of establishing itself at its new offices: see the letter of 23 November 1977, Mr. Morgan to Dr. Gaze, and Mr. Penna's memorandum of 2 December 1977. But, in addition, there is a mysterious sum of $160,000 that was paid to C.P.C. on 4 January 1978. The Cape documents that reveal this payment show it to have been a payment
E  from a bank account of Cape with Chase Manhattan Bank in London. Mr. Penna said that he thought it was a payment on account of future commission. He said he did not think it would have been a loan.

In the absence of any clear alternative explanation of the payment of this $160,000 to C.P.C., I infer that it was intended to enable C.P.C. to meet its overheads until payment of commission began to come in.
F  Whether it was intended that the $160,000 should be set off against future commission is not clear. This is no evidence one way or the other. I shall assume that it was not so intended and that it was a payment made by Cape to enable C.P.C. to set up in business and to perform the agency obligations expected of it. Acting as agent in connection with sales of Cape asbestos was not C.P.C.'s only business activity. In addition, it traded in asbestos textiles on its own account,
G  buying and selling as principal.

The conclusions of fact that I have set out above are not consistent with the contents of an affidavit sworn by Mr. Morgan on 16 March 1988 and introduced into evidence under the Civil Evidence Act 1968. In paragraph 5 of his affidavit, Mr. Morgan deposes:

H      "Prior to 6 January 1978 I had negotiated with a representative of an entity known as Associated Minerals Corporation (hereinafter called 'A.M.C.'). I understood that this company was an independent South African trading company which distributed asbestos for sale in international commerce."

This evidence is, in my opinion, disengenuous and false. Negotiations **A** regarding the new trading arrangements in which Mr. Morgan took part were negotiations, as he must have known, with Cape. I reject as false his evidence that he understood A.M.C. to be an independent South African trading company. I am satisfied that he knew very well it was a creature of Cape. It follows from the falsity of paragraph 5 that I am unable to place any reliance on the accuracy of the rest of the affidavit. The conclusions I have expressed about the $160,000 derive from my **B** opinion as to the probabilities inherent in the incorporation of C.P.C. and its commencement of business. They do not derive from Mr. Morgan's evidence.

C.P.C.'s conduct of its affairs was much the same as N.A.A.C.'s had been. It paid the rent for its offices and paid its employees. It received commission from A.M.C. as well as incurring expenditure and receiving **C** payments in connection with its independent trading activities.

Does the manner in which C.P.C. was established and carried on business justify the conclusion that C.P.C.'s presence in Illinois can, for jurisdiction purposes, be treated as the residence or presence of Cape? In my judgment, the answer is "No." I do not think, on analysis, that the plaintiffs' case is any stronger than their case regarding N.A.A.C. If anything, I think the case is weaker. N.A.A.C. was at least a wholly **D** owned subsidiary. C.P.C. even if incorporated and launched with Cape money, was, on my reading of the facts, an independently owned company. Like N.A.A.C., C.P.C. acted as agent for the purpose of facilitating the sale in the United States of Cape's asbestos. The seller of the asbestos in N.A.A.C.'s time was Egnep or Casap. The seller in C.P.C.'s time was, nominally, A.M.C. but, in reality, still, I think, **E** Egnep or Casap. C.P.C., like N.A.A.C., had no authority to bind Egnep, Casap or any other of the Cape subsidiaries to any contract. C.P.C. like N.A.A.C. carried on its own business from its own offices at 150, North Wacker Drive. The provision by Cape of the $160,000 as a starting-up fund does not make the offices Cape's offices or the business Cape's business.

Mr. Morison made a number of points on the evidence regarding **F** N.A.A.C. and C.P.C. with which I agree. He drew attention to the paucity of documents dealing with and revealing the true nature of the $160,000 and commented that there must be officers or ex-officers of Cape who could have given evidence about this. I agree. He invited me to infer that the $160,000 was a necessary payment to discharge the initial running expenses of C.P.C. I do so infer. He criticised Mr. **G** Penna's evidence regarding A.M.C. and C.P.C. and pointed out that it was Mr. Penna who had co-ordinated the setting up of A.M.C. I think this criticism was well founded. But none of this is, in my opinion, critical. What is critical is what C.P.C. and N.A.A.C. actually did on behalf of Cape or Capasco. Each company, C.P.C. and N.A.A.C., assisted in the sale of Egnep's asbestos in the United States. That is not enough. Mr. Morison invited me to infer from, in particular, Mr. **H** Penna's evidence that the corporate form of the Cape group was form only. I am not prepared to infer this. The evidence does not, in my view, justify it. Each corporate member of the Cape group had its own

A   well-defined commercial function designed to serve the over-all commercial purpose of mining and marketing asbestos. But that does not constitute a reason why Cape, the parent company, should be treated as present and amenable to be sued in each country in which a subsidiary was present and carrying on business.

Finally, Mr. Morison submitted that the onus was on Cape to establish that it was not resident in the United States and that I should
B   hold that Cape had failed to discharge that onus. I am not satisfied that it is correct to say that the onus lies on Cape to establish that it was not resident in the United States. The position seems to me to be this. The plaintiffs sue Cape on a judgment given by a United States court. The judgment is an apparently regular one. Cape disputes jurisdiction on the ground that it is a foreign company with no place of business
C   in the United States. The plaintiffs' answer is to assert that the presence in the United States of N.A.A.C. and C.P.C. is to be treated as Cape's presence. But each of N.A.A.C. and C.P.C. is in law an individual legal persona. A contention that the presence in the United States of either is to be treated as the presence of Cape requires, in my opinion, he who so contends to establish facts sufficient to support the contention. This, in my judgment, the plaintiffs have failed to do.

D   The plaintiffs' main case on "presence" was based upon the presence in the United States of N.A.A.C. and C.P.C. In his reply, Mr. Morison raised a third possibility. He suggested that A.M.C. may have been present in Illinois at the relevant time and that, whatever the position regarding N.A.A.C. and C.P.C., A.M.C. was, in effect, Cape. This suggestion was based on the evidence of Mr. Summerfield who testified
E   that an inspection of 150, North Wacker Drive in August 1984 revealed a notice-board giving the names of both C.P.C. and A.M.C. as the occupants of the 12th floor offices. Whether this notice-board was in the same state in 1979 when the sale to Transvaal Consolidated Exploration Co. Ltd. took place is not known. There is an allegation in the pleadings that, when the Tyler 2 actions were commenced, A.M.C. was present at 150, North Wacker Drive and, if I understood Mr. Morison correctly,
F   his submission was that since the onus was on Cape to satisfy me that it was not present in the United States, it was for Cape to establish that A.M.C. was not present in the United States at any material time. I do not accept this approach. There is no positive evidence to suggest that A.M.C. was an occupant of the 150, North Wacker Drive offices at the time the Tyler 2 actions were commenced.

G   I should also mention, in connection with Mr. Morison's wielding of the onus argument, a point made by him arising out of evidence given by Mr. Penna that there had at one time been an agency agreement between Cape and Capasco under which all of Capasco's business had been carried on by Capasco as agent for Cape. In effect, Capasco's business was Cape's business. This agreement had, said Mr. Penna, been terminated in the mid 1970s. He said that he had never seen any like
H   agency agreement between Cape and N.A.A.C. and did not think there had been one, but that he could not exclude the possibility. Mr. Morison submitted that the burden lay on Cape to satisfy me that there was no agency agreement between Cape and N.A.A.C. comparable to that

Scott J.                 **Adams v. Cape Industries Plc. (Ch.D.)**                 [1990]

between Cape and Capasco. I was so satisfied from, in particular, the     A
form of N.A.A.C.'s annual accounts. These were drawn on the footing
that N.A.A.C.'s business was its own business. There is nothing to
suggest that the accounts were drawn on a false footing. The
correspondence between N.A.A.C. and Cape concerning the amount of
the annual dividend to be declared by N.A.A.C. is entirely consistent
with the inferences to be drawn from the accounts. But, in any event,
there is no positive evidence to suggest that there was ever an agency     B
agreement between N.A.A.C. and Cape on the lines of that between
Cape and Capasco to which Mr. Penna had referred.

In my judgment, therefore, neither the presence in Illinois of
N.A.A.C. nor the presence in Illinois of C.P.C. can be represented, for
jurisdiction purposes, as the presence in Illinois of Cape or Capasco. It
follows that there was, in my judgment, no territorial basis that entitled     C
the Tyler court, by English common law standards, to take jurisdiction
over Cape or Capasco.


*Issue 6*

The question whether the residence or presence of Cape and Capasco
in Illinois entitled the Federal Court of Tyler, Texas, to take jurisdiction
over them does not, if my conclusions under 4 and 5 above are right,     D
arise. But it is clear that this case is likely to go further, and I think,
therefore, that I should deal with all the questions argued before me.
For the purpose of this question I must assume that Cape and Capasco
were present in Illinois when the Tyler 2 actions commenced. I
must start by describing, in outline, the nature, function and jurisdiction
of a United States district court. To enable me to do so, I have had     E
great assistance from the eminent United States jurists who have given
evidence in this case.

Section 1 of article III (the judicial article) of the United States
Constitution vests the judicial power of the United States in a Supreme
Court and such inferior courts as Congress may from time to time
establish. Federal circuit courts and federal district courts have been
established by Congress pursuant to this power. The procedure to be     F
observed by federal courts may be laid down either by Congress or the
Supreme Court.

Judges of federal courts are appointed by the President of the United
States and confirmed by the Senate. They are appointed for life and can
be removed only by Congress. Their salaries and expenses are a charge
on federal funds. They take oaths of allegiance to the United States     G
Constitution. All this is in contrast to judges of state courts who are
appointed by a state authority, are paid for by the state and take oaths
of allegiance to the state. The federal court system is headed by the
Supreme Court. Below the Supreme Court are the circuit courts, the
courts of appeals. The United States is divided into 13 judicial circuits,
each of which has a court of appeals. The Fifth Circuit includes
Louisiana, Mississippi and Texas. Judges of the circuit courts of appeals     H
are the circuit judges. The federal courts of first instance are the district
courts. Each state is, according to its population, allocated a number of
districts. Each district is allocated a number of judges. Texas has four

A   districts, one of which is the eastern district. The eastern district of Texas comprises seven divisions, one of which is the Tyler Division and another of which is the Marshall Division. Judge Steger was a district judge of the eastern district of Texas. He sat both at Tyler and at Marshall, as well as at other venues in the eastern district.

The subject matter jurisdiction of federal district courts established by Congress is set out in Chapter 85 of Title 28 of the United States

B   Code, entitled "Judicial Code and Judiciary." Section 1331 entitled "Federal question," provides: "The district courts shall have original jurisdiction of all civil actions arising under the constitution, laws or treaties of the United States." This is an exclusive jurisdiction. Actions of this character cannot be entertained by state courts unless specific statutory authorisation is given.

C   Section 1332 is headed "Diversity of citizenship." Paragraph (a) of the section provides:

"(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between (1) citizens of different states . . ."

D   Diversity jurisdiction, unlike federal question jurisdiction, is not an exclusive jurisdiction. An action involving diversity of citizenship which could have been brought in a federal district court can be commenced, if the plaintiff so elects, in a state court. Any defendant, however, may apply to the federal district court for the removal of the action, as of right, to the district court. But in the absence of any such application

E   the case may be prosecuted to judgment in the state court.

The necessity for Congress to have endowed federal district courts with federal question jurisdiction is, perhaps, obvious. Laws passed by Congress, treaties of the United States, the Constitution of the United States, may give rise to civil justiciable issues. Courts for the trial of such issues are necessary. Chapter 85 also gives district courts original

F   jurisdiction over actions brought against foreign states (section 1330) or brought by or against the United States itself (section 1345 and 1346). In addition, original jurisdiction over a number of specified types of actions is given to district courts. These include admiralty and maritime cases (section 1333), bankruptcy cases (section 1334), patent cases (section 1338), civil rights cases (section 1343) and many others. The explanation for the jurisdiction given to the federal courts can in all these cases be

G   found in the nature of the actions in question.

Diversity of citizenship jurisdiction, however, has a different provenance from any of these. There is no obvious constitutional reason why diversity jurisdiction should have been conferred on federal courts. A breach of contract action between two citizens of the State of New York can be entertained by the courts of New York. So can an action in contract between a citizen of New York and a citizen of Illinois. The

H   need to have provided in the latter case for federal district courts to have an overriding jurisdiction is not in the least obvious. The explanation for diversity jurisdiction given by the commentators and accepted by the witnesses before me is, broadly, that at the time of

APP.312

union there was not the same confidence as there would be today in the  A
judicial qualities of state judges, and, in particular, in their impartiality
when trying an action between a citizen of their own state and a citizen
of another state. It was, so the explanation goes, thought necessary to
provide defendants with an opportunity, when sued by a citizen of
another state, to have the action heard in a federal court. Consistent
with this explanation for the conferring of diversity jurisdiction on
federal district courts is the opinion of some distinguished United States  B
jurists that diversity jurisdiction has served its purpose and could with
no disadvantage now be abolished.

It is inherent in diversity of citizenship jurisdiction that it is the
identity of the parties, not the nature of the action, that confers
jurisdiction on the district court.

A federal district court exercising its diversity of citizenship jurisdiction  C
does not, save as to matters of procedure, apply federal law to the
determination of the rights which are in issue. It applies state law. Thus,
in the case of a contract governed by the law of Illinois, a breach of
contract action may be brought by a citizen of Illinois against a citizen of
Texas in a federal district court in Illinois; the law applied will be the
law of Illinois. If there is a car accident in New York, the law of New
York will determine the rights of any injured persons. That will be so  D
whether an action for redress is brought in a New York state court or in
a New York federal district court. That this is so was established by the
seminal decision of the United States Supreme Court in *Erie Railroad
Co. v. Tompkins* (1938) 304 U.S. 64. Justice Brandeis said, at p. 78:

> "Congress has no power to declare substantive rules of common law
> applicable in a state whether they be local in nature or "general,"  E
> be they commercial law or a part of the law of torts. And no clause
> in the Constitution purports to confer such a power upon the
> federal courts."

In a later Supreme Court case, *Prima Paint Corporation v. Flood &
Conklin Manufacturing Co.* (1967) 388 U.S. 395, 404, Justice Fortas
said:  F

> "Since the decision in *Erie Railroad Co. v. Tompkins* . . . federal
> courts are bound in diversity cases to follow state rules of decision
> in matters which are 'substantive' rather than 'procedural,' or where
> the matter is 'outcome determinative.'"

The decision in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 is, I think,  G
broadly accepted by U.S. jurists as resting

> "on the principle that the federal government as a whole, including
> Congress and the federal courts, has no more authority than that
> given to it by the Constitution. This principle, which is inherent in
> the political theory underlying the very concept and structure of the
> federal government, is reinforced by the 10th Amendment, which  H
> reserves to the states or to the people those powers not delegated to
> the federal government by the Constitution": see *Federal Practice
> and Procedure* by Wright, Miller & Cooper, vol. 19, para. 4505.

APP.313

A    Federal district courts sitting in diversity have, therefore, a dual character. In one sense they are national courts established and funded centrally; but they are applying state substantive law and, in that sense, may be regarded as state courts.

B    In order to entertain an action, a federal district court must not only have subject matter jurisdiction but also in personam jurisdiction over the defendants in the suit. It is an important and somewhat curious feature of the manner in which federal district courts are established that, save in cases specially provided for by Congress or the Supreme Court, each district court exercises the in personam jurisdiction permitted by the law of the state in which it sits: see Federal Rules of Procedure, rule 4. Thus, if an action for personal injuries is commenced in New York against a defendant resident in California, the jurisdiction of the

C    New York court over that defendant will depend upon the "long arm" statute of the state of New York. Each state has its own "long arm" statute serving, broadly, the purpose that R.S.C., Ord. 11 serves for our own jurisdiction. There is no separate federal "long arm" statute that Congress or the Supreme Court have enacted so as to confer special federal in personam jurisdiction on federal district courts. They must rely on the laws of the respective forum states. In *Point Landing Inc. v.*

D    *Omni Capital International Ltd.* (1986) 795 F. 2d 415, 419, a decision of the Court of Appeals for the Fifth Circuit, it was held:

> "Absent a rule or statute to the contrary, Federal Rule of Civil Procedure 4(*e*) permits a federal court to exercise jurisdiction over only those defendants who are subject to the jurisdiction of courts of the state in which the court sits."

E    This rule applies not only when the court is sitting in diversity but also when it is dealing with a federal question case or indeed any other type of case in which it has original jurisdiction.

     Accordingly, whether a federal district court is exercising federal question jurisdiction or whether it is exercising diversity jurisdiction, its entitlement to take jurisdiction over a particular defendant depends on

F    the "long arm" statute of the forum state. The jurisdiction objections taken by Cape in Tyler 1 were taken on the ground that the "long arm" statute of Texas did not entitle the federal district court at Tyler, Texas, to take jurisdiction over Cape.

     The effect of this rule and authority is that the Tyler court in the Tyler 2 actions was sitting in diversity, was applying to the causes of action Texas state law and relied for its in personam jurisdiction over

G    Cape on the Texas "long arm" statute.

     The question for me is whether presence in Illinois is, under English law, a sufficient foundation for jurisdiction to be taken by the federal district court sitting in Tyler, Texas.

     There is no doubt but that, for conflict of law purposes, each state within the United States is a "country" and that for many conflicts of

H    law purposes the United States is not a "country." Each state, for example, has its own common law. The United States has no common law. A person may be domiciled in a state. Domicile in the United States as a whole is a meaningless concept. The proper law of a contract

APP.314

or of a tort may be the law of a state, but cannot be the law of the      A
United States as a whole. In *Dicey's & Morris's Conflict of Laws*, 11th
ed. (1987), p. 26 there is this statement:

> "Meaning of 'country.' This word has from long usage become
> almost a term of art among English-speaking writers on the conflict
> of laws, and it is vitally important to appreciate exactly what it
> means. It was defined by Dicey as 'the whole of a territory subject      B
> under one sovereign to one body of law.' He suggested that a better
> expression might be 'law district': but this phrase has never found
> much favour with English-speaking writers, who prefer the more
> familiar word 'country.' England, Scotland, Northern Ireland, the
> Isle of Man, Jersey, Guernsey, Alderney, Sark, each British colony,
> each of the American and the Australian states and each of the
> Canadian provinces is a separate country in the sense of the conflict    C
> of laws, though not one of them is a state known to public
> international law."

As part of the discussion of the meaning of the word "state," the text
contains this statement, at p. 27:

> "A state may or may not coincide with a country in the sense of the      D
> conflict of laws. Unitary states like Sweden, the Netherlands and
> New Zealand, where the law is the same throughout the state, are
> 'countries' in this sense. But composite states like the United
> Kingdom, the United States, Australia and Canada are not."

I find it difficult to accept that for some private international law
purposes the United States may not be a "country." Take the case of a      E
federal district court hearing a federal anti-trust damages suit. The suit
would be a federal question case, not a diversity case. The law being
applied would be United States law, not state law. Professor Baade,
giving evidence for the defendants, said that in a federal anti-trust case
the "country" would be the United States. He accepted that this would
be so even though the in personam jurisdiction of the court was           F
determined by the forum state's "long arm" statute. This seems to me to
correspond with reality. Federal anti-trust law is the product of United
States statute, not state statute, and applies to the whole of the United
States. It is the United States Congress that has established the federal
courts in which anti-trust suits may be litigated. They are United States
courts. The in personam jurisdiction that enables a defendant in an anti-
trust suit to be brought before a federal district court sitting in Texas is   G
dependent upon the Texas "long arm" statute but that is because
Congress has not chosen to confer any specific federal in personam
jurisdiction upon federal district courts. I did not understand it to be
suggested that Congress could not, with constitutional propriety, do so if
it so desired.

It was suggested that when sitting in federal question jurisdiction a
federal district court was, on analysis, applying state law. The analysis   H
was based upon the provisions in the United States Constitution that
give federal legislation national efficacy. Federal legislation becomes, in
effect, it was argued, state law. Accordingly a federal district court in a

A   federal question case may be regarded as applying state substantive law just as a federal district court in a diversity case will be applying state substantive law.

This analysis is, in my opinion, little more than sophistry. The distinction between federal law derived from federal statute, on the one hand, and state law, whether derived from common law or state statute, on the other hand, seems to me a clear one. It must have seemed clear,

B   too, to Congress in enacting paragraph 1331 of the United States Code which refers to "civil actions arising under the Constitution, laws or treaties of the United States." In my opinion, when a federal district court is dealing with a federal question case, it is applying federal substantive law, not state law.

Suppose then, in a federal question case, a defendant who did not

C   appear or take any part in the case had a damages default judgment entered against him. If the federal district court was sitting in Texas and the defendant was resident in Illinois, would an English court decline to enforce the judgment against the defendant on the ground that the "country" of the court was Texas and the court, by the standards of English law, lacked jurisdiction over the defendant? I do not see any reason why it should do so. The court would be a United States court

D   applying United States law. Why should not such a court in such a case command the obedience of a resident anywhere in the United States? I justify my reaction by relying on the fundamental principle underlying territoriality as a basis of jurisdiction. The sovereignty of the United States in its own territory is, of course, recognised by English law. The entitlement of the United States to establish in its territory courts in

E   which issues arising under its laws may be adjudicated upon and disposed of is an attribute of its sovereignty. It is also an attribute of its sovereignty that the United States is entitled to invest its courts with jurisdiction over any persons resident in its territory. If Congress had chosen to establish a federal district court at Washington D.C. for the purpose of dealing with federal anti-trust cases, and with in personam jurisdiction over any persons resident in the United States, the

F   proposition that, under English law, that jurisdiction was excessive, would, in my view, have been unarguable. Under English law a resident in Alaska would owe the same obligation of obedience to such a court as would a resident of Washington D.C. The "country" of the court would, unarguably, be the United States as a whole.

I have been discussing that which for present purposes is hypothetical.

G   The Tyler court was sitting in diversity and was not dealing with a federal question case. But the arguments addressed to me by Sir Godfray Le Quesne on this issue have had at their core the proposition that the United States as a whole cannot be a "country" for private international law purposes nor, in particular, for the purpose of enforcement in England of a damages award made by a federal district court. I am unable to accept that proposition. In my judgment, where a

H   federal district court is exercising federal question jurisdiction it is doing so as a court of the United States in circumstances in which the "country" of the court is, for English law purposes, the United States. I therefore decline to approach the question before me on the footing that

APP.316

the United States cannot be a "country" for enforcement of foreign  A
judgment purposes.

The question before me is whether a federal district court sitting in
diversity in a tort case is to be regarded, for enforcement purposes, as a
court of the state in which it is sitting and whose law it is applying, or as
a court of the United States which established it. There is no authority
that provides an answer. A convenient starting point, however, is the
judgment of Blackburn J. in *Schibsby v. Westenholz*, L.R. 6 Q.B. 155.  B
He said, at p. 161—I have cited the passage before but I do so again:

> "If the defendants had been at the time of the judgment subjects of
> the country whose judgment is sought to be enforced against them,
> we think that its laws would have bound them. Again, if the
> defendants had been at the time when the suit was commenced
> resident in the country, so as to have the benefit of its laws  C
> protecting them, or, as it is sometimes expressed, owing temporary
> allegiance to that country, we think that its laws would have bound
> them."

How is this statement of principle to be applied where one sovereign
state has a number of different systems of law that apply in different
parts of its territory? Sir Godfray suggested that the critical question to  D
be asked was whether the defendant was present within the territorial
jurisdiction of the court which had given the judgment. He reminded me
of the statement by Lord Selborne L.C. in the *Rajah of Faridkote* case
[1894] A.C. 670, 683, that "all jurisdiction is properly territorial." If the
defendant was not within the territorial jurisdiction of the court
concerned, then, said Sir Godfray, it would be immaterial that he might  E
be resident in the jurisdiction of another court set up by the same
sovereign power. I do not find difficulty in accepting these submissions,
but they do not seem to me to point the way towards a solution to the
main problem. The question whether Cape was present within the
territorial jurisdiction of the federal district court at Tyler, Texas, is one
which must be answered by reference to English international law. It is
the attitude of English law to the territorial jurisdiction and competence  F
of a federal district court that I am trying to discover.

Sir Godfray submitted that the criterion to be applied in answering
the question depended on the function of the district court. If the
function of the court when sitting in diversity was the administration of
justice in Texas, then it should be regarded as a state court with a
territorial jurisdiction covering Texas. Unless its function was the  G
administration of justice in the United States as a whole, it should not
be regarded as a United States court with a territorial jurisdiction
covering the whole of the United States.

Sir Godfray then analysed the characteristics of a federal district
court and submitted that they showed the court, when sitting in diversity,
to be part of the system for the administration of justice in the state in
which it sat.  H

If Sir Godfray's approach is correct, I do not think his analysis or
conclusions can be faulted. But I am not satisfied that his approach is
correct. The question as to whether a foreign court has, in the eyes of

A   English law, jurisdiction over a defendant, may receive an affirmative answer if a sufficient territorial connection between the defendant and the court can be established. But the territorial basis of jurisdiction is dependent upon and cannot, in my opinion, be divorced from, the sovereignty of the "country" that has established the court in question. It is, I think, recognition of the sovereignty of a foreign country that leads to recognition of the entitlement of its courts to take jurisdiction

B   over persons resident in its sovereign territory. I do not regard the United Kingdom with its constituent private international law "countries" as inconsistent with this thesis. It would be open to Parliament, if it so desired, to create a court structure for the whole of the United Kingdom for a specified class of case. I can see no reason of principle why foreign countries, with a private international law similar to ours, should decline

C   to recognise the jurisdiction of such a court over persons resident anywhere in the United Kingdom. The United States is a sovereign power with a territory over which its sovereignty extends. It has established courts whose in personam jurisdiction, although subject to limits and derived from state statutes, is capable of extending to individuals anywhere in the United States.

D   As a matter of principle, in my view, if a United States court exercises jurisdiction over a person resident in the United States, it is exercising powers inherent in the sovereignty which adheres to the United States. As a matter of principle, too, in my view, English law should recognise the legitimacy of that exercise of jurisdiction.

It follows that I agree with Mr. Morison that the answer to the question which I must answer does not lie in investigating the function

E   discharged by the court but lies in investigating the source of the authority of the court. Whatever the function of a federal district court in a diversity case, the source of its authority is to be found in the sovereign power which established it. For those reasons I conclude that the exercise of jurisdiction by a federal district court over a person resident in the United States is, by the standards of English law, a legitimate and not an excessive exercise of jurisdiction. If I had felt able

F   to conclude that Cape and Capasco were, when the Tyler 2 actions were commenced, present in Illinois, I would have held that to be a sufficient basis, in English law, for the exercise by the Tyler court of jurisdiction over them.

There is one final point I wish to make before leaving this issue. Cape and Capasco protested the jurisdiction in the Tyler 1 actions. They

G   contended that the Texas "long arm" statute did not entitle the Tyler district court to exercise in personam jurisdiction over them. Their objections were overruled by Judge Steger at an interlocutory stage but were never the subject of a final ruling. The objections were not renewed in the Tyler 2 actions for the obvious reason that Cape and Capasco took no part therein. But it remains the contention of Cape and Capasco that, under the Texas "long arm" statute, the Tyler district

H   court was not entitled to exercise in personam jurisdiction over them. In the course of argument before me, I thought for a time, wrongly, that the alleged absence of in personam jurisdiction of the Tyler court was being advanced as a reason why the English courts should not recognise

APP.318

the jurisdiction exercised over Cape and Capasco by the Tyler court. Sir    A
Godfray made plain to me, however, that I was under a misapprehension
and that the contention that under the Texas "long arm" statute the
Tyler court lacked in personam jurisdiction was not being relied on as a
defence. Nonetheless, evidence was given by, in particular, Mr. Bernays
and Mr. Hall as to the consequences under United States law if that had
been so. Their evidence satisfied me that if a default judgment against a
defendant who has taken no part in the proceedings is given by a federal    B
district court in circumstances in which the court has erroneously
assumed in personam jurisdiction over the defendant, the defendant can
raise the error in collateral proceedings in order to resist the enforcement
of the judgment against him. In the instant case, Cape, if it owned
assets in California against which the plaintiffs sought to enforce the
default judgment, could, if its jurisdiction contention were a good one,    C
resist enforcement by establishing in collateral proceedings in California
the lack of jurisdiction of the Tyler court.

Mr. Morison submitted, and I think Sir Godfray agreed, that a
domestic lack of jurisdiction was not a ground upon which enforcement
of a foreign judgment in England could be resisted. *Pemberton v.
Hughes* [1899] 1 Ch. 781 was cited as authority: see especially *per* Sir
Nathaniel Lindley M.R. at p. 790. But *Pemberton v. Hughes* was a case    D
dealing with status, where special considerations apply.

I am not for a moment suggesting that the merits of a foreign
judgment can be re-examined in enforcement proceedings in this country.
But where enforcement of a foreign money judgment is sought, it seems
to me odd and anomalous that English courts should give to the
judgment an efficacy denied it by the courts of the forum. If, as I think,    E
the United States as a whole is the "country" of a federal district court
and if, within that country, collateral objection to the enforcement of a
default judgment is possible, I do not see, in principle, why that same
collateral objection should not be raised to resist enforcement of the
judgment in England. I need not and do not propose to express a final
opinion on this point since it does not arise as an issue in the present
case. But the matter has been touched on in argument as well as in    F
evidence and I would not wish this judgment to be taken as tacit support
for the view that, provided by English law standards the foreign court
was not claiming excessive jurisdiction, the judgment of the foreign
court would be enforceable in England notwithstanding that under the
law of the forum the court had lacked jurisdiction. My present view is to
the contrary.    G

*Summary of issue 7*

It is at this point that the definitive part of my judgment comes to an
end. I have still to deal with issue 7—fraud, natural justice and public
policy. My conclusions and findings on this issue are, in summary, these:

(1) The allegations against Mr. Blake Bailey of dishonesty and of    H
procuring the default judgment by fraud fail. (a) The several statements
contained in the findings of fact in the default judgment that were based
on the proposition that the Tyler 1 actions and the Tyler 2 actions could
be treated as one composite unit of litigation were not untrue statements

A   of fact but were statements based upon a legal theory that Mr. Bailey, as counsel for the plaintiffs, was entitled to espouse in the interests of his clients. The theory was, in my view, misconceived but it was not, in my judgment, dishonest for Mr. Bailey to draft the default judgment on the basis of that legal theory. (b) Paragraph 11 of the findings of fact contains statements of fact that were, in my judgment, untrue in that the court did not review the medical records of any of the plaintiffs and did

B   not make any determination in respect of any individual plaintiff of the amount of damages that would properly compensate that plaintiff for his or her medical treatment or pain and anguish or physical disability. But I do not find that in drafting the default judgment with paragraph 11 included therein or in submitting the draft to Judge Steger, Mr. Bailey was acting dishonestly. (c) Mr. Bailey did not, I find, dishonestly

C   procure Judge Steger to award the damages sum of $15,654,000 or to award an average of $75,000 per plaintiff. The allegations of misrepresentation based on the contents of the conversations between Judge Steger and Mr. Bailey prior to 12 September 1983 fail. (d) Mr. Bailey did not, I find, mislead Judge Steger either in respect of the findings of fact in the default judgment or in respect of the quantum of damages awarded. (e) It was not dishonest for Mr. Bailey to procure

D   Judge Steger to award the $15,654,000 whether or not that level of award can be categorised as exorbitant or as arbitrary.

But: (2) the default judgment is not, in my judgment, a judgment that should be enforced in an English court. (a) No evidence of damage or injury to any of the plaintiffs, whether oral or in affidavit form, was placed before Judge Steger. (b) Medical records together with counsel's

E   summary of each plaintiff's case were placed before the court on 12 September 1983 but the judgment was given before Judge Steger had had any sufficient opportunity to peruse them and, as I find, without him having done so. (c) The damages award was quantified either as a total figure to be divided among all the plaintiffs or on the basis of an average figure per plaintiff and, in either case, without any determination

F   in respect of any individual plaintiff of the amount of damages that that plaintiff ought to recover from the defendants for the injuries he or she had received. (d) The classification of the plaintiffs into bands for damages purposes was carried out by the plaintiffs' counsel and did not represent any judicial assessment made by Judge Steger of the relative seriousness of the individual plaintiff's injuries. (e) In the circumstances,

G   the individual awards of damages were arbitrary and did not follow upon a judicial determination of the quantum of damages that the individual plaintiffs were entitled to recover against the defendants.

For these reasons, expressed in summary form, the default judgment was obtained, in my judgment, in circumstances that, by the standards of English law, were contrary to natural justice.

H   In my view, a judgment obtained in the circumstances revealed by the evidence of this case does not give rise to any obligation of obedience enforceable in any English court.

26 July.   SCOTT J. read the following conclusion to his judgment:

APP.320

Scott J.                   **Adams v. Cape Industries Plc. (Ch.D.)**                   [1990]

*Issue 7: fraud, natural justice and public policy*                                   A

If my conclusion that, under English law, the Tyler court did not
have jurisdiction over Cape and Capasco is right, the issue whether
enforcement of the default judgment should be refused on the ground
that it was procured by fraud, or that its enforcement would offend
principles of natural justice or public policy, does not arise. But the
defendants' case under this head has involved allegations of dishonesty   B
against Mr. Blake Bailey. He, it is alleged, dishonestly procured the
default judgment. Allegations made against a professional man of
dishonesty in the course of his profession are allegations which, once
made, must be dealt with. Any other course would not be fair to Mr.
Bailey. For this reason, in particular, I must, notwithstanding my
conclusions on the other points in this case, deal in some detail with the
allegations of professional dishonesty made against Mr. Bailey. I propose   C
first to relate the circumstances in which, on my reading of the evidence,
the default judgment came to take the form it did. [His Lordship then
examined in detail the evidence as to the manner in which the default
judgment given by Judge Steger on 12 September 1983 came to be
delivered, concluded that the allegations against Mr. Bailey of dishonesty
and fraud based on the contents of the judgment failed, and continued:]   D
The defence that the default judgment was procured by fraud, therefore,
fails. That leaves the question whether, in the circumstances in which
the judgment was obtained its enforcement in England can be resisted
on natural justice or public policy grounds.

The circumstances in which the judgment was obtained involve these
particular features. (i) The judgment was not based on evidence in the
strict sense. There was none. Nor was it based on the unauthenticated   E
medical records that Mr. Bailey and Mr. Clark had lodged on 12
September 1983. Judge Steger had not had time to peruse them. (ii) The
medical material lodged by Mr. Bailey and Mr. Clark did not purport to
establish that the medical condition of the respective plaintiffs had been
caused by exposure to asbestos dust. Nor did the material deal with pain
and suffering, present or future physical disability, past or future medical
expenses or, indeed, any special damage of any kind. (iii) Judge Steger   F
indicated his willingness to grant an average of $75,000 per plaintiff.
This was his only contribution to the amount of the damages award. The
$200,000-odd by which the total award of $15,654,000 exceeded
the $75,000 average was simply the mathematical consequence of the
appendix A amendments effected by Mr. Bailey and Mr. Clark. (iv) The
provenance of the $75,000 average is uncertain. It is likely that it   G
derived from Judge Steger's knowledge of the statistics regarding the
level of current settlements in asbestos-related suits. It is possible that it
owed something to the arguments that Mr. Bailey addressed to the
judge at their third meeting. It could not, in my view, have owed
anything to the medical material lodged with the court on 12 September
1983. (v) The decision as to the category of damages into which each
plaintiff should be placed was made by counsel, Mr. Bailey and Mr.   H
Clark, not by Judge Steger. The decision as to the level of the four
categories and their relationship to one another was made by counsel,
not by Judge Steger. Judge Steger required the average award to be

A    reduced from $120,000 to $75,000. It was counsel, not the judge, who decided how that should be achieved. It was counsel, not the judge, who decided to shift two plaintiffs from the respective categories in which they had originally been placed into new categories. The judge was not told that this had been done and could not have known that it had been done. (vi) The features that I have mentioned justify, in my judgment, these conclusions. First, no judicial hearing, worthy of the

B    name, at which quantum of damages was assessed took place. Second, the attribution of specific damages to the individual plaintiffs was not the result of a judicial assessment of the individual entitlements of the respective plaintiffs. Third, the total sum of damages awarded was based on the judge's opinion as to what would represent an appropriate average award.

C    The procedure adopted by Mr. Bailey and Judge Steger that led to the award of damages was not, in my judgment, in accordance with the requirements of the relevant federal rules. I base this conclusion on the evidence in particular of Mr. Hall and Mr. Bernays, but also on that of Mr. Brin and Mr. Davis, all of whom were critical of the procedure that had been adopted. Mr. Bailey and Mr. Patrick gave evidence to the effect that Judge Steger was not required to hold a judicial hearing for

D    the purpose of assessment of damages, was entitled to take into account unauthenticated medical reports, could inform himself by whatever means he chose of the significance of the plaintiffs' medical condition, did not require evidence causally connecting the plaintiffs' medical condition with the defendants' negligence, and did not require evidence of the plaintiffs' pain and suffering, medical expenses past and future, or

E    disability in order to award damages in respect of these items. In preferring the evidence to the contrary given by the defendants' witnesses, I am influenced by my own instinctive reaction as a judge in a common law jurisdiction. The United States is—with all respect to Louisiana and its civil law heritage—one of the great common law jurisdictions. The federal rules relating to default judgments and the federal rules of evidence seemed to me familiar. They embody in broad

F    substance rules of evidence and of procedure similar to those which apply in this country. The proposition that a judge assessing tortious damages where liability has been established against defendants in default can dispense with a judicial hearing or with the rules of evidence, or with the need of evidence, offends my understanding of the role and function of a judge in a common law jurisdiction. I found it easy to

G    accept the evidence of Mr. Bernays, Mr. Hall, Mr. Brin and Mr. Davis and to conclude therefrom that that proposition forms no part of United States law and procedure.

   Whether it is relevant to find, as I do, that the procedure leading to the damages award of 12 September 1983 was not in accordance with the federal rules is another matter. It may be that it is not. But I would wish it to be clear that criticisms of that procedure are not criticisms of

H    the procedure prescribed by the federal rules. It has not been suggested on the defendants' side, and could not have been suggested, that the content of the federal rules relating to the manner in which default judgments can be obtained and to the procedure for an assessment of

damages are in any respect offensive to natural justice. Indeed, the
contrary is the case. Those rules, like our own corresponding rules, are
designed to enable justice to be done and, from a procedural point of
view, are unimpeachable. Criticism in the present case has been directed
to what actually happened. If Mr. Bailey had been correct in representing
the procedure followed as being consistent with the federal rules, the
criticism would have been a criticism also of the federal rules. But Mr.
Bailey was not, in my judgment, correct. So that point of criticism does
not arise.

   I must now consider the criteria to be applied in order to decide
whether or not a foreign judgment is impeachable on natural justice or
public policy grounds. I should say at once that, in my judgment,
natural justice and public policy cover, in the present case, the same
ground. If the judgment of 12 September 1983 is objectionable on
natural justice grounds, it is easy to conclude that it would be contrary
to public policy to permit its enforcement in this country. If it is not
objectionable on natural justice grounds, then, on the footing that no
jurisdictional objection can be taken, I cannot see any public policy
reason for not enforcing it.

   Mr. Falconer submitted that since due notice of the default application
had been given, no natural justice objection to the default judgment
could be maintained. On the authorities, he submitted, the requirements
of natural justice, at least in the context of enforcement of foreign
judgments, amount to no more than that sufficient notice of the
proceedings must be given, together with an opportunity for the
defendant to have its case heard. He referred to the service on Cape
and Capasco of the notice of the plaintiffs' application for a default
judgment and submitted that the defendants' natural justice defence
must, accordingly, fail.

   There are, I agree, authorities which give some support to this
approach. Thus in *Ochsenbein v. Papelier* (1873) L.R. 8 Ch. App. 695,
700, Mellish L.J. said:

   "It was always held that a foreign judgment could be impeached at
   law as contrary to the principles of natural justice, as, for instance,
   on the ground of the defendant having had no notice of the foreign
   action, or not having been summoned, or of want of jurisdiction, or
   that the judgment was fraudulently obtained."

In *Robinson v. Fenner* [1913] 3 K.B. 835, 842–843, Channell J. said:

   "It is not enough, therefore, to say that the result works injustice in
   the particular case, because a wrong decision always does. So far as
   I can see, all the instances given of what is 'contrary to natural
   justice' for the purpose of preventing a foreign judgment being sued
   on here are instances of injustice in the mode of arriving at the
   result, such as deciding against a man without hearing him or
   without having given him any notice or the like."

In *Jacobson v. Frachon* (1927) 138 L.T. 386, 390, Lord Hanworth M.R.
referred to Channell J.'s judgment in *Robinson v. Fenner* [1913] 3 K.B.
835 and said:

A    ". . . I am inclined to agree with the view that he presents there, that the question of natural justice is almost, if not entirely, comprised in considering whether there has been an opportunity of having had a hearing, and whether the procedure of the court has been in accordance with the instincts of justice whereby both parties are to be given a full opportunity of being heard."

B    In my view, however, the references in the dicta to service of notice of the hearing and to an opportunity to be heard are references, by way of examples, to circumstances which will constitute a want of natural justice and are not to be taken as exhaustive.

   In *Schibsby v. Westenholz*, L.R. 6 Q.B. 155, 159, Blackburn J. referred to the obligation on a defendant to obey an order of a foreign court of competent jurisdiction but went on to say that "anything which negatives that duty, or forms a legal excuse for not performing it, is a defence to the action."

C    In *Pemberton v. Hughes* [1899] 1 Ch. 781, 790–791, Lindley M.R. said:

D    "If a judgment is pronounced by a foreign court over persons within its jurisdiction and in a matter with which it is competent to deal, English courts never investigate the propriety of the proceedings in the foreign court, unless they offend against English views of substantial justice. Where no substantial justice, according to English notions, is offended, all that English courts look to is the finality of the judgment and the jurisdiction of the court, in this sense and to this extent—namely, its competence to entertain the sort of case which it did deal with, and its competence to require the defendant to appear before it. If the court has jurisdiction in this sense and to this extent, the courts of this country never inquire whether the jurisdiction has been properly or improperly exercised, provided always that no substantial injustice, according to English notions, has been committed."

E

F    That passage expresses, in my judgment, the fundamental criterion for the success of a natural justice objection to the enforcement of a foreign judgment. The proceedings in the foreign court must "offend against English views of substantial justice."

   Atkin L.J. in *Jacobson v. Frachon*, 138 L.T. 386 referred to *Pemberton v. Hughes* [1899] 1 Ch. 781 and to Lindley M.R.'s judgment and continued, at p. 392:

G    "By that it is quite plain from the context that Lindley M.R. is dealing with proceedings offending against English views of substantial justice. He is not dealing with the merits of the case or the actual decision, because he goes on to say in the same case, at p. 792, 'A judgment of a foreign court having jurisdiction over the parties and subject matter—i.e., having jurisdiction to summon the defendants before it and to decide such matters as it has decided—cannot be impeached in this country on its merits.' It is plain that the Master of the Rolls is dealing only with the proceeding, because it is obvious if a court gives judgment on the merits for the plaintiff,

H

A

when it is plain it ought to have given judgment for the defendant, or vice versa, that is a judgment which offends against the English views of substantial justice. Nevertheless as the Master of the Rolls says, it cannot be impeached upon that ground, but it can be impeached if the proceedings, the method by which the court comes to a final decision, are contrary to English views of substantial justice. The Master of the Rolls seems to prefer, and I can quite understand the use of the expression, 'contrary to the principles of natural justice;' the principles it is not always easy to define or to invite everybody to agree about, whereas with our own principles of justice we are familiar. Those principles seem to me to involve this, first of all that the court being a court of competent jurisdiction, has given notice to the litigant that they are about to proceed to determine the rights between him and the other litigant; the other is that having given him that notice, it does afford him an opportunity of substantially presenting his case before the court.

B

C

"Both those considerations appear to be essential if they are to be in accordance with natural justice. I think the expression of opinion of the late Professor Dicey in his great book on the *Conflict of Laws*, dealing with this subject matter is a little narrowly expressed. He says in rule 107 (4th ed., p. 444): 'A foreign judgment may sometimes be invalid on account of the proceedings in which the judgment was obtained being opposed to natural justice.' Then he says that is owing to want of due notice. 'But, in such a case, the court is generally not a court of competent jurisdiction.' It may be that the court is generally not a court of competent jurisdiction, but that seems to me by no means the whole of the rule. A court of competent jurisdiction, as I have said, may very well, either in accordance with its rules or in violence of them, refuse a substantial hearing to the party, and, if so, it appears to me that the judgment would be invalidated on the ground that it was contrary to natural justice for the reasons I have already to give. That gives quite free play for a variation between different countries and different jurisprudences of the method in which they shall hear the parties and the nature of the evidence to be given in the court. The case here depends upon whether or not the procedure of this foreign court did offend against our principles of substantial justice."

D

E

F

Despite Atkin L.J.'s particular reference to notice of the hearing being given to the litigant and to an opportunity for the litigant to present his case, he was not, in my view, purporting to limit natural justice objections to objections based on the absence of one or other of those features. He was limiting natural justice objections to objections based upon the procedure that had been adopted, but that, in my opinion, is the only limitation that can be spelled out of the judgment. The criterion expressed by Atkin L.J. in the last sentence of the passage I have cited, namely, whether "the procedure of this foreign court did offend against our principles of substantial justice," is a broad one.

G

H

In my judgment, therefore, I must consider the procedure which led to the 12 September 1983 default judgment and ask myself whether or not it offends against English principles of substantial justice.

A      I must start with the important circumstance that Cape and Capasco were in default and were thereby taken to have admitted the pleaded allegations made against them save in relation to damage. They had forfeited any entitlement to a hearing save on the issue of damages. There is no injustice in that. Second, Cape and Capasco were given notice of the plaintiffs' application for a default judgment. They were given notice that the application would be heard on 12 September 1983.

B    Venue was not specified, but I do not think that omission can be regarded as material.

It is important, however, to notice the nature of the relief which the plaintiffs were proposing to seek. Their application, according to the document served on Cape and Capasco, was to

C      "move the court to enter default judgment in favour of plaintiffs . . . and against defendants . . . and further, to hold hearing to determine the amount of relief entitled to plaintiffs."

This was notice to Cape and Capasco of a judicial hearing at which a judicial assessment of damages would take place.

D    The effect of the notice given to Cape and Capasco cannot be divorced from the content of the federal rules regarding default judgments. Under the federal rules, as under our own rules, a judicial assessment of damages where a defendant is in default is only necessary if the claim is for an unliquidated sum: see federal rule 55($b$). If the claim is "for a sum certain or for a sum which can by computation be made certain," the court clerk is required "upon request of the plaintiff and upon affidavit of the amount due [to] enter judgment for that amount . . . against the defendant."

E    A default judgment on a claim for a liquidated sum can, therefore, be obtained without any judicial hearing or any judicial assessment of the amount of the claim. There is no injustice in that.

The point can be taken further. It would be possible for procedural rules to provide, in the case of an unliquidated claim and a defendant in default, that the plaintiff be entitled, upon giving to the defendant a

F    written estimate of the recoverable damages, to enter judgment for the amount of the estimate, unless within some specified time the defendant gave notice of intention to dispute the amount. In that way an unliquidated claim could lead to a judgment against a defendant in default without any judicial hearing and without any judicial assessment of the damages. The case is hypothetical, but I do not think that a

G    judgment so obtained could be described as offending against English principles of substantial justice. The defendant would have received notice of the amount of the claim and would have been able to have disputed the quantum of damages and to have put the plaintiff to proof thereof if so advised.

I conclude that neither the absence of a judicial hearing nor the absence of a judicial assessment of damages is per se a procedural

H    feature that is objectionable. The context is all-important.

In the present case, the context is provided by the federal rules. The federal rules make provision, in actions for unliquidated damages where the defendant is in default, for a judicial process in the course of which

APP.326

evidence will be adduced and which will lead to due judicial consideration    A
by the judge, in the light of the pleadings and of the evidence, of the
amount of damages to which the plaintiff is entitled. A defendant in
default in an action for unliquidated damages is entitled to expect that
his liability to the plaintiff will be assessed by the judge in the light of
evidence which the judge has considered and which, in the judge's
opinion, justifies the award that is made.

The requirements of substantial justice in a particular case cannot, in    B
my judgment, be divorced from the legitimate expectation of both the
plaintiff and the defendant in the context of the procedural rules
applicable to the case.

Moving from the general to the particular, the defendants in the
present case, Cape and Capasco, were, in my view, entitled to expect
that their liability to the plaintiffs would be assessed by Judge Steger at    C
the hearing of which they had been given notice, in accordance with
evidence laid before and considered by the judge and in accordance with
the judge's assessment in the light of that evidence of the respective
plaintiffs' entitlements in damages. That is not what happened. There
was no consideration given by the judge to the medical material relating
to the individual plaintiffs and to the individual plaintiffs' entitlements in
the light of that medical material. If there had been, the judge would    D
not simply have said that he would award an average of $75,000 per
plaintiff. Damages calculated on an average-per-plaintiff basis may make
very good sense for the purposes of a settlement. The defendants who
pay are not concerned as to how the total sum is divided up among the
individual plaintiffs. But a judicial award so calculated is the antithesis
of an award based upon the individual entitlements of the respective
plaintiffs. Judge Steger's approach demonstrated, in my opinion, that he    E
was not considering the individual cases and how much the respective
individuals were entitled to recover against Cape and Capasco. The
judge purported to award sums for pain and suffering, for medical
expenses, for disability. But the judge's approach via an average sum
per plaintiff demonstrated that he was not giving any consideration to
these heads of damage in respect of plaintiffs individually.    F

Nor did Judge Steger have any material before him from which a
judicial estimate of pain and suffering or of medical expenses could have
been made. Nor did he, as opposed to counsel, determine the levels of
the four categories of damages or select the plaintiffs to be placed in
each of these categories. There was, in short, in my opinion, no judicial
assessment of damages.    G

In my judgment, the procedure adopted by Judge Steger offended
against English principles of substantial justice. The defendants were
entitled to a judicial assessment of their liability. They did not have one.
The award of damages was arbitrary in amount, not based on evidence
and not related to the individual entitlements of the plaintiffs. Many of
the features of the procedure to which I have drawn attention might,
taken singly, have been insufficient to meet the yardstick of substantial    H
injustice. Taken together, the criterion is, in my judgment, satisfied.

Mr. Falconer submitted that the procedural defects to which I have
drawn attention could have been the basis for an attack on the judgment

3:18-cv-00731-X    Document 273-6    Filed 07/30/19    Page 311 of 421    PageID

A    in the federal courts, whether by way of collateral action to have the judgment set aside or by way of appeal. This may well be right, although by now I suspect that such an attack or appeal would be time-barred. Mr. Falconer then submitted that where the foreign courts themselves provide a procedural remedy, the English courts should not entertain the objection. He referred me to *Cheshire and North's Private*

B    *International Law*, 11th ed. (1987), p. 378, where it is stated that "the defence will not succeed if the alleged unfairness consisted of something that might have been combatted and removed in the foreign action." *Jacobson v. Frachon*, 138 L.T. 386, is referred to in support of that proposition. But that case turned on the question whether the course of proceedings in the foreign court whereby the judgment was obtained offended English notions of substantial justice. It was held it did not.

C    The question whether, if the proceedings had offended, the defect would have been cured by the availability of an appeal procedure did not arise. As a matter of principle, in my opinion, Mr. Falconer's submission is unacceptable. If the procedure adopted by a foreign court offends English notions of substantial justice, whether or not the procedure be in accordance with the procedural rules of the foreign court, I cannot see any good reason why the resulting judgment should

D    be enforceable in England. It does not, in my view, create any obligation of obedience binding on the defendant that an English court should be required to recognise. So it is, in my judgment, with the default judgment of 12 September 1983. I do not accept that English law recognises any obligation on Cape or Capasco of obedience to a judgment so obtained, and I decline to enforce it.

E    It was argued, in addition, by Mr. Playford that the default judgment for $15,654,000 was exorbitant in amount, that the sums awarded to the individual plaintiffs were in a like state and that the default judgment should on that account, too, be rejected as offending against English notions of substantial justice. Mr. Playford reminded me of Dr. Bidstrup's evidence that had sought to establish that many of the plaintiffs were, judged by the medical records, suffering from no lung

F    injuries at all. Mr. Falconer justifiably pointed out that a defence on the merits is not a ground for declining to enforce a foreign judgment and that a complaint based on the allegedly excessive amount of the award was an attempt to re-open the merits. Mr. Playford's point about the amount of the award is not, in my view, a separate ground of complaint but is part and parcel of the complaint that there was no judicial

G    assessment.

   Judge Steger did not, in the present case, review the medical material relating to each individual plaintiff and then assess the damages to which that plaintiff was entitled. If he had done so and if he had awarded the same amounts as are contained in appendix A to the default judgment, Mr. Playford's complaint would, I agree, have represented an attempt to re-open the merits. I would then have had to decide whether there could

H    ever come a point at which an English court would feel so outraged by the excessive amount of a damages award that a refusal to enforce the award would be justified and, if so, whether that point had been reached in the present case. On the facts of the present case, however, I

do not, in my view, have to answer those questions. The damages A
awarded to the individual plaintiffs were not assessed by reference to
their respective individual circumstances. So the question whether by
reference to those circumstances the damages awarded were outrageously
excessive does not arise.

Nonetheless, Mr. Playford was, in my opinion, able to demonstrate,
in relation to a number of plaintiffs and their respective medical records,
inconsistencies in the levels of damages awarded to them. There were B
some in respect of whom it was difficult to accept that any real injury
had been suffered at all. These examples served, in my view, to confirm
that no consideration had been given to the individual deserts of the
plaintiffs, to underline, in short, the arbitrariness of the awards, rather
than to establish that the awards were exorbitant.

(vii) There are a few other minor matters that I should deal with. C
(1) The damages awarded to the plaintiffs in the action to which Capasco
was not a party are not enforceable against Capasco. That is accepted.
(2) There are some plaintiffs who were intervenors in one or other of
the Tyler 2 actions but notice of whose intervention was never served on
Cape or Capasco. Prima facie this failure represents a procedural defect
of substance. Why should the default judgment in favour of these
plaintiffs be enforced? Cape and Capasco were not in default and had D
no opportunity to file an answer to the pleadings. Mr. Falconer's answer
was that since Cape and Capasco had for tactical reasons decided to
take no part in the Tyler 2 actions, the failure to give notice of the
interventions did not prejudice them. They would, in any event, have
taken no steps to defend the claim. I accept Mr. Falconer's premise but
not his conclusion. I agree that it is as certain as anything can be certain E
that, if served with notice of the interventions, Cape and Capasco would
have done nothing. Nonetheless, notice to the defendants of the claims
was, in my view, an essential preliminary to recognition of the default
judgments. Substantial justice requires at least, and in all cases, that
notice of the claims be given to the defendants. If that is not done, I do
not think the resultant judgment is enforceable in this country. F
Accordingly, I would, on this ground also, have dismissed the actions of
those plaintiffs in respect of whom notice of intervention was not served
on the defendants. (3) Finally, it is accepted by Mr. Morison that, if,
contrary to my view, the default judgment is enforceable in England,
the defendants are entitled to set off against their liability thereunder
the sums recovered by the plaintiffs in the 1983 settlement. Otherwise
there would be double recovery. This point does not affect the Unarco G
plaintiffs.

I must conclude by expressing my indebtedness to counsel for their
very great assistance in a case that has been for me of unprecedented
interest both on the law and the facts and my regret that this final part
of my judgment has been delayed.

H

*Action dismissed.*
*Plaintiffs to pay four-fifths*
*of defendants' costs.*

A    *Solicitors: Herbert Oppenheimer Nathan & Vandyk; Davies Arnold & Cooper.*

APPEAL from Scott J.

The plaintiffs appealed on the grounds, which were amended at the hearing, inter alia, that (1) the judge misdirected himself in law in
B    holding (a) that the defendants were not present in the United States of America at the relevant dates and (b) that it would be contrary to natural justice for the judgment of the United States Federal Court of the Tyler District, Texas, dated 12 September 1983 to be enforced in this country; (2) at the trial, the plaintiffs contended that the defendants were present at 150, North Wacker Drive, Chicago, Illinois, from where asbestos mined in South Africa by the Cape group was marketed
C    throughout the United States of America and that the defendants were present there (a) by their wholly owned subsidiary, North American Asbestos Corporation ("N.A.A.C."), (b) by a company called Continental Productions Corporation ("C.P.C."), which was set up to replace N.A.A.C. in such a way as to disguise the defendants' continued involvement in the marketing of the group's asbestos in the United
D    States of America; (3) the judge failed to apply the correct test to determine whether the presence of a third party might constitute the presence of the defendant and instead he asked himself the fundamental question whether the United States court was entitled, on territorial grounds, to take jurisdiction over Cape; (4) the judge erred in law in rejecting the approach of the European Court to the question of jurisdiction where a parent outside the market set up a subsidiary within
E    it; (5) the judge misdirected himself as to the burden of proof in holding that the plaintiffs had the burden of proving that Cape were present in the United States, whereas the burden was on the defendants to prove that the judgment of the federal court was not enforceable; (6) on the facts as found, in particular with regard to N.A.A.C. the judge ought to have held that the defendants were present through it, which was carrying on the group's business and not, in any real sense, its own
F    business; (7) as to C.P.C. the judge wrongly concluded that it was an independently owned company and even if that conclusion were correct, C.P.C. was Cape's presence in the United States of America and the judge was wrong to conclude that C.P.C. and N.A.A.C. were carrying on their own business rather than the business of Cape; (8) the judge erred in law in his approach to the question whether it would be
G    contrary to natural justice to enforce the judgment and having stated that "the fundamental criterion for the success of natural justice objection" was whether the proceedings offended "against English views of substantial justice," he wrongly concluded that that criterion permitted him to investigate and make findings in relation to (a) the procedural rules relevant to the entering of the judgment and (b) the circumstances in which the judgment was entered and then he applied that criterion,
H    without qualification or limit, to the facts. The correct approach was to treat the boundaries of natural justice as a defence to the enforcement of a foreign judgment as confined to an examination of whether the defendant had had notice of the hearing or of the intention to enter

judgment and a fair opportunity of presenting his case: *Jacobson v.*    A
*Frachon* (1928) 138 L.T. 386, 392, *per* Atkin L.J. If the judge had
applied the correct test he would have been bound to conclude that the
natural justice defence failed and that a large part of the evidence on
behalf of the defendants was irrelevant on that issue. Any defects in the
manner in which the judgment was obtained or given were capable of
being corrected on appeal or by application to the federal judge at the
first instance.                                                           B

By a respondent's notice under R.S.C., Ord. 59, r. 6(1)(*b*) the
defendants gave notice of their intention of contending that the judgment
should be affirmed on additional grounds, inter alia, that the judge
misdirected himself in law in holding that if, contrary to his primary
findings, the defendants were resident or present in Illinois, then such
residence or presence was sufficient to give the Federal District Court    C
for the Eastern District of Texas, Tyler Division ("the Tyler court")
jurisdiction over the defendants recognisable according to English law.
The question which had to be decided was whether at the time each suit
was commenced the defendants were resident or present in the "country"
of the Tyler court. The judge misdirected himself in holding (a) that the
question had to be answered by investigating the source of the authority
of the court, (b) that a resident of Illinois was, according to English    D
private international law, subject by reason of that residence to the
jurisdiction of the Tyler court and (c) that a resident anywhere in the
United States was, according to English private international law, within
the jurisdiction of the Tyler court and that the United States was one
"country" or "law district." The Tyler court did not claim jurisdiction on
the grounds of the defendants' residence in Illinois. No American court    E
would regard a federal court sitting in one state as having jurisdiction
over a defendant resident in another state on the ground that that
defendant was resident within the United States. According to the
judge's decision, English rules of private international law would regard
as subject to the jurisdiction of the Tyler court many residents of the
United States whom no American court would hold to be so subject.
                                                                          F

*T. R. A. Morison Q.C.* and *Charles Falconer* for the plaintiffs.
*Sir Godfray Le Quesne Q.C., Jonathan Playford Q.C.* and *Adrian
Brunner* for the defendants.
The main submissions of counsel are dealt with in the judgment: see
post, pp. 514E–F, 518E–H, 519E–F, 528A–D, F—529C, 530B–C, 532B–E, F–G,
535D–F, 536C–H, 537E—538B, G—539C, 540G—541D, 544D–545A, 549F—    G
550C, 555B, F—557G, 561G—562D, 565D–H, 566D–E, 567E–F, 568H—569B,
570D.

*Cur. adv. vult.*

27 July 1989.   The following judgment of the court was handed    H
down.

A    SLADE L.J.

I *Introduction*

This is the judgment of the court, to which all its members have
contributed, on an appeal by the plaintiffs in 205 consolidated actions.
On 27 July 1988, Scott J. dismissed all their claims. The trial in the
court below lasted some 35 days and the argument before this court
B    extended over some 17 days. The case raises important points of law
and some substantial issues of fact.

Having reserved judgment at the end of the argument on 3 May
1989, we subsequently came to the firm conclusion that the appeal must
be dismissed and that in the particular circumstances of this case it was
right that the parties should be informed of our decision at once, rather
than having to wait for some more weeks before we were in a position
C    to give the reasons for our decision. On 24 May we accordingly
announced that the appeal would be dismissed and that we would give
the reasons for our decision in writing at a later date, at which date the
order dismissing the appeal would be drawn up. This we now do.

The plaintiffs in these proceedings are persons, or the personal
representatives of persons, in whose favour awards of damages were
D    made by the judgment, dated 12 September 1983, of Judge Steger, a
United States Federal District Court judge, in the District Court for the
Eastern District of Texas, United States of America ("the Tyler court").
The judgment was a default judgment against Cape Industries Plc.
("Cape") and Capasco Ltd. ("Capasco"), companies registered in
England and the sole defendants in all the actions before this court.
They had taken no part in the proceedings in which the judgment was
E    made. The judgment was for the specific sums payable to individual
plaintiffs set out in an appendix to the judgment: $37,000 each for 67
plaintiffs; $60,000 each for 31 plaintiffs; $85,000 each for 47 plaintiffs
and $110,000 each for 61 plaintiffs. The total of the individual awards
was $15.654m. and the awards were directed to bear interest at 9 per
cent. from judgment until payment.

F    The awards were made in respect of claims for damages for personal
injuries and consequential loss allegedly suffered by each plaintiff as a result
of exposure to asbestos fibres emitted from the premises of a primary
asbestos insulation factory in Owentown, Smith County, Texas, which was
operated from 1954 to 1962 by Unarco Industries Inc. ("Unarco") and from
1962 to 1972 by Pittsburgh Corning Corporation ("P.C.C."). The basis of
liability of Cape and Capasco was alleged to be negligent acts and omissions
G    and breaches of implied and express warranties.

The relationship of Cape and Capasco to the emission of asbestos fibres
fibres from the Owentown factory was, in summary, that Cape owned the
shares in subsidiary companies in South Africa which had mined the
asbestos and in its subsidiary Capasco. Capasco was concerned in
organising the sale of asbestos, mined in South Africa, throughout the
world to those who wished to use it in various industrial processes.
H    Between 1953 and 1978 when it was dissolved, another subsidiary of
Cape, North American Asbestos Corporation ("N.A.A.C.") assisted in
the marketing of asbestos of the Cape group in the United States of
America. The plaintiffs' contention was that the defendants had been

responsible for the supply of asbestos fibres directly or indirectly to   A
Unarco and P.C.C. without giving proper warning of the dangers
thereof.

*Summary of the proceedings in the Tyler court*

Different sets of proceedings with reference to claims arising from
the processing of asbestos in the Owentown factory had extended over   B
many years. An account of what took place is unnecessary for a proper
understanding of the course of the present proceedings. The first action
was commenced in the Tyler court in January 1974 and was framed as a
"class" action in which the plaintiffs sued "on behalf of themselves and
all others similarly situated." A second action was commenced in the
same month. They were assigned to Judge Steger. Cape was one of the   C
defendants. Capasco was added as a defendant in 1976. Egnep
(Proprietary) Ltd. ("Egnep"), a wholly owned South African subsidiary
of Cape, engaged in mining asbestos, was also a defendant. All filed
motions to quash service on the ground of lack of jurisdiction.

By July 1974 it was apparent that hundreds of claimants, alleging
injury caused by the amosite asbestos used in the Owentown plant, were
intending to pursue claims. Judge Steger in December 1974 ruled that   D
the actions should not proceed as class actions; that they should be
conducted under the federal "Rules for Complex and MultiDistrict
Litigation;" and that intervention in the proceedings should be allowed
freely for those claimants who wished to join. In consequence a large
number of claimants were added. In December 1974 a third action with
reference to asbestos from the Owentown plant was commenced in the
Tyler court in which the only defendant was the United States of   E
America. All these proceedings together have been known as the Tyler 1
proceedings. They were separate and distinct from the proceedings in
which the plaintiffs, now before this court, obtained their judgment in
September 1983.

The motions by Cape, Capasco and Egnep to dismiss the Tyler 1
proceedings as against them on the ground of lack of jurisdiction were   F
dismissed by Judge Steger in August 1977. That dismissal was not final
and it was open to the Cape companies to take the jurisdiction point at
the trial of the action. They filed answers in which they pleaded to the
merits of the claim while maintaining their objection to jurisdiction.

The number of claimants in the Tyler 1 proceedings had by mid 1977
risen to more than 400 and was still increasing. Trial was set for 12   G
September 1977. The purpose of Judge Steger in fixing that date
included that of causing the parties to consider settlement. On 12
September 1977 settlement discussions proceeded in which Judge Steger
took part in a manner which would be unusual, if not impossible, in this
country but which was effective and normal under the United States
system of civil justice. By 28 September 1977 a settlement figure of
$20m. was agreed for all the claimants who then numbered 462. Upon   H
agreement of the settlement figure it was ordered that as from 28
September 1977 no further intervention in any of the Tyler 1 actions
would be permitted.

APP.333

A      The sum of $20m. was provided by the defendants in agreed proportions: £5.2m. by N.A.A.C., Cape and Egnep; $1m. by Unarco (who had operated the Owentown plant from 1954 to 1962); $8.05m. by P.C.C. (who had operated the plant from 1962 to 1972) and its shareholders; and $5.75m. by the United States Government. The settlement was recorded and approved in a final judgment in the Tyler 1 actions dated 5 May 1978. The reference to shareholders in P.C.C. is to

B Pittsburgh P.G. Industries Inc. ("P.P.G.") and to Corning Glassworks Inc. who had been joined as defendants on the basis that each had taken such part in the management decisions regarding the use of asbestos as to be liable for injuries arising from that use.

     Upon prohibition by the order of Judge Steger of further interventions in the Tyler 1 proceedings, new actions were commenced by claimants in what have been called the Tyler 2 proceedings. There were eight

C separate actions. They were assigned to Judge Steger. The first was commenced on 19 April 1978 and the last on 19 November 1979. There followed intervention by a very large number of claimants. Cape, Egnep and N.A.A.C. were defendants in all the actions. Capasco was a defendant in three only. P.C.C., P.P.G., Corning Glassworks Inc. and O.C.A.W., a trade union to which some claimants had belonged, were

D also defendants in all actions. The United States Government was a defendant in some actions and third party defendant in others.

     In December 1981 Judge Steger gave directions by which each claimant was required to provide specified information with reference to his claim "on personal knowledge and attested to under penalty of perjury." As a result of those directions, and of the response, or lack of response, thereto, a large number of claimants had their claims summarily

E dismissed "without prejudice." The number of plaintiffs left in the Tyler 2 actions was about 206. It is to be assumed that each of those remaining claimants had responded to the order of December 1981 by alleging some physical condition that was capable of having been caused by exposure to asbestos dust and of constituting an injury.

     Cape, Capasco and Egnep took the decision to play no part in any of the Tyler 2 actions. They had initially regarded the Tyler 1 actions as

F having little more than nuisance value. They could not understand how tortious liability to the Owentown workers could be imposed upon the Cape companies merely on the ground that Cape subsidiary companies had mined the asbestos and sold it into the United States of America. They had had expectations of success on their jurisdiction objection. They had, however, succumbed to the pressure for settlement. They

G were unwilling to be left as the only defendants in a large and expensive jury trial. Having joined in the settlement of the Tyler 1 actions they decided, since they had no assets in the United States of America, to take no part in the Tyler 2 proceedings; to allow default judgments to be obtained against them; and to defend any actions brought in this country for enforcement of any such judgment on the ground that, under the law of this country, the Tyler court had no jurisdiction over

H Cape, Capasco or Egnep with reference to the claims of the claimants.

*The settlement against some defendants of the Tyler 2 proceedings*

     In circumstances which will be considered in more detail later in this judgment, the Tyler 2 proceedings were in February 1983 settled, as

against the effective defendants other than the Cape companies, for a      A
sum of $1.33m. The figure of $1.33m. was based upon an average award
of $10,000 for each of 133 plaintiffs represented in the settlement
negotiations. The sum of $1.33m. was to be provided as to $900,000 by
P.C.C., the firm which had operated the Owentown factory from 1962
to 1972, and by P.P.G., one of the corporations owning shares in
P.C.C.; $130,000 by Corning Glassworks Inc., the other corporation
holding shares in P.C.C.; $150,000 by O.C.A.W., and $250,000 by      B
N.A.A.C. Such was the considered value of the claims, as it emerged
from the settlement process between the judge and the parties, as
against the parties which included those alleged to have had some direct
concern in connection with the emission of asbestos particles at or from
the Owentown factory. On payment of those sums the settling defendants
were to be released from all claims by the 133 plaintiffs.      C

That settlement was complicated by a "device" devised by Mr.
Bailey, who was the attorney negotiating the settlement on behalf of the
claimants and which was intended, it was said, to give the claimants the
chance of additional recovery against the United States. The form of this
device, and the part which it was alleged to have played in the
formulation of the terms of the default judgment against the Cape
companies, was important to the allegations of fraud put forward against      D
Mr. Bailey, which, as stated below, were rejected by Scott J. It is
necessary to describe what happened to render intelligible some of the
matters discussed later in this judgment. The device was described by
Scott J., ante, p. 452c–f:

"The device was this: the settlement figure would be expressed in
the intended settlement agreement not as $1.33m. but instead as      E
$6.65m., an average of $50,000 per plaintiff. The defendants would
be obliged to pay only $1.33m. The balance of $5.32m. ($40,000 per
plaintiff) would be payable only if and to the extent that the
defendants' third party claims against the United States succeeded.
The prosecution of those claims in the names of the defendants was
to be the responsibility of the plaintiffs' counsel, no cost in respect
thereof falling on any of the defendants. The $6.65m. was a figure      F
proposed by Mr. Bailey. It was not a figure which mattered at all to
the defendants since their obligation to pay was limited to the
$1.33m. They did not bargain about the amount. They simply
agreed to Mr. Bailey's proposal· which would cost them nothing.
Mr. Bailey told me that the figure was based upon what he thought
might be awarded against the United States at the suit of the      G
settling defendants. How it could have been supposed that the
liability of the United States under the third party claims could
exceed the $1.33m. that the settling defendants, the third party
claimants, had agreed to pay the plaintiffs, defeats me."

On 2 February 1983 Judge Steger approved the settlement of the
Tyler 2 proceedings as against the settling defendants, and that approval      H
extended to the fairness and reasonableness of the settlement in the case
of any minor claimants. The trial date for the outstanding Tyler 2 claims
against the United States was fixed for 20 June 1983. Settlement was

A    discussed. An agreement of compromise dated 15 June 1983 was signed. The United States Government contributed nothing directly to the claimants but, in settlement of their claims against the United States, it was agreed that the United States would bear the costs of enforcement of default judgments against Cape, Capasco and Egnep in the United Kingdom or in South Africa. It is in performance of that promise that these proceedings have been pursued in this country.

B    The default judgment in the Tyler court, upon which the present proceedings in this country are based, was, as stated above, signed on 12 September 1983. The nature of the process in which that judgment came to be signed will be examined in detail later in this judgment when the issue of natural justice is considered.

C    *The consolidated actions in this country*

There is no statutory provision for the registration in this country of the judgments of the federal or state courts of the United States of America. The plaintiffs, therefore, took proceedings in this country seeking to recover the amount of their judgments from Cape and Capasco. The writ in the lead action of Mr. Jimmy Adams was issued on

D    1 August 1984 and claimed the amount of his separate award with interest. In law the claims of all the plaintiffs are based upon the principle of common law that, subject to certain qualifications, the judgment in personam of a foreign court of competent jurisdiction may be sued on in this country as creating a debt between the parties to it.

It would have been open to the plaintiffs in the first place to sue the defendants in this country rather than the United States of America,

E    provided that they could have shown that the acts complained of were actionable as a tort both under English law and the law of the place or places where they were committed: see *Boys v. Chaplin* [1971] A.C. 356. However, they chose to bring the proceedings in the United States of America and then to seek to enforce them in this country, where presumably the defendants are believed to have substantial assets.

F    *The issues at the trial before Scott J. and his decision*

The circumstances in which our courts will recognise a foreign court as competent to give a judgment in personam capable of enforcement in this country are stated thus in *Dicey & Morris, The Conflict of Laws,* 11th ed. (1987), vol. 1, pp. 436–437, rule 37:

G        "*First Case*—If the judgment debtor was, at the time the proceedings were instituted, resident (or, perhaps, present) in the foreign country.
        "*Second Case*—If the judgment debtor was plaintiff in, or counterclaimed, in the proceedings in the foreign court.
        "*Third Case*—If the judgment debtor, being a defendant in the foreign court, submitted to the jurisdiction of that court by

H        voluntarily appearing in the proceedings.
        "*Fourth Case*—If the judgment debtor, being a defendant in the original court, had before the commencement of the proceedings agreed, in respect of the subject matter of the proceedings, to

APP.336

Adams v. Cape Industries Plc. (C.A.)                    [1990]

submit to the jurisdiction of that court or of the courts of that       A
country."

At the trial the plaintiffs relied on three separate grounds for
enforcement of the judgment of the Tyler court in England, namely:
(i) that the defendants had voluntarily appeared in the proceedings in
the Tyler court; (ii) that the defendants had, before the proceedings
commenced, agreed to submit to the jurisdiction of the Tyler court;    B
(iii) that the defendants were resident in the United States of America
at the time of the commencement of the plaintiffs' proceedings in the
Tyler court. (A fourth pleaded ground, referred to as "comity or
reciprocity," was not in the event relied on at the trial.)

Scott J. concluded that the Tyler court had been competent to give a
judgment against Cape and Capasco on none of the three grounds relied
on (*Dicey & Morris'* First, Third and Fourth Cases). The plaintiffs'    C
claim, therefore, failed for this reason, if no other.

However, the judge proceeded to consider certain additional points
raised by the defendants by way of defence. The first point arose in this
way. According to the case made for the plaintiffs, the presence (if any)
of Cape and Capasco was in the State of Illinois where Cape's subsidiary,
N.A.A.C. had its office in Chicago from 1953 to 1978 when it was        D
wound up; and where in the same building from 1978 onwards
Continental Products Corporation ("C.P.C."), also an Illinois corporation
but not a subsidiary of Cape, carried out similar marketing functions in
the United States of America for the sale of asbestos produced by
Cape's South African subsidiaries. The plaintiffs did not contend that
Cape or Capasco had been present in Texas. In these circumstances, the
defendants contended that under English law presence in Illinois did not  E
suffice to give the Tyler court (a federal district court sitting in Texas)
jurisdiction to hear a claim in tort against the defendants governed by
the law of Texas. This argument, which we will call "the country issue,"
Scott J. rejected. He said, ante, p. 491F, that if he had felt able to
conclude that Cape and Capasco were present in Illinois when the Tyler
2 actions were commenced, he would have held that to be a sufficient    F
basis in English law for the exercise by the Tyler court of jurisdiction
over them.

The defendants further contended that, even if any grounds of
jurisdiction in the Tyler court had existed, yet the judgment should not
be enforced because (i) the judgment had been obtained by the fraud of
Mr. Blake Bailey, the attorney who had represented some of the         G
plaintiffs before Judge Steger in the proceedings upon the making of the
default judgment and who had drafted the terms in which the default
judgment was finally expressed; and (ii) it would be contrary to the
standards of natural justice required by our law, and contrary to the
principles of public policy applied by our law, to enforce the
judgment having regard to the circumstances in which, and the
procedures by which, it came to be made. Scott J. considered these     H
issues again on the assumption that, contrary to his conclusion, the
plaintiffs had made out a ground for jurisdiction in the Tyler court over
Cape and Capasco. He acquitted Mr. Bailey of having had any intention

A   to deceive and of having deceived anyone with reference to the terms and form of the judgment. The allegations that the judgment had been obtained by fraud accordingly failed. However, the defendants succeeded before Scott J. on the natural justice point. The judge found that the judgment was not such that it could be enforced in the courts of this country. The primary ground of that finding was that the procedure adopted in this particular case by the judge of the Tyler court offended

B   against the principles of substantial justice contained in our law.

Scott J. gave his judgment in two parts, which together covered 150 pages of transcript. On 17 June 1988 he announced that the claims of all the plaintiffs would be dismissed and he gave his reasons for rejecting each of the three grounds upon which the plaintiffs had claimed that their judgment in the Tyler court should be enforced in this country. He

C   also stated in summary form his reasons for rejecting the allegations of fraud against Mr. Bailey and for upholding the contentions of Cape/Capasco on the natural justice issue. On 26 July 1988 he gave his full reasons with reference to the issues of fraud and natural justice. The plaintiffs have invited this court to take a different view on some parts of the facts in this case, and to apply principles of law which the judge considered to be inapplicable. Mr. Morison, however, began his

D   submissions by rightly acknowledging the great care expended in, and the great accuracy and clarity of, the judgment of the judge, to which we also pay tribute.


*The issues on this appeal*

E   On this appeal the plaintiffs do not seek to challenge those parts of Scott J.'s judgment by which he rejected their submissions based on the alleged voluntary appearance by the defendants in the Tyler court proceedings or their alleged agreement to submit to the jurisdiction of that court. The defendants do not challenge his rejection of their allegation of fraud against Mr. Bailey. The plaintiffs do, however, seek to challenge those parts of his judgment by which (a) he rejected their

F   submissions based on the alleged residence or presence of Cape and Capasco in the United States of America ("the presence issue"); (b) he accepted the defendants' submissions based on natural justice ("the natural justice issue").

As part of their answer to the plaintiffs' case on presence, the defendants have cross-appealed on what we have described as "the

G   country issue."

To sum up, the three issues which have been argued on this appeal are (a) the presence issue; (b) the country issue; and (c) the natural justice issue. A decision on any one of these issues in favour of the defendants would strictly render a decision on the other two issues unnecessary. However, we think it right to deal fully with all three issues, not only out of deference to the excellent arguments which have

H   been presented to us on both sides, but also because these issues are important and we suppose that the case could proceed to a higher court. Furthermore, at least the first two of the three issues are closely connected with one another.

APP.338

Adams v. Cape Industries Plc. (C.A.)                    [1990]

II *The presence issue*                                    A

[Their Lordships referred to the depositions placed before Scott J. at the hearing, listed the facts found by the judge relevant to the presence issue, and continued:]

*The plaintiffs' challenge to Scott J.'s finding of facts relevant to the*     B
*"presence" issue*

The plaintiffs' challenge to the judgment of Scott J. on the "presence" issue is based not so much on the findings of primary fact which were made, but on his supposed failure to find all the material facts and to draw the correct inferences and conclusions which should have been drawn from such facts. In their amended notice of appeal (which we gave leave to amend at the hearing) the plaintiffs included a "Schedule   C
of facts which ought to have been found." This schedule included 25 paragraphs. For convenience we will set out and deal with the issues of fact raised by this schedule in an appendix to this judgment, which in our view would not need to be reported.* We observe at this point that, having been taken through the evidence relating to such of these 25 paragraphs as are disputed, we think that the majority of them (though by no means all) are in broad terms borne out by the evidence.   D
However, we do not think that those which are substantiated add very much to the strength of the plaintiffs' case on the presence issue or that they suffice to invalidate the ultimate conclusion of the judge on that issue.

On the basis of the findings of fact made by Scott J. and the further facts which they submit he ought to have found, the plaintiffs in their   E
amended notice of appeal submit that he was wrong to conclude:

"(1) N.A.A.C.'s business was its own business and not the business of Cape or Capasco;
"(2) C.P.C. . . . was . . . an independently owned company and carried on its own business;
"(3) As from 31 January 1978 N.A.A.C. ceased to act on behalf of   F
any of the Cape companies or to carry on any business on its own account save for the purpose of liquidating its assets;
"(4) Mr. Morgan was in executive control of N.A.A.C.'s conduct of its business."

Two important inferences of fact made by the judge (numbers (1) and (2)) and two important findings of primary fact (numbers (3) and   G
(4)) are thus challenged on this appeal. We shall consider contention (4) in the section of this judgment dealing with the "single economic unit" argument and in the appendix. We shall consider the contention that C.P.C. was "not an independently owned company" in the section dealing with the "corporate veil argument." We shall consider contention (3) and the contentions that N.A.A.C.'s business was not "its own   H
business" and that C.P.C.'s business was not "its own business" in the section dealing with what we will call the "agency" argument.

* *Reporter's Note:* The appendix has not been included in this report.

APP.339

A   *Some leading authorities relevant to the presence issue*

Provision has been made by statute for the enforcement in this country of the judgments of the courts of Commonwealth and foreign countries in a number of different circumstances: see in particular section 9 of the Administration of Justice Act 1920; section 4 of the Foreign Judgments (Reciprocal Enforcement) Act 1933 and the Civil

B   Jurisdiction and Judgments Act 1982. However, none of these statutory provisions applies in the present case. We are concerned solely with the common law: *Dicey & Morris,* vol. 1, p. 436, "First Case."

So far as appears from the many cases cited to us, neither this court nor the House of Lords has ever been called on to consider the principles which should guide an English court in deciding whether or not a foreign court was competent to assume jurisdiction over a

C   corporation (as opposed to an individual) on a territorial basis; and we have seen only two decisions of courts of first instance in which these principles fell to be considered. We will begin by mentioning some of the leading cases relating to judgments given against individuals.

Two points at least are clear. First, at common law in this country foreign judgments are enforced, if at all, not through considerations of comity but upon the basis of a principle explained thus by Parke B. in

D   *Williams v. Jones* (1845) 13 M. & W. 628, 633:

"where a court *of competent jurisdiction* has adjudicated a certain sum to be due from one person to another, a legal obligation arises to pay that sum, on which an action of debt to enforce the judgment may be maintained. It is in this way that the judgments of foreign and colonial courts are supported and enforced . . . " (Emphasis

E   added.)

Blackburn J. stated and followed the same principle in delivering the judgment of himself and Mellor J. in *Godard v. Gray* (1870) L.R. 6 Q.B. 139, 147, and the judgment of the Court of Queen's Bench in *Schibsby v. Westenholz* (1870) L.R. 6 Q.B. 155, 159. In the latter case

F   he said, at p. 159:

"It is unnecessary to repeat again what we have already said in *Godard v. Gray.* We think that, for the reasons there given, the true principle on which the judgments of foreign tribunals are enforced in England is that stated by Parke B. in *Russell v. Smith* (1842) 9 M. & W. 810, 819, and again repeated by him in *Williams*

G   *v. Jones,* 13 M. & W. 629, 633, that the judgment of a court of competent jurisdiction over the defendant imposes a duty or obligation on the defendant to pay the sum for which judgment is given, which the courts in this country are bound to enforce; and consequently that anything which negatives that duty, or forms a legal excuse for not performing it, is a defence to the action."

H   Secondly, however, in deciding whether the foreign court was one of competent jurisdiction, our courts will apply not the law of the foreign court itself but our own rules of private international law. As Lindley M.R. put it in *Pemberton v. Hughes* [1899] 1 Ch. 781, 791:

APP.340

"There is no doubt that the courts of this country will not enforce   A
the decisions of foreign courts which have no jurisdiction in the
sense above explained—i.e., over the subject matter or over the
persons brought before them . . . But the jurisdiction which alone
is important in these matters is the competence of the court in an
international sense—i.e., its territorial competence over the subject
matter and over the defendant. Its competence or jurisdiction in   B
any other sense is not regarded as material by the courts of this
country."

Subsequent references in this section of this judgment to the
competence of a foreign court are intended as references to its
competence under our principles of private international law, which will
by no means necessarily coincide with the rules applied by the foreign   C
court itself as governing its own jurisdiction. As the decision in
*Pemberton v. Hughes* [1899] 1 Ch. 781 shows, our courts are generally
not concerned with those rules.

Under the plaintiffs' case as pleaded, the obligation of the defendants
to obey the judgment of the Tyler court is said to arise because "the
defendants were resident in the United States of America at the time
the plaintiffs' proceedings were commenced in the Tyler court." The   D
jurisdiction of the Tyler court is thus said to be founded on territorial
factors.

Nearly 120 years ago in *Schibsby v. Westenholz,* L.R. 6 Q.B. 155,
the "residence" of an individual in a foreign country at time of
commencement of suit was recognised by the Court of Queen's Bench as
conferring jurisdiction on the court of that country to give a judgment in
personam against him. In that case the court declined to enforce a   E
judgment of a French tribunal obtained in default of appearance against
defendants who at the time when the suit was brought in France were
neither subjects of nor resident in France. On these facts the court
decided, at p. 163, "there existed nothing in the present case imposing
on the defendants any duty to obey the judgment of a French tribunal."
However, it regarded certain points as clear on principle, at p. 161:   F

"If the defendants had been at the time of the judgment subjects of
the country whose judgment is sought to be enforced against them,
we think that its laws would have bound them. Again, if the
defendants had been at the time when the suit was commenced
resident in the country, so as to have the benefit of its laws
protecting them, or, as it is sometimes expressed, owing temporary
allegiance to that country, we think that its laws would have bound   G
them."

In *Rousillon v. Rousillon* (1880) 14 Ch. D. 351, Fry J., after referring
to *Schibsby v. Westenholz* and in enumerating the cases where the courts
of this country regard the judgment of a foreign court as imposing on
the defendant the duty to obey it, at p. 371, similarly referred to one
such case as being "where he was resident in the foreign country when   H
the action began."

In *Emanuel v. Symon* [1908] 1 K.B. 302, this court had to consider
whether the fact of possessing property situate in Western Australia or

APP.341

A    the fact of entering into a contract of partnership in that country was sufficient to give a Western Australian court jurisdiction (in the private international law sense) over a British subject not resident in Western Australia at the start of the action, who had neither appeared to the process nor expressly agreed to submit to the jurisdiction of that court. This question was answered in the negative. Buckley L.J. said, at p. 309:

B

> "In actions in personam there are five cases in which the courts of this country will enforce a foreign judgment: (1) Where the defendant is a subject of the foreign country in which the judgment has been obtained; (2) where he was resident in the foreign country when the action began; (3) where the defendant in the character of plaintiff has selected the forum in which he is afterwards sued;
C    (4) where he has voluntarily appeared; and (5) where he has contracted to submit himself to the forum in which the judgment was obtained. The question in the present case is whether there is yet another and a sixth case."

After referring to the principles established by, inter alia, *Godard v. Gray*, L.R. 6 Q.B. 139, and *Schibsby v. Westenholz*, L.R. 6 Q.B. 155,
D    Buckley L.J. observed, at p. 310:

> "In other words, the courts of this country enforce foreign judgments because those judgments impose a duty or obligation which is recognised in this country and leads to judgment here also."

In agreement with the rest of the court, he considered that the factors
E    relied on by the plaintiff mentioned above did not suffice to impose a duty on the defendant to obey the Western Australian judgment which should be recognised in this country.

We pause to observe that Buckley L.J.'s second, third, fourth and fifth cases mentioned in his statement broadly correspond with *Dicey & Morris'* respective four cases. It is doubtful whether the first case mentioned in his statement would still be held to give rise to jurisdiction:
F    see *Dicey & Morris,* 11th ed., vol. 1, pp. 447–448, and the cases there cited. With this point we are not concerned.

Residence will much more often than not import physical presence. On the facts of the four cases last mentioned, any distinction between residence and presence would have been irrelevant. However, the brief statements of principle contained in the judgments left at least three
G    questions unanswered. First, does the temporary presence of a defendant in a foreign country render the court of that country competent (in the private international law sense) to assume jurisdiction over him? Secondly, what is the relevant time for the purpose of ascertaining such competence? Thirdly, what is to be regarded as the "country" in the case of a political country, such as the United States of America comprising different states which have different rules of law and legal
H    procedure?

We will have to revert to the third question in the section of this judgment dealing with the "country" issue; in the present section we will assume in favour of the plaintiffs that the United States of America,

APP.342

rather than the state of Texas, is to be regarded as the relevant country.   A
As to the first and second questions, we think that the most helpful
guidance is to be obtained from the decision of the Privy Council in
*Sirdar Gurdyal Singh v. Rajah of Faridkote* [1894] A.C. 670, the decision
of Lord Russell of Killowen in *Carrick v. Hancock* (1895) 12 T.L.R. 59
and the decision of the House of Lords in *Employers' Liability Assurance
Corporation Ltd. v. Sedgwick Collins & Co. Ltd.* [1927] A.C. 95.

In the *Sirdar Gurdyal Singh* case the Privy Council on an appeal   B
from the Chief Court of the Punjab considered the question whether the
courts of British India ought to have enforced against the defendant two
judgments obtained against him ex parte in the native state of Faridkote,
which for this purpose fell to be regarded as foreign judgments. The
defendant had ceased to reside in the state before the actions were
brought, and though he had received notice of the proceedings, he had   C
never appeared in either of them or otherwise submitted to the
jurisdiction of the Faridkote court. The Privy Council held the judgments
to be a nullity under international law. Lord Selborne, delivering their
opinion, said, at pp. 683–684:

"Under these circumstances there was, in their Lordships' opinion,
nothing to take this case out of the general rule, that the plaintiff   D
must sue in the court to which the defendant is subject at the time
of suit ('Actor sequitur forum rei'); which is rightly stated by Sir
Robert Phillimore (*International Law*, vol. 4, section 891) to 'lie at
the root of all international, and of most domestic, jurisprudence on
this matter.' All jurisdiction is properly territorial, and 'extra
territorium jus dicenti, impune non paretur.' Territorial jurisdiction
attaches (with special exceptions) upon all persons either permanently   E
or temporarily resident within the territory while they are within it;
but it does not follow them after they have withdrawn from it, and
when they are living in another independent country. . . . no
territorial legislation can give jurisdiction which any foreign court
ought to recognise against foreigners, who owe no allegiance or
obedience to the power which so legislates. In a personal action, to   F
which none of these causes of jurisdiction apply, a decree
pronounced in absentem by a foreign court, to the jurisdiction of
which the defendant has not in any way submitted himself, is by
international law an absolute nullity."

The Privy Council held, at p. 684, that the mere fact that the cause of
action had arisen in one country did not operate to confer jurisdiction   G
on the courts of that country over a defendant not otherwise subject to
it.

In *Carrick v. Hancock*, 12 T.L.R. 59, the principle of territorial
dominion was again referred to. In that case an action was brought upon
a monetary judgment obtained in Sweden by an Englishman domiciled
in Sweden against a defendant who resided and carried on business at
Newcastle. The writ was served on the defendant during a short visit he   H
was paying to Sweden and he duly appeared to answer it. Though he
did not himself remain in Sweden, he was represented throughout the
subsequent proceedings. He put in a defence and counterclaim and on

A   three separate occasions appealed to the Court of Appeal at Gota. It may be that in those circumstances, notwithstanding his protestations that he had "only appeared under pressure, duress and compulsion of law," the English court could properly have enforced the foreign judgment on the ground that the defendant had submitted to the jurisdiction of the Swedish court. However, Lord Russell of Killowen did not decide the case in favour of the plaintiff on that ground. After

B   reviewing the facts and arguments, he is reported as saying, at p. 60:

> "that the jurisdiction of a court was based upon the principle of territorial dominion, and that all persons within any territorial dominion owe their allegiance to its sovereign power and obedience to all its laws and to the lawful jurisdiction of its courts. In his opinion that duty of allegiance was correlative to the protection

C   > given by a state to any person within its territory. This relationship and its inherent rights depended upon the fact of the person being within its territory. It seemed to him that the question of the time the person was actually in the territory was wholly immaterial. This being so it was quite clear that under the facts of this case it was properly and lawfully initiated, and all its subsequent proceedings were lawful and valid, and that the Swedish courts had ample

D   > jurisdiction to enforce the plaintiff's claim against the defendant."

In the *Employers' Liability* case, Lord Parmoor said [1927] A.C. 95, 114–115:

> "My Lords, in the case of actions in personam, in which a writ has been regularly served on foreigners or foreign corporations, when present in this country, and a judgment has been obtained, it seems to be clear, as a general rule, that, under the obligations of that

E   > branch of international law, which governs the application of foreign judgments, other countries, whose governments have been recognised de jure and de facto by the government of this country, will accept the jurisdiction of the courts of this country, and regard their judgments as valid. In the case of such actions, it may also be stated negatively that, where a writ cannot be served on a defendant

F   > foreigner, or foreign corporation, when in this country, and no submission to jurisdiction is proved, any consequent judgment has no validity in any other country, on the ground that the courts of this country have no jurisdiction under international law over the person of an absent foreign defendant. In other words, the right to serve a writ, in an action in personam, on a foreign defendant, only

G   > becomes effective, as a source of jurisdiction, to be recognised in other countries when, at the date of service, such defendant is within the territorial jurisdiction of the English courts."

Lord Parmoor was in terms referring to the recognition by foreign countries of judgments given by our courts, but he was speaking generally in terms of private international law and would presumably

H   have regarded the same principles as applicable (mutatis mutandis) in a case where our courts were asked to enforce a foreign judgment.

From the three last mentioned authorities read together, the following principles can, in our judgment, be extracted. First, in determining the

APP.344

Adams v. Cape Industries Plc. (C.A.)                [1990]

jurisdiction of the foreign court in such cases, our court is directing its   A
mind to the competence or otherwise of the foreign court "to summon
the defendant before it and to decide such matters as it has decided:"
see *Pemberton v. Hughes* [1899] 1 Ch. 781, 790, *per* Lindley M.R.
Secondly, in the absence of any form of submission to the foreign court,
such competence depends on the physical presence of the defendant in
the country concerned at the time of suit. (We leave open the question
whether residence without presence will suffice.) From the last sentence   B
of the dictum of Lord Parmoor cited above, and from a dictum of
Collins M.R. in *Dunlop Pneumatic Tyre Co. Ltd. v. Actien-gesellschaft
für Motor und Motorfahrzeugbau vorm. Cudell & Co.* [1902] 1 K.B.
342, 346, it would appear that the date of service of process rather than
the date of issue of proceedings is to be treated as "the time of suit" for
these purposes. But nothing turns on this point in the present case and   C
we express no final view on it. Thirdly, we accept the submission of Sir
Godfray Le Quesne (not accepted by Mr. Morison) that the temporary
presence of a defendant in the foreign country will suffice provided at
least that it is voluntary (i.e. not induced by compulsion, fraud or
duress). Some further support for this submission is to be found in dicta
of Parke B. in *General Steam Navigation Co. v. Guillou* (1843) 11 M. &
W. 877.                                                                      D

The decision in *Carrick v. Hancock*, 12 T.L.R. 59, has been the
subject of criticism in *Cheshire & North's Private International Law*,
11th ed. (1987), p. 342, and in *Dicey & Morris*, 11th ed., vol. 1, where
it is said, at pp. 439–440:

"It may be doubted, however, whether casual presence, as distinct
from residence, is a desirable basis of jurisdiction if the parties are   E
strangers and the cause of action arose outside the country
concerned. For the court is not likely to be the forum conveniens,
in the sense of the appropriate court most adequately equipped to
deal with the facts or the law. Moreover, the English case referred
to above is open to the comment that the jurisdiction of the foreign
court might just as well have been based on the defendant's   F
submission as on his presence."

Our own courts regard the temporary presence of a foreigner in England
at the time of service of process as justifying the assumption of
jurisdiction over him: see *Colt Industries Inc. v. Sarlie* [1966] 1 W.L.R.
440 and *H.R.H. Maharanee Seethadevi Gaekwar of Baroda v. Wildenstein*
[1972] 2 Q.B. 283. However, *Cheshire & North*, 11th ed., comment, at   G
p. 342:

"any analogy based on the jurisdiction of the English courts is not
particularly convincing, since the rules on jurisdiction are operated
in conjunction with a discretion to stay the proceedings, and the
exercise of the discretion is likely to be an issue when jurisdiction is
founded on mere presence."                                                 H

We see the force of these points. They highlight the possible
desirability of a further extension of reciprocal arrangements for the
enforcement (or non-enforcement) of foreign judgments by convention.

APP.345

A   Nevertheless, while the use of the particular phrase "temporary
allegiance" may be a misleading one in this context, we would, on the
basis of the authorities referred to above, regard the source of the
territorial jurisdiction of the court of a foreign country to summon a
defendant to appear before it as being his obligation for the time being
to abide by its laws and accept the jurisdiction of its courts while present
in its territory. So long as he remains physically present in that country,
B   he has the benefit of its laws, and must take the rough with the smooth,
by accepting his amenability to the process of its courts. In the absence
of authority compelling a contrary conclusion, we would conclude that
the voluntary presence of an individual in a foreign country, whether
permanent or temporary and whether or not accompanied by residence,
is sufficient to give the courts of that country territorial jurisdiction over
C   him under our rules of private international law.
    In the forefront of his argument on this issue, Mr. Morison submitted
that the essential feature of this country's rules relating to the
enforcement of foreign judgments is "curial allegiance," which arises
"where there is sufficient connection between the debtor and the
rendering court at the date of suit so as to make it 'just' to enforce a
judgment of that court." The relevance of residence or presence, in his
D   submission, is that it provides the requisite connection. This, in our
judgment, is not quite the correct way to look at the matter. While
residence or presence will ex hypothesi give rise to a connection, it is
the residence or presence, not the connection as such, which gives rise
to the jurisdiction of the court. The question whether residence or
presence existed at the time of suit is determined by our courts not by
E   reference to concepts of justice or by the exercise of judicial discretion;
it is a question of fact which has to be decided with the help of the
guidance given by the authorities.
    However, none of the authorities so far referred to was concerned
with the question of enforcement of a foreign judgment against a
corporate body. The residence or presence of a corporation is a difficult
concept. A corporation is a legal person but it has no corporeal
F   existence. It can own property. It can by its agents perform acts. It is
clear that if an English corporation owns a place of business in a foreign
state from which it carries on its business that English corporation is,
under our law, present in that state for the purposes of in personam
jurisdiction. Those clear circumstances, however, may be varied in many
different ways. The corporation may not own the place of business but
G   have only the use of it or part of it. It may, instead of carrying on its
business by its own servants, cause its business to be done by an agent,
or through an agent, in the foreign state. The question will then arise
whether the commercial acts done are, for the purposes of our law, to
be regarded as done within the jurisdiction of the foreign state (a) by
the agent in the course of the agent's business or (b) by the corporation
itself. Further, and this is of central importance in this case, if the
H   English corporation causes to be formed under the law of the foreign
state a separate but wholly owned corporation to carry out the business
or commercial acts which it requires to be done, are those acts within
the jurisdiction of the foreign state to be regarded, for the purposes of

enforcement of a judgment of the courts of that state, as the acts of the     A
English corporation within that jurisdiction merely by reason that it
owns all the shares of its foreign corporation; and, if not, what degree of
power of control, or of exercise of control, and/or what other factors
will suffice, in our law, to cause the English corporation to be held to be
"present" within the jurisdiction of the foreign state?

The earliest case cited to us in which this court had to consider the     B
concept of residence or presence of a corporation in the context of a
claim to enforce a foreign judgment was *Littauer Glove Corporation v.
F. W. Millington (1920) Ltd.* (1928) 44 T.L.R. 746. In that case the
plaintiffs were manufacturers in the State of New York. The defendant
company, which conducted the business of clothiers' merchants, had its
principal place of business in Manchester. It bought from manufacturers
in various parts of the world and sold to wholesalers. On 17 March 1922     C
its managing director, Mr. Millington, arrived in New York on a
business visit with a view to seeing samples and making purchases. He
stayed in a New York hotel for four or five nights, where he did some
business for his company. Thereafter he visited various other states
where he also did business. On 1 April the plaintiffs took out a
summons against the defendant company. On 3 April Mr. Millington
returned to New York. On that date, while he was in the sale office in     D
New York of Union Mills Corporation, the defendant's principal United
States suppliers, he was served with process in the action. He entered no
appearance, took no steps in the proceedings and did not submit to the
jurisdiction of the American court. On 4 April he sailed for England.
The plaintiffs, having in due course obtained judgment against the
defendant company in default of appearance in New York, sought to     E
enforce the judgment against it in England. The defendant contended
that, under the rules of private international law, the New York court
had no jurisdiction to make the order against it. Many authorities were
cited to Salter J. From the report of the argument, it appears to have
been common ground that the question turned on the "residence" or
otherwise of the defendant company in the State of New York on 1
April 1922 when the proceedings were instituted. Salter J. identified the     F
question for his decision as being whether on 1 April 1922: "the
defendant company were resident in the State of New York so as to
have the benefit and be under the protection of the laws of that state."
The plaintiffs' counsel had contended that it was not necessary for them
to show that the defendant company was carrying on business at a fixed
place. In his submission, it was resident in New York because it carried
on business there: "the company is resident by its travellers and would     G
be subject to process of the country in which they happened to be."
Salter J. rejected this contention, saying, at p. 747:

> "What was meant by saying that a business corporation was resident
> in a foreign jurisdiction for that purpose? That depended on
> whether, on the day in question, it was carrying on business in the
> foreign state so that it could fairly and properly be said to be then     H
> resident in that state. If the defendant company were resident in the
> State of New York on 1 April 1922, where in that state were they
> resident? Mr. Le Quesne said that they were resident in Broadway,

A New York, but there must be some place of residence on which one
could put a finger. There was no suggestion that the name of the
defendant company was in any way displayed at the address in
Broadway, or that any letter paper of the company was used there,
or that any business was done there except what the company did
with firms in other parts of the United States. If the defendant
company were resident in Broadway, it would follow that they were
B resident wherever Mr. Millington did business. He was, however,
nothing more than a commercial traveller on that tour.

"If the company had 40 or 50 travellers ranging all over the
world, was it to be said that the company were resident wherever
the travellers put up at an hotel and took orders? He (his Lordship)
did not rely on the expression 'fixed place,' but on what was the fair
C meaning of 'residence.' The inference which he drew from the cases
cited was that there must be some carrying on of business at a
definite and, to some reasonable extent, permanent place. There
was no residence within the jurisdiction on the part of the defendant
company, and the action on that point must fail."

Thus, the effect of Salter J.'s decision was that if a foreign judgment
D is to be enforced in this country against a corporation, it must be shown
that at the relevant time (a) the corporation was carrying on business,
and (b) it was doing so at a definite and "to some reasonable extent
permanent place." This test is significantly different from that applicable
in the case of judgments against individuals. *Littauer* does not bind this
court, but we see no reason to doubt the correctness of this test so far as
it goes. It seems to us consistent with authority and to represent a
E common sense approach to the question of "presence" in the case of a
corporation. The difficulty may be to determine whether it can properly
be said in any given case that the corporation is itself carrying on
business in the country concerned.

The other, and most recent, leading case relating to the enforcement
of foreign judgments against corporations is *Vogel v. R. and A.
F Kohnstamm Ltd.* [1973] Q.B. 133. There the defendants were a company
registered in England. They sold leather skins to the plaintiffs through a
Mr. Kornbluth who had an office in Tel Aviv. The defendants had no
office of their own in Israel. All the material correspondence was
conducted with them in England. The contract of sale was not made in
Israel. The court in Israel gave judgment for the plaintiff on a claim for
breach of contract and the plaintiff sought to enforce it in England.
G Ashworth J. dismissed the plaintiff's claim. In his judgment he described
the functions of Mr. Kornbluth vis-à-vis the defendants, at p. 136A–B:

"Mr. Kornbluth's role was that of a person seeking customers who
would buy the defendants' goods. For this purpose he was provided
with samples for which he paid, and having found a potential
customer he would act as a go-between between that person and
H the defendants. Correspondence would pass between the defendants
and Mr. Kornbluth regarding a proposed order and Mr. Kornbluth
would be in communication with the customer. If as a result a
contract was made it would be made between the defendants and

the customer and at no time had Mr. Kornbluth any authority to   A
make a contract on behalf of the defendants."

He said, at p. 136G:

> "in order to succeed the plaintiff here has to persuade me either
> that the defendants were resident in Israel through Mr. Kornbluth
> as their agent or that they were carrying on business through him in
> such a way as to give rise to an implied agreement on their part to   B
> submit to the jurisdiction of Israeli courts."

With reference to the first of these two points, he observed, at p. 141:

> "As has been said in many cases, residence is a question of fact and
> when one is dealing with human beings one can normally approach
> the matter on the footing that residence involves physical residence
> by the person in question. I keep open the possibility that even in   C
> regard to such a person he may be constructively resident in another
> country although his physical presence is elsewhere. But in the case
> of a corporation there is broadly speaking no question of physical
> residence. A corporation or company, if resident in another country,
> is resident there by way of agents."

He recognised that the *Littauer* case was distinguishable on the ground:   D

> "the person through whom the defendant corporation was said to
> have residence in the United States was not a person with any fixed
> or reasonably permanent place . . ."

However, Ashworth J. pointed out, at p. 142, that the defendants in the
case before him had no office of their own in Israel, and that "All the   E
material correspondence was conducted with them in England and their
connection with the State of Israel was limited . . . to their dealings
through Mr. Kornbluth." He continued:

> "In examining how far the presence of a representative or agent
> will, so to speak, impinge on the absent company so as to render
> that absent company subject to the relevant jurisdiction, I find help   F
> to be obtained from cases in which the converse situation has been
> considered: namely, where the English courts have been invited to
> allow process to issue to foreign companies on the footing that such
> foreign companies are 'here.'"

He expressed his ultimate conclusion, at p. 143:

> ". . . I have asked myself anxiously in this case whether in any real   G
> sense of the word the defendants can be said to have been there in
> Israel: and all that emerges from this case is that there was a man
> called Kornbluth who sought customers for them, transmitted
> correspondence to them and received it from them, had no authority
> whatever to bind the defendants in any shape or form. I have come
> to the conclusion really without any hesitation that the defendants   H
> were not resident in Israel at any material time."

On this appeal, in accordance with the approach of the courts in the
*Littauer* and *Vogel* cases, it has been common ground that the Tyler

Adams v. Cape Industries Plc (C.A.)

A   court was competent to exercise jurisdiction over Cape and Capasco, if at all, only if they could properly be said to be resident or present in the United States of America at the relevant time. (In view of their contentions on the "country" issue, the defendants do not accept that the Tyler court would have been competent, even if the latter condition had been fulfilled.) The words "resident" or "present" or equivalent phrases have been used interchangeably in argument, just as they have

B   been used in the cases; we see no objection to this terminology if it is understood that in the case of a corporation the concept of "residence" or "presence" in any particular place must be no less of a legal fiction than the existence of the corporation itself. The argument has centred on the features which this concept embodies in the case of a corporation.

In considering these features, Salter J. in the *Littauer* case and

C   Ashworth J. in the *Vogel* case clearly attached great weight to a long line of cases where the English court has considered whether it should allow process to issue to foreign companies as being amenable to its jurisdiction. We will call this line "the *Okura* line of cases," because a leading example is the decision of this court in *Okura & Co. Ltd. v. Forsbacka Jernverks Aktiebolag* [1914] 1 K.B. 715.

The origin of this line requires some brief explanation. After it had

D   been decided in *Newby v. Von Oppen & Colt's Patent Firearms Manufacturing Co.* (1872) L.R. 7 Q.B. 293 that in appropriate circumstances a foreign corporation was capable of being sued in this country, our courts in a number of cases had to consider (a) whether on the facts the foreign corporate defendant was amenable to the jurisdiction of the English court, and if so (b) whether it had been properly served with the process. Most of these cases were concerned with the old Ord.

E   9, r. 8 of the Rules of the Supreme Court 1883, which provided:

"In the absence of any statutory provision regulating service of process, every writ of summons issued against a corporation aggregate may be served on the mayor or other head officer, or on the town clerk, clerk, treasurer or secretary of such corpora-

F   tion . . ."

The rule contained no such expressions as "reside" or "carry on business." However, as Ackner L.J. pointed out in *South India Shipping Corporation Ltd. v. Export-Import Bank of Korea* [1985] 1 W.L.R. 585, 589:

"Those expressions were used as convenient tests, to ascertain

G   whether the corporation had a sufficient 'presence' within the jurisdiction, since 'generally,' courts exercised jurisdiction only over persons who 'are within the territorial limits of their jurisdiction.' Apart from statute 'a court has no power to exercise jurisdiction over anyone beyond its limits,' *per* Cotton L.J. in *In re Busfield* (1886) 32 Ch.D. 123, 131, quoted by Lord Scarman in *Bethlehem*

H   *Steel Corporation v. Universal Gas* (unreported), 17 July 1978, House of Lords."

Phrases referring to residence or presence within the jurisdiction, or equivalent phrases, have been used by way of shorthand reference to

Adams v. Cape Industries Plc (C.A.) [1990]

the condition (or one of the conditions) which a foreign corporation has
to satisfy if it is to be amenable to the jurisdiction of the English court.
And indeed they have been used more or less interchangeably by the
courts. One typical example is the phraseology used by the Earl of
Halsbury L.C. in *La Compagnie Générale Transatlantique v. Thomas
Law & Co., La Bourgogne* [1899] A.C. 431, who said, at p. 433:

> "It appears to me that as a consequence of these facts the appellants
> are resident here in the only sense in which a corporation can be
> resident—to use the phrase which Mr. Joseph Walton has so
> constantly referred to, they are 'here;' and, if they are here, they
> may be served."

Perhaps the most helpful guidance in determining whether a foreign
corporation is "here" so as to be amenable to the jurisdiction of our
courts is the following passage from the judgment of Buckley L.J. in the
*Okura* case [1914] 1 K.B. 715, 718–719:

> "The point to be considered is, do the facts show that this
> corporation is carrying on its business in this country? In determining
> that question, three matters have to be considered. First, the acts
> relied on as showing that the corporation is carrying on business in
> this country must have continued for a sufficiently substantial period
> of time. That is the case here. Next, it is essential that these acts
> should have been done at some fixed place of business. If the acts
> relied on in this case amount to a carrying on of a business, there is
> no doubt that those acts were done at a fixed place of business. The
> third essential, and one which it is always more difficult to satisfy, is
> that the corporation must be 'here' by a person who carries on
> business for the corporation in this country. It is not enough to
> show that the corporation has an agent; he must be an agent
> who does the corporation's business for the corporation in this
> country. This involves the still more difficult question, what is
> meant exactly by the expression 'doing business?'"

It is clear that (special statutory provision apart) a minimum
requirement which must be satisfied if a foreign trading corporation is to
be amenable at common law to service within the jurisdiction is that it
must carry on business at a place within the jurisdiction: see *The
Theodohos* [1977] 2 Lloyd's Rep. 428, 430, *per* Brandon J.

(All the authorities cited to us have been directed, and all the
statements later in this judgment will be directed, to trading corporations.
In the case of non-trading corporations, the same principles would
presumably apply, with the substitution of references to the carrying on
of the corporation's corporate activities for references to the carrying
on of business.)

The court will not find much difficulty in holding that a foreign
corporation is present in this country if it has a fixed place of business of
its own here (whether as owner, lessee or licensee) and for more than a
minimal period of time has carried on its own business from such
premises by its servants or agents. Typical example of such cases (which
we will call "branch office cases") which have been cited to us are

A    (1) *Newby v. Von Oppen & Colt's Patent Firearms Manufacturing Co.,* L.R. 7 Q.B. 293; (2) *Haggin v. Comptoir d'Escompte de Paris* (1889) 23 Q.B.D. 519; (3) *La Bourgogne* [1899] P. 1; [1899] A.C. 431; (4) *Dunlop Pneumatic Tyre Co. Ltd. v. Actien-gesellschaft für Motor und Motorfahrzeugbau vorm. Cudell & Co.* [1902] 1 K.B. 342.

B    However, the cases also show that it may be permissible to treat a foreign corporation as resident in this country so as to be amenable to the jurisdiction of our courts even if it has no fixed place of business here of its own, provided that an agent acting on its behalf carries on its business (as opposed to his own business) from some fixed place of business in this country. Typical examples of such cases are:

    (1) *Saccharin Corporation Ltd. v. Chemische Fabrik Von Heyden Aktiengesellschaft* [1911] 2 K.B. 516 where the agent, Blasius, occupied
C  and paid rent for offices in London, and in the words of Fletcher Moulton L.J., at p. 524:

> "He carries on business at a fixed place in London as sole agent for the defendants in the United Kingdom, though it is true that he is also agent for another firm. He has power to enter into contracts of sale for the defendants."

D    (2) *Thames and Mersey Marine Insurance Co. v. Societa di Navigazione a Vapore del Lloyd Austriaco* (1914) 111 L.T. 97, where Buckley L.J. began his judgment with the following statement of principle, at p. 98:

> "If contracts have been habitually made for a reasonably sub-stantial period of time at a fixed place of business within the juris-
E    diction by a firm or a person there, without referring each time to the foreign corporation for instructions, and with the result that the foreign corporation has become bound to another party, then the foreign corporation for the present purpose carries on business at that place."

F    The ultimate problem in such cases may lie in determining whether the business carried on by the agent on behalf of the principal should properly be regarded on the one hand as his own business or on the other hand as the business of the foreign corporation. This must necessitate an investigation both of the activities of the agent and of the relationship between him and the corporation.

    In a few of the *Okura* line of cases which have been cited to us, the
G  court has had to consider the question whether a foreign corporation was carrying on business in this country in a context other than that of the old Ord. 9, r. 8, but nevertheless the like investigation was necessary. In *Grant v. Anderson & Co.* [1892] 1 Q.B. 108 the context was the old Ord. 48A, r. 1, which provided that any two or more persons claiming or being liable as co-partners "and carrying on business within the jurisdiction" might sue or be owed in the name of the respective firms.
H  The defendants, who were a Scottish firm of manufacturers carrying on business in Glasgow, employed an agent in London to obtain orders for them in London. He occupied an office in London, the rent of which he paid himself, and received a commission if, but only if, he got an order

which the firm accepted. In rejecting the contention that the firm carried   A
on business in London, the Court of Appeal attached great weight to
the fact that, in the words of Lord Esher M.R., at p. 116 "when he gets
an order, he has no power himself to accept it." As he put it, at p. 117:
"One might as well say that the defendants carry on business in any
place through which their goods pass while being sent to their customers."

   *Sfeir & Co. v. National Insurance Co. of New Zealand Ltd.* [1964] 1
Lloyd's Rep. 330 concerned a claim covered by section 9(2) of the   B
Administration of Justice Act 1920, of which paragraph (*b*) precluded
the registration of a judgment under the section if the judgment debtor

> "being a person who was neither carrying on business nor ordinarily
> resident within the jurisdiction of the original court, did not
> voluntarily appear or otherwise submit or agree to submit to the
> jurisdiction of that court . . ."   C

The first question Mocatta J. had to determine (see, at p. 336) was
whether the defendants at any material time carried on business in
Ghana. If they did so, this could only have been through a Ghanaian
company called Glyndova. He expressed his conclusion on this point, at
p. 339:   D

> "In my judgment, Mr. Mustill was right in submitting that the
> decision of the court at the end of the day after considering the
> guidance contained in the authorities and their application to
> the facts of a particular case is one of impression. The conclusion I
> have reached is that the limited authority possessed by Glyndova to
> bind the defendants by settlements of claims arising in Ghana under
> the defendants' policies issued elsewhere, even when coupled with   E
> the other matters relied upon which I have recited, did not amount
> to a carrying on of business by the defendants in Ghana. The
> business carried on in Ghana by Glyndova was their own and not
> that of the defendants."

   At least in cases other than branch office cases it is obvious that the   F
activities of the agent by whom the foreign corporation is said to be
present in this country and the extent of the authority of that agent will
be of particular importance in determining whether or not the corporation
is amenable to our courts' jurisdiction. Counsel on both sides have
referred us to numerous examples from the *Okura* line of cases in which
a number of different aphorisms have been used to express the relevant
test. Buckley L.J. (later Lord Wrenbury) "who made this subject   G
particularly his own" (see *The Lalandia* [1933] P. 56, 62, *per* Langton J.)
himself used a variety of expressions to state it on the facts of particular
cases. In the *Thames and Mersey* case he stated it thus, 111 L.T. 97, 98–
99:

> "Does the agent in carrying on the foreign corporation's business
> make a contract for the foreign corporation, or does the agent, in   H
> carrying on the agent's own business, sell a contract with the foreign
> corporation? In the former case the corporation is and in the latter
> it is not carrying on business at that place."

A       In the *Okura* case itself, Buckley L.J. [1914] 1 K.B. 715, 721, summarised his reasons for concluding that the defendant corporation was not present in this country as follows:

> "In my opinion the defendants are not 'here' by an alter ego who does business for them here, or who is competent to bind them in any way. They are not doing business here by a person but through
B       a person."

      At the trial of the present case a number of decisions from the *Okura* line of authorities were cited to Scott J. He said that counsel before him had treated the statements of principle to be found in the authorities as applicable equally to both classes of case. While expressing "a little unease" in this context, ante, p. 471F, he therefore assumed that
C the statements of principle applied equally to both classes of case.

      Having made this assumption, he extracted the following propositions from the *Okura* line of cases:

>     (1) "The cases establish that jurisdiction on the territorial basis may be taken by an English court over a foreign company if the foreign company has business premises in England from which or at
D     which its business is carried on:" ante, p. 468A.

>     (2) "There are, however, cases where residence or presence of a foreign company in England has been held established notwithstanding that the foreign company did not itself own or lease any business premises in England. A feature of these cases has been that the foreign company had a resident English agent who had authority to contract on behalf of and thereby to bind the principal.
E     In those circumstances the presence or residence in England of the agent has been treated as the presence or residence of the foreign company, the principal:" ante, p. 468E–F.

>     (3) "trading in a country is insufficient, by the standards of English law, to entitle the courts of the country to take in personam jurisdiction over the trader: see the *Littauer* . . . case. . . . The
F     trading must be reinforced by some residential feature, be it a branch office or a resident agent with power to contract:" ante, p. 476C.

      These conclusions as to the law were of critical importance because the judge later found as facts, ante, p. 477E–F, that the 150, North Wacker Drive offices were N.A.A.C.'s offices and that N.A.A.C. had
G no authority to contract on behalf of Cape or Capasco or any other company in the Cape group. He also found as facts, ante, p. 482E "C.P.C., like N.A.A.C., had no authority to bind Egnep, Casap or any other of the Cape subsidiaries to any contract," and the offices at 150, North Wacker Drive were C.P.C.'s "own offices."

      Mr. Morison did not challenge these particular findings of fact.
H However, he submitted that Scott J. erred in law in holding that, in cases other than branch office cases, "the trading must be reinforced by . . . a resident agent *with power to contract.*" This conclusion, he pointed out, was based primarily on the judge's analysis of the *Okura* line of cases. However, this line of cases, in Mr. Morison's submission,

while of some relevance and interest, does not provide the correct   A
yardstick to be applied in the present context. Contrary to the suggestion
made by Ashworth J. in the *Vogel* case [1973] Q.B. 133, he said, those
authorities do not represent the situation truly converse to the
enforcement of a foreign judgment; the true converse would be a
foreign court applying its own conflict rules, adjudicating on the
enforcement of an English judgment. Comity, as Blackburn J. pointed
out in *Schibsby v. Westenholz*, L.R. 6 Q.B. 155, 159, is not the basis   B
on which our courts enforce foreign judgments. Furthermore, the
circumstances in which an English court will assume jurisdiction over a
foreign corporation are closely bound up with our own rules of procedure
which are derived largely from statute or statutory instrument and will
be amended from time to time.

Pausing at this point, we would not go so far as to say that in every   C
case one can determine whether a foreign court was competent at
common law on territorial grounds to give a judgment against a
corporation merely by ascertaining whether in like circumstances, and
mutatis mutandis, our courts would have assumed jurisdiction over a
foreign corporation. Nevertheless, enough has been said to demonstrate
that in each case the same broad question falls to be answered by the
court under our own common law: "Was the corporation present in the   D
relevant jurisdiction at the relevant time?" In our judgment, Scott J. was
fully entitled to derive guidance from the *Okura* line of cases in deciding
whether Cape and Capasco were resident in the United States of
America at the relevant time.

Mr. Morison went on to submit that in any event the *Okura* line of
cases does not establish a universal rule that in cases where the foreign   E
corporation has no fixed place of business of its own "the trading must
be reinforced by . . . a resident agent *with power to contract.*" There
are, it is true, many dicta which suggest that the existence of power in
the agent to bind his principal to contracts, without reference back to
the principal, is an important indication that the principal himself is
carrying on business by the agent. However, it has apparently never
been held that this is an essential feature of "presence" in cases where   F
the corporation has no branch office in this country. Many of the
reported cases were concerned with selling agencies, particularly in the
shipping field, which were usually not exclusive to the principal
concerned. It is therefore hardly surprising, Mr. Morison submitted, that
the courts concentrated on the question of authority to contract, because
the agency was in a real sense carrying on its own agency business. In   G
the present case it is not alleged that N.A.A.C. or C.P.C. had power to
enter into sales contracts on behalf of Cape or Capasco. However, it is
said, they were carrying out a recognised business activity for the
exclusive benefit of Cape and Capasco, that is to say, the function of
marketing agents. The question whether N.A.A.C. or C.P.C. were
properly to be described as doing their own business or that of their
principals was not to be determined by asking whether or not they had   H
authority to contract, but by asking whether they had authority to
market and were carrying out this function. Mr. Morison invited us to
follow the general approach adopted by the court in two Canadian

A    cases, *Miller v. B. C. Turf Ltd.* (1969) 8 D.L.R. (3d) 383 and *Moore v. Mercator Enterprises Ltd.* (1978) 90 D.L.R. (3d) 590.

We would agree with Mr. Morison that the existence of a power in the resident agent to bind the foreign corporation to contracts can be neither an exclusive nor conclusive test of the residence of the corporation itself. As he pointed out, there are many cases in which the corporation has been held *not* to be carrying on business at the agency
B    notwithstanding the existence of authority of this kind: see for example *The Princesse Clementine* [1897] P. 18; *The Lalandia* [1933] P. 56 and *The Holstein* [1936] 2 All E.R. 1660. Conversely, we can conceive hypothetical cases in which it might be absurd to regard the test as conclusive. If in any given case all other factors indicate that the business carried on by the representative of a corporation in a particular
C    country was clearly the business of the corporation (rather than that of its representative), it could make no difference that the corporation required him to take its instructions before he actually concluded contracts on its behalf; the existence of such a requirement would not by itself prevent the corporation from being present in the country concerned and thus from being amenable to the jurisdiction of its courts.

Nevertheless, it is a striking fact that with one possible exception
D    (*The World Harmony* [1967] P. 341) in none of the many reported English decisions cited to us has it been held that a corporation has been resident in this country unless either (a) it has a fixed place of business of its own in this country from which it has carried on business through servants or agents, or (b) it has had a representative here who has had the power to bind it by contract and who has carried on business at or
E    from a fixed place of business in this country.

We do not find this surprising as a matter of principle. Indubitably a corporation can carry on business in a foreign country by means of an agent. "It may be stated as a general proposition that whatever a person has power to do himself he may do by means of an agent:" *Halsbury's Laws of England*, 4th ed., vol. 1 (1973), p. 420, para. 703. However, though the terms "agency" and "agent" have in popular use a number of
F    different meanings:

"in law the word 'agency' is used to connote the relation[ship] which exists where one person has an authority or capacity to create legal relations between a person occupying the position of principal and third parties:" *Halsbury's Laws of England,* vol. 1, p. 418, para. 701.

G
Where the representative of an overseas corporation has general authority to create contractual relations between the corporation and third parties and exercises this authority, there may be little difficulty in applying the maxim "qui facit per alium facit per se." Where no such authority exists, there may be much greater difficulty. We were not persuaded by Mr. Morison's submission, based primarily on a dictum of
H    Verchere J. in *Miller v. B. C. Turf Ltd.*, 8 D.L.R. (3d) 383, 386, that the capacity (or possible capacity) of N.A.A.C. or C.P.C. to render Cape/Capasco vicariously liable for negligence (and thereby to create relations in tort between them and third parties) is of any weight in

**Adams v. Cape Industries Plc. (C.A.)**                    **[1990]**

deciding whether Cape/Capasco were present in the United States of
America. The mere authority given by Cape/Capasco to N.A.A.C. or
C.P.C. to convey a message to a third party could render Cape/Capasco
potentially liable in tort to a third party if that message was carelessly
transmitted. The existence of such potential liability would go no way
towards establishing the presence of Cape/Capasco in the United States
of America.                                                            A

                                                                       B

*General principles derived from the authorities relating to the "presence"
issue*

    In relation to trading corporations, we derive the three following
propositions from consideration of the many authorities cited to us
relating to the "presence" of an overseas corporation.

    (1) The English courts will be likely to treat a trading corporation   C
incorporated under the law of one country ("an overseas corporation")
as present within the jurisdiction of the courts of another country only if
either (i) it has established and maintained at its own expense (whether
as owner or lessee) a fixed place of business of its own in the other
country and for more than a minimal period of time has carried on its
own business at or from such premises by its servants or agents (a        D
"branch office" case), or (ii) a representative of the overseas corporation
has for more than a minimal period of time been carrying on *the
overseas corporation's* business in the other country at or from some
fixed place of business.

    (2) In either of these two cases presence can only be established if it
can fairly be said that the *overseas corporation's* business (whether or
not together with the representative's own business) has been transacted   E
at or from the fixed place of business. In the first case, this condition is
likely to present few problems. In the second, the question whether the
representative has been carrying on the overseas corporation's business
or has been doing no more than carry on his own business will
necessitate an investigation of the functions which he has been performing
and all aspects of the relationship between him and the overseas
corporation.                                                              F

    (3) In particular, but without prejudice to the generality of the
foregoing, the following questions are likely to be relevant on such
investigation: (a) whether or not the fixed place of business from which
the representative operates was originally acquired for the purpose of
enabling him to act on behalf of the overseas corporation; (b) whether
the overseas corporation has directly reimbursed him for (i) the cost of   G
his accommodation at the fixed place of business; (ii) the cost of his
staff; (c) what other contributions, if any, the overseas corporation
makes to the financing of the business carried on by the representative;
(d) whether the representative is remunerated by reference to
transactions, e.g. by commission, or by fixed regular payments or in
some other way; (e) what degree of control the overseas corporation
exercises over the running of the business conducted by the representative;   H
(f) whether the representative reserves (i) part of his accommodation,
(ii) part of his staff for conducting business related to the overseas
corporation; (g) whether the representative displays the overseas

A  corporation's name at his premises or on his stationery, and if so, whether he does so in such a way as to indicate that he is a representative of the overseas corporation; (h) what business, if any, the representative transacts as principal exclusively on his own behalf; (i) whether the representative makes contracts with customers or other third parties in the name of the overseas corporation, or otherwise in such manner as to bind it; (j) if so, whether the representative requires specific authority in
B  advance before binding the overseas corporation to contractual obligations.

This list of questions is not exhaustive, and the answer to none of them is necessarily conclusive. If the judge, ante, p. 476B–C, was intending to say that in any case, other than a branch office case, the presence of the overseas company can *never* be established unless
C  the representative has authority to contract on behalf of and bind the principal, we would regard this proposition as too widely stated. We accept Mr. Morison's submission to this effect. Every case of this character is likely to involve "a nice examination of all the facts, and inferences must be drawn from a number of facts adjusted together and contrasted:" *La Bourgogne* [1899] P. 1, 18, *per* Collins L.J.

Nevertheless, we agree with the general principle stated thus by
D  Pearson J. in *F. & K. Jabbour v. Custodian of Israeli Absentee Property* [1954] 1 W.L.R. 139, 146:

"A corporation resides in a country if it carries on business there at a fixed place of business, and, in the case of an agency, the principal test to be applied in determining whether the corporation is carrying on business at the agency is to ascertain whether the
E  agent has authority to enter into contracts on behalf of the corporation without submitting them to the corporation for approval . . ."

On the authorities, the presence or absence of such authority is clearly regarded as being of great importance one way or the other. A fortiori the fact that a representative, whether with or without prior
F  approval, never makes contracts in the name of the overseas corporation or otherwise in such manner as to bind it must be a powerful factor pointing against the presence of the overseas corporation.

*The plaintiffs' submissions on the "presence" issue*

Ordinarily the three propositions set out above will fall to be applied
G  in the same way whether or not the representative is an individual or itself a corporate body. However, the present case has the peculiar feature that one of the representatives in the United States of America, whose acts are relied on as the carrying on of business by Cape, was itself a subsidiary of Cape—a feature which has not been present in any of the directly relevant authorities cited to us. We will make some further observations on the legal relevance, if any, of this feature when
H  we come to consider the second of Mr. Morison's main submissions on the presence issue.

These three main submissions were substantially as follows: (1) Cape and Capasco were present and carrying on business in the United States

of America, namely, marketing and selling the Cape group's asbestos, through N.A.A.C. until May 1978, and through C.P.C. (or Associated Mineral Corporation ("A.M.C."), a Liechtenstein corporation) until June 1979 from a place of business in Illinois because N.A.A.C. and C.P.C. were the agents of Cape. (We will call this "the agency argument"). (2) Cape/Capasco and N.A.A.C. constituted a single commercial unit and for jurisdictional purposes, N.A.A.C.'s presence in Illinois therefore sufficed to constitute the presence of Cape/Capasco. Likewise, Cape/Capasco and C.P.C., which performed the same functions as those previously carried on by N.A.A.C., constituted a single economic unit, and C.P.C.'s presence in Illinois sufficed to constitute the presence of Cape/Capasco. (We will call this "the single economic unit argument"). (3) In relation to C.P.C./A.M.C., the corporate veil should be lifted so that C.P.C.'s and A.M.C.'s presence in the United States of America should be treated as the presence of Cape/Capasco. (We will call this argument, which does not extend to N.A.A.C., "the corporate veil" argument.)

We find it convenient to deal with the second and third of these arguments before coming to the first.

*The "single economic unit" argument*

There is no general principle that all companies in a group of companies are to be regarded as one. On the contrary, the fundamental principle is that "each company in a group of companies (a relatively modern concept) is a separate legal entity possessed of separate legal rights and liabilities:" *The Albazero* [1977] A.C. 774, 807, *per* Roskill L.J.

It is thus indisputable that each of Cape, Capasco, N.A.A.C. and C.P.C. were in law separate legal entities. Mr. Morison did not go so far as to submit that the very fact of the parent-subsidiary relationship existing between Cape and N.A.A.C. rendered Cape or Capasco present in Illinois. Nevertheless, he submitted that the court will, in appropriate circumstances, ignore the distinction in law between members of a group of companies treating them as one, and that broadly speaking, it will do so whenever it considers that justice so demands. In support of this submission, he referred us to a number of authorities.

In *The Roberta* (1937) 58 Ll.L.R. 159 agents, acting on behalf of the Dordtsche Co., had signed bills of lading. It was conceded at the trial that in so doing the agents had made Walford Lines Ltd., the parent company of Dordtsche Co., responsible for the bills of lading. Langton J., who described the concession as properly made, said, at p. 169:

"The Dordtsche Co. are a separate entity from Walford Lines Ltd., in name alone, and probably for the purposes of taxation. Walford Lines Ltd. own all the issued shares of the Dordtsche Co., and in fact supply two out of the three directors."

In *Harold Holdsworth & Co. (Wakefield) Ltd. v. Caddies* [1955] 1 W.L.R. 352 the question arose whether the respondent company, which had entered into a service agreement with Mr. Caddies under which he was appointed managing director of the company, was entitled to require him to devote his whole time to duties in relation to subsidiaries of the

A  company. It was argued that the subsidiary companies were separate legal entities each under the control of its own board of directors, that in law the board of the appellant company could not assign any duties to anyone in relation to the management of the subsidiary companies, and that therefore the agreement could not be construed as entitling them to assign any such duties to Mr. Caddies. Lord Reid, in agreement with the majority, rejected this argument, saying, at p. 367:

B
"My Lords, in my judgment this is too technical an argument. This is an agreement in re mercatoria and it must be construed in light of the facts and realities of the situation."

In *Scottish Co-operative Wholesale Society Ltd. v. Meyer* [1959] A.C. 324 the respondent based his complaint on section 210 of the Companies Act 1948, which provided:

C
"(1) Any member of a company who complains that the affairs of the company are being conducted in a manner oppressive to some part of the members (including himself) . . . may make an application to the court by petition for an order under this section."

The appellant society had formed a subsidiary company, of which the respondent was a member. It was submitted on behalf of the society that even if it had acted in an oppressive manner, yet it had not conducted the affairs *of the company* in an oppressive manner within the meaning of the section. The House of Lords unanimously rejected this submission. Lord Simonds said, at p. 342:

E
"My Lords, it may be that the acts of the society of which complaint is made could not be regarded as conduct of the affairs of the company if the society and the company were bodies wholly independent of each other, competitors in the rayon market, and using against each other such methods of trade warfare as custom permitted. But this is to pursue a false analogy. It is not possible to separate the transactions of the society from those of the company. Every step taken by the latter was determined by the policy of the former."

F
A little later, at p. 343, Lord Simonds expressly approved words which had been used by Lord President Cooper on the first hearing of the case:

"In my view, the section warrants the court in looking at the business realities of a situation and does not confine them to a narrow legalistic view."

G
In *D.H.N. Food Distributors Ltd. v. Tower Hamlets London Borough Council* [1976] 1 W.L.R. 852 a group of three companies, "D.H.N.," "Bronze" and "Transport," all in voluntary liquidation at the relevant time, were seeking compensation under the Land Compensation Act 1961 following a compulsory purchase made by the respondent council.

H
D.H.N. held all the shares in Bronze and Transport. The business of the group was owned by D.H.N. The land was owned by Bronze. The vehicles were owned by Transport. The Lands Tribunal held that D.H.N. were licensees of Bronze and had no claim to compensation for

Adams v. Cape Industries Plc. (C.A.)                    [1990]

disturbance beyond that which could be allowed under section 20 of the    A
Compulsory Purchase Act 1965, which was negligible. This court allowed
D.H.N.'s appeal on three separate grounds. We are concerned with only
one of them, which Lord Denning M.R. explained, at p. 860:

> "Third, lifting the corporate veil. A further very interesting point
> was raised by Mr. Dobry on company law. We all know that in
> many respects a group of companies are treated together for the    B
> purpose of general accounts, balance sheet, and profit and loss
> account. They are treated as one concern. Professor Gower in
> *Modern Company Law*, 3rd ed. (1969), p. 216 says: 'there is
> evidence of a general tendency to ignore the separate legal entities
> of various companies within a group, and to look instead at the
> economic entity of the whole group.' This is especially the case
> when a parent company owns all the shares of the subsidiaries—so    C
> much so that it can control every movement of the subsidiaries.
> These subsidiaries are bound hand and foot to the parent company
> and must do just what the parent company says. A striking instance
> is the decision of the House of Lords in *Harold Holdsworth & Co.
> (Wakefield) Ltd. v. Caddies* [1955] 1 W.L.R. 352. So here. This
> group is virtually the same as a partnership in which all the three    D
> companies are partners. They should not be treated separately so as
> to be defeated on a technical point. They should not be deprived of
> the compensation which should justly be payable for disturbance.
> The three companies should, for present purposes, be treated as
> one, and the parent company D.H.N. should be treated as that one.
> So D.H.N. are entitled to claim compensation accordingly. It was
> not necessary for them to go through a conveyancing device to get    E
> it."

Goff L.J. said at p. 861:

> "this is a case in which one is entitled to look at the realities of the
> situation and to pierce the corporate veil. I wish to safeguard myself
> by saying that so far as this ground is concerned, I am relying on    F
> the facts of this particular case. I would not at this juncture accept
> that in every case where one has a group of companies one is
> entitled to pierce the veil, but in this case the two subsidiaries were
> both wholly owned; further, they had no separate business operations
> whatsoever; thirdly, in my judgment, the nature of the question
> involved is highly relevant, namely, whether the owners of this
> business have been disturbed in their possession and enjoyment of    G
> it."

   In *Revlon Inc. v. Cripps & Lee Ltd.* [1980] F.S.R. 85 the question
(among many other questions) arose as to whether the goods in question
were "connected in the course of trade with the proprietor . . . of the
trade mark" within the meaning of section 4(3) of the Trade Marks Act
1938." The proprietor of the trade mark was Revlon Suisse S.A., a    H
subsidiary of Revlon Inc. Buckley L.J., in the course of deciding that
the goods were connected in the course of trade with Revlon Suisse
S.A., said, at p. 105:

A    "Since, however, all the relevant companies are wholly owned
     subsidiaries of Revlon, it is undoubted that the mark is, albeit
     remotely, an asset of Revlon and its exploitation is for the ultimate
     benefit of no one but Revlon. It therefore seems to me to be
     realistic and wholly justifiable to regard Suisse as holding the mark
     at the disposal of Revlon and for Revlon's benefit. The mark is an
     asset of the Revlon group of companies regarded as a whole, which
B    all belongs to Revlon. This view does not, in my opinion, constitute
     what is sometimes called 'piercing the corporate veil;' it recognises
     the legal and factual position resulting from the mutual relationship
     of the various companies."

        Principally, in reliance on those authorities and the case next to be
     mentioned, Mr. Morison submitted that in deciding whether a company
C    had rendered itself subject to the jurisdiction of a foreign court it is
     entirely reasonable to approach the question by reference to "commercial
     reality." The risk of litigation in a foreign court, in his submission, is
     part of the price which those who conduct extensive business activities
     within the territorial jurisdiction of that court properly have to pay. He
     invited us to follow the approach of Advocate General Warner in
D    *Istituto Chemioterapico Italiano S.p.A. and Commercial Solvents
     Corporation v. Commission of the European Communities* (Cases 6 and
     7/73) [1974] E.C.R. 223 when considering whether a parent company
     and subsidiary were separate "undertakings" within the meaning of
     articles 85 and 86 of the E.E.C. Treaty. He said, at p. 263:

        "One starts to my mind from this, that neither article 85 nor article
E       86 anywhere refers to 'persons.' In both articles the relevant
        prohibitions are directed to 'undertakings,' a much wider and looser
        concept. This indeed is what one would expect, because it would be
        inappropriate to apply rigidly in the sphere of competition law the
        doctrine referred to by English lawyers as that of *Salomon v. A.
        Salomon & Co. Ltd.* [1897] A.C. 22—i.e. the doctrine that every
        company is a separate legal person that cannot be identified with its
F       members. Basically that doctrine exists in order to preserve the
        principle of limited liability. It is concerned with the rights of
        creditors in the context of company law. It has been applied, with
        more or less happy results, in other spheres, such as those of
        conveyancing, of contracts and of liability for tort. But to export it
        blindly into branches of the law where it has little relevance, could,
G       in my opinion, serve only to divorce the law from reality.
        "Suppose my Lords, that C.S.C. had traded in Italy through a
        branch office. There could have been no doubt then that it was
        amenable to the jurisdiction of the Commission and of this court.
        Could it have made any difference if C.S.C. has chosen to trade in
        Italy through a wholly owned subsidiary? The difference would
        have been one only of legal form, not of reality. Why then should it
H       make any difference that it chose to trade in Italy through a
        subsidiary that it controlled by a 51 per cent. majority rather than
        by a 100 per cent. majority? What matters in this field, in my view,
        is control . . . "

Advocate General Warner said, at p. 264:                                    A

> "(1) that there is a presumption that a subsidiary will act in
> accordance with the wishes of its parent because according to
> common experience subsidiaries generally do so act; (2) that, unless
> that presumption is rebutted, it is proper for the parent and the
> subsidiary to be treated, as a single undertaking for the purposes of
> articles 85 and 86 of the E.E.C. Treaty . . ."                           B

We have some sympathy with Mr. Morison's submissions in this
context. To the layman at least the distinction between the case where a
company itself trades in a foreign country and the case where it trades in
a foreign country through a subsidiary, whose activities it has full power
to control, may seem a slender one. Mr. Morison referred us to *Bulova
Watch Co. Inc. v. K. Hattori & Co. Ltd.* (1981) 508 F. Supp. 1322,        C
where the United States District Court held that it had jurisdiction over
a Japanese corporation which was expanding into a new market by
setting up subsidiaries and dealing with competition, both on the theory
that the corporation was "doing business" in New York and under the
New York "long-arm statute." In the course of his judgment, Weinstein
C.J. said, at p. 1342: "these subsidiaries almost by definition are doing
for their parent what their parent would otherwise have to do on its       D
own." It is not surprising that in many cases such as *Holdsworth* [1955] 1
W.L.R. 352, *Scottish Co-operative* [1959] A.C. 324, *Revlon* [1980] F.S.R.
85 and *Commercial Solvents* [1974] E.C.R. 223, the wording of a
particular statute or contract has been held to justify the treatment of
parent and subsidiary as one unit, at least for some purposes. The
relevant parts of the judgments in the *D.H.N.* case [1976] 1 W.L.R. 852   E
must, we think, likewise be regarded as decisions on the relevant
statutory provisions for compensation, even though these parts were
somewhat broadly expressed, and the correctness of the decision was
doubted by the House of Lords in *Woolfson v. Strathclyde Regional
Council*, 1978 S.L.T. 159 in a passage which will be quoted below.

Mr. Morison described the theme of all these cases as being that
where legal technicalities would produce injustice in cases involving      F
members of a group of companies, such technicalities should not be
allowed to prevail. We do not think that the cases relied on go nearly so
far as this. As Sir Godfray submitted, save in cases which turn on the
wording of particular statutes or contracts, the court is not free to
disregard the principle of *Salomon v. A. Salomon & Co. Ltd.* [1897]
A.C. 22 merely because it considers that justice so requires. Our law,     G
for better or worse, recognises the creation of subsidiary companies,
which though in one sense the creatures of their parent companies, will
nevertheless under the general law fall to be treated as separate legal
entities with all the rights and liabilities which would normally attach to
separate legal entities.

In deciding whether a company is present in a foreign country by a
subsidiary, which is itself present in that country, the court is entitled,  H
indeed bound, to investigate the relationship between the parent and the
subsidiary. In particular, that relationship may be relevant in determining
whether the subsidiary was acting as the parent's agent and, if so, on

A    what terms. In *Firestone Tyre and Rubber Co. Ltd. v. Lewellin* [1957] 1
W.L.R. 464 (which was referred to by Scott J.) the House of Lords
upheld an assessment to tax on the footing that, on the facts, the
business both of the parent and subsidiary were carried on by the
subsidiary as agent for the parent. However, there is no presumption of
any such agency. There is no presumption that the subsidiary is the
parent company's alter ego. In the court below the judge, ante, p. 484B,

B    refused an invitation to infer that there existed an agency agreement
between Cape and N.A.A.C. comparable to that which had previously
existed between Cape and Capasco and that refusal is not challenged on
this appeal. If a company chooses to arrange the affairs of its group in
such a way that the business carried on in a particular foreign country is
the business of its subsidiary and not its own, it is, in our judgment,

C    entitled to do so. Neither in this class of case nor in any other class of
case is it open to this court to disregard the principle of *Salomon v. A.
Salomon & Co. Ltd.* [1897] A.C. 22 merely because it considers it just
so to do.

      In support of the single commercial unit argument, Mr. Morison
made a number of factual submissions to the following effect: the
purpose of N.A.A.C.'s creation was that it might act as a medium

D    through which goods of the Cape group might be sold. The purpose of
the liquidation of N.A.A.C. was likewise to protect Cape. Any major
policy decisions concerning N.A.A.C. were taken by Cape. Cape's
control over N.A.A.C. did not depend on corporate form. It exercised
the same degree of control both before and after the removal of the
Cape directors from the N.A.A.C. board. The functions of N.A.A.C.'s

E    directors were formal only. Dr. Gaze effectively controlled its activities.
Cape represented N.A.A.C. to its customers as its office in the United
States of America. In broad terms, it was submitted, Cape ran a single
integrated mining division with little regard to corporate formalities as
between members of the group in the way in which it carried on its
business.

F    The plaintiffs further submitted in their notice of appeal that
N.A.A.C. "did not deal and was not permitted to deal with Egnep or
Casap, but had to go through Cape or Capasco." It seems clear that
N.A.A.C., as principal, made direct purchases of raw asbestos from
Egnep. On the balance of probabilities, we accept the plaintiffs'
submission that it made similar direct purchases from Casap. In referring
to the absence of dealing with Egnep or Casap, the plaintiffs were, we

G    understand, intending to submit that as a matter of group policy, which
Cape could and did enforce by its power of control over the boards of
Egnep, Capasco and N.A.A.C., the transmission of information and
orders to or from customers had to be effected and was effected by
N.A.A.C. through Capasco. We accept that submission. We also accept
that the matters referred to in this paragraph lend some broad support
to the submission that Cape ran a single integrated mining division with

H    little regard to corporate formalities as between members of the group.
However, there has been no challenge to the judge's finding that the
corporate forms applicable to N.A.A.C. as a separate legal entity were
observed.

As to the plaintiffs' other factual submissions in this context we will  A
deal with the purpose of N.A.A.C.'s creation and existence in considering
the "agency" argument. As to the relationship between Cape and
N.A.A.C., it is of the very nature of a parent company-subsidiary
relationship that the parent company is in a position, if it wishes, to
exercise overall control over the general policy of the subsidiary. The
plaintiffs, however, submitted that Cape's control extended to the day-  B
to-day running of N.A.A.C. They challenged the finding of fact made by
Scott J. that "Mr. Morgan was in executive control of N.A.A.C.'s
conduct of its business." We explore further the facts relative to this
finding and to the extent of Cape's control over N.A.A.C.'s activities in
the appendix to this judgment. Our conclusion, shortly stated, is that the
finding was justified by the evidence. A degree of overall supervision,
and to some extent control, was exercised by Cape over N.A.A.C. as is  C
common in the case of any parent-subsidiary relationship—to a large
extent through Dr. Gaze. In particular, Cape would indicate to N.A.A.C.
the maximum level of expenditure which it should incur and would
supervise the level of expenses incurred by Mr. Morgan. Mr. Morgan
knew that he had to defer in carrying out the business activities of
N.A.A.C. to the policy requirements of Cape as the controlling
shareholders of N.A.A.C. Within these policy limits, such as Cape's  D
requirement that N.A.A.C.'s orders for asbestos for sale by N.A.A.C.
in the United States of America be placed through Capasco on behalf of
Egnep and Casap, the day-to-day running of N.A.A.C. was left to him.
There is no challenge to the judge's findings that (a) the corporate
financial control exercised by Cape over N.A.A.C. in respect of the
level of dividends and the level of permitted borrowing was no more and  E
no less than was to be expected in a group of companies such as the
Cape group, ante, p. 474A–B; (b) the annual accounts of N.A.A.C. were
drawn on the footing that N.A.A.C.'s business was its own business and
there was nothing to suggest that the accounts were drawn on a false
footing, ante, p. 484A–B.

In the light of the set up and operations of the Cape group and of
the relationship between Cape/Capasco and N.A.A.C. we see the  F
attraction of the approach adopted by Lord Denning M.R. in the
*D.H.N.* case [1976] 1 W.L.R. 852, 860c, which Mr. Morison urged us to
adopt: "This group is virtually the same as a partnership in which all the
three companies are partners." In our judgment, however, we have no
discretion to reject the distinction between the members of the group as
a technical point. We agree with Scott J. that the observations of Robert  G
Goff L.J. in *Bank of Tokyo Ltd. v. Karoon (Note)* [1987] A.C. 45, 64,
are apposite:

"[Counsel] suggested beguilingly that it would be technical for us to
distinguish between parent and subsidiary company in this context;
economically, he said, they were one. But we are concerned not
with economics but with law. The distinction between the two is, in  H
law, fundamental and cannot here be bridged."

As to C.P.C., in Mr. Morison's submission, the replacement of
N.A.A.C. by C.P.C. was simply a substitute arrangement. The creation

A    of C.P.C. was affected and paid for by Cape so that it could perform the
same functions on behalf of Cape as N.A.A.C. had previously performed.
C.P.C., on behalf of A.M.C. (and thus Cape) made payment
arrangements with third parties and received moneys for A.M.C. (Cape).
While Mr. Morgan held all the shares in C.P.C. for his own benefit, the
rights of pre-emption reserved to A.M.C. by the agency agreement of 5
June 1978 left him with little substantial financial interest in C.P.C.'s
B    business, save for the office furniture and a right to an account which
would be of little value; effectively, it was submitted, C.P.C.'s business
was owned by A.M.C. (Cape).

Our reasons for rejecting the "single economic unit" argument in
relation to N.A.A.C. apply a fortiori in relation to C.P.C., because
C.P.C. was not Cape's subsidiary and its shares were held by Mr.
C    Morgan for his own benefit. We give our reasons in the next section of
this judgment for agreeing with the judge that C.P.C. was an
independently owned company.

*The "corporate veil" point*

D    Quite apart from cases where statute or contract permits a broad
interpretation to be given to references to members of a group of
companies, there is one well-recognised exception to the rule prohibiting
the piercing of "the corporate veil." Lord Keith of Kinkel referred to
this principle in *Woolfson v. Strathclyde Regional Council*, 1978 S.L.T.
159 in the course of a speech with which Lord Wilberforce, Lord Fraser
of Tullybelton and Lord Russell of Killowen agreed. With reference to
E    the *D.H.N.* decision [1976] 1 W.L.R. 852, he said, at p.161:

"I have some doubts whether in this respect the Court of Appeal
properly applied the principle that it is appropriate to pierce the
corporate veil only where special circumstances exist indicating that
it is a mere façade concealing the true facts."

F    The only allegation of a façade in the plaintiffs' pleadings was that
the formation and use of C.P.C. and A.M.C. in the

"alternative marketing arrangements of 1978 were a device or sham
or cloak for grave impropriety on the part of Cape or Capasco,
namely to ostensibly remove their assets from the United States of
America to avoid liability for asbestos claims whilst at the same
time continuing to trade in asbestos there."

G    In their notice of appeal (paragraph 2(b)) the plaintiffs referred to their
contention made at the trial that C.P.C. "was set up to replace
N.A.A.C. in such a way as to disguise the defendants' continued
involvement in the marketing of the group's asbestos in the United
States of America."

Scott J. more or less accepted this contention. He found as a fact,
H    ante, p. 478F:

"the arrangements made regarding N.A.A.C., A.M.C. and C.P.C.
were part of one composite arrangement designed to enable Cape
asbestos to continue to be sold into the United States while

reducing, if not eliminating, the appearance of any involvement   A
therein of Cape or its subsidiaries."

However, he went on to say, ante, p. 479B–C:

"But the question whether C.P.C.'s presence in Illinois can, for
jurisdiction purposes, be treated as Cape's presence, must, in my
view, be answered by considering the nature of the arrangements
that were implemented, not the motive behind them. The   B
documentary evidence I have seen has made clear that the senior
management of Cape, including Mr. Penna, were very anxious that
Cape's connections with C.P.C. and with A.M.C. should not
become publicly known. Some of the letters and memoranda have a
somewhat conspiratorial flavour to them. But this too, although
interesting to notice, is not, in my opinion, relevant to the main   C
question."

If and so far as the judge intended to say that the motive behind the
new arrangements was irrelevant as a matter of law, we would
respectfully differ from him. In our judgment, as Mr. Morison submitted,
whenever a device or sham or cloak is alleged in cases such as this, the
motive of the alleged perpetrator must be legally relevant, and indeed   D
this no doubt is the reason why the question of motive was examined
extensively at the trial. The decision in *Jones v. Lipman* [1962] 1
W.L.R. 832 referred to below was one case where the proven motive of
the individual defendant clearly had a significant effect on the decision
of Russell J.

The judge's finding of fact quoted above as to the motives of Cape
behind the new arrangements is accepted (no doubt welcomed) by the   E
plaintiffs, so far as it goes. They submit, rightly in our judgment, that
any such motives are relevant to the "corporate veil" point. They further
submit that the judge (a) erred in concluding that C.P.C. was an
"independently owned company;" and (b) failed to make a number of
findings of fact which are relevant in the context of the "corporate veil"
point.

Mr. Morison has taken us through the arrangements which led to the   F
extinction of N.A.A.C. and the emergence of A.M.C. and C.P.C. with
care and in considerable detail. The additional facts which the plaintiffs
say the judge ought to have found, and which are set out in the
appendix to this judgment, all relate to these arrangements. It is true
that, as the judge said, some of the letters and memoranda have a
"somewhat conspiratorial flavour to them." Since, contrary to the judge's   G
view, we think motive is relevant in this context, we have thought it
right to investigate these contentions in some detail in the appendix.

On analysis, much of the new material does little more than amply
support the judge's finding quoted above as to the purpose of the
composite arrangement. In this court Mr. Morison made it clear that the
plaintiffs were not alleging any unlawful purpose or impropriety on
the part of Cape in the sense of any intention to deceive or to do any   H
unlawful act, either in Illinois or in this country. It was, however,
asserted for the plaintiffs that A.M.C. and C.P.C. together constituted a
façade which concealed the real activities of Cape. We understand that

A to mean that the purpose of Cape was to conceal, so far as it lawfully could having regard to the requirements of the law in Illinois and this country, any connection of Cape with A.M.C. or C.P.C.

 Before expressing our own views as to Cape's purpose, we will state our conclusions as to Mr. Morgan's position. It is, in our judgment, right to infer, substantially as submitted by Mr. Morison, that the assistance derived from the presence of Mr. Morgan in Illinois, B undertaking the task through C.P.C. of marketing agent for the Cape subsidiaries in the United States, was regarded as being at least of great importance to the general purposes of the Cape group, and possibly essential for those purposes, because, if it was not so regarded, there is no apparent reason why Cape should assume the cost and such risk as might have arisen from setting up C.P.C. Sir Godfray, however, was in C our view plainly right in submitting that the agreement of Mr. Morgan was required for the creation of the alternative marketing arrangements by means of a new independent Illinois company and that his agreement, when given, was real. Cape had obligations of a moral nature to Mr. Morgan and to the long serving staff of N.A.A.C. Cape also, for its own purposes, wanted Mr. Morgan and Mrs. Holtze to continue with the D work previously done by them for N.A.A.C. If Mr. Morgan decided to take on the task of providing services to the subsidiaries of the Cape group through C.P.C., on the terms available to him as owner of the shares in C.P.C., Cape would get the benefit of his knowledge and experience as the person in charge of C.P.C. Nothing in the material to which our attention was drawn under these headings, however, causes us to doubt the correctness of Scott J.'s conclusion that the shares in E C.P.C. belonged both at law and in equity to Mr. Morgan. It is clear that Cape intended C.P.C. to be in reality Mr. Morgan's company because that was part of their purpose. Such as it was, and dependent for almost all of its business on the Cape subsidiaries, C.P.C. was Mr. Morgan's company. We therefore reject the challenge to the judge's finding that C.P.C. was an independently owned company.

F As to Cape's purpose in making the arrangements for the liquidation of N.A.A.C. and the creation of A.M.C. and C.P.C., we think that the extracts from the evidence set out in the appendix to this judgment (particularly under item (17)), sufficiently reveal both the substance of what the officers of Cape were doing and what they were trying to achieve. The allegation of impropriety was, in our view, rightly abandoned. The inference which we draw from all the evidence was that G Cape's intention was to enable sales of asbestos from the South African subsidiaries to continue to be made in the United States while (a) reducing the appearance of any involvement therein of Cape or its subsidiaries, and (b) reducing by any lawful means available to it the risk of any subsidiary or of Cape as parent company being held liable for United States taxation or subject to the jurisdiction of the United H States courts, whether state or federal, and the risk of any default judgment by such a court being held to be enforceable in this country. Inference (a) was also made by the judge. Inference (b) is our own addition.

The question of law which we now have to consider is whether the      A
arrangements regarding N.A.A.C., A.M.C. and C.P.C. made by Cape
with the intentions which we have inferred constituted a façade such as
to justify the lifting of the corporate veil so as that C.P.C.'s and
A.M.C.'s presence in the United States of America should be treated as
the presence of Cape/Capasco for this reason if no other.

In *Merchandise Transport Ltd. v. British Transport Commission*
[1962] 2 Q.B. 173, 206–207, Danckwerts L.J. referred to certain        B
authorities as showing:

> "where the character of a company, or the nature of the persons
> who control it, is a relevant feature the court will go behind the
> mere status of the company as a legal entity, and will consider who
> are the persons as shareholders or even as agents who direct and
> control the activities of a company which is incapable of doing       C
> anything without human assistance."

The correctness of this statement has not been disputed, but it does not
assist in determining whether "the character of a company or the nature
of the persons who control it" will be relevant in the present case.

Rather greater assistance on this point is to be found in *Jones v.
Lipman* [1962] 1 W.L.R. 832. In that case the first defendant had agreed    D
to sell to the plaintiffs some land. Pending completion the first defendant
sold and transferred the land to the defendant company. The evidence
showed that this company was at all material times under the complete
control of the first defendant. It also showed that the acquisition by him
of the company and the transfer of the land to the company had been
carried through solely for the purpose of defeating the plaintiff's right to
specific performance: see at p. 836. Russell J. made an order for specific   E
performance against both defendants. He held that specific performance
cannot be resisted by a vendor who, by his absolute ownership and
control of a limited company in which the property is vested, is in a
position to cause the contract to be completed. As to the defendant
company, he described it, at p. 836, as being

> "the creature of the first defendant, a device and a sham, a mask    F
> which he holds before his face in an attempt to avoid recognition by
> the eye of equity."

Following *Jones v. Lipman,* we agree with Mr. Morison that, contrary to
the judge's view, where a façade is alleged, the motive of the perpetrator
may be highly material.

Other cases were cited to us in which the court, on interlocutory    G
applications, has to a greater or lesser extent been prepared to look
behind the corporate veil and have regard to the persons ultimately
interested in a company under a group's company structure. For
example, it did so in exercising its *Mareva* injunction in *X Bank Ltd. v.
G.* (1985) 82 L.S.G. 2016 and in considering stays of execution in
*Canada Enterprises Corporation Ltd. v. MacNab Distillers Ltd. (Note)*
[1987] 1 W.L.R. 813 and *Burnet v. Francis Industries Plc.* [1987] 1    H
W.L.R. 802. The two last-mentioned decisions contain no statement of
relevant principle and the report of *X Bank Ltd. v. G.* is so brief that
we think it would not be safe to rely on it for present purposes.

A      We were referred to certain broad dicta of Lord Denning M.R. in *Wallersteiner v. Moir* [1974] 1 W.L.R. 991, 1013, and in *Littlewoods Mail Order Stores Ltd. v. Inland Revenue Commissioners* [1969] 1 W.L.R. 1241, 1254. In both these cases he expressed his willingness to pull aside the corporate veil, saying in the latter:

B       "I decline to treat the [subsidiary] as a separate and independent entity. . . . The courts can and often do draw aside the veil. They can, and often do, pull off the mask. They look to see what really lies behind. The legislature has shown the way with group accounts and the rest. And the courts should follow suit. I think that we should look at the Fork Manufacturing Co. Ltd. and see it as it really is—the wholly-owned subsidiary of Littlewoods. It is the creature, the puppet, of Littlewoods, in point of fact: and it should

C      be so regarded in point of law."

      However, in *Wallersteiner v. Moir* [1974] 1 W.L.R. 991 Buckley L.J., at p. 1027, and Scarman L.J., at p. 1032, expressly declined to tear away the corporate veil. In the *Littlewoods* case [1969] 1 W.L.R. 1241, 1255, Sachs L.J. expressly dissociated himself from the suggestion that the subsidiary was not a separate legal entity and Karminski L.J. refrained

D  from associating himself with it. We therefore think that the plaintiffs can derive little support from those dicta of Lord Denning M.R.

      From the authorities cited to us we are left with rather sparse guidance as to the principles which should guide the court in determining whether or not the arrangements of a corporate group involve a façade within the meaning of that word as used by the House of Lords in

E  *Woolfson*, 1978 S.L.T. 159. We will not attempt a comprehensive definition of those principles.

      Our conclusions are these. In our judgment, the interposition of A.M.C. between Cape and C.P.C. was clearly a façade in the relevant sense. Scott J., ante, p. 479E, said it seemed clear that A.M.C. was "no more than a corporate name" and that he would expect to find, if all the relevant documents were available, that "A.M.C. acted through

F  employees or officers of either Casap or Egnep." He rejected, ante, p. 482A, Mr. Morgan's evidence that he understood A.M.C. to be an independent South African trading company, and was satisfied that he knew very well that it was a "creature of Cape." "The seller in C.P.C.'s time was, nominally, A.M.C. but in reality still, I think, Egnep or Casap:" ante, p. 482E. In our judgment, however, the revelation of

G  A.M.C. as the creature of Cape does not suffice to enable the plaintiffs to show the presence of Cape/Capasco in the United States of America, since on the judge's undisputed findings, A.M.C. was not in reality carrying on any business in the United States of America.

      The relationship between Cape/Capasco and C.P.C. is the crucial factor, since C.P.C. was undoubtedly carrying on business in the United States of America. We have already indicated our acceptance of the

H  judge's findings that C.P.C. was a company independently owned by Mr. Morgan and that the shares therein belonged to him in law and in equity. These findings by themselves make it very difficult to contend that the operation of C.P.C. involved a façade which entitles the court

to pierce the corporate veil between C.P.C. and Cape/Capasco and treat    A
them all as one. Is the legal position altered by the facts that Cape's
intention, in making the relevant arrangements (as we infer), was to
enable sales of asbestos from the South African subsidiaries to be made
while (a) reducing if not eliminating the appearance of any involvement
therein of Cape or its subsidiaries, and (b) reducing by any lawful means
available to it the risk of any subsidiary or of Cape as parent company
being held liable for United States taxation or subject to the jurisdiction    B
of the United States courts and the risk of any default judgment by such
a court being held to be enforceable in this country?

The plaintiffs submitted (paragraph 7 of their notice of appeal) that
We think not. Mr. Morison submitted that the court will lift the
corporate veil where a defendant by the device of a corporate structure
attempts to evade (i) limitations imposed on his conduct by law; (ii) such
rights of relief against him as third parties already possess; and (iii) such    C
rights of relief as third parties may in the future acquire. Assuming that
the first and second of these three conditions will suffice in law to justify
such a course, neither of them apply in the present case. It is not
suggested that the arrangements involved any actual or potential illegality
or were intended to deprive anyone of their existing rights. Whether or
not such a course deserves moral approval, there was nothing illegal as
such in Cape arranging its affairs (whether by the use of subsidiaries or    D
otherwise) so as to attract the minimum publicity to its involvement in
the sale of Cape asbestos in the United States of America. As to
condition (iii), we do not accept as a matter of law that the court is
entitled to lift the corporate veil as against a defendant company which
is the member of a corporate group merely because the corporate
structure has been used so as to ensure that the legal liability (if any) in    E
respect of particular future activities of the group (and correspondingly
the risk of enforcement of that liability) will fall on another member of
the group rather than the defendant company. Whether or not this is
desirable, the right to use a corporate structure in this manner is
inherent in our corporate law. Mr. Morison urged on us that the
purpose of the operation was in substance that Cape would have the
practical benefit of the group's asbestos trade in the United States of    F
America without the risks of tortious liability. This may be so. However,
in our judgment, Cape was in law entitled to organise the group's affairs
in that manner and (save in the case of A.M.C. to which special
considerations apply) to expect that the court would apply the principle
of *Salomon v. A. Salomon & Co. Ltd.* [1897] A.C. 22 in the ordinary
way.    G

The plaintiffs submitted (paragraph 7 of their notice of appeal) that
the motive of the defendants in setting up the arrangements regarding
N.A.A.C., A.M.C. and C.P.C. as revealed in the documentary evidence
were "consistent only with an acceptance by Cape that they were
present in the United States through N.A.A.C. and C.P.C." We think
there is no substance in this point. These arrangements at most indicated
an apprehension on the part of the defendants that they might be held    H
to be so present and a desire that they should not be. They involved no
admission or acceptance of such presence.

We reject the "corporate veil" argument.

APP.371

A    *The "agency argument" in relation to N.A.A.C.*

We now proceed to consider the agency argument in relation to N.A.A.C. on the footing, which we consider to be the correct one, that N.A.A.C. must for all relevant purposes be regarded as a legal entity separate from Cape/Capasco. In an earlier section of this judgment we summarised three propositions which we derived from the authorities

B    relating to the "presence" of an overseas corporation. There we stated that, save in a "branch office" case (which the instant case is not), the English court will be likely to treat an overseas trading corporation as present within the jurisdiction of the courts of another country only if a representative of the overseas corporation has for more than a minimal period of time been carrying on the *overseas corporation's* business in the other country at or from some fixed place of business. In the present

C    case N.A.A.C., as representative of Cape/Capasco, unquestionably carried on business at a fixed place of business in the United States of America, 150, North Wacker Drive, for a substantial period of time. So no difficulty arises on that score. The crucial question is whether it can fairly be said that *Cape's* business has been transacted by N.A.A.C. at or from 150, North Wacker Drive. The judge's answer to it was that "N.A.A.C.'s business was its own business and not the business of Cape

D    or Capasco:" ante, p. 477E–F. The plaintiffs challenge the correctness of this answer to the question.

This question, as we said earlier, will necessitate an investigation of the functions which N.A.A.C. performed and all aspects of the relationship between it and Cape.

The factual material which we have principally in mind in considering

E    whether Cape's business was being transacted at or from 150, North Wacker Drive is to be found in the section of this judgment headed, "The facts on 'presence' as found by Scott J.," and in our observations in the appendix to this judgment. We summarise below what we consider the most material facts in context, having regard to the list of potentially relevant factors set out in an earlier section of our judgment.

F    We accept that the intention of Cape in procuring the incorporation of N.A.A.C. in the State of Illinois was that N.A.A.C. should assist in the marketing of asbestos in the United States of America upon sales by Egnep or Casap to purchasers in the United States of America and that it was to be the marketing agent of the Cape group in the United States of America. Nevertheless, in our judgment, it is indisputable that at very least a substantial part of the business carried on by N.A.A.C at all

G    material times was in every sense its own business. In these contexts we draw attention in particular to the following facts.

(1) Though we were referred to no evidence relating to the original acquisition by N.A.A.C. of its premises at 150, North Wacker Drive, we know that N.A.A.C. itself was the lessee of the premises and paid the rent for them. Furthermore, it owned the office furniture and employed there its own staff of four persons for whom it ran its own pension

H    scheme.

(2) From time to time it conducted the following activities as principal on its own account: (a) it bought asbestos from United States government stocks or from Egnep or Casap and sold it to United States

customers, such purchases representing about 25 per cent. of N.A.A.C.'s  A
business in terms of tonnage; (b) it imported asbestos goods from Japan
and sold them to United States customers. (While we accept that the
purchase by N.A.A.C. of asbestos goods was subordinate to its business
with or for Cape's subsidiaries, we do not accept the plaintiffs' submission
that such sales were trivial, having regard to the turnover of N.A.A.C.)

(3) For storing the asbestos which it has purchased from United
States Government stocks or Egnep or Casap, N.A.A.C. rented in its  B
own name and paid for warehousing facilities.

(4) N.A.A.C. earned profits and paid United States taxes thereon.

(5) N.A.A.C.'s creditors and debtors were its own (not those of
Cape).

(6) The return to Cape as N.A.A.C.'s shareholder took the form of
an annual dividend passed by a resolution of N.A.A.C.'s board of  C
directors.

(7) In other respects also the corporate forms applicable to N.A.A.C.
as a separate entity were observed.

In the face of these facts, now unchallenged, it is in our judgment
clear beyond argument that N.A.A.C. was carrying on business of its
own. The only question is whether, in performing the functions which it
performed on behalf of Cape/Capasco, it was carrying on its own  D
business or their business. What, then, were these functions? As we see
the position from the findings of the judge and the evidence put before
us, its functions were to assist in the marketing of asbestos in the United
States of America upon sales by Egnep or Casap and generally to assist
and encourage sales in the United States of America of asbestos of the
Cape group. It acted as the channel of communication between  E
Cape/Capasco and United States customers, such as P.C.C. It organised
and arranged the performance of contracts between United States
customers and Egnep. It had a co-ordinating role, particularly in
arranging delivery. The United States customer would specify to
N.A.A.C. from time to time the quantity of asbestos which it wished to
purchase and the time when it desired delivery to be made. This
information would be conveyed through N.A.A.C. to Casap and Egnep.  F
Shipping arrangements and delivery dates would be arranged by Casap
or Egnep and communicated to the United States customers via
N.A.A.C. N.A.A.C. would receive documents and pass them on to the
customers. It also received requests and complaints which it would
normally pass on to Capasco. Generally it assisted in "nursing" the
group's customers for asbestos and ensuring that they were satisfied. For  G
its services N.A.A.C. was remunerated by way of a commission paid to
it by Casap on sales effected by Egnep or Casap. There was no evidence
that N.A.A.C. reserved any part of its office premises or any part of its
staff exclusively for performing its agency functions.

Our further findings as to the functions which N.A.A.C. performed
and as to its relationship between N.A.A.C. and Cape are to be found
set out in the appendix. We bear in mind particularly the submissions  H
contained in item (9) that (i) when corresponding with United States
customers, Cape referred to N.A.A.C. as "our Chicago office" and
N.A.A.C. referred to Cape and Capasco as "our London office;"

A     (ii) N.A.A.C. held itself out to a large United States customer as being part of the Cape selling organisation, and (iii) N.A.A.C. was treated by the major customer "as the channel between them and Cape and Capasco." However, in the appendix we give our reasons for concluding that the matters shown in the evidence considered under this heading do not by themselves show anything inconsistent with the findings of Scott J. as to N.A.A.C.'s role and functions.

B     There is no doubt that the services rendered by N.A.A.C. in acting as intermediary in respect of contracts between the United States customers and Egnep or Casap were active and important services which were of great assistance to Cape/Capasco in arranging the sales of their group's asbestos in the United States of America. Nevertheless, for all the closeness of the relationship between Cape/Capasco and N.A.A.C.,

C strictly defined limits were imposed on the functions which N.A.A.C. were authorised to carry out or did carry out as their representative. First, N.A.A.C. had no general authority to bind Cape/Capasco to any contractual obligation. Secondly, as Mr. Morison expressly accepted, there is no evidence that N.A.A.C., whether with or without prior authority from Cape/Capasco, ever effected any transaction in such manner that Cape/Capasco thereby became subject to contractual

D obligations to any person. This significant factor renders the arguments in favour of "presence," at least in some respects, even less strong than they were in cases such as *The Lalandia* [1933] P. 56 and *The Holstein* [1936] 2 All E.R. 1660 where the argument failed. Having regard to the legal principles stated earlier in this judgment, and looking at the facts of the case overall, our conclusion is that the judge was right to hold

E that the business carried on by N.A.A.C. was exclusively its own business, not the business of Cape or Capasco, and that Cape and Capasco were not present within the United States of America, through N.A.A.C. at any material time. We see no sufficient grounds for disturbing this finding of fact.

    Under this section of our judgment we should mention one further point. The plaintiffs challenged the judge's finding that as from 31

F January 1978, N.A.A.C. ceased to act on behalf of any of the Cape companies or to carry on any business on its own account save for the purpose of liquidating its assets. The object of the challenge was to refute the suggestion that Cape could not be regarded as present in the United States of America through N.A.A.C. during the period between 31 January 1978 and N.A.A.C.'s formal dissolution on 19 May 1978.

G (They accepted that after 19 May Cape could not be said to be present in the United States of America, by or through N.A.A.C.) The plaintiffs regard this point as having potential legal relevance, since two of the eight actions which comprise Tyler 2 were begun before 18 May 1978. In the appendix we give our reasons for rejecting the challenge to the judge's finding of fact.

H    *The agency argument in relation to C.P.C.*

    We now consider whether Cape/Capasco were present in the United States of America by or through C.P.C. In dealing with the "corporate veil" point we have stated our inferences as to Cape's purpose in making

APP.374

the arrangements for the liquidation of N.A.A.C. and the creation of   A
A.M.C. and C.P.C. Part of the very purpose of these arrangements was
to enable sales of asbestos from the Cape group to continue to be made
in the United States of America while creating a greater distance both in
appearance and reality between Cape and the company (C.P.C.) which
was intended to carry out the functions on its behalf in the United States
of America which had previously been carried out by N.A.A.C. Having
dealt with the "corporate veil" point, we agree with the following   B
passage in Scott J.'s judgment, ante, p. 482D–F:

> "I do not think, on analysis, that the plaintiffs' case is any stronger
> than their case regarding N.A.A.C. If anything, I think the case is
> weaker. N.A.A.C. was at least a wholly owned subsidiary. C.P.C.,
> even if incorporated and launched with Cape money, was, on my
> reading of the facts, an independently owned company. Like   C
> N.A.A.C., C.P.C. acted as agent for the purpose of facilitating the
> sale in the United States of Cape's asbestos. The seller of the
> asbestos in N.A.A.C.'s time was Egnep or Casap. The seller in
> C.P.C.'s time was, nominally, A.M.C. but, in reality, still, I think,
> Egnep or Casap. C.P.C., like N.A.A.C., had no authority to bind
> Egnep, Casap or any other of the Cape subsidiaries to any contract,   D
> C.P.C., like N.A.A.C., carried on its own business from its own
> offices at 150, North Wacker Drive. The provision by Cape of the
> $160,000 as a starting-up fund does not make the offices Cape's
> offices or the business Cape's business."

The interposition of A.M.C. in the new arrangements made in 1978
cannot one way or the other affect the question whether Cape/Capasco   E
were present in the United States of America thereafter. For all relevant
purposes, as we have already indicated, we are prepared to treat Cape
and A.M.C. as one. The functions performed by C.P.C. and its
relationship with Cape through A.M.C. are the relevant considerations
for present purposes. Since Mr. Morgan held all the shares in C.P.C.
beneficially, Cape had no control as a shareholder over the activities of
C.P.C. similar to the control which it had exercised over N.A.A.C. Mr.   F
Morison did not dispute the judge's finding that the terms of the agency
agreement of 5 June 1978 were a reliable guide to the nature of the
relationship between C.P.C. and A.M.C. and hence between C.P.C.
and Cape. Under the terms of this agreement, C.P.C. were left free to
sell materials and products other than asbestos fibre and to involve itself
in other commercial activities. It is clear that it did so. While there is no   G
evidence that it followed N.A.A.C. in buying raw asbestos from Egnep
or Casap or the United States Government, it undoubtedly bought and
sold manufactured textiles on its own behalf as principal.

It is thus quite plain that at least a substantial part of C.P.C.'s
business was in every sense its own business. As with N.A.A.C. the only
question is whether, in performing the functions which it performed on
behalf of Cape/Capasco, it was carrying on its own business or their   H
business. As the terms of the agency agreement show, these functions
were very similar to those which had been performed by N.A.A.C. The
services rendered by C.P.C. to Cape/Capasco were similarly active and

A important. Again, however, strictly defined limits were imposed on the functions which C.P.C. was authorised to carry out or did carry out as the representative of Cape/Capasco (through A.M.C.). C.P.C. had no authority to bind A.M.C. or Cape or Capasco to any contractual obligation. Again too, there is no evidence that C.P.C., whether with or without prior authority from any of those three companies, ever carried out any transaction in such manner as to subject any of them to

B contractual obligations to any person. In the light of the legal principles stated above and of the facts of the case looked at as a whole, we see no sufficient grounds for disturbing the judge's finding that the business carried on by C.P.C. was exclusively its own business and that Cape and Capasco were not present within the Unites States of America through C.P.C. (or A.M.C.) at any material time.

C Under this heading, we refer to one further matter. The plaintiffs, on the evidence of Mr. Summerfield (that in August 1984 A.M.C.'s name was given as one of the occupants of the offices on the 12th floor at 150, North Wacker Drive), invited us to infer that A.M.C. had their plate up on those offices in 1978–79. Scott J. declined to draw any such inference. In our judgment, he was right to do so for the reasons given in the next section of this judgment dealing with burden of proof and under item

D (25) in the appendix.

### The onus of proof

The plaintiffs submitted to Scott J. that the onus was on Cape to establish that it was not resident in the United States of America and that he should hold that the defendants had failed to discharge that

E onus. He rejected that argument, saying, ante, p. 483c–d:

> "The plaintiffs sue Cape on a judgment given by a United States court. The judgment is an apparently regular one. Cape disputes jurisdiction on the ground that it is a foreign company with no place of business in the United States. The plaintiffs' answer is to assert that the presence in the United States of N.A.A.C. and C.P.C. is to
F > be treated as Cape's presence. But each of N.A.A.C. and C.P.C. is in law an individual legal persona. A contention that the presence of the United States of either is to be treated as the presence of Cape requires, in my opinion, he who so contends to establish facts sufficient to support the contention. This, in my judgment, the plaintiffs have failed to do."

G
Mr. Morison submitted that the judge misdirected himself as to the burden of proof. A foreign judgment, in his submission, prima facie gives rise to a legal obligation on the part of the defendant to obey the judgment and is thus prima facie enforceable in England. In support of this submission he invoked *Dicey & Morris,* 11th ed., vol. 1, p. 465, where it is said:

H > "the statement of claim in an action upon such a judgment need not specifically assert that the foreign court was competent in terms either of the relevant foreign law or of the English rules of conflict of laws, though it is usual to insert an allegation of this sort."

APP.376

Adams v. Cape Industries Plc. (C.A.)                    [1990]

We agree that generally no specific assertion need be made that the    A
foreign court was competent *in terms of the foreign law*, not because of
any question of burden of proof, but because such assertion is irrelevant.
As is stated in *Dicey & Morris*, 11th ed., vol. 1, pp. 464–465, a foreign
judgment cannot, in general, be impeached on the ground that the court
which gave it was not competent to do so according to the law of the
foreign country concerned.

However, as all the authorities show, it is only the judgment of a    B
foreign court recognised as competent by English law which will give
rise to an obligation on the part of the defendant to obey it. As a matter
of principle it seems to us that in the first place the onus must fall on the
plaintiff seeking to enforce the judgment of a foreign court to prove the
competence (in this sense) of such court to assume jurisdiction over him.
None of the authorities cited to us establish the contrary.                C

No doubt, in any case, the evidentiary burden may shift at the trial.
However, we agree with the judge that the presence of A.M.C.'s name
on a notice board at the office at 150, North Wacker Drive in 1984 did
not give rise to any presumption that it had been there in 1979.

More generally we should state that if, contrary to our view, the
onus fell on the defendants to disprove the competence of the Tyler
court to give judgment against them, they have discharged that onus by    D
showing that they were not "present" in any part of the United States of
America, at the time of commencement of the various suits between
April 1978 and November 1979.

This conclusion as to the presence issue means that this appeal must
fail on this account if no other. However, for reasons already stated,
and in case our conclusion on the "presence" issue is wrong, we think it    E
right to proceed to consider the "country" issue and the "natural justice"
issue. (As to the latter issue, there is no dispute that the onus of proof
falls on the defendants.)

### III  *The country issue*

Thus far we have been considering the criteria for ascertaining    F
whether a defendant was present in a particular place, and whether on
the facts of this case the criteria were satisfied by Cape and Capasco.
For this purpose, it was unnecessary to decide how to identify the place
in the United States at which the defendant must have been present,
when the action commenced, in order to make the judgment enforceable
against him here, since if Cape and Capasco were not present in
Chicago, they were not present anywhere else in the United States. If,    G
however, the conclusion expressed in the preceding section of this
judgment were to be incorrect, so that the companies were present in
Chicago, Illinois, it would become necessary to decide whether that
presence was sufficient to render enforceable in the United Kingdom the
judgment given by the District Court in Tyler, Texas.

This question may conveniently be labelled the "country" issue,
echoing the language of *Schibsby v. Westenholz,* L.R. 6 Q.B. 155, and    H
several of the later cases. We should, however, observe that this
terminology must be used with caution, lest it beg the very question
under consideration, and lead the reader to assume that the political

A   entity provides the geographical test. This point was not in issue in any
of the cases from which we have already quoted, and no assumption as
to the relevant principle can be drawn from the language in which the
courts chose to express their opinions on the question of "presence."

[Their Lordships summarised the evidence concerning the organisation
of the federal courts, their jurisdiction and the law which they enforced;
referred to *Mississippi Publishing Corporation v. Murphree* (1946) 326
B   U.S. 438, *Omni Capital International v. Rudolff Wolff & Co. Ltd.*
(1987) 108 S. Ct. 404, *Erie Railroad Co. v. Tompkins* (1938) 304 U.S.
64, *Guaranty Trust Co. v. York* (1945) 326 U.S. 99; and continued:]

Against this background we may now trace the reasoning by which
the judge arrived at his conclusion that, if Cape and Capasco had been
present in Illinois when the Tyler 2 actions were commenced, this would
have been a sufficient basis in English law for the exercise by the Tyler
C   court of jurisdiction over them. He began, by citing a passage from
*Dicey & Morris*, 11th ed., vol. 1, pp. 26–27, which we may usefully
repeat:

"Meaning of 'country.' This word has from long usage become
almost a term of art among English speaking writers on the conflict
of laws, and it is vitally important to appreciate exactly what it
D   means. It was defined by Dicey as 'the whole of a territory subject
under one sovereign to one body of law.' He suggested that a better
expression might be 'law district;' but this phrase has never found
much favour with English speaking writers, who prefer the more
familiar word 'country.' England, Scotland, . . . the Isle of Man,
Jersey, Guernsey, Alderney, Sark, each British colony, each of the
E   American and the Australian states and each of the Canadian
provinces is a separate country in the sense of the conflict of laws,
though not one of them is a state known to public international law.
. . . A state may or may not coincide with a country in the sense of
the conflict of laws. Unitary states like Sweden, the Netherlands
and New Zealand, where the law is the same throughout the state,
are 'countries' in this sense. But composite states like the United
F   Kingdom, the United States, Australia and Canada are not."

The judge differed from this opinion. He did not accept that for
some private international purposes the United States might not be a
"country;" and he went on to develop an analysis of the position which
would exist if the district court were sitting in a "federal question"
G   matter such as an anti-trust damages suit. In the result, the judge
concluded that the "court would be a United States court applying
United States law;" that it would command the obedience of a resident
anywhere in the United States; and that the sovereign from which the
district court derived its jurisdiction was the United States. The judge
continued this line by stating that, if Congress had chosen to establish a
Federal District Court at Washington D.C. with in personam jurisdiction
H   in respect of anti-trust cases, "the 'country' of the court would unarguably
be the United States as a whole."

Thus far, as the judge acknowledged, the discussion had been
hypothetical, since the Tyler court was sitting in diversity not in a

Adams v. Cape Industries Plc. (C.A.) **[1990]**

federal question case. Nevertheless, the judge attached great weight to    A
the rebuttal of what he saw as the main plank of the defendants' case,
namely, that the United States could not be a "country" for private
international law purposes. Having concluded that it could, he went on
to consider and reject the argument which he attributed to the
defendants, namely that the district court when sitting in diversity was
part of the system for the administration of justice in the state in which
it sat.    B

The judge then stated his own view as to the basis on which the English
court recognises the judgment of a foreign court, ante, p. 491A–B:

> "the territorial basis of jurisdiction is dependent upon and cannot, in
> in my opinion, be divorced from, the sovereignty of the 'country'
> that has established the court in question. It is, I think, recognition    C
> of the sovereignty of a foreign country that leads to the recognition
> of the entitlement of its courts to take jurisdiction over persons
> resident in its sovereign territory."

Founding on this principle, the judge concluded, ante, p. 491D–F:

> "As a matter of principle, in my view, if a United States court    D
> exercises jurisdiction over a person resident in the United States, it
> is exercising powers inherent in the sovereignty which adheres to
> the United States. As a matter of principle, too, in my view,
> English law should recognise the legitimacy of that exercise of
> jurisdiction. It follows that I agree with Mr. Morison that the
> answer to the question which I must answer does not lie in
> investigating the function discharged by the court but lies in    E
> investigating the source of authority of the court. Whatever the
> function of a federal district court in a diversity case, the source of
> its authority is to be found in the sovereign power which established
> it. For those reasons I conclude that the exercise of jurisdiction by a
> federal district court over a person resident in the United States is,
> by the standards of English law, a legitimate and not an excessive    F
> exercise of jurisdiction."

Any attempt to weigh up the soundness of this or any other account
of the rules governing the recognition of foreign judgments should, as it
seems to us, begin with an exploration of the reasons why such
judgments are recognised at all. Unfortunately, the cases give virtually
no guidance on this essential question. Underlying it all must be some    G
notion of comity, but this cannot be comity on an individual nation-to-
nation basis, for our courts have never thought it necessary to investigate
what reciprocal rights of enforcement are conceded by the foreign
country, or to limit their exercise of jurisdiction to that which they
would recognise in others. The most one can say is that the duty of
positive law first identified in *Schibsby v. Westenholz,* L.R. 6 Q.B. 155,
must stem from an acknowledgement that the society of nations will    H
work better if some foreign judgments are taken to create rights which
supersede the underlying cause of action, and which may be directly
enforced in countries where the defendant or his assets are to be found.

APP.379

A    But this tells one nothing of practical value about how to identify the foreign judgments which have this effect.

One possibility is to explain the principle in terms of allegiance. This idea, of which traces are found in the earliest cases, may have provided at least a moral underpinning for the concept that a foreigner who has chosen to establish himself within the territory of a sovereign owes to him, in exchange for an obligation to ensure the stranger's personal
B    safety and well-being, a personal duty to pay the sovereign due respect, an obligation which involves an obligation to respect the sovereign's law as enforced by his courts. This concept may have served well enough in the case of an individual established in long-term residence, but the idea that the Dunlop Company, a foreign company of manufacturers, present in the United Kingdom for a few days only through having set up a stall
C    at an exhibition, thereby incurred a duty of fealty to the King-Emperor is surely fanciful.

Nor in our judgment can this concept be made to seem more persuasive by re-writing it in modern terminology. A foreigner who is physically present in a country does thereby acquire rights and duties expressed in terms of the local law, although not necessarily the same as those which apply to the local citizens; but these are not rights and
D    duties which in any sensible way can be described as arising reciprocally with the sovereign. The foreigner does not owe duties to the Queen, or to the United States of America. Rather, by making himself present he contracts-in to a network of obligations, created by the local law and by the local courts.

This is not to say that sovereignty is immaterial to the present
E    problem, in the sense that an identification of the source from which the local laws and the agencies which enforce them derive their powers must be part at least of the task of delineating the obligations, stemming from the judgments of those agencies, which a foreign court ought to regard as binding. Thus, we entirely accept the conclusion, flowing from the judge's premise, that if we had here been concerned with the enforcement of a judgment given by a state court in Texas, we should have been
F    obliged to have regard to the territory of Texas alone, so that if the judgment now in suit had been given (say) by a Texas Supreme Court sitting in Austin, it would not (on the hypothesis of Cape and Capasco's presence in Illinois) have been enforceable. For neither the states outside Texas, nor the federal organs established by or on the authority of the constitution, played any part in giving the State of Texas the right
G    and power to establish its own courts of local jurisdiction. But the converse need not be true. Merely to identify X as the ultimate law giver and creator of the agencies through which those laws are enforced, and then move on to the proposition that a judgment given anywhere in the territory governed by X against someone present anywhere else in those territories should be enforced by foreign courts, seems a large step. Even today, Scotland and England are not the same jurisdictions,
H    and if one looks to the past, it is hard indeed to acknowledge that in Imperial times, all persons present in one part of the Empire could properly be regarded as present everywhere else in the Empire, notwithstanding the immense variety of laws, courts and constitutional

APP.380

Adams v. Cape Industries Plc. (C.A.)                    [1990]

systems which then prevailed, simply because as the ultimate source of    A
power there was to be found a single sovereign.

Another aspect of this idea is to be found in the functional test
propounded by the judge. We take this to invoke an inquiry as to the
task which the Tyler court was performing—a local or a national task.
We would not dissent from this approach, but we would venture to ask
whether the judge was not approaching it solely in terms of constitutional
theory. Because Congress could have created a single "Federal Court"    B
of which every court and every judge was a manifestation, it is assumed
that this is what has really happened, notwithstanding the cessation of a
state contribution in the sphere of substantive law and personal
amenability to service. On the evidence, we cannot accept that this
hypothesis is made out, any more than it is possible to say that the
Queen in Parliament has chosen, whatever powers may exist in reserve,    C
actually to give England and Scotland a unified judicial system applying
a unified law.

It is convenient to mention at this stage three suggested anomalies,
relied upon as pointing to one answer rather than another. The first is
that the need for the Tyler court in this case to have recourse to the
Texan long-arm statute in order to entertain the suit demonstrates that
the overseas defendants were not within the "country." We do not think    D
that this helps. The use of the long-arm statute shows no more than we
already know, namely, that the direct personal jurisdiction of a district
court is not for American purposes recognised as extending beyond the
boundaries of the state within which that particular court happens to sit.
The same can be said of another apparent anomaly on which stress was
laid, namely that, if the plaintiffs' submissions are correct, a judgment    E
which would be unenforceable in some other state such as Illinois might
nevertheless be effective to give recourse against the defendants' assets
in England. We do not regard this as a surprising result, or one which
points to any particular solution of the present problem, for if (contrary
to the defendants' contentions) the whole of the United States is to be
regarded as the territory within which the district court had jurisdiction,
the infraction of what must on this view be regarded as an internal    F
procedural rule is not something of which the English court should take
account.

The third suggested anomaly is this. On the judge's own analysis, the
jurisdiction of the Texas State Court, as recognised by the English court,
would not extend beyond the Texan borders. Thus if the judge's view is
right, the enforceability of the judgment in a case such as this would    G
depend upon whether the action was removed by the defendants into
the district court: and this notwithstanding that the courts would sit in
the same place and apply the same law. This is certainly a striking
result, but it must we believe follow from any tenable view of the law.
As we understand the arguments, Sir Godfray would have been disposed
to accept that if there were a single federal court of unitary jurisdiction,
applying a single law, a defendant could be present anywhere in the    H
United States and still have the judgment enforceable against him: and
we should ourselves be of this opinion. All this shows, however, is that
a person may be present in two different "countries" at the same time.

A  This is a good reason for discarding the word "country" as a useful test, and discarding with it the simple and attractive argument that the United States is a country, the Tyler court was a court of that country, the defendants were present in the United States, and hence they must necessarily have been within the jurisdiction of the country for the purpose of enforcement in England. Further than this, the argument does not run.

B  If these ideas are rejected as inconclusive, where should we look for the test? To our minds, the only way to find an answer is to consider why a person who goes abroad thereby incurs a duty to abide in England by a foreign judgment. The only reason that we can see is that by going to a foreign place he invests himself by tacit consent with the rights and obligations stemming from the local laws as administered by the local court: those laws including, of course, the local rules on the conflicts of laws.

C  Thus far we have experienced no great difficulty. What has raised very real problems is to apply the principle just suggested to the facts of the present case. It may be helpful to summarise the way in which the respective arguments might run.

D  For the defendants, one might begin with the example of a foreigner who has set himself up in Scotland. Such a person could properly be regarded as having done so, and having been allowed to do so, on terms that his rights and duties were to be governed by the laws of Scotland. But not by English law, or by decisions of the English courts, even though the latter might without procedural impropriety purport to exercise a jurisdiction over him. Equally, an Englishman who has gone to live in France and engaged in transactions there, might find himself sued on those transactions in Texas. Any resulting judgment would be unenforceable here, not because the Texas court had broken its own rules, or indeed had broken any rules of international comity, but simply because the Englishman had done nothing to bring himself into a relationship with the court in Texas and the law which it administered.

F  Now if these examples are sound, they may be transformed into something nearer the present case. If the Englishman had established himself in Chicago, would he be treated as having put himself into a relationship with the State Court in Austin, Texas? Surely not, the defendants could argue. The fact that Chicago is in the United States does not make Texas any the less a foreign court for a resident in Illinois than if Chicago were in France; and the fact that the long arm of the Texas court does not have to reach out to another continent should not make any difference. This would be so, the defendants could argue, even if the laws of Illinois and Texas were identical in the minutest respect; and on the evidence before us it seems that this is not so.

H  Let us now make the one alteration necessary to bring the example home to the present case: namely by assuming the court in Texas to be a federal district court of the Tyler Division of the Eastern Division of the State of Texas. This is not a state court, but (so the defendants can argue) a local court in a real sense, administering local law. The juridical identity of the Tyler court might have been different if those invested with constitutional powers had chosen to exercise them differently, but

we must take the facts as they are. On these facts, the defendants can   A
submit, there was no sufficient connection between the defendants,
resident as for present purposes we assume they were in Chicago, and
the federal court in Tyler, to justify the inference that by establishing
their residence there they had consented to the administration of Texan
laws as administered by the Tyler court.

For the plaintiffs, two preliminary points may be made. In the first
place, the decision to join Cape as defendant in the proceedings in the   B
Tyler court, as contrasted with the institution of separate proceedings
against Cape in a federal court in Illinois, was no doubt influenced by
the wish to rely upon the arguments about submission and consent,
based upon Cape's participation in the Tyler 1 proceedings (which
arguments were rejected by Scott J. and not renewed in this court). But
the joining of Cape in the proceedings in the Tyler court had, as we   C
understand it, no other element of forum shopping about it: no
advantage was gained, or present to be gained, as to the substantive law
which would be applicable in proceedings in the Tyler court as compared
with that applicable in a federal court sitting in Illinois. The joining of
Cape in the Tyler court proceedings was, in short, a normal and
appropriate course of proceeding viewed solely from the point of view of
United States law, whether federal or state law. If a default judgment   D
obtained in such circumstances is not enforceable according to our law it
is because the relevant rule of our law requires our courts thus to
discriminate between a judgment given in default by a federal district
court sitting in Illinois and a default judgment given by a federal district
court sitting in Texas.

Secondly, it is true that the definition of facts, which justified the   E
taking by the Tyler court of in personam jurisdiction over any person or
corporation throughout the United States, which is said to constitute
legitimate jurisdiction for the purposes of our private international law,
would also justify the taking of jurisdiction over any person or
corporation outside the territories of the United States, which, as is
common ground, would not be regarded as a legitimate jurisdiction for
our private international law. Nevertheless, there seems no doubt that   F
Congress has established a system of federal courts of which each one
has jurisdiction, in the terms defined by the various long arm statutes of
the forum states (where no specific federal statute provides otherwise) to
exercise in personam jurisdiction over any person or corporation present
in any state of the Union.

More detailed arguments available in support of the plaintiffs'   G
proposition may be summarised.

(i) The concept of "contracting in" by presence means that, in the
unitary state, the foreign resident is put in the same position, whether
the visitor be an individual or a corporation, as any other person or
corporation within that state so far as concerns obligations enforceable
by in personam judgments (i.e. not including matters dependent upon
domicile as opposed to mere presence).   H

(ii) Our law sets no standard with which the network of local law is
required to comply other than that of natural justice and public policy.
Within those limits, the foreign law, substantive and procedural, may be

APP.383

A  harsh, antiquated and unskilfully operated by the foreign court but the
foreign resident must put up with the consequences..

(iii) Our law, faced with a federal system of two networks of local
laws as administered by two sets of local courts, should, if it is to be
consistent, favour that court which will leave the resident visitor in
Illinois subject to the two local networks, both state and federal, to the
same extent as any other resident of Illinois so far as concerns the
B  validity of judgments rendered in the courts of either system, unless
there is some clear reason to do otherwise.

(iv) The limitations of the federal judicial system as it has in fact
been established, which cause the present system to fall short of a fully
realised national judicial system, arise from the history and political
principles which produced them. In other words, a national judicial
C  system has been devised and established in terms in accordance with the
political and social views of the peoples of the states which form the
Union. The checks and limitations are available for the protection and
convenience of the foreign resident as much as for the resident citizen.

(v) In particular, the decision that federal courts shall apply the law
of the forum state does not necessarily alter the fact that the federal
court, in so doing, is doing what it is commanded to do by federal law.
D  Equally, the fact that choice of law rules are not the same in all of the
states, does not necessarily alter the fact that the Supreme Court of
Congress, as the effective authority under the Constitution, has directed
or caused federal courts to continue to apply local choice of law rules as
the law to be applied to cases in the national courts.

(vi) Finally, if in personam jurisdiction is given by United States law
E  to federal courts to be exercised, within the circumstances stated, over
any person or corporation present within the territories of the United
States, the effectiveness of that jurisdiction for the purposes of our
private international law, is not necessarily reduced by the fact that the
jurisdiction is expressed in terms of and limited to the long arm
jurisdiction statutes of the forum state. There is no reason to regard the
in personam jurisdiction of the federal court of any federal state as
F  necessarily impaired, or as relegated to a local status within one state of
the Union, because the federal authorities have seen fit so to express
and limit that jurisdiction.

We have set out the facts and arguments on the country issue at
some considerable length, notwithstanding that our conclusion on the
presence issue is sufficient to dispose of the appeal, because they serve
G  to illuminate a question of general importance which may well arise for
decision in the future. In the event, as we have said, it is unnecessary to
express a final decision on the country issue and in all the circumstances
we think it better not to do so. All we should say is that we all incline to
favour, albeit with varying degrees of doubt, the view that if the
plaintiffs had not failed at the first hurdle, they would on the country
issue have been entitled to succeed.

H

## IV *The natural justice issue*

The assumptions upon which we consider this defence are that our
decision on the presence issue is wrong and that the assumed presence

3:18-cv-00731-X   Document 273-6   Filed 07/30/19   Page 368 of 421   PageID

of Cape/Capasco in Illinois at the commencement of the Tyler 2  A
proceedings rendered them subject to the jurisdiction of the Tyler court
in those proceedings for the purpose of our law of enforcement of
foreign judgments.

The conclusion of Scott J. on the issue of natural justice was
expressed, ante, p. 500G–H:

> "There was, in short, in my opinion, no judicial assessment of  B
> damages. In my judgment, the procedure adopted by Judge Steger
> offended against English principles of substantial justice. The
> defendants were entitled to a judicial assessment of their liability.
> They did not have one. The award of damages was arbitrary in
> amount, not based on evidence and not related to the individual
> entitlements of the plaintiffs. Many of the features of the procedure
> to which I have drawn attention might, taken simply, have been  C
> insufficient to meet the yardstick of substantial injustice. Taken
> together, the criterion is, in my judgment, satisfied."

The facts relevant to the defence of breach of natural justice were
stated in detail by Scott J. and no issue of primary fact has been raised
by either side. [Their Lordships referred to the material facts concerning
the procedure which led to the default judgment of 12 September 1983,  D
substantially in the words of Scott J., and continued:]

*The law applied by Scott J.*

In the view of Scott J. the fundamental criterion for the success of a
natural justice objection to the enforcement of a foreign judgment was
to be found in the judgment of Lindley M.R. in *Pemberton v. Hughes*  E
[1899] 1 Ch. 781, 790, where he said:

> "If a judgment is pronounced by a foreign court over persons within
> its jurisdiction and in a matter with which it is competent to deal,
> English courts never investigate the propriety of the proceedings in
> the foreign court, unless they offend against English views of
> substantial justice. Where no substantial justice, according to English  F
> notions, is offended, all that English courts look to is the finality of
> the judgment and the jurisdiction of the court, in this sense and to
> this extent—namely, its competence to entertain the sort of case
> which it deal with, and its competence to require the defendant
> to appear before it. If the court had jurisdiction in this sense and to
> this extent, the courts of this country never inquire whether the
> jurisdiction has been properly or improperly exercised, provided  G
> always that no substantial injustice, according to English notions,
> has been committed."

Thus in the opinion of Scott J. if the natural justice objection were
to succeed, the proceedings in the foreign court must "offend against
English views of substantial justice:" ante, p. 497F–G. With reference to
that broad criterion he considered the procedure which led to the  H
default judgment of 12 September 1983. The route which led him to his
conclusion on this issue was very briefly as follows: (i) Cape/Capasco
were in default and had forfeited any entitlement to a hearing save on

A   the issue of damages. There was no injustice in that. (ii) Cape/Capasco were given sufficient notice of the application for the default judgment but the application for relief of which notice was given was for a judicial assessment of damages at a judicial hearing. (iii) The effect of the notice given to Cape/Capasco could not be divorced from the context of the Federal Rules for default judgments. Having regard to that context a defendant in default in an action for unliquidated damages in the Tyler

B   court was entitled to expect that his liability to the plaintiff would be assessed by the judge in the light of evidence which the judge had considered and which, in the judge's opinion, justified the award which was made: ante, p. 500A–B.

> (iv) "The requirements of substantial justice in a particular case cannot . . . be divorced from the legitimate expectation of both the plaintiff and the defendant in the context of the procedural rules applicable to the case:" ante, p. 500B

C

> (v) Since there was no judicial assessment of the damages the proceedings offended our principles of substantial justice: ante, p. 500D.
>
> (vi) The fact that the default judgment might have been set aside on application to the judge, or an appeal, because of the breaches of local rules of procedure, did not as a matter of principle make the judgment enforceable notwithstanding the breach of natural justice: ante, p. 501C–E.

D

### Principles not in issue on this appeal: some general observations

E   In the context of the natural justice issue certain principles are common ground and appear to us to be indisputable. The first is that, upon proof of private international law jurisdiction in the Tyler court, Cape/Capasco would have come under an obligation to obey that judgment unless they should be able to impeach it on the ground of fraud, or breach of natural justice, or breach of the requirements of public policy. For the proof of these grounds of defence, all are to be

F   judged in the courts of this country according to the law in force in England and Wales and to the principles of that law. Further, whether any alleged breach of natural justice based on procedural irregularity is such as to render the foreign judgment unenforceable, the courts of this country must have regard to fundamental principles of justice and not to the letter of the rules which, either in our system, or in the relevant

G   foreign system, are designed to give effect to those principles.

The basis of the obligation, which our law would enforce against Cape/Capasco upon proof of jurisdiction in the Tyler court, is that, because Cape/Capasco were present within the territorial jurisdiction of that court at the date of service of the proceedings, the command contained in the document or process served upon them is regarded by our law as validly and effectively made. It would regard Cape/Capasco

H   as obliged to make such answer as they could put forward against the claims of the plaintiffs, and to make it in the Tyler court. If they chose not to make any answer, they would not be permitted to dispute in our courts the judgment of the Tyler court *upon the merits*. Subject to the

defences of fraud, breach of natural justice, and public policy,    A
Cape/Capasco would be liable upon the judgment.

It is clear that a corporate defendant, and those called upon to
advise it, may thus be placed in great difficulty by the working of our
rules of private international law. The directors of a defendant
corporation may reasonably believe, upon competent advice, that the
corporation was not, at the date of service of the proceedings present
within the jurisdiction of the foreign court. If they are right, they can    B
safely ignore the proceedings so far as concerns the assets of the
corporation within the jurisdiction of our courts. If they are wrong—and
the judgments of Scott J. and of this court show that the question may
be of considerable complexity—they may be sued in this country upon a
judgment which cannot be questioned as to the merits and substance of
the decision upon which the judgment is based. In particular, with    C
reference to the quantum of a judgment, whether for damages for tort
or for breach of contract, the corporate defendant is placed in difficulty.
Not infrequently plaintiffs, who are claiming damages, exaggerate their
injuries and their losses. When the defendant does not appear, and no
evidence is presented to answer the plaintiff's case, the court, which has
the task of assessing damages, can normally do no more than consider
the evidence put before it and base the assessment upon that evidence.    D
In adversarial systems, the court cannot normally do more in investigation
of the claims, or call for further evidence, and it is under no obligation
to do so. In particular, according to our law, a defendant corporation
which denies that it is subject to the jurisdiction of the foreign court,
could not effectively continue to dispute that jurisdiction while taking
part in the assessment of a damages claim because, if it did so take part,    E
it would thereby normally submit to the jurisdiction of the foreign court
and render itself liable to be sued in this country upon that judgment. In
the result, if the corporation is to be able effectively to maintain its
contention that it was not subject to the jurisdiction of the foreign court,
it must leave the plaintiff there to present a wholly uncontested claim
(as the defendants did in the present case). It will have no defence to an
action upon the ensuing judgment, if it is held by the courts of this    F
jurisdiction to have been in fact subject to the jurisdiction of the foreign
court, unless it can rely upon fraud, breach of natural justice or public
policy.

The plaintiff, too, in such a case may face the risk of an unjust
result. The defendant may have no answer on the merits to the plaintiff's
claim, and the judgment as entered in default may be in amount wholly
in accordance with substantial justice. Yet if, through no personal fault    G
of the plaintiff, the defendant can point to a sufficient breach of our
principles of natural justice simply in the procedure by which the
judgment was obtained, the plaintiff can recover nothing on the
judgment. He may, if the procedure of the foreign court permits him to
do so, start again at some point in the existing proceedings and continue
in a way which avoids the procedural defect. If the wrong is actionable    H
in this country, and the claim is not statute-barred here, he could sue
here. What he cannot do is to enforce the foreign judgment here to the
extent that it is unobjectionable and claim the assistance of our courts as

A   to the rest, unless, perhaps, some part of the judgment is clearly severable and unaffected by the defect in procedure. Thus, in these proceedings, upon the assumption that Cape/Capasco were present within the jurisdiction of the Tyler court, it would not be open to this court to enter judgment for the plaintiffs for damages to be assessed under the procedures of our court, although such an order would, if the plaintiffs cannot effectively start again in the Tyler court, get closer to

B   substantial justice than dismissal of their claims. Nor was it suggested that this court could direct that judgment be entered for the plaintiffs on liability, with a direction that the plaintiffs be at liberty to apply to enter judgment for such amount as may hereafter be assessed by the Tyler court. These are partial or alternative remedies which could only be provided by the terms of a statute, presumably to be based upon a

C   treaty or convention. The position therefore is that, if through the adoption of the procedure by which Judge Steger directed judgment to be entered for these 206 plaintiffs, there occurred a denial of the requirements of substantial justice, the plaintiffs would fail entirely although (as we assume for present purposes) Cape/Capasco were properly subject to the jurisdiction of the Tyler court. If, on the other hand, there was no such denial according to the established principles of

D   our law, then Cape/Capasco (on the same assumption) would be held liable for the full amount of the judgment notwithstanding the forceful objections of Cape/Capasco to the manner in which the Tyler court left so much of the assessment of the plaintiffs' claims to counsel acting for those plaintiffs.

E   *The plaintiffs' submissions on natural justice*

Mr. Falconer's submissions for the plaintiffs may be summarised as follows.

1. The natural justice defence has been limited by authority binding upon this court to lack of notice and denial of proper opportunity to be heard: see *Jacobson v. Frachon* (1928) 138 L.T. 386. The underlying

F   basis or reason for this limitation is that our law requires only that the judgment debtor be afforded by the foreign court a fair trial or the opportunity for a fair trial if the defendant chooses to take it. If the defendant is shown to have been deprived irremediably of a fair trial then the judgment is unenforceable here.

2. The defendant will be held to have been irremediably deprived of a fair trial by reason of defective procedure in two cases: (i) if the rules

G   of procedure of the foreign court are themselves by our standards unfair, because, in that case, there can be no prospect of the foreign court correcting what has been done under its rules; and, (ii) if the rules of procedure of the foreign court are by our standards fair; and the defective procedure was caused by departure from those rules, but it is impossible or impracticable for the defect to have been corrected within the foreign system: e.g. because the defendant only learned of the

H   judgment too late to advance an effective appeal or procedure for setting the judgment aside.

3. If the procedural defect was reasonably capable of remedy within the procedure of the foreign court, whether by application to set aside

**Adams v. Cape Industries Plc. (C.A.)**                    **[1990]**

the judgment, or by appeal, the defendant is not released from the    A
obligation to obey the judgment by reason of the procedural defect
because, being subject to the jurisdiction of the foreign court, he may
properly be required to have resort to the remedies provided by the
foreign system.

4. The basis and substance of those submissions for the plaintiffs
were said to be in accordance with justice, with practicality and with the
principles of our law in that (i) our law recognises that all courts make    B
procedural mistakes: the fact that a mistake is made, for which the
foreign court's procedure provides a remedy, should not release the
defendant who chooses not to avail himself of the remedy; (ii)
the argument is based upon the connection between the foreign court
and the defendant created by the voluntary act of the defendant in being
present within the foreign jurisdiction, or by submission thereto, etc.;    C
(iii) it is desirable that our courts should not be required to act as a
court of error for the examination and assessment of procedural defects
within the foreign system for which that system provides an effective
remedy; (iv) the submissions provide a framework of reasonable certainty
and clarity for the decision of pleas of breach of natural justice. By
contrast, the "broad criterion" applied by the judge, is too wide and too
uncertain a test.    D

5. The reliance placed by Scott J. on "legitimate expectation" was
unjustified. There had been no actual expectation on the part of
Cape/Capasco nor any reliance upon any expected form of procedure.
Nothing to that effect had been pleaded or proved. This concept of
legitimate expectation amounted, it was said, to no more than the
assertion that a defendant is entitled to expect that, in the conduct of    E
the proceedings in the foreign court, that court will correctly apply its
own procedure and that, if it does not, a sufficient breach of natural
justice is demonstrated. (We will refer to the submissions summarised in
this paragraph as "the legitimate expectation point.")

6. Upon the evidence and upon the findings of Scott J. the procedural
rules applicable in the Tyler court were fair and just. The defendants
could have applied to set aside the judgment on the grounds that the    F
procedure for the assessment of damages was irregular under the
relevant rules and such application would have been allowed if made in
due time. Further, an appeal to the Circuit Court was open to
Cape/Capasco. Since they took no step to correct the procedural defect,
and the consequences of it, they cannot rely upon it as a defence in
these proceedings.    G

*The defendants' submissions on natural justice*

To these submissions Mr. Playford for Cape/Capasco replied by
contending that Scott J. was right in his conclusion for the reasons which
he gave. Further, if it should appear to this court that the defendants
could not impeach the judgment on the ground of a procedural defect
which was capable of remedy within the system of the federal courts,    H
then it was said that the defendants did not know in time of the
procedural defects and could not reasonably be required or expected to
have sought such remedy there.

APP.389

A
*The decision in Jacobson v. Frachon*

A number of decisions were cited to us in the context of the natural justice issue. However, the most important of them was *Jacobson v. Frachon*, 138 L.T. 386, because it was said on behalf of the plaintiffs to establish legal principles which are binding on this court and render the natural justice defence unsustainable on the present facts by limiting that

B
defence to lack of notice and denial of proper opportunity to be heard. Furthermore, it was common ground that this is the only case in which the Court of Appeal has considered points relevant to the questions raised in this case under the heading of the natural justice issue.

In *Jacobson v. Frachon*, this court applied rigorously the principle that our courts will not impeach the judgment of a foreign court having competent jurisdiction on its merits. However, the crucial passage in

C
that case particularly relied upon by Mr. Falconer was a statement of Atkin L.J., who, after referring to the judgment of Lindley M.R. in *Pemberton v. Hughes* [1899] 1 Ch. 781, 790, said, at p. 392, that a judgment could be impeached "if the proceedings, the method by which the court comes to a final decision" are contrary to English views of substantial justice, and continued:

D
"The Master of the Rolls seems to prefer, and I can quite understand the use of the expression, 'contrary to the principles of natural justice;' the principles it is not always easy to define or to invite everybody to agree about, whereas with our own principles of justice we are familiar. *Those principles seem to me to involve this, first of all that the court being a court of competent jurisdiction, has*

E
*given notice to the litigant that they are about to proceed to determine the rights between him and the other litigant; the other is that having given him that notice, it does afford him an opportunity of substantially presenting his case before the court.* Both those considerations appear to be essential if they are to be in accordance with natural justice." (Emphasis added.)

F
We have had the benefit of very careful and detailed analyses in argument of the judgments in *Jacobson v. Frachon*. We intend no disrespect to such arguments if we do not prolong an already very long judgment (in which we have already decided that the defendants succeed on the presence issue) by recapitulating these analyses. We will summarise our conclusions in relation to *Jacobson v. Frachon*, 138 L.T.

G
386, as follows.

(1) Atkin L.J. in his judgment was not attempting to make an exclusive or comprehensive statement of the circumstances in which our courts will treat the procedure adopted by a foreign court in reaching its decision as offending against the principles of natural justice.

(2) Lord Hanworth M.R. was clearly of the view, at p. 390, which we share, that the requirements of due notice and proper opportunity to

H
be heard will, in the majority of cases which can be expected to arise, sufficiently comprise the concept of natural justice in a procedural context, but he prudently qualified his statement by saying that they "almost, if not entirely" comprise it.

APP.390

(3) We therefore reject the contention that the decision of this court      A
in *Jacobson v. Frachon* restricted the defence of breach of procedural
natural justice to the requirements of due notice and opportunity to put
a case. Scott J. was entitled, in our view, to direct himself by reference
to the test stated by Lindley M.R. in *Pemberton v. Hughes* [1899] 1 Ch.
781, 790, and to consider whether the procedural defect alleged by Cape
was such as to constitute a breach of an English court's views of
substantial justice. The point was not concluded against the defendants      B
merely because they had been given proper notice of the application for
default judgment and would, if they had attended, have been allowed
full opportunity to put their case.

(4) However, this court in *Jacobson v. Frachon*, 138 L.T. 386, was
not required to consider the relevance, if any, of any remedy which
might have been available to Jacobson under the French legal system,          C
whether by way of appeal or by application for the judgment to be set
aside, if the hearing in the French court had itself constituted a breach
of natural justice.


*"No judicial assessment of damages"*

The next question is whether, as Scott J. considered, the "method by          D
which the Tyler court came to its final decision," to use Atkin L.J.'s
words, was contrary to our views of substantial justice on the grounds
that there had been no judicial assessment of damages.

We have found this to be a matter of difficulty. We have, although
well aware of its limited nature, some general knowledge of the working
of the system of civil justice in the federal courts of the United States;    E
and we are aware that it is a system which has been developed by
judges of great distinction and learning, and subjected to continuous and
searching examination and comment both by the legal profession and by
academic lawyers of similar distinction and learning. Scott J. expressed
his view that the system of civil justice evidenced by the Federal Rules
and explained by the witnesses was an unimpeachable system of justice
within one of the great common law jurisdictions of the world and was         F
plainly in accordance with the requirements of natural justice. We make
the same respectful acknowledgement. But, as Scott J. pointed out, the
defendants made no criticism of that system of justice. Their complaint
was that, at the invitation of the plaintiffs' counsel, Judge Steger did not
proceed in accordance with it.

We recognise, further, that the federal courts have been required to          G
determine, and to develop methods for the effective control and
management of, civil litigation in product liability cases in which large
numbers of plaintiffs have made claims against numerous defendants
arising out of similar classes of injury and having broadly similar
consequences but with differing degrees of severity. We have had some
experience in this country of such litigation but in smaller volume. Our
own procedures have to an extent been modified to deal with the               H
preparation and settlement of such cases but we have not, to the same
extent, developed the techniques of a class action or the role of the
judge in procuring settlements. We are aware that our present system

A   has been subjected to criticism in having failed, as it has been said, to respond sufficiently to the requirements of such litigation.

The circumstances of 206 plaintiffs making claims based upon a common cause of injury were, as it seems to us, directly relevant to the method of decision adopted by Judge Steger without objection by the plaintiffs' counsel. The purpose was, as we infer, to avoid the private costs and public expenditure of court time which would have been

B   necessary if there had been either individual judicial assessments or judicial assessment by reference to groups based upon evidence directed to the individual cases. The method was adopted for proper purposes. We accept, as submitted by Mr. Falconer, that Judge Steger had knowledge and experience of Mr. Bailey and the other counsel and that Judge Steger must have reposed trust in those counsel to act properly in

C   the matters left by the judge to them. Mr. Falconer submitted that there was nothing inherently objectionable, according to our standards of substantial justice, in a court leaving to the plaintiffs' lawyers the fixing of figures for individual plaintiffs after the court has indicated an average basis of award for all plaintiffs.

In reply to that contention Mr. Playford pointed out that the indication by Judge Steger of an average basis of award for all plaintiffs

D   was based on nothing in the way of evidence as to the fair sums due for compensation for any of them. It may be that an average figure for settlement of such claims was known by the judge to be $75,000 but that provided no basis for a holding that the condition of these 206 plaintiffs was such as to justify a total award of $15.45m. or any other total award. If the judge had had before him, and had considered, evidence,

E   perhaps from one expert, to the effect that, by reference to the listed apparent injuries suffered by the plaintiffs, they properly belonged in certain categories of gravity of injury; and if he had, by reference thereto, estimated a figure for general damages for each category; and, then, by reference to the numbers of plaintiffs in each category calculated a total award which would be fair to the defendants, we could see no valid objection, which the defendants could have put forward, if the

F   judge had then left it to plaintiffs' counsel to allocate precise sums within the total award to individual plaintiffs. But we agree with Mr. Playford's submission that that was not what happened. The defect in the procedure adopted was, as Scott J. found, that the total award was not in any real sense based upon an objective assessment by the judge upon evidence as to the condition of these plaintiffs.

G   It seems to us that, in truth, Judge Steger was applying to the process of assessment of damages in default, when only the plaintiffs were represented before him, the process and technique appropriate to a settlement negotiated between both the plaintiffs and defendants with the intervention of the judge. If we understand the position properly, the only basis upon which Judge Steger, as the judge responsible for assessment of the damages, could assert, without knowledge of the

H   evidence relating to the 206 plaintiffs, that $120,000 average, $24.72m. total, was too high a figure, and that $75,000 average, $15.45m. total, was a proper figure, was that, if the defendants had been present and taking part, they would in probability have refused to settle for $24.72m.,

so as to avoid the risk of having to pay more after individual assessment, but would, in probability, have agreed to pay $15.45m. so as to avoid that risk. If that was the basis of his decision, there is nothing to show that he was in fact wrong upon the hypothesis upon which he acted and nothing to show that he was right; but, as Scott J. observed, ante, p. 56xxx, while damages calculated on an average per plaintiff basis may make very good sense for the purposes of a settlement, because defendants are not concerned with how the total will be divided up, a judicial award so calculated is the antithesis of an award based upon the individual entitlements of the respective plaintiffs.

Mr. Playford referred us to authority in order to demonstrate what he said should be regarded as the essential requirements of a court "acting judicially," and, in support of the proposition that it is part of the requirements of natural justice that the judgment of a foreign court, which is rendered for enforcement, be reached by that court "acting judicially." He referred in particular to *Local Government Board v. Arlidge* [1915] A.C. 120 and in particular to passages in the speech of Viscount Haldane L.C. at p. 132, of Lord Shaw of Dunfermline, at p. 138, of Lord Parmoor, at p. 142, and of Lord Moulton, at p. 150. That case was concerned with the validity of a closing order under section 17 of the Housing, Town Planning etc. Act 1909 and with the procedure on appeal to the Local Government Board. An example of the statements relied upon is that of Lord Parmoor, at p. 142:

> "Whether the order of the Local Government Board is to be regarded as of an administrative or of a quasi-judicial character appears to me not to be of much importance, since, if the order is one which affects the rights and property of the respondent, the respondent is entitled to have the matter determined in a judicial spirit, in accordance with the principles of substantial justice."

In our view, no significant assistance is to be derived from this case, or other decisions upon the requirements of natural justice in administrative law cases, where the requirements of substantial fairness depend upon the subject matter and the context. It is sufficient, in our view, to derive the requirements of natural justice for the purposes of enforcement of a foreign judgment and the special defence thereto of breach of natural justice from the principles stated in *Pemberton v. Hughes* [1899] 1 Ch. 781 and relied upon by Scott J., namely: did the proceedings in this foreign court offend against our views of substantial justice?

The notion of substantial justice must be governed in a particular case by the nature of the proceedings under consideration. The purpose of an in personam monetary judgment is that the power of the state through the process of execution will take the defendant's assets in payment of the judgment. In cases of debt and in many cases of contract the amount due will have been fixed by the acts of the parties and in such cases a default judgment will not be defective for want of judicial assessment. When the claim is for unliquidated damages for a tortious wrong, such as personal injury, both our system and the federal system of the United States require, if there is no agreement between the

A  parties, judicial asessment. That means that the extent of the defendant's
obligation is to be assessed objectively by the independent judge upon
proof by the plaintiff of the relevant facts. Our notions of substantial
justice include, in our judgment, the requirement that in such a case the
amount of compensation should not be fixed subjectively by or on behalf
of the plaintiff.

B      We do not find it necessary to decide whether, if the local rules
provide for service by the plaintiff of notice of a specific sum claimed for
damages, a default judgment may be entered for such a sum without
proof of judicial assessment and without there being breach of any
requirement of natural justice. Scott J. thought that there could be no
objection to such procedure and we think that in most cases that would
be right. The matter does not arise for decision in this case and we
express no concluded view. We would however not exclude the possibility
C  of a defence being upheld if the facts justified the conclusion that,
making due allowance for different levels of awards and of substantive
law, the amount of the actual award was irrational.

       Mr. Falconer relied upon Scott J.'s finding that there would be no
breach of natural justice in proceedings for a default judgment for
unliquidated damages if judgment were entered for the specific sum
D  claimed by the plaintiff. It was submitted that such a claim had in effect
been made by the 205 plaintiffs in these proceedings because their
pleading placed a limit upon the damages claimed in the sum of $100m.
We see no force in that point. The maximum of $100m. would, as we
understand it, prevent the court from entering judgment for any larger
sum but there is nothing to show that the limit was intended to mean, or
E  would be understood by any person familiar with procedure in the
federal courts as meaning, that the $100m. represented a sum which the
plaintiffs asserted to be the total of their estimated claims and for which
the court would be empowered to give judgment without proof of the
amount of injury and loss suffered.

F  *The "legitimate expectation" point*

       At first sight there appeared to us to be some force in Mr. Falconer's
criticism of the relevance of this concept in this case. It was accepted by
Mr. Playford that reliance by the defendants had not been pleaded or
proved with reference to any subjective expectation on their part that
the assessment of damages on the application for the default judgment
would proceed according to any particular method. We would also
G  accept that the adoption of a particular method of assessment of
damages by the foreign court, would not per se amount to an effective
defence, as a breach of natural justice under our law, merely because it
was shown that, by reference to the procedural rules of the foreign
court, the defendant might (on an objective basis) reasonably have
expected that a different method would be used. So to hold would be to
introduce, under the concept of reasonable expectation, a rule that
H  breach by the foreign court of its own rules of procedure renders the
foreign judgment unenforceable as offending our concepts of substantial
justice. It is clear law that mere procedural irregularity, on the part of
the foreign court and according to its own rules, is not such a ground of

APP.394

**Adams v. Cape Industries Plc. (C.A.)**                    **[1990]**

defence. *Pemberton v. Hughes* [1899] 1 Ch. 781 itself was an example of    A
mere procedural irregularity.

In our view, however, Scott J. did not so regard or use the point of
reasonable expectation. He made reference to it in dealing with the
question whether what had happened amounted to a breach of the
requirements of substantial justice, and after reference to the fact that
the rules of a court might, in his view, without offending those
requirements, provide for the giving of notice of the plaintiffs' estimate    B
of the recoverable damages and the entry of a default judgment for that
amount in the absence of opposition on the part of the defendant. The
question was to be decided, in the view of Scott J., by reference to the
context in which the alleged procedural defect had occurred. He was, in
our view, not in error in this regard. The fact was that the system of
legal procedure in which Judge Steger had signed the default judgment    C
had not contained any provision for converting an unliquidated damages
claim to a potentially fixed sum for the entry of a default judgment. His
reference to the fact that the defendant in a default action was entitled
to expect that his liability to the plaintiff would be assessed by the judge
on the evidence was not a reference to actual expectation on the part of
these defendants but to the requirements of natural justice against the
background of a system which contains no such provision.                      D

We therefore conclude that the defendants have demonstrated, as
Scott J. held, that the method by which Judge Steger came to a decision
as to the amount of the default judgment was by itself contrary to the
requirements of substantial justice contained in our law. If that fact is
regarded as a sufficient and conclusive description of the proceedings of
the Tyler court then, according to the judgment of Atkin L.J. in    E
*Jacobson v. Frachon*, 138 L.T. 386, 390, that finding would serve to
invalidate the judgment. But, as noted above, the Court of Appeal in
*Jacobson v. Frachon* was not required to consider whether, as Mr.
Falconer submits, an opportunity to correct such a defect, provided by
the foreign system of procedure, may either cause such a defect to cease
to be in our law an effective breach of natural justice or, if there is any
difference, cause the defendant to be unable to rely upon it for purposes    F
of impeaching the judgment.

*Requirement of use of remedy in foreign court*

Mr. Playford submitted that proof of this defect in the proceedings of
the Tyler court is a conclusive defence for the defendants, and he
submitted that it is just that it should be so. It is not exorbitant, he said,    G
to require that a default judgment, designed and intended for enforcement
in this country, should comply with so basic a principle as that the
amount of a judgment for personal injuries be fixed in substance by the
court upon the evidence and not in substance by the plaintiff. No
authority establishes, he said, the requirement of use by a defendant of
any local remedy.

We accept that no authority binding this court has been cited to us    H
establishing the proposition for which Mr. Falconer has contended. It is
at least clear that our law does not oblige a defendant who can show
that a foreign judgment has been obtained by fraud to have used any

A    available remedy in the foreign court with reference to that fraud if he is successfully to impeach that judgment in our courts: see *Abouloff v. Oppenheimer & Co.* (1882) 10 Q.B.D. 295 and *Jet Holdings Inc. v. Patel* [1990] 1 Q.B. 335. The position may well be the same in cases where there has been a breach of natural justice of the two primary kinds considered by Atkin L.J. in *Jacobson v. Frachon,* 138 L.T. 386, 392, namely, absence of notice of the proceedings or failure to afford the

B    defendant an opportunity of substantially presenting his case.

In this judgment, however, we are dealing with a case where, although there was in our view a departure from the basic principles of natural justice in the assessment of the amount of a default judgment, nevertheless (a) the error which led to this departure was an honest error on the part of all concerned; (b) the defendants had proper notice

C    of the proceedings and could have presented their case on its merits if they had chosen to do so, but chose not to do so; (c) the procedural rules applicable in the Tyler court were themselves fair and just; (d) the defendants had the right to apply to set aside the judgment on the grounds that the procedure for the assessment of damages was irregular under the relevant rules and such application would presumably have been allowed if made in due time.

D    Against this background, we are not persuaded that possession of and failure to exercise this right by the defendants can be disregarded as being wholly irrelevant in determining whether the proceedings in the Tyler court, which we think must be viewed as a whole, offend against English views of substantial justice, within the principles stated by Lindley M.R. in *Pemberton v. Hughes* [1899] 1 Ch. 781, 790, as the

E    plaintiffs would submit.

It is well established that a defendant, shown to have been subject to the jurisdiction of a foreign court, cannot seek to persuade our court to examine the correctness of the judgment whether on the facts, or as to the application by the foreign court of its own law or, when relevant, of the law of this country. A foreign judgment is not impeachable merely because it is "manifestly wrong:" *Godard v. Gray,* L.R. 6 Q.B.

F    139; *Castrique v. Imrie* (1870) L.R. 4 H.L. 414 and *Robinson v. Fenner* [1913] 3 K.B. 835, 842. In any such case it could be said that there has been a breach of natural justice, but it is not a type of breach which our courts will consider relevant. In effect, their attitude is that the only way in which the defendant can seek to correct an error of substance made by the foreign court is by using such means for correction of error as

G    may be provided under the foreign system.

This being the position where there has been an error of substance, it would, in our judgment, be anomalous if our courts were obliged wholly to disregard the existence of a perfectly good remedy under a foreign system of procedure in considering whether the defective operation of that procedure has led to a breach of natural justice. And, indeed, from some of the cases on procedural defects, support can be

H    derived from the proposition that, at least with reference to defects known to the defendant before judgment, the defendant can be required to have made use of any remedy available in the foreign court: see, for example, *Reynolds v. Fenton* (1846) 16 L.J.C.P. 15 and *Crawley v.*

*Isaacs* (1867) 16 L.T. 529, see particularly at p. 531, where Bramwell B.  **A**
said (obiter):

> "If the proceedings be in accordance with the practice of the foreign
> court, but that practice is not in accordance with natural justice, this
> court will not allow itself to be concluded by them, but on the other
> hand, if the procedure be in accordance with natural justice, the
> foreign court itself will interfere to prevent the plaintiff taking  **B**
> advantage of the judgment irregularly and improperly obtained."

Mr. Falconer relied strongly not only on that passage but on dicta of
Fry J. in *Rousillon v. Rousillon*, 14 Ch.D. 351, 370, and of Bray J. in
*Jeannot v. Fuerst* (1909) 100 L.T. 816, 818.

Since the ultimate question is whether there has been proof of
substantial injustice caused by the proceedings, it would, in our opinion,  **C**
be unrealistic in fact and incorrect in principle to ignore entirely the
possibility of the correction of error within the procedure of a foreign
court which itself provides fair procedural rules and a fair opportunity
for remedy. The court must, in our judgment, have regard to the
availability of a remedy in deciding whether in the circumstances of any
particular case substantial injustice has been proved. However, the  **D**
relevance of the existence of the remedy and the weight to be attached
to it must depend upon factors which include the nature of the
procedural defect itself, the point in the proceedings at which it occurred
and the knowledge and means of knowledge of the defendants of the
defect and the reasonableness in the circumstances of requiring or
expecting that they made use of the remedy in all the particular
circumstances.  **E**

We return then to the circumstances of this case, of which the most
relevant seem to us to be the following. First, the defendants who, for
present purposes, we assume were subject to the jurisdiction of the
Tyler court, were duly served with the proceedings; they chose to take
no part in them; they were given notice of the application for the default
judgment; they chose not to attend the hearing of that application; and
they were thereafter served with the default judgment.  **F**

Secondly, on service of the judgment, the defendants knew the
amount of the award to each plaintiff. It seems that they could have
obtained access to the medical records as to each plaintiff referred to in
the judgment, and advice as to the question whether, upon such
material, the awards appeared excessive according to the law in the
Tyler court.  **G**

Thirdly, by not attending the application for the default judgment,
the defendants deprived themselves of information as to what occurred
before the court. If they had attended before Judge Steger, the nature
of the proceedings would have been largely apparent. The proceedings
took place in public before the judge, and, at least so far as concerned
the facts that there was no evidence received by the judge in court on
the hearing and no arguments presented to the court, the defendants  **H**
would have discovered those facts.

Fourthly, it would have been open to them to apply for the judgment
to be set aside if they had formed an intention to contest the amount of

A   the awards. It seems to us to be probable at least that, since the method
of assessment adopted by Judge Steger was contrary to the Federal
Rules, an application of this nature made promptly to the Tyler court
would have succeeded.

Fifthly, however, the defendants, when the judgment was served
upon them, could not and did not know the method by which damages
had been assessed from anything stated in the judgment. The recitals in
B   the judgment were, as Scott J. held, false and misleading: there had
been no hearing at which damages had been assessed. The facts as to
what happened in the Tyler court became known to the defendants at
latest when evidence was given in the proceedings before Scott J. There
was, as we understand it, no evidence from the defendants directed to
the question when they first had knowledge of the method adopted by
C   Judge Steger for assessing damages. There is, however, nothing to
indicate that they were aware of the method adopted at any time before
the date when, after claims were made on them in this country on the
basis of the default judgment, the circumstances in which the judgment
was made were investigated for the purposes of these proceedings.

D   *Conclusion on the natural justice issue*

Giving full force to all these facts, we find it impossible to say that,
because the defendants did not apply to set the default judgment aside,
they could not rely upon the substantial injustice in the proceedings
constituted by the failure of the court to assess the damages judicially upon
the evidence. They did not wish to dispute the amount of the damages
award by presenting a case to the Tyler court. We cannot have regard, as
E   an excuse available to them, to the reason why they chose not to appear,
namely their unwillingness to submit to the jurisdiction of the Tyler court.
However, it cannot, in our view, be required of them that they should
have applied to the Tyler court to contest the amount of damages awarded
when they were necessarily content to leave the amount of the damages to
be assessed by the court. The only complaint which the defendants could
F   thereafter make would be as to procedural irregularity. As to that, as we
have stated, they had at the time of service of the judgment no knowledge.
The defendants were not told before the application for the default
judgment that plaintiffs' counsel intended to invite Judge Steger to accept
the view of plaintiffs' counsel as to the total value of the claim, based upon
an average of $120,000 per plaintiff, and that the plaintiffs would accept in
G   substitution for the assessment of the damages by the judge, such counter-
proposal based upon an average sum per plaintiff as the judge might be
minded to make, from his general knowledge of the proceedings and of the
settlement in the Tyler 2 proceedings to that date and from his knowledge
of national average settlement figures in asbestosis cases.

The fact that information as to the procedural defect would probably
have emerged if Cape had made an application to set the default judgment
H   aside on other grounds, seems to us to be of no relevance. Cape are not to
be treated as having information which they did not have because, if they
had made an application which they had no reason to make, they could
have obtained that information.

Adams v. Cape Industries Plc. (C.A.)                                      [1990]

A harsh but accurate summary of what happened is, in our judgment,   **A**
that those acting for the plaintiffs failed to give prior notice to the
defendants of the unusual course which they intended to pursue; they
chose not to try to prevent Judge Steger from adopting that method of
assessment; and they drew up and served a form of judgment which did
not reveal what had taken place. That was all done in good faith. There
was no dishonest purpose. But the effect upon the defendants was, in our
view, that they had at no material time knowledge of any basis for seeking   **B**
relief from the Tyler court in respect of the defect which Scott J. rightly
held to have been demonstrated by them to have occurred in the
proceedings in the Tyler court.

The only basis for attributing to the defendants constructive knowledge
of the defect, upon which they could reasonably be required to have used
any available remedy in the Tyler court, would be that a defendant who   **C**
has been given notice of the proceedings will be fixed with knowledge of
everything which he would have learned if he had attended those
proceedings. That, in our judgment, is not an acceptable basis for
considering proof of procedural injustice. Plaintiffs can, we think fairly be
left to avoid such procedural errors as will prevent enforcement of a
judgment in this country.

Accordingly, on the natural justice issue, although for somewhat   **D**
different reasons, we would uphold the decision of Scott J.

### V Conclusion

In the result, while we have some doubts as to whether the judge
reached the right conclusion on the country issue, we are satisfied that he
reached the right conclusions on the presence issue and the natural justice   **E**
issue. He was accordingly right, in our judgment, to dismiss the plaintiffs'
claims and this appeal likewise must be dismissed.

Finally, we acknowledge our debt to all counsel on both sides for the
great assistance which they have given us in this interesting but exceptionally
difficult case.

*Appeal dismissed with costs.*   **F**
*Leave to appeal refused.*

24 October 1989. The Appeal Committee of the House of Lords (Lord
Keith of Kinkel, Lord Griffiths and Lord Ackner) dismissed a petition by
the plaintiffs for leave to appeal.

*Solicitors: Nabarro Nathanson; Davies Arnold & Cooper.*   **G**

A. R.

**H**

# EXHIBIT H

A    elsewhere explained in detail, for reasons which it is unnecessary for me to repeat in the present case, why, on the basis of a line of established authority, I am at present inclined to the opinion that an injunction has generally been granted in such circumstances for the purpose of protecting the English jurisdiction, and why I doubt, with all respect, whether the speech of my noble and learned friend, Lord Scarman, in *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557, contains the

B    last word on the subject. I refer, in this connection, to my judgment in *Bank of Tokyo Ltd. v. Karoon* (Note) [1987] A.C. 45.

     Even so, I can see no basis for the grant of an injunction in the present case. In particular, in agreement with my noble and learned friend Lord Brandon of Oakbrook, and respectfully differing from Hobhouse J. and the Court of Appeal, I do not consider that the grant

C    of the injunction can be justified as necessary to protect the English jurisdiction on the facts of the present case. In this, I find myself entirely in agreement with the reasons expressed in the speech of my noble and learned friend, Lord Brandon of Oakbrook. I therefore agree that the appeal should be allowed.

*Appeal allowed with costs.*

D

   *Solicitors: Clyde & Co.; Herbert Smith & Co.*

J. A. G.

E

———————

NOTE

F

[COURT OF APPEAL]

BANK OF TOKYO LTD. v. KAROON AND ANOTHER

1984   April 3, 4, 5;             Ackner and Robert Goff L.JJ.

G      May 24

*Injunction—Jurisdiction to grant—Foreign proceedings—Interpleader proceedings to determine ownership of money held by bank in England—Bank's subsidiary in New York providing information concerning claimant and his accounts—Claimant bringing proceedings in New York against subsidiary—Whether bank entitled to injunction to restrain proceedings in New York*

H

APPEAL from Bingham J.

     In 1983 Mr. Majid Karoon started proceedings in New York against the Bank of Tokyo Ltd., a Japanese bank carrying on business in London, and also against a wholly-owned subsidiary of that bank, the Bank of Tokyo Trust Co.

(B.T.T.C.). The bank applied to the High Court in London for an order        A
preventing Mr. Karoon from continuing that action. On 7 November 1983
Bingham J. refused to order Mr. Karoon to discontinue his action against
B.T.T.C. but did order that he be restrained from continuing against the bank.

The bank appealed against that part of the order relating to B.T.T.C. The
grounds of their appeal, contained in a notice dated 18 November 1983, were
that (1)(i), in relation to Mr. Karoon's claim against B.T.T.C., the judge had
failed to give sufficient consideration to the facts that (a) the New York action    B
involved litigation of the matter already ordered to be determined in the trial of
an interpleader issue brought by the bank in the High Court regarding the true
ownership of the relevant moneys, (b) the continuation of the New York action
against B.T.T.C. would mean that the bank, contrary to their position as
interpleaders, would acquire an interest in the outcome of the interpleader issue
ordered between Mr. Karoon and his Iranian company, Maritime Co. Ltd., (c)
Mr. Karoon had made no complaint about the use or proposed use by the bank      C
of the information contained in their affidavit dated 20 May 1980 at any time
before the interpleader issue had, with his consent, been ordered, and (d) there
was no apparent difference between the laws of New York and England relating
to bank confidentiality; (ii) the judge failed to give sufficient weight to the
difficulty, inconvenience, undesirability and inappropriateness of entrusting to a
foreign court (with or without a jury) rather than to the English court the
investigation and determination of, inter alia, (a) whether the order of Robert
Goff J. dismissing Mr. Karoon's application made in the course of the           D
interpleader proceedings that no disclosure of the existence of certain sums of
money be made, had been caused by the information set out in that affidavit
and whether he would have reached a different conclusion if such evidence had
not been submitted by the bank, (b) whether, if the interpleader summons had
been struck out as regards the relevant sums of money, the bank would have
refused payment and defended any claim brought against them by Mr. Karoon
for such sums and, if so, what the consequences of such a course of action     E
would have been, (c) other incidental questions of the practice and procedure of
the High Court; (iii) the judge should have held that Mr. Karoon's contention
that the decision of Robert Goff J. was caused by the information in the
affidavit of 20 May 1980 was arguable; (iv) the judge failed to give sufficient
consideration or weight to the nature and amount of the damages which might
be recoverable by Mr. Karoon if any cause of action against B.T.T.C. was
established. (2) The judge should have held that the prosecution of the New     F
York action should be restrained in its entirety because (i) it involved relitigating
matters already determined or in issue in the English proceedings, namely the
propriety of the interpleader summons as regards the relevant moneys, and (ii)
it represented a sanction on the use by the bank of admissible and pertinent
evidence in the English proceedings. (3) The judge should have held that the
injustice to the bank in being sued by Mr. Karoon through the medium of the
bank's wholly-owned subsidiary and/or that it was unrealistic to distinguish     G
between the bank and B.T.T.C in this regard.

The facts are set out in the judgments of Ackner and Robert Goff L.JJ.

The following cases are referred to in the judgments:

*Abidin Daver, The* [1984] A.C. 398; [1984] 2 W.L.R. 196; [1984] 1 All E.R.
    470, H.L.(E.)                                                               H
*Armstrong v. Armstrong* [1892] P. 98
*Atlantic Star, The* [1974] A.C. 436; [1973] 2 W.L.R. 795; [1973] 2 All E.R.
    175, H.L.(E.)
*Bethell v. Peace* (1971) 441 F. 2d 495

A

*Booth v. Leycester* (1837) 1 Keen 579

*British Airways Board v. Laker Airways Ltd.* [1984] Q.B. 142; [1983] 3 W.L.R. 544; [1983] 3 All E.R. 375, C.A.

*Bushby v. Munday* (1821) 5 Madd. 297

*Carron Iron Co. v. Maclaren* (1855) 5 H.L.Cas. 416, H.L.(E.)

*Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557; [1980] 3 W.L.R. 991; [1981] 1 All E.R. 143, H.L.(E.)

B

*Chapman v. Honig* [1963] 2 Q.B. 502; [1963] 3 W.L.R. 19; [1963] 2 All E.R. 513, C.A.

*Christian v. Christian* (1897) 67 L.J.P. 18

*Cohen v. Rothfield* [1919] 1 K.B. 410, C.A.

*Cole v. Cunningham* (1890) 133 U.S. 107

*Distillers Co. (Biochemicals) Ltd. v. Thompson* [1971] A.C. 458; [1971] 2 W.L.R. 441; [1971] 1 All E.R. 694, P.C.

C

*Distin, In re* (1871) 24 L.T. 197

*Ellerman Lines Ltd. v. Read* [1928] 2 K.B. 144, C.A.

*Enoch and Zaretzky Bock & Co.'s Arbitration, In re* [1910] 1 K.B. 327, C.A.

*European Asian Bank A.G. v. Punjab & Sind Bank* [1982] 2 Lloyd's Rep. 356, C.A.

*Fallon v. Calvert* [1960] 2 Q.B. 201; [1960] 2 W.L.R. 346; [1960] 1 All E.R. 281, C.A.

D

*Graham v. Maxwell* (1849) 1 Mac. & G. 71

*Gulf Oil Corporation v. Gilbert* (1947) 330 U.S. 501

*Hyman v. Helm* (1883) 24 Ch.D. 531, C.A.

*Laker Airways Ltd. v. Sabena, Belgian World Airlines* (1984) 731 F. 2d 909

*Lett v. Lett* [1906] 1 I.R. 618

*McHenry v. Lewis* (1882) 22 Ch.D. 397, C.A.

*MacShannon v. Rockware Glass Ltd.* [1978] A.C. 795; [1978] 2 W.L.R. 362; [1978] 1 All E.R. 625, H.L.(E.)

E

*Moore v. Moore* (1896) 12 T.L.R. 221, C.A.

*North Carolina Estate Co. Ltd., In re* (1889) 5 T.L.R. 328

*Peruvian Guano Co. v. Bockwoldt* (1883) 23 Ch.D. 225, C.A.

*Piper Aircraft Co. v. Reyno* (1981) 454 U.S. 235

*St. Pierre v. South American Stores (Gath & Chaves) Ltd.* [1936] 1 K.B. 382, C.A.

F

*Sim v. Robinow* (1892) 19 R. 665

*Smith Kline & French Laboratories Ltd. v. Bloch* [1983] 1 W.L.R. 730; [1983] 2 All E.R. 72, C.A.

*Société du Gaz de Paris v. Société Anonyme de Navigation "Les Armateurs Français", 1926 S.C.(H.L.) 13, H.L.(Sc.)

*Tournier v. National Provincial and Union Bank of England* [1924] 1 K.B. 461, C.A.

G

*Trapp v. Mackie* [1979] 1 W.L.R. 377; [1979] 1 All E.R. 489, H.L.(Sc.)

*Trendtex Trading Corporation v. Credit Suisse* [1980] Q.B. 629; [1980] 3 W.L.R. 367; [1980] 3 All E.R. 721, C.A.; [1982] A.C. 679; [1981] 3 W.L.R. 766; [1981] 3 All E.R. 520, H.L.(E.)

*Tropaioforos, The (No. 2)* [1962] 1 Lloyd's Rep. 410

The following additional cases were cited in argument:

H

*Cook v. Swinfen* [1967] 1 W.L.R. 457; [1967] 1 All E.R. 299, C.A.

*Hadmor Productions Ltd. v. Hamilton* [1983] 1 A.C. 191; [1982] 2 W.L.R. 322; [1982] I.C.R. 114; [1982] 1 All E.R. 1042, H.L.(E.)

*Metall und Rohstoff A.G. v. A C L I Metals (London) Ltd.* [1984] 1 Lloyd's   A
Rep. 598, C.A.
*Portarlington v. Soulby* (1834) 3 My. & K. 104
*X A.G. v. A Bank* [1983] 2 All E.R. 464; [1983] 2 Lloyd's Rep. 535

*Leonard Hoffmann Q.C.* and *D. T. Donaldson* for the Bank.
*N. A. Strauss* for Mr. Karoon.

B

*Cur. adv. vult.*

24 May 1984.   The following judgments were read.

ACKNER L.J.   The respondent, Mr. Karoon, is neither a national of, nor
resident in, this country. He is an Iranian citizen who left Iran at the time of the
revolution in November 1979 and is now living in France. The Bank of Tokyo   C
Trust Co. ("B.T.T.C") is a New York corporation which is a wholly owned
subsidiary of the Bank of Tokyo Ltd. ("B.T."), the appellants, a Japanese bank
carrying on business in London.
On 7 November 1983 Bingham J. refused to grant an injunction restraining
Mr. Karoon from taking any further steps in an action that he had begun in
New York against B.T.T.C., or commencing or prosecuting any other proceedings
relating to the same subject matter before any other court than the English High   D
Court. It is against this refusal that B.T. now appeals. He did however order
that Mr. Karoon be restrained from continuing the proceedings against B.T.,
who had been joined as co-defendants with B.T.T.C. Against this decision
there is no cross-appeal.
The circumstances out of which his claim in the New York action arose
can be shortly stated. Although Mr. Karoon and his wife and children were
able to leave Iran, the rest of Mr. Karoon's family and his wife's family are
still in Iran and he has fears for their safety. From 1961 onwards he was the   E
chief operating officer of an Iranian company called Maritime Co. Ltd.
("Maritime") in which he owned nearly all the shares. Maritime carried on a
shipping business. For some years prior to his departure from Iran he
maintained a personal bank account with B.T.T.C. He also maintained both
a personal and a company account with B.T. Following his departure from
Iran, Mr. Karoon transferred approximately $685,000 from his personal
account with B.T.T.C. to his personal account with B.T. He also instructed   F
B.T. to transfer all money from the company account to his personal account.
In February 1980 B.T. received a letter from Maritime in Iran to advise
them that on 3 February 1980 Mr. Karoon had been sentenced in absentia to
10 years' imprisonment and that his property and the company's had been
taken over by the Government of Iran. B.T. was asked to transfer all
balances to Iran. B.T. responded to the effect that all the company's accounts
had been closed prior to their receipt of this letter, upon the instructions of   G
the accounts sole signatory (Mr. Karoon), and that under English law it
would be a breach of confidence to make any disclosure regarding a
customer's personal affairs without his prior authorisation. They also advised
Mr. Karoon of their receipt of this letter and their response. He thereupon
instructed them to transfer funds they were holding to an account which he
maintained with another bank. B.T. was concerned with its position. If it did
not carry out his instructions, it might be liable to him. On the other hand, if   H
it did carry out his instructions, it might be liable to those now in charge of
Maritime. Accordingly, on 21 March 1980, B.T. issued an interpleader
summons to determine whether the money which it held was payable to Mr.
Karoon or to Maritime.

A        On 15 April 1980 Mr. Karoon issued a summons to strike out the interpleader proceedings under R.S.C., Ord. 18, r. 19. In his affidavit he swore, inter alia:

> "On 3 December 1979 I remitted U.S. \$685,800 of my own money from my account at the bank's branch in New York to the bank . . . These moneys had not originated from the company."

B        He explained how they were placed on deposit and that on 27 December 1979 there was due to him U.S. \$689,421·88. He contended that Maritime could have no arguable claim to these moneys, even if proceedings were appropriate in respect of the English funds. He also expressed concern that, if the Iran Government knew about the funds in London, his relations would be used as a lever to force him to remit the money to Iran.

       In reply to this affidavit, Mr. Saunders, an officer of B.T., swore another affidavit in which he said, in paragraphs 1 to 4 as follows:

C
> "1. Inquiries have been made of the Bank of Tokyo Trust Co., New York in respect of a remittance in the sum of U.S. \$685,800 credited to the first defendant's external savings account number 61817–3 on 5 December 1979 in order to establish the source of the said money.
>
> "2. I am informed and verily believe that the said sum was made up from two fixed deposits ((a) and (b) respectively) which were automatically renewable every three months and which had been pre-matured and credited
D
> to the first defendant's New York checking account (number 121–004–775) in order to cover the said payment. Fixed deposit (a) was valued at U.S. \$183,797·83 and (b) at U.S. \$497,803·98.
>
> "3. Fixed deposit (a) was opened on 14 December 1978 with a transfer of U.S. \$170,000 from a savings account maintained by the first defendant, which account was opened on 5 April 1976 with initial funds of U.S. \$425,000 by means of a transfer from the first defendant's checking account number 121–004–775. I am informed that the sum of U.S. \$511,000 had
E
> been credited to the said checking account on 30 December 1975 by order of Fairfield International Ltd. of 227 Park Avenue, New York. Prior to 14 December 1978, the said savings account had been credited with U.S. \$115,200, being the proceeds of a cheque drawn on Midland Marine Bank, New York by order of Mowbrays Tug and Barge Sales Corporation.
>
> "4. Fixed deposit (b) was opened on 23 April 1979 with a transfer of U.S. \$473,000 from the said savings account maintained by the first
F
> defendant. The account had been credited on 11 April with the proceeds of a cheque for U.S. \$32,569·75 drawn on Wells Fargo Bank New York by order of Utah House Fire Insurance Co. and on 23 April with the proceeds of a cheque for U.S. \$441,992·01 drawn on Chase Manhattan Bank by order of Adams and Porter Inc."

       The affidavit was never served on Maritime, who were at that time not party to the proceedings to strike out. The application, which was heard by Robert
G
Goff J. failed. A note of his judgment was before Bingham J., and the relevant part of the proceedings before him was quoted by the judge:

> "There were certain accounts in the name of Majid Karoon and certain accounts in the name of Maritime. Certain moneys were transferred from New York which Majid Karoon says are his. There has been an amalgamation of accounts carried out in accordance with instructions given
H
> on 24 December 1979 and 20 February 1980. . . . Finally I am asked to look at the evidence to find that a substantial part of the moneys must belong to Majid Karoon. I am invited to look at the letter and to find that it makes no claim on Majid Karoon's assets. The difficulty is that I am faced with one party's evidence. The bank is in the middle and can only act fairly,

which it cannot do not knowing the full facts. It would be quite wrong for me to pre-empt the situation on one party's evidence—especially having regard to the history which shows that Majid Karoon has not sought to keep his own and Maritime's moneys separate. No accurate assumptions on a split can be made.

"It seems to me that the workers council letter is written in such English as the bank has reasonable grounds to assume that a claim may be pressed not only against Maritime's accounts but also against Majid Karoon's accounts in so far as the money is in origin Maritime's money which he has transferred into his own account. He may have acted in breach of his obligations to the company. In my judgment there are reasonable grounds that the bank may be sued for not only Maritime's money but also that money held by Majid Karoon. The bank was fully entitled to interplead. I cannot accede to the application. To interplead was a natural reflex of the bank."

On 4 March 1983 an interpleader issue was eventually ordered. The order was by consent, no attempt being made to limit the order to the English as opposed to the American moneys. It read as follows:

"1. The plaintiffs [B.T.] be forthwith discharged from any liability to either of the defendants in respect of any moneys the subject matter of these proceedings and that no action be brought in respect thereof against the plaintiffs by either of the defendants, including an action by the first defendants acting in the name of the second defendants.

"2. The plaintiffs do pay the moneys the subject matter of these proceedings after deduction of their usual banking charges into court as and when each of the current special deposits matures and that the moneys presently held on call be paid together with the first special deposit money on maturity thereof and that meanwhile the plaintiffs hold the said moneys to the direction of the court."

The complaint of the New York proceedings is based upon B.T.T.C.'s voluntary disclosure to B.T. of information relating to his account in New York. This disclosure is alleged to have been a breach of its contractual duty of confidence to Mr. Karoon, to have violated Mr. Karoon's "right of privacy", and made in conspiracy with B.T. to injure Mr. Karoon. A total of U.S. $4,000,000·00 damages is claimed, U.S. $1,000,000·00 as punitive damages for the breach of the "right of privacy" and the conspiracy, additional to the U.S. $1,000,000·00 claimed for "special damage" for each of the three causes of action.

Before Bingham J., Mr. Hoffmann submitted that the New York proceedings would cause injustice to his clients for a number of reasons, which the judge summarised under five headings. The first two can be taken together, it being submitted: whatever the prospects of success, the New York action is an attempt to penalise B.T. for availing itself of the interpleader procedure in England and complying with the Rules of the Supreme Court. The New York action would involve relitigating a matter already litigated in England, i.e. whether an interpleader should have been ordered in respect of moneys remitted from the United States. As such, the action is vexatious and oppressive. It is in truth doubly vexatious and oppressive because it has no reasonable prospect of success, since Mr. Karoon will be quite unable to show that he has suffered any damage, because Robert Goff J. would have made the self same order if B.T. had not relied upon the information provided to it by B.T.T.C.

Mr. Hoffmann's three further points submitted to the judge can be stated as one proposition, namely, that an English court is the forum conveniens because it can without difficulty resolve what duty of confidence, if any, was owed by the

A   New York bank in these circumstances to its client Mr. Karoon. *Tournier v. National Provincial and Union Bank of England* [1924] 1 K.B. 461, is the source of the law in both jurisdictions. By contrast, a New York judge would be faced with difficult questions concerning the duty of an English litigant in an English interpleader. Moreover, if Mr. Karoon were able to establish that he would have succeeded in striking out the interpleader proceedings had not B.T.T.C. provided the information to B.T., he would still have to establish, in order to
B   claim damages, that the money in London belonged to him and that issue has to be decided in London. Mr. Karoon, moreover, has no legitimate judicial advantages in proceeding in New York.

Before Bingham J. no submission appears to have been made to the judge that a different approach might be justified to the New York action, according to whether one was considering the position of B.T.T.C. or the position of B.T. Neither party asked the judge to differentiate between B.T. and B.T.T.C. in
C   any order he made. However, in his judgment, viewing the two companies as two separate legal entities, Bingham J. concluded that they should be treated separately. In regard to the New York action, in so far as it related to B.T.T.C., he said:

"It is an action brought in New York against a bank incorporated and carrying on business there. Mr. Karoon, an Iranian citizen resident in France, had an account with that bank. Although Mr. Karoon has advanced
D   three causes of action against B.T.T.C. (breach of confidence, invasion of privacy and conspiracy) it seems plain that his central complaint against B.T.T.C. arises from its voluntary dislosure to B.T. of information relating to his account. Whether this disclosure involved a breach of contractual duty, or Mr. Karoon's right to privacy, on the part of B.T.T.C. must be determined according to the law of New York. Whether B.T.T.C. was guilty of an actionable conspiracy may also fall to be decided under that
E   law, although this cause of action appears to be something of a makeweight. The disclosure by B.T. to the English court forms no part of Mr. Karoon's cause of action against B.T.T.C. That disclosure does have a significant bearing on Mr. Karoon's ability to prove actual damage flowing from the disclosure, since he could show none if Robert Goff J. would have made the same order even without the information concerning Mr. Karoon's American transactions in Mr. Saunders' affidavit. To that extent the action
F   does involve inquiry into what Robert Goff J. would have done on different evidence, an inquiry which would be best carried out by this court. It is, however, an inquiry which a New York court could doubtless undertake and resolve. Mr. Karoon may have a cause of action for invasion of privacy available to him in New York which is not available here. It would certainly appear that his chances of obtaining substantial damages on a punitive or exemplary basis are better there. His ability to sue in New York on a
G   contingency fee basis may not be a juridical advantage (*Smith Kline & French Laboratories Ltd. v. Bloch* [1983] 1 W.L.R. 730, 747ʜ) and is, in my view counterbalanced by B.T.T.C.'s inability to recover costs if successful, but is certainly not an argument against allowing the New York action to proceed against B.T.T.C. Overall, I do not regard an injunction as appropriate to restrain the action insofar as it lies against B.T.T.C. If the action were to proceed, B.T.T.C. might, of course, win or lose; and if it
H   lost the damages might be large, or nominal, or even non-existent. But all these seem to me to be matters best entertained and resolved in the New York court which would be applying its own law to events very largely occurring within its own jurisdiction."

In reaching his decision relative to B.T.T.C., Bingham J. was applying the
principles to which he made specific reference, as laid down or reflected in the
decisions of *The Atlantic Star* [1974] A.C. 436, *MacShannon v. Rockware Glass
Ltd.* [1978] A.C. 795, *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557
and *Trendtex Trading Corporation v. Credit Suisse* [1980] Q.B. 629. These
principles were not in dispute between the parties.

He then turned to the New York action against B.T., commenting that the
claim assumed a somewhat different aspect. He said:

"The crux of Mr. Karoon's complaint against B.T. is that it acted unlawfully
in seeking information from B.T.T.C. The allegation is made that B.T.
gratuitously revealed this information, but Mr. Strauss accepted that the
revelation was not gratuitous and acknowledged the difficulty of maintaining
that B.T. had no interest in revealing that information. B.T. is also accused
of conspiracy and inducement of breach of contract by B.T.T.C. but these
complaints arise out of the same factual premise, namely, the request for
information made by B.T. to B.T.T.C. This was a request made by B.T. in
the context of its role as a party seeking to interplead under R.S.C., Ord.
17. In his original affidavit, Mr. Saunders had made no overt reference to
these moneys transferred by B.T.T.C. to B.T. Mr. Karoon raised a clear
issue concerning them in his affidavit of 25 April. B.T. had either to let the
matter (and the moneys) go, with the risk that it might later be held
accountable for the moneys, or make such inquiries as it could (or, if it had
already made inquiry, inform the court of the result).

"Leaving entirely on one side the question whether, on information
being requested, B.T.T.C. should, as a matter of New York law, have
complied with the request, I think that two significant questions of English
law arise in respect of B.T.'s conduct: whether it was reasonable and proper
for B.T., *in seeking to protect its own interests, to request information from*
B.T.T.C.; and whether, in pursuance of its duty as a party applying to
interplead it was proper for B.T. to seek to lay before the court all evidence
within its power relevant to the application. This is a lis between a bank
carrying on business in London and a London customer of that bank arising
out of English interpleader proceedings to which both were party. Moreover,
it directly touches on a matter with which this court must be very closely
concerned, the proper conduct of a party to English interpleader proceedings.
I should not and do not form or express any opinion whether B.T.'s
conduct was proper or improper. That is not an issue before me. I am,
however, of the opinion that B.T. would be exposed to the risk of real
injustice if the propriety of its conduct were to be judged in any court other
than that in which the interpleader proceedings took place. It furthermore
appears to me that England is in every way a more appropriate forum than
New York for trial of the issues between Mr. Karoon and B.T. and that
Mr. Karoon would lose no legitimate juridical or personal advantage by
suing here. The New York forum would afford him no additional cause of
action and *the chance of an improved measure of damage would be*
problematical. These considerations are, however, in my judgment, of less
weight in this than the usual case because the overriding consideration of
what justice demands points strongly towards restraint of Mr. Karoon's
action against B.T. in New York. If B.T. were the only New York
defendant, I would, even bearing in mind the need for great caution in
restraining prosecution of a foreign action, think it right to grant an
injunction."

The difficulty which then faced Bingham J. was the combination in one set of
New York proceedings of claims against B.T.T.C., which he was not willing to

A  restrain, and claims against B.T., which he was. He concluded that it would not be right to grant an excessive injunction, which would be the case if he restrained the prosecution of an action which he regarded as properly brought against B.T.T.C. in New York, nor would it be right to expose B.T. to an unacceptable risk of injustice. He therefore made no mandatory order that Mr. Karoon discontinue his New York proceedings, but he continued the negative injunction made ex parte on 13 September 1983, restraining Mr. Karoon from

B  taking any further steps in the New York action so far as it related to B.T. Mr. Karoon thus remained free to prosecute the New York action against B.T.T.C. Mr. Strauss on behalf of Mr. Karoon is content with that position because B.T. is not a necessary party to the New York action. Mr. Karoon can obtain all the remedies to which he is entitled with the New York action limited to B.T.T.C.

Before us Mr. Hoffmann has stressed the distinction between his two lines of argument, and reinforced the distinction by reference to the recent decision of the United States Court of Appeal for the District of Columbia Circuit, in *Laker*

C  *Airways Ltd. v. Sabena, Belgian World Airlines* (1984) 731 F. 2d 909. His first line of argument is that, as a matter of English public policy, the claims in New York should not be allowed to be brought at all. Citing the American *Laker* case:

"Courts have a duty to protect their legitimately conferred jurisdiction to the extent necessary to provide full justice to litigants. . . . a court

D  may freely protect the integrity of its judgments by preventing their evasion through vexatious or oppressive relitigation" (*per* Judge Wilkey, at pp. 928–929),

he maintained: (1) that there is "an overriding public policy" that a litigant should be able to take all proper steps to put relevant evidence before the court; (2) that it is in the public interest that there should be finality in litigation, and since Mr. Karoon had not objected to Mr. Saunders' affidavit being put before

E  Robert Goff J., he should not now be allowed to bring an action for damages allegedly arising from the use of that affidavit.

As regards the latter point, Mr. Hoffmann expressly accepted that any objection by Mr. Karoon would have been doomed to failure and in such circumstances it seems to me plain that Mr. Karoon cannot be blamed for having failed to take what is accepted would have been futile action.

Thus, Mr. Hoffmann's first and main criticism of Bingham J.'s decision is

F  that he treated the case as being an ordinary case of competition between two jurisdictions where the question was which was the most appropriate forum.

It is however quite fundamental to Mr. Hoffmann's submission, (and he readily accepts this) that the public policy on which he relied requires the court to overlook the corporate distinctions in law between B.T. and B.T.T.C. While accepting that B.T. and B.T.T.C. are separate legal entities, Mr. Hoffmann contends that from a practical point of view it makes no difference whether

G  B.T.T.C. was a branch of B.T. or a subsidiary. He argues that if one looks at the substance of the matter, B.T. are being sued in New York on account of the evidence which they gave in their own defence in proceedings brought against them by Mr. Karoon in London. The protection of B.T.'s own interests required the giving of this information and accordingly B.T., which must in practice be treated as having this information in their possession, was not in breach of its implied obligation of secrecy: see *Tournier v. National Provincial and Union*

H  *Bank of England* [1924] 1 K.B. 461.

The reality of the matter is that B.T.T.C. is not a branch of B.T. That is not the way in which B.T. has chosen to organise its business as a bank. Of course, B.T. is entitled to take all proper steps to obtain evidence to resist Mr. Karoon's application to strike out the interpleader summons, but the issue remains, were

these steps proper ones? If, as Mr. Karoon maintains, B.T.T.C. owed him a   A
duty of confidence and was therefore not entitled to communicate to another
separate legal entity any information concerning his account with them without
his approval, then B.T.T.C. was in breach of its duty and it would follow that
B.T. induced a breach of contract. Mr. Hoffmann accepted that if B.T.T.C. was
not a subsidiary of B.T. but was another bank, then Mr. Karoon would certainly
have a cause of action, although he maintained his contention that his damages
would be purely nominal.                          .
                                                                                B
    I can see no valid basis, and certainly no authority was provided to us by Mr.
Hoffmann, for the contention that we must ignore the separate legal existence of
B.T.T.C. Once the corporate distinction in law between B.T. and B.T.T.C. has
to be recognised, the foundation of Mr. Hoffmann's submission that there is an
English rule of public policy which requires that this action should not be
allowed to be brought disappears. There is an arguable case that B.T.T.C., a
separate juridical entity, owing Mr. Karoon an obligation of secrecy, broke that
obligation when, without his consent, they revealed to B.T. the material referred   C
to above concerning his account in New York.
    In his reply, Mr. Hoffmann formulated a further issue of public policy,
namely, that damages cannot be recovered, other than nominal damages for
breach of contract, as a result of there being introduced into litigation in
England relevant and admissible evidence, *even though such evidence has
been improperly obtained.* He submitted that as a matter of public policy it is
so essential to the administration of justice that all relevant and admissible   D
evidence is placed before the courts that, even though such evidence may
have been provided in breach of a contract not to divulge such material and
damage can be established to have resulted from this wrongful disclosure, the
plaintiff's remedy is limited to nominal damages for breach of contract, and
he has no remedy against the person who wrongfully induced the breach of
contract.
    Mr. Hoffmann was at pains to make quite clear that he was not limiting this   E
rule of public policy to the case of a plaintiff who had wrongfully concealed
evidence or sought to mislead the court, and had ultimately failed in his claim
because evidence improperly obtained had ultimately been put before the court.
That would merely be an example of the well-established principle, ex turpi
causa non oritur actio. Mr. Hoffmann was unable to produce any authority in
support of the existence of this rule of public policy and it became apparent in
the course of his submissions that it would not be difficult to imagine examples   F
where such a rule would operate contrary to accepted notions of justice and
fairness. Moreover, it is of the very essence of our adversarial system that the
court decides the dispute on the material placed before the court, it being for
the parties and not for the court to decide of what that material should consist.
Hence the well-established principle that in civil litigation the judge is not
entitled, without the consent of the parties, to call a witness, although he may
have every reason to believe that such a witness might well enable him the   G
better to reach a just decision: see *In re Enoch and Zaretzky Bock & Co.'s
Arbitration* [1910] 1 K.B. 327 and *Fallon v. Calvert* [1960] 2 Q.B. 201.
    I am therefore far from satisfied that such a wide principle of public policy
exists. But, even were it to exist, it would not justify the *striking out* of the
action. Ex hypothesi, the plaintiff would have a good cause of action for breach
of contract, and the fact that his damages might well be nominal still entitles
him to bring his action. He might well be content with a declaration which   H
established that the defendant broke some important duty of secrecy and was
therefore not to be trusted. Accordingly, this rule of English public policy, were
it to exist, cannot support Mr. Hoffmann's contention that the action against
B.T.T.C. should never have been brought and therefore that the proceedings

3:18-cv-00731-X   Document 273-6   Filed 07/30/19    Page 394 of 421   PageID 1

A   should be stopped in limine. It would merely preclude the right to recover more than nominal damages.

The action brought by Mr. Karoon against B.T.T.C. is in every sense an American action. The contract upon which the contractual claim is based was made in New York with a New York corporation. The proper law of that contract is American law and if according to American law a breach of that contract took place when B.T.T.C. divulged information to B.T., then the

B   breach of that contract took place in New York. So far as the tort of conspiracy is concerned, the alleged conspirator who is being sued is a New York corporation and for an alleged conspiracy that took place in New York, because it was there that both the agreement and the overt acts in pursuance of that conspiracy were made and carried out. It will be for American law to determine whether the tort of conspiracy was committed and for this decision the New York court is the natural forum: see *Distillers Co. (Biochemicals) Ltd. v.*

C   *Thompson* [1971] A.C. 458. Further, the alleged invasion of privacy occurred in New York. It is a cause of action as yet unknown to English law and will have to be determined in accordance with New York law. In the result New York law will be the proper law for the determination of whether or not there has been a breach of contract and whether or not B.T.T.C. has committed the two torts alleged. New York law will also be the lex fori. In such circumstances it seems to me to be irrelevant that in England, assuming Mr. Hoffmann's submission to be correct, Mr. Karoon would have recovered only nominal damages for breach

D   of contract.

As regards Mr. Hoffmann's second line of attack, he ultimately conceded that, if the corporate distinctions in law must not be overlooked and B.T.T.C. must be treated as a separate legal entity (as is indeed my view), then New York is the natural forum for the reasons to which I have recently referred. In such circumstances there is no need to consider the balance of legitimate juridical advantages. However, were we obliged to consider that matter, I do

E   not think that Mr. Hoffmann would have seriously contended that the balance was other than in favour of the action remaining in New York. Mr. Karoon alleges on affidavit that as a result of B.T. successfully interpleading he has no funds to support his litigation. However, in America he can bring his claim because of the contingency fee system. The *Smith Kline* case [1983] 1 W.L.R. 730 was a decision on its own very special facts, where the Court of Appeal was clearly of the view that the plaintiff, who had legal aid in England, was abusing

F   the contingency fee system in order to bring proceedings in America against the American parent corporation, against which he had no real cause of action. His cause of action, if any, lay against the English subsidiary and his conduct in bringing the American proceedings was clearly vexatious. Thus, in that case it was not a *legitimate* juridical advantage. Moreover, were Mr. Karoon to bring proceedings in England, he would inevitably be met with a claim for security of costs, being resident out of the jurisdiction, and this he could not, or would

G   have great difficulty in meeting. He is of course faced with no such problems in the United States. It is common ground that under New York law he may well have a claim for exemplary damages. Although this is certainly not accepted by B.T., Mr. Karoon might, under New York law, be able to recover exemplary damages, even though he only obtained nominal damages for the alleged breach of contract and/or no actual damage for the torts of invasion of privacy or conspiracy.

H   In the end there is left only one unusual feature which will face the New York court. It will have to decide whether the provision by B.T.T.C. to B.T. of the information which B.T. subsequently put before the court in fact resulted in Mr. Karoon losing any real chance of either striking out the interpleader summons or obtaining summary relief under R.S.C., Ord. 17, r. 5—in short,

what probably would have happened in England if B.T.T.C. had not made the    A
information available to B.T. Although this is an unusual inquiry for a New
York court to make, it will, if and when required, be provided with expert
evidence as to English law and procedure and should ultimately have no
difficulty in resolving this issue.

I would accordingly dismiss this appeal.

ROBERT GOFF L.J.   The judge was faced with the following situation. The    B
Bank of Tokyo Ltd., the appellant before this court ("B.T."), had commenced
interpleader proceedings in this country. It had done so because there were
moneys credited to accounts at its London branch to which competing claims
were being made—on the one hand by an Iranian company, Maritime Co. Ltd.
("Maritime"), through a workers' council in Iran which, following the revolution
in that country, appeared to have gained control of Maritime; and, on the other
hand, by an Iranian gentleman, Mr. Karoon, the respondent before this court,    C
who formerly controlled Maritime but who has, since the revolution in Iran, left
that country and taken up residence in France. The interpleader proceedings
have been complicated by the fact that Mr. Karoon, fearing that disclosure to
Maritime of the existence of certain of these moneys might have an adverse
effect on his family in Iran, sought to persuade the English court that no such
disclosure should be allowed. That attempt has in fact failed, because disclosure
was necessary to enable the interpleader issue to be tried. However, one of the    D
steps which Mr. Karoon at one time took was to ask the English court to strike
out the interpleader proceedings under R.S.C., Ord. 18, r. 19, his submission
being that certain moneys which had been transferred to B.T.'s London branch
from Mr. Karoon's personal account with the Bank of Tokyo Trust Co., the
New York subsidiary of B.T. ("B.T.T.C."), were his own and were moreover
moneys to which Maritime could have no arguable claim, so that they should
not be the subject of the interpleader proceedings.

The commercial judge (who, it so happens, was myself) dismissed that    E
application. A note of the judgment is before this court and shows that the basis
of the decision was that the court considered that, having regard in particular to
a letter emanating from the workers' council, B.T. had reasonable grounds for
thinking that it might be sued by Maritime not only in respect of moneys of
Maritime but also in respect of moneys of Mr. Karoon on the ground that they
had emanated from Maritime, and that it would be wrong for the court to pre-
empt the situation on the evidence of one party only. At all events, for the    F
purposes of his application to strike out, Mr. Karoon swore an affidavit
concerning the moneys which had been transferred from B.T.T.C., stating that
those moneys had not originated from Maritime. As a result, B.T. made
inquiries of B.T.T.C. about those moneys. B.T.T.C. then supplied information
about the moneys to B.T., some of which was embodied in an affidavit sworn by
Mr. Saunders of B.T. for the purpose of laying the information before the
commercial judge when he dealt with Mr. Karoon's application to strike out.    G

Mr. Karoon has taken objection to his bankers in New York, B.T.T.C.,
supplying this information to B.T., and indeed he has objected to B.T. seeking
to obtain the information from B.T.T.C. So, on 7 July 1983, he commenced
proceedings in New York against both B.T. and B.T.T.C. In those proceedings
he alleged (1) breach by B.T.T.C. of its contractual duty of confidence to him,
in revealing the information to B.T.; (2) breach of contract by B.T. in obtaining
the information; (3) violation by B.T.T.C. of Mr. Karoon's right of privacy; (4)    H
conspiracy by B.T. and B.T.T.C.; and (5) that B.T. wrongfully induced B.T.T.C.
to break its contract with Mr. Karoon.

On its application before the judge, B.T. asked for an order directing Mr.
Karoon to discontinue the action in New York against B.T. and B.T.T.C.

A      and/or an injunction restraining Mr. Karoon from taking any further steps in the
       New York action or "commencing or pursuing any other proceedings relating to
       the same subject matter before any other court than this Honourable Court."
       The judge declined to make a mandatory order, but he maintained an injunction
       (which had earlier been granted ex parte) in terms expressly limited to the New
       York proceedings against B.T. The effect was that Mr. Karoon was free to
       prosecute his New York action against B.T.T.C. but not against B.T.

B          [His Lordship referred to the judgment of Bingham J. below, cited passages
       set out in the judgment of Ackner L.J., ante, pp. 49G—50c, 51c, D–H, 52B–G
       and continued:] B.T. has appealed to this court against the judge's decision, in
       so far as he failed to restrain Mr. Karoon from pursuing the New York action as
       against B.T.T.C. There is no cross-appeal by Mr. Karoon. This is for the simple
       practical reason that Mr. Karoon's New York action can continue just as well
       against B.T.T.C. alone. However, in so far as it may be necessary for the
       purposes of resisting B.T.'s appeal, Mr. Karoon has by his respondent's notice
C      taken the point that the judge was wrong to continue the injunction restraining
       Mr. Karoon from further prosecuting the New York action against B.T.

          Before the judge, Mr. Hoffmann for B.T. had argued that the New York
       proceedings would cause injustice to his clients for a number of reasons, viz:
       (1) the New York action was vexatious because (a) it was an attempt to penalise
       B.T. for availing itself of the interpleader proceedings in England, (b) it would
       involve re-litigating the question (already litigated here) whether an interpleader
D      issue should have been ordered, and (c) it had no reasonable prospect of
       success; and (2) any action should be tried in England because (a) the
       interpleader proceedings were already here, (b) an English court could, without
       difficulty, resolve what duty of confidence is owed by a New York bank to its
       client, whereas a New York judge would be faced with difficult questions
       regarding English interpleader proceedings, (c) the question of ownership of the
       moneys had to be decided first anyway, and (d) the availability of a contingency
E      fee to Mr. Karoon could not, on the authorities, be regarded as a juridical
       advantage to him. Before this court, however, Mr. Hoffmann's argument was
       somewhat different. The reason for the development of his argument was the
       intervening decision of the U.S. Court of Appeals in *Laker Airways Ltd. v.
       Sabena, Belgian World Airlines* (1984) 731 F. 2d 909 which was only decided on
       6 March 1984 and so was not available to Bingham J. in the present case. Mr.
       Hoffmann drew on the analysis of Judge Wilkey, who delivered the majority
F      judgment in that case, and urged this court to do likewise in considering the
       problem in the present case. In order to place Mr. Hoffmann's submissions in
       their context, it will be necessary briefly to summarise the relevant principles
       stated by Judge Wilkey. This is no easy task. The judgment is substantial both
       in content and in length. I have studied it with interest and, indeed, respect.

          *Laker Airways Ltd. v. Sabena, Belgian World Airlines* is concerned with the
       unhappy clash of jurisdiction which has occurred between courts in this country
G      and courts in the United States, following upon the commencement by the
       liquidators of Laker of antitrust proceedings in the United States against a
       number of international airlines, alleging that their combined activities were the
       cause of Laker's downfall. Among the airlines so sued were two British airlines,
       British Airways and British Caledonian. Following the making of an order by
       the Secretary of State for Trade and Industry in this country (acting under
       powers conferred on him by Act of Parliament) which had the effect of
H      prohibiting the two British airlines from complying with "United States antitrust
       measures," the Court of Appeal in this country granted an injunction restraining
       Laker from taking any steps against British Airways and British Caledonian in
       the United States action: *British Airways Board v. Laker Airways Ltd.* [1984]
       Q.B. 142. Meanwhile, in the United States Laker obtained temporary restraining

orders from the District Court restraining other airlines from instituting in the courts in this country similar proceedings for an injunction. Two of those airlines, KLM and Sabena, challenged the District Court's preliminary injunction on appeal to the Court of Appeals. The Court of Appeals, by a majority, declined to overturn the injunction so granted.

In the course of his judgment Judge Wilkey analysed in depth the applicable principles of law. I am only concerned, for present purposes, with his consideration of the propriety of what he called "the antisuit injunction." I shall summarise the principles stated by him as briefly as I can, though I realise that so brief a summary cannot do justice to his reasoning.

(1) He observed, 731 F. 2d 909, 926–927, that the sufficiency of jurisdictional contacts with both the United States and England resulted in concurrent jurisdiction to prescribe.

> "However, the fundamental corollary to concurrent jurisdiction must ordinarily be respected: parallel proceedings on the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata in the other . . . For this reason, injunctions restraining litigants from proceeding in courts of independent countries are rarely issued," though "A second reason cautioning against exercise of the power is avoiding the impedance of the foreign jurisdiction."
> (2) "There are no precise rules governing the appropriateness of antisuit injunctions. The equitable circumstances surrounding each request for an injunction must be carefully examined to determine whether, in the light of the principles outlined above, the injunction is required to prevent an irreparable miscarriage of justice."

However, (3) injunctions are most often necessary (a) to protect the jurisdiction of the enjoining court, or (b) to prevent the litigant's evasion of the important public policies of the forum.

(4) With regard to (3)(a) above, viz. protection of the jurisdiction of enjoining court, a distinction is drawn between cases where the enjoining court has proceeded to judgment on the merits, and cases where an injunction is requested to protect the court's jurisdiction before a judgment has been reached. In the former case there is little interference with the rule favouring parallel proceedings in matters subject to concurrent jurisdiction: so a court may protect the integrity of its judgments by preventing their evasion through vexatious or oppressive relitigation: see, e.g., *Bethell v. Peace* (1971) 441 F. 2d 495. In the latter case the factors which might support the issue of an injunction do not usually outweigh the importance of permitting foreign concurrent actions; and the policies underlying the rule permitting parallel proceedings in concurrent in personam actions are more properly considered in a motion for dismissal for forum non conveniens. Even so, there must be circumstances in which an antisuit injunction is necessary to conserve the court's ability to reach a judgment, and the District Court's injunction was proper on that basis.

(5) With regard to (3)(b) above, viz. preventing the litigant's evasion of the *important public policies of the forum*, an antisuit injunction will issue *to* preclude participation in the litigation only when the strongest equitable factors favour its use. Among the authorities cited by Judge Wilkey where such an injunction has issued was *Cole v. Cunningham* (1890) 133 U.S. 107, a case concerned with protecting the exercise of bankruptcy jurisdiction. Judge Wilkey further considered that the District Court's injunction properly prevented KLM and Sabena from attempting to escape the application of the United States antitrust laws to the conduct of business in the United States.

Mr. Hoffmann urged us to adopt a similar approach in the present case to that adopted by Judge Wilkey in his analysis, and in particular to distinguish, on

59

3:18-cv-00731-X   Document 273-6   Filed 07/30/19   Page 398 of 421   PageID
Bank of Tokyo Ltd. v. Karoon (C.A.)

**A**  the basis of both English and United States authorities, the two groups of cases where injunctions may be granted, viz. to protect the jurisdiction of the court and to prevent the litigant's evasion of the important public policies of the forum. The present case before us fell, submitted Mr. Hoffmann, within these principles. He asked us to approach the case by considering first whether, if B.T. in London and B.T.T.C. in New York had been a single entity and all relevant events had happened in England, proceedings in this country similar to those commenced by Mr. Karoon in New York would have been struck out as

**B**  an abuse of process. He submitted that they would, because such proceedings would have infringed both the public interest in making available all relevant evidence for the court and the public interest that there should be finality in litigation. That being so, he submitted that it made no difference that Mr. Karoon had commenced his proceedings not in this country but in New York, because the English court, in protecting the integrity of its own jurisdiction, should not allow a litigant, subject to its jurisdiction, to bring such an action in a

**C**  foreign jurisdiction. Furthermore, he submitted, having regard to the basis of the jurisdiction, the court should not be deflected from giving effect to its public policy by the fact that B.T. and B.T.T.C. are different legal entities; otherwise it would be sacrificing substance to form.

As an alternative to this main line of argument, Mr. Hoffmann invoked the principles enunciated by the House of Lords in recent cases concerned with alternative forums, viz. *MacShannon v. Rockware Glass Ltd.* [1978] A.C. 795

**D**  and *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557, and submitted that, on the "critical equation" referred to in those cases, the balance pointed towards requiring Mr. Karoon to litigate in England.

In considering Mr. Hoffmann's submissions, I recognise that it is not merely legitimate but desirable that courts in this country should pay due regard to developments in sister common law jurisdictions, notably the United States; this is especially desirable when the court is concerned with principles of law

**E**  affecting the relationship between our two jurisdictions and when we are presented with an analysis as profound as that of Judge Wilkey in *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F. 2d 909. Even so, we have to proceed with due caution. Not only do we have to operate within the confines of the doctrine of precedent in this country, but we have to bear in mind that the development of the relevant principles of law in our two countries may not be identical. Frequently, however, under the influence of history and of

**F**  practical pressures to which both jurisdictions are subject, it transpires that there have taken place in our two jurisdictions parallel developments which, though neither simultaneous nor identical, reveal a very similar trend.

This is just what we find in the case of what American lawyers call "antisuit injunctions." At bottom, the fundamental principles appear to have developed along similar lines. Thus, the jurisdiction is very wide, being available for exercise whenever justice demands the grant of an injunction. Again, the

**G**  English court does not attempt to restrain the foreign court, but operates in personam, restraining a party from instituting or prosecuting the suit in the foreign jurisdiction; though an injunction will only be granted to restrain a person who is regarded as being properly amenable to the jurisdiction of the English courts. Furthermore, it has been repeatedly stated that the jurisdiction must be exercised with extreme caution, indeed sparingly: this is partly because concurrent proceedings in different jurisdictions are tolerated, but also because

**H**  of a desire to avoid conflict with other jurisdictions. For it is accepted, as is indeed obvious, that courts of two different jurisdictions, one in this country and one in a foreign country, can have jurisdiction over the same dispute. It is not prima facie vexatious for the same plaintiff to commence two actions relating to the same subject matter, one in England and one abroad; but the court may be

less ready to tolerate suits in two jurisdictions in the case of actions in rem than it is in the case of actions in personam. All these principles are well-established, and indeed non-controversial, and appear to be common to both the English and the United States jurisdictions.

But the jurisdiction to grant such an injunction has only rarely been exercised in this country. The earliest cases in which the jurisdiction was established do not necessarily provide authoritative examples of its exercise today; indeed one of them (*Bushby v. Munday* (1821) 5 Madd. 297) was later to be described by Lord Brougham as going to the "very verge of the law" (see *Carron Iron Co. v. Maclaren* (1855) 5 H.L.Cas. 416, 446). In the course of the 19th century, there developed a line of cases in which assets were being administered by the English court, and one interested person sought to gain an advantage over other interested persons by prosecuting proceedings in a foreign country where part of the assets were situated. In such cases, for example, where a person sought in this way to gain the benefit of foreign assets of an estate after a decree of administration (see, e.g., *Graham v. Maxwell* (1849) 1 Mac. & G. 71), or of a bankrupt after his petition in bankruptcy (see, e.g., *In re Distin* (1871) 24 L.T. 157), or of a company after winding up proceedings had been commenced (see, e.g. *In re North Carolina Estate Co. Ltd.* (1889) 5 T.L.R. 328), such a person has been restrained by injunction from pursuing foreign proceedings, but only if he were a domiciled Englishman or otherwise amenable to the jurisdiction of the English court. In the later 19th century, however, following the decisions of the Court of Appeal in *McHenry v. Lewis* (1882) 22 Ch.D. 397 and *Peruvian Guano Co. v. Bockwoldt* (1883) 23 Ch.D. 225, it became accepted that, at least in the case of actions in personam, concurrent proceedings by the same party in this country and abroad were not prima facie vexatious, and the proceedings abroad should not therefore be restrained. It was for the party seeking an injunction to prove that the proceedings abroad were vexatious; for that purpose, he had generally to show that the plaintiff in the foreign court could not obtain an advantage from the foreign procedure which he could not obtain in the English court: see in particular *Hyam v. Helm* (1883) 24 Ch.D. 531, and *Cohen v. Rothfield* [1919] 1 K.B. 410. That criterion was very rarely fulfilled: for examples where it was fulfilled see *Armstrong v. Armstrong* [1892] P. 98, *Moore v. Moore* (1896) 12 T.L.R. 221 and *Christian v. Christian* (1897) 67 L.J.P. 18.

Injunctions have however also been granted to restrain proceedings brought in breach of contract (see *Lett v. Lett* [1906] 1 I.R. 618 and *The Tropaioforos (No. 2)* [1962] 1 Lloyd's Rep. 410), and to restrain enforcement of a judgment obtained fraudulently: see *Ellerman Lines Ltd. v. Read* [1928] 2 K.B. 144. Putting aside these latter cases, however, and without attempting to cut down the breadth of the jurisdiction, the golden thread running through the rare cases where an injunction has been granted appears to have been the protection of the jurisdiction; an injunction has been granted where it was considered necessary and proper for the protection of the exercise of the jurisdiction of the English court. This can be said not only of cases where assets were being administered by the English court but also of cases where proceedings abroad were restrained as vexatious, for a party who attempts to reap the benefit of proceeding vexatiously is interfering with the proper course of administration of justice here: for example, see *Armstrong v. Armstrong* [1892] P. 98, 101, *per* Jeune J. But there was this difference between these two groups of cases: that, whereas in the latter group the foreign proceedings were regarded as vexatious because the plaintiff could derive no advantage from them, in the former group he was restrained precisely because he might gain an advantage from the foreign proceedings.

Now at one time it was thought that the requirement that proceedings must be vexatious was applicable, not only to the exercise of the court's jurisdiction

A    to restrain a party from instituting or prosecuting foreign proceedings, but also to the exercise of the court's jurisdiction to stay proceedings commenced in this country: see again *McHenry v. Lewis*, 22 Ch.D. 397 and *Peruvian Guano Co. v. Bockwoldt*, 23 Ch.D. 225. A stay would only be granted if the continuance of the action in this country would be oppressive or vexatious to the defendant or otherwise an abuse of the process of the court, and if a stay would not cause an injustice to the plaintiff: see *St. Pierre v. South American Stores (Gath & Chaves) Ltd.* [1936] 1 K.B. 382, *per* Greer L.J., at p. 392 and *per* Scott L.J., at p. 398. Again, these criteria were rarely fulfilled. However, in *The Atlantic Star* [1974] A.C. 436, the House of Lords recognised that this very rare restrictive criterion for staying proceedings in this country was too nationalistic: Lord Reid referred to it, at p. 453, as a "rather insular doctrine." In that case the court relaxed the criteria of "oppression" and "vexation." Four years later, in *MacShannon v. Rockware Glass Ltd.* [1978] A.C. 795, the House of Lords relaxed the criteria still further, abandoning altogether the criteria of "oppression" and "vexation," and adopting a principle which is now accepted to be indistinguishable from the principle of forum non conveniens as accepted in Scottish law: see *The Abidin Daver* [1984] A.C. 398. A parallel development has taken place in the United States: see *Gulf Oil Corporation v. Gilbert* (1947) 330 U.S. 501 and *Piper Aircraft Co. v. Reyno* (1981) 454 U.S. 235.

On these authorities it may be observed that there are strong similarities in the way in which the law on this topic has developed in both countries. However, in 1981 there occurred a development in this country which has sharply differentiated the two jurisdictions. In *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557, Lord Scarman (who delivered a speech with which the remainder of the House of Lords agreed) treated the criteria applicable to the exercise of the court's discretion to impose a stay or grant an injunction as identical. He said, at p. 574: "It is unnecessary now to examine the earlier case law. The principle is the same whether the remedy sought is a stay of English proceedings or a restraint upon foreign proceedings." After referring to *The Atlantic Star* [1974] A.C. 436, he quoted a passage from Lord Diplock's speech in *MacShannon's* case [1978] A.C. 795, 812, as embodying his distillation of principle in the case of a stay, which reads:

"In order to justify a stay two conditions must be satisfied, one positive and the other negative: (*a*) the defendant must satisfy the court that there is another forum to whose jurisdiction he is amenable in which justice can be done between the parties at substantially less inconvenience or expense, and (*b*) the stay must not deprive the plaintiff of a legitimate personal or juridical advantage which would be available to him if he invoked the jurisdiction of the English court."

Lord Scarman then said, at p. 575:

"Transposed into the context of the present case, this formulation means that to justify the grant of an injunction the defendants must show: (*a*) that the English court is a forum to whose jurisdiction they are amenable in which justice can be done at substantially less inconvenience and expense, *and* (*b*) the injunction must not deprive the plaintiff of a legitimate personal or juridical advantage which would be available to him if he invoked the American jurisdiction. The formula is not, however, to be construed as a statute. No time should be spent in speculating as to what is meant by 'legitimate.' It, like the whole of the context, is but a guide to solving in the particular circumstances of the case the 'critical equation' between advantage to the plaintiff and disadvantage to the defendants."

Lord Scarman did not apparently consider it necessary to give reasons for his opinion that the principle is the same whether the remedy sought is a stay of

English proceedings or a restraint upon foreign proceedings, and that it was    A
therefore unnecessary, having regard to the decisions of the House of Lords in
*The Atlantic Star* [1974] A.C. 436 and *MacShannon's* case [1978] A.C. 795, both
of which related only to a *stay* of *English* proceedings, to examine earlier case
law on *restraint* of *foreign* proceedings. As I have recorded, it is now recognised
that the principle applicable in the case of a stay of foreign proceedings is
indistinguishable from the Scottish principle of forum non conveniens. This
Latin tag is, like many others, misleading: proceedings in the English forum are    B
stayed not because *England* is an *inconvenient* forum, but because there is
another clearly more *appropriate* forum *abroad*. The classic statement of
principle is to be found in the judgment of Lord Kinnear in *Sim v. Robinow*
(1892) 19 R. 665, 668, when, after stating that the court would not refuse to
exercise its jurisdiction "upon the ground of a mere balance of convenience and
inconvenience," he said that

> "the plea can never be sustained unless the court is satisfied that there is    C
> some other tribunal, having competent jurisdiction, in which the case may
> be tried more suitably for the interests of all the parties and for the ends of
> justice."

A similar principle was adopted by Lord Sumner in *Société du Gaz de Paris v.*
*Société Anonyme de Navigation "Les Armateurs Français"*, 1926 S.C. (H.L.) 13,
22, when he said that the object was to find "that forum which was the more    D
suitable for the ends of justice."

It follows that the policy underlying the principle of forum non conveniens is
a policy of declining to exercise jurisdiction where there is another clearly more
appropriate forum; though, if in such circumstances trial in England would offer
the plaintiff a real advantage, a balance must be struck and the court must
decide in its discretion whether justice requires a stay. This policy, avowedly less
nationalistic than the old principle of vexation or oppression as applied in the    E
past in cases of stay of proceedings, is one which is given effect to, on an
application by the defendant, by a court of the forum in which there have been
commenced proceedings over which the court has jurisdiction. It is a self-
denying ordinance. The principle (derived from the speeches of their Lordships
in *MacShannon's* case [1978] A.C. 795) was so interpreted and applied in
*Trendtex Trading Corporation v. Credit Suisse* [1980] Q.B. 629, with the approval
of the House of Lords in that case, Lord Roskill [1982] A.C. 679, 705,    F
describing the judge's approach as "entirely correct in principle." Furthermore,
the exercise of the judge's discretion, so approved, in that case involved the
granting of a stay, although the plaintiff was thereby deprived of a most valuable
juridical advantage in this country, viz. discovery of documents in accordance
with English rules of procedure. It appears therefore that a juridical advantage
of the plaintiff in this country will not necessarily be decisive. (That this is
indeed so can be illustrated by the often-quoted example of a road accident    G
involving two motorists in a foreign country, both being resident nationals of
that country: one seizes the opportunity given by the casual presence of the
other in this country to serve proceedings upon him here, with the aim of
recovering the higher damages available in the English courts. The English court
would surely order a stay of proceedings on the application of the defendant,
though the plaintiff's whole purpose in proceeding here was to obtain the
juridical advantage of higher damages.) The decision of the House of Lords in    H
the *Trendtex* case was followed by the Court of Appeal in *European Asian Bank*
*A.G. v. Punjab & Sind Bank* [1982] 2 Lloyd's Rep. 356. The principles in these
two cases, derived from all the speeches of the House of Lords in *MacShannon's*
case [1978] A.C. 795 and approved by the House of Lords in the *Trendtex* case

A   [1982] A.C. 679, are, I understand, regularly followed in the Commercial Court, where cases of this kind tend to arise for decision.

In *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557 Lord Scarman has taken the principle of forum non conveniens as developed in relation to a stay of English proceedings where it was expressly developed in order to adopt a *less* nationalistic approach, i.e. to render the English courts *less* tenacious of proceedings started within its jurisdiction, and has applied it *inversely* in cases of

B   restraint by the English courts of foreign proceedings. The effect would appear to be, not only that in cases of restraint of foreign proceedings the very restrictive principle of protection of the English jurisdiction has been abandoned, but also that the English court will now be more free to grant injunctions restraining foreign proceedings than it was in the past under the old case law. We should perhaps not be surprised to discover that the approach of Lord Scarman in *Castanho* is different from the approach of courts in the United States. There, as here, the grant of stay of proceedings depends upon the

C   application of the principle of forum non conveniens: see, e.g., *Piper Aircraft Co. v. Reyno,* 454 U.S. 235. But the grant of an injunction restraining foreign proceedings depends upon the twin principles of protection of the jurisdiction of the court of the forum, and of preventing evasion of important public policies of the forum; and in each case the principles have been stated and applied in restrictive terms. So cases of stay of proceedings and of restraint of foreign proceedings are regarded as being founded upon different principles. Furthermore,

D   as appears from Judge Wilkey's opinion in *Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, in the United States it is considered more appropriate, where there is a clash of jurisdiction, for a stay of proceedings to be considered by the court seised of the matter rather than for a court to establish its own forum as the more appropriate forum by granting an injunction restraining proceedings in a foreign court.

Given the present divergence between the principles applicable in our two countries, it is, I fear, very difficult for this court to respond to Mr. Hoffmann's

E   submission that we should proceed on the basis of Judge Wilkey's analysis in *Laker Airways Ltd. v. Sabena, Belgian World Airlines.* I can only console myself with the reflection that in any event Mr. Hoffmann's submission appears to me to involve an illegitimate extension, in at least two respects, of the principles as stated by Judge Wilkey, and indeed of the principle as developed in the long line of English cases before *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C.

F   557.

I first address myself to the public interest that there should be finality in litigation. Such a public interest no doubt exists. Moreover, authorities can be found, both in this country and in the United States, in which courts have gone so far as to grant injunctions restraining persons properly amenable to their jurisdiction from relitigating abroad matters which have already been the subject of a judgment of the court of the forum. For an English example, see the old

G   case of *Booth v. Leycester* (1837) 1 Keen 579; and for an American example, see *Bethell v. Peace,* 441 F.2d 495. *The Tropaioforos (No. 2)* [1962] 1 Lloyd's Rep. 410 could perhaps also be treated as falling under this head, though it contained the exceptional feature that the litigant sought to be restrained had entered into an agreement with all underwriters to be bound by the outcome of the proceedings, thereby providing a contractual basis for the grant of the injunction. However, I do not regard the present case as falling under this head

H   of public policy. In the New York proceedings, Mr. Karoon is not, as I understand it, seeking to relitigate a matter which has been the subject of a judgment in this country. He is seeking rather to obtain redress from a bank in New York in respect of disclosure of confidential information by that bank in New York. I cannot see that the mere fact that Mr. Karoon had an opportunity,

which he did not take, to object to Mr. Saunders' affidavit being put in evidence     A
on the striking out application in London has any effect on the situation. The
simple fact is that the cause of action alleged by Mr. Karoon against B.T.T.C.
has not been the subject of a judgment in this country. I can therefore see no
basis for the submission of Mr. Hoffmann.

    Mr. Hoffmann's second submission however raises more difficult problems.
He asserted a public interest in making available all relevant evidence for the
court. This public interest was, he submitted, exemplified by the rule that     B
statements in affidavits are absolutely privileged in defamation proceedings (see
*Trapp v. Mackie* [1979] 1 W.L.R. 377, 378–379, *per* Lord Diplock), and by the
rule that victimisation of a witness on account of evidence he has given is a
contempt of court: see *Chapman v. Honig* [1963] 2 Q.B. 502, 512, *per* Lord
Denning M.R. His original submission before us was that, on this principle,
B.T. could not be sued for adducing evidence in the interpleader summons.
However, in the course of argument he recognised that the gravamen of his     C
submission lay in a litigant seeking to recover damages in respect of the
disclosure of material evidence in proceedings, when the only damage suffered
was (it was submitted) a failure to achieve a result which would have been
achieved had the material evidence not been disclosed. As a matter of public
policy such damages should not, submitted Mr. Hoffmann, be recoverable in
law.

    Now this submission does indeed raise novel and difficult problems. It cannot
be said to be entirely without substance, but it was not founded on any authority     D
cited to us, either from this country or from the United States. Furthermore, if
any such policy exists, as proposed by Mr. Hoffmann, it may be given effect to
as part of the lex fori; and it does not necessarily follow that a court of this
country would give effect to it by an injunction restraining proceedings in
another jurisdiction. We have also always to bear in mind the restraint we must
impose upon ourselves before taking any steps which might bear upon the
exercise by the courts of another country of its own jurisdiction. However, in     E
the present case, I must desist from exploring this interesting and novel
proposition, because there is in my judgment a fatal obstacle to Mr. Hoffmann's
argument. This is that the evidence in question was adduced in a court of this
country not by B.T.T.C., but by B.T. The proceedings which Mr. Hoffmann is
asking this court to restrain are proceedings by Mr. Karoon against B.T.T.C., in
respect of their having divulged confidential information not to the English court
but to B.T. I cannot for my part see that the public policy now asserted by Mr.     F
Hoffmann should (assuming that it exists) provide any ground for restraining
those proceedings. Mr. Hoffmann suggested beguilingly that it would be technical
for us to distinguish between parent and subsidiary company in this context;
economically, he said, they were one. But we are concerned not with economics
but with law. The distinction between the two is, in law, fundamental and
cannot here be bridged. For this reason, I should in any event have dismissed
this argument.     G

    I turn then to consider Mr. Hoffmann's alternative submission which was
founded upon Lord Scarman's speech in *Castanho v. Brown & Root (U.K.) Ltd.*
[1981] A.C. 557. This was to the effect that, applying the principles in
*MacShannon's* case [1978] A.C. 795, the balance points towards requiring Mr.
Karoon to litigate in England. He relied in this connection in particular upon
the following factors: proceedings were already on foot in London between B.T.
and Mr. Karoon; the issue whether Mr. Karoon was entitled to the moneys in     H
question will in any event have to be decided in the interpleader issue in
London; there is no dispute of fact over what happened in New York, and the
principles of law on bankers' confidentiality in New York and London are
substantially the same; the critical question whether the provision of information

A    caused any loss to Mr. Karoon would be better decided here; and Mr. Karoon has no legitimate juridical advantage in New York.

    I have to confess that I find the consequences of this argument to be startling. There is no pending litigation in this country between Mr. Karoon and B.T.T.C.; that of itself would render any order by the English court restraining the action in New York a remarkable restraint upon the prosecution of proceedings in that state. Even if England were to be regarded by the English court as a clearly more appropriate forum, or the natural forum, for the trial of

B    the action, I feel the gravest reservations about an English court granting an injunction restraining Mr. Karoon from proceeding in New York rather than allowing a court of that state, being the forum having jurisdiction where an action has already been commenced, making its own decision whether England is the more appropriate forum and whether it should in the circumstances grant a stay of proceedings. But in any event I am not prepared to hold that England is a clearly more appropriate forum for the trial of the action between Mr.

C    Karoon and B.T.T.C. The cause of action arose in New York. One of the parties is a New York corporation: the other is an Iranian citizen resident in France. The applicable law is the law of the State of New York; and, even if New York law on breach of confidence by a banker shares a common origin with our own law on the subject, I am not prepared to assume in the present case that they are identical, and in any event there are other legal issues in the case (for example, a claim to penal damages). Taking into account the factors

D    relied upon by Mr. Hoffmann, I cannot see that· they displace the strong connection with the New York jurisdiction. That being so, on the principles expounded by the House of Lords in *MacShannon's* case [1978] A.C. 795, as interpreted with the approval of the House of Lords in the *Trendtex* case [1982] A.C. 679, there can be no basis, upon the inverse application of the principle of forum non conveniens, to grant an injunction restraining Mr. Karoon from continuing with his proceedings against B.T.T.C. in New York.

E    For these reasons, I would dismiss the appeal.

*Appeal dismissed with costs.*
*Leave to appeal refused.*
*Injunctions to continue over hearing of*
    *petition for leave to appeal.*

F    *Solicitors: Herbert Smith & Co.; Baker & McKenzie.*

[Reported by Mrs. HARRIET DUTTON, Barrister-at-Law]

# EXHIBIT I



Neutral Citation Number: [2013] EWCA Civ 730

Case No: A3/2012/1905

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE QUEEN'S BENCH DIVISION, COMMERCIAL COURT**
**The Hon. Mr Justice Teare**
**[2012] EWHC 1887 (Comm)**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 19/06/2013

**Before:**

**LORD JUSTICE LLOYD**
**LORD JUSTICE BEATSON**
and
**LORD JUSTICE RYDER**

- - - - - - - - - - - - - - - - - - - -

**Between:**

| | |
|---|---|
| **Antonio Gramsci Shipping Corporation and others** | **Appellant** |
| **- and -** | |
| **Aivars Lembergs** | **Respondent** |

- - - - - - - - - - - - - - - - - - - -

(Transcript of the Handed Down Judgment of
WordWave International Limited
A Merrill Communications Company
165 Fleet Street, London EC4A 2DY
Tel No: 020 7404 1400, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)

- - - - - - - - - - - - - - - - - - - -

**Simon Rainey QC and Natalie Moore** (instructed by **Clyde & Co LLP**) for the **Appellant**
**Anthony de Garr Robinson QC and Laurence Emmett** (instructed by **Pinsent Masons LLP**)
for the **Respondent**

Hearing date: 10 June 2013

- - - - - - - - - - - - - - - - - - - -

# Approved Judgment
Judgment
As Approved by the Court

Crown copyright©

**Lord Justice Beatson :**

**1. Introduction:**

1.      This is an appeal by Antonio Gramsci Shipping Corporation and others ("Antonio Gramsci") against the Order by Teare J on 24 July 2012 reflecting his judgment handed down on 12 July. The judge held that the courts of England and Wales do not have jurisdiction pursuant to Articles 23 and 24 of the Brussels Regulation[1] over Mr Aivars Lembergs, a wealthy businessman domiciled in Latvia.  This appeal is only concerned with Article 23.

2.      Article 23 provides that where parties (one or more or whom is domiciled in an EU Member State) "have agreed that … the courts of a Member State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, … those courts shall have jurisdiction". Absent an agreement otherwise, such jurisdiction is to be exclusive.

3.      As will be seen, in this appeal Antonio Gramsci relies, as it did below, on "piercing" a corporate veil. It does not, however, rely on the principal way jurisdiction pursuant to Article 23 was asserted against Mr Lembergs below. That was a direct contractual route. The appeal is concerned only with the circumstances in which a person who is not a party to a contract containing a jurisdiction clause can be regarded as having given his consent to the chosen jurisdiction. Antonio Gramsci's case is that as a matter of EU law such a person will be so regarded where he is a controller of a corporate entity which is a party to the contract and he has arguably fraudulently caused that corporate entity to enter into the contract in order to defraud the other party to the contract who has brought a claim.

**2. The background:**

4.      The material parts of the factual and procedural background are stated in [2] – [10] of the judgment below, and can be summarised as follows. The substantive dispute concerns sixty-three charterparties of vessels owned by Antonio Gramsci to five offshore companies ("the Corporate Defendants") on the SHELLTIME 4 Time Charterparty form which contained an exclusive jurisdiction clause in favour of the courts of England and Wales. Antonio Gramsci alleges that the charterparties were entered into as part of a fraudulent scheme to charter the vessels from it at less than the market rate, and to sub-charter them at the market rate, thereby depriving it of the difference between the market rate and the charter rates. It alleges that the profits so made by the Corporate Defendants were to be used to enable Mr Lembergs and others who are alleged to have at that time been in control of the Corporate Defendants (including a Mr Stepanovs) to purchase shares in Antonio Gramsci's parent company, the Latvian Shipping Company ("LSC").

5.      Proceedings were initially brought only against the Corporate Defendants. Although an application for summary judgment against them was refused by Gross J ([2010]

---

[1]      Council Regulation (EC) No 44/2001, the Brussels Regulation on Jurisdiction and the Recognition and Enforcement of Judgments in Civil and Commercial Matters

EWHC 1134 (Comm)), he permitted them to defend the claim only if they made a substantial payment into court. They did not do this, and in due course Antonio Gramsci obtained judgment against them in its claim for restitution of the profits unlawfully diverted from it. Antonio Gramsci has since sought to make Mr Lembergs and Mr Stepanovs liable for the diverted profits. The allegation is that they, along with others, established the Corporate Defendants and used them as a device for the purpose of diverting the profits, and that Antonio Gramsci is therefore entitled to pierce the corporate veil both in respect of the substantive claims and also to enforce the English jurisdiction clauses.

6.   Proceedings against Mr Stepanovs were lodged in October 2010 and he challenged the jurisdiction of the English court. The question for decision for Burton J in that case was whether a party to a contract with a corporation, which is controlled by an individual who has used it as a device or façade to conceal wrongdoing, can proceed against the individual in contract, and can establish jurisdiction by virtue of a jurisdictional clause in the contract with the corporate entity. On 25 February 2011, in *Antonio Gramsci Shipping Corporation v Stepanovs* [2011] EWHC 333 (Comm) 2011]; 1 Lloyd's Rep 647 ("the *Stepanovs* case") Burton J held there was a good arguable case that the corporate veil could be pierced or lifted to permit this and dismissed Mr Stepanovs' challenge to jurisdiction.

7.   Proceedings against Mr Lembergs commenced with an application for a worldwide freezing order which was granted on 13 April 2011, and which, in a decision given on 4 August 2011, Cooke J refused to set aside. Shortly after that, on 24 August, Mr Lembergs issued his challenge to the jurisdiction of this court. At that time, the main way Antonio Gramsci put its case for jurisdiction based on Article 23 was the direct contractual route accepted by Burton J in Mr Stepanovs' case.

8.   The hearing before Teare J commenced on 16 November 2011. By then the hearing before Arnold J in *VTB Capital plc v Nutritek International Corp. and others,* had concluded. In that case after a jurisdictional challenge to its pleaded case in tort the claimant sought to amend to raise the direct contractual route to jurisdiction in the *Stepanovs* case. The defendant challenged that route too. The decision in *VTB Capital* ([2011] EWHC 3107 (Ch)) was handed down before the conclusion of the hearing in these proceedings. Arnold J disagreed with Burton J's decision in the *Stepanovs* case and rejected the direct contractual route to jurisdiction. His decision and his view of Burton J's decision was affirmed by this Court in its decision in the *VTB Capital* case on 20 June 2012: [2012] EWCA Civ 808. Teare J, who had deferred giving his decision, pending the outcome of that appeal, held that, in the light of it, he was bound to reject this argument.

9.   As a result of permission being given by the Supreme Court for an appeal in the *VTB Capital* case on the direct contractual route to jurisdiction, permission to appeal that aspect of Teare J's decision was given. This ground was properly abandoned by Antonio Gramsci when the Supreme Court affirmed the decision of this court in the *VTB Capital* case: [2013] UKSC 5. That it is untenable has, if anything, been underlined by the very recent decision of the Supreme Court, after the hearing in these proceedings, in *Prest v Petrodel Resources Ltd and others* [2013] UKSC 34, on which see  [65] and [66] below. Permission to appeal against Teare J's decision that Mr Lembergs had not submitted to the jurisdiction for the purposes of Article 24 of the Brussels Regulation was refused.

**3. The question for decision:**

10.     The sole question for decision in this appeal now is what I, reflecting the substance of its characterisation in the submissions of Mr Rainey QC, on behalf of Antonio Gramsci, will describe as "the EU law point". It is whether the controller of a corporate body who has used the corporate body as a device or façade to conceal wrongdoing by entering into a contract with another containing an English jurisdiction clause can be regarded as having consented to jurisdiction within Article 23, although he is not a party to the contract with that other.  In his judgment dated 24 July 2012 Teare J held that unless the controller "himself" has expressed or indicated any willingness that claims brought against him by the other contracting party may be tried in this jurisdiction, the answer is "no".  I deal with Mr Rainey's submissions as to why the judge fell into error at  [20]-[31]. At this stage it suffices to say that he maintains that the judge gave insufficient weight to the European jurisprudence on this point, in particular an established use in the context of Article 23 of deemed consent in particular circumstances, and that he was unduly and wrongly influenced by English contract law analysis including the analysis of the Court of Appeal in the *VTB Capital* case.

**4. The judgment:**

11.     The judge dealt with the direct contractual route to jurisdiction, now blocked as a result of the Supreme Court's decision in the *VTB Capital* case, under two headings; "the factual issue" between [11]  and [48] , and "the legal issue" between [49] and [55]. I have stated that this is no longer a live issue in this appeal. But because of at least the significant factual overlap between it and the "EU law" Article 23 point, I will summarise the part of his judgment dealing with the first of the two headings before dealing with the "EU law" point.

12.     Under the heading "the factual issue", the judge dealt with whether there is a good arguable case that Mr Lembergs was a beneficial owner and controller of the Corporate Defendants which were, on Antonio Gramsci's case, incorporated for the purposes of diverting profits from it. He stated (at [11]) that this was the factual case which Antonio Gramsci was required to establish in order to the lay the foundation for its argument the corporate veil may be pierced. At [34] he put the matter as follows:

> "The factual issue is whether or not Mr Lembergs was a beneficial owner of the Corporate Defendants with control over them who had brought about their incorporation with a view to effecting the alleged fraudulent scheme."

    That issue was, he stated, relevant both to the jurisdiction gateway, "Did Mr Lembergs agree to the English jurisdiction in the charterparties?", and to whether he was liable in restitution in respect of the charterparties jointly and severally with the Corporate Defendants.

13.     The evidence before the judge as to who owned the Corporate Defendants differed from that before Gross and Burton JJ. In particular (see judgment, [17]), there were two statements from Mr Lembergs, a decision of a Latvian criminal court recording testimony from other persons, and five additional pieces of documentary evidence.

14.     In his judgment refusing summary judgment to which I have referred at [5], Gross J stated that the evidence adduced by Antonio Gramsci against the Corporate

Defendants gave it the better of the arguments at that stage. The evidence relied upon by Antonio Gramsci in these proceedings was in essence that evidence, in particular that of a Mr Paderov, who stated that he set up the Corporate Defendants "for the purpose of carrying out the charters", and a Mr Kveps, a lawyer who acts for other beneficial owners of the Corporate Defendants. There is, however, a sharp conflict between that evidence and the evidence adduced by and on behalf of Mr Lembergs in these proceedings: see the summary by the judge at [31].

15.     The judge addressed the difficulty the court faces in a jurisdiction challenge where there is a conflict of evidence on the factual issues and, in particular, Waller LJ's statement in *Canada Trust v Stolzenberg (No. 2)* [1998] 1 WLR 547 at 555. Waller LJ stated that the court considering jurisdiction must be concerned "not even to appear to express some concluded view on the merits" and that the "good arguable case" test in this context means that one side must have "a much better argument on the material available". The judge also considered the view of Christopher Clarke J in *Cherney v Deripaska* [2008] EWHC 1530 (Comm) at [19] – [44] that the need, in what has become known as "the *Canada Trust* gloss", to avoid expressing a concluded view as to the merits while applying the "good arguable case" test is met because the court, at the jurisdiction stage, is concerned with the <u>arguments</u> in favour of the respective parties rather than any determination on the balance of probabilities.

16.     Teare J accepted that he was bound to apply the "*Canada Trust* gloss" but was not sure that concentrating on the arguments avoided the difficulty. He agreed with Hamblen J in *Cecil v Bayat* [2010] EWHC 641 (Comm) that difficulties remained and stated that the court was still at risk of appearing to conduct a trial prior to the trial itself. He also stated (at [42]) that where "the factual dispute is as stark as it is in this case it is difficult to say that the claimants have a much better argument on the material available". Relying on the observations of Toulson J (as he then was) in *Petroleum Investment Co Ltd v Cant-Pan Holdings* [2002] 1 All ER (Comm) 124 at [38] and *WPP Holdings (Italy) v Benatti* [2007] 1 WLR 2316 at [44], he considered (see [45]) that in such a case it was preferable "to concentrate on whether factors exist which allow the court to take jurisdiction".

17.     Using the approach based on Toulson J's observations, Teare J concluded (see [48]) that Antonio Gramsci's evidence had "sufficient strength", assuming its submissions on the law were correct, "to allow the court to take jurisdiction". This was "notwithstanding that, by reason of the conflict of evidence and the limitations imposed by the interlocutory process", he was not able to conclude in advance of hearing oral evidence that Antonio Gramsci had "the better of the argument".

18.     This court's decision in the *VTB Capital* case was handed down on 20 June 2012, some four months after the conclusion of the oral submissions in this case. After that, Antonio Gramsci's representatives contacted the judge to identify an independent argument which, it maintained, had been pleaded and raised, which could allow it to succeed in invoking Article 23 even if its direct contractual route to jurisdiction based on the *Stepanovs* case was bound to fail as a result of the decision in the *VTB Captal* case. The judge stated (see [58]) that it appeared from three paragraphs of the two skeleton arguments before him that the point had been argued. Mr Emmett, on behalf of Mr Lembergs, accepted that the point, which I have characterised as "the EU law point" had been raised "albeit faintly", and the judge dealt with it at [59] – [62].

19.     The judge stated:

> "59.  As explained by Burton J. in the *Stepanovs* case at [2011] 1 Lloyd's Rep. 647, paragraphs 31-63, the national law determines who is party to the jurisdiction agreement whereas EU law determines whether there has been sufficient "consensus" between the parties identified by the national law. "Consensus" in article 23 requires a claimant to show that a defendant has clearly and distinctly consented to the alleged jurisdiction agreement.
>
> 60.  Burton J. does not appear to have alluded to the argument to which Mr. Rainey has referred. But assuming that it is possible to demonstrate consensus in the absence of a formal contract (as Mr. Thomas submitted was indicated by *Berghoefer GmbH v ASA SA* [1985] ECR 2699 and *Powell Duffryn v Petereit* [1992] ECR 1-1745 and as Adrian Briggs has argued in *Agreements on Jurisdiction and Choice of Law* at paragraphs 7.36-38) such consensus must be established on the facts. Adrian Briggs suggests that there must be some "public willingness" to agree to the jurisdiction of the court in question.
>
> 61.  In circumstances where, on the evidence adduced by [Antonio Gramsci], Mr. Lembergs has induced [Antonio Gramsci] to contract with the Corporate Defendants on terms which included a jurisdiction clause in favour of the English court but where there is no evidence that Mr. Lembergs has himself expressed or indicated any willingness (public or otherwise) that claims brought against him by [Antonio Gramsci] may be tried in the English court, I do not consider that there is an arguable case that Mr. Lembergs has indicated his willingness to be sued in the English court so as to give rise to the sort of consensus required by article 23. Just as it is not permissible to raise the corporate veil to reveal Mr. Lembergs as party to the charterparties and to the jurisdiction clause within them so it is not possible, in my judgment, to raise the corporate veil to reveal Mr. Lembergs as a person expressing his willingness to submit to the jurisdiction of the English court. It is, it seems to me, unrealistic (or, as the Court of Appeal has more forcibly put it, "pure fiction") to say that Mr. Lembergs has demonstrated a willingness to have claims against him brought in the English court when he has, on [Antonio Gramsci's] case, carefully avoided doing that and has, at best, demonstrated only a willingness that claims against the Corporate Defendants be brought in the English court.
>
> 62. I therefore hold that [Antonio Gramsci is] unable to establish jurisdiction pursuant to Article 23 of the Brussels Regulation."

## 5. The submissions on behalf of Antonio Gramsci

20.     Mr Rainey's starting point was that, although the judge did not expressly record it as such, in the section of his judgment dealing with "the factual issue" he held that Antonio Gramsci had shown a good arguable case for "piercing" the corporate veil because there was a good arguable case that Mr Lembergs was a beneficial owner and controller of the Corporate Defendants which were incorporated for the purpose of diverting profits from it, he was one of the "masterminds behind the scheme to divert profits" from it, and he "approved the arrangements" for the scheme, including the conclusion of the charterparties. Mr Rainey submitted that these findings of fact were unaffected by the decision of the Supreme Court in the *VTB Capital* case, which was concerned with the position under the law of England and Wales and not EU law, and because the Supreme Court accepted that there are circumstances in which a court should pierce the corporate veil: see [2013] UKSC 5 at [118]-[130] *per* Lord Neuberger.

21.     Mr Rainey was critical of the brevity of the judge's treatment of the EU law point on Article 23 and submitted that the judge erred and did not correctly apply that law to his factual findings. He accepted that the explanation for the brevity may be the way the point had been dealt with before and at the hearing. It is clear that the bulk of the written submissions on Article 23 before the judge concerned the direct contractual route. I have referred (see [18] above) to the discussion some four months after the conclusion of the oral submissions in this case in the light of the decision of this court in the *VTB Capital* case. The question was whether Antonio Gramsci had contended that there was a different way Article 23 could apply if it was unable to say that Mr Lembergs was a party to the charterparties and the jurisdiction clauses. The need for that discussion suggests that what Mr Rainey described as Antonio Gramsci's alternative case on Article 23 cannot have played any real part in the oral submissions.

22.     The focus of Mr Rainey's criticism was the judge's statement that there must be "some public willingness" to agree to the jurisdiction of the court. He submitted this erred because it did not recognise that the jurisprudence of the ECJ (now the CJEU) is that "deemed consensus" may be sufficient for the purposes of Article 23 of the Brussels Regulation. In particular circumstances, such deemed consensus may suffice irrespective of whether the Defendant actually knew about the jurisdiction clause in question or intended to agree to it and although it is not possible to establish any actual consensus on the facts.

23.     Mr Rainey relied in particular on the decision of the ECJ in Case C-214/89 *Powell Duffryn Plc v Petereit* [1992] ILPr 300 and on the decision of the Commercial Court in *Standard Steamship Owners' Protection and Indemnity Association (Bermuda) Ltd v GIE Vision Bale & ors* [2004] EWHC 2919 (Comm). In his oral submissions Mr Rainey stated he was not relying on the principle of succession, in particular succession in the context of bills of lading and the line of cases starting with Case C-71/83 *Tilly Russ v Haven & Vervoerbedrijf Nova NV* [1985] QB 931.

24.     In the *Powell Duffryn* case the ECJ accepted that a jurisdiction clause contained in a company's articles of association was "an agreement conferring jurisdiction" within the meaning of the predecessor of Article 23 and that it bound the shareholders of the company even though there was nothing in writing which contained or evidenced the shareholders' agreement to the clause and even where the shareholders had objected to the relevant changes to the articles.

25.     In the *Standard Steamship Owners*' case Cooke J, in the context of Article 23, held that in the context of P&I insurance the conclusion of the agreement on jurisdiction in correspondence by agents of the assured and agents for the club sufficed. He stated (at [41]) that the actual consensus between the two agents could not be doubted, and (at [52]) that none of the authorities discussed the position of agents in this context. He then stated (at [54]) that "if the agent has appropriate authority to bind the principal … the agent's consensus is that of the principal and no further enquiry beyond the agent's consensus is therefore required".

26.     The *Standard Steamship Owners*' case concerned disclosed agents, but Mr Rainey submitted that the same approach would be applied by the CJEU or the English court if it had to consider whether an undisclosed principal had agreed to a jurisdiction agreement to which his agent had expressly consented, so that consent by the

undisclosed principal would be deemed or presumed. While recognising that the relationship in the present case between Mr Lembergs and the Corporate Defendants is not one of agency, Mr Rainey submitted that this case is analogous to the case of an undisclosed principal.

27.     Mr Rainey buttressed his submissions by references to the purposes of the Brussels Regulation. He contended that the judge had erred in not giving sufficient weight to the purpose of securing legal certainty by enabling the parties reliably to foresee which court will have jurisdiction and minimising the possibility of concurrent proceedings in different jurisdictions: see Recitals (11) and (15) to the Regulation and the decision of the ECJ in *Powell Duffryn v Petereit*, in particular [13]-[14], [16]-[18] and [20] of the judgment.

28.     He also relied on the need to have regard to the principle of good faith in this, a case of alleged fraud, which has been applied in the interpretation of Article 23. In Case C-221/84 *Berghoefer GmbH & Co KG v ASA SA* [1986] 1 CMLR 13, the court stated (at [15]) that if it is actually proved that jurisdiction was conferred by an oral agreement, and if the written confirmation of the oral agreement given by one of the parties was received by the other who raised no objection in reasonable time, it would be contrary to good faith for the party who had not objected to dispute the existence of a jurisdiction agreement.

29.     As to the position of Community law about piercing the corporate veil, Mr Rainey relied on Case C-81/09 *Idrima Tipou AE v Ipourgos Tipou kai Mason Mazikis Enimerosis* [2011] 1 CMLR 42 as indicating (in the opinion of the Advocate General) that doing this is perfectly lawful although the Community legislature does not regulate this itself.  He submitted that the need to deal with cases of fraud and improper use of corporate entities justified looking to what he described as the underlying reality and regarding both the corporate entity and the controller as being deemed as having consented to jurisdiction. This, he submitted was necessary so that fraudsters are not able "to shelter behind the corporate structure of companies which they have set up for the purpose of defrauding an innocent party with whom their puppet company contracts in order to avoid being sued in the courts of a Member State in which the puppet company has agreed to be sued".

30.     Mr Rainey criticised the judge for not referring to the European jurisprudence and for basing his reasoning "entirely upon a short passage" in Professor Briggs' *Agreements on Jurisdiction and Choice of Law*" (2008) 7.37 which was in a section headed *"Unilateral or bilateral agreement?"*. That passage, he submitted, was dealing with a different point, and did not refer to the decision in *Powell Duffryn v Petereit*. Underlying Mr Rainey's criticisms is an implicit suggestion that the judge did not fully take on board the extent to which this alternative submission was different from the submission that there was a direct contractual route to jurisdiction.

31.     In summary, Mr Rainey submitted the judge did not appreciate that EU law has recognised deemed consent in a proper case even where there is no actual consent. He maintained that, before doing so, the court will have in mind the factual matters linking a party to the party to the contract which contains the jurisdiction clause. It will consider the true nature of the legal relationship in the eyes of EU law, and what the agreement is in the light of the way the third party has conducted himself. It will,

he submitted, also take account of the principle of certainty and the need to avoid multiplicity of grounds of jurisdiction where there is a jurisdiction clause.

32.    In the event that this court did not accept his submissions as to the proper interpretation of Article 23, Mr Rainey submitted that it make a reference to the CJEU for a preliminary ruling under Article 267 of the Treaty of the Functioning of the European Union ("the TFEU"). He submitted that the question should be:

> "Where:
>
> (i)   a person A improperly sets up a company B as a vehicle of fraud and causes it to enter into a contract with another party C to defraud C and to conceal his participation from C; and
>
> (ii)   the contract which A procures contains a jurisdiction clause in favour of the courts of a Member State to which A causes his creature company B to consent, in circumstances where A knows or it is held that he ought to know (a) that the use of the company is improper…[2]; (b) that if the true facts are discovered the corporate veil may be pierced and he may be liable to C in connection with or in respect of the transaction,
>
> will A be deemed to have consented to the same jurisdiction as that to which the company B consented 'to settle any disputes which have arisen or which may arise in connection with a particular legal relationship' under Article 23 of Council Regulation (EC) 44/2001 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters?"

33.    He gave three reasons for this submission. First, the meaning of Article 23 in the particular context of this case is not *acte clair*. Secondly, the application of Article 23 to the case of an individual who controls a company and causes it to enter into a contract with a jurisdiction agreement in order to defraud the company's contractual counterparty has not been considered by the CJEU. Thirdly, the question is an important one. It concerns whether the CJEU will allow fraudsters to shelter behind the corporate structure of companies which they have set up for the purpose of defrauding an innocent party with whom their puppet company contracts in order to avoid being sued in the courts of the Member State in which the puppet company has agreed to be sued.

## 6. Discussion

*(i) The approach of an appellate court:*

34.    I start by reminding myself of the statements in the *VTB Capital* case about the approach of an appellate court to a question such as the one before this court: see [2013] UKSC 5 at [69], [96], [97] and [156] *per* Lord Mance, Lord Neuberger and Lord Wilson. If the judge has erred in law, or taken into account any irrelevant matter or failed to take into account a relevant matter which could influence the conclusion reached, the appeal will be allowed. But they emphasised that, although the question before the judge is not the exercise of a discretion, it is "an evaluative, or a balancing exercise", "a classic interlocutory exercise with which an appellate court should be slow to interfere".

---

[2] The written submissions stated the circumstances to be "improper and fictive".

*(ii) Article 23: Introduction*

35.     I turn to the Brussels Regulation. The general rule under the Regulation is that jurisdiction is generally to be based on the defendant's domicile. The underlying principle is that it must always be so based, save in well defined situations in which the subject matter of the litigation or the autonomy of the parties requires a different linking fact: see Recital (11) to the Regulation. A further principle (see Recital (15)) is that it is necessary to minimise the possibility of concurrent proceedings.

36.     Article 23, which requires a consensus between the parties that a particular court is to have jurisdiction, like its predecessor Article 17 of the Brussels Convention, is based on the autonomy of the parties. Its material part provides:

> "1. If the parties, one or more of whom is domiciled in a Member State, have agreed that a court or the courts of a Member State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have jurisdiction. Such jurisdiction shall be exclusive unless the parties have agreed otherwise. Such an agreement conferring jurisdiction shall be either:
>
> (a) in writing or evidenced in writing; or
>
> [(b) and (c) are omitted]"

37.     The purpose of Article 23 is to ensure that the parties have actually consented to the choice of jurisdiction. The decisions of the ECJ (now the CJEU) make it clear that, to be effective for the purpose of Article 23, an agreement to confer jurisdiction must establish consensus between the parties "clearly and precisely": Case C-24/76 *Estasis Salotti v RÜWA Polstereimaschinen GmbH* [1977] 1 CMLR 345 and case C-25/76 *Galleries Segoura SPRL v Rahim Bonakdarain* [1976] ECR 1851.

38.     There is, however, a measure of flexibility. Although (see Case C-313/85 *Iveco Fiat SpA v Van Hool NV* [1986] ECR 3337) the ECJ stated that "the purpose of the formality requirement [in Article 23] is to ensure that the consensus between the parties is in fact established", an oral agreement conferring jurisdiction can suffice. This will be so where the oral agreement is later confirmed in writing by one party and the other party has raised no objection in sufficient time: Case C-221/84 *Berghoefer GmbH v ASA SA* [1986] 1 CMLR 13. *Briggs on Civil Jurisdiction and Judgment* (5th ed 2009, ed Rees) 178 states that the formal requirements "are a means to an end, and are not an end in themselves", and "the only question, sight of which must not be lost, is that the formal requirements are there to ensure that there was consensus. If the consensus can be clearly and precisely established by other means, they serve no additional function, and there is no further need to consider them".

39.     Secondly, written consensus may exist in the absence of a binding contract: see Fentiman, *International Commercial Litigation* (2010) at 2.40, giving a non-binding memorandum and an unsigned version of a contract which requires a signature as examples.

40.     Despite this measured flexibility, the jurisprudence of the ECJ regards the departures from the general rule of domicile-based jurisdiction, including Article 23, as derogations. In that sense they are regarded as exceptions to the general rule, although

to regard jurisdiction based on Article 23 as exceptional may (see Fentiman, *International Commercial Litigation* (2010) 2.42) risk placing an obstacle to giving effect to party autonomy.

41. There are also statements that departures from the general rule of domicile-based jurisdiction should be strictly construed (see Case C-24/76 *Estasis Salotti v RÜWA* [1977] 1 CMLR 345 at [7] and *Bank of Tokyo-Mitsubishi v Baskan Gida Sanayi Pazarlama* [2004] EWHC 945 (Ch) at [191] *per* Lawrence Collins J, as he then was) and interpreted in "keeping with the spirit of certainty". This means they should be interpreted so as to ensure that they are only applicable in clear cases and without having to delve into the merits of the underlying dispute: see Case C-159/97 *Castelletti v Trumpy* [1999] ILPr 492 at [48]-[49]. This last point has particular relevance when what is under consideration is an enquiry at the interlocutory stage in a case such as this one where there is a sharp conflict of evidence.

*(iii) Fact and law*

42. With this background I turn to Mr Rainey's submissions about the terms "agreed" and "agreement" in Article 23. Mr Rainey is clearly correct in emphasising that whether a person against whom jurisdiction is claimed by virtue of Article 23 has consented to jurisdiction is an autonomous question of EU law. That was indeed common ground. For examples of statements to this effect see *Powell Duffryn v Petereit* at [13] and [20] and Case C-543/10 *Refcomp SpA v AXA Corporate Solutions Assurance SA* [2013] ILPr 17 at [21] and [39]-[40]. The reason for this autonomous meaning is the need to avoid a multiplicity of grounds of jurisdiction for disputes arising out of the same factual relationship.

43. It is, however, also clear that the autonomous requirement raises a question of fact: see Case C-24/76 *Estasis Salotti v RÜWA* [1977] 1 CMLR 345 at [7] where it was noted that the court must examine "whether the clause conferring jurisdiction upon it was <u>in fact</u> the subject of a consensus between the parties …" (emphasis added). This was repeated in Case C-387/98 *Coreck Maritime v Handelsveem* [1999] ILPr 721 at [13] and [14], where the ECJ added that what is now Article 23 "is based on a recognition of the independent will of the parties to a contract in deciding which courts are to have jurisdiction …".

44. I accept the submission in the skeleton argument of Messrs de Garr Robinson QC and Emmett on behalf of Mr Lembergs that the judge did not find as a matter of fact that the present case was an appropriate one for "piercing" the corporate veil. Mr Rainey's submission (summarised at [20] above) that the judge did so find depends on a rigid separation of the parts of the judgment dealing with "the factual" and "the legal" issue. But, as Lloyd LJ observed during the course of the hearing, courts do not pierce a corporate veil at large and then look at the consequences. They consider whether, in the light of the purpose for which it is desired to pierce the veil, the facts of a case make it an appropriate one for doing so.

45. In this case, the factual issues concerned whether there was a good arguable case that Mr Lembergs was a beneficial owner and controller of the Corporate Defendants and whether they were incorporated for the purpose of diverting profits from Antonio Gramsci. But those questions of ownership and control and alleged fraud are different from the question whether the consequence of establishing them to the requisite

standard is that the corporate veil may be pierced. The latter question is a legal one and the answer to it is a finding of at least mixed law and fact, if not one of pure law. It was so treated by the judge. It is significant that the judge's conclusion at [48] (which I have summarised at [17]) was a conclusion reached on the assumption (which he then rejected) that Antonio Gramsci's argument on the law was correct.

46.   The non-automatic nature of "piercing the veil" as a consequence of finding that an individual owns and controls the relevant company at the relevant time and has used it as a façade to conceal the true facts is seen from the statement in this court's judgment in the *VTB Capital* case ([2012] EWCA Civ 808 at [92]) that, "in a case in which it is thought appropriate to pierce the veil, any order made in consequence of such a veil piercing is by way of the exercise by the court of a discretionary jurisdiction".

47.   Mr Rainey's approach is, in my judgment, also contrary to the decision of the Supreme Court in the *VTB Capital* case. Lord Neuberger stated ([2013] UKSC 5 at [147]) that on the facts of the *Stepanovs* case, which for these purposes are identical to those of the present case, establishing the requisite facts was not itself "enough to justify piercing the corporate veil for the purpose of holding the individual liable for the transaction, action or receipt, especially where the action is entering into a contract". It should be noted that the words "liable for the transaction … or receipt" indicate wider purposes than making the individual a party to the contract. He also stated (at [146]) that he was not attracted by the notion that the principle of "piercing the corporate veil" should be invoked simply to enable a claimant to justify proceedings being heard in this jurisdiction if they otherwise could not be.

*(iv) The relevance of the VTB Capital case*

48.   Although Mr Rainey relied on the decision of the Commercial Court in the *Standard Steamship Owners'* case in support of his submissions, on EU law and Article 23, he submitted that the *VTB Capital* case was concerned only with the law of England and Wales. He argued that its approach to piercing the veil had no relevance when determining whether there was consensus for the purposes of Article 23. Strictly speaking this may be so. But the submission has an air of unreality about it. The *VTB Capital* case was a challenge to jurisdiction by Nutritek. It was in that context that the lawyers and judges in the case grappled with the question of whether it is possible to pierce the veil to establish that a person is the true party to a contract. Given that context, and Lord Wilson's specific reference to Article 23 at [158], it is likely that the Supreme Court was alive to this aspect of the case.

49.   There are two reasons the approach in the judgments in the *VTB Capital* case is very material to the question whether it is possible to show consensus by piercing the veil to establish that a party is to be taken to have agreed to jurisdiction for the purpose of Article 23 irrespective of whether that party is party to the contract containing the jurisdiction clause. First, for the reasons I give at [64], it appears that EU law may leave the regulation of when the veil can be pierced to national law.

50.   Secondly, and irrespective of that, the present case is one in which it is said that the veil should be pierced to enable ascertainment of consensus. It is said that Mr Lembergs is to be "deemed" to have given consent or "may be regarded" as having given it for the purpose of EU law because of the piercing of the veil between him and the Corporate Defendants. It is this submission which makes it difficult to assert that

the *VTB Capital* case is not relevant for the purpose of considering consensus and agreement under Article 23. What Antonio Gramsci has sought to assert is that the same facts as have been held not to amount to constituting Mr Lembergs a party to the charterparties containing the jurisdiction clauses show that he is a party to an agreement containing the clauses or that there is consensus between him and Antonio Gramsci about the operation of the clauses.

*(v) The EU jurisprudence*

51.    I turn to the decisions of the ECJ and the CJEU. I do not consider that the cases relied on by Mr Rainey in fact support his case. He was correct not to rely on the *Tilly Russ* line of cases about succession in the context of bills of lading. The reasoning in those cases concerned the consent of the original parties to the bills of lading, not the consent of a subsequent and third-party holder of the bill of lading. The ECJ did not, moreover, rely on "deemed consent" by the third-party holder but (see [1985] QB 931 at [27]) on the fact that the third-party succeeded to the rights and obligations of the shipper when he acquired the bill of lading. It contrasted the position that would have obtained had the third party holder not succeeded to the rights and obligations of the shipper. The ECJ stated that, in those circumstances, the court would have to ascertain "whether [the third party holder] accepted [the jurisdiction] clause having regard to the requirements" in what is now the first paragraph of Article 23. Save for the specific situation in which the holder in due course has succeeded to the shipper's rights and obligations, the ECJ thus emphasised the need to establish actual consent.

52.    Notwithstanding the subtlety of Mr Rainey's submissions on *Refcomp SpA v AXA Corporate Solutions Assurance SA* [2013] ILPr 17, I do not consider that he is assisted by that case. He placed particular reliance on the statement of the CJEU at [29]-[30]. The CJEU stated that, while "in order for a third party to rely on the [jurisdiction] clause it is, in principle, necessary that the third party has given his consent to that effect", "the conditions and the forms under which a third party to the contract <u>may be regarded as having given his consent to a jurisdiction clause</u> may vary in accordance with the nature of the initial contract" (emphasis added). He was, however, not able to identify a principle upon which the "nature" of the initial contract would justify a "deemed consent" as opposed to actual consent by the individual.

53.    In the *Refcomp* case, the CJEU referred to the *Powell Duffryn* case and the *Tilly Russ* line of cases, but stated (see [32]) that jurisprudence could not be transposed to the relationship between a sub-buyer of goods purchased from an intermediate seller and the manufacturer of those goods. This was because (see [37]) the relationship of succession in string contracts for the sale of goods is not regarded as the transfer of a single contract or the transfer of all the rights and obligations for which it provides. Moreover, in some cases the different contracts in the string may not be on exactly the same terms. It has not been suggested that in the circumstances of the present case there has been a transfer of the charterparties or the transfer of all the rights and obligations under them.

54.    That leaves the *Powell Duffryn* case (see [24] above) and the decision of the English Commercial Court in the *Standard Steamship Owners'* case (see [25] and [26] above). I do not consider that either decision assists Antonio Gramsci's case.

55.   *Powell Duffryn* was a case in which there was clearly a contract between the company and the shareholder. The question was not as to the existence of a contract or consensus between the claimant and the party against whom jurisdiction was claimed. There was a clear and distinct relationship between the parties in that the party resisting jurisdiction had bought shares in the company. The question was whether by buying the shares, that shareholder was "deemed" to have consented to the jurisdiction clause in the articles of association. The point was not whether there was consensus but the incorporation of the jurisdiction clause in what was undoubtedly a consensual relationship, a contract, between the parties. The statement at [19] of the judgment that "… by becoming and by remaining a shareholder of a company the member agrees to submit to all the provisions of the articles of association … even if he is not in agreement with some of those provisions …" is not an alternative to the requirement to establish agreement in fact, but a finding that the act of becoming and remaining a shareholder amounted to such agreement. The ECJ was working out what the parties actually intended in a common sense way. It regarded (see [16]) the articles of association as "a contract covering both the relations between the shareholders and also the relations between them and the company they set up".

56.   The only references to "deeming" in that case concern the requirement of writing in what is now Article 23. For the shareholder to be "deemed to be aware of the clause and to have given actual consent to the conferment of jurisdiction" the ECJ required (see [28] and [29]) that the company's articles of association be lodged at a place which is accessible to the shareholders or kept in a public register. What the case shows is that, where there is clearly an agreement between a claimant and the party resisting jurisdiction, it suffices for there to be an agreement to terms containing a jurisdiction clause and it is not necessary for there to be an agreement specifically as to that jurisdiction clause: see also *Polskie Ratownictwo Okretowe v Rallo Vito and C.Snc* [2009] EWHC 2249 (Comm) at [37] *per* Hamblen J.

57.   A situation similar to that of the shareholder in *Powell Duffryn's* case concerns assignment. Assignment involves the transfer of the contractual rights to the assignee. By taking the assignment of a contract containing a jurisdiction clause, the assignee, like the shareholder, agrees to its terms including the jurisdiction clause. In *Bank of Tokyo-Mitsubishi v Baskan Gida Sanayi Pazarlama* [2004] EWHC 945 (Ch) at [191] Lawrence Collins J (as he then was) stated that "an assignee of a contract may be bound by a jurisdiction clause contained in it", citing Case C-201/82 *Gerling Konzern Speziale Kreditversicherung AG v Amministrazione del Tesoro dello Stato* [1983] ECR 2503.

58.   *Standard Steamship Owners'* is also a case in which there was no need for "deemed consent". Where a person provides an agent with actual or apparent authority to make agreements on its behalf, that person has agreed to what its agent agrees, within the scope of the authority, on its behalf. In that case the parties knew about the principals, but in principle the position would be the same in the case of an undisclosed principal.

59.   As to the analogy which Mr Rainey sought to draw with cases relating to undisclosed principals and the facts of this case, I accept the written submission of Messrs de Garr Robinson QC and Emmett that this does not assist. First, a person can only be held to have contracted as an undisclosed principal where that person has actually authorised the agent to contract on its behalf, although such authorisation may be implied. There is thus consent of the same kind as existed in the *Standard Steamship Owners'* case.

In these proceedings, Antonio Gramsci's case is not that Mr Lembergs authorised the Corporate Defendants to contract on his behalf, but that he specifically sought to avoid this.

60. Secondly, in the *VTB Capital* case the Supreme Court rejected the undisclosed principal doctrine as a suitable analogy in the context of piercing the corporate veil: see [2013] UKSC 5 at [141] *per* Lord Neuberger. His Lordship stated that the rule "has long been regarded as an anomaly". He approved the statement by the Court of Appeal in that case ([2012] EWCA Civ 808 at [89]) that it would be inappropriate to extend an anomaly save where it would be unjust and unprincipled not to do so. He also relied on the statement of Lord Hoffmann in *OBG Ltd v Allen* [2008] AC 1 at [103] and [106] that "an anomaly created by the judges to solve a particular problem" is "an insecure base" on which to justify an extension to a principle, especially when that principle can itself be said to be anomalous.

61. I can deal with the decision of the ECJ in the *Berghoefer* case (see the summary of Mr Rainey's submission on this at [29] above) briefly. That was a case in which there was an oral agreement between the claimant and the party resisting jurisdiction. Here the question is whether there is an agreement between Antonio Gramsci and Mr Lembergs.

62. I return to the question whether there is an underlying principle as to when "deemed consent" will or may suffice and the reference in *Refcomp SpA v AXA Corporate Solutions Assurance SA* [2013] ILPr 17 to the nature of the contract as relevant to this. My consideration of the cases has identified only one principle deployed for doing so. That is where the situation is one in which there has been a transfer of the contract or of all the rights and obligations for which it provides. That is not the position here.

*(vi) The policy-based submission*

63. It remains to deal with Mr Rainey's policy-based submission (summarised at [29] above). This is that the court needs to prevent fraudsters sheltering behind the corporate structure of companies in circumstances such as the facts alleged in this case. There is undoubted force in this submission. In the context of *forum conveniens* such an approach is favoured by Briggs, [2012] LMCLQ 364, with whom Lord Clarke agreed in his dissenting judgment in the *VTB Capital* case: [2013] UKSC 5 at [221] – [222] and [234] – [235].

64. Mr Rainey's case is that the court can and should pierce the corporate veil where there is a good arguable case that the defendant has set up the puppet company for the purpose of defrauding an innocent party with whom their puppet company contracts in order to avoid being sued in the courts of a Member State in which the puppet company has agreed to be sued. It was in this context that he relied on the Advocate-General's opinion in *Idrima Tipou AE v Ipourgos Tipou kai Mason Mazikis Enimerosis* [2011] 1 CMLR 42. That case may show that piercing the corporate veil is lawful under EU law, but the passage in that case relied on (see [26] above) expressly states that the Community legislature does not regulate this itself. Accordingly, the question of when it is possible to do so is of necessity thrown back to national law.

65. The references in Lord Sumption's judgment in *Prest v Petrodel Resources Ltd and others* [2013] UKSC 34 (at [27] and [34]) to "abuse of corporate legal personality" as

justifying piercing the corporate veil may appear to give some support to a policy-based approach. But it is clear from the decision of the Supreme Court that, in the present state of English law, the Court can only pierce the corporate veil when "a person is under an existing legal obligation or liability or subject to an existing legal restriction which he deliberately evades or whose enforcement he deliberately frustrates by interposing a company under his control": see [35], [60] and [98]. Lord Mance and Lord Clarke (see [100] and [103]) did not want to foreclose further development of the law, and Lady Hale's approach (at [91] – [92] appears to be to the same effect, but that is where English law stands at present. In the light of the decisions in *VTB Capital* and *Prest v Petrodel*, the submission that it is possible to pierce the corporate veil in in this case to deem Mr Lembergs to have consented to the jurisdiction clause is untenable.

66.     As to further development of the law, doing so by classical common law techniques may not be easy. In *Prest's* case Lord Sumption (at [28]) identified two underlying principles which he called "the concealment principle" and "the evasion principle". But Lord Neuberger was of the view (at [75] that there is a "lack of any coherent principle in the application of the doctrine of "piercing the corporate veil", and Lord Walker's view (at [106]) was that it is not a doctrine in the sense of a coherent principle or rule of law but a label. Lady Hale (at [92]) was "not sure whether it is possible to classify all of the cases in which the courts have been or should be prepared to disregard the separate legal personality of a company  neatly into cases of either concealment or evasion". Absent a principle, further development of the law will be difficult for the courts because development of common law and equity is incremental and often by analogical reasoning. It was because the law governing undisclosed principals was regarded as unprincipled, that, in the *VTB Capital* case, it was not regarded as a suitable analogy: see [60] above. The position in this context appears similar to the former position in the area of law now recognised to be governed by the principle against unjust enrichment. So, in *Orakpo v Manson Investments Ltd* [1978] AC 95 at 104 Lord Diplock stated the circumstances in which a person who discharged the debts of another may recover the sums so paid defeated classification except as an "empirical remedy". He stated that made "particularly perilous any attempt to rely on analogy to justify applying to one set of circumstances a remedy which has been held to be available in another and different circumstances".

*(vii) Conclusion*

67.     Despite the clear, elegant and attractive way Mr Rainey made his submissions, I would dismiss this appeal and would not refer the question he formulated to the CJEU.

**Lord Justice Ryder:**

68.     I agree.

**Lord Justice Lloyd:**

69.     I also agree.