<u>**IN THE UNITED STATES DISTRICT COURT**</u>
<u>**FOR THE NORTHERN DISTRICT OF TEXAS**</u>

<u>**CIVIL ACTION NO: 3:18-cv-00731-M**</u>

**MCR OIL TOOLS LLC**

*Plaintiff*

**vs**

**SPEX OFFSHORE LIMITED**
**SPEX SERVICES LIMITED**
**SPEX OFFSHORE (UK) LIMITED**
**SPEX GROUP US LLC**
**SPEX ENGINEERING (UK) LIMITED**
**SPEX GROUP HOLDINGS LIMITED**
**SPEX CORPORATE HOLDINGS LIMITED**
**and**
**JAMIE OAG**

*Defendants*

---

**SECOND DECLARATION OF GARRY BORLAND, Q.C.**

---

<u>**Introduction and instructions**</u>

1.  My name is Garry Borland QC.

2.  I have previously given a declaration, dated 30 January 2019 (the "First Declaration"), in relation to the ongoing court proceedings raised by MCR Oil Tools, LLC ("MCR") against the above-named defendants. Those proceedings are taking place in the United States District Court for the Northern District of Texas (the "Court").

3.  In my First Declaration, I set out my academic qualifications and professional history, as well as details of my relevant experience. I also addressed my role as an expert in relation to these proceedings, including the duties which come with that role. All the

1

**EXHIBIT 7**

points made in relation to the foregoing matters should simply be taken as repeated in the present declaration.

4.      My current instructions come from Pinsent Masons LLP ("PM"), a law firm acting for SPEX Corporate Holdings Limited. I refer to the letter of instruction from PM to me dated 23 July 2019 which is attached to this declaration as Exhibit A.

5.      Those instructions ask me to comment on a declaration from Ms Roisin Higgins QC, dated 26 June 2019, which is filed on behalf of MCR. In the PM letter of instruction, I am asked to provide my opinion on five questions which relate to particular paragraphs of Ms Higgins' declaration. In what follows, I will sub-divide the current declaration under reference to those five questions.

6.      For the purposes of this declaration, I will take my First Declaration as read. The opinions which I set out in this declaration should be read in conjunction with those expressed in the First Declaration. I hold to the views which I stated in the First Declaration.

**Question 1**

*Prefatory points*

7.      In this context, I am asked to comment on paras 19-29 of Ms Higgins' latest declaration.

8.      In that section of her declaration, she appears to be making two main, related points. She makes these points on the basis of the recent decision of the English Court of Appeal in *Rossendale Borough Council v Hurstwood Properties (A) Limited and others*, [2019] EWCA Civ 364 (hereinafter "*Rossendale*")[1]. In *Rossendale*, the main judgment which dealt with the issue of piercing the corporate veil was delivered by Richards LJ[2].

---

[1] Judgment in the case was issued on 7 March 2019.
[2] Henderson and Baker LJJ both agreed with Richards LJ's judgment in relation to that issue.

9.      First, Ms Higgins suggests[3] that in *Rossendale* the court proceeded on the footing that it might be able to pierce the corporate veil in situations which are not covered by the so-called evasion principle enunciated by Lord Sumption in the case of *Prest v Petrodel Resources Limited and others*, [2013] 2 AC 415 (hereinafter "*Prest*"). Second, she says that a Scottish judge would be entitled to take a similar approach to the court in *Rossendale*, namely, that there is scope for "principled development" (to use Ms Higgins' expression) beyond the evasion principle[4].

*My response*

10.     I make seven points in response to this.

11.     First, it is clear, on the basis of the law as it currently stands, that in Scots and English law piercing the corporate veil can only be justified in "very rare circumstances": see *Persad v Singh*, [2017] BCC 779 (hereinafter "*Persad*"), per the judgment of the Judicial Committee of the Privy Council (the "JCPC") at para 17. I note that the two Scottish justices in the UK Supreme Court – Lords Reed and Hodge – were party to the JCPC's judgment in *Persad*.

12.     Second, piercing the corporate veil is justifiable "when a person is under an existing legal obligation or liability or subject to an existing legal restriction which he deliberately evades or whose enforcement he deliberately frustrates by interposing a company under his control": *Prest*, per Lord Sumption at para 35; affirmed in *Persad* by the JCPC at para 17. This is the so-called evasion principle.

13.     Third, as I pointed out in my First Declaration[5], whilst Lord Mance in *Prest* did not wish to foreclose development of the law in future cases, he made it very clear that, "No one should, however, be encouraged to think that any further exceptions, in addition to the evasion principle, will be easy to establish, if any exists at all"[6]. Lord Clarke was to the same effect[7]: "I also agree with Lord Mance...and others that the situations in which piercing the corporate veil may be available as a fall-back are

---

[3] Ms Higgins' declaration, at para 26, final sentence.
[4] Ms Higgins' declaration, at para 28.
[5] At para 43.
[6] Para 102, emphasis added.
[7] Para 103.

likely to be very rare and that no one should be encouraged to think that any further exceptions, in addition to the evasion principle, will be easy to establish. It will not."

14.   In *Rossendale*, Richards LJ stated that if there was ever to be an extension of the basis for piercing the corporate veil, beyond the evasion principle enunciated in *Prest*, such an extension would only be justifiable in "very rare and novel cases"[8]. Later in his judgment, his Lordship emphasised the difficulties facing any attempt at extending the veil-piercing doctrine beyond the evasion principle[9].

15.   Fourth, it follows that whilst I too cannot foreclose the possibility of the Scots law relative to piercing the corporate veil developing in future cases, it is plain that any extension of veil-piercing, going beyond the evasion principle, would be very difficult to establish.

16.   Fifth, at para 28 of her declaration, Ms Higgins states that there is scope for "principled development" beyond the evasion principle. At para 31 of her declaration, she appears to suggest that where an interposed company is used as "an engine for fraud or to take an unconscionable advantage", that would be a basis for piercing the corporate veil which went beyond the evasion principle. I will address fraud (and unconscionable advantage) in the context of answering question 3 in PM's instructions.

17.   But even supposing that fraud and/or unconscionable advantage were potential bases for corporate veil-piercing, Ms Higgins does not suggest that the circumstances of the present case could actually fall within such a development of the law, nor any reasoning as to why that should be so.

18.   Sixth, and in any event, I consider that the decision in *Rossendale* is highly instructive, in that it supports the analysis and opinion which I set out in my First Declaration[10].

19.   The plaintiff local authority[11] in *Rossendale* was advancing a claim against a number of defendants in terms of which it sought payment of a local property tax[12] in respect

---

[8] *Rossendale,* at para 46.
[9] *Rossendale,* at para 47.
[10] The decision in *Rossendale* was issued after my First Declaration was produced.

4

of unoccupied properties. The defendants had sought to avoid payment of the tax by granting leases in relation to the properties to third party special purpose vehicle companies (referred to as "SPVs"). The defendants had procured the incorporation of the SPVs. The SPVs had no assets, and thus the plaintiff had no hope of recovering the tax from them. At first instance, the judge held that it was arguable that the plaintiff could seek to pierce the corporate veil of the SPVs, with a view to fixing liability for the taxes on the defendants[13].

20.    The Court of Appeal held that the judge was wrong[14]. Richards LJ noted[15] that the tax at issue accrued on each day of ownership of the relevant property, but not before. Hence for so long as the defendants were the owners of the properties, they were liable to pay the tax. Once, however, they granted leases of the properties to the SPVs, the defendants ceased to be the "owners" in terms of the relevant taxation statute[16], and the SPVs became the owners. Richards LJ went on to say:

> "It follows that the liability for NDR [the tax] arising on each day of the term of the lease was that of the SPV alone. It was not, and never had been, a liability of the defendant lessor. It was thus as a matter of law impossible to say, as one must if the evasion principle is to apply, that the defendants were under an existing obligation or liability for NDR during the terms of the leases which they deliberately evaded by interposing a company under their control"[17].

21.    In my First Declaration, at para 67(a), I stated that, in the present context of deciding whether the corporate veil could be pierced as a matter of Scots law, the first critical question is to ask whether the parties supposedly behind the corporate veil and against whom MCR wishes to establish liability were actually subject to an <u>existing</u> legal obligation owed to MCR. That is the same test which Richards LJ applied in *Rossendale*. Applying that test, his Lordship held that the evasion principle had no application because the defendants were not under any existing obligation owed to the

---

[11] Broadly, the equivalent of a US municipality.
[12] Called non-domestic rates or "NDR".
[13] *Rossendale*, at para 30.
[14] *Rossendale*, at paras 39 and 41.
[15] *Rossendale*, at para 39.
[16] *Rossendale*, at paras 6-11, especially para 11. The relevant statutory provision was the Local Government Finance Act 1988, section 65(1), in terms of which the "owner" was defined as the person entitled to possession of the property.
[17] *Rossendale*, para 39.

plaintiff local authority in respect of the taxes at issue. Rather, once the leases were granted, the obligation to pay the tax was owed by the SPVs, and not the defendants[18]. In these circumstances, there was, Richard LJ observed, no liability of the defendants that could have been defeated or evaded by use of the SPVs[19]. I adopted the same essential line of analysis in paras 69-81 and 83-90 of my First Declaration.

22.   Seventh, in *Rossendale* Richards LJ did consider[20] whether the case before the court could fall within the category of a "very rare or novel" case which might somehow justify piercing the corporate veil on a basis going beyond the evasion principle enunciated in *Prest* and affirmed in *Persad*. But even in a case such as the one before him, in which the plaintiff's position was that the defendants were engaged in a deliberate and concerted tax avoidance scheme, Richards LJ held that extending the basis for piercing the corporate veil could not be justified. The use of the SPV companies in *Rossendale* could not, he held, be described as rare or novel[21].

23.   Turning to the litigation currently being pursued by MCR, I am not aware of any suggestion in MCR's pleadings to the effect that the use or organisation of the SPEX companies could properly be regarded as in any way rare or novel.

### *What in summary should be taken from the* **Rossendale** *case?*

24.   What in summary can the Court take from *Rossendale*? In my view, there are four key points, as follows.

(a)   It is a case in which the Court of Appeal in England rigorously applied the evasion principle analysis enunciated in *Prest*.

(b)   In particular, the court subjected the facts and the legal position to very close examination with a view to determining whether the defendants had been under any <u>existing</u> obligation (rather than a future or contingent liability) owed to the plaintiff which they had then sought to evade by interposing the SPVs.

---

[18] *Rossendale*, at paras 39 and 41.
[19] *Rossendale*, at para 41.
[20] *Rossendale*, at paras 49-51.
[21] *Rossendale*, at para 49.

APP.444

(c)    On that analysis, the plaintiff's attempt to pierce the corporate veil failed. That was because the defendants were not under any existing obligation in respect of the tax at issue. Consequently, it could not be said that they had sought to evade enforcement of an obligation by using the SPVs.

(d)    The Court of Appeal refused to extend the basis for piercing the corporate veil beyond the evasion principle. There was nothing novel or rare about the case which might have justified such a step.

25.    The analysis and result in *Rossendale* are, in my opinion, instructive for the Court when it comes to determining whether the corporate veil should be pierced in the present case.

**Question 2**

26.    Here I am asked to comment on Ms Higgins' statement at para 29 of her latest declaration that there are means other than piercing the corporate veil which the courts in the UK have utilised in order to "unpick" the acts of companies and their directors.

27.    What Ms Higgins says here is essentially a word for word repetition of what she said at para 19 of her second declaration, dated 4 June 2018. Nothing by way of analysis has been added in the year since the statement was first made.

28.    Thus, all that Ms Higgins does at para 29 of her latest declaration is to make reference, in the most general way, to the laws of agency, joint wrongdoing, trusts or beneficial ownership. She does not develop her passing comment in any meaningful way. In particular, she does not proffer any analysis as to (i) what the specific applicable principles in these areas of law might be; (ii) whether they form part of Scots law[22]; and (iii) how they might apply in the present context of the proceedings being pursued by MCR.

---

[22] For instance, Ms Higgins mentions beneficial ownership which, as she herself pointed out in her second declaration, is not a concept known in Scots law. Refer to her second declaration, dated 4 June 2018, at para 19, footnote 12.

7

29.     Accordingly, I consider that what Ms Higgins says at para 29 of her latest declaration does not advance matters for the Court in terms of it deciding the case on proper, reasoned grounds.

## Question 3

### Introduction

30.     At para 31 of her latest declaration, Ms Higgins makes reference to fraud and unconscionable advantage. This, she suggests, could "conceivably permit of a situation where what was being evaded was a future or contingent obligation".

31.     In the light of this, I am asked to identify the requirements of Scots law in relation to allegations of fraud (in a civil context), and to comment on their potential application in the present case. I will also comment on unconscionable advantage.

### The nature of fraud in Scots law

32.     In Scots law, fraud requires proof of actual dishonesty: see *Grant Estates Limited (in liquidation) v The Royal Bank of Scotland plc and others,* [2012] CSOH 133 (hereinafter referred to as *"Grant Estates"*)[23], per Lord Hodge at para 86.

33.     In *Ross v Davy*, 1996 SCLR 369[24], at p 388E, Lord Penrose stated that dishonesty was the "very essence" of the term fraud.

### The requirements for pleading a fraud case in Scots law

34.     In Scots law, if a claim of fraud is to be properly advanced, there requires to be clear and specific pleading in relation to three matters:

    (i)     identification of the act(s) founded upon as fraudulent;

    (ii)    the occasion on which the act was committed; and

    (iii)   the circumstances relied upon as yielding the inference that the act was fraudulent (i.e., dishonest).

---

[23] Produced as Exhibit B.
[24] Produced as Exhibit C.

8

Refer to *The Royal Bank of Scotland plc v Holmes*, 1999 SLT 563[25], per Lord Macfadyen at p 569K-L; and also *Grant Estates*, per Lord Hodge at para 88.

35.    In Scots law, it has been emphasised that allegations of fraud must not be made lightly. In *Zurich CSG Limited v Gray & Kellas*, 2007 SLT 917[26], at para 24, Lord Brodie said:

> "Fraud is not something to be lightly inferred. Nor should it be lightly averred."

This statement was endorsed by Lord Hodge[27] in *Grant Estates*, at para 93.

### Analysis in relation to the present case

36.    In MCR's third amended complaint, dated 30 August 2018 (the "MCR Complaint"), MCR's veil-piercing allegations are made in the section of that document headed "count nine" (page 65 et seq). At para 232 of the MCR Complaint, it is averred that the conduct of SPEX Services Limited ("SPEX Services"), SPEX Offshore Limited ("SPEX Offshore") and Mr Jamie Oag involved "dishonesty of purpose, actual fraud and intent to deceive". It is then averred that several different defendants are "mere tools or business conduits or alter egos" of SPEX Services, SPEX Offshore and/or Mr Oag. There is no other suggested basis for, or specification of, the alleged fraud given in para 232 of the MCR Complaint.

37.    I addressed this "alter ego" argument in my First Declaration at paras 57-59. For the reasons set out therein, the argument is not one which is recognised in Scots law as a proper basis for ignoring the separate personalities of the companies. Moreover, I consider that the bare assertion that certain companies are "mere tools or business conduits or alter egos"[28] of others does not of itself indicate any element of dishonesty or fraud whatsoever.

---

[25] Produced as Exhibit D.
[26] Produced as Exhibit E.
[27] Lord Hodge is now a member of the UK Supreme Court.
[28] The use of such expressions having been criticised most recently in *Persad*, at para 21.

9

38.   If the pleadings concerning fraud contained in para 232 of the MCR Complaint were advanced in Scottish proceedings, my opinion is that they would be held by a Scottish court to be legally irrelevant, with the result that the fraud allegations would not be allowed to go to trial. In my view, the bare assertion in para 232 of "mere tools or business conduits or alter egos" does not get anywhere near, as a matter of Scots law, the clear and specific pleading required as the basis upon which a Scottish court could properly infer at trial that the parties against whom fraud is alleged acted in a dishonest manner. Viewed as a matter of Scots law, I consider that the para 232 pleadings do not contain any meaningful averments indicating any dishonesty at all.

### Unconscionable advantage

39.   As noted above, this is mentioned by Ms Higgins at para 31 of her latest declaration. She does not, however, seek to define this concept, and nor does she suggest that the circumstances of the present case actually fall within such a concept. Nor does she offer any reasoning as to why that should be so.

40.   That is particularly important because what Ms Higgins says at para 31 of her declaration is explicitly based on the decision in *Rossendale*. It is therefore important to note what Richards LJ said in this connection in *Rossendale* (at para 51):

> "Nor can it be said that the SPVs were used in the present case as engines of fraud or to take an unconscionable advantage. Views may differ as to whether the purpose for which the SPVs were used was socially reprehensible, but, <u>assuming it was</u>, there is <u>no</u> suggestion in *Prest* or in any of the other cases that such disapproval can found the application of the radical doctrine of disregarding the separate legal personality of a registered company"[29].

41.   Thus, even if the court considers that the use of a corporate vehicle is "socially reprehensible"[30], that will not be enough, according to Richards LJ, to justify piercing the corporate veil.

---

[29] Emphasis added.
[30] Which was the assumption on which Richards LJ was proceeding in his comments at para 51.

APP.448

**Question 4**

42.   In this context, I am asked to comment on paras 32-38 of Ms Higgins' latest declaration.

43.   At paras 32-34, Ms Higgins appears to criticise the emphasis I placed in my First Declaration on the dates of incorporation of the relevant companies alleged by MCR to be behind the corporate veil of SPEX Services and/or SPEX Offshore (see paras 75 and 84 of my First Declaration). At para 32 of her declaration, Ms Higgins states that, "The obligation/liability/restriction requires to be in existence at the time the company is <u>interposed</u>, not at the time the company is <u>incorporated</u>" (her emphasis).

44.   I remain of the view that the time of incorporation of the entities in question remains highly relevant in deciding whether there would be a proper basis, in Scots law, for piercing the corporate veil in the present situation.

45.   One can use SPEX Services as an example. MCR wishes to pierce the corporate veil of this company: see the MCR Complaint, at para 232. The companies alleged there to be behind the corporate veil of SPEX Services are SPEX Offshore (UK) Limited; SPEX Group US LLC; SPEX Engineering (UK) Limited; SPEX Group Holdings Limited; and SPEX Corporate Holdings Limited.

46.   By examining the date of incorporation of the companies said to be behind the corporate veil of SPEX Services, one can determine whether it is possible for any of those companies to have been subject to an <u>existing</u> obligation which they then sought to evade by means of interposing another company – on this hypothesis SPEX Services – into the relevant legal obligation or transaction. This is exactly the type of analysis adopted by Richards LJ in *Rossendale*.

47.   Developing the example further, if it is MCR's position that these other entities interposed SPEX Services into a transaction by procuring that SPEX Services entered into the 16 May 2011 licence agreement with MCR, then on the evasion principle enunciated in *Prest* one needs to determine whether any of those companies could

conceivably have been subject to an existing legal obligation as at 16 May 2011 (or indeed whether any of them could have procured that SPEX Services entered into the licence agreement) which they then sought to evade by interposing SPEX Services.

48. Given the dates of incorporation of SPEX Group US LLC, SPEX Engineering (UK) Limited, SPEX Group Holdings Limited and SPEX Corporate Holdings Limited[31], it is simply not possible for those entities to have been subject to an existing legal obligation owed to MCR on or before 16 May 2011 because those companies were not in existence. They had not been incorporated at that time. Incorporation did not occur until much later.

49. Accordingly, on Ms Higgins' formulation at para 32 of her declaration (that the obligation only requires to be in existence at the time the company is interposed), then in the above-noted example the corporate veil of SPEX Services could not be pierced with a view to fixing liability on any of those companies since they could not have been subject to an existing legal obligation at the time of the supposed "interposition" on 16 May 2011.

50. In any event, one should not lose sight of the fact that nowhere in the MCR Complaint is there any suggestion that any of these companies (including, in addition, SPEX Offshore (UK) Limited) was subject to an existing obligation owed to MCR on or before 16 May 2011, and that they sought to evade that obligation by interposing SPEX Services into the obligation. On this basis alone, I consider that an attempt to pierce the corporate veil of SPEX Services would fail, as a matter of pleading, in Scots law.

51. At paras 35-38 of her latest declaration, Ms Higgins appears to be suggesting that the concept of piercing the corporate veil can be used to fix liability on those simply "in control" of the relevant company. I respond to this by making five points.

---

[31] The dates of incorporation which I have been supplied with by PM are as follows: SPEX Offshore (UK) Limited (4 May 2011); SPEX Group US LLC (22 July 2013); SPEX Engineering (UK) Limited (26 February 2015); SPEX Group Holdings Limited (1 March 2016); and SPEX Corporate Holdings Limited (21 December 2016).

12

52.     First, as I explained at para 32 of my First Declaration, the decision of the House of
        Lords in *Salomon v A Salomon & Company Limited*, [1897] AC 22 (hereinafter
        "*Salomon*"), established that the fundamental attribute of corporate personality is that
        a company is a legal entity distinct from its members (i.e., its shareholders). Hence the
        company is capable of enjoying rights, and being subject to duties, which are not the
        same as, and indeed are regarded as separate from, those enjoyed or borne by the
        company's members. The company's property is its own, and not that of its
        shareholders.

53.     As the JCPC put it in *Persad*, at para 20, the importance of the decision in *Salomon*
        was that it "famously established the difference between a company and its
        shareholders".

54.     Second, and related, in *Prest* Lord Sumption[32] said that when referring to piercing the
        corporate veil, one should be speaking:

>       "...<u>only</u> of those cases which are true exceptions to the rule in *Salomon v A
>       Salomon & Co Ltd* [1897] AC 22, ie where a person who <u>owns</u> and controls a
>       company is said in certain circumstances to be identified with it in law by virtue
>       of that <u>ownership</u> and control"[33].

55.     In the context of a company, "ownership" refers to ownership of the shares in that
        company.

56.     Third, I consider that when Lord Sumption was referring, at para 35 of *Prest*, to being
        able to pierce the corporate veil where a person who was subject to an existing legal
        obligation seeks to evade that obligation by interposing a company "under his
        control", he was plainly referring to the situation where the person had control by way
        of ownership of shares, i.e., either as the direct owner of the shares of the company
        being interposed or held through intermediate entities. Such a reading is consistent
        with Lord Sumption's earlier definition (at para 16) of the situation in which one can
        properly refer to piercing the corporate veil – namely, the situation where a person

---

[32] With whom the other members of the UK Supreme Court agreed: see para 41 of my First Declaration.
[33] *Prest*, at para 16, emphasis added.

APP.451

who "owns and controls" a company is said in certain circumstances to be identified with it in law by virtue of that "ownership and control".

57.     Fourth, Ms Higgins says at para 36 that she "can see nothing in the authorities to suggest that control could not arise from some other position or office, such as director of the company". In my view, there is no warrant for this proposition in the case-law.

58.     The case of *Trustor AB v Smallbone and others (No. 2)*, [2001] 1 WLR 1177, which she cites is not authority for her proposition. In *Prest*, at para 32, Lord Sumption explained that the *Trustor* case was not a case involving piercing the corporate veil at all. Indeed, his Lordship explained that the case was simply "an application of the principle...that receipt [of monies] by a company will count as receipt <u>by the shareholder</u> if the company received it as his agent or nominee, but not if it received it in its own right"[34].

59.     Nor does *Prest* offer Ms Higgins support. As she acknowledges, the UK Supreme Court held that the corporate veil could not be pierced in that case. Further, and in any event, in his judgment, at para 2, Lord Sumption stated that the trial judge found that the companies at issue were "wholly owned and controlled" by the defendant husband against whom the veil-piercing claim was directed[35]. Indeed, the trial judge, Moylan J, made a finding that the defendant was the only effective shareholder of the companies in question[36].

60.     Fifth, Ms Higgins is therefore unable to cite any case properly understood as a true example of piercing the corporate veil[37] where a UK court has been prepared to pierce the veil of a company such as to fix liability on a person simply *qua* director of that company.

---

[34] *Prest*, para 32, emphasis added. Lord Neuberger PSC agreed with Lord Sumption in this regard, stating at para 68(vi) that the *Trustor* case involved an illegitimate application of the doctrine of piercing the corporate veil.
[35] Despite the complexities of the group of companies which was the subject of the dispute in *Prest*, the trial judge, Moylan J, held that the defendant husband was the "effective <u>owner</u> and controller of the whole of the... corporate structure": [2011] EWHC 2956 (Fam), at para 208, emphasis added.
[36] See [2011] EWHC 2956 (Fam), at para 209.
[37] Neither the *Trustor* case, nor *Prest* fall into this category.

14

61.    Nor has she cited any example of the courts in the UK being prepared to pierce the corporate veil of one company, such as to fix liability on another company in the group, where the two companies are at the same level of the group structure and one is not a shareholder in the other.

**Question 5**

62.    At para 56 of my First Declaration, I cited the case of *Adams v Cape Industries plc,* [1990] Ch 433, in which Slade LJ observed[38] at p 536G:

> "...save in cases which turn on the wording of particular statutes or contracts, the court is not free to disregard the principle in *Salomon v A Salomon & Co Ltd* [1897] AC 22 merely because it considers that justice so requires. Our law, for better or worse, recognises the creation of subsidiary companies, which though in one sense the creatures of their parent companies, will nevertheless under the general law fall to be treated as separate legal entities with all the rights and liabilities which would normally attach to separate legal entities."

63.    At para 39 of her latest declaration, Ms Higgins suggests that what Slade LJ said is "irrelevant to the question of piercing the corporate veil between subsidiary companies".

64.    I disagree.

65.    Slade LJ's statement is a general one, and was cited with approval by Lord Sumption in *Prest*[39] in that way. It serves to emphasise that subsidiaries in a corporate group in the UK are treated as separate legal entities.

66.    Slade LJ's statement also confirms that a Scottish or English court is not free to disregard the *Salomon* principle and pierce the corporate veil "merely because it

---

[38] Giving the judgment of the court.
[39] *Prest*, at para 21.

considers that justice so requires"[40]. A call to justice is simply too vague a basis on which to allow piercing of the corporate veil.

**Declaration**

67.     I declare that the foregoing represents my opinion on Scots law in relation to the matters considered herein. I declare under the penalty of perjury under the law of the United States of America that the foregoing opinion is true and correct to the best of my understanding, knowledge and research of the issues addressed.

Executed in Edinburgh, Scotland, on 30 July 2019.

........................................

**GARRY BORLAND, Q.C.**

---

[40] Compare paras 235 and 236 of the MCR Complaint in which MCR urges the Court to pierce the corporate veil, as holding only certain SPEX companies liable would, it is asserted, "result in injustice".

16

**EXHIBIT A**



## Pinsent Masons

BY EMAIL AND POST

Garry Borland QC
Axiom Advocates
Advocates Library
Parliament House
Edinburgh
EH1 1RF

Our Ref 106596720.3\gs4\673087.07001

23 July 2019

Dear Sir

**SPEX CORPORATE HOLDINGS LIMITED**

We refer to the above matter and to your Declaration dated 30 January 2019.

On 3 July 2019 we provided you with core papers which were updated to include a copy of Roisin Higgins QC's latest (fifth) Declaration together with the responses to a Motion to Dismiss dating from October 2018. These include Roisin Higgins QC's Fourth Declaration.

We should be grateful if you would review Roisin Higgins QC's fifth Declaration and prepare a further Declaration addressing Ms Higgins fifth Declaration. While we would like you to consider and comment on the Declaration generally, we request that specific consideration is given to the following issues:

1.      Paragraphs 19 to 29 – In these paragraphs Ms Higgins seeks to argue that it is theoretically possible for a Scottish Court to look behind the corporate veil in circumstances other than where evasion can be shown. We are keen to understand you view on Ms Higgins' interpretation of the case law she has cited to support her position, in particular her view that the law in this area is not "settled". We also wish to understand whether you are aware of any circumstances in which a Court may be persuaded to develop the concept of piercing the veil in line with Ms Higgins' conclusions, and if so whether the circumstances of this case are apt for such development in the common law.

2.      Paragraph 29 – Ms Higgins makes reference to other circumstances where the UK courts have "unpicked the acts of companies and their directors". We note there is no suggestion that any of these circumstances are germane to the present case. At the very least the phraseology adopted appears pejorative. It may however be helpful for the judge in Texas to understand how the heads of claim she has noted differ from piercing the corporate veil.

Pinsent Masons LLP

141 Bothwell Street  Glasgow  G2 7EQ  United Kingdom

T  +44 (0)141 567 8400  F  +44 (0)141 567 8401  DX  135 - Glasgow

Pinsent Masons LLP is a limited liability partnership, registered in England and Wales (registered number: OC333653) authorised and regulated by the Solicitors
Regulation Authority and the appropriate jurisdictions in which it operates.  Reference to "Pinsent Masons" is to Pinsent Masons LLP and/or one or more of the
affiliated entities that practise under the name "Pinsent Masons" as the context requires.  The word "partner", used in relation to the LLP, refers to a member or
an employee or consultant of the LLP or any affiliated firm, with equivalent standing.  A list of members of Pinsent Masons, those non-members who are
designated as partners, and non-member partners in affiliated entities, is available for inspection at our offices or at www.pinsentmasons.com
For a full list of the jurisdictions where we operate, see www.pinsentmasons.com

3.  Paragraph 31 – in this paragraph Ms Higgins seeks to introduce an allegation of fraud. Your earlier Declaration does not address fraud as fraud is distinct from the issue of piercing the veil. However, as Ms Higgins appears in this paragraph to be conflating fraud and piercing the corporate veil we should be grateful if you would consider the necessary requirements for an allegation of fraud to succeed in Scotland and provide commentary on this in your new Declaration, and whether these principles have any application to the facts in this case.

4.  Paragraphs 32 to 38 – we would welcome your views on Ms Higgins' comments on the 3 stage test you set out in your first Declaration.

5.  Paragraph 39 - Ms Higgins seeks to undermine your conclusion that you cannot use the concept of piercing the veil to pass liability from a subsidiary company to another subsidiary absent shareholding in the first subsidiary company. Ms Higgins suggests that the support drawn from Adams v Cape Industries plc [1990] Ch 433 is misguided and taken out of context. We would welcome your views on this point.

It is intended that your opinion be filed at court in the same form as your previous Declaration. With that in mind, we should be grateful if you would provide your opinion in the same format.

The Texan Court has issued an order which requires a response to Ms Higgins Declaration to be filed by 30 July. This is earlier than we had initially thought. With that in mid, we should be grateful if you would let us have your Declaration in draft before midday on 29 July 2019.

Should you require any additional information beyond that provided in this letter and the supporting documents, please do not hesitate to contact Joanne Gillies on her direct dial 0141 567 8638 or by email Joanne.Gillies@pinsentmasons.com or Gillian Anderson on her direct dial 0141 249 5458 or by email Gillian.Anderson@pinsentmasons.com.

Yours faithfully

Joanne Gillies
Partner
Pinsent Masons LLP

**EXHIBIT B**



OUTER HOUSE, COURT OF SESSION

[2012] CSOH 133

CA152/11

OPINION OF LORD HODGE

in the cause

GRANT ESTATES LIMITED (IN
LIQUIDATION); RUARI STEPHEN; and
JAMIE STEPHEN

Pursuers:

against

(1) THE ROYAL BANK OF SCOTLAND
PLC; and (2) THOMAS CAMPBELL
MACLENNAN and KENNETH ROBERT
CRAIG, JOINT ADMINISTRATORS OF
GRANT ESTATES LIMITED

Defenders:

———————

Pursuer: I G Mitchell QC, Wallace; Balfour & Manson LLP
Defender: A. Clark QC, MacGregor; Brodies LLP (First Defenders)

21 August 2012

**Introduction**

[1] The pursuer, Grant Estates Limited ("GEL") is a single venture company which in

2007 was developing properties at 1 School Wynd and 4 Bank Street, Elie, Fife with

the assistance of loan finance from The Royal Bank of Scotland plc ("RBS"). In common with many property developers, GEL encountered financial difficulties in the economic downturn from about 2008. As a result of GEL's inability to meet its obligations under its finance agreements, RBS placed it into administration on 25 February 2011. GEL has attempted to challenge the appointment of the administrators in various processes but has eventually concentrated on this action as the vehicle for its challenge.

