## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **MCR OIL TOOLS, LLC,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 3:18-CV-00731-E** |
| | § | |
| **GENERAL SERVICES 1, LTD.,** | § | |
| **f/k/a SPEX OFFSHORE, LTD.,** | § | |
| **GENERAL SERVICES 2, LTD.,** | § | |
| **f/k/a SPEX SERVICES, LTD.,** | § | |
| **SPEX OFFSHORE (UK) LTD.,** | § | |
| **SPEX GROUP US LLC,** | § | |
| **SPEX ENGINEERING (UK)** | § | |
| **LTD., SPEX GROUP** | § | |
| **HOLDINGS, LTD,** | § | |
| **SPEX CORPORATE** | § | |
| **HOLDINGS, LTD., and** | § | |
| **JAMIE OAG.** | § | |
| | § | |
| *Defendants.* | § | |

---

### PLAINTIFF MCR OIL TOOLS, LLC'S FIFTH AMENDED COMPLAINT AND APPLICATION FOR PERMANENT INJUNCTIVE RELIEF

Plaintiff MCR Oil Tools, LLC files this Fifth Amended Complaint and Application for Permanent Injunctive Relief against Defendants General Services I, Ltd., f/k/a/ SPEX Offshore, Ltd., General Services 2, Ltd., f/k/a/ SPEX Services, Ltd., SPEX Offshore (UK) Ltd., SPEX Group US, LLC, SPEX Engineering (UK) Ltd., SPEX Group Holdings, Ltd., SPEX Corporate Holdings, Ltd. and Jamie Oag (collectively, the "SPEX Defendants") as follows:

## PARTIES

1.    Plaintiff MCR Oil Tools, LLC ("MCR") is a Texas limited liability company who has appeared in this action.

2.    Defendant General Services I, Ltd., f/k/a/ SPEX Offshore, Ltd. ("SPEX Offshore") is organized under the laws of the United Kingdom, with its principal place of business in the United Kingdom. SPEX Offshore has engaged in business in the State of Texas but does not maintain a regular place of business or a designated agent for service of process in Texas. SPEX Offshore has appeared in this action.

3.    Defendant General Services 2, Ltd., f/k/a/ SPEX Services, Ltd. ("SPEX Services") is organized under the laws of the United Kingdom, with its principal place of business in the United Kingdom. SPEX Services has engaged in business in the State of Texas but does not maintain a regular place of business or a designated agent for service of process in Texas. SPEX Services has appeared in this action.

4.    Defendant SPEX Offshore (UK) Ltd. ("SPEX Offshore UK") is organized under the laws of the United Kingdom and has appeared in this action.

5.    Defendant SPEX Group US, LLC ("SPEX Group") is a Texas limited liability company that has appeared in this action.

6.    Defendant SPEX Engineering (UK) Ltd. ("SPEX Engineering UK") is organized under the laws of the United Kingdom and has appeared in this action.

7.     Defendant SPEX Group Holdings, Ltd. ("SPEX Holdings") is organized under the laws of the United Kingdom and has appeared in this action. SPEX Holdings has engaged in business in the State of Texas but does not maintain a regular place of business or a designated agent for service of process in Texas.

8.     Defendant SPEX Corporate Holdings, Ltd. ("SPEX Corporate Holdings") is organized under the laws of the United Kingdom and has appeared in this action. SPEX Corporate Holdings has engaged in business in the State of Texas but does not maintain a regular place of business or a designated agent for service of process in Texas.

9.     Defendant Jamie Oag ("Oag") is an individual residing in the United Kingdom and has appeared in this action. Oag has engaged in business in the State of Texas but does not maintain a regular place of business or a designated agent for service of process in Texas.

**CO-CONSPIRATORS**

10.     Co-conspirator, Wireline Well Services Tunisia ("WWS") is a Tunisian company at the center of a similar lawsuit with MCR over the use of MCR's tools.

11.     Co-conspirator, Expro Holdings UK 4 Limited ("Expro") is a United Kingdom company, also at the center of another lawsuit adverse to MCR.

12.     Co-conspirator Sidney Johnston ("Johnston") is an individual who resides in the United Kingdom and works for SPEX Group Holdings Limited, and potentially other SPEX entities.

13.     Co-conspirator Dr. Thomas Chang ("Chang") is an individual who resides in the United States who serves as President of Explosives Bureau ("EB"), one of the six DOT-approved explosives test labs.

14.     Co-conspirator Thaddeus Speed ("Speed") is an individual residing in the United States who served as a Senior Consultant for German company, DEKRA, as well as acted as the Technical Director for one of six DOT-approved labs, Energetics Experts, LLC.

15.     Co-conspirator Craig Dillard ("Dillard") is an individual who resides in Texas and has represented Defendants as counsel of record in this litigation, and other lawsuits adverse to MCR.

16.     Co-conspirator Terrell Miller ("Miller") is an individual residing in Texas who, at relevant times to this litigation, has represented Defendants with Dillard.

17.     Co-conspirator Peter Shelley ("Shelley") is an individual who resides in Scotland and, at relevant times throughout this case, was Managing Director of Onepoint4 Ltd., a Scottish entity.

18.    Co-conspirator Business Growth Fund is a United Kingdom investment company that provides venture capital for businesses in the United Kingdom, including at least one Defendant, SPEX Group.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332 as the matter in controversy exceeds $75,000 and the suit involves a citizen or subject of a State and citizens or subjects of a foreign state.

20.    The Court has personal jurisdiction over SPEX Offshore because it established sufficient minimum contacts with the State of Texas such that exercise of jurisdiction over SPEX Offshore would not offend traditional notions of fair play and substantial justice. Among other acts, SPEX Offshore has engaged in business in Texas, entered into contracts in Texas, directed substantial communications to MCR representatives in Texas, and sent agents to Texas to test and develop competing tools or products. In addition, SPEX Offshore, both directly and through its affiliates and directors, has committed and continues to commit intentional torts expressly aimed at Texas, causing serious harm to MCR in Texas. At all relevant times, SPEX Offshore knew that the brunt of the injury resulting from its wrongful conduct would be felt by MCR in Texas. MCR's claims against SPEX Offshore arise out of events occurring in Texas.

21.    The Court has personal jurisdiction over SPEX Services because it established sufficient minimum contacts with the State of Texas such that exercise of jurisdiction over SPEX Services would not offend traditional notions of fair play and substantial justice. Among other acts, SPEX Services has engaged in business in Texas, entered into contracts in Texas, directed substantial communications to MCR representatives in Texas, and sent agents to Texas to test and develop competing tools or products. In addition, SPEX Services, both directly and through its affiliates and directors, has committed and continues to commit intentional torts expressly aimed at Texas, causing serious harm to MCR in Texas. At all relevant times, SPEX Services knew that the brunt of the injury resulting from its wrongful conduct would be felt by MCR in Texas. MCR's claims against SPEX Services arise out of events occurring in Texas.

22.    The Court has personal jurisdiction over Jamie Oag because he established sufficient minimum contacts with the State of Texas such that exercise of jurisdiction over Oag would not offend traditional notions of fair play and substantial justice. Among other acts, Oag has engaged in business in Texas, entered into contracts in Texas, directed substantial communications to MCR representatives in Texas, and sent agents to Texas to test and develop competing tools or products. In addition, Oag, both directly and through the SPEX Defendants, has committed and continues to commit intentional torts expressly aimed at Texas, causing serious

harm to MCR in Texas. At all relevant times, Oag knew that the brunt of the injury resulting from his wrongful conduct would be felt by MCR in Texas. MCR's claims against Oag arise out of events occurring in Texas.

23.    The Court has personal jurisdiction over SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings because each of these entities established sufficient minimum contacts with the State of Texas such that exercise of jurisdiction over them would not offend traditional notions of fair play and substantial justice. Among other acts, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings, both directly and through directors and affiliates, has engaged in business in Texas, directed substantial communications to MCR representatives in Texas, and sent agents to Texas to test and develop competing tools or products. In addition, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings, both directly and through affiliates and directors, have committed and continue to commit intentional torts expressly aimed at Texas, causing serious harm to MCR in Texas. At all relevant times, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings knew that the brunt of the injury resulting from their wrongful conduct would be felt by MCR in Texas. MCR's claims against SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings arise out of events occurring in Texas. Alternatively, the Court has

personal jurisdiction over SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings because they are alter egos of SPEX Offshore, SPEX Services, and Oag.

24.    Venue is proper because this district and division embrace the place in which the removed action was pending. 28 U.S.C. § 1441.

## BACKGROUND FACTS

**A.    MCR owns valuable oilfield tools and intellectual property.**

25.    For more than three decades, MCR has worked in the oilfield tool industry. MCR researches, invents, designs, develops, manufactures and sells oilfield tools, products, equipment and accessories ("Tools"), using patented technology, trade secrets, and confidential and proprietary information. MCR's Tools are generally non-explosive, thermite-based tools—pipe cutters or torches fueled by solid combustible fuel—used to cut, perforate and consume oil well pipe downhole.

26.    With respect to its Tools, MCR owns and controls a compilation of confidential and proprietary information and know-how relating to, among other things, the internal body size dimensions defining the diameter and length of the corresponding fuel load, the use of fuel extensions to increase power for the Tools, the design and function of nozzles (including the diameter, length, and number of nozzle holes), the design and length of pellets, the percentages of fuel mixtures and

materials, and the size of fuel loads, for its radial cutting, axial cutting, and perforating torches, and consumables.

27.    This know-how together with other confidential and proprietary information comprises protected trade secrets, all of which were developed and designed to obtain an advantage over MCR's competitors. MCR's trade secrets include all improvements, experimentation, designs, refinements, processes, formulations, tool configurations, know-how, data, reports, methods, test methods and systems developed, tested, perfected and owned by MCR for the purpose of designing, developing and manufacturing its Tools.

28.    MCR's trade secrets include not only how to design, develop, test, configure and manufacture its Tools for proper field use and to achieve successful downhole cutting and perforating of downhole tubulars, but also how *not* to design, develop, configure and manufacture the Tools. MCR's trade secrets include methods of design, manufacturing and use that were effective, and methods that were *not* effective, toward reaching certain goals for the optimization of MCR's Tools.

29.    Lastly, MCR's trade secrets include specialized knowledge, know-how and skills gained by MCR's employees through experimentation, testing, development, trial and error, and from the investment and expenditure of time, money, and resources.

30.    MCR has invested substantial time, money, resources, and effort to develop the confidential and proprietary information comprising its trade secrets. MCR's highly valuable trade secrets represent decades of research and development and provide MCR an advantage over its competitors. MCR's trade secrets derive independent economic value because they are not generally known to, or readily ascertainable through proper means by, other persons who can obtain economic value from the disclosure or use of the information.

**B.    MCR takes active measures to protect its Tools and intellectual property.**

31.    MCR closely regulates access to its valuable trade secrets and confidential and proprietary information by limiting access to and disclosure of such information. As one such security measure, MCR limits access to its offices, files, and computers.

32.    In addition, MCR takes other active measures to prevent theft of its intellectual property by dishonest, cunning licensees hoping to reverse engineer MCR's Tools or rebrand MCR's intellectual property as their own. Most importantly, MCR sells products only to licensees, not customers at large, and requires those licensees to enter into comprehensive, well-crafted license agreements, which MCR has invested substantial time and resources developing and strengthening over the years. MCR likewise requires that its licensees complete MCR training on the operation and function of MCR's products and Tools. MCR

closely monitors all licensees' use of its Tools and intellectual property once they are bound by the detailed license agreements, which are specifically designed to protect these valuable assets.

33.     As set forth below in detail, the crux of MCR's claims against the SPEX Defendants stem from breaches (and continuing breaches) of MCR's license agreements.

## C.    MCR licenses its Tools and intellectual property to SPEX Services in 2009 and 2011, and to SPEX Offshore in 2014 and 2015.

### SPEX Services

34.     On April 20, 2009, SPEX Services was incorporated.

35.     On or about June 29, 2009, MCR licensed its Tools and intellectual property to SPEX Services.

36.     On May 16, 2011, MCR entered into a subsequent license agreement with SPEX Services.[1] John Fox ("Fox") signed the 2011 License Agreement as SPEX Services' Director.

37.     On May 24, 2011, eight days after signing the 2011 License Agreement, SPEX Services appointed Jamie Oag as Director.[2]

---

[1] Exhibit A (the "2011 License Agreement").
[2] In the 2011 License Agreement, SPEX Services listed Dunnottar House, Howe Moss Drive, Kirkhill Industrial Estate, Dyce AB21 OFN ("Dunnottar House") for notices. Upon information and belief, this is Jamie Oag's home address.

38.     On July 26, 2012, and April 18, 2013, respectively, SPEX Services appointed Rae Younger ("Younger") and Nadir Mahjoub ("Mahjoub") as Directors.

**SPEX Offshore**

39.     On September 11, 2012, SPEX Offshore was incorporated.[3] At the time of incorporation, SPEX Offshore listed Fox and Ryan Strachan ("Strachan") as Directors.

40.     On February 21, 2014, SPEX Offshore appointed Oag as Director.

41.     On May 21, 2014, MCR entered into a license agreement with SPEX Offshore.[4] Oag signed the 2014 License Agreement as SPEX Offshore's Chief Executive Officer.[5]

42.     On June 1, 2015, MCR agreed to extend the terms of the 2014 License Agreement for one year—to May 21, 2016.[6] Oag signed the 2015 Extension as SPEX Offshore's Chief Executive Officer.

43.     Importantly, in the 2015 Extension, MCR and SPEX Offshore agreed that "[e]xcept as specifically and explicitly amended … no other terms of the [2014 License Agreement] shall be affected by this extension."[7]

---

[3] SPEX Offshore listed Blackwood House, Union Grove Lane, Aberdeen AB10 6XU ("Blackwood House") as its registered address.
[4] Exhibit B (the "2014 License Agreement").
[5] Although SPEX Offshore listed Blackwood House as its registered address in its incorporation papers, it listed Dunnottar House for notices in the 2014 License Agreement.
[6] Exhibit C (the "2015 Extension").
[7] *Id.*

44.     The 2011 and 2014 License Agreements (and the 2015 Extension) contain essentially the same material terms, representations, acknowledgments and agreements by SPEX Services, SPEX Offshore and Oag, which were specifically negotiated by MCR in order to protect its Tools and intellectual property. Moreover, in entering into the 2011 and 2014 License Agreements (and the 2015 Extension), MCR relied on all representations, acknowledgments and agreements made by SPEX Services, SPEX Offshore and Oag in the respective agreements.

**D.     The 2014 License Agreement contains specific terms and definitions related to MCR's Tools and intellectual property.**

45.     In the 2014 License Agreement, "Confidential Information" is defined to include, among other things, MCR's "confidential or proprietary information," "know-how," "methods," "processes," and "trade secrets."[8] "Confidential Information" also includes MCR's "products," "equipment," and "instruments," *i.e.*, its Tools.[9]

46.     "Improvements" are defined as any improvement or modification, or future improvement or modification, of any "device, product, method, or process belonging to MCR."[10] With respect to ownership of any Improvements, the 2014 License Agreement explicitly provides that "any and all future improvements and/or modifications … whether conceived and/or developed independently … or jointly

---

[8] Exhibit B at §1.01.
[9] *Id*.
[10] *Id*. at § 1.02.

… will be owned by MCR."[11]

47.    "Licensed Patents" are defined as U.S. and foreign patents MCR owns or holds, as listed in Appendix A to the 2014 License Agreement.[12]

48.    "Licensed Products" are defined as MCR's products, as listed in Appendix B to the 2014 License Agreement.[13]

49.    "Licensed Technology" is defined as MCR's "confidential or proprietary information" relating to its Licensed Patents and Licensed Products, specifically including, among other things, MCR's "know-how," "methods," "trade secrets," and "processes."[14]

50.    The 2011 License Agreement contains similar terms and definitions related to MCR's Tools and intellectual property.[15]

E.    **Oag and SPEX Offshore make numerous representations and acknowledgements in the 2014 License Agreement related to MCR's Tools and intellectual property.**

51.    Immediately following the definitions section in the 2014 License Agreement are representations and acknowledgements, which MCR requires of its licensees as part of its consistent, ongoing effort to protect its Tools and intellectual property.[16] These representations and acknowledgments, which Oag and SPEX

---

[11] *Id.* at §§ 1.02, 3.04.
[12] *Id.* at § 1.04.
[13] *Id.* at § 1.05.
[14] *Id.* at § 1.06.
[15] *See, e.g.*, Exhibit A at §§ 1.02, 1.03, 1.04, 1.06, 1.09, 1.10, 3.04.
[16] Exhibit B, p. 2-3.

Offshore made and MCR acted and relied on, include the following:

- Oag and SPEX Offshore acknowledged that MCR holds valuable rights in its Tools and intellectual property;[17]

- Oag and SPEX Offshore acknowledged that MCR has spent significant time and effort, at significant expense, to develop, acquire, protect, maintain and license its Tools and intellectual property;[18]

- Oag and SPEX Offshore represented that SPEX Offshore had not invented, designed, developed, or improved (nor contributed to inventing, designing, developing or improving) any technology or products for perforating, consuming or cutting of downhole pipes using any part of MCR's Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools;[19]

- Oag and SPEX Offshore represented that SPEX Offshore was not aware of any person or entity having invented, designed, developed or improved (nor contributed to inventing, designing, developing or improving) any technology or products for perforating, consuming or cutting of downhole pipes using any of MCR's Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools;[20]

---

[17] *Id*. at § 2.01.
[18] *Id*. at § 2.02.
[19] *Id*. at § 2.03.
[20] *Id*. at § 2.05.

- Oag and SPEX Offshore represented that SPEX Offshore was not in the business of designing or developing thermite-based products or technology substantially similar to or competitive with MCR's Licensed Products and Licensed Technology;[21] and

- Oag and SPEX Offshore represented that SPEX Offshore had no intention of entering into the business of designing or developing thermite-based products or technology substantially similar to or competitive with MCR's Licensed Products and Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools.[22]

52.    In the 2011 License Agreement, SPEX Services made similar representations and acknowledgements, which MCR acted and relied on.[23]

**F.    Oag and SPEX Offshore make numerous agreements in the 2014 License Agreement regarding their use of MCR's Tools and intellectual property.**

53.    Throughout various provisions of the 2014 License Agreement, Oag and SPEX Offshore made numerous agreements regarding SPEX Offshore's use of MCR's Tools and intellectual property, which MCR acted and relied on. These agreements include the following:

---

[21] *Id.*
[22] *Id.*
[23] *See., e.g.*, Exhibit A at §§ 2.01, 2.02, 2.03, 2.05.

- Oag and SPEX Offshore agreed not to engage or assist in any testing, modifying, reverse engineering, or development of any of MCR's Tools or intellectual property, either directly or by cooperation with a third party;[24]

- Oag and SPEX Offshore agreed to use MCR's Tools and Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools, only in strict accordance with the terms of the agreement;[25]

- Oag and SPEX Offshore agreed that all rights, title and interest to any Improvements to MCR's Tools or intellectual property, including any and all patents and trade secrets, shall be exclusively owned by MCR;[26]

- Oag and SPEX Offshore agreed to assign and convey to MCR its entire right, title and interest to all Improvements, if any, including all applicable intellectual property rights related to any such Improvements;[27]

- Oag and SPEX Offshore agreed not to cooperate with, or seek to benefit from, any third party's infringement of MCR's rights in connection with its Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools;[28]

---

[24] Exhibit B at § 3.03.
[25] *Id*.
[26] *Id*. at § 3.04. Within this provision, SPEX Offshore also agreed to provide MCR with prompt notice of the development of any Improvement and all information necessary to practice any such Improvement.
[27] *Id*.
[28] *Id*. at § 3.05.

- Oag and SPEX Offshore agreed to promptly notify MCR of any third-party infringement or threatened infringement of MCR's Licensed Patents or Licensed Technology;[29]

- Oag and SPEX Offshore agreed to protect MCR's Confidential Information, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools, and to use it only for purposes of the agreement;[30]

- Oag and SPEX Offshore agreed, upon expiration of the 2014 License Agreement, to cease all activities concerning and all use of MCR's Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools, and to return the Licensed Technology to MCR;[31] and

- Oag and SPEX Offshore agreed that all material terms related to the licensing, use, and confidentiality of MCR's Tools and intellectual property and the enforcement of MCR's rights under the 2014 License Agreement survived termination of the agreement.[32]

54.    In the 2011 License Agreement, SPEX Services made similar agreements regarding its use of MCR's Tools and intellectual property, which MCR

---

[29] *Id*. at § 5.01.
[30] *Id*. at § 6.01.
[31] *Id*. at § 7.05.
[32] *Id*. at § 7.06.

acted and relied on.[33]

### G.     Through Directors and affiliates, the SPEX Defendants file numerous international patent applications derived from MCR's Tools and intellectual property.

55.     Just prior to and soon after Oag and SPEX Offshore signed the 2014 License Agreement, SPEX Services and its Directors and affiliates (including Oag) began filing patent applications, without notice to MCR, in an attempt to rebrand MCR's intellectual property as their own.[34]

56.     After filing these applications, the SPEX Defendants created shell companies, assigned the applications to the newly-created shell companies, and then used the shell companies to file additional patent applications derived from MCR's Tools and intellectual property. The SPEX Defendants also began appointing and terminating officers and directors in an ongoing game of musical chairs. The SPEX Defendants took these measures, among others, in an effort to avoid liability for their contractual breaches and to hide their wrongful conduct from MCR.

### Oag and Younger file priority applications derived from MCR's Tools and intellectual property.

57.     On March 21, 2014, SPEX Services terminated Younger's appointment as Director.

---

[33] Exhibit A at §§ 3.01, 3.03, 3.04, 7.01, 8.01, 9.04.

[34] As discovery has only begun, MCR continues to discover patent applications that were filed by the SPEX Defendants in violation of the 2011 and 2014 License Agreements and 2015 Extension, as part of their scheme to misappropriate MCR's trade secrets and confidential and proprietary information.

58.     On September 22, 2014, Oag, Chief Executive Officer of SPEX Offshore and signatory to the 2014 License Agreement, filed UK Patent Application No. GB1416720.9 for an "Improved Plug" ("SPEX 1"). SPEX 1 was abandoned prior to publication and grant. However, it served as a priority document for PCT/GB2015/052738 ("SPEX PCT 1"), filed by Oag and Younger as co-inventors pursuant to the Patent Cooperation Treaty ("PCT"), which provides protection in all member countries for a period of time. After the initial protection period expires, applicants may pursue patent protection in a number of individual countries.

59.     On November 18, 2014, Oag filed UK Patent Application No. GB1420491.1 for a "Downhole Tool with a Propellant Charge" ("SPEX 2"). SPEX 2 was abandoned prior to publication and grant. However, it served as a priority document for PCT/GB2015/053507 ("SPEX PCT 2"), filed by Oag, Younger and Johnston as co-inventors.

### **After the filing of the priority applications, SPEX Engineering UK is formed.**

60.     On February 26, 2015, SPEX Engineering UK was incorporated.[35] SPEX Engineering UK is the parent company of SPEX Group.

61.     On May 5, 2015, SPEX Engineering UK appointed Oag, Mahjoub and Strachan as Directors.

---

[35] SPEX Engineering UK was known as SLLP 121 Ltd. until its name change on May 18, 2015.

**Oag, Younger and SPEX Engineering UK file additional priority applications derived from MCR's Tools and intellectual property.**

62.    On March 3, 2015, Oag filed UK Patent Application No. GB1503608.0 for "A Tool for Severing Or Assisting In The Severing Of A Conduit" ("SPEX 3"). SPEX 3 was abandoned prior to publication and grant. However, it served as a priority document for PCT/GB2016/050562 ("SPEX PCT 3"), filed by Oag and Younger as co-inventors.

63.    On April 13, 2015, Younger filed UK Patent Application No. GB1506265.6 for an "Improved Tool" ("SPEX 4"). SPEX 4 was abandoned prior to grant. However, it served as a priority document for PCT/GB2016/051032 ("SPEX PCT 4"), also filed by Younger.

64.    On November 18, 2015, Oag, Younger and Johnston filed UK Patent Application No. GB2532609 for a "Downhole Tool" ("SPEX 4A"). That same day, SPEX Engineering UK filed UK Patent Application No. GB2544616 for a "Downhole Tool" ("SPEX 4B"). Oag, Younger and Johnston are named as co-inventors on both SPEX 4A and SPEX 4B.[36]

**Oag and Younger assign patent applications to SPEX Services.**

65.    After filing the UK application for SPEX 1, but prior to September 22, 2015 (the date on which it expired), Oag and Younger assigned SPEX 1 to SPEX

---

[36] Both SPEX 4A and SPEX 4B disclose subject matter related to SPEX PCT 4.

Services.

66.     In the same manner, on or prior to November 25, 2015, Oag, Younger and Johnston assigned SPEX 2, 3, 4 and 4A to SPEX Services.

**Oag, SPEX Services and SPEX Engineering UK file additional patent applications derived from MCR's Tools and intellectual property.**

67.     On September 22, 2015 (the same day Oag and Younger assigned SPEX 1 to SPEX Services), SPEX Services filed SPEX PCT 1 for an "Improved Plug."

68.     On November 18, 2015, SPEX Services filed SPEX PCT 2 for a "Downhole Tool With Propellant Charge."

69.     On March 3, 2016, SPEX Engineering UK filed SPEX PCT 3 for "A Tool for Severing Or Assisting In the Severing Of A Conduit." That same day, Oag and Younger filed related UK Patent Application No. GB2538346 ("SPEX 3A") for an "Improved Tool."

70.     On April 13, 2016, SPEX Engineering UK filed SPEX PCT 4 for an "Improved Tool." That same day, Younger filed UK Patent Application No. GB2537749 for "Improved Tool" ("SPEX 4C").

**SPEX Services assigns patent applications to SPEX Engineering UK.**

71.     On November 25, 2015, SPEX Services assigned SPEX 2, SPEX PCT 2, SPEX 3, SPEX 4 and SPEX 4A to SPEX Engineering UK. Mahjoub, who, at

relevant times to this litigation, served as Director of assignee SPEX Engineering UK, signed on behalf of assignor SPEX Services.

72.    On March 8, 2016, SPEX Services assigned SPEX PCT 1 to SPEX Engineering UK. Strachan, who, at relevant times to this litigation, served as Manager of SPEX Group and Director of SPEX Engineering UK and SPEX Offshore, signed on behalf of assignor SPEX Services.

73.    Soon after the filing of SPEX 4C on April 13, 2016, Younger assigned SPEX 4C to SPEX Engineering UK.

### The first wave of SPEX patent applications are published.

74.    On March 31, 2016, SPEX PCT 1 was published.[37]

75.    On May 26, 2016, SPEX PCT 2 was published.

76.    In May 2016, SPEX 4A and 4B were published.

77.    On September 9, 2016, SPEX PCT 3 was published.

78.    On October 20, 2016, SPEX PCT 4 was published.

79.    On October 26, 2016, SPEX 4C was published.

80.    On November 16, 2016, SPEX 3A was published.

---

[37] In successive motions to dismiss, the SPEX Defendants allege that MCR's claims are barred by the applicable statute of limitations. *See, e.g.*, Doc. 20, 31. PCT applications are published as soon as possible after the expiration of 18 months from the earliest filing date. SPEX PCT 1—the earliest patent application derived from MCR's Tools and intellectual property—was not published until March 31, 2016. As a result, the SPEX Defendants' wrongful acts were inherently undiscoverable prior to March 31, 2016, and all of MCR's claims are therefore timely. *WesternGeco v. Ion Geophysical Corp.*, 2009 WL 3497123, at *5 (S.D. Tex. Oct. 28, 2009). Moreover, and as set forth in detail herein, MCR affirmatively pleads application of the discovery rule and fraudulent concealment, both of which toll limitations.

**H.    In the midst of filing patent applications derived from MCR's Tools and intellectual property, the SPEX Defendants take active measures to conceal and avoid liability for their wrongful conduct.**

81.    As the first wave of SPEX patent applications were being published, the SPEX Defendants began a new cycle of forming shell holding companies, filing patent applications derived from MCR's Tools and intellectual property, assigning applications between and among affiliates, and appointing and terminating Directors. In an effort to further conceal their conduct, the SPEX Defendants also began changing corporate names, diverting assets between and among affiliates, causing entities to be undercapitalized, and dissolving contractually-liable entities.

**SPEX Holdings is formed.**

82.    On March 1, 2016, SPEX Holdings was incorporated. SPEX Holdings appointed Oag, Strachan and Mahjoub as Directors.

83.    On or about April 25, 2016, SPEX Holdings became the parent company of SPEX Engineering UK "following a share for share transfer" with SPEX Services.

84.    On July 5, 2016, SPEX Holdings changed its registered address to Blackwood House—the same address as SPEX Offshore.

**SPEX Offshore and SPEX Services divert assets, change names and terminate Directors.**

85.    On April 25, 2016, SPEX Services purposely caused itself to be undercapitalized through a payment of dividends to its affiliates, an asset transfer to SPEX Holdings, and a reduction of its share premium account to zero.

86.    On June 16, 2016, SPEX Offshore terminated Oag as Director.

87.    On June 30, 2016, SPEX Services terminated Oag and Mahjoub as Directors.

88.    On August 1, 2016, SPEX Offshore purposely caused itself to be undercapitalized by transferring its assets to SPEX Offshore UK. SPEX Offshore also transferred its employment contracts to SPEX Offshore UK. Prior to the transfer, SPEX Offshore UK had no personnel.

89.    On August 19, 2016, SPEX Services changed its name to General Services 2, Ltd. ("General Services 2"). That same day, SPEX Offshore changed its name to General Services 1, Ltd. ("General Services 1"). Coincidentally, the only two SPEX Defendants to change their names away from the "SPEX" brand—SPEX Services and SPEX Offshore—are signatories to the 2011 and 2014 License Agreements and 2015 Extension.

90.    On October 27, 2016, after changing its name to General Services 2, SPEX Services passed a resolution to voluntarily wind itself up and appoint

liquidators for that purpose. Strachan signed the resolution on behalf of SPEX Services.

91.    On December 2, 2016, both SPEX Services and SPEX Offshore terminated Strachan as Director.

**SPEX Corporate Holdings is formed.**

92.    On December 21, 2016, SPEX Corporate Holdings was incorporated. Its Directors are Oag, Mahjoub, and Strachan, and its registered address is Blackwood House—the same address as SPEX Offshore and SPEX Holdings. SPEX Holdings is the parent of SPEX Corporate Holdings, SPEX Offshore UK, SPEX Engineering UK and SPEX Engineering, Ltd.

93.    During the same time period in which SPEX Services, SPEX Offshore and Oag were entering into, operating under, and concluding the License Agreements, Halliburton Energy Services, Inc. took steps to terminate its license agreements with MCR due to their developing relationship with SPEX. Halliburton has continuously sought to obtain MCR's valuable thermite-based cutting tool technology.  For example, in 2008, MCR filed a lawsuit against Halliburton because Halliburton tried to claim MCR's Modified Radial Cutting Torch (MRT), for use in consuming downhole plugs, packers and other wellbore materials, as Halliburton's own technology. In 2010, a settlement was reached between MCR and Halliburton

Energy Services, whereby Halliburton agreed that the MRT was invented and owned by MCR.

94.    The Defendants continued to consolidate the assets and intellectual property, including that obtained in violation of the License Agreements, in a single SPEX entity, SPEX Corporate Holdings. On information and belief, Halliburton made an offer to purchase SPEX Corporate Holdings, which held the rights to the patents for which SPEX was in the process of applying.

95.    MCR only became aware of the true nature of Halliburton's interest in SPEX and its intellectual property years after these proceedings were initiated. Defendants were attempting to use the improperly obtained information, including the results of the violations of the License Agreements, to develop a competitor to MCR and develop similar products to MCR's tools and technology. This would make SPEX Corporate Holdings more valuable and justify purchase of various SPEX entities by Halliburton.

**In various countries around the world, SPEX Services and SPEX Engineering UK file patent applications derived from MCR's Tools and intellectual property.**

96.    At the conclusion of the PCT application procedure, SPEX PCT 1 entered the "national phase," in which applicants may pursue patent protection directly in specific countries.

97.    In March and April of 2017, SPEX Services filed national phase applications, claiming priority from SPEX PCT 1, in Canada, Europe, Australia and the United States.

98.    In May and June of 2017, SPEX Services filed national phase applications, claiming priority from SPEX PCT 2, in Canada, Australia, the United States and Europe.

99.    In August and September of 2017, SPEX Engineering UK filed national phase applications, claiming priority from SPEX PCT 3, in Canada, Australia, the United States, and Europe (including the United Kingdom).

100.    In October 2017, SPEX Engineering UK filed national phase applications, claiming priority from SPEX PCT 4, in Australia, Canada, the United States and Europe.

**SPEX Engineering UK files additional patent applications derived from MCR's Tools and intellectual property.**

101.    On January 19, 2017, SPEX Engineering UK filed International PCT Application No. PCT/GB2017/050129 for a "Tool With Propellant Sections" ("SPEX PCT 5") and UK Patent Application No. GB2546630 for an "Improved Tool" ("SPEX 5A").

102.    On May 18, 2017, SPEX Engineering UK filed International PCT Application No. PCT/GB2017/051390 for a "Tool For Severing A Downhole

Tubular By A Stream Of Combustion Products" ("SPEX PCT 6") and UK Patent Application No. GB2550691 for an "Improved Tool" ("SPEX 7").

**The SPEX Defendants take further active measures to conceal their wrongful conduct, even after MCR filed its State Court Petition.**

103.    With the new patent applications on file and sham holding companies in place (SPEX Holdings and SPEX Corporate Holdings), the SPEX Defendants no longer had any use for contractual signatory SPEX Offshore, which had already changed its name away from the "SPEX" brand. Thus, on September 30, 2017, the SPEX Defendants dissolved General Services 1 (formerly SPEX Offshore) without notice to MCR.

104.    On October 31, 2017, SPEX Engineering UK assigned numerous SPEX patents and patent applications to the newly-formed SPEX Corporate Holdings. The assignment included but was not limited to transfer of all rights, title and interest to: (1) SPEX PCT 1, including the national phase applications filed in Australia, Canada, Europe and the United States; (2) SPEX PCT 2, including the national phase applications filed in Australia, Canada, Europe and the United States; (3) SPEX PCT 4, including the national phase applications filed in Australia, Canada, Europe and the United States; and (4) SPEX 4A, SPEX 4B, SPEX 4C, SPEX PCT 5, SPEX 5A, SPEX PCT 6, and SPEX 7. Strachan signed as SPEX Engineering UK's Director, Oag signed as SPEX Corporate Holdings' Director, and Mahjoub served as witness.

105.   On October 31, 2017, contemporaneous with the assignment to SPEX Corporate Holdings, SPEX Engineering UK changed its registered address to Blackwood House—the same address as SPEX Offshore, SPEX Holdings and SPEX Corporate Holdings.

106.   On December 27, 2017, MCR filed its original state court petition in this matter against SPEX Offshore, SPEX Offshore UK, SPEX Group, and SPEX Engineering UK. Because MCR was unaware of the full nature and extent of the SPEX Defendants' wrongful conduct, it did not name SPEX Services as a defendant at that time.

107.   Just nine days later, on January 5, 2018, the SPEX Defendants dissolved SPEX Services, which had changed its name to General Services 2, without notice to MCR.

## I.     The SPEX Patents are derived from MCR's Tools and intellectual property.

108.   The SPEX patents and patent applications ("SPEX Patents") are derived from MCR's Confidential Information, Licensed Patents, Licensed Products, and Licensed Technology, as those terms are defined in the 2011 and 2014 License Agreements.[38] In addition, the SPEX Patents relate to MCR's radial cutting torches, solid combustible charge-based tools, thermite-based tools and technology,

---

[38] Exhibit A at §§ 1.02, 1.03, 1.04, 1.06, 1.09, 1.10; Exhibit B at §§ 1.01, 1.04, 1.05 1.06, 1.09.

or constitute substantially similar technology.

109.   To the extent that any of the inventions or alleged inventions disclosed in the SPEX Patents are deemed patentable, they are Improvements, as that term is defined in the 2011 and 2014 License Agreements.[39] Pursuant to the terms of the 2011 and 2014 License Agreements and 2015 Extension, any such Improvements belong exclusively to MCR.[40]

110.   SPEX PCT 1 includes, among other things, embodiments of a consumable plug (tool) that is consumed or partially disintegrated by a deflagration reaction using solid combustible charge-based tools, thermite-based technology or substantially similar technology. The embodiments include a plug or tool body comprising a propellant and an initiator adapted to initiate the propellant causing deflagration, in which the plug or tool body partially disintegrates.

111.   SPEX PCT 1 discloses that the propellant is comprised of an oxidizer and metallic segments that are keyed together by the propellant, or a mix of materials, which may include an oxidizer with metals, glass, or gravel. This technology is taught and disclosed by, and directly related to, MCR's Licensed Patents, and substantially similar to MCR's Licensed Technology.

112.   SPEX PCT 2 includes, among other things, embodiments of propellant

---

[39] Exhibit A at § 1.09; Exhibit B at § 1.02.
[40] Exhibit A at §§ 1.09, 3.04; Exhibit B at §§ 1.02, 3.04; Exhibit C.

combinations that undergo deflagration reactions to create a stream of combustion products that are directed and flow through nozzles (outlets) for manipulating (*e.g.*, cutting) a tubular or segment of casing. SPEX PCT 2 includes nozzle patterns and configurations for directing the flow of the stream of the combustion products to cut or perforate downhole tubulars or other equipment. This technology is the same as or substantially similar to MCR's Licensed Technology, including MCR's nozzle patterns and configurations, and flow paths shown and described in MCR's Licensed Patents and contained within MCR's Licensed Technology.

113.    SPEX PCT 3 and SPEX 3A include, among other things, embodiments of a tool comprising at least one propellant, an ignition mechanism for igniting the propellant, and at least one modifying material, wherein ignition of the propellant causes deflagration and the release of a stream of combustion products that flow through channels and outlets (nozzles) to cut or sever a conduit. The propellant comprises a metal oxidizer and a modifying material in the form of a metal, which, upon deflagration, forms a molten plasma for cutting or severing the target (*e.g.*, conduit). This technology is taught and disclosed by, and directly related to, MCR's Licensed Patents, and substantially similar to MCR's Licensed Technology.

114.    SPEX PCT 4 includes, among other things, embodiments of a tool for removing material from a target, wherein the tool comprises a propellant that is ignited to form combustion products that are directed along at least one tool flow

path. The tool flow path(s) can be selectively opened or closed, such that upon exiting the tool flow path(s), the combustion products interact with a target causing the material to be removed.

115. SPEX PCT 4 also includes figures showing the nozzle configurations and patterns for directing the combustion products along the tool flow path(s), which are the same as MCR's nozzle patterns and configurations for directing a stream of combustion products (*e.g.*, MCR's thermite combustion products) along MCR's cutter tool's flow paths and out toward the targeted conduit. This technology is shown and described in MCR's Licensed Patents and contained within MCR's Licensed Technology.

116. SPEX PCT 4 further discusses a solid propellant that can comprise layers for different burn rates, and the direction of the combustion products that can be varied or deflected with respect to the tool. This technology is shown and described in MCR's Licensed Patents and contained within MCR's Licensed Technology.

117. Below is a comparison of SPEX PCT 4 and MCR's related patent. This is just one example clearly demonstrating that the SPEX Patents were derived from MCR's Tools and intellectual property, in violation of the 2011 and 2014 License Agreements and 2015 Extension.

| SPEX Patent Applications: | MCR Licensed Patents and Technology: |
|---|---|
| **SPEX PCT 4, "Downhole Tool With A Propellant Charge":** PCT/GB2016/051032:<br>**Publication Date: October 20, 2016:**<br><u>National Phase:</u><br>• Australia 2016247742<br>• Canada 2982254<br>• Europe 16724446.6<br>• US 15/565,497<br><br>**SPEX PCT 4, Claim 1**. A method of removing material from a target, the method comprising the steps of:<br><br>providing **a tool**, the tool having at least one propellant source,<br><br>**igniting at least one of the propellant source(s)** to form a **combustion zone**, pressurizing the tool to a pressure higher than the environmental pressure, and<br><br>**directing combustion products** generated at the combustion zone **along at least one tool flow path, the tool flow path(s) being selectively openable or closable,** such that upon **exiting the tool flow path(s) the combustion products interact with a target**, the interaction causing **material to be removed from the target**. | **MCR U.S. Patent No. 6186226 (MCR-003); Filed: May 4, 1999 and Issued February 13, 2001, having a title of "Borehole Conduit Cutting Apparatus." (US6186226 is included in Appendix A of the 2011 and 2014 License Agreements):**<br><br>**Claim 1**. An apparatus for use for severing a metal conduit disposed in a borehole extending downward into the earth, comprising:<br>a body adapted to be lowered into the metal conduit to be severed,<br>**said body comprising** a surrounding wall defining an elongated chamber with a central axis and having a lower portion, **an intermediate portion,** and an upper portion,<br>said lower portion defining a cavity with a plurality of apertures extending through said wall in a given plane at angularly spaced apart positions located 360° around said axis for providing passages from said cavity to the outside of said wall,<br>**a combustible charge located in said intermediate portion**,<br>a movable seal means located in said cavity above said apertures next to and below said combustible charge, and<br>an ignition means coupled to said upper portion for **igniting said combustible charge for creating a flame and hot combustion products** for moving said movable seal means in said cavity below said apertures **for passage of said flame and hot combustion products into said cavity and out of said apertures for severing the surrounding metal conduit**. |

WO 2016/166531            PCT/GB2016/051032

## CLAIMS

1. A method of removing material from a target, the method comprising the steps of:

    providing a tool, the tool having at least one propellant source,

5    igniting at least one of the propellant source(s) to form a combustion zone,

    pressurising the tool to a pressure higher than the environmental pressure, and

    directing combustion products generated at the combustion zone along at least one tool flow path, the tool flow path(s) being selectively openable or closable,

10    such that upon exiting the tool flow path(s) the combustion products interact with a target, the interaction causing material to be removed from the target.

2. The method of claim 1, wherein material is removed from the target by ablation, erosion, impacting, cleaning and/or transmitting heat to the target.

3. The method of claim 2, wherein ablation, erosion, impacting and/or

15 cleaning the target and/or transmitting heat to the target removes material from the target by severing, crushing, vibrating, skimming, applying a pressure to, hitting the target, propelling or moving and/or melting the target.

4. The method of, wherein the combustion products create a chemical reaction in the target.

20 5. The method of any preceding claim, wherein the step of directing combustion products generated at the combustion zone along at least one tool flow path, is at least partially continuous.

6. The method of any preceding claim, wherein the flow path defines a flow path profile, the flow path profile being configured to create a change in a

25 combustion product parameter.

19

---

US 6,186,226 B1

**3**

of the lower chamber portion 341L by way of the apertures 351 and to the pipe 323 to cut or sever the pipe 323 at the level of the apertures.

The aperture 353 acts as a damper to allow the liquid below the seal member 361 to slowly flow out into the borehole and hence prevents the seal member 361 from slamming open against the bottom wall 345, 349B which may otherwise damage the bottom of the apparatus.

After the pipe has been severed, the apparatus 321 is removed from the borehole, allowing the upper portion of the drill pipe to be removed and the lower portion of the drill pipe then drilled out in the event that the drill pipe 323 had become stuck in the borehole.

In one embodiment, the outside diameter of section 331B may be 1 inch with 15 equally spaced apart apertures 351 around the axis 343 formed through the wall of member with each apertures 351 having a diameter of about 0.060. It is to be understood, however, that these specifications may vary.

The apparatus 321 also may be used to cut or sever conventional metal production tubing, metal coiled tubing, or metal casing in a borehole for remedial purposes. In FIG. 3, the apparatus 321 is employed to cut or sever metal casing 331 located in the borehole 325.

In FIG. 1, there is shown an anchor stud 301 connected to the bottom wall 345 of the apparatus to which a pressure balance anchor assembly may be coupled which may be of the type disclosed in U.S. Pat. No. 5,435,394. Referring to FIG. 4, there is illustrated an anchor 303 coupled to the anchor stud 301. The anchor 303 has an aperture 305 for receiving the stud 301 and set-screw holes 307 for receiving set screws 309 for coupling the anchor 303 to the stud 301.

In another embodiment, a slickline battery firing system may be employed in lieu of the electric line firing system to energize the ignition means 44. This system comprises a slickline cable connection for supporting the modified apparatus 321 and which is connected to a pressure firing head. The pressure firing head comprises a metal piston having a larger diameter head with a smaller diameter rod end extending downward from the bottom of the larger diameter head. The piston is slidably located in a hollow cylinder. A spring surrounding the rod is employed to provide upward pressure against the under side of the larger diameter head. The spring is adjustable to allow for hydrostatic compensation of well fluids so that the system does not fire at bottom hole pressure. When the piston is moved downward, the lower end of the rod will make contact with an electrical lead from the battery pack and electrical lead from one side of the ignition means (the minus terminal of the battery pack and the other side of the ignition means 44 are grounded) to discharge current to the ignition means to ignite the combustible charges 78. Fluid ports extend through the wall of the cylinder above the larger diameter piston head. When the borehole member is in place in the borehole ready to cut the metal conduit, a pump at the surface increases the fluid pressure in the conduit and moves the piston downward against the pressure of the spring to allow the rod to make electrical contact with the leads to fire the combustible charges 78.

In still another embodiment, a slickline percussion firing system may be comprised in lieu of the electric line firing system to ignite the charges 78. This system comprises a slickline cable head connection for supporting the modified apparatus 321 and which is connected to a pressure firing subassembly. The pressure firing subassembly comprises a cylinder having the piston and spring described in connection with the battery firing system. Ports are formed through

**4**

the cylinder wall above the piston. Fluid pressure is increased, to force the piston rod (firing pin) against a lower percussion firing cap which ignites upon impact to ignite the charges 78.

Also a percussion firing system run via coiled tubing, production tubing, or drill pipe may be employed in lieu of the electric firing system to ignite the charges 78. This system comprises coiled tubing for supporting the modified apparatus 321 connected to a connector subassembly which connects to a pressure firing head which comprises a hollow cylinder with a piston located therein and supported by shear pins. The coiled tubing is coupled to the interior of the cylinder at its upper end. The piston has a central flow path extending axially downward from its upper end and then radially outward through the cylinder wall. A firing pin extends from the lower end of the piston. The flow path extends to the coiled tubing to fill with water as the assembly is lowered downhole and also allows for circulation of fluid in running of the assembly. When the apparatus is at the desired cutting depth, a ball is dropped into the tubing which passes to the piston, plugging the flow path allowing an increase in fluid pressure to be achieved in the tubing and upper end of the cylinder which shears the shear pins driving the firing pin into the percussion cap to ignite the charges 78.

What is claimed is:

1. An apparatus for use for severing a metal conduit disposed in a borehole extending downward into the earth, comprising:

    a body adapted to be lowered into the metal conduit to be severed,

    said body comprising a surrounding wall defining an elongated chamber with a central axis and having a lower portion, an intermediate portion, and an upper portion,

    said lower portion defining a cavity with a plurality of apertures extending through said wall in a given plane at angularly spaced apart positions located 360° around said axis for providing passages from said cavity to the outside of said wall,

    a combustible charge located in said intermediate portion,

    a movable seal means located in said cavity above said apertures next to and below said combustible charge, and

    an ignition means coupled to said upper portion for igniting said combustible charge for creating a flame and hot combustion products for moving said movable seal means in said cavity below said apertures for passage of said flame and hot combustion products into said cavity and out of said apertures for severing the surrounding metal conduit.

2. The apparatus of claim 1, wherein:

said combustible charge comprises a pyrotechnic charge.

3. The apparatus of claim 1, wherein:

said combustible charge comprises a plurality of pyrotechnic charges.

4. The apparatus of claim 1, wherein:

said seal means supports said combustible charge in said intermediate portion of said chamber prior to ignition.

5. The apparatus of claim 4, wherein:

said charge comprise a pyrotechnic charge.

6. The apparatus of claim 5, wherein:

said combustible charge comprises a plurality of pyrotechnic charges.

---

| SPEX PCT 4 Application Drawings, Fig. 6: PCT/GB2016/051032: Publication Date: October 20, 2016: | MCR U.S. Patent No. 6186226 (MCR-003); Filed: May 4, 1999 and Issued February 13, 2001 (US6186226 is included in Appendix A of the 2011 and 2014 License Agreements): |
|---|---|
|  **SPEX PCT 4, Fig. 6, Drawing page 6/6.** Propellant source 412 is housed within tool body 416, and ignition mechanism 418 ignites propellant source 412 to create combustion zone 420, inside ignition recess 422 (cavity), for creating combustion products 428. Combustion products 428 are directed into flow paths 430 that narrow into nozzle head 432 having a plurality of nozzles 434 for directing flow of combustion products 428. The flow path 430 is sealed by a | **MCR U.S. Patent No. 6186226:**<br><br>**Claim 1**. An apparatus for use for severing a metal conduit disposed in a borehole extending downward into the earth, comprising:<br><br>     a body adapted to be lowered into the metal conduit to be severed,<br><br>     **said body comprising** a surrounding wall defining **an elongated chamber with a central axis** and **having a lower portion, an intermediate portion, and an upper portion,**<br><br>     said **lower portion defining a cavity with a plurality of apertures extending through said wall** in a given plane at angularly spaced apart positions located 360° around said axis for **providing passages from said cavity to the outside of said wall**,<br><br>     **a combustible charge located in said intermediate portion**, |

| | |
|---|---|
| frustoconical seal 440 that prevents combustion products from exiting the tool body and nozzles 434 until the seal is broken/eroded and the flowpath is opened. | **a movable seal means located in said cavity above said apertures next to and below said combustible charge**, and<br><br>**an ignition means** coupled to said upper portion for **igniting said combustible charge for creating a flame and hot combustion products for moving said movable seal means** in said cavity below said apertures **for passage of said flame and hot combustion products** into said cavity and **out of said apertures for severing the surrounding metal conduit**. |
| **SPEX PCT 4, Claim 51**.<br><br>The method of any preceding claim, wherein the method comprises the step of **varying the direction of the combustion products exiting the flow path with respect to the tool.** | **MCR U.S. Patent No. 6186226 (MCR-003), Claim 1:**<br>…said lower portion defining a cavity with **a plurality of apertures extending through said wall in a given plane at angularly spaced apart positions located 360° around said axis for providing passages from said cavity to the outside of said wall**…<br>…an ignition means coupled to said upper portion for igniting said combustible charge for creating a flame and hot combustion products for moving said movable seal means in said cavity below **said apertures for passage of said flame and hot combustion products into said cavity and out of said apertures for severing the surrounding metal conduit.** |

| SPEX PCT 4 Application Drawings, FIG. 3: PCT/GB2016/051032: Publication Date: October 20, 2016: | MCR U.S. Patent No. 6,598,679 Drawings (MCR-004), FIG. 3, Filed September 19, 2001 and Issued July 29, 2003, and MCR U.S. Patent No. 6925,937 (MCR-004:CIP), Issued August 9, 2005: |
|---|---|
|  |  |
| SPEX PCT 4, FIG. 3, Drawing Page 3/6 of the 6 pages of drawings contained in the SPEX PCT 4 Application.<br><br>Propellant Source 112 includes a solid propellant 152 housed within the body of a tool 110. The tool includes a deflector plate | MCR US Patent 6,598,679, titled "Radial Cutting Torch With Mixing Cavity and Method." (See FIG. 3 on page 3/7 of the Drawings), and MCR U.S. Patent No. 6925,937, titled "Thermal Generator For Downhole Tools And Methods of Igniting And Assembly." (See FIG. 3 on page 3/11).<br><br>There are significantly similar paths taken by the combustion materials, as shown in both Figures (i.e., SPEX |

154 (diverter), which assists in deflecting the flow of the combustion products 128 through the nozzles 134.

FIG. 3 and MCR FIG. 3). This is especially pertinent because this type of flow path (*i.e.*, the **use of nozzles** for **directing the flow path** shown in the FIGs.) **was not possible with the explosive tools that SPEX was using prior to the license agreements with MCR.** In general, you cannot use nozzles, in this type of configuration, as an explosive device. This is a nozzle design for a thermite tool (deflagration reaction), and MCR's US6598679B, US6186226 and US6925937 Patents are listed in Appendix A of the 2011 and the 2014 License Agreements.

| SPEX PCT 4 Application Drawings, Fig. 6: PCT/GB2016/051032: Publication Date: October 20, 2016: | MCR U.S. Patent No. 6,598,679 Drawings (MCR-004), FIG. 3, Filed September 19, 2001 and Issued July 29, 2003, and MCR U.S. Patent No. 6925,937 (MCR-004:CIP), Issued August 9, 2005: |
|---|---|
|  |  |
| **SPEX PCT 4, FIG. 6, Drawing page 6/6:** Propellant source 142 is housed within a tool body 416, and ignition mechanism 418 ignites propellant source 412 to create combustion zone 420, inside an ignition recess 422, for creating combustion products 428. | **MCR U.S. Patent No. 6,598,679, FIG. 3 and MCR U.S. Patent No. 6925,937, FIG. 3:** Combustible material 75, housed within a tool body, is ignited to generate combustion products that flow through openings |

| | |
|---|---|
| The combustion products 428 are directed into flow paths 430 that narrow into a nozzle head 432 having a plurality of nozzles 434 for directing the flow of the combustion products 428. The flow path 430 is sealed by a frustoconical seal 440, which prevents the combustion products from exiting the tool body and nozzles 434 until the seal is broken or eroded and the flowpath is opened. | 135 into a chamber or cavity (ignition recess) 153, for directing the flow of a flame and combustion products through aligned hole sets (nozzle flow paths) 225, into an annular chamber (narrowing of flow paths into a nozzle head) and out through nozzles (gaps) 243. (See Col. 4, ll. 16-41 of the '679 Patent). (MCR's US6598679B and US6925937 are included in Appendix A of the 2011 and 2014 License Agreements). |
| **SPEX PCT 4:**<br>**PCT/GB2016/051032:**<br>**Publication Date: October 20, 2016:** | **MCR U.S. Patent No. 6186226 (MCR-003):** |
| **SPEX PCT 4, Claim 73**.<br>A tool for removing material from a target, the **tool comprising: at least one propellant source,** | **Claim 1:**<br>…a body adapted to be lowered into the metal conduit to be severed, **said body comprising** a surrounding wall defining an elongated chamber with a central axis and having a lower portion, **an intermediate portion**, and an upper portion,…<br><br>…**a combustible charge located in said intermediate portion**… |
| at least one **mechanism for igniting the propellant source(s),** and | … **an ignition means** coupled to said upper portion for **igniting said combustible charge for creating a flame and hot combustion products**… |
| **at least one tool flow path**, the **tool flow path(s) being selectively openable or closable**; wherein, **upon ignition, at least one of the propellant source(s) combusts to form a** | …**said lower portion defining a cavity with a plurality of apertures extending through said wall** in a given plane at angularly spaced apart positions located 360° |

| | |
|---|---|
| **combustion zone releasing combustion products** which pressurize the tool to a pressure higher than the environmental pressure, the **combustion products, in use, flowing out of the tool along the tool flow path(s) towards a target from which material is to be removed.** | around said axis **for providing passages from said cavity to the outside of said wall**…<br><br>…**an ignition means coupled to said upper portion for igniting said combustible charge for creating a flame and hot combustion products for moving said movable seal means in said cavity below said apertures for passage of said flame and hot combustion products into said cavity and out of said apertures for severing the surrounding metal conduit**. |
| **SPEX PCT 4, Claim 74**. A method of initiating a change in a target, the method comprising the steps of:<br><br>providing **at least one propellant source**, | **MCR U.S. Patent No. 6186226 (MCR-003):**<br>**Claim 1:**<br>    …a body adapted to be lowered into the metal conduit to be severed,<br>        **said body comprising** a surrounding wall defining an elongated chamber with a central axis and having a lower portion, **an intermediate portion**, and an upper portion,…<br><br>…**a combustible charge located in said intermediate portion**… |
| **igniting at least one of the propellant source(s) to form a combustion zone**, and | …**an ignition means** coupled to said upper portion for **igniting said combustible charge for creating a flame and hot combustion products**… |
| **directing combustion products** generated at the combustion zone **along at least one flow path, such that upon exiting the** | …said lower portion defining a cavity with **a plurality of apertures extending through said wall** in a given plane at |

| | |
|---|---|
| **flow path(s) the combustion products interact with a target, the interaction causing a change in the target.** | angularly spaced apart positions located 360° around said axis **for providing passages from said cavity to the outside of said wall**… <br><br> …**an ignition means** coupled to said upper portion **for igniting said combustible charge for creating a flame and hot combustion products** for moving said movable seal means in said cavity below said apertures **for passage of said flame and hot combustion products into said cavity and out of said apertures for severing the surrounding metal conduit.** |
| **SPEX PCT 4, Claim 56:** The method of any preceding claim, wherein the method comprises the step of deflecting the generated combustion products prior to exiting the flow path. <br><br> **SPEX PCT 4, Claim 57:** The method of claim 56, wherein the combustion products are deflected by a deflector. | **MCR US Patent No. 6598679 (MCR-004)**: <br><br> Claims 1, 3, 4, and 8 include "a nozzle and a diverter," wherein the diverter is used as deflector for deflecting the flow of the flame and combustion products. |

118.   SPEX 4A, 4B and 4C include, among other things, nozzle patterns and configurations for directing a flow of a stream of combustion products to cut or perforate downhole tubulars or other equipment. This technology, including the nozzle patterns, configurations and flow paths, is the same as or substantially similar to MCR's Licensed Technology, including MCR's nozzle patterns and configurations and flow paths shown and described in MCR's Licensed Patents and contained within MCR's Licensed Technology.

119.   SPEX PCT 5 includes, among other things, embodiments of a tool for manipulating a tubular (cutting or removing sections) that includes a propellant, an ignition mechanism and at least one modifying agent (a metal). Upon ignition, the propellant, comprising the modifying agent, is adapted to deflagrate, creating a stream of combustion products that are directed to flow away from the outer surface of the propellant source and through nozzles to impact the tubular. This technology is taught and disclosed by, and directly related to, MCR's Licensed Patents, and substantially similar to MCR's Licensed Technology.

120.   SPEX 5A includes, among other things, embodiments relating to a propellant and modifying agent, wherein an "ignition mechanism causes the propellant to deflagrate rather than explode, producing a high pressure stream of products." The propellant may be provided in a single state and as a solid, and the modifying agent can be a metal. The high-pressure stream of products flow through

nozzles to impact the targeted tubular. This technology is taught and disclosed by, and directly related to, MCR's Licensed Patents, and substantially similar to MCR's Licensed Technology.

121.  SPEX PCT 6 includes, among other things, embodiments of a tool that includes an ignition mechanism for igniting a propellant, and a propellant comprised of a metal oxidizer and particles of a metal modifying agent.  When ignited, the propellant is operable to deflagrate, creating a stream of combustion products that are directed through various outlets (nozzles) and towards a tubular to be manipulated. This technology is taught and disclosed by, and directly related to, MCR's Licensed Patents, and substantially similar to MCR's Licensed Technology.

122.  SPEX 7 includes, among other things, embodiments of a tool that includes a propellant comprised of a metal oxidizer and particles of a metal modifying agent. When ignited, the propellant is operable to deflagrate, creating a stream of combustion products that are directed through various outlets (nozzles) and towards a tubular to be manipulated. Control of the propellant may be achieved by controlling the constitution of the propellant or changing it into a molten plasma, which may include the introduction of oxygen. This technology is taught and disclosed by, and directly related to, MCR's Licensed Patents, and substantially similar to MCR's Licensed Technology.

**J.    SPEX Services made false representations and breached numerous provisions of the 2011 License Agreement.**

123.    SPEX Services breached the 2011 License Agreement by falsely representing that it was not in the business of designing or developing thermite-based products, technology substantially similar to MCR's Licensed Products or Licensed Technology, or any competing technology, and that it had no intention of entering into any such business.[41] Based on the following, it is clear that SPEX Services was either actively engaged in such business or had an intention of entering into such business at the time it entered into the 2011 License Agreement:

- The filing of the SPEX Patents by SPEX Services, both directly and by and through its Directors;

- The content of the SPEX Patents, which are derived from MCR's Tools and intellectual property;

- The assignment of the SPEX Patents from SPEX Services' Directors to SPEX Services, and from SPEX Services to SPEX Engineering UK; and

- The subsequent development of competing tools and products.[42]

124.    SPEX Services made this representation knowing it to be false and with the intention that MCR act and rely on it. In addition, SPEX Services made this false

---

[41] Exhibit A at §§ 2.03, 2.05.
[42] According to documents produced by the SPEX Defendants, they are continuing to develop competing tools and products. However, these documents have been designated Attorney's Eyes Only.

representation for the consideration bargained for in the 2011 License Agreement, including but not limited to access to and license to use MCR's valuable Tools and intellectual property in accordance with the terms of the agreement.

125.   SPEX Services breached the 2011 License Agreement by engaging and assisting in the testing, modifying, reverse engineering, and development of MCR's Tools and intellectual property, both directly and by cooperation with a third party.[43] Specifically, SPEX Services (both directly and by and through its Directors) tested, modified, reverse engineered, and developed MCR's Tools to develop competing tools and products and for use in the SPEX Patents, which were later assigned to SPEX Services. In addition, SPEX Services assisted and cooperated with SPEX Engineering UK and its Directors in testing, modifying, reverse engineering, and developing MCR's Tools and intellectual property by, among other things, assigning the SPEX Patents to SPEX Engineering UK.

126.   Moreover, because SPEX Services and the other SPEX Defendants share common officers and Directors, the knowledge obtained by SPEX Services' Directors (including Oag) through the testing, modifying, reverse engineering, and development of MCR's Tools and intellectual property on behalf of SPEX Services, was imparted on the other SPEX Defendants and their Directors. These acts further establish cooperation with a third party in violation of the 2011 License Agreement.

---

[43] Exhibit A at § 3.03.

127.    SPEX Services breached its agreement to use MCR's Tools and Licensed Technology only in strict accordance with the terms of the 2011 License Agreement.[44] In fact, SPEX Services used MCR's Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools, to: (1) develop and design competing tools and products; (2) test, modify, reverse engineer, improve upon and develop MCR's Tools and intellectual property; (3) file the SPEX Patents through its Directors and affiliates in an attempt to rebrand MCR's technology as its own; and (4) cooperate with third parties in performing these wrongful acts.

128.    SPEX Services breached its agreement to provide MCR with prompt notice of any development of, and all information necessary to, practice any Improvement to MCR's intellectual property.[45] Instead of complying with this provision, SPEX Services concealed the improvements and modifications it made to MCR's Tools and intellectual property along with the design and development of competing tools and products. SPEX Services concealed this information from MCR in order to allow its affiliates and Directors to use the information to develop competing tools and products and file the SPEX Patents, which were later assigned to SPEX Services.

---

[44] *Id.*
[45] *Id.* at § 3.04.

129.   SPEX Services breached its agreement that all rights, title and interest to any Improvements to MCR's intellectual property, specifically including MCR's Licensed Patents and Licensed Technology, shall be exclusively owned by MCR.[46] SPEX Services concealed the improvements and modifications it made to MCR's Tools and intellectual property along with the design and development of competing tools and products. In addition, SPEX Services (by and through its Directors) filed the SPEX Patents, seeking protection and ownership of the Improvements in direct violation of the 2011 License Agreement. SPEX Services' Directors then assigned the SPEX Patents to SPEX Services, instead of MCR. Subsequently, SPEX Services assigned the SPEX Patents to SPEX Engineering UK, instead of MCR. SPEX Services, its affiliates and Oag now claim that the SPEX Patents are not Improvements, as that term is defined in the 2011 and 2014 License Agreements. In addition, the SPEX Defendants claim ownership of the SPEX Patents and have refused to assign or convey them to MCR.

130.   SPEX Services breached its agreement to assign or convey to MCR its entire right, title and interest to all Improvements, including all applicable intellectual property rights related to any Improvements.[47] SPEX Services concealed the improvements and modifications it made to MCR's Tools and intellectual

---

[46] *Id.*
[47] *Id.*

property along with the design and development of competing tools and products. In addition, SPEX Services (by and through its Directors) filed the SPEX Patents, seeking protection and ownership of the Improvements in direct violation of the 2011 License Agreement. SPEX Services' Directors then assigned the SPEX Patents to SPEX Services, instead of MCR. Subsequently, SPEX Services assigned the SPEX Patents to SPEX Engineering UK, instead of MCR. SPEX Services, its affiliates and Oag now claim that the SPEX Patents are not Improvements, as that term is defined in the 2011 and 2014 License Agreements. In addition, the SPEX Defendants claim ownership of the SPEX Patents and have refused to assign or convey them to MCR.

131.    SPEX Services breached the 2011 License Agreement by failing to promptly notify MCR of any third-party infringement or threatened infringement of MCR's Licensed Patents or Licensed Technology.[48] Although SPEX Services was aware of (and complicit in): (1) the filing and assignment of the SPEX Patents; (2) the testing, modifying, reverse engineering, and development of MCR's Tools and intellectual property; (3) the development of competing tools and products; and (4) the theft of MCR's trade secrets, it failed to notify MCR of such infringement or threatened infringement. SPEX Services also failed to notify MCR of the third-party

---

[48] *Id*. at § 5.01.

infringement or threatened infringement by SPEX Engineering UK and its Directors, including Oag.

132.   SPEX Services breached its agreement to protect MCR's Confidential Information, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools, and to use it only for purposes of the 2011 License Agreement.[49] SPEX Services disclosed MCR's Confidential Information to its Directors, who then used the information to test, modify, reverse engineer, and improve upon MCR's Tools and intellectual property for the design and development of competing tools and technology. SPEX Services' Directors also used MCR's Confidential Information in applying for the SPEX Patents. Finally, SPEX Services disclosed MCR's Confidential Information to SPEX Engineering UK and its Directors, including Oag, who then used the information to test, modify, reverse engineer, and improve upon MCR's Tools and intellectual property for the design and development of competing tools and technology and for use in applying for the SPEX Patents.

## K.   SPEX Offshore and Oag made false representations and SPEX Offshore breached numerous provisions of the 2014 License Agreement and 2015 Extension.

133.   SPEX Offshore breached the 2014 License Agreement and 2015 Extension by falsely representing that it had not invented, designed, developed, or

---

[49] *Id*. at § 8.01.

improved (nor contributed to inventing, designing, developing or improving) any technology or products for the perforating, consuming or cutting of downhole pipes using any part of MCR's Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools.[50] In fact, SPEX Offshore (by and through its Directors and affiliates) was in the process of developing competing tools and technology derived from MCR's Tools and intellectual property, which SPEX Services (and its common officers and Directors) had gained access to through the 2011 License Agreement. At the time SPEX Offshore entered into the 2014 License Agreement and 2015 Extension, SPEX Offshore and Oag knew that SPEX Offshore was in the process of developing competing tools and technology and contributed to the development of competing tools and technology by its Directors and affiliates, including but not limited to SPEX Engineering UK and Oag.

134.    SPEX Offshore further breached the 2014 License Agreement and 2015 Extension by falsely representing that it was not aware of any person or entity having invented, designed, developed or improved (nor contributed to inventing, designing, developing or improving) any technology or products for the perforating, consuming or cutting of downhole pipes using any part of MCR's Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid

---

[50] Exhibit B at §§ 2.03, 2.05.

combustible charge-based tools.[51] At the very least, SPEX Offshore knew of the activities of SPEX Services and its officers and Directors, including their: (1) development of competing tools and products; and (2) testing, modifying, reverse engineering, and development of MCR's Tools and intellectual property and improvements to MCR's Tools and intellectual property.

135. SPEX Offshore breached the 2014 License Agreement and 2015 Extension by falsely representing that it was not in the business of designing or developing thermite-based products or technology substantially similar to or competitive with MCR's Licensed Products and Licensed Technology, and that it had no intention of entering into any such business.[52] In fact, SPEX Offshore (by and through its Directors and affiliates) were in the process of developing competing tools and products derived from MCR's Tools and intellectual property, which SPEX Services and Oag had gained access to through the 2011 License Agreement. SPEX Offshore and Oag knew that SPEX Offshore was in the process of developing competing tools and products and contributed to the development of competing tools and products by its Directors and affiliates, including but not limited to SPEX Engineering UK and Oag. Alternatively, SPEX Offshore and Oag knew that SPEX Offshore intended to enter into the business of designing or developing thermite-

---

[51] *Id.* at § 2.05.
[52] *Id.*

based products or technology substantially similar to or competitive with MCR's Licensed Products and Licensed Technology.

136.   SPEX Offshore and Oag made these representations knowing them to be false and with the intention that MCR act and rely on them. SPEX Offshore and Oag made these false representations for the consideration bargained for in the 2014 License Agreement and 2015 Extension, including but not limited to access and license to use MCR's valuable Tools and intellectual property in accordance with the terms of the agreement.

137.   SPEX Offshore breached the 2014 License Agreement and 2015 Extension by engaging and assisting in the testing, modifying, reverse engineering, and development of MCR's Tools and intellectual property, both directly and by cooperation with a third party.[53] More specifically, SPEX Offshore engaged or assisted its affiliates and Directors, including but not limited to Oag, SPEX Services, and SPEX Engineering UK, in the testing, modifying, reverse engineering, and development of MCR's Tools. Specifically, SPEX Offshore (by and through its Directors) tested, modified, reverse engineered, and developed MCR's Tools for use in the SPEX Patents. SPEX Offshore also assisted and cooperated with SPEX Engineering UK, and its Directors, in testing, modifying, reverse engineering, and improving MCR's Tools and intellectual property to develop competing tools and

---

[53] *Id*. at § 3.03.

products and for use in the SPEX Patents.

138.   Moreover, because SPEX Offshore and the other SPEX Defendants share common officers and Directors, the knowledge obtained by SPEX Offshore's Directors through the testing, modifying, reverse engineering, and developing MCR's Tools and intellectual property on behalf of SPEX Offshore, was imparted on the other SPEX Defendants and their Directors. These acts further establish cooperation with a third party in violation of the 2014 License Agreement and 2015 Extension.

139.   SPEX Offshore breached its agreement to use MCR's Tools and Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools, only in strict accordance with the terms of the agreement.[54] In fact, SPEX Offshore and Oag used MCR's Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools, to: (1) develop and design competing tools and products; (2) test, modify, reverse engineer, improve on and develop MCR's Tools and intellectual property; (3) file the SPEX Patents through its Directors and affiliates in an attempt to rebrand MCR's technology as its own; and (4) cooperate with third parties in performing these wrongful acts.

---

[54] *Id.*

140.   SPEX Offshore breached its agreement to provide MCR with prompt notice of any development of, and all information necessary to, practice any Improvement to MCR's intellectual property.[55] Instead of complying with this provision, SPEX Offshore concealed the improvements and modifications it had made to MCR's Tools along with its design and development of competing tools and products. SPEX Offshore concealed this information from MCR in order to allow its affiliates and Directors to use the information to develop competing tools and products and to file the SPEX Patents.

141.   SPEX Offshore breached its agreement that all rights, title and interest to any Improvements to MCR's intellectual property, specifically including MCR's Licensed Patents and trade secrets, shall be exclusively owned by MCR.[56] SPEX Offshore concealed the improvements and modifications it made to MCR's Tools along with the development of competing tools and products. In addition, SPEX Offshore (by and through its affiliates and Directors) filed the SPEX Patents, seeking protection and ownership of the Improvements in direct violation of the 2014 License Agreement. SPEX Offshore, its affiliates and Oag now claim that the SPEX Patents are not Improvements, as that term is defined in the 2011 and 2014 License Agreements. In addition, the SPEX Defendants claim ownership of the SPEX

---

[55] *Id*. at § 3.04.
[56] *Id*.

Patents and have refused to assign or convey them to MCR.

142.   SPEX Offshore breached its agreement to assign and convey to MCR its entire right, title and interest to all Improvements, if any, including all applicable intellectual property rights related to any Improvements.[57] SPEX Offshore, its affiliates and Oag now claim that the SPEX Patents are not Improvements, as that term is defined in the 2011 and 2014 License Agreements. In addition, the SPEX Defendants claim ownership of the SPEX Patents and have refused to assign or convey them to MCR.

143.   SPEX Offshore breached the 2014 License Agreement by failing to promptly notify MCR of any third-party infringement or threatened infringement of MCR's Licensed Patents or Licensed Technology.[58] Although SPEX Offshore was aware of (and complicit in): (1) the filing and assignment of the SPEX Patents; (2) the testing, modifying, reverse engineering, and development of MCR's Tools and intellectual property; (3) the development of competing tools and products; and (4) the theft of MCR's trade secrets, it failed to notify MCR of such infringement or threatened infringement. SPEX Offshore also failed to notify MCR of the third-party infringement or threatened infringement by SPEX Services, SPEX Engineering UK and their Directors, including Oag.

---

[57] *Id.*
[58] *Id.* at § 5.01.

144.    SPEX Offshore breached its agreement to protect MCR's Confidential Information, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools, and to use it only for purposes of the 2014 License Agreement.[59] SPEX Offshore disclosed MCR's trade secrets to its Directors and affiliates, including but not limited to SPEX Engineering UK, for use in filing the SPEX Patents and developing competing tools and products.

145.    SPEX Offshore breached the 2014 License Agreement by failing to cease all activities concerning and all use of MCR's Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools, upon expiration of the agreement, and to return the Licensed Technology to MCR.[60] SPEX Offshore (by and through its Directors and affiliates, including Oag) continues to use MCR's Licensed Technology to develop competing tools and products and in prosecuting the SPEX Patents.

146.    In addition to the breaches described above, former SPEX Offshore employee Robert McKay recently confirmed that SPEX Offshore violated and continues to violate the 2014 License Agreement and 2015 Extension. Based on a conversation with SPEX representative, McKay learned that the SPEX Defendants are currently developing a non-explosive cutter to cut pipe downhole. In other words,

---

[59] *Id*. at § 6.01.
[60] *Id*. at § 7.05.

the SPEX Defendants are currently attempting to replicate MCR's Tools and intellectual property through development of competing tools and products.

147.   Finally, MCR has learned that representatives of the SPEX Defendants recently met at SPEX Group's office in Houston, Texas to finalize the development of a thermite-based or solid combustible charge-based tool or product, which they plan to launch in 2018. Upon information and belief, the SPEX Defendants sent agents to Texas and are utilizing a research center in Texas to assist in the testing and development of these competing tools or products.[61]

## L.   Numerous facts demonstrate unity between the SPEX Defendants and their utter disregard for the corporate form.

### The SPEX Defendants share common stock ownership.

148.   When SPEX Offshore was incorporated, it listed SPEX Services as its sole initial shareholder. All of SPEX Offshore's annual returns list SPEX Services as its sole shareholder.

149.   In SPEX Offshore UK's 2013, 2014, 2015 and 2016 annual returns, it disclosed SPEX Services as its sole shareholder.[62] SPEX Offshore UK did not disclose any new assets in its financial statements until the end of 2016. According to SPEX Offshore UK's 2016 financial statement, its immediate and ultimate parent company is SPEX Holdings.

---

[61] Based on documents produced by the SPEX Defendants, MCR has discovered the identity and location of the research center. However, these documents have been designated Attorney's Eyes Only.
[62] SPEX Offshore UK was formerly known as Hot Forge, Ltd. until its name change on June 30, 2016.

150.   On May 5, 2016, SPEX Services transferred its 100% ownership of SPEX Offshore UK to SPEX Holdings.

151.   In its Annual Return dated February 2, 2016, SPEX Engineering UK listed SPEX Services as its shareholder.

152.   On or about April 25, 2016, SPEX Holdings became the parent company of SPEX Engineering UK "following a share for share transfer" with SPEX Services.

153.   In its 2016 annual report, SPEX Holdings disclosed that it owned 100% of SPEX Engineering UK, SPEX Offshore UK, and SPEX Engineering, Ltd. In that same return, SPEX Holdings also disclosed that it had disposed of its 100% ownership of SPEX Offshore, SPEX Services, and SPEX Production, Ltd.

154.   When SPEX Corporate Holdings was incorporated, it listed SPEX Holdings as an initial shareholder. SPEX Holdings is the parent/shareholder of SPEX Corporate Holdings, SPEX Engineering UK and SPEX Offshore UK. In addition, SPEX Engineering UK is the parent/shareholder of SPEX Group.

155.   In SPEX Holdings' March 3, 2017 confirmation statement, Oag, Strachan and Younger are disclosed as shareholders. In addition, Oag is listed as a Person with Significant Control.

156.   In SPEX Holdings' March 5, 2018, confirmation statement, Oag, Strachan, Younger, Johnston and Mahjoub are disclosed as shareholders.

**The SPEX Defendants share common officers and Directors.**

157.   At relevant times throughout this litigation, there was complete and total overlap between the officers and Directors of the SPEX Defendants:

| | Jamie Oag | Nadir Mahjoub | Ryan Strachan |
|---|---|---|---|
| **SPEX Group** | Chief Executive Officer<br><br>President | Chief Executive Officer | Manager<br><br>Secretary |
| **SPEX Services** | Director | Director | Director |
| **SPEX Offshore** | Chief Executive Officer<br><br>Director | Director | Director |
| **SPEX Engineering UK** | Chief Executive Officer<br><br>Director | Director | Director |
| **SPEX Offshore UK** | Chief Executive Officer<br><br>Director | Director | Director |
| **SPEX Holdings** | Director | Director | Director |
| **SPEX Corporate Holdings** | Director | Director | Director |

158. In addition, Oag, Mahjoub and Strachan are Directors of all other entities in the SPEX corporate enterprise, including but not limited to SPEX Engineering, Ltd., SPEX Oil and Gas, Ltd., SPEX Oilfield, Ltd. and SPEX Saudi Arabia, LLC.

**The SPEX Defendants share financial statements.**

159. On June 12, 2014, SPEX Services filed its "Annual Report and Consolidated Financial Statements for the Year Ended 31 December 2013." In the corporate registration records, it is labeled as "Group of companies' accounts made up to 31 December 2013."

160. Likewise, on June 12, 2014, SPEX Offshore filed the same document — SPEX Services' "Annual Report and Consolidated Financial Statements for the Year Ended 31 December 2013." In the corporate registration records, it is labeled as "Consolidated accounts of parent company for subsidiary company period ending 31/12/13."

161. On October 1, 2015, SPEX Services filed its "Annual Report for the Year Ended 31 December 2014." In the corporate registration records, it is labeled as "Group of companies' accounts made up to 31 December 2014." The report includes SPEX Services' consolidated financial statements.

162. Likewise, on October 1, 2015, SPEX Offshore filed the same document — SPEX Services' "Annual Report for the Year Ended 31 December 2014." In the

corporate registration records, it is labeled as "Consolidated accounts of parent company for subsidiary company period ending 31/12/14."

163.   On September 13, 2016, SPEX Services filed its "Annual Report and Financial Statements for the Year Ended 31 December 2015." In the corporate registration records, it is labeled as "Group of companies' accounts made up to 31 December 2015."

164.   Likewise, on September 16, 2016, SPEX Engineering UK filed the same document — SPEX Services' "Annual Report for the Year Ended 31 December 2015." In the corporate registration records, it is labeled as "Consolidated accounts of parent company for subsidiary company period ending 31/12/15."

165.   According to SPEX Offshore UK's 2016 financial statement, its statements are consolidated into the financial statements of SPEX Holdings.

**The SPEX Defendants' corporate email practice further demonstrates a blending of identities and disregard of the separation between corporate entities.**

166.   A mere cursory review of the SPEX Defendants' email practice, both internally and with MCR, demonstrates unity between the SPEX Defendants. It also demonstrates that their daily operations are not kept separate between and among affiliates.

167.   For example, on April 25, 2016, Barry Chapman, Operations Director of SPEX Offshore, sent an email to MCR regarding setting up a meeting between

MCR, Oag and Mahjoub. Chapman sent the email from a SPEX Group email address (barry.chapman@spex-group.com) to other SPEX Group employees, along with JJ Welsh, a SPEX Engineering UK employee, at his SPEX Engineering UK email address (jj.welsh@spex-engineering.com).

168.    As a second example, on April 25, 2016, Mahjoub sent an internal email from his First Organization email address (nadir_mahjoubf4f@first_organization.com) to other SPEX Group employees regarding "MCR license."[63] The signature block on Mahjoub's email from his First Organization email account states his title as Chief Operating Officer of SPEX Group.

169.    As a third example, on June 3, 2016, Chapman sent an email to MCR and SPEX Group employees regarding "Return of MCR confidential information." Although Chapman sent the email from his SPEX Group email address, the signature block states his title as Operations Director of SPEX Offshore (licensee to the 2014 License Agreement and 2015 Extension). SPEX Group employee Steven McPhee, Logistics and Materials Coordinator of SPEX Holdings, responded to Chapman's email confirming delivery details.

170.    As a fourth example, on May 17, 2016, SPEX Group employee Craig Lowe sent an email to MCR regarding "our obligations to our current license with

---

[63] SPEX Offshore was dissolved into First Organization.

MCR…" Lowe's signature block states his title as Global Operations Manager of SPEX Offshore. Although the email pertained solely to SPEX Offshore's alleged fulfillment of certain licensee obligations to MCR, Lowe used his SPEX Group email address (craig.lowe@spex-group.com) and copied four other SPEX Group employees with SPEX Group email addresses.

171.  As a fifth example, in a string of emails between July 26, 2016 and August 18, 2016, several SPEX Group and SPEX Engineering UK employees discuss the return of MCR inventory pursuant to the obligations set forth in the 2014 License Agreement and 2015 Extension between MCR and SPEX Offshore. However, no SPEX Offshore employee email addresses are included in the email string. Moreover, SPEX Group employee Andy Eaton's email address changes from andy.eaton@spex-group.com to andy.eaton@spex-engineering.com within the same email string.

172.  As a final example, on April 27, 2017, Chapman used his SPEX Offshore email address (barry.chapman@spex-offshore.com) instead of his SPEX Group email address to send an email regarding "MCR Casing Removal Tool Patent" to SPEX Engineering UK employee John Fox (john.fox@spex-engineering.com) and SPEX Group employee Andrew Pettitt (andrew.pettitt@spex-group.com).

173.    Once discovery continues, MCR will support these contentions, allegations and claims with additional detailed facts.

174.    MCR pleads all claims herein in the alternative.

**M.    Defendants gathered a web of agents to sabotage MCR's business throughout the world and used American administrative agencies as pawns in their anti-competitive, illegal, and tortious agenda.**

175.    MCR has recently discovered, through a Freedom of Information Act ("FOIA") request to the Pipeline and Hazardous Materials Safety Administration ("PHMSA"), the American administrative agency which regulates the safety and reliability of hazmat transportation, a pattern of improper actions that Defendants and their co-conspirators orchestrated and conducted throughout the course of this lawsuit. Defendants were not content to steal MCR's intellectual property, they also organized a web of agents to attempt to shut down MCR through the manipulation of American administrative agencies.

176.    Defendants, all of whom are foreign entities and individuals, sought to harm MCR through many different tactics[64] throughout the world,[65] but most maliciously acted as puppet master to an interconnected web of agents to manipulate

---

[64] See all the allegations above.

[65] Defendants, and their co-conspirators/agents, targeted MCR through administrative proceedings in the United States, and, in the same vein, contacted other foreign agencies to coerce reclassification of MCR's thermite-based technology as an explosive. So far—as MCR discovered through similar FOIA-esque requests—Defendants have lobbied governmental bodies in the United Kingdom, Germany, Spain, and Tunisia (and likely others) seeking to reclassify MCR's thermite-based tools as an explosive, with the intent of driving MCR out of business so that SPEX Defendants may profit in MCR's place, all to no avail.

American administrative agencies into sabotaging a homegrown Texas company for foreign Defendants' (and their co-conspirators) financial gain. Upon information and belief, at some point during the labyrinth of litigation against MCR by foreign licensees, Defendants developed a strategy to use agencies such as the United States' Department of Transportation ("DOT") and PHMSA to act as Defendants' puppets and alter the longstanding Hazardous Materials Regulation ("HMR") classification of MCR's thermite-based technology from a Class 4 "non-explosive" categorization to an erroneous Class 1 "explosive" designation.[66] The reclassification of MCR's thermite-based technology was devastating to MCR as a company, causing a wide range of civil and criminal penalties as punishment, and resulting in complete shutdowns and grave monetary loss. This was Defendants' precise intent—to use their web of agents to damage MCR and obtain a competitive advantage in the marketplace.

## CO-CONSPIRATORS

177. Many of the actions taken against MCR were not directly performed by Defendants, but in conjunction with and at their behest through numerous co-conspirators. MCR is still discovering the breadth of Defendants' schemes and their full complement of conspirators and agents, but upon information and belief, the

---

[66] 49 C.F.R. § 173.50.

following is a sampling of the co-conspirators who advanced Defendants' agenda at their request:

178.    Co-conspirator WWS was sued by MCR and WWS, or one of its agents, allowed other conspirators to use confidential documents and information produced by MCR in that litigation to manipulate PHMSA to re-classify MCR's thermite-based technology. Additionally, WWS's retained expert in that case was fellow co-conspirator Speed, and WWS's attorney was co-conspirator Dillard.

179.    Co-conspirator Expro is also in active litigation with MCR regarding breach of its own license agreement for MCR's thermite-based technology. Expro's prior CEO, Graeme Coutts, became a Director of SPEX Group. Expro's attorney is co-conspirator Dillard, and Expro has coordinated with Dillard to use the PHMSA determination to violate its license agreement and cause damages to MCR. The connections between Defendants, other co-conspirators, and Expro establish the incestuous relationship of foreign companies that share the agenda to harm homegrown innovator, MCR.

180.    Co-conspirator Shelley had numerous communications with PHMSA related to the classification of thermite-based technology under the HMR. Upon information and belief, Shelley was being directed by Defendants as he used documentation obtained through the course of WWS litigation to bolster his questioning to PHMSA. Upon information and belief, Shelley was acting in

conjunction with Defendants to achieve the shared goal of shutting down MCR so these foreign-based companies may have more success in the market.

181. Co-conspirator Chang, President of EB, upon information and belief, acted at the behest of Defendants, or one of their agents, when he petitioned PHMSA to more closely review MCR's thermite-based technology and urged PHMSA to reclassify the technology as a Class 1 Explosive. Conveniently, EB is now represented by Defendants' attorney, Dillard, which not only raises a series of ethical issues, but also shows they are both part of the web of agents Defendants gathered to take down MCR.

182. Co-conspirator Speed served as a Senior Consultant for German company, DEKRA, as well as acted as the Technical Director for one of six DOT-approved labs, Energetics Experts, LLC.[67] WWS retained Speed as a paid expert in their case against MCR. Speed used information and documents gathered during the WWS litigation to prepare a report adverse to MCR. Speed's WWS report was attached to Chang's report, which was meant to prompt a PHMSA investigation, as supposed evidence of MCR's thermite-based technology's "explosive" characteristics. When PHMSA later asked Speed to review PHMSA's report on thermite-based tools, Speed did not disclose he was paid to provide "opinions" adverse to MCR. PHMSA relied on Speed's position as one of expertise, trust, and

---

[67] https://www.phmsa.dot.gov/hazmat/energetic-materials-approvals/explosive-test-labs

unbiased perspective, which he betrayed by not disclosing his adverse interest.

183.   Co-conspirator Dillard is counsel of record for Defendants in this litigation. Additionally, Dillard has represented a series of parties with interests adverse to MCR including WWS, Expro Holdings UK 4 Limited ("Expro") (another United Kingdom company involved in active litigation with MCR over breaching MCR's license agreement), and now EB. After Chang's requests and letter to PHMSA did not convince PHSMA to reclassify MCR's thermite-based technology and shut down MCR, Dillard penned his own 11-page missive to PHMSA purporting to be merely a concerned, disinterested third-party. Dillard directly demanded MCR's thermite-based technology be reclassified and encouraged PHMSA to take draconian enforcement action against MCR. Upon information and belief, Dillard used his position as counsel for each of these entities to obtain and disclose privileged and confidential information to PHMSA at Defendants' request.

184.   Co-conspirator Miller is another individual who, at relevant times to this litigation, has represented SPEX Defendants with Dillard. Miller also used information gained during the course of other litigation adverse to MCR to promote Defendants', and other co-conspirators', interests. When Dillard's letter did not get attention at the speed in which the co-conspirators preferred, Miller himself reached out to PHMSA to pressure them to respond, continuing the pressure from the web of conspirators.

185.   Co-conspirator Johnston works for SPEX Group, and potentially other SPEX entities. Johnston was the tip of the spear for Defendants' direct actions and demands to PHMSA. Johnston contacted PHMSA hundreds of times via phone, email, and various video-conferencing platforms throughout the years-long course of each seemingly-unrelated co-conspirator's attempts to urge PHMSA to misclassify MCR's thermite-based technology as an explosive. After Dillard's letter, Johnston maintained pressure on efforts to prosecute and shut down MCR through constant communications, instructions, and recommendations to PHMSA.

186.   Co-conspirator Business Growth Fund is a United Kingdom investment company that has provided funding to advance the schemes of the SPEX hydra by giving venture capital to fuel the maliciously motivated attacks at the behest of SPEX Group.

### SPEX Group official, Johnston, consistently reached out to PHMSA officials feigning concern for thermite-based tools' "misclassification" under the HMR.

187.   Beginning in 2019 at the latest (he may have begun much earlier), SPEX Group official Johnston began an unceasing strategy to influence PHMSA to open an inquiry, investigation, and prosecution of MCR based on a false assertion that MCR's thermite-based technology was incorrectly classified under the HMR. Johnston openly stated he was "a non-expert in the field" and yet corresponded with PHMSA over hundreds of emails and countless Zoom meetings where he feigned

distress over the potential defective designation of MCR's thermite-based technology. In reality, the real distress Johnston was experiencing was in defending MCR's ongoing lawsuit against Defendants for the claims stated herein—which he never disclosed to PHMSA. Instead of facing the music of this lawsuit, Johnston initiated a ruse to harm MCR through back-channel efforts at instigating an administrative action against MCR.

188. Johnston entreated PHMSA to reclassify MCR's thermite-based technology by consistently directing PHMSA officials to different PHMSA-approved explosive lab reports and Interpretation Letters, which upon information and belief, Defendants coordinated. Johnston was trying to have MCR's tools classified as explosives, which carried a range of costly consequences. Johnston never disclosed his affiliation with any of the "supposedly unrelated" entities he was relying on to showcase "unbiased" perspectives on MCR's thermite-based technology "misclassification."

189. Johnston was an unceasing thorn in the side of PHMSA, but Johnston was not alone. Instead, Defendants used Johnston as just one voice in its shared chorus signing the false narrative of the dangers of MCR's thermite-based technology. While Johnston was emailing throughout the early 2020's, until at least 2024, other co-conspirators directed similar missives to PHMSA, and similarly hid their connections to Defendants. Johnston continued to hound PHMSA to reclassify

MCR's thermite-based technology also while, upon information and belief, playing puppet master to the string of co-conspirators to come knocking on PHMSA's door.

**Next, a new wave of co-conspirators attempted to sway PHMSA with a supposedly "unbiased" DOT-approved explosive lab report, which cited to other reports created for and paid by Defendants.**

190.   Defendants hired Chang at the EB as one of its insulated intermediaries to propose an "unbiased" perspective to PHMSA demanding reclassification of MCR's thermite-based technology. EB is one of six DOT-approved explosives test labs that customers can hire to investigate potentially hazardous products and provide a recommendation for its appropriate classification. After PHMSA receives these test lab recommendations as to what classification the lab believes the product should be designated, PHMSA is under pressure to do what these labs suggest; however, PHMSA has the authority to classify the product even if it results in disagreement with the test lab.

191.  Here, EB was retained by an undisclosed "interested third-party/customer," whom, upon information and belief, MCR believes to be Defendants or one of their co-conspirators, to investigate the non-explosive status of MCR's thermite-based technology.[68] On or about January 13, 2020, Chang called

---

[68] When MCR reached out to EB to discover the name of the "interested customer" that retained EB, MCR received a shocking response. SPEX Defendants' attorney, Craig Dillard, responded in a letter stating **he represented EB**. Dillard and EB refused to disclose the "interested customer" and instead made veiled threats regarding MCR bringing any further action against this web of agents. Upon information and belief, MCR believes this to be a massive conflict of interest and raises multiple ethical concerns about Dillard's representation in this matter. Even absent an ethical conflict, this shows EB is represented by SPEX

PHMSA and used his position of trust, expertise, and influence to insist MCR's thermite-based technology was incorrectly classified under the HMR and should be redesignated as a Class 1 explosive.[69] Chang suggested PHSMA begin an enforcement proceeding against MCR. PHMSA directed Chang's complaint to the enforcement office via email.

192.    In his report, Chang attached documents that his "customer provided him." Chang failed to disclose these documents had been obtained during the WWS litigation adverse to MCR. Specifically, Chang's report—which was produced on behalf of SPEX—cited to Speed's report drafted when Speed was a paid witness in the WWS case. Chang never disclosed the explicit bias of the materials he was relying on when lobbying PHMSA to investigate MCR. Speed's report – and the other materials he had been provided – were organized expressly to provide adverse opinions against MCR. They were not objective, valid, or complete. Chang purported to be an unbiased third party, when, upon information and belief, he was a paid agent of Defendants, who were seeking to shield their own actions in this misguided witch hunt against MCR.

193.    After Chang's phone call and subsequent emails pleading with PHMSA to look into MCR's HMR classification status, PHMSA began reaching out to other

---

Defendants' attorney, which supports MCR's belief that EB/Chang is part of a complex web of co-conspirators attempting to harm MCR's business and was improperly provided with confidential information.

[69] It is notable that Chang did not contact MCR at any point during his "investigation."

DOT-approved explosive labs to weigh in on a separate report prepared for DOT/PHMSA on the Energetic Properties of Thermites. PHMSA was unaware Defendants had already begun poisoning the well of DOT-approved explosive labs by, upon information and belief, reaching out and directing them to provide "opinions" adverse to MCR. Specifically, PHMSA reached out to Speed's DOT-approved explosives lab, Energetics Experts, assuming they would get an unbiased opinion related to this report. However, Speed was already retained as a paid expert with significant prior knowledge of MCR's thermite-based technology. Upon information and belief, MCR believes Defendants', or their co-conspirators, had already reached out to even more, if not all, of the other DOT-approved explosive labs to solicit opinions that MCR's thermite-based technology was incorrectly classified.[70]

194.   Chang's informal requests and phone calls were not sufficient to convince PHSMA. Because of this, on March 7, 2020, Chang sent a formal complaint letter against MCR directly to PHMSA. Chang again asserted MCR's thermite-based technology being labeled as non-explosive was inconsistent with the HMR and should be investigated. Chang sent his letter to the relevant PHMSA authorities, who entered the formal complaint as INTID 26275 on March 27, 2020.

---

[70] Another DOT-approved explosive lab, SMS, revealed to PHMSA that they had been having discussing with a SPEX entity regarding classification of thermite-based mixtures in at least April 2020.

195.   After Chang's formal complaint was lodged, PHMSA investigated MCR's facilities on June 15, 2020, and unsurprisingly, found no probable violations and instead maintained that MCR's thermite-based technology retained the appropriate non-explosive categorization. PHMSA even came back on May 26, 2021, to investigate MCR again, but still found no reason to reclassify MCR's thermite-based technology as a Class 1 explosive.

196.   When these efforts failed at convincing PHMSA to shut down MCR and reclassify MCR's thermite-based technology, Defendants redoubled their efforts. PHMSA indicated they were unpersuaded by each of these conspirators' challenges to MCR's thermite-based technology, so Defendants restrategized another approach to persuade PHMSA to react in a manner that aligned with their desire of causing harm to MCR.

### Defendants urge the next agent in a web of conspirators, Craig Dillard, to directly approach PHMSA for the purpose of getting PHMSA to reclassify MCR's thermite-based technology as a Class 1 explosive.

197.   On December 3, 2021, after the two audits of MCR's facilities, which did not yield the egregious consequences Defendants desired, Defendants' counsel, Dillard, took a more direct approach. He wrote an eleven-page letter to PHMSA on the letterhead of his law firm at the time, Foley and Lardner LLP, again falsely accusing MCR of violating the HMR's regulatory requirements (the "Dillard Letter") without disclosing his/his clients' connections to the repeated attempts at

re-categorizing MCR's thermite-based technology. Additionally, when emailing PHMSA a copy of the Dillard Letter he drafted the email subject line read "SPEX/MCR Oil Tools, LLC." This was a blatant attempt by Defendants to have PHMSA take action to harm MCR at the behest of Defendants, although, conspicuously, the Dillard Letter did not detail Dillard's intimate connections to Defendants and the other co-conspirators.

198.   Dillard was no stranger to MCR—in fact, Dillard has largely spent his recent years representing foreign companies who commit unlawful and/or tortious acts against Texas-based company MCR. Beyond representing foreign Defendants at the center of this litigation, Dillard represented Tunisian entity, WWS; Scottish entity, Expro; and now he has suddenly taken on representing Chang's explosives testing lab, EB.

199.   In the Dillard Letter, Dillard made multiple maliciously-motivated assertions that lacked any reasonable foundation for his claim that MCR's decades-long classification as a Class 4 non-explosive was improper. Dillard alleged that MCR misunderstood/misapplied the UN/HMR classifications to its thermite-based technology—while Dillard fully knew that PHMSA had refused to adopt Chang's findings after two extensive audits of MCR. Dillard referenced a DOT investigation of MCR—yet he hid his clients' connection to being an instigator of that investigation and refrained from disclosing that investigation did not result in a

reclassification of MCR's thermite-based technology. Additionally, Dillard richly suggested that the prior testing of MCR's thermite-based technology was biased by using Southwest Research Institute ("SwRI")—but he did not disclose the fact that the explosive lab results Dillard would prefer to substitute (despite PHMSA's original refusal to adopt the findings) were from labs that had been paid to provide opinions adverse to MCR.

200.   Dillard suggested that "no one can be sure of the dangers to employees, customers, shippers, or public at large" until "MCR's tools were tested by the competent authority." In fact, Dillard knew MCR's thermite-based technology had been tested by a DOT-approved lab, ETC, but since PHMSA, in its discretion, refused to adopt ETC's erroneous report, Dillard continued to push PHMSA for further action. Dillard continued to fearmonger PHMSA to change its findings. Dillard, at best, did not fully and fairly disclose the facts as he knew them to PHMSA in his letter, and at worst, knowingly deceived PHMSA by promulgating this tactic to harm MCR based on a theory that lacked any reasonable basis.[71] Defendants' hope was that by having numerous purportedly "unbiased" agents separately sending PHMSA information, it would look like a deluge of evidence. In reality, it was a

---

[71] This tactic is one Defendants have used not just to turn American administrative agencies against MCR, but used as leverage to try to get MCR's thermite-based tools labeled as an explosive in the UK, Spain, Germany, and Tunisia. In 2022, Defendants tested the tools at U.K. in a tainted environment where they took the results and upon information and belief used those results to pay off foreign governmental officials to bow to Defendant's goal of harming MCR's use of their state-of-the-art technology that Defendant was also trying to steal.

coordinated ghost attack on MCR and PHMSA by Defendants and their web of agents.

201.   Furthermore, the Dillard Letter purported to include only publicly available information about MCR; however, the letter relies on and attaches as exhibits which were obtained during litigation adverse to MCR and were clearly marked "confidential" and "AEO [Attorney's Eyes Only.]" Upon information and belief, MCR believes Dillard, or an agent on his behalf, also furnished these cherry-picked documents to the test labs which also allegedly cited only "publicly available information" but included private MCR licensing agreements. This inclusion of AEO, confidential, and non-publicly available materials violated protective orders that judges had put in place to protect this Texas-based company, and these documents contributed to the inaccurate and incomplete picture Dillard painted so PHMSA would initiate yet another investigation/prosecution against MCR.

202.   After sending this deceitful letter, another attorney from Foley and Lardner LLP, Miller, followed up and suggested PHMSA review a recently released DOT PHSMA Interpretation Letter that discussed thermite classification—unsurprisingly, this letter was solicited by another UK Corporation, OnePoint4, Ltd, which again, upon information and belief, had connections to Defendants. Upon information and belief, Defendants recruited this entity to act as another agent in Defendants' conspiracy to inflict harm upon MCR by seeking to get the thermite-

based technology reclassified and conveniently broaden the market for their own thermite-based technology. It was no surprise that a letter purporting to ask questions about thermite classification came from a UK company – just like Defendants – and the attorney sending the letter was from Foley – the same law firm as Dillard.

203.    This Dillard Letter exemplifies another attempt by Defendants to manipulate PHMSA to bow to Defendants' desires to reclassify MCR's thermite-based technology as an explosive—while repeatedly stating in this proceeding that MCR's thermite-based technology was not explosive whenever it benefitted Defendants to do so. While Defendants were representing to this Court that the MCR's technology, especially its thermite, was non-explosive, they were using numerous agents, including the attorneys arguing before this Court, to convince PHMSA of the exact opposite – that MCR's technology, especially its thermite, was explosive. *See* ECF No. 4 at 4 ("MCR . . . utilizes technology does [sic] use thermite and that is distinguishable from the explosives developed by [Defendants]"); ECF No. 6 at 139 (Spex's Petition for Writ of Mandamus to Texas Supreme Court stating, "MCR's technology . . . uses non-explosive thermite."); ECF No. 38 at 5-6 ("[SPEX] Engineering UK develops technologies that use classified explosives . . . MCR . . . provides tools that use non-explosive thermite"); ECF No. 54 at 8 (stating that "[SPEX] Engineering UK has developed technologies that use classified explosives . . . MCR . . . provides tools that use non-explosive thermite. . . . MCR's down hole

well pipe cutting products utilize thermite that is distinguishable from the explosives"); ECF No. 71 at 6-7 ("[SPEX] Engineering UK develops technologies that use classified explosives . . . MCR uses non-explosive thermite." and referring multiple times to MCR's "non-explosive" tools); ECF No. 204-1 at 21, 25 ("SPEX affiliated entities utilized explosives which is different from thermite-base products").

204.    Unfortunately, it eventually worked. Defendants' actions throughout each of these undisclosed and interconnected attempts to get PHMSA to reclassify MCR's thermite-based technology do not in any way suggest that Defendants had an actual concern or suddenly became a public safety advocate.  The Dillard Letter was sent for one reason—to inflict severe harm upon MCR in a manner consistent with each prior attempt.    Each of these co-conspirators—individually and collectively—had personal and financial interests in causing harm to MCR.

### **PHMSA's misguided reaction to Defendants, and their conspirators', unceasing attempts to get MCR's thermite-based technology reclassified and the harm the MCR incurred.**

205.    Despite no injuries or deaths due to thermite-based technology, three decades of consistent non-explosive classification, multiple thorough audits in the prior two years revealing no HMR violations, and no indication PHMSA was considering completely changing MCR's classification, after the incessant urging of Defendants and their agents/conspirators through multiple different avenues, on

February 14, 2022, PHMSA issued a letter to MCR reclassifying its thermite-based technology as a Class 4.1 Flammable Solid. This devastated MCR and completely halted the company's production and shipments. MCR was prevented from transporting its products for approximately six weeks while it reconfigured its supply chain to transport materials labeled as a flammable solid. MCR had transported products as a non-hazardous material since 2015 upon successful UN testing protocol. MCR suffered extensive monetary damage, estimated to exceed over $10 million to date, due to this reclassification and proceedings brought against MCR. MCR sought review of this erroneous determination and was denied creating a final administrative regulation by PHMSA.

206.    MCR also suffered damages from licensees, such as Expro, who used the PHMSA issuance of an EX number for MCR's tools, along with information from Defendants and Dillard, to breach their contract and as pretext for litigation. Defendants were using their agents and co-conspirators in every way to financially harm MCR, with the expectation that a weakened MCR would be limited in its pursuit of Defendants in this and related litigation.

207.    Alongside and following the February 2022 letter, Johnston, Miller, and Defendants' co-conspirators continued their directions and coordinated whispers in PHMSA's ear to encourage punitive conduct against MCR. In May 2024, PHMSA again issued a damning letter to MCR preventing it from transporting any thermite-

based technology because its products were not approved for transport, again costing MCR extensive monetary damages. These proceedings by PHMSA were instigated by and a byproduct of Defendants' concerted effort to harm MCR through the reclassification of its thermite-based technology.

### **Finally, the anti-competitive, illegal, and tortious actions by Defendants failed when PHMSA's erroneous misclassification was rectified by the Fifth Circuit Court of Appeals, but MCR is still facing the consequences.**

208.   On July 30, 2024, MCR was finally absolved of these baseless investigations and proceedings brought by PHMSA (at Defendants' insistence) when the United States Court of Appeals for the Fifth Circuit determined the civil proceedings against MCR by PHMSA were "arbitrary and capricious thrice over." The Fifth Circuit concluded the witch hunt against MCR by determining that the thermite-based technology MCR manufactured was **not** a Class 1 explosive, vacated the RCT action, and remanded it for further consideration. The Fifth Circuit undertook the arduous task of analyzing PHMSA's flimsy findings based on erroneous materials – materials that had been provided, in part, by Defendants – and determined the agency's actions against MCR were a "clear error of judgment" and solidified MCR's classification as a manufacturer of non-explosive thermite-based technology. On June 9, 2025, PHMSA issued approval for MCR to continue transporting its thermite-based products as a non-hazardous material.

209.   Upon information and belief, MCR believes Defendants and their co-conspirators, who were acting in conjunction with or at the behest of Defendants, are part of a conspiratorial web who sought to harm MCR and protect their own illegally-derived patents and financial interests. These conspirators still seek to harm MCR across the world in other countries' administrative bodies; however, the American judicial system has rightly resolved these baseless proceedings in MCR's favor.

210.   In fact, Defendants' continued scheme to obtain access to MCR technology through license agreements and build a competing business based on offering a set of tools identical to MCR's offerings took another step towards success on June 30, 2025, when Halliburton Energy Services, Inc. completed its purchase of SPEX Corporate Holdings.

211.   One financial incentive behind Defendants' bad acts is clear. SPEX was founded in part by several former Halliburton employees. Halliburton worked with SPEX to develop, test, and produce the SPEX patents and tools, which are the same as or remarkably similar to MCR's tools. Halliburton offered to purchase SPEX as early as 2017, providing SPEX with a roadmap to misuse its access to MCR's tools to reverse-engineer MCR's technology and develop a competing suite of tools, unfairly compete with the original developer of the underlying, original tools, then

attempt to isolate liability for its bad acts on two entities it could render insolvent and dissolve at will.

212.   At the same time, Defendants, individually and through their web of agents, were attempting to shut MCR down through its efforts to have MCR's technology and tools classified as explosives. While they were pressing on all sides at PHMSA with claims MCR's tools and technology were explosive, they repeatedly admitted before this Court and in legal proceedings that the difference between SPEX and MCR was that SPEX used explosives, and MCR's technology was non-explosive.

213.   But Defendants, despite their best efforts, have not yet gotten away with it. Because the laws of the United States of America and the State of Texas prohibit Defendants' actionable misconduct, MCR is seeking damages and justice for the anti-competitive and self-seeking instigation of these costly allegations and actions against MCR's state-of-the-art thermite-based technology.

COUNT ONE – BREACH OF CONTRACT

214.   MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

215.   MCR entered into valid, binding contracts with SPEX Offshore and SPEX Services. All necessary and material terms were agreed to by the parties. MCR fully performed its obligations under the contracts. Alternatively, MCR's

performance was excused by the acts of SPEX Offshore and SPEX Services.

216.  SPEX Offshore and SPEX Services breached and have failed to perform their obligations under the contracts, and are continuing to do so. As a result of these breaches, MCR has suffered actual, consequential, and incidental damages, as well as attorney's fees and costs of court. In addition to direct and actual damages, MCR seeks recovery of its out-of-pocket expenses, loss of use, lost profits, and pre-judgment interest.

217.  All conditions precedent necessary for MCR to recover in this action have been performed, occurred, or have been waived.

218.  Pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001, MCR is entitled to recover its reasonable and necessary attorney's fees for the investigation and prosecution of this action, including all trials and appeals.

## COUNT TWO – SPECIFIC PERFORMANCE

219.  MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

220.  SPEX Offshore and SPEX Services entered into valid, binding contracts with MCR. All necessary and material terms were agreed to by the parties. MCR did not repudiate or materially breach the contracts and has clean hands in the transactions.  MCR was ready, willing and able to timely perform its obligations under the contracts and did perform its obligations under the contracts. Alternatively,

MCR's performance was excused by the acts of SPEX Offshore and SPEX Services.

221.   There is no adequate remedy at law to compensate MCR for its loss and it cannot be fully compensated through the remedy of damages. MCR is therefore entitled to specific performance of SPEX Offshore and SPEX Services' obligation to assign, convey and transfer the SPEX Patents and all Improvements, as that term is defined in the contracts, to MCR.

## COUNT THREE - DECLARATORY JUDGMENT

222.   MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

223.   A dispute has arisen regarding the rights, responsibilities and obligations between the parties. Specifically, MCR claims that it is the rightful owner of all products, engineering, drawings, trade secrets, confidential information, and any other information related in any way to any thermite tool, thermite-based technology or solid combustible charge-based tool invented, developed, modified, or improved by or on behalf of the SPEX Defendants. Therefore, pursuant to 28 U.S.C.A. § 2201(a), MCR requests an order declaring that is the rightful owner of all products, engineering, drawings, trade secrets, confidential information, and any other information related in any way to any thermite tool, thermite-based technology or solid combustible charge-based tool invented, developed, modified, or improved by or on behalf of the SPEX Defendants.

224. In addition, MCR claims that the SPEX Patents constitute Improvements, as that term is defined in the 2011 and 2014 License Agreements. The SPEX Defendants dispute that the SPEX Patents constitute Improvements and, as such, have been unwilling to assign, transfer or convey the SPEX Patents to MCR pursuant to the terms of the 2011 and 2014 License Agreements and 2015 Extension. Therefore, pursuant to 28 U.S.C.A. § 2201(a), MCR requests an order declaring that the SPEX Patents constitute Improvements as defined in the 2011 and 2014 License Agreements and 2015 Extension.

225. MCR's request for declaratory relief is supported by numerous underlying, viable causes of actions and judicially remediable rights, including claims for breach of contract, misappropriation of trade secrets, fraud and fraudulent inducement, tortious interference with contract and unfair competition.

226. MCR is entitled to recover its reasonable and necessary attorney's fees for the investigation and prosecution of this action, including all trials and appeals.

## COUNT FOUR - MISAPPROPRIATION OF TRADE SECRETS UNDER THE TEXAS UNIFORM TRADE SECRETS ACT

227. MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

228. MCR owns valuable trade secrets. MCR uses its trade secrets in its business to obtain an advantage over competitors. MCR's trade secrets derive independent actual and potential value because they are not generally known or

readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

229.    MCR takes active measures to protect the secrecy of its trade secrets by limiting access to and the disclosure of its trade secrets, limiting access to its offices, files, computers, and taking other security measures. MCR also requires its customers to enter into license agreements containing confidentiality provisions, which MCR has invested substantial time and resources developing and strengthening over the years.

## A.    The SPEX Defendants misappropriated MCR's trade secrets by acquiring them through improper means.

230.    The SPEX Defendants acquired MCR's trade secrets by improper means, which is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, to limit use, or to prohibit discovery of a trade secret, or espionage through electronic or other means." TEX. CIV. PRAC. & REM. CODE § 134A. They did so with the intent of developing a set of similar tools, building a competing business on the back of those tools, and selling the enterprise to Halliburton.

### SPEX Services

231.    In the 2011 License Agreement, SPEX Services falsely represented that it was not in the business of designing or developing thermite-based products or technology substantially similar to or competitive with MCR's Licensed Products

and Licensed Technology, and that it had no intention of entering into any such business. SPEX Services made these false representations in order to acquire MCR's trade secrets by improper means. MCR acted and relied on these false representations in disclosing and licensing the use of its trade secrets to SPEX Services.

232.    In the 2011 License Agreement, SPEX Services agreed to maintain the secrecy of MCR's trade secrets. SPEX Services breached this duty by, among other things, disclosing MCR's trade secrets to its Directors and affiliates, including but not limited to Oag, Younger, Johnston, and the other SPEX Defendants.

233.    SPEX Services also agreed to limitations on the use of MCR's trade secrets. SPEX Services breached its duty to limit its use of MCR's trade secrets by, among other things, reverse engineering, developing, improving and modifying MCR's Tools for the benefit of SPEX Services and its Directors and affiliates, and the other SPEX Defendants, and filing patents for competing or substantially similar tools and products derived from MCR's trade secrets.

### SPEX Offshore

234.    In the 2014 License Agreement and 2015 Extension, SPEX Offshore falsely represented that it had not invented, designed, developed, or improved (nor contributed to inventing, designing, developing or improving) any technology or products for the perforating, consuming or cutting of downhole pipes using any part

of MCR's Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools. SPEX Offshore also falsely represented that it was not aware of any person or entity having done so.

235.    SPEX Offshore also falsely represented that it was not in the business of designing or developing thermite-based products or technology substantially similar to or competitive with MCR's Licensed Products and Licensed Technology, and that it had no intention of entering into any such business. SPEX Offshore made these false representations in order to acquire MCR's trade secrets by improper means. MCR acted and relied on these false representations in disclosing and licensing the use of its trade secrets to SPEX Offshore.

236.    In the 2014 License Agreement and 2015 Extension, SPEX Offshore agreed to maintain the secrecy of MCR's trade secrets. SPEX Offshore breached this duty by, among other things, disclosing MCR's trade secrets to its Directors and affiliates, including but not limited to Oag, Younger, Johnston, and the other SPEX Defendants.

237.    SPEX Offshore also agreed to limit its use of MCR's trade secrets. SPEX Offshore breached its duty to limit its use of MCR's trade secrets by, among other things, reverse engineering, developing, testing, improving, and modifying MCR's Tools for the benefit of SPEX Offshore and its Directors and affiliates,

including the other SPEX Defendants.

### Jamie Oag

238.   In the 2014 License Agreement and 2015 Extension, Oag falsely represented that SPEX Offshore had not invented, designed, developed, or improved (nor contributed to inventing, designing, developing or improving) any technology or products for the perforating, consuming or cutting of downhole pipes using any part of MCR's Licensed Technology, which is defined to include MCR's trade secrets, thermite-based technology and solid combustible charge-based tools. Oag also falsely represented that SPEX Offshore was not aware of any person or entity having done so.

239.   In addition, Oag falsely represented that SPEX Offshore was not in the business of designing or developing thermite-based products or technology substantially similar to or competitive with MCR's Licensed Products and Licensed Technology, and that it had no intention of entering into any such business. Oag made these false representations in order to acquire MCR's trade secrets by improper means. MCR acted and relied on these false representations in disclosing and licensing the use of its trade secrets to Oag and SPEX Offshore.

240.   In the 2014 License Agreement and 2015 Extension, Oag agreed to maintain the secrecy of MCR's trade secrets. Oag breached this duty by, among other things, disclosing MCR's trade secrets to SPEX Offshore's Directors and

affiliates, including but not limited to Younger, Johnston, and the other SPEX Defendants.

241.   Oag also agreed, on behalf of SPEX Offshore, to limit SPEX Offshore's use of MCR's trade secrets. Oag breached this duty to limit SPEX Offshore's use of MCR's trade secrets by, among other things, reverse engineering, developing, testing, improving, and modifying MCR's Tools for the benefit of SPEX Offshore and its Directors and affiliates, and the other SPEX Defendants.

### SPEX Group, SPEX Offshore UK and SPEX Engineering UK

242.   SPEX Group, SPEX Offshore UK and SPEX Engineering UK induced SPEX Services, SPEX Offshore and Oag to breach their duties to maintain secrecy and to limit their use of MCR's trade secrets. In addition, at the time SPEX Group, SPEX Offshore UK and SPEX Engineering UK acquired MCR's trade secrets, they knew or had reason to know that SPEX Services, SPEX Offshore and Oag had acquired MCR's trade secrets through improper means.

### SPEX Holdings and SPEX Corporate Holdings

243.  SPEX Holdings and SPEX Corporate Holdings induced SPEX Services, SPEX Offshore and Oag to breach their duties to maintain secrecy and to limit their use of MCR's trade secrets. In addition, at the time SPEX Holdings and SPEX Corporate Holdings acquired MCR's trade secrets, they knew or had reason to know that SPEX Services, SPEX Offshore and Oag, and the other SPEX

Defendants, had acquired MCR's trade secrets through improper means.

**B.**     **The SPEX Defendants misappropriated MCR's trade secrets by using or disclosing them without MCR's consent.**

**<u>SPEX Services</u>**

244.   As set forth above, SPEX Services acquired knowledge of MCR's trade secrets by improper means. SPEX Services disclosed and used MCR's trade secrets without consent by, among other things: (a) disclosing MCR's trade secrets to its affiliates and other persons, including but not limited to Oag, Younger, Johnston, and the other SPEX Defendants; (b) using MCR's trade secrets to reverse engineer, develop, improve and modify MCR's Tools for the benefit of SPEX Services and its Directors and affiliates, and the other SPEX Defendants; (c) using MCR's trade secrets to develop competing tools and products; and (d) using MCR's trade secrets to file patents for competing or substantially similar tools and products either directly or through its Directors and affiliates.

245.   At the time SPEX Services disclosed or used MCR's trade secrets without consent, it knew that its knowledge of MCR's trade secrets was: (a) derived from or through a person who had used improper means to acquire the trade secrets; (b) acquired under circumstances giving rise to a duty to maintain secrecy and limit use; or (c) derived from or through a person who owed a duty to maintain the secrecy or limit use of MCR's trade secrets.

**SPEX Offshore**

246.   As set forth above, SPEX Offshore acquired knowledge of MCR's trade secrets by improper means. SPEX Offshore disclosed and used MCR's trade secrets without MCR's consent by, among other things: (a) disclosing MCR's trade secrets to its affiliates and other persons, including but not limited to Oag, Younger, Johnston, and the other SPEX Defendants; (b) using MCR's trade secrets to reverse engineer, develop, test, improve, and modify MCR's Tools for the benefit of SPEX Services and its Directors and affiliates, and the other SPEX Defendants; (c) using MCR's trade secrets to develop competing tools and products; and (d) using MCR's trade secrets to file patents for competing or substantially similar tools and products either directly or through its Directors and affiliates.

247.   At the time SPEX Offshore disclosed or used MCR's trade secrets without its consent, SPEX Offshore knew that its knowledge of MCR's trade secrets was: (a) derived from or through a person who had utilized improper means to acquire the trade secrets; (b) acquired under circumstances giving rise to a duty to maintain secrecy and limit use; or (c) derived from or through a person who owed a duty to maintain secrecy or limit use of MCR's trade secrets.

**Jamie Oag**

248.   As set forth above, Oag acquired knowledge of MCR's trade secrets by improper means. Oag disclosed and used MCR's trade secrets without MCR's

consent by, among other things: (a) disclosing MCR's trade secrets to the SPEX Defendants and their Directors, including but not limited to Younger, Johnston, and the other SPEX Defendants; (b) using MCR's trade secrets to reverse engineer, develop, test, improve, and modify MCR's Tools for his personal benefit and the benefit of the SPEX Defendants and their Directors, and the other SPEX Defendants; (c) using MCR's trade secrets to develop competing tools and products; and (d) using MCR's trade secrets to file patents for competing or substantially similar tools and products.

249.    At the time Oag disclosed or used MCR's trade secrets without its consent, he knew that his knowledge of MCR's trade secrets was: (a) derived from or through a person who had utilized improper means to acquire the trade secrets; (b) acquired under circumstances giving rise to a duty to maintain secrecy and limit use; or (c) derived from or through a person who owed a duty to maintain secrecy or limit use of MCR's trade secrets.

**SPEX Group, SPEX Offshore UK and SPEX Engineering UK**

250.    As set forth above, SPEX Group, SPEX Offshore UK and SPEX Engineering UK acquired knowledge of MCR's trade secrets by improper means. SPEX Group, SPEX Offshore UK and SPEX Engineering UK disclosed and used MCR's trade secrets without MCR's consent by, among other things: (a) disclosing MCR's trade secrets to its affiliates and other persons, including but not limited to

Oag, Younger, Johnston, SPEX Holdings and SPEX Corporate Holdings; (b) using MCR's trade secrets to reverse engineer, develop, test, improve, and modify MCR's Tools for their own benefit or the benefit of their Directors and affiliates, and the other SPEX Defendants; (c) using MCR's trade secrets to develop competing tools and products; and (d) using MCR's trade secrets to file patents for competing or substantially similar tools and products either directly or through their Directors and affiliates.

251.   At the time SPEX Group, SPEX Offshore UK and SPEX Engineering UK disclosed or used MCR's trade secrets without its consent, SPEX Group, SPEX Offshore UK and SPEX Engineering UK knew that their knowledge of MCR's trade secrets was: (a) derived from or through a person who had utilized improper means to acquire the trade secrets; (b) acquired under circumstances giving rise to a duty to maintain secrecy and limit use; or (c) derived from or through a person who owed a duty to maintain secrecy or limit use of MCR's trade secrets.

### **SPEX Holdings and SPEX Corporate Holdings**

252.   As set forth above, SPEX Holdings and SPEX Corporate Holdings acquired knowledge of MCR's trade secrets by improper means. SPEX Holdings and SPEX Corporate Holdings disclosed and used MCR's trade secrets without MCR's consent by, among other things: (a) disclosing MCR's trade secrets to its affiliates and other persons, including but not limited to Oag, Younger, and

Johnston; (b) using MCR's trade secrets to reverse engineer, develop, test, improve, and modify MCR's Tools for their own benefit or the benefit of their Directors and affiliates, and the other SPEX Defendants; (c) using MCR's trade secrets to develop competing tools and products; and (d) using MCR's trade secrets to file patents for competing or substantially similar tools and products either directly or through their Directors and affiliates.

253. At the time SPEX Holdings and SPEX Corporate Holdings disclosed or used MCR's trade secrets without its consent, SPEX Holdings and SPEX Corporate Holdings knew that their knowledge of MCR's trade secrets was: (a) derived from or through a person who had utilized improper means to acquire the trade secrets; (b) acquired under circumstances giving rise to a duty to maintain secrecy and limit use; or (c) derived from or through a person who owed a duty to maintain secrecy or limit use of MCR's trade secrets.

**Jamie Oag**

254. As set forth above, Oag acquired knowledge of MCR's trade secrets by improper means. Oag disclosed and used MCR's trade secrets without MCR's consent by, among other things: (a) disclosing MCR's trade secrets to the SPEX Defendants and their Directors, including but not limited to Younger, Johnston, and the other SPEX Defendants; and (b) using MCR's trade secrets to reverse engineer,

develop, test, improve, and modify MCR's Tools for his own benefit and that of the SPEX Defendants and their Directors and affiliates.

255.   At the time Oag disclosed or used MCR's trade secrets without its consent, Oag knew that his knowledge of MCR's trade secrets was: (a) derived from or through a person who had utilized improper means to acquire the trade secrets; (b) acquired under circumstances giving rise to a duty to maintain secrecy and limit use; or (c) derived from or through a person who owed a duty to maintain secrecy or limit use of MCR's trade secrets.

## C.    Damages and injunctive relief.

256.   MCR requests that the Court order the SPEX Defendants to pay all damages for actual loss, lost profits, unjust enrichment, head-start damages or, in lieu of damages measured by other methods, imposition of a reasonable royalty for the SPEX Defendants' unauthorized disclosure and use of MCR's trade secrets.

257.   The SPEX Defendants' conduct in misappropriating MCR's trade secrets was willful and malicious. As a result, MCR is entitled to an award of exemplary damages. TEX. CIV. PRAC. & REM. CODE § 134A.004(b).

258.   In addition to damages, MCR will be irreparably harmed if the SPEX Defendants are allowed to continue or further benefit from their unlawful acts. Pursuant to TEX. CIV. PRAC. & REM. CODE § 134A.004(a), MCR requests that the

SPEX Defendants be enjoined from disclosing or using, or further disclosing or using, MCR's trade secrets.

259.   Pursuant to TEX. CIV. PRAC. & REM. CODE §134A.005, MCR is entitled to recover its reasonable and necessary attorney's fees for the investigation and prosecution of this action, including all trials and appeals.

### COUNT FIVE – MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT

260.   MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

261.   MCR owns valuable trade secrets related to a product or service used in interstate or foreign commerce. MCR has invested considerable time, effort, and financial resources to develop and protect its trade secrets. MCR has treated the information as confidential and has protected the information from discovery by third parties. The information gives MCR a competitive advantage over others in the marketplace who do not know of or how to use it.

262.   The SPEX Defendants have misappropriated and wrongfully exploited MCR's trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1832, *et seq*. The SPEX Defendants have, without MCR's authorized consent, used or intended to use MCR's trade secrets in interstate or foreign commerce, including to build a competing business by using tools remarkably similar to MCR's tools.

263.   MCR requests that the Court order the SPEX Defendants to pay all damages for actual loss, any unjust enrichment not addressed in computing damages for actual loss, head-start damages or, in lieu of damages measured by other methods, damages measured by imposition of a reasonable royalty for the SPEX Defendants' unauthorized disclosure and use of MCR's trade secrets.

264.   The SPEX Defendants' actions in misappropriating MCR's trade secrets were willful and malicious, entitling MCR to exemplary damages under 18 U.S.C. § 1836(3)(C) and an award of reasonable attorney's fees under 18 U.S.C. § 1836(3)(D).

265.   Pursuant to 18 U.S.C. § 1836(3), MCR requests that the SPEX Defendants be enjoined from disclosing or using, or further disclosing or using, MCR's trade secrets and confidential information. MCR further requests an injunction requiring the SPEX Defendants to take all necessary affirmative actions to ensure protection of MCR's trade secrets.

266.   Wrongful acts in furtherance of the SPEX Defendants' misappropriation under the Defend Trade Secrets Act were committed in the United States.

### COUNT SIX - UNFAIR COMPETITION UNDER TEXAS LAW

267.   MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

268. MCR owns valuable confidential and proprietary information and know-how. MCR created its confidential and proprietary information and know-how through extensive time, labor, skill and money. The SPEX Defendants misappropriated and used MCR's confidential and proprietary information and know-how in competition with MCR, thereby gaining a special advantage in that competition (*i.e.,* a "free ride") because the SPEX Defendants were burdened with little or none of the expense incurred by MCR. This special advantage translated into a valuable purchase of the SPEX business by Halliburton, a significant player in the industry.

269. In addition, the SPEX Defendants defrauded MCR, fraudulently induced MCR into entering the License Agreements, disparaged MCR's business, and fraudulently transferred assets between the various SPEX entities. Each rendered a special advantage for the SPEX Defendants, including access to MCR technology and/or harm to MCR's business. The SPEX Defendants activities were based on fraud, fraudulent inducement, business disparagement, fraudulent transfer, and denuding the corporate form.

270. The SPEX Defendants' misappropriation and unauthorized use of MCR's confidential and proprietary information and know-how has caused MCR actual, consequential, and incidental damages, as well as attorney's fees and costs of court.

271. Moreover, the SPEX Defendants' misappropriation of MCR's confidential and proprietary information and know-how will continue to have a significant negative effect on MCR's business. MCR believes that SPEX's use of MCR's confidential and proprietary information and know-how will continue unless enjoined by the Court. MCR therefore requests a preliminary and permanent injunction due to the irreparable harm caused by the misappropriation and use of MCR's confidential and proprietary information and know-how.

**COUNT SEVEN – COMMON LAW FRAUD AND FRAUDULENT INDUCEMENT[72]**

272. MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

273. At the time the parties entered into the 2011 and 2014 License Agreements and 2015 Extension, SPEX Services, SPEX Offshore and Oag made material misrepresentations and omissions to MCR, which were false, and which were known to be false when made or were asserted recklessly or without knowledge of their truth. SPEX Services, SPEX Offshore and Oag intended MCR to act and rely upon these misrepresentations, and MCR did act and rely on these misrepresentations in entering into the 2011 and 2014 License Agreements and 2015

---

[72] MCR recognizes that fraudulent inducement and common law fraud are separate causes of action. MCR has elected to plead them together solely for purposes of identifying the fraudulent representations and omissions for purposes of complying with Federal Rule of Civil Procedure 9(b) and to avoid any further challenge by the SPEX Defendants through yet another motion to dismiss.

Extension, causing MCR injury. It was reasonable for MCR to act and rely on these misrepresentations, as they were part of the express terms of the agreement in the 2011 and 2014 License Agreements and 2015 Extension.

274. Specifically, by the time Jamie Oag signed the 2015 Extension, SPEX had already filed at least four patent applications based on technology that was the same as or similar to MCR's licensed technology. SPEX first began development on their suite of tools in February 2014. As a result, the false representations by the SPEX Defendants regarding development of competing tools or participation in a competing industry were made knowingly.

275. SPEX Services, SPEX Offshore and Oag made these material misrepresentations in order to induce MCR to enter into the 2011 and 2014 License Agreements and 2015 Extension, and to benefit from MCR's performance of the agreements. MCR would not have entered into the 2011 and 2014 License Agreements and 2015 Extension had it known that the representations were false or that SPEX Services, SPEX Offshore and Oag did not intend to bind themselves to the terms of the agreement.

276. MCR has sufficiently alleged the time, place and contents of the false representation(s), as well as the identity of the person making the misrepresentation(s) and what that person or entity obtained by making the misrepresentation(s).

277.   Moreover, the acts by SPEX Services, SPEX Offshore and Oag post-execution of the 2011 and 2014 License Agreements and 2015 Extension indicate that they never intended to comply with the terms of the agreements. Instead, SPEX Services, SPEX Offshore and Oag used the license agreements merely as a vehicle to misappropriate MCR's trade secrets and confidential and proprietary information for their own benefit and for the benefit of the other SPEX Defendants. This benefit was realized when SPEX Services, SPEX Offshore and Oag made a profit from the 2025 sale to Halliburton of a business built by the misappropriation of MCR's technology.

278.   Additionally, SPEX Defendants and their co-conspirators defrauded PHMSA when the co-conspirators made material misrepresentations at best, and outright deceitful lies at worst, to various PHMSA employees for the purpose of getting PHMSA to initiate an investigation and proceedings against MCR for allegedly misclassifying its thermite-based technology. PHMSA relied on these misrepresentations and MCR was harmed a result.

279.   MCR has been damaged as a result of the SPEX Services, SPEX Offshore, and Oag's fraud and fraudulent inducement and is entitled to damages, pre- and post-judgment interest, costs and attorney's fees.

## COUNT EIGHT – TORTIOUS INTERFERENCE WITH AN EXISTING CONTRACT

280.   MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

281.   MCR had contracts with SPEX Offshore and SPEX Services, in the form of license agreements, subject to interference. Oag, SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings, and SPEX Corporate Holdings willfully and intentionally interfered with the contracts proximately causing injury to MCR. As a result of the interference by Oag, SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings, MCR has suffered actual damages or loss.

282.   MCR further had contracts with other entities, including Expro and Wireline Well Services – Tunisia, with which Defendants interfered by their acts and caused MCR actual damages or loss.

## COUNT NINE – ALTER EGO/PIERCING THE CORPORATE VEIL

283.   MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

284.   By forming SPEX Offshore, SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings for the specific purpose of: (1) testing, modifying, reverse engineering, and developing of MCR's Tools and intellectual property in violation of the 2011 License Agreement, 2014

License Agreement and 2015 Extension, both directly and by cooperation with affiliates; and (2) filing, assigning, and holding the SPEX Patents, SPEX Services, SPEX Offshore and Oag used the corporate form as an unfair device to achieve an inequitable result; specifically, theft of MCR's trade secrets, development of competing tools and products, and ownership of all Improvements and the SPEX Patents.

285.   SPEX Offshore, SPEX Services and Oag also used the corporate form to evade or avoid their legal obligations. SPEX Services, SPEX Offshore and Oag had, among other obligations, a duty to protect MCR's trade secrets and confidential information, and to use MCR's Tools and intellectual property in strict accordance with the terms of the respective license agreements. Instead of fulfilling these duties, SPEX Services, SPEX Offshore and Oag—through affiliates and common officers and Directors—created sham entities, changed corporate names, diverted corporate assets, and dissolved corporate entities to escape legal and contractual liabilities. In doing so, SPEX Services, SPEX Offshore and Oag deceived and violated confidences owed to MCR.

286.   As affiliates of SPEX Services and SPEX Offshore, SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings, and those in common and majority control of these entities (including Oag), used the corporate form for the purpose of perpetrating an actual fraud on

MCR for the direct benefit of Oag, SPEX Services and SPEX Offshore, their common officers and Directors, and the other SPEX Defendants.

287.    The conduct of SPEX Services, SPEX Offshore and Oag involved dishonesty of purpose, actual fraud and intent to deceive. The corporate form should be disregarded because SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings are alter egos of SPEX Services, SPEX Offshore and Oag. The corporate form of SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings should be disregarded because these entities were organized and operated by SPEX Services, SPEX Offshore and Oag as mere tools or business conduits, or alter egos of themselves, by those in common and majority ownership and control of both entities. As affiliates of each other, with common majority owners, the SPEX Defendants have or had a direct financial interest in each other.

288.    Moreover, there is such a unity between the SPEX Defendants and a blurring of identities that the separateness of SPEX Services, SPEX Offshore and Oag on the one hand, and SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings, SPEX Corporate Holdings and Oag, on the other hand, never existed or has ceased to exist. Holding only SPEX Services and SPEX Offshore liable for their contractual obligations would result in an injustice in that SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings, SPEX

Corporate Holdings and Oag would be allowed to reap the benefits of SPEX Services and SPEX Offshore's wrongful conduct, escape or avoid liability, and walk away with MCR's intellectual property rebranded as their own.

289.   The SPEX Defendants, and each of them, used assets of each of the other SPEX Defendants for their own purposes as though the assets were their own, and caused assets to be transferred between them or to entities they controlled. In addition, the SPEX Defendants each directly and indirectly controlled each other. Each of the SPEX Defendants also has or had direct and indirect control of the other, including the power to direct or cause the direction of the management and polices of the other. Finally, the SPEX Defendants exercised active control over the day-to-day affairs of each other.

290.  For these reasons, SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings, SPEX Corporate Holdings and Oag may be held liable for the tortious acts and fraudulent conduct of SPEX Services, SPEX Offshore and Oag, in as much as these persons or entities are alter egos of SPEX Services, SPEX Offshore and Oag. Given that the two contractually-bound entities purposefully changed names and diverted all assets prior to their dissolution, holding only SPEX Services and SPEX Offshore liable would result in an injustice.

291.   Conversely, SPEX Services and SPEX Offshore may be held liable for the tortious acts and fraudulent conduct of Oag, SPEX Group, SPEX Offshore UK,

SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings, in as much as these entities are alter egos of Oag, SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings. Holding only Oag, SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings for their conduct would result in an injustice.

292.   In addition, MCR alleges that because SPEX Services, SPEX Offshore and Oag perpetrated an actual fraud on MCR, Oag, SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings should be held liable for the existing legal and contractual obligations of SPEX Services and SPEX Offshore. Adherence to the fiction of the separate existence of SPEX Group, SPEX Offshore UK, SPEX Engineering UK, SPEX Holdings and SPEX Corporate Holdings as entities distinct from SPEX Services, SPEX Offshore and Oag would permit an abuse of the corporate privilege, sanction fraud and promote injustice.

293.   Because this action involves assets located in Texas and transactions that took place in Texas, this action is brought pursuant to Texas law, including the Texas Business Corporations Act, TEX. BUS. ORGS. CODE § 21.001 *et seq*.

## COUNT TEN – DENUDING THE CORPORATION

294.   MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

295.   The SPEX Defendants deliberately stripped SPEX Services and SPEX Offshore of their assets prior to dissolution. In addition, the SPEX Defendants engaged in conduct to divert company assets between and among affiliates that are within control of the SPEX Defendants, including Oag. This rendered SPEX Services and SPEX Offshore incapable of paying their debts. Therefore, the SPEX Defendants denuded the corporations and are liable for damages resulting from the MCR's claims against SPEX Services and SPEX Offshore.

### COUNT ELEVEN - CONSPIRACY

296.   MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

297.   The SPEX Defendants, through a combination of two or more persons, sought to accomplish an unlawful objective. The SPEX Defendants reached a meeting of the minds to achieve their unlawful objective and committed numerous overt acts in pursuit of their objective.

298.   The objective of the SPEX Defendants' conspiracy was to: (1) gain access to MCR's trade secrets, Licensed Technology, Licensed Patents, Licensed Products and confidential and proprietary information; (2) reverse engineer, modify, test, improve, and develop MCR's trade secrets and confidential and proprietary information into competing tools and products; (3) apply for and obtain patents using MCR's trade secrets, Licensed Technology, Licensed Patents, Licensed Products

and confidential and proprietary information, all without MCR's detection; (4) manipulate United States administrative agencies to wrongfully reclassify MCR's thermite-based tools as an explosive for SPEX Defendants' and their conspirators' own financial gain while also achieving maliciously-motivated revenge against MCR; (5) build a competing business by leveraging an unfair competitive advantage derived from misappropriation of MCR's technology; and (6) realize a profit by selling that business, and the tools that support it, to Halliburton.

299.   Whenever in this complaint it is alleged that Defendants did any act or thing, it is meant that Defendants, themselves or their agents, officers, managers, servants, employees, principals, or representatives did such act or caused such act to be taken at Defendants' instruction, and it was done with the authorization, approval, or ratification of Defendants or done in the normal routine, course, or scope of the agency, representation, relationship, or employment of Defendants or their agents, officers, managers, servants, employees, principals, or representatives.

300.   As a direct and proximate result of the SPEX Defendants' conduct, MCR has suffered damages and the SPEX Defendants have been unjustly enriched. MCR further seeks an award of attorney's fees, interest and court costs.

301.   The SPEX Defendants' conduct was malicious and done with an intentional disregard of MCR's rights, thereby entitling MCR to an award of punitive damages.

302.   The SPEX Defendants and their officers, directors, agents and employees aided and abetted each other in these tortious acts. As a result of their conduct, conspiracy and scheme, each SPEX Defendant is jointly and severally liable for MCR's damages.

## COUNT TWELVE – MALICIOUS PROSECUTION

303.   MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

304.   In the alternative, MCR alleges that Defendants maliciously initiated and/or procured proceedings against MCR in an anti-competitive and maliciously-motivated attempt to harm MCR. At all times, the co-conspirator individuals or entities other than Defendants taking action furthering the malicious prosecution were acting as agents of Defendants.

305.   Whenever in this complaint it is alleged that Defendants or their co-conspirators did any act or thing, it is meant that Defendants, themselves or their agents, officers, managers, servants, employees, principals, or representatives did such act or caused such act to be taken at Defendants' instruction, and it was done with the authorization, ratification, or approval of Defendants or done in the normal routine, course, or scope of the agency, representation, relationship, or employment of Defendants or their agents, officers, managers, servants, employees, principals, or representatives.

306.    Upon information and belief, Defendants, foreign entities and individuals, used multiple different agents to manipulate a United States federal agency, PHMSA, to prosecute Texas-based company, MCR, when PHMSA initiated proceedings with civil and/or criminal penalties against MCR related to the potential misclassification of MCR's thermite-based technology.

307.    The PHMSA investigation and reclassification of MCR's thermite-based technology was instituted due to a concerted, interconnected, and undisclosed effort, by Defendants and through the use of their co-conspirators.

308.    Defendants acted with malice in coercing PHMSA to initiate these proceedings against MCR, as Defendants were never genuinely concerned about the safety of MCR's thermite-based technology... until they found themselves adverse to MCR in litigation and needed a cudgel to try and beat down MCR. Instead, Defendants and their web of agents/conspirators used MCR's thermite-based technology for years as licensees with no complaints, injuries, or whisper of concern. It was only after this litigation ensued that Defendants suddenly became bothered by the non-explosive classification of MCR's thermite-based technology.

309.    Defendants lacked probable cause to continuously and unceasingly coerce PHMSA to initiate such investigations into MCR's thermite-based technology. Defendants were aware of MCR's long-standing Class 4 non-explosive designation, the long-standing safety record of such thermite-based technology,

PHMSA's audits of MCR's facilities which yielded no violations, and PHMSA's continued stance against each co-conspirator's suggestion to reclassify MCR's thermite-based technology. Defendants also had access to substantial additional information based on their status as a licensee of MCR that was contrary to the assertions presented to PHMSA at their behest, yet Defendants continued to their attempts force PHMSA's hand. At the same time Defendants were representing to this Court that MCR's technology was non-explosive, they were alleging to PHMSA the opposite.

310.    Unfortunately for Defendants, after an arduous and costly investigation, reclassification, and shutdown, PHMSA's investigation and reclassification was overturned on July 30, 2024, when the Fifth Circuit Court of Appeals found in MCR's favor, holding that PHMSA's baseless prosecution of MCR was arbitrary and capricious.[73] The reclassification of MCR's thermite-based technology was (as PHMSA originally and consistently held until Defendants finally wore them out) baseless. The Fifth Circuit Court of Appeals found in MCR's favor, finding MCR was innocent of any HMR violations related to its thermite-based technology.

311.    Defendant's wrongful conduct caused MCR to face multiple million-dollar loses from shutdowns and never-ending attorneys' invoices from this unfounded and baseless attack Defendants manipulated PHMSA to take against

---

[73] *MCR Oil Tools, L.L.C. v. United States Dep't of Transp.,* 110 F.4th 677, 683 (5th Cir. 2024).

MCR resulting in injury to their reputation and good will, the lost value of the use of property during the time MCR was unable to ship and manufacture their thermite-based technology, and significant attorneys' fees expenses. MCR also incurred costs for additional testing, governmental affairs support, operational transition costs, increased transportation costs, lost work from licensees, and opportunity costs, all related to the improper classification by PHMSA that was done at Defendants' instruction. Defendants also encouraged their agents and co-conspirators to use the baseless "explosive" classification as pretext to breach their own agreements with MCR, as has been done by Expro. They then encouraged the use of the same playbook followed with PHMSA through their co-conspirator Dillard, as counsel for Expro, as the foundation for breaching MCR's license agreement and causing additional financial harm to MCR.

312.    MCR seeks damages within the jurisdictional limits of this court.

313.    MCR's injury resulted from SPEX Defendants' malice, which entitles MCR to exemplary damages under Tex. Civ. Prac. Rem. Code. § 41.003(a)(2).

### COUNT THIRTEEN – TEXAS UNIFORM FRAUDULENT TRANSFER ACT

314.    MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

315.    At all relevant times, MCR was a creditor of the SPEX Defendants within the meaning of Tex. Bus. § Com. Code § 24.002(4), by virtue of the 2011 and

2014 License Agreements and related obligations.

316.    The SPEX Defendants, including but not limited to SPEX Services (later General Services 2, Ltd.) and SPEX Offshore (later General Services 1, Ltd.), made transfers of assets and interests in property to insiders and affiliates, including SPEX Holdings, SPEX Corporate Holdings, and SPEX Offshore UK, as well as to individual Defendant Oag. These transfers include, but are not limited to:

a.    The payment of dividends, asset transfers, and capital reductions by SPEX Services in 2016, which rendered it undercapitalized;
b.    The transfer by SPEX Offshore of substantially all assets and employment contracts to SPEX Offshore UK in August 2016, leaving SPEX Offshore insolvent; and
c.    The assignment of patents and patent applications derived from MCR's intellectual property to SPEX Engineering UK, and subsequently to SPEX Corporate Holdings, for little or no consideration.

317.    These transfers were made with actual intent to hinder, delay, or defraud MCR, as evidenced by the following "badges of fraud" under Tex. Bus. & Com. Code § 24.005(b):

a.    The transfers were to insiders;
b.    The transfers were concealed through sham entities, corporate name changes, and overlapping officers and directors;
c.    The transfers were made after suit was threatened and/or filed;
d.    The transfers involved substantially all assets of the transferors; and
e.    The transferors were rendered insolvent or undercapitalized as a result of the transfers.

318.    Alternatively, and in addition, the transfers were constructively fraudulent under Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.006 because the SPEX Defendants did not receive reasonably equivalent value in exchange for the

transfers, and the transferors were insolvent or became insolvent as a result of the transfers, or were engaged in business for which their remaining assets were unreasonably small in relation to the business or intended business.

319.   Pursuant to Tex. Bus. & Com. Code § 24.008, MCR seeks to recover for the injury caused by the SPEX Defendants' fraudulent transfers.

### COUNT FOURTEEN – BUSINESS DISPARAGEMENT

320.   MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

321.   The SPEX Defendants, by and through their agent, caused false and disparaging statements concerning MCR's products and technology to be made to PHMSA. Specifically, Defendants caused their agent to transmit a letter to PHMSA that misrepresented the safety, reliability, and legitimacy of MCR's thermite-based cutting tools and related technology.

322.   The statements contained in the PHMSA letter were false, disparaging, and made with malice. Defendants knew the statements were false, or acted with reckless disregard for their truth or falsity, because Defendants were at the same time misappropriating and patenting MCR's technology for their own use. Defendants also admitted to this Court and others that MCR's technology was non-explosive, all the while claiming the opposite to PHMSA.

323.   PHMSA is an external regulatory agency, not an internal affiliate of Defendants, and is accordingly a third party. Defendants voluntarily and intentionally published the disparaging statements in order to hinder MCR's regulatory standing and business operations.

324.   As a direct and proximate result of the PHMSA letter to MCR and PHMSA's false conclusions drawn in part from Defendants' misrepresentations, MCR suffered special damages, including but not limited to:

 a. Facility closures prompted by PHMSA's adverse regulatory action;
 b. Loss of customers and business;
 c. Increased shipping costs and logistical burdens caused by the facility closures and regulatory disruption;
 d. Supply chain disruption impairing MCR's ability to timely deliver its products to customers; and
 e. Litigation costs incurred to contest and correct PHMSA's false conclusions and to protect MCR's business reputation and intellectual property.

325.   MCR has been injured by these acts and seeks to recover its actual damages, including all special damages described above.

### APPLICATION FOR PERMANENT INJUNCTION

326.   MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

327.   Pursuant to Section 12.07 of the 2011 License Agreement, SPEX Services acknowledged that any breach of the agreement would irreparably harm MCR, that damages would be an inadequate remedy, and that injunctive relief would

be appropriate to protect MCR's rights in its Licensed Technology, which includes MCR's confidential and proprietary information, trade secrets, thermite-based technology and solid combustible charge-based tools.

328.   Pursuant to Section 9.07 of the 2014 License Agreement, SPEX Offshore and Oag acknowledged that any breach of the agreement would irreparably harm MCR, that damages would be an inadequate remedy, and that injunctive relief would be appropriate to protect MCR's rights in its Licensed Technology, which includes MCR's trade secrets, confidential and proprietary information, thermite-based technology and solid combustible charge-based tools.[74]

329.   MCR will suffer immediate irreparable injury if SPEX Services, SPEX Offshore and Oag are allowed to continue using MCR's valuable confidential and proprietary information, trade secrets, and intellectual property, either directly or through their affiliates, including SPEX Group, SPEX Engineering UK, SPEX Holdings, SPEX Corporate Holdings and SPEX Offshore UK. As a result of the actions of SPEX Services, SPEX Offshore and their affiliates, and Oag, MCR will be irreparably harmed due to SPEX Services and SPEX Offshore's breaches of the 2011 and 2014 License Agreements and 2015 Extension and their use and disclosure of MCR's trade secrets and confidential and proprietary information.

---

[74] In the 2015 Extension, SPEX Offshore agreed that no other terms shall be affected except as "specifically and explicitly amended." Exhibit C. The parties did not amend the terms of Section 9.07.

330.    MCR believes that the SPEX Defendants intend to continue using MCR's valuable trade secrets, confidential and proprietary information, and intellectual property. It is clear that the SPEX Defendants have no regard for the promises and agreements SPEX Services, SPEX Offshore and Oag made in the 2011 and 2014 License Agreements and 2015 Extension. It is also clear that the SPEX Defendants intend to use MCR's valuable trade secrets, confidential and proprietary information, and intellectual property for their own benefit.

331.    Moreover, there is no adequate remedy at law to compensate MCR for the damage inflicted by, among other unlawful acts, SPEX Services and SPEX Offshore's numerous breaches of the 2011 and 2014 License Agreements and 2015 Extension, the SPEX Defendants' misappropriation of MCR's trade secrets and confidential and proprietary information, and the disclosure or use of such information by the SPEX Defendants in competition with MCR.

332.    In addition to the strong language of Section 12.07 of the 2011 License Agreement and Section 9.07 of the 2014 License Agreement, SPEX has possession of MCR's trade secrets and confidential and proprietary information. And when a defendant possesses trade secrets and is in a position to use them, harm to the trade secret owner may be presumed.[75]

---

[75] *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 200 (Tex. App.—Fort Worth 2005, no pet.)*; T–N–T Motorsports, Inc. v. Hennessey Motorsports,* 965 S.W.2d 18, 24 (Tex. App.—Houston [1st Dist.] 1998, no pet.) (holding that appellant possessed confidential information and was in a position to use it; thus, appellant was likely to use information to former employer's detriment). The threatened disclosure of

333.   Under circumstances like these, where the SPEX Defendants' entire corporate enterprise was built upon the theft of MCR's trade secrets and confidential and proprietary information, and where the stolen trade secrets are "inextricably intertwined" with the SPEX Defendants' business operations, an injunction prohibiting the SPEX Defendants from using those trade secrets is appropriate and warranted. There is no way for the SPEX Defendants to "unlearn" or divorce their knowledge of the misappropriated trade secrets from future business operations to which those trade secrets relate or concern.

334.   MCR is substantially likely to prevail on the merits of its claims. The injury to MCR greatly outweighs any injury to the SPEX Defendants that the requested injunction may cause. The balance of hardships tips strongly in favor of MCR. Finally, the injunction will not disserve the public interest. Therefore, MCR is entitled to permanent injunctive relief against the SPEX Defendants as set forth more fully herein.

335.   Unless the SPEX Defendants are permanently enjoined, MCR will be irreparably harmed. Therefore, MCR requests[76] that after final trial on the merits, MCR be awarded a permanent injunction ordering as follows:

---

trade secrets constitutes irreparable injury as a matter of law. *Bell Helicopter*, 160 S.W.3d at 200; *Williams v. Compressor Eng'g Corp.,* 704 S.W.2d 469, 471 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (citing *FMC Corp. v. Varco Int'l, Inc.,* 677 F.2d 500, 503 (5th Cir.1982)).

[76] MCR notes that, pursuant to this request, an Agreed Preliminary Injunction was entered in this case on October 23, 2018. ECF No. 157. But in violation of the Injunction, Defendants have continued to develop, manufacture, test, market and sell SPEX's tools and technology, which relate to MCR's Licensed

a. The SPEX Defendants, and anyone in concert with them, shall immediately cease the development, marketing or sale of any thermite-based tools or products, solid combustible charge-based tools or products, or any tools or products related in any way to thermite-based technology or solid combustible charge-based technology;

b. The SPEX Defendants, and anyone in concert with them, shall immediately return and cease the use and disclosure of all MCR's trade secrets, confidential and proprietary information and all MCR's products or any documents or products related to thermite-based technology or solid combustible charge-based tools or products in their possession;

c. The SPEX Defendants, and anyone in concert with them, shall immediately return and cease the use and disclosure of all notes, memorandums, or copies of MCR's trade secrets, confidential and proprietary information that relate to the 2011 License Agreement, or to any thermite-based technology or solid combustible charge-based tools or products developed by, or on behalf of, any of the SPEX Defendants;

d. The SPEX Defendants, and anyone in concert with them, shall immediately return and cease the use and disclosure of all notes, memorandums, or copies of MCR's trade secrets, confidential and proprietary information that relate to the 2014 License Agreement, or to any thermite-based technology or solid combustible charge-based

---

Technology. This includes violation of the Injunction in the following ways:

a. Defendants' use and modification of MCR's Licensed Technology, defined in the 2014 License Agreement, including MCR's Radial Cutting Torches (RCT), Perforating Torches (PT), Center Nozzle Tool (7" RCT), and Pyro Torches (Axial Pyro Torch (APT) and High Pressure/High Temperature (HPHT) Cutting/Severing Torches, and Modified Radial Cutting Torches (MRT) to design, develop, and test a collection of SPEX tools, for building a business utilizing these SPEX tools (modified MCR Technology) to unfairly compete with MCR;

b. Defendants' marketing the SPEX tools, relating to MCR's Licensed Technology, as SPEX's RCT, Punch Tool, PropCUT, PropPUNCH, and Axial Nozzle Tool, in unfair competition with MCR; and

c. Defendants' filing and prosecuting over 24 patent applications for protecting and marketing Defendants' SPEX tools, which were developed with respect to MCR's Licensed Technology.

tools or products developed by, or on behalf of, any of the SPEX Defendants;

e.  The SPEX Defendants, and anyone in concert with them, shall not use, disclose or transfer to any third party any records, communications, documents, and/or electronic data, or records, documents, and electronic data that belongs to MCR, relates to MCR's trade secrets, confidential and proprietary information or the 2011 License Agreement, or any thermite-based technology or solid combustible charge-based tools or products developed by, or on behalf of, the SPEX Defendants or was in any way derived from MCR's trade secrets or confidential and proprietary information, that is in their possession, for any purpose other than its return to MCR;

f.  The SPEX Defendants, and anyone in concert with them, shall not use, disclose or transfer to any third party any records, communications, documents, and/or electronic data, or records, documents, and electronic data that belongs to MCR, relates to MCR's trade secrets or confidential and proprietary information or the 2014 License Agreement, or any thermite-based technology or solid combustible charge-based tools or products developed by, or on behalf of, the SPEX Defendants or was in any way derived from MCR's trade secrets or confidential and proprietary information, that is in their possession, for any purpose other than its return to MCR;

g.  The SPEX Defendants, and anyone in concert with them, shall not destroy, delete, hide, secret, or otherwise remove from the jurisdiction of this Court any communications, documents, records, discs, drawings, photographs, or any other written or electronic documents or media which contains or describes any MCR records, documents, and/or electronic data, or relates to MCR's trade secrets or confidential and proprietary information, or any records, documents, and electronic data that was derived from MCR's records, documents, and/or electronic data, or relates to MCR's trade secrets or confidential and proprietary information;

h.  The SPEX Defendants, and anyone in concert with them, shall return all documents containing MCR's trade secrets or confidential and proprietary information and all copies of such information;

i. The SPEX Defendants, and anyone in concert with them, shall destroy all electronically recorded or stored copies of MCR's trade secrets and confidential and proprietary information including such information stored on mobile phones, personal computers, or from any other device owned or controlled by the SPEX Defendants, with a statement under oath from an officer of each of the SPEX Defendants that such action has been completed;

j. The SPEX Defendants, and anyone in concert with them, shall immediately cease obtaining, downloading, using or disclosing MCR's trade secrets and confidential and proprietary information;

k. The SPEX Defendants, and anyone in concert with them, shall immediately cease manufacturing any thermite technology, thermite-based tools or products or solid combustible charge-based tools or products;

l. The SPEX Defendants shall immediately execute all necessary documents to fully comply with the terms of the 2011 and 2014 License Agreements and 2015 Extension.

## TOLLING OF LIMITATIONS - DISCOVERY RULE

336.   MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

337.   To the extent necessary, MCR affirmatively pleads the discovery rule. The SPEX Defendants' wrongful conduct was both inherently undiscoverable and objectively verifiable. As such, MCR claims are not precluded by the statute of limitations.

338.   MCR did not know, and through the exercise of due diligence, could not have known, of the SPEX Defendants' wrongful conduct giving rise to MCR's claims and damages. The matters themselves were objectively verifiable, but the

failure of the SPEX Defendants to provide information such that MCR could know of the events and the injury means that limitations were tolled until such time as MCR knew or using reasonable diligence could have known of the facts giving rise to its claims. MCR is entitled to application of the discovery rule, whereby a cause of action accrues either when the injury is discovered or when facts giving rise to its claims might reasonably be discovered through reasonable diligence.

**TOLLING OF LIMITATIONS – FRAUDULENT CONCEALMENT**

339.   MCR repeats, realleges, and incorporates by reference each and every fact and allegation set forth above.

340.   To the extent necessary, MCR affirmatively pleads fraudulent concealment, whereby the statute of limitations is tolled when the actions of a defendant prevent the plaintiff from discovering the facts giving rise to its claims. The SPEX Defendants knew of the facts giving rise to MCR's claims and had a duty to disclose these material facts to MCR. The SPEX Defendants knew that MCR was unaware of the facts and lacked an equal opportunity to discover such facts, but the SPEX Defendants were deliberately silent when they had a duty to speak. Instead of disclosing their wrongful conduct to MCR, the SPEX Defendants actively made misrepresentations and took measures to conceal it. Any applicable statutes of limitation have been tolled by the knowing and active concealment and denial of material facts known by the SPEX Defendants when they had a contractual or other

duty to disclose those facts.

341.    The SPEX Defendants are estopped from asserting a statute of limitations defense due to their failure to disclose, among other things, the following: (1) Improvements made to MCR's Tools and intellectual property; (2) the development of competing tools and products; (3) the filing of the SPEX Patents; (4) breach of the 2011 and 2014 License Agreements and 2015 Extension; (5) the unauthorized use and misappropriation of MCR's trade secrets and confidential and proprietary information.

342.    The SPEX Defendants are further estopped from asserting a statute of limitations defense due to their fraud, which they committed through affirmative misrepresentations and omissions. As a result of the SPEX Defendants' fraudulent concealment, MCR was unaware and could not have known through reasonable diligence that the SPEX Defendants had committed the wrongful conduct giving rise to MCR's claims.

## CONDITIONS PRECEDENT

343.    All conditions precedent to MCR's claims for relief have been performed or have occurred.

## REQUEST FOR JURY TRIAL

344.    MCR requests a trial by jury on all triable issues and has paid the required fee.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that Defendants SPEX Offshore, Ltd., SPEX Services, Ltd., SPEX Group US, LLC, SPEX Offshore (UK) Ltd., SPEX Engineering (UK), Ltd., SPEX Group Holdings, Ltd., SPEX Corporate Holdings, Ltd., and Jamie Oag be cited to appear and answer, and that upon a final hearing of the cause, judgment be entered for Plaintiff and against Defendants as follows:

  a.   A permanent injunction restraining Defendants from the actions described above;

  b.   All damages suffered by Plaintiff;

  c.   Specific performance;

  d.   All pre-judgment and post-judgment interest as allowed by law;

  e.   Costs of court;

  f.   Attorney's fees; and

  g.   Such other and further relief, at law or in equity, to which Plaintiff may show itself to be justly entitled.

**Dated:**   **August 27, 2025.**

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**

By: */s/ Perrin B. Fourmy*
Benjamin L. Riemer
Texas Bar No. 24065976
briemer@bellnunnally.com
Perrin B. Fourmy
Texas Bar No. 24087535
pfourmy@bellnunnally.com
Meredith N. Palmer
Texas Bar No. 24137097
mpalmer@bellnunnally.com

2323 Ross Avenue, Suite 1900
Dallas, TX 75201
(214) 740-1400 – Telephone
(214) 740-1499 – Facsimile

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a true and correct copy of the above and foregoing document has been delivered to all persons authorized to receive notice in this case, pursuant to Fed. R. Civ. P. 5(b)(2)(E), through the ECF system on August 27, 2025.

*/s/ Perrin B. Fourmy*
Perrin B. Fourmy

10898745.1

# EXHIBIT A

# MCR OIL TOOLS, LLC

## LICENSE AND ROYALTY AGREEMENT

## FOR ALL RENEWING LICENSES

License Number  XRT2010-0021

# LICENSE AND ROYALTY AGREEMENT

This License and Royalty Agreement ("Agreement"), effective as of the last date of signature below (the "Effective Date"), is made and entered into by and between MCR Oil Tools, LLC, a Texas limited liability company ("MCR""), and the entity identified as "Licensee" in Appendix A attached hereto. MCR and Licensee are each referred to herein as a "Party" and collectively as the "Parties."

NOW THEREFORE, in consideration of the premises and mutual promises and agreements set forth herein, and the representations, warranties and covenants herein contained, MCR and Licensee agree as follows:

## Article I.    DEFINITIONS

Section 1.01    "Licensed Level Restrictions" means the qualifications and grant restrictions of a license level specified on Appendix A, as such qualifications, grant restrictions, and license levels are set forth on Appendix C.

Section 1.02    "Licensed Patents" means all rights, title, and interest in and to the United States and foreign Patents set forth on Appendix A that MCR holds directly or indirectly as of the Effective Date and all those Patents that MCR may acquire and in its discretion add to Appendix A subsequent to the Effective Date.

Section 1.03    "Licensed Products" means those products listed on Appendix B, and includes those products as modified or improved, and includes those products that MCR may in its discretion add to Appendix B, during the term of this Agreement.

Section 1.04    "Licensed Technology" means confidential or proprietary information of MCR relating to the Licensed Patents and/or Licensed Products, including, without limitation, know-how, methods, techniques, trade secrets, processes, design specifications, drawings, operating procedures, test procedures, methods of operation, and descriptive literature relating to the design, assembly, testing, use, and repair of the Licensed Products that are provided by MCR to Licensee pursuant to this Agreement.

Section 1.05    "Net Sales Revenue" means the amount actually received, if any, by Licensee or any designee of licensee for any and all sales and services provided by Licensee to any third party in connection with the Licensed Products or Licensed Technology, less amounts actually repaid or credited by reason of rejection or rebate, and any sales taxes, value-added taxes, excise taxes, or duties paid on such amounts by Licensee.

Section 1.06    "Patents" means all rights, title and interest in and to all U.S. and foreign patents and utility models and applications therefor, and all improvements, modifications, reissues, divisionals, reexaminations, renewals, extensions, provisionals, continuations, and continuations-in-part thereof, whether acquired or arising prior to or subsequent to the Effective Date.

Section 1.07    "Territory" means the geographical region specified on Appendix A.

Section 1.08    "Third Party" means any person or entity other than MCR and Licensee.

Section 1.09    "Improvements and/or Modifications means any improvement and/or modification of a device, product, method, or process that is, or that could be described in a patent or patent application belonging to MCR.  Any and all future improvements and/or modifications, as set forth above, whether conceived and/or developed independently by MCR or Licensee, or jointly by MCR and Licensee, will be owned by MCR.

Section 1.10    "Confidential Information" means and includes a Disclosing Party's confidential and proprietary information, including, but not limited to, know-how, ideas, concepts, inventions and related proprietary subject matter, invention techniques, algorithms, methods, processes, programs, designs, drawings, schematics, sketches, products, equipment, instruments, documents, manuals, reports, studies, findings, research, samples, prototypes, product descriptions, trade secrets, financial and pricing information, customer lists, software source code, testing and operation procedures and/or manuals, plans, business and/or marketing studies and/or plans, and any other information designated as "Confidential" by the Disclosing Party, whether the information is disclosed in writing, in graphics, orally, in electronic form, or in any other manner which the Disclosing Party considers confidential.

## Article II.    ACKNOWLEGEMENTS

Section 2.01    Licensee acknowledges that MCR holds valuable rights in and to pipe-cutting technology and products for perforating, consuming and/or cutting of tubulars and equipment, and conducts research into, and has licensed and/or developed, and continues to license and/or develop, valuable and unique pipe-cutting technology and products for perforating, consuming and/or cutting of tubulars and equipment.

Section 2.02    Licensee acknowledges that MCR has spent significant time and effort, at significant expense to MCR, in the development, acquisition, and licensing of its intellectual property, including the Licensed Patents, Licensed Products, and Licensed Technology.

Section 2.03    Licensee acknowledges, as of the Effective Date, that (a) it has not invented, designed, developed, or improved (nor contributed to the invention, design, development or improvement of) any technology or products for the perforating, consuming and/or cutting of downhole pipes and/or tubulars and equipment using Licensed Products or Licensed Technology.

Section 2.04    Licensee acknowledges that, as of the Effective Date, it has no claim to ownership rights in the Licensed Patents or Licensed Technology, nor knows of any basis for such a claim.

Section 2.05    Licensee acknowledges that, as of the Effective Date, it is not aware of any person or entity having invented, designed, developed, or improved (nor contributed to the invention, design, development or improvement of) any technology or products for the perforating, consuming and/or cutting of downhole pipes and/or tubulars and equipment using Licensed

2

Products or Licensed Technology., other than MCR and its personnel. Licensee further acknowledges that it is not in the business of designing or developing Licensed Products or Licensed Technology. for use in pipe-cutting/consuming applications relating to the perforating, consuming and/or cutting of downhole pipes and/or tubulars and equipment or otherwise, and Licensee has no intention of entering such business.

Section 2.06 Licensee acknowledges and stipulates that, as of the Effective Date, it is aware of no basis for any challenge to the validity of the Licensed Patents and agrees not to challenge the validity of such Patents.

### Article III.    LICENSE GRANT

Section 3.01 Grant of Restricted License. Subject to the terms and conditions of this Agreement, MCR hereby grants to Licensee a non-exclusive and nontransferable, license under the Licensed Patents and under the Licensed Technology (a) solely to use the Licensed Products within the Territory, within the License Level Restrictions, for its own use or in connection with the services that Licensee customarily provides to its customers, and (b) solely to use the Licensed Technology in support of the Licensed Products.

Section 3.02 License Only. Licensee agrees that its possession and use of the Licensed Products and Licensed Technology is pursuant to this restricted license only, and that all Licensed Technology, Licensed Patents, and any other rights thereto, including Improvements and /or Modifications to the Licensed Products and/or Licensed Technology. are and shall remain the sole property of MCR. All rights in the Licensed Patents and Licensed Technology not otherwise granted by MCR to Licensee explicitly herein are expressly reserved to MCR.

Section 3.03 Limits on Use. No use under the Licensed Patents or the Licensed Technology, and no use of the Licensed Products, other than as specifically provided for herein, is licensed or authorized. Licensee shall only use the Licensed Products and Licensed Technology in strict accordance with the specifications, operating procedures, safety precautions, and training requirements established by MCR, and with the provisions of this Agreement. Nothing in this Agreement shall be construed as granting any rights or licenses to Licensee other than the rights and licenses specifically granted herein. Licensee may not engage in any testing, modifying, reverse engineering, or development with respect to the Licensed Patents, the Licensed Technology, MCR's confidential information, or the Licensed Products unless explicitly granted the right to do so by MCR in a writing bearing the handwritten signature of a duly authorized officer of MCR, which writing shall amend this Agreement and allow for such testing, modifying, reverse engineering or development (as the case may be) only to the extent explicitly provided for in such writing from MCR. With the exception of Licensed Technology that may be included in the product information to be provided to Licensee's customers as described in Section 6.04, Licensee shall not transmit or transfer any Licensed Technology or Licensed Products to any third party transferee regardless of whether such transferee may be an affiliate of Licensee, unless (a) the transmission or transfer has been explicitly authorized by MCR in advance in a writing bearing the handwritten signature of a duly authorized officer of MCR; AND (b) such transferee has, in advance, entered into a binding license agreement with MCR; AND (c) Licensee remains strictly liable for the satisfaction of all terms of this Agreement by

3

such transferee; provided, however, that Licensee may transfer temporary possession of the Licensed Products to a third-party shipping company or a wholly owned subsidiary shipping company solely for the purposes of shipping the Licensed Products to a specified location for use by the Licensee.

Section 3.04    Improvements and/or Modifications.    Licensee acknowledges and agrees that all rights, title, and interest in and to any improvements and/or modifications under the Licensed Patents or the Licensed Technology ("Improvements"), including any intellectual property represented thereby or therein, including without limitation patents and trade secrets, are and shall be owned exclusively by MCR.  Licensee shall provide prompt notice to MCR of the development of any Improvements and/or Modifications, including all information necessary to practice the Improvements and/or Modifications.  Licensee hereby irrevocably assigns, conveys, and sells to MCR its right, title, and interest in and to all Improvements and/or Modifications, if any, including all applicable intellectual property rights thereto.  Licensee shall in good faith cooperate in executing or causing to have executed by its/his officers, employees, agents, and/or legal representatives, any and all documents, including without limitation, assignments, applications, declarations, affidavits, powers of attorney, and other instruments, and in doing all other acts and things as may be reasonably necessary and/or needed to affect transfer of Licensee's rights, title, and interest in and to any and all Improvements and/or Modifications, as set forth above.

Section 3.05    Agreement Not to Challenge Validity.    Licensee shall never voluntarily assist, directly or indirectly, in a challenge to the validity or enforceability of the Licensed Patents or the Licensed Technology, and hereby disclaims any basis for such a claim.  Licensee further agrees not to request or participate in any way, directly or indirectly, in any interference proceeding or reexamination of any claim of the Licensed Patents.  Licensee shall not in any manner represent, directly or indirectly, that it has any ownership interest in any Licensed Technology or Licensed Patent.  Licensee acknowledges that injunctive or protective relief would be appropriate in order to redress or prevent a breach by Licensee of this Section 3.05, and further acknowledges that in the event of such a breach Licensee would be liable to MCR for MCR's attorneys' fees, general administrative costs, market disruption, and all other consequential and incidental damages reasonably attributable to such breach.

## Article IV.    LICENSE FEES, ROYALTIES, REPORTS, AND AUDIT

Section 4.01    License Fee.    On or before three calendar days following the Effective Date, Licensee shall pay to MCR the non-refundable license fee specified on Appendix A.  This license fee shall be in addition to any other charges or fees specified in this Agreement, including any royalty payments.  During the Term of this Agreement, Licensee may elect to purchase additional license levels of the license in force and effect at the time..

Section 4.02    Running Royalties.    Licensee shall pay to MCR the running royalty fees in the percentages specified in Appendix A on the total Net Sales Revenue.  Licensee shall pay any such running royalties to MCR on or before the last day of April, July, October and January for the preceding calendar quarter for which the royalties are due hereunder.  Any services provided by Licensee to a third party already licensed by MCR under the Licensed Patents shall not be

exempt from the royalty obligation under this Section (but such third party licensee shall not be required to pay a royalty to MCR under its own license).

Section 4.03   Royalty Reports.  Together with each royalty payment that may be due, Licensee shall submit a royalty report that shall be certified by an authorized representative of Licensee and shall state and identify the number of Licensed Products sold, the net sales price per Licensed Product, and the aggregate net sales prices of all Licensed Products sold.  In the event a Licensed Product is sold at varying net sales prices, then the report shall indicate the number of Licensed Products sold at each net sales price.  In addition, Licensee shall furnish whatever information MCR may reasonably request from to enable MCR to verify the identity of the Licensed Product and net sales prices, and to calculate the royalties due pursuant to this Agreement, including, but not limited to, access to all specifications of any product requested by MCR.

Section 4.04   Records.  As to items reported under Section 4.03, it is agreed by the Parties that all computations relating to determination of the amounts of royalties and other sums due and payable pursuant to this Agreement shall be made in accordance with generally accepted accounting principles.  As to items reported under Section 4.03, during the Term of this Agreement and for a period of three years thereafter, Licensee shall maintain complete and accurate books and records with respect to sales of Licensed Products on which royalties may be due or otherwise pertaining to the payments hereunder.  As to items reported under Section 4.03, MCR, by way of an independent auditor named by MCR and approved by Licensee, shall be entitled to audit the books and records of Licensee at any time, but no more than twice a year, for the sole purpose of confirming the accuracy of payments due hereunder, including an audit to determine the products subject to royalty payments hereunder.  Any such audit shall be performed during normal business hours and at MCR's expense; provided, however, if such audit reveals an underpayment of five percent or more of the amount that should have been paid to MCR for the period audited, then Licensee shall bear the expense of such audit.  In the event of any underpayment of any sum due hereunder, Licensee shall promptly remit to MCR all amounts due plus a late payment charge equal to one and one-half percent of the amount otherwise due, or the maximum amount permitted by law, whichever is less, for each month or portion thereof that the payment was delayed.

Section 4.05   Field Reports.  Licensee shall provide to MCR timely field reports on all jobs performed using the Licensed Products.  Such field reports shall be provided to MCR in a form consistent with the field report form published at www.mcroiltools.com (or as otherwise modified by MCR) but not less than quarterly.

**Article V.     PROVISION OF LICENSED PRODUCTS TO LICENSEE; PAYMENTS**

Section 5.01   Purchase Orders.  Licensee may order the Licensed Products by issuing purchase orders to MCR specifying the desired quantity, shipping schedule (dates), and any other handling and/or billing instructions.  Notwithstanding any other provision of this Agreement, MCR shall have no obligation to fulfill any purchase order until and unless Licensee receives a written acceptance of such purchase order from MCR.  In light of the compliance obligations and objectives of both Parties, Licensee acknowledges and agrees that acceptance of any purchase

5

order by MCR may require (in MCR's sole discretion) that Licensee provide to MCR customer information and a customer consent in accordance with the terms of Section 5.07 below, and that Licensee complete training with respect to the ordered products as set out in Section 6.01 below. Licensee agrees that it will procure the Licensed Products only from MCR directly, during the term of this Agreement.

Section 5.02  Purchase Price.   The purchase price for the Licensed Products ordered by Licensee shall be the applicable prices defined in Appendix B: (a) Price Level 1 is a discount price for receipt and use of Licensed Products in the United States; (b) Price Level 2 is a discount price for use of Licensed Products in any country other than the United States; and (c) Price Level 3 is a non-discounted retail price. The Licensee shall be entitled to purchase the Licensed Products at Price Levels 1 and 2, unless the Licensed Products are purchased by Licensee for the purpose of resale to a third party (which must have the prior written approval of MCR, which approval may be withheld for any reason at MCR's sole discretion), in which case the Licensee shall pay the Level 3 retail price. MCR shall have the right, in its sole discretion, to change the prices on Appendix B going forward by providing Licensee with thirty calendar days' prior written notice.

Section 5.03  Taxes and Currency.  All payments and offsets due or made under this Agreement to MCR shall be in United States dollars and shall be net of all sales taxes, duties, or other governmental levies of any sort (other than any state or federal income or margin taxes that may be payable by MCR). Royalties based on sales in currencies other than United States dollars shall be converted to dollars according to the market exchange rate for that currency, as published in the Wall Street Journal on the date on which payments are actually made.

Section 5.04  Shipping Terms.  Unless otherwise specified in the purchase order, MCR will ship all Licensed Products Ex Works MCR's facility, Arlington, Texas, in accordance with the 2000 ICC INCOTERMS. In the event that any purchase order received by MCR from Licensee shall specify different shipping terms, such shipping terms shall be considered a request from the Licensee to apply such terms to that shipment only, which request shall not be binding upon the Parties unless and until accepted by MCR in its sole discretion. Any such acceptance of the Licensee's proposed modified shipping terms shall not apply to any other shipment or purchase order and shall not modify the terms of this Agreement. In the event that MCR chooses to accept the proposed modified shipping terms, it will bill Licensee for any and all costs incurred by MCR in complying with those terms, and Licensee shall reimburse MCR for all such costs, which costs shall include both all third-party charges and any time spent by MCR management and staff in meeting the requested shipping terms.

Section 5.05  Payment.   Payment for Licensed Products delivered by MCR under this Agreement shall be in U.S. dollars and is due and payable, in net, within thirty days (30) after the invoice shipment date for such Licensed Products. All invoiced amounts unpaid after such thirty days (30) shall accrue interest at a rate of one percent per month (equivalent to 12% per annum).

6

Section 5.06  **Compliance.**  Licensee acknowledges that exports and transactions related to the Licensed Products are subject to U.S. regulations restricting the destinations to which the Licensed Products may be shipped, and the parties to whom such products may be shipped or sold. Licensee specifically agrees that it will not export or re-export, directly or indirectly, any Licensed Product or Licensed Technology in or to any destination to which such export or re-export is restricted or prohibited under U.S. law, except as authorized in written approvals or authorizations by the U.S. Commerce Department's Bureau of Industry and Security, and/or the U.S. Treasury Department's Office of Foreign Assets Control. Further, Licensee acknowledges that the U.S. Foreign Corrupt Practices Act (the "FCPA") prohibits U.S. persons (or persons acting on their behalf) from paying inducements directly or indirectly to foreign government officials, including the employees of state-owned companies. MCR requires from Licensee strict compliance with the FCPA (and any similar anti-corruption laws that may apply to Licensee's activities abroad) in connection with any commerce engaged in by the Licensee involving the Licensed Products.  Licensee hereby acknowledges that it has informed itself of these requirements of U.S. law and has consulted with U.S. legal counsel as appropriate in order to resolve any questions Licensee may have regarding the application of these laws to the activities under this Agreement.  Failure by the Licensee to adhere to any of the above-mentioned legal requirements shall, regardless of whether such compliance failures are prosecuted, constitute a material breach of this Agreement and shall entitle MCR to terminate this Agreement immediately, and to cancel any order already placed by the Licensee. In addition, any and all losses incurred by MCR in connection with or as a result of any compliance activity or lapse by Licensee, including MCR's costs of complying with any governmental investigation or internal investigation by MCR or Licensee of Licensee's business connected with the Licensed Products, shall fall within the scope of the MCR losses indemnified by Licensee as set out in Section 10.03.

Section 5.07  **Customer Information and Consents**.  Licensee acknowledges that MCR has an interest in protecting the Licensed Technology and in taking steps to ensure MCR's compliance with U.S. laws as described in Section 5.06. MCR reserves the right to require, as a condition to fulfilling any Purchase Order, all relevant information pertaining to the customers of Licensee for whom the Licensed Products will be used. Further, MCR may require that Licensee submit for each such customer a binding consent from such customer to MCR (a) representing that Licensee's transactions with such customer comply with applicable law, and (b) consenting to suit by MCR against such customer in case of any breach by such customer of MCR's rights in connection with the Licensed Technology or the Licensed Patents.

**Article VI.    TECHNICAL  ASSISTANCE,  TRAINING,  AND  INFORMATION  TO CUSTOMERS**

Section 6.01  Training Regarding the Safe Handling and Use of the Licensed Products. Licensee acknowledges that improper handling or use of the Licensed Products may cause serious harm or death to Licensee's employees or to others, and may damage facilities where the Licensed Products are used and thereby cause very substantial economic harm to such facilities. As a condition to the granting and maintenance of the License established by this Agreement, and to the fulfillment of any purchase order, MCR requires that Licensee's employees undergo such training at MCR's facilities as MCR may deem appropriate in its sole discretion to ensure

7

the safe and proper transportation, handling, and use of the Licensed Products. Licensee shall ensure that any of its employees handling or using the Licensed Products have completed all training at MCR's facilities as recommended by MCR.

Section 6.02    Additional Training. Upon request by Licensee, MCR may in its sole discretion agree to provide additional training to Licensee beyond that standard training described in Section 6.01 hereof. In addition, MCR may also agree in its sole discretion to offer training to employees of the Licensee at a location other than the facilities of MCR. Licensee agrees to pay MCR for such additional training, and/or for any training at any location other than MCR's facilities, at MCR's then-current training rates, plus, for remote training, reimbursement for any reasonable travel expenses incurred by MCR personnel plus an additional service fee equal to fifteen percent of such travel expenses. Invoices for training shall be paid by Licensee within thirty days following Licensee's receipt of MCR's invoice.

Section 6.03    Technical Assistance. MCR will provide Licensee with commercially reasonable customer support for the Licensed Products by telephone and email during normal business hours (in the U.S. Central Time Zone) and to the extent that MCR in its sole discretion makes such support generally available to its licensees without a separate charge. Upon request by Licensee, MCR may also elect to provide Licensee with access to and use of additional support, which may include certain Licensed Technology, for use by Licensee in support of the Licensed Products. Unless otherwise agreed to by MCR in writing, MCR reserves the right to invoice Licensee for the provision of such additional support at its then-current rates, and such invoices shall be paid by Licensee within thirty days following Licensee's receipt of such invoice.

Section 6.04    Product Information to Customers and Potential Customers. As acknowledged by Licensee above, any handling or use of the Licensed Technology and/or the Licensed Products in a manner inconsistent with MCR-specified procedures and parameters may cause damage to persons or property at the facilities of Licensee's customers. In order to inform Licensee's customers of such risks, Licensee shall instruct each of its customers as to the specifications and usage manuals for any Licensed Products used by Licensee for such customer, either by providing each customer copies of written information obtained by Licensee from MCR, or by directing such customer to the MCR website. Licensee shall provide such information to the customer prior to performing any services for such customer. Upon request Licensee shall provide to MCR evidence that Licensee has provided such information to its customers. Further, all promotional materials prepared and distributed by Licensee, whether in printed or electronic form, which material describes the capabilities, performance, or characteristics of the Licensed Products, or Licensee's rights to use the Licensed products, shall be true and accurate, and any publication of any (a) material misstatement as compared to the specifications, usage manual, and performance data provided to Licensee by MCR, or any (b) material mischaracterization of the Licensee's rights under this Agreement, or any (c) disparagement of or challenge to the intellectual property rights claimed by MCR in connection with the Licensed Technology and the Licensed Patents, shall constitute a material breach of this Agreement. Licensee shall make all such promotional material available to MCR for MCR's review and approval prior to or concurrent with the publication of that material to Licensee's customers. Further, Licensee shall not remove or modify any patent marking, or any other intellectual property marking, from any Licensed Product, any Licensed Technology, or any documentation or packaging provided with

8

any Licensed Product or Licensed Technology.

## Article VII.  ENFORCEMENT

Section 7.01  Notification.  Should Licensee become aware of any infringement or threatened infringement of any of the Licensed Patents or Licensed Technology by a third party, then Licensee will promptly use reasonable efforts to so notify MCR in writing setting forth the basis for any claim of infringement or potential infringement and to provide any supporting documentation in its possession or control.

Section 7.02  Infringement.  In the event of any infringement or potential infringement of the Licensed Patents or the Licensed Technology by a third party, MCR shall have the sole right, but not the obligation, to police infringements thereof unless the Parties otherwise agree in writing at such time.  Licensee shall cooperate fully with MCR in making any claim relating to the Licensed Patents or Licensed Technology and, if requested, agrees to join MCR as a party plaintiff where joinder is needed to afford MCR the full relief provided by applicable law; provided, however, that MCR shall reimburse Licensee's reasonable costs and expenses incurred in the performance of obligations under this Section 7.02.  MCR shall be entitled to the full amount recovered in pursuit of an infringement claim brought by MCR in compliance with this Section 7.02.

Section 7.03  Licensee's Representations and Warranties.  By execution of this Agreement, Licensee represents, acknowledges, covenants, and warrants to MCR that: (i) the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated under this Agreement have been duly authorized by Licensee, and no other action on the part of Licensee is necessary to authorize this Agreement and the consummation of the transactions contemplated under this Agreement; (ii) this Agreement constitutes a valid and binding obligation of Licensee, enforceable in accordance with its terms; (iii) the negotiated fees, royalties, and prices set forth in this Agreement reflect the value of the rights of use licensed under this Agreement with all of the conditions and restrictions set forth in this Agreement; (iv) Licensee has conducted sufficient due diligence with respect to all terms and issues pertaining to this Agreement, including the qualities, specifications, and value of the Licensed Technology and the Licensed Products; and (v) all right, title, and interest in and to the Licensed Products and the Licensed Technology, including technology and trade secrets embodied therein and Improvements and/or Modifications related thereto, shall belong solely and exclusively to MCR and/or its licensors, and Licensee shall have no rights whatsoever in any of the foregoing except as provided explicitly herein.

## Article VIII.  CONFIDENTIALITY

Section 8.01  Confidentiality.  Each Party agrees to protect the other's confidential and/or proprietary information and/or data in the same manner as each protects the confidentiality of its own proprietary and confidential materials, but in no event with less than a reasonable standard of care.  Any information disclosed by one Party (hereinafter the "Disclosing Party" is the Party disclosing Confidential Information) to the other Party (hereinafter the "Receiving Party" is the Party receiving Confidential Information from the Disclosing Party) in connection with this Agreement that is marked confidential or that, due to its character and nature, as set forth in

9

Section 1.10 of this Agreement, a reasonable person under like circumstances would treat as confidential (the "Confidential Information"), will be protected and held in confidence by the Receiving Party. By way of example and without limiting the foregoing, the Parties shall presume that all information disclosed by MCR regarding the use, capability, design, manufacture or application of the Licensed Technology or the Licensed Products shall be Confidential Information protected within the scope of this Agreement unless such information is published by MCR, for example a publication on its website, or is commonly provided by MCR to its customers in the ordinary course of business. The Licensee agrees that, before making any disclosure of MCR's Confidential Information not previously approved in writing by a corporate officer of MCR, and in reliance upon any of the foregoing exceptions, Licensee will first give MCR at least ten (10) business days' written notice specifying the applicable exceptions(s) and the circumstances giving rise thereto. Further, Confidential Information specifically includes the terms of this Agreement. In the event that the Receiving Party shall have any doubts as to whether information received from the Disclosing Party shall be considered Confidential Information for the purposes hereof, the Receiving Party shall seek confirmation of such from the Disclosing Party and shall, until such confirmation is received in writing, treat the information as Confidential Information. Confidential Information will be used by the Receiving Party only for the purposes of this Agreement and related internal administrative purposes. Disclosure of the Confidential Information by the Receiving Party shall be on a "need to know" basis in connection with the Licensed Products and shall be restricted to the Receiving Party's employees, contractors, or agents who are, prior to any disclosure, bound by confidentiality obligations no less stringent than these.

Section 8.02    **Disclosure:** A Party may disclose Confidential Information: (a) to a government agency, (b) as necessary in a legal proceeding, including any legal proceeding to enforce any provision of this Agreement, or (c) as required to be disclosed by law, but any of the foregoing disclosures will not relieve such Party of its confidentiality obligations with respect to maintaining confidentiality from any other third party, and such Party will provide written notification, to the Party owning the Confidential Information, of any such disclosures at least ten (10) business days prior to the disclosure.

Section 8.03    **Return of Confidential Information.** All Confidential Information that is disclosed in a tangible form by MCR to Licensee under this Agreement (including, without limitation, documents, writings, designs, drawings, specifications and information incorporated in computer software, held in electronic storage media, or disclosed in any other tangible form) shall be returned to MCR promptly upon the termination of this Agreement, or destroyed upon written request by MCR, and shall not thereafter be retained in any form by Licensee, except as otherwise provided by this Agreement.

**Article IX.    TERM AND TERMINATION**

Section 9.01    Term. The term of this Agreement shall commence upon the Effective Date and shall expire thirty-six months from the Effective Date (the "Term") unless terminated earlier in accordance with Section 9.02 below. Notwithstanding any discussions or course of conduct between the Parties, no renewal or extension of this Agreement shall be made except by way of a re-execution of a new version of this license agreement by both Parties.

10

Section 9.02    Early Termination.  This Agreement may be terminated prior to the expiration of the Term by written notice of termination by MCR immediately upon receipt by Licensee of MCR's written notice if (i) Licensee violates any of the compliance obligations set out in Section 5.06, or if Licensee fails to participate in or satisfactorily complete the training programs specified in Article 6, or fails to handle or use the Licensed Products in strict compliance with the safety guidelines set out by MCR in such training; (ii) Licensee uses the Licensed Products or Licensed Technology outside of the scope of use authorized in this Agreement and such unauthorized use is incurable or remains uncured after five days after receipt by Licensee of written or verbal notice of such misuse from MCR; (iii) Licensee does not make timely payment of amounts due under this Agreement and fails to cure such payment default within five calendar days of receipt of written notice from MCR; or (iv) Licensee violates any of its obligations set out in Section 3.05. Except as otherwise provided above in this Section 9.02, either Party may terminate this Agreement if the other Party breaches any of its obligations under this Agreement and the breach is not substantially cured within thirty calendar days of receipt of written notice of such breach sent from the non-breaching Party.

Section 9.03    Insolvency of a Party.  If a Party hereto becomes bankrupt or insolvent, or has a receiver appointed against it, or files or has filed against it a petition for bankruptcy or petition seeking reorganization or rearrangement with creditors, or takes advantage of any other law relating to relief of debtors, then the other Party hereto shall have the right to terminate this Agreement with respect to that Party immediately upon giving a written notice, without prejudice to any other rights or remedies that such other Party may have under this Agreement or in equity.

Section 9.04    Survival.  Sections 3.02, 3.04, 3.05, 4.02, 4.03, 4.04, 12.01, 12.06 and 11.07, and Articles 7, 8, and 11 of this Agreement shall survive the termination or expiration of this Agreement.

## Article X.    WARRANTIES, LIMITATIONS, AND INDEMNITY

Section 10.01    Product Warranty.  MCR represents and warrants that all Licensed Products manufactured by MCR and delivered to Licensee will be free from defects in labor, material, and workmanship and will be manufactured in a good and workmanlike manner in accordance with MCR's specifications.  Upon Licensee's written request, MCR further agrees to assign to Licensee any warranties offered by third party manufacturers of the Licensed Products. EXCEPT FOR THE FOREGOING AND AS OTHERWISE SPECIFICALLY STATED IN THIS AGREEMENT, MCR MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY, NON-INFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE, OR CONFORMITY TO ANY REPRESENTATION OR DESCRIPTION.

## Article XI.    ADDITIONAL PATENT DISCLAIMER.

Section 11.01    Additional Patent Disclaimer. Nothing in this Agreement shall be construed as: (a) a warranty or representation by MCR as to the validity or scope of any Licensed Patent; (b) a requirement that MCR file any patent application, secure any patent, or maintain any patent in force; or (c) an obligation of MCR to bring or prosecute actions or suits against third parties for

11

the infringement of any of the Licensed Patents.

Section 11.02 Indemnity. LICENSEE SHALL DEFEND, INDEMNIFY, REIMBURSE, AND HOLD HARMLESS MCR, ITS AFFILIATES, AND ANY OF THEIR MANAGERS, OFFICERS, OWNERS, EMPLOYEES, OR REPRESENTATIVES, FROM ANY LOSSES, LIABILITIES, DAMAGES, ACTIONS, CLAIMS, FINES, PENALTIES, OR EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES AND COURT COSTS) ARISING OUT OF OR RESULTING FROM: (A) ANY BREACH BY LICENSEE OF THIS AGREEMENT, OR FROM (B) ANY USE OF THE LICENSED PRODUCTS OR LICENSED TECHNOLOGY BY LICENSEE, OR BY ANY OTHER PERSON OBTAINING THE LICENSED PRODUCTS OR LICENSED TECHNOLOGY FROM LICENSEE (INCLUDING WITHOUT LIMITATION ANY PERSONS EVER AFFILIATED WITH LICENSEE OR ANY CUSTOMER OF LICENSEE), REGARDLESS OF WHETHER OBTAINED OR USED WITH OR WITHOUT AUTHORIZATION OR APPROVAL BY LICENSEE, AND REGARDLESS OF WHETHER OBTAINED OR USED LAWFULLY.

Section 11.03 Limitation of Liability. THE TOTAL LIABILITY OF MCR IN THE AGGREGATE TO LICENSEE ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, THE LICENSED PRODUCTS, AND/OR THE LICENSED TECHNOLOGY WILL BE LIMITED TO THE AMOUNT OF THE PAYMENTS ALREADY RECEIVED FROM LICENSEE UNDER THIS AGREEMENT. MCR SHALL NOT BE LIABLE FOR DIRECT, INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES OF ANY TYPE ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, THE LICENSED PRODUCTS, AND/OR THE LICENSED TECHNOLOGY, WHETHER OR NOT MCR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND WHETHER BASED UPON BREACH OF CONTRACT OR TORT.

Section 11.04 Insurance. Without limiting the indemnity obligations or liabilities of Licensee, at all times during the term of this Agreement, Licensee agrees to maintain sufficient insurance to cover all losses or damages arising or resulting in connection with Licensee's use of the Licensed Technology or Licensed Products. Upon request, Licensee shall provide MCR with written evidence of such insurance.

## Article XII  GENERAL TERMS

Section 12.01 No Assignment. Except as expressly provided in this Agreement, nothing contained in this Agreement is intended to confer upon any third party (including any affiliate of Licensee) any rights, benefits, or remedies of any kind or character whatsoever. Licensee shall not assign, sublicense, delegate, or otherwise transfer this Agreement or any of Licensee's rights or obligations hereunder, in any manner, including by way of merger, exchange or combination, or sale of its ownership interests or assets, without the prior written consent of MCR expressly providing therefore and signed in handwriting by a duly authorized officer of MCR. Any attempted assignment or transfer of this Agreement or any rights or obligations hereunder in violation of the preceding sentence will be void and of no effect. Licensee shall be strictly liable

12

for any actions of any affiliate in violation of any terms of this Agreement or of any proprietary rights of MCR.

Section 12.02 <u>Independent Contractors</u>. The relationship of the Parties as established by this Agreement is that of independent contractors, and neither Party will have any power or authority to make any commitment or incur any obligation on behalf of the other Party.

Section 12.03 <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement, or the application thereof to any person or under any circumstances, is invalid or unenforceable to any extent under applicable law, and the extent of such invalidity or unenforceability does not cause substantial deviation from the underlying intent of the Parties as expressed in this Agreement, then such provision will be deemed severed from this Agreement with respect to such person or such circumstance, without invalidating the remainder of this Agreement or the application of such provision to other persons or circumstances, and a new provision will be deemed substituted in lieu of the provision so severed which new provision will, to the extent possible, accomplish the intent of the Parties hereto as evidenced by the provision so severed.

Section 12.04 <u>Force Majeure</u>. If the performance of any obligation under this Agreement is prevented, restricted, or hindered by reason of fire, earthquake, or other natural disaster; strikes or labor disputes; war or civil unrest; laws, orders, proclamations, regulations, ordinances, demands or requirements of any governmental authority; or any other occurrence or condition beyond the reasonable control of the Parties hereto ("Event of Force Majeure"), the Party so affected, upon giving prompt notice to the other Party, shall be excused from such performance to the extent of such prevention, restriction, or interference; <u>provided</u>, however, that the Party so affected shall use commercially reasonable efforts to avoid or remove such causes of nonperformance and shall continue performance hereunder with the utmost dispatch whenever such causes are removed. The Party suffering an Event of Force Majeure shall timely notify the other Party of the occurrence of such Event of Force Majeure and within thirty days shall furnish the other Party with a recovery plan of action. Without limiting the foregoing, a Party suffering an Event of Force Majeure shall use commercially reasonable efforts to limit the impact of the Event of Force Majeure on such Party's performance of this Agreement.

Section 12.05 <u>Notice</u>. Except as otherwise expressly provided in this Agreement, any notice, consent or approval required or permitted under this Agreement shall be in writing, and shall be delivered (a) personally by hand, (b) by Federal Express or other recognized international courier, or (c) by facsimile with confirmation of completed transmission, to the Party's address specified in Appendix A. Either Party may change the person(s) and/or address(es) designated in Appendix A effective ten days following delivery of notice of such change(s). Notice given will be deemed effective on the date actually delivered. Any notice the receipt of which is actually acknowledged in writing by the recipient, shall be deemed valid. regardless of how delivered, as of the date of such acknowledgement.

Section 12.06 <u>Disputes, Arbitration and Interpretation</u>. Any dispute, controversy, or claim arising out of or relating to this Agreement, or the breach, termination or invalidity thereof, shall

13

be finally settled by arbitration in accordance with the Federal Arbitration Act, Title 9, USC, and the commercial arbitration rules of the American Arbitration Association. Within ten (10) days of being notified of the dispute, each Party shall select an arbitrator, and the two party-appointed arbitrator(s) shall select a neutral arbitrator. The place of arbitration shall be Dallas, Texas. The language to be used in the arbitral proceedings shall be English. In recognition of the need to protect MCR's intellectual property rights, the arbitral panel shall award provisional or interim measures as appropriate to protect the rights of MCR under this Agreement. Any award rendered by the arbitral panel shall be binding and enforceable immediately when rendered, and judgment upon the award may be rendered by any court with competent jurisdiction. The arbitration hearing shall begin no later than sixty (60) days after all Parties have received the arbitration notice. The arbitrators are empowered to award damages, as appropriate, as well as reasonable attorney's fees and injunctive relief. **Notwithstanding the foregoing, MCR may apply to any relevant government agency or any court of competent jurisdiction to preserve its intellectual property and its rights under this Agreement and to obtain any preliminary injunctive relief to which it may be entitled, either against Licensee or against a non-party; provided, however, that no such agency or court shall have the right or power to impede or interfere with the arbitration proceeding(s).** The proceedings of the arbitration shall be treated as Confidential Information by the Parties. This Agreement and the relation of the Parties hereto shall be governed by the laws of the State of Texas to the exclusion of the laws of any other state, country, or treaty (including the UN Convention on Contracts for the International Sale of Goods). The Parties waive any defenses to the enforcement of this Agreement, or to the enforcement of an arbitral award rendered hereunder, except for those defenses set out in the U.S. Federal Arbitration Act. This Agreement has been executed only in the English language, which version of this Agreement shall be controlling regardless of whether any translations of this Agreement have been prepared or exchanged. Licensee represents that it has carefully reviewed this Agreement with the involvement and assistance of Licensee's officials, advisors, and/or legal counsel fluent in the English language, that it has consulted with legal counsel competent to render advice with respect to transactions governed by Texas law, that it has no questions regarding the meaning of any of this Agreement's terms, and that it has obtained high-quality translations of this Agreement for use by any of Licensee's officials who are not fluent in the English language, with the understanding that Licensee alone shall bear the risk of any misunderstandings that may arise as a result of such translation.

Section 12.07 <u>Irreparable Harm and Right to Injunctive Relief</u>. Licensee acknowledges that any breach of this Agreement by Licensee, other than a breach involving only Licensee's payment obligations, would irreparably harm MCR, that damages would be an inadequate remedy, and that the granting of injunctive relief by a court, and/or of protective measures by an arbitral tribunal, would be appropriate to protect MCR's proprietary rights in the Licensed Technology and the Licensed Products. Licensee hereby waives any objection on procedural or fairness grounds to the issuance of such relief on a preliminary or permanent basis, without, however, waiving or prejudicing in any way Licensee's right to raise any claim or defense it may have as to the merits underlying any claim of breach raised by MCR in any proceeding.

Section 10.02 Section 12.08 <u>Entire Agreement</u>. Upon the execution of this Agreement, the rights, duties, and obligations of the Parties hereto with respect to the matters set forth herein will be governed solely by the provisions of this Agreement, and all representations, warranties,

14

terms, and conditions with respect to such matters contained in any prior agreements or understandings (written or oral) between the Parties will be null and void and of no further force and effect; provided, however, that any nondisclosure agreement between the Parties will remain in effect in accordance with its terms and will continue to apply to confidential information disclosed between the Parties outside of the scope of this Agreement. The Appendices to this Agreement constitute an integral part of this Agreement. . In the event of a conflict between the term(s) of a prior nondisclosure agreement between the Parties and the term(s) of this Agreement, the term(s) of this Agreement will prevail.

Section 12.09 No Waiver; Amendments. No waiver of any provision of this Agreement will be effective unless made in writing and signed by hand by the Party to be charged with the waiver. Failure of any Party at any time to require the other Party's performance of any obligation under this Agreement will not affect the right to require performance of that obligation. Any waiver by any Party of any breach of any provision of this Agreement will not be construed as a waiver of any continuing or succeeding breach of such provision, or as a waiver or modification of the provision itself. This Agreement may only be amended by a written agreement executed by both Parties by hand referencing this Agreement and the provisions hereof to be amended; absent such signatures and such reference, no terms contained in any purchase order, confirmation notice, or other document delivered by one Party to the other in connection with this Agreement shall serve to amend or modify any provision of this Agreement.

Section 12.10 Counterparts. This Agreement may be executed in one or more counterparts, all of which will be deemed an original, and will become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Party, it being understood that all Parties need not sign the same counterpart; all of such counterparts will together constitute one and the same instrument. The Parties agree that facsimile copies of this Agreement will be deemed to be the equivalent of originals.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement, effective as of the Effective Date.

**MCR:**

MCR Oil Tools LLC

By: _____

Michael C. Robertson

Title: President

Date: May 13, 2011

**LICENSEE:**

SPEX Services Limited

Name: _____

John Fox

Title: COMMERCIAL DIRECTOR

Date: 16/05/2011

16ᵗʰ May 2011

16

# APPENDIX  A

1.    Licensee:

SPEX Services  Limited

2.    Licensed Patents:

A. Michael C. Robertson, U.S. Patent No. 4,598,769; Pipe Cutting Apparatus
B. Michael C. Robertson, U.K. Patent No. 2169940; Pipe Cutting Apparatus
C. Michael C. Robertson, Canada Patent No. 1234350; Pipe Cutting Apparatus
D. Michael C. Robertson, Mexico Patent No. 167908 ; Pipe Cutting Apparatus
E. Michael C. Robertson, Italy Patent No. 1203725; Pipe Cutting Apparatus
F. Michael C. Robertson, German Patent No. G 8600093.4; Pipe Cutting Apparatus
G. Michael C. Robertson, U.S. Patent No. 6,186,226B1; Borehole Conduit Cutting
H. Michael C. Robertson, U.S. Patent No.6,71,449B2; Pipe Cutting Apparatus
I.  Michael C. Robertson, U.S. Patent No. 6,598,679B2; Pipe Cutting Apparatus
J.  Michael C. Robertson, U.S. Patent No. 6,925,937B2; Thermal Generator
K. Michael C. Robertson, U.S. Patent No. 5,435,394; Anchor System for Pipe Cutting
    Apparatus

3.    Territory:

Global

4.    Addresses for Notices:

If to licensee:

SPEX Services Limited
Dunnottar House
Howe Moss Drive
Kirkhill Industrial Estate
Aberdeen, Scotland
AB21 0FN

If to MCR:

MCR Oil Tool Corp.
7315 Business Place
Arlington, Texas 76001

5.    License fees:  Select appropriate License level and fee from Appendix C.

6.    Running Royalties:  Royalties are waived.

17

# APPENDIX   B

## Price List

# MCR OIL TOOLS
Price List
Effective Date – August 1, 2010

| Item | Description | Currency | Qty | UOM | Retail Price | International Price | Domestic Price | Effective Date |
|------|-------------|----------|-----|-----|--------------|-------------------|----------------|----------------|
| AES.0.750-0084 | 3/4" ROPE SOCKET 7/32" LINE | USD | 1 | EACH | $84.00 | $84.00 | $84.00 | 8/1/2010 |
| AES.0.750-0085 | 3/4" CLAMP RING 7/32" LINE | USD | 1 | EACH | $49.00 | $49.00 | $49.00 | 8/1/2010 |
| AES.0.750-0087 | CBLHD TOOL 3/4" | USD | 1 | EACH | $138.00 | $138.00 | $138.00 | 8/1/2010 |
| AES.AS10009 | AES PIN 11/16" / GO BOX 3/4" | USD | 1 | EACH | $453.00 | $453.00 | $453.00 | 8/1/2010 |
| AES.AS20004-7/32 | CBLHD 3/4" AES 7/32" LN | USD | 1 | EACH | $1,134.00 | $1,134.00 | $1,134.00 | 8/1/2010 |
| AES.AS20005 | SB ASS'Y STL 3/4" X 5" W/PROT | USD | 1 | EACH | $1,248.00 | $1,248.00 | $1,248.00 | 8/1/2010 |
| ARM-1500-340 | #0 EMA ARM PACK | USD | 1 | EACH | $160.00 | $160.00 | $160.00 | 8/1/2010 |
| ARM-1500-341 | #1 EMA ARM PACK | USD | 1 | EACH | $160.00 | $160.00 | $160.00 | 8/1/2010 |
| ARM-1500-342 | #2 EMA ARM PACK | USD | 1 | EACH | $160.00 | $160.00 | $160.00 | 8/1/2010 |
| ARM-1500-343 | #3 EMA ARM PACK | USD | 1 | EACH | $160.00 | $160.00 | $160.00 | 8/1/2010 |
| ARM-1500-344 | #4 EMA ARM PACK | USD | 1 | EACH | $160.00 | $160.00 | $160.00 | 8/1/2010 |
| ARM-1500-345 | #5 EMA ARM PACK | USD | 1 | EACH | $160.00 | $160.00 | $160.00 | 8/1/2010 |
| ARM-1500-346 | #6 EMA ARM PACK | USD | 1 | EACH | $160.00 | $160.00 | $160.00 | 8/1/2010 |
| ARM-1500-347 | #7 EMA ARM PACK | USD | 1 | EACH | $160.00 | $160.00 | $160.00 | 8/1/2010 |
| ARM-1500-348 | #8 EMA ARM PACK | USD | 1 | EACH | $160.00 | $160.00 | $160.00 | 8/1/2010 |
| ARM-1500-349 | #9 EMA ARM PACK | USD | 1 | EACH | $160.00 | $160.00 | $160.00 | 8/1/2010 |
| ARM.1500.KIT | #0 THRU #7 EMA ARM KIT | USD | 1 | EACH | $1,240.00 | $1,240.00 | $1,240.00 | 8/1/2010 |
| CFP-1500-100 | CHECK FIRE PANEL | USD | 1 | EACH | $5,160.00 | $5,160.00 | $5,160.00 | 8/1/2010 |
| EMA-1500-100KT | E-LINE Electro Mechanical Anchor KIT | USD | 1 | EACH | $15,460.00 | $15,460.00 | $15,460.00 | 8/1/2010 |
| EMA-1500-200KT | SLICKLINE Electro Mechanical Anchor KIT | USD | 1 | EACH | $15,460.00 | $15,460.00 | $15,460.00 | 8/1/2010 |
| EXT-0750-100 | 3/4" EXTENSION | USD | 1 | EACH | $2,940.00 | $2,940.00 | $1,029.00 | 6/1/2010 |
| EXT-0875-100 | 7/8" EXTENSION | USD | 1 | EACH | $2,940.00 | $1,323.00 | $1,029.00 | 8/1/2010 |
| EXT-1000-100 | 1" EXTENSION | USD | 1 | EACH | $2,940.00 | $1,323.00 | $1,029.00 | 8/1/2010 |
| EXT-1375-100 | 1-3/8" EXTENSION | USD | 1 | EACH | $820.00 | $369.00 | $287.00 | 8/1/2010 |
| EXT-1500-100 | 1-1/2" EXTENSION | USD | 1 | EACH | $860.00 | $387.00 | $301.00 | 8/1/2010 |
| EXT-1688-100 | 1 11/16" EXTENSION | USD | 1 | EACH | $900.00 | $405.00 | $315.00 | 8/1/2010 |
| EXT-1750-100 | 1-3/4" EXTENSION | USD | 1 | EACH | $1,200.00 | $540.00 | $420.00 | 8/1/2010 |
| EXT-2000-100 | 2" EXTENSION | USD | 1 | EACH | $1,220.00 | $549.00 | $427.00 | 8/1/2010 |

## MCR OIL TOOLS
Price List
Effective Date - August 1, 2010

| Item | Description | Currency | Qty | UOM | Retail Price | International Price | Domestic Price | Effective Date |
|------|-------------|----------|-----|-----|--------------|--------------------|-----------------|----------------|
| EXT-2500-100 | 2-1/2" EXTENSION | USD | 1 | EACH | $1,240.00 | $558.00 | $434.00 | 8/1/2010 |
| EXT-2937-100 | 2-15/16" EXTENSION | USD | 1 | EACH | $1,360.00 | $612.00 | $476.00 | 8/1/2010 |
| EXT-3375-100 | 3-3/8" EXTENSION | USD | 1 | EACH | $1,760.00 | $792.00 | $616.00 | 8/1/2010 |
| EXT-4000-100 | 4' & 5" EXTENSION | USD | 1 | EACH | $1,860.00 | $837.00 | $651.00 | 8/1/2010 |
| FPF-0000-100 | FIRE PANEL FILTER | USD | 1 | EACH | $2,000.00 | $2,000.00 | $2,000.00 | 8/1/2010 |
| GSS-0750-100 | 3/4" GENERATOR SUB SAFETY SLEEVE | USD | 1 | EACH | $1,240.00 | $1,240.00 | $1,240.00 | 8/1/2010 |
| GSS-0875-100 | 7/8" GENERATOR SUB SAFETY SLEEVE | USD | 1 | EACH | $1,240.00 | $1,240.00 | $1,240.00 | 8/1/2010 |
| GSS-1000-100 | 1" GENERATOR SUB SAFETY SLEEVE | USD | 1 | EACH | $1,240.00 | $1,240.00 | $1,240.00 | 8/1/2010 |
| GSS-1125-100 | 1-1/8" GENERATOR SUB SAFETY SLEEVE | USD | 1 | EACH | $1,240.00 | $1,240.00 | $1,240.00 | 8/1/2010 |
| GSS-1375-100 | 1-3/8" GENERATOR SUB SAFETY SLEEVE | USD | 1 | EACH | $1,240.00 | $1,240.00 | $1,240.00 | 8/1/2010 |
| GSS-1500-100 | 1-1/2" GENERATOR SUB SAFETY SLEEVE | USD | 1 | EACH | $1,240.00 | $1,240.00 | $1,240.00 | 8/1/2010 |
| GSS-1688-100 | 1-11/16" GENERATOR SUB SAFETY SLEEVE | USD | 1 | EACH | $1,240.00 | $1,240.00 | $1,240.00 | 8/1/2010 |
| GSS-2000-100 | 2" GENERATOR SUB SAFETY SLEEVE | USD | 1 | EACH | $1,240.00 | $1,240.00 | $1,240.00 | 8/1/2010 |
| GSS-2500-100 | 2-1/2" GENERATOR SUB SAFETY SLEEVE | USD | 1 | EACH | $1,240.00 | $1,240.00 | $1,240.00 | 8/1/2010 |
| GSS-2937-100 | 2-15/16" GENERATOR SUB SAFETY SLEEVE | USD | 1 | EACH | $1,240.00 | $1,240.00 | $1,240.00 | 8/1/2010 |
| GSS-3375-100 | 3-3/8" GENERATOR SUB SAFETY SLEEVE | USD | 1 | EACH | $1,240.00 | $1,240.00 | $1,240.00 | 8/1/2010 |
| GSS-4500-100 | 4-1/2" GENERATOR SUB SAFETY SLEEVE | USD | 1 | EACH | $1,540.00 | $1,540.00 | $1,540.00 | 8/1/2010 |
| HAF-1000-100 | ANCHOR FINGERS | USD | 1 | EACH | $20.00 | $9.00 | $7.00 | 8/1/2010 |
| HCK-1437-100 | 1-7/16" CENTRALIZER KIT COMPLETE | USD | 1 | EACH | $2,120.00 | $2,120.00 | $2,120.00 | 8/1/2010 |
| HCK-1688-100 | 1-11/16" CENTRALIZER KIT COMPLETE | USD | 1 | EACH | $3,140.00 | $3,140.00 | $3,140.00 | 8/1/2010 |
| HCK-2750-100 | 2-3/4" SINGLE ADJUSTABLE CENTRALIZER | USD | 1 | EACH | $6,900.00 | $6,900.00 | $6,900.00 | 8/1/2010 |
| HOK-AES-1437 | 1-7/16" DECENTRALIZING MECH ARM TOP KIT | USD | 1 | EACH | $4,510.00 | $4,510.00 | $4,510.00 | 8/1/2010 |
| HOK-0750-100 | 3/4" HARDWARE O'RING KIT | USD | 1 | EACH | $40.00 | $18.00 | $14.00 | 8/1/2010 |
| HOK-0875-100 | 7/8" HARDWARE O'RING KIT | USD | 1 | EACH | $40.00 | $18.00 | $14.00 | 8/1/2010 |
| HOK-1000-100 | 1" HARDWARE O'RING KIT | USD | 1 | EACH | $40.00 | $18.00 | $14.00 | 8/1/2010 |
| HOK-1375-100 | 1-3/8" HARDWARE O'RING KIT | USD | 1 | EACH | $40.00 | $18.00 | $14.00 | 8/1/2010 |
| HOK-1500-100 | 1-1/2" HARDWARE O'RING KIT | USD | 1 | EACH | $60.00 | $27.00 | $21.00 | 8/1/2010 |
| HOK-1688-100 | 1-11/16" HARDWARE O'RING KIT | USD | 1 | EACH | $60.00 | $27.00 | $21.00 | 8/1/2010 |

## MCR OIL TOOLS
Price List
Effective Date - August 1, 2010

| Item | Description | Currency | Qty | UOM | Retail Price | International Price | Domestic Price | Effective Date |
|---|---|---|---|---|---|---|---|---|
| HOK-2000-100 | 2" HARDWARE ORING KIT | USD | 1 | EACH | $80.00 | $36.00 | $28.00 | 8/1/2010 |
| HOK-2500-100 | 2-1/2" HARDWARE ORING KIT | USD | 1 | EACH | $80.00 | $36.00 | $28.00 | 8/1/2010 |
| HOK-2937-100 | 2-15/16" HARDWARE ORING KIT | USD | 1 | EACH | $80.00 | $36.00 | $28.00 | 8/1/2010 |
| HOK-3375-100 | 3-3/8" HARDWARE ORING KIT | USD | 1 | EACH | $80.00 | $36.00 | $28.00 | 8/1/2010 |
| HOK-4000-100 | 4" HARDWARE ORING KIT | USD | 1 | EACH | $100.00 | $45.00 | $35.00 | 8/1/2010 |
| HOK-5000-100 | 5" HARDWARE ORING KIT | USD | 1 | EACH | $100.00 | $45.00 | $35.00 | 8/1/2010 |
| HPF-HPH-1375-100 | 1-3/8" PRESSURE FIRING HEAD SYSTEM | USD | 1 | EACH | $4,820.00 | $4,820.00 | $4,820.00 | 8/1/2010 |
| HPF-HPI-1658-100 | 1-11/16" PRESSURE FIRING HEAD SYSTEM | USD | 1 | EACH | $3,680.00 | $3,680.00 | $3,680.00 | 8/1/2010 |
| HSS-0250-CP | 1/4"-20 X 1/4" ANCHOR SET SCREWS (CP) | USD | 1 | PK-100 | $100.00 | $45.00 | $35.00 | 8/1/2010 |
| HSS-0375-HD | 1/4"-20 X 3/8" ANCHOR SET SCREWS (HD) | USD | 1 | PK-100 | $100.00 | $45.00 | $35.00 | 8/1/2010 |
| HSS-0500-HD | 1/4"-20 X 1/2" ANCHOR SET SCREWS (HD) | USD | 1 | PK-100 | $100.00 | $45.00 | $35.00 | 8/1/2010 |
| HSS-0750-HD | 1/4"-20 X 3/4" ANCHOR SET SCREWS (HD) | USD | 1 | PK-100 | $100.00 | $45.00 | $35.00 | 8/1/2010 |
| HTK-0750-100 | 3/4" & 7/8" & 1" HARDWARE TOOL KIT | USD | 1 | EACH | $100.00 | $45.00 | $35.00 | 8/1/2010 |
| HTK-1375-100 | 1-3/8" & 1-1/2" HARDWARE TOOL KIT | USD | 1 | EACH | $100.00 | $45.00 | $35.00 | 8/1/2010 |
| HTK-1658-100 | 1-11/16" & 2" HARDWARE TOOL KIT | USD | 1 | EACH | $100.00 | $45.00 | $35.00 | 8/1/2010 |
| HTK-2500-100 | 2-1/2" & 2-15/16" HARDWARE TOOL KIT | USD | 1 | EACH | $100.00 | $45.00 | $35.00 | 8/1/2010 |
| HTK-3375-100 | 3-3/8" & 4" & 5" HARDWARE TOOL KIT | USD | 1 | EACH | $100.00 | $45.00 | $36.00 | 8/1/2010 |
| HTS-1000-001 | HARDWARE TORCH SHIELD | USD | 1 | EACH | $5,740.00 | $2,583.00 | $2,009.00 | 8/1/2010 |
| HTS-1000-002 | HARDWARE TORCH SHIELD | USD | 1 | EACH | $6,300.00 | $2,835.00 | $2,205.00 | 8/1/2010 |
| HTS-1000-003 | 4" & 5" HARDWARE TORCH SHIELD | USD | 1 | EACH | $7,500.00 | $3,375.00 | $2,625.00 | 8/1/2010 |
| KIT-0750-300 | 3/4" RADIAL CUTTING TORCH KIT | USD | 1 | EACH | $38,000.00 | $17,100.00 | $13,300.00 | 8/1/2010 |
| KIT-0875-300 | 7/8" RADIAL CUTTING TORCH KIT | USD | 1 | EACH | $38,000.00 | $17,100.00 | $13,300.00 | 8/1/2010 |
| KIT-1000-300 | 1" RADIAL CUTTING TORCH KIT | USD | 1 | EACH | $38,000.00 | $17,100.00 | $13,300.00 | 8/1/2010 |
| KIT-1375-400 | 1-3/8" RADIAL CUTTING TORCH KIT | USD | 1 | EACH | $18,600.00 | $8,370.00 | $6,510.00 | 8/1/2010 |
| KIT-1500-400 | 1-1/2" RADIAL CUTTING TORCH KIT | USD | 1 | EACH | $17,000.00 | $7,650.00 | $5,950.00 | 8/1/2010 |
| KIT-1500-999XP | 1-1/2" RADIAL CUTTING TORCH XP KIT | USD | 1 | EACH | $36,800.00 | $16,560.00 | $12,880.00 | 8/1/2010 |
| KIT-1688-400 | 1-11/16" RADIAL CUTTING TORCH KIT | USD | 1 | EACH | $20,200.00 | $9,090.00 | $7,070.00 | 8/1/2010 |
| KIT-1750-999XP | 1-3/4" RADIAL CUTTING TORCH XP KIT | USD | 1 | EACH | $39,200.00 | $17,640.00 | $13,720.00 | 8/1/2010 |

MCR OIL TOOLS
Price List
Effective Date - August 1, 2010

| Item | Description | Currency | Qty | UOM | Retail Price | International Price | Domestic Price | Effective Date |
|---|---|---|---|---|---|---|---|---|
| KIT-2000-400 | 2" RADIAL CUTTING TORCH KIT | USD | 1 | EACH | $22,900.00 | $10,305.00 | $8,015.00 | 8/1/2010 |
| KIT-2500-400 | 2-1/2" RADIAL CUTTING TORCH KIT | USD | 1 | EACH | $27,500.00 | $12,375.00 | $9,625.00 | 8/1/2010 |
| KIT-2937-300 | 2-15/16" RADIAL CUTTING TORCH KIT | USD | 1 | EACH | $31,300.00 | $14,085.00 | $10,965.00 | 8/1/2010 |
| KIT-3375-400 | 3-3/8" RADIAL CUTTING TORCH KIT | USD | 1 | EACH | $43,000.00 | $19,350.00 | $15,050.00 | 8/1/2010 |
| KIT-4000-400 | 4" RADIAL CUTTING TORCH KIT | USD | 1 | EACH | $43,400.00 | $19,530.00 | $15,190.00 | 8/1/2010 |
| KIT-5000-400 | 5" RADIAL CUTTING TORCH KIT | USD | 1 | EACH | $47,300.00 | $21,285.00 | $16,555.00 | 8/1/2010 |
| KIT-7000-300 | 7" RADIAL CUTTING TORCH KIT | USD | 1 | EACH | $84,220.00 | $37,899.00 | $29,477.00 | 8/1/2010 |
| KXRT-1125-300 | 1-1/8" EXTENDED REACH TORCH KIT | USD | 1 | EACH | $29,900.00 | $13,455.00 | $10,465.00 | 8/1/2010 |
| KXRT-1375-300 | 1-3/8" EXTENDED REACH TORCH KIT | USD | 1 | EACH | $20,400.00 | $9,180.00 | $7,140.00 | 8/1/2010 |
| KXRT-1500-300 | 1-1/2" EXTENDED REACH TORCH KIT | USD | 1 | EACH | $18,600.00 | $8,370.00 | $6,510.00 | 8/1/2010 |
| KXRT-1688-300 | 1-11/16" EXTENDED REACH TORCH KIT | USD | 1 | EACH | $21,400.00 | $9,630.00 | $7,490.00 | 8/1/2010 |
| KXRT-1750-200 | 1-3/4" EXTENDED REACH TORCH KIT | USD | 1 | EACH | $22,860.00 | $10,287.00 | $8,001.00 | 8/1/2010 |
| KXRT-2000-300 | 2" EXTENDED REACH TORCH KIT | USD | 1 | EACH | $24,000.00 | $10,800.00 | $8,400.00 | 8/1/2010 |
| KXRT-2500-300 | 2-1/2" EXTENDED REACH TORCH KIT | USD | 1 | EACH | $28,000.00 | $12,600.00 | $9,800.00 | 8/1/2010 |
| KXRT-2937-300 | 2-15/16" EXTENDED REACH TORCH KIT | USD | 1 | EACH | $34,000.00 | $15,300.00 | $11,900.00 | 8/1/2010 |
| KXRT-3375-300 | 3-3/8" EXTENDED REACH TORCH KIT | USD | 1 | EACH | $44,000.00 | $19,800.00 | $15,400.00 | 8/1/2010 |
| KXRT-4000-300 | 4" EXTENDED REACH TORCH KIT | USD | 1 | EACH | $45,700.00 | $20,565.00 | $15,995.00 | 8/1/2010 |
| PBA-0750-321 | 3/4" PBA BODY | USD | 1 | EACH | $1,600.00 | $720.00 | $560.00 | 8/1/2010 |
| PBA-0875-321 | 7/8" PBA BODY | USD | 1 | EACH | $1,600.00 | $720.00 | $560.00 | 8/1/2010 |
| PBA-1000-321 | 1" PBA BODY | USD | 1 | EACH | $1,600.00 | $720.00 | $560.00 | 8/1/2010 |
| PBA-1125-321 | 1-1/8" PBA BODY | USD | 1 | EACH | $1,600.00 | $720.00 | $560.00 | 8/1/2010 |
| PBA-1375-121 | 1-3/8" PBA BODY | USD | 1 | EACH | $740.00 | $333.00 | $259.00 | 8/1/2010 |
| PBA-1500-121 | 1-1/2" PBA BODY | USD | 1 | EACH | $840.00 | $378.00 | $294.00 | 8/1/2010 |
| PBA-1688-216 | 1-11/16" PBA SOCKET SUB | USD | 1 | EACH | $280.00 | $126.00 | $98.00 | 8/1/2010 |
| PBA-1688-219 | 1-11/16" PBA CONNECTOR | USD | 1 | EACH | $280.00 | $126.00 | $98.00 | 8/1/2010 |
| PBA-1688-220 | 1-11/16" PBA BULL PLUG | USD | 1 | EACH | $240.00 | $108.00 | $84.00 | 8/1/2010 |
| PBA-1688-221 | 1-11/16" PBA BODY | USD | 1 | EACH | $740.00 | $333.00 | $269.00 | 8/1/2010 |
| PBA-2000-218 | 2" PBA SOCKET SUB | USD | 1 | EACH | $420.00 | $189.00 | $147.00 | 8/1/2010 |

## MCR OIL TOOLS
Price List
Effective Date – August 1, 2010

| Item | Description | Currency | Qty | UOM | Retail Price | International Price | Domestic Price | Effective Date |
|------|-------------|----------|-----|-----|--------------|--------------------|----------------|----------------|
| PBA-2000-219 | 2" PBA CONNECTOR | USD | 1 | EACH | $380.00 | $171.00 | $133.00 | 8/1/2010 |
| PBA-2000-220 | 2" PBA BULL PLUG | USD | 1 | EACH | $280.00 | $126.00 | $98.00 | 8/1/2010 |
| PBA-2000-221 | 2" PBA BODY | USD | 1 | EACH | $600.00 | $270.00 | $210.00 | 8/1/2010 |
| PBA-2500-218 | 2-1/2" PBA SOCKET SUB | USD | 1 | EACH | $460.00 | $207.00 | $161.00 | 8/1/2010 |
| PBA-2500-219 | 2-1/2" PBA CONNECTOR | USD | 1 | EACH | $440.00 | $198.00 | $154.00 | 8/1/2010 |
| PBA-2500-220 | 2-1/2" PBA BULL PLUG | USD | 1 | EACH | $320.00 | $144.00 | $112.00 | 8/1/2010 |
| PBA-2500-221 | 2-1/2" PBA BODY | USD | 1 | EACH | $780.00 | $351.00 | $273.00 | 8/1/2010 |
| PBA-2937-218 | 2-15/16" PBA SOCKET SUB | USD | 1 | EACH | $420.00 | $189.00 | $147.00 | 8/1/2010 |
| PBA-2937-219 | 2-15/16" PBA CONNECTOR | USD | 1 | EACH | $400.00 | $180.00 | $140.00 | 8/1/2010 |
| PBA-2937-220 | 2-15/16" PBA BULL PLUG | USD | 1 | EACH | $380.00 | $171.00 | $133.00 | 8/1/2010 |
| PBA-2937-221 | 2-15/16" PBA BODY | USD | 1 | EACH | $960.00 | $432.00 | $336.00 | 8/1/2010 |
| PBA-3375-218 | 3-3/8" PBA SOCKET SUB | USD | 1 | EACH | $440.00 | $198.00 | $154.00 | 8/1/2010 |
| PBA-3375-219 | 3-3/8" PBA CONNECTOR | USD | 1 | EACH | $400.00 | $180.00 | $140.00 | 8/1/2010 |
| PBA-3375-220 | 3-3/8" PBA BULL PLUG | USD | 1 | EACH | $420.00 | $189.00 | $147.00 | 8/1/2010 |
| PBA-3375-221 | 3-3/8" PBA BODY | USD | 1 | EACH | $980.00 | $441.00 | $343.00 | 8/1/2010 |
| PBA-3375-319 | 3-3/8" EXTENDED PBA CONNECTOR( 7.5") | USD | 1 | EACH | $500.00 | $500.00 | $500.00 | 8/1/2010 |
| PBA-3375-421 | 3-3/8" EXTENTED PBA BODY (65") | USD | 1 | EACH | $2,000.00 | $2,000.00 | $2,000.00 | 8/1/2010 |
| PBA-3375-521 | 3-3/8" EXTENDED PBA BODY ( 44") | USD | 1 | EACH | $2,400.00 | $2,400.00 | $2,400.00 | 8/1/2010 |
| PBE-1375-121 | 1-3/8" PBA EXTENSION | USD | 1 | EACH | $640.00 | $288.00 | $224.00 | 8/1/2010 |
| PBE-1500-121 | 1-1/2" PBA EXTENSION | USD | 1 | EACH | $740.00 | $333.00 | $259.00 | 8/1/2010 |
| PTC-0750-200 | 3/4" PERFORATING TORCH CUTTER | USD | 1 | EACH | $7,420.00 | $3,339.00 | $2,597.00 | 8/1/2010 |
| PTC-0875-200 | 7/8" PERFORATING TORCH CUTTER | USD | 1 | EACH | $7,440.00 | $3,348.00 | $2,604.00 | 8/1/2010 |
| PTC-1000-200 | 1" PERFORATING TORCH CUTTER | USD | 1 | EACH | $7,500.00 | $3,375.00 | $2,625.00 | 8/1/2010 |
| PTC-1375-200 | 1-3/8" PERFORATING TORCH CUTTER | USD | 1 | EACH | $7,300.00 | $3,285.00 | $2,555.00 | 8/1/2010 |
| PTC-1688-200 | 1-11/16" PERFORATING TORCH CUTTER | USD | 1 | EACH | $5,640.00 | $2,538.00 | $1,974.00 | 8/1/2010 |
| PTC-2500-200 | 2-1/2" PERFORATING TORCH CUTTER | USD | 1 | EACH | $8,660.00 | $3,897.00 | $3,031.00 | 8/1/2010 |
| PTC-2937-200 | 2-15/16" PERFORATING TORCH CUTTER | USD | 1 | EACH | $10,480.00 | $4,716.00 | $3,668.00 | 8/1/2010 |
| PTS-0750-300 | 3/4" PERFORATING TORCH SYSTEM | USD | 1 | EACH | $15,240.00 | $6,858.00 | $5,334.00 | 8/1/2010 |

MCR OIL TOOLS
Price List
Effective Date - August 1, 2010

| Item | Description | Currency | Qty | UOM | Retail Price | International Price | Domestic Price | Effective Date |
|------|-------------|----------|-----|-----|--------------|--------------------|----------------|----------------|
| PTS-0875-300 | 7/8" PERFORATING TORCH SYSTEM | USD | 1 | EACH | $15,240.00 | $6,858.00 | $5,334.00 | 8/1/2010 |
| PTS-1000-300 | 1" PERFORATING TORCH SYSTEM | USD | 1 | EACH | $15,240.00 | $6,858.00 | $5,334.00 | 8/1/2010 |
| PTS-1375-400 | 1-3/8" PERFORATING TORCH SYSTEM | USD | 1 | EACH | $15,000.00 | $6,750.00 | $5,250.00 | 8/1/2010 |
| PTS-1688-300 | 1-11/16" PERFORATING TORCH SYSTEM | USD | 1 | EACH | $13,100.00 | $5,895.00 | $4,585.00 | 8/1/2010 |
| PTS-2500-300 | 2-1/2" PERFORATING TORCH SYSTEM | USD | 1 | EACH | $14,600.00 | $6,570.00 | $5,110.00 | 8/1/2010 |
| PTS-2937-300 | 2-15/16" PERFORATING TORCH SYSTEM | USD | 1 | EACH | $18,860.00 | $8,487.00 | $6,601.00 | 8/1/2010 |
| RCT-1375-200 | 1-3/8" RADIAL CUTTING TORCH | USD | 1 | EACH | $4,000.00 | $1,800.00 | $1,400.00 | 8/1/2010 |
| RCT-1500-200 | 1-1/2" RADIAL CUTTING TORCH | USD | 1 | EACH | $3,400.00 | $1,530.00 | $1,190.00 | 8/1/2010 |
| RCT-1500-999XP | 1-1/2" RADIAL CUTTING TORCH | USD | 1 | EACH | $11,860.00 | $5,337.00 | $4,151.00 | 8/1/2010 |
| RCT-1688-200 | 1-11/16" RADIAL CUTTING TORCH | USD | 1 | EACH | $3,600.00 | $1,620.00 | $1,260.00 | 8/1/2010 |
| RCT-1750-999XP | 1-3/4" XP RADIAL CUTTING TORCH | USD | 1 | EACH | $16,000.00 | $7,200.00 | $5,600.00 | 8/1/2010 |
| RCT-2000-200 | 2' RADIAL CUTTING TORCH | USD | 1 | EACH | $4,200.00 | $1,890.00 | $1,470.00 | 8/1/2010 |
| RCT-2500-200 | 2-1/2" RADIAL CUTTING TORCH | USD | 1 | EACH | $4,700.00 | $2,115.00 | $1,645.00 | 8/1/2010 |
| RCT-2937-100 | 2-15/16" RADIAL CUTTING TORCH | USD | 1 | EACH | $5,400.00 | $2,430.00 | $1,890.00 | 8/1/2010 |
| RCT-3375-200 | 3-3/8" RADIAL CUTTING TORCH | USD | 1 | EACH | $10,000.00 | $4,500.00 | $3,500.00 | 8/1/2010 |
| RCT-4000-100 | 4" RADIAL CUTTING TORCH | USD | 1 | EACH | $10,800.00 | $4,860.00 | $3,780.00 | 8/1/2010 |
| RCT-5000-050 | 5" RADIAL CUTTING TORCH | USD | 1 | EACH | $11,000.00 | $4,950.00 | $3,850.00 | 8/1/2010 |
| SUB-0750-500 | 3/4" ISOLATION SUB (BOX-STYLE) | USD | 1 | EACH | $1,960.00 | $882.00 | $686.00 | 8/1/2010 |
| SUB-0875-500 | 7/8" ISOLATION SUB (BOX-STYLE) | USD | 1 | EACH | $1,960.00 | $882.00 | $686.00 | 8/1/2010 |
| SUB-1000-500 | 1" ISOLATION SUB (BOX-STYLE) | USD | 1 | EACH | $1,960.00 | $882.00 | $686.00 | 8/1/2010 |
| SUB-1375-300 | 1-3/8" PRESSURE FIRING SUB | USD | 1 | EACH | $460.00 | $207.00 | $161.00 | 8/1/2010 |
| SUB-1375-700 | 1-3/8" GENERATOR SUB (HEATER) | USD | 1 | EACH | $460.00 | $207.00 | $161.00 | 8/1/2010 |
| SUB-1500-300 | 1-1/2" PRESSURE FIRING SUB | USD | 1 | EACH | $480.00 | $216.00 | $168.00 | 8/1/2010 |
| SUB-1600-500 | 1-1/2" ISOLATION SUB (BOX-STYLE) | USD | 1 | EACH | $440.00 | $198.00 | $154.00 | 8/1/2010 |
| SUB-1500-700 | 1-1/2" GENERATOR SUB (HEATER) | USD | 1 | EACH | $440.00 | $198.00 | $154.00 | 8/1/2010 |
| SUB-1688-300 | 1-11/16" PRESSURE FIRING SUB | USD | 1 | EACH | $440.00 | $198.00 | $154.00 | 8/1/2010 |
| SUB-1688-700 | 1-11/16" GENERATOR SUB (HEATER) | USD | 1 | EACH | $480.00 | $216.00 | $168.00 | 8/1/2010 |
| SUB-2000-300 | 2" PRESSURE FIRING SUB | USD | 1 | EACH | $460.00 | $207.00 | $161.00 | 8/1/2010 |

## MCR OIL TOOLS
Price List
Effective Date - August 1, 2010

| Item | Description | Currency | Qty | UOM | Retail Price | International Price | Domestic Price | Effective Date |
|---|---|---|---|---|---|---|---|---|
| SUB-2000-700 | 2" GENERATOR SUB (HEATER) | USD | 1 | EACH | $480.00 | $216.00 | $168.00 | 8/1/2010 |
| SUB-2500-300 | 2-1/2" PRESSURE FIRING SUB | USD | 1 | EACH | $540.00 | $243.00 | $189.00 | 8/1/2010 |
| SUB-2500-700 | 2-1/2" GENERATOR SUB (HEATER) | USD | 1 | EACH | $500.00 | $225.00 | $175.00 | 8/1/2010 |
| SUB-2937-300 | 2-15/16" PRESSURE FIRING SUB | USD | 1 | EACH | $600.00 | $270.00 | $210.00 | 8/1/2010 |
| SUB-2937-700 | 2-15/16" GENERATOR SUB (HEATER) | USD | 1 | EACH | $640.00 | $288.00 | $224.00 | 8/1/2010 |
| SUB-3375-300 | 3-3/8" PRESSURE FIRING SUB | USD | 1 | EACH | $820.00 | $369.00 | $287.00 | 8/1/2010 |
| SUB-3375-700 | 3-3/8" GENERATOR SUB (HEATER) | USD | 1 | EACH | $840.00 | $378.00 | $294.00 | 8/1/2010 |
| SUB-4000-300 | 4" PRESSURE FIRING SUB | USD | 1 | EACH | $860.00 | $387.00 | $301.00 | 8/1/2010 |
| SUB-4000-700 | 4" GENERATOR SUB (HEATER) | USD | 1 | EACH | $1,420.00 | $639.00 | $497.00 | 8/1/2010 |
| SUB-4500-700 | 4-1/2" GENERATOR SUB (HEATER) | USD | 1 | EACH | $1,500.00 | $675.00 | $525.00 | 8/1/2010 |
| THG-0750-100 | 3/4" THERMAL GENERATOR | USD | 1 | EACH | $3,960.00 | $1,782.00 | $1,386.00 | 8/1/2010 |
| THG-0875-100 | 7/8" THERMAL GENERATOR | USD | 1 | EACH | $3,960.00 | $1,782.00 | $1,386.00 | 8/1/2010 |
| THG-1000-100 | 1" THERMAL GENERATOR | USD | 1 | EACH | $3,960.00 | $1,782.00 | $1,386.00 | 8/1/2010 |
| THG-1002-700 | 1" THERMAL GENERATOR (HV) | USD | 1 | EACH | $1,140.00 | $513.00 | $399.00 | 8/1/2010 |
| XRT-1375-100 | 1-3/8" EXTENDED REACH TORCH | USD | 1 | EACH | $4,040.00 | $1,816.00 | $1,414.00 | 8/1/2010 |
| XRT-1500-100 | 1-1/2" EXTENDED REACH TORCH | USD | 1 | EACH | $4,240.00 | $1,908.00 | $1,484.00 | 8/1/2010 |
| XRT-1685-100 | 1-11/16" EXTENDED REACH TORCH | USD | 1 | EACH | $4,500.00 | $2,025.00 | $1,575.00 | 8/1/2010 |
| XRT-1750-100 | 1-3/4" EXTENDED REACH TORCH | USD | 1 | EACH | $4,860.00 | $2,187.00 | $1,701.00 | 8/1/2010 |
| XRT-2000-100 | 2" EXTENDED REACH TORCH | USD | 1 | EACH | $5,200.00 | $2,340.00 | $1,820.00 | 8/1/2010 |
| XRT-2500-100 | 2-1/2" EXTENDED REACH TORCH | USD | 1 | EACH | $6,100.00 | $2,745.00 | $2,135.00 | 8/1/2010 |
| XRT-2937-100 | 2-15/16" EXTENDED REACH TORCH | USD | 1 | EACH | $7,900.00 | $3,555.00 | $2,765.00 | 8/1/2010 |
| XRT-3375-100 | 3-3/8" EXTENDED REACH TORCH | USD | 1 | EACH | $12,600.00 | $5,670.00 | $4,410.00 | 8/1/2010 |
| XRT-4000-100 | 4" EXTENDED REACH TORCH | USD | 1 | EACH | $13,400.00 | $6,030.00 | $4,690.00 | 8/1/2010 |

* MRT's were removed from our price list at the request of Bill Imvalle of HES

# APPENDIX C

## License Fee Structure

April 10, 2006

The following License fees are non-refundable.
The Licenses are for a standard term of three (3) years.
Renew ability of the License is subject to performance of the company.
NO renewable License fees are applicable and will NOT be charged to any Licensee.

### Domestic Licenses:

#### Level 1 License:

| | | |
|---|---|---|
| Price: | $10,000.00 | |
| Qualifications: | 1. | Single Shop Location |
| | 2. | 10 trucks or less in the company |
| | 3. | Single state territory |
| License Grant: | 1. | Use of the RCT equipment per MCR Specifications anywhere within the state boundary. |
| | 2. | No Offshore jobs permitted. |
| | 3. | Ability to purchase MCR products at the domestic discounted price Level 1. |

#### Level 2 License:

| | | |
|---|---|---|
| Price: | $25,000.00 | |
| Qualifications: | 1. | More than three shop locations |
| | 2. | 20 trucks or more in the company |
| | 3. | Three or more state territories |
| License Grant: | 1. | Use of the RCT equipment per MCR Specifications anywhere within the US territorial boundaries. |
| | 2. | No Offshore jobs permitted. |
| | 3. | Ability to purchase MCR products at the domestic discounted price Level 1. |

#### Level 3 License:

| | | |
|---|---|---|
| Price: | $50,000.00 | |
| Qualifications: | 1. | More than three shop locations |
| | 2. | 20 trucks or more in the company |
| | 3. | Three or more state territories |
| License Grant: | 1. | Use of the RCT equipment per MCR Specifications worldwide (as a service provider). |
| | 2. | Ability to purchase MCR products at the domestic discounted price Level 1 for domestic use  and price Level 2 for international use. |

## International Licenses

**Level 4 License:**

| | | |
|---|---|---|
| Price: | | $20,000.00 |
| Qualifications: | 1. | Single Shop Location |
| | 2. | 10 trucks or less in the company |
| | 3. | Single country territory |

| | | |
|---|---|---|
| License Grant: | 1. | Use of the RCT equipment per MCR Specifications anywhere within the designated country. |
| | 2. | No Offshore jobs permitted. |
| | 3. | Offshore jobs permitted with a $ 5,000.00 addition. |
| | 4. | Ability to purchase MCR products at the international discounted price Level 2. |

**Level 5 License:**

| | | |
|---|---|---|
| Price: | | $35,000.00 |
| Qualifications: | 1. | Three or less shop locations |
| | 2. | Fewer than 20 trucks in the company |
| | 3. | Single country territory |

| | | |
|---|---|---|
| License Grant: | 1. | Use of the RCT equipment per MCR Specifications any where within the designated country. |
| | 2. | No Offshore jobs permitted. |
| | 3. | Offshore jobs permitted with a $ 5,000.00 addition |
| | 4. | Ability to purchase MCR products at the international discounted price Level 2. |

**Level 6 License:**

| | | |
|---|---|---|
| Price: | | $70,000.00 |
| Qualifications: | 1. | More than three shop locations |
| | 2. | 20 trucks or more in the company |
| | 3. | Single country territory |

| | | |
|---|---|---|
| License Grant: | 1. | Use of the RCT equipment per MCR Specifications any where within the designated country. |
| | 2. | Offshore jobs permitted |
| | 3 | Ability to purchase MCR products at the international discounted price Level 2. |

# EXHIBIT B

# MCR OIL TOOLS, LLC

## LICENSE AGREEMENT

License Number XRT-2013-0021

**LICENSE AGREEMENT**

This License Agreement ("Agreement"), effective as of the last date of signature below (the "Effective Date"), is made and entered into by and between MCR Oil Tools, LLC, a Texas limited liability company ("MCR"), and the entity identified as "Licensee" in Appendix A attached hereto.

## ARTICLE I.  DEFINITIONS

Section 1.01   "Confidential Information" means and includes a Disclosing Party's confidential or proprietary information, which may include, but is not limited to, know-how, ideas, concepts, inventions and related proprietary subject matter, invention techniques, algorithms, methods, processes, programs, designs, drawings, schematics, sketches, products, equipment, instruments, documents, manuals, reports, studies, findings, research, samples, prototypes, product descriptions, trade secrets, financial and pricing information, customer lists, software source code, testing methods and results, operation procedures and/or manuals, plans, business and/or marketing studies and/or plans, and any other information, whether the information is disclosed in writing, in graphics, orally, in electronic form, or in any other manner.  By way of example and without limiting the foregoing, the Parties shall presume that all non-public information disclosed by MCR regarding the use, capability, design, manufacture or application of the Licensed Technology or the Licensed Products shall be Confidential Information protected within the scope of this Agreement unless such information is published by MCR, for example on its website, or is commonly provided by MCR to its customers in the ordinary course of business.  Further, Confidential Information specifically includes the terms of this Agreement. In the event that the Receiving Party shall have any doubts as to whether information received from the Disclosing Party shall be considered Confidential Information for the purposes hereof, the Receiving Party shall seek confirmation from the Disclosing Party and shall, until such confirmation is received in writing, treat the information as Confidential Information. Notwithstanding the foregoing, Confidential Information shall not include information made known to or independently developed by the Receiving Party from a source unrelated (directly or indirectly) to MCR and disclosed with no breach of any duty owed to MCR by any party.  The foregoing notwithstanding, the fact that individual elements of Confidential Information may come within the above exceptions shall not relieve the Receiving Party of its obligations hereunder unless all elements, and the specific combination of such elements, disclosed in such Confidential Information come within the above exceptions.

Section 1.02   "Improvements" means any improvement and/or modification of a device, product, method, or process belonging to MCR or its licensor(s).   Any and all future improvements and/or modifications, as set forth above, whether conceived and/or developed independently by MCR or Licensee, or jointly by MCR and Licensee, will be owned by MCR pursuant to the provisions of Section 3.04 below.

Section 1.03   "Licensed Level Restrictions" means the qualifications and grant restrictions of the license level specified on Appendix A, subject to such qualifications, grant restrictions, and license levels as are set forth on Appendix C for such license level.

1

Section 1.04 "Licensed Patents" means the United States and foreign Patents set forth on Appendix A that MCR owns or in which MCR otherwise holds, directly or indirectly, licensable rights as of the Effective Date and all those Patents with respect to which MCR may acquire licensable rights and, in its discretion, add to Appendix A subsequent to the Effective Date.

Section 1.05 "Licensed Products" means those products listed in Appendix B, and the term includes those products as modified or improved, and includes those products that MCR may in its discretion, but without any obligation, add to Appendix B, during the term of this Agreement.

Section 1.06 "Licensed Technology" means confidential or proprietary information of MCR relating to the Licensed Patents and/or Licensed Products, including, without limitation, know-how, methods, techniques, trade secrets, processes, design and/or performance specifications, drawings, operating procedures, test procedures, test results, methods of operation, and descriptive literature relating to the design, assembly, testing, use, and repair of the Licensed Products that are provided by MCR to Licensee pursuant to this Agreement.

Section 1.07 "Net Sales Revenue" means the amount actually received, if any, by Licensee or any designee of Licensee for any and all sales and services provided by Licensee to any Third Party in connection with the Licensed Products or Licensed Technology, less amounts actually repaid or credited by reason of rejection or rebate, and any sales taxes, value-added taxes, excise taxes, or duties paid on such amounts by Licensee.

Section 1.08 "Party" means either MCR or Licensee, as applicable, and "Parties" means both MCR and Licensee.

Section 1.09 "Patents" means all rights, title and interest in and to all U.S. and foreign patents and utility models and applications therefor, and all improvements, modifications, reissues, divisionals, reexaminations, renewals, extensions, provisionals, continuations, and continuations in-part thereof, whether acquired, licensed, or arising prior to or subsequent to the Effective Date.

Section 1.10 "Territory" means the geographical region specified on Appendix A.

Section 1.11 "Third Party" means any person or entity other than MCR and Licensee.

## ARTICLE II. REPRESENTATIONS AND ACKNOWLEDGEMENTS

Section 2.01 Licensee acknowledges that MCR holds valuable rights in and to pipe-cutting and perforating technology, and products for down-hole perforating, consuming, and/or cutting of tubulars and equipment, and conducts research into, and has licensed and/or developed, and continues to license and/or develop, valuable and unique technology and products for perforating, consuming and/or cutting of tubulars and equipment.

Section 2.02 Licensee acknowledges that MCR and/or its licensor(s) have spent significant time and effort, at significant expense, in the development, acquisition, protection, maintenance

2

and licensing of its intellectual property, including the Licensed Patents, Licensed Products, and Licensed Technology.

Section 2.03   Licensee acknowledges, as of the Effective Date, that (a) it has not invented, designed, developed, or improved (nor contributed to the invention, design, development or improvement of) any technology or products for the perforating, consuming and/or cutting of downhole pipes and/or tubulars and equipment using all or any part of the Licensed Products or Licensed Technology or thermite-based technology substantially similar thereto.

Section 2.04   Licensee acknowledges that, as of the Effective Date, it has no claim to ownership rights in the Licensed Patents or Licensed Technology, nor knows of any basis for such a claim.

Section 2.05   Licensee acknowledges that as of the Effective Date, it is not aware of any person or entity having invented, designed, developed, or improved (nor contributed to the invention, design, development or improvement of) any technology or products for the perforating, consuming and/or cutting of downhole pipes and/or tubulars and equipment using Licensed Products or Licensed Technology, or thermite-based technology substantially similar thereto, other than MCR and its personnel, licensor(s), and/or affiliates. Licensee further acknowledges and stipulates that it is not in the business of designing or developing thermite-based products or technology substantially similar to or competitive with the Licensed Products or Licensed Technology for use perforating, consuming and/or cutting of downhole pipes, tubulars, and/or equipment, and Licensee has no intention of entering such business.

Section 2.06   Licensee represents that as of the Effective Date, it is not aware of any basis for any challenge to the validity of the Licensed Patents or any claims therein, or of their enforceability against Licensee. Further, Licensee represents that, as of the Effective Date, it has no knowledge or notice of, nor any reason to know of, any claim, suit, action or proceeding (or threat thereof) that could: (a) invalidate or render unenforceable any claim of any Licensed Patent; (b) prove that the Licensed Products are not covered by any claim of any Licensed Patent; or (c) cause any claim of any Licensed Patent to fail to issue or be materially limited or restricted as compared with its currently pending scope.

Section 2.07   Licensee represents that it has not entered into any agreement with any Third Party that would conflict with any of Licensee's obligations under this Agreement, including, without limitation, Licensee's obligation to assign Improvements to MCR. In addition, Licensee represents that there is (a) no legal, administrative, arbitral, or other proceeding, suit, claim, or action of any nature, and (b) no judgment, decree, decision, injunction, writ, or order pending or, to the knowledge of Licensee, threatened or contemplated by or against or involving Licensee pertaining to Licensee's ability to fulfill its obligations under this Agreement or otherwise relevant to this Agreement before or by any arbitral body, governmental or quasi-governmental entity, administrative or regulatory agency, or any court.

## ARTICLE III.    LICENSE GRANT

Section 3.01   Grant of Restricted License:   Subject to the terms and conditions of this Agreement, MCR hereby grants to Licensee a limited, non-exclusive, non-assignable, nontransferable, non-sublicensable license under the Licensed Patents and under the Licensed

3

Technology during the Term (a) solely to use the Licensed Products within the Territory, within the License Level Restrictions, for its own use or in connection with the services that Licensee customarily provides to its customers, and (b) solely to use the Licensed Technology in support of the Licensed Products.

Section 3.02    License Only:  Licensee agrees that its non-exclusive possession and use of the Licensed Products and Licensed Technology is pursuant to this restricted license only, and that all Licensed Technology, Licensed Patents, and any other rights thereto, including Improvements, are and shall remain the property of MCR.  Licensee acknowledges and agrees that nothing in this Agreement shall be deemed to convey, by implication, estoppel, or otherwise, any ownership interest in the Licensed Technology or Licensed Patents to Licensee.  Any and all rights in the Licensed Patents and Licensed Technology not otherwise granted by MCR to Licensee explicitly herein (including without limitation the right to make, have made, offer to sell, sell, or import the Licensed Products, and the right to reproduce, distribute, display, or make derivative works from the Licensed Technology or Confidential Information) are expressly reserved to MCR.

Section 3.03    Limits on Use:  No use under the Licensed Patents or the Licensed Technology, and no use of the Licensed Products, other than as specifically provided for herein, is licensed or authorized.  Licensee shall only use the Licensed Products and Licensed Technology in strict accordance with the specifications, operating procedures, safety precautions, and training requirements established by MCR, and with the provisions of this Agreement.  Nothing in this Agreement shall be construed as granting any rights or licenses to Licensee other than the rights and licenses specifically granted herein.  Licensee may not, directly or by cooperation with a Third Party, engage or assist in any testing, modifying, reverse engineering, or development, with respect to the Licensed Patents, the Licensed Technology, MCR's Confidential Information, or the Licensed Products unless explicitly granted the right to do so by MCR in a writing bearing the handwritten signature of a duly authorized officer of MCR, which writing shall amend this Agreement and allow for such testing, modifying, reverse engineering, or development (as the case may be) only to the extent explicitly provided for in such writing from MCR.  With the exception of Licensed Technology that may be included in the product information to be provided to Licensee's customers as described in Paragraph 2.4 of the Terms and Conditions attached hereto as Appendix D,  Licensee shall not transmit or transfer any Licensed Technology or Licensed Products to any Third Party transferee regardless of whether such transferee may be an affiliate of Licensee, unless (a) the transmission or transfer has been explicitly authorized by MCR in advance in a writing bearing the handwritten signature of a duly authorized officer of MCR; AND (b) such transferee has, in advance, entered into, a binding license agreement with MCR; AND (c) Licensee remains strictly liable for the satisfaction of all terms of this Agreement by such transferee; provided, however, that Licensee may transfer temporary possession of the Licensed Products to an affiliated or Third Party shipping company solely for the purposes of shipping the Licensed Products to a specified location for use by the Licensee.

Section 3.04    Improvements:  Licensee acknowledges and agrees that all rights, title, and interest in and to any Improvements under the Licensed Patents or the Licensed Technology, including any intellectual property represented thereby or therein, including without limitation any and all patents and trade secrets, are and shall be owned exclusively by MCR.  Licensee shall provide prompt notice to MCR of the development of any Improvement, including all

4

information necessary to practice the Improvement. Licensee hereby irrevocably assigns, conveys, and sells to MCR its entire right, title, and interest in and to all Improvements, if any, including all applicable intellectual property rights thereto. Licensee shall in good faith cooperate in executing or causing to have executed by its officers, employees, agents, and/or legal representatives, any and all documents, including without limitation, assignments, applications, declarations, affidavits, powers of attorney, and other instruments, and in doing all other acts and things as may be reasonably necessary and/or needed to effect a transfer of Licensee's rights, title, and interest in and to any and all Improvements, as set forth above.

Section 3.05   Agreement Not to Challenge Validity or Cooperate with Infringement: Licensee shall never voluntarily assist, directly or indirectly, in a challenge to the validity or enforceability of the Licensed Patents or the Licensed Technology, and hereby disclaims any knowledge of any basis for such a claim as of the Effective Date. Licensee further agrees not to in any way request or participate in, directly or indirectly, any interference proceeding or reexamination of any claim of the Licensed Patents. Licensee shall not in any manner represent, directly or indirectly, that it has any ownership interest in any Licensed Technology or Licensed Patent. Licensee acknowledges and agrees that, if Licensee breaches or threatens to breach any provision of this Section 3.05, (a) MCR may thereafter terminate this Agreement upon three days written notice to Licensee with no opportunity for Licensee to cure, and (b) MCR shall be entitled to injunctive or protective relief to redress or prevent such breach, and further acknowledges and stipulates that in the event of such a breach Licensee would be liable to MCR for MCR's attorneys' fees, general administrative costs, market disruption, and all other consequential and incidental damages reasonably attributable to such breach. Further, Licensee shall not knowingly cooperate with or seek to benefit from any Third Party's infringement of MCR's rights in connection with the Licensed Patents or the Licensed Technology.

Section 3.06   Patent Prosecution and Maintenance: For each patent and patent application included as a Licensed Patent, MCR shall be solely responsible for, and make all decisions concerning, the preparation, filing, prosecution, and/or maintenance thereof, and shall have no obligation to notify Licensee of any additions or deletions and any changes in the status of any Licensed Patent.

Section 3.07   No Exhaustion; Enforcement Against Third Parties:

(a)     MCR's Reserved Patent Claims. Licensee acknowledges and agrees that certain Patent claims included in MCR's Licensed Patents would not be infringed by Licensee within the scope of the Licensed Level Restrictions within the Territory to the extent that Licensee's activities in the Territory do not substantially embody the totality of all such Patent claims; all such patent claims not so embodied are referred to herein as the "Reserved Patent Claims."

(b)     No Rights to Third Parties. All rights under this Agreement are granted by MCR only to Licensee, and no provision hereof grants any right to license, sublicense, release, or otherwise purport to authorize any Third Party to make, use, practice, or sell or offer for sale any system, method, or device under any of the Licensed Patents. Further, no provision of this Agreement grants any express or implied right to make, have made, use, sell, offer for sale, or import products, services, systems, or methods that infringe a Reserved Patent Claim; as a result, no right to any Reserved Patent Claim (including through the doctrine of exhaustion) may be

5

obtained by any Third Party as a result of Licensee's activities hereunder. MCR expressly reserves the right to assert claims and/or maintain causes of action against Third Parties for the infringement of any Reserved Patent Claim.

Section 3.08    Portfolio License:  Licensee's obligations hereunder will not be diminished in whole or in part as the result of the expiration of any particular Licensed Patent or any judicial or administrative decision regarding the validity, invalidity, or enforceability of any Licensed Patent.  MCR may in its sole discretion abandon, transfer or allow any Licensed Patent to lapse without diminution of any of Licensee's payment obligations or other requirements hereunder.

## ARTICLE IV.       LICENSE FEES, REPORTS, AND AUDIT

Section 4.01    License Fee:  On or before seven calendar days following the Effective Date, Licensee shall pay to MCR the non-refundable license fee specified on Appendix A.  This license fee shall be in addition to any other charges or fees specified in this Agreement or agreed between the Parties.  During the Term of this Agreement, Licensee may elect to purchase additional license levels of the license in force and effect at the time and pay any additional license fee that may arise as a result.

Section 4.02    Field Reports; Compliance Audit:  Licensee shall provide to MCR timely field reports on all jobs performed using the Licensed Products.  Such field reports shall be provided to MCR in a form consistent with the field report form published at www.mcroiltools.com (or as otherwise modified by MCR) not less than quarterly.  MCR may make a written request to Licensee for reasonable information and access to Licensee's facilities and job sites (including in each case knowledgeable representatives) that MCR in good faith contends will permit it to make a preliminary or final determination as to whether Licensee's use of the Licensed Products is consistent with the terms of this Agreement.  Licensee agrees to (a) comply with any such requests, (b) make available to MCR access to such facilities, job sites, and representatives, and (c) certify in writing to MCR that any such information provided is complete and accurate.

## ARTICLE V.  ENFORCEMENT

Section 5.01    Notification:  Should Licensee become aware of any infringement or threatened infringement of any of the Licensed Patents or Licensed Technology by a Third Party, then Licensee will promptly use reasonable efforts to so notify MCR in writing setting forth the basis for any claim of infringement or potential infringement and to provide any supporting documentation in its possession or control.

Section 5.02    Infringement:  In the event of any infringement or potential infringement of the Licensed Patents or the Licensed Technology by a Third Party, MCR shall have the sole right, but not the obligation, to police infringements thereof unless the Parties otherwise agree in writing at such time.  Licensee shall cooperate fully with MCR in making any claim relating to the Licensed Patents or Licensed Technology and, if requested by MCR, shall join MCR as a party plaintiff where joinder is needed to afford MCR the full relief provided by applicable law; provided, however, that MCR shall reimburse Licensee's reasonable costs and any attorney fees incurred in the performance of obligations under this Section 5.02.  MCR shall be entitled to the

6

full amount recovered in pursuit of an infringement claim brought by MCR in compliance with this Section 5.02.

## ARTICLE VI.     CONFIDENTIALITY

Section 6.01   Confidentiality: Each Party agrees to protect the other's Confidential Information in the same manner as each protects the confidentiality of its own proprietary and confidential materials, but in no event with less than a reasonable standard of care. Any information disclosed by one Party (hereinafter the "Disclosing Party" is the Party disclosing Confidential Information) to the other Party (hereinafter the "Receiving Party" is the Party receiving Confidential Information from the Disclosing Party) in connection with this Agreement that is marked confidential or that, due to its character and nature, a reasonable person under like circumstances would treat as confidential, will be protected and held in confidence by the Receiving Party. Confidential Information will be used by the Receiving Party only for the purposes of this Agreement and related internal administrative purposes.     Disclosure of the Confidential Information by the Receiving Party shall be on a "need to know" basis in connection with the Licensed Products and shall be restricted to the Receiving Party's employees, contractors, or agents who are, prior to any disclosure, bound by confidentiality obligations no less stringent than these.

Section 6.02   Disclosure:   Except as may otherwise be agreed in advance in writing, a Party may disclose Confidential Information only: (a) as required by law to a government agency, (b) as necessary in a legal proceeding, including any legal proceeding to enforce any provision of this Agreement, or (c) as otherwise required to be disclosed by law, but any required disclosure to an agency or court will not relieve such Party of its obligations with respect to maintaining confidentiality from any other Third Party, and such Party will provide written notification, to the Party owning the Confidential Information, of any such disclosures at least ten business days prior to the disclosure.

Section 6.03   Return of Confidential Information:   All Confidential Information that is disclosed in a tangible form by one Party to the other under this Agreement (including, without limitation, documents, writings, designs, drawings, specifications and information incorporated in computer software, held in electronic storage media, or disclosed in any other tangible form) shall be returned promptly upon the termination of this Agreement, or destroyed upon written request of the Disclosing Party, and shall not thereafter be retained in any form by the Receiving Party, except as otherwise provided by this Agreement.

## ARTICLE VII.     TERM AND TERMINATION

Section 7.01   Term:   The term of this Agreement shall commence upon the Effective Date and shall expire twelve (12) months from the Effective Date (the "Term") unless terminated earlier in accordance with the provisions of this Agreement. Notwithstanding any discussions or course of conduct between the Parties, no renewal or extension of this Agreement shall be made except by way of a re-execution of a new version of this license agreement by both Parties. Each Party shall have absolute discretion to consider whether such a new license would be appropriate. MCR makes no representation or commitment that it shall extend, renew, or re-execute any

license with Licensee, and Licensee hereby disclaims any expectation or reliance in connection therewith.

Section 7.02   Early Termination:  This Agreement may be terminated prior to the expiration of the Term by written notice of termination by MCR immediately upon receipt by Licensee of MCR's written notice if: (a) Licensee violates any of the compliance obligations set out in Appendix D, or if Licensee fails to participate in or satisfactorily complete the training programs specified herein, or fails to handle or use the Licensed Products in strict compliance with the safety guidelines set out by MCR in such training; (b) Licensee uses the Licensed Products or Licensed Technology outside of the scope of use authorized in this Agreement and such unauthorized use is incurable or remains uncured after five days after receipt by Licensee of written or verbal notice of such misuse from MCR; (c) Licensee does not make timely payment of amounts due under this Agreement and fails to cure such payment default within five calendar days of receipt of written notice from MCR; or (d) Licensee violates any of its obligations set out in Section 3.05.  Except as otherwise provided above in this Section, either Party may terminate this Agreement if the other Party breaches any of its obligations under this Agreement and the breach is not substantially cured within thirty calendar days of receipt of written notice of such breach sent from the non-breaching Party.

Section 7.03   Termination for Use of Inconsistent Products:  Licensee acknowledges that the terms of this Agreement, as well as the safe and effective use of the Licensed Products and Licensed Technology, require from Licensee's personnel specialized training and careful attention to MCR's customer instructions and information as to use, handling, and specifications of the Licensed Products, as such instructions and information may be updated from time to time.  Licensee further acknowledges that, in the event that other thermite-based products are introduced in the market that are directly competitive with the Licensed Products and Licensed Technology, given the complex nature of both the downhole environment and the operation of such tools, field technicians and operators using both the Licensed Products and competing thermite-based products could be challenged, and potentially confused, as to how the competing tools compare and vary as to their operational, performance, and safety requirements and parameters, and Licensee further acknowledges MCR's reasonable need to take reasonable and prudent steps to minimize the potential risks that could arise from any such confusion.  Therefore, in the event that the Licensee begins marketing or using products that are directly competitive with, and that use thermite-based technologies similar to, MCR's Licensed Products, MCR may terminate this Agreement on thirty days written notice to Licensee; provided, however, that MCR shall return to Licensee, within sixty days of such cancellation, a prorated portion of the license fee paid under Section 4.01.

Section 7.04   Insolvency of a Party:  If a Party hereto becomes bankrupt or insolvent, or has a receiver appointed against it, or files or has filed against it a petition for bankruptcy or petition seeking reorganization or rearrangement with creditors, or takes advantage of any other law relating to relief of debtors, then the other Party hereto shall have the right to terminate this Agreement with respect to that Party immediately upon giving a written notice, without prejudice to any other rights or remedies that such other Party may have under this Agreement or in equity.

Section 7.05   Effect of Termination:  Within five days after termination or expiration of this Agreement, Licensee shall: (a) submit any payments due to MCR; (b) immediately cease all

activities concerning and all use of the Licensed Patents and Licensed Technology; and (c) within an additional ten days, (i) return to MCR all documents and tangible materials (and any copies) containing, reflecting, incorporating, or based on MCR's Confidential Information; (ii) permanently erase any such Confidential Information from its computer systems; and (iii) certify in writing to MCR that it has complied with the requirements of this Section 7.05(c).

Section 7.06   Survival:   Article VI of this Agreement, Article III of Appendix D hereto, and Sections 3.02, 3.03, 3.04, 3.05, 5.02, 9.06 and 9.07 of this Agreement shall survive the termination or expiration of this Agreement.

### Article VIII.  PATENT DISCLAIMER

Nothing in this Agreement shall be construed as:  (a) a warranty or representation by MCR as to the validity, enforceability, or scope of any Licensed Patent; (b) a requirement that MCR file any patent application, secure any patent, or maintain any patent in force; (c) imposing upon MCR any obligation to institute any suit or action for infringement of any Licensed Patent or to defend any suit, action, or administrative proceeding that challenges or concerns the validity, enforceability, or scope of any Licensed Patent; (d) a representation or warranty that the use of any Licensed Product will be free from infringement, misappropriation, or other claims as to violation of any patent or other intellectual property right of any Third Party; or (e) granting a license to Licensee of any intellectual property right of any current or future affiliate of MCR.

### ARTICLE IX.      GENERAL TERMS

Section 9.01   Incorporation of General Terms and Conditions:   Appendix D to this Agreement is hereby incorporated into this Agreement, in its entirety and without exception, as if fully set forth herein.

Section 9.02   No Assignment:   Except as expressly provided in this Agreement, nothing contained in this Agreement is intended to confer upon any Third Party (including any affiliate of Licensee) any rights, benefits, or remedies of any kind or character whatsoever.  Licensee shall not assign, sublicense, delegate, or otherwise transfer this Agreement or any of Licensee's rights or obligations hereunder, in any manner, including by way of merger, exchange or combination, or sale of its ownership interests or assets, without the prior written consent of MCR expressly providing therefor and signed in handwriting by a duly authorized officer of MCR.  Any attempted assignment or transfer of this Agreement or any rights or obligations hereunder in violation of the preceding sentence will be void and of no effect.  Licensee shall be strictly liable for any actions of any affiliate in violation of any terms of this Agreement or of any proprietary rights of MCR.

Section 9.03   Independent Contractors:   The relationship of the Parties as established by this Agreement is that of independent contractors; the Parties shall not be deemed to be coventurers, and neither Party will have any power or authority to make any commitment or incur any obligation on behalf of the other Party.

Section 9.04   Severability:   Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law, but if any

provision of this Agreement, or the application thereof to any person or under any circumstances, is invalid or unenforceable to any extent under applicable, law, and the extent of such invalidity or unenforceability does not cause substantial deviation from the underlying intent of the Parties as expressed in this Agreement, then such provision will be deemed severed from this Agreement with respect to such person or such circumstance, without invalidating the remainder of this Agreement or the application of such provision to other persons or circumstances, and a new provision will be deemed substituted in lieu of the provision so severed which new provision will, to the extent possible, accomplish the intent of the Parties hereto as evidenced by the provision so severed.

Section 9.05    Notice:  Except as otherwise expressly provided in this Agreement, any notice, consent or approval required or permitted under this Agreement shall be in writing, and shall be delivered (a) personally by hand, (b) by Federal Express or other reputable international courier, or (c) by facsimile with confirmation of completed transmission, to the Party's address specified in Appendix A.   Either Party may change the person(s) and/or address(es) designated in Appendix A effective ten days following delivery of notice of such change(s).  Notice given will be deemed effective on the date actually delivered unless delivered on a day that is not a business day when delivery is made, in which case notice will be effective as of the next business day.  Any notice the receipt of which is actually acknowledged in writing by the recipient, shall be deemed valid, regardless of how delivered, as of the date of such acknowledgement.

Section 9.06    Disputes, Arbitration and Interpretation:   Any dispute, controversy, or claim arising out of or relating to this Agreement, or the breach, termination or invalidity thereof, shall be finally settled by arbitration in accordance with the UNCITRAL Arbitration Rules (2010). The appointing authority, should one prove necessary, shall be the London Court of International Arbitration, which shall otherwise have no role in the proceedings. The place of arbitration shall be Dallas, Texas.  The language to be used in the arbitral proceedings shall be English.  In recognition of the need to protect MCR's intellectual property rights, the arbitral panel shall award provisional or interim measures as appropriate to protect the rights of MCR under this Agreement.   Any award rendered by the arbitral panel shall be binding and enforceable immediately when rendered, and judgment upon the award may be rendered by any court with competent jurisdiction. **Notwithstanding the foregoing, MCR may apply to any relevant government agency or any court of competent jurisdiction to preserve its intellectual property and its rights under this Agreement and to obtain any injunctive relief to which it may be entitled, either against Licensee or against a non-Party; provided, however, that no such agency or court shall have the right or power to award damages or impede the arbitration proceeding(s).** The proceedings of the arbitration shall be treated as Confidential Information by the Parties.  This Agreement and the relation of the Parties hereto shall be governed by the laws of the State of Texas to the exclusion of the laws of any other state, country, or treaty (including the UN Convention on Contracts for the International Sale of Goods). This Agreement has been executed only in the English language, which version of this Agreement shall be controlling regardless of whether any translations of this Agreement have been prepared or exchanged.  Licensee represents that it has carefully reviewed this Agreement with the involvement and assistance of Licensee's officials, advisors, and/or legal counsel fluent in the English language, that it has consulted with legal counsel competent to render advice with respect to transactions governed by Texas law, that it has no questions regarding the meaning of any of this Agreement's terms, and that it has obtained high-quality translations of this

10

Agreement for use by any of Licensee's officials who are not fluent in the English language, with the understanding that Licensee alone shall bear the risk of any misunderstandings that may arise as a result of such translation.

Section 9.07    Irreparable Harm and Right to Injunctive Relief:  Licensee acknowledges that any breach of this Agreement by Licensee, other than a breach involving only Licensee's payment obligations, would irreparably harm MCR, that damages would be an inadequate remedy, and that the granting of injunctive relief by a court, and/or of protective measures by an arbitral tribunal, would be appropriate to protect MCR's proprietary rights in the Licensed Technology and the Licensed Products.  Licensee hereby waives any objection on procedural or fairness grounds to the issuance of such relief on a preliminary or permanent basis, without, however, waiving or prejudicing in any way Licensee's right to raise any claim or defense it may have as to the merits underlying any claim of breach raised by MCR in any proceeding.

Section 9.08    Entire Agreement:  Upon the execution of this Agreement, the rights, duties, and obligations of the Parties hereto with respect to the matters set forth herein will be governed solely by the provisions of this Agreement, and all representations, warranties, terms, and conditions with respect to such matters contained in any prior agreements or understandings (written or oral) between the Parties will be null and void and of no further force and effect; provided, however, that any nondisclosure agreement between the Parties will remain in effect in accordance with its terms and will continue to apply to confidential information disclosed between the Parties outside of the scope of this Agreement.  The Appendices to this Agreement constitute an integral part of this Agreement.  In the event of a conflict between the terms of a prior nondisclosure agreement between the Parties and the terms of this Agreement, the terms of this Agreement will prevail.

Section 9.09   No Waiver; Amendments:  No waiver of any provision of this Agreement will be effective unless made in writing and signed by hand by the Party to be charged with the waiver.  Failure of any Party at any time to require the other Party's performance of any obligation under this Agreement will not affect the right to require performance of that obligation.  Any waiver by any Party of any breach of any provision of this Agreement will not be construed as a waiver of any continuing or succeeding breach of such provision, or as a waiver or modification of the provision itself.  This Agreement may only be amended by a written agreement executed by both Parties by hand referencing this Agreement and the provisions hereof to be amended; absent such signatures and such reference, no terms contained in any purchase order, confirmation notice, or other document delivered by one Party to the other in connection with this Agreement shall serve to amend or modify any provision of this Agreement.

Section 9.10    Counterparts:  This Agreement may be executed in one or more counterparts, all of which will be deemed an original, and will become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Party, it being understood that all Parties need not sign the same counterpart; all of such counterparts will together constitute one and the same instrument.  The Parties agree that facsimile execution copies of this Agreement will be deemed to be the equivalent of originals.

11

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement, effective as of the Effective Date.

**MCR:**

MCR Oil Tools, LLC

By: _____
          Michael C. Robertson

Title:  President

Date:  _____May 12, 2014_____

**LICENSEE:**

SPEX Offshore, Ltd.

By: _____
          Jamie Oag

Title:  CEO

Date:  ___21st MAY  2014___

**SPEX™**

Dunnottar House, Howe Moss Drive
Kirkhill Industrial Estate, Dyce  AB21 0FN
Tel: +44 (0)1224 727840

Signature Page to License Agreement

## APPENDIX A

1.    Licensee:    SPEX Offshore, Ltd.

2.    Licensed Patents:

A.    Michael C. Robertson, U.S. Patent No. 4,598,769; Pipe Cutting Apparatus
B.    Michael C. Robertson, U.K. Patent No. 2169940; Pipe Cutting Apparatus
C.    Michael C. Robertson, Canada Patent No. 1234350; Pipe Cutting Apparatus
D.    Michael C. Robertson, Mexico Patent No. 167908 ; Pipe Cutting Apparatus
E.    Michael C. Robertson, Italy Patent No. 1203725; Pipe Cutting Apparatus
F.    Michael C. Robertson, German Patent No. G 8600093.4; Pipe Cutting Apparatus
G.    Michael C. Robertson, U.S. Patent No 6,186,226B1; Borehole Conduit Cutting
H.    Michael C. Robertson, U.S. Patent No.6,971,449B2; Pipe Cutting Apparatus
I.    Michael C. Robertson, U.S. Patent No. 6,598,679B2; Pipe Cutting Apparatus
J.    Michael C. Robertson, U.S. Patent No, 6,925,937B2; Thermal Generator
K.    Michael C. Robertson, U.S. Patent No. 5,435,394; Anchor System for Pipe Cutting
      Apparatus

3.    Territory:    Global

4.    Addresses for Notices:

      If to Licensee: SPEX Offshore, Ltd.
                      Dunnottar House
                      Howe Moss Drive
                      Kirkhill Industrial Estate
                      Aberdeen, Scotland
                      AB21 OFN

      If to MCR:
                      MCR Oil Tools, LLC
                      7327 Business Place
                      Arlington, Texas 76001
                      Facsimile: (817) 701-5105

5.    License fees: No license fee required – License Renewal

Appendix A – Page 1

**APPENDIX B**

**Products and Price List**

MCR OIL TOOLS®

MCR OIL TOOLS, LLC | 7327 Business Place | Arlington, TX 76001
phone: 817-701-5100 or 1-866-400-8148 fax:817-701-5105
Email orders to: sales@mcroiltools.com
www.mcroiltools.com

## Price List (Effective Date April 1, 2013)

### Standard Pressure (SP) Radial Cutting Torch Kits up to 10,000 psi

| Product Number | Description | Currency | UOM | Retail Price | Discount Price |
|---|---|---|---|---|---|
| KIT-0750-300 | 3/4" RADIAL CUTTING TORCH KIT | USD | 1 | $38,000 | $17,100 |
| KIT-0875-300 | 7/8" RADIAL CUTTING TORCH KIT | USD | 1 | $38,000 | $17,100 |
| KIT-1000-300 | 1" RADIAL CUTTING TORCH KIT | USD | 1 | $38,000 | $17,100 |
| KIT-1375-400 | 1-3/8" RADIAL CUTTING TORCH KIT | USD | 1 | $18,600 | $8,370 |
| KIT-1500-400 | 1-1/2" RADIAL CUTTING TORCH KIT | USD | 1 | $17,000 | $7,650 |
| KIT-1500-999XP | 1-1/2" RADIAL CUTTING TORCH XP KIT | USD | 1 | $36,800 | $16,560 |
| KIT-1688-400 | 1-11/16" RADIAL CUTTING TORCH KIT | USD | 1 | $20,200 | $9,090 |
| KIT-1750-999XP | 1-3/4" RADIAL CUTTING TORCH XP KIT | USD | 1 | $39,200 | $17,640 |
| KIT-2000-400 | 2" RADIAL CUTTING TORCH KIT | USD | 1 | $22,900 | $10,305 |
| KIT-2500-400 | 2-1/2" RADIAL CUTTING TORCH KIT | USD | 1 | $27,500 | $12,375 |
| KIT-2937-300 | 2-15/16" RADIAL CUTTING TORCH KIT | USD | 1 | $31,300 | $14,085 |
| KIT-3375-400 | 3-3/8" RADIAL CUTTING TORCH KIT | USD | 1 | $45,000 | $20,250 |
| KIT-4000-400 | 4" RADIAL CUTTING TORCH KIT | USD | 1 | $43,400 | $19,530 |
| KIT-5000-400 | 5" RADIAL CUTTING TORCH KIT | USD | 1 | $47,300 | $21,285 |
| KIT-7000-300 | 7" RADIAL CUTTING TORCH KIT | USD | 1 | $84,000 | $37,800 |
| KXRT-SP-0750-200-E | 3/4" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $38,000 | $17,100 |
| KXRT-SP-0750-200-T | 3/4" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $38,000 | $17,100 |
| KXRT-SP-0875-200-E | 7/8" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $38,000 | $17,100 |
| KXRT-SP-0875-200-T | 7/8" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $38,000 | $17,100 |
| KXRT-SP-1000-200-E | 1" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $38,000 | $17,100 |
| KXRT-SP-1000-200-T | 1" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $38,000 | $17,100 |
| KXRT-SP-1125-200-E | 1-1/8" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $38,000 | $17,100 |
| KXRT-SP-1125-200-T | 1-1/8" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $38,000 | $17,100 |
| KXRT-SP-1375-200-E | 1-3/8" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $18,600 | $8,370 |
| KXRT-SP-1375-200-T | 1-3/8" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $18,600 | $8,370 |
| KXRT-SP-1500-200-E | 1-1/2" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $17,000 | $7,650 |
| KXRT-SP-1500-200-T | 1-1/2" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $17,000 | $7,650 |
| KXRT-SP-1750-300-T | 1-3/4" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $22,900 | $10,305 |

* a $20,000 license fee applies to High Pressure kits ($10,000 per torch)

Revision 03012013



## MCR OIL TOOLS®

MCR OIL TOOLS, LLC | 7327 Business Place | Arlington, TX 76001
phone: 817-701-5100 or 1-866-400-8148 fax:817-701-5105
Email orders to: sales@mcroiltools.com
www.mcroiltools.com

## Price List (Effective Date April 1, 2013)

| Product Number | Description | Currency | UOM | Retail Price | Discount Price |
|---|---|---|---|---|---|
| KXRT-SP-1750-300-E | 1-3/4" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $22,900 | $10,305 |
| KXRT-SP-2000-300-E | 2" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $24,900 | $11,205 |
| KXRT-SP-2000-300-T | 2" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $24,900 | $11,205 |
| KXRT-SP-2500-300-E | 2-1/2" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $27,500 | $12,375 |
| KXRT-SP-2500-300-T | 2-1/2" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $27,500 | $12,375 |
| KXRT-SP-2937-300-E | 2-15/16" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $31,300 | $14,085 |
| KXRT-SP-2937-300-T | 2-15/16" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $31,300 | $14,085 |
| KXRT-SP-3375-300-E | 3-3/8" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $45,000 | $20,250 |
| KXRT-SP-3375-300-T | 3-3/8" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $45,000 | $20,250 |
| KXRT-SP-4000-400-E | 4" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $43,400 | $19,530 |
| KXRT-SP-4000-400-T | 4" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $43,400 | $19,530 |
| KXRT-SP-7000-300-E | 7" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $84,000 | $37,800 |
| KXRT-SP-7000-300-T | 7" STANDARD PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $84,000 | $37,800 |

## High Pressure (HP) Radial Cutting Torch Kits 10,001 to 15,000 psi

| Product Number | Description | Currency | UOM | Retail Price | Discount Price |
|---|---|---|---|---|---|
| HP-0750-1000 | 3/4" HP RADIAL CUTTING TORCH KIT | USD | 1 | $47,500 | $47,500 |
| HP-0875-1000 | 7/8" HP RADIAL CUTTING TORCH KIT | USD | 1 | $47,500 | $47,500 |
| HP-1125-2000 | 1-1/8" HP RADIAL CUTTING TORCH KIT | USD | 1 | $47,500 | $47,500 |
| HP-1375-1000 | 1-3/8" HP RADIAL CUTTING TORCH KIT | USD | 1 | $23,250 | $23,250 |
| HP-1500-1000 | 1-1/2" HP RADIAL CUTTING TORCH KIT | USD | 1 | $21,250 | $21,250 |
| HP-1688-1000 | 1-11/16" HP RADIAL CUTTING TORCH KIT | USD | 1 | $25,250 | $25,250 |
| HP-2000-2000 | 2" HP RADIAL CUTTING TORCH KIT | USD | 1 | $28,625 | $28,625 |
| HP-2500-5000 | 2-1/2" HP RADIAL CUTTING TORCH KIT | USD | 1 | $31,125 | $31,125 |
| HP-2937-1000 | 2-15/16" HP RADIAL CUTTING TORCH KIT | USD | 1 | $39,125 | $39,125 |
| HP-3375-3000 | 3-3/8" HP RADIAL CUTTING TORCH KIT | USD | 1 | $56,250 | $56,250 |
| HP-4000-4000 | 4" HP RADIAL CUTTING TORCH KIT | USD | 1 | $54,250 | $54,250 |
| KXRT-HP-0750-100-E | 3/4" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $47,500 | $47,500 |
| KXRT-HP-0750-1G0-T | 3/4" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $47,500 | $47,500 |
| KXRT-HP-0875-100-T | 7/8" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $47,500 | $47,500 |

* a $20,000 license fee applies to High Pressure kits ($10,000 per torch)

Revision 03012013

# MCR OIL TOOLS

MCR OIL TOOLS, LLC | 7327 Business Place | Arlington, TX 76001
phone: 817-701-5100 or 1-866-400-8148 fax:817-701-5105
Email orders to: sales@mcroiltools.com
www.mcroiltools.com

## Price List (Effective Date April 1, 2013)

| Product Number | Description | Currency | UOM | Retail Price | Discount Price |
|---|---|---|---|---|---|
| KXRT-HP-0875-100-T | 7/8" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $47,500 | $47,500 |
| KXRT-HP-1125-100-E | 1-1/8" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $47,500 | $47,500 |
| KXRT-HP-1125-100-T | 1-1/8" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $47,500 | $47,500 |
| KXRT-HP-1375-100-E | 1-3/8" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $23,250 | $23,250 |
| KXRT-HP-1375-100-T | 1-3/8" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $23,250 | $23,250 |
| KXRT-HP-1500-100-E | 1-1/2" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $21,250 | $21,250 |
| KXRT-HP-1500-100-T | 1-1/2" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $21,250 | $21,250 |

## High Pressure (HP) Radial Cutting Torch Kits 10,001 to 15,000 psi

| Product Number | Description | Currency | UOM | Retail Price | Discount Price |
|---|---|---|---|---|---|
| KXRT-HP-1750-200-E | 1-3/4" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $26,500 | $26,500 |
| KXRT-HP-1750-200-T | 1-3/4" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $26,500 | $26,500 |
| KXRT-HP-2000-200-E | 2" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $28,625 | $28,625 |
| KXRT-HP-2000-200-T | 2" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $28,625 | $28,625 |
| KXRT-HP-2500-100-E | 2-1/2" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $34,375 | $34,375 |
| KXRT-HP-2500-100-T | 2-1/2" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $34,375 | $34,375 |
| KXRT-HP-2500-200-E | 2-1/2" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $34,375 | $34,375 |
| KXRT-HP-2500-200-T | 2-1/2" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $34,375 | $34,375 |
| KXRT-HP-2937-100-E | 2-15/16" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $39,125 | $39,125 |
| KXRT-HP-2937-100-T | 2-15/16" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $39,125 | $39,125 |
| KXRT-HP-3375-300-E | 3-3/8" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $56,250 | $56,250 |
| KXRT-HP-3375-300-T | 3-3/8" HIGH PRESSURE XRT™ RADIAL CUTTING TORCH KIT | USD | 1 | $56,250 | $56,250 |

## Standard Pressure (SP) Circulating Pyro Torch™ Kits

| Product Number | Description | Currency | UOM | Retail Price | Discount Price |
|---|---|---|---|---|---|
| KCPT1-SP-0750-200-E | 3/4" STANDARD PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $30,480 | $13,716 |
| KCPT1-SP-0750-200-T | 3/4" STANDARD PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $30,480 | $13,716 |
| KCPT1-SP-0875-200-E | 7/8" STANDARD PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $30,480 | $13,716 |
| KCPT1-SP-0875-200-T | 7/8" STANDARD PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $30,480 | $13,716 |
| KCPT1-SP-1500-200-E | 1-1/2" STANDARD PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $30,000 | $13,500 |

* a $20,000 license fee applies to High Pressure kits ($10,000 per torch)

Revision 03012013



# MCR OIL TOOLS®

MCR OIL TOOLS, LLC  |  7327 Business Place  |  Arlington, TX 76001
phone: 817-701-5100 or 1-866-400-8148 fax:817-701-5105
Email orders to sales@mcroiltools.com
www.mcroiltools.com

## Price List (Effective Date April 1, 2013)

| Product Number | Description | Currency | UOM | Retail Price | Discount Price |
|---|---|---|---|---|---|
| KCPT1-SP-1500-200-T | 1-1/2" STANDARD PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $30,000 | $13,500 |
| KCPT1-SP-1750-200-E | 1-3/4" STANDARD PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $26,200 | $11,790 |
| KCPT1-SP-1750-200-T | 1-3/4" STANDARD PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $26,200 | $11,790 |
| KCPT1-SP-2500-200-E | 2-1/2" STANDARD PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $30,000 | $13,500 |
| KCPT1-SP-2500-200-T | 2-1/2" STANDARD PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $30,000 | $13,500 |
| KCPT2-SP-2937-200-E | 2-15/16" STANDARD PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $37,200 | $16,740 |
| KCPT2-SP-2937-200-T | 2-15/16" STANDARD PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $37,200 | $16,740 |

## High Pressure (HP) Circulating Pyro Torch Kits™ 10,001 to 15,000 psi

| Product Number | Description | Currency | UOM | Retail Price | Discount Price |
|---|---|---|---|---|---|
| KCPT1-HP-0750-100-E | 3/4" HIGH PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $38,100 | $38,100 |
| KCPT1-HP-0750-100-T | 3/4" HIGH PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $38,100 | $38,100 |
| KCPT1-HP-0875-100-E | 7/8" HIGH PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $38,100 | $38,100 |
| KCPT1-HP-0875-100-T | 7/8" HIGH PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $38,100 | $38,100 |
| KCPT1-HP-1125-100-E | 1-1/8" HIGH PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $38,100 | $38,100 |
| KCPT1-HP-1125-100-T | 1-1/8" HIGH PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $38,100 | $38,100 |
| KCPT1-HP-1500-100-E | 1-1/2" HIGH PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $37,500 | $37,500 |
| KCPT1-HP-1500-100-T | 1-1/2" HIGH PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $37,500 | $37,500 |
| KCPT1-HP-1750-100-E | 1-3/4" HIGH PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $32,750 | $32,750 |
| KCPT1-HP-1750-100-T | 1-3/4" HIGH PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $32,750 | $32,750 |
| KCPT1-HP-2500-100-E | 2-1/2" HIGH PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $37,500 | $37,500 |
| KCPT1-HP-2500-100-T | 2-1/2" HIGH PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $37,500 | $37,500 |
| KCPT1-HP-2500-200-E | 2-1/2" HIGH PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $37,500 | $37,500 |
| KCPT1-HP-2500-200-T | 2-1/2" HIGH PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $37,500 | $37,500 |
| KCPT2-HP-2937-100-E | 2-15/16" HIGH PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $46,500 | $46,500 |
| KCPT2-HP-2937-100-T | 2-15/16" HIGH PRESSURE CIRCULATING PYRO TORCH™ KIT | USD | 1 | $46,500 | $46,500 |

## Standard Pressure (SP) Perforating Pyro Torch® Kits

| Product Number | Description | Currency | UOM | Retail Price | Discount Price |
|---|---|---|---|---|---|
| KPPT2-SP-2500-100-E | 2-1/2" STANDARD PRESSURE 2-PORT PERFORATING PYRO TORCH® KIT | USD | 1 | $46,000 | $20,700 |

* a $20,000 license fee applies to High Pressure Kits ($10,000 per torch)

Revision 03012013

MCR OIL TOOLS®

MCR OIL TOOLS, LLC | 7327 Business Place | Arlington, TX 76001
phone: 817-701-5100 or 1-866-406-8148 fax:817-701-5105
Email orders to: sales@mcroiltools.com
www.mcroiltools.com

## Price List (Effective Date April 1, 2011)

| Product Number | Description | Currency | UOM | Retail Price | Discount Price |
|---|---|---|---|---|---|
| KFPT2-SP-2500-100-T | 2 1/2" STANDARD PRESSURE 2-PORT PERFORATING PYRO TORCH® KIT | USD | 1 | $46,000 | $20,700 |
| KFPT2-SP-2937-100-E | 2 15/16" STANDARD PRESSURE 2-PORT PERFORATING PYRO TORCH® KIT | USD | 1 | $48,800 | $21,960 |
| KFPT2-SP-2937-100-T | 2 15/16" STANDARD PRESSURE 2-PORT PERFORATING PYRO TORCH® KIT | USD | 1 | $48,800 | $21,960 |
| KFPT2-SP-3375-100-E | 3 3/8" STANDARD PRESSURE 2-PORT PERFORATING PYRO TORCH® KIT | USD | 1 | $52,000 | $23,400 |
| KFPT2-SP-3375-100-T | 3 3/8" STANDARD PRESSURE 2-PORT PERFORATING PYRO TORCH® KIT | USD | 1 | $52,000 | $23,400 |
| KFPT4-SP-2500-100-E | 2 1/2" STANDARD PRESSURE 4-PORT PERFORATING PYRO TORCH® KIT | USD | 1 | $46,000 | $20,700 |
| KFPT4-SP-2500-100-T | 2 1/2" STANDARD PRESSURE 4-PORT PERFORATING PYRO TORCH® KIT | USD | 1 | $46,000 | $20,700 |
| KFPT4-SP-2937-100-E | 2 15/16" STANDARD PRESSURE 4-PORT PERFORATING PYRO TORCH® KIT | USD | 1 | $48,800 | $21,960 |
| KFPT4-SP-2937-100-T | 2 15/16" STANDARD PRESSURE 4-PORT PERFORATING PYRO TORCH® KIT | USD | 1 | $48,800 | $21,960 |
| KFPT4-SP-3375-100-E | 3 3/8" STANDARD PRESSURE 4-PORT PERFORATING PYRO TORCH® KIT | USD | 1 | $52,000 | $23,400 |
| KFPT4-SP-3375-100-T | 3 3/8" STANDARD PRESSURE 4-PORT PERFORATING PYRO TORCH® KIT | USD | 1 | $52,000 | $23,400 |

## Electronic Systems and Accessories

| | | | | | |
|---|---|---|---|---|---|
| EMA-1500-100KT | E-LINE Electro Mechanical Anchor KIT | USD | 1 | $35,600 | $16,020 |
| EMA-1500-200KT | SLICKLINE Electro Mechanical Anchor KIT | USD | 1 | $35,600 | $16,020 |
| ARM-1500-340 | #0 EMA ARM PACK | USD | 1 | $400 | $180 |
| ARM-1500-341 | #1 EMA ARM PACK | USD | 1 | $400 | $180 |
| ARM-1500-342 | #2 EMA ARM PACK | USD | 1 | $400 | $180 |
| ARM-1500-343 | #3 EMA ARM PACK | USD | 1 | $400 | $180 |
| ARM-1500-344 | #4 EMA ARM PACK | USD | 1 | $400 | $180 |
| ARM-1500-345 | #5 EMA ARM PACK | USD | 1 | $400 | $180 |
| ARM-1500-346 | #6 EMA ARM PACK | USD | 1 | $400 | $180 |
| ARM-1500-347 | #7 EMA ARM PACK | USD | 1 | $400 | $180 |
| ARM-1500-348 | #8 EMA ARM PACK | USD | 1 | $400 | $180 |
| ARM-1500-349 | #9 EMA ARM PACK | USD | 1 | $400 | $180 |
| ARM-1500-KIT | #0 THRU #7 EMA ARM KIT | USD | 1 | $3,200 | $1,440 |
| CFP-1500-100 | CHECK FIRE PANEL | USD | 1 | $12,300 | $5,535 |
| FFP-0000-100 | FIRE PANEL FILTER | USD | 1 | $4,800 | $2,160 |
| RFM-0875-100KT | REMOTE FIRING MECHANISM KIT | USD | 1 | $21,000 | $94,950 |

* a $20,000 license fee applies to High Pressure kits ($10,000 per torch)

5

Revision 03012013



**MCR OIL TOOLS**®

MCR OIL TOOLS, LLC | 7327 Business Place | Arlington, TX 76001
phone:817-701-5100 or 1-866-400-8148 fax:817-701-5105
Email orders to sales@mcroiltools.com
www.mcroiltools.com

## Price List (Effective Date April 1, 2013)

### Generator Safety Sleeves

| Product Number | Description | Currency | UOM | Retail Price | Discount Price |
|---|---|---|---|---|---|
| GSS-0750-100 | 3/4" GENERATOR SAFETY SLEEVE | USD | 1 | $2,920 | $1,314 |
| GSS-0875-100 | 7/8" GENERATOR SAFETY SLEEVE | USD | 1 | $2,920 | $1,314 |
| GSS-1000-100 | 1" GENERATOR SAFETY SLEEVE | USD | 1 | $2,920 | $1,314 |
| GSS-1125-100 | 1-1/8" GENERATOR SAFETY SLEEVE | USD | 1 | $2,920 | $1,314 |
| GSS-1375-100 | 1-3/8" GENERATOR SAFETY SLEEVE | USD | 1 | $2,920 | $1,314 |
| GSS-1500-100 | 1-1/2" GENERATOR SAFETY SLEEVE | USD | 1 | $2,920 | $1,314 |
| GSS-1688-100 | 1-11/16" GENERATOR SAFETY SLEEVE | USD | 1 | $2,920 | $1,314 |
| GSS-2000-100 | 2" GENERATOR SAFETY SLEEVE | USD | 1 | $2,920 | $1,314 |
| GSS-2500-100 | 2-1/2" GENERATOR SAFETY SLEEVE | USD | 1 | $2,920 | $1,314 |
| GSS-2937-100 | 2-15/16" GENERATOR SAFETY SLEEVE | USD | 1 | $2,920 | $1,314 |
| GSS-3375-100 | 3-3/8" GENERATOR SAFETY SLEEVE | USD | 1 | $2,920 | $1,314 |
| GSS-4500-100 | 4-1/2" GENERATOR SAFETY SLEEVE | USD | 1 | $3,600 | $1,620 |

### Other Individual Components

| Product Number | Description | Currency | UOM | Retail Price | Discount Price |
|---|---|---|---|---|---|
| CRATE-1 | U.N. CERTIFIED HEAT-TREATED WOOD CRATE (42x6x3) | USD | 1 | $120 | $120 |
| CRATE-2 | U.N. CERTIFIED HEAT-TREATED WOOD CRATE (72x7x5-1/2) | USD | 1 | $120 | $120 |
| CRATE-3 | U.N. CERTIFIED HEAT-TREATED WOOD CRATE (62x5-1/2x4) | USD | 1 | $120 | $120 |
| CRATE-4 | U.N. CERTIFIED HEAT-TREATED WOOD CRATE (42x6x5) | USD | 1 | $120 | $120 |
| AES.0.790-0087 | CBLHD TOOL 3/4" | USD | 1 | $295 | $295 |
| AES.AS10009 | AES PIN 11/16" / GO BOX 3/4" | USD | 1 | $450 | $450 |
| AES.AS20004-7/32 | CBLHD 3/4" AES 7/32" LN | USD | 1 | $1,134 | $1,134 |
| AES.AS20005 | SB ASSY STL 3/4" X 5" W/PROT | USD | 1 | $1,260 | $1,260 |
| EXT-0750-100 | 3/4" EXTENSION | USD | 1 | $3,080 | $1,386 |
| EXT-0875-100 | 7/8" EXTENSION | USD | 1 | $3,080 | $1,386 |
| EXT-1000-100 | 1" EXTENSION | USD | 1 | $3,080 | $1,386 |
| EXT-1375-100 | 1-3/8" EXTENSION | USD | 1 | $1,080 | $486 |
| EXT-1500-100 | 1-1/2" EXTENSION | USD | 1 | $1,080 | $486 |

* a $20,000 license fee applies to High Pressure kits ($10,000 per torch)

6

Revision G301|2013

**MCR OIL TOOLS®**

MCR OIL TOOLS, LLC  |  7327 Business Place  |  Arlington, TX 76001

phone: 817-701-5100 or 1-866-400-8148 fax:817-701-5105

Email orders to: sales@mcroiltools.com

www.mcroiltools.com

## Price List (Effective Date April 1, 2013)

| Product Number | Description | Currency | UOM | Retail Price | Discount Price |
|---|---|---|---|---|---|
| EXT-1588-100 | 1-11/16" EXTENSION | USD | 1 | $1,140 | $513 |
| EXT-1750-100 | 1-3/4" EXTENSION | USD | 1 | $1,460 | $657 |
| EXT-2000-100 | 2" EXTENSION | USD | 1 | $1,460 | $657 |
| EXT-2500-100 | 2-1/2" EXTENSION | USD | 1 | $1,520 | $684 |
| EXT-2937-100 | 2-15/16" EXTENSION | USD | 1 | $1,600 | $720 |
| EXT-3375-100 | 3-3/8" EXTENSION | USD | 1 | $2,000 | $900 |
| EXT-4000-100 | 4" & 5" EXTENSION | USD | 1 | $2,100 | $945 |
| FHB-2750-100 | FIRING HEAD BAKER #10 GO BOX | USD | 1 | $1,200 | $540 |
| FHB-3250-200 | FIRING HEAD BAKER #10 QUICK CHANGE | USD | 1 | $1,600 | $720 |
| FHB-3438-100 | FIRING HEAD BAKER #20 GO BOX | USD | 1 | $1,200 | $540 |
| FHB-3438-200 | FIRING HEAD BAKER #20 QUICK CHANGE | USD | 1 | $1,600 | $720 |
| HRK-3250-200 | HARDWARE RE-BUILD KIT FOR FHB-3250-200 | USD | 1 | $300 | $135 |
| HRK-3438-100 | HARDWARE RE-BUILD KIT FOR FHB-3438-100 | USD | 1 | $240 | $108 |
| HRK-3438-200 | HARDWARE RE-BUILD KIT FOR FHB-3438-200 | USD | 1 | $300 | $135 |
| HAF-1000-100 | ANCHOR FINGERS | USD | 1 | $20 | $9 |
| HCK-1437-100 | 1-7/16" CENTRALIZER KIT COMPLETE | USD | 1 | $2,124 | $2,124 |
| HCK-1688-100 | 1-11/16" CENTRALIZER KIT COMPLETE | USD | 1 | $3,150 | $3,150 |
| HCK-2750-100 | 2-3/4" SINGLE ADJUSTABLE CENTRALIZER | USD | 1 | $6,775 | $6,775 |
| HDK-AES-1437 | 1-7/16" DECENTRALIZING MECH ARM TOP KIT | USD | 1 | $4,518 | $4,518 |
| HOK-0750-100 | 3/4" HARDWARE O-RING KIT | USD | 1 | $40 | $18 |
| HOK-0875-100 | 7/8" HARDWARE O-RING KIT | USD | 1 | $40 | $18 |
| HOK-1000-100 | 1" HARDWARE O-RING KIT | USD | 1 | $40 | $18 |
| HOK-1375-100 | 1-3/8" HARDWARE O-RING KIT | USD | 1 | $40 | $18 |
| HOK-1500-100 | 1-1/2" HARDWARE O-RING KIT | USD | 1 | $60 | $27 |
| HOK-1688-100 | 1-11/16" HARDWARE O-RING KIT | USD | 1 | $60 | $27 |
| HOK-2000-100 | 2" HARDWARE O-RING KIT | USD | 1 | $80 | $36 |
| HOK-2500-100 | 2-1/2" HARDWARE O-RING KIT | USD | 1 | $80 | $36 |
| HOK-2937-100 | 2-15/16" HARDWARE O-RING KIT | USD | 1 | $80 | $36 |
| HOK-3375-100 | 3-3/8" HARDWARE O-RING KIT | USD | 1 | $80 | $36 |
| HOK-4000-100 | 4" HARDWARE O-RING KIT | USD | 1 | $100 | $45 |

* a $20,000 license fee applies to High Pressure kits ($10,000 per torch)

7

Revision C30120113

**MCR OIL TOOLS**®

MCR OIL TOOLS, LLC | 7327 Business Place | Arlington, TX 76001
phone: 817-701-5100 or 1-866-400-8148 fax:817-701-5105
Email orders to: sales@mcroiltools.com
www.mcroiltools.com

## Price List (Effective Date April 1, 2013)

| Product Number | Description | Currency | UOM | Retail Price | Discount Price |
|---|---|---|---|---|---|
| HOX-5000-100 | 5" HARDWARE O-RING KIT | USD | 1 | $100 | $45 |
| HPF-HPH-1375-100 | 1-3/8" PRESSURE FIRING HEAD SYSTEM | USD | 1 | $4,833 | $4,833 |
| HPF-HPH-6588-100 | 1-11/16" PRESSURE FIRING HEAD SYSTEM | USD | 1 | $3,681 | $3,681 |
| HSS-0250-CP | 1/4"-20 X 1/4" ANCHOR SET SCREWS (CP) | USD | 1 | $120 | $54 |
| HSS-0375-HD | 1/4"-20 X 3/8" ANCHOR SET SCREWS (HD) | USD | 1 | $120 | $54 |
| HSS-0500-HD | 1/4"-20 X 1/2" ANCHOR SET SCREWS (HD) | USD | 1 | $120 | $54 |
| HSS-0750-HD | 1/4"-20 X 3/4" ANCHOR SET SCREWS (HD) | USD | 1 | $120 | $54 |
| HTK-0750-100 | 3/4" & 7/8" & 1" HARDWARE TOOL KIT | USD | 1 | $120 | $54 |
| HTK-1375-100 | 1-3/8" & 1-1/2" HARDWARE TOOL KIT | USD | 1 | $120 | $54 |
| HTK-1688-100 | 1-11/16" & 2" HARDWARE TOOL KIT | USD | 1 | $120 | $54 |
| HTK-2500-100 | 2-1/2" X 2-15/16" HARDWARE TOOL KIT | USD | 1 | $120 | $54 |
| HTK-3375-100 | 3-3/8" & 4" & 5" HARDWARE TOOL KIT | USD | 1 | $120 | $54 |
| HTK-0750-200 | 3/4" & 7/8" & 1" HARDWARE TOOL KIT | USD | 1 | $120 | $54 |
| HTK-1375-200 | 1-3/8" & 1-1/2" HARDWARE TOOL KIT | USD | 1 | $120 | $54 |
| HTK-1688-200 | 1-11/16" & 2" HARDWARE TOOL KIT | USD | 1 | $120 | $54 |
| HTK-2500-200 | 2-1/2" & 2-15/16" HARDWARE TOOL KIT | USD | 1 | $120 | $54 |
| HTK-3375-200 | 3-3/8" & 4" & 5" HARDWARE TOOL KIT | USD | 1 | $120 | $54 |
| HTS-1000-001 | HARDWARE TORCH SHIELD | USD | 1 | $5,740 | $2,583 |
| HTS-1000-002 | HARDWARE TORCH SHIELD | USD | 1 | $6,300 | $2,835 |
| HTS-1000-003 | 4" & 5" HARDWARE TORCH SHIELD | USD | 1 | $7,500 | $3,375 |
| PBA-0750-321 | 3/4" PBA BODY | USD | 1 | $1,660 | $747 |
| PBA-0875-321 | 7/8" PBA BODY | USD | 1 | $1,660 | $747 |
| PBA-1000-321 | 1" PBA BODY | USD | 1 | $1,660 | $747 |
| PBA-1125-321 | 1-1/8" PBA BODY | USD | 1 | $1,660 | $747 |
| PBA-1375-121 | 1-3/8" PBA BODY | USD | 1 | $780 | $351 |
| PBA-1500-121 | 1-1/2" PBA BODY | USD | 1 | $880 | $396 |
| PBO-1688-218 | 1-11/16" PBA SOCKET SUB | USD | 1 | $340 | $153 |
| PBA-1688-219 | 1-11/16" PBA CONNECTOR | USD | 1 | $340 | $153 |
| PBA-1688-220 | 1-11/16" PBA BULL PLUG | USD | 1 | $300 | $135 |
| PBA-1688-220-SRT | 1-11/16" PBA BULL PLUG W/SRT | USD | 1 | $340 | $153 |

* a $20,000 license fee applies to High Pressure kits ($10,000 per torch)

8

**MCR OIL TOOLS**®

MCR OIL TOOLS, LLC  |  7327 Business Place  |  Arlington, TX 76001
phone: 817-701-5100 or 1-866-400-8148 fax:817-701-5105
Email orders to sales@mcroiltools.com
www.mcroiltools.com

## Price List (effective Date April 1, 2013)

| Product Number | Description | Currency | UOM | Retail Price | Discount Price |
|---|---|---|---|---|---|
| PBA-1688-221 | 1-11/16" PBA BODY | USD | 1 | $780 | $351 |
| PBA-2000-218 | 2" PBA SOCKET SUB | USD | 1 | $460 | $207 |
| PBA-2000-219 | 2" PBA CONNECTOR | USD | 1 | $440 | $198 |
| PBA-2000-220 | 2" PBA BULL PLUG | USD | 1 | $340 | $153 |
| PBA-2000-221 | 2" PBA BODY | USD | 1 | $660 | $297 |
| PBA-2500-218 | 2-1/2" PBA SOCKET SUB | USD | 1 | $520 | $234 |
| PBA-2500-219 | 2-1/2" PBA CONNECTOR | USD | 1 | $480 | $216 |
| PBA-2500-220 | 2-1/2" PBA BULL PLUG | USD | 1 | $360 | $162 |
| PBA-2500-221 | 2-1/2" PBA BODY | USD | 1 | $840 | $378 |
| PBA-2937-218 | 2-15/16" PBA SOCKET SUB | USD | 1 | $840 | $378 |
| PBA-2937-219 | 2-15/16" PBA CONNECTOR | USD | 1 | $440 | $198 |
| PBA-2937-220 | 2-15/16" PBA BULL PLUG | USD | 1 | $420 | $189 |
| PBA-2937-221 | 2-15/16" PBA BODY | USD | 1 | $1,000 | $450 |
| PBA-3375-218 | 3-3/8" PBA SOCKET SUB | USD | 1 | $500 | $225 |
| PBA-3375-219 | 3-3/8" PBA CONNECTOR | USD | 1 | $460 | $207 |
| PBA-3375-220 | 3-3/8" PBA BULL PLUG | USD | 1 | $480 | $216 |
| PBA-3375-221 | 3-3/8" PBA BODY | USD | 1 | $1,040 | $468 |
| PBA-3375-319 | 3-3/8" EXTENDED PBA CONNECTOR(7.5") | USD | 1 | $1,160 | $522 |
| PBA-3375-421 | 3-3/8" EXTENDED PBA BODY (65") | USD | 1 | $4,680 | $2,106 |
| PBA-3375-521 | 3-3/8" EXTENDED PBA BODY (44") | USD | 1 | $5,590 | $2,511 |
| PBE-1375-171 | 1-3/8" PBA EXTENSION | USD | 1 | $680 | $306 |
| PBE-1500-171 | 1-1/2" PBA EXTENSION | USD | 1 | $780 | $351 |
| PTC-0750-200 | 3/4" PERFORATING TORCH CUTTER | USD | 1 | $9,120 | $4,104 |
| PTC-0875-200 | 7/8" PERFORATING TORCH CUTTER | USD | 1 | $9,120 | $4,104 |
| PTC-1000-200 | 1" PERFORATING TORCH CUTTER | USD | 1 | $9,120 | $4,104 |
| PTC-1375-200 | 1-3/8" PERFORATING TORCH CUTTER | USD | 1 | $8,900 | $4,005 |
| PTC-1686-200 | 1-11/16" PERFORATING TORCH CUTTER | USD | 1 | $7,360 | $3,312 |
| PTC-2500-200 | 2-1/2" PERFORATING TORCH CUTTER | USD | 1 | $10,240 | $4,608 |
| PTC-2937-200 | 2-15/16" PERFORATING TORCH CUTTER | USD | 1 | $12,240 | $5,508 |
| CPT1-SP-0750-100 | 3/4" CIRCULATING PYRO TORCH™ | USD | 1 | $10,460 | $4,707 |

* a $20,000 license fee applies to High Pressure kits ($10,000 per torch)

9

Revision 03012013



**MCR OIL TOOLS®**

MCR OIL TOOLS, LLC | 7327 Business Place | Arlington, TX 76001
phone: 817-701-5100 or 1-866-400-8148 fax:817-701-5105
Email orders to_sales@mcroiltools.com
www.mcroiltools.com

## Price List (Effective Date April 1, 2013)

| Product Number | Description | Currency | UOM | Retail Price | Discount Price |
|---|---|---|---|---|---|
| CPT1-SP-0875-100 | 7/8" CIRCULATING PYRO TORCH™ | USD | 1 | $10,460 | $4,707 |
| CPT1-SP-1000-100 | 1" CIRCULATING PYRO TORCH™ | USD | 1 | $10,460 | $4,707 |
| CPT1-SP-1375-100 | 1-3/8" CIRCULATING PYRO TORCH™ | USD | 1 | $10,260 | $4,617 |
| CPT1-SP-1750-100 | 1-3/4" CIRCULATING PYRO TORCH™ | USD | 1 | $8,680 | $3,906 |
| CPT1-SP-2500-100 | 2-1/2" CIRCULATING PYRO TORCH™ | USD | 1 | $11,560 | $5,202 |
| CPT2-SP-2563-100 | 2-15/16" CIRCULATING PYRO TORCH™ | USD | 1 | $13,560 | $6,102 |
| PTS-0750-1000 | 3/4" HP PERFORATING TORCH SYSTEM | USD | 1 | $21,987 | $21,987 |
| PTS-0750-300 | 3/4" PERFORATING TORCH SYSTEM | USD | 1 | $15,560 | $7,002 |
| PTS-0875-1000 | 7/8" HP PERFORATING TORCH SYSTEM | USD | 1 | $21,987 | $21,987 |
| PTS-0875-300 | 7/8" PERFORATING TORCH SYSTEM | USD | 1 | $15,560 | $7,002 |
| PTS-1000-1000 | 1" HP PERFORATING TORCH SYSTEM | USD | 1 | $21,987 | $21,987 |
| PTS-1000-300 | 1" PERFORATING TORCH SYSTEM | USD | 1 | $15,560 | $7,002 |
| PTS-1375-400 | 1-3/8" PERFORATING TORCH SYSTEM | USD | 1 | $16,340 | $6,903 |
| PTS-1688-300 | 1-11/16" PERFORATING TORCH SYSTEM | USD | 1 | $13,340 | $6,003 |
| PTS-2500-300 | 2-1/2" PERFORATING TORCH SYSTEM | USD | 1 | $14,840 | $6,678 |
| PTS-2937-300 | 2-15/16" PERFORATING TORCH SYSTEM | USD | 1 | $19,100 | $8,595 |
| PPT2-SP-2500-100 | 2 1/2" STANDARD PRESSURE 2-PORT  PERFORATING PYRO TORCH® | USD | 1 | $20,000 | $9,000 |
| PPT2-SP-2937-101 | 2 15/16" STANDARD PRESSURE 2-PORT  PERFORATING PYRO TORCH® | USD | 1 | $21,100 | $9,495 |
| PPT2-SP-3375-100 | 3 3/8" STANDARD PRESSURE 2-PORT  PERFORATING PYRO TORCH® | USD | 1 | $22,200 | $9,990 |
| PPT4-SP-2500-100 | 2 1/2" STANDARD PRESSURE 4-PORT  PERFORATING PYRO TORCH® | USD | 1 | $20,000 | $9,000 |
| PPT4-SP-2937-100 | 2 15/16" STANDARD PRESSURE 4-PORT  PERFORATING PYRO TORCH® | USD | 1 | $21,100 | $9,495 |
| PPT4-SP-3375-100 | 3 3/8" STANDARD PRESSURE 4-PORT  PERFORATING PYRO TORCH® | USD | 1 | $22,200 | $9,990 |
| RCT-1375-200 | 1-3/8" RADIAL CUTTING TORCH | USD | 1 | $4,400 | $1,980 |
| RCT-1500-200 | 1-1/2" RADIAL CUTTING TORCH | USD | 1 | $4,400 | $1,980 |
| RCT-1500-999XP | 1-1/2" RADIAL CUTTING TORCH | USD | 1 | $13,200 | $5,940 |
| RCT-1688-250 | 1-11/16" RADIAL CUTTING TORCH | USD | 1 | $5,000 | $2,250 |
| RCT-1750-999XP | 1-3/4" XP RADIAL CUTTING TORCH | USD | 1 | $16,000 | $7,200 |
| RCT-2000-200 | 2" RADIAL CUTTING TORCH | USD | 1 | $6,500 | $2,925 |
| RCT-2500-200 | 2-1/2" RADIAL CUTTING TORCH | USD | 1 | $7,000 | $3,150 |
| RCT-2937-100 | 2-15/16" RADIAL CUTTING TORCH | USD | 1 | $9,000 | $4,050 |

* a $20,000 license fee applies to High Pressure kits ($10,000 per torch).

10

Revision 03012013

MCR OIL TOOLS

**MCR OIL TOOLS, LLC  |  7327 Business Place  |  Arlington, TX 76001**
**phone: 817-701-5100 or 1-866-400-8148 fax:817-701-5105**
Email orders to sales@mcroiltools.com
www.mcroiltools.com

## Price List (Effective Date April 1, 2013)

| Product Number | Description | Currency | UOM | Retail Price | Discount Price |
|---|---|---|---|---|---|
| RCT-3375-200 | 3-3/8" RADIAL CUTTING TORCH | USD | 1 | $10,000 | $4,500 |
| RCT-4000-100 | 4" RADIAL CUTTING TORCH | USD | 1 | $10,800 | $4,860 |
| RCT-5000-050 | 5" RADIAL CUTTING TORCH | USD | 1 | $11,000 | $4,950 |
| SUB-0750-500 | 3/4" ISOLATION SUB (BOX-STYLE) | USD | 1 | $1,960 | $882 |
| SUB-0875-500 | 7/8" ISOLATION SUB (BOX-STYLE) | USD | 1 | $1,960 | $882 |
| SUB-1000-500 | 1" ISOLATION SUB (BOX-STYLE) | USD | 1 | $1,960 | $882 |
| SUB-1375-300 | 1-3/8" PRESSURE FIRING SUB | USD | 1 | $460 | $207 |
| SUB-1375-500G | 1-3/8" LV THG ISO SUB | USD | 1 | $1,500 | $675 |
| SUB-1375-700 | 1-3/8" GENERATOR SUB (HEATER) | USD | 1 | $460 | $207 |
| SUB-1375-700G | 1-3/8" HV THG ISO SUB | USD | 1 | $1,500 | $675 |
| SUB-1500-300 | 1-1/2" PRESSURE FIRING SUB | USD | 1 | $480 | $216 |
| SUB-1500-500G | 1-1/2" LV THG ISO SUB | USD | 1 | $1,500 | $675 |
| SUB-1500-600G | 1-1/2" GENERATOR SUB (HEATER) | USD | 1 | $440 | $198 |
| SUB-1500-700G | 1-1/2" HV THG ISO SUB | USD | 1 | $1,500 | $675 |
| SUB-1500-1000 | 1-1/2" MHP ISOLATION SUB ASSEMBLY | USD | 1 | $500 | $225 |
| SUB-1688-300 | 1-11/16" PRESSURE FIRING SUB | USD | 1 | $440 | $198 |
| SUB-1688-600G | 1-11/16" LV THG ISO SUB | USD | 1 | $1,500 | $675 |
| SUB-1688-700 | 1-11/16" GENERATOR SUB (HEATER) | USD | 1 | $480 | $216 |
| SUB-1688-700G | 1-11/16" HV THG ISO SUB | USD | 1 | $1,500 | $675 |
| SUB-2000-300 | 2" PRESSURE FIRING SUB | USD | 1 | $460 | $207 |
| SUB-2000-500G | 2" LV THG ISO SUB | USD | 1 | $1,600 | $720 |
| SUB-2000-700 | 2" GENERATOR SUB (HEATER) | USD | 1 | $480 | $216 |
| SUB-2000-700G | 2" HV THG ISO SUB | USD | 1 | $1,600 | $720 |
| SUB-2500-300 | 2-1/2" PRESSURE FIRING SUB | USD | 1 | $540 | $243 |
| SUB-2500-500G | 2-1/2" LV THG ISO SUB | USD | 1 | $1,600 | $720 |
| SUB-2500-700 | 2-1/2" GENERATOR SUB (HEATER) | USD | 1 | $500 | $225 |
| SUB-2500-700G | 2-1/2" HV THG ISO SUB | USD | 1 | $1,600 | $720 |
| SUB-2637-300 | 2-15/16" PRESSURE FIRING SUB | USD | 1 | $600 | $270 |
| SUB-2637-600G | 2-15/16" LV THG ISO SUB | USD | 1 | $1,600 | $720 |
| SUB-2637-700 | 2-15/16" GENERATOR SUB (HEATER) | USD | 1 | $640 | $288 |

* a $20,000 license fee applies to High Pressure Kits ($10,000 per torch)

11

Revision 03012013



**MCR OIL TOOLS, LLC | 7327 Business Place | Arlington, TX 76001**
phone: 817-701-5100 or 1-866-400-8148 fax:817-701-5105
Email orders to: sales@mcroiltools.com

www.mcroiltools.com

| Product Number | Price List (Effective Date April 1, 2013) Description | Currency | UOM | Retail Price | Discount Price |
|---|---|---|---|---|---|
| SUB-2937-700IG | 2-15/16" HV THG ISO SUB | USD | 1 | $1,600 | $720 |
| SUB-3375-300 | 3-3/8" PRESSURE FIRING SUB | USD | 1 | $820 | $369 |
| SUB-3375-800IG | 3-3/8" LV THG ISO SUB | USD | 1 | $1,600 | $720 |
| SUB-3375-700 | 3-3/8" GENERATOR SUB (HEATER) | USD | 1 | $840 | $378 |
| SUB-3375-700IG | 3-3/8" HV THG ISO SUB | USD | 1 | $1,600 | $720 |
| SUB-4000-300 | 4" PRESSURE FIRING SUB | USD | 1 | $860 | $387 |
| SUB-4000-700 | 4" GENERATOR SUB (HEATER) | USD | 1 | $1,420 | $639 |
| SUB-4500-500IG | 4-1/2" LV THG ISO SUB | USD | 1 | $1,600 | $720 |
| SUB-4500-700 | 4-1/2" GENERATOR SUB (HEATER) | USD | 1 | $1,500 | $675 |
| SUB-4500-700IG | 4-1/2" HV THG ISO SUB | USD | 1 | $1,600 | $720 |
| THG-0750-750 | 3/4" THERMAL GENERATOR | USD | 1 | $3,960 | $1,782 |
| THG-0875-750 | 7/8" THERMAL GENERATOR | USD | 1 | $3,960 | $1,782 |
| THG-1000-750 | 1" THERMAL GENERATOR | USD | 1 | $3,960 | $1,782 |
| THG-1125-750 | 1 1/8" THERMAL GENERATOR | USD | 1 | $3,960 | $1,782 |
| TG-B-150E-01 | 1" THERMAL GENERATOR B E-LINE | USD | 1 | $1,140 | $513 |
| TG-B-U081-01 | 1" THERMAL GENERATOR TYPE SLICK LINE | USD | 1 | $1,400 | $630 |
| XRT-SP-1375-100 | 1-3/8" STANDARD PRESSURE (X) RADIAL CUTTING TORCH | USD | 1 | $5,000 | $2,250 |
| XRT-SP-1500-100 | 1-1/2" STANDARD PRESSURE (X) RADIAL CUTTING TORCH | USD | 1 | $5,000 | $2,250 |
| XRT-SP-1688-100 | 1-11/16" STANDARD PRESSURE (X) RADIAL CUTTING TORCH | USD | 1 | $5,500 | $2,475 |
| XRT-SP-1750-100 | 1-3/4" STANDARD PRESSURE (X) RADIAL CUTTING TORCH | USD | 1 | $6,000 | $2,700 |
| XRT-SP-2000-100 | 2" STANDARD PRESSURE (X) RADIAL CUTTING TORCH | USD | 1 | $7,400 | $3,330 |
| XRT-SP-2500-100 | 2-1/2" STANDARD PRESSURE (X) RADIAL CUTTING TORCH | USD | 1 | $8,000 | $3,600 |
| XRT-SP-2937-100 | 2-15/16" STANDARD PRESSURE (X) RADIAL CUTTING TORCH | USD | 1 | $10,500 | $4,725 |
| XRT-SP-3375-100 | 3-3/8" STANDARD PRESSURE (X) RADIAL CUTTING TORCH | USD | 1 | $11,500 | $5,175 |
| XTN-SP-0750-100 | 3/4" STANDARD PRESSURE EXTENSION | USD | 1 | $3,340 | $1,503 |
| XTN-SP-0875-100 | 7/8" STANDARD PRESSURE EXTENSION | USD | 1 | $3,340 | $1,503 |
| XTN-SP-1000-100 | 1" STANDARD PRESSURE EXTENSION | USD | 1 | $3,340 | $1,503 |
| XTN-SP-1375-100 | 1-3/8" STANDARD PRESSURE EXTENSION | USD | 1 | $1,140 | $513 |
| XTN-SP-1500-100 | 1-1/2" STANDARD PRESSURE EXTENSION | USD | 1 | $1,160 | $522 |
| XTN-SP-1688-100 | 1-11/16" STANDARD PRESSURE EXTENSION | USD | 1 | $1,200 | $540 |

* a $20,000 license fee applies to High Pressure kits ($10,000 per torch)    12    Revision 03012013



**MCR OIL TOOLS**®

MCR OIL TOOLS, LLC | 7327 Business Place | Arlington, TX 76001
phone: 817-701-5100 or 1-866-400-8148 fax:817-701-5105

Email orders to sales@mcroiltools.com

www.mcroiltools.com

## Price List (Effective Date: April 1, 2013)

| Product Number | Description | Currency | UOM | Retail Price | Discount Price |
|---|---|---|---|---|---|
| KTN-SP-1750-100 | 1-3/4" STANDARD PRESSURE EXTENSION | USD | 1 | $1,520 | $684 |
| KTN-SP-2000-100 | 2" STANDARD PRESSURE EXTENSION | USD | 1 | $1,540 | $693 |
| KTN-SP-2500-100 | 2-1/2" STANDARD PRESSURE EXTENSION | USD | 1 | $1,560 | $702 |
| KTN-SP-2937-100 | 2-15/16" STANDARD PRESSURE EXTENSION | USD | 1 | $1,680 | $756 |
| KTN-SP-3375-100 | 3-3/8" STANDARD PRESSURE EXTENSION | USD | 1 | $2,080 | $936 |
| KTN-SP-4000-100 | 4" STANDARD PRESSURE EXTENSION | USD | 1 | $2,180 | $981 |

* a $20,000 license fee applies to High Pressure kits ($10,000 per torch)

13

Revision 03012013

**APPENDIX C**

License Fee Structure                                        Revised September 2013

The following License fees are not refundable under any circumstances except those provided in Section 7.03 of the Agreement.

**License Levels:**

**Level "A" License:**

| | | | |
|---|---|---|---|
| Price: | | Country: | $20,000.00 |
| | | Continent: | $50,000.00 includes offshore |
| Qualifications: | 1. | Single shop location | |
| | 2. | 10 trucks or less in the company | |
| | 3. | Single Country / Continent territory | |

License Grant:

1.  Use of MCR Technology per MCR's license terms and conditions anywhere within the designated Country / Continent
2.  No Offshore jobs permitted with Country designation
3.  Offshore jobs permitted with a $5,000.00 addition to Country designation
4.  Ability to use MCR Licensed Technology and to purchase MCR products at the Discount Price

**Level "B" License**

| | | | |
|---|---|---|---|
| Price: | | Country: | $35,000.00 |
| | | Continent: | $65,000.00 includes offshore |
| Qualifications: | | | |
| | 1. | Three or less shop locations | |
| | 2. | Fewer than 20 trucks in the company | |
| | 3. | Single Country / Continent territory | |

License Grant

1.  Use of MCR Technology per our specifications anywhere within the designated Country / Continent
2.  No Offshore jobs permitted with Country designation
3.  Offshore jobs permitted with a $5,000.00 addition to Country designation
4.  Ability to use MCR Licensed Technology and to purchase MCR products at the Discount Price

Appendix C – Page 1

**Level "C" License**

| Price: | | Country: | $70,000.00 |
|---|---|---|---|
| | | Continent: | $100,000.00 includes offshore |

Qualifications:

1. More than three shop locations
2. 20 trucks or more in the company
3. Single Country / Continent territory

License Grant:

1. Use of MCR Technology per our specifications anywhere within the designated Country / Continent
2. No Offshore jobs permitted with Country designation
3. Offshore jobs permitted with a $5,000.00 addition to Country designation
4. Ability to use MCR Licensed Technology and to purchase MCR products at the Discount Price

**One-Off Jobs Outside of the Licensed Territory:**

All Licensees are permitted to use the Licensed Products and Licensed Technology in any allowed global market without purchasing a License for that country, provided the Licensee notifies MCR in writing in advance. Licensees will be permitted this territorial variance regardless of their present License Territory, provided the Licensee pays the Retail Price for the tools shipped to or used for the one-off job in the country of interest. This territory variance is intended to allow Licensees the opportunity to perform one-off jobs around the world without having to acquire a License for each country.

**Notwithstanding the foregoing, however, any Licensee performing jobs outside of their License territory and without MCR's prior written approval and without paying Retail Price for the Licensed Products used in such job will be assessed a re-certification fee of $100,000 in order to retain the license in effect.** Licensees who deviate from this policy will be determined to be in material breach of the Agreement, and shall be subject to termination of the License Agreement in accordance with the terms thereof.

**Continent Option:**
Select a Continent that is of interest for your business. By paying the Continent Fee noted above, Licensee may operate in any country within the boundaries of that Continent. Current Licensees are able to upgrade their License by adding the Continental Option and paying the difference between the License Fee already paid and the Continental Option Fee. The Continent Options offered by MCR are Asia; Africa; Australia; Europe (including all of the North Sea); North America, and Caribbean & South/Central America. The countries included in each continent territory grouping are specified below. **NOTE THAT MCR HAS RESTRICTED THE DEFINITION OF LICENSED CONTINTENT GROUPINGS TO EXCLUDE CERTAIN COUNTRIES THAT MAY TYPICALLY BE CONSIDERED PART OF SUCH CONTINENT. FOR EXAMPLE, IRAN, NORTH KOREA, AND CHINA ARE NOT INCLUDED IN AN ASIA LICENSE. SIMILARLY, CUBA IS NOT INCLUDED WITHIN THE CARIBBEAN & SOUTH/CENTRAL AMERICA GROUPING.**

## ASIA

| | | | |
|---|---|---|---|
| Afghanistan | Indonesia | Malaysia | Saudi Arabia |
| Armenia | Iraq | Maldives | Sri Lanka |
| Azerbaijan | Japan | Mongolia | Syria |
| Bahrain | Jordan | Nepal | Tajikistan |
| Bangladesh | Kazakhstan | Oman | Thailand |
| Brunei | South Korea | Pakistan | Turkmenistan |
| Cambodia | Kuwait | Papua New Guinea | UAE |
| East Timor | Kyrgyzstan | Philippines | Uzbekistan |
| Georgia | Laos | Qatar | Vietnam |
| India | Lebanon | Russia | Yemen |

## AFRICA

| | | | |
|---|---|---|---|
| Algeria | Eritrea | Mauritania | Sierra Leone |
| Angola | Ethiopia | Mauritius | Somalia |
| Benin | Gabon | Mayotte | South Africa |
| Botswana | Gambia | Morocco | South Sudan |
| Burkina Faso | Ghana | Mozambique | Sudan |
| Burundi | Guinea | Namibia | Swaziland |
| Cameroon | Guinea-Bissau | Niger | Tanzania |
| Cape Verde | Ivory Coast | Nigeria | Togo |
| Cen. African Rep. | Kenya | Rep. Congo | Tunisia |
| Chad | Lesotho | Réunion | Uganda |
| Comoros | Liberia | Rwanda | Western Sahara |
| DR Congo | Libya | St Helena/Ascension | Zambia |
| Djibouti | Madagascar | São Tomé/Príncipe | Zimbabwe |
| Egypt | Malawi | Senegal | |
| Equatorial Guinea | Mali | Seychelles | |

## AUSTRALIA

| | |
|---|---|
| Australia | New Zealand |
| Fiji | Palau |
| Kiribati | Papua New Guinea |
| Marshall Islands | Solomon Islands |
| Micronesia | Tonga |
| Nauru | Tuvalu |

Appendix C – Page 3

## EUROPE

| | | | |
|---|---|---|---|
| Albania | Denmark | Liechtenstein | Russia |
| Andorra | Estonia | Lithuania | San Marino |
| Armenia | Finland | Luxembourg | Serbia |
| Austria | France | Macedonia | Slovenia |
| Azerbaijan | Georgia | Malta | Spain |
| Belarus | Germany | Moldova | Sweden |
| Belgium | Greece | Monaco | Turkey |
| Bosnia and | Hungary | Montenegro | Ukraine |
| Herzegovina | Iceland | Netherlands | UK (plus Chanel |
| Bulgaria | Ireland | Norway | Islands) |
| Croatia | Italy | Poland | Vatican City |
| Cyprus | Kazakhstan | Portugal | |
| Czech Republic | Latvia | Romania | |

## NORTH AMERICA
Canada
Mexico
Saint Pierre and Miquelon (France)
United States

## CARIBBEAN & CENTRAL/SOUTH AMERICA

| | |
|---|---|
| Anguilla | Martinique |
| Antigua and Barbuda | Montserrat |
| Aruba | Navassa Island |
| Bahamas | Puerto Rico |
| Barbados | Saba |
| Bermuda | Saint Barthélemy |
| Bonaire | Saint Kitts and Nevis |
| British Virgin Islands | Saint Lucia |
| Cayman Islands | Saint Martin |
| Cuba | Saint Vincent and the Grenadines |
| Curaçao | Saint Eustatius |
| Dominica | Saint Maarten |
| Dominican Republic | Trinidad and Tobago |
| Grenada | Turks and Caicos Islands |
| Guadeloupe | United States Virgin Islands |
| Haiti | |
| Jamaica | |
| | |
| Belize | Honduras |
| Costa Rica | Nicaragua |
| El Salvador | Panama |
| Guatemala | |
| | |
| Brazil | Uruguay |
| Colombia | Guyana |
| Argentina | Suriname |
| Peru | French Guiana |
| Venezuela | Falkland Islands |
| Chile | |
| Ecuador | |
| Bolivia | |
| Paraguay | |

## APPENDIX D

### TERMS AND CONDITIONS
### REGARDING SALE AND DELIVERY OF MCR PRODUCTS

These Terms and Conditions apply to all products or spare parts sold, leased, or otherwise supplied by, and all services performed by, MCR pursuant to a purchase order or other order placement document submitted by Licensee or its designee to MCR, including both the Licensed Products and unlicensed products and services. **All MCR products and services are supplied _only_ under the following Terms and Conditions, and the use and/or acceptance of any MCR products or services by Licensee shall constitute acceptance of these Terms and Conditions in their entirety. Any purported acceptance of an MCR offer by Licensee under terms that vary from, conflict with, or modify these Terms and Conditions shall not be effective. Neither MCR's commencement of performance nor MCR's delivery of any product shall be deemed to constitute acceptance by MCR of any term that varies from, conflicts with, or modifies these Terms and Conditions, regardless of whether such varying terms by Licensee are set out in any acknowledgement, order, or other document of Licensee.** Failure by MCR to enforce any or all of these Terms and Conditions in any case or cases shall not constitute a waiver of or preclude subsequent enforcement of any or all of such Terms and Conditions.

## I.     PURCHASE ORDERS

1.1     Purchase Orders:  Licensee may order MCR products by issuing purchase orders to MCR specifying the desired products, the quantity, the desired delivery dates, and any other handling and/or billing instructions. Notwithstanding any other provision of any license, purchase order, or agreement, MCR shall have no obligation to fulfill any purchase order until and unless Licensee receives a written acceptance of such purchase order from MCR. In light of the compliance obligations and objectives of both Parties, Licensee acknowledges and agrees that acceptance of any purchase order by MCR may require (in MCR's sole discretion) that Licensee provide to MCR customer information and a customer consent in accordance with the terms of Paragraph 1.7 below, and that Licensee complete training with respect to the ordered products as set out in Paragraph 2.1 below. Licensee shall procure MCR products only from MCR directly. Except with respect to specific products that are already the subject of a purchase order accepted by MCR, MCR reserves the right to change the designs, materials, and specifications of its products, or to discontinue the manufacture or sale of any products, at any time without any notice or liability to Licensee.

1.2     Purchase Price:  The purchase price for MCR products ordered by Licensee shall be the applicable prices set forth on Appendix B: the Discount Price List is applicable only for Licensees, and the Retail Price List is MCR's non-discounted retail price. The Licensee shall be entitled to purchase MCR products for the Discount Price Level unless the products are purchased by Licensee for the purpose of resale to a Third Party (**which resale must have the prior written approval of MCR, which approval may be withheld for any reason or for no reason at MCR's sole discretion**), in which case the Licensee shall pay the Retail Price. MCR

shall have the right, in its sole discretion, to change the prices on Appendix B going forward by providing Licensee with thirty calendar days' prior written notice.

1.3    Taxes and Currency: All amounts payable under this Agreement are exclusive of taxes. Licensee shall be responsible for all sales, use, transaction, excise and value added-taxes and any other similar taxes, duties and charges of any kind imposed by any federal, state or local governmental authority on any amounts payable by Licensee hereunder, other than any taxes imposed on MCR's income, personnel, or assets, and Licensee shall pay all sums payable hereunder free and clear of all deductions and withholdings whatsoever. If, however, any deduction or withholding on any payment is required by law, Licensee shall pay to MCR such sum as will, after the deduction or withholding has been made, leave MCR with the same amount as it would have been entitled to receive without any such requirement to make a deduction or withholding. All payments and offsets due or made to MCR hereunder shall be in United States dollars.

1.4    Shipping Terms: Receipt of Products: Unless otherwise specified in the purchase order, MCR will ship all products Ex Works MCR's facility, Arlington, Texas, in accordance with the 2010 ICC INCOTERMS. In the event that any purchase order received by MCR from Licensee shall specify different shipping terms, such shipping terms shall be considered a request from the Licensee to apply such terms to that shipment only, which request shall not be binding upon the Parties unless and until accepted by MCR in its sole discretion. Any such acceptance of the Licensee's proposed modified shipping terms shall not apply to any other shipment or purchase order and shall not modify the terms of this Agreement. In the event that MCR chooses to accept the proposed modified shipping terms, it will bill Licensee for any and all costs incurred by MCR in complying with those terms, and Licensee shall reimburse MCR for all such costs, which costs shall include both all Third Party charges and any time spent by MCR personnel in meeting the requested shipping terms. Licensee represents and warrants, by acceptance or use of a product, that Licensee is familiar with the product and its proper use and all safety issues attendant thereto. Before using any product, Licensee shall give the product reasonable and prudent examination and/or tests to determine the suitability of the product for Licensee's intended use. Licensee shall be deemed to have accepted any MCR product upon the earlier of Licensee's use of the product or fifteen calendar days after Licensee's receipt of the product unless, before that time, MCR has received from Licensee written notice of any defect or nonconformity.

1.5    Payment: Payment for all products delivered by MCR is due and payable, in net, within thirty days after the shipment date for such products. All invoiced amounts unpaid after such thirty days shall accrue interest at a rate of one and one half percent per month (equivalent to 18% per annum) or the maximum interest rate allowed by law, whichever is lower.

1.6    Compliance: Licensee acknowledges that exports and transactions related to MCR products are subject to U.S. regulations restricting the destinations to which MCR products may be shipped, and the parties to whom such products may be shipped or sold. Licensee specifically agrees that it will not export or re-export, directly or indirectly, any MCR product or technology in or to any destination to which such export or re-export is restricted or prohibited under U.S. law, except as authorized in written approvals or authorizations by the U.S. Commerce

1759319.4

Department's Bureau of Industry and Security, and/or the U.S. Treasury Department's Office of Foreign Assets Control. Further, Licensee acknowledges that the U.S. Foreign Corrupt Practices Act (the "FCPA") prohibits U.S. persons (or persons acting on their behalf) from offering or paying inducements directly or indirectly to foreign government officials, including the employees of state-owned companies. MCR requires from Licensee strict compliance with the FCPA (and any similar anti-corruption laws that may apply to Licensee's activities abroad) in connection with any commerce engaged in by the Licensee involving MCR products. Licensee hereby acknowledges that it has informed itself of these requirements of U.S. law and has consulted with U.S. legal counsel as appropriate in order to resolve any questions Licensee may have regarding the application of these laws to the activities under this Agreement. Failure by the Licensee to adhere to any of the above-mentioned legal requirements shall, regardless of whether such compliance failures are prosecuted, constitute a material breach of this Agreement and shall entitle MCR to terminate this Agreement immediately, and to cancel any order already placed by the Licensee. In addition, any and all losses incurred by MCR in connection with or as a result of any compliance activity or lapse by Licensee, including MCR's costs of complying with any governmental investigation or internal investigation by MCR or Licensee of Licensee's business connected with MCR products, shall fall within the scope of the MCR losses indemnified by Licensee.

1.7     Customer Information and Consents: Licensee acknowledges that MCR has an interest in protecting its technology and in taking steps to ensure MCR's compliance with U.S. laws as described in Paragraph 1.6 immediately above. MCR reserves the right to require, as a condition to fulfilling any Purchase Order, all relevant information pertaining to the customers of Licensee for whom MCR products will be used. Further, MCR may require that Licensee submit for each such customer a binding consent from such customer to MCR (a) representing that Licensee's transactions with such customer comply with applicable law, and (b) consenting to suit by MCR against such customer in case of any breach by such customer of MCR's rights in connection with MCR's technology or patents.

## II.     TECHNICAL ASSISTANCE; TRAINING; INFORMATION TO CUSTOMERS

2.1     Training Regarding the Safe Handling and Use of MCR Products: Licensee acknowledges that improper handling or use of MCR products may cause serious harm or death to Licensee's employees or to others, and may damage facilities where the MCR products are used and thereby cause very substantial economic harm to such facilities. As a condition to the granting and maintenance of any MCR license and to the fulfillment of any purchase order, MCR requires that Licensee's employees undergo such training at MCR's facilities as MCR may deem appropriate in its sole discretion to ensure the safe and proper transportation, handling, and use of MCR products. Licensee shall ensure that any of its employees handling or using MCR products have completed all training at MCR's facilities as recommended by MCR.

2.2     Additional Training: Upon request by Licensee, MCR may in its sole discretion agree to provide additional training to Licensee beyond that standard training described in Paragraph 2.1 hereof. In addition, MCR may also agree in its sole discretion to offer training to employees of the Licensee at a location other than the facilities of MCR. Licensee agrees to pay MCR for such additional training, and/or for any training at any location other than MCR's facilities, at MCR's

1759319.4

then-current training rates, plus, for remote training, reimbursement for any reasonable travel expenses incurred by MCR plus an additional service fee equal to fifteen percent of such travel expenses. Invoices for training shall be paid by Licensee within thirty days following Licensee's receipt of MCR's invoice.

2.3     Technical Assistance:     MCR will provide Licensee with commercially reasonable customer support for MCR products by telephone and email during normal business hours (in the U.S. Central Time Zone) and to the extent that MCR in its sole discretion makes such support generally available to its licensees without a separate charge. Upon request by Licensee, MCR may also elect to provide Licensee with access to and use of additional support, which may include certain Licensed Technology, for use by Licensee in support of MCR products. Unless otherwise agreed to by MCR in writing. MCR reserves the right to invoice Licensee for the provision of such additional support at its then-current rates, and such invoices shall be paid by Licensee within thirty days following Licensee's receipt of such invoice. Notwithstanding the foregoing, Licensee acknowledges and stipulates that (a) any customer support provided by MCR may be provided in reliance upon the limited information provided by the Licensee, which information may or may not be sufficient to render reliable product assistance in any particular application or context, and (b) MCR is a manufacturer rather than an oilfield service company and as such does not claim or offer any expertise in managing or accomplishing any particular oilfield operation, and (c) it is the sole responsibility of the Licensee to operate any Licensed Products or Licensed Technology in a safe and prudent manner in the field, and (d) it is the sole responsibility of Licensee to evaluate whether any assistance offered or provided by MCR is applicable to the particular circumstances faced by the Licensee in the field.

2.4     Product Information to Customers and Potential Customers:     Licensee acknowledges that any handling or use of MCR's technology and/or products in a manner inconsistent with MCR-specified procedures and parameters may cause damage to persons or property of the Licensee or of Licensee's customers. In order to inform Licensee's customers of such risks, Licensee shall instruct each of its customers as to the specifications and usage manuals for any MCR products used by Licensee for such customer, either by providing each customer copies of written information obtained by Licensee from MCR, or by directing such customer to the MCR website. Licensee shall provide such information to the customer prior to performing any services for such customer. Upon request Licensee shall provide to MCR evidence that Licensee has provided such information to its customers.

2.5     Promotional Material; Use of MCR Trademarks:     All promotional materials prepared and distributed by Licensee, whether in printed or electronic form, which material describes the capabilities, performance, or characteristics of the Licensed Products, or Licensee's rights to use the Licensed products, shall be true and accurate, and any publication of any (a) material misstatement as compared to the specifications, usage manual, and performance data provided to Licensee by MCR, or any (b) material mischaracterization of the Licensee's rights under this Agreement, or any (c) disparagement of or challenge to the intellectual property rights claimed by MCR in connection with its technology or patents, shall constitute a material breach of this Agreement. Licensee shall make all such material available to MCR for MCR's review and approval prior to or concurrent with the publication of that material. Further, Licensee shall not remove or modify any trademark or patent marking, or any other licensed documentation or

packaging provided with any MCR product or technology. **Licensee shall make no use of any trademark of MCR, whether registered or not, in any form of media, except in accordance with any guidelines made available to Licensee by MCR.** Licensee acknowledges that Licensee's willingness and ability to abide by MCR's reasonable trademark policies may affect MCR's willingness to renew or re-execute any new license with Licensee at the end of the Term.

## III. WARRANTIES, LIMITATIONS, AND INDEMNITY

3.1     Product Warranty: MCR represents and warrants that all products manufactured by MCR and delivered to Licensee pursuant to a valid purchase order issued and accepted hereunder will be free from material defects in labor, material, and workmanship and will be manufactured in a good and workmanlike manner in accordance with MCR's specifications. Any and all warranty claims brought by Licensee under this warranty must be presented to MCR within eighteen months of MCR's delivery of the product, or such claim shall be considered waived by Licensee and shall be validly rejected by MCR. Any Product returned under claim of defect shall be sent prepaid by appropriate transportation, and Licensee is responsible for all damage or loss resulting from improper packing or handling, and for any loss or damage occurring during the transmission of the Product to MCR. If any Product is returned and is found not to be defective, MCR will notify Licensee and, at Licensee's option, will return the Product to Licensee at Licensee's expense, and Licensee shall reimburse MCR for all costs incurred in testing and examining the Product. Further, MCR warrants that any service provided hereunder shall be in conformance with the specifications set forth in the relevant scope of work document agreed to in writing by MCR and Licensee. In the event that the services do not so conform, then Licensee's sole remedy shall be for MCR to re-perform that part of the non-conforming services.

EXCEPT FOR THE FOREGOING AND AS OTHERWISE SPECIFICALLY STATED IN THIS AGREEMENT, MCR EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, WHETHER WRITTEN, ORAL, EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, CONCERNING THE VALIDITY, ENFORCEABILITY, AND SCOPE OF THE LICENSED PATENTS, THE ACCURACY, COMPLETENESS, SAFETY, USEFULNESS FOR ANY PURPOSE, OR LIKELIHOOD OF SUCCESS (COMMERCIAL, REGULATORY, OR OTHER) OF MCR PRODUCTS, TECHNOLOGY, AND ANY OTHER TECHNICAL INFORMATION, TECHNIQUES, MATERIALS, METHODS, PRODUCTS, PROCESSES, OR PRACTICES AT ANY TIME MADE AVAILABLE BY MCR, INCLUDING ALL IMPLIED WARRANTIES OF MERCHANTABILITY, QUALITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, AND WARRANTIES ARISING FROM A COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE, OR TRADE PRACTICE. WITHOUT LIMITATION TO THE FOREGOING, MCR SHALL HAVE NO LIABILITY WHATSOEVER TO LICENSEE OR ANY OTHER PERSON FOR OR ON ACCOUNT OF ANY INJURY, LOSS, OR DAMAGE, OF ANY KIND OR NATURE, SUSTAINED BY, OR ANY DAMAGE ASSESSED OR ASSERTED AGAINST, OR ANY OTHER LIABILITY INCURRED BY OR IMPOSED ON, LICENSEE OR ANY OTHER PERSON, ARISING OUT OF OR IN CONNECTION WITH OR RESULTING FROM (A) THE MANUFACTURE, USE, OFFER FOR SALE, SALE, OR SHIPMENT OF ANY MCR PRODUCT, OR THE PRACTICE OF MCR'S LICENSED PATENTS; (B) THE USE OF, OR ANY ERRORS OR OMISSIONS IN, ANY KNOW-HOW, TECHNICAL INFORMATION, TECHNIQUES, OR PRACTICES

1759319.4

DISCLOSED BY MCR; OR (C) ANY ADVERTISING OR OTHER PROMOTIONAL ACTIVITIES CONCERNING ANY OF THE FOREGOING.

3.2    Indemnity: LICENSEE SHALL DEFEND, INDEMNIFY, REIMBURSE, AND HOLD HARMLESS MCR, ITS AFFILIATES, AND ANY OF THEIR MANAGERS, OFFICERS, OWNERS, EMPLOYEES, OR REPRESENTATIVES, FROM ANY LOSSES, LIABILITIES, DAMAGES, ACTIONS, CLAIMS, FINES, PENALTIES, OR EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES AND COURT COSTS) ARISING OUT OF OR IN CONNECTION WITH (A) ANY BREACH BY LICENSEE OF THIS AGREEMENT, OR FROM (B) ANY USE OF MCR PRODUCTS OR TECHNOLOGY BY LICENSEE, OR BY ANY OTHER PERSON OBTAINING THE PRODUCTS OR LICENSED TECHNOLOGY FROM LICENSEE (INCLUDING WITHOUT LIMITATION ANY PERSONS EVER AFFILIATED WITH LICENSEE OR ANY CUSTOMER OF LICENSEE), REGARDLESS OF WHETHER OBTAINED OR USED WITH OR WITHOUT AUTHORIZATION OR APPROVAL BY LICENSEE, AND REGARDLESS OF WHETHER OBTAINED OR USED LAWFULLY.

3.3    Limitation of Liability: **LICENSEE'S REMEDIES FOR ANY AND ALL BREACHES OF ANY NATURE, INCLUDING WITHOUT LIMITATION BREACHES OF CONTRACT AND WARRANTY, ARE LIMITED TO THE REMEDIES OF PRODUCT REPAIR OR REPLACEMENT AS SPECIFICALLY STATED IN THESE TERMS AND CONDITIONS, UP TO THE STATED LIMITS OF MCR'S LIABILITY. THE REMEDIES PROVIDED HEREIN ARE THE EXCLUSIVE REMEDIES OF LICENSEE FOR FAILURE OF MCR TO MEET ITS OBLIGATIONS, WHETHER CLAIMS OF LICENSEE ARE BASED ON CONTRACT, IN TORT, OR OTHERWISE, AND UPON EXPIRATION OF THE APPLICABLE WARRANTY PERIOD APPLICABLE TO ANY PRODUCTS, ALL OBLIGATIONS OF MCR WITH RESPECT TO THOSE PRODUCTS WILL TERMINATE. THE TOTAL LIABILITY OF MCR IN THE AGGREGATE TO LICENSEE ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, ANY MCR PRODUCTS, AND/OR ANY MCR TECHNOLOGY WILL BE LIMITED TO ONE HUNDRED THOUSAND DOLLARS, EVEN IF THE LOSS OR DAMAGE IS DUE TO STRICT LIABILITY OR THE SOLE, JOINT, COMPARATIVE, OR CONCURRENT NEGLIGENCE OF MCR OR ANY AFFILIATE THEREOF.** FURTHER, TO THE FULLEST EXTENT PERMITTED BY LAW, MCR SHALL NOT BE LIABLE TO LICENSEE OR ANY OTHER PERSON FOR ANY INJURY TO OR LOSS OF GOODWILL, REPUTATION, BUSINESS, PRODUCTION, REVENUES, PROFITS, ANTICIPATED PROFITS, CONTRACTS, OR OPPORTUNITIES (REGARDLESS OF HOW THESE MAY BE CLASSIFIED AS DAMAGES), OR FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, PUNITIVE, OR ENHANCED DAMAGES WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT, STRICT LIABILITY, PRODUCT LIABILITY, OR OTHERWISE, REGARDLESS OF WHETHER SUCH LOSS OR DAMAGE WAS FORESEEABLE OR WHATEVER THE PARTY AGAINST WHOM SUCH LIABILITY IS CLAIMED HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED REMEDY OR ESSENTIAL PURPOSE.

1759319.4

3.4    Insurance:  Without limiting the indemnity obligations or liabilities of Licensee, at all times during the term of this Agreement, Licensee agrees to maintain commercial liability insurance coverage of no less than three million dollars on a per occurrence basis to cover all losses or damages arising or resulting in connection with Licensee's use of the Licensed Technology or Licensed Products.  Upon request, Licensee shall provide MCR with written evidence that such insurance is in force and is granted in standard and reasonable terms reasonably acceptable to MCR.

3.5    Force Majeure:  If the performance of any obligation in connection with any purchase order hereunder is prevented, restricted, or hindered by reason of fire, earthquake, or other natural disaster; strikes or labor disputes; war or civil unrest; laws, orders, proclamations, regulations, ordinances, demands, or requirements of any governmental authority; or any other occurrence or condition that was not reasonably foreseeable or is beyond the reasonable control of the Parties hereto ("Event of Force Majeure"), the Party so affected, upon giving prompt notice to the other Party, shall be excused from such performance to the extent of such prevention, restriction, or interference; provided, however, that the Party so affected shall use commercially reasonable efforts to avoid or remove such causes of nonperformance and shall continue performance hereunder whenever such causes are removed.  The Party suffering an Event of Force Majeure shall timely notify the other Party of the occurrence of such Event of Force Majeure and within thirty days shall furnish the other Party with a recovery plan of action.  Without limiting the foregoing, a Party suffering an Event of Force Majeure shall use commercially reasonable efforts to limit the impact of the Event of Force Majeure on such Party's performance of this Agreement.

3.6 Product Returns:  No credit shall be given for any product returned to MCR unless returned with the prior approval of an officer of MCR issuing to the Licensee a Return Goods Number.  Risk of loss or damage in respect of any product returned with MCR's authorization will remain with the Licensee until the product is received by MCR.  Except for products validly returned under warranty, a charge of not less than fifteen percent of the purchase price or such larger amount as MCR may consider reasonable in the circumstances, with a minimum of one thousand dollars per product, will be charged by MCR on all products returned, in order to pay for cost of inspection, repacking, handling, and accounting for the product.  MCR shall not be responsible for holding or accounting for any products returned without the required Return Goods Number.  If freight and other transportation costs are not prepaid on any returned product, the cost thereof will be deducted from any credit issued by MCR.  No credit will be given on any non-standard product manufactured at the request of, or to the individual specifications of, any Licensee.

# EXHIBIT C





MICHAEL C. ROBERTSON
PRESIDENT & CEO

LETTER AGREEMENT

SPEX Offshore Ltd.
Dunnottar House, Howe Moss Drive
Kirkhill Industrial Estate
Aberdeen AB21 0FN Scotland

Gentlemen:

This letter shall confirm the understanding that we have discussed regarding the status of the License Agreement (the "License") in effect between MCR Oil Tools, LLC ("MCR") and SPEX Offshore Ltd. ("SPEX").

It is agreed that:

1.    The License shall be extended, as modified herein, for a period of one year—i.e., until May 21, 2016—with no additional license fee required.

2.    The geographic scope of the License shall be limited to the Middle East: Saudi Arabia, UAE, Kuwait, Bahrain, Qatar, Oman, Yemen, Egypt, Jordan, Israel, and Iraq. In the event that SPEX has a specific job in another country that it would like to run, it may inquire with MCR as to whether that country could be added to that list, or that job be approved on a one-off basis.

3.    In order for the License to remain in effect, SPEX must consult with a member of MCR's senior engineering team—Bill Boelte, Doug Streibich, or Tony Grattan, or such other person as MCR may inform SPEX—prior to performing any job with any MCR tools, in order to obtain input from MCR, in writing, as to the proper tools, specifications, string configuration, etc. for that job based on well conditions, customer objectives, and other relevant factors. In the event that SPEX performs jobs with MCR tools in the absence of, or in deviation from, MCR instructions, MCR may terminate the License prior to its expiration. (The parties recognize, however, that in certain circumstances customers of SPEX may set job parameters and limitations, and these shall be taken into account by MCR in providing any instructions.)

4.    SPEX shall provide to MCR, within forty-five days after any job run by SPEX with MCR tools, a Supplier Performance Scorecard or similar report from the end customer as to the customer's satisfaction with SPEX's performance of the job. The report shall be in a form reasonably acceptable to MCR, and shall be signed by the customer. Notwithstanding the foregoing, in the event that the customer declines to provide SPEX with any such report, MCR shall be free to inquire directly with the customer as to the outcome of the job, per the terms of

the Agreement Granting Access to Confidential Information entered into between the parties substantially contemporaneously herewith, and MCR shall make available to SPEX any information MCR receives in response to any such inquiry.

5.   MCR and SPEX shall meet in person or by phone no less frequently than monthly in order to discuss and track expectations, to discuss any service quality issues that may have arisen, to run to ground any stray reports or rumors that may affect their relationship, and to discuss plans regarding markets and sales objectives.

Except as specifically and explicitly amended by the terms set forth above, no other terms of the License shall be affected by this extension.

You signature below shall indicate your acceptance of these terms.  We thank you for your cooperation in working-out these terms, and hope that the terms agreed herein will provide a foundation for expansion of our relationship in the future.

Best regards,

Michael C. Robertson

AGREED:
SPEX Offshore Ltd.

By:    James Oak
Name:  James Oak
Title:  CEO
Date:   1st June 2015