[2] The directors of GEL are two brothers, Mr Ruari Stephen and his brother Mr Jamie Stephen, who were sisted as additional pursuers on 11 April 2012 in order to be responsible for any adverse awards of expenses and thereby avoid an order for caution under section 726 of the Companies Act 1985.

[3] Mr MacLennan and Mr Craig, the second defenders, are the administrators of GEL but have taken no part in this action in which GEL and its directors seek among other remedies, the suspension of their appointment as joint administrators. To date the administrators have not been able to make progress in the administration as they have given undertakings not to dispose of the properties pending the outcome of the debate which I have heard. In that debate RBS has sought to have the action dismissed as fundamentally irrelevant.

[4] At the heart of GEL's claim against RBS is an allegation that the bank's employees mis-sold to GEL an interest rate swap agreement ("IRSA"), which they represented was a device to protect GEL from a rise in interest rates. As a result of the financial crisis, the sharp fall in interest rates in 2008 and their low level thereafter, the IRSA, far from protecting GEL from rising interest rates, became a burden on the company, which would have benefitted from the lower rates which it would have paid on its

borrowing. GEL in challenging the validity of the administration has from the outset asserted that, but for the obligations which it incurred under the IRSA, it would not have been in default of its obligations under its loan agreement with RBS and would not have gone into administration. RBS has challenged that assertion and pointed out that GEL had not the means to repay the loan.

[5] GEL alleges that the sale of the IRSA was (i) in breach of the requirements of both the Conduct of Business Sourcebook ("COBS ") issued by the Financial Services Authority ("FSA") and also the Markets in Financial Instruments Directive 2004/39/EC as implemented by Directive 2006/73/EC ("MiFID") and (ii) as a result of misrepresentation by RBS's employees which it characterises as fraudulent or at least negligent. It also asserts that RBS entered into a contract to give it advice on financial products and also that it was negligent in that advice. RBS challenges the relevancy of each of those cases.

[6] The summons claimed three principal remedies. First, it sought reduction of the loan agreement, the securities in support of the borrowing and the IRSA on the basis that they were all parts of a single unlawful scheme. In the debate Mr Iain Mitchell QC for GEL departed from the assertion that his challenge to the IRSA would invalidate the loan agreement and the securities. He sought reduction only of the IRSA. Secondly, GEL made claims for restitution based on the invalidity of those agreements and securities. Thirdly, it sought damages for loss resulting from (i) the breach of the COBS rules and MiFID, (ii) breach of contract, (iii) negligent advice and (iv) misrepresentation.

[7] In the wide-ranging debate there were five principal issues. They were (i) whether the alleged breaches of the COBS rules could be made the subject of a claim in a civil

action; (ii) whether RBS was in breach of contract; (iii) whether GEL had pleaded a relevant case of negligent misrepresentation; and (iv) whether there were relevant averments of fraudulent misrepresentation. The fifth issue was whether compliance with the COBS rules was a term of the contract or was subsumed within a delictual duty of care. Connected to the second issue, GEL also argued that section 17 of the Unfair Contract Terms Act 1977 applied so as to prevent RBS from relying on its contractual provisions that limited or excluded its contractual liability for the advice which its employees had given.

[8] During the debate Mr Mitchell intimated that for pragmatic reasons GEL was not insisting on its claim that RBS's employees acted fraudulently. That issue therefore does not affect the outcome of the debate. But as I am concerned that the allegations were made at all, I discuss the fraudulent misrepresentation case in paragraphs [85] - [93] below.


**The averred factual background**

[9] The relevant events began with an email from Mr Kevan Munro of the Global Banking and Marketing ("GBM") division of RBS to Mr Ruari Stephen on 3 July 2007 in which he referred to a prior telephone call and attached a copy an RBS booklet called "Interest rate hedging solutions". The booklet described in simple terms commonly used hedging products including base rate caps, base rate collars and base rate swaps. In the email he gave some guidance on the cost of an interest rate cap and said that he would telephone to discuss the matter further. The email contained certain standard statements that the bank was not giving advice, that the recipient should understand the potential risks that derivative products involved,

and that RBS might have an interest in the financial instruments. GEL avers that the email was sent but denies that Mr Stephen received it. RBS therefore did not rely on it in the debate.

[10] On 6 and 11 July GEL and RBS entered into a loan agreement under which GEL borrowed £775,000 at an interest rate of 1.4% over base rate which on 6 July was 5.75%, and with a repayment date of five years after the loan was drawn. The loan agreement contained a precondition on the drawing of the loan that RBS was satisfied with the customer's interest rate hedging arrangements and GEL undertook to maintain those arrangements.

[11] GEL avers that on 19 July 2007 Mr Ruari Stephen met Mr Munro of RBS and that the former sought and the latter gave financial advice in relation to interest rate swap agreements. It avers:

> "During the course of that discussion, Mr Munro indicated that although the base rate currently stood at 6.5% pa, those rates were likely to rise and that a fixed rate of 6.4% pa was reasonable."

Mr Stephen did not take out a hedging arrangement at that time.

[12] At that meeting Mr Munro gave Mr Ruari Stephen a letter containing a Notice of Regulatory Classification and as an attachment the bank's terms of business. I set out the relevant terms of business including the risk warning in paragraphs [29] and [30] below. The letter informed GEL that it was a "Private Customer" within the meaning and for the purposes of the FSA rules. It drew attention to the risk warning and informed GEL that by signing and returning the letter it acknowledged receipt of the risk warning and confirmed acceptance of its contents. It stated:

> "Action to be taken

Please read our Terms of Business carefully. They contain important information about our respective rights and obligations, including about certain limitations on our liability to you. ... By signing and returning this letter, you will be deemed to have agreed and accepted our Terms of Business which will therefore become legally binding on you and, in the absence of any other agreement between us and you, will apply to all dealings which we may conduct with you or on your behalf. If you are in any doubt about the meaning or the legal or financial effect of these Terms of Business or any other documents we provide to you, you should obtain professional advice as necessary."

On 11 August 2007 Mr Ruari Stephen signed on behalf of GEL an acknowledgement of the letter, which stated that he had read and understood the notice of regulatory classification and the risk warnings and assented to their terms. He sent the acknowledgement to RBS.

[13] Notwithstanding the precondition in the loan agreement, RBS advanced the £775,000 loan to GEL on 17 October 2007 without putting in place any interest rate hedging arrangement.

[14] On 25 October 2007 Mr Ruari Stephen emailed Mr Munro to thank him for a telephone call on the previous day and stated that he would discuss interest rate options with his brother and take a decision. He said that he would telephone RBS.

[15] RBS avers that by letter dated 29 October 2007 it issued revised Terms of Business to GEL to take account of the requirements of MiFID which came into effect on 1 November 2007. But as GEL denies receipt of the letter or the terms of business, the letter and the new terms of business are not relevant to the debate.

[16] On 8 November 2007 Mr Munro emailed Mr Ruari Stephen to record that the Bank of England had kept the base rate at 5.75%, which he stated was a "little bit unexpected." He continued:

APP.464

"However the problems in the stock markets have moved into the interest rate markets - which means that a 6 year swap/fix is now trading at 5.75%. e.g. you could fix your costs for debt at the same price as you are currently paying for the next 5 years. Really need the documents I sent you signed and back. Any questions give me a call."

[17] On 9 November 2007 Mr Stephen and Mr Munro spoke on the telephone. GEL

avers as follows:

"During the course of that conversation, Mr Munro indicated to Mr Stephen that, while he considered that interest rates were about to fall when the Monetary Policy Committee met the following day, he believed they might quickly rise again."

GEL also avers that:

"By email dated 9 November 2007, Mr Munro contacted the pursuer giving further advice and making further representations in respect of an interest rate swap arrangement."

[18] That email stated, so far as relevant:

"Ruari further to our call I have priced up a couple of ideas that a lot of customers are looking at present. I have based it on the following Amount - £500,000 - bullet Start date -19/10/07 End date - 19/10/12 - 5 years Current Floating Base Price - 5.75% excluding lending margin Fixed Rate/Swap - 5.87% - excludes lending margin Interest Rate collar - Min 5.5% to Max 6.5% - excluding lending margin, In this example base rate floats between 5.5% and 6.5% so at the moment would be 5.75% but for example if it went to 7% you would pay 6.5% and likewise if it fell to 5% you would pay 5.5%. No fee for either of these products. Hopefully you have the documents we need signed - they are called notice of risk warnings - if you could sign them and return we can then close out by phone. I will give you a call early next week to discuss in detail.

Regards Kevan Munro

The contents of this document are indicative and are subject to change without notice. This document is intended for your sole use on the basis that before entering into this, and/or any related transactions, you will ensure that you fully understand the potential risks and return of this, and/or any related transactions and determine if is appropriate for you given your objectives, experience, financial and operation resources, and other relevant

circumstances. You should consult with such advisors as you deem necessary to assist you in making these determinations. The Royal Bank of Scotland plc ("RBS") will not act as your advisor or owe any fiduciary duties to you in connection with this, and/or any related transaction and no reliance may be placed on RBS for advice or recommendations of any sort. RBS makes no representations or warranties with respect to the information and disclaims all liability for any use you or your advisors make of the contents of this document. RBS and its affiliates, connected companies, employees or clients may have an interest in financial instruments of the type described in this document and/or related financial instruments. ...."

[19] Mr Stephen and Mr Munro appear to have had a further telephone discussion on 5 December because Mr Ruari Stephen refers to it in his affidavit, without recalling what was discussed, and because on 6 December 2007 Mr Munro emailed Mr Stephen in these terms:

"I have checked with Aberdeen and you are quite right the facility is for 60 months (5 years) so the maturity of your facility will be 31/7/2012. Therefore what the deal will look like is start 5/12/2007 end 31/6/2012 - the reason I have taken it to then is interest is taken on calendar 1/4s. So first adjustment would be on the 31/12/07 and then 31/3/08, 30/6/08 etc etc etc. amount 500K bullet rates 5.48% - dropped again a little lower. As always worth remembering that if you wish to repay this money before the expiry of the swap rate then there could be a cost or benefit depending on which way interest rates have moved. Will txt you in the morning to get a decision."

[20] GEL also avers that on three occasions on 6 December Ms Fiona Muntz of the GBM division of RBS spoke to Mr Stephen on the telephone. RBS produced recordings of those phone calls but I was not asked to listen to them. GEL avers:

"In the course of the first of those conversations Ms Muntz stated that she understood that the pursuer wished to put in place 'fixed rate protection'. She then made a number of representations to Mr Stephen. During the course of the conversation, he asked her to give him advice on a number of matters concerning the proposed IRSA, which she did. In particular, in course of giving the advice and making the representations, she repeatedly described the making of such an arrangement by the pursuer as 'protection' of the pursuer. Mr Stephen asked if the whole amount were placed on a fixed rate as opposed to a swap rate what the costs would be. In response Ms Muntz stated that 'the swap rate is the same as the fixed rate there being merely a

difference of terminology but that it is a bit ambiguous'. She went on to state that at present the pursuer had a floating rate with its relationship manager and that the floating part can be 'fixed with a swap'. She stated that the overall rate would be 5.47% plus lending margin and that would be fixed for the period of time the pursuer was thinking about, which was for five years. Mr Stephen asked about 'protecting' either £775,000 or £500,000. Interest rates and their likely trend were further discussed. Ms Muntz further stated that the first defender did not take a position in relation to the proposed deal and that the first defender was trying to protect the pursuer. During this call, Mr Ruari Stephen repeatedly asked about ways to avoid or limit the pursuer's exposure if interest rates were to fall and to limit breakage costs. Mrs Muntz suggested only that the 'protection' might be limited to part only of the amount borrowed. Further, the first defender both through Mr Munro and through Ms Muntz referred to Bank of England Base Rate, implying that the Swap (and, hence, the breakage charges) was priced upon the basis of Bank of England Base Rate. During the third of those telephone calls, which took place at about 2.42 p.m., Ms Muntz explained that it would be possible to take out £500,000 of 'protection' immediately but that depending on the outcome of discussions with the first defender's relationship manager for the pursuer, it would probably be possible to increase the 'protection' to £775,000 later in the day. Mr Ruari Stephen gave instructions to Ms Muntz to proceed on that basis."

[21] On 6 December 2007 GEL instructed RBS to enter into the IRSA transaction. On the same day RBS sent GEL a post-transaction acknowledgement confirming the terms of the transaction and asking Mr Stephen to sign and return a copy of the acknowledgement. In the notes attached to the acknowledgement the following was stated:

> "1. The transaction terms agreed between us verbally are legally binding contract terms. Following execution of the trade you will be required to sign legal documentation (which may include a confirmation and Master Agreement) to confirm those terms.
> ...
> 3. The interest rate contract that you have entered into with RBS is a separate legal contract from any borrowing it may relate to. In particular, they may be terminated independently of each other and early termination of one does not automatically terminate the other.
> ...
> 8. You are acting for your own account, and have made an independent evaluation of the transactions entered into and their associated risks and have had the opportunity to seek independent financial advice if unclear about any

aspect of the transaction or risks associated with it and you place, or have placed, no reliance on us for advice or recommendations of any sort.
...
11. We would also draw your attention to our terms of business."

[22] On 19 December 2007 RBS sent GEL a letter setting out the terms of the IRSA for £775,000 which had been transacted on 6 December. The letter provided for GEL to sign a confirmation of the agreement. But GEL did not sign or return either the post transaction confirmation or the IRSA letter. The IRSA contained deemed warranties from GEL to the following effect:

"(e) it is entering into this Agreement solely for the purpose of reducing the risks associated with fluctuating rates of interest and not for the purposes of speculation.

(f) in entering into this Agreement it is not relying upon [RBS] in relation to any advice or forecast or estimate of future trends in relation to interest rates or otherwise nor in relation to the fiscal consequences of this Agreement.

(g) it is acting for its own account, and has made its own independent decisions to enter into this Agreement and as to whether this Agreement is appropriate or proper for it based on its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of [RBS] as investment advice or as a recommendation to enter into this Agreement; it being understood that information and explanations related to the terms and conditions of this Agreement shall not be considered investment advice or a recommendation to enter into this Agreement. It understands that no communication (written or oral) received from [RBS] can be considered to be an assurance or guarantee as to the expected results of this Agreement."

[23] On 4 September 2008 Ms Birch-Machlin of the GBM division of RBS wrote to GEL and referred to the telephoned instruction of 6 December 2007, the original RBS terms of business, the revised terms of business and the formal confirmation dated 19 December 2007. She stated:

"To our knowledge, you have not yet signed and returned a copy of the Formal Confirmation. In accordance with our internal policy (and Clause 9 of

the original RBS Terms of Business and Clause 13 of the revised RBS Terms of Business), I am writing to inform you that we will assume that you have approved the terms of the Transaction as set out in the Formal Confirmation, unless you notify us of any objections that you might have within the next five London business days."

GEL did not respond to this communication and the parties operated the terms of the IRSA. While GEL initially challenged the validity of the IRSA on the ground that there was no written agreement, it did not persevere with that challenge which was undermined by RBS's terms of business which I discuss in paragraphs [29] and [30] below.

**The allegations of advice and misrepresentation**

[24] It is central to GEL's case that RBS gave it financial advice in relation to interest rate swap agreements in both July and December 2007 and that GEL relied on that advice in deciding to enter into the IRSA. In his affidavit, which parties agreed that I could consider in expansion of GEL's pleadings, Mr Ruari Stephen emphasised that he trusted RBS to do what was in GEL's best interests when advising him on financial products of which he had no experience. In summary he stated that RBS advised him that interest rates were likely to rise and that the IRSA provided protection to GEL against such rises and allowed it to fix its costs over a five year period. He accepted that advice and acted on it. This, GEL avers, created a contract to give financial advice.

[25] In alleging both fraudulent and in any event negligent misrepresentation, GEL avers that RBS had a pressing need to maximise its cash flow to fund its expansion, including the acquisition of ABN Amro. It avers (in article 11 of Condescendence)

that RBS's pro forma documentation which Mr Munro completed had a section headed "ABN Impact Discussed?" and asserts that that indicated a connection between the sale of IRSAs and the need to raise capital.

[26] In support of the allegation of fraudulent or negligent misrepresentation, GEL avers that in a report for customers dated 6 December 2007 Mr Dicks and Mr Walker, who were economists employed by RBS, had predicted further cuts in interest rates. Although the report was not produced, I was informed that it predicted a fall from 5.75% to 5.25%. GEL avers that RBS's opinion was that "interest rates were likely to fall, to continue to fall, and to remain low for some time."

[27] Against this background, GEL avers five separate misrepresentations. They are, first, Mr Munro's representation on 19 July 2007 that interest rates were likely to rise, and secondly his representation in November 2007 that although interest rates were about to fall, they would rise again. The others are representations by Ms Muntz in the telephone calls on about 6 December 2007. The third is her statement that RBS did not take a position on the deal and that it was protecting GEL. The fourth is her representation that GEL could limit its exposure to a market of falling interest rates by taking an IRSA for only part of the sum which it had borrowed. This, GEL avers, was calculated to convey the impression that there was no other way of limiting such exposure such as by means of an interest rate cap. Fifthly, GEL avers that both she and earlier Mr Munro misrepresented the truth by saying that the IRSA was priced on the Bank of England base rate when in fact it was based on the LIBOR rate.

[28] In article 13 of condescendence GEL avers that those representations were fraudulent. In the following article of condescendence it avers in the alternative that the representations were made negligently.

**RBS's Terms of Business and Risk Warning**

[29] RBS's terms of business which it gave GEL on 19 July and which Mr Ruari

Stephen signed on 11 August 2007 included the following provisions:

> "1.1 These Terms of Business apply to all designated investment business carried on by The Royal Bank of Scotland plc. ...

> 2.2 Where these Terms conflict with Applicable Regulations, the latter shall prevail. Applicable Regulations shall include the FSA Rules, the rules of any other relevant regulatory authority or exchange and any applicable laws and regulations in force from time to time. ...

> 3. Our Services

> 3.1 These Terms shall take immediate effect. Any queries about them should be addressed to Corporate Markets Regulatory Risk Department, 135 Bishopsgate, London EC2M 3UR.

> 3.2 We will provide you with general dealing services on an execution-only basis in relation to ... contracts for differences and rights or interests in investments. ...

> 3.3 We will not provide you with advice on the merits of a particular transaction or the composition of any account nor will we bring investment opportunities to your attention. You should obtain your own independent financial, legal and tax advice. Opinions, research or analysis expressed or published by us or our affiliates are for your information only and do not amount to advice, an assurance or a guarantee. The content is based on information that we believe to be reliable but we do not represent that it is accurate or complete. ...

> 4. Our Authority and Duties

> 4.4 Your attention is drawn to the fact that when we deal with you, we, an affiliate, or some other person connected with us, may have an interest, relationship or arrangement that is material in relation to the investment, transaction or service concerned. Such material interests may include *inter alia*: ...

>> d) holding a position in, or trading, dealing or market-making in, investments purchased or sold by you;

4.6 Any information we have provided to you relating to trades is believed to be reliable, but no representation is made or warranty given or liability accepted, as to its completeness or accuracy. In particular, market conditions and pricing may have changed by the time you approach us with a view to entering into a trade. Any opinions constitute our judgement as of the date indicated and do not constitute investment advice or an assurance or guarantee as to the expected outcome of any transaction. ...

9. Confirmations

After we have executed a transaction, we shall confirm details to you (which confirmation may be in electronic format or made available on a website, in which case such electronic format shall have the same effect as if served on you in written hard copy). The content of our confirmations will, in the absence of manifest error, be deemed conclusive and binding on you unless you object in writing within five business days of despatch.

10. Best Execution

As we or our affiliates will act as principal in all transactions covered by these Terms, no duty of best execution arises under FSA Rules as no transactions are executed in circumstances giving rise to duties similar to those arising on an order to execute a transaction as agent. You may either accept or reject the price we offer you and we do not represent that such price is necessarily the best price. ...

19. Exclusion of Liability/Indemnities

19.1 Nothing in these Terms shall oblige us to do anything that we believe to be contrary to Applicable Regulations. Nothing in these Terms will exclude or restrict any liability that we owe you under FSA Rules. Except to the extent that the same results from our or their gross negligence, wilful default or fraud, we, our directors, officers, employees and agents shall not be liable for any loss resulting from any act or omission made under or in relation to or in connection with these Terms or the solvency, acts or omissions of any third party with whom we deal or transact business or who is appointed by us in good faith on your behalf. We will make available to you, when and to the extent reasonably so requested and at your expense, any rights that we may have against such person."

[30] Annexed as schedule 1 to the terms of business was a risk warning notice which

included the following:

"This notice is provided to you, as a private customer, in compliance with the rules of the Financial Services Authority ('FSA'). Private customers are afforded greater protections under the rules than other customers are and you should ensure that your firm tells you what this will mean to you. This notice cannot disclose all the risks and other significant aspects of warrants and/or derivative products such as futures, options, and contracts for differences. You should not deal in these products unless you understand their nature and the extent of your exposure to risk. You should also be satisfied that the product is suitable for you in the light of your circumstances and financial position. Certain strategies, such as 'spread' position or a 'straddle', may be as risky as a simple 'long' or 'short' position. ...

4. Futures

Transactions in futures involve the obligation to make, or to take, delivery of the underlying assets of the contract at a future date, or in some cases to settle the position with cash. They carry a high degree of risk. ...

6. Contracts for differences

Futures and options contracts can also be referred to as contracts for differences. These can be options and futures on the FTSE 100 index or any other index, as well as currency and interest rate swaps. However, unlike other futures and options, these contracts can only be settled in cash. Investing in a contract for differences carries the same risks as investing in a future or an option and you should be aware of these as set out in paragraph 4 and 5 respectively. Transactions in contracts for differences may also have a contingent liability and you should be aware of the implications of this as set out in paragraph 9."

**The legal issues in the debate**

*(i) Whether breaches of COBS rules are actionable*

[31] Mr Mitchell for GEL submitted that the contractual framework which RBS sought to put in place did not protect it from civil actions for breaches of the COBS rules nor did it alter the reality that if RBS staff gave advice to a customer, they were not dealing on an execution-only basis. It was clear from clause 2.2 of the terms of business (paragraph [29] above) that the FSA rules prevailed over the terms if there was a conflict.

[32] Counsel accepted both that COBS implemented MiFID and that GEL had no direct claim against RBS under MiFID. The issue therefore was the correct interpretation of the UK legislation and regulatory rules having regard to the results which MiFID sought to achieve.

*(a) Interpretation consistent with EU law*

[33] In discussing how the court should interpret United Kingdom legislation and the COBS rules in the context of EU law Mr Mitchell referred me to a considerable tract of authority including *von Colson and Kamann* v *Land Nordrhein- Westfalen* [1984] ECR 1891, *Köbler* v *Austria* [2003] ECR I-10290, *Marshall* v *Southampton and S W Hampshire Area Health Authority* [1986] 1 QB 401, *Marleasing SA* v *La Comercial Internacional de Alimentación SA* [1990] ECR I-4135, *Wagner Miret* v *Fondo de Garantía Salarial* [1993] ECR I-6911, *Faccini Dori* [1994] ECR I - 3325, *El Corte Inglés SA* v *Rivero* (Case C-192/94), *Inter-Environment Wallonie ASBL* v *Région Wallonie* [1997] ECR I-7411, *Mangold* v *Helm* [2005] ECR I-10013, *Pfeiffer and Others* [2004] ECR I-8835, *Adeneler* v *Ellinikos Organismos Galaktos* [2006] ECR I-6091, *Angelidaki* v *Organismos Nomarkhiaki Aftodiikisi* [2009] ECR I-3071, *Küciikdeveci* v *Swedex GmbH & Co KG* [2010] ECR I-365, *Dominguez* v *Centre Informatique du Centre Ouest Atlantique* [2012] EUECJ C-282/10 and *R* v *Secretary of State for the Home Department ex p Factortame Limited* [1990] ECR I-2433.

[34] It seems to me that those authorities on the superordination of EU law can be summarised so far as relevant to this case in the following four points.

[35] First, the member states are obliged to take all appropriate measures under article 4 of the Treaty on European Union ("the TEU") to ensure fulfilment of their

there was to be a harmonised and transparent working of the market for financial services and consumer protection in that market. He argued that the national court must set aside a provision of national law which was in conflict with that principle. I am not aware of any such principle and Mr Mitchell produced no authority to support its existence.

*(b) The COBS rules*

[41] Under sections 138 and 139 of the Financial Services and Markets Act 2000 ("FSMA") the Financial Services Authority ("the FSA") has powers to make rules which apply to authorised persons. The FSA is also the competent authority designated by the United Kingdom for the purposes of MiFID. Exercising its rule making power, the FSA produced COBS, in which rules which create binding obligations have the suffix "R". Where a provision has the suffix "G", it is normally guidance which need not be followed and which does not create a presumption of non-compliance.

[42] As discussed below, as a general rule a private person who suffers loss as a result of the contravention of a rule may raise a court action for damages. Breaches of the rules may lead to disciplinary action under Part XIV of FSMA.

*(c) UK legislation on a direct right of action for breach of COBS rules*

[43] Section 138 of FSMA empowers the FSA to make rules in relation to the carrying on of regulated activities. Section 150 provides:

> " (1) A contravention by an authorised person of a rule is actionable at the suit of a private person who suffers loss as a result of the contravention, subject to

the defences and other incidents applying to actions for breach of statutory duty. ...
(5) 'Private person' has such meaning as may be prescribed."

[44] That prescription is found in regulation 3 of the Financial Services and Markets Act 2000 (Rights of Action) Regulations 2001 (SI 2001 No 2256) ("the 2001 Regulations") which provides:

"(1) In these Regulations, "private person" means -
(a) any individual, unless he suffers the loss in question in the course of carrying on -
(i) any regulated activity; or
(ii) any activity which would be a regulated activity apart from any exclusion by article 72 (overseas persons) or 72A (information society services) of the Regulated Activities Order; and
(b) any person who is not an individual, unless he suffers the loss in question in the course of carrying on business of any kind."

*(d) Submissions and discussion*

[45] Counsel addressed two principal issues which arose from the definition in Regulation 3 of the 2001 Regulations. First, Mr Mitchell submitted that the distinction between individuals and corporate persons was not authorised by MiFID and the Regulation should be construed in a way which was compatible with EU law. Secondly and in any event, he submitted that the phrase "in the course of carrying on business of any kind" should be construed narrowly and that something which was done as a one-off transaction or which was incidental to a business was not encompassed within the statutory expression. In the event that I was against him on the second issue and the UK legislation could not be construed in a way which was compatible with EU law, Mr Mitchell submitted that the restrictions of the UK legislation had to be set aside.

[46] In support of his submission on the first issue Mr Mitchell referred me to MiFID. He referred to recitals 2-5, 9, 17, 29, 31, 33, 41, 58 and 61 and articles 1, 4, 13, 18, 19 and 21 of the 2004 Directive. He also referred me to recitals 1-6, 44-48, 69 and 81, and articles 21, 22, 27, 28, 29, 31 and 37 of the 2006 Directive. In summary, he submitted that in accordance with MiFID, RBS, which was providing services to its client, was under an obligation of best execution in relation to the IRSA which was a complex financial instrument. The 2004 directive made no distinction between natural persons and non-natural persons and the 2006 directive did not distinguish between an individual retail customer and a corporate retail customer.

[47] I agree that the two directives which comprise MiFID do not make a distinction between a customer who is a natural person and one who is a non-natural person. But the question is whether MiFID requires a member state to provide the consumer protection for which it calls by means of a civil action. In a careful and helpful submission Mr Mitchell demonstrated how the relevant provisions of MiFID had been implemented in COBS. But, as Mr Clark pointed out, the United Kingdom legislation provides regulatory remedies for breaches of the COBS rules. This is consistent with recital 58 of the 2004 directive which envisaged that member states would designate competent authorities to enforce the obligations created by MiFID. The FSA can enforce the COBS rules by public censure (FSMA section 205) or by imposing a financial penalty (FSMA section 206). The court on the application of the FSA or the Secretary of State can make a restitution order requiring payment to the FSA if it is satisfied that a person has contravened a requirement imposed under FSMA (FSMA section 382). Particularly relevant to the customer is the power given to the FSA to require an authorised person to pay compensation to persons who have

suffered loss or an adverse effect as a result of contravention of such a requirement (FSMA section 384). These regulatory remedies, which implement MiFID, do not distinguish between natural and non-natural persons.

[48] The answer to the first issue is therefore that MiFID does not require a member state to provide protection to a customer by means of a direct right of action against the authorised person. Nor did the United Kingdom choose to confer such a right when it implemented MiFID. As I set out below, section 150 and the 2001 Regulations were a response to a perceived mischief which antedated MiFID. It is not correct to assert, as Mr Mitchell did, that the United Kingdom had chosen to implement MiFID by allowing the enforcement of rights by civil action but had done so in a discriminatory way which MiFID did not authorise. MiFID was implemented in COBS and in the regulatory remedies to which I have referred. Accordingly, the limitation in regulation 3 of the 2001 Regulations on the right of a non-natural person to sue does not have to be construed narrowly in order to avoid contravening EU law.

[49] I turn then to the second issue which is the meaning of the phrase in regulation 3(1)(b) of the 2001 Regulations, "in the course of carrying on business of any kind." For the reasons which I have just set out this question of statutory construction is not complicated by an EU overlay which I discussed in paragraphs [34] to [39].

[50] In the absence of any authority and without regard to the legislative history of the provision, I should be inclined to interpret the phrase broadly. It refers to "business of any kind" and is clearly intended in its context to be broader than the phrase in regulation 3(1)(a), "in the course of carrying on - any regulated activity". Consideration of the history of the legislative provision of a right of action for breach

of the regulatory regime also supports a broad interpretation of the phrase in the 2001 Regulations.

[51] In *Titan Steel Wheels Ltd* v *The Royal Bank of Scotland plc* [2010] 2 Lloyd's Rep 92, David Steel J discussed the prior legislative history of the restriction of the right of the non-natural person to sue for breaches of regulatory provisions. As he set out in paragraphs 51 - 58 of his judgment, the government initially enacted a right to sue for regulatory breaches in section 62 of the Financial Services Act 1986 ("the 1986 Act"). Because the 1986 Act entailed a wide-ranging reform of the regulation of financial services, section 62 was not brought into force for six months while the government consulted the financial services industry. The government responded to concerns which the industry expressed about investors raising strategic lawsuits to gain competitive advantage. Parliament enacted section 193 of the Companies Act 1989 which introduced section 62A of the 1986 Act. That provision empowered the Secretary of State to make regulations determining the circumstances in which a person other than a private investor could raise a civil action for regulatory breaches.

[52] In September 1990 the DTI issued a consultative document (Ref FS3a 1/90), "Defining the Private Investor", which contained a draft statutory instrument including a regulation which was substantially the same as regulation 3 of the 2001 Regulations. The DTI said (in para 4.2) that it wished to avoid complexity and sought to introduce a definition which was "as brief and clear as possible." In para 5.2 of the consultation paper the DTI stated:

> "This proposed definition is intended to have the following effects:-
>
> All individuals would retain their s62 rights for all purposes. Individuals who carry on investment business would lose their s62 rights only in relation to

> any action taken by them, or anything done to them, in the course of that investment business.
>
> All non-individuals would lose their s62 rights in relation to any form of business. Most charities and similar bodies do not carry on any form of business, and would therefore retain their s62 rights for all purposes. Those who do carry on business would lose their s62 rights only in relation to any action taken by them, or anything done to them, in the course of that business."

As David Steel J stated, the draft regulations were eventually promulgated as the Financial Services Act 1986 (Restriction of Right of Action) Regulations 1991 (SI 1991 no 489) and the relevant phrase was adopted in the 2001 Regulations.

[53] It appears therefore that the mischief which section 150 of FSMA and regulation 3 of the 2001 Regulations address is the misuse by businesses of a right of civil action to raise strategic actions to obtain competitive advantage and that any non-natural person, including a charity, is barred from raising a civil claim in respect of anything done by or to it in the course of business.

[54] That consideration points towards a broad interpretation but by itself does not determine what is the scope of the phrase "in the course of carrying on business of any kind." In support of his narrow construction of that phrase, Mr Mitchell submitted that COBS was designed to promote the protection of investors and restrictions on a civil right of action militated against that aim. He suggested that prevention of strategic law suits did not require a wide interpretation of the phrase. In support of his preferred test he referred me to four cases which were discussed in *Titan Steel*, namely *Havering LBC* v *Stevenson* [1970] 1 WLR 1375, *Davies* v *Sumner* (HL) [1984] 1 WLR 1301, *R&B Customs Brokers Co Ltd* v *United Dominions Trust Ltd* (CA) [1988] 1 WLR 321, and *Stevenson* v *Rogers* (CA) [1999] QB 1028. Each of those

cases concerned statutory provisions with slightly different wording from the 2001 Regulations.

[55] *Havering* and *Davies* were concerned with section 1(1) of the Trade Descriptions Act 1968 and the phrase "in the course of a trade or business". In the context of that Act, which created criminal offences in the interest of consumer protection, the phrase was held to require a degree of regularity in an activity so as to be an integral part of the person's business. *R & B Customs Brokers Ltd* concerned the phrase "in the course of a business" in section 12(1) of the Unfair Contract Terms Act 1977 ("the 1977 Act") and the question whether a finance company could exclude an implied term as to fitness for purpose when selling a car to the plaintiff company for use by one of its directors. The Court of Appeal held that the finance company could not because the plaintiff company was dealing as a consumer for the purposes of the section and section 6(2) of that Act. It adopted a similar approach to that in *Havering* and *Davies* and held that for a contract to be made in the course of a business the transaction had to be an integral part of the business concerned and if it was incidental to the carrying on of the business a degree of regularity had to be shown. In *Stevenson* the Court of Appeal considered the phrase "in the course of a business" in section 14(2) of the Sale of Goods Act 1979. It looked at the phrase in the context of the Act and interpreted it broadly as the aim of the section was to provide increased protection to buyers who purchased goods from a seller who was carrying on business. Thus it distinguished the earlier cases, including *R & B Customs Brokers Ltd.*

[56] I am not persuaded that the "integral part of business" test is the correct criterion for the phrase in regulation 3 of the 2001 Regulations for the following three reasons. First, it is trite that a statutory provision must be interpreted in the context of the Act

or regulations of which it forms part. The case law developed from the Trade Descriptions Act 1968 involves a very different context. The demands of contextual interpretation can trump the desire for consistency in construing statutory phrases.

[57] Secondly, it is clear from the DTI consultative document that the government sought to adopt a simple test to prevent opportunistic "strategic claims". Even a charitable organisation is excluded if its claim arises in course of carrying on a business. The DTI deliberately took a broad approach in the interests of simplicity when it might have taken a more nuanced approach to address the mischief.

[58] Thirdly, the phrase is not confined to a professional investor or someone carrying on regulated activity, who might be the most obvious originator of a strategic action. The use on regulation 3(1)(b) of the words "business of any kind" is in my view a deliberate extension of the restriction beyond that set out in regulation 3(1)(a) which addresses regulated activities. If Parliament had intended the phrase to cover only transactions which were an integral part of the person's business, that would have confined the restriction principally to such regulated activities. Instead, it appears to have cast the net more widely to prevent a competitor from using an associated company, which was engaged in other business activities, as the claimant in a strategic action. In that context the "integral part" test makes little sense.

[59] Accordingly, I reach a conclusion similar to that of David Steel J in *Titan Steel* that the "integral part of business" test is not relevant to regulation 3(1)(b) of the 2001 Regulations. I observe for completeness that counsel also referred me to *Camerata Property Inc* v *Credit Suisse Securities (Europe) Ltd* [2012] EWHC 7 (Comm) in which Flaux J followed David Steel's reasoning in *Titan Steel* in concluding that the

phrase in the 2001 Regulations had a wider meaning than "in the course of business" in the 1977 Act and similar phrases in the other statutes.

[60] In any event if, contrary to my view, the phrase is properly interpreted as encompassing only transactions which are an integral part of a person's business, that test is met in this case. The circumstances are very different from the purchase or sale of a company car acquired for the use of a director or employee. Such transactions can readily be categorised as incidental to a business. By contrast, the hedging transaction was part of the arrangement with RBS which was fundamental to the financing of GEL's business. GEL is a development company which sought to develop residential properties using in large measure borrowed funds. It aimed to generate income from lettings. It was and is an essential part of the business planning of such companies to ensure that the income which the developed properties can generate will be available soon enough and in sufficient amount to meet the interest payments on the borrowings and generate a surplus to pay back the borrowed funds over time. To do so, the developer will seek to manage financial risk, including the risk of increased interest charges due to market fluctuations. That is what GEL's directors were doing in their dealings with RBS.

[61] The fact that GEL did not regularly enter into such arrangements does not matter because GEL was established as a one-venture company. The transaction was still an integral part of the particular development business (c.f. *Davies*, Lord Keith of Kinkel at p. 1305G; *R & B Customs Brokers Ltd*, Dillon LJ at pp.330H - 331B).

[62] I conclude that GEL is not a "private person" in terms of s. 150 of FSMA and regulation 3 of the 2001 Regulations and accordingly has no right of action for

breaches of the COBS rules. Its case based directly on those breaches is therefore irrelevant.

*(ii) A collateral agreement to advise?*

[63] GEL avers (in article 16 of condescendence) that in the circumstances averred and summarised above Mr Ruari Stephen asked RBS for advice and that its employees provided financial advice. This, it asserts, amounted to a contract to give such advice, giving rise to implied terms in relation to the exercise of skill and care. GEL does not assert any express agreement to give advice but seeks to establish the contract by implication from the parties' acts.

[64] The fundamental problem of this case, as Mr Clark submitted, is that the alleged implied contract contradicts RBS's terms of business to which GEL agreed. See, for example para 3.3 of the terms of business set out in paragraph [29] above. There are no averments of any express agreement to depart from those agreed terms.

[65] In *Standard Chartered Bank* v *Ceylon Petroleum Corporation* [2011] EWHC 1785 (Comm) Hamblen J addressed a similar argument that the bank was under a duty of care in contract to advise on hedging and derivative instruments in the context of oil derivative transactions. In paras 474 -476 he founded on the decision of the Court of Appeal in *The Aramis* [1989] 1 Lloyd's Rep 213 and held that a contract will only be implied from the parties' conduct where it is necessary to do so to give business reality to a transaction. He also referred (at para 477) to the judgment of Mance J in *Baird Textile Holdings ltd* v *Marks & Spencer plc* [2001] CLC 999 at para 61 in which he upheld the test of necessity and stated:

> "It could not be right to adopt a test of necessity when implying terms into a contract and a more relaxed test when implying a contract - which must itself have terms."

[66] This is not a case in which an attempt to imply a contract fails because the parties would have acted as they did without a contract. In this case there was a written contract setting out what RBS was to undertake and expressly warning GEL that it should obtain its own independent financial, legal and tax advice. The acts of the employees of RBS are consistent with a contractual regime in which the customer had agreed that it would not treat any views which they expressed in bringing about the derivative transaction as advice on which it was entitled to rely. Mr Ruari Stephen signed the terms of business which established this contractual regime. In the circumstances I am satisfied that GEL has no averments which can support the test of necessity. Its case of an implied contract is accordingly irrelevant.

[67] I have also to consider the suggestion that the first sentence in para 2.2 of the terms of business should be construed as incorporating certain of the COBS rules into the parties' contract. The sentence is:

> "Where these Terms conflict with Applicable Regulations, the latter shall prevail."

In my view it has the effect that the terms of business cannot qualify or exclude duties imposed on RBS under the COBS rules. Thus the contract cannot be pleaded against a complaint to the FSA that RBS had broken those rules. It might be argued that the sentence is unnecessary if that were all that it sought to achieve, but the sentence has value as a clarification. Does it go further and create contractual rights out of the COBS rules? In my opinion it does not. If it had been intended to incorporate obligations under COBS into the parties' contract I consider that the

terms would have stated that clearly. The terms did not. A customer of RBS might rely on the sentence in the civil courts to prevent the bank from enforcing a provision which adversely affected the customer's ability to obtain a regulatory remedy, if there were such a provision. But that is very different from making the COBS rules into contractual rights. GEL's contractual case therefore fails.

*(iii) Whether there is a relevant case of negligent misrepresentation and negligent advice?*

[68] Mr Clark challenged as irrelevant GEL's cases of negligent misrepresentation and negligent advice (articles 14 and 17 of condescendence) on the basis that the parties' relationship was governed by the terms of their contract which excluded any basis on which the common law would impose a duty of care in the provision of advice.

[69] In recent years the courts have adopted at a high level of generality three approaches or tests in determining whether a duty of care in tort or delict to avoid causing pure economic loss exists in a particular case. They are:

(i) the assumption of responsibility test, coupled with reliance;

(ii) the three-fold test, namely whether the loss was a reasonably foreseeable consequence of a defender's act or omission, whether the relationship between the parties was of sufficient proximity and whether it was fair, just and reasonable in all the circumstances to impose such a duty on the defender; and

(iii) the incremental test of developing novel categories of negligence by analogy with established categories.

The assumption of responsibility test is applied objectively and may involve the court imposing responsibility in a manner essentially similar to the three-fold test. Whichever test is adopted, the court, when deciding whether the law imposes a duty of care, will have regard to the detailed circumstances of the particular case: *Commissioners of Customs & Excise* v *Barclays Bank plc* [2007] 1 AC 181, Lord Bingham at paras 4-8. In a commercial context the focus on those detailed circumstances and the particular relationship between the parties requires the court to take into account among other things the terms which the parties have agreed will govern their commercial dealings in order to ascertain what their reasonable expectations would have been.

[70] GEL argues that those circumstances include the regulatory obligations contained in the COBS rules. It asserts that RBS's employees did in fact provide financial advice in circumstances in which it was entitled to and did rely on that advice. It asserts that RBS broke the COBS rules in the advice which its employees gave. Mr Mitchell submitted that even if the breaches of the COBS rules were not directly actionable as breaches of statutory duty, they were relevant to the existence of a common law duty of care. He linked the obligations under COBS with a delictual duty of care by arguing that no reasonably competent adviser would have acted in a manner inconsistent with the COBS rules. In substance he submitted that, whatever RBS stated in its terms of business which GEL accepted, RBS's employees gave financial advice which breached the COBS rules, and GEL relied on that advice, thereby giving rise to a common law duty of care.

[71] I am not persuaded that GEL can rely on either the acts of the RBS employees or the COBS rules to bring into existence a common law duty of care in relation to the

provision of financial advice. In relation to the former it is necessary to consider the effect of the contractual terms which the parties agreed. In many cases involving claims for pure economic loss the courts have resisted invitations to develop the law of tort or delict to impose common law duties in commercial transactions in conflict with the terms on which parties have agreed in their contracts to conduct their affairs and have allocated their respective risks and responsibilities.

[72] Mr Clark referred me to a number of cases which addressed this issue in circumstances which are analogous to those in this case, namely *J P Morgan Chase Bank* v *Springwell Navigation Corporation* [2008] EWHC 1186 (Comm) and, on appeal, [2010] EWCA Civ 1221 ("*Springwell*"); *Standard Chartered Bank* v *Ceylon Petroleum Corporation* (above); *IFE Fund SA* v *Goldman Sachs International* [2006] EWHC 2887 (Comm) and on appeal [2007] EWCA Civ 811, [2007] 2 Lloyd's Rep 449; *Peekay Intermark Ltd* v *Australia and New Zealand Banking Group Ltd* [2006] 2 Lloyd's Rep 511; *Bank Leumi (UK) plc* v *Wachner* [2011] EWHC 656 (Comm) and *Raiffeisen Zentralbank Osterreich* v *The Royal Bank of Scotland* [2011] 1 Lloyd's Rep 123. He referred also to *Titan Steel* (above) and *Wilson* v *MF Global UK Ltd* [2011] EWHC 138 (QB).

[73] In my view the following five propositions in relation to a delictual or tortious duty of care can be derived from those authorities:

> (1) It is not sufficient to set up a duty of care to assert the existence of an "advisory relationship". There is a clear distinction between giving advice and assuming legal responsibility for that advice. A salesperson of a financial product may give investment advice or express opinions without becoming an investment adviser and undertaking duties of care as such. Whether the giving of advice gives rise to legal obligations in tort or delict to exercise

reasonable care or to advise on certain matters depends on the terms of the legal relationship between the parties: *Standard Chartered Bank*, Hamblen J at paras 505ff, 544.

(2) The absence of any written advisory agreement is a significant pointer against the existence of an advisory obligation: *Springwell*, (first instance) Gloster J at para 440; *Wilson* v *M F Global*, Eady J at para 174.

(3) Parties can enter into a contract which defines the basis of their trading or banking relationship and allocates risk in a way which negates any possibility of a general or specific advisory duty coming into existence: *Springwell* (1st instance), Gloster J at paras 475 and 478. The outcome can be expressed in different ways but with the same meaning. The contractual terms can define the parties' relationship in a way that no assumption of responsibility can be inferred. The relationship so defined is not equivalent to that of professional adviser and advisee which would make it just and reasonable to impose a duty of care: *IFE Fund SA*, Toulson J at paras 70-71.

(4) The contractual delineation of responsibility and allocation of risk may preclude a party from founding on the actual reality which eventuates if he has contracted to accept a particular state of affairs as true. Thus if A and B agree that B will not advise A and A will not rely on any statement by B as advice, the contract will bar A from asserting the giving of that advice and his reliance on it. See, for example, the non-reliance statements in *Standard Chartered Bank* which prevented Ceylon Petroleum Corporation from asserting that advice had been given and relied on (para 544). See also *Peekay Intermark Ltd*, Moore-Bick LJ at para 56; and *Springwell* (CA), Aikens LJ at

para 156f. English law treats the matter as a species of estoppel in which

issues of unconscionability do not arise, namely contractual estoppel. In Scots

law I consider that the correct analysis is that there is a contractual bar and

that issues of inconsistency and fairness, which would be relevant in personal

bar (Reid and Blackie, *Personal Bar*, chapter 2), do not arise.

(5) The approach in (4) above extends to a retrospective agreement in relation

to past events. A and B may agree that their relationship will be on the basis

of a certain state of affairs in the past which they know not to be the case,

such as that B had not made any representations, and A will thereafter be

obliged to act on the basis of that acknowledgement. See *Peekay*, Moore-Bick

LJ at para 57; *Springwell* (CA) Aikens LJ at paras 141 - 171.

[74] The application of those propositions to the averred facts undermines GEL's case

of negligent misrepresentation and negligent advice.

[75] If there had been no contractual delineation of responsibility the court would

have had to consider evidence of the circumstances in a proof in order to decide

whether there was an advisory relationship of a nature that gave rise to a duty of

care (propositions (1) and (2) above). But here contract is clear. In paragraph [29]

above I set out relevant provisions from RBS's terms of business which GEL received

and accepted. In this context I refer in particular to RBS's statements in (i) para 3.2

that it would provide dealing services on an execution-only basis, (ii) para 3.3 that it

would not provide advice on the merits of a particular transaction and that the

customer should obtain independent advice, (iii) para 4.6 that it made no

representation or warranty and that it would give no investment advice and (iv)

para 10 that it undertook no duty of best execution.

[76] What the RBS employees said to Mr Ruari Stephen falls to be analysed in the context of those terms of business. If, as averred, GEL relied on their statements as investment advice, that reliance was not reasonable in the face of the contractual arrangements into which the parties had entered. The answer to GEL's case in negligence is pithily stated by Hamblen J in *Standard Chartered Bank* (at para 544):

> "The point and effect of the Non-Reliance Statements is to require the parties to accept a particular state of affairs as true, even if the actual reality was different. One cannot, merely by referring to what is asserted to be the underlying reality, avoid the effect of those provisions."

In this case the parties have allocated their respective roles and responsibilities in the agreed terms of business. Thus if RBS's employees provided information and opinions which might fairly be described as advice, the contractual provisions catered for that situation: *Peekay*, Moore-Bick LJ at para 56; *Titan Steel*, David Steel J at paras 77-93.

[77] In reaching this view I have borne in mind that, in contrast with some of the cases which were cited, the parties in this case were of unequal bargaining power. GEL was a small property company and its directors did not have experience of investing in complex financial instruments. Parliament has addressed certain ill consequences which are the result of unequal bargaining power in the 1977 Act. It has also enacted a regulatory regime which the contractual provisions do not supersede and which may provide statutory remedies if GEL can establish breach of that regime. But unless there is a remedy in the 1977 Act, I see no basis for overriding the contractual allocation of responsibility in the context of a common law claim. In the relevant paragraphs of the terms of business RBS made it clear that it was willing to enter into the IRSA with GEL only on the basis that GEL should take independent

advice and that it should understand the risks which the transaction involved. I consider that the principle which Moore-Bick LJ stated in *Peekay* (at para 43) is both relevant and salutary in the interest of certainty in commercial dealings:

> "A person who signs a document knowing that it is intended to have legal effect is generally bound by its terms, whether he has actually read them or not."

[78] Mr Mitchell also pointed out that the directors of GEL were young and inexperienced. While I recognise the inequality of bargaining power between GEL and RBS, I do not think that the relative youth of the directors is a separate and relevant consideration as a ground for departing from that principle. Company law expects directors of a limited liability company to achieve an objective standard of competence and knowledge (see section 174 of the Companies Act 2006) and GEL cannot be heard to plead their inexperience and the resulting lack of knowledge. Where COBS rule 10.2.1 applies, the authorised person has an obligation to enquire into and assess the experience of the client when considering the appropriateness of a financial product. But that duty under COBS, if applicable, does not in my view alter the position of GEL at common law.

[79] More widely, I do not think that GEL can rely on the COBS rules to create a common law duty of care in relation to the provision of advice. A common law duty can arise from the existence of a statutory duty as part of the background circumstances; and the existence of a statutory duty may show that a particukar risk should have been foreseen. When the court assesses the effect of the statutory duty on the question whether it is just and equitable to impose a duty of care the primary consideration is, in my view, the policy of the statute. Looking to the policy of the

FSMA one discovers that it provides protection to consumers of financial services through a self-contained regulatory code and statutory remedies for breach of its rules. As I have said, it needs no fortification by the parallel creation of common law duties and remedies. Further, the existence of a duty in negligence for failure to comply with the COBS rules would circumvent the statutory restriction on the direct right of action which I discussed in paragraphs [31]-[60] above. See, as examples of the correct approach of looking to the policy of the statute (in the context of the statutory duties of public authorities), *X (Minors)* v *Bedfordshire County Council* [1995] 2 AC 633, Lord Browne-Wilkinson at 739; and *Stovin* v *Wise* [1996] AC 923, Lord Hoffmann at 952F-H. To my mind that approach is applicable also where Parliament imposes statutory duties on private bodies and individuals.

[80] I therefore conclude that GEL's cases of negligent misrepresentation and negligent advice are irrelevant.


*(iv) Section 17 of the Unfair Contract Terms Act 1977*

[81] To counter the effect of the contractual terms of business on its claims that RBS acted in breach of contract GEL asserts that the provisions in RBS's terms of business which purport to exclude liability for breach of a contractual obligation in relation to the giving of financial advice should not be given effect because it was not fair or reasonable to incorporate those terms into the parties' contract: section 17 of the 1977 Act. It avers that:

> "by seeking to stipulate in the standard form contract that no advice is given, [RBS] is, in effect, seeking to exclude liability for that advice."

[82] In my opinion this is not so. It is necessary to look at the substance of the contractual provisions rather than their form. But that does not assist GEL. The terms, which GEL accepted several months before the IRSA transaction was effected, defined the relationship between the parties and the character of what RBS's employees said. Those terms do not restrict liability for breach of a contractual obligation but by defining the scope of service negate the relationship of adviser and advisee and the assumption of a general or specific advisory duty. See *IFE Fund SA*, Toulson J at paras 70-71, and, on appeal, Waller LJ at para 28; and *Titan Steel*, David Steel J at para 98f. Further, as Mr Clark pointed out, section 25(5) of the 1977 Act, which extends a reference to excluding or restricting liability for breach of an obligation or duty to include a reference to excluding or restricting the obligation or duty itself, does not apply to section 17.

[83] GEL agreed in advance the contractual definition of its relationship with RBS and must accept the consequences of that agreement on its contractual and other common law claims. The circumstances are very different from those which Christopher Clarke J discussed in *Raiffeisen Zentralbank* (at paras 314-315) when he spoke of a transaction with a man in the street in which a retrospective provision parted company with reality. Had the deemed warranties in the IRSA (paragraph [22] above) stood alone, things might have been different; but they did not.

[84] GEL's case under section 17 of the 1977 Act therefore fails.

*Whether relevant averments of fraudulent misrepresentation?*

[85] As I have said, Mr Mitchell departed from his case of fraudulent misrepresentation. It is not necessary for my decision to consider the relevancy of

those averments. But as I am concerned that the case was pleaded at all, I make the following observations.

[86] It is the law in this jurisdiction and in England and Wales that fraud involves actual dishonesty. Erskine described fraud as:

> "a machination or contrivance to deceive."

(Erskine, *Institute* (Nicholson ed.) II. 668)

More recently, Christopher Clarke J in *Raiffeisen Zentralbank* (at para 338) stated:

> "In order to establish a claim in deceit it is necessary for the claimant to prove that the relevant representations were dishonestly made in that the defendant: (a) knew that he was making the statement that the court finds him to have made; and (b) had conscious knowledge of the facts alleged to render the statement false."

[87] In cases in which damages are sought for fraudulent misrepresentation it is common in this jurisdiction to refer to the standard definition of fraud in *Derry* v *Peek* (1889) 14 App Cas 337, in which Lord Herschell stated at p.374:

> "First, in order to sustain an action in deceit, there must be proof of fraud and nothing short of that will suffice. Secondly, fraud is proved when it is shown that a false representation has been made (1) knowingly, (2) without belief in its truth, or (3) recklessly, careless whether it be true or false."

Recklessness itself in this context is a species of dishonesty, a wilful disregard of the importance of truth, and is not merely a failure to take care, however gross: *AIC Ltd* v *ITS Testing Services (UK) Ltd* [2007] 1 Lloyd's Rep 555, Rix LJ at paras 256-257.

[88] Mr Clark also referred me to the well-known authorities on the need for clear and specific averments of fraud, namely *Shedden* v *Patrick* (1852) 14 D 721, *Kaur* v *Singh* 1998 SC 233, *The Royal Bank of Scotland plc* v *Holmes* 1999 SLT 563, and *Wright* v *Cotias Investments Inc* 2001 SLT 353, Lord Macfadyen at para 38. In the *Royal Bank*

case Lord Macfadyen stated (at p. 569K-L) that it was essential to have clear and specific averments on three matters, namely:

> (i) the act or representation founded upon,
>
> (ii) the occasion on which the act was committed or the representation made, and
>
> (iii) the circumstances relied on as yielding the inference that that act or representation was fraudulent.

[89] In my opinion GEL's case fails on the third of these matters. In relation to the allegation of fraud in expressing an opinion on future interest rates it relies on a contrast between what Mr Munro told Mr Stephen in July and November 2007 and what Ms Muntz said in December 2007 on the one hand and the views stated by two RBS economists in a report dated 6 December 2007. It avers that the economists expressed an opinion that interest rates were likely to fall, to continue to fall and to remain low for some time. Although neither party made available the report, Mr Clark informed me that the prediction was that interest rates would fall from 5.75% to 5.25%. It is not suggested that anyone in RBS foresaw the collapse of interest rates from 2008 or that interest rates would remain depressed for several years. In each case GEL avers that Mr Munro and Ms Muntz were either aware of the economists' opinion or "could readily have ascertained that opinion." In the context of averments of fraud in which there must be a clear and specific basis for the inference of dishonesty, that weaker alternative is fundamentally irrelevant.

[90] Further I was given no explanation as to how a report dated December 2007 could be used to infer fraud in relation to a statement made in the preceding July and November. In any event GEL appears not to have considered whether the

economists' published views were possibly sufficient to support the inference that opinions that interest rates were likely to rise, or to fall and later rise, were dishonest views in relation to a derivative instrument which was to remain in place for five years.

[91] In relation to other averments of fraud, namely (i) Ms Muntz's representation that RBS did not take a position on the deal and that RBS was protecting GEL, and (ii) her failure to alert GEL to the possibility of using interest rate caps, GEL again avers that if she was not aware she could readily have ascertained the correct information. Again that falls under the weaker alternative rule. Finally, there are no averments to support the inference of fraud in relation to a representation by both Mr Munro and Ms Muntz that the IRSA was priced upon the Bank of England Base Rate rather than LIBOR. Mr Stephen's affidavit does not disclose the context of the alleged statements or support the view that GEL relied on them in deciding to enter into the IRSA.

[92] In my view GEL's averments of fraud are either irrelevant or fundamentally lacking in specification and fall to be excluded as irrelevant.

[93] As Lord Brodie stated in *Zurich CSG Ltd* v *Gray & Kellas* 2007 SLT 917, at para 24:

> "Fraud is not something to be lightly inferred. Nor should it be lightly averred."

Allegations of dishonesty can have very serious consequences for people, particularly those engaged in regulated professions, and can blight careers, at least temporarily, even if they are eventually not substantiated. I invite counsel to bear in mind these considerations.

**Other matters**

[94] As I have dealt with the substantive grounds of the action and found them to be irrelevant, it is not necessary to deal with subsidiary arguments and matters. But lest my opinion is overturned on appeal, I record briefly my views on those arguments and matters and also concessions that were made.

[95] Mr Clark attacked as irrelevant GEL's assertion (in article 9 of condescendence) that RBS could not rely on the deemed warranties in clause 8 of the IRSA (set out in paragraph [22] above) which it sent out on 19 December 2007 because they came too late to be incorporated into the contract. He submitted that this was not so because paragraph 9 of the agreed terms of business provided that the contents of formal confirmations of transactions were deemed to be final and binding unless an objection was taken within five days. I am satisfied that that submission is correct.

[96] As mentioned in paragraph [25] above, GEL avers that in a *pro forma* note which Mr Munro used at the meeting on 19 July 2007 there was an item "ABN impact discussed". GEL asserts that this showed a linkage between the IRSA transaction and the commercial imperative of generating profit to fund the acquisition of ABN. But Mr Mitchell could not explain why the form had a reminder to discuss the acquisition with the customer. He was not able to disagree with Mr Clark's suggestion that the *pro forma* entry was to remind RBS employees to discuss with customers whether they had dealings with ABN and whether they might be affected by the merger. I am satisfied that the reference to ABN does not support the inference which GEL avers.

[97] Mr Mitchell conceded that he could not seek the reduction of the loan agreement or the standard securities and consented to the repelling of his first and third pleas in law.

[98] If I am correct in my view that the COBS rules do not assist GEL in its contractual or delictual claims, it is not for this court to rule on GEL's allegations of mis-selling and in particular that RBS breached rules 2.1.1, 2.1.2, 2.2.1, 3.3.1, 4.5, 9.2.1, 10.2.1 and 11.2 of the COBS rules. GEL if so advised can pursue its complaints before the FSA. But, as Mr Clark pointed out, section 151(2) of FSMA provides that a contravention of the COBS rules does not make the transaction void or unenforceable. GEL's regulatory claim, if successful, (or any common law claim based on the COBS rules if I am overturned) does not provide a basis for suspending the administration of GEL.

**Conclusion**

[99] I am grateful to counsel for both parties for their careful submissions.

[100] As I am satisfied that GEL's averments in support of its civil action for breach of COBS and each of its common law claims are irrelevant, I sustain the defenders' first plea in law, repel the pursuers' first, second, third and eleventh pleas in law and dismiss the action. I will have the case put out by order to deal with (i) the administrators' undertaking, (ii) the other proceedings, and (iii) expenses.

**EXHIBIT C**

A

COURT OF SESSION                                     *21st December 1995*
*Outer House*
Lord Penrose

KENNETH A. ROSS                                            *Pursuer*
                                                                              B
    against

ROBERT S. DAVY                                            *Defender*

Companies—Directors—Breach of fiduciary duty—Summary remedy—
Insolvency Act 1986 (c. 45), s. 212

Limitation of actions—Prescriptive period—Breach of trust—'Fraudulent'
breach of trust—Prescription and Limitation (Scotland) Act 1973 (c. 52),
ss. 6, 7, 8, Sched. 1, paras 1(d), 2(h), Sched. 3, para. (e)(ii)          C

Trusts and trustees—Breach of trust—'Fraudulent' breach of trust—
Prescriptive period—Prescription and Limitation (Scotland) Act 1973
(c. 52), ss. 6, 7, 8, Sched. 1, paras 1(d), 2(h), Sched. 3, para. (e)(ii)

Section 212 of the Insolvency Act 1986 provides inter alia:

    '(1) This section applies if in the course of the winding up of a company it
appears that a person who—                                                D
      (a) is or has been an officer of the company, . . .
has misapplied or retained, or become accountable for, any money or other prop-
erty of the company, or been guilty of any misfeasance or breach of any fiduciary
or other duty in relation to the company. . . .
    (3) The court may, on the application of the official receiver or the liquidator,
or of any creditor or contributor, examine into the conduct of the person falling
within subsection (1) and compel him—
      (a) to repay, restore or account for the money or property, or any part of it,
with interest at such rate as the court thinks just, or
      (b) to contribute such sum to the company's assets by way of compensation in   E
respect of the misfeasance or breach of fiduciary or other duty as the court
thinks just.'

The Prescription and Limitation (Scotland) Act 1973 provides by s. 6 inter alia:

    '(1) If, after the appropriate date, an obligation to which this section applies
has subsisted for a continuous period of five years—. . .
then as from the expiration of that period the obligation shall be extinguished. . . .
    (2) Schedule 1 to this Act shall have effect for defining the obligations to which   F
this section applies.'

Paragraph 1 of Sched. 1 to the 1973 Act provides that s. 6 applies inter alia:

    '(d) to any obligation arising from liability (whether arising from any enact-
ment or from any rule of law) to make reparation'.

Paragraph 2 of Sched. 1 provides inter alia:

    'Notwithstanding anything in the foregoing paragraph, section 6 of this Act
does not apply—. . .                                                         G

369

A     (h) to any obligation specified in Schedule 3 to this Act as an imprescriptible obligation.'

   Sections 7 and 8 of the 1973 Act provide for the extinction of obligations or other rights relating to property by prescriptive periods of twenty years, but both sections except therefrom any obligation specified in Sched. 3 as an imprescriptible obligation. Schedule 3 provides a list of such imprescriptible obligations, including:

   '(e) any obligation of a trustee . . .
B        (ii) to make reparation or restitution in respect of any fraudulent breach of trust to which the trustee was a party or was privy'.

   The pursuer was the liquidator of a limited company ('Milndavie') of which the defender was a director until he resigned in 1986. During his time as a director, Milndavie entered into a joint venture to develop a site which it owned. Another company ('Stewart') was appointed to act as main contractors for the construction work. At all material times the defender was also a director of Stewart. In terms of the contract Stewart became entitled to payment by Milndavie upon the issuing of an architect's certificate in respect of work done. The architects issued ten certifi-
C   cates for payment but the pursuer averred that the defender had authorised other payments by Milndavie to Stewart without the authority of any certificate and that such overpayments constituted a fraudulent breach of his duty of trust as a director. He sued for payment of the sum of £93,379, said to be the loss suffered by Milndavie as a result of that breach of duty.
   The defender averred in reply that the contract for the building works was altered by agreement to provide for payment on a basis other than certification. He also contended that a fraudulent breach of trust involved fraud as it was understood in Scots criminal law, being a false pretence leading to a practical result. Since there were no averments of fraud in those terms, the action so far as based
D   on a fraudulent breach of trust was irrelevant and, so far as the action was based on a non-fraudulent breach of trust, it had prescribed in terms of para. (e)(ii) of Sched. 3 to the 1973 Act. At the debate the pursuer sought leave to amend by introducing a conclusion for an order in terms of s. 212 of the 1986 Act. He contended that an action under s. 212 was not an action for reparation so as to be subject to prescription.
   *Held* (1) that s. 212 of the 1986 Act is designed to enable a summary remedy to be provided in the context of liquidation where the court is satisfied that wrongful conduct by a designated officer has occurred (p. 378C–D);
   (2) that it would be contrary to the structure and to the spirit of the Rules of
E   Court to entertain an application under s. 212 in an ordinary action (p. 378E–F);
   (3) that, accordingly, the conclusion sought to be introduced by the minute of amendment was incompetent and the minute of amendment ought not to be allowed insofar as it sought to add a case under s. 212 (p. 378F–G);
   (4) that it was a misconception to attempt to apply the provisions of the 1973 Act to s. 212 as if it were a source of remedy rather than a procedural device. As a procedural device the section could neither extend nor limit the liability of a director. It followed that if a wrongous act is of a character that is affected by the quinquennial prescription, that will apply irrespective of the procedural means adopted to
F   enforce it (pp. 379F–380A);
   (5) that para. (e) of Sched. 3 to the 1973 Act itself referred to the obligation of a trustee to 'make reparation . . . in respect of any fraudulent breach of trust'. There could be no reason for characterising the obligation in that way in respect of fraudulent breach of trust if an obligation relating to breach of trust generally were not, or could not be, of the same character and, therefore, unless the obligation relied on was imprescriptible, the short negative prescription applied to the claim for damages for breach of trust made by the pursuer in terms of para. 1(d) of Sched. 1 (p. 384E–F);
   (6) that the expression 'fraudulent' is clearly capable of supporting a meaning
G   which does not require the false pretence procuring a practical result of the com-

mon law definitions of fraud but, as a lowest common denominator, dishonest conduct or conduct from which dishonesty can be inferred is of the very essence of the term (p. 388E); and

(7) that there was a sufficient basis in averment on which, if the pursuer's case as a whole were fully proved, it would be legitimate to infer that the payments of sums from the resources of Milndavie without warrant under contract to a company substantially owned by the defender involved a dishonest appropriation of funds of Milndavie (p. 389D); and proof before answer allowed.

*Cases referred to:*

*Allen* v *McCombie's Trustees,* 1909 S.C. 710; 1909, 1 S.L.T. 296
*Baird* v *Magistrates of Dundee* (1862) 24D. 447; (1863) 1 Macph. (H.L.) 6
*Barns* v *Barns' Trustees* (1857) 19D. 626
*Blin* v *Johnstone,* 1988 S.L.T. 335
*Boustead* v *Gardner* (1879) 7R. 139
*Canadian Land Reclaiming & Colonising Co.: Coventry & Dickson's Case,* Re (1880) 14 Ch.D. 660
*City of Glasgow Bank, Liquidators of* v *Mackinnon* (1882) 9R. 535
*Derry* v *Peek* (1889) 14 App. Cas. 337
*Etic Ltd,* Re [1928] Ch. 861
*Exchange Banking Co.: Flitcroft's Case,* In re (1882) 21 Ch.D. 519
*Forest of Dean Coal Mining Co.,* In re (1878) 10 Ch.D. 450
*Gibson* v *National Cash Register Co. Ltd,* 1925 S.C. 500; 1925 S.L.T. 377
*Hastie's Judicial Factor* v *Morham's Executors,* 1951 S.C. 668; 1952 S.L.T. 2
*Henderson* v *Henderson's Trustees* (1900) 2F. 1295; (1900) 8 S.L.T. 222
*Henderson* v *Watson,* 1939 S.C. 711; 1939 S.L.T. 539 (sub nom. *Stuart's Judicial Factor* v *Watson*)
*Heritable Reversionary Co. Ltd* v *Millar* (1892) 19R. (H.L.) 43
*Hobday* v *Kirkpatrick's Trustees,* 1985 S.L.T. 197
*Hood* v *Macdonald's Trustees,* 1949 S.C. 24; 1949 S.L.T. 172
*Johnson (B.) & Co. (Builders) Ltd,* Re [1955] Ch. 634; [1955] 3 W.L.R. 269; [1955] 2 All E.R. 75
*Lands Allotment Co.,* In re [1894] 1 Ch. 616
*McKendrick* v *Sinclair,* 1972 S.C. (H.L.) 25; 1972 S.L.T. 110
*Metropolitan Bank Ltd* v *Heiron* (1880) 5 Ex.D. 319; (1880) 43 L.T. 676
*Milne (John) & Co.* v *Aberdeen District Committee* (1899) 2F. 220; (1899) 7 S.L.T. 259
*Raes* v *Meek* (1889) 16R. (H.L.) 31
*Sale Hotel and Botanical Gardens Co. Ltd: Hesketh's Case,* In re [1898] 77 L.T. 681
*Selangor United Rubber Estates Ltd* v *Cradock (No. 3)* [1968] 1 W.L.R. 1555; [1968] 2 All E.R. 1073
*Shedden* v *Patrick* (1852) 14D. 721
*Sugden* v *H.M. Advocate,* 1934 J.C. 103
*Thain* v *Thain* (1891) 18R. 1196
*Town & County Bank Ltd* v *Walker* (1904) 12 S.L.T. 411
*United Collieries Ltd* v *Lord Advocate,* 1950 S.C. 458; 1950 S.L.T. 316 (sub nom. *United Collieries Ltd* v *United Collieries Ltd*)
*University of Aberdeen* v *Magistrates of Aberdeen* (1876) 3R. 1087
*Wright* v *Guild & Wyllie* (1893) 30 S.L.R. 785.

The circumstances of the case and the submissions of counsel are set out in the following opinion of the Lord Ordinary, which was delivered on 21st December 1995.

APP.503

A   LORD PENROSE. The pursuer is liquidator of Milndavie Property Development Co.
Ltd. He was appointed at a meeting of creditors on 18th November 1994. The defen-
der was a director of Milndavie between 7th July 1982 and 16th July 1986, when he
resigned. On 3rd September 1984 Milndavie entered into a joint venture agreement
with William Reid & Sons (Property) Ltd, in terms of which the two companies
agreed to develop a site owned by Milndavie at Mitre Road, Glasgow, by way of
construction and marketing of sheltered housing. It was further agreed that R. D.
Stewart Ltd would act as main contractors for the construction work. At the date of
the agreement and at all material times thereafter the defender was a director of

B   Stewart. Stewart were engaged and sums of money were paid by the joint venture to
Stewart. The pursuer sues for payment of a sum of £93,379. In the summons the
basis of the claim was that the defender had authorised and made overpayments
to Stewart constituting a fraudulent breach of his duty of trust as director.
£93,379 was said to be the loss suffered by Milndavie as a result of that breach of
duty. At the debate, the pursuer sought leave to amend the summons by introdu-
cing a conclusion for an order in terms of section 212 of the Insolvency Act 1986
finding that the defender had, while taking part in the management of the com-

C   pany, misapplied or retained or become accountable for monies and other property
of the company and had been guilty of misfeasance and breach of fiduciary or other
duty in relation to the company, and for payment of the same sum of £93,379 in that
respect. The case went to debate on pleas-in-law for the defender attacking the rele-
vancy of the summons and the competency and relevancy of the alternative remedy
focused in the minute of amendment.
      The pursuer avers that the architects acting under the building contract with
Stewart issued ten certificates for payment under and in terms of the building con-
tract between 14th November 1984 and 17th June 1986 for a total sum of £482,679. In

D   or about July 1986 a receiver was appointed to Stewart, who thereafter ceased to
trade. It is averred that at the time that occurred the works were finished apart
from outstanding works of some £25,000 only. It was further averred that between
7th September 1984 and 19th June 1986 Stewart were paid a total of £803,474 from
the joint venture bank account. £595,138 was said to have been paid after 30th
August 1985. Of the sum of £803,474, £32,620 was paid to third parties as profes-
sional fees. After allowing for that sum, the payments to Stewart were said to
have constituted an overpayment as against the certified sums of £288,157 [sic].
Milndavie had not recovered any sums from Stewart. The averments set out that

E   the anticipated profit on the venture was of the order of £159,020. Milndavie's
share of that sum would have been £101,168. The eventual loss incurred by the
joint venture was £7,221. After a contribution from Reid's the profit realised by
the company was £7,789. The loss of profit to the company as a result of the over-
payments was accordingly brought out at the sum of £93,379 claimed as damages.
      The critical averments for present purposes were that the defender had
authorised all of the payments to Stewart's. He was the director of Milndavie exer-
cising day-to-day supervision of the contract. He was authorised on behalf of the

F   company to sign cheques drawn on the joint venture bank account. A co-signatory
was Mr Ian Reid of Reid's. Mr Reid was said to have signed cheques in blank, leav-
ing it to the defender to complete the cheques and on signature by him to issue them
in payment. An exception to this arrangement was said to have been a payment of
£109,643 made by solicitors on behalf of the company to the defender's knowledge.
The payments were said to have been made at times when Stewart were increas-
ing financial difficulty. The summons then proceeded to state:

      'The making, and authorising of said overpayments to R.D. Stewart Ltd consti-
G     tuted a fraudulent breach of the defender's duty of trust which he owed to the

company in his capacity as a director. Said payments were made, or in any event     A
authorised, on the basis of a pretence that R.D. Stewart Ltd was entitled to pay-
ment for works carried out to the Mitre Road project. Said pretence was false.
The effect of it was to secure overpayments from funds held in the Mitre Road
account, a proportion of which were the property of the company. Said overpay-
ments could not have been made without the participation, or in any event, con-
nivance, of the defender.'

The defence, either expressly or by implication, involves the contention that the
building contract for the works was altered by agreement to provide for payment     B
on a basis other than certification. The defender avers that it was agreed by the
parties to the joint venture that Stewart would be paid on a stage-payment basis
for works actually carried out by them in the performance of the contract.
Valuations of the work were said to have been made by one of the directors of
Stewart, Mr Dunigan, in conjunction with a firm of chartered quantity surveyors
employed in connection with the contract. There were averments about access to
Stewart's books and about the bookkeeping methods employed to record expendi-
ture on the project. It was stated that in about April 1986 Mr Dunigan prepared a
draft final account showing the costs incurred by Stewart at a sum of £745,320. The     C
payments made to Stewart were said to have been calculated by reference to the
costs incurred by them and to have been approved in advance by Mr Ian Reid. Mr
Steele, the third director of Milndavie and the company secretary, was also said to
have been personally involved in supervising the works and monitoring the opera-
tions of the payment provisions.

In the minute of amendment tendered by the pursuer there were averments in
response to some of the factual material set out in the defences. It was stated that,
having regard to the sums included in the draft final account and the inclusion     D
therein of payments for which Stewart had no liability, namely professional fees
and double glazing and washing machines, the total amount which could properly
have been paid to Stewart on the basis averred by the defender was £681,687. On
that basis there was an overpayment of £121,787 which was authorised by the
defender in his capacity as a director of Milndavie.

The alternative basis of claim was then set out as follows.

'As hereinbefore condescended upon, the director (sic) as an officer of the com-
pany authorised the making of payments to the said R.D. Stewart Ltd. Said pay-
ments were not made in accordance with the contract between the company and     E
the said R.D. Stewart Ltd of which the defender, as a director of the company,
was well aware. Said payments were not made in terms of article 30(1) of the stan-
dard terms and conditions. Separatim, esto the defender, qua officer of the said
company, varied the terms of the company's contract with the said R.D. Stewart
Ltd, as averred by him, which is not known and not admitted, et separatim, the
draft final accounts relied upon by him representing sums expended by the said
R.D. Stewart Ltd in the amount of £745,320, in any event, the defender as an offi-
cer of the company authorised payment by the company to the said R.D. Stewart
Ltd in excess of any valuation of work carried out by the said R.D. Stewart Ltd or     F
sums expended by them. . . . The defender has accordingly misapplied and
become accountable for said sums. He has separatim been guilty of misfeasance
and of breach of his fiduciary duty to the company. The sum misapplied and in
respect of which the defender has become accountable to the company is in the
sum of not less than £93,379.'

Counsel for the defender contended that, apart from the ground of action based
on fraud, the claim was time-barred: Prescription and Limitation (Scotland) Act
1973. Schedule 3 to that Act by paragraph (e)(ii) made imprescriptible any obliga-
tion of a trustee to make reparation or restitution in respect of any fraudulent     G

A   breach of trust to which the trustee was a party or was privy. He contended that there were no relevant averments of fraudulent breach of trust by the defender and that, accordingly, the action as originally laid was irrelevant and should be dismissed. The material provisions of the 1973 Act reflected earlier statutory provisions in England. The rules in respect of fraudulent breach of trust were essentially the same in England and in Scotland, though the structure of the legislation now in force differed. In both countries fraudulent breach of trust was imprescriptible. Counsel referred to section 8 of the Trustee Act 1888, section 19 of the Limitation Act 1939, and section 21 of the Limitation Act 1980. Section 21 set out the current

B   English position. No period of limitation prescribed by the Act applied to an action by a beneficiary under a trust in respect of any fraud or fraudulent breach of trust to which the trustee was a party or was privy. Section 21(3) provided that, apart from the specific preceding provisions and in the absence of any alternative period of limitation prescribed, a beneficiary's right to recover trust property or to take action in respect of any breach of trust should not be brought after the expiration of six years from the date on which the right of action accrued. Counsel made reference to Pennington's *Company Law* (6th edn), p. 603, and Halsbury, p. 1238,

C   for accounts of the effect of these provisions. He contended that notwithstanding structural variations in the Scottish provisions, the effect was the same. Fraudulent breach of trust was made imprescriptible but other remedies for breach of trust were subject to the ordinary rules of prescription and the short negative prescriptive period applied in particular in this case. Reference was made to section 6 of and to Schedule 1, paragraph 1(d), to the Act and to Gloag and Henderson, p. 831.

It was accepted that for present purposes a director was in a fiduciary position which brought him within Schedule 3 to the Act, though not a trustee in all cases:

D   *Selangor United Rubber Estates* v *Cradock (No. 3)* at p. 1577; In re *Lands Allotment Co.*; and In re *Forest of Dean Coal Mining Co.* Turning to the requisites of a relevant case of fraudulent breach of trust, counsel referred to the distinction drawn by Halsbury and by Pennington between breach of duty generally and situations in which a director has been guilty of fraud or misappropriation of company property. In a Scottish context fraud was defined by Macdonald, Criminal Law and by Gordon. No definitive authority excluded the application of the criminal standard. In any event, on a sound construction of the pursuer's pleadings, what was relied upon was a false pretence having a practical result and these were the components

E   of the general test. The pursuer therefore required to set out a false pretence in fact or facts from which a false pretence could be inferred. There required to be some form of fraud relevantly averred for a remedy that was imprescriptible. In re *Sale Hotel and Botanical Gardens Co. Ltd: Hesketh's Case* was difficult to reconcile with this approach. Moral fraud was excluded. Nevertheless an imprescriptible breach of duty was held to have occurred. However, on any view the case highlighted the distinction between innocent breaches of duty which might be negligent and fraudulent breaches of duty which alone fell within the material provisions.

F   *Metropolitan Bank Ltd* v *Heiron* demonstrated that knowledge on the part of the creditor obliged him to raise proceedings within the ordinary limitation periods and emphasised that only if a breach of trust were truly fraudulent would the obligation be imprescriptible. A claim which was otherwise barred by the passage of time should only be allowed to proceed where there was the clearest and most specific breach of trust of a fraudulent character. In re *Lands Allotment Co.* pointed in the same direction. Reference was made to the opinions of Wright J. at p. 624, and of Lindley L.J. at p. 629 and at p. 632. The authorities as a whole drew a clear distinction between negligence, incompetence, simple mistake and other similar breaches

G   of duty on the one hand and fraud on the other. The pursuer's averments amounted

to no more than an allegation that, as director, the defender had been party to the      A
paying of cash to a third party in excess of what was certified as due by architects.
The rules of pleading in Scotland were clear. General averments were not accept-
able. The party averring fraud must state clearly and particularly in what the fraud
consisted and what were the acts from which the existence of fraud was to be
inferred: Green's Encyclopaedia, volume 10, paragraph 125; *Wright* v *Guild &
Wyllie* at p. 787; and *Shedden* v *Patrick*. There were no relevant averments. There
was no representation to anyone. The action was predicated on a false pretence
but no such pretence was averred. There were no averments of any machination        B
or contrivance to deceive. There was nothing that could be said to be distinctly
and unambiguously fraudulent on the part of the defender so far as the averments
went.

Turning to the minute of amendment, counsel took no objection to those parts of
it which introduced factual responses or developed factual matters in relation to
the averments of the defender. He contended, however, that a conclusion in a com-
mercial action for an order under section 212 of the Insolvency Act was incompe-
tent and that, in any event, a claim for an order of this kind was subject to
limitation in terms of paragraph 1(d) of Schedule 1 to the 1973 Act, having regard    C
to the nature of the order sought. Section 212 did not introduce a new remedy but
merely allowed a summary remedy where appropriate: *Blin* v *Johnstone* at p. 338
and *B. Johnson & Co. (Builders) Ltd.* However, it followed that if one were to rely
upon it, one must find authority or principle in the general law of Scotland to sup-
port the remedy sought. Secondly, if one took the view that it was competent to
introduce an application of this kind into an ordinary action, the amendment
should still be refused as a matter of discretion in the whole circumstances of the
case. An action had been raised in the sheriff court in 1991 based on the negligence
of the defender. Twenty payments had been made and by the date of raising that      D
action nineteen of the twenty had been made more than five years previously.
There had been extensive proceedings in the sheriff court and the action had even-
tually been abandoned in the course of appeal to the Court of Session. The sheriff
court proceedings had effectively been superseded by the current action which
introduced a new suggestion of fraudulent breach of trust. On no view should the
court exercise its discretion to allow a fresh application under section 212. Failing
proof of fraud, this could be seen as no more than a further attempt to find a ground
of action which would fall outwith the scope of the prescriptive period by reformu-
lation of the claim without altering its substance. The claim under section 212 was    E
clearly affected by prescription. Misapplication, to fall within section 212, must
imply a form of diversion of funds. In this case, the payment made by the joint ven-
ture to contractors in the course of building works could not be of that character.
The contractors were entitled to be paid for their services in terms of the contract.
It was not obvious that what the defender did was, knowingly, in breach of his duty.
If there had been a pretence, one would have thought that with a limited number of
individuals involved in the business that would have become apparent. Simply
overpaying was not a misapplication of funds: *Selangor*. The defender was not       F
prima facie acting ultra vires. He was doing something within the scope of his
duties. Misapplication in the sense of a diversion of funds was something that the
ordinary man in the street would characterise as being clearly wrong. Turning to
the argument on the interpretation of the 1973 Act, counsel submitted that
Schedule 1 set out a relatively comprehensive list of obligations. When one had
regard to paragraph (e) of Schedule 3, one found the language of reparation and
restitution used in the definition of imprescriptible obligations in the context of
breach of trust. Against that background paragraph 1(d) of Schedule 1 should be
construed widely. It should be treated as comprehensive so far as its language       G

A   allowed except insofar as cut down by Schedule 3. Section 7 of the Act provided a safety net. However, it was clearly no more than that and the overall intention was to provide for all reasonably anticipated situations in the specific provisions of Schedules 1 and 3. So far as the pursuer sought to rely on section 212, one was concerned simply with breach of trust. *Hobday* v *Kirkpatrick's Trustees* created certain difficulties in the interpretation of this provision. But for it, the general indications in the English authorities would have indicated that there were no problems. Counsel submitted that the Lord Ordinary was wrong in *Hobday* and had erred in characterising the transaction involved in that case. Properly viewed, it was a

B   claim for damages and was of the character of reparation. It was difficult to reconcile the opinion with the terms of the 1973 Act. If the pursuer was correct in his approach to section 212, then the company director in Scotland was at considerably greater risk than his counterpart in England under the same statutory provisions. *Flitcroft's Case* dealt with the law prior to the 1883 Trustee Act. Under that Act the structure was changed, as shown by the *Lands Allotment* case. Turning to the argument on the nature of fraud in this context, counsel was critical of the attempt to suggest that the averments of pretence were an over-embellishment of the case. It

C   was the whole basis of the pursuer's case. If it were removed, one was left with no averments at all. The suggestion that there could be an implied pretence did not help the pursuer. If one took the basis of implication as essentially valid, one was still left asking by whom and to whom the implied pretence had been made. The pursuer's case was wholly speculative. That was demonstrated by the difficulty in pinning down the development of the argument implied in it. The pursuer clearly had no information on which to base a relevant case. The issue was focused in article 6 of the condescendence. The pursuer had not set out anything of the nature of an unequivocal allegation of fraud. Viewed objectively, the facts relied upon could

D   point to incompetence or sheer stupidity.

    Counsel for the pursuer contended that jurisdiction to pronounce an order under section 212 of the Insolvency Act was vested in the court which had jurisdiction to wind up the company. He referred to section 251 of the 1986 Act and to Part 26 of the Companies Act 1985 and in particular section 744. The Court of Session and sheriff court had concurrent jurisdiction. There could therefore be no objection to the competency of the court to entertain the application unless there were some provision of the Rules of Court making the present application incompetent. Rule 47 was sufficiently wide to cover the application. In the ordinary course petition proce-

E   dure was appropriate. Rules 74(2) and 74(9) applied. However, in this case proceedings were already before the court and separate proceedings were not necessary. Section 212 did not provide a substantive remedy in itself. It permitted a summary remedy on grounds otherwise available: Re *Canadian Land Reclaiming & Colonising Co.: Coventry & Dickson's Case* at p. 670. The court should not be inclined to excessive technicality in relation to pleadings: *Liquidators of City of Glasgow Bank* v *Mackinnon* at p. 564 and *Blin* v *Johnstone*. On any view the sum paid to Stewart exceeded what could have been justified even on the final account pre-

F   pared as set out in the defender's averments. Even if the defender were correct, a substantial sum remained unaccounted for and that provided a remedy in terms of section 212. The situation amounted to a fraudulent breach of trust but section 212 provided the court with a broader discretionary power to give a remedy in circumstances in which funds had been misapplied. The court's power to grant a remedy under section 212 was not affected by the 1973 Act in this case. Fraudulent breach of trust and the making good of trust property were imprescriptible. Claims founded on breach of trust where there was no allegation of fraud or retention of funds were subject to the long negative prescription. Such claims were not covered

G   by Schedule 1 to the Act. The Scottish provisions did not contain an equivalent of

section 21(3) of the English Act. A claim for restoration to a trust fund of property   A
that had been misdirected was not a claim for reparation: *Barns* v *Barns' Trustees*
and *Hobday* v *Kirkpatrick's Trustees*. The present averments were akin to what was
described there. The sum sought by the pursuer had been limited to what would be
recoverable as damages for fraudulent breach of trust. However, it was not sought
as damages under section 212. So far as English law was concerned, breach of trust
was not prescriptible prior to the modern legislation: In re *Exchange Banking Co.:*
*Flitcroft's Case* at p. 527. There was no policy reason why a person in the position of
a liquidator should be disabled by prescription from pursuing a director for breach
of trust which occurred a substantial time before his appointment but was          B
unearthed by him in the course of carrying out his duties. The remedy under section
212 was open to the pursuer in the present case and was not defeated by prescrip-
tion. It was clear that what was alleged in this case did amount to breach of trust:
Ungoed-Thomas J. in *Selangor* at p. 1575.

Turning to the general case, counsel contended that the pursuer's averments
were sufficiently relevant for enquiry and set out facts and circumstances from
which fraud could properly be inferred. It was not disputed that averments of
fraud must be specific. The averments in this case were far from the vague shadowy   C
and inconsistent averments criticised in authorities such as *Shedden* v *Patrick*. The
factors on which the pursuer relied were that the defender was a director; that he
was entrusted with the management of the joint venture account; that he was a
director of the contractor; that the process of certification continued throughout
the relevant period; and that the payments made exceeded by a very considerable
margin those that were appropriate and competent in terms of the contract under
which the work was carried out. There was pretence at least by implication in the
misrepresentation that the sums in respect of which cheques were made out were
due in terms of the only contract for the work that was ever entered into between   D
the joint venture and Stewart. The pursuer had produced a schedule setting out the
pattern of payments measured against the certificates available. Having regard to
the specification provided, it could not be said on any view that the allegations
were less than clear and specific. Comparisons were drawn between the present
case and *Boustead* v *Gardner*; *John Milne & Co.* v *Aberdeen District Committee*; and
*Wright* v *Guild & Wyllie*, in each of which criticism was made of averments of fraud.
Counsel questioned whether one could derive any significant assistance from
English authorities in this context in view of the fundamental differences of
approach between the two jurisdictions to the question of fraud. Subject to that,   E
he observed that in *Hesketh's Case* the distinction drawn between negligent or inno-
cent actions on the one hand and fraudulent actions on the other was of little assis-
tance, since on the pursuer's pleadings no question of innocent or negligent
conduct arose. The conduct complained of was deliberate. The *Metropolitan Bank*
case was concerned with a totally different category of circumstances and took one
nowhere in particular. In re *Lands Allotment* was not relevant. If the pursuer's
averments bore the interpretation that the defender proceeded to make payment
without the benefit of certification, it could not be said to be a transaction in the   F
ordinary course of business. The averment of pretence derived from Lord
Herschell's formulation of the standard test of fraud in *Derry* v *Peek* at p. 374. It
arose as a matter of inference from the general facts. Fraud was often held to
occur without positive representation to a third party: Gordon at p. 589 and Gloag
on Contract at p. 475. Cases of embezzlement would fall naturally within the
expressions used in this case: *Town & County Bank Ltd* v *Walker* at p. 412.
However, the pretence relied on arose by inference from the deception of the joint
venture by the presentation to its banker of cheques which implied that the sums
paid were due. If it were inappropriate to characterise this as a pretence, what one   G

A   was concerned with remained a fraudulent breach of trust and not a fraud in the sense of Scots criminal law. Fraudulent breach of trust had a wide connotation: *Hesketh's Case*. In that case there was no question of pretence. The act complained of was inconsistent with fiduciary duties and that was sufficient. On the same basis the pursuer's averments in the present case were relevant. There was no tenable alternative such as mistake. Variation of contract and dishonesty were the alternatives. It was a matter of fact for enquiry whether there had been a variation of the contract and the defender would require to prove that. The only other inference favoured the pursuer and was of a fraudulent breach of trust. The position was clo-

B   sely analogous to the analysis set out by Lord Justice-Clerk Alness in *Gibson* v *National Cash Register Co. Ltd* at p. 504. If the basic facts indicated a prima facie case of fraud at proof in that case then the averments in the present case were clearly relevant to go to enquiry.

   The arguments of counsel in this case ranged widely. I propose to consider in the first place the defender's argument that the application for an order under section 212 is incompetent in an ordinary action. In *Blin* v *Johnstone* at p. 338 the Lord Justice-Clerk followed the Master of the Rolls in *B. Johnson & Co. (Builders) Ltd*

C   and Maugham J. in Re *Etic Ltd* in holding that the predecessor of section 212 was a procedural section dependent for its substantive scope on the general law of reme-dies for wrongs of the kind identified in it. In that context the observations of Lord President Inglis in *Liquidators of City of Glasgow Bank* v *Mackinnon* are important. One is not concerned with the application of normal rules of pleading. The provi-sion is designed to enable a summary remedy to be provided in the context of liqui-dation where the court is satisfied that wrongful conduct by a designated officer had occurred. The Rules of Court make specific provision for the form of procedure to be applied and for the jurisdiction of the court to be exercised so far as practic-

D   able by a Lord Ordinary nominated for the purpose. Rule 74.2 provides that all pro-ceedings in the Outer House in a cause under or by virtue of the Insolvency Act 1986 'shall be brought before a judge of the court nominated by the Lord President as the insolvency judge or, where the insolvency judge is not available, any other judge of the court'. Rule 74.9 requires that the proceedings should be by petition. It is, in my opinion, clearly envisaged that the scope of the summary remedy and the particular provisions made for disposal of applications of the kind are closely interrelated. Frequently applications of this as other matters peculiar to the liquidation judge require to be disposed of by Outer House judges generally.

E   That, however, proceeds on the basis that the judge substitutes for the performance of the particular duties as a matter of necessity. The provisions in other respects define a jurisdiction with particular attributes. It would be contrary to the struc-ture and to the spirit of the rules to entertain an application under section 212 in an ordinary action. A commercial cause must of its nature be an action which addi-tionally falls within the scope of the Commercial Rules. A further indication that it would be inconsistent with the structure of the rules to entertain an application under section 212 in ordinary procedure is the opinion of Lord President Inglis

F   reflected in *Blin* that the ordinary rules of pleading are inappropriate. It would be inconsistent with that view that one should adopt the forms of ordinary procedure but abandon the requirements of them except as specifically authorised by the rules. The use of the Commercial Rules could not of itself justify such an inconsis-tency of approach. The Commercial Rules make no provision for petition processes to be brought before a commercial judge. In my opinion accordingly the conclusion sought to be introduced by the minute of amendment is incompetent and the minute of amendment ought not to be allowed insofar as it seeks to add a case under the Insolvency Act.

G   While that is sufficient to deal with the substantial point between parties, I

should make some comment on the other issues that were raised. The first of these A
relates to the scope of section 212 itself. In *Blin* the adoption by the Lord Justice-
Clerk of Maugham J's comments in Re *Etic Ltd* supplies a substantial part of the
answer to the issue in this case. The provision applies only where there has been
some wrongful act by the director or other officer 'either of the nature of misfea-
sance, or of the nature of breach of trust in a wide sense, including no doubt a
breach of trust by negligence, or something of that kind'. This does not bear to be
a comprehensive definition of the scope of the provision and it may be that one
could not with safety attempt any such definition. That would be consistent with
the view that the provision is not primarily concerned with definition of grounds of B
action which find their source in the statute but with procedural means for accel-
erated disposal of issues otherwise actionable in the context of insolvency. One
need only consider the references to breach of trust in this context. It is clear that
'breach of any fiduciary or other duty' in relation to a company may extend across a
wide range of conduct. A breach of fiduciary duty may at one end of the spectrum
include simple carelessness and at the other extend to acts which on any view are
criminal in the narrowest sense of that expression. Embezzlement liable to action
under the criminal law would fall within the provision, as would negligent invest-    C
ment. The observations of Ungoed-Thomas J. in *Selangor* at p.1575 demonstrate
that there is scope for very considerable overlap between the expression 'breach
of any fiduciary duty' on the one hand and misapplication of company funds on
the other. He said:

> 'So, even though the scope and operation of such obligation differs in the case
> of directors and strict settlement trustees, the nature of the obligation with
> regard to property in their hands or under their control is identical, namely, to
> apply it to specified purposes for others beneficially. This is to hold it on trust for
> the company or the settlement beneficiaries as the case may be. That is what    D
> holding it on trust means. That is why a misapplication of it is equally in each
> case a breach of trust. This is just not treating as a breach of trust something
> which is not a breach of trust. No ground has been suggested for treating it as a
> breach of trust except that it is a breach of trust. It would be topsy turvy, as seems
> sometimes to have been suggested, to make the misapplication of property that is
> held a breach of trust (and not just treat it as a breach of trust though not a
> breach of trust) without the property having been held on trust and thus convert
> into a trust what was not a trust before the misapplication.'

It appears to me that problems of this kind indicate that the provision must not be    E
taken as itself the source of obligation. It does not define directors' obligations. The
reference to the source of the obligation is ancillary merely to defining the scope of
the summary remedy and to ensuring that so far as practicable there are no techni-
cal objections to the application of that remedy across a very wide range of conduct
in relation to the administration of companies' affairs. In the present case, that is
another reason for holding the conclusion incompetent. As expressed, it appears to
derive the basis of the remedy from the section and to ignore the injunction in the
authorities that that basis must be found in general law. In my opinion it would be    F
wrong to construe section 212 in these circumstances as if it were intended to define
in any way the scope of remedies available against directors.

The third chapter of argument related to the application of the provisions of the
Prescription and Limitation Act to section 212. It appears to me necessarily to fol-
low from the analysis in the last paragraph that it is a misconception to attempt to
apply the provisions of the 1973 Act to section 212 as if it were a source of remedy
rather than a procedural device. As a procedural device the section can neither
extend nor can it limit the liability of a director. It subjects him to an alternative
to ordinary procedure for the vindication of a wrong but it does not independently    G

2B

A   create any obligation which could, of its nature, be affected by the 1973 Act. It appears to follow that if a wrongous act is of a character that is affected by the quinquennial prescription, that will apply irrespective of the procedural means adopted to enforce it. If the obligation arising from the wrong is imprescriptible, or if the long negative prescription is applicable, then those rules will apply. I consider that the approach adopted by the pursuer has been misconceived since it was predicated on the view that adopting the section 212 route would obviate independent analysis of the grounds of action. In the end the question whether there is a subsisting right of action in this case must depend on an application of the 1973 Act

B   to the averments as they stand.

    In these circumstances it appears to me to be unnecessary to consider the argument advanced by counsel for the pursuer that what was sought under reference to section 212 was not of the nature of damages and in particular was not a claim for reparation. In my opinion there is no doubt that as a matter of interpretation of the pleadings and on a sound analysis of the underlying approach of the pursuer what is sought in this case is damages for a wrongful act. The allegation is that the defender wrongfully diverted funds from Milndavie into the hands of Stewart, thereby preventing Milndavie from obtaining the profit on the development that it reason-

C   ably anticipated it should have. The loss of profit is in my opinion properly characterised as damages in these circumstances. One does not avoid that consequence by qualifying the claim by language such as 'up to'. So far as it is necessary to have regard to this matter, it provides another reason for refusing the minute of amendment in this respect. If it merely reformulates a claim for damages for fraud, it is unnecessary. If it is an attempt to obtain damages without allegation of fraud, it relies upon an obligation of reparation as defined in *Hobday*. Having regard to the passage of time since the acts in question, that liability would have prescribed. In

D   the whole circumstances I shall allow amendment in terms of paragraph 2 of the minute of amendment only.

    It was not disputed by the defender that as a director of Milndavie he held the property of the company on trust, nor that the misapplication of that property would be a breach of trust. The observations of Ungoed-Thomas J. in *Selangor United Rubber Estates Ltd* v *Cradock (No. 3)* at p. 1557 were clearly relevant in this context.

    The present action must be dismissed unless the pursuer has set out a relevant case based on a breach of an imprescriptible obligation or an obligation subject to

E   the long negative prescription.

    The short negative prescription applies inter alia '(b) to any obligation based on redress of unjustified enrichment, including without prejudice to that generality any obligation of restitution, repetition or recompense' and '(d) to any obligation arising from liability . . . to make reparation' excepting liability to make reparation in respect of personal injuries or death. Schedule 3 includes in the list of imprescriptible rights and obligations: '(e) any obligation of a trustee . . . (ii) to make reparation or restitution in respect of any fraudulent breach of trust to which the

F   trustee was a party or was privy'; and '(iii) to make furthcoming to any person entitled thereto any trust property, or the proceeds of any such property, in the possession of the trustee, or to make good the value of any such property previously received by the trustee and appropriated to his own use'. The first question which arises in relation to the case, as amended, is whether, in the absence of relevant averments of fraudulent conduct, the right to pursue a claim for breach of trust prescribes in five years or only after the expiry of the long negative prescriptive period.

    Breach of trust is an expression of very wide meaning. In *Town & County Bank*

G   *Ltd* v *Walker* at p. 412, Lord Kyllachy said:

'A breach of trust may consist of embezzlement, or it may arise simply from    A
failure to account, or it may consist . . . of some act or default which amounts
only to some irregularity or error of judgment for which, nevertheless, there
may be a personal liability.'

In *Allen* v *McCombie's Trustees*, an action by a beneficiary against trustees for
the restoration of trust funds alleged to have been lost by improper investment,
the court distinguished liability for breach of trust from liability for breach of con-
tract. Lord President Dunedin attributed the Scottish jurisprudence to the adop-
tion of English Chancery principles in the middle of the nineteenth century. At    B
p. 717 he said:

'When we come to the question of breach of trust by a malinvestment, every-
body knows it is not a case of all being bound or all being free. One trustee may be
guilty and another may be innocent. It all depends upon the facts. . . . That, I
think, shews, I will not say *quasi*-delict, but something which may more properly
be described, in the general terms in which it is described in the Chancery law of
England, as breach of duty. And as a matter of fact, that that has been the view of
our law upon the question of trusts I have no doubt. Long before there was any    C
question of this class of case in the Scottish Courts, there was an immense body of
law in England, created by the Court of Chancery; and looking back to the ear-
liest cases in which this remedy was sought in Scotland . . . I found that the
Judges, without any difficulty, simply took the English Chancery doctrine.
They considered that our jurisprudence was quite sufficient to visit breach of
duty with its proper consequences, and I do not think that anyone for one
moment ever dreamt of rigidly assigning the matter either to breach of contract
or *quasi*-delict.'

Lord McLaren traced the development of liability from Roman sources, exclud-    D
ing breach of contract as the foundation of liability. He offered no comment on
quasi-delict, but discussed the liability in terms of guilt or fault. Lord Kinnear
took a different approach. At p. 720 he said:

'I agree that the particular complaint in this case does not involve any wrong
so grave as to be properly called a delict, but then the term "*quasi*-delict" is a
very wide term, and it will cover any degree of imprudence or neglect on the
part of a trustee by which trust property which it was his duty to preserve is
lost. On the form of this action I have no hesitation in saying that it is an action
founded upon *quasi*-delict, and not upon breach of contract.'    E

Lord Pearson did not deliver an opinion.
In his book on Civil Remedies Professor Walker, citing *Allen,* says that breach of
trust is breach of a duty sui generis. He also draws attention to the quality of the
duty of care owed by trustees. Of the authorities he refers to it is sufficient to men-
tion *Raes* v *Meek.* At p. 33 Lord Herschell defines the duty as requiring of the trustee
'the same degree of diligence that a man of ordinary prudence would exercise in the
management of his own affairs'. Irrespective of the procedures adopted to recover
loss in such circumstances, the claim is likely to be characterised as one for    F
damages: Professor Walker at p. 1069. It is, however, clear that breach of duty may
occur in cases involving no failure in any duty of care. In the absence of consent a
trustee is not entitled to charge for professional services rendered to the trust:
*Henderson* v *Watson.* That was perceived to be a branch of the doctrine of auctor in
rem suam: Lord Mackay at p. 720. If paid, the professional person may be held liable
to make repetition. Again a trustee may be liable to account for personal profit on
the principle of auctor in rem suam: Mackenzie Stuart on Trusts, pp. 174–175. The
rule then may be more akin to disgorgement of benefit accruing from the wrong than
compensation to the victim for loss suffered as a result of the wrong.    G

A     This is by no means a comprehensive analysis. But it suggests that one should exercise a degree of caution before expressing any general view that liability for breach of trust falls within or does not fall within Schedule 1 to the 1973 Act. One might rather incline to the view that in every case the application of the Act would depend on the nature of the breach and the remedy sought.

There is little assistance in the publications of the Scottish Law Commission. The Commission's memorandum on the law relating to prescription and limitation of actions, No. 9 of 1968, was followed by Report No. 15 in 1970. The memorandum sought representations on the reform of the law relating inter alia to actions

B     founded on delict in respect of which the long negative prescription applied at that time, and proposed the application of the new short negative prescription. Delict was not defined in the memorandum. Instead reference was made to the list set out in the index of contents in volume 1 of the then current edition of Walker on Delict, sections IX–XIV. The list was wide. It included civil claims founded on criminal conduct and, in particular, fraud. It included assault. That was consistent with the general view that an action for damages quasi ex delicto is the ordinary remedy for loss suffered as a result of such criminal conduct, and it was characterised as an

C     action for reparation in that context: *McKendrick* v *Sinclair*, especially Lord Reid at p. 53. Professor Walker's list did not include breach of trust, since he did not consider that it was comprised in the scope of delict as properly understood. As a matter of presentation the memorandum and the report dealt separately with delict and breach of trust in different chapters.

In the report the long negative prescription was dealt with generally. The scope of the prior law was described in paragraph 25. Included were 'rights to recover or claim damages'. Exceptions, so far as material for present purposes, included obligations of trustees to account for trust funds to beneficiaries. Part IV of the report

D     dealt with the shorter negative prescription. After lengthy criticism of the prior piecemeal system, the report set out the general principles for reform which were recommended. In paragraph 60 there was reference to the more broadly based system in England, and an expression of general support for that approach. Part IV was said to leave out of account, for later treatment, 'obligations arising from delict and breach of contract (other than specific implement)'. Rights and obligations to account were included, excluding accounting for trust funds. Following the example of English law, provision was proposed for certain specific classes of exception. In paragraph 65 it was stated that certain kinds of rights and obligations

E     would be excluded from the new shorter negative prescription. These included:

'(2) Rights and obligations of a kind excluded from the operation of the long negative prescription, such as those based on trust. . . .'

Generally, therefore, the structure of the report suggested that one should look to Part V and subsequent parts for the material relevant for present purposes.

Part V dealt with delict and quasi delict. The report recommended that 'a short prescription should be enacted to extinguish rights and obligations based on delict

F     and quasi delict' other than those affected by the Law Reform (Limitation of Actions etc.) Act 1954. In paragraph 98 the same approach was adopted to breach of contract. Part VII dealt with trusts. In paragraph 127, describing the prior law, it was said:

'If an executor or trustee fails to ingather debts due to the estate he is liable in damages to the beneficiaries, but the claim of damages will be extinguished by the long negative prescription.'

G     Paragraph 129 stated:

'In a question with a beneficiary the possession of a trustee or executor is not      A
adverse possession since it is possession upon a title on which the beneficiary
claims, and for his benefit. So the long negative prescription would not affect (i)
a claim to accounting for trust or executry property in the possession of the trus-
tee or executor, nor (ii) recovery of trust property which the trustee or executor
had in breach of trust appropriated to his own use, nor (iii) recovery of trust prop-
erty which the trustee had fraudulently transferred to a third party who was not
acting in good faith. Where the trustee or executor had fraudulently transferred
property to a third party who had received it in good faith, prescription would
not affect the claim of the beneficiary against the trustee or executor but would      B
extinguish the right of the beneficiary to recover from the third party. Where the
trustee or executor had in good faith transferred trust property to a person whom
he believed to be beneficially entitled to it, and the true beneficiary had knowl-
edge of the transaction, the right of the true beneficiary to challenge the action
of the trustee or executor or to recover the property from the transferee would be
extinguished by the long negative prescription. Claims by a beneficiary against a
trustee or executor in respect of loss caused by *ultra vires* or negligent acts are
also cut off by the long negative prescription.'

It is clear that the writers of the report therefore had in mind, as respects the      C
existing law, inter alia the appropriation by the trustee in breach of trust of prop-
erty held for trust purposes, and the making over of trust property to a person
whom the trustees believed to be beneficially entitled to it. But there is little in
the terms of either document to suggest that any comprehensive analysis of the
conceptual basis of liability for breach of trust had been carried out. Paragraph
131 of the report drew comparisons with English law, as had the memorandum,
but it did not expand on the meaning of the terms of art used in that jurisdiction.
Paragraph 132 stated:                                                                  D

'We consider . . . that in consonance with our proposals relating to rights and
obligations based on delict, actions by beneficiaries in respect of loss and
damage caused by *ultra vires* or negligent acts of trustees . . . should be subject
to the short prescription of five years. . . .'

The scope of paragraph 1(d) of Schedule 1 to the 1973 Act was considered in
*Hobday* v *Kirkpatrick's Trustees.* The critical issue in that case came to be whether
the particular obligation relied on was an obligation to make reparation. The pur-
suer alleged that there had been an alienation of trust property. The trustees were   E
alleged to have made over to the person not entitled as beneficiary under the will
certain assets held in connection with the deceased's former business. Persons
claiming to be the true beneficiaries sought an order that the surviving trustees
were liable to make good to the estate the loss of capital and revenue which
resulted. The Lord Ordinary held that that was not a claim for reparation. He said
at p. 199:

'Reparation in this context seems to me to involve the concept of damages for a
wrongful act, and while a breach of trust is a wrongful act, the note of objections   F
is not designed to recover damages. What is being sought . . . is the restoration to
the trust estate of the value of trust property which has been wrongly parted with
and not a sum of damages. . . .'

From the report it appears that the Lord Ordinary was not referred to *Hood* v
*Macdonald's Trustees,* which suggests that the remedy available to a beneficiary
for a breach of trust involving the making over of assets otherwise than in accor-
dance with the provisions of a will may be a claim for damages. The Lord Justice-
Clerk characterises the action at p. 27 as 'an action against the sole surviving trus-   G

A    tees for damages for breach of trust'. In view of the case of *Barns* v *Barns' Trustees,* to which the Lord Ordinary makes reference, the form of action is not determinative of the issue. In many cases the form of action adopted in *Hobday* would be the only course open. In a discretionary trust a beneficiary seeking a remedy for a misapplication of funds by a trustee, such as paying a sum from capital to a beneficiary qualified to receive income payments only, would require to raise an action of count-reckoning and to seek the restoration of the estate available for distribution to the class of beneficiaries qualified to receive capital payments, because the discretionary nature of the trust would prevent him having a direct right to damages

B    on his own account. According to *Hobday* that right would be cut off only by the long negative prescription in the absence of fraud. However, a beneficiary to whom the capital of a trust had become payable might in certain circumstances have a right to damages for wrongful application of capital for the benefit of a liferent beneficiary, and could suffer the loss of that right after the short prescriptive period if the issue were brought to court as an action for damages. The consequences appear to be open to question. Again, if the remedy sought was, as it was in *Henderson* v *Henderson's Trustees,* declarator that trustees who had made an

C    imprudent investment were liable to replace the capital of the trust estate lost, apparently the long negative prescription would apply.

   I should note the observation in Wilson and Duncan on Trusts at pp. 383–384 [p. 453 of the 2nd edn] that the long negative prescription applies to liability for breach of trust. While there may be cases of breach of trust which do fall within the scope of the long negative prescription, it appears to me that the generality is not correct.

   Where, as in this case, a beneficiary expressly claims damages for breach of trust, it is difficult to see why it should not be within the meaning of the expression

D    'reparation' and subject to the short negative prescription simply on the language of the Act. There are likely to be many examples of breach of trust which will be characterised in the same way.

   Negligent investment of trust funds may be a typical example. It is difficult to see any policy reason why liability for damages arising from breach of trust of that type, or at that end of the scale of wrongs which a trustee might commit, should not be treated in the same way for purposes of prescription as breaches of duty by professional fund managers in managing investments. The standard of care would differ. But essentially the activity, the means by which losses might occur, and

E    quantification would be similar. In Schedule 3, paragraph (e), the Act itself refers to the obligation of a trustee to 'make reparation . . . in respect of any fraudulent breach of trust'. There could be no reason for characterising the obligation in that way in respect of fraudulent breach of trust if an obligation relating to breach of trust generally were not, or could not be, of the same character.

   On the terms of the Act itself, I have come to the view that unless the obligation relied on is imprescriptible, the short negative prescription applies to the claim for damages for breach of trust made in this case on the ground that paragraph 1(d) of

F    Schedule 1 applies. In seeking damages for breach of trust in the way the pursuer in this case does, he seeks a remedy of reparation and the action cannot properly be described in any other way.

   I turn therefore to the scope of the imprescriptible obligation and in particular of the expression 'fraudulent breach of trust'. The Law Commission memorandum is less than helpful. The reference to the English Limitation Act of 1939 indicates that in the law of England at that time the Act did not bar actions based on fraudulent breach of trust. The memorandum stated that there was little difference between Scots and English law but that it would probably be desirable that a new statute on

G    prescription should be made comprehensive. So far as material, the advertised

intention was that prescription would not affect a claim to accounting for trust   A
funds which were in the possession of the trustees; nor recovery of trust funds
which the trustee had in breach of trust appropriated to his own use; nor recovery
of trust funds which the trustee had fraudulently, but not merely in honest error,
conveyed to a third party. As already indicated, the analysis is less than compre-
hensive. The report is similarly unhelpful and I have already referred to its ma-
terial provisions. The prior law was clear in relation to some at least of the points
raised. A trustee's duty to account was imprescriptible: *Hastie's Judicial Factor* v
*Morham's Executors*. That case made it clear that the prescription of liability to pay   B
was a different issue. *Barns' Trustees* was before the court, and although it is not
referred to in terms in his opinion, it was clearly in the Lord President's mind in
drawing that distinction. It was well settled that prescription could not be pleaded
against the right of a beneficiary to follow extant trust property, or its identifiable
proceeds or surrogatum, into the hands of a trustee or anyone acquiring from the
trustee not being a bona fide possessor for value not having notice of the trust: Lord
President Cooper at p. 676. There were other relevant examples in cases such as
*University of Aberdeen* v *Magistrates of Aberdeen,* especially in the opinion of Lord
Deas at pp. 1099–1100, where he commented on *Baird* v *Magistrates of Dundee* and   C
*United Collieries Ltd* v *Lord Advocate* at p. 467. One can, with little difficulty, find
antecedents for Schedule 3, paragraphs (e)(i), (e)(iii) and (f), at least generally. But
it is less than easy to find warrant in prior Scots law for the relevant paragraph.
Professor Walker in *The Laws of Prescription and Limitation of Actions in Scotland*
(4th edn) at pp. 75–76 cites *Thain* v *Thain* at p. 1201 for observations of Lord
Kinnear in support of the proposition that:

> 'A fraudulent breach of trust certainly covers a breach done with intention to
> defraud, but it is questionable if it is confined to that; it may include a breach of
> trust, even negligent, which has the effect of defrauding a beneficiary of what he   D
> is rightly entitled to under the trust.'

I have not found the reference to *Thain* helpful in this context. There was no case
of fraud made out. In paragraph 129 of the Commission's report there are references
to 'fraudulently' transferring property in a context which most closely resembles
the crime of embezzlement. As already mentioned, paragraph 131 refers to the
English rule relating to fraudulent breach of trust. But there is no discussion of
its content.

It is not obvious that the provision simply relates to some general principle that   E
liability for damages caused by criminal conduct generally, or for fraud in the sense
of Scots criminal law, does not prescribe. The memorandum and report make it
clear that prescription of crime as such was not addressed. The context discloses
that what was ignored was the prescription of the prosecutor's title in relation to
criminal conduct. The reference to *Sugden* v *H.M. Advocate* is instructive. It dealt
exclusively with the rights of the prosecutor, and in particular the Crown: see Lord
Justice-Clerk Aitchison at pp. 109, 110 and 112, and Lord Hunter at p. 117. That
decision and the discussion in the Law Commission's publications had no bearing   F
on the law relating to civil claims arising from criminal conduct. The reference to
Professor Walker's index might suggest that such claims were intended to be sub-
ject to the short negative prescription and that the special treatment of fraudulent
breach of trust must depend on another explanation. The most obvious explanation
is that it was an importation from English law. There has been a progressive assim-
ilation in this context. See the observations of the Lord President in *Allen* quoted
above for one view of the historical background generally. Section 32 of the Trusts
(Scotland) Act 1921 introduced English rules relating to the relief of trustees from
liability for breach of trust where the trustees acted honestly and reasonably. In   G

A    English law that might be a proper antithesis of 'fraudulent breach of trust', given the width of that term. But it is not clear that any such approach would be valid in Scots law.

    The discussion of the developments of English law for which I am grateful to Mr Anderson provide some explanation of the background to the provisions of section 19 of the Limitation Act 1939 (now section 21 of the Limitation Act 1980). But I have not found it possible to apply the reasoning directly to the Scottish Act. Section 19 excluded from limitation

B       'any fraud or fraudulent breach of trust to which the trustee was a party or privy'.

    There is some superficial similarity of language but it may conceal differences of approach and context. The reference to fraud and to fraudulent breach of trust certainly suggests such differences. Section 19 reflected the terms of section 8 of the Trustee Act 1888. The earliest of the cases referred to, *Metropolitan Bank Ltd* v *Heiron* related to circumstances before the introduction of the 1888 Act and was concerned substantially with the statutory limitation 21 Jac. 1 cap. 16. The differ-
C  ences in the statutory context and the fact that the allegation in question was one that would be considered fraudulent on any view, deprives that case of much value in the present context. The allegation was that a company director had taken a bribe to influence his colleagues to agree to a favourable compromise of a claim against the payer. The liability to the company was characterised as an equitable debt to which, in the opinion of James L.J. the courts of equity had always followed the statutes of limitations by analogy. The second relevant case, *Flitcroft's Case,* dealt with the application of the statute of limitations to breach of trust as such.
D  False accounts were placed before a company in annual general meetings in successive years and as a result dividends were declared. The persons who were directors when the dividends were paid were held liable for the whole amount paid out. At p. 534 the Master of the Rolls, Sir George Jessel, said:

    'It follows then that if directors who are *quasi* trustees for the company improperly pay away the assets to the shareholders, they are liable to replace them.'

    Brett L.J. at p. 535 said:

E    'It is therefore [the liquidator's] duty when such a breach of trust as this is discovered to get a return of the assets improperly expended that they may be applied in payment of debts. The act of the directors is impeached as a breach of trust, not on the ground of tort or misfeasance. There are persons who may be made liable under section 165, without having been guilty of a breach of trust; but where the person charged under that section is a trustee, the act which brings him within the section is a breach of trust.'

    Cotton L.J. at pp. 535–536 said:

F    'But directors are in the position of trustees, and are liable not only for what they put into their own pockets, but for what they in breach of trust pay to others.'

    Although the court referred to the fact that the accounts on which the dividends were declared were false, it appears that the basis of the decision was that the payments of dividend out of capital was contrary to the constitution of the company. There was no finding of moral dishonesty in the case. In In re *Lands Allotment Co.* there was a transaction characterised by Wright J. at p. 624 as an ultra vires invest-
G  ment. The response of the respondents was that the statute of limitations applied.

They relied upon the Trustee Act 1888. At p. 625 he said that, on the assumption that   A
the 1888 Act applied, it was incumbent upon the applicant to show that the directors
were disentitled to claim the benefit of the statute on the ground of 'fraud or fraudu-
lent breach of trust to which the trustee was party or privy'. He turned to the ques-
tion of whether there was evidence to support that. At p. 626 he said:

> 'But here only one charge of fraud is made—that is, a fraud of concealment,
> which is sought to be supported by evidence of what took place at a meeting in
> 1885. Apart from that, I am quite satisfied that there was neither fraud nor negli-
> gence on the part of any of these gentlemen. . . . I think they might perfectly well   B
> believe themselves justified in acting upon the articles of association; and on the
> articles of association, apart from the memorandum of association, I have no
> doubt that this investment would have been within the powers of the company:
> in which case there is no evidence to shew that it was any such irrational thing
> for the directors to do so as to make them guilty of misfeasance.'

The case went on appeal to the Court of Appeal. At p. 632 Lindley L.J. supported
the decision of the judge of the first instance generally. But from p. 634 onwards he
came to consider a separate question. A director, Mr Brock, had taken an active   C
part in promoting one of the investments under attack and had, it appeared, spoken
at a general meeting of the company supporting what had been done as a proper and
good investment. At the end of his opinion on p. 636 he said:

> 'I take him as doing exactly what he says he did—exercising his judgment upon
> it, believing perfectly honestly that it was *intra vires*, but making a mistake as to
> the powers of directors in investing money. As regards him, therefore, it appears
> to me that the appeal must succeed and he must be held liable for [the sum in
> question].'
>                                                                                   D

So far as the decision of Wright J. was reversed, the case has no bearing upon
fraudulent breach of trust as one would understand it on any general view unless
it included an error of judgment as to the scope of the directors' powers. The final
case in the series which is material is In re *Sale Hotel and Botanical Gardens Co. Ltd:
Hesketh's Case*. In it, it is perhaps sufficient to note that Wright J. held that Mr
Hesketh was not guilty of any moral fraud whatsoever. Mr Hesketh had taken a
payment in connection with the promotion of the company. He was in a fiduciary
position. But it was said by Wright J. at p. 682:                                  E

> 'The material exception is where the claim against the trustee is "founded
> upon any fraud or fraudulent breach of trust to which the trustee was party or
> privy". I cannot come to any other conclusion than that a promoter, in the fidu-
> ciary position in which he stands to a company, making a secret profit, which he
> knows is not brought to the knowledge of the company as a whole, and as to
> which he must have the knowledge imputed to him that it is contrary to the
> law, is guilty of fraud within the meaning of that section, or any other equitable
> definition of fraud. It would be impossible to hold that moral fraud . . . is required
> for the purposes of that section. That section seems to me directed to the relief of   F
> trustees from what may be called innocent or negligent breaches of trust, and not
> breaches of trust in which, for their own personal gain, the trustees have com-
> mitted knowingly acts from the nature of which the law imputes to them knowl-
> edge that they are doing wrong.'

So far as is material, the case indicates an approach to the concept of fraud which
extends beyond dishonesty to include breach of fiduciary duty in circumstances in
which the deemed knowledge of the law imputes to the individual knowledge of
illegality of the conduct in question.                                            G

A    In my view it is apparent from an examination of these cases that the approach to the interpretation of the language of the English legislation is alien to that of Scots law generally in relation to fraud, with the possible exceptions of the treatment of fraudulent preferences in the context of bankruptcy and concepts such as fraud on a power in the context of trust. The Law Commission's writings on this matter do not make clear the underlying understanding of the English concept that was held in adopting the expression for use in a Scottish Act. In my opinion one is left at the end of the day to construe the language in the context of Scots law in the knowledge that it may have been an adaptation of an English concept but without definition

B    provision or other assistance that would enable one to deal with the provisions as incorporating the history from English law necessary to give the expression a meaning of the kind attributed to it by Wright J.

    Dishonesty is in general fundamental to the Scottish notion of fraudulent conduct. It would be contrary to principle to treat conduct which was honest, but unreasonable, and therefore excluded from relief under the Trusts (Scotland) Act, as automatically being fraudulent. On the other hand, there appears to me to be no reason to equate the meaning of the term in the Act with common law fraud.

C    Embezzlement would obviously be a fraudulent breach of trust. Clearly, if the funds embezzled fell within paragraph (e)(iii) of Schedule 3 to the Act, one could rely upon that provision, but it may not be and damages may be the only remedy available. It is unthinkable that a remedy for embezzlement would be excluded and indeed one might think that embezzlement of trust funds would be the more normal case. It is perhaps unlikely that one would find fraud in the common law sense of that expression practised by a trustee against his fellow trustees.

    There are many dicta which suggest that the diversion of trust funds is of its nature a fraudulent act. In *Heritable Reversionary Co. Ltd* v *Millar* Lord Watson, speak-

D   ing of what is comprised in a man's estate, in the context of property held in trust, said at pp. 49–50 that a man's property did not include estate in which he had no beneficial interest and which he could not dispose of 'without committing a fraud'. He repeated the point at pp. 50–51, commenting that a hypothetical disposition of assets held in trust for third parties upon the sequestration of the holder would require one to assume that Parliament had intended a disposition 'which but for the statute he could not have granted without being guilty of the crime of breach of trust and embezzlement'. The expression 'fraudulent' is clearly capable of supporting a meaning which does not require the false pretence procuring a prac-

E   tical result of the common law definitions of fraud. But as a lowest common denominator it appears to me that dishonest conduct or conduct from which dishonesty can be inferred is of the very essence of the term.

    Against that background I turn finally to the defender's contentions that no relevant case of fraudulent breach of trust has been made out. Mr Anderson invited me to approach that issue, having in mind inter alia the defence set out in the pleadings which, as presented by him, provided a circumstantial account of the unfolding events which the pursuer required as a matter of pleading to meet if a case of

F   fraud was to be maintained. In my opinion, the averments of the defender are not of primary importance in this context. However, if one did adopt the approach which the defender urged upon me, there is in this case a significant deficiency which cannot be accounted for by him. The pursuer's complaint is that substantial sums of money were paid as set out in a document, No. 5(7) of Process, without there being available architect's certificates showing that the employer was obliged to make payment. By about 19th August 1985 the discrepancy between certificate and payment was relatively low at £4,385. Thereafter throughout the period beginning in September 1985 and ending on 10th September 1987 payments were very

G   considerably in excess of the sum certified. The total amount paid eventually

amounted to some £803,474. The defences set out an alternative method of quanti-   A
fying the sums payable to Stewart. The draft final account prepared by Mr Dunigan
brought out a sum of £745,320. Without reference to the more sophisticated analy-
sis in the minute of amendment for the pursuer in response to these averments by
the defender, it is plain that the defender has not provided an adequate account of
the payment by Milndavie to Stewart of the aggregate sum involved. Indeed, on the
defender's own approach there would appear to be a significant shortfall in the jus-
tification of the payments on any view. However, the relevancy of the pursuer's
case must depend upon the legitimacy of the inference drawn from the payment as
between related companies, of which the defender was a director, of very substan-   B
tial sums of money without the warrant or certificate stipulated for in the formal
building contract entered into by the companies. The liquidator of Milndavie owes
duties to creditors, as did the directors of the company, and it is not immediately
clear as a matter of relevancy that the knowledge of all those concerned in an
executive capacity in the management of Milndavie or the joint venture to which
it was party would of itself necessarily avail as an answer to any misconduct other-
wise established. At the end of the day the single question for me at this stage is
whether the pursuer must necessarily fail in establishing the fraudulent breach of   C
trust on which he relies, if proof is led. In that context the pursuer may fail to estab-
lish a 'pretence'. However, I regard the averments of pretence as mere repetition of
the common law formula for the crime of fraud rather than as a fundamental ele-
ment in the pursuer's case. The observations of Lord Watson in *Heritable
Reversionary Co. Ltd* v *Millar* go far to suggest that the relationship of trust may
be a factor which colours the conduct of the trustee and may characterise, or
point towards the characterisation of, conduct as fraudulent where funds have
been diverted to purposes other than those for which they are held. On the other
hand, openness was a factor identified in *Thain* as important in excluding fraud:   D
see especially Lord Adam at p. 1205. In the whole circumstances, it appears to me
that there is a sufficient basis in averment on which, if the pursuer's case as a whole
were fully proved, it would be legitimate to infer that the payments of sums from
the resources of the joint venture belonging in part to Milndavie without warrant
under contract to a company substantially owned by the defender involved a dis-
honest appropriation of funds of Milndavie. If variation of the building contract is
established, on the other hand, and all of the material transactions were carried
out openly and with the concurrence of other directors of the companies involved,
the pursuer would fail. In these circumstances the appropriate course is to allow   E
proof before answer on the parties' respective averments. As already indicated, I
shall allow the summons to be amended to the extent only of adding the factual
matters to which I have already referred.

For the pursuer: *Bowen, Q.C., Paterson,* instructed by *Bishop and Robertson
Chalmers,* Solicitors, Edinburgh.

For the defender: *R.W.J. Anderson,* instructed by *Macbeth, Currie & Co., W.S.*   F


COMMENTARY

The failure to understand the function of s. 212 of the 1986 Act is not uncommon. I
thought it might be useful, in order to consider the point in terms of sheriff court
procedure, to refer to part of a note of my own to an interlocutor of 28th April 1994
in *Datastor Technology Ltd* v *Baston.* There was an appeal to the Sheriff Principal
which was refused without any written judgment given.                    →   G

390                          *Ross* v *Davy* (O.H.)                       1996 S.C.L.R.

A      'Crave 1 asks the court:

          '"To find and declare that the defender, as an officer of the company,
       Datastor Technology Ltd, misapplied, retained and is accountable for money
       and other property of the said company, and has been guilty of breach of his
       fiduciary duty in relation to the said company, in terms of the Insolvency Act
       1986, section 212."

       'Crave 2 asks the court:

          '"To ordain the defender to repay to the pursuers the sum of TWENTY-EIGHT
B      THOUSAND TWO HUNDRED AND FORTY-TWO POUNDS SIXTY-THREE PENCE
       (£28,242.63) STERLING with interest thereon at the rate of fifteen per centum
       per annum from the date of citation to follow hereon until payment."

       'Part of [the defender's solicitor's] response to attacks upon the defender's
       pleadings, by which the defender sought to explain certain payments to him,
       was to assert that the onus of proof was on the pursuer, in terms of section 212
       of the Insolvency Act 1986, to demonstrate that the defender has misapplied or
       retained or become accountable for any money or other property of the company
       or had been guilty of any misfeasance or breach of any fiduciary duty in relation
C      to the company. Accordingly, unlike any other ordinary action such as by a sup-
       plier looking for payment of goods, the defender did not have to be any more spe-
       cific than he had been. [His solicitor seemed] to be suggesting that the defender
       would only be required to repay sums received if the pursuer proved that section
       212 applied and that the defender was entitled to sit back and require the pursuer
       to prove it. That appears to me to misunderstand section 212 altogether, but it is
       apparently a misunderstanding shared by the pursuer. I have to say that I do not
       understand what crave 1 is supposed to achieve but, in my view, crave 2 is per-
       fectly capable of standing on its own without reference to crave 1.

D      'Section 212 does not provide for any special circumstances in which the defen-
       der becomes liable to repay sums misapplied. It seems to me that the defender
       would be liable to repay to the liquidator in any of the circumstances set out in
       section 212(1), whether or not section 212 existed. What section 212 does, as its
       heading says, is to afford a summary remedy against delinquent directors, but
       one which the pursuer has chosen to ignore. In terms of subsection (1), the sec-
       tion applies if "it appears that" an officer of the company has misapplied money,
       etc. In that circumstance, in terms of subsection (3):

          '"The court may, on the application of . . . the liquidator . . . examine into
E      the conduct of the person falling within subsection (1) and compel him—
          (a) to repay, restore or account for the money or property or any part of it,
       with interest at such rate as the court thinks just; . . ."

       'Had this been a winding up by the court, the application would be made under
       rule 30 of the Sheriff Court Company Insolvency Rules 1986 by a note in the pro-
       cess. This being a creditors voluntary liquidation, however, the application
       would be a summary application, in terms of section 3(p) of the Sheriff Courts
       (Scotland) Act 1907. It may be regretted that the pursuer did not choose that
       course, in which case these matters would have been disposed of long ago.
F      Since he has not chosen to do so, it is difficult to see what crave 1 seeks to
       achieve. So far as crave 2 is concerned, however, it seems to me that the normal
       rules for candid pleading on the part of both sides apply. It seems to me that, if
       the defender, as managing director of the company, has received or paid to him-
       self money belonging to the company, he is required to offer some justification for
       it or to repay it.'

G

**EXHIBIT D**

**SLT** THE ROYAL BANK OF SCOTLAND PLC v HOLMES (OH) 563

A ence that the delinquent was the defenders' employee. That is an inference which it would be more appropriate for a judge to deal with than a jury.

The function of the court in relation to the mode of inquiry was described in *Graham v Associated Electrical Industries*, by the Lord President at 1968 SLT, p 82 as follows:

"The question of what the mode of inquiry should be has been argued before us this morning.

B "A question of this sort is essentially a matter for the discretion of the Court, the object being to select as between the alternative methods of inquiry which type of tribunal would best secure justice as between the parties to the action."

In the present case difficulties in my view will arise in relation to the proof of the employment of the alleged delinquent for the reasons above noted. In addition, if the pursuer does in fact know the identity of the employee then the matter of his own contribu-
C tion, if any, to his accident may assume differing proportions. These are considerations which might have made the case unsuitable for jury trial even if the pursuer had been able to make the averments it was suggested he should make.

In addition, the defenders argued that difficult questions of medical evidence also made the case unsuitable for jury trial in that the pursuer had a pre-existing condition which may have been exacerbated. He also averred matters about depression and it was
D unclear whether one or other or both of those matters affected his ability to work or otherwise.

The short time the pursuer had until retirement age obviates, I think, in this case the difficulties posed by the decision of the House of Lords in *Wells v Wells* which desiderates a somewhat elaborate process for the calculation of future wage loss with, as a starting point instead of as a check, the "Ogden Tables". An article at 1998 SLT (News) 291 in which a junior counsel pleads for guidance from the Inner House,
E perhaps by way of a report, on this matter was published on the day of the debate.

So far as the matters of medical complexity were concerned I was referred, for illustrative purposes, to a decision of Temporary Judge Horsburgh in *Meechan v McFarlane* and of Lord Cameron of Lochbroom in *Pietryea v Strathclyde Regional Council*. The latter case manifestly had more complexities than the present and, insofar as the former case was
F concerned, with due respect to the views of the judge, I would not have come to the same conclusion on the facts as they were stated in the report. I note that that case was the subject of a reclaiming motion but that the reclaiming motion did not proceed.

Accordingly, while I would not have considered the medical matters argued by themselves as sufficient to amount to special cause for withholding the case from jury trial, they are an additional factor to the factors which I have considered to be overwhelming in rela-tion to the merits of the action. This case is unsuitable

for jury trial and I accordingly allow a proof before answer. G

---

*Counsel for Pursuer, Allardice; Solicitors, Thompsons — Counsel for Defenders, Liddle; Solicitors, Bishop and Robertson Chalmers.*

DAK

H

# The Royal Bank of Scotland plc v Holmes

OUTER HOUSE
LORD MACFADYEN
8 JANUARY 1999

I

*Fraud — Fraudulent misrepresentation — Guarantee — Bank making payment to Lloyd's under guarantee — Bank seeking reimbursement from name — Name alleging fraud by Lloyd's which induced him to join — Whether defence of fraud available — Whether averments of fraud sufficiently specific.*

*Bank — Guarantee — Fraud — Bank making payment to Lloyd's under guarantee — Bank seeking reimburse-ment from name — Name alleging fraud by Lloyd's which induced him to join — Whether defence of fraud available* J *— Whether averments of fraud sufficiently specific.*

*Process — Pleadings — Specification — Incorporation of documents. brevitatis causa — Whether appropriate or sufficient.*

A Lloyd's name procured guarantees by a bank in favour of Lloyd's amounting in total to £60,000, and granted corresponding indemnities in favour of the bank. In 1994, Lloyd's made claims under the guar-
K antees of £22,681.02 which were paid by the bank, and the name duly indemnified the bank. From 1995 to 1997 Lloyd's claimed the balance of £37,318.98 which was paid by the bank. In an action by the bank for payment under the indemnities the name argued that the bank should not have paid this sum due to fraud by Lloyd's. He averred that he had been induced to become a name at Lloyd's due to fraud on their part. For specification of the fraud, reference was made to correspondence, including two lengthy
L letters from the defender's solicitors to the bank which were incorporated brevitatis causa and made reference to various proceedings in other jurisdictions in which similar allegations of fraud were being made.

**Held,** (1) that in Scotland as in England, in appro-priate circumstances fraud was an exception to the rule that a bank was entitled to make payment under a letter of credit or guarantee (dictum in *Centri-Force Engineering Ltd v Bank of Scotland*, 1993 SLT 190, *followed*) (p 569C); (2) that allegations of fraud had to

A  be supported by specific averments clearly setting out the acts or representations founded upon, the occasions on which such acts were committed or representations made, and the circumstances relied on as yielding the inference of fraud (p 569K-L); (3) that in averring fraud it was essential to identify the person committing the fraudulent act or making the fraudulent misrepresentation, and it was insufficient to aver that an organisation such as Lloyd's had perpetrated a fraud without specifying the individuals concerned (*Thomson & Co v Pattison Elder & Co*

B  (1895) 22 R 432, *applied*) (pp 569K-570A); (4) that it was appropriate to refer at debate to documents incorporated into the pleadings brevitatis causa (*Eadie Cairns v Programmed Maintenance Painting Ltd*, 1987 SLT 777, *distinguished*) (p 570E-F); (5) that the correspondence incorporated brevitatis causa in this case did not provide adequate specification of the allegations of fraud against Lloyd's (pp 570L-571D); and defences *repelled* and decree de plano *pronounced*.

C  **Opinion reserved**, as to whether an allegation of fraud in the underlying contract as opposed to fraud in the claim for payment from the bank was a relevant defence to a claim for reimbursement by the bank (p 569J).

**Observed**, that in some cases where it was necessary to specify a large amount of technical information, presentation by a document incorporated brevitatis causa might be preferable to narrating the

D  information in the pleadings, but that the wholesale incorporation into pleadings of a lengthy document, only parts of which were relevant, was generally unsatisfactory (p 570G-H).

---

**Action of payment**

The Royal Bank of Scotland plc raised a commercial action against Peter Holmes, a Lloyd's name,

E  for payment of sums due to the bank under certain indemnities in respect of sums paid by the bank to Lloyd's under corresponding guarantees.

The case came to debate before the Lord Ordinary (Macfadyen).

**Cases referred to**

*Centri-Force Engineering Ltd v Bank of Scotland*, 1993 SLT 190.

F  *Discount Records Ltd v Barclays Bank Ltd* [1975] 1 WLR 315; [1975] 1 All ER 1071.
*Drummond's Trustees v Melville* (1861) 23 D 450.
*Eadie Cairns v Programmed Maintenance Painting Ltd*, 1987 SLT 777.
*Gillespie v Russel* (1856) 18 D 677.
*Harbottle (R D) (Mercantile) Ltd v National Westminster Bank Ltd* [1978] QB 146; [1977] 3 WLR 752; [1977] 2 All ER 935.
*L v L*, 1996 SLT 767.
*Mullan v Anderson*, 1993 SLT 835.

*Owen (Edward) Engineering Ltd v Barclays Bank International Ltd* [1978] QB 159; [1977] 3 WLR
G  764; [1978] 1 All ER 976.
*Shedden v Patrick* (1852) 14 D 721.
*Society of Lloyd's v Canadian Imperial Bank of Commerce* [1993] 2 Lloyd's Rep 579.
*Sztejn v J Henry Schroder Banking Corporation* 31 NYS 2d 631 (1941).
*Thomson (R H) & Co v Pattison, Elder & Co* (1895) 22 R 432.
*United City Merchants (Investments) Ltd v Royal Bank of Canada* [1983] 1 AC 168; [1982] 2 WLR
H  1039; [1982] 2 All ER 720.
*United Trading Corporation SA v Allied Arab Bank Ltd* [1985] 2 Lloyd's Rep 554.

**Textbooks referred to**

McBryde, *Contract*, p 225, para 10-61 (3) (a).
Walker and Walker, *Evidence*, para 70.

On 8 January 1999 the Lord Ordinary *repelled* the defences and *granted* decree de plano.          I

**LORD MACFADYEN.**—The defender was, at the times material for the purposes of this action, a name at Lloyd's. In that connection he entered into a security and trust deed in terms of which he undertook an obligation to procure a guarantee in favour of Lloyd's for the due payment of sums covenanted by him to be paid to Lloyd's. In pursuance of that obligation the defender procured that the pursuers granted in favour of Lloyd's three guarantees, "the
J  first guarantee" (which was for £37,500), the second guarantee" (which was for £12,500), and "the third guarantee" (which was for £10,000). The defender in turn granted indemnities in favour of the pursuers, undertaking to pay to them any sums which they became liable to pay to Lloyd's under the guarantees. There were two such indemnities, one ("the first indemnity") in respect of the first guarantee, and the other ("the second indemnity") in respect of the second and third guarantees. In due course Lloyd's
K  made certain claims under the guarantees. On 7 March 1994 Lloyd's demanded payment of £12,500 under the second guarantee and £10,181.02 under the first guarantee. These demands were met by the pursuers, and the defender in due course met his corresponding obligations to the pursuers under the indemnities. Subsequently Lloyd's made three further demands, namely (i) on 3 August 1995 a demand for £16,528.09 under the first guarantee, (ii) on 6 November 1996 a further demand for
L  £10,790.89 again under the first guarantee, and (iii) on 30 May 1997 a demand for £10,000 under the third guarantee. Each of these demands was met by the pursuers. The pursuers have called upon the defender to make corresponding payments to them under the indemnities, but he refuses to do so. In this action the pursuers accordingly seek to enforce the defender's obligations under the indemnities by seeking payment of the three sums of £16,528.09, £10,790.89 and £10,000, with interest in each case

A from the date on which they made payment to Lloyd's under the guarantees.

The defender's position is that the pursuers, having had notice of his contention that Lloyd's had acted fraudulently, ought not to have made payment to Lloyd's under the guarantees, and are accordingly not entitled to pursue him for reimbursement under the indemnities. The pursuers dispute the relevancy of that contention as a defence to their claims. That issue was appointed as a debate. Although there are other factual issues which on the face of the pleadings

B appear to be disputed, counsel for the defender accepted at the beginning of the debate that if the fraud defence were held to be irrelevant, there was no other basis on which the defender could seek to resist the pursuers' claims, and that in that event decree de plano should be granted.

The debate took a somewhat unusual course, in respect that, despite the fact that the debate was on the pursuers' plea to the relevancy of the defences,

C counsel for the defender addressed me first. Counsel for the pursuers did not object to that order of proceeding.

Counsel for the defender began with a number of preliminary submissions on aspects of the law relating to the proof of fraud. He accepted that there is a presumption in favour of honest behaviour, one corollary of which is that the burden of proving fraud rests on the party alleging it (Walkers on *Evidence*, para 70). He also submitted that fraud could be

D proved by uncorroborated evidence (Civil Evidence (Scotland) Act 1988, s 1 (1)), and that the relevant standard of proof was the balance of probabilities (*L v L*, per Lord Hamilton at 1996 SLT, p 773B-E; *Mullan v Anderson*). Apart from the acceptance that the onus of proof, and therefore of averment, rests on the party alleging fraud, these points, sound though they are, do not appear to me to have any bearing on the only issue presently before me, namely whether the defender's averments constitute a relevant

E defence to the pursuers' claims.

The next part of the defender's submissions was concerned with authorities on the so called "fraud exception", on which counsel relied for support for the relevancy of the defences. The first case cited was *R D Harbottle (Mercantile) Ltd v National Westminster Bank Ltd*. There the plaintiffs had entered into contracts of sale with Egyptian buyers. Each contract pro-vided that the plaintiffs would establish a guarantee

F confirmed by a bank in favour of the buyers. The guarantees were widely expressed, and secured payment on the buyers' demand. They were estab-lished with Egyptian banks and confirmed by the defendant English bank. The buyers demanded payment under the guarantees. The plaintiffs main-tained that there was no justification for the demand for payment, and sought declarations to that effect and injunctions against the defendants from making payment under the guarantees. Interlocutory injunc-tions were granted ex parte but then discharged on

the application of the defendant bank. Counsel for the defender relied on the case as exemplifying the G reluctance of the court to interfere by way of injunc-tion, as a matter of the balance of convenience. The point was expressed by Kerr J (at [1978] QB, p 155 B-D) thus:

"If [the threatened payment] is in accordance with the contract, then the plaintiffs have no cause of action against the bank and, as it seems to me, no possible basis for an injunction against it. Alter-natively, if the threatened payment is in breach of con-tract . . . then the plaintiffs would have good claims for H damages against the bank. In that event the injunc-tions would be inappropriate, because they interfere with the bank's obligations to the Egyptian banks, because they might cause greater damage to the bank than the plaintiffs could pay on their undertaking as to damages, and because the plaintiffs would then have an adequate remedy in damages. The balance of con-venience would in that event be hopelessly weighted against the plaintiffs."                                            I

At pp 155H-156A he added: "Except possibly in clear cases of fraud of which the banks have notice, the courts will leave the merchants to settle their disputes under the contracts by litigation or arbitration as available to them or stipulated in the contracts. The courts are not concerned with their difficulties to enforce such claims; these are risks which the mer-chants take. . . . The machinery and commitments of banks are on a different level. They must be allowed to be honoured, free from interference by courts. J Otherwise, trust in international commerce could be irreparably damaged."

In discussing the authorities, Kerr J noted one American case, *Sztejn v J Henry Schroder Banking Corporation*, in which an injunction against a bank under a confirmed credit was granted on the assump-tion that the bank had clear notice of an established fraud, but noted also that it had been distinguished by Megarry J in *Discount Records Ltd v Barclays Bank Ltd*. K

Counsel for the defender next referred to *Edward Owen Engineering Ltd v Barclays Bank International Ltd*. That case concerned a contract by the English plaintiffs to erect greenhouses in Libya for Libyan customers. The contract contained provision for a performance guarantee. It also provided that an irrevocable confirmed letter of credit would be opened by the customers in favour of the plaintiffs. After the plaintiffs had granted a counter guarantee in favour of the defendants, an English bank, the defen- L dants gave a performance bond to a Libyan bank, in terms of which they confirmed that their guarantee was payable "on demand without proof or con-ditions". The Libyan bank then issued a corres-ponding guarantee bond in favour of the Libyan customers. No letter of credit which complied with the requirements of the contract was opened. The plaintiffs therefore told the customers that the guar-antee was in the circumstances of no effect, and treated the failure to open a letter of credit as repudi-

THE ROYAL BANK OF SCOTLAND PLC v HOLMES (OH)                    1999

ation of the contract by the customers. At the customers' request the Libyan bank made a claim under the guarantee against the defendant bank. An interim injunction was granted ex parte but then discharged. The Court of Appeal declined to hold that fraud had been established, and refused the appeal. Lord Denning MR said (at [1978] QB, p 169A-G): "It has long been established that when a letter of credit is issued and confirmed by a bank, the bank must pay it if the documents are in order and the terms of the credit are satisfied. Any dispute between buyer and seller must be settled between themselves. The bank must honour the credit. . . . To this general principle there is an exception in the case of what is called established or obvious fraud to the knowledge of the bank. . . . [T]he bank ought not to pay under the credit if it knows that the documents are forged or that the request for payment is made fraudulently in circumstances when there is no right to payment"; and (at p 171B), after concluding that a performance bond stands on a similar footing to a letter of credit, added: "The bank must pay according to its guarantee, on demand, if so stipulated, without proof or conditions. The only exception is where there is a clear fraud of which the bank has notice."

Browne LJ said (at pp 172H-173A):

"That exception is that where the documents under the credit are presented by the beneficiary himself and the bank knows when the documents are presented that they are forged or fraudulent, the bank is entitled to refuse payment.

"But it is certainly not enough to allege fraud; it must be 'established,' and in such circumstances I should say very clearly established." (See also Geoffrey Lane LJ at p 175E-H.)

In *United City Merchants (Investments) Ltd v Royal Bank of Canada*, a letter of credit case, the House of Lords (per Lord Diplock at [1983] 1 AC, p 183G) reaffirmed the scope of the fraud exception as being: "where the seller, for the purpose of drawing on the credit, fraudulently presents to the confirming bank documents that contain, expressly or by implication, material representations of fact that to his knowledge are untrue", adding (at p 184A): "The exception for fraud on the part of the beneficiary seeking to avail himself of the credit is a clear application of the maxim ex turpi causa non oritur actio or, if plain English is to be preferred, 'fraud unravels all'. The courts will not allow their process to be used by a dishonest person to carry out a fraud."

Two further propositions may be taken from *United Trading Corporation SA v Allied Arab Bank Ltd*. In the context of discussion of the bank's liability in negligence to its customer if it complied with a demand made by the beneficiary which, to the bank's knowledge, was fraudulent, Ackner LJ said (at [1985] 2 Lloyd's Rep, p 560, col 1): "Knowledge in this context would include what the bank ought to know on the basis of clear information already made available to it, but would not of course include notice of a

mere allegation by the plaintiffs that [the beneficiary's] demand was fraudulent; the bank is under no duty to investigate such an allegation."

Later (also at p 560, col 1) Ackner LJ added: "It seems to us clear that, where payment has in fact been made by the beneficiary on the performance bond was fraudulent must exist prior to the actual payment to the beneficiary and that its knowledge at that date must be proved."

In *Lloyd's v Canadian Imperial Bank of Commerce*, the position of the bank, faced with information suggesting fraud, was described by Saville J (at [1993] 2 Lloyd's Rep, p 581 col 2) as follows: "If a bank has notice of matters which might amount to evidence of fraud, then it must make up its mind whether or not the material is sufficient to justify a plea of fraud. If it is, then the bank can resist payment on this basis and if it can establish relevant fraud it will be under no obligation to honour the letter of credit. If the bank considers the material to be insufficient to plead fraud, then its assessment will be either right or wrong. If right, then ex hypothesi there will be no notice of relevant fraud and thus the customer can hardly resist reimbursing the bank who pays in those circumstances. If the bank incorrectly concludes that there is insufficient material to plead fraud, then it can hardly complain if it is not reimbursed, any more than it could if it mistakenly paid on non-conforming documents."

Finally, counsel for the defender cited one Scottish case, *Centri-Force Engineering Ltd v Bank of Scotland*. There the pursuers sought to obtain interim interdict preventing the bank from making payment under a letter of credit, averring that an engineer's certificate vouching that equipment had been properly commissioned (which was one of the documents which in terms of the letter of credit required to accompany a demand for payment) had been fraudulently issued, in that at its date the equipment was not in satisfactory working condition, and that the signatory of the certificate knew that it was false or was reckless as to whether it was true or false. Lord Abernethy refused to grant interim interdict. Citing *UCM v Royal Bank of Canada*, his Lordship said at 1993 SLT, p 193D-F: "The only exception to the basic rule recognised by English law, drawing on authority from the United States of America, is where the beneficiary himself presents the documents required by the letter of credit and they are forged or fraudulent. . . . I have no reason to doubt that . . . that exception would apply in Scots law. But it does not assist on the facts of this case. Although prima facie the commissioning certificate was in my view presented fraudulently, it was not presented by or on behalf of the beneficiary. It was presented by a third party".

Counsel for the defender submitted that in light of those authorities it was a relevant defence to the claims made by the pursuers in this action for the defender to offer to prove that at the time when the

pursuers made payment to Lloyd's under the guarantees they had been made aware of fraud on the part of Lloyd's. The defender's pleadings concentrate on setting out the basis for the contention that the pursuers were aware of the allegation of fraud. Counsel accepted, however, that for the defence to be relevant it was necessary for the defender to assert not only that the pursuers had had notice of the fraud, but also that the allegation of fraud of which the pursuers had been given notice was well founded.

As becomes evident when regard is had to the correspondence which is incorporated into ans 5 of the defences, the fraud of which the defender says the pursuers had notice was alleged fraud on the part of Lloyd's in connection with the terms on which he was invited to become, and did become, a name at Lloyd's. The contention is that that fraud undermines the validity of his underlying contract with Lloyd's, and thus undermines Lloyd's entitlement to make demands for payment under the guarantees. The alleged fraud is thus more remote from the demand for payment under the guarantee than was the case in any of the authorities cited. They were all concerned with a demand fraudulently made or fraudulently vouched. Counsel for the defender submitted, however, that that distinction did not affect the availability of the fraud exception.

As a preface to his submissions as to the sufficiency of the defender's averments of fraud and of notice of fraud, counsel for the defender submitted that it was no longer appropriate to apply the approach to the pleading of fraud that was required in the 19th century. Reference was made in the course of the debate to McBryde on *Contract*, p 225, para 10-61 (3) (a) where it is stated that: "it is settled law that there must be specific averments of fraud". Among the authorities there cited for that proposition, which were also cited in the course of the debate, were *Gillespie v Russel, Drummond's Trs v Melville, Shedden v Patrick* and *R H Thomson & Co v Pattison, Elder & Co.* Counsel submitted, however, that cases such as those were distinguishable, because they were concerned with an issue as to fraud in a litigation between the victim of the fraud and the perpetrator. Different considerations applied when, as here, the pursuers were not party to the fraud. He pointed also to the fact that the law of evidence as to the proof of fraud was different at the time the cases referred to were decided, corroboration then being required, but that now not being so. As I understood him, he also maintained that the defender was constrained as to the specification of the alleged fraud which he could give by the fact that the only fraud which was relevant was the fraud of which the pursuers had been given notice. Reference to the letters incorporated in the pleadings, by which it was said that notice of the fraud had been given to the pursuers, was therefore the appropriate way to give such specification of the fraud as was required.

The averments on which the defence is based are set out in ans 5. They begin with the statement that:

"the defender has made repeated allegations of fraud [against Lloyd's] as have his agents acting upon his behalf". Reference is then made to a letter of 8 August 1995 from the defender's London solicitors to the pursuers, and the letter is incorporated in the pleadings brevitatis causa. The content of part of the letter is then briefly summarised, and it is averred: "As at the date of receipt of the letter the pursuers were given sufficient notice of fraud. The effect of fraud being established would render the security void ab initio." There follows reference to a letter of 24 August from the defender to the pursuers, which is not incorporated in the pleadings, and to the pursuers' indication that they had not been provided with clear evidence of fraud. A second letter from the defender's solicitors to the pursuers dated 14 November is described as containing further specification of fraud, and is also incorporated in the pleadings brevitatis causa. A letter from the defender himself to the pursuers dated 9 January 1996 indicating that there was "sufficient evidence" of fraud is also incorporated in the pleadings brevitatis causa. The averments then conclude as follows: "In the circumstances the pursuers ought not to have made any payment to Lloyd's confronted with escalating information with regard to fraud on the defender during the material period. They are not entitled to be reimbursed by the defender in respect of any sum paid after being fixed with clear evidence and knowledge of fraud upon the defender. Any payment made by the pursuers in said period of imputed knowledge would have been in breach of contract with the defender. They would not have been able to insist upon performance by the defender."

The defender's solicitors' letter of 8 August 1995 runs to six closely typed pages, and need not be set out in full. It begins by referring to proceedings taken by Lloyd's against Canadian and United States names, in which defences had been served which contained "detailed allegations that Lloyd's had acted fraudulently in its conduct of the Lloyd's insurance market and had made false misrepresentations to its members". It then states that the pleading is fully particularised, and that counsel were satisfied from the evidence in their possession that the defendant was able to allege fraud. It then continues: "The circumstances of the underwriting of your Customers [sic; sc the defender] are the same in all material respects as those on whose behalf the Defences have been served". Reference is then made to a request for further and better particulars made in those proceedings and to the fact that the defendants had served a response comprising 166 pages and three appendices. There then follows a passage (which is referred to in the summary of the letter in ans 5) dealing with the assertion that five Canadian banks which had provided letters of credit to Lloyd's refused to make payment to Lloyd's on the basis that their customers had provided information which amounted to a sufficient case of fraud to entitle the banks to decline to honour drafts that had been presented. The passage from the judgment of Saville J in *Lloyd's v Canadian*

*Imperial Bank of Commerce* which I have quoted above is then set out. Later in the letter there is reference to a litigation in Texas and a lengthy quotation from a speech made by the Chief Executive Officer of Lloyd's, which is cited as "Clear evidence that Lloyd's itself does not believe in the sums which it is now demanding from your Customers".

The defender's solicitors' letter of 14 November is also six pages long. It begins with lengthy quotation from the judgment of Cresswell J in a litigation involving Merrett Syndicates Ltd, goes on to discuss the position adopted by Lloyd's in relation to asbestos and pollution claims, and then (at p 6) contains the following passage:

"Throughout the 1980's Lloyd's, in full knowledge of the extent of the escalating problems associated with asbestos and pollution claims, fraudulently misrepresented the state of the Market to Names. . . . Lloyd's continuously published material which contained statements as to the nature, role and function of Lloyd's to the effect that:

"1. Lloyd's conducted itself with utmost good faith;

"2. The ownership, control and activities of underwriting agents operating in the Lloyd's market were strictly regulated by Lloyd's;

"3. Lloyd's required syndicates' annual reports and accounts to show a true and fair view of the profit or loss of syndicates for closed years of account;

"4. The insurance market at Lloyd's was properly regulated by Lloyd's.

"Lloyd's manifestly misrepresented the true state of affairs in each instance and your customers contend that it did so knowingly. . . .

"In the continued absence of any substantive denial from Lloyd's and in the context of all the matters of which you have notice, your Customers have more than discharged the burden upon them to provide you with 'clear and obvious' evidence of fraud by Lloyd's."

The defender's letter of 9 January 1996 contained no specification of the fraud complained of, but made reference to further litigation in Colorado, USA, and made the following statement of his own position: "if I had been fully informed of all the asbestos, pollution risk, LMX Spiral and self insuring of all loss policies during my Syndicate and ROTA interviews on 1st Nov 1984 I would never have joined Lloyd's or pre-signed the indemnity on 18th October 1984".

Counsel's submission was that the averments in ans 5, when read with the contents of the letters which were incorporated in the pleadings, gave sufficient specification of the fraud which was alleged against Lloyd's, and of the notice and evidence of that fraud given to the pursuers.

Counsel for the pursuers submitted that an allegation of fraud required to be specifically averred. She referred to the authorities which I have already mentioned, drawing attention in particular to the following dicta: "I think a party laying an action on

that ground is bound to set forth in very explicit terms, the fraud of which he complains. . . . [T]he question here is, whether this party has made the ground of action—that is, that fraud—perfectly clear and explicit in statement" (*Gillespie v Russel*, per Lord President McNeill at (1856) 18 D, p 682); "If an action is laid upon misrepresentation, the misrepresentation itself must be set forth . . . no person accused of fraudulent misrepresentation can be bound to go to trial, unless he is told what the fraudulent misrepresentation is that he is said to have made" (*Drummond's Trs v Melville*, per Lord President McNeill at (1861) 23 D, p 462); "It is not enough for a party, founding a reduction on the head of fraud, to state that fraud has been committed. . . . The party . . . must state in what the fraud consists, and what the acts are from which the existence of fraud is to be inferred" (*Shedden v Patrick*, per Lord Fullerton at (1852) 14 D, pp 727-728); and "Fraud is a personal matter, and can only be committed by an individual. . . . Now, this record does not allege acts complained of against any individual at all. Accordingly, it is not by a mere euphemism that this case differs from and falls short of a case of fraud" (*Thomson & Co v Pattison, Elder & Co*, per Lord President Robertson at (1895) 22 R, p 436).

Counsel for the pursuers submitted that the need for specific averments of fraud was all the greater where, as here, the averments of fraud were made in defence to a claim by a party other than the one who was alleged to have committed the fraud. Here the defender's pleadings, even if they were to be taken to include all that was set out in the letters incorporated into the defences, did not clearly and specifically identify the fraudulent act or acts or statement or statements on which the defender founded, or the person or persons who committed the acts or made the statements. In short the defender had wholly failed to meet the strict standards of pleading required in a case based upon fraud.

In connection with the defender's incorporation of the terms of the letters mentioned in ans 5 into the defences, counsel for the pursuers referred to *Eadie Cairns v Programmed Maintenance Painting Ltd*. In that case the court declined to permit a party to rely on specification given not in the pleadings but in reports which were lodged in productions and merely referred to in the pleadings. It is to be noted that there the productions were not said to be incorporated or repeated in the pleadings. The most strongly worded rejection of that approach to specification is to be found in the opinion of Lord Avonside at 1987 SLT, p 780E: "It is a strict rule of our system of pleadings, for long recognised, that in debates related to relevancy and specification no reference whatsoever can be made to productions lodged by one side or another said to support written pleadings unless both sides are in agreement that such productions are accurate and acceptable." Counsel, however, accepted that the defender had here taken the step, which had been omitted in *Eadie Cairns*, of adopting

the correspondence as part of his pleadings. She submitted, however, that it was for the defender clearly to identify the fraud on which he founded, and that it was not adequate specification to leave the pursuers and the court to search through the mass of assertion and argument contained in the correspondence to find the core of the defender's case.

Counsel for the pursuers did not dispute the availability in principle of the fraud exception as a defence to the pursuers' claims, but based her submission that the defences were irrelevant principally on the absence of adequate specification of the fraud founded on. She made the additional point that the normal foundation for the fraud exception is fraud in making the claim for payment under the letter of credit, performance bond or guarantee, and that the fraud here alleged appeared to be fraud on the part of Lloyd's at the earlier stage when the defender became a name. There was, she submitted, no precedent for the fraud exception being given effect on the basis of fraud at that stage.

I agree with the view expressed by Lord Abernethy in *Centri-Force Engineering Ltd v Bank of Scotland* that there is no reason to suppose that the fraud exception is not available under Scots law in appropriate circumstances. The authorities disclose two situations in which it may be relied upon. It may be deployed in support of an application for interdict to prevent the bank from meeting a demand made by the beneficiary in the letter of credit or guarantee, where the bank's customer is in a position to satisfy the court that there is a prima facie case that the beneficiary is acting fraudulently in making the claim, and that the balance of convenience favours interim interdict. As is always the case, the strength of the prima facie case of fraud will have an influence on the balance of convenience, but the authorities suggest that the balance of convenience will seldom favour interference with the performance of the bank's obligation under the letter of credit, since such interference may do incalculable commercial harm and the customer has other remedies (see, for example *R D Harbottle (Mercantile) Ltd v National Westminster Bank Ltd*, per Kerr J at p 155). The fraud exception may also be deployed as a defence to a claim for reimbursement by the bank against its customer in respect of sums paid in response to the demand of the beneficiary in the letter of credit or guarantee. That will arise when the bank, faced with the dilemma described by Saville J in *Lloyd's v Canadian Imperial Bank of Commerce* at p 581, has decided that the evidence presented to it by its customer before the payment was made was insufficient to support the fraud exception, and has therefore satisfied the beneficiary's demand. In that situation, to resist reimbursement, the customer must show that a fraud has indeed been committed by the beneficiary, and that (contrary to the view taken by the bank) the material presented to the bank before the demand was met was sufficient evidence of that fraud to justify the bank in refusing to meet the demand.

All of the authorities on the fraud exception cited in the course of the debate, whether concerned with injunction to prevent the bank from meeting the beneficiary's demand or with the customer's defence to a claim by the bank for reimbursement, depended upon an allegation of fraud in the making of the demand by the beneficiary, either in tendering false or forged documents or in making the claim in knowledge that the payment was not properly due. The fraud alleged by the defender in the present case is not fraud in making the demand, but fraud inducing the defender to enter into the underlying contract with Lloyd's. The use which the defender seeks to make of the fraud exception thus appears to be unprecedented. It is an open question whether fraud inducing the underlying contract will "infect" the claim for payment, enabling the customer to resist the bank's claim for reimbursement on the ground of that fraud provided the bank was furnished with adequate material evidencing that fraud before it met the beneficiary's demand. My initial impression was that fraud at that earlier stage would not support the fraud exception, but on reflection it seems to me that it might do so. If the defender was induced to become a name by fraud on the part of Lloyd's, it might be said that a subsequent demand by Lloyd's under the guarantees was in a derivative sense also fraudulent. The issue seems to me to be potentially complex, and it was not very fully argued at the debate. Had that been the only point of relevancy taken by the pursuers, I would have been inclined to allow a proof before answer, reserving the issue for decision after the facts had been ascertained. In these circumstances, I wish expressly to reserve my opinion on whether the fraud exception can be founded on fraud which induced the customer to enter into the underlying contract with the beneficiary, as well as on fraud in the making or vouching of the beneficiary's demand under the guarantee.

The issue thus comes to be whether the defender has pled the fraud exception with sufficient specification. I am in no doubt that Professor McBryde is correct in stating that it is settled law that there must be specific averments of fraud. That is amply borne out by the authorities cited in the course of the debate. It is in my view essential for the party alleging fraud clearly and specifically to identify the act or representation founded upon, the occasion on which the act was committed or the representation made, and the circumstances relied on as yielding the inference that that act or representation was fraudulent. It is also, in my view, essential that the person who committed the fraudulent act or made the fraudulent misrepresentation be identified. Counsel for the defender suggested that what was said in *Thomson & Co v Pattison, Elder & Co* about the need to identify the individual was said in the context of partnership, where questions of relief between the innocent partners and the guilty partner might arise, and did not apply in other circumstances. It seems to me, however, that it will not do to say that a fraud has been perpetrated by Lloyd's, without further specification. The Society of

A
Lloyd's, like a partnership or company or other corporate body, must, if it commits a fraud, do so through the medium of one or more individuals. It seems to me that the need to give fair notice of the identity of the alleged perpetrator is as great when the fraud is said to have been committed by Lloyd's as it is when the fraud is alleged against a partnership. There may be circumstances in which identification of the specific act founded on operates as sufficient identification of the perpetrator (for example, where a fraudulent statement is said to have been made in a specified letter), but in principle identification of the

B
alleged perpetrator is in my view essential. I do not consider that counsel for the defenders was well founded in his attempt to distinguish the authorities about the need for specific pleadings of fraud on the basis that they were developed in cases in which the person allegedly responsible for the fraud was a party to the proceedings, whereas here Lloyd's are not a party to the present action. It is no doubt correct that that was the context in which the line of authority

C
developed, but in my opinion the need for specification is present a fortiori in a case where the party against whom the fraud is pled as a defence to his claim is not the person alleged to have been responsible for the fraud. In such a situation the pursuers are in at least as much need of fair notice of precisely what is alleged against Lloyd's as Lloyd's would be if the point were pled directly against them. Finally, I am not persuaded that the changes in the law of evidence make any difference to the applicability of the rule

D
requiring specific pleadings of fraud. I see no logic in thinking that, because fraud may now be proved by uncorroborated evidence, the person against whom it is pled has less need for fair notice of the allegation. Arguably the need is even greater. I am therefore satisfied that in judging the adequacy of the specification of the defender's averments of fraud on the part of Lloyd's, it is appropriate to apply the rigorous standards laid down in the authorities.

Before turning to examine the specification of

E
the defender's pleadings, it is convenient to deal with the point taken with regard to the incorporation of the correspondence in the defences. *Eadie Cairns* is not, in my opinion, directly in point. There, although the reports in question were produced and referred to for their terms, it was not averred that they were incorporated in the pleadings. That was the ground on which reference to the reports in supplement of the specification contained in the pleadings was held to be illegitimate. I am of opinion, however, that what Lord

F
Avonside said at p 780E must be read with the fact firmly in mind that there was in that case no incorporation of the reports into the pleadings. It is, in my view, in the absence of such incorporation that the rule is that no reference may be made to productions unless they are agreed. In my opinion, any document may be incorporated in the pleadings, and if that is done and it is produced reference may be made to it at debate as if it were part of the pleadings (as indeed it is, by virtue of the incorporation). There is, in my view, no need for an incorporated document to be

G
agreed before it can be referred to at debate. Whether such incorporation is a satisfactory way of giving specification is another matter. That will depend on the nature of the case, and the nature of the incorporated material. In some cases in which there is need, as a matter of proper specification, to give a large amount of detailed technical information, the presentation of that information in the form of a documentary production referred to and incorporated in the pleadings brevitatis causa may be more satisfactory than an attempt to give the information in narrative form in the pleadings. On the other hand,

H
the wholesale incorporation into the pleadings of a lengthy document, only parts of which are in any way relevant to the issues identified in the pleadings, is in general unsatisfactory, and may well be held not to give the specification required. In the present case the correspondence from the defender and his solicitors has been incorporated into the pleadings (counsel for the pursuers having accepted that the slightly unusual phrase used — "referred to for its terms held repeated herein brevitatis causa" — amounted to incor-

I
poration). The question to which I therefore turn is whether the defences and the incorporated material give adequate specification of the fraud alleged to have been committed by Lloyd's and of the notice and evidence of that fraud given to the pursuers before they met Lloyd's demands under the guarantees.

The defences themselves contain nothing by way of specification (or even of bare assertion) of fraud on the part of Lloyd's. All that is said in the defences is

J
that the defender and his solicitors made to the pursuers allegations that Lloyd's had been guilty of fraud, and provided certain unspecified material in support of those allegations. Beyond that, it is necessary to look to the incorporated correspondence. The defender's own correspondence seems to me to contribute only one piece to the jigsaw, namely the statement in the letter of 9 January 1996 that if he had been informed of certain matters at certain meetings he would not have joined Lloyd's. It is to the solicitors'

K
letters that it is necessary to turn in the search for specification of the alleged fraud. The fact that these letters are lengthy, and that it is necessary to search through them for material that might be regarded as giving specification of the fraud alleged, suggests strongly that incorporation of them in the defences is not in this case a satisfactory method of pleading. The letters were not concerned directly to formulate the charge or charges of fraud. They were intended to persuade the pursuers that Lloyd's demands should

L
not be met. They are therefore concerned partly with argument, partly with narrative of, or at least reference to, what is seen as evidential material, and partly with drawing analogies with other proceedings. Much of their content would, if repeated verbatim in the defences, have been clearly irrelevant; and it is no more relevant because it has been incorporated by reference rather than set out in full.

There is in my opinion nothing in the letter of 8 August 1995 which properly formulates an allega-

A  tion of fraud. The letter seeks to formulate the allegation by reference to the litigations involving the Canadian name, Mr Mason, and the United States name, Mr Salonitis. The allegations, as expressed in the letter—"that Lloyd's had acted fraudulently in its conduct of the Lloyd's insurance market and had made false representations to its members, the Names"—are wholly inspecific, and consequently so too is the assertion that the defender's circumstances are the same in all material respects. It appears that the pleadings, including the further and better parti-

B  culars, in the other litigations were supplied to the pursuers, but the contents of those pleadings are not incorporated in the defences in the present case. In my opinion the incorporation of the letter of 8 August wholly fails to introduce into this case proper specification of the charge of fraud laid against Lloyd's in respect of the defender. Nor does it properly identify what evidential material, if any, relating to that alleged fraud was laid before the pursuers at that time.

C  I turn therefore to the letter of 14 November. It is to be noted that it came too late to be capable of founding the fraud exception as a defence to the first or second conclusions, since they relate to demands by Lloyd's met on 4 September and 6 November 1995 respectively (*United Trading Corporation SA v Allied Arab Bank Ltd*, per Ackner LJ at p 560). That letter comes closer to identifying the alleged fraud of which the defender complains. In particular, the passage which I have quoted above from p 6 of

D  the letter sets out in general terms the nature of the fraudulent representations alleged. That passage does not, however, in my view come near to satisfying the standard of specification required. It does not identify the individual representations alleged to have been made to the defender and to have induced him to become a name, or the occasions on which those specific representations were made, or the persons by whom they were made.

E  Counsel for the defender submitted that the defender was constrained in the way he could plead this case by the terms in which the allegation of fraud was intimated to the pursuers in 1995. In my opinion he greatly overestimated the effect of that constraint. It is no doubt right that, in putting forward the fraud exception as a defence to this action, the defender is confined to relying on that allegation of fraud of which he gave notice to the pursuers before they met Lloyd's demands under the guarantees. I do not see, however, why that should inhibit the defender from formu-

F  lating precisely and clearly in his pleadings the respects in which, and occasions on which, identified representatives of Lloyd's made fraudulent misrepresentations to him. The letters and the material supplied with them or at the same time as they were sent no doubt define the material of which the pursuers were given notice, but the allegation of fraud, consistent with what that material is thought to vouch, must be capable of clear and precise formulation. In my opinion, the defender has wholly failed to give the degree of specification which the pursuers

are entitled to have before the case can be remitted to inquiry.                                                                              G

In the course of the debate counsel for the defender made a motion to discharge the debate, part heard, and to allow the defender time within which to tender a minute of amendment. That motion was opposed. Counsel for the defender was unable to tell me even in outline what form the proposed amendment would take. In these circumstances I thought it appropriate to refuse the motion for time to lodge a minute of amendment, and the debate proceeded to its conclusion.                                                                              H

In the result therefore, since I have come to the conclusion that the defender's averments in support of the fraud exception are fundamentally lacking in specification, I shall sustain the pursuers' first plea in law and repel the defences, and thereafter sustain the pursuers' second plea in law and grant decree de plano in terms of the conclusions.

———————                                                    I

*Counsel for Pursuers, L J Milligan; Solicitors, Paull & Williamsons — Counsel for Defender, G M Henderson; Solicitors, Alex Morison & Co, WS.*

                                                          P McC

                                                                              J

# S v M

EXTRA DIVISION
LORDS PROSSER, CAPLAN AND ALLANBRIDGE
19 JANUARY 1999

*Parent and child — Adoption — Agreement — Dispensation with agreement — Parent who "cannot be* K *found" — Steps requiring to be taken — Procedure to be adopted when parent alleges after adoption order made that insufficient steps taken to find her — Adoption (Scotland) Act 1978 (c 28), s 16 (2) (a).*

The Adoption (Scotland) Act 1978, s 16 (2) provides that the natural parents of a child must agree to the making of an adoption order or their agreement must be dispensed with on certain specified grounds. These grounds include that the parent "cannot be L found", and also that the parent "has persistently failed, without reasonable cause" to fulfil certain parental responsibilities in relation to the child.

In adoption proceedings in respect of a young girl, where the petitioner was the child's aunt, the sheriff dispensed with the consent of the natural mother, on the grounds that she could not be found and that she had persistently failed to fulfil parental responsibilities, and granted the adoption order. Within the process the steps which had been taken to locate the

**EXHIBIT E**

A

B

C

# Zurich CSG Ltd v Gray & Kellas

OUTER HOUSE

LORD BRODIE

30 MAY 2007

[2007] CSOH 91

*Partnership — Knowledge of individual partner — Whether imputed to firm — Partnership Act 1890 (53 & 54 Vict, c 39), s 16.*

*Fraud — Fraudulent misrepresentation — Insurance company granting bond of caution in relation to estate of deceased — Partner of legal firm handling estate aware of debt — Whether knowledge of individual imputed to firm — Whether fraudulent.*

*Reparation — Negligence — Solicitor — Insurance company granting bond of caution in relation to estate of deceased — Estate subject to debt — Failure to obtain documents from firm previously handling estate — Whether negligent.*

Section 16 of the Partnership Act 1890 provides that "[N]otice to any partner who habitually acts in the partnership business of any matter relating to partnership affairs operates as notice to the firm except in the case of fraud on the firm committed by or with the consent of that partner".

An insurance company granted a bond of caution binding itself that an estate as contained in the confirmation dative of a deceased, should be made free and forthcoming to all parties having interest therein. The estate was in fact subject to a debt, which the insurance

G

H

I

J

K

L

A  company met following judicial proceedings, contrary to information provided by the executor dative in the bond of caution application form. The insurance company thereafter sought reparation for damages from the firm of solicitors handling the estate, claiming that it was induced into granting the bond as a result of the defenders' fraudulent *et separatim* negligent misrepresentation. The pursuer alleged that one partner of the firm might be taken to have been aware of the claim, having been instructed by the executor dative's sister in relation to a potential

B  claim prior to the application, as was at least one employee of another firm previously handling the estate.

**Held,** (1) that by virtue of s 16, a partner's knowledge of a fact was imputed to his or her firm with all partners of that firm being deemed to have had notice of that information (p 922B-E); (2) that the representation made by the said partner was false and could properly be characterised as a misrepresen-

C  tation (p 922E); (3) that the imputed knowledge of a firm and the actual knowledge of individual partners differed: an individual could lack an honest belief and make fraudulent misrepresentations whereas a firm was not a natural person and was incapable of dishonesty, although it could be vicariously liable for the dishonest actions of its individual partners whether acting alone or together (p 923D-E); (4) that the pursuer's case based on fraud was irrelevant: the said partner's actions in signing a solicitors' certificate

D  without having requested unidentified papers from the firm previously handling the estate suggested a want of care, but making a false statement through such, differed from fraud (p 924I-J); (5) that the pursuer's case of negligence was irrelevant where it could not be said that a reasonably careful solicitor in the position of the said partner was obliged to request papers or information from the firm previously handling the estate (p 925J-L); (6) that the pursuer's averments of settling a vouched claim were sufficient

E  to entitle them to a proof in relation to causation (p 926G); and action *dismissed*.

*Derry v Peek* (1889) 14 LR App Cas 337, *applied*.

**Opinion,** that had the pursuer's case based on fraud and negligence been relevant, the defenders' second plea in law would have been upheld, probation of the defenders' averments as to good faith would have been allowed, but the defenders'

F  averments relating to lines of defence that might have been adopted by the pursuer in answer to the action involving the debt other than that relating to reduction or setting aside the bond, would not have been allowed to go to probation (p 928G-I).

---

**Action of damages**

Zurich GSG Ltd raised an action of damages for reparation against Gray & Kellas and others, on the basis that it was induced into granting a bond of caution as a result of the defenders' fraudulent *et separatim* negligent misrepresentation.                    G

The action came before the Lord Ordinary (Brodie) for debate on the procedure roll.

**Statutory provisions**

The Partnership Act 1890 provides:

"16.— Notice to any partner who habitually acts in the partnership business of any matter relating to partnership affairs operates as notice to the firm except in the case of fraud on the firm committed by or with the consent of that partner."                    H

**Cases referred to**

*Banco de Portugal v Waterlow & Sons Ltd* [1932] AC 452.
*Campbell v McCreath*, 1975 SC 81; 1975 SLT (Notes) 5.
*Clydesdale Bank Co v Paul* (1877) 4R 626.
*Derry v Peek*, (1889) 14 LR App Cas 337.
*Hedley Byrne & Co v Heller & Partners* [1964] AC 465; [1963] 3 WLR 101.                    I
*Hunter v Hanley*, 1955 SC 200; 1955 SLT 213.
*J Dykes Ltd v Littlewoods Mail Order Stores Ltd*, 1982 SLT 50.
*Jamieson v Allan McNeil & Co WS*, 1974 SLT (Notes) 9.
*Jamieson v Jamieson*, 1952 SC (HL) 44; 1952 SLT 257; [1952] AC 525.
*Malhi v Abbey Life* [1996] LRLR 237.
*Miller v South of Scotland Electricity Board*, 1958 SC (HL) 20; 1958 SLT 229.                    J
*Oropesa (The)* [1943] P 32; [1943] 1 All ER 211.
*Prince Jefri Bolkiah v KPMG* [1999] 2 AC 222.
*Rakusen v Ellis Munday & Clarke* [1912] 1 Ch 831.
*Scholefield v Templer* (1859) 28 LJ Ch 452.
*Sutherland v W M Low & Co* (1901) 3F 972.
*Three Rivers District Council v Bank of England (No 6)* [2005] 1 AC 610; [2004] 3 WLR 1274.
*Wardlaw v McKenzie* (1859) 21D 940.                    K

**Textbooks referred to**

Begg, *Law Agents* (1883), p 312.
Gloag, *The Law of Contract* (2nd ed), p 333.
Lindley & Banks, *Partnership* (18th ed), para 12-26.
Miller, *Partnership* (2nd ed), p 221.
*Stair Memorial Encyclopaedia,* Vol 3, paras 895 and 896.

On 30 May 2007 the Lord Ordinary *dismissed* the action.                    L

**LORD BRODIE.—**

**Introduction**

[1] An executor dative, other than a spouse who has right to the whole estate by virtue of prior rights, must find caution as a condition of confirmation: Confirmation of Executors Act 1823 s 2, as amended by the Law Reform (Miscellaneous Provisions) (Scotland) Act 1980 s 5. This requirement does not apply to an executor nominate.

[2] The pursuer in this action, remitted from
A Aberdeen sheriff court, is an insurance company. On
22 November 2002 the pursuer granted a bond of
caution ("the [B]ond") in terms of which it bound
itself that the estate as contained in the confirmation
dative of the deceased John George Watson Murdoch,
wherein David Murdoch had been decerned and was
to be confirmed executor dative qua son to the
deceased, should be made free and forthcoming to all
parties having interest therein.

B    [3] The pursuer sues the defenders, a firm of
solicitors, for damages for reparation on the basis that
the pursuer was induced into granting the bond "as a
result of the defenders' fraudulent *et separatim*
negligent misrepresentations".

    [4] The action came before me for debate on
procedure roll for discussion of the first and second
pleas in law for the defenders and the first plea in law
for the pursuer. Counsel appeared for the pursuer.
C Counsel appeared for the defenders. Both parties had
lodged notes of argument to which they referred.
When he opened his submissions, counsel for the
pursuer's primary motion was for decree *de plano* but
his position came to be that I should allow a proof,
having excluded certain of the defenders' averments
from probation. Counsel for the defenders' primary
motion was for dismissal.

    [5] Counsel for the defenders began. He developed
D his submissions in what he described as six chapters.
In his first chapter counsel for the defenders set out
the factual background as disclosed in the averments.
In each of his five subsequent chapters he put forward
a separate argument. In so doing he both advanced
criticisms of the pursuer's pleadings and, in the light
of the pursuer's note of argument, responded to antici-
pated criticisms of the defenders' pleadings. Counsel
for the pursuer followed this structure when he came
E to respond but added a further chapter in which he
indicated how the pursuer's pleas should be dealt
with, having regard to his previously developed
arguments. When recording and discussing counsels'
respective submissions I too shall broadly follow this
structure.

**The factual background as averred in the
pleadings**
    [6] As I have already indicated, the pursuer is
F cautioner in terms of a bond of caution granted on 22
November 2002 by which it bound itself that the estate
of the deceased John Murdoch, to the extent of
£82,000 as contained in the relative confirmation
dative, be made free and forthcoming to all parties
having an interest. The executor dative of John
Murdoch was his son, David Murdoch. David
Murdoch died on 15 March 2003. The executor of
David Murdoch was Carol Murdoch. The defenders
are a partnership of solicitors and the individual
partners thereof.

[7] David Murdoch initially instructed Messrs
Matheson Ritchie, solicitors in Glasgow, in relation G
to the administration of John Murdoch's estate and
on 7 June 2002 David Murdoch was decerned as
executor dative of his late father on a petition drafted
by Matheson Ritchie. However, on or about 20
September 2002 David Murdoch instructed the
present defenders to deal with any matters relating to
the estate of the deceased John Murdoch. The
defenders were provided with a copy of the petition
and correspondence from Matheson Ritchie.

H
[8] Ms Alison Merson, an unqualified legal assistant
employed by the defenders, was given the responsibil-
ity of carrying out the work involved in winding up
John Murdoch's estate.

[9] On 18 November 2002 Ms Merson completed a
copy of the pursuer's bond of caution application
form. In that form there was entered information
about the executor dative, the estate and the benefici-
aries, which information Ms Merson had verified I
with David Murdoch as applicant in the presence of one of the
partners of the defenders, Mr Graham Morrison.
The form included a "Solicitor's Certificate" which
confirmed, *inter alia*, that: "We are not aware of any
fact or circumstance that would render the informa-
tion set out in this form untrue or inaccurate. We have
been instructed to advise and act in all matters
concerning the administration of the Estate. We will
advise you promptly of any claim or dispute affecting
the Estate … ." Mr Morrison signed the certificate, J
appending the defenders' partnership name.

[10] The application form included the question:
"Are the proposed Executors or their solicitors aware
of any claims or disputes affecting the Estate". The
answer given was "No". That answer had been
provided to Ms Merson by David Murdoch. To David
Murdoch's knowledge that answer was false in that he
was aware that the British Nursing Association,
otherwise Nestor Healthcare Ltd ("Nestor"), had K
intimated a claim in respect of an alleged debt owed
by the estate in the sum of £43,255.50. Neither Ms
Merson nor Mr Morrison was aware of this fact at the
time of completing the application form and signing
the certificate. However, another partner of the
defenders, Mr John Hardie, may be taken to have
been aware of it. In July 2002, prior to the defenders
being instructed by David Murdoch to act in relation
to the estate, Lorraine Murdoch, the sister of David
Murdoch, had instructed the defenders in relation to L
a potential claim to the Criminal Injuries Compensa-
tion Authority relating to injury sustained by John
Murdoch. Mr Hardie acted for Lorraine Murdoch in
relation to that matter. By letter dated 16 July 2002 Mr
Hardie wrote to Messrs Ness Gallagher, the solicitors
of the late John Murdoch, requesting details of John
Murdoch's claim to the Criminal Injuries Compensa-
tion Authority. On 29 July 2002 Messrs Ness
Gallagher wrote to Mr Hardie in terms that included
the following: "With reference to the late Mr

**SLT**                    ZURICH CSG LTD v GRAY & KELLAS (OH)                    **920**

Murdoch's case … We would advise that an outstand-

A  ing liability to the BNA in excess of £40,000 exists."

[11] Also aware of this claim was at least one person who was an employee or partner of the firm of Messrs Matheson Ritchie. The British Nursing Association Legal Department had written to Messrs Matheson Ritchie noting their interest in John Murdoch's estate by letter dated 16 August 2002. As I have already mentioned, the pursuer avers that the defenders were provided with a copy of the petition and correspon-

B  dence from Messrs Matheson Ritchie but, so the averments continue, the defenders did not "request any papers from Messrs Matheson Ritchie in this regard". The pursuer further avers that although David Murdoch was the executor dative, Lorraine Murdoch was the defenders' principal contact in relation to the administration of the estate and that the defenders accepted instructions from both Lorraine Murdoch and David Murdoch in connection with the estate.

C
[12] The defenders, acting for the executor, distrib-uted the estate to the beneficiaries by payments made on 25 February and 2 June 2003. By letter dated 10 July 2003 solicitors acting for Nestor intimated a claim against the estate to the defenders for payment of £43,255 in respect of services provided to the late John Murdoch. On 21 December 2004 Nestor raised an action for payment of £43,255 against, first, Carol Murdoch as executor dative of the late John Murdoch

D  and, second, the pursuer as cautioner for the executive dative. The pursuer settled the action against them by making a payment of £20,000. It incurred legal fees and outlays of £14,895.02. It is these two sums that the pursuer seeks to recover by way of damages in the present action.

**Section 16 of the Partnership Act 1890**

[13] Section 16 of the Partnership Act 1890 provides: [his Lordship quoted its terms set out supra and

E  continued:]

[14] In developing the first chapter of his argument, counsel for the defender explained that, as appeared from its note of argument, the pursuer relied on s 16 of the 1890 Act to impute the knowledge of Mr Hardie to the firm and therefore to Mr Morrison, as a partner of the firm, with a view to characterising Mr Morrison's signing of the certificate on behalf of the firm as a fraudulent misrepresentation. Counsel submitted that this approach was to adopt too broad

F  an interpretation of s 16. He accepted that notice to a partner was the equivalent of notice to the firm and he did not seek to distinguish the expression "notice … of any matter" from the giving of information or imparting knowledge of a fact (cf Lindley & Banks On *Partnership* (18th ed) para 12–26) but, so he submitted, it was not the case that the giving of any information to any partner, irrespective of the nature of that information, necessarily had the result that the information was to be imputed to the firm as a whole. This was a case where information was scattered over

the defenders' organisation. Subject to the effect of

s 16, it could not be imputed to the defenders unless it  G

had been received by a person able to appreciate its sig-nificance: *Malhi v Abbey Life* at [1996] LRLR, p 242. Turning to the effect of s 16, a limitation had to be read into its *ex facie* broad terms in order to accommodate the overriding obligation of a solicitor to keep confi-dential, even from his partners, information relating to the affairs of a client or advice given to that client: Begg on *Law Agents* (1883) p 312, Law Society of Scotland Code of Conduct, *Three Rivers District Council v Bank of England (No 6)*, *Prince Jefri Bolkiah*  H

*v KPMG* at [1999] 2 AC pp 226H and 233H and *Rakusen v Ellis Munday & Clarke*. Here it was averred that Lorraine Murdoch was involved both in the matter for which Mr Hardie was responsible and that for which Mr Morrison was responsible, but one could not merge these two separate items of business into one. It would be unworkable, indeed absurd, if a partner in a professional firm was to be held to have implied knowledge of something that he was not permitted to know. Counsel for the defenders gave  I

the example of two partners of a firm of solicitors, each instructed by a different client to offer for the purchase of the same property. It would be wholly unworkable if each was to be taken as having imputed knowledge of the price that the client of his partner was proposing to offer. The purpose of s 16 was to state an equitable doctrine preventing a partnership from taking points against people who reasonably thought that they were dealing with the firm. However, clients of a firm might have conflicts of  J

interest. They had a right to have their affairs kept con-fidential. Any certificate granted by the firm therefore had to be read subject to the limitation which flowed from the firm's corresponding obligation of confiden-tiality. Accordingly, the certificate in the present case could not be read as saying "[We] have investigated the affairs of all our clients and on that basis state that we are not aware of any claims or disputes affecting the estate" but rather "[W]e have carried out proper steps in relation to this client's affairs and on that basis state  K

that we are not aware of any claims or disputes affecting the estate, but in carrying out these proper steps we have not breached any obligation of confidence to any other client." Counsel for the defenders referred to the factors that were narrated in his note of argument: the information received from Messrs Ness Gallagher related to a different client of the firm, Lorraine Murdoch, who had been referred to the defenders on the grounds of conflict of interest; it was communicated to the defenders as agents for  L

Lorraine Murdoch and in no other capacity; it related to a prospective application by Lorraine Murdoch to the Criminal Injuries Compensation Authority; it was confidential to her; and it was com-municated at a time when the defenders did not act for David Murdoch. In these circumstances, counsel for the defenders submitted that the representation made by Mr Morrison by signing the certificate was not false. It was not a misrepresentation, far less a fraudulent one.

[15] In reply, counsel for the pursuer began by reminding me of the terms of s 16 and of counsel for the defenders' acceptance that "notice … of any matter" comprehended knowledge of a fact. The section identified the circumstances in which knowledge could be imputed to a partnership. There was no equivalent provision in the companies' legislation and, accordingly, nothing said in *Malhi v Abbey Life* could detract from the impact of s 16 when what was in issue was what was to be taken to be within the knowledge of a partnership. The section excluded the situation of fraud on the firm committed by or with the consent of the partner to whom notice was given, but no other exception was identified. The terms of the section were clear. They make no distinction as between confidential information and non-confidential information. However if, despite that, s 16 was to be read as qualified by an exception relating to confidentiality, that was not the position here. On the facts of the case there was no reason why Mr Hardie should not have drawn the relevant piece of information to the attention of Mr Morrison. Just as the terms of s 16 were clear, so were the terms of the certificate. It was granted on behalf of the firm. It used the formulation "[W]e are not aware". No rider was added. What the pursuer was looking for in the answer to the question in the application form was an independent mind being brought to bear on the material in the form which had been provided by the executor dative, rather than a mere rubber stamp. The language of the certificate was of recommendation or confirmation. The certificate was of considerable practical importance by reason of it being granted by the solicitors employed to ingather and distribute the estate. It would be unworkable if the cautioner had to accept the certificate, despite its express terms, as having only been granted by one of the partners in the firm and only in relation to his personal state of knowledge. Counsel for the defenders' approach, counsel for the pursuer argued, was to rob the certificate of all practical effect.

[16] It was counsel for the defenders' submission that, on a proper construction of s 16 of the Partnership Act 1890, the pursuer had failed to aver a basis upon which the representation made by the solicitor's certificate could be regarded as false. I disagree.

[17] It may well be, as counsel were agreed, that there is a dearth of authority as to the effect of s 16 (the decision of Lord Stott in *Campbell v McCreath* was noticed but neither counsel for the defenders nor counsel for the pursuer commended it as an authority from which I might draw assistance). However, I did not understand the following statement, in Lindley & Banks supra at para 12–26, to be challenged: "The section has the following two consequences: (1) If a firm claims the benefit of a transaction entered into by a partner or is otherwise bound by his acts, it cannot use its own ignorance of what that partner knew to place itself in a more favourable position than could have been achieved by that partner if he had been acting on his own account. (2) When it is

necessary to prove that a firm has notice of some fact, all that is required is to show that notice was given to one of the partners who habitually acts in the partnership business. It should be emphasised that the firm does not have notice of everything done by each of its members, but only of those matters which relate to the partnership. Any other result would be absurd."

[18] Obviously it is the second of the two consequences identified by the author that has immediate application here, although I shall return later in this opinion to the distinction in the first consequence between, on the one hand, the ignorance of the firm and the knowledge of a partner. It may be thought that the second consequence is no more than a close paraphrase of the terms of the section but it underlines that if it is necessary to show that a partnership was aware of a particular fact then it is enough to establish that one of the partners who habitually acted in the business was aware of the fact. Mr Morrison, by signing the solicitor's certificate in the name of the firm, chose to certify that "[W]e" were not aware of any fact or circumstance that would render the information set out in the form to be untrue or inaccurate. "[W]e" can only mean the defenders. Mr Hardie, a partner who habitually acted in the partnership business, was aware of facts and circumstances which would appear to render the executor's negative answer to the question: "Are the proposed Executors or their solicitors aware of any claims or disputes affecting the Estate?" untrue. The effect of s 16 is to impute Mr Hardie's knowledge to the firm. That would seem to be the plain meaning of the section. That is what Lindley & Banks say is the effect of s 16. If a firm has imputed knowledge of facts and circumstances that would render information untrue, a statement on its behalf that it was unaware of facts and circumstances that would render the information untrue is false, whether or not it is made in good faith. Now, I did not understand counsel for the defenders to take issue with any of this, at least as a matter of generality. However, he argued for exceptional treatment of confidential information, pointing to the apparent paradox where a partner (Mr Morrison, for example) is taken as having imputed knowledge of what he is not permitted to know.

[19] I see no basis for treating information that can be regarded as confidential differently from other sorts of information. Apart from anything else, to borrow a consideration put forward by both counsel for their different purposes, I would see an exception for confidential information to be unworkable. It is not always easy to identify what is truly confidential information. Much depends on the attitude of the giver of the information. Often information is confidential in the sense that its distribution is restricted to a particular group or for a particular purpose, rather than absolutely prohibited. The group or purpose may expand or contract depending how things fall out over time. In the case of professional firms the exception might well swallow up the rule. Importantly, and on this I agree with counsel for the pursuer, there

A is no basis for such an exception in the plain terms of the statute. I would add this. The section is concerned with imputing knowledge ("operates as notice") to the entity that is the firm. In Scotland, but not in England, a firm is a legal person distinct from the partners of whom it is composed: Partnership Act 1890 s 4 (2). It is therefore possible to distinguish between what an individual partner, who is a natural person, knows and what a firm, which is no more than a legal person without any cognitive capacity, is taken to "know". However, even if that were not so, it seems to me both

B possible and necessary to distinguish between what is within the actual knowledge of an individual partner and what the firm and therefore the partners are deemed to know (cf Miller, *Partnership* (2nd ed) p 221). I see recognition of that in the first consequence referred to by the author of Lindley & Banks in the passage quoted above with its contrast as between the "ignorance" of the firm and "what that partner knew". In my opinion the effect of s 16 is to do with imputed or deemed knowledge. It has nothing to

C do with actual knowledge. At least one partner, acting in the partnership business must, at least at one moment in time, have actual knowledge of the relevant fact. Once that is the case knowledge of the fact is imputed to the firm by virtue of s 16 but that is as far as it goes. There is nothing in the language of s 16 to suggest that the other partners are taken actually to know what in fact they do not know. I do see not any difficulty with confidential information. I accept that a partner of a professional firm and indeed, although

D perhaps less commonly, a partner of a commercial firm, may receive information which is of a confidential nature which he could not share with his partners without breaching an obligation of confidence owed to a client or customer. In such circumstances he will presumably not pass on the information and therefore his partners will not have actual knowledge of it. In such circumstances the information will therefore be within the actual knowledge of only one of the partners (as, in practice, will be true of much of the information held within the partnership). I simply

E do not see that as a reason why the firm, and therefore all the partners, should not nevertheless be deemed to have notice of that information. I would therefore regard the representation made by Mr Morrison as having been false and therefore properly characterised as a misrepresentation. However, as I shall discuss further below, it does not necessarily follow that it was made either negligently or fraudulently.

F **Fraud**

[20] The pursuer's case depends upon the proposition that the misrepresentation by Mr Morrison on behalf of the defenders was fraudulent or at least negligent. That is how it is pled and counsel for the pursuer confirmed as much during his submissions. In this, the second chapter of his argument, counsel for the defenders submitted that the pursuer's averments of fraud did not meet the test of relevancy. He referred me to the decision of the House of Lords in *Derry v Peek* and, in particular to the speech of Lord Herschell where, at (1889) 14 LR App Cas, p 374, there

is set out the requirements of what is there described as an action of deceit. The action of deceit required there G to have been fraud and what was said by Lord Herschell has become generally accepted as the definition of fraud: "First, in order to sustain an action of deceit, there must be proof of fraud, and nothing short of that will suffice. Secondly, fraud is proved when it is shewn that a false representation has been made (1) knowingly, or (2) without belief in its truth, or recklessly, careless whether it be true or false. Although I have treated the second and third as distinct cases, I think the third is but an instance of the H second, for one who makes a statement under such circumstances can have no real belief in the truth of what he states. To prevent a false statement being fraudulent, there must, I think, always be an honest belief it its truth. And this probably covers the whole ground, for one who knowingly alleges what is false, has obviously no such honest belief. Thirdly, if fraud be proved, the motive of the person guilty of it is immaterial. It matters not that there was no intention to cheat or injure the person to whom the statement I was made."

[21] Here, said counsel for the defenders, there was no suggestion that there had not been an honest belief on the part of Mr Morrison in the truth of his statement. Among the matters that were not known and not admitted by the pursuer were the defenders' averments that Ms Merson was unaware of the debt claimed by Nestor, that the solicitor's certificate had been signed in good faith by Mr Morrison and that J neither Ms Merson nor Mr Morrison was aware of the information received from Messrs Ness Gallagher. Counsel for the defenders compared the situation revealed by the pursuer's response to the defenders' averments with what appears in Lord Herschell's speech at p 375: "… making a false statement through want of care falls far short of, and is a very different thing from, fraud, and the same may be said of a false representation honestly believed though on insufficient grounds." The pursuer did not aver K absence of honest belief on the part of Mr Morrison. It had not relevantly averred fraud.

[22] Reflecting what appeared in the pursuer's note of argument, counsel for the pursuer stressed that this was not a case of intentional fraud but, as appeared from the passage from the speech of Lord Herschell which had been cited by counsel for the defenders, it was sufficient to instruct fraud that a statement had been made recklessly, without caring whether it was L true or false. Here it was averred that there had been a failure to request papers from Messrs Matheson Ritchie. There was an issue as to whether Mr Morrison had an honest belief in the truth of the representation. The defenders asserted that he did. This was denied.

[23] In considering the relevancy of the pursuer's averments of fraud I take as my starting point counsel for the pursuer's acceptance that the pursuer does not aver intentional fraud. In other words, Mr Morrison

A may have made a misrepresentation but he did not do so knowingly. Accordingly, correctly in my opinion, counsel for the pursuer did not suggest that the effect of s 16 of the 1890 Act was that Mr Morrison should be treated as actually knowing something that he did not know. That position, correct as I take it to be, does not entirely reflect what appears in the pursuer's pleadings. In art 5 of condescendence it is stated that "the defenders knew" that the representations in the solicitor's certificate were false, that "the defenders were aware" of a claim of at least £40,000 on the

B estate, and that "the defenders were aware" that what appeared in the application form was untrue or inaccurate. Counsel for the pursuer did not rely on any of these averments. Had he done so it would have been difficult to understand why he disavowed a case of intentional fraud. It appears to me that the author of the pursuer's pleadings had taken a different view of the effect of s 16 than I would take and, if I understood him correctly, counsel for the pursuer took. The pleader seems to have proceeded on the

C basis that once knowledge of an accurate piece of information is imputed to a firm by virtue of s 16 of the Act then any statement by any partner of the firm to contrary effect is not only false but fraudulent. That is to treat the partnership as an aggregate or, in Scotland, a person, knowing everything that each of its partners knows. Up to a point that is correct but much depends upon what is meant by "know". As I have already mentioned, once notice has been given to a partner who acts in the partnership business,

D notice has been given to the partnership. However, as I have attempted to explain, it appears to me that the imputed knowledge of the firm and the actual knowledge of the individual partners are different one from the other. An intentionally false and therefore dishonest statement requires actual knowledge on the part of the person making the statement that the statement he is making is false. A firm, which is not a natural person, is incapable of dishonesty, although it might be vicariously liable for

E the dishonest actions of its individual partners (or employees), whether acting alone or together. Only individuals can lack an honest belief. Only individuals therefore can make fraudulent misrepresentations.

[24] At least as presented by counsel for the pursuer, the pursuer's case includes an acceptance that Mr Morrison did not know that by signing the solicitor's certificate he was making a false statement. He did not intend to defraud the pursuer. Why then is it said that

F he was acting fraudulently? One does not get an answer to that question by reading the pursuer's averments. Counsel for the pursuer, echoing what appears in the pursuer's note of argument, presented the misrepresentation by Mr Morrison as one which, on the pursuer's pleadings, was said to have been made without belief in its truth and therefore recklessly. I disagree. The proposition that the pursuer avers that Mr Morrison made the misrepresentation without an honest belief in its truth sits uneasily with a not known and not admitted response to the defenders' averment that the solicitor's certificate had been signed by Mr

G Morrison in good faith. However, I would regard the pursuer's averments as deficient even had that averment by the defenders been denied (something that it would appear that the pursuer cannot, with proper candour, do). Fraud is not something to be lightly inferred. Nor should it be lightly averred. It is for a party alleging fraud to prove it and, in order to do so, to set out in specific terms the basis upon which the court will be invited to infer that the party against whom fraud is alleged did not honestly believe that the representation in question was true. A denial

H of the defenders' averment that Mr Morrison honestly believed the representation to be true takes the pursuer nowhere. The onus of proof is not on the defenders. The only averment relied on by counsel for the pursuer as a basis for inferring that Mr Morrison did not honestly believe in the truth of what was represented by virtue of the solicitor's certificate was in these terms: "The defenders were provided with a copy of the Petition and correspondence from Messrs Matheson Ritchie, but did not request any papers from Messrs Matheson Ritchie in this regard." That

I Mr Morrison signed the certificate without having requested unidentified "papers" additional to the correspondence from the solicitors who had previously acted for the executor-dative which had been provided, at its very highest might just suggest a want of care (something to which I shall have to return), but, as appears from the speech of Lord Herschell, "making a false statement through want of care falls far short of, and is a very different thing from, fraud". In my opinion there is simply no basis in the averments here

J for leading evidence from which the inference could be drawn that Mr Morrison had no honest belief that the representation he was making was true. I am accordingly not prepared to admit the case to probation, in so far as it is based on fraud.

**Negligence**

[25] Counsel for the defenders began by outlining what averments were required to make a relevant case of negligent misrepresentation against the defenders:

K that the defenders made a representation, which they knew or ought to known would be relied on, which induced the pursuer to enter into a contract, and which the defenders knew or ought to have known was false. Counsel for the defenders did not dispute that in the circumstances averred by the pursuer Mr Morrison owed a duty of care when signing the solicitor's certificate. This was a case of the sort of liability recognised in *Hedley Byrne & Co v Heller & Partners*. Counsel for the defenders had no quarrel with the suf-

L ficiency of the averments of foreseeability of reliance on the representation or the consequence of that reliance: the pursuer granting the bond. However, he submitted that there was not sufficient by way of averment to explain why it was said that the defenders had been negligent. The pursuer avers that "[the] defenders representations were made negligently" but does not give adequate specification of that bald assertion. The only discernible duty that was founded upon (if it was a duty) was that "[I]n particular, the defenders ought to have requested papers from

A Messrs Matheson Ritchie prior to making the representations". But why? counsel for the defenders asked rhetorically. What "papers" were being referred to? What was to be achieved by requesting them? In short, there was nothing to explain why it was said that that particular duty was incumbent in the circumstances. There were no averments, for example, to the effect that this is something any solicitor of ordinary competence would have done if exercising reasonable care: cf *Hunter v Hanley*. There was no express averment of breach of duty. Counsel for the B defenders submitted that the pursuer's case insofar as based on negligence was irrelevant.

[26] As he had accepted that it was for the pursuer to demonstrate in its averments not only that the representation was false but that it was fraudulent, counsel for the pursuer accepted that the pursuer had to aver why it was maintained that it had been made negligently. He conceded that inaccuracy, of itself, was not C enough. However, in order to make a case of negligence against a firm of solicitors it was not, in his submission, necessary to adopt the formulation which is appropriate to a case of professional negligence. It was simply a question of demonstrating that the misrepresentation had been made negligently. The duties which it was said that the defenders had breached were set out in art 5 of condescendence. In particular it was averred that the defenders ought to have requested papers from Messrs Matheson Ritchie prior to making the representations. In the D circumstances disclosed in the pleadings that was no more than what had been required by common sense.

[27] It is trite that the purpose of pleadings is to give notice, in sufficient detail as to be comprehensible, of the case that is being made. In *Jamieson v Allan McNeil & Co WS* Lord Maxwell said this: "... it is my understanding that our system of pleading still requires in actions for damages for negligence first, that the essential facts relied on should be set out E with reasonable clarity; second, that the duties alleged to have been breached should be plainly stated and should be duties which the court can be satisfied at least might have been incumbent upon the defenders in law in the circumstances averred ... third, that it should be reasonably apparent how any alleged loss is claimed to be attributable to any one or more alleged breaches of duty; and, fourth, that in so far as the nature of any head of patrimonial loss permits, at least some notice should be given of the F amount claimed ... ."

[28] I very respectfully agree with the way the matter is put by Lord Maxwell. I draw particular attention to what he says about duties being plainly stated and being such that the court can be satisfied at least might have been incumbent upon the defenders in the circumstances averred. It is not simply a question of form or undue reverence for the conventions of pleading. The different audiences towards whom the pleadings are directed, the other parties and the court, require to know what a pursuer's case is about;

the other parties in order to know what it is they have G to answer and the court, given our system of debate on preliminary pleas, in order to determine whether the leading of evidence need be and should be allowed. Candid and careful pleading promotes efficient litigation. One of the efficiencies is that it permits the identification of cases that cannot succeed on what the pursuer is in a position to prove or at the very least willing to attempt to prove and that therefore should be dismissed without involving the expenditure of time, effort and money which is involved in the H leading of evidence: *Jamieson v Jamieson* at 1952 SC, pp 50 and 63; 1952 SLT, pp 257 and 264; 1952 AC, pp 534 and 550. Of course before it dismisses a case the court must have careful regard to familiar propositions derived from familiar cases. An action will not be dismissed as irrelevant unless it must necessarily fail even if all the pursuer's averments are proved. There is no onus on a pursuer to show that if it proves its averments it is bound to succeed: *Jamieson v Jamieson* supra at p 50; p 257; p 534. An action of damages for I negligence will only be dismissed on grounds of relevancy in a very clear case: *Miller v South of Scotland Electricity Board* at 1958 SC, pp 32 and 33; 1958 SLT, pp 234–235 and 236.

[29] Here counsel for the defenders makes no complaint about the clarity with which the pursuer has pled the facts which it seeks to prove and upon which it must be taken to rely. Remarkably, the pursuer does not, as one might have expected in conventionally set out pleadings, open art 5 with, or at J least include in that article, the proposition that, in the circumstances, the defenders owed a duty of care to the pursuer. However, counsel for the defenders made nothing of that. He accepted that the factual averments are sufficient to identify a degree of proximity from which a duty of care might arise. Indeed, he went further and accepted that in the circumstances a duty of care did arise. Moreover, albeit in response to a question from me as to how the solicitor's certificate could be construed, he accepted that K the terms of the certificate implied that the defenders had taken what he described as "proper steps in relation to this client's affairs". Given counsel for the defenders' approach, although the pursuer has not chosen to do so in its pleadings, it appears to me to be appropriate to test their relevancy on the assumption that there is enough from which to imply an averment of a general duty of care and, moreover, a particularisation of that duty to the extent of there being a duty to take some sort of steps in order to ascertain that the L information set out in the form was not untrue or inaccurate. I put it that way deliberately. The certificate is couched as "[W]e are not aware of any fact or circumstance ..." but I understood counsel for the defenders to accept that for a partner of the defenders to act in a way that was consistent with fulfilling his duty of reasonable care he had to do something in order to attempt to acquaint himself with the true state of affairs. However, counsel for the defenders' generosity in relation to the pursuer's pleadings gave out at this point and he took issue with the unex-

A plained insertion of a duty in these terms: "the defenders ought to have requested papers from Messrs Matheson Ritchie prior to making the representations". Why that particular duty? asked counsel for the defenders. Common sense, responded counsel for the pursuer. That response was eloquent in that it was about all that counsel for the pursuer could say, given the absence of averment. There is simply no explanation in the pleadings why unidentified "papers" should have been requested from the solicitors who had obtained decerniture in favour of

B David Murdoch as executor dative. Nor is there any averment indicating what, if any, the response by these solicitors to such a request might have been. For whatever reason, that is left to speculation. There is therefore no basis in averment explaining (and therefore no offer to prove) how the loss is claimed to be attributable to the only alleged breach of duty.

[30] For the purposes of relevancy, as Lord Maxwell explained, the court must be satisfied, on the basis of

C the circumstances averred, that the duty in question at least might have been incumbent upon the defender. It is not enough simply to pluck a supposed duty from the air without setting it in a context of averment which allows the court to understand why the pursuer maintains there to have been this particular duty and how a court, having found the pursuer's factual averments proved, might come to conclusion that the duty was indeed incumbent upon the defender in the circumstances. Lord Stewart

D explained how this should be done in his opinion in *J Dykes Ltd v Littlewoods Mail Order Stores Ltd* at 1982 SLT, 52: "The fundamental duty to be observed, whether the case involves professional negligence or any other fault at common law, is the duty to take reasonable care in the circumstances. A pursuer, however, cannot plead a relevant case by merely stating this generality and then plucking out of the air a number of alleged particular duties which are not set in the context of some recognised framework. By a

E recognised framework I mean either a framework set by accepted precedent of which an example is the duty of an employer to take reasonable care to maintain his plant and machinery in safe condition, or else a framework set in a professional negligence case by reference to the professional standard of the time. Taking an analogy from the old form of indictment in criminal pleadings, there must be a standard set by the major premise before the minor premise can be seen to have any validity. If that

F standard is already assimilated into the law there may strictly be no need for the pleader to refer to it, just as there is now no need in indictments to state a major premise. Nevertheless, it is still good pleading practice in civil causes to state the general proposition from which the particular duty is deduced."

[31] Here there is no such general proposition. It is not said that there was a practice among solicitors in the circumstances of the case to act in a particular way. It is not said that no competent solicitor would have requested papers beyond those that he had

G already received. It cannot be said that this particular duty has been established by accepted precedent, as in the case of the maintenance of plant and machinery instanced by Lord Stewart. I see in the pursuer's pleadings a failure of analysis, the origin of which may lie in a view taken as to the effect of s 16 and which is pointed up by the pursuer's references to "the defenders" as being aware of certain things and the representations founded on being those of "the defenders". Now, to an extent, these references may be acceptable shorthand but they may have misled

H the pursuer as to the nature of its case, if it indeed has one. On the pursuer's averments the person who made the representations upon which the pursuer founds was Mr Morrison, signing on behalf of the defenders. As I have previously discussed, it is not said that Mr Morrison personally knew that the representations were false; the only basis of the pursuer's assertion that "the defenders" knew that they were false being the fact that another partner of the defenders (Mr Hardie) had received information which would render the representations untrue. In terms of s 10 of

I the 1890 Act the firm is liable for "any wrongful act or omission of any partner acting in the course of the business of the firm or with the authority of his co-partners". That provision makes clear that a partnership may be directly liable for negligence or it may be vicariously liable for the negligence of a partner. It may also be liable vicariously for the negligence of an employee. Where the act or omission arises from or is ratified by a collective decision of all the partners or arises from a failure to make a collective decision then

J the liability will be direct. Where, as has to be the position here, the act or omission is that of an individual partner acting in the course of the business of the firm then the liability is vicarious. There is no doubt but that there may be vicarious liability but only if the individual partner is negligent. Here, I am simply unable to understand how it can be said, assuming that the pursuer proves all its averments, that in the circumstances a reasonably careful person or a reasonably careful solicitor in the

K position of Mr Morrison was obliged to request "papers", or information of any sort, from the solicitors who had previously acted in the capacity attributed to Messrs Matheson Ritchie. I certainly could not come to that conclusion uninstructed and no instruction whatsoever is offered by the pursuer's averments. Moreover, as I have already mentioned, there is nothing in the averments to indicate whether such papers would or could have been provided and what they would have contained had they been

L provided. In my opinion the pursuer's case of negligence is irrelevant and should not be admitted to probation.

**Failure to aver reasonable conduct of the previous litigation**

[32] Counsel for the defenders explained that this chapter of his argument went to causation because misrepresentation only gives rise to an action for damages in respect of loss where there has been no intervening act which breaks the chain of causation.

Here the pursuer sues for its losses in defending and
A then settling the action at the instance of Nestor. For
there to be no break in the chain of causation, so
submitted counsel for the defenders, under reference
to what had been said in *Banco de Portugal v Waterlow
& Sons Ltd* at [1932] AC, p 506 and *The Oropesa* at
1943 P, p 39; 1943 All ER, p 215, it was for the pursuer
to aver that it had acted reasonably and, moreover, to
aver how exactly it had acted. Counsel for the
defenders submitted that the pursuer had failed to
satisfy that test. It had given neither fair notice nor
B reasonable specification as to why it had settled the
action at the instance of Nestor and, in particular,
why it had rejected the various lines of argument that
had been suggested to its agents by the defenders in
their letter of 6 June 2005 and which had been
referred to and adopted into the pleadings. Thus the
pursuer had failed relevantly to aver that the misrepre-
sentation of which it complained had caused its loss.

[33] In response, counsel for the pursuer did not
C dispute that in order to recover damages in respect of
the costs of settling a claim, a party such as the pursuer
had to show that it had acted reasonably. However, that
was all it had to do: *Banco de Portugal v Waterlow &
Sons Ltd*, supra at p 506. Counsel for the pursuer
submitted that it was not necessary for the purposes
of relevancy in the present action to put forward a
reasoned rebuttal of every conceivable defence that
might have been advanced in answer to the Nestor
action. Here the pursuer had provided specification
D of the nature of the claim by lodging and referring to
the record in the Nestor action. Vouching of the sum
sued for by Nestor was available in the productions.
Enough was averred to allow the leading of evidence
on the basis of which the court could come to a
conclusion as to whether the pursuer had acted
reasonably.

[34] This chapter of argument rather runs into the
chapter which follows. Parties were agreed as to the
applicable principles of law. It was not said that there
E was anything incompetent about suing to recover a
sum paid in voluntary settlement of a claim made in
another action. However, if a party suffers loss
through the wrongful act of another and wishes to
recover that loss by way of an action of damages it
will only be able to do so to the extent that it has acted
reasonably to minimise or remedy what it claims to be
the consequences of the wrongful act. Thus, if the
party acts unreasonably the chain of causation will be
taken to have been broken and damages will not be
F recoverable. However, measures taken by an injured
party will not be judged too exactly: "The law is
satisfied if the party placed in a difficult situation by
reason of the breach of a duty owed to him has acted
reasonably in the adoption of remedial measures, and
he will not be held disentitled to recover the cost of
such measures merely because the party in breach
can suggest that other measures less burdensome to
him might have been taken": *Banco de Portugal
v Waterlow & Sons Ltd*, supra at p 506. In the next
chapter of argument I shall have to look at counsel for

the defenders' contentions that there were defences
available that should have been insisted upon by the   G
pursuer rather than settling with Nestor, but in
relation to this chapter I am in agreement with
counsel for the pursuer. In my opinion, there is
enough in the pursuer's averments of settling a
vouched claim, the making of which upon the
pursuer had been intimated the defenders, at a
reduced sum (albeit with considerable expenditure in
legal fees) to entitle the pursuer to proof in relation to
causation. I reject counsel for the defenders' argument
on this point.                                           H

**Unreasonable rejection of lines of defence to the
previous action**

[35] Under this chapter of his submissions counsel
for the defenders turned to consider two of the lines
of defence that had been suggested to the pursuer's
agents in a letter from the defenders dated 6 June
2005 but rejected by them: voidability of the bond,
and failure by Nestor to constitute the debt or have it   I
admitted. Other lines of defence had also been put
forward in the letter but counsel for the defenders did
not seek to support them. However, it was his
submission that either of the two identified lines
would have provided a complete answer to Nestor's
claim and therefore should have been insisted upon.
Because the pursuer had not insisted on what would
have been good lines of defence it could not now
maintain that any act or omission by the defenders or
for which they were liable had caused their loss. As   J
appeared from the pursuer's note of argument, it was
its position (and this is what counsel for the pursuer
came to argue) that each of the suggested lines of
defence was without foundation and that therefore
the reference to them in answer 4 in the present
action was irrelevant and should not be admitted to
probation. Counsel for the defenders, for his part,
was concerned to emphasise that at this stage it was
only a question of determining whether the lines of
defence were arguable. In that case the averments   K
relating to them should go to proof. It would be for
the judge at proof, on a consideration of the whole
evidence, to determine whether it would have been
reasonable for the pursuer to maintain the suggested
lines of defence as answers to the Nestor claim and
whether, had it done so, the lines or one or other of
them would have succeeded.

[36] As far as the first line of defence was concerned,
it was counsel for the defenders' submission that   L
because the bond had been granted in consequence
of a fraudulent misrepresentation by David
Murdoch, notwithstanding that Nestor knew nothing
of that misrepresentation, the bond was voidable and
could be set aside. Counsel for the defenders referred
me to the following authorities: *Wardlaw v McKenzie,
Sutherland v W M Low & Co, Clydesdale Bank Co
v Paul*, Gloag *The Law of Contract* (2nd ed) at p 333
and the *Stair Memorial Encyclopaedia*, Vol 3 at para
896.

[37] The way the matter is put in Gloag is that it is probably the law that if a debtor fraudulently induces a third party to guarantee his debt, the creditor, though innocent of the fraud, cannot enforce the guarantee unless he has given some consideration for it, either by abstaining from suing the debtor or by making fresh advances to him. However, having taken me through the cases, counsel for the defenders put less stress on what appeared in Gloag than on what is found in the article in the *Stair Memorial Encyclopaedia* on *Cautionary Obligations and Representations as to Credit* by Sandra Eden. At para 895 of Vol 3 of the encyclopaedia there is a statement of a general rule that misrepresentations by the debtor, whether fraudulent or innocent, have no effect on the contract of caution. The next paragraph is headed "Limitations to the general rule" and includes the following: "… in accordance with the general law of contract, if the misrepresentation by the debtor is such as to generate error as to the substantials of the contract, this excludes consent and the contract is void *ab initio*. … A further qualification to the general rule that misrepresentations by the debtor do not affect contracts of caution lies in the equitable principle expressed in *Clydesdale Bank Co v Paul*, namely that 'a person cannot avail himself of what has been obtained by the fraud of another, unless he is not only innocent of the fraud but has given some valuable consideration'. In other words, in the context of a cautionary obligation, the creditor must be unaware of any fraud of the debtor, and must have acted to his own prejudice on the faith of the obligation before the cautioner remains bound. This principle found its clearest expression in *Sutherland v W M Low & Co* … the cautioner must have been induced by the fraud of the debtor; merely negligent misrepresentation is not sufficient. … the requirement that the person taking advantage of the fraud of the other must have given valuable consideration means that the creditor must have acted in reliance on the guarantee to his prejudice. So if the further advances are made, or the creditor has prejudiced his chances of recovery from the debtor by abstaining from suing, he will be able to rely on the guarantee. Where the caution was interposed for an existing debt, the creditor's position has not been prejudiced and the guarantor will not be bound."

[38] Thus, submitted counsel for the defenders, the applicable general principle was to allow reduction of a deed induced by fraud notwithstanding that the party benefiting from the deed was innocent, where that party had given no consideration. The first line of defence was clearly arguable and the defenders' averments on this point should be remitted to proof.

[39] Counsel for the pursuer argued that the first line of defence was not a relevant answer to the Nestor claim. The statement of the law founded on by counsel for the defenders was dependent on what were (with the exception of what appears in *Wardlaw v Mackenzie*) obiter dicta. The cases referred to had dealt with the relationship of creditor/debtor/ cautioner. It was difficult to extrapolate what had been said to the more complex situation of an executory, where not only there were beneficiaries with an interest but also creditors, many of whose debts will have pre-existed the executor's appointment. It will be unusual for any of them to have given consideration. Such commentary as there was did not address the particular features of a bond of caution in the circumstances of an executory. The decision in *Wardlaw v Mackenzie* suggested that a critical feature in such a case was whether or not the bond had been necessary in order for the party whose intromissions were the subject of the cautionary obligation to enter into the administration of an estate. Accordingly, to focus simply on the absence of consideration is an inadequate approach. To set aside a bond in the absence of consideration having been given will not always be equitable. An insurance company, such as the pursuer here, must proceed responsibly in response to claims directed to it. Counsel for the pursuer therefore submitted that in all the circumstances of the present case the first line of defence was not relevant but even if the court was to conclude that the matter was not clear, that would indicate that it had been eminently reasonable for the pursuer to compromise the Nestor claim on the best available terms.

[40] In the event of it being necessary to do so, I would admit the defenders' averments relating to the first line of defence to probation. The parties were agreed that David Murdoch acted fraudulently in completing the application form when he stated that there were no debts or liabilities on the estate of the late John Murdoch and that he was unaware of any claims or disputes affecting the estate. It is the pursuer's case that it was induced to grant the bond by reason of the terms in which the application form was completed. Now, I have held that the pursuer has not relevantly averred that it was induced to grant the bond by reason of the fraud of the defenders but it is clear on the pleadings that the pursuer is maintaining that it was induced to grant the bond by reason of the fraud of David Murdoch. I did not understand it to be disputed that, as a matter of generality, a deed induced by fraud may be reduced (or otherwise not given effect) where it is equitable so to do. Equally, I did not understand it to be disputed that there will be circumstances where it will not be equitable to reduce a deed induced by fraud and that accordingly the obligation constituted by the deed will stand. Turning more particularly to the contract of caution, while it may be correct to state as a general rule that even fraudulent misrepresentations by the debtor to the cautioner will have no effect in a question as between the cautioner and the debtor's creditor, as is demonstrated by the opinions in *Wardlaw v Mackenzie* and *Sutherland v W M Low & Co*, there may be circumstances in which the court will consider it equitable to reduce a bond of caution, notwithstanding the inevitable prejudice to a creditor. A variety of circumstances may be relevant to the question as to where the equities lie, but the matter is succinctly put by the

A  dictum of Lord Shand in *Clydesdale Bank v Paul* (which he took from the judgment of Lord Chancellor Campbell in *Scholefield v Templer* which is quoted in the article on cautionary obligations in the *Stair Encyclopaedia*: "a person cannot avail himself of what has been obtained by the fraud of another, unless he is not only innocent of the fraud but has given some valuable consideration". In the case of a cautionary obligation giving valuable consideration would obviously comprehend extending credit or abstaining from diligence, as is instanced by Gloag, but it appears

B  to me that it might also include any material change of position or other reliance on the existence of the bond. It might include, as counsel for the pursuer stressed, the grant of a title of intromission: *Wardlaw v Mackenzie* supra at (1859) 21D, pp 946 and 948 to 949. Here, on such information as is available from the averments it is difficult to see that any consideration was given directly by Nestor, but I agree with counsel for the pursuer that a legal requirement that a bond be obtained guaranteeing the intromissions of

C  an executor as a prerequisite for the administration of the executory estate, introduces a degree of complexity. As I would see it, there is something to be said on either side of the question as to whether the bond could have been reduced at the instance of the pursuer on the grounds of David Murdoch's fraud. It is a question that would be better considered after full inquiry into the facts. It is sufficient for counsel for the defenders' purposes that this line of defence is arguable. In my opinion it is arguable and for that reason I

D  would be prepared to admit the relevant averments to probation. It is not appropriate that I express a view beyond that.

[41] In relation to the further line of defence that should have been adopted, I took counsel for the defenders to argue the failure by Nestor to constitute the debt point only rather faintly. As I understood the point it was that the bond of caution was to be construed narrowly, so as to limit the extent of the pursuer's obligation. Accordingly, before the pursuer

E  could be called on to make payment of a sum that the executor should have made free and forthcoming to a party having interest, that party must establish its entitlement by constituting a debt as against the executor or at least having the debt admitted by the executor. The pursuer was not obliged by the terms of the bond to pay an illiquid claim. Therefore, if it nevertheless chose to do so, it could not then contend in an action against the present defenders that its loss was due to it being induced to grant the bond.

F  [42] I do not propose to examine the soundness of the propositions advanced by counsel for the defenders in support of this part of his argument because in my opinion it was simply and conclusively answered by counsel for the pursuer pointing to the admission by the defenders that Nestor had taken decree in absence against Carol Murdoch, as executor dative of the late David Murdoch, prior to the conclusion of the settlement by the pursuer of Nestor's claim. If constitution of the debt was a necessary prerequisite of liability, that prerequisite

was met. I accordingly reject this part of counsel for the defenders' argument. It follows that were I to  G allow the pursuer proof I would not admit the defenders' averments as to the availability of this line of defence to probation.

**Disposal of pleas and conclusion**

[43] The pursuer's case is based on fraudulent and negligent misrepresentations. For the reasons given above I consider that neither the fraud case nor the negligence case is relevant. I shall therefore uphold the defenders' first plea in law and dismiss the action.  H  It follows that had I taken a different view on the pursuer's negligence case and admitted it to probation I would have nevertheless upheld the defenders' second plea in law. Had I been prepared to allow proof of the pursuer's case of fraud, contrary to counsel for the pursuer's submissions I would have allowed probation of the defenders' averments as to good faith. Had I been prepared to allow proof of the pursuer's case of fraud or its case of negligence, I would not have allowed probation of the defenders'  I  averments relating to lines of defence that might have been adopted by the pursuer in answer to the action at the instance of Nestor other than that relating to reduction or setting aside of the bond and would therefore have upheld the pursuer's first plea in law to that extent.

[44] I shall reserve all matters relating to expenses.

_____

*Counsel for Pursuer, E Robertson; Solicitors, Brodies  J LLP — Counsel for Defenders, D Johnston, QC; Solicitors, Lesley A Gray.*

K

L